**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| *In re* Application of RICARDO BENJAMIN SALINAS PLIEGO & CORPORACIÓN RBS S.A. de C.V., for an Order Pursuant to 28 U.S.C. § 1782 Authorizing Discovery for Use in a Foreign Proceeding | Case No._____ |

**RICARDO BENJAMIN SALINAS PLIEGO & CORPORACIÓN RBS S.A. de C.V.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR EX PARTE APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 AUTHORIZING DISCOVERY FOR <u>USE IN A FOREIGN PROCEEDING</u>**

Applicants Ricardo Benjamin Salinas Pliego and Corporación RBS S.A. de C.V. ("**RBS**") (collectively, the "**Applicants**") submit this ex parte application under 28 U.S.C. § 1782 ("**Section 1782**") in support of an order authorizing the issuance of subpoenas designed to gather discovery for use in a foreign proceeding. Specifically, Applicants request the issuance of subpoenas directed to Aleksei Skachkov (a/k/a Alexi Skachov a/k/a Alexi Skachkov a/k/a Alexey Skachkov a/k/a Thomas Mellon a/k/a Thomas Astor-Mellon), Wells Fargo Bank, N.A. Inc. & Company ("**Wells Fargo"**), and Discover Bank, Inc. ("**Discover**").

As set forth in more detail below, the discovery sought from Mr. Skachkov, Wells Fargo, and Discover is for use in a proceeding captioned *Ricardo Benjamin Salinas Pliego & Another v Astor Asset Management 3 Limited & Others* (case no: CL-2024-000450), currently pending in the High Court of Justice, King's Bench Division, Business and Property Courts of England and Wales Commercial Court (the **"English Court"**), which involves the theft of hundreds of millions of dollars through an international web of shell companies, bank accounts, and false identities (the **"English Action"**).  In particular, and as set forth in a Judgment issued in the English Action, various parties—including at least one person currently located in this District—engaged in an elaborate "stock-based lending scheme" to steal hundreds of millions of dollars from the Applicants.  The discovery sought here will be used in furtherance of the English Action both to establish liability against the defendants in that action and to assist in identifying and freezing proceeds of the fraud, tens of millions of dollars of which went to or through persons or entities located in this District.

This is Applicants' first application for discovery filed in this District. Applicants filed and were granted a prior application under Section 1782 in the United States District Court for the Southern District of New York with respect to individuals and entities different from those from whom discovery is sought through

the present application (the **"New York Application"**).  The discovery sought here is based in part on documents obtained through the New York Application, including materials provided by JPMorgan Chase Bank, N.A. (the **"JPMC Documents"**).[1]

## I.    NATURE OF THE APPLICATION[2]

Mr. Salinas is a Mexican businessman and the founder and chairman of Grupo Salinas, a multi-billion dollar conglomerate operating across various industries, including the banking, media, and retail sectors.  In 2021, as part of an effort to re-finance a large loan that was coming due, Mr. Salinas was put in contact with entities representing themselves as the "Astor Group."  These entities, which falsely held themselves out both orally and in writing as connected to the prominent Astor

---

[1] Although the specific materials obtained through the New York Application cited herein, the JPMC Documents, are not subject to a protective order, Applicants are submitting them subject to a Motion to Seal being filed concurrently with this Application to ensure confidentiality and to comply with the procedures identified in the protective order entered in conjunction with the New York Application nevertheless.

[2]  Unless otherwise noted, the facts set forth in this memorandum are based upon the following documents, to which the Court is respectfully referred:

- the August 23, 2024 Application for an Order pursuant to 18 U.S.C. § 1782 filed in the United States District for the Southern District of New York (since granted by the Honorable Lewis A. Kaplan, U.S.D.J.), attached as Exhibit 2 to the accompanying Declaration of John Veysey (**Exhibit C**); and

- the October 7, 2024 Judgment by Mr. Justice Calver in the High Court of Justice, King's Bench Division, Business and Property Courts of England and Wales Commercial Court, attached as Exhibit 16 to the accompanying the Declaration of Edward Allen.

Family, eventually entered into a stock-backed loan agreement (the **"SLA"**) with Applicants whereby the Applicants agreed to post hundreds of millions of dollars' worth of shares of a Grupo Salinas entity, Grupo Elektra S.A.B. de C.V. ("**Elektra**"), as collateral (the **"Collateral Shares"**) for a loan of approximately $115 million provided by Astor Asset Management 3 Ltd. ("**Astor 3**"). The operative agreements provided that the lender would not trade, transfer, or sell the Collateral Shares (held by a custodian) except in the event of a default or upon maturity of the loan.

In 2024, Applicants discovered that Astor 3—contrary to its express representations—had been secretly directing custodians appointed under the SLA to transfer the Elektra Collateral Shares to certain Astor-related entities, selling them, and generating hundreds of millions of dollars in proceeds. Further investigation revealed that the Astor entities are a front for an individual named Vladimir ("Val") Sklarov, a convicted felon who has admitted to using an alias and posing as "Gregory Mitchell" in his dealings with Applicants, and who has an extensive track record of engaging in "stock-backed lending frauds" like the one perpetrated here. Mr. Sklarov carried out the fraudulent scheme in conjunction with several associates, including Mr. Skachkov, who is also a convicted felon and who posed as the CEO of the Astor Group under the name "Thomas Mellon."

Applicants immediately brought an action in the English Court against Mr. Sklarov and related parties, seeking damages and an injunction preventing them (and certain entities believed to be holding proceeds of the fraud) from transferring or otherwise dissipating those proceeds. The English Court granted those applications on August 2, 2024, August 7, 2024, and August 13, 2024, and entered worldwide freezing orders and proprietary injunctions against Mr. Sklarov and several Astor-related entities, preventing the movement or disposal of certain assets and proceeds associated with the fraud, and proprietary injunctions against two depository brokers. Mr. Sklarov and the Astor-related entities sought to set aside the worldwide freezing orders and proprietary injunctions entered against them. That attempt was unsuccessful (as reflected in the judgment of Mr. Justice Calver dated October 7, 2024, referred to in footnote 1 above and further below), and the worldwide freezing orders and proprietary injunctions remain in place (although permission to appeal the judgment is being sought). In service of the English Action, Applicants issued subpoenas through the New York Application compelling the production of records, including bank statements, from entities located in that district. These records, specifically the JPMC Documents, along with others obtained in the English Action, revealed evidence of extensive payments to and through people and bank accounts found in this District. Applicants accordingly bring the instant application.

Applicants respectfully request that the Court rule on this application with appropriate urgency. Although Applicants successfully obtained freezing orders in the English Action and have been told by one of the custodians that it has frozen several hundred million dollars of assets, Applicants remain unaware of the location or nature of those assets, including the financial institution at which (or currency in which) those frozen assets are held.

## II.    **RELEVANT FACTS**

### A.    **Mr. Salinas and RBS Enter a Stock Lending Agreement with Astor 3, and Astor 3 Handpicks Weiser as the Custodian to Hold the Collateral Shares.**

In 2021, Grupo Salinas, through its Vice President for Financial Investment & Analysis, Eduardo Gonzalez Salceda Sanchez, began to explore refinancing a large outstanding loan. **Exhibit A**, Declaration of Eduardo Gonzalez Salceda Sanchez, ¶¶ 19–20. Eventually, Mr. Salceda was introduced to an individual named "Gregory Mitchell," who purported to be the Managing Director of the Astor Group, which held itself out as a "premier asset management and securities finance company" affiliated with the Astor family. *Id.*, ¶ 25. Mr. Sklarov, who was previously convicted of conspiracy to defraud the United States in the Western District of Pennsylvania, initially instructed his solicitors in the English Action to say that he had never dealt directly with "Gregory Mitchell," but has since admitted

in the English Action that he used "Gregory Mitchell" as an alias. **Exhibit B**, Declaration of Edward Allen, Ex. 16, ¶¶ 18, 59, Ex. 18, ¶¶ 5, 68, 87–88.

Mitchell's emails in turn copied "Thomas Mellon," described as the CEO of Astor Wealth Group. Ex. A, ¶ 25. Sklarov has now admitted (and the English Court has now found) that "Thomas Mellon" is a fictitious name used by Aleksei Skachkov, himself a recidivist felon and a person from who discovery is sought here. Ex. B, ¶¶ 44–47 , citing Ex. 16, Ex. 18, ¶¶ 85–86.

Applicants and the Astor Group eventually negotiated the SLA and related addenda. Ex. A, ¶¶ 24–37. Under the SLA, Astor 3 lent RBS funds in several tranches that eventually totaled $2.15 billion MXN, approximately $108 million USD at then-prevailing exchange rates. *Id.*, ¶¶ 15, 44. RBS secured the loan through delivery of the Collateral Shares, 7,204,296 Elektra shares owned by Mr. Salinas. *Id.*, ¶¶ 16, 44–45. Grupo Salinas and Astor 3 entered the operative SLA and its related addenda between July 28, 2021 and July 19, 2022. *Id.*, ¶¶ 54–58. The SLA prohibited Astor 3 from selling, short-selling, or transferring the shares from their designated custodian account except upon an incurable "Event of Default."

The SLA provided that a third-party custodian would hold the Collateral Shares as a depository broker, and that only in the event of an incurable default could the custodian be directed to transfer the Collateral Shares to Astor 3's accounts (or

elsewhere). *See, e.g.*, Ex. A, ¶¶ 13–14, 32(e).  Astor 3 entered the SLA on the condition it could select the custodian, *id.*, ¶ 27, and Astor 3 chose Weiser Global Capital Markets Ltd. ("**Weiser**"), an entity incorporated in the Bahamas. *Id.*, ¶ 13.

### B.    While Negotiating the SLA and Other Loan Documents, Sklarov and His Associates Open Domestic Checking Accounts.

Starting in January 2021, while engaged in purported "loan" negotiations with the Applicants, Mr. Sklarov, through various associates, began opening a number of U.S.-based accounts that would later receive proceeds of their fraud.  For example, on January 7, 2021, Jaitegh "JT" Singh, Mr. Sklarov's U.S. attorney and business associate, created an entity called Jurist IQ Corp. ("**Jurist IQ**") and opened two Jurist IQ accounts at JPMorgan Chase Bank, N.A. (**"JPMC"**) in New York. Ex. A, ¶ 116; Ex. B, ¶ 54, Ex. 23.  One of these accounts was named the "Jurist IQ Corp. IOLA Attorney Trust Account," ███████████████████████████████████ ███████████ (the "**JIQ Account**"). **Exhibit D, Selection J.P. Morgan Chase Bank, N.A. Records,** (the "JPMC Records") pp. 569-571.[3]

---

[3] As noted in the Veysey Declaration, the JPMC Documents included thousands of pages of banking information.  For the Court's convenience and to avoid any unnecessary use of third-party financial information, Exhibit D is only a sample of materials relevant to this Application. Ex. C, ¶ 10.  The citations to Exhibit D in this Application correspond to the original pagination provided by JPMC during its initial production.  Because Exhibit D is only a subset of the JPMC Documents, the pages numbers are not entirely consecutive.

Following execution of the initial SLA, Mr. Sklarov and his associates created and updated other domestic accounts. On June 2, 2021, Mr. Singh and Tetyana Sklarov, who is Mr. Sklarov's wife, opened JPMC checking accounts for Kiev Equity Capital Ltd. and Lviv Estate Holdings Ltd. (the "**Kiev and Lviv Accounts**"), in each case listing a company address at 142 Gold Springs Court, Canton, Georgia, 30114 (the "**Canton Residence**"). *See, e.g.*, Ex. D, pp. 734, 841. Mr. Sklarov lists this same address in recent court documents. *See, e.g.*, Ex. B, Ex. 18, p. 1. Ms. Sklarov appears as "President" on each account. Ex. D, pp. 734, 841. On July 28, 2021, when the parties executed an addendum to the SLA, Mr. Singh made ███ payments from an IOLTA account (the "**Singh IOLTA 0210 Account**") connected to his law firm, Singh Law Firm, P.A., to each of Ms. Sklarov's Kiev and Lviv Accounts. *Id*., p. 2074.

On June 3, 2021, Mr. Singh amended a separate account at JPMC in the name of "Sierra Universal Corp." (the "**Sierra Universal Account**") to include Ms. Sklarov as an account holder. *Id*., p. 1747. Ms. Sklarov signed the account amendment documents as "President" of Sierra Universal Corp. *Id*. Records obtained through the English Action, in addition to the JPMC Documents, indicate that the Lviv, Kiev, and Sierra Accounts, all in Ms. Sklarov's name, later received and disposed of tens of millions of dollars in proceeds from the fraud.

**C.    Weiser Transfers Collateral Shares and the Parties Replace Weiser as Custodian with Tavira; Tavira Also Permits Sklarov Entities to Transfer and Sell Collateral Shares.**

The first tranche of Collateral Shares was transferred to Weiser in June 2021. Shortly thereafter, on or about October 5, 2021, Applicants learned that Astor 3 had asked Weiser to transfer all of these shares to an entity named "Astor Capital Fund Ltd." Ex. A, ¶ 48.  This entity was previously unknown to Applicants. *Id*.

Astor 3's instructions to Weiser were in breach of the SLA, and Mr. Salceda immediately demanded that Weiser secure the return of the shares, a reassurance that Weiser (falsely) provided. Ex. A, ¶¶ 48–52.  The JPMC Documents confirm that between October 28, 2021 and November 9, 2021—when Astor 3 had secured the transfer of shares to Astor Capital—Mr. Sklarov and his associates ███████ ████████████████████████████████████████████████████████████ ████████████████. Ex. D, p. 2099.  These transactions and other information discovered through Applicants' investigation support their belief that the shares transferred to the Astor Capital account were never returned to the Astor account and were instead secretly sold.[4]

---

[4] The JPMC Documents indicate that shortly before this, on September 28, 2021, Mr. Singh ████████████████████████████████████ to Ms. Sklarov to create a New York-based checking account with HSBC USA. Ex. D, p. 2094. On October 6, 2021, using the same account, Mr. Singh ███████████ to Mr. Sklarov to a Wells Fargo account connected to the Sklarovs' residence in Canton,

When Applicants insisted that Astor 3 replace Weiser with another depository broker, Astor 3 appointed a new firm, Tavira Monaco SAM ("**Tavira**"), to serve as custodian for further deliveries of Collateral Shares. Ex. A, ¶ 53.  In executing the necessary documents, the parties reinforced the safeguards designed to ensure that Astor 3 could not access the Collateral Shares absent default. *Id*., ¶ 56.  Nevertheless, almost immediately thereafter, Mr. Sklarov began directing that shares be secretly transferred to an affiliated entity named Cornelius Vanderbilt Capital Management Ltd. ("**Vanderbilt**").[5]  Vanderbilt in turn proceeded to slowly sell the shares, generating hundreds of millions of dollars in proceeds. Ex. B, Ex. 16, ¶¶ 30–31.

**D.    Suspicious Trading Activity Triggers Applicants' Investigation of the Astor 3 Parties and Applicants' Investigation Reveals Sklarov's Fraud.**

---

Georgia. *Id*. p. 2097–98.  During the same period, Mr. Singh paid himself from the ████████████████ Account, through shell companies, over ███████████████████████████████████████████████

[5] Mr. Sklarov implicitly acknowledged his connection to Vanderbilt in an affidavit submitted in the English Action. Ex. B, Ex. 18, ¶¶ 18, 20.  In particular, Mr. Sklarov explained how Elektra shares were "hypothecated" by Astor 3 to Vanderbilt and then sold by Vanderbilt. *Id*., ¶¶ 42–60.  Several lawsuits in the United States have also connected Mr. Sklarov and/or known associates to Vanderbilt. *See, e.g.*, *Chenming Holdings (Hong Kong) Limited v. John Does 1-10*, No. 1:24-cv-00935 (S.D.N.Y. Feb 8, 2024); *Hryn et al v. Weiser Global Capital Markets Ltd. et al.*, No. 1:21-cv-08437 (S.D.N.Y. Oct 13, 2021).

In 2024, Applicants again developed concerns that Astor 3 was trading the Collateral Shares. Ex. A, ¶¶ 59, 63. When the Astor parties were unable to provide evidence of the location of the shares, the Applicants began to investigate the Astor entities and discovered Mr. Sklarov's involvement for the first time. *Id*., ¶¶ 60–67. That investigation revealed that Mr. Sklarov is a serial fraudster who has engaged in several stock-backed lending schemes through a variety of shell companies, many of which bear the names of historically wealthy families and legitimate financial institutions. Ex. A, ¶¶ 68–94[6]

---

[6] *See, e.g.*, *Two Rivers Water & Farming Co. v. Am. 2030 Cap. Ltd.*, No. 19-CV-01640-CMA-STV (D. Colo. Oct. 25, 2019) (temporary restraining order issued against Mr. Sklarov's America 2030 Capital Ltd. to enjoin him from selling the plaintiff's restricted collateral shares in a similar lending agreement); *Barclays PLC et al. v. Sklarov*, No. 20-cv-8437 (S.D.N.Y. Oct. 9, 2020) (permanent injunction entered against Mr. Sklarov and his attorney, Mr. Singh, in suit alleging that Mr. Sklarov was the ring-leader of a fraudulent scheme to mislead and deceive the public by "seeking to . . . pass themselves off as the legitimate Lehman brothers" and, operating through shell companies that he controlled, attempted to register trademarks containing the Lehman Brothers name and marks); *Chenming Holdings (Hong Kong) Limited v. John Does*, No. 1:24-cv-00935-KPF (S.D.N.Y. Feb. 8, 2024) (Plaintiff filed suit against Mr. and Ms. Sklarov, Astor Asset Management 2 Limited, Vanderbilt, and other entities, alleging a stock-backed loan fraud scheme nearly identical to the one here, including the use of Weiser as a custodian); *Satterfield v. Vstock Transfer*, LLC, 220 A.D.3d 551 (1st Dep't 2023) (order upholding contempt ruling against Mr. Sklarov and two of his entities and warrant for his arrest for failure to return collateral shares in fraud action arising from similar stock-backed lending arrangement); *Rothschild & Co. Continuation Holdings A.G. v. Sklarov*, 440 F. Supp. 3d 1385 (N.D. Ga. 2020) (Mr. Sklarov found liable to

### E.    Applicants Initiate the English Action.

Upon discovering the truth about Astor and Mr. Sklarov, on August 2, 2024, Applicants filed the English Action, submitting ex parte and accelerated applications for injunctions and other relief against Astor 3, Mr. Sklarov, Weiser, and Tavira. Ex. A, ¶¶ 109–111.  On August 2, 2024, Mr. Justice Jacobs of the English Court issued a freezing and proprietary order against Astor 3 and Mr. Sklarov and a proprietary order against Weiser and Tavira to prevent further disposal of any assets, including the Collateral Shares. Ex. B, ¶¶ 33–38.[7]  The orders also required the defendants in the English Action to produce information to Applicants by certain deadlines. *Id.* Around the same time, Astor 3 emailed the Applicants, asserting that the Applicants had defaulted on the loan and forfeited all of their interest in the Collateral Shares. Ex. A, ¶¶ 107, 122.

On August 5, 2024, Tavira submitted a response to the English Court's proprietary order that revealed that between December 2021 and September 2023,

---

Rothschild & Co. for trademark infringement for attempts to register the name "Bentley Rothschild").

[7] On August 7, 2024, the English Court issued a second Freezing and Proprietary Order adding Vanderbilt as a party subject to the order. Ex. B, ¶ 39.

Astor and Vanderbilt had stolen and sold all of the Collateral Shares, and in doing so had generated more than $350 million in proceeds. Ex. A, ¶¶ 115–117.[8]

**F.    Judge Kaplan Grants the New York Application and Records Obtained to Date Show Money Flows Involving Persons and Entities in this District.**

On August 23, 2024, Applicants filed the New York Application seeking discovery in aid of the English Action. Ex. C, ¶ 3.  On September 9, 2024, U.S. District Judge Lewis A. Kaplan granted the New York Application, and Applicants promptly served subpoenas on Mr. Singh, the Singh Law Firm, Jurist IQ Corp., and JPMC. Ex. C, ¶ 4.  Through counsel, the Singh entities have thus far made five productions of documents and, as referenced herein, on October 18, 2024, JPMC produced nearly 3,000 pages of account records associated with Singh. *Id.*, ¶¶ 6–7.

**G.    Persons and Entities for Whom Subpoenas Are Sought through This Application.**

Together, the JPMC Documents arising from the New York Application and documents and pleadings filed in the English Action reflect the following about the persons and entities from who discovery is sought through this Application.

---

[8] The defendants to the English Action sought to "discharge" the injunctive relief awarded by the English Court "solely on the ground that the Claimants were in breach of their duty of full and frank disclosure," rather than a substantive basis. Ex. B, ¶¶ 41, 44–46.  Mr. Justice Calver denied the discharge application finding that the Applicants were not in breach of their duties and continued the Freezing Orders pending further order of the English court *Id.* at ¶¶ 45–46.

1.    Aleksei (Alexi) Skachkov

Bank records indicate that Mr. Skachkov lives in Canton, Georgia and received more than ███████████████████████████████████████████████ Accounts since ███████. Ex. D, p. 512–541, 1629–1630, 1640–1645.  The timing of those transfers, and Mr. Skachkov's role in the fraud, suggest that the payments could be linked to Mr. Sklarov's sale of the Collateral Shares.  Indeed, Mr. Sklarov has acknowledged to the English Court that he and Mr. Skachkov started doing deals together in or around 2019, and that "[they] discussed the name of the company that [Mr. Skachkov] would use – he wanted to use the name Astor.  He used the name Thomas Mellon for his business activity."  Ex. B, ¶ 46, *quoting* Ex. 18, ¶ 85.  Emails sent to Salinas representatives, including Mr. Salceda, reflect that Thomas Mellon, using the email address "thomas.mellon@astorassetgroup.com," was involved in negotiations of the SLA and custodial management agreements and discussions regarding the transfer of shares and funds associated with the SLA. Ex. A, ¶ 25.

Other evidence reflects the ties between Mr. Sklarov and Mr. Skachkov: public filings in the Superior Court of Cobb County, Georgia reveal a letter from Mr. Sklarov on behalf of America 2030 Capital Ltd. (another one of Mr. Sklarov's shell companies) in support of the early termination of Mr. Skachkov's term of

probation, stating that the company needed Mr. Skachkov to relocate to Europe for business purposes. **Exhibit E,** September 18, 2020 Val Sklarov Letter.

      2.    <u>Wells Fargo</u>

Between October 6, 2021 and December 11, 2023, the ████████████ Account wired ████████████ to Mr. Sklarov's Canton, Georgia account. Ex. D, p. 2096–2099, 2121–24, 2150–79, 2282.  Wells Fargo, which has a registered Georgia address and does business in this District, and its routing number appears alongside notes stating "████████████████████████████" in the transfers described above. *Id*.

      3.    <u>Discover</u>

Between July 12, 2022 and September 28, 2022, the Sierra Universal Account wired approximately ████████████ to Ms. Sklarov's Canton, Georgia Discover account. Ex. D, p. 1683–84, 1689–90, 1693–94.  On March 6, 2023, the ████████ ████████ Account wired ████████ to the same Discover account. *Id.* at 2194. Discover has a registered agent and does business in this District.

## III.   **LEGAL STANDARD**

Section 1782 authorizes "[t]he district court of the district in which a person resides or is found [to] order [them] to give [their] testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or

international tribunal . . . upon the application of any interested person . . . ." 28

U.S.C. § 1782(a).  To obtain discovery under Section 1782, an applicant must meet

four statutory requirements:

> (1) the request must be made 'by a foreign or international tribunal,' or by 'any interested person'; (2) the request must seek evidence, whether it be the 'testimony or statement' of a person or the production of a 'document or other thing'; (3) the evidence must be 'for use in a proceeding in a foreign or international tribunal'; and (4) the person from whom discovery is sought must reside or be found in the district of the district court ruling on the application for assistance.

*In re Sociedad Militar Seguro de Vida,* 985 F. Supp. 2d 1375, 1378–79 (N.D. Ga.

2013) (quoting *In re Clerici*, 481 F. 3d 1324, 1331–32 (11th Cir. 2007)).

Upon finding that the Section 1782 prima facie factors are met, courts then

consider certain discretionary factors when determining whether to grant the relief

sought. These factors include: (1) whether "the person from whom discovery is

sought is a participant in the foreign proceeding"; (2) "the nature of the foreign

tribunal, the character of the proceedings underway abroad, and the receptivity of

the foreign government or the court or agency abroad to U.S. federal-court judicial

assistance"; (3) "whether the discovery request is an "attempt to circumvent proof-

gathering restrictions or other policies of a foreign country or the United States"; and

(4) whether the discovery requested is "unduly intrusive or burdensome." *Id.*

(*quoting In re Clerici*, 481 F.3d at 1334) [hereinafter the "***Intel* Factors**"].

IV.   **ARGUMENT**

District courts are empowered by Section 1782 to compel discovery for use in a proceeding in a foreign or international tribunal.  In this case, the Applicants request information from persons and entities located within this Court's jurisdiction regarding, among other things, the fraudulent conduct at issue and the transfer of Collateral Shares and related proceeds, all for use in a pending civil proceeding in England.  For the reasons set forth below, this Court should grant this Application, and authorize the issuance of the Subpoenas attached as **Composite Exhibit G.**

A.   **The Discovery Sought Meets the Statutory Requirements of Section 1782.**

1.   The Applicants Qualify as "Interested Persons."

Applicants are "interested persons" under Section 1782 because Applicants filed the English Action for misappropriation of the Collateral Shares. *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 256 (2004) (holding that a complainant who triggered a European Commission investigation is an "interested person" under Section 1782); *see also In re Sociedad Militar Seguro de Vida*, 985 F. Supp. 2d at 1380.  Accordingly, Applicants satisfy the first statutory requirement.

2.   The Application Seeks Appropriate Discovery.

Applicants seek discovery through means specifically covered by the statute. *See id.* at 1379 (finding the second requirement met where the applicant sought

"evidence in form of testimony and the production of documents"). Applicants seek documents (and, as appropriate, related testimony) regarding both Astor's receipt and sale of the Collateral Shares and the flow of the proceeds of those sales. In particular, Applicants seek information relating to correspondence between and among Mr. Skachkov and Mr. Sklarov and his associates and related entities regarding fraudulent conduct.

### 3. The Requested Discovery Is Sought for Use in the English Action.

The third statutory requirement is that the discovery sought is intended "for use" in a "foreign or international tribunal." *Intel Corp.*, 542 U.S. at 258. To meet the "for use" test, the materials sought need not be discoverable in the foreign proceeding, *id.* at 243, nor must the applicant even show that the materials are admissible as evidence in the foreign jurisdiction. *In re Roz Trading Ltd.*, No. 1:06-CV-02305-WSD, 2007 WL 120844, at *2 (N.D. Ga. Jan. 11, 2007) ("[Section] 1782 aid [is] appropriate even in situations where the tribunal would not order such discovery itself, or might decide not to accept all discovery properly ordered pursuant to § 1782(a)").

The discovery Applicants seek is relevant to the English Action, including to establish the underlying facts and enforce the English Court's freezing and proprietary injunction orders. *See*, *e.g.*, Ex. B, ¶¶ 23–35; *see also In re Arida, LLC*, No. 19-MC-

522 (PKC), 2020 WL 7496355, at *4 (S.D.N.Y. Dec. 21, 2020) ("[S]ection 1782 relief may properly be granted to take discovery of assets in order to enforce an existing judgment, provided that the applicant has adequately identified the proceeding and demonstrated that the materials sought could be employed to some advantage in the proceeding.").  The discovery sought will serve several purposes, including shedding light on the relationships among and between parties involved in the fraudulent scheme at issue, the creation of bank accounts for shell entities that received stolen proceeds, the current location of proceeds, and any other evidence to support Applicants' claims in the English Action. *See, e.g.*, *id*., ¶¶ 63–65.

4.   The Parties from Whom Discovery Is Sought Are Found in this District.

The parties from whom Applicants seek discovery are all found in this District for purposes of Section 1782, which "provides that '[t]he district court of the district in which a person resides or is found may order him … to produce a document or other thing for use a proceeding in a foreign or international tribunal." *Weber v. Finker*, 554 F. 3d 1379, 1383 (11th Cir. 2009).  Specifically, bank records indicate that Mr. Skachkov is located in Canton or nearby. *See, e.g.*, JPMC 512, 2096–2099. Wells Fargo is registered at a Peachtree Corners address and Discover is registered

at a Lawrenceville address. *See* **Exhibit F,** Georgia Corporations Division Discover

and Wells Fargo Entity Information.  Each location is in this District.[9]

      **B.**      **The Discovery Sought Meets the *Intel* Discretionary Factors.**

      The Court should grant this Application because each of the discretionary

factors identified by the Supreme Court in *Intel* weigh in favor of granting this

Application.

      1.      <u>The Persons and Entities from Whom Discovery Is Sought Are</u>
                 <u>Not Participants in the English Action.</u>

      Because the persons and entities from whom discovery is sought are not

"participant[s] in the foreign proceeding," *Intel Corp.*, 542 U.S. at 264, the first

*Intel* factor weighs in favor of granting the Application. *See also In re:*

*Application Bracha Foundation*, 663 F. App'x 755, 764–65 (11th Cir. 2016).

      Here, the persons and entities from whom discovery is sought are not

parties or participants in the English Action, it is not expected that they will become

---

[9] Even in the event the requested discovery is located outside the jurisdiction where the Application is filed, this Court may compel production of the requested parties. "[T]he location of responsive documents and electronically stored information to the extent a physical location can be discerned in this digital age – does not establish a per se bar to discovery under § 1782." *Sergeeva v. Tripleton Int'l Ltd.*, 834 F. 3d 1194, 1200 (11th Cir. 2016).  It is well established in this Circuit that § 1782 has "extraterritorial reach." *Fuhr v. Credit Suisse AG*, 687 F. App'x 810, 816 n.8 (11th Cir. 2017) (rejecting the argument "that [a] district court lack[s] the power to compel production of [] documents that [an applicant] sought because the documents were located abroad, and § 1782 does not have extraterritorial reach").

parties. Ex. B, ¶ 57.  Accordingly, this factor weighs in favor of granting the Application. *See Intel Corp.*, 542 U.S. at 264 ("[W]hen the person from whom discovery is sought is a participant in the foreign proceeding . . ., the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad.").

> 2.    There is No Issue Regarding the Nature of the Foreign Tribunal or the English Court's Receptivity to the Discovery Sought.

The second *Intel* factor requires the Court to consider "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance." *Id*.  This factor "examines whether the foreign tribunal 'is willing to consider the information sought.'" *In re MTS Bank*, No., 17-21545-MC, 2018 WL 3145806, at *6 (S.D. Fla. June 27, 2018) (citing *Siemens AG v. W. Digital Corp.*, No. 8:13–cv–01407, 2013 WL 5947973, *3 (C.D. Cal. Nov. 4, 2013)).  Under this factor, courts look for "authoritative proof that a foreign tribunal would *reject* evidence obtained with the aid of § 1782." *Euromepa S.A. v. R. Esmerian, Inc*., 51 F.3d 1095, 1100 (2d Cir. 1995) (emphasis added).  The second factor does not "require the Court find that the tribunal will definitely welcome and accept discovery produced pursuant to Section 1782.  The Court is required only to evaluate the nature and character of the proceedings and the overall receptivity of

the tribunal to its assistance." *In re Roz Trading Ltd.*, 2007 WL 120844, at *2. There are no known restrictions or any policies under the laws of England limiting U.S. judicial assistance, and courts in England are receptive to assistance in discovery by U.S. federal courts. Ex. B, ¶¶ 7–9. Indeed, district courts have allowed disclosure under Section 1782 specifically for use in English proceedings. *See, e.g.*, *In re Application of Shervin Pishevar*, 439 F. Supp. 3d 290, 303 (S.D.N.Y. 2020).

Accordingly, because England is receptive to U.S. federal court judicial assistance (and because there is no reason to believe that the English Court would object to discovery of the information sought by this Application), this factor weighs in favor of authorizing discovery.

3.   Discovery Sought through this Application Is Not an Attempt to Circumvent the English Court's Proof-Gathering Restrictions.

The third *Intel* factor examines whether the request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel Corp.*, 542 U.S. at 264–65. Courts have found that this factor weighs in favor of discovery where there is "nothing to suggest that [the applicant] is attempting to circumvent foreign proof gathering restrictions." *In re Google Inc.*, No. 14-mc-80333-DMR, 2014 WL 7146994, at *3 (N.D. Cal. Dec. 15, 2014); *see also In re: Application of Bracha Foundation*, 663 F. App'x at 764 (holding Applicants "needed to be armed with evidence to support their claims of

bad financial acts on the part of the proposed defendants, and that obtaining financial records from a bank not located within the jurisdiction of BVI tribunals to show inconsistencies and anomalies in those records could provide that support…."); *In re Chevron Corp.*, No. 1:10-MI-0076-TWT-GGB, 2010 WL 8767265, at *4 (N.D. Ga. Mar. 2, 2010) ("[I]t appears that the [Ecuadorian] court ordered at least some of the discovery that Chevron now seeks, but it was not forthcoming…."); *In re MTS Bank*, 2017 WL 3155362, at *9 (finding no indication that parties for whom discovery was sought were within Russian tribunal's reach). Here, no information is sought from parties to the English Action, and Applicants are not attempting to circumvent any foreign proof-gathering restrictions or other policies of England or the United States. Ex. B, ¶ 63.

### 4. The Requested Discovery Is Not Unduly Intrusive or Burdensome.

The fourth and final *Intel* factor is whether "the discovery requested is unduly intrusive or burdensome." *Intel Corp.*, 542 U.S. at 265. Requests are unduly intrusive and burdensome where they are not narrowly tailored and appear to be a broad "fishing expedition" for irrelevant information. *In re O'Keeffe*, 660 F. App'x 871, 874 (11th Cir. 2016) (application was not "based on speculation, but rather upon" specific facts and instances). Here, the discovery sought is tailored to secure information around certain financial transactions with two purposes.

First, Applicants seek discovery that will indicate or provide further details regarding the conduct of Mr. Sklarov and his associates, including conduct in relation to Mr. Skachkov's use of a false identity, and conduct related to Mr. Sklarov's efforts to establish entities and accounts designed to receive and launder the proceeds of the sale of Collateral Shares.  This information will clearly aid in the prosecution of the English Action.  The discovery will also allow the Applicants to take reasonable measures to prevent further damage to or disposal of their assets. *See In re JSC BTA Bank*, 577 F. Supp. 3d 262, 266 (S.D.N.Y. 2021) (allowing discovery under 28 U.S.C. § 1782 where applicant sought to use discovery to identify the status of assets in support of an existing judgment in addition to identifying entities and individuals involved in a money laundering scheme being adjudicated in a lawsuit in the U.K.).  The information sought through this Application can also help identify other individuals and entities involved in the conduct at issue.

## V.    <u>CONCLUSION</u>

Applicants satisfy the statutory requirements of Section 1782, and the relevant *Intel* support the granting of the requested relief.  This Court should accordingly exercise its discretion to authorize the requested discovery.

Dated: December 10, 2024          Respectfully submitted,

NELSON MULLINS RILEY &
SCARBOROUGH LLP

By:     */s/ Jeffrey L. Mapen*
        Jeffrey L. Mapen
        jeff.mapen@nelsonmullins.com
        Atlantic Station, Suite 1700
        201 17th Street NW
        Atlanta, GA 30363
        Tel: (404) 322-6157 Fax: (404) 322-6050

        P. John Veysey (*pro hac vice* forthcoming)
        john.veysey@nelsonmullins.com
        One Financial Center, Suite 3500
        Boston, MA 02111
        Tel: (617) 217-4645 Fax: (617) 217-4710

        Attorneys for Ricardo Benjamin Salinas
        Pliego and Corporación RBS S.A. de C.V.

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1D</u>

Pursuant to Local Rule 7.1D of the United States District Court for the

Northern District of Georgia, the undersigned hereby that the foregoing filing is

prepared in Times New Roman, 14-point font, in accordance with Local Rule 5.1C

of the United District Court for the Northern District of Georgia.

Dated: December 10, 2024          Respectfully submitted,

NELSON MULLINS RILEY &
SCARBOROUGH LLP

By:    */s/ Jeffrey L. Mapen*
        Jeffrey L. Mapen
        jeff.mapen@nelsonmullins.com
        Atlantic Station, Suite 1700
        201 17th Street NW
        Atlanta, GA 30363
        Tel: (404) 322-6157 Fax: (404) 322-6050

P. John Veysey (*pro hac vice* forthcoming)
john.veysey@nelsonmullins.com
One Financial Center, Suite 3500
Boston, MA 02111
Tel: (617) 217-4645 Fax: (617) 217-4710

Attorneys for Ricardo Benjamin Salinas
Pliego and Corporación RBS S.A. de C.V.