# Exhibit A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| *In re* Application of RICARDO BENJAMIN SALINAS PLIEGO & CORPORACIÓN RBS S.A. de C.V., for an Order Pursuant to 28 U.S.C. § 1782 Authorizing Discovery for Use in a Foreign Proceeding | Case No._____ |

## <u>DECLARATION OF EDUARDO GONZALEZ SALCEDA SANCHEZ</u>

I, EDUARDO GONZALEZ SALCEDA SANCHEZ, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.    I hold the position of Vice President (Financial Investment & Analysis) in a group of companies called Grupo Salinas.

2.    Save where otherwise stated, the facts and matters set out in this declaration are within my own knowledge and I believe them to be true. Where I refer to information supplied by others, the source of the information is identified; facts and matters derived from other sources are true to the best of my knowledge and belief. My first language is Spanish, but I am fluent in English and I have made this affidavit in English.

1

3.      Applicants' related action in England (the "**English Action**"), described below, and for which I understand the Applicants are seeking foreign discovery in this Court, names Astor Asset Management 3 Limited ("**Astor 3**"), Vladimir "Val" Sklarov, Weiser Global Capital Markets Ltd. ("**Weiser**"), Tavira Monaco SAM ("**Tavira**"), Cornelius Vanderbilt Capital Management Ltd. ("**Vanderbilt**") and Astor Capital Fund Ltd ("**Astor Capital**"). For the sake of convenience and consistency with affidavits that I submitted on Applicants' behalf in the English Action, I may collectively refer to the parties just described as "**Respondents**" in this Declaration where it concerns their role in the English Action.

## A. Introduction

4.      By way of background, the First Applicant, Ricardo Salinas Pliego ("**Mr. Salinas**") is one of the wealthiest individuals in Mexico with a net worth of several billion US dollars. He is the founder and chairman of Grupo Salinas, a conglomerate with interests in many different businesses in Mexico (including financial services, retail, media, telecommunications and the internet). The Second Applicant Corporación RBS S.A. C.V. ("**RBS**") is a Mexican company beneficially owned and controlled by Mr. Salinas.

5.      My First Affidavit in the English Action (dated August 2, 2024) and my Declaration in support of the 1782 Application made by the Applicants in support of the New York Application (as defined at paragraph 129 below) were

prepared in circumstances of urgency as part of the Applicant's efforts to prevent the ongoing dissipation of the Applicants' assets. With the benefit of further time, I have been able to check certain points which is the explanation for any differences between this Declaration and the aforementioned First Affidavit and the Declaration in the New York Application.

6.      The companies within Grupo Salinas include another Mexican company called Grupo Elektra SAB de CV ("**Elektra**"), which is listed on the Mexican Stock Exchange. Elektra operates a large and well-known chain of retail stores (which sell consumer goods and also provide various financial services) in Mexico and Central and South America. Mr. Salinas is the direct or indirect beneficial owner or controller of approximately 67,544,413 shares in Elektra, representing 30.47% of Elektra's share capital (disregarding the impact of the fraudulent scheme described below).

7.      On July 25, 2024, after a consultation with the Applicants' legal advisers (the details of which are privileged), I discovered that there were credible grounds for suspecting that the Respondents are engaged in a fraudulent scheme to misappropriate Elektra shares belonging to Mr. Salinas with a value of up to MXN 7,565,879,616 (Mexican peso), equivalent to approximately $416,394,035 USD at the exchange rates at the time Applicants filed the English Action.

8.    On the same day, the Applicants appointed a forensic investigation firm known as Forward Risk to investigate the potential fraud as a matter of urgency.

9.    It appears that the scheme to misappropriate Mr. Salinas' Elektra shares has been orchestrated by Mr. Sklarov, an individual in the United States who is the Fourth Respondent in the English Action. Mr. Sklarov has been connected to similar frauds against a number of third parties (as confirmed by a series of court decisions and arbitral awards).

10.    The Applicants are continuing to investigate the precise identities of all those behind the fraud. Some of those involved do not appear to be real people and are simply aliases of Mr. Sklarov and/or his associates. If Applicants reveal other culprits in this fraud through their investigation, the reserve the right to seek injunctive relief through the appropriate legal authorities and courts against them.

## B.   Factual background

Overview

11.    The First Respondent in the English Action, Astor 3, and the Applicants are parties to a stock loan agreement dated July 28, 2021 (the "SLA") (**Exhibit 1**). Under the SLA:

    a)   Astor 3 is the "Lender";

    b)   RBS is the "Borrower"; and

    c)   Mr. Salinas is the "Guarantor".

Ex. 2, § II.

12.    Pursuant to the SLA, Astor 3 agreed to advance loans of up to MXN 3,008,580,000 to RBS, secured over certain Elektra shares owned by Mr. Salinas. *Id*. at § II.1(a).

13.    The relevant Elektra shares are (or should be) held by two custodians, Weiser and Tavira (the "**Depository Brokers**"). *Id*. at § III.4.

14.    Weiser is incorporated in The Bahamas. Tavira is incorporated in Monaco. They are parties to two separate agreements (the "**Depository Agreements**"), namely:

a) A custodian management agreement dated July 28, 2021, between RBS, Mr. Salinas, Astor 3 and Weiser (the "**Weiser Agreement**") (**Exhibit 2**); and

b) A control agreement dated November 1, 2021, between RBS, Mr. Salinas, Astor 3, and Tavira (the "**Tavira Agreement**") (**Exhibit 3**).

15.    Five loans have been advanced by Astor 3 pursuant to the SLA, with a total principal amount of MXN 2,154,218,552.55 (approximately $105,577,212 USD as of December 2, 2024).  These loans were advanced on five dates between 2021 and 2023 (August 9, 2021, September 17, 2021, February 7, 2022, June 22, 2022, and September 15, 2023) in accordance with five "Closing Statements" (**Exhibits 4–8**).

5

16.     A total of 7,204,296 Elektra shares belonging to Mr. Salinas have been posted as collateral for the loans advanced by Astor 3 under the SLA. These shares are collectively referred to herein as the "**Collateral Shares**", and they are described as the "Pledged Collateral" in the SLA. Ex. 2, § II.7. This number reflects the aggregate number of Collateral Shares set out in the Tranche 5 Closing Statement (as defined below) (being 5,476,089) and certain additional Collateral Shares which were posted in response to a margin call (being 1,728,207). Ex. 9. Per these tranches, my calculation is that 935,913 of the Collateral Shares should be held by Weiser and 6,268,383 of the Collateral Shares should be held by Tavira.

17.     The investigation to date suggests that Astor 3, Mr. Sklarov and their collaborators misappropriated at least a substantial number of the Collateral Shares as part of a scheme that they continue to perpetrate against the Applicants.

18.     For reference, it is necessary for me to explain the background of the SLA.

**C. Background of the SLA.**

19.     In 2021, I began exploring raising finance for Grupo Salinas by offering shares in Elektra as collateral. I was the primary person responsible for negotiating the SLA on behalf of the Applicants. I did so with Mr. Salinas' express authority. At the outset of negotiations, I explained the basic features of the commercial bargain to Mr. Salinas. Amongst other things, I explained that the

arrangement would involve a stock-backed lending arrangement in respect of Elektra stock held by Mr. Salinas. Mr. Salinas gave me the authority to negotiate the transaction on behalf of Mr. Salinas and RBS.

20.     It is my understanding that the SLA was designed to provide a source of liquidity without the need for Mr. Salinas to sell any Elektra shares. Similar arrangements are commonplace among wealthy individuals with substantial shareholdings in companies that they have founded.

21.     During negotiations, Astor 3 represented itself as part of a corporate group variously described as Astor Wealth Group, Astor Asset Group, or Astor Asset Management ("**Astor**").

22.     I was introduced to Astor 3 by Alexandre Torti ("**Mr. Torti**") of "Fininvesta", a financial advisory firm. Mr. Torti provided me with an initial pitch document put together by Astor on April 6, 2021. Mr. Torti has provided financial advisory services to Mr. Salinas and his related entities for more than 20 years. Mr. Torti appears to have been introduced to Astor by Zara Akbar ("**Ms. Akbar**") of "Enness", another financial advisory firm. I now have concerns about the role of Ms. Akbar and her relationship with Astor, but I did not have any such concerns at the time.

23.     Prior to Mr. Torti's introduction, I did not have any business relationship with Ms. Akbar (and, to my knowledge, neither did Mr. Salinas or

his related entities). However, it was normal for me to be introduced to potential commercial counterparties by Mr. Torti.

24. During the SLA negotiations, I believed that Astor was a legitimate lending firm. Mr. Torti told me that Astor was owned by the wealthy Astor family in the United States (and I understood that Ms. Akbar told him this).

25. As part of the negotiations (and subsequently), I was on various email chains involving me, Mr. Torti, Ms. Akbar, and various individuals representing themselves as Astor personnel. The key Astor personnel at that time were identified as "Thomas Mellon" ("**Mr. Mellon**") and "Gregory Mitchell" ("**Mr. Mitchell**"). In more recent communications from this year, Astor communicated via an individual identified as "Albert Yuen" ("**Mr. Yuen**"). I now know Messrs Mellon and Mitchell were aliases or pseudonyms for other individuals. In particular, I now know from admissions by Mr. Sklarov in the English proceedings that Mr. Mitchell is really Mr. Sklarov himself, and Mr. Mellon is really Aleksei Skachkov ("**Mr. Skachkov**"), a business associate of Mr. Sklarov (see paragraph 60 of the judgment of Mr. Justice Calver, attached as Exhibit 16 to the Declaration of Edward Allen).

26. During the negotiating process, there was a change in the legal entity that would act as the Lender under the SLA. The initial version (dated May 1, 2021) was signed by a Californian company called Astor Asset Management Ltd (**Exhibit 9**). This was then replaced by another version of the SLA dated July 14,

2021, between the same parties (**Exhibit 10**). On July 28, 2021, the SLA was re-executed by Astor 3 in place of Astor Asset Management Ltd. Ex. 1. This is the version of the contract that I refer to as the "SLA" in the remainder of this Declaration.

27.    I was also introduced to the Depository Brokers, Weiser and Tavira, through Astor, who entered the SLA on the condition it could select the custodians.  The Applicants did not have any pre-existing relationship with either of the Depository Brokers. I was responsible for opening the accounts with each Depository Broker. The process for opening such accounts was broadly consistent with what I would expect for a financial institution.

**D. Terms of the SLA**

28.    I will not seek to summarise all the terms of the SLA in this Declaration, only those that may be relevant to the Application.

29.    The following is a non-exhaustive summary of the SLA's basic commercial terms:

    a)   By Clause II.1(a), RBS (as Borrower) is entitled to request loan advances in a "Loan Principal Amount" of up to MXN 3,008,580,000 from Astor 3 (as Lender). These loans shall be secured by a "Lien" over the "Pledged Collateral", which consist of Elektra shares belonging to Mr. Salinas (as Guarantor).

    b)   By Clause II.1(c), the maximum available lending amount is equal to 55% of the fair market value ("FMV") of the Pledged Collateral. I refer to 55% as the "loan-to-value" or "LTV" ratio. The LTV ratio was subsequently reduced (see below).

c)    By Clause II.1(a), the normal interest rate is equal to 1.15% per annum. After an Event of Default, the interest rate increases very significantly (to 1.5% per month): see Clause II.1(b). There are also various fees payable in connection with the SLA: see Clause II.3.

d)    By Clause II.6(a), the Loan Principal Amount is repayable on the date falling 5 years after the "Loan Term" begins (the "Maturity Date").

e)    By Clause III.1, the SLA is a non-recourse lending arrangement. This means that Astor 3 cannot bring proceedings against the Borrower or the Guarantor in the event of non-payment (and can only have recourse to the Pledged Collateral).

f)    By Clause III.4, the Pledged Collateral is to be held with a "Depository Broker" appointed by the Lender. For the first two tranches of lending under the SLA, the Depository Broker was Weiser. For the third to fifth tranches of lending under the SLA, the Depository Broker was Tavira. I explain the reasons for this change below.

By Clause VII, the SLA is governed by English law and is subject to the exclusive jurisdiction of the English Court.

Ex. 1.

30.    At this juncture, I should refer to a particularly important section of the SLA, namely Clause V (entitled "Lender Warranties and Representations"). This clause takes the form of a series of representations and warranties given by Astor 3, and the clause begins as follows: "*Lender represents and warrants to Borrower that ...*"

31.    The provisions of Clause V were explicitly discussed in pre-contractual negotiations. These included email discussions concerning the prohibitions on short-selling and front-running at Clauses V.4 and the section of

10

term sheets prepared by Astor entitled "*Restrictions on Lender*". Astor's

representations and warranties at Clause V were of great importance to me and

Mr. Salinas. Without those representations and warranties, the Applicants would

not have entered the SLA.

32.    I refer, in particular, to the following provisions of Clause V in

Exhibit 1:

a)    By Clause V.2, Astor 3 represented and warranted that it would
     deposit "Cash Collateral" into an account held by RBS at the
     Depository Broker, which would then be released at "Closing" to
     fund the Loan Principal Amount. This provision was designed to
     ensure that Astor 3 would fund the lending from its own cash
     resources (and not by selling the Pledged Collateral belonging to Mr.
     Salinas, which I would regard as fraudulent).

b)    By Clause V.3, Astor 3 represented and warranted that all dividends
     on the Pledged Collateral would be credited to Mr. Salinas.

c)    By Clause V.4(b), Astor represented and warranted as follows:
     "*During the Loan Term, provided that there has not been an Event
     of Default, the Lender will not sell or short-sell the shares of the
     Pledged Collateral on any publicly traded securities exchange.
     However, upon the occurrence of an incurable Event of Default, the
     Lender reserves the right to dispose of the Collateral on any publicly
     traded securities exchange, but is not obligated in doing so.*"

d)    By Clause V.5, Astor 3 represented and warranted as follows:
     "*Payments received from sale of Collateral upon Event of Default
     shall be applied in the following order: (i) firstly, to all outstanding
     Principal balance, interest and fees ...*"

e)    By Clause V.6, Astor 3 represented and warranted as follows: "*The
     Lender will not transfer the securities to its own account unless an
     incurable Event of Default has taken place. Only upon an incurable
     Event of Default will Lender request the Depository Broker to
     transfer securities in the Guarantor's account to Lender's sole*

11

>control and custody in order to satisfy Obligations of Borrower and
>Guarantor*".

    f)    By Clause V.8, Astor 3 represented and warranted that "*it will fully
cooperate with the registered owner of the securities of Issuer
[Elektra] in exercising its Voting Rights* …"

33.     The same contractual provisions were contained in the drafts of the

SLA which were circulated to the Applicants for execution (and also the version

executed on July 14, 2021, which was then superseded by the version executed

on July 28, 2021). Importantly, the SLA defines the Collateral Shares as the

*actual* shares that Mr. Salinas supplied as Guarantor, and not some substitute or

equivalent. Ex. 1, § II.7

34.     The Claimants' position in the English Action is that Astor 3 made

a number of "**Key Representations**" which induced the Applicants to enter into

the SLA, as set out in paragraphs 17 and 18 of the Applicants' Particulars of

Claim in the English Action **(Exhibit 11)**:

>*17. In order to induce the Claimants to (i) transfer Elektra Shares to
>Weiser and Tavira and (ii) provide Astor 3 with the power to instruct
>Weiser and Tavira to dispose of the Elektra Shares, the following express
>representations were made to the Claimants by or on behalf of Mr
>Sklarov, Astor Fund and/or Astor 3:*
>
>>*(1) Astor and the companies in its group (including Astor Fund and
>>Astor Asset Management) were associated with the Astor Family
>>and Astor 3 was a special purpose vehicle owned and controlled by
>>Astor.*
>>
>>*(2) Astor, Astor Fund and Astor Asset Management had entered
>>into many bona fide stock-lending transactions in the past.*

*(3) The dealings and affairs of Astor, Astor Fund, Astor Asset Management and Astor 3 were controlled and/or overseen by individuals by the names of Thomas Mellon (a descendant of the Astor Family and the chief executive officer of Astor Asset Management) and/or Gregory Mitchell (the Managing Director of Astor Asset Management in North America and/or "Managing Director of North America" for Astor Fund).*

*18. Further or alternatively, in order to induce the Claimants to (i) transfer Elektra Shares to Weiser and Tavira and (ii) provide Astor 3 with the power to instruct Weiser and Tavira to dispose of the Elektra Shares, the following implied representations were made to the Claimants by or on behalf of Mr Sklarov, Astor Fund and/or Astor 3:*

*(1) Astor and the companies in its group (including Astor Fund and Astor Asset Management) were associated with the Astor Family and Astor 3 was a special purpose vehicle owned and controlled by Astor.*

*(2) Astor and the companies in its group (including Astor Fund, Astor 3 and Astor Asset Management) were legitimate and honest financial institutions which carried on legitimate and honest stock-backed lending activities.*

*(3) The dealings and affairs of Astor, Astor Fund, Astor Asset Management and Astor 3 were controlled and/or overseen by individuals by the names of Thomas Mellon (a descendant of the Astor Family and the chief executive officer of Astor Asset Management) and/or Gregory Mitchell (the Managing Director of Astor Asset Management in North America and/or "Managing Director of North America" for Astor Fund).*

*(4) Astor, Astor Fund, Astor Asset Management and/or Astor 3 intended a member of the Astor group (in the event, Astor 3) to enter into a legitimate and bona fide contract of loan with the intention and ability to fund the loan with their own cash resources and not by selling any of the Elektra Shares.*

*(5) The lender in respect of such a loan (in the event, Astor 3) would intend and/or (once incorporated) did intend to comply with*

13

*its obligations in respect of the loan and security as it honestly understood them to be.*

35.     I would also emphasise that some of the Key Representations were apparent from the Pitch Deck I received, which was circulated to me in April 2021 and was the basis upon which I decided to pursue a stock-backed lending arrangement with Astor. For example, the Pitch Deck stated as follows:

| **Restrictions on Lender:** | During the Loan term and while the Loan remains in full force and effect, Lender shall not engage in short selling or selling of the Securities. |
|---|---|

36.     I now believe that the Key Representations were made dishonestly by Astor 3 in order to perpetrate a fraud against the Applicants. Astor 3 duped the Applicants into entering into the SLA and transferring the shares to Weiser and Tavira by pretending to be a legitimate financial business connected to the wealthy Astor family, rather than a criminal enterprise linked to Mr. Sklarov, a known fraudster. Moreover, Astor 3 never had any intention to act in accordance with its contractual obligations in relation to the Collateral Shares. Rather, it was always Astor 3's intention to misappropriate the Pledged Collateral. I believe that the lending advanced by Astor 3 under the SLA was funded, in whole or in substantial part, by selling the Pledged Collateral itself. I explain the basis for these beliefs in detail later in this declaration.

The Closing Statements

37.    I will now address the precise contractual mechanism by which Astor 3 advanced five tranches of funding under the SLA.

38.    This was achieved by a series of Closing Statements (Exhibits 4 to 8). I summarise the five Closing Statements below.

39.    The first Closing Statement is dated August 9, 2021 (the "**Tranche 1 Closing Statement**"). Pursuant to the Tranche 1 Closing Statement, a sum of MXN 501,591,693 was advanced by Astor 3 to RBS, secured over 563,569 shares in Elektra owned by Mr. Salinas. These shares were held in an account maintained by Weiser as Depository Broker in the name of Mr. Salinas.

40.    The second Closing Statement is dated September 10, 2021 (the "**Tranche 2 Closing Statement**"). Pursuant to the Tranche 2 Closing Statement, a sum of MXN 327,497,030 was advanced by Astor 3 to RBS, secured over an additional 372,344 shares in Elektra owned by Mr. Salinas. These shares were held in an account maintained by Weiser as Depository Broker in the name of Mr. Salinas.

41.    The third Closing Statement is dated February 4, 2022 (the "**Tranche 3 Closing Statement**"). Pursuant to the Tranche 3 Closing Statement, a sum of MXN 532,484,020 was advanced by Astor 3 to RBS, secured over an additional 1,299,497 shares in Elektra owned by Mr. Salinas. These shares were held in an account maintained by Tavira as Depository Broker in the name of Mr. Salinas. I explain the reasons for the change of the Depository Broker below.

15

42.    The fourth Closing Statement is dated June 22, 2022 (the "**Tranche 4 Closing Statement**"). Pursuant to the Tranche 4 Closing Statement, a sum of MXN 613,000,000 was advanced by Astor 3 to RBS, secured over an additional 2,796,290 shares in Elektra owned by Mr. Salinas. These shares were held in an account maintained by Tavira as Depository Broker in the name of Mr. Salinas.

43.    The fifth and final Closing Statement is dated September 15, 2022 (the "**Tranche 5 Closing Statement**"). Pursuant to the Tranche 5 Closing Statement, a sum of MXN 179,645,808 was advanced by Astor 3 to RBS, secured over an additional 444,389 shares in Elektra owned by Mr. Salinas. These shares were held in an account maintained by Tavira as Depository Broker in the name of Mr. Salinas.

44.    The result, therefore, is that five loans have been advanced by Astor 3 pursuant to the SLA, with a total principal amount of MXN 2,154,218,552.55. These loans were secured over a total of 5,476,089 Elektra shares belonging to Mr. Salinas as collateral for the loans advanced by Astor 3 under the SLA (the "**Collateral Shares**"). The position is set out in the Tranche 5 Closing Statement as follows:

FUNDING PROCEEDS AND COLLATERALIZATION RECORD

| | LTV | FMP (MXN) | Facility (MXN) | Shares Pledged | Avg. Volume[3] |
|---|---|---|---|---|---|
| | 35% | MXN 1,155.01 | MXN 1,974,572,743.94 | 444,389 | 48,850 |

| Tranche No. | Date | Price (MXN) | | Gross Funding Amount (MXN) | | Collateralized Shares | Net Funds after Deductions (USD) | |
|---|---|---|---|---|---|---|---|---|
| 1 | 9-Aug-21 | MXN 1,618.23 | MXN | 501,591,693.09 | | 563,569 | MXN | 500,000,000.00 |
| 2 | 17-Sep-21 | MXN 1,599.19 | MXN | 327,497,030.23 | | 372,344 | MXN | 300,000,000.00 |
| 3[4] | 7-Feb-22 | MXN 1,353.54 | MXN | 532,484,020.62 | | 1,299,497 | MXN | 510,000,000.00 |
| 4[5] | 22-Jun-22 | MXN 1,150.00 | MXN | 613,000,000.00 | | 2,796,290 | MXN | 592,871,767.12 |
| 5 | 15-Sep-23 | MXN 1,155.01 | MXN | 179,645,808.61 | | 444,389 | MXN | 173,586,459.31 |
| | **Total Funding to Date:** | | MXN | **2,154,218,552.55** | | | | |
| | **Current FMV of Collateralized Shares:** | | MXN | **6,324,937,555.89** | | | | |

45.     On March 24, 2023, Astor 3 made a margin call for 1,728,207 additional Elektra shares. Mr. Salinas complied with that margin call and transferred the relevant shares to his account with Tavira.

The Depository Agreements

46.     The Depository Agreements (Ex. 2 & 3) govern the terms on which the Depository Brokers held the Collateral Shares. These comprise the Weiser Agreement (which is relevant to the first two lending tranches lending) and the Tavira Agreement (which is relevant to the third, fourth and fifth lending tranches).

47.     The Tavira Agreement is stated to be effective as of November 1, 2021, although it was in fact executed at a later time. (For example, it appears that Tavira executed the document on December 13, 2021.)

48.     Tavira was appointed as the Depository Broker for the final three tranches of lending following a curious incident that took place in October 2021, the details of which are set out in an email chain involving Mr. Torti, Ms. Akbar and Weiser (**Exhibit 12**). In summary, the Applicants were notified by Weiser in an email dated October 5, 2021, that Astor 3 had issued an "Entitlement Order" to transfer 935,913 Collateral Shares held by Weiser to the account of Astor Capital, a previously unknown entity which appears to be entity affiliated with Astor 3. The Applicants asked Mr. Torti to raise a complaint with Weiser, which he did on October 19, 2021. Weiser responded on October 22, 2021, that it was required to comply with any Entitlement Order given by Astor 3. On October 23, 2021, Mr. Torti wrote to Ms. Akbar as follows:

> "… *it looks like the party which is the source of all this trouble is Astor. Could you kindly transmit this message to Astor and get their position and clear explanation as to what is causing all this mess?*"

49.     Later that day, Mr. Torti chased Ms. Akbar for a response:

> *It is very important that you have the sensibility of the necessity for the shares to return to the collateral contract until no later than in this week, since if the account statement is issued without the shares there could be trigger an alienation with great tax implications!*
>
> *Please we really need your help to make Astor and Weiser understand that they are breaching and violating the contracts.*

50.     On October 25, 2021, Ms Akbar responded as follows:

> *I am happy to advise that I have been informed by Astor that the instructions for the transfer of the 935,913 (collateralised) shares of Group Elektra S.A.B. de CV (ELEKTRA\*:MX) shall be reversed back*

18

*to the account # 200-804765 of Mr. Ricardo B. Salinas Pliego within the next 24 hours.*

*So we should see the shares reappear back into the account later today or tomorrow.*

*Please let me know if you have any further questions.*

51.    I was reassured to learn that Astor 3 had returned the shares. I assumed that there was a mistake or misunderstanding (perhaps involving Weiser) rather than a fraud. Furthermore, Astor 3 appears to have accepted that it was not entitled to take the shares for itself, which is presumably why it returned the shares.

52.    Since this dispute arose, it is no longer clear to me whether Astor 3 did in fact return any shares in October 2021. However, I did not realise these matters at the time.

53.    In any event, the Applicants insisted that Weiser should be replaced with another Depository Broker for all future tranches of lending, and that is why Tavira was appointed. Tavira was introduced to the Applicants by Astor 3.

**E. Addenda to the SLA**

54.    The SLA was amended on four occasions pursuant to a series of "Addenda" (**Exhibits 13 to 16**).

55.    The first Addendum ("**Addendum 1**") is dated July 31, 2021. Its principal purpose is to record that the version of the SLA executed between the

Applicants and Astor 3 on July 28, 2021, supersedes and **replaces** the prior versions of the SLA executed on May 1, 2021 and July 14, 2021.

56.    The second Addendum ("**Addendum 2**") is dated December 6, 2021. It was executed in response to the Applicants' concerns as to whether Astor 3 and/or Weiser had wrongfully disposed of the Collateral Shares. The operative clause states as follows:

> *It is mutually agreed, understood and represented that all Entitlement Orders issued by Lender in relation to the Custodian Management Agreement executed by and between the Lender, the Depository Broker and the Guarantor will be in accordance with the terms of the Loan Agreement.*

57.    The third Addendum ("**Addendum 3**") is dated June 13, 2022. Its principal purpose is to amend the SLA so as to make the terms more favourable to Astor 3. Clause I states that the LTV ratio is reduced to 35% (which meant that Astor 3 had an even greater level of security than before). Clause II expands the circumstances in which Astor 3 can make a margin call for yet more security.

58.    The fourth and final Addendum ("**Addendum 4**") is dated July 19, 2022. It deals with the release of a dividend to the Borrower.

## F.   Interactions with Astor prior to July 25, 2024

59.    Following an Elektra shareholders' meeting in April 2024, it was clear that the amount of existing shares did not match our records and so the decision was taken to send letters to all banks and custodians of Elektra shares in order to confirm that the Elektra shares were still being validly held. As part of

this process, on June 10, 2024, Mr. Salinas wrote to Weiser (**Exhibit 17**) and Tavira (**Exhibit 18**). The letters stated that Weiser and Tavira should not dispose of the Collateral Shares and sought information as to the quantity of Collateral Shares that had been disposed of.

60.     Weiser and Tavira did not respond by way of letter. However, on June 13, 2024, Astor 3 responded with a letter of its own (**Exhibit 19**), apparently because Weiser and Tavira had provided Astor 3 with copies of the correspondence from Mr. Salinas. The letter from Astor 3 is dated June 12 but was sent on June 13. The letter is unusual in several respects. It is not written on what I recognise as a normal corporate letterhead, and it does not identify any individual who sent the letter. The letter itself was sent by email from the "Operations" department at Astor Asset Management Group, and the email did not identify any individual who could be contacted to discuss the letter (**Exhibit 20**).

61.     In the letter, Astor 3 asserted that it had an unrestricted right to dispose of the Collateral Shares. I do not agree with this assertion (which is inconsistent with the Key Representations set out above).

62.     At this stage, Astor 3 did not assert that any Event of Default had occurred under the SLA. Instead, Astor 3 stated that Mr. Salinas should cease to "*interfere*" with the Depository Brokers.

63.    Based on Astor 3's letter, I became concerned that Astor 3 had disposed of a significant quantity of the Collateral Shares. Far from denying that disposals had taken place, Astor 3 effectively accepted that this had occurred (but sought to justify the disposals).

64.    On July 2, 2024, I contacted Gregory Mitchell (of Astor 3) by telephone and explained that the Applicants wished to prepay all sums owing to Astor 3 (in exchange for the return of the Collateral Shares). I followed up with emails to Mr. Mitchell and Mr. Yuen on July 5 and July 12, 2024, to which I only received further vague emails from Mr. Yuen that an unnamed committee at Astor 3 would consider my communications.

65.    This only exacerbated my concerns, and Applicants, through counsel, began investigating Astor 3, including hiring Forward Risk, an outside forensic vendor.

**G.  Investigation for Fraud**

66.    I now know that the Applicants have been the victims of a fraud committed by the Respondents in the English Action and others. These matters came to my attention between Thursday July 25, 2024 (the date of the privileged consultation with the Applicants' legal advisers) and Wednesday July 31, 2024 (when Forward Risk reported their findings to me).

67.    I now understand that stock-backed lending arrangements are a relatively common source of fraud in the financial markets. I have since read

various legal resources and other materials that associate various stock-backed

lending fraud claims with an individual known as Vladimir "Val" Sklarov. I detail

below what I have since learned about Mr. Sklarov.

<u>Vladimir "Val" Sklarov</u>

68.    I reviewed different materials where Mr. Sklarov is described as a

resident of Illinois (US), Florida (US) and Ukraine: see paragraph 6 of the

Satterfield Complaint; paragraph 27 of the Barclays Complaint; and the NYSE

Decision (each as defined below). Because I am not a licensed attorney, I describe

these legal actions as I understand them based on my review of the facts alleged

and the ultimate ruling in each case to consider similarities in my own work

negotiating with parties like Astor 3, and my ultimate role in ordering the

investigations described herein and underlying the Applicants' 1782 Application.

Accordingly, I do not opine on the law analysed in those decisions or the merits

of each case.

69.    In the 1990s, I understand that Mr. Sklarov was convicted of felony

charges arising out of a Medicare fraud, sentenced to one year in prison and

ordered to pay US$14 million in restitution: see *USA v. Sklarov, et al.*, 97-cr-

00176 (DJL) (W.D. Pa.) **Exhibit 21**.

70.    Mr. Sklarov has also been sued or found to have impersonated

legitimate financial institutions such as the New York Stock Exchange, Barclays

and Rothschild. For example, in a complaint I reviewed that was filed by Barclays

23

against Mr. Sklarov in the United States District Court for the Southern District of New York dated October 2020 (the "**Barclays Complaint**") (**Exhibit 22**), Mr. Sklarov was sued for impersonating a lengthy list of entities associated with Barclays. On March 19, 2021, Judge Lewis Kaplan entered a permanent injunction against Mr. Sklarov and his attorney, an individual known as Jaitegh "JT" Singh ("**Singh**") (**Exhibit 23**). Notably, the order was made with the consent of Mr. Sklarov and Mr. Singh, who signed the consent order. I also reviewed the decisions made in the cases involving the New York Stock Exchange (the "**NYSE Decision**") (**Exhibit 24**) and Rothschild (**Exhibit 25**).

71.    Mr. Sklarov was also found in contempt of court in another case (**Exhibit 26**).

72.    In recent years, it appears that Mr. Sklarov was repeatedly accused of stock-backed lending fraud. For example, the Barclays Complaint states as follows (at ¶¶ 124 to 125):

> "*124. Sklarov also has been sued by multiple parties for civil fraud in connection with the purported offering of securities-backed loans.*
>
> *125. Although Sklarov has used various shell companies to perpetuate each alleged fraud, the fact patterns underlying each of the schemes are nearly identical: a Sklarov-related entity promises to provide a loan to a borrower backed by securities owned by the borrower; the borrower pledges the shares as collateral to the Sklarov-controlled entity; the Sklarov-controlled entity provides little if any of the promised loan funds to the borrower and then sells or attempts to sell the shares proffered only as collateral, and retains the proceeds.*"

73.    Paragraphs 126 to 143 of the Barclay's Complaint provide a useful summary of the stock-backed lending frauds which associated with Mr. Sklarov. In a separate 2019 complaint filed against Mr. Sklarov in New York by Brent Satterfield (the "**Satterfield Complaint**") (**Exhibit 27**), similarly stock-backed lending frauds are listed (see ¶¶ 52 to 62. Paragraph 60 of the Satterfield Complaint lists one example involving a company generally associated with the "America 2030" business name, that I now understand to be commonly associated with Mr. Sklarov:

> "*In the UK, the CEO of a company named Angus Energy had to step down, after the company disclosed he had transferred his Angus Energy shares to a company called America 2030 Capital Limited for "nil consideration". It was said to be "in contemplation of a possible equity linked loan against his shareholding". Unbelievably, the company reports that America 2030 sold 10 million shares (a value of over $100 million) before it was discovered.*"

74.    In another example, a Singapore company called Sunpower Group announced that trading in its shares would be halted after two of its substantial shareholders had informed the company that "*they had placed 14 million shares each with a lender, America 2030 Capital Ltd., as collateral for a loan, and said the shares were no longer in the depository broker account*": see paragraph 56 of the Satterfield Complaint. Notably, the custodian in that case was Weiser. The Satterfield Complaint asserts that the High Court of St. Kitts and Nevis ruled that Mr. Sklarov (under the alias "Mark Simon Bentley") and Weiser had conspired to commit a stock-backed loan fraud (**Exhibit 28**). Another summary can be

found in a later Bermudian judgment that recognised and enforced the Nevis judgment (**Exhibit 29**).

75.    Mr. Satterfield eventually managed to obtain an arbitration award against Mr. Sklarov in July 2021 (the "**Satterfield Award**") (**Exhibit 30**). Weiser was also involved and gave evidence on behalf of Mr. Sklarov: see paragraph 113 of the Satterfield Award.

76.    The contents of the Satterfield Award are notable for several reasons that I feel qualified to address or otherwise seem straightforward to me based on the plain language of that decision. First, it is apparent that the lending documentation in that case was drafted in very similar terms to the SLA in the present case: see below. Second, the Satterfield Award contains a detailed description of Mr. Sklarov's fraudulent scheme and says that he gave false and dishonest evidence to the tribunal: see e.g. paragraphs 177 and 178.

77.    As mentioned above, Mr. Sklarov is associated with an attorney called Jaitegh "JT" Singh, who frequently acts for him in litigation: see the Barclays Complaint at paragraph 33 (Ex. 22). I address Mr. Singh in further detail below.

78.    It is unclear how many of Mr. Sklarov's associates or accomplices are fictitious creations of Mr. Sklarov's own mind, and how many of them are real people. He appears to deploy an extensive range of pseudonyms, aliases and alter egos.

Astor 3 Red Flags

79.    In light of the matters set out above, Applicants carried out an investigation to consider whether Astor 3 might be controlled by Mr. Sklarov, which revealed further evidence that Astor 3 is not a legitimate enterprise.

80.    I now understand that Astor 3 is not a conventional financial institution, and its affairs are shrouded in secrecy. For example:

a) Astor 3's letter dated July 12, 2024, is not on a normal corporate letterhead and does not identify any individual person who sent the letter.

b) The website and email addresses set out in the SLA for Astor 3 appear to be invalid.

c) Page 31 of the SLA identifies five offices around the world where Astor 3 is said to be located, but these all appear to be flexible / serviced offices. It appears there is no evidence that Astor 3 has any meaningful physical presence anywhere.

d) I now understand that the SLA itself is very poorly drafted.

e) In those circumstances, Applicants now doubt that Astor 3 could fund loans worth hundreds of millions of dollars from its own capital (or by borrowing the money from legitimate third parties). Mr. Sklarov has admitted in the English Action that at least three of the loan tranches were funded by the sale of Mr. Salinas's shares. (Ex. 64, ¶ 32).

81.     The SLA suggests that Astor 3 is registered in Vancouver, British Columbia. However, this looks incorrect. Furthermore, I note that the British Columbia Securities Commission issued an Early Intervention Alert on April 9, 2020, as follows (**Exhibit 31**):

> "*Astor Capital Fund Limited (Astor)*
> *Astor claims to have an office in Vancouver, British Columbia (BC), and offers wealth management and advisory services.*
> *Astor is not registered to trade in, or advise on, securities or derivatives in BC.*
> *We urge BC residents to exercise caution when dealing with firms that are not registered to trade or advise in BC*."

82.     The Tavira Agreement, meanwhile, states that Astor 3 is registered in Quebec.

83.     I have reviewed an extract from Astor 3's entry on the Quebec company registry (**Exhibit 32**). The register purports to identify Astor 3's directors and beneficial owners, but the information creates other questions as to the propriety of the company:

a) According to the register, Astor 3 has a single director/administrator known as Jonathan Clifford Bibi (whose address is in the Seychelles). The same individual can be identified on Companies House in England (**Exhibit 33**); his date of birth is in July 1984. This individual appears to be a former defender on the Seychelles national soccer team (**Exhibit 34**). Perhaps more importantly, the same Jonathan Bibi from the

Seychelles has been involved in a series of cryptocurrency scams, and he

was named as a fraudster by the State of Missouri in 2018 (**Exhibit 35**).

b) The SLA and the other contractual documents are ostensibly signed by

"Mariia Mitsa" on behalf of Astor 3. She is described as a "Managing

Member" of Astor 3. However, no such person is identified in the Quebec

register, and the name "Mariia Mitsa" returns zero Google search results.

This name is probably a pseudonym.

c) The register also states that the beneficial owner of Astor 3 is a person

known as "Oksana Hryn", who is said to be resident in Ukraine (and is a

known associate of Mr. Sklarov). I address this individual in detail below.

84.    Astor 3's logo (as shown in the SLA) is the same as the logo of

"Astor Wealth Group" (**Exhibit 36**). Astor Wealth Group was founded by one

"Thomas Mellon", the same individual copied on various emails when the SLA

was being negotiated.

85.    "Thomas Mellon" claimed to be a member of the wealthy Astor

family. He is mentioned in a number of suspicious publications (and which may

have been written by an artificial intelligence application), containing colourful

references to his supposed intellectual brilliance and family wealth (**Exhibits 37

and 38**). He is not mentioned anywhere in conventional media. His account on

"X" (formerly Twitter) has 12,600 followers, but his tweets only receive 2 to 4

"likes" per tweet. On his "X" account, he refers to his "*Supreme Elegance and*

*Artistry in Contemporary Investing*", a phrase that is also used on the Astor Wealth Group website. (**Exhibit 39**)

86.    As I explain further below, Mr. Sklarov accepted in a witness statement filed on 16 September 2024 that Mr. Mellon does not exist at all, and that "Thomas Mellon" is an alias of Mr. Skachkov.

87.    It is also notable that Astor 3 (and "Astor Wealth Group") have names that are similar to a legitimate mutual fund manager known as Astor Investment Management LLC. However, the latter entity appears to have completely different ownership from the Astor entities that are involved in the SLA. I believe that Astor 3 and "Astor Wealth Group" were selected precisely in the hope of creating confusion with an existing legitimate investment manager.

Reasons to believe that Mr. Sklarov is in control of Astor 3

88.    Several reasons indicate that Mr. Sklarov is Astor 3's true beneficial owner and controller.

89.    First, Indiana corporate records show that an entity called Astor Capital was registered in the state as a foreign corporation in June 2019. When this entity was registered, Mr. Sklarov was listed as the CEO. By April 2020, "Thomas Mellon" had replaced Mr. Sklarov in the corporate records and became the CEO, director, and registered agent of Astor Capital Mr. Singh, Mr. Sklarov's attorney, was the legal representative of Astor Capital who signed the document

authorising "Thomas Mellon" as head of the company. Mr. Singh appears as the entity's legal representative.

90.    <u>Second</u>, the sole beneficial owner of Astor 3, a Ukraine resident described as "Oksana Hryn"), appears to be a known associate of Mr. Sklarov. As to this:

a) In October 2021, "Oksana Hryn" was named as a co-plaintiff in a lawsuit alongside numerous other shell companies that can be traced to Mr. Sklarov. Weiser was one of the defendants, and damages of US$450 million were sought. It was voluntarily dismissed after only 4 days.

b) In August 2023, Mr. Sklarov's attorney (JT Singh) wrote a letter on behalf of "Oksana Hryn" to OffshoreAlert, a website that tracks "[r]ed flags in high-value international finance," offering to pay the site $25,000 USD to remove an unfavourable article (**Exhibit 40**). The letters and emails from JT Singh to OffshoreAlert are available online. (**Exhibit 41**).

91.    <u>Third</u>, Mr. Sklarov (via Mr. Singh) attempted to register a trademark in the name of "Astor Capital". This incident is described in paragraph 240 of the Barclays Complaint.

92.    <u>Fourth</u>, at least one of Astor 3's employees (namely Mr. Yuen) is a known associate of Mr. Sklarov. In this respect, Mr. Yuen and Mr. Singh are co-directors of an English company called Luxfin Capital Ltd. (see **Exhibit 42**).

93.    <u>Fifth</u>, the SLA is notably similar to the contractual documents used in other reported cases where Mr. Sklarov has been found liable for stock-backed lending fraud. The Satterfield Award (Ex. 30) is a particularly good example. In that case:

a)  There was the same use of a series of confusing Addenda (see paragraph 11).

b)  The key operative provisions were essentially the same as the SLA in the present case (see paragraph 73).

c)  The contract contained a similar lengthy disclaimer at Clause 10 (see paragraph 80).

d)  The same "Closing Statements" were used (see paragraphs 82*ff*).

e)  There were numerous other distinctive words and phrases which are the same or materially the same as those found in the SLA.

94.    <u>Sixth</u>, there is at least one reported case (from the Supreme Court of Jamaica) in which Astor 3 appears to have engaged in a stock-backed lending fraud (**Exhibit 43**). Injunctive relief was apparently granted in Hong Kong to restrain Astor 3 from disposing of the shares (although the case was ultimately resolved on the basis that Astor 3 had operated in breach of the Hong Kong regulatory regime): see paragraph 7. The underlying facts of that case have all the hallmarks of the other fraud schemes alleged against Mr. Sklarov, and the contractual arrangements bear a striking similarity to the present case.

95.    Seventh, Sklarov has submitted numerous affidavits and witness statements in the English Action on behalf of Astor 3. Sklarov has asserted that he is only a "*technical consultant*" of Astor 3 and connected entities, even though he is the only person to have submitted evidence on Astor 3's behalf in the English Action. This is implausible, as acknowledged by Mr Justice Calver in paragraph 58 of his judgment in the Discharge Application:

> "*58. Indeed, subsequent to the hearing before Jacobs J, in paragraph 12 of his witness statement of 1 September 2024 Mr. Sklarov sought to distance himself from the alleged fraud by suggesting that he was merely a "technical consultant" for Astor 3, Vanderbilt and Astor Capital and so on a day to day basis he had "limited knowledge" of the precise transactions entered into by those entities and limited access to their correspondence. He said he was "not an owner, beneficiary nor employee or officer of those entities". But that arguably appears to have been false, as he then swore two affidavits on 5 September 2024 on behalf of each of those companies as to their respective assets which he states is within his own knowledge. Similarly, his 4th witness statement of 16 September 2024 demonstrates that the "Elektra deal" as he calls it was his idea and his 'business strategy.'*"

96.    Finally, there is reason to believe that one of the custodians appointed by Astor 3, Weiser has previously associated with Mr. Sklarov in his stock-backed lending frauds. For example:

a)  I explain above that the High Court of St. Kitts and Nevis ruled that Mr. Sklarov and Weiser conspired to commit a stock-backed loan fraud.

b)  Weiser was also involved in the Satterfield matter and gave evidence on behalf of Mr. Sklarov.

c) Weiser communicates in the same tone and style as Astor 3. For example, on June 22, 2021, I received an email from an anonymous "Collateral Services" department at Weiser without any identifiable individual being named anywhere in Weiser's email.

97.     Based on the forgoing, it seems likely that the Applicants have fallen victim to a stock-backed lending fraud carried out by Mr. Sklarov and his associates.

98.     After my review of Mr. Sklarov's legal history, I also doubt that Astor 3 funded the five lending tranches pursuant to the SLA from its own resources. The more likely conclusion – and the one that reflects the apparent approach taken by Astor 3 (and Mr. Sklarov) in other cases and consistent with my own experience in finance – is that the lending advanced by Astor 3 under the SLA was funded, in whole or in substantial part, by selling the Collateral Shares belonging to Mr. Salinas. Indeed, Mr. Sklarov has admitted that the Loan Tranches 3, 4 and 5 were funded by the sale of Mr. Salinas's shares. I strongly suspect that same applies in relation to Tranches 1 and 2. (**Exhibit 44, ¶¶** 42, 51–60).

99.     It now appears that Astor 3's intended purpose from the very moment that it was incorporated on June 28, 2021, (shortly before the SLA was executed on July 28, 2021), and that of Mr Sklarov throughout, was to target

Applicants in this scheme. We now doubt Astor 3 ever had any intention to act in accordance with its contractual obligations in relation to the Collateral Shares.

## H.   The Applicants' reaction to the discovery of the fraud

100.   On 26 July 2024, Elektra issued the following press release (**Exhibit 45**):

> "*MEXICO CITY, July 26, 2024 /PRNewswire/ -- Grupo Elektra, S.A.B. de C.V. (BMV: ELEKTRA\* Latibex: XEKT), Latin America's leading specialty retailer and financial services company, and the largest non-bank provider of cash advance services in the United States, informs investors that it has received information from its controlling group regarding a possible fraud by depositaries of their shares, which could cause unusual movements of its share price on the stock markets.*
>
> *Thereafter, the company informs that it has made contact with the corresponding authorities to determine the applicable measures.*"

101.   On the same date, Elektra's shares were suspended from trading by the Mexican stock exchange. This provided some temporary limited protection to the Applicants. However, the trading suspension has since been overturned by Mexican financial regulators, who ruled that trading in Elektra shares be allowed to continue. Applicants are considering an appeal.

102.   On July 26, 2024, I emailed Weiser and Tavira to request a meeting.

103.   On July 26, 2024, Weiser responded as follows (from an email address described as "collateralservices", without identifying any individual who could be contacted):

> "*Weiser cannot participate in discussions which are contractual matters that Weiser is not party to. Per the control management agreement (CMA) which Weiser is a party to, Weiser will take direction with regard to collateral on notice of release by the Lender.*"

104.    On July 29, 2024, Tavira responded as follows (from an email address described as "INTL Operations", also without identifying any individual who could be contacted):

> "*Thank you for your email. Please be advised, Tavira are bound by the terms of the CMA agreement and follow the terms within it. We kindly advise you to communicate with the lender directly to discuss any questions you have.*"

105.    The style and content of the emails (and the fact that they are sent from anonymous email addresses) are strongly reminiscent of emails sent by Astor 3.

106.    On July 27, 2024, I received an email from Mr. Yuen (of Astor 3) as follows:

> "*We are aware of reports that came out yesterday regarding the company which are alarming. Can you please elaborate on this? Please see the article below as reference ...*
> *Furthermore, it was confirmed and reiterated prior that under the agreed SLA, there is no provision for prepayment before the conclusion of the agreed to term. If there is a different interpretation of that, please clarify.*"

107.    On July 30, 2024, I received an email from "Global Operations" at Astor 3 (see **Exhibit 46**). The email enclosed a letter (erroneously dated July 27, 2024) asserting, for the first time, that the Applicants had committed numerous

alleged Events of Default under the SLA (**Exhibit 47**). The covering email stated

as follows:

> "*According to the Loan Agreement, the Loan is now Accelerated and all sums thereunder are now due, which includes loan amount, custody fees, maintenance fees, collateral transfer fees and any other fees and costs imposed by the Custodian Brokers or Astor Asset Management 3 Ltd.*
>
> *We bring to your attention that the default interest rate according to the Loan Agreement is 1.5% per month and will accrue for all outstanding debts effective immediately. This represents an annual fee of 18%.*
>
> *Should you wish to discuss an informal settlement without prejudice and avoid the publicity surrounding your default, you may do so by contacting us. If your preference is to litigate, we will in the courts of England and Wales seek full remedy afforded to us under the Loan Agreement, including the return of all monies and fees computed at a monthly 1.5% default interest rate until such time as you make full settlement of all debts owed.*
>
> *We would also be willing to enter into a "Confidential Forbearance Agreement", whereby this Event of Default will be stayed indefinitely confidentially.*
>
> *This Notice of Default and proposed confidential settlement discussion is being served upon you without prejudice and we reserve all rights afforded to us under the Loan Agreement and subsequent Addendums executed by the Lender, Borrower and Guarantor.*"

108.   On August 1, 2024, I was copied into an email chain originated by

Tavira (see **Exhibit 48**). In that chain, Tavira attached an updated statement of

account (**Exhibit 49**) which appears to show that the **entirety** of the Collateral

Shares held by Mr. Salinas with Tavira were transferred away on July 29, 2024.

The terms of that transfer are stated to be "FOP" which I understand to mean "free

of payment" (i.e. that they were transferred without a reciprocal payment of cash

consideration) and the identity of the transferee is not stated in the statement. However, in the email chain, Tavira stated as follows: "*Under the terms of the CMA the lender (Astor) instructed us to move the shares to Astor's account*".

**The English Action**

109.   As explained in more detail in Paragraphs 34–41 Mr Allen's declaration, Applicants promptly filed ex parte applications for injunctions and other orders against Astor 3, Sklarov, Weiser, and Tavira in the Business and Property Courts of England and Wales, Commercial Court (the "**English Action**").

The August 2, 2024, Hearing.

110.   On August 2, 2024, Applicants *attended an ex parte hearing* before Mr. Justice Jacobs, following which two orders were granted in relation to Astor 3 and Sklarov:

a)   A Freezing and Proprietary Injunction Order ("the Original Freezing Order").

b)   An order permitting service of documents out of the jurisdiction ("the Original Service Order").

111.   Copies of the Original Freezing Order and the Original Service Order are enclosed at **Exhibits 50 & 51**. On August 2, 2024, these documents were served on all four Respondents – Astor 3, Weiser, Tavira, and Sklarov (the

"**Original Respondents**"). These copies included a Penal Notice for non-compliance.

112.   Pursuant to paragraph 11 of the Original Freezing Order, all Original Respondents were obliged to provide certain information to the Applicants' attorneys in England by 5:00 pm on August 6, 2024 (in the case of the Astor 3 and Mr. Sklarov) and by 5:00 PM on August 5, 2024, (in the case of Weiser and Tavira).

113.   Specifically, the Second and Third Respondents (Weiser and Tavira) were, pursuant to paragraph 11(b) of the Original Freezing Order, obliged to confirm, to the best of their ability:

> "…*whether they hold any Collateral Shares and/or their traceable proceeds and if so the value of the said shares or proceeds*."

114.   By virtue of paragraph 12 of the Original Freezing Order, an affidavit was also required on behalf of each of the Original Respondents to provide the information at (*inter alia*) paragraph 11 of the Original Freezing Order as quoted above. These affidavits need to be served by August 9, 2024 (i.e. within 7 days of being served with the Original Freezing Order).

## I.    Information Provided by the Respondents.

Tavira

115.   At 4:12 PM BST on August 5, 2024, Applicants' counsel received an email from Tavira. A copy of that email and its related attachments are

39

enclosed at **Exhibits 52–58**. In response to the Original Freezing Order, the email

confirmed the following:

> *"Tavira currently holds in custody 336,475 shares of Grupo Elektra SAB De CV valued at USD 15,709,093.*
>
> *Astor Asset Management 3 Limited rehypothecated the shares to Cornelius Vanderbilt Capital Management Ltd.*
>
> *The attached Excel file (Elektra.xlsx) shows the dates and amounts of share sales undertaken by Cornelius Vanderbilt Capital Management Ltd.*
>
> *Astor Asset Management 3 Limited currently has in custody with Tavira USD 963k in cash in its account.*
>
> *Cornelius Vanderbilt Capital Management Ltd holds in custody with Tavira USD 10.46m in cash plus USD 6.7m worth of other shareholdings.*
>
> *Attached are the cash redemptions for both Astor Asset Management 3 Limited (AA Redemptions) and Cornelius Vanderbilt Capital Management Ltd (CV Redemptions).*
>
> *These redemption proceeds were sent to their lawyers' trust account held at JP Morgan Chase (see attached JIQ Wiring Instructions)*
>
> *Also attached are the trade reports for both Ricardo Salinas and Corporacion RBS SA de CV which show the share and cash movements in the accounts."*

116.    With regards to the attachments to this email:

a) **Exhibit 53** – this is an Excel spreadsheet purportedly setting out the dates and amounts of the share transactions undertaken by the Tavira as part of the rehypothecation. For reference, rehypothecation is generally defined as where a lending party holding securities as collateral uses that collateral for their own purposes. As I describe above, the SLA, pursuant

40

to the Second Addendum entered on December 6, 2021, ensure that the terms of the SLA, which prohibit rehypothecation, govern any requests made between Astor 3 and the Depository Brokers. There are 635 transactions recorded between December 16, 2021, and July 26, 2024. The precise nature of the transactions is currently unclear to me, but the aggregate number of Collateral Shares traded appears to have been 5,960,424 (of the 6,268,383 Collateral Shares which the Third Respondent should be holding).

b) **Exhibit 54** – this is an Excel spreadsheet purportedly setting out cash redemptions for the Astor 3 between January 31, 2022, and July 10, 2023, for a total of $43,025,048 USD.

c) **Exhibit 55** – this is an Excel spreadsheet purportedly setting out cash redemptions for Cornelius Vanderbilt Capital between January 31, 2022, and July 5, 2024. The total figure is not entirely clear but appears to be $228,660,424 USD.

d) **Exhibit 56** – this is a document purportedly setting out the details of the bank account for which the cash redemptions were paid on behalf of the First and Fifth Respondents. The account is with *"Jurist Iq Corp Attorney Trust Account IOLA"* held by JP Morgan Chase Bank NA in New York. This is a law firm associated with Jaitegh "JT" Singh, who is listed as the Chief Executive Officer of Jurist IQ Corp. on the New York State Division of Corporations (**Exhibit 60**). I understand from counsel that an IOLA account is an 'Interest on Lawyer Account' established to hold client funds for a short period of time and/or where the amounts are too small to generate sufficient interest to justify the expense of administering a separate account.

e) **Exhibits 57–58** – these are purportedly trade reports for the Applicants' accounts with the Third Respondent.

117.  Prior to this email, I had no knowledge of the involvement of Cornelius Vanderbilt Capital ("**Vanderbilt**") in the relevant transactions, and the email caused me considerable concern that the Vanderbilt appears to have held and then sold a significant number of Collateral Shares. On August 6, 2024, Applicants amended their claim form in the English Action to include Vanderbilt, and served the amended claim form on the original four respondents on August 7, 2024. The English Court has since entered a similar Freezing Order against Vanderbilt.

Weiser

118.  On August 5, 2024, Applicants' counsel in England received communications from Weiser's solicitors (Holman Fenwick Willan LLP) ("**HFW**") stating:

> *"As you will appreciate, the period between our client being served with the WFO and the time for responding to you in accordance with the terms of the WFO is oppressively short. We confirm that our client is currently taking steps to investigate fully the status of any Collateral Shares. However, it may potentially take four to eight weeks for our client to undertake this investigation properly. In the meantime, our client confirms that*

*it has frozen the relevant accounts whilst it undertakes the investigation."*

119.    Given the urgency involved in this matter, this response only increased Applicants' concerns and supports the Applicants' expectation and contention in the English Action that Weiser forms a central part of the scheme being investigated. I know, based on experience, that genuine depository broker should be able to provide the information about the Collateral Shares expeditiously. Applicants' counsel in English responded (**Exhibit 59A**) seeking compliance with the terms of the Original Freezing Order. HFW responded on August 7, 2024 (**Exhibit 59B**) but that letter did not comply with the terms of the Original Freezing Order, and Applicants' Counsel in England responded later that day (**Exhibit 59C**).

120.    On August 9, 2024, and as summarised in my third witness statement in the English Proceedings (**Exhibit 61**, at ¶ 20(2)), Weiser finally responded to the original Freezing Order.  Weiser revealed that it sold nearly all of Mr. Salinas' shares in its control to Astor Capital at a substantial undervalue (approximately $12.6 million for shares valued at around $52 million on that date), which another judge in the English Court concluded was a strong indication that Astor Capital was not a bona fide purchaser in that transaction. On August 13, 2024, the English Court granted a freezing order, a proprietary injunction and directions for disclosure against Astor Capital. (*Id*. at ¶ 20(8).)

<u>First Respondent (Astor 3), Fourth Respondent (Sklarov), Fifth Respondent (Vanderbilt), Sixth Respondent (Astor Capital) (the "**Sklarov Parties**")</u>

121.    At 18:14pm on 5 September 2024, the Sklarov Parties served two sworn affidavits from Mr Sklarov in purported belated compliance with the information provision obligations in the Injunction Orders. These statements have since been shown to be incomplete and misleading. For example, Mr Sklarov disclosed only eight assets, two of which the Claimants identified were in fact owned by Mr Sklarov's wife. Further, Mr Sklarov failed to disclose that he owns a residential property in Marousi, Greece, which he purchased in December 2021 in his own name. Subsequent investigation has also found that Mr Sklarov is likely to disguise his beneficial ownership of further assets thinly through the use of offshore structures and/or family members. For instance, Mr Sklarov did not declare that he is the protector of a BVI trust which is the beneficial owner of a French chateau purchased in April 2024 for EUR 4,450,000. His wife is the settlor of the trust.

122.    In addition, Astor 3 has sent two documents relating to the SLA since the Original Freezing Order was granted:

a)    An amended notice of default dated August 3, 2024 (**Exhibit 62**). This supplements the email sent by the Astor 3 on July 30, 2024, asserting, for the first time, Events of Default by the Applicants under the SLA (described at paragraph 124 above). I do not consider that the

arguments asserted in the amended notice have any basis based on my own knowledge of the parties' agreements and the Applicants and their affiliates' own operations and performance, including, but not limited to, Grupo Salinas and Elektra.

b) An email demanding payment dated August 5, 2024 (**Exhibit 63**).

## J.    Concerns of Fraud by Vanderbilt

Information provided by Tavira

123.    Given the clear concerns regarding the conduct by Astor 3, Sklarov, Weiser, and Tavira – the Original Respondents in the English Action – the information provided by Tavira in its email dated August 5, 2024 (as described in paragraph 115 above) only served to heighten those concerns and confirm Vanderbilt's apparently significant involvement here.

Forward Risk Report

124.    Since Tavira confirmed Vanderbilt's involvement in its August 5, 2024, email, Forward Risk, Applicants' outside forensic consulting vendor, separately investigated Vanderbilt as a matter of urgency. Even from these preliminary investigations it appeared there were a number of suspicious factors relating to Vanderbilt as well as links between it and the other Respondents.

125.    As I explained above, on August 6, 2024, Applicants amended their claim form in the English Action to include Vanderbilt, and served the amended

claim form on the Original Respondents on August 7, 2024. The English Court has since entered a similar Freezing Order against Vanderbilt.

*Chenming* Claim

126.    Since the English Court granted the Original Freezing Order on August 2, 2024, I learned about other proceedings in the United States brought by *Chenming Holdings (Hong Kong) Limited in the Southern District of New York* (Civil Case No. 24-cv-935) (**Exhibit 64**) (the "***Chenming* Claim**"). That complaint makes fraud allegations against similar parties, including Sklarov, Mr. Singh, and Vanderbilt. Weiser also appears. I attach the complaint and note the following is alleged by the Plaintiff:

a) That a loan agreement was signed by a fictitious name (Christopher Warner) on behalf of Vanderbilt (paragraph 11).

b) The *Chenming* plaintiff had substantially repaid a loan made by the Vanderbilt (paragraph 15) but withheld final repayments pending proof from Vanderbilt that the shares it had deposited under the relevant loan agreement remained safe in custody and sought reassurance that those shares would be returned upon full repayment of its loan (paragraph 16). Vanderbilt never responded to this request (paragraph 17).

c) Further details of the loan of $12,572,187.35 USD made by Vanderbilt are provided at paragraphs 39 to 45 and show a similar stock-based lending *modus operandi* to the scheme that the Applicants are currently

trying to investigate. The *Chenming* Claim alleges that the lenders have not returned the collateralized shares at issue in that transaction, nor have those lenders returned the $5.8 million USD in cash that was also provided to Vanderbilt in response to margin calls. The *Chenming* Claim alleges that by August 4, 2021, Vanderbilt transferred or sold all of the 58,414,000 shares at issue (paragraph 57).

**K.    Mr. Sklarov Responds and Confirms His Affiliation with Astor and Vanderbilt.**

127.   On August 20, 2024, after over two weeks of silence and refusal to comply with the English Court's earlier Orders, Mr. Sklarov, Astor 3, Astor Capital, and Vanderbilt filed a Discharge Application through their attorneys. My understanding is that this was a petition to ask a court to reverse or remove their prior order. Mr. Sklarov filed a statement on behalf of himself and these other Respondents, which confirmed his ownership and affiliation with each shell company. His statement attacked Mr. Salinas personally, criticized the English Court, and signalled his stated intention to not comply with the English Court's orders.

**L.    The Applicants Seek Foreign Discovery in the New York Federal Courts.**

128.   Beginning with Tavira's August 5, 2024 email response, described above at ¶¶ 117–119, and upon further review and investigation of the matters and parties described above, including, but not limited to, review of the *Chenming*

complaint, it appeared Mr. Sklarov and his collaborators were channelling most of the proceeds from the sale of the Collateral Shares through the Jurist IQ account, held by JPMorgan Chase Bank, N.A. in New York.

129.   On August 23, 2024, Applicants filed an Ex Parte Application for an Order Pursuant to 28 U.S.C. § 1782 Authorizing Discovery for Use in a Foreign Proceeding to subpoena records from Jaitegh "JT" Singh, Singh Law Firm, Jurist IQ Corp., and JPMorgan Chase Bank, N.A. in a U.S. federal court in New York (the "**New York Application**").  I prepared and signed a declaration similar to this Declaration in support of that Application using information that was available to me and my own personal knowledge of these matters at that point.

130.   In early September 2024, the New York Court granted the New York Application and Mr. Singh, the Singh Law Firm, Jurist IQ Corp., and JPMorgan Chase Bank, N.A. all have since begun producing records in response to those subpoenas.

131.   An investigation of the records since received following the New York Application reveal a complex scheme by Mr. Sklarov and his associates to distribute millions of dollars arising from the proceeds of the Collateral Shares to a multitude of domestic accounts, shell companies, family members, offshore accounts, and other destinations, including to pay for significant legal, accounting, and other consulting costs and fees to sustain the schemes perpetrated by Mr. Sklarov and his associates.

132.   Among those transactions are a series of payments to one "Alexi Skachov" in Canton, Georgia.

133.   These records also reveal that Mr. Sklarov directly funnelled money into accounts in the United States held himself and various family members that amounted to ████████ of dollars. These include ████████ dollars wired to a Wells Fargo bank account under Val Sklarov's name, located in Canton, Georgia, and ████████ dollars wired to a Discover bank account under his wife's name, also at the family's Canton, Georgia address.

## M. Mr. Sklarov Submits Witness Statements in the English Action Identifying "Thomas Mellon" as Aleskei Skachkov and the English Court Denies the Discharge Application.

134.   On October 7, 2024, Mr. Justice Calver in the High Court of Justice, King's Bench Division, Business and Property Courts of England and Wales Commercial Court issued a Judgment that denied Mr. Sklarov and the other Respondents' discharge petition (the "October 7 Judgment"). (**Exhibit 65**).

135.   The October 7 Judgment makes specific note of several sworn filings by Mr. Sklarov where he contradicts prior falsehoods that he had a limited role with companies like Astor 3 and Vanderbilt, and admits that he was indeed the "Gregory Mitchell" with whom I dealt via email when negotiating the SLA, and that the "Elektra deal" was his idea and strategy. (Ex. 64, Paragraph 58, 61).

136.   Importantly, along with Mr. Sklarov's admission that "Gregory Mitchell" was a fake name, the October 7 Order also notes Mr. Sklarov's sworn admissions that Aleskei Skachkov was an alias for "Thomas Mellon," with whom I also dealt while negotiating the SLA. (Exhibit 64, Paragraph 60).

137.   My understanding is that notwithstanding these clear findings and judgment by the English Court—based largely on Mr. Sklarov's own admissions—Mr. Sklarov and his companies are now seeking permission to appeal the October 7 Order. I understand that the Court of Appeal's decision on the application for permission to appeal is pending.

138.   Because Mr. Sklarov and these other entities are determined to further obstruct the information gathering process in the English Courts, I believe this underscores why Applicants must prioritize finding information on the funds since converted in accounts that likely house or did house those funds or the related Collateral Shares at one point.

139.   Additionally, because Mr. Sklarov continues to directly attack the English Courts' well-reasoned decisions, rather than simply comply with their Orders, my concern is that he will use the extra time to further obscure the trail of he and his collaborators' nefarious scheme. This underscores the urgency of the matter for me, as a financial executive in the Applicants' broader organization, considering the sizable amount of funds and securities these parties converted and continue to convert.

140.    Finally, while the number of Defendants to the English Action is significant and may expand as further aspects of the fraud are uncovered, I do not expect Mr. Skachkov, Discover, and Wells Fargo, however, to become parties in the English Action. There is no suggestion of wrongdoing by Wells Fargo. The position with regard to Mr. Skachkov is less clear-cut and he may have been implicated in fraudulent conduct. However, there is no intention to join Mr. Skachkov to the English Action on the basis of the information revealed to date.

Executed this 6th day of December, 2024.

Eduardo Gonzalez Salceda Sanchez
Title: Vice President (Financial
Investment & Analysis) of Grupo Salinas

51

# EXHIBIT 1





# SECURITIES-BACKED FINANCING

**A Fixed Instrument, Collateralized Non-Recourse Facility**

## STOCK LOAN AGREEMENT



Astor Asset Management 3 Ltd

**STOCK LOAN AGREEMENT ("SLA")**
July 28, 2021    Guarantor  Borrower  Lender

This Stock Loan Agreement is established as of ~~July 14th, 2021~~ (the "Effective Date") between Astor Asset Management 3 Limited, a Canadian corporation, duly organized under the laws of Canada, with its office located at 777 Dunsmuir Street, Suite 1400, Vancouver, British Columbia, Canada V7Y 1K4 ("Lender") and:

Corporacion RBS SA de CV, a corporation with a principal place of business located at Ave. Ferrocarril de Rio Frio 419 A99, Cuchilla del Moral 1, Iztapalapa 09319 Ciudad de Mexico, Mexico (hereinafter "Borrower") and Ricardo Benjamin Salinas Pleigo, an individual with a principal place of business located at Cristobal Colon 79 INT C, Mexico 09360 (hereinafter "Guarantor"), mutually hereinafter and together with the Lender shall be referred to as the ("Parties").

This Agreement shall remain in effect until (a) fully satisfied and mutually terminated in writing upon mutual satisfaction; (b) all Indebtedness is paid in full and Borrower and Guarantor are released by Lender in writing; or (c) the Agreement is terminated in writing by Lender in accordance with the covenants and terms provided herein.

### WITNESSETH

STOCK LOAN AGREEMENT On this date, and from time-to-time hereafter, Lender may make Loans to Borrower, who's performance is guaranteed by Guarantor. Borrower and Lender (collectively, the "Parties") enter into this Stock Loan Agreement ("SLA") which, together with the applicable supplement(s) and other Loan Documents, shall govern each separate Loan and all indebtedness between the Parties and the subject Loan and Borrowers performance is unconditionally guaranteed by the Guarantor. Unless stated to the contrary elsewhere, the provisions of all Loan Documents are incorporated by reference herein as if stated in full. This SLA supersedes all previous term sheets, emails, representations, warranties and discussions and is the final documentation of the Parties' undertakings. For the value received, Borrower promises to pay Lender, all indebtedness governed by this Agreement. Nothing herein shall be construed to obligate Lender to restructure or renew any unpaid balance, forgive any part thereof, fund in full, or to make any additional or future loans or financial accommodations to Borrower.

**GUARANTEE AND SECURITY** In consideration of the Lender making available Loan facilities under this Agreement, the Guarantor hereby irrevocably and unconditionally guarantees to the Lender the due and prompt payment and discharge of Borrowers Obligations and undertakes that the Guarantor will on demand make good any Event of Default by the Borrower in payment or discharge of the Borrowers Obligations or any part thereof as if the Guarantor instead of the Borrower were expressed to be the primary obligor in respect thereof, together with interest and all other indebtedness expressed herein to be payable by the Borrower on the Borrowers Obligations under the Loan Documents until payment thereof in full and all other warranties, representations and covenants are satisfied to Lenders satisfaction and the herein Terms and Conditions.

**GRANT OF GUARANTOR COLLATERAL** Subject to the grant of Security Interest in the subject Collateral by the Guarantor, the Guarantor hereby unconditionally and irrevocably Pledges and grants to the Lender for the duration of the Loan Term and until all indebtedness of Borrower is fully satisfied and discharged, a Lien and Security Interest in and to Lenders right of set-off against the rights, title and interest in the three million five hundred thousand (3,500,000) publicly traded shares of **Grupo Elektra SAB DE CV** and known as ELEKTRA:MX (hereinafter the "Collateral") on deposit in favor of Lender with Weiser Global Capital Markets and the Guarantor

Astor Asset Management 3 Ltd

Pledges the Collateral as security for the prompt and complete payment and performance of Borrower when due, whether at the stated maturity, by Acceleration or otherwise.

**DEFINED TERMS WITHIN AGREEMENT**

1) "Acceleration Notice" shall mean a written notice given to Borrower and Guarantor after the occurrence and continuation of an Event of Default declaring all amounts and sums accrued and unpaid to be immediately due and payable, at which point the Loan is in state of Default.

2) "Advance" shall, for purposes of this Agreement refer to any sum of money and to any entry by said sub to any account of Borrower, or any third-party account, whether controlled by Borrower or not, if directed to do so by Borrower, for and on behalf of Borrower. All payments made to any third party for or on behalf of Borrower shall constitute as several having been made to Borrower.

3) "Agreement" shall mean this Stock Loan Agreement and (if any, supplements or attachments hereto, and other subsequent written agreements, which shall be incorporated by reference along with all amendments, modifications, and reinstatements thereof in written form. Emails are expressly excluded, are not binding, and are not to be construed to be of any agreement or modification.

4) "Approved Loan Amount" shall mean the maximum total amount the Lender is willing to fund to Borrower based on Pledged Collateral of Guarantor to be deposited with Depository Broker represented throughout as Loan Principal Amount or Principal. For purposes of this Agreement the Approved Loan Amount may be paid out in several draws or in lump sum.

5) "Balance Payment" shall mean the Loan Principal Amount less any Obligation, fees, or expenses, if applicable, not satisfied in cash by Borrower.

6) "Borrower" shall mean the corporate entity and the individual designated herein and/or other. For purposes of this Agreement.

7) "Breach" shall mean any of the Events of Default by Borrower or Guarantor pursuant to this Agreement and unless specified otherwise, other Loan Documents that constitute a default.

8) "Business Day" shall mean any day other than Saturday, Sunday, or a holiday observed as applicable laws.

9) "Cash Collateral" shall mean all the Loan Principal Amount to be funded to Borrower which at all times shall be computed by Lender and reflected in the Closing Statement. The Cash Collateral shall be the net amount to be funded, less fees and costs as stipulated in this Agreement and the Closing Statement and disbursed on the Closing Date.

10) "Closing Date" shall have the same meaning as Closing Date and used interchangeably throughout. Closing Statement is issued and thereafter the Loan Principal Amount is disbursed to Borrower. When Loan Principal Amount is disbursed in several tranches, in each case a Closing Statement will be issued. Erratic or unforeseen market conditions may warrant an unlikely issuance and delay in funding.

11) "Closing Date" shall occur after the Confirmation Day and shall mean the date on which the Closing Statement is issued and thereafter the Loan Principal Amount is disbursed to Borrower. When Loan Principal Amount is disbursed in several tranches, in each case a Closing Statement will be issued. Erratic or unforeseen market conditions may warrant an unlikely issuance and delay in funding.

| | Guarantor | Borrower | Lender |
|---|---|---|---|
| Initials: | | | |

v. 1.06.1020                Page 3 of 31        Initials: _____  _____  _____

Astor Asset Management 3 Ltd

12) "Closing Statement" shall mean a Lender issued and determined document which references final financial provisions, currency conversions and terms of the Loan prior to disbursement.

13) "Collateral" shall mean publicly traded securities of issuer (together with any split-up dividend payable to shareholder of record.

14) "Confirmation Day" shall mean the Business Day after the Pledged Collateral has been ready and valid in all respects to be registered as Pledged Collateral. The Depository Broker

15) "Confirmation Day" shall mean the Business Day after the Pledged Collateral has been received, settled and posted in favor of Lender at the Depository Broker and is adequately

16) "Cure Period" shall mean a period of time when a Party that breaches a contract can remedy the breach without penalty, provided a Cure Period is offered and stated as such. The Cure Period when provided as per this Agreement is five (5) Business Days.

17) "Currency" shall mean Mexican Pesos ("MXN") is Currency shall include the Loan, including all interest and fees thereof, and any funds transferred in this Agreement. If Pledged Collateral is a security that is priced and traded in a market and currency other than MXN, the Parties agree to convert to MXN for all purposes. Conversions to such currency shall be per the Lender's choice of Bank or those published by Yahoo Finance or comparable news source. Any conversions selected by the Lender's choice of bank the Borrower shall assume a 1.50% conversion rate computed according to the purchase of HSB exchange rate published by Banamex, if the Borrower elects to receive funding in Mexican Pesos.

18) "Depository Broker" shall mean a regulated financial institution selected by Lender within the custody of the securities, specifically the Pledged Collateral and any top-up. A Depository Broker is a firm that facilitates the custody of the Pledged Collateral acting as an intermediary between the Borrower, Guarantor and Lender and which will adhere to an executed Custodian.

19) "Effective Date" shall mean the date the Agreement is effective of the Pledged Collateral without Lenders prior written authorization. For purposes of this definition, Encumbrance shall

20) "Master Loan Agreement" means in accordance with all terms and conditions set herein this Agreement

21) "Encumbrance" shall mean Lender's legal claim on Pledged Collateral that affects the Borrower's ability to transfer ownership in anyway or dispose of the Pledged Collateral without Lender option written authorization. For purposes of this definition, Encumbrance shall mean lien, mortgage, charge, hypothecation, rehypothecation, rights, barter, pawn, trade, dispose, deal-in, pledge, re-pledge, repo, borrow or transfer of security interest in Collateral.

22) "Event of Default" with respect to this Loan or any, shall mean any of the events specified in Clause VI hereof in addition to any omission or failure to perform a legal or contractual duty as obligated, stated or outlined herein. An Event of Default will cause Acceleration of the Loan.

v.1.05.1020          Page 4 of 31          Initials:  ___  ___  ___
                                                    Guarantor  Borrower  Lender

v.1.05.1020          Page 4 of 31          Initials:  ___  ___  ___
                                                    Guarantor  Borrower  Lender

Astor Asset Management 3 Ltd

23) "Fair Market Price" ("FMP") shall mean the lower of, the average of the last sale price of the Pledged Collateral on three (3) consecutive Business Days prior to closing or recording of the pledge at the Transfer Agent or Depository Broker or the lowest trading price at Closing. The

24) "FMV" shall mean the amount, expressed in Mexican Pesos (MXN), equating to the FMP for the Pledged Collateral multiplied by the number of such shares pledged or transferred for lending purpose.

25) "Guarantor" shall mean the individual described herein and who either for purposes of this Agreement, who agreed to personally undertake and guarantee in all respects the full and faithful performance of Borrower and hereby agrees to Pledge herein described Collateral to render his/their total commitment as structured as an Investment and a Loan, resulting in a Hybrid Loan.

26) "Hybrid Loan" shall have the same meaning as a Loan with respect to purpose but shall

27) "Interest" shall mean the sum of money paid regularly at a particular rate for the use of money or a discrete charge imposed by Lender for all funds advanced to Borrower in a form of a Loan.

28) "Investment" shall mean that this Loan may be construed as a speculative Investment Borrower and Guarantor being considered a sophisticated professional investors, and both being aware of all the risks associated with making a major investment where the outcome is

29) "Investment Risk" means that unregistered or illiquid which is compensation which is a type of a speculative investment where the results and the outcome are both unprofitable and whereby the consequences could be materially negative. Borrower and guarantor are

30) "Lender" shall mean the corporate entity that has issued and distributed the shares of Grupo Elektra SAB DE CV (ELEKTRA;MX).

32) "Lender's Discretion" specifically that under described herein or construed any written or unless of this Agreement the Closing Date.

33) "Lender's Remedy" shall mean Acceleration of the Loan and Principal and the termination of the Agreement, specifically termination of the Loan and forfeiture of the Pledged Collateral per Clause VI.4 as provided herein, which may result in case of a default by Borrower in any

34) "Lien" shall mean any Encumbrance of any kind referenced herein concerning the Pledged Collateral of Guarantor. A lien is the Lender's right to retain possession of property belonging to Guarantor until a debt owed by that Borrower is fully discharged per this Agreement

**Astor Asset Management 3 Ltd**

35) "**Loan**" shall mean the total contractual gross amount computed together when proportionally Advanced or lent by Lender to Borrower on a nonrecourse basis for the specified duration and subject to the stated conditions. The Loan is funded based on FMP of the Pledged Collateral. For purposes of this agreement all fees and costs due to Lender shall fall within this definition

36) "**Closing Documents**" shall mean collectively, this Agreement or Custodian Manag_ _ _ _ Agreement, the Closing Statement and any other documents, instruments, exhibits, or statements delivered in connection with the Loan. Each to be read and construed _ _ _

37) "**Loan Principal Amount**" shall mean full or allotment of monies borrowed by Bor_ _ _ _ together they member to give meaning in effect to attribute growth loan to Value and as due and owed to the Lender. The Loan Principal Amount represents the Approved Loan Amount.

38) "**Loan-To-Value**" shall have the meaning provided in Clause II.6 herein _ _ _ _ _

40) "**Material Event**" shall mean any event or possible adverse event which may adversely alter value of Collateral or prejudice Lender's standing Lien.

42) "**Maturity Date**" shall have the meaning provided in Clause II.5 a herein.

41) "**Maturity**" shall have the same meaning as Maturity Date and used interchangeably.

43) "**Obligations**" shall mean any and all promises, commitments and requirements monetary or non-monetary by which one is legally bound and has a duty to perform as obligated itself herein.

44) "**Party**" or "**Parties**" (made up of Guarantor, Lender and Borrower) shall mutually, individually and collectively refer to one another as members of and to this agreement and their successors, affiliates and assigns. third party.

46) "**Pay-Off**" when capitalized the word means both Borrower Guarantor and the Borrower when other if Pay not capitalized shall refer to any other third party request the Pay-Off Amount of Lender in writing ten (10) Business Days in advance of the actual Pay-Off Date. The Pay-Off Amount shall be sent by Borrower to Lender by wire transfer in Mexican Pesos to a Lenders designated Depository Broker or Lenders commercial bank account at least three (3) _ _ _

47) "**Pay-Off Date**" shall mean the date determined by Lender on which Borrower will lend the Pay-Off Amount to Lender in exchange for Lender discharging the Lien over the Guarantors Pledged Collateral being held at the Depository Broker

Guarantor    Borrower    Lender

![Astor Asset Management 3 Ltd]

48) "Pledged Collateral" shall mean the total actual shares pledged by Guarantor to Lender as consideration for the Loan to Borrower and any shares or proceeds resulting from any transaction, split-up, revision, reclassification, or other like change that may take place in the Pledged Collateral during the Term of the Loan. The contemplated pledged securities of Guarantor being a gift or a purchase, instead being pledged to Lender for Loan purposes.

49) "Principal/Fund" shall in the same meanings as / Approved/Union/Amount/ are often used interchangeably.

50) "Security Interest" shall mean a written proof of a lien on real property as secured by Grantor in the Borrower's real property such as securities as Collateral for a Loan to Borrower. The Security Interest granted to Lender prevents the Guarantor from disposing or transferring the property or security granted to Lender prevents the Guarantor from disposing or transferring the property or

51) "Security Interest" shall mean a lien or Encumbrance granted by Guarantor to Lender in the real property such as securities as Collateral for a Loan to Borrower. The Security Interest granted to Lender prevents the Guarantor from disposing or transferring the property or

52) "Statement of Knowledge" shall mean any statements, representations or warranties which Borrower does not have disclosed that the Borrower and Guarantor, constructive or otherwise, whether Borrower or Guarantor knew or should have known or was expected to know.

53) "Term of the Loan" shall mean the period beginning on the first day when the Approved Loan amount is fully funded to the Borrower and ending on Maturity Date, calculated in years.

54) "Transfer/Assignment" shall mean the transfer of title or other transfer of ownership of shares by Issuer of securities.

56) "Underwriting" shall mean a discretionary and subjective credit qualification process using factors such as stock market dynamics, liquidity, earnings, public date by which Lender approves a Loan based on its risk management policy, Collateral in question and Borrower's ability to repay the Loan.

57) "Valuation Event" shall mean that the FMP of the Pledged Collateral has fallen to less than seventy percent (70%) of the FMP used to calculate the Loan Principal Amount as reflected by the average of the last sale price on three (3) consecutive Business Days on a national or international exchange. A Valuation Event may also be triggered by external market conditions or unreasonably expected to impact the securities of Issuer.

58) "CONSIDERATION" shall mean the right given to a shareholder of Issuer to allow shareholder to receive or purchase assets of corporate entity, or issuer before the Issuer/agreement equals to or exceeds the fair value of the consideration it is delivering to the other Party. In consideration of IN CONSIDERATION THEREOF: Each Party agreed that the fair value of consideration it is receiving has been received and will continue to receive under this Agreement equals to or exceeds the fair value of the consideration it is delivering to the other Party. In consideration of mutual promises provided or to be provided, and other good, valuable, sufficient, equitable consideration, and mutual covenants, the receipt of, adequacy and sufficiency of which is hereby acknowledged, exchanged, and satisfied by all and between all parties, and intending to be bound

# Aster Asset Management 3 Ltd

hereby the performance thereof, and such payments reasonably just, equitable, adequate and reasonable in value, the parties hereto covenant and agree to and stipulate. Consideration will include monetary and non-monetary exchanges, services, in-kind, of every nature and type and otherwise as well as other covenants which the Parties may choose to agree to exchange in the performance thereof. The parties hereto covenant hitherto . Consideration will , in-ind, of every nature and type , agree to exchange in the

performance thereof. The parties **SUBSTANTIVE TERMS OF THE LOAN**

## 1. Principal Amount.

a) Subject to and upon the terms and conditions set forth herein, Borrower, Guarantor and Lender hereby further set forth their rights and obligations to one another and Guarantor hereby grants to Lender Lien rights over the Pledged Collateral and in exchange, the Lender agrees to advance to Borrower a Loan consisting of funds up to **THREE BILLION EIGHT MILLION FIVE HUNDRED EIGHTY THOUSAND (3,008,580,000.00) Mexican Pesos (MXN)** (constituting the "Approved Loan Amount") at the Current FMV of the Pledged Collateral of: **Grupo Elektra SAB DE CV (ELEKTRA:MX)** subject to all the terms, covenants and conditions of this Agreement. The said sum represents the Loan Principal Amount and is advanced to Borrower not permanently, but temporarily for the duration of the subject loan Term. Funding of Loan Principal Amount will be initiated within one (1) Business Day of the Closing Day (the "Closing Day") and shall be memorialized by Lender's issuance of an executed Closing Statement. The Loan Principal Amount to be secured by Cash Collateral to be deposited by Lender into Borrowers account at the Depository Broker within twenty-four (24) hours of delivery of Pledged Collateral.

b) The Borrower shall be entitled to the appreciation, if any, of the FMV of the Collateral if the Loan is repaid in full by Maturity.

c) The amount that Lender may make available under Loan shall be calculated by multiplying fifty-five percent (55%) of the value of Pledged Collateral by the FMV.

## 2. Interest Rate.

a) All outstanding amounts of the Loan shall bear an interest rate in an amount equal to one and fifteen one hundredths of a percent (1.15%) per year to be paid to Lender in quarterly installments, as directed by Lender, by the issuance of payment statement in advance of due date Interest payment shall be collected in advance which command shall accrue daily from laelincl and after any default of the loan, demand, court judgment, be computed and any intervals calculated based on the actual number of days elapsed and on the basis of a year of three hundred and sixty-five (365) days (three hundred and sixty-six (366) days in a leap year)

b) All interest and principal must be paid by way of bank certified check, wire transfer or other immediately available funds without undue delay or further demand to address or bank account indicated herein, or as further may be directed by Lender. In Event of Default, to the extent permitted by applicable law, the interest rate on Loan shall be computed at a rate equal to one and one-half percent (1.5%) per month and shall continue until satisfied and owed by Borrower or released by Lender.

c) The first interest payment shall be subtracted from Loan proceeds at the time of the drawing. Further interest payments for the Loan shall be due timely on the first Business Day of each month following the Closing Date, and such payment schedule shall be based on twelve

Astor Asset Management 3 Ltd

months or calendar year, regardless of the actual number of days between the applicable Closing Date and the date such first interest payment is due.

(f) Any funds received on prepayment from or on behalf of the Borrower, shall be applied by Lender in accordance with the following: (i) first, if applicable, to all outstanding interest and fees; (ii) second, to fees and costs due to third-parties engaged by Lender to enforce covenant, and provisions of this agreement; (iii) third, to any outstanding Principal balance; and (iv) fourth,

3. **Loan Fees and Costs** received by Lender from the sale of Collateral in Event of Default to be returned to Borrower.

a) **Origination Fee.** Borrower shall pay to Lender an agreed upon Loan Origination Fee of one Principal Amount contemporaneous with the funding of the Loan by Lender, ("Lender's Origination Fee") to be paid to Lender. The Lender is authorized to deduct the 50% of the subject Origination Fee from Loan Principal Amount, with the balance

b) **Maintenance Fee.** Borrower on the 1st Anniversary of the Loan. The Lender is non-refundable and fully and twenty-five hundredths basis points (0.0625%) of the Loan Principal Amount ("Lender's Maintenance Fee"). The Lender is authorized to deduct the Maintenance Fee in advance from the Loan Principal Amount in the last period. It shall be immaterial to the Closing Statement and the same exact amount shall be paid by Borrower, automatically and

c) **Liquidated Damages.** If Borrower or Guarantor shall fail to deliver to us with in forty-two (42) days, if required, Pledged Collateral and/or the Depository Broker into the account of Borrower after both the duly signed Agreement and the Custodian Management Agreement is in place and has an Approved Loan Amount, then there shall be Liquidated. Damages are effective upon the execution of this Agreement by both Parties and shall be Lender's only claim against Borrower for damage as a result of Borrower's failure to deliver the Pledged Collateral and/or Depository Broker into the account of Borrower. The two percent (2%) Liquidated Damages applies only to Borrower's or Guarantor's failure to deliver the Pledged Collateral and does not apply to other Event(s) of Default, which is covered under Clause VI of this Agreement. This two percent (2%) Liquidated Damages if applied due to failure by

d) **Expenses.** Borrower agrees to pay all of Lender's reasonable costs and fees, including legal fees and out of pocket expenses that might arise in the course of Lender enforcing, collecting, defending, executing, and maintaining this Agreement. For the services provided, the Depository Broker's engaged in the performance of this Agreement are entitled to a nominal custodian management charge to be paid by Borrower based on the cumulative asset value of all Depository Account(s) at time of delivery of the Pledged Collateral and limited to fifteen hundredths of one (0.15%) percent. The annual custodian management charge is exclusive of any transaction fee, transfer fee, exit fee, or other administrative costs and fees which Depository Broker may possibly impose. Such fee shall be nonrefundable and shall be paid one (1) year in advance. First year's fee may be deducted from the Loan

Guarantor   Borrower   Lender

Initial: _____   _____   _____

Guarantor   Borrower   Lender

**Astor Asset Management 3 Ltd**

proceeds or charges to Borrower's account directly by the Depository Broker. In subsequent years, the amount shall be either the exact same one every year at least fourteen (14) days prior to the Effective Date to be remitted by Lender to Depository Broker.

4. **Additional Funds Amount:** In Lender the exact same into every year at least fourteen (14) days prior to the Effective Date to be remitted by Lender to Depository Broker. Amount of the same LTV as provided herein, at which time an amendment to this Agreement regarding the following whether the additional Lender increases the Loan Principal Amount of the same LTV provided therein, at which time the amendment to this Agreement. Funding additional may be at the Lender's will, as unrestricted. Lender will have sole discretion in determining whether to fund any additional funds in addition to the Loan Principal Amount.

5. **Early Prepayment:** The Pledged Collateral at the term of the written request by Borrower, only any loan this provision the more than lock every three (3) months in the Loan Term ("Lock-Up Period") unless any payments are to be received according to a **Early Prepayment:** There shall be no early prepayment of "Prepayment" Before completion of Principal Prepaid interest due under the Loan permitted during the first six (6) months of the Loan Term ("Lock-Up Period") unless any payments are to be received according to a Undisputed Collateral event on with written agreement from Lender. The Borrower may ask Borrower Principal Amount of a Loan Up Period, but shall be subject to a penalty of compromised (flat%) administrative and closure fee. Until resolved, the Lock-Up Period shall be extended in the event of Lender's inability due to regulatory constraints placed on the securities.

6. **Term and Maturity Date:** circumstance outside of Lender's control or remedies placed on securities.

a) **Maturity Date:** The Loan Principal Amount together with all accrued interest and fees shall be due and payable on ( ) years after the Loan Term begins and subsequently ends (the "Maturity Date"). The Borrower may extend the Maturity Date if the Lender agrees to do

6. **Maturity Date:** The Loan Principal Amount together with all accrued interest and fees and Extension if each shall be ( ) ( ) years after the Loan Term begins and subsequently ends (the "Maturity Date"). The Borrower may extend the Maturity Date if the Lender agrees to do does not respond to the amount of request (1% of the Loan Principal Amount per ten Business Days") shall be due and payable on the origination Maturity. Default the Lender and the Guarantor the Maturity Date at the same interest rate as the time of the extension. In the Agreement. Directs the of Principal Loan Principal Amount and other Obligations will the event. Will the shall send the Lender Maturity Date become will send a notice to Borrower and Guarantor advising Borrower that the Loan will terminate under the default provision of the

b) **Loan Completion:** No loan principal Amounts due on the very at Maturity Date become in operate. Borrower intends the Loan on by Lender Pledged Collateral Borrower intends to repay the Loan Principal Amount on the Maturity Date by requesting the Pay-Off Amount in writing and

b) **Loan Completion:** No later than fourteen (14) calendar days before the Maturity, within Three Business Days from on the Pay-off on by Lender in writing within three (3) business day before the Borrower Amount prior to Maturity Date by requesting the Pay-Off Amount. The Lender will Obligations Pay-Off Date and Lender shall provide the Pay-Off Amount in writing from within three (3) Business Days. No later than fourteen (14) calendar days before the Maturity Date.

7. **Loan Termination and Return of Collateral:** Loan due Principal Amount plus other Borrowers Obligations due on the Maturity Date in the Event of Default. Upon Event of Default, Lender will diligently and in good consistent disposal of Collateral in order to satisfy

7. **Obligations in Loan and Return of Collateral:** If the Agreement shall terminate and all Borrower's Obligations have been paid in full or in the Event of Default. Upon Event of Default, Guarantor will diligently Common good consistent disposal of Collateral in order to satisfy Obligations to Borrower and will sole Guarantor any excess stock. Lender continue own will maintain its full ability to cease and discharge the Lien and return the Pledged Collateral to Guarantor free of any Encumbrance within three (3) Business Days of Borrower's satisfaction Obligations. Provided, However, that the Agreement shall be reinstated if any payment

Astor Asset Management 3 Ltd

in respect of the Loan's Obligations is rescinded, invalidated, declared to be fraudulent or preferential or otherwise required to be voided or returned by Lender for any reason. A return of identical securities means a return of the Pledged Collateral as modified as a result of any split-up, revision, conversion, reclassification, declaration, or other change of the Pledged Collateral. Any cash or shares tendered to buy down the Loan as a result of a Valuation Event are subject to redelivery and shall become part of the Pledged Collateral to be returned to Guarantor.

8. **Closing.** The Closing Date in most cases will be no later than one (1) Business Day after the Confirmation Day, provided the conditions to Lender's Obligations as outlined in Clause V herein are satisfied and the written receipt by Lender of a Confirmation that the Pledged Collateral has been deposited and verified with the Depository Broker in a form and manner satisfactory to Lender and its counsel. The balance payment ("Balance Payment") shall be paid within one (1) Business Day of Closing. Delivery of the Balance Payment shall be paid to the Borrower's account at the Depository Broker or to an account of Borrower at a commercial bank account per the following instructions outlined in Schedule B attached to the back of this Agreement.

## III.    LOAN AND COLLATERAL FEATURES AND ATTRIBUTES

1. **Non-Recourse Loan.** Lender agrees that it will at all times look only to the Pledged Collateral of Guarantor identified in this Agreement for payment of Borrower's Obligations and will not make any claim or institute any action or proceeding against Borrower or Guarantor or any representatives, agents, successors, assigns, or affiliates of Borrower or Guarantor for any deficiency remaining after applying the Pledged Collateral to any sums due Lender. This is a Non-Recourse loan except for the provisions provided under Clause II.3.c of this Agreement.

2. **Due Diligence.** Lender has the right but not the obligation to perform enhanced due diligence on the Pledged Collateral and the Borrower and Guarantor shall fully cooperate.

3. **Material Information.** Borrower and Guarantor have disclosed any and all relevant and material information regarding the Pledged Collateral and of the Issuer and all such relevant and material information has been disclosed and provided by Borrower and Guarantor to Lender. During the Loan Term, Borrower and Guarantor will continue to voluntarily provide all such relevant and material information to Lender and not withhold information deemed to be Material.

4. **Depository Broker.** Lender shall have the exclusive right to appoint a Depository Broker which will provide custody for the Pledged Collateral through a known global bank.

## IV.    BORROWER'S WARRANTIES AND OBLIGATIONS

Borrower represents and warrants to Lender that:

1. **Accredited Investor.** Borrower is a "professional accredited investor" as may be defined by ordinance of Borrower domicile, the jurisdiction of securities Issuer or jurisdiction of Governing Law of this Agreement.

2. **Announcement.** Neither Lender nor Depository Broker assumes any responsibility or warranty for filing on behalf of Borrower or Guarantor regulatory announcement(s) that are or may be

Page 11 of Guarantor re _____    Initials:

| Guarantor | Borrower | Lender |
|---|---|---|

**Astor Asset Management 3 LLC**

required by the laws, rules, and regulations of any securities regulatory authorities or agencies that may have jurisdiction over such transactions with respect to the securities including without limitation, loan transactions in which the securities are pledged as collateral. Borrower and Guarantor acknowledge and agree that as a condition for the closing of the loan transaction described in this Agreement, Borrower and Guarantor shall comply with such laws, rules, and regulations, and assumes all such responsibilities and liabilities, including liability for all legal, administrative, and any and all other costs and expenses associated with making and filing all regulatory announcement(s). In the event Borrower or Guarantor fail, refuse or does not timely fulfill its regulatory announcement/Disclosure obligations described in this Section, then in addition to any and all other remedies available to Lender and/or Depository Broker on account of Borrower's or Guarantor's non-compliance, Lender or Depository Broker may, in their sole and absolute discretion, prepare, file and publish any and all regulatory announcements that either of them may deem to be necessary and/or appropriate in such jurisdictions that Lender or Depository Broker determine to be necessary and/or appropriate including without limitation in Borrower's or Guarantor's country of residence or domicile. In such event, and notwithstanding any confidentiality or other provisions in this Agreement or any other documents or agreement among the parties, Borrower or Guarantor may publish and/or file regulatory announcements that include, without limitation, a disclosure of Guarantor's Pledge and the number of shares that Guarantor Pledged pursuant to this Agreement, the current disposition of the securities, any party's purchases, sales, conversions, holdings, and exits from such holdings, changes of beneficial or legal ownership of the securities, changes involving successors-in-interest to the securities, repayment of loan principal in whole or in part and termination of the loan, and proxy and other filings involving voting or other control and management of the securities of the issuer and/or other related matters required by the governing securities authority or agency.

3. **Depository Broker.** Both Borrower and Guarantor hereby affirm to fully abide by the Terms and Conditions of the Depository Broker and if there is any inconsistency between this Agreement and the Terms and Conditions of the Depository Broker, then the Terms and Conditions of the Depository Broker will prevail over this Agreement fully abide by the terms.

4. **Full Disclosure.** Borrower and Guarantor further represents and warrants that all statements and documentation it has provided to Lender directly and/or through its agents in connection with this Agreement are true, complete, and do not omit any material facts or information, which if provided, would have impacted Underwriting prudence. Borrower and Guarantor consent to provide to Lender any and all relevant material identification and/or information necessary for any Lender to conduct a prudent risk assessment evaluation of Issuer, Guarantor and Borrower.

5. **Knowledge.** None of the rights of Guarantor arising as the legal and beneficial owner of the Pledged Collateral have been surrendered, cancelled or terminated. Guarantor has no knowledge of any material non-public information inside information or similar terms as defined by applicable law with respect to governing the Issuer, which has not been either disclosed to Lender or the public surrendered, cancelled or terminated. Guarantor has not been surrendered.

6. **Intentionally left in blank.**

7. **Liens, Reliance, and Cooperation.** As of the date of this Agreement, the securities constituting the Pledged Collateral are owned by Guarantor free and clear of any Lien, Encumbrance or contractual statutory, or regulatory limitation or restriction of whatever nature, are in good standing in accordance with their country of issue, and are freely tradable and transferable securities that Guarantor hereby represents are freely tradable and transferable securities.

Initials
_____   _____
Guarantor   Borrower

Page 1.

_____
Guara

Aton Asset Management E.Ltd

interest as a Lien and Encumbrance rights to Lender in exchange for Borrower receiving a Loan. Borrower and Guarantor further represent and warrant that they have not relied on, and that Lender has not made any representation, advice or recommendation with respect to securities, either directly or through Prohibition.

Neither Borrower nor Guarantor have relied on any marketing materials or any other written or oral statements of fact or otherwise made by anyone prior to entering into this agreement, and any such materials and/or statements or representations, if any, written or oral, shall be purged from existence as in no event are all previous agreements, representations, statements both written or oral, express or implied with respect to subject matter hereof, are superseded by this Agreement and hereby merged into this Agreement. It is encumbent upon Guarantor to initiate and facilitate the transfer of the Pledged Collateral. Borrower and Guarantor will cooperate in executing documents provided by Lender, and the Depository Broker, and clearinghouse/registry as requested by Lender, Depository Broker, applicable laws and regulations. Borrower and Guarantor shall, to the extent they shall cooperate to facilitate this Loan transaction in a timely manner. Borrower, and clearinghouse/re

Borrower and Guarantor represent, warrant, and covenant that they understand that securities borrowing is highly speculative and requires sophistication and that Guarantor may lose and forfeit the Pledged Collateral when Pledging Collateral in margin borrowing. Guarantor should only attempt a margin borrowing to Guarantor if Guarantor is sole of the potential losses, is a highly speculative securities investor, is an accredited professional investor and has ability to employ management strategies in place in the event of margin call or any other warranty, representation or action of Lender or claimed performance of Pledged Collateral.

8. **Necessary Filings.** Borrower and Guarantor warrant and concede that any necessary announcement associated with this Agreement is the sole responsibility of the Borrower and Guarantor, and that both Borrower and Guarantor will comply with all requirements of local securities regulatory authorities and any outstanding with each announcement and the sole responsibility of the Borrower and Guarantor. Lender is not responsible for filing any necessary reports for or on behalf of the Borrower or Guarantor, but Lender may, to do so in order to comply with regulations imposed to associate.

9. **Notification to Lender.** Upon occurrence of any of the foregoing events or when Lender shall occur, the Borrower or Guarantor shall promptly inform Lender in writing if any Borrower or Guarantor has filed for bankruptcy or filed any petition seeking creditor protection, (i) any creditor of Borrower or Guarantor has taken legal action against Borrower or Guarantor to recover debts owed by any Borrower has sought or is threatening to seek confirmation or garnishment of property of Borrower or Guarantor. Absent of the preceding events, Borrower and Guarantor will once a year, on each anniversary of the Effective Date, submit a written attestation to Lender representing that (to the best of Borrower's knowledge) none of the preceding events had taken place.

10. **Waiver.** Borrower and Guarantor will not take any suit in action against third parties or affiliates who may be acting on behalf of or for the Lender within the scope of this Agreement. Any dispute or controversy with third parties arising from this Agreement will solely be limited to this Agreement which must be resolved in accordance with the dispute resolution provision of Clause VII herein. It is hereby agreed that third parties, such as the Depository, Transfer Agent, referral sources or other affiliates, agents for assignees of Lender facilitating the scope of this Agreement are hereby acknowledged, released, forever discharged and absolved from any claim.

Astor Asset Management 3 Ltd

Event of Default injunctive relief any remedy and right of redemption are hereby waived by the Borrower and Guarantor, and neither the Borrower nor Guarantor will assert any right or claim against the forfeited collateral transferred to Lender as a result of an incurable Event of Default. During the pendency of this Loan, neither the Borrower nor Guarantor will seek injunctive relief or interference from any court of law, regulatory body, Transfer Agent, custodian, sub-custodian, Depository Broker, central depositories or stock exchange requesting to invalidate, suspend, limit, impede, terminate or restrict this Agreement or freeze the shares. Injunctive relief by Borrower or Guarantor or any interference by Borrower or Guarantor, central depository or regulatory agency shall be an incident and an incurable Event of Default. Neither Borrower nor Guarantor will interfere in any way or challenge the validity or enforceability of this Agreement (Guarantor) there shall be a breach thereof. Guarantor, central depository or regulatory agent;

Neither Borrower nor Guarantor will interfere in any

11. **Suitability.** Both Borrower and Guarantor have carefully considered, and have discussed with their own respective professional legal, tax and financial advisers, the suitability of this Agreement and Investment Risk associated with it and have fully considered for purposes of this Loan the risks of this Investment, and understand that (i) this Loan is an Investment and is suitable only for an investor who is able to bear the economic consequences of losing its entire Investment, (ii) the margin loan backed by the Securities is a speculative Investment which involves a high degree of risk with there is a lack of predictability in final loan amount, (iv) potential forfeiture of the Collateral, (v) that there are various unforeseen financial implications, independent and dependent on actions of Borrower or Guarantor in the continued fluctuating and final value of the Collateral (vi) Guarantor's inability to liquidate amount the Collateral and its adverse value.

of Borrower or Guarantor has

anties

## V.    LENDER WARRANTIES AND REPRESENTATIONS

Lender represents and warrants to Borrower that:

1. **Best Efforts Approach.** Despite stock market volatility, erratic trading volume, and pricing fluctuations, best efforts will be employed by Lender to facilitate the funding of the Loan in its entirety for the full Approved Loan Amount, in accordance with this Agreement and as contemplated herein by both Parties. Lender will not act in bad faith at any time during the Term of the Loan.

entirety for the full Approved Lo       mount in accordance with this Agreement and as

2. **Cash Collateral.** The lender will deposit Cash Collateral into Borrowers designated account at the Depository Broker which shall coincide with Loan Principal Amount to be funded and released to Borrower at Closing upon execution of the Closing Statement.

into Borrowers

3. **Dividend Distributions.** Lender will credit the Guarantor/Company, and all dividends declared or credited to the Lender. If dividends are not received from the Guarantor's account at the Depository Broker, then Guarantor is not entitled to any to be credited, Lender shall credit Borrower for all dividends received on behalf of Guarantor if any, all Maintenance loan to be subtracted from outstanding principal balance. No dividends will be credited to Borrower or Guarantor if the issuer does not pay them to the Depository Broker for any reason whatsoever. Dividends may not be used to offset any sums due to Lender prior to Loan Maturity unless required as advance to Borrower on outstanding principal Loan

4. **Dealing with Securities.**

e due to Lender prior to Loan
Lender in writing

Astor Asset Management 3 Ltd

a) The Borrower and Guarantor acknowledge and agree that upon the transfer of the Pledged Collateral to the Depository Broker by the Guarantor, the subject Pledged Collateral will (i) have been given value by the Lender for the use of the Pledged Collateral, for purposes of determining Fair Market Value ("FMV"), in establishing that the Lender has Lien and Encumbrance rights in the Pledged Collateral, (ii) including the power to transfer rights in such Pledged Collateral, as may be contemplated by Lender in accordance with the terms of this Agreement.

b) During the Loan Term, provided that there has not been an Event of Default, the Lender will not sell or short-sell the shares of the Pledged Collateral on any publicly traded securities exchange. However, upon the occurrence of an incurable Event of Default, the Lender reserves the right to dispose of the Collateral for any publicly traded securities exchange and is not obligated in doing so.

c) [illegible]

d) The Lender will not engage in short-selling the Pledged Collateral by borrowing the shares of a third party from any entity or person and later buying the shares in the same security, then returning the borrowed shares in an effort to make a profit.

5. Order of Payment: Payments received from sale of Collateral upon Event of Default will be applied in the following order: (i) firstly, to all outstanding Principal balance, interest and fees, (ii) second, to any costs and fees charged by Custodian to Lender, and (iii) lastly, to any access proceeds of sale of Collateral to be returned to Guarantor. Notwithstanding the foregoing, in case of an incurable Event of Default, nothing contained herein shall obligate the Lender to maximize sales proceeds, sell at market, or any specific platform or exchange, or transfer shares to provide accountability for the forfeited Collateral or to quantify the return to Borrower or Guarantor remaining balance of any proceeds. Incurable Event of Default will Lender request the Depository Broker to transfer the securities in the Guarantor's account to

6. Transfer of Securities: The Lender will not transfer the securities to the current account unless an incurable Event of Default has taken place. Only upon an incurable Event of Default will

7. Fulfilling Guarantee Deposit by Broker Remands the securities in the Guarantor's account to Lender's sole and total control and custody in order to satisfy Obligations of Borrower and upon Closing Date. If the Lender or the Depository Broker fails to release the stated funding partially or in

7. Fulfilling Guarantee and Borrowers Remedy. The Lender guarantees to begin funding the stated loan (such the Approved Loan Amount within one (1) Business Days from the Closing Date, (if the Lender or the Depository Broker fails to release the stated funding partially or in full within five (5) Business Days of Closing Date, then Borrower shall have the right to terminate this Agreement provided that the shares owned in form and manner in full in escrow once the Approved Loan Amount of the conditions stipulated herein have been met, shares are not restricted, are free-trading and neither Borrower nor Guarantor interfered with the Depository Broker or central depository trading of the Issuer shares where an Unfavorable force majeure event that may have interfered or prevent Lender nor Guarantor for two (2) times the amount of the Pledged Collateral on deposit at the Depository Broker.

Should Lender fail to return to Guarantor the Pledged Collateral within five (5) Business Days of receipt of Pay-Off Amount, the Lender shall be liable to Guarantor for two (2) times the amount of the Pledged Collateral on deposit at the Depository Broker.

Astor Asset Management 3 Ltd

**8. Voting Rights.** Lender represents that it will fully cooperate with the registered owner of the securities of issuer on exercising the Voting Rights on issues brought by the Issuer before its shareholders and the Lender will either instruct the Depository Broker to vote on behalf of registered owning the liabilities on issues brought by the registered owner will vote on behalf of registered owner. Should the registered owner request that Lender vote on behalf of the registered owner, the registered owner may assign in writing the Voting Rights to Lender and Lender will agree to accept such Voting Rights from the registered owner. However, in no event will the Lender be liable in any way to Borrower or any third party as a result of any voting rights restriction.

**1. Conditions Precedent.** The obligation of the Lender to fund the Loan is subject to the fulfillment of the following conditions precedent to (the satisfaction of Lender): (a) The delivery of duly executed Stock Loan Agreement, Closing Statement, Custodian Management Agreement (CLM) for submission of all matters, facts, representations, and communication, announcements, filings, due diligence, regulatory compliance, or instruments in connection with Pledged Collateral Issued and that Loan have been met and are for loan and substance satisfactory to Lender's compliance, underwriting team, Global Custodian and Intermediary Custodian, as well its counsel; (c) the delivery of the work in electronic form to Lender's.

**2. Valid Transactions and Events of Default.** In order for the transaction to be completed to Maturity by the Borrower, the Borrower and Guarantor must fulfill in the performance of and observance of any covenant, representation, provision or agreement contained herein and.

**3. Observance** of any covenant, representation, provision or agreement contained herein and not default in any other loan document or provision.

a) Borrower is obliged to remedy the following matters or cure unfulfilled orders to avoid to with in breach of the Loan or any other than Agreement Amount when due, or any other default in the performance of an obligation that is not cured within the applicable Cure Period;

a) Failure by Borrower or Guarantor to pay the interest and all applicable fees or charges when due, according to the terms of the Approved Loan Amount which dues for any other balance default which performance of a distinct obligation that is not fulfilled within the applicable Cure Period once on three (3) Business Days by the securities exchange (the "Margin-Call"). If this occurs, then the

b) If the Collateral has fallen to less than seventy percent (70%) of the Fair Market Price ("FMP") of the Loan Amount published by the average of the closing price on three (3) Business Days by the securities exchange (the "Margin-Call"), if this occurs, then the Borrower will within five (5) Business Days and without further number FMP, automatically transfer to the Depository Broker a top-up of shares at least equal to twenty percent (20%) more than the FMP and cure the deficiency. Hereinafter a new FMP is established as seventy-five percent (75%) of the original FMP. There will not be opportunity to cure if the Pledged Collateral falls

c) By more than sixty percent (60%) of FMP, as FMP as Lender will sell the securities to satisfy the Loan Obligations and terminate the Agreement with no further recourse to Borrower

d) If the class of securities provided as Pledged Collateral is delisted or trading is halted for five (5) or more Business Days by a regulatory agency or otherwise prove to have been knowingly untrue, omitted or misleading in any material respect.

d) If any representation or warranty made by Borrower or Guarantor in this Agreement or in any statement furnished in contemplation of obtaining a Loan shall prove to have been knowingly untrue, omitted or misleading in any material respect.

Guarantor    Borrower    Lender
Initials: _____ _____ _____
Guarantor    Borrower    Lender

Astor Asset Management 3 Ltd

e) If any of the Loan Documents shall at any time after their execution and delivery for any reason cease to be in full force and effect or shall be declared invalid, null or void or the validity, obligations hereunder or enforceability thereof shall be contested, repudiated.

e) that in effect or challenged by Borrower or Guarantor or its agents or counsel or by any other person or entity acting on behalf of either Borrower or Guarantor; validity, obligations hereunder or enforceability ther

f) A governmental agency which controls the actions of Issuer has commenced an investigation of the Issuer;

g) A Material Event upon the financial condition of Borrower, Guarantor or Issuer;

h) The Issuer is seeking or applied for an extension in which to file the required regulatory reports; financial condition of Borrower, G;

i) An incurable Event of Default occurring in any other Loan between Lender and Borrower.

4. **Lender's Remedy.** If the Obligations aforementioned are not met, the Lender's remedy shall include and not be limited to any course of action against Borrower and Guarantor for Breach of this Agreement, including the occurrence of any of the foregoing Event(s) of Default. If not cured within the designated Cure Period, and if applicable, shall terminate the Stock Loan Agreement, result in Acceleration of all of any amounts, interest, costs, expenses, and fees due thereunder, and cause forfeiture of the Guarantor's Pledged Collateral; any and all excess proceeds of the sale of Collateral in Event(s) of Default will be returned to Guarantor.

Notwithstanding the above, in case of an incurable Event of Default, nothing contained herein shall obligate or create any duty upon the Lender in any way to apply the proceeds of any sale of the Pledged Collateral to the Loan Principal or against any other Obligation of Borrower or Guarantor or to return remaining balance or proceeds related to the liquidation of any such Pledged Collateral, to maximize sales proceeds, sell the Pledged Collateral in the market or at any specific price, or in any specific order, or on any specific day or to provide accounting or accountability with respect to the disposition of the Pledged Collateral as a result of an incurable Event of Default. There is no duty owed or implied to Borrower or Guarantor by Lender to maximize the sale of Pledged Collateral upon incurable Event of Default.

5. **Market Conditions.** If the Pledged Collateral experiences a Material Event or Weakening Event, Borrower's or Guarantor's lack of cooperation, restriction or material change in area prior to or post-funding, the Lender will have the right to cease the funding of the Loan or amend the Underwriting criterion, until such circumstances are dissipated and correct, or adjust funding based on new Underwriting criterion.

amend the Underwriting criterion.

## VII.   GOVERNING LAW, JURISDICTION.

a) This Agreement and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement and the transactions contemplated hereby shall be governed by, and construed in accordance with, the laws of England and Wales, controversy, c

b) Each party hereto irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind whatsoever, whether in law or equity, or whether in contract or tort or otherwise, against any other party hereto in any way relating to this Agreement or the transactions contemplated hereby, in any forum other than the courts of England and Wales, and any appellate court from any thereof. Each of the parties hereto irrevocably and

Guarantor/its Borrower irrevocably a

Astor Asset Management 3 Ltd

unconditionally submits to the exclusive jurisdiction of such courts and agrees that any such action, litigation or proceeding may be brought in any England and Wales court to the fullest extent permitted by applicable law. Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding, subject to any permitted appeal, shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

c) Each party hereto irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court referred to in Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

d) Irrespective of any outcome of any such legal proceeding, the Lender will be awarded all of its reasonable legal fees and costs in enforcing, collecting, defending, executing, and maintaining this Agreement.

## VIII.  INDEMNIFICATION AND LIMITED LIABILITY RELEASE

1. Lender will not be liable for any indirect, incidental, special, punitive, opportunity loss, or consequential damages, forgone or speculative profit, including loss of revenue or profits or losses arising from Lender's performance under this Agreement. However, the Borrower and Guarantor will be liable for Lender's recovery, speculative profit and opportunity loss when Borrower or Guarantor willfully obstructs or delay's Lender's recovery and enforcement efforts. Borrower and Guarantor agree to indemnify the Lender, each legal entity, if any, who controls, is controlled by or is under common control with the Lender, and each of their respective directors, assignees, officers and employees (the "Indemnified Parties"), and to hold each Indemnified Party of Lender harmless from and against any and all claims, damages, losses, liabilities and expenses (including all fees and charges of internal or external counsel with whom any Indemnified Party may consult and all expenses of litigation and preparation therefor) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority (including any person or entity claiming derivatively on behalf of Borrower or Guarantor), in connection with or arising out of or relating to the matters referred to in this Agreement whether (a) arising from or incurred in connection with any breach of a representation, warranty or covenant by the Lender, or (b) arising out of or resulting from any suit, action, claim, proceeding or governmental investigation, pending or threatened, whether based on statute, regulation or order, or tort, or contract or otherwise, before any court or governmental authority. The indemnity agreement contained in this Section shall survive the termination of this Agreement, payment of any amounts hereunder and the assignment of any rights hereunder       to

2. Neither Borrower nor Guarantor will not hold Lender, its agents, directors, shareholders, assignees, Depository Broker or other known and unknown persons responsible for any fluctuations or depreciation in the value of the Pledged Collateral that Guarantor may experience during the pendency of Loan. Borrower and Guarantor agree to indemnify Lender for and to hold Lender harmless from, any loss or expense that such Borrower or Guarantor may sustain or incur as a consequence of default by Borrower or Guarantor and making a borrowing. This covenant shall survive the termination of this Agreement.

Initials:

Guarantor      Borrower      Lender



Astor Asset Management 3 Ltd

IX.    GENERAL PROVISIONS

1. **Amendments.** Amendments to this Agreement (including the adding or updating of any annexes, appendices, or schedules) will not be enforced unless such amendment is in writing and signed by authorized signatories on behalf of both Parties and added as an Addendum, with the exception of either Party informing the other of change of name, address and only entering such change is sufficient. Electronic email exchanges will not modify this Agreement. No amendment, modification or waiver in respect to this Agreement will be effective unless in writing evidenced by a facsimile transmission and executed by each of the Parties.

2. **Assignment.** This Agreement, its equities, and Obligations shall be freely transferable, pledge-able or assignable in whole or in part as the Parties may see fit or as may be in their best interest. Any transfer or assignment action by either Party shall be followed up by written notice to the other Party.

3. **Balance of Equities.** In the event that this Agreement is reviewed, interpreted or evaluated by any judiciary body or arbitration tribunal in assessing the balance of equities based on this Agreement and law, notwithstanding any of the other terms within this Agreement, the arbitration tribunal in assessing the balance of equities based on this Agreement and law, notwithstanding any of the other terms within this Agreement, the

4. **Clause of Redemption.** This Agreement is not a mortgage and will not be construed as a mortgage by the Parties or any tribunal or court of law. This is a hybrid Loan requiring an Investment through Pledge of Collateral by Guarantor. In case there is an Event of Default neither Borrower nor Guarantor shall have equity of redemption or right to redeem the Pledged Collateral and no Decrable. Event of Default shall be construed as an equity or equity of redemption or right to forfeiture of the Pledged Collateral will not be absolute and supersede as Pledged Collateral. No provision of this Agreement on any Clause of Lender upon an unusable Event of Default will be construed as a clog or equity of redemption and Lenders right to forfeiture of Pledged Collateral is absolute and final. Guarantor shall be able to redeem

5. **Confidentiality.** This Agreement is in its truest construction and is not to be reproduced in any manner whatsoever for persons other than the Parties hereto. Specifically, each Party agrees to maintain the confidentiality of the business, trade, finances, and methods ("Confidential Information") of the other Party and non-disclose the Confidential Information to any persons other than those whose knowledge is essential for the performance of this Loan. Lender will not reveal the existence of this Agreement to the media or any regulatory body or government agency unless ordered to do so. If it found that Lender may reveal the contents of this Agreement to defend Lender's dignity and reputation and dispel incurred public information about the subject transaction. A default under this Agreement by the Borrower or Guarantor will deem this clause invalidated. The Parties acknowledge that the existence and the terms of this Agreement and any oral or written information exchanged between the Parties in connection with the preparation and performance of this Agreement are regarded as confidential information. Each Party shall maintain confidentiality of all such confidential information, and without obtaining the written consent of the other Party is prohibited to disclose any relevant confidential information to any third parties, except for the information that (a) is or will be in the public domain (other than through the receiving Party's unauthorized disclosure); (b) is under the obligation to be disclosed pursuant to the applicable laws or

Guarantor    Borrower    Lender

Astor Asset Management 3 Ltd

regulations, rules of any stock exchange, or orders of the court or other government authorities; or (ii) required to the disclosed by any Party to its shareholders, investors, legal counsels or financial advisors regarding the transaction contemplated hereunder, provided that such shareholders, investors, legal counsels or financial advisors regarding the transaction contemplated hereunder are bound by the confidentiality obligations similar to those set forth in this Section. Disclosure of any confidential information by the staff members or agencies hired by any Party shall be deemed disclosure of such confidential information by such Party, which Party shall be held liable for such disclosure.

6. **Consideration.** This Section shall survive the termination of this Agreement for any reason. There shall be no argument or defense raised at any time that Consideration is in any way insufficient or was not made. For purposes of this provision Consideration will include Lender coordinating, arranging, advising as well as agreeing to

7. **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement regardless of number in existence or distribution.

8. **Cross-Default.** A default in any other loan will cause an incurable Event of Default in this

9. **Depository Broker.** The Depository Broker reserves the right to custody and sub-custody the Agreement Collateral to any licensed financial institution in accordance with its Terms & Conditions.

10. **Enforcement of Clauses.** If any arbitrator, court or other party determines that any term, phrase, clause or provision in this Agreement is in conflict with or contradicts any of its other terms, phrases, clauses, or provisions, then this Agreement shall be allowed to be amended by Lender by modifying or striking the contradictory term, word, phrase, clause, covenant or provision such that the Agreement and remaining provision and covenant is deemed to be

11. **Entire Agreement and Merger Clause.** This Agreement represents the entire Agreement between the Parties hereto and is legally binding upon them as of the date of the execution hereof. There were not and will be any oral, written or electronic modifications other than written Addendums duly executed by both Parties, which will supersede the Agreement and no final written or electronic notations or modifications other than written Addendums executed by both Parties are enforceable, and all previous known and unknown statements and promises, written or oral are hereby merged in to this Agreement. This Agreement shall be

12. **Errors and Omissions.** Borrower and Guarantor expressly agree and acknowledge that they had reasonable opportunity to obtain their assistance of its own counsel to fully review and participate in the negotiation and revision of any of the terms, provisions, covenants representations, warranties and conditions of this Agreement prior to its execution and the decision of whether or not to seek advice of counsel with respect to this Agreement is the

responsibility of Borrower and Guarantor. Therefore, under no circumstances shall Lender be liable to Borrower or Guarantor for any errors or omissions in this Agreement that may be disadvantageous to Borrower or Guarantor, or which may result in claims of actual or alleged [illegible]

Astor Asset Management 3 Ltd

responsibility of Borrower and Guarantor. Therefore, under no circumstances shall Lender be liable to Borrower or to Guarantor for any errors or omissions in this Agreement that may be disadvantageous to Borrower or Guarantor, or which may result in claims of actual or [illegible] Guarantor [illegible] to Borrower [illegible] Borrower and Guarantor further [illegible] acknowledges that any errors or omissions in the Agreement shall not [illegible] in favor of the Lender after this Agreement is fully executed by both parties. Borrower and Guarantor fully and completely waive all rights to [illegible] any such errors or omissions [illegible] seek redress against Lender for any such errors or omissions, whether by arbitration [illegible] or any other equitable remedy. In addition, if Borrower, Guarantor or anyone on [illegible] makes a demand or claim for liability against Lender that arises out of, results from, or relates in any way to any such error or omission in this Agreement, Borrower and Guarantor shall [illegible]

13. Indemnify. Defend and hold harmless Lender from any such liability which may be incurred [illegible] the result of such [illegible] are not expressly stated herein. Notwithstanding anything to the contrary contained in this [illegible]

13. Fiduciary Duty: This Agreement is not intended to create [illegible] of the Parties that there is a fiduciary or trustee duty [illegible] similar concepts [illegible] are not expressly stated herein. Notwithstanding anything to the contrary contained in this Agreement, [illegible] or otherwise applicable [illegible] of law or equity, neither Party shall be liable to the other for any [illegible] implied covenant of good faith and fair dealing and the same is expressly excluded. Any fiduciary or trustee duty whatsoever to the other is hereby irrevocably disclaimed [illegible]

14. Force Majeure: [illegible] perform its Obligations under this Agreement to the extent such performance is hindered, delayed or prevented by Force Majeure (except for failure to make payments hereunder). If [illegible]

14. Force Majeure: Lender will not be liable to the Borrower and/or Guarantor for failure to perform any of its Obligations under this Agreement to the extent such performance is hindered, delayed or prevented by Force Majeure (except for failure to make payments hereunder). If Lender is unable, in whole or in part, to carry out its Obligations under this Agreement due to Force Majeure, it must provide notice to the Borrower and Guarantor. [illegible] given [illegible] written notification with reasonably full particulars of the event or occurrence [illegible] as soon as reasonably possible. If Lender will claim Force Majeure, it will promptly give written notice to the Borrower and Guarantor of the termination of such Force Majeure event [illegible] performance of any [illegible] obligation [illegible] as reasonably possible after termination of such Force Majeure. For purposes of this Agreement, "Force Majeure" will mean causes, conditions, events or circumstances which are beyond the reasonable control of the Lender claiming Force Majeure. Notwithstanding any provision of this Agreement, Lender shall not be liable for its inability in performing any of its Obligations hereunder if such inability is caused by [illegible] reasonable control ("Force Majeure Event"). For the purposes of this Clause, a Force Majeure Event shall include, without limitation, inability or delay in performance caused through [illegible] [illegible] degradation in stock value [illegible] market crash, illiquidity of the stock, Borrower's or Guarantor's lack of [illegible] adverse financial market conditions [illegible] damage, storms, [illegible] electronic malfunction, acts or omissions of telecommunication carriers, acts of government or other regulatory authority, acts or omissions of [illegible] bodies in which Lender [illegible] thereby is not responsible, and any other circumstance beyond the reasonable control of the Lender which may possibly undermine the Pledged Collateral or [illegible] Issuer. Force Majeure applies only to Lender and does not apply to Borrower, nor shall excuse Borrower from complying with terms of this Agreement.

15. Intentionally left in blank.

Initials: ______ Guarantor ______ Borrower ______ [illegible]

v. 1.06.1020 Page [illegible] of [illegible]

Initials: ______ Guarantor ______ Borrower ______ [illegible]

Astor Asset Management 3 Ltd

16. **Headings.** The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

17. **Joint and Several Liability of Borrower.** Borrower and Guarantor shall be jointly and severally liable hereunder and under each of the Loan Documents to which it is a party with respect to all Obligations. Notwithstanding the foregoing, the Borrower's obligations and liabilities with respect to the Loan proceeds which it receives, and related fees, costs and expenses, and it's obligations and liabilities arising as the result of the joint and several liability of the Borrower and Guarantor hereunder with respect to proceeds (recovered by Borrower together with the related fees, costs and expenses, shall be separate and mutual obligations that constitute are primary obligations of the Borrower and the Guarantor to any reasonably and unconditionally guarantees the payment of all Obligations and performance of the Borrower. Neither the joint and several liability of the Borrower and the Guarantor shall be impaired or released which would or might, in the absence of this provision, operate to release, discharge or otherwise prejudicially affect the obligations of the Borrower. Without limiting the generality of the foregoing, any and all representations and warranties of Borrower and Guarantor contained herein are made jointly and severally. For purposes of this Agreement and any other Loan Documents, representations, warranties and covenants contained in this Agreement shall be imputed to the Borrower and its Guarantor and any

18. **Lender's Obligations.** All of Lender's obligations, representations and warranties in the performance of this Agreement are contingent upon Borrower and Guarantor performing in accordance with this Agreement and as the Lender may at its sole discretion from time to time

19. **Margin Call.** The Borrower and Guarantor must, just margin by topping-up additional cash or shares in the event of a Margin Call as stipulated in Section VI(3)(b). This provision may be triggered and called-upon by the Lender irrespective of amount funded to Borrower and the amount funded shall at no time be contingent on Margin Call validity or enforceability. A Margin Call is a standard provision in securities lending whereby the price of the securities has degraded to a point where the status of Pledged Collateral is deemed to be insufficient and viewed or risky from Lender's risk management perspective. Satisfaction of Margin Call by Borrower and Guarantor is required in order for funding to continue and avoid an Event of

20. **Non-Disparagement.** The Borrower and Guarantor agree not to intentionally make, threaten to make or truthfully cause any other person to make, any public statement that is intended to criticize or disparage the Lender, any of its affiliates, agents or any of their respective officers, managers or directors. This clause shall not be construed to prohibit any person from making truthful statement when required by law, subpoena, court order, or the like. The clause shall remain in full force and survive the execution, delivery, cancellation, and

21. **Non-Illusory.** Notwithstanding the Terms and Conditions set forth herein, Lender and Borrower acknowledge, accept and agree that Collateral is fluid, variable, may vary and fluctuate in value and that Lender's faithful performance is conditional upon the full and faithful performance of Borrower, stability of the Collateral, absence of any Market Operations

16. **Headings.** The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

17. Joint and Several Liability of Borrower...

18. **Lender's Obligations.** All of Lender's obligations, representations and warranties in the performance of this Agreement are contingent upon Borrower and Guarantor performing in accordance with this Agreement and as the Lender may at its sole discretion from time to time

19. **Margin Call.** With this Agreement and as the Lender may at its sole discretion from time to time decide, in the event of a Margin Call as stipulated in Section VI(3)(b). This provision may be triggered and called-upon by the Lender irrespective of amount funded to Borrower and the

20. **Non-Disparagement.** The Borrower and Guarantor agree not to intentionally make, threaten to make or truthfully cause any other person to make, any public statement that is intended to criticize or disparage the Lender, any of its affiliates, agents or any of their respective

21. **Non-Illusory.** Notwithstanding the Terms and Conditions set forth herein, Lender and Borrower acknowledge, accept and agree that Collateral is fluid, variable, may vary and fluctuate in value and that Lender's faithful performance is conditional upon the full and faithful

Initials: _____ / _____ / _____
Guarantor   Borrower   Lender

Astor Asset Management 5 Ltd

Lender to establish whether Borrower and Guarantor creditworthiness. Yearly upon the anniversary of the Effective Date, the Borrower and Guarantor will submit to Lender in writing declaration attesting to whether securities of same Issuer were sold or pledged to anyone in the preceding year. If none were sold or pledged, the Borrower and Guarantor shall inform ...

26. **Redemption.** If any were sold or pledged, then Borrower and Guarantor shall identify such transactions existing or hereafter created providing for redemption of a right or redemption from any sale of Collateral made under this Loan as a result of incurable Event of Default and ...

26. **Redemption.** This is a hybrid Loan and Borrower and Guarantor expressly waives the terms of all rows now existing or hereafter created providing for redemption of a right or redemption from any sale of Collateral made under this Loan as a result of incurable Event of Default and Borrower hereby releases all rights of redemption to which Borrower or Guarantor would ...

27. **Release and Waiver.** When the Collateral is forfeited and disposed of as a result of an incurable Event of Default by Borrower, course of dealing between Borrower, Guarantor and Lender shall operate as a waiver of any of the rights of the Parties under the Agreement with ...

27. **Release and Waiver.** No waiver of any provision of this Agreement shall be effective unless ...

[remaining text heavily degraded and illegible]

Astor Asset Management 3 Ltd

right. All of Lender's rights are reserved and none are Waived. Lender's acceptance of partial payments shall not invalidate, waive or diminish Lenders rights afforded herein.

28. **Severability.** If any of the provisions of this Agreement or any of the Loan Documents are found by an actual tribunal and/or court of competent jurisdiction to be unlawful, then such provision will be further altered and modified in Lender's favor to meet legal conformity or, if unavailable is stricken out entirely as if swap never over written in the first place, and the remainder of the rights, warranties, provisions, covenants, and Obligations contained in this Agreement or any of the Loan Documents shall continue to be in full force and effect. If any provision is held invalid due to its scope or breadth, such provision shall to the extent valid to the extent of its scope and breadth permitted by law after referenced herein, unless otherwise qualified hereunder means a statement of the Borrower and Guarantor declaring

29. **Statement of Knowledge.** For purposes of this Agreement, the Borrower and Guarantor shall be deemed to have knowledge of a particular fact or matter, reference Borrower, Seller or otherwise qualified hereunder means a statement of the Borrower and Guarantor declaring knowledge of the actual facts or circumstances to which such phrase relates having made reasonably diligent inquiry into the relevant subject matter.

30. **Survival of Investigation.** in connection with such facts and circumstances Borrower having concluded reasonably diligent inquiry into the relevant subject matter covenants made in this Agreement shall remain in full force and survive the execution, delivery, cancellation, and terminating of this Agreement regardless of the consummation of events and transactions contemplated hereof. All of the Lender's rights, benefits, enforcement covenants and secured interest into the collateral shall survive the termination of this Agreement, except for further funding of the Loan. The Lender shall receive, obtain and retain all the benefits, until and

31. **Termination.** Early termination or rescission is not permitted under the Agreement, regardless of the reason or need to do so, and this Agreement will be valid and in full force and effect and its execution for its full Term, provided it can only be terminated after its maturity jointly by the Parties and will be for only and memorialized in writing. Addendum of mutual written released or as stipulated therein, and/or no other Consent. All enforcement, covenants, agreements, and waivers will survive termination. If the Loan Documents shall, at any time after Borrower's execution and delivery for any reason, cause to be in full force and effect or shall be cancelled, declared invalid, null or void by Borrower or Guarantor, their representatives or their agents, or the validity or enforceability thereof shall be contested or challenged by Borrower, Guarantor or by any other person for or on the Borrower's or Guarantor's behalf, the Loan will be considered in default. The Lender retains the right to convert the Collateral during the Loan Term, and thereafter should Borrower.

## REQUIRED DISCLOSURES

It is mutually understood and agreed that Lender has a financial interest and privilege in the pledged shares according to the parties' understanding and contractual agreement. Borrower assumes the burden of topping up when required to do so. Borrower and Guarantor concede that Lender is not responsible for the degradation of the stock value, whether owing to action(s) or inaction(s) of Lender. A decline in value may require additional securities or cash to increase the value of the collateral. Borrower's or Guarantor's default will cause forfeiture of securities. Borrower and Guarantor now waive and forever discharge Lender against any claims under any applicable securities laws. Tax consequences are the responsibility of Borrower and Guarantor

Initials: _____   _____   _____
              Guarantor    Borrower      Lender

# Astor Asset Management 3 Ltd

Lender and its loan officers have not provided legal or tax advice of any kind to Borrower or Guarantor. Borrower and Guarantor acknowledge that they were represented by legal counsel representing its interests and Borrower and Guarantor have had ample opportunity to consult one. Borrower's and Guarantor's decision that will end solely based on its independent judgment. Borrower and Guarantor have evaluated all risks independently and did not rely on representations made by Lender if any. Lender does not discriminate based on age, race ...

This disclosure provides full transparency of risks involved. Neither Borrower nor Lender will participate in or engage in any money laundering scheme. Lender does not provide investment advice and its loan officer ...

Loan is non-recourse to Borrower or to Guarantor and ...

... Lender will recommended that Borrower consult a professional tax advisor to determine the tax implications of a loan under the terms of this agreement before proceeding. Lender will not be liable for the devaluation of securities during the term of Loan. Lender is not an owner of the securities being pledged by Guarantor and Lender does not and has not offered to buy or sell advice to Borrower. Lender utilizes independent third-party compliance consultants in risk management analysis and underwriting recommendations. A default of Loan will cancel Lender's obligation to Borrower, and to Guarantor. Neither Borrower nor Guarantor will undermine or interfere with securities of Lender. Borrower will not use Loan proceeds for any illegal activity, including without limitation to use of Loan proceeds in the financing of terrorism or support of terrorist groups ...

Guarantor represents that Guarantor has full ownership of the securities and legal custody and as of the date of this Agreement is not a defendant in any lawsuit where the ownership and control of the pledged shares are challenged because Lender will not be a Party to any such challenge. Borrower will not transact with any entity or any internationally sanctioned list using the Loan proceeds. Lender is not affiliated with any government agency. Lender may modify loan criteria due to adverse market conditions. Borrower ...

Lender has the right, but not the obligation, to refinance or increase Loan amount if the value of securities increases during the term of Loan. Borrower and Guarantor have no tolerance and the financial ability and liquid assets to post margin in the event of Default. Lender is not and does not hold itself out to be a ...

... This is not an offer to or solicitation to purchase or sell securities. Loan will be based on all applicable laws, present Underwriting, and market conditions at the time of funding. Borrower and Guarantor agree to provide information necessary to the contemplated transaction in a timely, complete and accurate manner. The Borrower and Guarantor further represent and warrant that all statements and documentation provided above ... Loan are true and complete and do not omit or forge any material facts or information. Borrower understands that funding correlates and is relative to most current market conditions at time of funding or loan indexing, and may cause Lender to Advance Loan in tranches, adjust or postpone funding. Due to market dynamics, at all times throughout, the loan is subject to re-analysis and Underwriting reassessment prior to funding. During the Loan term, all benefits and proceeds of Pledged Collateral inure to Lender ...

Loan until Maturity Date unless a default has occurred. The Cash Collateral to be deposited in to Borrower's own account shall be solely computed by the Lender. No notice of any type is due to Borrower or to Guarantor ...

IN WITNESS WHEREOF, and after revision, negotiation and consultation with their own legal counsel, the Parties have executed this Loan Agreement as of the date first written above.

## END OF TEXT

 Astor Asset Management 3 Ltd

## SIGNATORY PARTIES

**LENDER**: Astor Asset Management 3 Limited, a Canadian corporation.



Signature      _Mariia Mitsa, Managing Member_    07/28/2021
                Name and Title              Date

## BORROWER NOTARIZATION

**BORROWER**: Corporacion RBS SA de CV

July 28, 2021

Signature      Ricardo Benjamin Salinas Pliego   July 14th, 2021
                Name and Title                  Date

Notary Seal

Attorney/Notary/Witness          Eduardo Gonzalez Saluda
                              Attorney/Notary/Witness

Signature   July 14th 2021     Eduardo Gonzalez Saluda
               Date           Signature             Date



# Astor Asset Management 3 Ltd

The Guarantor hereby attests and guarantees unconditionally the due, prompt and faithful performance and discharge by, and compliance with, all of the obligations, covenants, terms, conditions and undertakings under this Agreement in accordance with the terms hereof, including any such obligations, covenants, terms, conditions and undertakings that are required to be performed, discharged or complied with and that Guarantor has the capacity to full fill the full and faithful performance of Borrower as stipulated herein.

**GUARANTOR**: Ricardo Benjamin Salinas Pliego

July 28, 2021

_____         Ricardo Benjamin Salinas Pliego  July 14th 2021
Signature                       Name                                Date

Notary Seal
_____

_____         Edwardo Gonzalez Salceda
Attorney/Notary/Witness         Attorney/Notary/Witness

_____         Edwardo Gonzalez Salceda
Signature          July 14th, 2021   Signature          Date
Date


Astor Asset Management 3 Ltd

Astor Asset Management 3 Ltd

**SCHEDULE A**
**BANKING INFORMATION**

### BORROWER BANKING INFORMATION (CORPORATE):

**Bank/Institution Name:**

**Swift Code No/Routing No:**
**Account Number:**

**Account Name:**    Corporacion RBS SA de CV

**Bank Code:**
**Branch Code:**    ı

**Address of Account:**

### CASH AND STOCK TOP UP ACCOUNT INFORMATION (CORPORATE):

**Institution's Name:**    Weiser Global Capital Markets

**Account Number:**    200-804762 ; 200-804763

**Account Name:**    Corporacion RBS SA de CV

**Address of Account:**    4   2 : 2

rp   ac    R

# Astor Asset Management 3 Ltd

**BORROWER BANKING INFORMATION (INDIVIDUAL):**

**Bank/Institution Name:**

**Swift Code No/Routing No:**

**Bank Code:**                                    Ricardo Benjamin Salinas Pliego

**Account Number:**

**Branch Name:**                                  Ricardo Benjamin Salinas Pliego

**Address Bank Code:**

**Branch Code:**

**CASH AND STOCK TOP UP ACCOUNT INFORMATION (INDIVIDUAL):**

**Institution's Name:**                           Weiser Global Capital Markets

**Account Number:**                               200-804764 : 200-804765

**Account Name:**                                 Ricardo Benjamin Salinas Pliego

**Address of Account:**


**INTEREST, PRINCIPAL AND PAYMENT INFORMATION:**

**Please make payment payable to:**
Astor Asset Management 3 Limited
777 Dunsmuir Street, Suite 1400
Vancouver, British Columbia  \ 7Y 1  4

## Astor Asset Management

www.astorassetgroup.com

## Astor Asset Management

www.astorassetgroup.com

**Singapore**
Six Battery Road
Level 42

**Singapore**
Six Battery Road
Level 42
Singapore, 049909

asia.inquiries@astorassetgroup.com
+65 800 492 2419

**Germany**
Niederrad business district
LYONER STRASSE 14

**Germany**
Niederrad business district
LYONER STRASSE 14
FRANKFURT, GERMANY, 60528

europe.inquiries@astorassetgroup.com
+49 0800 1812772

**Hong Kong**
18 Westlands Road
Level 23

**Hong Kong**
18 Westlands Road
Level 23
Hong Kong, 964 226

asia.inquiries@astorassetgroup.com
+852 800 964 226

**Australia**
330 Collins Street,
level 14

**Australia**
330 Collins Street,
level 14
Melbourne, Australia, 3000

oceania.inquiries@astorassetgroup.com
+613 8375 7172

**United Kingdom**
20 MIDTOWN
20 PROCTER STREET,

**United Kingdom**
20 MIDTOWN
20 PROCTER STREET,
LONDON, UK, WC1V 6NX

europe.inquiries@astorassetgroup.com
+44 2 0386 84 620

# EXHIBIT 2



**WEISER**
GLOBAL CAPITAL MARKETS

**WEISER**

CUSTODIAN MANAGEMENT AGREEMENT

Security Name: Grupo Elektra SAB DL CV
CUSTODIAN MANAGEMENT AGREEMENT
Symbol: ELEKTRA MX

NOW, THEREFORE, for and in consideration of mutual premises promised or to be provided and other good and valuable, sufficient, and equitable, the WEISER as proprietary or in-kind, and other mutual covenants, the receipt of, adequacy and sufficiency of which is hereby acknowledged, provided for and mutual promises, the parties hereto covenant and agree to and stipulate of mutual premises promised or in-kind, and other mutual covenants, the receipt of adequacy and sufficiency of which is hereby acknowledged, provided for and mutual promises the parties hereto covenant and agree to and stipulate or to the value of the consideration it is delivering.

Corporation RICardo Benjamin (hereinafter "Borrower") and Ricardo Benjamin Salazar Glueck a corporation (hereinafter the "Guarantor") with principal place of residence/business located at Cristobal Colon 79 INT C, Mexico 00000 (hereinafter "Guarantor") and kindly represent and warrant that both the corporation and the individual have the capacity and standing to enter into this Agreement (hereinafter cumulatively the "Principal Account Holder"):

Astor Asset Management 3 Limited, for itself, representatives, affiliates, and assigns, with an office located at 777 Dunsmuir Street, Suite 1400, Vancouver, British Columbia, Canada V7Y 1K4, which represents and warrants that it has the capacity and standing to enter into this Agreement (hereinafter the "Astor Asset Management 3 Limited, for itself, representatives, affiliates, and assigns, with an office located at 777 Dunsmuir Street, Suite 1400, Vancouver, British Columbia, Canada V7Y 1K4, which represents and warrants that it has the capacity and standing to enter into this Agreement (hereinafter the "Lender"):

Weiser Global Capital Markets, a Class 1 registered custodial broker dealer, for itself, affiliates, and subsidiaries, with a principal place of business located At Unit A- Balmoral Corporate Center, Balmoral Development, Sanford Drive, Nassau, Bahamas, which represents and warrants that they have the capacity and standing but Corporate Center, Balmoral Development, Sanford Drive, Nassau, Bahamas, which represents and warrants that they have the capacity and standing but Corporate Center, Balmoral Development, Sanford Drive, Nassau, Bahamas, which represents and warrants that they have the capacity

WHEREAS: the order with deposit Custodian the securities to (hereinafter "Hunter"), Borrower, and the collateral Custodian which whatever another account is opened by Custodian for the Borrower for purposes of continuing to carry out the WHEREAS obligation will deposit Cash Collateral to the Borrower Account so that the collateral must be held in the exclusive property of Lender and controlled by the Custodian for the Borrower for purposes of continuing to carry out the reserves the obligation of Parties, to underwrite fund Mortgagor and whereby it is mutually recognized that the Collateral until released to Guarantor in writing through a written Closing Statement, is the sole and exclusive property of Lender and controlled by this CMA. The written Closing Statement will memorialize the amount of funds to be released to Borrower and any expenses.

Collateral Services Department
Phone +1-242-808-0000
Email: servicedesk@weisergcm.com Web www.weisergcm.com
Weiser Global Capital Markets
Collateral Services Department
Phone +1-242-808-0000
Email: servicedesk@weisergcm.com Web www.weisergcm.com

Initials ___

Guarantor   Borrower   Lender / Custodian

Initials ___

Guarantor   Borrower   Lender   Custodian



**WEISER**
GLOBAL CAPITAL MARKETS

1. **Pledge by Borrower and Guarantor** ... hereby appoint and authorize Lender as the exclusive lien holder over certain Pledged Collateral held on account of the Guarantor and in the Guarantors name, place and stead, giving and granting to Lender general, full power and ...

2. **Severability** ... Dealer is not bound, and in no event interpret or attempt to adhere to it, shall not have a Lender's entitlement order ("Entitlement Order") or ...

3. **Control by Lender** ... limited the sole risk belong to ... ability obligations and perform all duties and obligations which may now or in the future pertain to the Principal Account Holder. The Parties further acknowledge that Lender reserves the right to direct the ...

3.1. The Depository Account(s) maintained by the Borrower and Guarantor and held by the Custodian in favor of Lender are as follows:

| | |
|---|---|
| Depository Broker Name: | Weiser Global Capital Markets |
| Depository Broker Address: | Unit A, Balmoral Corporate Center, Balmoral Development, Nassau, Bahamas |
| Depository Account Number(s): | Weiser Global Capital Markets |
| Borrower Account Name: | Corporation Balmoral Corporate Center, Balmoral Development, Nassau, Bahamas A09, Cuehila del Moral L. |
| Borrower Account Number(s): | 200-804760 & 200-804765, Mexico, Mexico |
| Borrower Account Name: | Corporation RBS SA de CV |
| Borrower Account Address: | Ave. Ferrocarril de Rio Frio 419 A09, Cuehila del Moral L. Iztapalapa 09319 Ciudad de Mexico, Mexico |
| Depository Broker Name: | Weiser Global Capital Markets |
| Depository Broker Address: | Unit A, Balmoral Corporate Center, Balmoral Development, Nassau, Bahamas |
| Custodian Account Numbers: | Weiser Global Capital Markets |
| Guarantor Account Name: | Ricardo Benjamin Salinas Corporate Center, Balmoral Development, Nassau, Bahamas 09360 |
| Guarantor Account Address: | |
| Guarantor Account Numbers: | 200-804764 & 200-804765 |
| Guarantor Account Name: | Ricardo Benjamin Salinas Pliego |
| Guarantor Account Address: | Cristobal Colon 79 INT C, Mexico 09360 |

The Dealer's custodial banking counter parties consist of top tier multi-national banks.

Weiser Global Capital Markets
General Service Department
Phone: +1-242-698-9900
Email: jarrellmarchose@weiser.com.bs www.weiser.com.bs
Weiser Global Capital Markets
General Service Department
Phone: +1-242-698-9900
Email: jarrellmarchose@weiser.com.bs www.weiser.com.bs

The Dealer's custodial banking counter parties consist of top tier multi-national banks.

Initials: _____

| Guarantor | Borrower | Lender | Custodian |
|---|---|---|---|

Initials: _____

| Guarantor | Borrower | Lender | Custodian |
|---|---|---|---|



**WEISER**
GLOBAL CAPITAL MARKETS

**WEISER**

Authorized Account of Party to Receive Shares, Funds for Top-Up, Conduct, Transmit and Engage in All Transfers, Including Sale Proceeds Withdrawals

Authorized Account of Party to Receive Shares, Funds for Top-Up, Conduct, Transmit and Intermediary Transfers, Including Sale Proceeds Withdrawals

| Swift: | |
|---|---|
| Intermediary Bank: | Weiser Global Capital Markets Ltd. |
| REF: | |
| FFC: | Weiser Global Capital Markets | clientservices@weiser.com.bc |
| REF: | |

3.2. The Lender's lien and security interest also includes all proceeds of the foregoing, and all proceeds of trades. Guarantor represents and warrants to both Lender and the Dealer that they own the Pledged Collateral free and clear of any lien, whether voluntary or involuntary.

3.2. The Lender's lien and security interest also includes all proceeds of the foregoing, and all proceeds

3.3. *[illegible degraded text]*

3.3. The *[illegible degraded text]*

3.4. *[illegible degraded text]*

3.5. During *[illegible degraded text]*

3.5. *[illegible degraded text]*

3.6. *[illegible degraded text]* Guarantor *[illegible]* jointly and severally liable for and absolutely and unconditionally guarantee the performance of all obligations under this Agreement and the Lender will not exhaust

3.6. *[illegible degraded text]* Guarantor *[illegible]* jointly and severally liable for and absolutely and unconditionally guarantee the performance of all obligations under this Agreement and the Lender will not exhaust

4. **Borrowers and Guarantors Rights in the Dedicated Depository Accounts.** Until the Lender notifies the Dealer in writing that the Lender's security interest in the Depository Accounts have

Borrowers and Guarantors Rights in the Dedicated Depository Accounts. Until the Lender notifies the Dealer in writing that the Lender's security interest in the Depository Accounts have

collateralservices@weiser.com.bc www.weiser.com.bc
Weiser Global Capital Markets
Collateral Services Department
Phone +1242-824-6600
collateralservices@weiser.com.bc www.weiser.com.bc

| Guarantor | Borrower | Lender | Custodian |
|---|---|---|---|
| | | | |

Initials

| Guarantor | Borrower | Lender | Custodian |



terminated, the Dealer shall not distribute to or transfer to or deliver or any securities, assets, funds, or property currently or in the future held in the Depository Accounts.

5. Waiver. Lender and Dealer will not be distribute all monies from Communication in any transaction, and be entitled for and by assign be the Dealer held under the Monetary Agreement, Guarantor hereby waive any rights to claims against the Dealer in connection thereto. Further, it is agreed that the Dealer is not obliged to

5. Waiver and buy Dealer will not or Lender held under the Borrower and Guarantor the comply mg with any Entitlement Orders originated by the Lender and the Borrower and Guarantor hereby waive any right.

6. Indemnification. Neither Dealer or each transaction they're the under entirely be agreed and the Dealer is not obliged to and agents against any individual dealer and their rights hold harmless and codes related to arising out of or in connection with this agreement (including without limitation any and all court costs, reasonable

6. And out of the bottom of severed and Guarantor. Both Body the Lender and out of cost and indebtedness to and the two both do out of out of claims advice from the business liabilities and a design restriction Borrower and Guarantor liability with and a agreement excluding without limitation any and all costs and Reasonable both Borrowers and aggregate and disburse costs both Borrower each out of transaction acknowledge under that the both Guaranty the financial covenants that be hands agreed the Lender's Asset Dealer, Lender's Borrowers and both both the liability under a be a design a right and need to. Between the Lender, Borrower and Company both Borrower and Guarantor agree to be responsible for and to reimburse Lender for any liability under

7. Gender Neutrality. All the economy options, used and being multiple the expended that respectively terminate and under be a shall by Lender's for a neighbour the without and all include plural and vice versa.

7. Gender Neutrality. All personal pronouns used in this Agreement, whether used in the masculine

8. Termination. Agreement. shall distance the both and the singular shall include plural and vice usage in the Dealer, the Borrower and Guarantor. The Dealer may terminate this Agreement on no less than five (5) days written notice to the Lender, the Borrower and Guarantor. Upon such termination by the

8. Dealer that and on the the with an event a Limitation the agreement on all conserve under the the Dealer, and on the and Dealer and Optionally, Borrower that it originate all to the Dealer may terminate to such agreement consider the with an on such claims associated to be which be both the Borrower to both and to join on to transfer to transfer to the Dealer, the Dealer shall within a week. After type of any remain for multi may related the Dealer with any the Dealer to promptly transfer the Pledged Collateral to the Lender or to such persons under the

9. Applicable Law and Jurisdiction an Hard out of Disputes. A transfer persons held or such on a without Borrower. With Governing this and in the Agreement or govern under this give here fully to shall dealer's Account Terms & Conditions. If a dispute arises with respect to Borrower, Guarantor and the Lender.

9. Applicable Law out out of pros costing for the out of Dispute this should select synthesis respect no Monito. In a result and in conditional be plan and avail and proceedings both become on of with in the Dealer's Account Jurisdiction for an out of account of place of residence location of parties, Guarantor and the dispute any applicable demand proceedings shall be set forth in the Stock Loan Agreement The Parties irrevocably and unconditionally waive any defense or claim of inconvenient or improper forum or

10. Miscellaneous. on account of place of residence, location of parties, location of transaction or any other subject matter

    10.1.    Neither the Borrower nor the Guarantor may assign, transfer, charge, or novate any of its

10. Miscellaneous. obligations under this Agreement

    10.1.    Neither the Borrower nor the Guarantor may assign, transfer, charge, or novate any of its rights or obligations under this Agreement

    10.3.    Communications. communicated form that have them meetings set by so it to the addresses listed below or electronically and shall in the case of the latter, have full legal force and effect, including electronic signatures contained therein

    10.3.    All communications from and to any of the Parties hereto may be transmitted by mail to the addresses listed below or electronically and shall in the case of the latter, have full legal force and effect, including electronic signatures contained therein

| | Guarantor | Borrower | Lender | Guarantor |
|---|---|---|---|---|
| Weiser Global Capital Markets Collateral Services Department Phone +1-242-604-5001 | Initials | | | |
| | Guarantor | Borrower | Lender | Guarantor |



**Lender:**

Astor Asset Management 3 Limited

Loan Services

777 Dunsmuir Street, Suite 1400,

Vancouver, British Columbia, Canada V7Y 1K4

ComplianceServices@astorcapitalfund.com ; +1 888 775 1628

777 Dunsmuir Street, Suite 1400

Vancouver, British Columbia, Canada V7Y 1K4

ComplianceServices@astorcapitalfund.com ; +1 888 775 1628

Cristobal Colon 79 INT C, Mexico 09360

ssalinas@gruposalinas.com.mx , +5215530091016

Ricardo Benjumin Salinas Pliego

Cristobal Colon 79 INT C, Mexico 09360

ssalinas@gruposalinas.com.mx , +5215530091016

Ave. Ferrocarril de Rio Frio 419 A99,

Iztacalco del Moral 1, Iztapalapa 09319 Ciudad de Mexico, Mexico

calinas@gruposalinas.com.mx : 005255172000089

Ave. Ferrocarril de Rio Frio 419 A99,

Cuchilla del Moral 1, Iztapalapa 09319 Ciudad de Mexico, Mexico

**Depository Broker:**

salinas@gruposalinas.com.mx : 005255172000089

20 Bay Street, 11th Floor

Toronto, Canada, M5J2N8

CollateralServices@weiser.com bs : +1 416 915 0808

20 Bay Street, 11th Floor

Toronto, Canada, M5J2N8

CollateralServices@weiser.com bs : +1 416 915 0808

Weiser Global Capital Markets

Unit A, Balmoral Corporate Center, Balmoral Development

Sanford Drive, Nassau, Bahamas

CollateralServices@weiser.com bs : +1 242 698 6600

Unit A, Balmoral Corporate Center, Balmoral Development

Sanford Drive, Nassau, Bahamas

CollateralServices@weiser.com bs : +1 242 698 6600

- DISCLAIMER -

BORROWER AND GUARANTOR REPRESENT THAT THE SECURITIES AND OR PROPERTY IN THE DEPOSITORY ACCOUNT(S) ARE NOT PART OF ANY ILL-GOTTEN GAIN OR A RESULT OF ANY FRAUDULENT ACTIVITY WHICH WILL FALL UNDER PENAL LAW, BORROWER AND GUARANTOR REPRESENT THAT THE SECURITIES AND OR PROPERTY IN THE DEPOSITORY ACCOUNT(S) ARE NOT PART NOR ANY KIND OF ILL-GOTTEN GAIN OR A RESULT OF ANY FRAUDULENT ACTIVITY WHICH WILL FALL UNDER PENAL LAW, BORROWER AND GUARANTOR ARE NOT UNDER THE INFLUENCE OF DRUGS OR ALCOHOL WHEN ENTERING INTO THIS AGREEMENT, NEITHER BORROWER NOR GUARANTOR HAVE BEEN DECLARED MENTALLY INCOMPETENT. THE SUBJECT SHARES AND REPRESENTATIONS IN THE DEPOSITORY ACCOUNT(S) ARE NOT PART OR ANY PENDING LITIGATION AND ARE A KRISHAH, ANY LIEN OR ENCUMBRANCE OR BORROWER, AND GUARANTOR OR DEALS AND MANDA TO SHAH DO HANDO THAT IRRESPECTIVE OF HOW THIS AGREEMENT MAY SHALL BE FULFILLED OR ANY AND ALL FULFILLMENT OR DERS SHALL COME SOLELY FROM LENDER AND SHALL NOT BE REFUTED, QUESTIONED OR CONTESTED. THE PARTIES HAVE EVALUATED ALL RISKS INDEPENDENTLY AND DID NOT RELY ON REPRESENTATIONS MADE BY LENDER. THE DEALER SHALL BE FULLY INDEMNIFIED BY

collateralservices@weiser.com bs www.weiser.com bs
Weiser Global Capital Market
Collateral Services Department
Phone: +1-242-698-6600
collateralservices@weiser.com bs www.weiser.com bs

| Guarantor | Borrower | Lender | Custodian |
| --- | --- | --- | --- |
| Initials. | | | |
| Guarantor | Borrower | Lender | Custodian |



BORROWER AND GUARANTOR AND LENDER AGAINST ANY LIABILITIES OCCASIONED BY THIS AGREEMENT. NO FUDICIARY DUTY EXISTS BETWEEN LENDER THE BORROWER OR GUARANTOR. BORROWER AND GUARANTOR ATTEST THAT, AT ALL TIMES, THEY WERE REPRESENTED BY LEGAL COUNSEL AND/OR BORROWER AND GUARANTOR HAVE HAD THE OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL. DEALER WILL NOT BE LIABLE TO BORROWER OR GUARANTOR FOR COMPLYING WITH ENTITLEMENT ORDERS ORIGINIATED BY LENDER, EVEN IF BORROWER OR GUARANTOR NOTIFIES DEALER OR DEALER BELIEVES THAT LENDER IS NOT LEGALLY ENTITLED TO ISSUE THE ENTITLEMENT ORDER.

** END OF TEXT **

Weiser Global Capital Markets
Collateral Services Department
Phone: +1-242-698-6600
collateralservices@weiser.com.bs www.weiser.com.brs

Initials _____

Guarantor   Borrower   Lender   Custodian



## WEISER
### GLOBAL CAPITAL MARKETS

### BY GUARANTOR

Ricardo Benjamin Salinas Pliego
Name of Individual

_(signature)_
Signature

July 28, 2021
Date

On this July 28, 2021, before me appeared _Ricardo Benjamin Salinas Pliego_ (Authorized Signatory) as principal of this agreement who proved to me through government issued photo identification to be the above-named person, in my presence executed foregoing instrument and acknowledged that he/she executed the same at his/her free act and deed.

_____ (seal)
Attorney/Notary/Witness Public

Each Attorney/Notary/Witness is only certifying Borrower's signature.

************************************************************************************

### BY LENDER

Astor Asset Management 3 Limited
Name of Corporation

Authorized Signatory

07/28/2021
Date

Mariia Mitsa, Managing Member
Name, Title

************************************************************************************

### BY DEPOSITORY BROKER

Weiser Global Capital Markets
Name of Corporation

Authorized Signatory

Date

Name, Title

Weiser Global Capital Markets
Collateral Services Department
Phone: +1-242-698-6600
collateralservices@weiser.ccm.bs www.weiser.ccm.bs

Initials: ___  ___  ___  ___
Guarantor   Borrower   Lender   Custodian



**IN WITNESS WHEREOF,** the Parties, intending to be legally bound, have caused their proper and duly authorized officers to execute and deliver this Agreement as of the day and year signed;

BY BORROWER

July 28, 2021

Corporacion RBS SA de CV
Name of Corporation                    Authorized Signatory                    Date

Ricardo Benjamin Salinas Pliego
Name, Title

July 28, 2021

On this _____ , before me appeared Ricardo Benjamin Salinas Pliego (Authorized Signatory) as principal of this agreement who proved to me through government issued photo identification to be the above-named person, in my presence executed foregoing instrument and acknowledged that he/she executed the same at his/her free act and deed.

_____ (seal)
Attorney/Notary/Witness Public

Each Attorney/Notary/Witness is only certifying Borrowers signature.

**************************************************************************************************

Initials: _____ _____ _____ _____

Guarantor    Borrower    Lender    Custodian

# EXHIBIT 3

# Control Agreement

This Control Agreement (this "Agreement"), e f f e c t i v e  as of November 1st, 2021, is entered into by: (1) **Corporation RBS SA de CV.**, a Limited Liability Corporation with its principal place of business located at Ave. Ferrocarril de Rio Frio 419 A99, Cuchilla del Moral 1, Iztapalapa 09319 Ciudad de Mexico, Mexico (hereinafter the "Borrower"); (2) **Ricardo Benjamin Salinas Pliego**, an individual with his principal place of residence located at Cristobal Colon 79 INT C, Mexico 09360 (hereinafter the "Guarantor") (the Borrower and Guarantor shall jointly herein be referred to as the "Principal Account Holders"); (3) **Astor Asset Management 3 Limited**, account TMC-70, a Limited Liability Corporation with its principal place of business located at 18C – 3107 Av des Hotels, Quebec, Canada G1W 4W5 (hereinafter the "Lender"); and (4) **Tavira Monaco SAM**, a company authorised and regulated by the CCAF and whose registered office address is Le Montaigne, 6 Bd Des Moulins, 98000 Monaco (the "Depository Broker").

## WITNESSETH:

WHEREAS the Lender has agreed to make a loan (the "Loan") to the Principal Account Holders and, in that regard, the Lender and the Principal Account Holders have entered into a Non-Recourse Loan and Securities Pledge Agreement dated as of 28th of July, 2021 (as amended, supplemented or modified from time to time, the "Loan Agreement"), in which, among other things, the Principal Account Holders have granted to the Lender a security interest and/or pledge in the Principal Account Holders' assets included in the professional brokerage accounts respectively numbered TMC-63 and TMC-64, which the Depository Broker maintains for the Principal Account Holders (the "Accounts");

AND WHEREAS the Loan Agreement provides that the Principal Account Holders will execute and deliver to the Lender and/or the Depository Broker such form of power of attorney, charge and any other document or instrument in respect of the Accounts as the Lender and/or the Depository Broker require to give effect to the terms of the Loan Agreement;

AND WHEREAS the parties are entering into this Agreement in order to grant the rights to the Lender over the Accounts provided by the Loan Agreement and perfect the Lender's security interest in the Accounts.

NOW THEREFORE, in consideration of the premises and in order to induce the Lender to make the Loan under the Loan Agreement, the parties hereto hereby agree as follows:

1. **CONTROL BY LENDER.** The parties acknowledge that the Lender may from time to time provide notifications to the Depository Broker directing it to sell, transfer, pledge, hypothecate, lend, withdraw or redeem any funds, stocks or other property in the Accounts or any act in furtherance thereof (each, an "Entitlement Order"). The parties further acknowledge that the Depository Broker shall comply with any such Entitlement Order originated by the Lender without any requirement for consent from, or notice to, the Principal Account Holders. For the avoidance of doubt, the Principal Account Holders shall have no right whatsoever to object to any Entitlement Order originated by the Lender and complied with by the Depository Broker.

2. **PRINCIPAL ACCOUNT HOLDERS' RIGHTS IN ACCOUNTS.** Each of the Depository Broker and the Principal Account Holders acknowledges that the Principal Account Holders shall have no right to give an Entitlement Order or other direction to the Depository Broker in respect of the

EWG

Accounts or the property therein, without the prior written consent of the Lender.

3. **DEPOSITORY BROKER'S REPRESENTATIONS AND WARRANTIES.** The Depository Broker represents and warrants to the Lender that:

   3.1 the Depository Broker maintains the Accounts for the Principal Account Holders; and

   3.2 the Depository Broker does not know of any claim to or interest in the Accounts, except for the claims and interests of the parties referred to in this Agreement.

4. **RELIANCE ON REPRESENTATIONS AND WARRANTIES BY DEPOSITORY BROKER.** By executing this Agreement, the Principal Account Holders hereby agree with the Depository Broker that the Depository Broker shall have the benefit of the representations, warranties and covenants made by the Principal Account Holders to the Lender in the Loan Agreement and acknowledge that the Depository Broker will be relying on such representations, warranties and covenants in connection with the transactions contemplated herein.

5. **PRIORITY OF LENDER'S SECURITY INTEREST.**

   5.1 The Depository Broker hereby subordinates, in favour of the Lender, any security interest, lien or right of setoff it may have, now or in the future, against the Accounts or property in the Accounts, except that the Depository Broker will retain its prior lien on property in the Accounts to secure payment for property purchased for the Accounts and normal commissions and fees for the Accounts.

   5.2 The Depository Broker covenants not to agree with any third party that the Depository Broker will comply with any Entitlement Order or other direction to the Depository Broker in respect of the Accounts or the property therein originated by such third party.

   5.3 Should any dispute arise between the Lender and the Principal Account Holders and be notified in writing by the Lender to the Depository Broker, the Depository Broker will transfer all property and amounts within the Accounts to the Lender and the Principal Account Holders will not object to any such transfers.

6. **STATEMENTS and CONFIRMATIONS.** The Depository Broker will send a copy of all statements and confirmations for the Accounts that it sends to the Principal Account Holders simultaneously to the Lender.

7. **DEPOSITORY BROKER'S RESPONSIBILITY.**

   7.1 The Depository Broker will not be liable to the Lender for complying with Entitlement Orders originated from the Principal Account Holders that are received by the Depository Broker before the date hereof.

   7.2 The Depository Broker will not be liable to the Principal Account Holders for complying with any Entitlement Orders originated by the Lender or performing its obligations under subsection 9.3 hereof, even if the Principal Account Holders notify the Depository Broker, or the Depository Broker believes, that the Lender is not legally entitled to issue the Entitlement

EWG

Order, unless the Depository Broker takes the action after it is served with an injunction, restraining order or other valid legal process enjoining it from doing so issued by a court of competent jurisdiction, and has had a reasonable opportunity to act on the injunction, restraining order or other legal process.

7.3 This Agreement does not create any obligation of the Depository Broker except for those expressly set forth in this Agreement. In particular, the Depository Broker need not investigate and will not investigate whether the Lender is entitled under the Loan Agreement to give an Entitlement Order. The Depository Broker may rely on, and act upon, without inquiry, any notices and communications which it believes are given by the appropriate party, including any Entitlement Orders issued by the Lender after the effective date of this Agreement.

8. **INDEMNITY.** The Lender and the Principal Account Holders will indemnify the Depository Broker, its officers, directors, employees, assignees and agents against any and all claims, demands, lawsuits, liabilities or expenses which may be sustained or incurred by any of such persons in connection with or arising out of the Depository Broker's performance under this Agreement, except any claims, demands, lawsuits, liabilities or expenses which are caused by the Depository Broker's fraud, gross negligence or wilful misconduct. The Lender's and the Principal Account Holders' liability under this section is joint and several. The Principal Account Holders acknowledge and agree that the Depository Broker will act solely in accordance with the instructions issued by the Lender, and that the Depository Broker shall have no liability to the Principal Account Holders for acting in accordance with such instructions save in the event of the Depository Broker's fraud, gross negligence or wilful misconduct.

## 9. **TERMINATION; SURVIVAL.**

9.1 The Lender may at any time terminate this Agreement by written notice to the Depository Broker and the Principal Account Holders. The Depository Broker may terminate this Agreement on not less than ten (10) business days' written notice to the Lender and the Principal Account Holders. Upon such termination by the Depository Broker, the Depository Broker shall promptly transfer all property and other amounts in the Accounts to the Lender or pursuant to instructions issued by or on behalf of the Lender.

9.2 If the Lender notifies the Depository Broker in writing that the Lender's security interest in the Accounts has been terminated, this Agreement will thereupon immediately terminate and cease to exist without any further action on the part of the parties or repercussion for the Depository Broker.

9.3 If the Lender notifies the Depository Broker in writing that an event of default has occurred under the Loan Agreement, this Agreement will thereupon immediately terminate and cease to exist without any further action on the part of the parties and the Depository Broker shall promptly transfer all property and other amounts in the Accounts to the Lender or pursuant to instructions issued by or on behalf of the Lender without any further action on the part of the parties or repercussion f o r the Depository Broker.

9.4 Sections 5, 7, 8, 9 and 10 hereof will survive termination of this Agreement.

EWG

## 10. **MISCELLANEOUS.**

10.1 Governing Law. This Agreement and the Accounts shall be governed by the laws of England and Wales. The Depository Broker and the Principal Account Holders may not change the law governing the Accounts without the Lender's express written consent.

10.2 Consent to Jurisdiction; Venue. Each party to this Agreement irrevocably agrees that the courts of England shall have exclusive jurisdiction to hear, settle and/or determine any dispute, controversy or claim (including any non-contractual dispute, controversy or claim) arising out of or in connection with this Agreement, including any question regarding its existence, validity, formation or termination. For these purposes, each party irrevocably submits to the exclusive jurisdiction of the English courts.

10.3 Entire Agreement; Paramountcy. This Agreement constitutes the entire agreement between the parties pertaining to the subject-matter hereof and, except for the Loan Agreement between the Lender and the Principal Account Holders, supersedes all prior agreements, understandings, negotiations and discussions of the parties, whether oral or written. In the event of any conflict, inconsistency, ambiguity or difference between the provisions of this Agreement and any agreement between the Depository Broker and the Principal Account Holders, the provisions of this Agreement shall govern and be paramount and any such provision in such other agreement(s) shall be deemed to be amended to the extent necessary to eliminate any such conflict, inconsistency, ambiguity or difference.

10.4 Amendments, Etc. No amendments to, or waiver of a right under, this Agreement will be binding unless it is in writing and signed by the parties to this Agreement.

10.5 Severability. To the extent a provision of this Agreement is unenforceable, this Agreement will be construed as if the unenforceable provision were omitted.

10.6 Successors and Assigns. A successor to or assignee of the Lender's rights and obligations under the Loan Agreement will succeed to the Lender's rights and obligations under this Agreement. The Principal Account Holders may not assign, transfer, charge or novate any of its rights or obligations under this Agreement.

10.7 Notices. Any notices or other communications to a party under this Agreement, including any Entitlement Orders, shall be in writing and, with respect to the Principal Account Holders and the Lender, shall be given in accordance with the notice provisions of the Loan Agreement.

10.8 Language. The parties hereto acknowledge and confirm that they have requested that this Agreement, as well as all notices and other documents contemplated hereby, be drawn up in the English language.                                        EWG

10.9 Independent Legal Advice. The Principal Account Holders acknowledge that: (i) each of the Lender and the Depository Broker has recommended and encouraged the Principal Account Holders to obtain independent legal advice with respect to this Agreement and the transactions contemplated hereby; (ii) they have, in fact, been given an opportunity to obtain independent legal advice from counsel/advisors of their choosing; and (iii) if they have

not obtained independent legal advice, despite having been encouraged and given the opportunity to do so, the Principal Account Holders explicitly waive the right to obtain such advice, and, in any event, the Principal Account Holders acknowledge that they have read and understood this Agreement.

10.10 <u>Counterparts and Transmission.</u> This Agreement may be: (i) executed in two or more counterparts, each of which counterparts when so executed and delivered shall be deemed to be an original, but all of which counterparts together shall constitute one and the same document; and/or (ii) transmitted by facsimile and/or internet device and that the reproduction of signatures by way of facsimile and/or PDF device will be treated as though such reproductions were executed originals and communication by such means will be legal and binding.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

**Astor Asset Management 3 Limited (LENDER)**

By: _____    Print Name Mariia Mitsa    Date  03.12.21
Signature                    Managing Member

**Tavira Monaco SAM (DEPOSITORY BROKER)**

By: _____    Eliot Goodfellow    13/12/2021
Signature                    Print Name            Date

**Corporation RBS SA de CV (BORROWER)**


By: _____          Ricardo Benjamin Salinas Pliego          30 Nov 21
      Signature                                    Print Name                                          Date



**Ricardo Benjamin Salinas Pliego (GUARANTOR)**


By: _____          Ricardo Benjamin Salinas Pliego          30 Nov 21
      Signature                                    Print Name                                          Date

EWG

# EXHIBIT 4

## NOTICE TO BORROWER AND GUARANTOR

PLEASE TAKE NOTICE THAT A COLLATERALIZED, SECURED FIXED INSTRUMENT BASED LOAN TRANSACTION MAY INVOLVE SUBSTANTIAL ELEMENTS OF RISK THAT INVOLVE SHARES IN PUBLICLY TRADED SECURITIES WHICH MAY BE SUBJECT TO ADVERSE CREDIT RISKS, ADVERSE TAX RISKS AND/OR ADVERSE MARKET CONDITIONS THAT COULD NEGATIVELY IMPACT ALL OR PART OF THE COLLATERALIZED, SECURED, FIXED INSTRUMENT LOAN TRANSACTION. ALWAYS CONSULT WITH A REGISTERED INVESTMENT ADVISOR AND YOUR ATTORNEYS BEFORE INVESTING OR ENGAGING IN MARGIN BORROWING.

THIS CLOSING STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY ANY SECURITIES REGULATORS OR COMMISSIONS OR SECURITIES EXCHANGES IN ANY JURISDICTION (THE "SECURITIES REGULATORS").

NO SECURITIES REGULATORS HAVE ISSUED A RULING ON EITHER THE ACCURACY OR LEGAL SUFFICIENCY OF THIS CLOSING STATEMENT NOR OF THE UNDERLYING COLLATERALIZED, SECURED, FIXED INSTRUMENT LOAN TRANSACTION (THE "TRANSACTION") THAT THIS CLOSING STATEMENT PROMULGATES.

NEITHER THIS CLOSING STATEMENT NOR THE UNDERLYING TRANSACTION IS INTENDED IN ANY WAY TO BE A PUBLIC OFFERING, BUT INSTEAD IS A CLOSING FOR AN UNDERLYING COLLATERALIZED, SECURED, FIXED-INSTRUMENT FINANCING TRANSACTION TO BE OFFERED TO AND AS AGREED TO BY QUALIFIED INVESTORS, AS DEFINED BY SECURITIES REGULATORS AND/OR BY ANY APPLICABLE SECURITIES ACT. MARGIN BORROWING ENTAILS RISK, AND THE BORROWER AND GUARANTOR ARE AWARE OF SUCH RISKS AND HAVE EFFECTIVE MANAGEMENT STRATEGIES IN PLACE TO REDUCE OR ELIMINATE RISK AS A RESULT OF MARGIN BORROWING.

LENDER INTENDS TO FUND THE BORROWER IN ACCORDANCE WITH THE STOCK LOAN AGREEMENT EXECUTED BETWEEN BORROWER, GUARANTOR AND LENDER. THE FUNDING WILL CONSIST OF MULTIPLE TRANCHES WITH DURATION BETWEEN EACH TRANCHE AND THE FUNDING AMOUNT DEPENDENT ON MARKET CONDITIONS AND LENDERS SOLE DISCRETION. ALL CALCULATIONS SHOULD BE VERIFIED BY BORROWER AND GUARANTOR UPON RECEIPT AS LENDER TAKES NO RESPONSIBILITY FOR ERRORS. CALCULATIONS INCLUDE COSTS, DEDUCTIONS, EXPENSES AND ADJUSTMENTS RECITED.



2

# CLOSING STATEMENT

**Gross Proceeds: MXN 501,591,693.09**
**Funds Settled (Net): MXN 500,000,000.00**
**Tranche 1**
**August 9, 2021**

**WHEREAS**, Astor Asset Management 3 Limited ("Lender"), Corporacion RBS SA de CV ("Borrower") and Ricardo Benjamin Salinas Pliego ("Guarantor"), collectively herein known as the "Parties", have entered into an agreed upon collateralized, secured fixed instrument-based loan transaction (the "Loan Transaction"); and

**WHEREAS**, the Parties entered into an agreed upon and fully executed Stock Loan Agreement (the "SLA") established as of July 28, 2021 to facilitate and collateralize the agreed upon Loan Transaction by and between the Parties; and

**WHEREAS**, on the date of July 30, 2021 ("Confirmation Day") Lender received the required confirmation from the Depository Broker that three million six hundred thousand (3,600,000) shares (the "Shares") of Grupo Elektra, S.A.B. de C.V., ELEKTRA:MX, (the "Issuer") posted to Guarantor's account #200-804764 at the Depository Broker (the "Pledged Collateral"), pursuant to the SLA; and

**WHEREAS**, the Loan-to-Value ratio (the "LTV") of the Shares is set in the SLA at fifty-five percent (55%) of the Shares' Fair Market Value (the "FMV"); and

**WHEREAS**, acceptance of funds constitutes Borrower's and Guarantor's further recognition and acknowledgment of all terms and conditions herein; and

**WHEREAS**, the Loan Transaction proceeds as more fully stated herein in this Closing Statement, have been or shall imminently be transferred to Borrower and credited to Borrower's account #200-804763 at the SLA listed Depository Broker upon or post the Tranche Date listed herein, in accordance with the SLA and this Closing Statement; and

**WHEREAS**, as per the SLA, the Shares have been pledged to Lender and shall be collateralized by Lender in order to release the Loan Transaction proceeds and to provide the funding facility in accordance with the SLA, which has become legally binding and in full force and effect by and between the Parties; and

**NOW, THEREFORE**, in consideration of the premises and of the representations, warranties, covenants and agreements herein contained, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto, intending to be legally bound, hereby agree as follows:



3

## STATEMENT OF TRANCHE PROCEEDS

| | | |
|---|---:|---|
| Tranche Proceeds (Gross): | ₱ 501,591,693.09 | MXN |
| Deductions: | | |
| Annual Custodian Management Charge: 0.15% | ₱ (2,938,860.67) | MXN |
| Maintenance Fee: 0.0625% per quarter[1] | ₱ 2,002,559.63 | MXN |
| Origination Fee: 1%[2] | ₱ 2,507,958.47 | MXN |
| Foreign Exchange & Bank Fees: | ₱ - | MXN |
| Legal Expenses: | ₱ 20,035.66 | MXN |
| Quarterly Advance Interest: 1.15% per annum | TBD | |
| **Net Settled Funds:** | **₱ 500,000,000.00** | **MXN** |

## FUNDING PROCEEDS AND COLLATERALIZATION RECORD

| | LTV | FMP (MXN) | Facility (MXN) | Shares Pledged | Avg. Volume[3] |
|---|---|---|---|---|---|
| Master Facility | 55% | ₱1,618.23 | ₱3,204,095,400.00 | 3,600,000 | 82,368 |
| Current FMP (USD): | | ₱1,618.23 | | | |

| Tranche No. | Tranche Date | Price (MXN) | Gross Funding Amount (MXN) | Collaterized Shares | Net Funds after Deductions (MXN) |
|---|---|---|---|---|---|
| 1 | 9-Aug-21 | ₱1,618.23 | ₱ 501,591,693.09 | 563,569 | ₱ 500,000,000.00 |
| 2 | | | | | |
| 3 | | | | | |
| 4 | | | | | |
| 5 | | | | | |

| | | | |
|---|---|---|---|
| **Total Funding to Date:** | ₱ 501,591,693.09 | | ₱ 500,000,000.00 |
| **Current Value of Pledged Shares:** | ₱5,825,628,000.00 | | |
| **Current Value of Uncollateralized Shares:** | ₱4,913,643,737.13 | 3,036,431 | |
| **Balance due Borrower at Tranche Price:** | ₱2,702,504,055.42 | | |

---

1. *Maintenance Fee in the exact same amount as initial charge is due in advance every three months; future payments must be paid by Borrower to Lender in advance every three months on the quarterly anniversary of the Tranche 1 Closing Statement for the term of the Loan Transaction without further notice or repeated demand.*

2. *Pursuant to the SLA, 50% of the Origination Fee applicable to each tranche is deducted from the Loan Principal Amount. The balance of the 1% Origination Fee in the exact same amount as the initial deduction listed in each Closing Statement is due without further notice or repeated demand on the first annual anniversary of each respective Tranche Date.*

3. *Daily Average Volume for one month preceding collateral settlement per Yahoo Finance data for June 30, 2021 to July 29, 2021.*



Borrower and Guarantor hereby acknowledge, understand and agree that the current FMV of the shares, as stated above, is the FMV of the shares at the time of funding and is for this tranche, as per the Schedules in this Closing Statement.

Borrower and Guarantor further hereby acknowledge, understand and agree that each subsequent tranche of the Loan Principal Amount and its loan proceeds accordingly may vary and may likely fluctuate due to market conditions, risk management, daily trading price of the Shares at time of funding and changes in Borrower or Guarantor qualification, and Lender may issue future Closing Statements without requiring the signature of Borrower and Guarantor.

Borrower and Guarantor shall note that the first year's Annual Custodian Management Charge has been invoiced to Borrower directly by Depository Broker. Tranche 1 Closing Statement includes an adjustment in favor of Borrower for excess amount invoiced by Depository Broker. For each subsequent annual period, the Annual Custodian Management Charge in the amount of USD$440,044.43 must be remitted by Borrower to Lender at least fourteen (14) days prior to the Effective Date of the SLA without further notice or repeated demand.

Borrower and Guarantor shall additionally note that quarterly interest shall be due and payable in advance on the 1st of the month every three (3) months, with interest accruing from the date Cash Collateral is deposited by Lender to Borrower's account.

Borrower and Guarantor hereby acknowledge and agree that Lender reserves the right to deduct from loan proceeds foreign exchange and banking costs incurred by Lender in funding the Loan Transaction which is denominated in Mexican Pesos, and any such costs may be applied retroactively after Lender determines costs incurred.

All Parties hereby agree that Weiser Global Capital Markets Ltd. ("Weiser"), as the agreed-upon Depository Broker, is not a party to the transaction between Lender, Borrower and Guarantor, nor does Weiser take responsibility or assume any liability in coordinating, structuring or overseeing any aspect of the underlying Loan Transaction and merely acts as a custodian over the collateral Shares. Any and all arrangements between Lender, Borrower and Guarantor have been negotiated and determined by and between their respective counsel.

Borrower and Guarantor expressly agree that the SLA and all of its provisions, warranties, rights, terms and conditions are valid and in full legal force and effect as of the date of this Closing Statement and there are no material changes.

Borrower and Guarantor expressly agree that failure to remedy any event of default or other deficiency in this Loan Transaction, other loan facilities between the Parties or any other loan or debt facility of the Borrower or Guarantor ("All Facilities") will constitute a default of All Facilities between the Parties.

Borrower and Guarantor expressly represent that they are not subject to, part of nor the subject of any criminal investigation where the Pledged Collateral may be exposed to seizure or claim.



5

Borrower and Guarantor expressly represent that there has not been any material change to the Shares or the shares of the Issuer, Borrower or Guarantor which may undermine the value of the Pledged Collateral, and, to the best of Borrower's and Guarantor's knowledge, the Issuer of the Shares is not subject to any criminal investigation or misconduct and has timely filed all of its required reports with the stock exchange where Shares are traded.

Borrower and Guarantor expressly represent and agree to cooperate with the Lender, Depository Broker, Global Custodian and sub-Custodian and any third-party due diligence and compliance firm in furnishing any further required audited financial records and due diligence.

Borrower and Guarantor expressly represent that they are currently registered, domiciled and in Good Standing in their corporate home jurisdiction, have not declared bankruptcy in the last seven (7) years and are fully solvent.

Borrower and Guarantor expressly represent that the pledged securities as above stated are not restricted in any way, are free trading and that neither Borrower nor Guarantor have received any notice of any kind from any stock exchange or any broker-dealer which has informed or advised Borrower or Guarantor that the pledged securities are in any way restricted, under a special watch, are on a special hotlist or stop trade limitation and, further that Borrower and Guarantor are not aware of any such notice or alert that any issued security of the Issuer of the Shares is limited or restricted in trading in any way.

Borrower and Guarantor expressly represent that no representations or warranties of any kind have been made by Lender to Borrower or Guarantor, other than those in the written and executed loan agreement by and between the Parties to this Loan Transaction.

Borrower and Guarantor hereby acknowledge, understand and agree that in the event of any inconsistency or conflict with the signed and executed SLA, this Closing Statement shall be the final and controlling document, and the protective covenants and provisions of this Closing Statement shall prevail over any previous document, and furthermore, Borrower and Guarantor expressly agree that in section II.3(b) of the SLA the reference to "every four months" is replaced by "every three months" and in section VI.3(b) of the SLA the reference to "Hereinafter a new FMP" is replaced by "Thereafter a new Margin Call threshold" and the reference to "original FMP" is replaced by "original Margin Call threshold".

Borrower and Guarantor expressly represent that they are not a resident or citizen of the United States of America, that they to the best of their knowledge are not subject to the Securities and Exchange Acts of 1933 and 1934 and are not a subject of any investigation or action by the United States Securities & Exchange Commission or any other regulatory or enforcement agency of the United States of America.

Borrower and Guarantor hereby acknowledge, understand and agree that failure of Lender to exercise any right, power or remedy provided under this Closing Statement or the SLA or otherwise available in respect hereof at law or in equity, or to insist upon compliance by any party hereto with its obligations hereunder, and any custom or practice of the parties at



variance with the terms hereof, shall not constitute a waiver by Lender of its right to exercise any such or other right, power or remedy available to it at any time or to demand such compliance at any time in the future. At no time shall funding be construed to be a waiver of any kind including funding provided after an Event of Default. Lender reserves the right to continue funding and invoke an Event of Default at any time in the future. All of Lender's rights are reserved.

Borrower and Guarantor expressly represent that at all times they have been represented by competent legal counsel and that Borrower and Guarantor have had ample opportunity to consult separately with independent legal counsel in order to make an informed decision whether to agree to execute the SLA and this Closing Statement.

Borrower and Guarantor expressly represent that this Closing Statement has not been modified, edited or altered in any way and expressly agree this Closing Statement cannot be modified except by written addendum thereto fully executed by the Parties herein.

Borrower and Guarantor further and expressly represent that they are Qualified/Professional Investors, have agreed to this Closing Statement and all of its representations, warranties, covenants and agreements herein contained of their own free will, based upon their independent judgment and upon the advice of competent independent legal counsel

Borrower and Guarantor further and expressly understand that Lender's underwriting may change at any time up-until funding or during funding if such funding is in tranches and market conditions, changes in Pledged Collateral or deterioration of Borrower's or Guarantor's qualifying criteria, in Lenders sole discretion, warrant it. Borrower and Guarantor further understand and expressly agree that the Lock-Up Period for Prepayment of the Loan Transaction shall be extended to coincide with loan Maturity Date. Lender does not guarantee funding or voting rights and all funding is at Lenders sole discretion until disbursement.

Borrower and Guarantor are capable and willing to post margin when required to do so.

## I. LOAN PROCEEDS ACCOUNT INFORMATION:

| Institution's Name | Weiser Global Capital Markets Ltd. |
|---|---|
| Account Number | 200-804763 |
| Account Name | Corporacion RBS SA de CV |

## II. CASH & STOCK TOP UP ACCOUNT INFORMATION:

| Institution's Name | Weiser Global Capital Markets Ltd. |
|---|---|
| Account Number | 200-804765 |
| Account Name | Ricardo Benjamin Salinas Pliego |




7

It is Borrower's and Guarantor's responsibility to notify Lender of transfers and confirm each transaction is processed by the receiving institution before any applicable due date.

IN WITNESS WHEREOF, the Parties hereto have caused this Closing Statement and Addendum to be duly executed as of the day and year written below. Each Party has consulted their respective legal counsel and agree to the terms written herein.

**BORROWER:** Corporacion RBS SA de CV

| | | |
|---|---|---|
| _____ | Ricardo Benjamin Salinas Pliego | August 9, 2021 |
| Signature | Name and Title | Date |

| | | |
|---|---|---|
| _____ | Eduardo Gonzalez Salceda Sanchez | |
| Seal | Witness | |
| | Witness is only certifying Borrower's Signature | |

**GUARANTOR:** Ricardo Benjamin Salinas Pliego

| | | |
|---|---|---|
| _____ | Ricardo Benjamin Salinas Pliego | August 9, 2021 |
| Signature | Name and Title | Date |

| | | |
|---|---|---|
| _____ | Eduardo Gonzalez Salceda Sanchez | |
| Seal | Witness | |
| | Witness is only certifying Guarantor's Signature | |

**LENDER:** Astor Asset Management 3 Limited

| | | |
|---|---|---|
| _____ | _____ | _____ |
| Signature | Name and Title | Date |



8



## United Kingdom
20 MIDTOWN
20 PROCTER STREET,
LONDON, UK, WC1V 6NX

europe.inquiries@astorassetgroup.com
**+44 2 0386 84 620**

## Germany
Niederrad business district
LYONER STRASSE 14
FRANKFURT, GERMANY, 60528

europe.inquiries@astorassetgroup.com
**+49 0800 1812772**

## Australia
330 Collins Street,
level 14
Melbourne, Australia, 3000

oceania.inquiries@astorassetgroup.com
**+613 8375 7172**

## Vietnam
65 Le Loi Street, Level 14,
Bem Nghe Ward
Ho Chi Minh City, Vietnam, District 1

asia.inquiries@astorassetgroup.com
**+84 28 4458 1398**

## Hong Kong
18 Westlands Road
Level 23
Hong Kong, Hong Kong

asia.inquiries@astorassetgroup.com
**+852 800 964 226**

## Singapore
Six Battery Road
30 Cecil Street Level 42
Singapore, Singapore 049909

asia.inquiries@astorassetgroup.com
**+65 800 492 2419**



# EXHIBIT 5



Astor Asset Management

# SECURITIES-BACKED FINANCING

**A Fixed Instrument, Collateralized Non-Recourse Facility**

## CLOSING STATEMENT AND SETTLEMENT

Prepared Exclusively for a Shareholder of

**GRUPO ELEKTRA, S.A.B. DE C.V.**
**SYMBOL: (ELEKTRA:MX)**

# NOTICE TO BORROWER AND GUARANTOR

PLEASE TAKE NOTICE THAT A COLLATERALIZED, SECURED FIXED INSTRUMENT BASED LOAN TRANSACTION MAY INVOLVE SUBSTANTIAL ELEMENTS OF RISK THAT INVOLVE SHARES IN PUBLICLY TRADED SECURITIES WHICH MAY BE SUBJECT TO ADVERSE CREDIT RISKS, ADVERSE TAX RISKS AND/OR ADVERSE MARKET CONDITIONS THAT COULD NEGATIVELY IMPACT ALL OR PART OF THE COLLATERALIZED, SECURED, FIXED INSTRUMENT LOAN TRANSACTION. ALWAYS CONSULT WITH A REGISTERED INVESTMENT ADVISOR AND YOUR ATTORNEYS BEFORE INVESTING OR ENGAGING IN MARGIN BORROWING.

THIS CLOSING STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY ANY SECURITIES REGULATORS OR COMMISSIONS OR SECURITIES EXCHANGES IN ANY JURISDICTION (THE "SECURITIES REGULATORS").

NO SECURITIES REGULATORS HAVE ISSUED A RULING ON EITHER THE ACCURACY OR LEGAL SUFFICIENCY OF THIS CLOSING STATEMENT NOR OF THE UNDERLYING COLLATERALIZED, SECURED, FIXED INSTRUMENT LOAN TRANSACTION (THE "TRANSACTION") THAT THIS CLOSING STATEMENT PROMULGATES.

NEITHER THIS CLOSING STATEMENT NOR THE UNDERLYING TRANSACTION IS INTENDED IN ANY WAY TO BE A PUBLIC OFFERING, BUT INSTEAD IS A CLOSING FOR AN UNDERLYING COLLATERALIZED, SECURED, FIXED-INSTRUMENT FINANCING TRANSACTION TO BE OFFERED TO AND AS AGREED TO BY QUALIFIED INVESTORS, AS DEFINED BY SECURITIES REGULATORS AND/OR BY ANY APPLICABLE SECURITIES ACT. MARGIN BORROWING ENTAILS RISK, AND THE BORROWER AND GUARANTOR ARE AWARE OF SUCH RISKS AND HAVE EFFECTIVE MANAGEMENT STRATEGIES IN PLACE TO REDUCE OR ELIMINATE RISK AS A RESULT OF MARGIN BORROWING.

LENDER INTENDS TO FUND THE BORROWER IN ACCORDANCE WITH THE STOCK LOAN AGREEMENT EXECUTED BETWEEN BORROWER, GUARANTOR AND LENDER. THE FUNDING WILL CONSIST OF MULTIPLE TRANCHES WITH DURATION BETWEEN EACH TRANCHE AND THE FUNDING AMOUNT DEPENDENT ON MARKET CONDITIONS AND LENDERS SOLE DISCRETION. ALL CALCULATIONS SHOULD BE VERIFIED BY BORROWER AND GUARANTOR UPON RECEIPT AS LENDER TAKES NO RESPONSIBILITY FOR ERRORS. CALCULATIONS INCLUDE COSTS, DEDUCTIONS, EXPENSES AND ADJUSTMENTS RECITED.



# CLOSING STATEMENT

### Gross Proceeds: MXN 327,497,030.23
### Funds Settled (Net): MXN 300,000,000.00
### Tranche 2
### September 10, 2021

**WHEREAS**, Astor Asset Management 3 Limited ("Lender"), Corporacion RBS SA de CV ("Borrower") and Ricardo Benjamin Salinas Pliego ("Guarantor"), collectively herein known as the "Parties", have entered into an agreed upon collateralized, secured fixed instrument-based loan transaction (the "Loan Transaction"); and

**WHEREAS**, the Parties entered into an agreed upon and fully executed Stock Loan Agreement (the "SLA") established as of July 28, 2021 to facilitate and collateralize the agreed upon Loan Transaction by and between the Parties; and

**WHEREAS**, on the date of July 30, 2021 ("Confirmation Day") Lender received the required confirmation from the Depository Broker that three million six hundred thousand (3,600,000) shares (the "Shares") of Grupo Elektra, S.A.B. de C.V., ELEKTRA:MX, (the "Issuer") posted to Guarantor's account #200-804764 at the Depository Broker (the "Pledged Collateral"), pursuant to the SLA; and

**WHEREAS**, the Loan-to-Value ratio (the "LTV") of the Shares is set in the SLA at fifty-five percent (55%) of the Shares' Fair Market Value (the "FMV"); and

**WHEREAS**, acceptance of funds constitutes Borrower's and Guarantor's further recognition and acknowledgment of all terms and conditions herein; and

**WHEREAS**, the Loan Transaction proceeds as more fully stated herein in this Closing Statement, have been or shall imminently be transferred to Borrower and credited to Borrower's account #200-804763 at the SLA listed Depository Broker upon or post the Tranche Date listed herein, in accordance with the SLA and this Closing Statement; and

**WHEREAS**, as per the SLA, the Shares have been pledged to Lender and shall be collateralized by Lender in order to release the Loan Transaction proceeds and to provide the funding facility in accordance with the SLA, which has become legally binding and in full force and effect by and between the Parties; and

**NOW, THEREFORE**, in consideration of the premises and of the representations, warranties, covenants and agreements herein contained, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto, intending to be legally bound, hereby agree as follows:

 www.AstorAssetGroup.com

03

## STATEMENT OF TRANCHE PROCEEDS

| | | |
|---|---:|---|
| Tranche Proceeds (Gross): | ₱ 327,497,030.23 | MXN |
| Deductions: | | |
| Custodian Management Charge: | | |
| 0.0375% per quarter | ₱ 5,132,326.99 | MXN |
| Maintenance Fee: 0.0625% per quarter[1] | ₱ - | MXN |
| Origination Fee: 1%[2] | ₱ 1,637,485.15 | MXN |
| Foreign Exchange & Bank Fees: 2.5% | ₱ 20,727,218.09 | MXN |
| Legal Expenses: | ₱ - | MXN |
| **Quarterly Advance Interest: 1.15% per annum** | TBD | |
| **Net Settled Funds:** | **₱ 300,000,000.00** | **MXN** |

## FUNDING PROCEEDS AND COLLATERALIZATION RECORD

| | LTV | FMP (MXN) | Facility (MXN) | Shares Pledged | Avg. Volume[3] |
|---|---|---|---|---|---|
| Master Facility | 55% | ₱1,618.23 | ₱3,204,095,400.00 | 3,600,000 | 82.368 |
| | Current FMP (USD): | ₱1,599.19 | | | |

| Tranche No. | Tranche Date | Price (MXN) | Gross Funding Amount (MXN) | Collaterized Shares | Net Funds after Deductions (MXN) |
|---|---|---|---|---|---|
| 1 | 9-Aug-21 | ₱1,618.23 | ₱ 501,591,693.09 | 563,569 | ₱ 500,000,000.00 |
| 2 | 17-Sep-21 | ₱1,599.19 | ₱ 327,497,030.23 | 372,344 | ₱ 300,000,000.00 |
| 3 | | | | | |
| 4 | | | | | |
| 5 | | | | | |
| **Total Funding to Date:** | | | **₱ 829,088,723.32** | | **₱ 800,000,000.00** |
| **Current Value of Pledged Shares:** | | | **₱5,757,084,000.00** | | |
| **Current Value of Uncollateralized Shares:** | | | **₱4,260,381,289.53** | **2,664,087** | |
| **Balance due Borrower at Tranche Price:** | | | **₱2,343,209,709.24** | | |

1 - *Maintenance Fee in the exact same amount as initial charge is due in advance every three months; future payments must be paid by Borrower to Lender in advance every three months on the quarterly anniversary of the Tranche 1 Closing Statement for the term of the Loan Transaction without further notice or repeated demand.*

2 - *Pursuant to the SLA, 50% of the Origination Fee applicable to each tranche is deducted from the Loan Principal Amount. The balance of the 1% Origination Fee in the exact same amount as the initial deduction listed in each Closing Statement is due without further notice or repeated demand on the first annual anniversary of each respective Tranche Date.*

3. *Daily Average Volume for one month preceding collateral settlement per Yahoo Finance data for June 30, 2021 to July 29, 2021.*

 www.AstorAssetGroup.com

04

Borrower and Guarantor hereby acknowledge, understand and agree that the current FMV of the shares, as stated above, is the FMV of the shares at the time of funding and is for this tranche, as per the Schedules in this Closing Statement.

Borrower and Guarantor further hereby acknowledge, understand and agree that each subsequent tranche of the Loan Principal Amount and its loan proceeds accordingly may vary and may likely fluctuate due to market conditions, risk management, daily trading price of the Shares at time of funding and changes in Borrower or Guarantor qualification, and Lender may issue future Closing Statements without requiring the signature of Borrower and Guarantor.

Borrower and Guarantor shall note that the Custodian Management Charge for the first three (3) months has been deducted from loan proceeds. Tranche 1 Closing Statement includes a Custodian Management Charge adjustment in favor of Borrower which is reversed in Tranche 2 Closing Statement, and the Custodian Management Charge for the initial period is deducted from loan proceeds in Tranche 2 Closing Statement. For each subsequent quarterly period, the Custodian Management Charge in the amount of USD$110,011.11 must be remitted by Borrower to Lender at least fourteen (14) days prior to each quarterly anniversary of the Effective Date of the SLA without further notice or repeated demand.

Borrower and Guarantor shall additionally note that quarterly interest shall be due and payable in advance on the 1st of the month every three (3) months, with interest accruing from the date Cash Collateral is deposited by Lender to Borrower's account.

Borrower and Guarantor hereby acknowledge and agree that Lender reserves the right to deduct from loan proceeds foreign exchange and banking costs incurred by Lender in funding the Loan Transaction which is denominated in Mexican Pesos, and any such costs may be applied retroactively after Lender determines costs incurred.

All Parties hereby agree that Weiser Global Capital Markets Ltd. ("Weiser"), as the agreed-upon Depository Broker, is not a party to the transaction between Lender, Borrower and Guarantor, nor does Weiser take responsibility or assume any liability in coordinating, structuring or overseeing any aspect of the underlying Loan Transaction and merely acts as a custodian over the collateral Shares. Any and all arrangements between Lender, Borrower and Guarantor have been negotiated and determined by and between their respective counsel.

Borrower and Guarantor expressly agree that the SLA and all of its provisions, warranties, rights, terms and conditions are valid and in full legal force and effect as of the date of this Closing Statement and there are no material changes.

Borrower and Guarantor expressly agree that failure to remedy any event of default or other deficiency in this Loan Transaction, other loan facilities between the Parties or any other loan or debt facility of the Borrower or Guarantor ("All Facilities") will constitute a default of All Facilities between the Parties.

Borrower and Guarantor expressly represent that they are not subject to, part of nor the subject of any criminal investigation where the Pledged Collateral may be exposed to seizure or claim.



www.AstorAssetGroup.com                                                                    05

Borrower and Guarantor expressly represent that there has not been any material change to the Shares or the shares of the Issuer, Borrower or Guarantor which may undermine the value of the Pledged Collateral, and, to the best of Borrower's and Guarantor's knowledge, the Issuer of the Shares is not subject to any criminal investigation or misconduct and has timely filed all of its required reports with the stock exchange where Shares are traded.

Borrower and Guarantor expressly represent and agree to cooperate with the Lender, Depository Broker, Global Custodian and sub-Custodian and any third-party due diligence and compliance firm in furnishing any further required audited financial records and due diligence.

Borrower and Guarantor expressly represent that they are currently registered, domiciled and in Good Standing in their corporate home jurisdiction, have not declared bankruptcy in the last seven (7) years and are fully solvent.

Borrower and Guarantor expressly represent that the pledged securities as above stated are not restricted in any way, are free trading and that neither Borrower nor Guarantor have received any notice of any kind from any stock exchange or any broker-dealer which has informed or advised Borrower or Guarantor that the pledged securities are in any way restricted, under a special watch, are on a special hotlist or stop trade limitation and, further that Borrower and Guarantor are not aware of any such notice or alert that any issued security of the Issuer of the Shares is limited or restricted in trading in any way.

Borrower and Guarantor expressly represent that no representations or warranties of any kind have been made by Lender to Borrower or Guarantor, other than those in the written and executed loan agreement by and between the Parties to this Loan Transaction.

Borrower and Guarantor hereby acknowledge, understand and agree that in the event of any inconsistency or conflict with the signed and executed SLA, this Closing Statement shall be the final and controlling document, and the protective covenants and provisions of this Closing Statement shall prevail over any previous document, and furthermore, Borrower and Guarantor expressly agree that in section II.3(b) of the SLA the reference to "every four months" is replaced by "every three months" and in section VI.3(b) of the SLA the reference to "Hereinafter a new FMP" is replaced by "Thereafter a new Margin Call threshold" and the reference to "original FMP" is replaced by "original Margin Call threshold".

Borrower and Guarantor expressly represent that they are not a resident or citizen of the United States of America, that they to the best of their knowledge are not subject to the Securities and Exchange Acts of 1933 and 1934 and are not a subject of any investigation or action by the United States Securities & Exchange Commission or any other regulatory or enforcement agency of the United States of America.

Borrower and Guarantor hereby acknowledge, understand and agree that failure of Lender to exercise any right, power or remedy provided under this Closing Statement or the SLA or otherwise available in respect hereof at law or in equity, or to insist upon compliance by any party hereto with its obligations hereunder, and any custom or practice of the parties at

 www.AstorAssetGroup.com

06

variance with the terms hereof, shall not constitute a waiver by Lender of its right to exercise any such or other right, power or remedy available to it at any time or to demand such compliance at any time in the future. At no time shall funding be construed to be a waiver of any kind including funding provided after an Event of Default. Lender reserves the right to continue funding and invoke an Event of Default at any time in the future. All of Lender's rights are reserved.

Borrower and Guarantor expressly represent that at all times they have been represented by competent legal counsel and that Borrower and Guarantor have had ample opportunity to consult separately with independent legal counsel in order to make an informed decision whether to agree to execute the SLA and this Closing Statement.

Borrower and Guarantor expressly represent that this Closing Statement has not been modified, edited or altered in any way and expressly agree this Closing Statement cannot be modified except by written addendum thereto fully executed by the Parties herein.

Borrower and Guarantor further and expressly represent that they are Qualified/Professional Investors, have agreed to this Closing Statement and all of its representations, warranties, covenants and agreements herein contained of their own free will, based upon their independent judgment and upon the advice of competent independent legal counsel.

Borrower and Guarantor further and expressly understand that Lender's underwriting may change at any time up-until funding or during funding if such funding is in tranches and market conditions, changes in Pledged Collateral or deterioration of Borrower's or Guarantor's qualifying criteria, in Lenders sole discretion, warrant it. Borrower and Guarantor further understand and expressly agree that the Lock-Up Period for Prepayment of the Loan Transaction shall be extended to coincide with loan Maturity Date. Lender does not guarantee funding or voting rights and all funding is at Lenders sole discretion until disbursement.

Borrower and Guarantor are capable and willing to post margin when required to do so.

## I. LOAN PROCEEDS ACCOUNT INFORMATION:

| Institution's Name | Weiser Global Capital Markets Ltd. |
|---|---|
| Account Number | 200-804763 |
| Account Name | Corporacion RBS SA de CV |

## II. CASH & STOCK TOP UP ACCOUNT INFORMATION:

| Institution's Name | Weiser Global Capital Markets Ltd. |
|---|---|
| Account Number | 200-804765 |
| Account Name | Ricardo Benjamin Salinas Pliego |



## III. INTEREST, PRINCIPAL & FEE PAYMENT INFORMATION:

| | |
|---|---|
| Institution's Name | Weiser Global Capital Markets Ltd. |
| Account Number | 200-804586 |
| Account Name | Astor Interest Credit |

*NOTE: Depository Broker must be contacted to request internal transfer of funds from Borrower account.*

It is Borrower's and Guarantor's responsibility to notify Lender of transfers and confirm each transaction is processed by the receiving institution before any applicable due date.

*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*



IN WITNESS WHEREOF, the Parties hereto have caused this Closing Statement and Addendum to be duly executed as of the day and year written below. Each Party has consulted their respective legal counsel and agree to the terms written herein.

**BORROWER:** Corporacion RBS SA de CV

| Signature | Name and Title<br>Ricardo Benjamin Salinas Pliego | Date<br>September 17, 2021 |

Seal

Eduardo Gonzalez Salceda Sanchez
Witness
Witness is only certifying Borrower's Signature

**GUARANTOR:** Ricardo Benjamin Salinas Pliego

Signature    Name and Title
Ricardo Benjamin Salinas Pliego    Date
September 17, 2021

Seal

Eduardo Gonzalez Salceda Sanchez
Witness
Witness is only certifying Guarantor's Signature

**LENDER:** Astor Asset Management 3 Limited

Signature    Name and Title
Mariia Mitsa, Managing Member    Date
09/13/2021



# EXHIBIT 6

# NOTICE TO BORROWER AND GUARANTOR

PLEASE TAKE NOTICE THAT A COLLATERALIZED, SECURED FIXED INSTRUMENT BASED LOAN TRANSACTION MAY INVOLVE SUBSTANTIAL ELEMENTS OF RISK THAT INVOLVE SHARES IN PUBLICLY TRADED SECURITIES WHICH MAY BE SUBJECT TO ADVERSE CREDIT RISKS, ADVERSE TAX RISKS AND/OR ADVERSE MARKET CONDITIONS THAT COULD NEGATIVELY IMPACT ALL OR PART OF THE COLLATERALIZED, SECURED, FIXED INSTRUMENT LOAN TRANSACTION. ALWAYS CONSULT WITH A REGISTERED INVESTMENT ADVISOR AND YOUR ATTORNEYS BEFORE INVESTING OR ENGAGING IN MARGIN BORROWING.

THIS CLOSING STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY ANY SECURITIES REGULATORS OR COMMISSIONS OR SECURITIES EXCHANGES IN ANY JURISDICTION (THE "SECURITIES REGULATORS").

NO SECURITIES REGULATORS HAVE ISSUED A RULING ON EITHER THE ACCURACY OR LEGAL SUFFICIENCY OF THIS CLOSING STATEMENT NOR OF THE UNDERLYING COLLATERALIZED, SECURED, FIXED INSTRUMENT LOAN TRANSACTION (THE "TRANSACTION") THAT THIS CLOSING STATEMENT PROMULGATES.

NEITHER THIS CLOSING STATEMENT NOR THE UNDERLYING TRANSACTION IS INTENDED IN ANY WAY TO BE A PUBLIC OFFERING, BUT INSTEAD IS A CLOSING FOR AN UNDERLYING COLLATERALIZED, SECURED, FIXED-INSTRUMENT FINANCING TRANSACTION TO BE OFFERED TO AND AS AGREED TO BY QUALIFIED INVESTORS, AS DEFINED BY SECURITIES REGULATORS AND/OR BY ANY APPLICABLE SECURITIES ACT. MARGIN BORROWING ENTAILS RISK, AND THE BORROWER AND GUARANTOR ARE AWARE OF SUCH RISKS AND HAVE EFFECTIVE MANAGEMENT STRATEGIES IN PLACE TO REDUCE OR ELIMINATE RISK AS A RESULT OF MARGIN BORROWING.

LENDER INTENDS TO FUND THE BORROWER IN ACCORDANCE WITH THE STOCK LOAN AGREEMENT EXECUTED BETWEEN BORROWER, GUARANTOR AND LENDER. LENDER WILL AT ALL TIMES MAINTAIN ITS ABILITY TO RETURN AN EQUIVALENT NUMBER OF ISSUER SECURITIES VALUED AT FAIR MARKET VALUE. THE FUNDING WILL CONSIST OF MULTIPLE TRANCHES WITH DURATION BETWEEN EACH TRANCHE AND THE FUNDING AMOUNT DEPENDENT ON MARKET CONDITIONS AND LENDERS SOLE DISCRETION. ALL CALCULATIONS SHOULD BE VERIFIED BY BORROWER AND GUARANTOR UPON RECEIPT AS LENDER TAKES NO RESPONSIBILITY FOR ERRORS. CALCULATIONS INCLUDE COSTS, DEDUCTIONS, EXPENSES AND ADJUSTMENTS RECITED.






# CLOSING STATEMENT

**Gross Proceeds: MXN 532,484,020.62**
**Funds Settled (Net): MXN 510,000,000.00**
**Tranche 3**
**February 4, 2022**

**WHEREAS**, Astor Asset Management 3 Limited ("Lender"), Corporacion RBS SA de CV ("Borrower") and Ricardo Benjamin Salinas Pliego ("Guarantor"), collectively herein known as the "Parties", have entered into an agreed upon collateralized, secured fixed instrument-based loan transaction (the "Loan Transaction"); and

**WHEREAS**, the Parties entered into an agreed upon and fully executed Stock Loan Agreement (the "SLA") established as of July 28, 2021 to facilitate and collateralize the agreed upon Loan Transaction by and between the Parties; and

**WHEREAS**, on the date of July 30, 2021 ("Confirmation Day") Lender received the required confirmation from the Depository Broker that three million six hundred thousand (3,600,000) shares (the "Shares") of Grupo Elektra, S.A.B. de C.V., ELEKTRA:MX, (the "Issuer") posted to Guarantor's account at the Depository Broker (the "Pledged Collateral"), pursuant to the SLA; and

**WHEREAS**, the Loan-to-Value ratio (the "LTV") of the Loan was originally set in the SLA at fifty-five percent (55%) of the Shares' Fair Market Value (the "FMV"), it has been mutually agreed that the LTV of the Loan is hereby adjusted to forty-five percent (45%); and

**WHEREAS**, the Approved Loan Amount is hereby being reduced to Two Billion Sixty Eight Million Mexican Pesos (MXN 2,068,000,000.00) with an equivalent number of shares to be collateralized and any remaining uncollateralized shares to be returned to Borrower upon successful competition of funding; and

**WHEREAS**, acceptance of funds constitutes Borrower's and Guarantor's further recognition and acknowledgment of all terms and conditions herein; and

**WHEREAS**, the Loan Transaction proceeds as more fully stated herein in this Closing Statement, have been or shall imminently be transferred to Borrower upon or post the Tranche Date listed herein, in accordance with the SLA and this Closing Statement; and

**WHEREAS**, as per the SLA, the Shares have been pledged to Lender and shall be collateralized by Lender in order to release the Loan Transaction proceeds and to provide the funding facility in accordance with the SLA, which has become legally binding and in full force and effect by and between the Parties; and

**NOW, THEREFORE**, in consideration of the premises and of the representations, warranties, covenants and agreements herein contained, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto, intending to be legally bound, hereby agree as follows:



## STATEMENT OF TRANCHE PROCEEDS

| | | | |
|---|---|---:|---|
| Tranche Proceeds (Gross): | ₱ | 532,484,020.62 | MXN |
| Deductions: | | | |
| Custodian Transfer Charge: | ₱ | 6,509,500.00 | MXN |
| Maintenance Fee: 0.0625% per quarter[1] | ₱ | - | MXN |
| Origination Fee: 1%[2] | ₱ | 2,662,420.10 | MXN |
| Foreign Exchange & Bank Fees: 2.5% | ₱ | 13,312,100.52 | MXN |
| Legal Expenses: | ₱ | - | MXN |
| Quarterly Advance Interest: 1.15% per annum | | TBD | |
| **Net Settled Funds:** | **₱** | **510,000,000.00** | **MXN** |

## FUNDING PROCEEDS AND COLLATERALIZATION RECORD

| | LTV | FMP (MXN) | Facility (MXN) | Shares Pledged | Avg. Volume[3] |
|---|---|---|---|---|---|
| Master Facility | 45% | ₱1,618.23 | ₱2,621,532,600.00 | 3,600,000 | 32,368 |
| Current FMP (USD): | | ₱1,353.54 | | | |

| Tranche No. | Tranche Date | Price (MXN) | Gross Funding Amount (MXN) | Collaterized Shares | Net Funds after Deductions (MXN) |
|---|---|---|---|---|---|
| 1 | 9-Aug-21 | ₱1,618.23 | ₱ 501,591,693.09 | 563,569 | ₱ 500,000,000.00 |
| 2 | 17-Sep-21 | ₱1,599.19 | ₱ 327,497,030.23 | 372,344 | ₱ 300,000,000.00 |
| 3[4] | 7-Feb-22 | ₱1,353.54 | ₱ 532,484,020.62 | 1,299,497 | ₱ 510,000,000.00 |
| 4 | | | | | |
| 5 | | | | | |
| **Total Funding to Date:** | | | **₱1,361,572,743.94** | | **₱1,310,000,000.00** |
| **Current Value of Pledged Shares:** | | | **₱4,872,744,000.00** | | |
| **Current Value of Uncollateralized Shares:** | | | **₱1,847,027,148.60** | **1,364,590** | |
| **Balance due Borrower at Tranche Price:** | | | **₱ 831,162,216.87** | | |

1. *Maintenance Fee in the exact same amount as initial charge is due in advance every three months; future payments must be paid by Borrower to Lender in advance every three months on the quarterly anniversary of the Tranche 1 Closing Statement for the term of the Loan Transaction without further notice or repeated demand.*

2. *Pursuant to the SLA, 50% of the Origination Fee applicable to each tranche is deducted from the Loan Principal Amount. The balance of the 1% Origination Fee in the exact same amount as the initial deduction listed in each Closing Statement is due without further notice or repeated demand on the first annual anniversary of each respective Tranche Date.*

3. *Daily Average Volume for one month preceding collateral settlement per Yahoo Finance data for June 30, 2021 to July 29, 2021.*

4. *Collateralized shares are adjusted to reflect reduction of Loan to 45% LTV.*



Borrower and Guarantor hereby acknowledge, understand and agree that the current FMV of the shares, as stated above, is the FMV of the shares at the time of funding and is for this tranche, as per the Schedules in this Closing Statement.

Borrower and Guarantor further hereby acknowledge, understand and agree that each subsequent tranche of the Loan Principal Amount and its loan proceeds accordingly may vary and may likely fluctuate due to market conditions, risk management, daily trading price of the Shares at time of funding and changes in Borrower or Guarantor qualification, and Lender may issue future Closing Statements without requiring the signature of Borrower and Guarantor.

Borrower and Guarantor shall note that the Custodian Management Charge for the first three (3) months has been deducted from loan proceeds. Borrower is responsible for these and all Custodian and third-party fees related to custody. Tranche 1 Closing Statement includes a Custodian Management Charge adjustment in favor of Borrower which is reversed in Tranche 2 Closing Statement, and the Custodian Management Charge for the initial period is deducted from loan proceeds in Tranche 2 Closing Statement. For each subsequent quarterly period, the Custodian Management Charge in the amount of USD$110,011.11 must be remitted by Borrower to Lender at least fourteen (14) days prior to each quarterly anniversary of the Effective Date of the SLA without further notice or repeated demand.

Borrower and Guarantor shall additionally note that quarterly interest shall be due and payable in advance on the 1st of the month every three (3) months, with interest accruing from the date Cash Collateral is deposited by Lender to Borrower's account.

Borrower and Guarantor hereby acknowledge and agree that Lender reserves the right to deduct from loan proceeds foreign exchange and banking costs incurred by Lender in funding the Loan Transaction which is denominated in Mexican Pesos, and any such costs may be applied retroactively after Lender determines costs incurred.

All Parties hereby agree that Tavira Securities Limited ("Tavira "), as the agreed-upon Depository Broker, is not a party to the transaction between Lender, Borrower and Guarantor, nor does Tavira take responsibility or assume any liability in coordinating, structuring or overseeing any aspect of the underlying Loan Transaction and merely acts as a custodian over the collateral Shares. Any and all arrangements between Lender, Borrower and Guarantor have been negotiated and determined by and between their respective counsel.

Borrower and Guarantor expressly agree that the SLA and all of its provisions, warranties, rights, terms and conditions are valid and in full legal force and effect as of the date of this Closing Statement and there are no material changes.

Borrower and Guarantor expressly agree that failure to remedy any event of default or other deficiency in this Loan Transaction, other loan facilities between the Parties or any other loan or debt facility of the Borrower or Guarantor ("All Facilities") will constitute a default of All Facilities between the Parties.



Borrower and Guarantor expressly represent that they are not subject to, part of nor the subject of any criminal investigation where the Pledged Collateral may be exposed to seizure or claim.

Borrower and Guarantor expressly represent that there has not been any material change to the Shares or the shares of the Issuer, Borrower or Guarantor which may undermine the value of the Pledged Collateral, and, to the best of Borrower's and Guarantor's knowledge, the Issuer of the Shares is not subject to any criminal investigation or misconduct and has timely filed all of its required reports with the stock exchange where Shares are traded.

Borrower and Guarantor expressly represent and agree to cooperate with the Lender, Depository Broker, Global Custodian and sub-Custodian and any third-party due diligence and compliance firm in furnishing any further required audited financial records and due diligence.

Borrower and Guarantor expressly represent that they are currently registered, domiciled and in Good Standing in their corporate home jurisdiction, have not declared bankruptcy in the last seven (7) years and are fully solvent.

Borrower and Guarantor expressly represent that the pledged securities as above stated are not restricted in any way, are free trading and that neither Borrower nor Guarantor have received any notice of any kind from any stock exchange or any broker-dealer which has informed or advised Borrower or Guarantor that the pledged securities are in any way restricted, under a special watch, are on a special hotlist or stop trade limitation and, further that Borrower and Guarantor are not aware of any such notice or alert that any issued security of the Issuer of the Shares is limited or restricted in trading in any way.

Borrower and Guarantor expressly represent that no representations or warranties of any kind have been made by Lender to Borrower or Guarantor, other than those in the written and executed loan agreement by and between the Parties to this Loan Transaction.

Borrower and Guarantor hereby acknowledge, understand and agree that in the event of any inconsistency or conflict with the signed and executed SLA, this Closing Statement shall be the final and controlling document, and the protective covenants and provisions of this Closing Statement shall prevail over any previous document, and furthermore, Borrower and Guarantor expressly agree that in section II.3(b) of the SLA the reference to "every four months" is replaced by "every three months" and in section VI.3(b) of the SLA the reference to "Hereinafter a new FMP" is replaced by "Thereafter a new Margin Call threshold" and the reference to "original FMP" is replaced by "original Margin Call threshold".

Borrower and Guarantor expressly represent that they are not a resident or citizen of the United States of America, that they to the best of their knowledge are not subject to the Securities and Exchange Acts of 1933 and 1934 and are not a subject of any investigation or action by the United States Securities & Exchange Commission or any other regulatory or enforcement agency of the United States of America.



Borrower and Guarantor hereby acknowledge, understand and agree that failure of Lender to exercise any right, power or remedy provided under this Closing Statement or the SLA or



otherwise available in respect hereof at law or in equity, or to insist upon compliance by any party hereto with its obligations hereunder, and any custom or practice of the parties at variance with the terms hereof, shall not constitute a waiver by Lender of its right to exercise any such or other right, power or remedy available to it at any time or to demand such compliance at any time in the future. Lender's acceptance of late or partial payments remitted by Borrower or Borrower's tardy compliance with any term or provision of the SLA will not be a waiver of Lender's rights. At no time shall funding be construed to be a waiver of any kind including funding provided after an Event of Default. Lender reserves the right to continue funding and invoke an Event of Default at any time in the future. All of Lender's rights are reserved.

Borrower and Guarantor expressly represent that at all times they have been represented by competent legal counsel and that Borrower and Guarantor have had ample opportunity to consult separately with independent legal counsel in order to make an informed decision whether to agree to execute the SLA and this Closing Statement.

Borrower and Guarantor expressly represent that this Closing Statement has not been modified, edited or altered in any way and expressly agree this Closing Statement cannot be modified except by written addendum thereto fully executed by the Parties herein.

Borrower and Guarantor further and expressly represent that they are Qualified/Professional Investors, have agreed to this Closing Statement and all of its representations, warranties, covenants and agreements herein contained of their own free will, based upon their independent judgment and upon the advice of competent independent legal counsel.

Borrower and Guarantor further and expressly understand that Lender's underwriting may change at any time up-until funding or during funding if such funding is in tranches and market conditions, changes in Pledged Collateral or deterioration of Borrower's or Guarantor's qualifying criteria, in Lenders sole discretion, warrant it. Borrower and Guarantor further understand and expressly agree that the Lock-Up Period for Prepayment of the Loan Transaction shall be extended to coincide with loan Maturity Date. Lender does not guarantee funding or voting rights and all funding is at Lenders sole discretion until disbursement.

Borrower and Guarantor are capable and willing to post margin when required to do so.

## I. CASH & STOCK TOP UP ACCOUNT INFORMATION:

| | |
|---|---|
| Institution's Name | Tavira Securities Limited |
| Account Number | TMC-63 |
| Account Name | **Ricardo Benjamin Salinas Pliego** |



## II. INTEREST, PRINCIPAL & FEE PAYMENT INFORMATION:

| | |
|---|---|
| Beneficiary | Sierra Universal Corp |
| Beneficiary Account Number | 898123822869 |
| Beneficiary Bank | Bank of America |
| Beneficiary Bank ABA | 026 009 593 |
| Beneficiary Bank SWIFT | BOFAUS6S |
| Reference | Astor interest payment from RBS SA de CV |

It is Borrower's and Guarantor's responsibility to notify Lender of transfers and confirm each transaction is processed by the receiving institution before any applicable due date.

*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*



IN WITNESS WHEREOF, the Parties hereto have caused this Closing Statement and Addendum to be duly executed as of the day and year written below. Each Party has consulted their respective legal counsel and agree to the terms written herein.

**BORROWER:** Corporacion RBS SA de CV

_____          Ricardo Salinas Pliego          16/02/22
Signature                            Name and Title                   Date


_____          _____     _____
Seal                                 Witness
                                     Witness is only certifying Borrower's Signature


**GUARANTOR:** Ricardo Benjamin Salinas Pliego

_____          Ricardo Salinas Pliego          16/02/22
Signature                            Name and Title                   Date


_____          _____     _____
Seal                                 Witness
                                     Witness is only certifying Guarantor's Signature


**LENDER:** Astor Asset Management 3 Limited

_____          Mariia Mitsa, Managing Member   16/02/2022
Signature                            Name and Title                   Date





# EXHIBIT 7

# NOTICE TO BORROWER AND GUARANTOR

PLEASE TAKE NOTICE THAT A COLLATERALIZED, SECURED FIXED INSTRUMENT BASED LOAN TRANSACTION MAY INVOLVE SUBSTANTIAL ELEMENTS OF RISK THAT INVOLVE SHARES IN PUBLICLY TRADED SECURITIES WHICH MAY BE SUBJECT TO ADVERSE CREDIT RISKS, ADVERSE TAX RISKS AND/OR ADVERSE MARKET CONDITIONS THAT COULD NEGATIVELY IMPACT ALL OR PART OF THE COLLATERALIZED, SECURED, FIXED INSTRUMENT LOAN TRANSACTION. ALWAYS CONSULT WITH A REGISTERED INVESTMENT ADVISOR AND YOUR ATTORNEYS BEFORE INVESTING OR ENGAGING IN MARGIN BORROWING.

THIS CLOSING STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY ANY SECURITIES REGULATORS OR COMMISSIONS OR SECURITIES EXCHANGES IN ANY JURISDICTION (THE "SECURITIES REGULATORS").

NO SECURITIES REGULATORS HAVE ISSUED A RULING ON EITHER THE ACCURACY OR LEGAL SUFFICIENCY OF THIS CLOSING STATEMENT NOR OF THE UNDERLYING COLLATERALIZED, SECURED, FIXED INSTRUMENT LOAN TRANSACTION (THE "TRANSACTION") THAT THIS CLOSING STATEMENT PROMULGATES.

NEITHER THIS CLOSING STATEMENT NOR THE UNDERLYING TRANSACTION IS INTENDED IN ANY WAY TO BE A PUBLIC OFFERING, BUT INSTEAD IS A CLOSING FOR AN UNDERLYING COLLATERALIZED, SECURED, FIXED-INSTRUMENT FINANCING TRANSACTION TO BE OFFERED TO AND AS AGREED TO BY QUALIFIED INVESTORS, AS DEFINED BY SECURITIES REGULATORS AND/OR BY ANY APPLICABLE SECURITIES ACT. MARGIN BORROWING ENTAILS RISK, AND THE BORROWER AND GUARANTOR ARE AWARE OF SUCH RISKS AND HAVE EFFECTIVE MANAGEMENT STRATEGIES IN PLACE TO REDUCE OR ELIMINATE RISK AS A RESULT OF MARGIN BORROWING.

LENDER INTENDS TO FUND THE BORROWER IN ACCORDANCE WITH THE STOCK LOAN AGREEMENT EXECUTED BETWEEN BORROWER, GUARANTOR AND LENDER. LENDER WILL AT ALL TIMES MAINTAIN ITS ABILITY TO RETURN AN EQUIVALENT NUMBER OF ISSUER SECURITIES VALUED AT FAIR MARKET VALUE. THE FUNDING WILL CONSIST OF MULTIPLE TRANCHES WITH DURATION BETWEEN EACH TRANCHE AND THE FUNDING AMOUNT DEPENDENT ON MARKET CONDITIONS AND LENDERS SOLE DISCRETION. ALL CALCULATIONS SHOULD BE VERIFIED BY BORROWER AND GUARANTOR UPON RECEIPT AS LENDER TAKES NO RESPONSIBILITY FOR ERRORS. CALCULATIONS INCLUDE COSTS, DEDUCTIONS, EXPENSES AND ADJUSTMENTS RECITED.



# CLOSING STATEMENT

Gross Proceeds: MXN 613,000,000.00
Funds Settled (Net): MXN 592,871,767.12
Tranche 4
June 22, 2022

**WHEREAS,** Astor Asset Management 3 Limited ("Lender"), Corporacion RBS SA de CV ("Borrower") and Ricardo Benjamin Salinas Pliego ("Guarantor"), collectively herein known as the "Parties", have entered into an agreed upon collateralized, secured fixed instrument-based loan transaction (the "Loan Transaction"); and

**WHEREAS,** the Parties entered into an agreed upon and fully executed Stock Loan Agreement (the "SLA") established as of July 28, 2021 to facilitate and collateralize the agreed upon Loan Transaction by and between the Parties; and

**WHEREAS,** the Parties subsequently entered into the Addendum to SLA dated July 31, 2021 and the Second Addendum to SLA dated December 6, 2021 and a Third Addendum to SLA dated June 13, 2022, each of which remains in full force and effect to date; and

**WHEREAS,** on the date of July 30, 2021 ("Confirmation Day") Lender received the required confirmation from the Depository Broker that three million six hundred thousand (3,600,000) shares (the "Shares") of Grupo Elektra, S.A.B. de C.V., ELEKTRA MX, (the "Issuer") posted to Guarantor's account at Weiser Global Capital Markets, the Depository Broker (the "Pledged Collateral"), pursuant to the SLA; and

**WHEREAS,** on the date of June 22, 2022 ("Confirmation Day") Lender received the required confirmation from the Depository Broker that one million four hundred thirty-one thousand seven hundred (1,431,700) shares (the "Shares") of Grupo Elektra, S.A.B. de C.V., ELEKTRA:MX, (the "Issuer") were posted to Guarantor's account at the Depository Broker (the "Pledged Collateral"), pursuant to the SLA; and

**WHEREAS,** the Loan-to-Value ratio (the "LTV") of the Loan was originally set in the SLA at fifty-five percent (55%) of the Shares' Fair Market Value (the "FMV"), subsequently for Tranche 3 reduced to forty-five percent (45%), and it has been mutually agreed that the LTV of the Loan is hereby adjusted to thirty-five percent (35%); and

**WHEREAS,** the Approved Loan Amount is hereby being reduced to One Billion Nine Hundred Seventy Four Million Five Hundred Seventy Two Thousand Seven Hundred Forty Three Mexican Pesos and Ninety Four Centavos (MXN 1,974,572,743.94), funding completed, the Term of the Loan has now commenced upon completion of funding and all shares are collateralized; and

**WHEREAS,** acceptance of funds constitutes Borrower's and Guarantor's further recognition and acknowledgment of all terms and conditions herein; and

**WHEREAS,** the Loan Transaction proceeds as more fully stated herein in this Closing Statement, have been or shall imminently be transferred to Borrower upon or post the Tranche Date listed herein, in accordance with the SLA and this Closing Statement; and



**WHEREAS**, as per the SLA, the Shares have been pledged to Lender and shall be collateralized by Lender in order to release the Loan Transaction proceeds and to provide the funding facility in accordance with the SLA, which has become legally binding and in full force and effect by and between the Parties; and

**NOW, THEREFORE**, in consideration of the premises and of the representations, warranties, covenants and agreements herein contained, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto, intending to be legally bound, hereby agree as follows:

*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*

## STATEMENT OF TRANCHE PROCEEDS

| | | |
|---|---|---|
| Tranche Proceeds (Gross): | ₱ 613,000,000.00 | MXN |
| | | |
| **Deductions:** | | |
| Custodian Management Charge: 0.0375% per quarter | ₱ | MXN |
| Maintenance Fee: 0.0625% per quarter[1] | ₱ | - |
| Origination Fee: 1%[2] | ₱ 3,065,000.00 | MXN |
| Foreign Exchange & Bank Fees 2.5% | ₱ 15,325,000.00 | MXN |
| Legal Expenses: | ₱ | |
| Quarterly Advance Interest: 1.15% per annum | ₱ 1,738,232.88 | MXN |
| **Net Settled Funds:** | ₱ 592,871,767.12 | MXN |

## FUNDING PROCEEDS AND COLLATERALIZATION RECORD

| | LTV | FMP (MXN) | Facility (MXN) | Shares Pledged | Avg. Volume |
|---|---|---|---|---|---|
| **Master Facility** | 35% | ₱1,618.23 | ₱1,974,572,743.94 | 3,600,000 | 58,419 |
| Current FMP (MXN): | | ₱1,150.00 | | 1,431,700 | |

| Tranche No. | Date | Price FMP (MXN) | | Gross Funding Amount (MXN) | Collateralized Shares | | Net Funding (after Deductions + SD) |
|---|---|---|---|---|---|---|---|
| 1 | 9-Aug-21 | ₱ 1,618.23 | ₱ | 501,591,693.09 | 563,569 | ₱ | 500,000,000.00 |
| 2 | 17-Sep-21 | ₱ 1,599.19 | ₱ | 327,497,030.23 | 372,344 | ₱ | 300,000,000.00 |
| 3[4] | 7-Feb-22 | ₱ 1,353.54 | ₱ | 532,484,020.62 | 1,299,497 | ₱ | 510,000,000.00 |
| 4[5] | 22-Jun-22 | ₱ 1,150.00 | ₱ | 613,000,000.00 | 2,796,290 | ₱ | 592,871,767.12 |

| | | | |
|---|---|---|---|
| **Total Funding to Date:** | ₱ | 1,974,572,743.94 | |
| **Current FMV of Collateralized Shares:** | ₱ | 5,786,455,000.00 | |
| **Current FMV of Uncollateralized Shares:** | ₱ | - | |

---

1. *Maintenance Fee in the exact same amount as initial charge is due in advance every three months; future payments must be paid by Borrower to Lender in advance every three months on the quarterly anniversary of the Tranche 1 Closing Statement for the term of the Loan Transaction without further notice or repeated demand.*

2. *Pursuant to the SLA, 50% of the Origination Fee applicable to each tranche is deducted from the Loan Principal Amount. The*



05

balance of the 1% Origination Fee in the exact same amount as the initial deduction listed in each Closing Statement is due without further notice or repeated demand on the first annual anniversary of each respective Tranche Date.

3.  Daily Average Volume for one month preceding collateral settlement per Yahoo Finance data for June 30, 2021 to July 29, 2021.

4.  Collateralized shares are adjusted to reflect reduction of Loan to 45% LTV.

5.  Collateralized shares reflect reduction of Loan to 35% LTV and current tranche price.

*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*



Borrower and Guarantor hereby acknowledge, understand and agree that the current FMV of the shares, as stated above, is the FMV of the shares at the time of funding and is for this tranche, as per the Schedules in this Closing Statement.

Borrower and Guarantor further hereby acknowledge, understand and agree that each subsequent tranche of the Loan Principal Amount and its loan proceeds accordingly may vary and may likely fluctuate due to market conditions, risk management, daily trading price of the Shares at time of funding and changes in Borrower or Guarantor qualification, and Lender may issue future Closing Statements without requiring the signature of Borrower and Guarantor.

Borrower and Guarantor shall note that the Custodian Management Charge for the first three (3) months has been deducted from loan proceeds. Borrower is responsible for these and all Custodian and third-party fees related to custody. Tranche 1 Closing Statement includes a Custodian Management Charge adjustment in favor of Borrower which is reversed in Tranche 2 Closing Statement, and the Custodian Management Charge for the initial period is deducted from loan proceeds in Tranche 2 Closing Statement. For each subsequent quarterly period, the Custodian Management Charge in the amount of USD$110,011.11 must be remitted by Borrower to Lender at least fourteen (14) days prior to each quarterly anniversary of the Effective Date of the SLA without further notice or repeated demand.

Borrower and Guarantor shall additionally note that quarterly interest shall be due and payable in advance on the 1st of the month every three (3) months, with interest accruing from the date Cash Collateral is deposited by Lender to Borrower's account.

Borrower and Guarantor hereby acknowledge and agree that Lender reserves the right to deduct from loan proceeds foreign exchange and banking costs incurred by Lender in funding the Loan Transaction which is denominated in Mexican Pesos, and any such costs may be applied retroactively after Lender determines costs incurred.

All Parties hereby agree that Tavira Securities Limited ("Tavira"), as the agreed-upon Depository Broker, is not a party to the transaction between Lender, Borrower and Guarantor, nor does Tavira take responsibility or assume any liability in coordinating, structuring or overseeing any aspect of the underlying Loan Transaction and merely acts as a custodian over the collateral Shares. Any and all arrangements between Lender, Borrower and Guarantor have been negotiated and determined by and between their respective counsel.

Borrower and Guarantor expressly agree that the SLA and all of its provisions, warranties, rights, terms and conditions are valid and in full legal force and effect as of the date of this Closing Statement and there are no material changes.

Borrower and Guarantor expressly agree that failure to remedy any event of default or other deficiency in this Loan Transaction, other loan facilities between the Parties or any other loan or debt facility of the Borrower or Guarantor ("All Facilities") will constitute a default of All Facilities between the Parties.



Borrower and Guarantor expressly represent that they are not subject to, part of nor the subject of any criminal investigation where the Pledged Collateral may be exposed to seizure or claim.

Borrower and Guarantor expressly represent that there has not been any material change to the Shares or the shares of the Issuer, Borrower or Guarantor which may undermine the value of the Pledged Collateral, and, to the best of Borrower's and Guarantor's knowledge, the Issuer of the Shares is not subject to any criminal investigation or misconduct and has timely filed all of its required reports with the stock exchange where Shares are traded.

Borrower and Guarantor expressly represent and agree to cooperate with the Lender, Depository Broker, Global Custodian and sub-Custodian and any third-party due diligence and compliance firm in furnishing any further required audited financial records and due diligence.

Borrower and Guarantor expressly represent that they are currently registered, domiciled and in Good Standing in their corporate home jurisdiction, have not declared bankruptcy in the last seven (7) years and are fully solvent.

Borrower and Guarantor expressly represent that the pledged securities as above stated are not restricted in any way, are free trading and that neither Borrower nor Guarantor have received any notice of any kind from any stock exchange or any broker-dealer which has informed or advised Borrower or Guarantor that the pledged securities are in any way restricted, under a special watch, are on a special hotlist or stop trade limitation and, further that Borrower and Guarantor are not aware of any such notice or alert that any issued security of the Issuer of the Shares is limited or restricted in trading in any way.

Borrower and Guarantor expressly represent that no representations or warranties of any kind have been made by Lender to Borrower or Guarantor, other than those in the written and executed loan agreement by and between the Parties to this Loan Transaction.

Borrower and Guarantor hereby acknowledge, understand and agree that in the event of any inconsistency or conflict with the signed and executed SLA, this Closing Statement shall be the final and controlling document, and the protective covenants and provisions of this Closing Statement shall prevail over any previous document, and furthermore, Borrower and Guarantor expressly agree that in section II.3(b) of the SLA the reference to "every four months" is replaced by "every three months" and in section VI.3(b) of the SLA the reference to "Hereinafter a new FMP" is replaced by "Thereafter a new Margin Call threshold" and the reference to "original FMP" is replaced by "original Margin Call threshold".

Borrower and Guarantor expressly represent that they are not a resident or citizen of the United States of America, that they to the best of their knowledge are not subject to the Securities and Exchange Acts of 1933 and 1934 and are not a subject of any investigation or action by the United States Securities & Exchange Commission or any other regulatory or enforcement agency of the United States of America.

Borrower and Guarantor hereby acknowledge, understand and agree that failure of Lender to exercise any right, power or remedy provided under this Closing Statement or the SLA or



otherwise available in respect hereof at law or in equity, or to insist upon compliance by any party hereto with its obligations hereunder, and any custom or practice of the parties at variance with the terms hereof, shall not constitute a waiver by Lender of its right to exercise any such or other right, power or remedy available to it at any time or to demand such compliance at any time in the future. Lender's acceptance of late or partial payments remitted by Borrower or Borrower's tardy compliance with any term or provision of the SLA will not be a waiver of Lender's rights. At no time shall funding be construed to be a waiver of any kind including funding provided after an Event of Default. Lender reserves the right to continue funding and invoke an Event of Default at any time in the future. All of Lender's rights are reserved.

Borrower and Guarantor expressly represent that at all times they have been represented by competent legal counsel and that Borrower and Guarantor have had ample opportunity to consult separately with independent legal counsel in order to make an informed decision whether to agree to execute the SLA and this Closing Statement.

Borrower and Guarantor expressly represent that this Closing Statement has not been modified, edited or altered in any way and expressly agree this Closing Statement cannot be modified except by written addendum thereto fully executed by the Parties herein.

Borrower and Guarantor further and expressly represent that they are Qualified/Professional Investors, have agreed to this Closing Statement and all of its representations, warranties, covenants and agreements herein contained of their own free will, based upon their independent judgment and upon the advice of competent independent legal counsel.

Borrower and Guarantor further and expressly understand that Lender's underwriting may change at any time up-until funding or during funding if such funding is in tranches and market conditions, changes in Pledged Collateral or deterioration of Borrower's or Guarantor's qualifying criteria, in Lenders sole discretion, warrant it. Borrower and Guarantor further understand and expressly agree that the Lock-Up Period for Prepayment of the Loan Transaction shall be extended to coincide with loan Maturity Date. Lender does not guarantee funding or voting rights and all funding is at Lenders sole discretion until disbursement.

Borrower and Guarantor are capable and willing to post margin when required to do so.

## I. CASH & STOCK TOP UP ACCOUNT INFORMATION:

| | |
|---|---|
| Institution's Name | Fovira Securities Limited |
| Account Number | TMG-53 |
| Account Name | Ricardo Benjamin Salinas Pliego |



## II. INTEREST, PRINCIPAL & FEE PAYMENT INFORMATION:

| | |
|---|---|
| Beneficiary | Sierra Universal Corp |
| Beneficiary Account Number | 898123822869 |
| Beneficiary Bank | Bank of America |
| Beneficiary Bank ABA | 026 009 593 |
| Beneficiary Bank SWIFT | BOFAUS6S |
| Reference | Astor interest payment from RBS SA de CV |

It is Borrower's and Guarantor's responsibility to notify Lender of transfers and confirm each transaction is processed by the receiving institution before any applicable due date.

*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*



IN WITNESS WHEREOF, the Parties hereto have caused this Closing Statement and Addendum to be duly executed as of the day and year written below. Each Party has consulted their respective legal counsel and agree to the terms written herein.

**BORROWER:** Corporacion RBS SA de CV

| | Ricardo Salinas Pliego | 27. 06. 2022 |
|---|---|---|
| Signature | Name and Title | Date |

| | | |
|---|---|---|
| Seal | Witness | |
| | Witness is only certifying Borrower's Signature | |

**GUARANTOR:** Ricardo Benjamin Salinas Pliego

| | Ricardo Salinas Pliego | 27.06.2022 |
|---|---|---|
| Signature | Name and Title | Date |

| | | |
|---|---|---|
| Seal | Witness | |
| | Witness is only certifying Guarantor's Signature | |

**LENDER:** Astor Asset Management 3 Limited

| | Maria Mitsa  Managing Member | June 27 2022 |
|---|---|---|
| Signature | Name and Title | Date |





## United Kingdom
20 MIDTOWN
20 PROCTER STREET,
LONDON, UK, WC1V 6NX

europe.inquiries@ astorassetgroup.com
**+44 2 0386 84 620**

## Australia
330 Collins Street,
level 14
Melbourne, Australia, 3000

oceania.inquiries@ astorassetgroup.com
**+613 8375 7172**

## Hong Kong
18 Westlands Road
Level 23
Hong Kong, Hong Kong

asia.inquiries@ astorassetgroup.com
**+852 800 964 226**

## Germany
Niederrad business district
LYONER STRASSE 14
FRANKFURT, GERMANY, 60528

europe.inquiries@ astorassetgroup.com
**+49 0800 1812772**

## Vietnam
65 Le Loi Street, Level 14,
Bem Nghe Ward
Ho Chi Minh City, Vietnam, District 1

asia.inquiries@ astorassetgroup.com
**+84 28 4458 1398**

## Singapore
Six Battery Road
30 Cecil Street Level 42
Singapore, Singapore 049909

asia.inquiries@ astorassetgroup.com
**+65 800 492 2419**



# EXHIBIT 8



# SECURITIES-BACKED FINANCING

**A Fixed Instrument, Collateralized Non-Recourse Facility**

## CLOSING STATEMENT AND SETTLEMENT



red Exclusively for a Shareholder of

**GRUPO ELEKTRA, S.A.B. DE C.V.**

# NOTICE TO BORROWER AND GUARANTOR

PLEASE TAKE NOTICE THAT A COLLATERALIZED, SECURED FIXED INSTRUMENT BASED LOAN TRANSACTION MAY INVOLVE SUBSTANTIAL ELEMENTS OF RISK THAT INVOLVE SHARES IN PUBLICLY TRADED SECURITIES WHICH MAY BE SUBJECT TO ADVERSE CREDIT RISKS, ADVERSE TAX RISKS AND/OR ADVERSE MARKET CONDITIONS THAT COULD NEGATIVELY IMPACT ALL OR PART OF THE COLLATERALIZED, SECURED, FIXED INSTRUMENT LOAN TRANSACTION. ALWAYS CONSULT WITH A REGISTERED INVESTMENT ADVISOR AND YOUR ATTORNEYS BEFORE INVESTING OR ENGAGING IN MARGIN BORROWING.

THIS CLOSING STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY ANY SECURITIES REGULATORS OR COMMISSIONS OR SECURITIES EXCHANGES IN ANY JURISDICTION (THE "SECURITIES REGULATORS").

NO SECURITIES REGULATORS HAVE ISSUED A RULING ON EITHER THE ACCURACY OR LEGAL SUFFICIENCY OF THIS CLOSING STATEMENT NOR OF THE UNDERLYING COLLATERALIZED, SECURED, FIXED INSTRUMENT LOAN TRANSACTION (THE "TRANSACTION") THAT THIS CLOSING STATEMENT PROMULGATES.

NEITHER THIS CLOSING STATEMENT NOR THE UNDERLYING TRANSACTION IS INTENDED IN ANY WAY TO BE A PUBLIC OFFERING, BUT INSTEAD IS A CLOSING FOR AN UNDERLYING COLLATERALIZED, SECURED, FIXED-INSTRUMENT FINANCING TRANSACTION TO BE OFFERED TO AND AS AGREED TO BY QUALIFIED INVESTORS, AS DEFINED BY SECURITIES REGULATORS AND/OR BY ANY APPLICABLE SECURITIES ACT. MARGIN BORROWING ENTAILS RISK, AND THE BORROWER AND GUARANTOR ARE AWARE OF SUCH RISKS AND HAVE EFFECTIVE MANAGEMENT STRATEGIES IN PLACE TO REDUCE OR ELIMINATE RISK AS A RESULT OF MARGIN BORROWING.

LENDER INTENDS TO FUND THE BORROWER IN ACCORDANCE WITH THE STOCK LOAN AGREEMENT EXECUTED BETWEEN BORROWER, GUARANTOR AND LENDER. LENDER WILL AT ALL TIMES MAINTAIN ITS ABILITY TO RETURN AN EQUIVALENT NUMBER OF ISSUER SECURITIES VALUED AT FAIR MARKET VALUE. THE FUNDING WILL CONSIST OF MULTIPLE TRANCHES WITH DURATION BETWEEN EACH TRANCHE AND THE FUNDING AMOUNT DEPENDENT ON MARKET CONDITIONS AND LENDERS SOLE DISCRETION. ALL CALCULATIONS SHOULD BE VERIFIED BY BORROWER AND GUARANTOR UPON RECEIPT AS LENDER TAKES NO RESPONSIBILITY FOR ERRORS. CALCULATIONS INCLUDE COSTS, DEDUCTIONS, EXPENSES AND ADJUSTMENTS RECITED.

# CLOSING STATEMENT

## Gross Proceeds: MXN 179,645,808.61
## Funds Settled (Net): MXN 173,586,459.31
## Tranche 5
## September 15, 2023

**WHEREAS**, Astor Asset Management 3 Limited ("Lender"), Corporacion RBS SA de CV ("Borrower") and Ricardo Benjamin Salinas Pliego ("Guarantor"), collectively herein known as the "Parties", have entered into an agreed upon collateralized, secured fixed instrument-based loan transaction (the "Loan Transaction"); and

**WHEREAS**, the Parties entered into an agreed upon and fully executed Stock Loan Agreement (the "SLA") established as of July 28, 2021 to facilitate and collateralize the agreed upon Loan Transaction by and between the Parties; and

**WHEREAS,** the Parties subsequently entered into the Addendum to SLA dated July 31, 2021 and the Second Addendum to SLA dated December 6, 2021 and a Third Addendum to SLA dated June 13, 2022, and a Fourth Addendum dated July 19, 2022, each of which remains in full force and effect to date; and

**WHEREAS,** on the date of July 30, 2021 ("Confirmation Day") Lender received the required confirmation from the Depository Broker that three million six hundred thousand (3,600,000) shares (the "Shares") of Grupo Elektra, S.A.B. de C.V., ELEKTRA:MX, (the "Issuer") posted to Guarantor's account at Weiser Global Capital Markets, the Depository Broker (the "Pledged Collateral"), pursuant to the SLA; and

**WHEREAS,** on the date of June 22, 2022 ("Confirmation Day") Lender received the required confirmation from the Depository Broker that one million four hundred thirty-one thousand seven hundred (1,431,700) shares (the "Shares") of Grupo Elektra, S.A.B. de C.V., ELEKTRA:MX, (the " Issuer") were posted to Guarantor's account at the Depository Broker (the "Pledged Collateral"), pursuant to the SLA; and

**WHEREAS**, on the date of September 13, 2023 ("Confirmation Day") Lender received the required confirmation from the Depository Broker that four hundred forty-four thousand three hundred eighty-nine (444,389) shares (the "Shares") of Grupo Elektra, S.A.B. de C.V., ELEKTRA:MX, (the "Issuer") posted to Guarantor's account at the Depository Broker (the "Pledged Collateral"), pursuant to the SLA; and

**WHEREAS,** the Parties now wish to enter into this Fifth Addendum whereby the Lender agrees to make an additional loan to the Borrower in the amount up to One Hundred and Ninety-Two Million, One hundred Thousand Mexican Pesos (MXN 192,100,000), or such lesser amount as determined by Lender in accordance with the SLA and this Fifth Addendum, against four hundred forty four thousand three hundred eighty nine (444,389) newly pledged shares of Grupo Elektra, S.A.B. de C.V. ("ELEKTRA:MX") pledged by Guarantor and transferred to the account of Ricardo Benjamin Salinas Pliego located at Tavira Monaco SAM and known as TMC-63 to be pledged to Lender for duration of Loan Term until maturity on June 22, 2027.

**WHEREAS**, the Loan-to-Value ratio (the "LTV") of the Loan was originally set in the SLA at fifty-five percent (55%) of the Shares' Fair Market Value (the "FMV"), and it has been mutually agreed that the LTV of the Loan is hereby adjusted to thirty-five percent (35%); and

**WHEREAS**, acceptance of funds constitutes Borrower's and Guarantor's further recognition and acknowledgment of all terms and conditions herein; and

**WHEREAS**, the Loan Transaction proceeds as more fully stated herein in this Closing Statement, have been or shall imminently be transferred to Borrower upon or post the Tranche Date listed herein, in accordance with the SLA and this Closing Statement; and

**WHEREAS**, as per the SLA, the Shares have been pledged to Lender and shall be collateralized by Lender in order to release the Loan Transaction proceeds and to provide the funding facility in accordance with the SLA, which has become legally binding and in full force and effect by and between the Parties; and

**NOW, THEREFORE**, in consideration of the premises and of the representations, warranties, covenants and agreements herein contained, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto, intending to be legally bound, hereby agree as follows:

*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*

## STATEMENT OF TRANCHE PROCEEDS

| | | |
|---|---|---|
| Tranche Proceeds (Gross): | 179,645,808.61 | MXN |
| **Deductions:** | | |
| Custodian Management Charge: 0.0375% per quarter | 48,289.81 | MXN |
| Maintenance Fee: 0.0625% per quarter[1] | 112,278.63 | MXN |
| Origination Fee: 1%[2] | 898,229.04 | MXN |
| Foreign Exchange & Bank Fees 2.5% | 4,491,145.22 | MXN |
| Quarterly Advance Interest: 1.15% per annum | 509,406.61 | MXN |
| **Net Settled Funds** | **173,586,459.31** | **MXN** |

### FUNDING PROCEEDS AND COLLATERALIZATION RECORD

| LTV | FMP (MXN) | Facility (MXN) | Shares Pledged | Avg. Volume[3] |
|---|---|---|---|---|
| 35% | MXN 1,155.01 | MXN 1,974,572,743.94 | 444,389 | 48,850 |

| Tranche No. | Date | Price (MXN) | Gross Funding Amount (MXN) | Collateralized Shares | Net Funds after Deductions (USD) |
|---|---|---|---|---|---|
| 1 | 9-Aug-21 | MXN 1,618.23 | MXN 501,591,693.09 | 563,569 | MXN 500,000,000.00 |
| 2 | 17-Sep-21 | MXN 1,599.19 | MXN 327,497,030.23 | 372,344 | MXN 300,000,000.00 |
| 3[4] | 7-Feb-22 | MXN 1,353.54 | MXN 532,484,020.62 | 1,299,497 | MXN 510,000,000.00 |
| 4[5] | 22-Jun-22 | MXN 1,150.00 | MXN 613,000,000.00 | 2,796,290 | MXN 592,871,767.12 |
| 5 | 15-Sep-23 | MXN 1,155.01 | MXN 179,645,808.61 | 444,389 | MXN 173,586,459.31 |
| | **Total Funding to Date:** | | MXN 2,154,218,552.55 | | |
| **Current FMV of Collateralized Shares:** | | | MXN 6,324,937,555.89 | | |

1. *Maintenance Fee in the exact same amount as initial charge is due in advance every three months; future payments must be paid by Borrower to Lender in advance every three months on the quarterly anniversary of the Tranche 1 Closing Statement for the term of the Loan Transaction without further notice or repeated demand.*
2. *Pursuant to the SLA, 50% of the Origination Fee applicable to each tranche is deducted from the Loan Principal Amount. The balance of the 1% Origination Fee in the exact same amount as the initial deduction listed in each Closing Statement is due without further notice or repeated demand on the first annual anniversary of each respective Tranche Date.*
3. *Daily Average Volume for one month preceding collateral settlement per Yahoo Finance.*
4. *Collateralized shares are adjusted to reflect reduction of Loan to 45% LTV.*
5. *Collateralized shares reflect reduction of Loan to 35% LTV and current tranche price.*

Borrower and Guarantor hereby acknowledge, understand and agree that the current FMV of the shares, as stated above, is the FMV of the shares at the time of funding and is for this tranche, as per the Schedules in this Closing Statement.

Borrower and Guarantor further hereby acknowledge, understand and agree that each subsequent tranche of the Loan Principal Amount and its loan proceeds accordingly may vary and may likely fluctuate due to market conditions, risk management, daily trading price of the Shares at time of funding and changes in Borrower or Guarantor qualification, and Lender may issue future Closing Statements without requiring the signature of Borrower and Guarantor.

Borrower and Guarantor shall note that the Custodian Management Charge for the first three (3) months has been deducted from loan proceeds. Borrower is responsible for these and all Custodian and third-party fees related to custody. Tranche 1 Closing Statement includes a Custodian Management Charge adjustment in favor of Borrower which is reversed in Tranche 2 Closing Statement, and the Custodian Management Charge for the initial period is deducted from loan proceeds in Tranche 2 Closing Statement. For each subsequent quarterly period, the Custodian Management Charge for Tranche 5 in the amount of MXN 48,289.81 must be remitted by Borrower to Lender at least fourteen (14) days prior to each quarterly anniversary of the Effective Date of the SLA without further notice or repeated demand.

Borrower and Guarantor shall additionally note that quarterly interest shall be due and payable in advance on the 1st of the month every three (3) months, with interest accruing from the date Cash Collateral is deposited by Lender to Borrower's account.

Borrower and Guarantor hereby acknowledge and agree that Lender reserves the right to deduct from loan proceeds foreign exchange and banking costs incurred by Lender in funding the Loan Transaction which is denominated in Mexican Pesos, and any such costs may be applied retroactively after Lender determines costs incurred.

All Parties hereby agree that Tavira Securities Limited ("Tavira"), as the agreed-upon Depository Broker, is not a party to the transaction between Lender, Borrower and Guarantor, nor does Tavira take responsibility or assume any liability in coordinating, structuring or overseeing any aspect of the underlying Loan Transaction and merely acts as a custodian over the collateral Shares. Any and all arrangements between Lender, Borrower and Guarantor have been negotiated and determined by and between their respective counsel.

Borrower and Guarantor expressly agree that the SLA and all of its provisions, warranties, rights, terms and conditions are valid and in full legal force and effect as of the date of this Closing Statement and there are no material changes.

Borrower and Guarantor expressly agree that failure to remedy any event of default or other deficiency in this Loan Transaction, other loan facilities between the Parties or any other loan or debt facility of the Borrower or Guarantor ("All Facilities") will constitute a default of All Facilities between the Parties.

Borrower and Guarantor expressly represent that they are not subject to, part of nor the subject of any criminal investigation where the Pledged Collateral may be exposed to seizure or claim.

Borrower and Guarantor expressly represent that there has not been any material change to the Shares or the shares of the Issuer, Borrower or Guarantor which may undermine the value of the Pledged Collateral, and, to the best of Borrower's and Guarantor's knowledge, the Issuer of the Shares is not subject to any criminal investigation or misconduct and has timely filed all of its required reports with the stock exchange where Shares are traded.

Borrower and Guarantor expressly represent and agree to cooperate with the Lender, Depository Broker, Global Custodian and sub-Custodian and any third-party due diligence and compliance firm in furnishing any further required audited financial records and due diligence.

Borrower and Guarantor expressly represent that they are currently registered, domiciled and in Good Standing in their corporate home jurisdiction, have not declared bankruptcy in the last seven (7) years and are fully solvent.

Borrower and Guarantor expressly represent that the pledged securities as above stated are not restricted in any way, are free trading and that neither Borrower nor Guarantor have received any notice of any kind from any stock exchange or any broker-dealer which has informed or advised Borrower or Guarantor that the pledged securities are in any way restricted, under a special watch, are on a special hotlist or stop trade limitation and, further that Borrower and Guarantor are not aware of any such notice or alert that any issued security of the Issuer of the Shares is limited or restricted in trading in any way.

Borrower and Guarantor expressly represent that no representations or warranties of any kind have been made by Lender to Borrower or Guarantor, other than those in the written and executed loan agreement by and between the Parties to this Loan Transaction.

Borrower and Guarantor hereby acknowledge, understand and agree that in the event of any inconsistency or conflict with the signed and executed SLA, this Closing Statement shall be the final and controlling document, and the protective covenants and provisions of this Closing Statement shall prevail over any previous document, and furthermore, Borrower and Guarantor expressly agree that in section II.3(b) of the SLA the reference to "every four months" is replaced by "every three months" and in section VI.3(b) of the SLA the reference to "Hereinafter a new FMP" is replaced by "Thereafter a new Margin Call threshold" and the reference to "original FMP" is replaced by "original Margin Call threshold".

Borrower and Guarantor expressly represent that they are not a resident or citizen of the United States of America, that they to the best of their knowledge are not subject to the Securities and Exchange Acts of 1933 and 1934 and are not a subject of any investigation or action by the United States Securities & Exchange Commission or any other regulatory or enforcement agency of the United States of America.

Borrower and Guarantor hereby acknowledge, understand and agree that failure of Lender to exercise any right, power or remedy provided under this Closing Statement or the SLA or

otherwise available in respect hereof at law or in equity, or to insist upon compliance by any party hereto with its obligations hereunder, and any custom or practice of the parties at variance with the terms hereof, shall not constitute a waiver by Lender of its right to exercise any such or other right, power or remedy available to it at any time or to demand such compliance at any time in the future. Lender's acceptance of late or partial payments remitted by Borrower or Borrower's tardy compliance with any term or provision of the SLA will not be a waiver of Lender's rights. At no time shall funding be construed to be a waiver of any kind including funding provided after an Event of Default. Lender reserves the right to continue funding and invoke an Event of Default at any time in the future. All of Lender's rights are reserved.

Borrower and Guarantor expressly represent that at all times they have been represented by competent legal counsel and that Borrower and Guarantor have had ample opportunity to consult separately with independent legal counsel in order to make an informed decision whether to agree to execute the SLA and this Closing Statement.

Borrower and Guarantor expressly represent that this Closing Statement has not been modified, edited or altered in any way and expressly agree this Closing Statement cannot be modified except by written addendum thereto fully executed by the Parties herein.

Borrower and Guarantor further and expressly represent that they are Qualified/Professional Investors, have agreed to this Closing Statement and all of its representations, warranties, covenants and agreements herein contained of their own free will, based upon their independent judgment and upon the advice of competent independent legal counsel.

Borrower and Guarantor further and expressly understand that Lender's underwriting may change at any time up-until funding or during funding if such funding is in tranches and market conditions, changes in Pledged Collateral or deterioration of Borrower's or Guarantor's qualifying criteria, in Lenders sole discretion, warrant it. Borrower and Guarantor further understand and expressly agree that the Lock-Up Period for Prepayment of the Loan Transaction shall be extended to coincide with loan Maturity Date. Lender does not guarantee funding or voting rights and all funding is at Lenders sole discretion until disbursement.

Borrower and Guarantor are capable and willing to post margin when required to do so.

## I. CASH & STOCK TOP UP ACCOUNT INFORMATION:

| | |
|---|---|
| Institution's Name | Tavira Securities Limited |
| Account Number | TMC-63 |
| Account Name | Ricardo Benjamin Salinas Pliego |

## II. INTEREST, PRINCIPAL & FEE PAYMENT INFORMATION:

| | |
|---|---|
| Beneficiary | Astor Client Management Account |
| Beneficiary Bank | Dime Community Bank |
| Beneficiary Account Number | 5000227657 |
| Beneficiary Bank SWIFT | BHNBUS3B |
| Reference | Astor interest payment from RBS SA de CV |

It is Borrower's and Guarantor's responsibility to notify Lender of transfers and confirm each transaction is processed by the receiving institution before any applicable due date.

*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*

IN WITNESS WHEREOF, the Parties hereto have caused this Closing Statement and Addendum to be duly executed as of the day and year written below. Each Party has consulted their respective legal counsel and agree to the terms written herein.

**BORROWER:** Corporacion RBS SA de CV

|  |  |  |
|---|---|---|
| _Signature_ | RICARDO B. SALINAS PLIEGO<br>Name and Title | SEPTEMBER 19, 2023<br>Date |

|  |  |
|---|---|
| Seal | Witness<br>Witness is only certifying Borrower's Signature |

**GUARANTOR:** Ricardo Benjamin Salinas Pliego

|  |  |  |
|---|---|---|
| _Signature_ | RICARDO B. SALINAS PLIEGO<br>Name and Title | SEPTEMBER 19, 2023<br>Date |

|  |  |
|---|---|
| Seal | Witness<br>Witness is only certifying Guarantor's Signature |

**LENDER:** Astor Asset Management 3 Limited

|  |  |
|---|---|
| _Signature_ | Mariia Mitsa, Managing Member    20 September 2023<br>Name and Title                              Date |



# EXHIBIT 9

## Astor Capital Fund

### STOCK LOAN AGREEMENT ("SLA")

This Stock Loan Agreement is established as of May 1st, 2021 (the "Effective Date") between Astor Asset Management 3 Limited, a corporation with its office located at 777 Dunsmuir Street, Suite 1400, Vancouver, British Columbia, Canada V7Y 1K4 ("Lender") and:

Corporacion RBS SA de CV, with a principal place of business located at Ave. Ferrocarril de Rio Frio 419 A99, Cuchilla del Moral 1, Iztapalapa 09319 Ciudad de Mexico, Mexico, ("Borrower"), mutually hereinafter the Borrower and Lender shall be referred to as the ("Parties").

This Agreement shall remain in effect until (a) fully satisfied and mutually terminated in writing upon mutual satisfaction; (b) all Indebtedness is paid in full and Borrower is released by Lender in writing; or (c) the Agreement is terminated in writing by Lender in accordance with the covenants and terms provided herein.

### WITNESSETH

**STOCK LOAN AGREEMENT** On this date, and from time-to-time hereafter, Lender may make Loans to Borrower. Borrower and Lender (collectively, the "Parties") enter into this Stock Loan Agreement ("SLA") which, together with the applicable supplement(s) and other Loan Documents, shall govern each separate Loan and all indebtedness between the Parties. Unless stated to the contrary elsewhere, the provisions of all Loan Documents are incorporated by reference herein as if stated in full. This SLA supersedes all previous term sheets, emails, representations, warranties and discussions and is the final documentation of the Parties' undertakings. For the value received, Borrower promises to pay Lender, all indebtedness governed by this Agreement. Nothing herein shall be construed to obligate Lender to restructure or renew any unpaid balance, forgive any part thereof, fund in full, or to make any additional or future loans or financial accommodations to Borrower.

## I.    DEFINED TERMS WITHIN AGREEMENT:

1) **"Acceleration Notice"** shall mean a written notice given to Borrower after the occurrence and continuation of an Event of Default declaring all amounts and sums accrued and unpaid to be immediately due and payable, at which point the Loan is in state of Default.

2) **"Advance"** shall for purposes of this Agreement refer to any sum of money and in any currency, paid out to any account of Borrower, or any third-party account, whether controlled by Borrower or not, if directed to do so by Borrower, for and on behalf of Borrower. All payments made to any third-party for or on behalf of Borrower shall constitute as payment having been made to Borrower.

3) **"Agreement"** shall mean this Stock Loan Agreement, including any supplements or attachments hereto, and other subsequent written agreements, which shall be incorporated by reference along with all amendments, modifications, and restatements thereof in written form. Emails are expressly excluded, are not binding, and are not to be construed as part of any agreement or modification.

4) **"Approved Loan Amount"** shall mean the maximum total amount the Lender is willing to fund to Borrower based on Pledged Collateral to be deposited with Depository Broker represented throughout as Loan Principal Amount or Principal. For purposes of this Agreement, the Approved Loan Amount may be paid out in draws or in lump sum.

**Astor Capital Fund**

5) **"Balance Payment"** shall mean the Loan Principal Amount less any Origination Fee, costs, or expenses, if applicable, not satisfied in cash by Borrower.

6) **"Borrower"** shall mean the entity or individual described herein and no other for purposes of this Agreement.

7) **"Breach"** shall mean any of the Events of Default specified in this Agreement and unless specified otherwise, other Loan Documents that constitute a default.

8) **"Business Day"** shall mean any day other than Saturday, Sunday or a holiday observed by applicable laws.

9) **"Cash Collateral"** shall mean the Loan Principal Amount to be funded to Borrower, which at all times shall be computed by Lender and reflected in the Closing Statement. The Cash Collateral shall be the net amount to be funded, less fees and costs as stipulated in this Agreement and the Closing Statement and disbursed on the Closing Date.

10) **"Closing"** shall have the same meaning as Closing Date and used interchangeably throughout.

11) **"Closing Date"** shall occur after the Confirmation Day and shall mean the date(s) on which the Closing Statement is issued and thereafter the Loan Principal Amount is disbursed to Borrower. When Loan Principal Amount is disbursed in several tranches, in each case a Closing Statement will be issued. Erratic or unforeseen market conditions may warrant an untimely issuance and delay in funding.

12) **"Closing Statement"** shall mean a Lender issued and determined document which references the final financial provisions, currency conversions and terms of the Loan prior to disbursement.

13) **"Collateral"** shall mean publicly traded securities of Issuer, together with any split-up or dividend payable to shareholder of record.

14) **"Confirmation"** shall have the same meaning as Confirmation Day and used interchangeably.

15) **"Confirmation Day"** shall mean the Business Day after the Pledged Collateral has been received, settled and posted in favor of Lender at the Depository Broker and is adequately ready and valid in all respects to be registered as Pledged Collateral. The Depository Broker shall notify the Borrower and Lender in writing of this event.

16) **"Cure Period"** shall mean a period of time when a Party that breaches a contract can remedy the breach without penalty, provided a Cure Period is afforded and stated as such. The Cure Period when provided as per this Agreement is five (5) Business Days.

17) **"Currency"** shall mean Mexican Pesos ("MXN"). Currency shall include the Loan, including all interest and fees thereof, and any funds transferred in this Agreement. If Pledged Collateral is a security that is priced and traded in a market and currency other than MXN, the Parties agree to convert to MXN for all purposes. Conversions for such currency shall be selected by Lender's choice of bank or those published by Yahoo Finance or comparable news source. Any conversions selected by the Lender's choice of bank the Borrower shall assume a 1.50% - 2.50% conversion rate computed according to the purchase of USD exchange rate published by Banamex, if the Borrower elects to receive funding in Mexican Pesos.

## Astor Capital Fund

18) **"Default"** shall mean a breach of this Agreement and have the same meaning as Event of Default.

19) **"Depository Broker"** shall mean a regulated financial institution selected by Lender for the receipt of the securities, specifically the Pledged Collateral and any top-up. A Depository Broker is a firm that facilitates the custody of the Pledged Collateral acting as an intermediary between the Borrower and Lender and which will adhere to an executed Custodian Management Agreement, in accordance with all terms and conditions set herein this Agreement.

20) **"Effective Date"** shall mean the date the Agreement is effective.

21) **"Encumbrance"** shall mean Lender's legal claim on Pledged Collateral that affects the Borrower's ability to transfer ownership to anyone or to dispose of the Pledged Collateral without Lenders prior written authorization. For purposes of this definition, Encumbrance shall mean lien, mortgage, charge, hypothecation, rehypothecation, rights, barter, pawn, trade, dispose, deal-in, pledge, re-pledge, repo, borrow or transfer of security interest in Collateral. The Pledged Collateral will be restricted to Borrower and Encumbrance rights exclusively granted to Lender.

22) **"Event of Default"** with respect to this Loan or any, shall mean any of the events specified in Clause VI hereof in addition to any omission or failure to perform a legal or contractual duty as obligated, stated or outlined herein. An Event of Default will cause Acceleration of the Loan.

23) **"Fair Market Price" ("FMP")** shall mean the lower of, the average of the last sale price of the Pledged Collateral on three (3) consecutive Business Days prior to closing or recording of the pledge at the Transfer Agent or Depository Broker or the lowest trading price at Closing. The average price shall be the per-share price of the Pledged Collateral establishing its Fair Market Value ("**FMV**").

24) **"FMV"** shall mean the amount, expressed in Mexican Pesos (MXN), equating to the FMP for each share of the Pledged Collateral multiplied by the number of such shares pledged or transferred for lending purpose.

25) **"Hybrid Loan"** shall have the same meaning as a Loan with respect to purpose, but shall mean that this Agreement is structured as an Investment and a Loan, resulting in a Hybrid Loan.

26) **"Interest"** shall mean the sum of money paid regularly at a particular rate for the use of money lent. It represents a charge imposed by Lender for all funds advanced to Borrower in a form of a Loan.

27) **"Investment"** shall mean that this Loan may be construed as a speculative Investment. Borrower being considered a sophisticated professional investor, and Borrower being aware of all the risks associated with making a major Investment where the outcome is unpredictable.

28) **"Investment Risk"** means that margin borrowing entails risk which is commensurate with any type of a speculative investment where the results and the outcome are both unpredictable and whereby the consequences could be materially negative. Borrower is fully informed of all risks, is a seasoned professional investor and is prepared to accept an unpredictable outcome having realized that this is a speculative undertaking.

**Astor Capital Fund**

29) **"Issuer"** shall mean the corporate entity that has issued and distributed the shares of: **Grupo Elektra SAB DE CV (ELEKTRA*:MM)**.

30) **"Lender"** shall mean specifically the Lender described herein and not any other for purposes of this Agreement.

31) **"Lender's Discretion"** means Lender shall have the right to not proceed with the funding at any time up until the Closing Date.

32) **"Lender's Remedy"** shall mean Acceleration of the Loan and Principal and the termination of this Agreement, specifically termination of the Loan and forfeiture of the Pledged Collateral per Clause VI.4 as provided herein, which may result because of a default by Borrower; in any case, excess funds received by Lender from the sale of Collateral in Event of Default will be returned to Borrower.

33) **"Lien"** shall mean any Encumbrance of any kind referenced herein concerning the Pledged Collateral. A lien is the Lender's right to retain possession of property belonging to Borrower until a debt owed by that Borrower is fully discharged per this Agreement.

34) **"Loan"** shall mean the total contractual gross amount computed together when proportionally Advanced or lent by Lender to Borrower on a nonrecourse basis for the specified duration and subject to the stated conditions. The Loan is funded based on FMP of the Pledged Collateral. For purposes of this agreement, all fees and costs due to Lender shall fall within this definition. For purposes of this Agreement, the Loan can be sent by bank wire transfer to Borrower or deposited by Lender into Borrower's own account held at the Depository Broker.

35) **"Loan Documents"** shall mean collectively, this Agreement, Custodian Management Agreement, the Closing Statement and any other agreements, documents, instruments, exhibits, or statements delivered in connection with the Loan. Each to be read and construed together in a manner to give meaning and effect to all their provisions.

36) **"Loan Principal Amount"** shall mean full or allotment of monies borrowed by Borrower or advanced by Lender under Clause II.1.a hereof, in accordance with Loan to Value and is due and owed to the Lender. The Loan Principal Amount represents the Approved Loan Amount.

37) **"Loan Term"** see meaning of Term of Loan. For purposes of this Agreement, the phrases may be used interchangeably throughout, but shall have the same meaning.

38) **"Loan-to-Value (LTV)"** shall mean the ratio describing the total amount of the loan in relation to the value of the secured collateral pledged or transferred.

39) **"Material Event"** shall mean any event or possible outcome which may undermine or alter value of Collateral or prejudice Lender's standing Lien.

40) **"Maturity"** shall have the same meaning as Maturity Date and used interchangeably.

41) **"Maturity Date"** shall have the meaning provided in Clause II.6.a herein.

42) **"Obligations"** shall mean any and all promises, commitments and requirements, monetary and otherwise, made by Borrower to Lender. Borrower is morally and legally bound and has a duty to perform as obligated itself herein.

**Astor Capital Fund**

43) **"Party"** shall mean Lender or Borrower, as the case may be, and their agents, representatives, successors, affiliates, and assigns.

44) **"Parties"** when capitalized, the word means both Borrower and Lender and no other. When not capitalized, shall refer to any other third party.

45) **"Pay-Off Amount"** shall mean the amount expressed in Mexican Pesos that Borrower will need to pay to satisfy the Terms of the Loan. Borrower shall request the Pay-Off Amount of Lender in writing ten (10) Business Days in advance of the actual Pay-Off Date. The Pay-Off Amount shall be sent by Borrower to Lender by wire transfer in Mexican Pesos to Lenders designated Depository Broker or Lenders commercial bank account at least three (3) Business Days prior to the Pay-Off Date. The Pay-Off Amount shall be in Mexican Pesos equal to the Loan Principal Amount as referred to in the Closing Statement.

46) **"Pay-Off Date"** shall mean the date determined by Lender on which Borrower will tender the Pay-Off Amount to Lender in exchange for Lender discharging the Lien over the Pledged Collateral being held at the Depository Broker.

47) **"Pledged Collateral"** shall mean the total actual shares pledged to Lender as consideration for the Loan and any shares or proceeds resulting from any transaction, split-up, revision, reclassification, or other like change that may take place of the Pledged Collateral during the Term of the Loan. The contemplated pledged securities are not a gift or a purchase, instead being pledged to Lender for Loan purposes.

48) **"Principal"** shall have the same meaning as Approved Loan Amount and used interchangeably.

49) **"Proof of Funds"** shall mean written proof of cash or liquid securities held in the Borrower's name.

50) **"Security Interest"** shall mean a Lien or Encumbrance granted by Borrower to Lender in real property such as securities as Collateral for a loan. The Security Interest granted to Lender prevents the Borrower from disposing or transferring the property or securities until such time as the Loan is repaid to Lender.

51) **"Statement of Knowledge"** shall mean any statements, representations or warranties which are based upon the knowledge of the Borrower, constructive or otherwise, whether Borrower knew or should have known or was expected to know.

52) **"Term of the Loan"** shall mean the period beginning on the first day when the Approved Loan amount is fully funded to the Borrower and ending on Maturity Date, calculated in months or years.

53) **"Tranche"** shall mean that parts into which the payment of this financial arrangement are divided into.

54) **"Transfer Agent"** shall mean the organization selected by Issuer to maintain and record the ownership of shares by Issuer of securities.

55) **"Underwriting"** shall mean a discretionary and subjective credit qualification process using factors such as stock market dynamics, liquidity, earnings, public data by which Lender

**Astor Capital Fund**

approves a Loan based on its risk management policy, Collateral in question and Borrower's ability to repay the Loan.

56) **"Valuation Event"** shall mean that the FMP of the Pledged Collateral has fallen to less than seventy percent (70%) of the FMP used to calculate the Loan Principal Amount as reflected by the average of the last sale price on three (3) consecutive Business Days on a national or international securities exchange. A Valuation Event may also be triggered by erratic market conditions or news reasonably expected to impact the securities of Issuer.

57) **"Voting Rights"** shall mean the right given to shareholder of Issuer to allow shareholder to vote on various matters of corporate policy or issues before the Issuer.

**IN CONSIDERATION THEREOF:** Each Party agrees that the fair value of consideration it is receiving, has been received, and will continue to receive under this Agreement equals to or exceeds the fair value of the consideration it is delivering to the other Party. In consideration of mutual promises provided or to be provided, and other good, valuable, sufficient, equitable consideration, and mutual covenants, the receipt of, adequacy and sufficiency of which is hereby acknowledged, exchanged, and satisfied by all and between all parties, and intending to be bound hereby the performance thereof, and such represents reasonably just, equitable, adequate and reasonable in value, the parties hereto covenant and agree to and stipulate. Consideration will include monetary and non-monetary exchanges, services, in-kind, of every nature and type and otherwise as well as other covenants which the Parties may choose to agree to exchange in the performance thereof. The parties hereto agree as follows:

## II.   SUBSTANTIVE TERMS OF THE LOAN

### 1. Principal Amount.

a) Subject to and upon the terms and conditions set forth herein, Borrower and Lender hereby further set forth their rights and obligations to one another and Borrower hereby grants to Lender Lien rights over the Pledged Collateral and in exchange, the Lender agrees to advance to Borrower a Loan consisting of funds up to **THREE BILLION EIGHT MILLION FIVE HUNDRED EIGHTY THOUSAND (3,008,580,000.00)** Mexican Peso (MXN) (constituting the **"Approved Loan Amount"**) of the current FMV of the Pledged Collateral of: **Grupo Elektra SAB DE CV (ELEKTRA*:MM)** subject to all the terms, covenants and conditions of this Agreement. The said sum represents the Loan Principal Amount and is advanced to Borrower not permanently, but temporarily for the duration of the subject Loan Term. Funding of Loan Principal Amount will be initiated within one (1) Business Day of the Closing Day (the "Closing Day") and shall be memorialized by Lender's issuance of an executed Closing Statement. The Loan Principal Amount to be secured by Cash Collateral to be deposited by Lender into Borrowers account at the Depository Broker within twenty-four (24) hours of delivery of Pledged Collateral.

b) The Borrower shall be entitled to the appreciation, if any, of the FMV of the Collateral if the Loan is repaid in full by Maturity.

c) The amount that Lender may make available under Loan shall be calculated by multiplying fifty-five percent (55%) of the value of Pledged Collateral by the FMV.

### 2. Interest Rate.

 Astor Capital Fund

a) All outstanding amounts of the Loan shall bear an interest rate in an amount equal to **one and fifteen one hundredths of a percent (1.15%)** per year to be paid to Lender in quarterly installments, as directed by Lender, by the issuance of payment statement in advance of due date. Interest payment shall be collected in advance of Loan and shall accrue daily both before and after any default of the loan, demand, court judgment, or arbitral award, and shall be calculated based on the actual number of days elapsed and on the basis of a year of three hundred and sixty-five (365) days (three hundred and sixty-six (366) days in a leap year).

b) All interest and principal must be paid by way of bank certified check, wire transfer or other immediately available funds without undue delay or further demand to address or bank account indicated herein, or as further may be directed by Lender. In Event of Default, to the extent permitted by applicable law, the interest rate on Loan shall be computed at a rate equal to one and one-half percent (1.5%) per month and shall continue until satisfied and cured by Borrower or released by Lender.

c) The first interest payment shall be subtracted from Loan proceeds at the time of the funding. Further interest payments for the Loan shall be due timely on the first Business Day of each month following the Closing Date, and such payment schedule shall be based on twelve months per calendar year, regardless of the actual number of days between the applicable Closing Date and the date such first interest payment is due.

d) Any funds received as payment from or on behalf of the Borrower shall be applied by Lender in accordance with the following: (i) first, if applicable, to all outstanding interest and fees; (ii) second, to fees and costs due to third-parties engaged by Lender to enforce covenants and provisions of this agreement; (iii) third, to any outstanding Principal balance; and (iv) fourth, any excess funds received by Lender from the sale of Collateral in Event of Default to be returned to Borrower.

**3. Loan Fees and Costs.**

a) **Origination Fee.** Borrower shall pay to Lender an agreed-upon Loan Origination Fee of one percent (1%) of Loan Principal Amount contemporaneous with the funding of the Loan by Lender, ("**Lender's Origination Fee**") to be paid to Lender. The Lender is authorized to deduct the 50% of the subject Origination Fee from Loan Principal Amount, with the balance to be paid by the Borrower on the 1st Anniversary of the Loan. The fee is non-refundable and fully earned.

b) **Maintenance Fee.** Borrower shall pay Lender every three (3) months the maintenance fee of six and twenty-five hundredths basis points (0.0625%) of the Loan Principal Amount ("**Lender's Maintenance Fee**"). The Lender is authorized to deduct the Maintenance Fee in advance from the Loan Principal Amount for the first period, it shall be memorialized in the Closing Statement and the same exact amount shall be paid by Borrower, automatically and without further demand, every four months thereafter for all the years constituting the Term of the Loan. Lender's Maintenance Fee is non-refundable and will be paid in advance.

c) **Liquidated Damages.** If Borrower fails to deliver in full, within forty-five (45) days, the required Pledged Collateral to the Depository Broker into the account of Borrower after both the duly signed Agreement and the Custodian Management Agreement to catalyze and bring about the Approved Loan Amount, then there shall be Liquidated Damages equal to two percent (2%) of the stated Approved Loan Amount. The Liquidated Damages are effective upon the execution of this Agreement by both Parties and shall be Lender's only claim against Borrower for damages as a result of Borrower's failure to deliver the Pledged Collateral to custodian



Depository Broke into the account of Borrower. The two percent (2%) Liquidated Damages applies only to Borrower's failure to deliver the Pledged Collateral and does not apply to other Event(s) of Default, which is covered under Clause VI of this Agreement. This two percent (2%) Liquidated Damages if applied due to failure by Borrower to proceed or in failing to deliver Pledged Collateral to the Depository Broker in full, is therefore Lender's rightful claim.

d) **Expenses.** Borrower agrees to pay all of Lender's reasonable costs and fees, including legal fees and out of pocket expenses that might arise in the course of Lender enforcing, collecting, defending, executing, and maintaining this Agreement. For the services provided, the Depository Brokers engaged in the performance of this Agreement are entitled to an annual custodian management charge to be paid by Borrower based on the cumulative net asset value of all Dedicated Depository Account(s) at time of delivery of the Pledged Collateral and limited to fifteen hundredths of one (0.15%) percent. The annual custodian management charge is exclusive of any transaction fee, transfer fee, exit fee, or other administrative costs and fees which Depository Broker may possibly impose. Such fee shall be nonrefundable and shall be paid one (1) year in advance. First year's fee may be deducted from the Loan proceeds or charged to Borrower's account directly by the Depository Broker. In subsequent years, the Borrower will remit to Lender the exact same fee every year at least fourteen (14) days prior to the Effective Date, to be remitted by Lender to Depository Broker.

4. **Additional Loan Amount.** In the event of an increase in the FMV of the Pledged Collateral, the Borrower has the right to request that Lender increase the Loan Principal Amount at the same LTV as provided herein, at which time an amendment to this Agreement regarding additional funds to be provided will be incorporated. Lender will have sole discretion in determining whether to fund any additional funds in addition to the Loan Principal Amount, up to the full FMV of the Pledged Collateral at the time of the written request by Borrower. Borrower may exercise this provision not more than once every three (3) months.

5. **Early Prepayment.** There shall be no early prepayment ("Prepayment") of the Loan Principal Amount or of any interest due under the Loan permitted during the first sixty (60) months of the Loan Term ("**Lock-Up Period**") unless any payments are to be received according to a Change in Collateral event or with written permission from Lender. The Borrower may prepay the Loan Principal Amount after a "Lock-Up Period" but shall be subject to a half of one percent (0.5%) administrative and closure fee. Until resolved, the "Lock-Up Period" shall be extended in the event of Lender's inability due to regulatory constraints placed on the securities, Borrower's willful lack of cooperation, circumstances outside of Lender's control or restrictions placed on securities.

6. **Term and Maturity Date of Loan.**

a) **Maturity Date:** The Loan Principal Amount together with all accrued interest and fees and shall be due and payable, five (5) years after the Loan Term begins and subsequently ends (the "Maturity Date"). The Borrower may extend the Maturity Date if the Lender agrees to do so in writing. A fee in the amount of one percent (1%) of the Loan Principal Amount (the "Extension Fee") shall be due and payable on the original Maturity Date if the Lender agrees to extend the Maturity Date at the annual interest rate at the time of an extension. If Lender does not receive the overdue Loan Principal Amount and other Obligations within ten (10) Business Days of the original Maturity Date, Lender will send a notice to Borrower advising Borrower that the Loan will terminate under the default provisions of this Agreement. The Loan Principal Amount is due in entirety at Maturity Date and is irrespective of any action taken by Lender over the Pledged Collateral.


Astor Capital Fund

**b) Loan Completion:** No later than thirty (30) calendar days before the Maturity Date, the Borrower shall communicate to Lender in writing whether Borrower intends to repay the Loan Principal Amount on the Maturity Date by requesting the Pay-Off Amount in writing and specifying the Pay-Off Date and Lender shall provide the Pay-Off Amount in written form within three (3) Business Days. No later than fourteen (14) calendar days before the Maturity Date, Borrower shall provide Proof of Funds to repay the Loan Principal Amount plus any other Obligations due to Lender on the Maturity Date.

7. **Loan Termination and Redelivery of Collateral.** This Agreement shall terminate when all of Borrower's Obligations have been paid in full, or in the Event of Default. Upon Event of Default, Lender will diligently and in good conscience dispose of Collateral in order to satisfy Obligations of Borrower and return to Borrower any excess stock. Lender confirms and will maintain its full ability to release and discharge the Lien and return the Pledged Collateral, to Borrower, free of any Encumbrance within three (3) Business Days of Borrower's satisfaction of its Obligations. Provided, however, that this Agreement shall be reinstated if any payment in respect of the Loan's Obligations is rescinded, invalidated, declared to be fraudulent or preferential or otherwise required to be restored or returned by Lender for any reason. A return of identical securities means a return of the Pledged Collateral as modified as a result of any split-up, revision, conversion, reclassification, degradation, or other like change of the Pledged Collateral. Any cash or shares tendered to buy down the Loan as a result of a Valuation Event are subject to redelivery and shall become part of the Pledged Collateral to be returned to Borrower.

8. **Closing.** The Closing Date in most cases will be no later than one (1) Business Day after the Confirmation Day, provided the conditions to Lender's Obligations as outlined in Clause V herein are satisfied and the written receipt by Lender of a Confirmation that the Pledged Collateral has been deposited and verified with the Depository Broker in a form and manner satisfactory to Lender and its counsel. The balance payment ("Balance Payment") shall be paid within one (1) Business Days of Closing Date. The Balance Payment shall be paid to the Borrower's account at the Depository Broker or to an account of Borrower at a commercial bank account per the following instructions outlined in Schedule A annexed to the back of this Agreement.

## III.    LOAN AND COLLATERAL FEATURES AND ATTRIBUTES

1. **Non-Recourse Loan.** Lender agrees that it will at all times look only to the Pledged Collateral identified in this Agreement for payment of Borrower's Obligations and will not make any claim or institute any action or proceeding against Borrower or any representatives, agents, successors, assigns, or affiliates of Borrower for any deficiency remaining after applying the Pledged Collateral to any sums due Lender. This is a Non-Recourse loan except for the provisions provided under Clause II.3.c of this Agreement.

2. **Due Diligence.** Lender has the right but not the obligation to perform enhanced due diligence on the Pledged Collateral and the Borrower shall fully cooperate.

3. **Material Information.** Borrower has tendered any and all relevant and material information regarding the Pledged Collateral and of the Issuer and all such relevant and material information has been disclosed and provided by Borrower to Lender. During the Loan Term, Borrower will continue to voluntarily provide all such relevant and material information to Lender and not withhold information deemed to be Material.

 Astor Capital Fund

4. **Depository Broker.** Lender shall have the exclusive right to appoint a Depository Broker which will provide custody for the Pledged Collateral through a known global bank.

## IV.    BORROWER'S WARRANTIES AND OBLIGATIONS

Borrower represents and warrants to Lender that:

1. **Accredited Investor.** Borrower is a "professional accredited investor" as may be defined by ordinance of Borrower domicile, the jurisdiction of securities Issuer or jurisdiction of Governing Law of this Agreement.

2. **Announcement.** Neither Lender nor Depository Broker assume any responsibility or liability for filing on behalf of Borrower regulatory announcement(s) that are or may be required by the laws, rules, and regulations of any securities regulatory authorities or agencies that may have jurisdiction over any transactions with respect to the securities, including without limitation, loan transactions in which the securities are pledged as collateral. Borrower acknowledges and agrees that as a condition for the closing of the loan transaction described in this Agreement, Borrower shall comply with such laws, rules, and regulations, and assumes all such responsibilities and liabilities, including liability for all legal, administrative, and any and all other costs and expenses associated with making and filing all regulatory announcement(s). In the event Borrower fails, refuses or does not timely fulfill its regulatory announcement Obligations described in this Section, then in addition to any and all other remedies available to Lender and/or Depository Broker on account of Borrower's non-compliance, Lender or Depository Broker may, in their sole and absolute discretion, prepare, file and publish any and all regulatory announcements that either of them may deem to be necessary and/or appropriate in such jurisdictions that Lender or Depository Broker determine to be necessary or appropriate, including without limitation in Borrower's country of residence or domicile. In such event, and notwithstanding any confidentiality or other provisions in this Agreement or any other documents or agreement among the parties, Borrower may publish and/or file regulatory announcements that include, without limitation: a disclosure of Borrower's pledge and the number of shares that Borrower pledged to secure a loan; the current disposition of the securities; any party's purchases, sales, conversions, holdings, and exits from such holdings; changes of beneficial or legal ownership of the securities; changes involving successors-in-interest to the securities; repayment of loan principal in whole or in part and termination of the loan; and proxy and other filings involving voting or other control and management of the securities of Issuer, per the laws, rules, and regulations of the governing securities authority or agency.

3. **Depository Broker.** Borrower hereby affirms to fully abide by the Terms and Conditions of the Depository Broker and if there is any inconsistency between this Agreement and the Terms and Conditions of the Depository Broker, then the Terms and Conditions of the Depository Broker will prevail over this Agreement.

4. **Full Disclosure.** Borrower further represents and warrants that all statements and documentation it has provided to Lender directly or through its agents in connection with this Agreement are true, complete, and do not omit any material facts or information, which if provided, would have impacted Underwriting prudence. Borrower consents to provide to Lender any and all relevant material information which is necessary for any Lender to conduct a prudent risk assessment evaluation of Issuer and Borrower.

 Astor Capital Fund

5. **Knowledge.** None of the rights of Borrower arising as the legal and beneficial owner of the Pledged Collateral have been surrendered, cancelled or terminated. Borrower has no knowledge of any material non-public information, inside information or similar terms as defined by applicable law with respect to governing the Issuer, which has not been generally disclosed to Lender or the public.

6. **Intentionally left in blank.**

7. **Liens; Reliance; and Cooperation.** As of the date of this Agreement, the securities constituting the Pledged Collateral are owned by Borrower free and clear of any Liens, Encumbrance or contractual, statutory, or regulatory limitation or restriction of whatever nature; are in good standing in accordance with their country of issue; and are freely tradable and transferable securities and Borrower hereby grants absolute first position Security Interest as a Lien and Encumbrance rights to Lender in exchange for receiving a Loan. Borrower further represents and warrants that it has not relied on, and that Lender has not made, any representation, advice, or recommendation with respect to securities, either directly or through publication. Borrower has not relied on any marketing materials or any other written or oral statements of fact or otherwise made by anyone prior to entering into this agreement, and any such materials and/or statements or representations, if any, written or oral, shall be purged from existence as if never having existed. All previous agreements, representations, statements both written or oral, express or implied with respect to subject matter hereof, are superseded by this Agreement and hereby merged into this Agreement. It is encumbered upon Borrower to initiate and facilitate the transfer of the Pledged Collateral. Borrower will cooperate in executing documents provided by Lender, Lender's Depository Broker, and clearinghouse/registry as requested by Lender, Depository Broker, applicable laws and regulations. Borrower further represents that it shall in good faith cooperate to facilitate this Loan transaction in a timely manner.

Borrower represents, warrants, and covenants that it understands that securities borrowing is highly speculative and requires sophistication and that Borrower may lose and forfeit the Pledged Collateral when engaging in margin borrowing. Borrower should only attempt margin borrowing if Borrower completely understands its potential losses; is a seasoned speculative securities investor; is an accredited professional investor; and has solid risk management strategies in place in the event of margin-call or any other warranty, representation or action of Lender or market performance of Collateral.

8. **Necessary Filings.** Borrower warrants and concedes that any regulatory announcement associated with this Agreement is the sole responsibility of the Borrower, and Borrower will comply with all requirements placed by local securities regulatory authorities and any costs associated with such announcements are the sole responsibility of the Borrower. Lender is not responsible for filing any necessary reports for or on behalf of the Borrower, but at its option may elect to do so in order to comply with regulations imposed.

9. **Notification to Lender.** Upon occurrence of any of the foregone events or whenever they shall occur, the Borrower shall promptly inform Lender in writing if a) Borrower has filed for bankruptcy or filed any petition seeking creditor protection; b) any creditor of Borrower has taken legal action against Borrower to recover debts owed to it; c) any creditor has sought or is threatening to seek confiscation or garnishment of property of Borrower. Absent of the preceding events, Borrower will once per year, on each anniversary of the Effective Date, submit a written attestation to Lender representing that to the best of Borrower's knowledge, none of the preceding events had taken place.

 Astor Capital Fund

10. **Waiver.** Borrower will not take any suit or action against third parties or affiliates who may be acting on behalf of or for the Lender within the scope of this Agreement. Any dispute or controversy with third parties arising from this Agreement will solely be limited to this Agreement which must be resolved in accordance with the dispute resolution provision of Clause VII herein. It is hereby agreed that third parties such as the Depository Broker, Transfer Agent, referral sources or other affiliates, agents, or assignees of Lender facilitating the scope of this Agreement are hereby indemnified, released, forever discharged and absolved from any claim, controversy or action whatsoever. Should there be an incurable Event of Default, unjust enrichment, extreme remedy and right of redemption are hereby waived by the Borrower, and the Borrower will not assert any right or claim against the forfeited collateral transferred to Lender as a result of an incurable Event of Default. During the pendency of this Loan, Borrower will not seek injunctive relief or interference from any court of law, regulatory body, Transfer Agent, custodian, sub-custodian, Depository Broker, central depository or stock exchange requesting to invalidate, suspend, limit, impede, terminate or restrict this Agreement or freeze the shares. Injunctive relief by Borrower or any interference by Borrower, central depository or regulatory agency shall be an immediate and an incurable Event of Default. Borrower will not interfere in any way or challenge the validity or enforceability of this Agreement, and the same shall be a Breach thereof.

11. **Suitability.** Borrower has carefully considered, and has discussed with the Borrowers own professional legal, tax and financial advisers the suitability of this Agreement and Investment Risk associated with it and has fully considered for purposes of this Loan the risks of this Investment, and understands that (i) this loan is an Investment and is suitable only for an investor who is able to bear the economic consequences of losing its entire Investment, (ii) the margin loan backed by the Securities is a speculative Investment which involves a high degree of risk, (iii) that there is lack of predictability in final loan amount, (iv) potential forfeiture of the Collateral, (v) that there are various unforeseen financial implications, independent and dependent on actions of Borrower, including the fluctuating and final value of the Collateral, (vi) Borrowers inability to receive back the Collateral and its adverse value.

## V.    LENDER WARRANTIES AND REPRESENTATIONS

Lender represents and warrants to Borrower that:

1. **Best Efforts Approach.** Despite stock market volatility, erratic trading volume, and pricing fluctuations, best efforts will be employed by Lender to facilitate the funding of the Loan in its entirety for the full Approved Loan Amount, in accordance with this Agreement and as contemplated herein by both Parties. Lender will not act in bad faith at any time during the Term of the Loan.

2. **Cash Collateral.** The lender will deposit Cash Collateral into Borrowers designated account at the Depository Broker which shall coincide with Loan Principal Amount to be funded and released to Borrower at Closing upon execution of the Closing Statement.

3. **Dividend Distributions.** Lender will credit the Borrower for any, and all dividends received or credited to the Lender. If dividends are not received or credited to the Borrower's account at the Depository Broker, then Borrower is not entitled to any to be credited. Lender shall credit Borrower for all dividends if any, at Maturity of the loan to be subtracted from outstanding principal balance. No dividends will be credited to Borrower if the issuer does not pay them to the Depository Broker for any reason whatsoever. Dividends may not be used to offset any

**Astor Capital Fund**

sums due to Lender prior to Loan Maturity unless requested so in advance by Borrower and approved by Lender in writing.

## 4. Dealing with Securities.

a) The Borrower acknowledges and agrees that upon the transfer of the Pledged Collateral to the Depository Broker, the subject Pledged Collateral will: (i) have been given value by the Lender for the use of the Pledged Collateral, for purpose of determining Fair Market Value ("FMV"), in establishing that the Lender has Lien and Encumbrance rights in the Pledged Collateral; (ii) including the power to transfer rights in such Pledged Collateral as may be contemplated by Lender, in accordance with the herein Agreement.

b) During the Loan Term, provided that there has not been an Event of Default, the Lender will not sell or short-sell the shares of the Pledged Collateral on any publicly traded securities exchange. However, upon the occurrence of an incurable Event of Default, the Lender reserves the right to dispose of the Collateral on any publicly traded securities exchange, but is not obligated in doing so.

c) The Borrower acknowledges and agrees that the Pledged Collateral will be utilized by Lender to assert its preferential Lien over it.

d) The Lender will not engage in short-selling the Pledge Collateral by borrowing the shares of same Issuer from any entity or person and later buying the shares in the same security, then returning the borrowed shares in an effort to make a profit.

e) The Lender will not engage in Front Running, by buying or selling ahead of arrival of the Pledged Collateral.

## 5. Order of Payment.
Payments received from sale of Collateral upon Event of Default shall be applied in the following order: (i) firstly, to all outstanding Principal balance, interest and fees; (ii) second, to any costs and fees charged by Custodian to Lender; and (iii) lastly, to any excess proceeds of sale of Collateral to be returned to Borrower. Notwithstanding the forgoing, in case of an incurable Event of Default, nothing contained herein shall obligate the Lender to maximize sales proceeds, sell at market, on any specific platform or exchange, or at any specific price, provide accountability on the forfeited Collateral or to qualify the return to Borrower remaining balance of any proceeds.

## 6. Transfer of Securities.
The Lender will not transfer the securities to its own account unless an incurable Event of Default has taken place. Only upon an incurable Event of Default will Lender request the Depository Broker to transfer the securities in the Borrower's account to Lender's sole control and custody in order to satisfy Obligations of Borrower.

## 7. Funding Guarantee and Borrowers Remedy.
The Lender guarantees to begin funding the stated Loan and the Approved Loan Amount within one (1) Business Days from the Closing Date. If the Lender or the Depository Broker fails to release the stated funding partially or in full within the one (1) Business Days of Closing Date, then Borrower shall have the right to terminate this Agreement, provided that the shares were in fact delivered in full to effectuate the Approved Loan Amount, all of the conditions stipulated herein have been met, shares are not restricted, are free-trading and Borrower did not interfere with the Depository Broker or central depository, trading of the Issuer shares were not halted and force majeure conditions did not interfere or prevent Lender from funding.


**Astor Capital Fund**

Should Lender fail to return to Borrower the Pledged Collateral within five (5) Business Days of receipt of Pay-Off Amount, the Lender shall be liable to Borrower for two (2) times the amount of the Pledged Collateral on deposit at the Depository Broker.

8. **Voting Rights.** Lender represents that it will fully cooperate with the registered owner of the securities of Issuer in exercising its Voting Rights on issues brought by the Issuer before its shareholders and the Lender will either instruct the Depository Broker to vote on behalf of registered owner of the securities of Issuer, or the Lender will vote on registered owner's behalf in accordance with instructions issued by the registered owner. Should the registered owner request that Lender vote on behalf of the registered owner, the registered owner may assign in writing the Voting Rights to Lender and Lender will agree to accept such Voting Rights from the registered owner. However, in no event will the Lender be liable in any way to Borrower or any registered owner as a result of any voting action or inaction.

## VI.  CONDITIONS TO FUNDING; EVENTS OF DEFAULT; AND REMEDIES

1. **Conditions Precedent.** The obligation of the Lender to fund the Loan is subject to the fulfillment of the following conditions precedent to the satisfaction of Lender: (a) The delivery of duly executed Stock Loan Agreement, Closing Statement, Custodian Management Agreement (CMA); (b) that all matters, facts, representations, documentation, announcements, filings, due diligence, regulatory compliance, and instruments in connection with Pledged Collateral, Issuer, and the Loan have been met and are in form and substance satisfactory to Lender's compliance, underwriting team, Global Custodian and Intermediary Custodian, as well its counsel; (c) the delivery of the stock in electronic form to Lender's Depository Broker representing the Pledged Collateral; and (d) Borrowers transfer of Security Interest in the Collateral as a Pledge.

2. **Valid Transactions and Events of Default.** In order for the transaction to be completed to Maturity by the Borrower, the Borrower must fulfill in the performance of and observance of any covenant, representation, provision or agreement contained herein and not default in any other loan document or provision.

3. Borrower is obliged to remedy the following matters, if occurred, in order to avoid being in breach of this or any other loan Agreement:

a) Failure by Borrower to pay the interest and all applicable fees or charges when due as stipulated, or the Approved Loan Amount when due, or any other default in the performance of an obligation that is not cured within the applicable Cure Period;

b) If the Collateral has fallen to less than seventy percent (70%) of the Fair Market Price ("FMP") utilized to compute the Loan Amount published by the average of the closing price on three (3) Business Days by the securities exchange (the "Margin-Call"). If this occurs, then the Borrower will, within five (5) Business Days and without further demand, automatically transfer to the Depository Broker a top-up of shares or cash equal to twenty percent (20%) more than the FMV and cure the deficiency. Hereinafter a new FMP is established at seventy-five percent (75%) of the original FMP. There will not be opportunity to cure if the Pledged Collateral falls by more than fifty percent (50%) of FMP as the Lender will sell the securities to satisfy the Loan Obligations and terminate this Agreement with no further recourse to Borrower;

c) If the class of securities provided as Pledged Collateral is delisted or trading is halted for five (5) or more Business Days by a regulatory agency or otherwise;

 **Astor Capital Fund**

d) If any representation or warranty made by Borrower in this Agreement or in any statement furnished in contemplation of obtaining a Loan shall prove to have been knowingly untrue, omitted or misleading in any material respect;

e) If any of the Loan Documents shall at any time after their execution and delivery for any reason, cease to be in full force and effect or shall be declared invalid, null or void or the validity, obligations hereunder or enforceability thereof shall be contested, repudiated, disaffirmed or challenged by Borrower, it's agents or counsel or by any other person or entity acting on behalf of or for the Borrower;

f) A governmental agency which controls the actions of Issuer has commenced an investigation of the Issuer;

g) A Material Event upon the financial condition of Borrower or Issuer;

h) The Issuer is seeking or applied for an extension in which to file the required regulatory reports;

i) An incurable Event of Default occurring in any other Loan between Lender and Borrower.

4. **Lender's Remedy.** If the Obligations aforementioned are not met, the Lender's remedy shall include and not be limited to any course of action against Borrower for Breach of this Agreement, including the occurrence of any of the foregoing Event(s) of Default, if not cured within the designated Cure Period, and if applicable, shall terminate the Stock Loan Agreement, result in Acceleration of all Loan amounts, interest, costs, expenses, and fees due thereunder, and cause forfeiture of the Pledged Collateral; any and all excess proceeds of the sale of Collateral in Event(s) of Default will be returned to Borrower.

Notwithstanding the above, in case of an incurable Event of Default, nothing contained herein shall obligate or create any duty upon the Lender in any way to apply the proceeds of any sale of the Pledged Collateral to the Loan Principal or against any other Obligation of Borrower or to return remaining balance of proceeds realized as a result of any sale of Pledged Collateral, to maximize sales proceeds, sell the Pledged Collateral in the market, or at any specific price, or in any specific order, or on any specific day or to provide accounting or accountability with respect to the disposition of the Pledged Collateral as a result of an incurable Event of Default. There is no duty owed or implied to Borrower by Lender to maximize the sale of Pledged Collateral upon incurable Event of Default.

5. **Market Conditions.** If the Pledged Collateral experiences a Material Event or Valuation Event, Borrower's lack of cooperation, restriction or material change in price prior to or post-funding, the Lender will have the right to cease the funding of the Loan or amend the Underwriting criterion, until such circumstances are dissipated and cured, or adjust funding based on new Underwriting criterion.

### VII.    GOVERNING LAW. JURISDICTION.

a) This Agreement and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement and the transactions contemplated hereby shall be governed by, and construed in accordance with, the laws of England Wales.

 Astor Capital Fund

b) Each party hereto irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind whatsoever, whether in law or equity, or whether in contract or tort or otherwise, against any other party hereto in any way relating to this Agreement or the transactions contemplated hereby, in any forum other than the State or Federal courts of the United Kingdom, and any appellate court from any thereof. Each of the parties hereto irrevocably and unconditionally submits to the exclusive jurisdiction of such courts and agrees that any such action, litigation or proceeding may be brought in any such United Kingdom court or, to the fullest extent permitted by applicable law, in such federal court of United Kingdom. Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

c) Each party hereto irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court referred to in Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

d) Irrespective of any outcome of any such legal proceeding, the Lender will be awarded all of its reasonable legal fees and costs in enforcing, collecting, defending, executing, and maintaining this Agreement.

## VIII.    INDEMNIFICATION AND LIMITED LIABILITY RELEASE

1. Lender will not be liable for any indirect, incidental, special, punitive, opportunity loss, or consequential damages, forgone or speculative profit, including loss of revenue or profits or losses arising from Lender's performance under this Agreement. However, the Borrower will be liable for Lender's recovery, speculative profit and opportunity loss when Borrower willfully obstructs or delay's Lender's recovery and enforcement efforts. Borrower agrees to indemnify the Lender, each legal entity, if any, who controls, is controlled by or is under common control with the Lender, and each of their respective directors, assignees, officers and employees (the "Indemnified Parties"), and to hold each Indemnified Party of Lender harmless from and against any and all claims, damages, losses, liabilities and expenses (including all fees and charges of internal or external counsel with whom any Indemnified Party may consult and all expenses of litigation and preparation therefor) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority (including any person or entity claiming derivatively on behalf of Borrower), in connection with or arising out of or relating to the matters referred to in this Agreement whether (a) arising from or incurred in connection with any breach of a representation, warranty or covenant by the Lender, or (b) arising out of or resulting from any suit, action, claim, proceeding or governmental investigation, pending or threatened, whether based on statute, regulation or order, or tort, or contract or otherwise, before any court or governmental authority. The indemnity agreement contained in this Section shall survive the termination of this Agreement, payment of any amounts hereunder and the assignment of any rights hereunder.

2. Borrower shall not hold Lender, its agents, directors, shareholders, assignees, Depository Broker or other known and unknown persons responsible for any fluctuations or depreciation in the value of the Pledged Collateral that Borrower may experience during the pendency of Loan. Borrower agrees to indemnify Lender for and to hold Lender harmless from, any loss or

 **Astor Capital Fund**

expense that such Borrower may sustain or incur as a consequence of default by Borrower in making a borrowing. This covenant shall survive the termination of this Agreement.

## IX.    GENERAL PROVISIONS

1. **Amendments.** Amendments to this Agreement (including the adding or updating of any annexes, appendices, or schedules) will not be enforced unless such amendment is in writing and signed by authorized signatories on behalf of both Parties and added as an Addendum, with the exception of either Party informing the other of change of banks and only notice of such change is sufficient. Electronic email exchanges will not modify this Agreement. No amendment, modification or waiver in respect to this Agreement will be effective unless in writing (including writing evidenced by a facsimile transmission) and executed by each of the Parties.

2. **Assignment.** This Agreement, its equities, and Obligations shall be freely transferrable, pledge-able or assignable in whole or in part as the Parties may see fit or as may be in their best interest. Any transfer or assignment action by either Party shall be followed up by written notice to the other Party.

3. **Balance of Equities.** In the event that this Agreement is reviewed, interpreted or evaluated by any judiciary body or arbitration tribunal in assessing the balance of equities based on this Agreement and law, notwithstanding any of the other terms within this Agreement, the outcome of any decision shall be interpreted to weight in favor of and benefit the Lender at all times irrespective of unjust enrichment and extreme remedy.

4. **Clog on Redemption.** This Agreement is not a mortgage and will not be construed as a mortgage by the Parties or any tribunal or court of law. This is a Hybrid Loan requiring an investment through Pledge of Collateral. In case there is an Event of Default, Borrower shall not have equity of redemption or right to redeem the Pledged Collateral and no incurable Event of Default shall be construed as a clog on equity of redemption and Lenders right to forfeiture of the Pledged Collateral will trump and supersede any right of redemption. No provision of this Agreement or any action of Lender upon an incurable Event of Default will be construed as a clog on equity of redemption and Lenders right to forfeiture of Pledged Collateral is absolute and final. Borrower shall be able to redeem its Pledged Collateral after the Lock-Up period, provided that all Obligations of Borrower are satisfied, and the Loan has not experienced an incurable Event of Default.

5. **Confidentiality.** This Agreement is to be kept confidential and is not to be reproduced in any manner whatsoever for persons other than the Parties hereto. Specifically, each Party agrees to maintain the confidentiality of the business, trade, finances, and methods ("Confidential Information") of the other Party and not disclose the Confidential Information to any person other than those whose knowledge is essential for the performance of this Loan. Lender will not reveal the existence of this Agreement to the media or any regulatory body or government agency unless ordered to do so by a court of law. Lender may reveal the contents of this Agreement to defend Lender's dignity and reputation and dispel incorrect public information about the subject transaction. A default under this Agreement by the Borrower will deem this clause invalidated. The Parties acknowledge that the existence and the terms of this Agreement and any oral or written information exchanged between the Parties in connection with the preparation and performance of this Agreement are regarded as confidential information. Each Party shall maintain confidentiality of all such confidential information, and without obtaining the written consent of the other Party, it shall not disclose any relevant



confidential information to any third parties, except for the Information that: (a) is or will be in the public domain (other than through the receiving Party's unauthorized disclosure); (b) is under the obligation to be disclosed pursuant to the applicable laws or regulations, rules of any stock exchange, or orders of the court or other government authorities; or (c) is required to be disclosed by any Party to its shareholders, investors, legal counsels or financial advisors regarding the transaction contemplated hereunder, provided that such shareholders, investors, legal counsels or financial advisors shall be bound by the confidentiality Obligations similar to those set forth in this Section. Disclosure of any confidential Information by the staff members or agencies hired by any Party shall be deemed disclosure of such confidential information by such Party, which Party shall be held liable for breach of this Agreement. This Section shall survive the termination of this Agreement for any reason.

6. **Consideration.** This Agreement and the transaction herein constitute adequate, just and sufficient consideration. There shall be no argument or defense raised at any time that Consideration is in any way insufficient or was not made. For purposes of this provision, Consideration will include Lender coordinating, arranging, advising as well as agreeing to extend financing as stipulated in this Agreement, sufficiency of which is accepted and acknowledged.

7. **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement regardless of number in existence or distribution.

8. **Cross-Default.** A default in any other loan will cause an incurable Event of Default in this Loan and a default in this Agreement will cause an incurable Event of Default in other Loan agreements with Lender.

9. **Depository Broker.** The Depository Broker reserves the right to custody and sub-custody the Pledged Collateral to any licensed financial institution in accordance with its Terms & Conditions.

10. **Enforcement of Clauses.** If any arbitrator, court or other party determines that any term, phrase, clause, or provision in this Agreement is in conflict with or contradicts any of its other terms, phrases, clauses, or provisions, then this Agreement shall be allowed to be amended by Lender by modifying or striking the contradictory term, word, phrase, clause, covenant or provision such that the Agreement and remaining provision and covenant is deemed to be fully enforceable and in all cases as to Lender's exclusive and sole benefit, to the full purpose and intent hereof as intended by Lender.

11. **Entire Agreement and Merger Clause.** This Agreement contains the entire Agreement between the Parties hereto and is legally binding upon them as of the date of the execution hereof. There were not and will be any oral, written or electronic modifications other than written Addendums duly executed by both Parties, which will supersede this Agreement. Oral or written or electronic notations or modifications other than written Addendums executed by both Parties are not enforceable, and all previous known and unknown statements and promises, written or oral are hereby merged in to this Agreement. This Agreement shall be final, controlling, and fully merged with respect to any previous discussions, promises, , understandings, representations or warranties made by Lender.

12. **Errors and Omissions.** Borrower expressly agrees and acknowledges that it has had reasonable opportunity to obtain the assistance of its own counsel to fully review and participate in the negotiation and revision of any of the terms, provisions, covenants

 **Astor Capital Fund**

representations, warranties and conditions of this Agreement prior to its execution; and the decision of whether or not to seek advice of counsel with respect to this Agreement is the responsibility of Borrower. Therefore, under no circumstances shall Lender be liable to Borrower for any errors or omissions in this Agreement that may be disadvantageous to Borrower, or which may result in claims of actual or alleged or perceived harm to Borrower. Borrower further agrees and acknowledges that any errors or omissions in the Agreement shall be strictly construed to favor the Lender. Once this Agreement is fully executed by both parties, Borrower fully and completely waives all rights to correct any such errors or omissions, or to seek redress against Lender for any such errors or omissions, whether by arbitration, lawsuit or any other equitable remedy. In addition, if Borrower or anyone on its behalf, makes a demand or claim for liability against Lender that arises out of, results from, or relates in any way to any such error or omission in this Agreement, Borrower shall indemnify, defend and hold harmless Lender from any such liability which may be incurred as the result of such demand or claim, including court costs and attorney's fees.

13. **Fiduciary Duty.** This Agreement is not intended to create or impose or give the appearance to the Parties that there is a fiduciary or trustee duty or other similar common law rights that are not expressly stated herein. Notwithstanding anything to the contrary contained in this Agreement, perception drawn or otherwise applicable provision of law or equity, neither Party shall be liable to the other for any act or omission that constitutes a bad faith violation of implied covenant of good faith and fair dealing and the same is expressly excluded. Any fiduciary or trustee duty whatsoever to the other is hereby irrevocably disclaimed and not provided. No duty of any type is owed to Borrower other than which is explicitly stated.

14. **Force Majeure.** Lender will not be liable to the Borrower for failure to perform any of its Obligations under this Agreement to the extent such performance is hindered, delayed or prevented by Force Majeure (except for failure to make payments hereunder). If Lender is unable, in whole or in part, to carry out its Obligations under this Agreement due to Force Majeure, it must provide notice to the Borrower. Initial notice may be given orally; however, written notification with reasonably full particulars of the event or occurrence is required as soon as reasonably possible. If Lender will claim Force Majeure, it will promptly give written notice to the Borrower of the termination of such Force Majeure and will resume performance of any suspended obligation as soon as reasonably possible after termination of such Force Majeure. For purposes of this Agreement, "Force Majeure" will mean causes, conditions, events or circumstances which are beyond the reasonable control of the Lender claiming Force Majeure. Notwithstanding any provision of this Agreement, Lender shall not be liable for its inability in performing any of its Obligations hereunder if such inability is caused by or arises as a result of circumstances beyond its reasonable control ("Force Majeure Event"). For the purposes of this Clause, a Force Majeure Event shall include, without limitation, inability or delay in performance caused through acts of God, fire, flood, riot, epidemics or population quarantine, degradation in stock value, stock market crash, illiquidity of the stock, Borrower's lack of cooperation and other adverse financial market conditions, lightning, explosion, civil commotion, war, malicious damage, storm, tempest, electronic malfunctions, acts or omissions of telecommunications carriers, acts of government or other regulatory authority, acts or omissions of persons or bodies for which Lender affected thereby is not responsible, and any other circumstances beyond the reasonable control of the Lender which may possibly undermine the Pledged Collateral or securities of Issuer. Force Majeure applies only to Lender and does not apply to Borrower, nor shall excuse Borrower from complying with terms of this Agreement.

15. **Intentionally left in blank.**


**Astor Capital Fund**

16. **Headings.** The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

17. **Lender's Obligations.** All of Lender's obligations, representations and warranties in the performance of this Agreement are contingent upon Borrower performing in accordance with this Agreement and as the Lender may at its sole discretion from time to time decide.

18. **Margin Call.** The Borrower must post margin by toping-up additional cash or shares in the event of a Margin Call as stipulated in Section VI(3)(b). This provision may be triggered and called-upon by the Lender irrespective of amount funded to Borrower and the amount funded shall at no time be contingent on Margin Call validity or enforceability. A Margin Call is a standard provision in securities lending whereby the price of the securities has degraded to a point where the status of Pledged Collateral is deemed to be insufficient, and a credit risk from Lender's risk management perspective. Satisfaction of Margin Call by Borrower is required in order for funding to continue and avoid an Event of Default. The Margin Call is set in accordance with the herein sections and at no time shall be waived or forgiven.

19. **Non-Disparagement.** The Borrower agrees not to intentionally make, threaten to make or intentionally cause any other person to make, any public statement that is intended to criticize or disparage the Lender, any of its affiliates, agents or any of their respective officers, managers or directors. This clause shall not be construed to prohibit any person from making truthful statements when required by law, subpoena, court order, or the like. This clause shall remain in full force and survive the execution, delivery, cancellation, and termination of this Agreement regardless of the consummation of events and transactions contemplated hereof and all events to follow.

20. **Not Construed Against Drafter.** The rule of construction that a contract be construed against the drafter shall not be applied in interpreting or affecting this Agreement and no ambiguity or conclusion drawn whatsoever in this Agreement or any portion thereof shall be construed or interpreted against the preparer and it will be deemed and established that both Parties actively participated in drafting and concluding this Agreement, each having been represented by its respective counsel.

21. **Notice.** Borrower further represents and warrants that it will yearly, on the anniversary of the Effective Date, submit a written statement to Lender by means of declaration stating whether Borrower obtained any other loans from any third parties pledging securities of same Issuer and whether there has been a material change in Borrowers financial condition, such as bankruptcy or insolvency filing of Borrower or any entity controlled by Borrower. Borrower must also declare if any material lawsuit has been filed against it.

22. **Notices.** All notices and communications to either of the Parties by the other shall be in writing, sent by government mail, electronic mail or by a reputable commercial carrier and shall be deemed duly given on the earlier of the date the same is sent or when deposited in the mail to each Party as follows:

| If to Lender: | Astor Asset Management 3 Limited |
|---|---|
| Attention: | Operations Manager |
| | 777 Dunsmuir Street Suite 1400 |
| | Vancouver, British Columbia, V7Y 1K4 |
| | Email: compliance@astorcapitalfund.com ; Telephone: +1 888 775 1628 |

**Astor Capital Fund**

| If to Borrower: | Corporacion RBS SA de CV |
|---|---|
| Attention: | Ave. Ferrocarril de Rio Fno 419 A99, Cuchilla del Moral 1, Iztapalapa 09319 Ciudad de Mexico, Mexico |
| | Email: egonzalez@gruposalinas.com.mx ; Telephone: 0052551720[0089] |

Either Party may designate by notice in writing to the other a new address to which notices, requests, and other communications hereunder shall be given.

23. **Records.** At the request of Lender, Borrower will cooperate in providing financial or other records, including audited financial statement reasonably necessary by Lender to establish ongoing Borrower credit-worthiness. Yearly upon the anniversary of the Effective Date, the Borrower will submit to Lender in writing declaration attesting to whether securities of same issuer were sold or pledged to others in the preceding year. If none were sold or pledged, the Borrower shall inform Lender accordingly. If any were sold or pledged, then Borrower shall identify such transactions.

24. **Redemption.** This is a Hybrid Loan and Borrower expressly waives the benefit of all laws now existing or hereafter enacted providing for redemption of a right or redemption from any sale of Collateral made under this Loan as a result of incurable Event of Default and Borrower hereby releases all rights of redemption to which Borrower would otherwise be entitled, when the Collateral is forfeited and disposed of as a result of an incurable Event of Default.

25. **Release and Waiver.** No waiver of any provision of this Agreement shall be effective unless agreed to in writing by the Parties. No course of dealing between Borrower and Lender shall operate as a waiver of any of the rights of the Parties under this Agreement with the exception of an action for injunctive relief, which shall not be permitted or attempted and shall be nullified by the judicial body upon its application. Should Lender fail to timely exercise any of its rights, options or elections hereunder, irrespective of whether Lender continues to fund the Borrower, the Lender shall not be deemed to have waived any breach or default declaration on the part of Borrower or to have released Borrower from any of the Obligations mandated herein, unless such waiver is strictly in writing, is signed by Lender and expressly waives Lenders rights. Delayed or postponed implementation of any of Lenders rights does not waive any rights afforded to Lender herein and the Lender is free to invoke such rights at any time Lender chooses in doing so. For consideration herein provided, Borrower hereby releases, absolves and forever discharges Lender and their respective successors, assigns, partners, directors, shareholders, officers, beneficial owners, advisers, affiliates, agents, attorneys, transferees, and employees from any and all claims, legal fees, demands, torts, cross-actions, controversies, omissions, inaccuracy, nonfulfillment of any representation or warranty, oversight, exclusion, negligence, causes of action, suits, damages, rights, outcomes, liabilities and obligations, at law or in equity whatsoever, known or unknown, whether past, present or future, now held, owned or possessed by Borrower, or which Borrower may, as a result of any of Lenders actions, inactions, going-concern status, assignments, dealings, failings to act, calculations or directives occurring on or prior or after the execution of this Agreement, and hereafter hold or claim to hold under common law or statutory right, arising, directly or indirectly out of the Loan or any of the Loan Documents or any of the documents, instruments or any other transactions contemplated thereby. Borrower understands and agrees that this is a full, final and complete release and agrees that this release may be pled as an absolute and the final bar to any or all suit or suits pending, or which may hereafter be filed, claimed or prosecuted by Borrower, or anyone claiming by, through or under Borrower, in respect of any of the matters described herein may hereafter be had from anyone whomsoever. No Waiver is asserted or claimed against the Lender which refutes Lenders dominion and right to

 **Astor Capital Fund**

foreclose, deal-in or transact in the Pledged Collateral and no Waiver is alleged or claimed against the Lender which prohibits Lender prior to or post an Event of Default to exhaust its recourse against the Borrower or any other person or persons, third party guarantors or against any other security it may hold in respect to the Obligations of Borrower, before realizing upon or otherwise dealing with the Pledged Collateral in such manner as Lender may consider necessary or befitting in its own right. All of Lenders rights are reserved and none are Waived. Borrower agrees and acknowledges that Lender reserves the right to, in Lenders sole discretion, to unilaterally modify the terms and conditions of this Agreement to reflect any changes in laws, policies, rules or regulations, due diligence or any material discoveries to Collateral or Issuer. Lenders acceptance of partial payments shall not invalidate, waive or diminish Lenders rights afforded herein.

26. **Severability.** If any of the provisions of this Agreement or in any of the Loan Documents is found by an arbitral tribunal and/or court of competent jurisdiction to be unlawful, then such provision will be further altered and modified in Lender's favor to meet legal conformity or, if impracticable, is stricken out entirely as if it was never even written in the first place, and the remainder of the rights, warranties, provisions, covenants and Obligations contained in this Agreement or any of the Loan Documents shall continue to be in full force and effect. If any provision shall be deemed invalid due to its scope or breadth, such provision shall be deemed valid to the extent of the scope and breadth permitted by law.

27. **Statement of Knowledge.** For purposes of this Agreement, the Borrower shall be deemed to have knowledge of a particular fact or matter referenced herein, unless otherwise qualified hereunder means a statement of the Borrower declaring knowledge of the actual facts or circumstances to which such phrase relates having made inquiries or investigations in connection with such facts and circumstances, Borrower having conducted reasonably diligent inquiry into the relevant subject matter.

28. **Survival.** Except as herein provided, all of the Borrower's representations, warranties, waivers, Obligations, releases, indemnities, and covenants made in this Agreement shall remain in full force and survive the execution, delivery, cancellation, and termination of this Agreement regardless of the consummation of events and transactions contemplated hereof. All of the Lender's rights, benefits, enforcement covenants and secured interest into the collateral shall survive the termination of this Agreement, except for further funding of the Loan. The Lender shall receive, obtain and retain all the benefits, profit and interest of the securities pledged during the Loan Term and upon its expiration, should any amounts be further owed to Lender.

29. **Termination.** Early termination or rescission is not permitted under the Agreement, regardless of the reason or need to do so, and this Agreement will be valid and in full force and effect after its execution for its full Term, provided it can only be terminated after its maturity, jointly by both Parties in written form only and memorialized as an Addendum or mutual written release, or as stipulated herein and for no other reason. All enforcement covenants, conditions, and waivers will survive termination. If the Loan Documents shall, at any time after their execution and delivery for any reason, cease to be in full force and effect or shall be canceled, declared invalid, null or void by Borrower, their representatives or their agents or the validity or enforceability thereof shall be contested or challenged by Borrower or by any other person for or on the Borrower's behalf, the Loan will be considered in default. The Lender retains the right to convert the Collateral during the Loan Term, and thereafter should Borrower default.

 Astor Capital Fund

## X.    REQUIRED DISCLOSURES

It is mutually understood and agreed that Lender has a financial interest and privilege in the pledged shares according to the parties' understanding and contractual agreement. Borrower assumes the burden of topping up when required to do so. Borrower is aware that market conditions may cause the value of securities to decline. Borrower concedes that Lender is not responsible for the degradation of the stock value, whether owing to action(s) or inaction(s) of Lender. A decline in value may require additional securities or cash to increase the value of the collateral. Borrower's default will cause forfeiture of securities. Borrower now waives and forever discharges Lender against any claims under any applicable securities laws. Tax consequences are the responsibility of Borrower. Lender and its loan officers have not provided legal or tax advice of any kind to Borrower. Borrower attests that, at all times, it was represented by legal counsel representing its interests and Borrower has had ample opportunity to consult one. Borrower's decision is at will and solely based on its independent judgment. Borrower has evaluated all risks independently and did not rely on representations made by Lender, if any. Lender does not discriminate based on sex, race, nationality, or religion. Lender is not a broker-dealer or financial advisor. This disclosure provides full transparency of risks involved. Neither Borrower nor Lender will participate in or engage in any money laundering scheme. Lender does not provide investment advice and its loan officers, and sales staff are prohibited from doing so. Borrower must ensure that the Pledged Collateral stays within Lender's value requirement following this Agreement. Loan is non-recourse to Borrower and recourse will be against collateral only. Lender has recommended that Borrower consult a professional tax advisor to determine the tax implications of a loan under the terms of this agreement before proceeding. Lender will not be liable for the devaluation of securities during the term of Loan. Lender is not an insider of the securities being pledged by Borrower and Lender does not and has not offered to buy or sell advice to Borrower. Lender utilizes independent third-party compliance consultants in risk management analyses and underwriting recommendations. A default of Loan will cancel Lender's obligation to Borrower. Borrower will not undermine or interfere with securities of Issuer. Borrower will not use Loan proceeds for any illegal activity, including without limitation to, use of Loan proceeds in the drug trade or support of terrorist groups. Borrower is to consult a tax professional for any tax advice. Borrower represents that Borrower has full ownership of the securities and legal custody and as of the date of this agreement, is not a defendant in any lawsuit where the ownership and control of the pledged shares are challenged because Lender will not be a Party to any such challenge. Borrower will not transact with any entity on any international sanctioned list using the Loan proceeds. Lender is not affiliated with any government agency. Lender may readjust loan criterion due to adverse market conditions, Borrower's lack of cooperation or devaluation of securities. Borrower agrees that Loan is suitable for Borrower's needs. Lender has the right, but not the obligation, to refinance or increase Loan amount if the value of securities increases during the term of Loan. Borrower has risk-tolerance and has the financial ability and liquid assets to post margin in the Event of Default. Lender is not and does not hold itself out to be a tax advisor. This is not an offer to or solicitation to purchase or sell securities. Loan will be based on all applicable laws, present Underwriting, and market conditions at the time of funding. Borrower agrees to provide information necessary to the contemplated transaction in a timely, complete, and accurate manner. The Borrower further represents and warrants that all statements and documentation provided about Loan are true and complete and do not omit or forgo any material facts or information. Borrower understands that funding correlates and is relative to most current market conditions at time of funding or force majeure, and may cause Lender to advance Loan in tranches, adjust or postpone funding. Due to market dynamics, at all times throughout, the loan is subject to re-analysis and Underwriting reassessment prior to funding. During the Loan Term, all benefits and proceeds of Pledged Collateral inure to Lender. Lender reserves the right to maintain dominion over the Collateral during the Loan Term, which affords Lender the right to deal-in, dispose or convert over the Pledged Collateral. Lender may not call the Loan before Maturity Date unless a default has occurred. The Cash Collateral to be deposited in to Borrowers own account shall be solely computed by the Lender. No notice of any type is due to Borrower other than the notices described herein. During the pendency of the Loan, Borrower is not entitled to receive or retain any benefits or rights not specifically stated or contemplated herein.

IN WITNESS WHEREOF, and after review, mutual preparation and consultation with respective legal counsel, the Parties have executed this Loan Agreement as of the date first written above.

### END OF TEXT


**Astor Capital Fund**

## SIGNATORY PARTIES

**LENDER**: Astor Asset Management 3 Limited

_____    _____    _____
Signature                Name and Title           Date

## BORROWER NOTARIZATION

**BORROWER**: Corporacion RBS SA de CV

_____    Ricordo Salinas    May 7, 2021
Signature                Name and Title     Date

_____
Notary Seal

Eduardo Gonzalez
_____                    _____
Attorney/Notary/Witness                  Attorney/Notary/Witness

_____  May 7, 2021      _____
Signature              Date             Signature           Date


Astor Capital Fund

**SCHEDULE A**

**BANKING INFORMATION**

BORROWER BANKING INFORMATION:

| | |
|---|---|
| **Bank/Institution Name:** | |
| **Swift Code No/Routing No:** | |
| **Account Number:** | |
| **Account Name:** | Corporacion RBS SA de CV |
| **Bank Code:** | |
| **Branch Code:** | |
| **Address of Account:** | |

CASH AND STOCK TOP UP ACCOUNT INFORMATION:

| | |
|---|---|
| **Institution's Name:** | |
| **Account Number:** | |
| **Account Name:** | Corporacion RBS SA de CV |
| **Address of Account:** | |

INTEREST, PRINCIPAL AND PAYMENT INFORMATION:

**Please make payment payable to:**
Astor Asset Management 3 Limited
777 Dunsmuir Street, Suite 1400
Vancouver, British Columbia, V7Y 1K4

# EXHIBIT 10



Astor Capital Fund

# SECURITIES-BACKED FINANCING

**A Fixed Instrument, Collateralized Non-Recourse Facility**

**STOCK LOAN AGREEMENT**

**Astor Capital Fund**

Astor Asset Management Ltd.

## STOCK LOAN AGREEMENT ("SLA")
United States of America

This Stock Loan Agreement is established as of July 14th 2021 (the "Effective Date") between Astor Asset Management a Limited a Canadian corporation, duly organized under the laws of Canada, with its office located at 777 Dunsmuir Street, Suite 1400, Vancouver, British Columbia Canada V7Y 1K4 ("Lender") and  386 Market St, San Francisco, CA 94133, USA United States of America

Corporacion RBS SA de CV, a corporation with a principal place of business located in Ave. Ferrocarril de Rio Frio 419 A99, Cuchilla del Moral 1, Iztapalapa 09119 Ciudad de Mexico, Mexico (hereinafter "Borrower") and Ricardo Benjamin Salinas Pliego, an individual with a principal place of business located at Cristobal Colon 79 INT C, Mexico 09300 (hereinafter "Guarantor"), mutually hereinafter and together with the Lender shall be referred to as the ("Parties")

This Agreement shall remain in effect until (a) fully satisfied and mutually terminated in writing upon mutual satisfaction; (b) all Indebtedness is paid in full and Borrower and Guarantor are released by Lender in writing; or (c) the Agreement is terminated in writing by Lender in accordance with the covenants and terms provided herein.

WITNESSETH

**STOCK LOAN AGREEMENT** On this date, and from time-to-time hereafter, Lender may make Loans to Borrower, who's performance is guaranteed by Guarantor. Borrower and Lender (collectively, the "Parties") enter into this Stock Loan Agreement ("SLA") which, together with the applicable supplement(s) and other Loan Documents, shall govern each separate Loan and all indebtedness between the Parties and the subject Loan and Borrowers performance unconditionally guaranteed by the Guarantor. Unless stated to the contrary elsewhere, the provisions of all Loan Documents are incorporated by reference herein as if stated in full. This SLA supersedes all previous term sheets, emails, representations, warranties and discussions and is the final documentation of the Parties' undertakings. For the value received, Borrower promises to pay Lender, all indebtedness governed by this Agreement. Nothing herein shall be construed to obligate Lender to restructure or renew any unpaid balance, forgive any part thereof, fund in full, or to make any additional or future loans or financial accommodations to Borrower.

**GUARANTEE AND SECURITY** In consideration of the Lender making available Loan facilities under this Agreement, the Guarantor hereby irrevocably and unconditionally guarantees to the Lender the due and prompt payment and discharge of Borrowers Obligations and undertakes that the Guarantor will on demand make good any Event of Default by the Borrower in payment or discharge of the Borrowers Obligations or any part thereof as if the Guarantor instead of the Borrower were expressed to be the primary obligor in respect thereof, together with interest and all other indebtedness expressed herein to be payable by the Borrower on the Borrowers Obligations under the Loan Documents until payment thereof in full and all other warranties representations and covenants are satisfied to Lenders satisfaction and the herein Terms and Conditions.

**GRANT OF GUARANTOR COLLATERAL** Subject to the grant of Security Interest in the company Collateral by the Guarantor, the Guarantor hereby unconditionally and irrevocably Pledges and grants to the Lender for the duration of the Loan Term and until all indebtedness of Borrower is fully satisfied and discharged, a Lien and Security Interest in and to Lenders right of set-off against the rights, title and interest in the three million five hundred thousand (3,500,000) publicly traded shares of Grupo Elektra SAB DE CV and known as ELEKTRA:MX (hereinafter the "Collateral") on deposit in favor of Lender with Weiser Global Capital Markets and the Guarantor

v: 1.05.1020          Page 7 of 11          Initials _____ _____
                                              Guarantor   Borrower

 Astor Capital Fund

Pledges the Collateral as security for the prompt and complete payment and performance of Borrower when due, whether at the stated maturity, by Acceleration or otherwise.

## I.    DEFINED TERMS WITHIN AGREEMENT:

1) **"Acceleration Notice"** shall mean a written notice given to Borrower and Guarantor after the occurrence and continuation of an Event of Default declaring all amounts and sums accrued and unpaid to be immediately due and payable, at which point the Loan is in state of Default.

2) **"Advance"** shall for purposes of this Agreement refer to any sum of money and in any currency, paid out to any account of Borrower, or any third-party account, whether controlled by Borrower or not, if directed to do so by Borrower, for and on behalf of Borrower. All payments made to any third-party for or on behalf of Borrower shall constitute as payment having been made to Borrower.

3) **"Agreement"** shall mean this Stock Loan Agreement, including any supplements or attachments hereto, and other subsequent written agreements, which shall be incorporated by reference along with all amendments, modifications, and restatements thereof in written form. Emails are expressly excluded, are not binding, and are not to be construed as part of any agreement or modification.

4) **"Approved Loan Amount"** shall mean the maximum total amount the Lender is willing to fund to Borrower based on Pledged Collateral of Guarantor to be deposited with Depository Broker represented throughout as Loan Principal Amount or Principal. For purposes of this Agreement, the Approved Loan Amount may be paid out in draws or in lump sum.

5) **"Balance Payment"** shall mean the Loan Principal Amount less any Origination Fee, costs or expenses, if applicable, not satisfied in cash by Borrower.

6) **"Borrower"** shall mean the corporate entity and the individual described herein and no other for purposes of this Agreement.

7) **"Breach"** shall mean any of the Events of Default by Borrower or Guarantor specified in this Agreement and unless specified otherwise, other Loan Documents that constitute a default.

8) **"Business Day"** shall mean any day other than Saturday, Sunday or a holiday observed by applicable laws.

9) **"Cash Collateral"** shall mean the Loan Principal Amount to be funded to Borrower, which at all times shall be computed by Lender and reflected in the Closing Statement. The Cash Collateral shall be the net amount to be funded, less fees and costs as stipulated in this Agreement and the Closing Statement and disbursed on the Closing Date.

10) **"Closing"** shall have the same meaning as Closing Date and used interchangeably throughout.

11) **"Closing Date"** shall occur after the Confirmation Day and shall mean the date(s) on which the Closing Statement is issued and thereafter the Loan Principal Amount is disbursed to Borrower. When Loan Principal Amount is disbursed in several tranches, in each case a Closing Statement will be issued. Erratic or unforeseen market conditions may warrant an untimely issuance and delay in funding.

Initials _____    _____    _____
         Guarantor  Borrower   Lender

 Astor Capital Fund

12) **"Closing Statement"** shall mean a Lender issued and determined document which references the final financial provisions, currency conversions and terms of the Loan may to disbursement.

13) **"Collateral"** shall mean publicly traded securities of Issuer, together with any spin-up or dividend payable to shareholder of record.

14) **"Confirmation"** shall have the same meaning as Confirmation Day and used interchangeably.

15) **"Confirmation Day"** shall mean the Business Day after the Pledged Collateral has been received, settled and posted in favor of Lender at the Depository Broker and is adequately ready and valid in all respects to be registered as Pledged Collateral. The Depository Broker shall notify the Borrower and Lender in writing of this event.

16) **"Cure Period"** shall mean a period of time when a Party that breaches a contract can remedy the breach without penalty, provided a Cure Period is afforded and stated as such. The Cure Period when provided as per this Agreement is five (5) Business Days.

17) **"Currency"** shall mean Mexican Pesos ("MXN"). Currency shall include the Loan, including all interest and fees thereof, and any funds transferred in this Agreement. If Pledged Collateral is a security that is priced and traded in a market and currency other than MXN, the Parties agree to convert to MXN for all purposes. Conversions for such currency shall be selected by Lender's choice of bank or those published by Yahoo Finance or comparable news source. Any conversions selected by the Lender's choice of bank the Borrower shall assume a 1.50% – 2.50% conversion rate computed according to the purchase of USD exchange rate published by Banamex, if the Borrower elects to receive funding in Mexican Pesos.

18) **"Default"** shall mean a breach of this Agreement and have the same meaning as Event of Default.

19) **"Depository Broker"** shall mean a regulated financial institution selected by Lender for the receipt of the securities, specifically the Pledged Collateral and any top-up. A Depository Broker is a firm that facilitates the custody of the Pledged Collateral acting as an intermediary between the Borrower, Guarantor and Lender and which will adhere to an executed Custodian Management Agreement, in accordance with all terms and conditions set herein this Agreement.

20) **"Effective Date"** shall mean the date the Agreement is effective.

21) **"Encumbrance"** shall mean Lender's legal claim on Pledged Collateral that affects the Borrower's ability to transfer ownership to anyone or to dispose of the Pledged Collateral without Lenders prior written authorization. For purposes of this definition, Encumbrance shall mean lien, mortgage, charge, hypothecation, rehypothecation, rights, barter, pawn, trade, dispose, deal-in, pledge, re-pledge, repo, borrow or transfer of security interest in Collateral. The Pledged Collateral will be restricted to Guarantor and Encumbrance rights exclusively granted to Lender.

22) **"Event of Default"** with respect to this Loan or any, shall mean any of the events specified in Clause VI hereof in addition to any omission or failure to perform a legal or contractual duty as obligated, stated or outlined herein. An Event of Default will cause Acceleration of the Loan

Guarantor    Borrower    Len

 Astor Capital Fund

23) **"Fair Market Price"** **("FMP")** shall mean the lower of, the average of the last sale price of the Pledged Collateral on three (3) consecutive Business Days (prior to closing or recording of the pledge at the Transfer Agent or Depository Broker or the lowest trading price at Closing. The average price shall be the per-share price of the Pledged Collateral establishing its Fair Market Value ("FMV").

24) **"FMV"** shall mean the amount, expressed in Mexican Pesos (MXN), equating to the FMP for each share of the Pledged Collateral multiplied by the number of such shares pledged or transferred for lending purpose.

25) **"Guarantor"** shall mean the individual described herein and no other for purposes of this Agreement, who agreed to personally undertake and guarantee in all respects the full and faithful performance of Borrower and hereby agrees to Pledge herein described Collateral to Lender in a form of a Lien.

26) **"Hybrid Loan"** shall have the same meaning as a Loan with respect to purpose and shall mean that this Agreement is structured as an Investment and a Loan, resulting in a Hybrid Loan.

27) **"Interest"** shall mean the sum of money paid regularly of a particular rate for the use of money lent. It represents a charge imposed by Lender for all funds advanced to Borrower in a form of a Loan.

28) **"Investment"** shall mean that this Loan may be construed as a speculative Investment. Borrower and Guarantor being considered a sophisticated professional investors, and with being aware of all the risks associated with making a major Investment where the outcome is unpredictable.

29) **"Investment Risk"** means that margin borrowing entails risk which is commensurate with any type of a speculative Investment where the results and the outcome are both unpredictable and whereby the consequences could be materially negative. Borrower and guarantor are fully informed of all risks, is a seasoned professional investor and is prepared to accept an unpredictable outcome having realized that this is a speculative undertaking.

30) **"Issuer"** shall mean the corporate entity that has issued and distributed the shares of **Grupo Elektra SAB DE CV (ELEKTRA:MX)**.

31) **"Lender"** shall mean specifically the Lender described herein and not any other for purposes of this Agreement.

32) **"Lender's Discretion"** means Lender shall have the right to not proceed with the financing at any time up until the Closing Date.

33) **"Lender's Remedy"** shall mean Acceleration of the Loan and Principal and the termination of this Agreement, specifically termination of the Loan and forfeiture of the Pledged Collateral per Clause VI.4 as provided herein, which may result because of a default by Borrower; in any case, excess funds received by Lender from the sale of Collateral in Event of Default will be returned to Guarantor.

34) **"Lien"** shall mean any Encumbrance of any kind referenced herein concerning the Pledged Collateral of Guarantor. A lien is the Lender's right to retain possession of property belonging to Guarantor until a debt owed by that Borrower is fully discharged per this Agreement.

 **Astor Capital Fund**

35) **"Loan"** shall mean the total contractual gross amount computed together when proportionally Advanced or lent by Lender to Borrower on a nonrecourse basis for the specified duration and subject to the stated conditions. The Loan is funded based on FMP of the Pledged Collateral. For purposes of this agreement, all fees and costs due to Lender shall fall within this definition. For purposes of this Agreement, the Loan can be sent by bank wire transfer to Borrower or deposited by Lender into Borrower's own account held at the Depository Broker.

36) **"Loan Documents"** shall mean collectively, this Agreement, Custodian Management Agreement, the Closing Statement and any other agreements, documents, instruments, exhibits, or statements delivered in connection with the Loan. Each to be read and construed together in a manner to give meaning and effect to all their provisions.

37) **"Loan Principal Amount"** shall mean full or allotment of monies borrowed by Borrower or advanced by Lender under Clause II.1.a hereof, in accordance with Loan to Value and in due and owed to the Lender. The Loan Principal Amount represents the Approved Loan Amount.

38) **"Loan Term"** see meaning of Term of Loan. For purposes of this Agreement, the phrases may be used interchangeably throughout, but shall have the same meaning.

39) **"Loan-to-Value (LTV)"** shall mean the ratio describing the total amount of the loan in relation to the value of the secured collateral pledged or transferred.

40) **"Material Event"** shall mean any event or possible outcome which may undermine or alter value of Collateral or prejudice Lender's standing Lien.

41) **"Maturity"** shall have the same meaning as Maturity Date and used interchangeably.

42) **"Maturity Date"** shall have the meaning provided in Clause II.6.a herein.

43) **"Obligations"** shall mean any and all promises, commitments and requirements, monetary and otherwise, made by Borrower to Lender. Borrower is morally and legally bound and has a duty to perform as obligated itself herein.

44) **"Party"** shall mean Lender, Guarantor or Borrower, as the case may be, and their agents, representatives, successors, affiliates, and assigns.

45) **"Parties"** when capitalized, the word means both Borrower, Guarantor and Lender and no other. When not capitalized, shall refer to any other third party.

46) **"Pay-Off Amount"** shall mean the amount expressed in Mexican Pesos that Borrower will need to pay to satisfy the Terms of the Loan. Borrower shall request the Pay-Off Amount of Lender in writing ten (10) Business Days in advance of the actual Pay-Off Date. The Pay-Off Amount shall be sent by Borrower to Lender by wire transfer in Mexican Pesos to Lenders designated Depository Broker or Lenders commercial bank account at least three (3) Business Days prior to the Pay-Off Date. The Pay-Off Amount shall be in Mexican Pesos equal to the Loan Principal Amount as referred to in the Closing Statement.

47) **"Pay-Off Date"** shall mean the date determined by Lender on which Borrower will tender the Pay-Off Amount to Lender in exchange for Lender discharging the Lien over the Guarantors Pledged Collateral being held at the Depository Broker.

 Astor Capital Fund

48) **"Pledged Collateral"** shall mean the total actual shares pledged by Guarantor to Lender as consideration for the Loan to Borrower and any shares or proceeds resulting from any transaction, split-up, revision, reclassification, or other like change that may take place at the Pledged Collateral during the Term of the Loan. The contemplated pledged securities of Guarantor are not a gift or a purchase, instead being pledged to Lender for Loan purposes.

49) **"Principal"** shall have the same meaning as Approved Loan Amount and used interchangeably.

50) **"Proof of Funds"** shall mean written proof of cash or liquid securities held in the Borrower's name.

51) **"Security Interest"** shall mean a Lien or Encumbrance granted by Guarantor to Lender in real property such as securities as Collateral for a Loan to Borrower. The Security Interest granted to Lender prevents the Guarantor from disposing or transferring the property or securities until such time as the Loan is repaid by Borrower to Lender and all Obligations of Borrower to Lender are discharged.

52) **"Statement of Knowledge"** shall mean any statements, representations or warranties which are based upon the knowledge of the Borrower and Guarantor, constructive or otherwise whether Borrower or Guarantor knew or should have known or was expected to know.

53) **"Term of the Loan"** shall mean the period beginning on the first day when the Approved Loan amount is fully funded to the Borrower and ending on Maturity Date, calculated in months or years.

54) **"Tranche"** shall mean that parts into which the payment of this financial arrangement are divided into.

55) **"Transfer Agent"** shall mean the organization selected by Issuer to maintain and record the ownership of shares by Issuer of securities.

56) **"Underwriting"** shall mean a discretionary and subjective credit qualification process using factors such as stock market dynamics, liquidity, earnings, public data by which Lender approves a Loan based on its risk management policy, Collateral in question and Borrower's ability to repay the Loan.

57) **"Valuation Event"** shall mean that the FMP of the Pledged Collateral has fallen to less than seventy percent (70%) of the FMP used to calculate the Loan Principal Amount as collected by the average of the last sale price on three (3) consecutive Business Days on a national or international securities exchange. A Valuation Event may also be triggered by erratic market conditions or news reasonably expected to impact the securities of Issuer.

58) **"Voting Rights"** shall mean the right given to shareholder of Issuer to allow shareholder to vote on various matters of corporate policy or issues before the Issuer.

**IN CONSIDERATION THEREOF:** Each Party agrees that the fair value of consideration it is receiving, has been received, and will continue to receive under this Agreement equals to or exceeds the fair value of the consideration it is delivering to the other Party. In consideration of mutual promises provided or to be provided, and other good, valuable, sufficient, equitable consideration, and mutual covenants, the receipt of, adequacy and sufficiency of which is hereby acknowledged, exchanged, and satisfied by all and between all parties, and intending to be bound

Guarantor    Borrower    Lender

 **Astor Capital** Fund

hereby the performance thereof, and such represents reasonably just, equitable, adequate and reasonable in value, the parties hereto covenant and agree to and stipulate. Consideration will include monetary and non-monetary exchanges, services, in-kind, of every nature and type and otherwise as well as other covenants which the Parties may choose to agree to exchange in the performance thereof. The parties hereto agree as follows

## II.    SUBSTANTIVE TERMS OF THE LOAN

**1. Principal Amount.**

a) Subject to and upon the terms and conditions set forth herein, Borrower, Guarantor and Lender hereby further set forth their rights and obligations to one another and Guarantor hereby grants to Lender Lien rights over the Pledged Collateral and in exchange, the Lender agrees to advance to Borrower a Loan consisting of funds up to **THREE BILLION EIGHT MILLION FIVE HUNDRED EIGHTY THOUSAND (3,008,580,000.00)** Mexican Peso (MXN) (constituting the **"Approved Loan Amount"**) of the current FMV of the Pledged Collateral of: **Grupo Elektra SAB DE CV (ELEKTRA:MX)** subject to all the terms, covenants and conditions of this Agreement. The said sum represents the Loan Principal Amount and is advanced to Borrower not permanently, but temporarily for the duration of the subject Loan Term. Funding of Loan Principal Amount will be initiated within one (1) Business Day of the Closing Day (the "Closing Day") and shall be memorialized by Lender's issuance of an executed Closing Statement. The Loan Principal Amount to be secured by Cash Collateral to be deposited by Lender into Borrowers account at the Depository Broker within twenty-four (24) hours of delivery of Pledged Collateral.

b) The Borrower shall be entitled to the appreciation, if any, of the FMV of the Collateral if the Loan is repaid in full by Maturity.

c) The amount that Lender may make available under Loan shall be calculated by multiplying fifty-five percent (55%) of the value of Pledged Collateral by the FMV.

**2. Interest Rate.**

a) All outstanding amounts of the Loan shall bear an interest rate in an amount equal to one and fifteen one hundredths of a percent (1.15%) per year to be paid to Lender in quarterly installments, as directed by Lender, by the issuance of payment statement in advance of due date. Interest payment shall be collected in advance of Loan and shall accrue daily both before and after any default of the loan, demand, court judgment, or arbitral award, and shall be calculated based on the actual number of days elapsed and on the basis of a year of three hundred and sixty-five (365) days (three hundred and sixty-six (366) days in a leap year.

b) All interest and principal must be paid by way of bank certified check, wire transfer or other immediately available funds without undue delay or further demand to address or bank account indicated herein, or as further may be directed by Lender. In Event of Default, to the extent permitted by applicable law, the interest rate on Loan shall be computed at a rate equal to one and one-half percent (1.5%) per month and shall continue until satisfied and cured by Borrower or released by Lender.

c) The first interest payment shall be subtracted from Loan proceeds at the time of the funding. Further interest payments for the Loan shall be due timely on the first Business Day of each month following the Closing Date, and such payment schedule shall be based on twelve

 Astor Capital Fund

months per calendar year, regardless of the actual number of days between the anniversary Closing Date and the date such first interest payment is due.

d) Any funds received as payment from or on behalf of the Borrower shall be applied by Lender in accordance with the following: (i) first, if applicable, to all outstanding interest and fees; (ii) second, to fees and costs due to third-parties engaged by Lender to enforce covenant and provisions of this agreement; (iii) third, to any outstanding Principal balance; and (iv) fourth, any excess funds received by Lender from the sale of Collateral in Event of Default will be returned to Borrower.

## 3. Loan Fees and Costs.

a) **Origination Fee.** Borrower shall pay to Lender an agreed-upon Loan Origination Fee of one percent (1%) of Loan Principal Amount contemporaneous with the funding of the loan by Lender, ("**Lender's Origination Fee**") to be paid to Lender. The Lender is authorized to deduct the 50% of the subject Origination Fee from Loan Principal Amount, with the balance to be paid by the Borrower on the 1st Anniversary of the Loan. The fee is non-refundable and fully earned.

b) **Maintenance Fee.** Borrower shall pay Lender every three (3) months the maintenance fee of six and twenty-five hundredths basis points (0.0625%) of the Loan Principal Amount ("**Lender's Maintenance Fee**"). The Lender is authorized to deduct the Maintenance Fee in advance from the Loan Principal Amount for the first period, it shall be memorialized in the Closing Statement and the same exact amount shall be paid by Borrower, automatically and without further demand, every four months thereafter for all the years constituting the Term of the Loan. Lender's Maintenance Fee is non-refundable and will be paid in advance.

c) **Liquidated Damages.** If Borrower or Guarantor shall fail to deliver in full, within forty-five (45) days, the required Pledged Collateral to the Depository Broker into the account of Borrower after both the duly signed Agreement and the Custodian Management Agreement to analyze and bring about the Approved Loan Amount, then there shall be Liquidated Damages equal to two percent (2%) of the stated Approved Loan Amount. The Liquidated Damages are effective upon the execution of this Agreement by both Parties and shall be Lender's only claim against Borrower for damages as a result of Borrower's failure to deliver the Pledged Collateral to custodian Depository Broker into the account of Borrower. The two percent (2%) Liquidated Damages applies only to Borrower's or Guarantor's failure to deliver the Pledged Collateral and does not apply to other Event(s) of Default, which is covered under Clause VI of this Agreement. This two percent (2%) Liquidated Damages if applied due to failure by Borrower to proceed or in failing to deliver Pledged Collateral to the Depository Broker in full is therefore Lender's rightful claim.

d) **Expenses.** Borrower agrees to pay all of Lender's reasonable costs and fees, including legal fees and out of pocket expenses that might arise in the course of Lender enforcing, collecting, defending, executing, and maintaining this Agreement. For the services provided, the Depository Brokers engaged in the performance of this Agreement are entitled to an annual custodian management charge to be paid by Borrower based on the cumulative net asset value of all Dedicated Depository Account(s) at time of delivery of the Pledged Collateral and limited to fifteen hundredths of one (0.15%) percent. The annual custodian management charge is exclusive of any transaction fee, transfer fee, exit fee, or other administrative costs and fees which Depository Broker may possibly impose. Such fee shall be nonrefundable and shall be paid one (1) year in advance. First year's fee may be deducted from the Loan

 Astor Capital Fund

proceeds or charged to Borrower's account directly by the Depository Broker. In subsequent years, the Borrower will remit to Lender the exact same fee every year at least fourteen (14) days prior to the Effective Date, to be remitted by Lender to Depository Broker.

4. **Additional Loan Amount.** In the event of an increase in the FMV of the Pledged Collateral, the Borrower has the right to request that Lender increase the Loan Principal Amount at the same LTV as provided herein, at which time an amendment to this Agreement regarding additional funds to be provided will be incorporated. Lender will have sole discretion in determining whether to fund any additional funds in addition to the Loan Principal Amount, up to the full FMV of the Pledged Collateral at the time of the written request by Borrower. Borrower may exercise this provision not more than once every three (3) months.

5. **Early Prepayment.** There shall be no early prepayment ("Prepayment") of the Loan Principal Amount or of any interest due under the Loan permitted during the first sixty (60) months of the Loan Term ("Lock-Up Period") unless any payments are to be received according to a Change in Collateral event or with written permission from Lender. The Borrower may prepay the Loan Principal Amount after a "Lock-Up Period" but shall be subject to a half of one percent (0.5%) administrative and closure fee. Until resolved, the "Lock-Up Period" shall be extended in the event of Lender's inability due to regulatory constraints placed on the securities, Borrower's willful lack of cooperation, circumstances outside of Lender's control or restrictions placed on securities.

6. **Term and Maturity Date of Loan.**

a) **Maturity Date:** The Loan Principal Amount together with all accrued interest and fees and shall be due and payable, five (5) years after the Loan Term begins and subsequently annum (the "Maturity Date"). The Borrower may extend the Maturity Date if the Lender agrees to do so in writing. A fee in the amount of one percent (1%) of the Loan Principal Amount (the "Extension Fee") shall be due and payable on the original Maturity Date if the Lender agrees to extend the Maturity Date at the annual interest rate at the time of an extension. If Lender does not receive the overdue Loan Principal Amount and other Obligations within ten (10) Business Days of the original Maturity Date, Lender will send a notice to Borrower and Guarantor advising Borrower that the Loan will terminate under the default provisions of this Agreement. The Loan Principal Amount is due in entirety at Maturity Date and is irrespective of any action taken by Lender over the Pledged Collateral.

b) **Loan Completion:** No later than thirty (30) calendar days before the Maturity Date, the Borrower shall communicate to Lender in writing whether Borrower intends to repay the Loan Principal Amount on the Maturity Date by requesting the Pay-Off Amount in writing and specifying the Pay-Off Date and Lender shall provide the Pay-Off Amount in written form within three (3) Business Days. No later than fourteen (14) calendar days before the Maturity Date, Borrower shall provide Proof of Funds to repay the Loan Principal Amount plus any other Obligations due to Lender on the Maturity Date.

7. **Loan Termination and Redelivery of Collateral.** The Agreement shall terminate when all of Borrower's Obligations have been paid in full, or in the Event of Default. Upon Event of Default, Lender will diligently and in good conscience dispose of Collateral in order to satisfy Obligations of Borrower and return to Guarantor any excess stock. Lender confirms and will maintain its full ability to release and discharge the Lien and return the Pledged Collateral to Guarantor, free of any Encumbrance within three (3) Business Days of Borrower's satisfaction of its Obligations. Provided, however, that this Agreement shall be reinstated if any payment

 **Astor Capital Fund**

In respect of the Loan's Obligations is rescinded, invalidated, declared to be fraudulent or preferential or otherwise required to be restored or returned by Lender for any reason. A return of identical securities means a return of the Pledged Collateral as modified as a result of any split-up, revision, conversion, reclassification, degradation, or other like change of the Pledged Collateral. Any cash or shares tendered to buy down the Loan as a result of a Valuation Event are subject to redelivery and shall become part of the Pledged Collateral to be returned to Guarantor.

8. **Closing.** The Closing Date in most cases will be no later than one (1) Business Day after the Confirmation Day, provided the conditions to Lender's Obligations as outlined in Clause V herein are satisfied and the written receipt by Lender of a Confirmation that the Pledged Collateral has been deposited and verified with the Depository Broker in a form and manner satisfactory to Lender and its counsel. The balance payment ("Balance Payment") shall be paid within one (1) Business Day of Closing Date. The Balance Payment shall be paid to the Borrower's account at the Depository Broker or to an account of Borrower at a commercial bank account per the following instructions outlined in Schedule A annexed to the back of this Agreement.

### III.    LOAN AND COLLATERAL FEATURES AND ATTRIBUTES

1. **Non-Recourse Loan.** Lender agrees that it will at all times look only to the Pledged Collateral of Guarantor identified in this Agreement for payment of Borrower's Obligations and will not make any claim or institute any action or proceeding against Borrower or Guarantor or any representatives, agents, successors, assigns, or affiliates of Borrower or Guarantor for any deficiency remaining after applying the Pledged Collateral to any sums due Lender. This is a Non-Recourse loan except for the provisions provided under Clause II.3.e of this Agreement.

2. **Due Diligence.** Lender has the right but not the obligation to perform enhanced due diligence on the Pledged Collateral and the Borrower and Guarantor shall fully cooperate.

3. **Material Information.** Borrower and Guarantor have tendered any and all relevant and material information regarding the Pledged Collateral and of the Issuer and all such relevant and material information has been disclosed and provided by Borrower and Guarantor to Lender. During the Loan Term, Borrower and Guarantor will continue to voluntarily provide all such relevant and material information to Lender and not withhold information deemed to be Material.

4. **Depository Broker.** Lender shall have the exclusive right to appoint a Depository Broker which will provide custody for the Pledged Collateral through a known global bank.

### IV.    BORROWER'S WARRANTIES AND OBLIGATIONS

Borrower represents and warrants to Lender that:

1. **Accredited Investor.** Borrower is a "professional accredited investor" as may be defined by ordinance of Borrower domicile, the jurisdiction of securities issuer or jurisdiction of Governing Law of this Agreement.

2. **Announcement.** Neither Lender nor Depository Broker assume any responsibility or liability for filing on behalf of Borrower or Guarantor regulatory announcement(s) that are or may be

**Astor Capital Fund**

required by the laws, rules, and regulations of any securities regulatory authorities or agencies that may have jurisdiction over any transactions with respect to the securities, including without limitation, loan transactions in which the securities are pledged as collateral. Borrower and Guarantor acknowledges and agrees that as a condition for the closing of the loan transaction described in this Agreement, Borrower and Guarantor shall comply with such laws, rules, and regulations, and assumes all such responsibilities and liabilities, including liability for all legal, administrative, and any and all other costs and expenses associated with making and filing all regulatory announcement(s). In the event Borrower or Guarantor fails, refuse or does not timely fulfill its regulatory announcement Obligations described in this Section, then in addition to any and all other remedies available to Lender and/or Depository Broker on account of Borrower's or Guarantor's non-compliance, Lender or Depository Broker may, in their sole and absolute discretion, prepare, file and publish any and all regulatory announcements that either of them may deem to be necessary and/or appropriate in such jurisdictions that Lender or Depository Broker determine to be necessary or appropriate, including without limitation in Borrower's or Guarantor's country of residence or domicile. In such event, and notwithstanding any confidentiality or other provisions in this Agreement or any other documents or agreement among the parties. Borrower or Guarantor may publish and/or file regulatory announcements that include, without limitation: a disclosure of Guarantor's Pledge and the number of shares that Guarantor Pledged to secure the loan; the current disposition of the securities; any party's purchases, sales, conversions, holdings, and exits from such holdings; changes of beneficial or legal ownership of the securities, changes involving successors-in-interest to the securities; repayment of loan principal in whole or in part and termination of the loan; and proxy and other filings involving voting or other control and management of the securities of Issuer, per the laws, rules, and regulations of the governing securities authority or agency.

3. **Depository Broker.** Both Borrower and Guarantor hereby affirm to fully abide by the Terms and Conditions of the Depository Broker and if there is any inconsistency between this Agreement and the Terms and Conditions of the Depository Broker, then the Terms and Conditions of the Depository Broker will prevail over this Agreement.

4. **Full Disclosure.** Borrower and Guarantor further represents and warrants that all statements and documentation it has provided to Lender directly or through its agents in connection with this Agreement are true, complete, and do not omit any material facts or information, which if provided, would have impacted Underwriting prudency. Borrower and Guarantor consent to provide to Lender any and all relevant material information which is necessary for any Lender to conduct a prudent risk assessment evaluation of Issuer, Guarantor and Borrower.

5. **Knowledge.** None of the rights of Guarantor arising as the legal and beneficial owner of the Pledged Collateral have been surrendered, cancelled or terminated. Guarantor has no knowledge of any material non-public information, inside information or similar terms as defined by applicable law with respect to governing the Issuer which has not been generally disclosed to Lender or the public.

6. **Intentionally left in blank.**

7. **Liens; Reliance; and Cooperation.** As of the date of this Agreement, the securities constituting the Pledged Collateral are owned by Guarantor free and clear of any liens, Encumbrance or contractual, statutory, or regulatory limitation or restriction of whatever nature; are in good standing in accordance with their country of issue; and are freely tradable and transferable securities and Guarantor hereby grants absolute first position Security

**Astor Capital Fund**

Interest as a Lien and Encumbrance rights to Lender in exchange for Borrower receiving a Loan. Both Borrower and Guarantor further represent and warrant that they have not relied on, and that Lender has not made, any representation, advice, or recommendation with respect to securities, either directly or through publication.

Neither Borrower nor Guarantor have relied on any marketing materials or any other written or oral statements of fact or otherwise made by anyone prior to entering into this agreement, and any such materials and/or statements or representations, if any, written or oral, shall be purged from existence as if never having existed. All previous agreements, representations, statements both written or oral, express or implied with respect to subject matter hereof, are superseded by this Agreement and hereby merged into this Agreement. It is encumbent upon Guarantor to initiate and facilitate the transfer of the Pledged Collateral. Borrower and Guarantor will cooperate in executing documents provided by Lender, Lender's Depository Broker, and clearinghouse/registry as requested by Lender, Depository Broker, applicable laws and regulations. Borrower and Guarantor further represents that they shall in good faith cooperate to facilitate the Loan transaction in a timely manner.

Borrower and Guarantor represent, warrant, and covenant that they understand that securities borrowing is highly speculative and requires sophistication and that Guarantor may lose and forfeit the Pledged Collateral when Pledging Collateral in margin borrow. Guarantor should only attempt margin borrowing if Guarantor completely understand the potential losses; is a seasoned speculative securities investor, is an accredited professional investor; and has solid risk management strategies in place in the event of margin-call vs any other warranty, representation or action of Lender or market performance of Collateral.

8. **Necessary Filings.** Borrower and Guarantor warrant and concede that any regulatory announcement associated with this Agreement is the sole responsibility of the Borrower and Guarantor, and that both Borrower and Guarantor will comply with all requirements placed by local securities regulatory authorities and any costs associated with such announcements are the sole responsibility of the Borrower and Guarantor. Lender is not responsible for filing any necessary reports for or on behalf of the Borrower or Guarantor, but at its option may elect to do so in order to comply with regulations imposed.

9. **Notification to Lender.** Upon occurrence of any of the foregone events or whenever they shall occur, the Borrower or Guarantor shall promptly inform Lender in writing if a) Borrower or Guarantor has filed for bankruptcy or filed any petition seeking creditor protection; b) any creditor of Borrower or Guarantor has taken legal action against Borrower or Guarantor to recover debts owed to it; c) any creditor has sought or is threatening to seek confiscation or garnishment of property of Borrower or Guarantor. Absent of the preceding events, Borrower and Guarantor will once per year, on each anniversary of the Effective Date, submit a written attestation to Lender representing that to the best of Borrower's knowledge, none of the preceding events had taken place.

10. **Waiver.** Borrower and Guarantor will not take any suit or action against third parties or affiliates who may be acting on behalf of or for the Lender within the scope of this Agreement. Any dispute or controversy with third parties arising from this Agreement will solely be limited to this Agreement which must be resolved in accordance with the dispute resolution provision of Clause VII herein. It is hereby agreed that third parties such as the Depository Broker, Transfer Agent, referral sources or other affiliates, agents or assignees of Lender facilitating the scope of this Agreement are hereby indemnified, released, forever discharged and absolved from any claim, controversy or action whatsoever. Should there be an incumble


Astor Capital Fund

Event of Default, unjust enrichment, extreme remedy and right of redemption are hereby waived by the Borrower and Guarantor, and neither the Borrower nor Guarantor will assert any right or claim against the forfeited collateral transferred to Lender as a result of an Incurable Event of Default. During the pendency of this Loan, neither the Borrower nor Guarantor will seek Injunctive relief or interference from any court of law, regulatory body, Transfer Agent, custodian, sub-custodian, Depository Broker, central depository or stock exchange requesting to invalidate, suspend, limit, impede, terminate or restrict this Agreement or freeze the shares. Injunctive relief by Borrower or Guarantor or any interference by Borrower or Guarantor, central depository or regulatory agency shall be an immediate and an incurable Event of Default. Neither Borrower nor Guarantor will interfere in any way or challenge the validity or enforceability of this Agreement, and the same shall be a Breach thereof.

11. **Suitability.** Both Borrower and Guarantor have carefully considered, and have discussed with their own respective professional legal, tax and financial advisers the suitability of this Agreement and Investment Risk associated with it and have fully considered for purposes of this Loan the risks of this Investment, and understand that (i) this Loan is an Investment and is suitable only for an investor who is able to bear the economic consequences of losing its entire investment, (ii) the margin loan backed by the Securities is a speculative Investment which involves a high degree of risk, (iii) that there is lack of predictability in final loan amount, (iv) potential forfeiture of the Collateral, (v) that there are various unforeseen financial implications, independent and dependent on actions of Borrower or Guarantor, including the fluctuating and final value of the Collateral, (vi) Guarantors inability to receive back the Collateral and its adverse value.

## V.    LENDER WARRANTIES AND REPRESENTATIONS

Lender represents and warrants to Borrower that:

1. **Best Efforts Approach.** Despite stock market volatility, erratic trading volume, and pricing fluctuations, best efforts will be employed by Lender to facilitate the funding of the Loan in its entirety for the full Approved Loan Amount, in accordance with this Agreement and as contemplated herein by both Parties. Lender will not act in bad faith at any time during the Term of the Loan.

2. **Cash Collateral.** The lender will deposit Cash Collateral into Borrowers designated account at the Depository Broker which shall coincide with Loan Principal Amount to be funded and released to Borrower at Closing upon execution of the Closing Statement.

3. **Dividend Distributions.** Lender will credit the Guarantor for any, and all dividends received or credited to the Lender, if dividends are not received or credited to the Guarantor's account at the Depository Broker, then Guarantor is not entitled to any to be credited. Lender shall credit Borrower for all dividends received on behalf of Guarantor if any, at Maturity of the loan to be subtracted from outstanding principal balance. No dividends will be credited to Borrower or Guarantor if the Issuer does not pay them to the Depository Broker for any reason whatsoever. Dividends may not be used to offset any sums due to Lender prior to Loan Maturity unless requested so in advance by Borrower and approved by Lender in writing.

4. **Dealing with Securities.**

Initials:
Guarantor    Borrower    Lender


Astor Capital Fund

a) The Borrower and Guarantor acknowledge and agree that upon the transfer of the Pledged Collateral to the Depository Broker by the Guarantor, the subject Pledged Collateral will (i) have been given value by the Lender for the use of the Pledged Collateral, for purposes of determining Fair Market Value ("FMV"), in establishing that the Lender has Lien and Encumbrance rights in the Pledged Collateral; (ii) including the power to transfer rights in such Pledged Collateral as may be contemplated by Lender in accordance with the herein Agreement.

b) During the Loan Term, provided that there has not been an Event of Default, the Lender will not sell or short-sell the shares of the Pledged Collateral on any publicly traded securities exchange. However, upon the occurrence of an incurable Event of Default, the Lender reserves the right to dispose of the Collateral on any publicly traded securities exchange, but is not obligated in doing so.

c) The Borrower acknowledges and agrees that the Pledged Collateral will be utilized by Lender to assert its preferential Lien over it.

d) The Lender will not engage in short-selling the Pledge Collateral by borrowing the shares of same Issuer from any entity or person and later buying the shares in the same security, then returning the borrowed shares in an effort to make a profit.

e) The Lender will not engage in Front Running, by buying or selling ahead of arrival of the Pledged Collateral.

5. **Order of Payment.** Payments received from sale of Collateral upon Event of Default shall be applied in the following order: (i) firstly, to all outstanding Principal balance, interest and fees; (ii) second, to any costs and fees charged by Custodian to Lender; and (iii) lastly, any excess proceeds of sale of Collateral to be returned to Guarantor. Notwithstanding the forgoing, in case of an incurable Event of Default, nothing contained herein shall obligate the Lender to maximize sales proceeds, sell at market, on any specific platform or exchange, or at any specific price, provide accountability on the forfeited Collateral or to qualify the return to Borrower or Guarantor remaining balance of any proceeds.

6. **Transfer of Securities.** The Lender will not transfer the securities to its own account unless an incurable Event of Default has taken place. Only upon an incurable Event of Default will Lender request the Depository Broker to transfer the securities in the Guarantor's account to Lender's sole control and custody in order to satisfy Obligations of Borrower and Guarantor.

7. **Funding Guarantee and Borrowers Remedy.** The Lender guarantees to begin funding the stated Loan and the Approved Loan Amount within one (1) Business Days from the Closing Date. If the Lender or the Depository Broker fails to release the stated funding partially or in full within the one (1) Business Days of Closing Date, then Borrower shall have the right to terminate this Agreement, provided that the shares were in fact delivered in full to effectuate the Approved Loan Amount, all of the conditions stipulated herein have been met, shares are not restricted, are free-trading and neither Borrower nor Guarantor interfered with the Depository Broker or central depository, trading of the Issuer shares were not halted and force majeure conditions did not interfere or prevent Lender from funding.

Should Lender fail to return to Guarantor the Pledged Collateral within five (5) Business Days of receipt of Pay-Off Amount, the Lender shall be liable to Guarantor for two (2) times the amount of the Pledged Collateral on deposit at the Depository Broker.

Initials: _____  _____  _____
Guarantor    Borrower    Lender

**Astor Capital Fund**

8. **Voting Rights.** Lender represents that it will fully cooperate with the registered owner of the securities of Issuer in exercising its Voting Rights on issues brought by the Issuer before its shareholders and the Lender will either instruct the Depository Broker to vote on behalf of registered owner of the securities of Issuer, or the Lender will vote on registered owner's behalf in accordance with instructions issued by the registered owner. Should the registered owner request that Lender vote on behalf of the registered owner, the registered owner may assign in writing the Voting Rights to Lender and Lender will agree to accept such Voting Rights from the registered owner. However, in no event will the Lender be liable in any way to Borrower or Guarantor or any registered owner as a result of any voting action or inaction.

## VI.    CONDITIONS TO FUNDING; EVENTS OF DEFAULT; AND REMEDIES

1. **Conditions Precedent.** The obligation of the Lender to fund the Loan is subject to the fulfillment of the following conditions precedent to the satisfaction of Lender: (a) The delivery of duly executed Stock Loan Agreement, Closing Statement, Custodian Management Agreement (CMA); (b) that all matters, facts, representations, documentation, announcements, filings, due diligence, regulatory compliance, and instruments in connection with Pledged Collateral, Issuer, and the Loan have been met and are in form and substance satisfactory to Lender's compliance, underwriting team, Global Custodian and Intermediary Custodian, as well its counsel; (c) the delivery of the stock in electronic form to Lender's Depository Broker representing the Pledged Collateral; and (d) Guarantors transfer of Security Interest in the Collateral as a Pledge.

2. **Valid Transactions and Events of Default.** In order for the transaction to be completed to Maturity by the Borrower, the Borrower and Guarantor must fulfill in the performance of and observance of any covenant, representation, provision or agreement contained herein and not default in any other loan document or provision.

3. Borrower is obliged to remedy the following matters, if occurred, in order to avoid being in breach of this or any other loan Agreement:

a) Failure by Borrower or Guarantor to pay the interest and all applicable fees or charges when due as stipulated, or the Approved Loan Amount when due, or any other default in the performance of an obligation that is not cured within the applicable Cure Period;

b) If the Collateral has fallen to less than seventy percent (70%) of the Fair Market Price ("FMP") utilized to compute the Loan Amount published by the average of the closing price on three (3) Business Days by the securities exchange (the "Margin-Call"). If this occurs, then the Borrower will, within five (5) Business Days and without further demand, automatically transfer to the Depository Broker a top-up of shares or cash equal to twenty percent (20%) more than the FMV and cure the deficiency. Hereinafter a new FMP is established at seventy-five percent (75%) of the original FMP. There will not be opportunity to cure if the Pledged Collateral falls by more than fifty percent (50%) of FMP as the Lender will sell the securities to satisfy the Loan Obligations and terminate this Agreement with no further recourse to Borrower.

c) If the class of securities provided as Pledged Collateral is delisted or trading is halted for five (5) or more Business Days by a regulatory agency or otherwise;

d) If any representation or warranty made by Borrower or Guarantor in this Agreement or in any statement furnished in contemplation of obtaining a Loan shall prove to have been knowingly untrue, omitted or misleading in any material respect;

Initials: _____  _____  _____
Guarantor   Borrower   Le

**Astor Capital Fund**

e) If any of the Loan Documents shall at any time after their execution and delivery for any reason, cease to be in full force and effect or shall be declared invalid, null or void or the validity, obligations hereunder or enforceability thereof shall be contested, repudiated, disaffirmed or challenged by Borrower or Guarantor, it's agents or counsel or by any other person or entity acting on behalf of or for the Borrower or Guarantor;

f) A governmental agency which controls the actions of Issuer has commenced an investigation of the Issuer;

g) A Material Event upon the financial condition of Borrower, Guarantor or Issuer;

h) The Issuer is seeking or applied for an extension in which to file the required regulatory reports;

i) An incurable Event of Default occurring in any other Loan between Lender and Borrower.

4. **Lender's Remedy.** If the Obligations aforementioned are not met, the Lender's remedy shall include and not be limited to any course of action against Borrower and Guarantor for breach of this Agreement, including the occurrence of any of the foregoing Event(s) of Default, if not cured within the designated Cure Period, and if applicable, shall terminate the Stock Loan Agreement, result in Acceleration of all Loan amounts, interest, costs, expenses, and fees due thereunder, and cause forfeiture of the Guarantor's Pledged Collateral; any and all excess proceeds of the sale of Collateral in Event(s) of Default will be returned to Guarantor.

Notwithstanding the above, in case of an incurable Event of Default, nothing contained herein shall obligate or create any duty upon the Lender in any way to apply the proceeds of any sale of the Pledged Collateral to the Loan Principal or against any other Obligation of Borrower or Guarantor or to return remaining balance of proceeds realized as a result of any sale of Pledged Collateral, to maximize sales proceeds, sell the Pledged Collateral in the market, or at any specific price, or in any specific order, or on any specific day or to provide accounting or accountability with respect to the disposition of the Pledged Collateral as a result of an incurable Event of Default. There is no duty owed or implied to Borrower or Guarantor by Lender to maximize the sale of Pledged Collateral upon incurable Event of Default.

5. **Market Conditions.** If the Pledged Collateral experiences a Material Event or Valuation Event, Borrower's or Guarantor's lack of cooperation, restriction or material change in price prior to or post-funding, the Lender will have the right to cease the funding of the Loan or amend the Underwriting criterion, until such circumstances are dissipated and cured or adjust funding based on new Underwriting criterion.

### VII.    GOVERNING LAW. JURISDICTION.

a) This Agreement and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement and the transactions contemplated hereby shall be governed by, and construed in accordance with the laws of England and Wales.

b) Each party hereto irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind whatsoever, whether in law or equity, or whether in contract or tort or otherwise, against any other party hereto in any way relating to this Agreement or the transactions contemplated hereby, in any forum other than the courts of England and Wales, and any appellate court from any thereof. Each of the parties hereto irrevocably and

 Astor Capital Fund

unconditionally submits to the exclusive jurisdiction of such courts and agrees that any such action, litigation or proceeding may be brought in any England and Wales court to the fullest extent permitted by applicable law. Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding, subject to any permitted appeal, shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

c) Each party hereto irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court referred to in Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

d) Irrespective of any outcome of any such legal proceeding, the Lender will be awarded all of its reasonable legal fees and costs in enforcing, collecting, defending, executing and maintaining this Agreement.

## VIII.   INDEMNIFICATION AND LIMITED LIABILITY RELEASE

1. Lender will not be liable for any indirect, incidental, special, punitive, opportunity cost or consequential damages, forgone or speculative profit, including loss of revenue or profits or losses arising from Lender's performance under this Agreement. However, the Borrower and Guarantor will be liable for Lender's recovery, speculative profit and opportunity loss when Borrower or Guarantor willfully obstructs or delay's Lender's recovery and enforcement efforts. Borrower and Guarantor agree to indemnify the Lender, each legal entity, if any, who controls, is controlled by or is under common control with the Lender, and each of their respective directors, assignees, officers and employees (the "Indemnified Parties"), and to hold each Indemnified Party of Lender harmless from and against any and all claims, damages, losses, liabilities and expenses (including all fees and charges of internal or external counsel with whom any Indemnified Party may consult and all expenses of litigation and preparation therefor) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority (including any person or entity claiming derivatively on behalf of Borrower or Guarantor), in connection with or arising out of or relating to the matters referred to in this Agreement whether (a) arising from or incurred in connection with any breach of a representation, warranty or covenant by the Lender, or (b) arising out of or resulting from any suit, action, claim, proceeding or governmental investigation, pending or threatened, whether based on statute, regulation or order, or tort, or contract or otherwise, before any court or governmental authority. The indemnity agreement contained in this Section shall survive the termination of this Agreement, payment of any amounts hereunder and the assignment of any rights hereunder.

2. Neither Borrower nor Guarantor will not hold Lender, its agents, directors, shareholders, assignees, Depository Broker or other known and unknown persons responsible for any fluctuations or depreciation in the value of the Pledged Collateral that Guarantor may experience during the pendency of Loan. Borrower and Guarantor agree to indemnify Lender for and to hold Lender harmless from, any loss or expense that such Borrower or Guarantor may sustain or incur as a consequence of default by Borrower or Guarantor in making a borrowing. This covenant shall survive the termination of this Agreement.

Guarantor     Borrower     Lender

 Astor Capital Fund

IX.    GENERAL PROVISIONS

1. **Amendments.** Amendments to this Agreement (including the adding or updating of any annexes, appendices, or schedules) will not be enforced unless such amendment is in writing and signed by authorized signatories on behalf of both Parties and added as an Addendum, with the exception of either Party informing the other of change of banks and only notice of such change is sufficient. Electronic email exchanges will not modify this Agreement. No amendment, modification or waiver in respect to this Agreement will be effective unless in writing (including writing evidenced by a facsimile transmission) and executed by each of the Parties.

2. **Assignment.** This Agreement, its equities, and Obligations shall be freely transferable, pledge-able or assignable in whole or in part as the Parties may see fit or as may be in their best interest. Any transfer or assignment action by either Party shall be followed up by written notice to the other Party.

3. **Balance of Equities.** In the event that this Agreement is reviewed, interpreted or evaluated by any judiciary body or arbitration tribunal in assessing the balance of equities between this Agreement and law, notwithstanding any of the other terms within this Agreement, the outcome of any decision shall be interpreted to weight in favor of and benefit the Lender at all times irrespective of unjust enrichment and extreme remedy.

4. **Clog on Redemption.** This Agreement is not a mortgage and will not be construed as a mortgage by the Parties or any tribunal or court of law. This is a Hybrid Loan requiring an Investment through Pledge of Collateral by Guarantor. In case there is an Event of Default, neither Borrower nor Guarantor shall have equity of redemption or right to redeem the Pledged Collateral and no incurable Event of Default shall be construed as a clog on equity of redemption and Lenders right to forfeiture of the Pledged Collateral will trump and supersede any right of redemption. No provision of this Agreement or any action of Lender upon an incurable Event of Default will be construed as a clog on equity of redemption and Lenders right to forfeiture of Pledged Collateral is absolute and final. Guarantor shall be able to redeem its Pledged Collateral after the Lock-Up period, provided that all Obligations of Borrower are satisfied, and the Loan has not experienced an incurable Event of Default.

5. **Confidentiality.** This Agreement is to be kept confidential and is not to be reproduced in any manner whatsoever for persons other than the Parties hereto. Specifically, each Party agrees to maintain the confidentiality of the business, trade, finances, and methods ("Confidential Information") of the other Party and not disclose the Confidential Information to any person other than those whose knowledge is essential for the performance of this Loan. Lender will not reveal the existence of this Agreement to the media or any regulatory body or government agency unless ordered to do so by a court of law. Lender may reveal the contents of this Agreement to defend Lender's dignity and reputation and dispel incorrect public information about the subject transaction. A default under this Agreement by the Borrower or Guarantor will deem this clause invalidated. The Parties acknowledge that the existence and the terms of this Agreement and any oral or written information exchanged between the Parties in connection with the preparation and performance of this Agreement are regarded as confidential information. Each Party shall maintain confidentiality of all such confidential information, and without obtaining the written consent of the other Party, it shall not disclose any relevant confidential information to any third parties, except for the information that (a) is or will be in the public domain (other than through the receiving Party's unauthorized disclosure); (b) is under the obligation to be disclosed pursuant to the applicable laws or

**Astor Capital Fund**

regulations, rules of any stock exchange, or orders of the court or other government authorities; or (c) is required to be disclosed by any Party to its shareholders, investors, legal counsels or financial advisors regarding the transaction contemplated hereunder, provided that such shareholders, investors, legal counsels or financial advisors shall be bound by the confidentiality Obligations similar to those set forth in this Section. Disclosure of any confidential information by the staff members or agencies hired by any Party shall be deemed disclosure of such confidential information by such Party, which Party shall be held liable for breach of this Agreement. This Section shall survive the termination of this Agreement for any reason.

6. **Consideration.** This Agreement and the transaction herein constitute adequate, just and sufficient consideration. There shall be no argument or defense raised at any time that Consideration is in any way insufficient or was not made. For purposes of this provision, Consideration will include Lender coordinating, arranging, advising as well as agreeing to extend financing as stipulated in this Agreement, sufficiency of which is accepted and acknowledged.

7. **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement regardless of number in existence or distribution.

8. **Cross-Default.** A default in any other loan will cause an incurable Event of Default in this Loan and a default in this Agreement will cause an incurable Event of Default in other Loan agreements with Lender.

9. **Depository Broker.** The Depository Broker reserves the right to custody and sub-custody the Pledged Collateral to any licensed financial institution in accordance with its Terms & Conditions.

10. **Enforcement of Clauses.** If any arbitrator, court or other party determines that any term, phrase, clause, or provision in this Agreement is in conflict with or contradicts any of its other terms, phrases, clauses, or provisions, then this Agreement shall be allowed to be amended by Lender by modifying or striking the contradictory term, word, phrase, clause, covenant or provision such that the Agreement and remaining provision and covenant is deemed to be fully enforceable and in all cases as to Lender's exclusive and sole benefit, to the full purpose and intent hereof as intended by Lender.

11. **Entire Agreement and Merger Clause.** This Agreement contains the entire Agreement between the Parties hereto and is legally binding upon them as of the date of the execution hereof. There were not and will be any oral, written or electronic modifications other than written Addendums duly executed by both Parties, which will supersede this Agreement. Oral or written or electronic notations or modifications other than written Addendums executed by both Parties are not enforceable, and all previous known and unknown statements and promises, written or oral are hereby merged in to this Agreement. This Agreement shall be final, controlling, and fully merged with respect to any previous discussions, promises, understandings, representations or warranties made by Lender.

12. **Errors and Omissions.** Borrower and Guarantor expressly agree and acknowledge that they had reasonable opportunity to obtain the assistance of its own counsel to fully review and participate in the negotiation and revision of any of the terms, provisions, covenants, representations, warranties and conditions of this Agreement prior to its execution; and the decision of whether or not to seek advice of counsel with respect to this Agreement is the

Initials _____  _____  _____
        Guarantor  Borrower   Lender

**Astor Capital Fund**

responsibility of Borrower and Guarantor. Therefore, under no circumstances shall Lender be liable to Borrower or to Guarantor for any errors or omissions in this Agreement that may be disadvantageous to Borrower or Guarantor, or which may result in claims of actual or alleged or perceived harm to Borrower or Guarantor. Borrower and Guarantor further agree and acknowledges that any errors or omissions in the Agreement shall be strictly construed in favor the Lender. Once this Agreement is fully executed by both parties, Borrower and Guarantor fully and completely waive all rights to correct any such errors or omissions, or to seek redress against Lender for any such errors or omissions, whether by arbitration, lawsuit or any other equitable remedy. In addition, if Borrower, Guarantor or anyone on its behalf makes a demand or claim for liability against Lender that arises out of, results from, or relates in any way to any such error or omission in this Agreement, Borrower and Guarantor shall indemnify, defend and hold harmless Lender from any such liability which may be incurred as the result of such demand or claim, including court costs and attorney's fees.

**13. Fiduciary Duty.** This Agreement is not intended to create or impose or give the appearance to the Parties that there is a fiduciary or trustee duty or other similar common law rights that are not expressly stated herein. Notwithstanding anything to the contrary contained in this Agreement, perception drawn or otherwise applicable provision of law or equity, neither Party shall be liable to the other for any act or omission that constitutes a bad faith violation of implied covenant of good faith and fair dealing and the same is expressly excluded. Any fiduciary or trustee duty whatsoever to the other is hereby irrevocably disclaimed and not provided. No duty of any type is owed to Borrower or to Guarantor other than which is expressly stated.

**14. Force Majeure.** Lender will not be liable to the Borrower or to Guarantor for failure to perform any of its Obligations under this Agreement to the extent such performance is hindered, delayed or prevented by Force Majeure (except for failure to make payments hereunder). If Lender is unable, in whole or in part, to carry out the Obligations under this Agreement due to Force Majeure, it must provide notice to the Borrower and Guarantor. Initial notice may be given orally; however, written notification with reasonably full particulars of the event or occurrence is required as soon as reasonably possible. If Lender will claim Force Majeure, it will promptly give written notice to the Borrower and Guarantor of the termination of such Force Majeure and will resume performance of any suspended obligation as soon as reasonably possible after termination of such Force Majeure. For purposes of this Agreement, "Force Majeure" will mean causes, conditions, events or circumstances which are beyond the reasonable control of the Lender claiming Force Majeure. Notwithstanding any provision of this Agreement, Lender shall not be liable for its inability in performing any of its Obligations hereunder if such inability is caused by or arises as a result of circumstances beyond its reasonable control ("Force Majeure Event"). For the purposes of this Clause, a Force Majeure Event shall include, without limitation, inability or delay in performance caused through acts of God, fire, flood, riot, epidemics or population quarantine, degradation in stock value, stock market crash, illiquidity of the stock, Borrower's or Guarantor's lack of cooperation and other adverse financial market conditions, lightning, explosion, civil commotion, war, malicious damage, storm, tempest, electronic malfunctions, acts or omissions of telecommunications carriers, acts of government or other regulatory authority, acts or omissions of persons or bodies for which Lender affected thereby is not responsible, and any other circumstances beyond the reasonable control of the Lender which may possibly undermine the alleged Collateral or securities of Issuer. Force Majeure applies only to Lender and does not apply to Borrower, nor shall excuse Borrower from complying with terms of this Agreement.

**15. Intentionally left in blank.**

 Astor Capital Fund

16. **Headings.** The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

17. **Joint and Several Liability of Borrower.** Borrower and Guarantor shall be jointly and severally liable hereunder and under each of the Loan Documents to which it is a party with respect to all Obligations. Notwithstanding the foregoing, the Borrower's obligations and liabilities with respect to the Loan proceeds which it receives, and related fees, costs and expenses, and it's obligations and liabilities arising as a result of the joint and several liability of the Borrower and Guarantor hereunder with respect to proceeds received by Borrower, together with the related fees, costs and expenses, shall be separate and distinct obligations, both of which are primary obligations of the Borrower, and the Guarantor hereby irrevocably and unconditionally guarantees the payment of all Obligations and performance of the Borrower. Neither the joint and several liability of the Borrower and the Guarantor shall be impaired or released which would or might, in the absence of this provision, operate to release, discharge or otherwise prejudicially affect the obligations of the Borrower. Without limiting the generality of the foregoing in any manner, all representations and warranties of Borrower and Guarantor contained herein are made jointly and severally. For purposes of this Agreement and any other Loan Documents, representations, warranties and covenants contained in this Agreement shall be imputed to the Borrower and the Guarantor and any consent by one Borrower shall constitute the consent of and shall bind the Borrower and Guarantor.

18. **Lender's Obligations.** All of Lender's obligations, representations and warranties in the performance of this Agreement are contingent upon Borrower and Guarantor performing in accordance with this Agreement and as the Lender may at its sole discretion from time to time decide.

19. **Margin Call.** The Borrower and Guarantor must post margin by toping-up additional cash or shares in the event of a Margin Call as stipulated in Section VI(3)(b). This provision may be triggered and called-upon by the Lender irrespective of amount funded to Borrower and the amount funded shall at no time be contingent on Margin Call validity or enforceability. A Margin Call is a standard provision in securities lending whereby the price of the securities has degraded to a point where the status of Pledged Collateral is deemed to be insufficient and a credit risk from Lender's risk management perspective. Satisfaction of Margin Call by Borrower and Guarantor is required in order for funding to continue and avoid an Event of Default. The Margin Call is set in accordance with the herein sections and at no time shall be waived or forgiven.

20. **Non-Disparagement.** The Borrower and Guarantor agrees not to intentionally make, threaten to make or intentionally cause any other person to make, any public statement that is intended to criticize or disparage the Lender, any of its affiliates, agents or any of their respective officers, managers or directors. This clause shall not be construed to prohibit any person from making truthful statements when required by law, subpoena, court order, or the like. This clause shall remain in full force and survive the execution, delivery, cancellation and termination of this Agreement regardless of the consummation of events and transactions contemplated hereof and all events to follow.

21. **Non-Illusory.** Notwithstanding the Terms and Conditions set forth herein, Lender and Borrower acknowledge, accept and agree that Collateral is fluid, variable, may vary and fluctuate in value and that Lenders faithful performance is conditional upon the full and faithful performance of Borrower, stability of the Collateral, absence of any Market Conditions

Guarantor    Borrower



Material Event or an Event of Default and that sufficient and equitable consideration has been exchanged between the Parties, such that this Agreement is not illusory and should not be considered or declared as such. The Borrower acknowledges, accepts and agrees that the Terms and Conditions of this Agreement are reasonable and constitute an enforceable Agreement, the consideration provided by Lender are not illusory but are in fact material and considerable and the restrictions within this Agreement are necessary and reasonable for the protection of the legitimate business interests and goodwill of Lender.

22. **Not Construed Against Drafter.** The rule of construction that a contract be construed against the drafter shall not be applied in interpreting or affecting this Agreement and no ambiguity or conclusion drawn whatsoever in this Agreement or any portion thereof shall be construed or interpreted against the preparer and it will be deemed and established that both Parties actively participated in drafting and concluding this Agreement, each having been represented by its respective counsel.

23. **Notice.** Borrower and Guarantor further represent and warrant that they will yearly on the anniversary of the Effective Date, submit a written statement to Lender by means of declaration stating whether Borrower or Guarantor obtained any other loans from any third parties pledging securities of same Issuer and whether there has been a material change in Borrowers or Guarantors financial condition, such as bankruptcy or insolvency filing of Borrower or Guarantor or of any entity controlled by Borrower or Guarantor. Borrower and Guarantor must also declare if any material lawsuit has been filed against it.

24. **Notices.** All notices and communications to either of the Parties by the other shall be in writing, sent by government mail, electronic mail or by a reputable commercial carrier and shall be deemed duly given on the earlier of the date the same is sent or when deposited in the mail to each Party as follows:
Astor Asset Management Ltd.

| If to Lender: | Astor Asset Management 3 Limited |
|---|---|
| Attention: | Operations Manager |
| | 777 Dunsmuir Street Suite 1400 388 Market St, San Francisco, CA 94133, USA |
| | Vancouver, British Columbia, V7Y 1K4 |
| | Email: compliance@astorcapitalfund.com : Telephone: +1 888 775 1628 |

| If to Borrower: | Corporacion RBS SA de CV |
|---|---|
| Attention: | Ave. Ferrocarril de Rio Frio 419 A09, Cuchilla del Moral 1, Iztapalapa |
| | 09319 Ciudad de Mexico, Mexico |
| | Email: agonzalez@gruposalinas.com.mx |
| | Telephone: 0052551720[0089] |

| If to Guarantor: | Ricardo Benjamin Salinas Pliego |
|---|---|
| Attention: | Cristobal Colon 79 INT C, Mexico 09340 |
| | Email: egsalceda@gruposalinas.com.mx |
| | Telephone: +5215530091016 |

Either Party may designate by notice in writing to the other a new address to which notices, requests, and other communications hereunder shall be given.

25. **Records.** At the request of Lender, Borrower and Guarantor will cooperate in providing financial or other records, including audited financial statement reasonably necessary by

initials        Guarantor        Borrower

# Astor Capital Fund

Lender to establish ongoing Borrower and Guarantor credit-worthiness. Yearly from the anniversary of the Effective Date, the Borrower and Guarantor will submit to Lender a writing declaration attesting to whether securities of same Issuer were sold or pledged to others in the preceding year. If none were sold or pledged, the Borrower and Guarantor shall inform Lender accordingly. If any were sold or pledged, then Borrower and Guarantor shall identify such transactions.

26. **Redemption.** This is a Hybrid Loan and Borrower and Guarantor expressly waives the benefit of all laws now existing or hereafter enacted providing for redemption of a right or redemption from any sale of Collateral made under this Loan as a result of incurable Event of Default and Borrower hereby releases all rights of redemption to which Borrower or Guarantor would otherwise be entitled, when the Collateral is forfeited and disposed of as a result of an incurable Event of Default by Borrower.

27. **Release and Waiver.** No waiver of any provision of this Agreement shall be effective unless agreed to in writing by the Parties. No course of dealing between Borrower, Guarantor and Lender shall operate as a waiver of any of the rights of the Parties under this Agreement with the exception of an action for injunctive relief, which shall not be permitted or attempted and shall be nullified by the judicial body upon its application. Should Lender fail to timely exercise any of its rights, options or elections hereunder, irrespective of whether Lender continues to fund the Borrower, the Lender shall not be deemed to have waived any breach or default declaration on the part of Borrower or to have released Borrower or Guarantor from any of the Obligations mandated herein, unless such waiver is strictly in writing. Is signed by Lender and expressly waives Lenders rights. Delayed or postponed implementation of any of Lenders rights does not waive any rights afforded to Lender herein and the Lender is free to invoke such rights at any time Lender chooses in doing so. For consideration herein provided, Borrower hereby releases, absolves and forever discharges Lender and their respective successors, assigns, partners, directors, shareholders, officers, beneficial owners, members, affiliates, agents, attorneys, transferees, and employees from any and all claims: legal laws, demands, torts, cross-actions, controversies, omissions, inaccuracy, nonfulfillment of any representation or warranty, oversight, exclusion, negligence, causes of action, suits, damages, rights, outcomes, liabilities and obligations at law or in equity whatsoever, known or unknown, whether past, present or future, now held, owned or possessed by Borrower or Guarantor, or which Borrower or Guarantor may, as a result of any of Lenders actions, inactions, going-concern status, assignments, dealings, failings to act, calculations or directives occurring on or prior or after the execution of this Agreement, and hereafter hold or claim to hold under common law or statutory right, arising, directly or indirectly out of the Loan or any of the Loan Documents or any of the documents, instruments or any other transactions contemplated thereby. Borrower and Guarantor understand and agree that this is a full, final and complete release and agrees that this release may be pled as an absolute and the final bar to any or all suit or suits pending, or which may hereafter be filed, claimed or prosecuted by Borrower or Guarantor, or anyone claiming by, through or under Borrower or Guarantor in respect of any of the matters described herein may hereafter be had from anyone whomsoever. No Waiver is asserted or claimed against the Lender which refutes Lenders dominion and right to foreclose, deal-in or transact in the Pledged Collateral and no Waiver is alleged or claimed against the Lender which prohibits Lender prior to or post an Event of Default to exhaust its recourse against the Borrower or Guarantor or any other person or persons, third party guarantors or against any other security it may hold in respect to the Obligations of Borrower or Guarantor, before realizing upon or otherwise dealing with the Pledged Collateral in such manner as Lender may consider necessary or befitting in its own

 Astor Capital Fund

right. All of Lenders rights are reserved and none are Waived. Lenders acceptance of partial payments shall not invalidate, waive or diminish Lenders rights afforded herein.

28. **Severability.** If any of the provisions of this Agreement or in any of the Loan Documents is found by an arbitral tribunal and/or court of competent jurisdiction to be unlawful, then such provision will be further altered and modified in Lender's favor to meet legal conformity or, if impracticable, is stricken out entirely as if it was never even written in the first place, and the remainder of the rights, warranties, provisions, covenants and Obligations contained in this Agreement or any of the Loan Documents shall continue to be in full force and effect. If any provision shall be deemed invalid due to its scope or breadth, such provision shall be deemed valid to the extent of the scope and breadth permitted by law.

29. **Statement of Knowledge.** For purposes of this Agreement, the Borrower and Guarantor shall be deemed to have knowledge of a particular fact or matter referenced herein, unless otherwise qualified hereunder means a statement of the Borrower and Guarantor the having knowledge of the actual facts or circumstances to which such phrase relates having made inquiries or investigations in connection with such facts and circumstances, Borrower having conducted reasonably diligent inquiry into the relevant subject matter.

30. **Survival.** Except as herein provided, all of the Borrower's and Guarantor's representations, warranties, waivers, Obligations, releases, indemnities and covenants made in this Agreement shall remain in full force and survive the execution, delivery, cancellation and termination of this Agreement regardless of the consummation of events and transactions contemplated hereof. All of the Lender's rights, benefits, enforcement covenants and secured interest into the collateral shall survive the termination of this Agreement, except for further funding of the Loan. The Lender shall receive, obtain and retain all the benefits, profit and interest of the securities pledged during the Loan Term and upon its expiration, should any amounts be further owed to Lender.

31. **Termination.** Early termination or rescission is not permitted under the Agreement, regardless of the reason or need to do so, and this Agreement will be valid and in full force and effect after its execution for its full Term, provided it can only be terminated after its maturity wholly by both Parties in written form only and memorialized as an Addendum or mutual written release, or as stipulated herein and for no other reason. All enforcement covenants, conditions, and waivers will survive termination. If the Loan Documents shall, at any time after their execution and delivery for any reason, cease to be in full force and effect or will be canceled, declared invalid, null or void by Borrower or Guarantor, their representatives or their agents or the validity or enforceability thereof shall be contested or challenged by Borrower, Guarantor or by any other person for or on the Borrowers or Guarantor's behalf, the Loan will be considered in default. The Lender retains the right to convert the Collateral during the Loan Term, and thereafter should Borrower or Guarantor default.

## REQUIRED DISCLOSURES

It is mutually understood and agreed that Lender has a financial interest and privilege in the pledged shares according to the parties' understanding and contractual agreement. Borrower assumes the burden of topping up when required to do so. Borrower is aware that market conditions may cause the value of securities to decline. Borrower and Guarantor concede that Lender is not responsible for the degradation of the stock value, whether owing to action(s) or inaction(s) of Lender. A decline in value may require additional securities or cash to increase the value of the collateral. Borrower's or Guarantor's default will cause forfeiture of securities. Borrower and Guarantor now waive and forever discharge Lender against any claims under any applicable securities laws. Tax consequences are the responsibility of Borrower and Guarantor.

 Astor Capital Fund

Lender and its loan officers have not provided legal or tax advice of any kind to Borrower or Guarantor. Borrower and Guarantor attest that, at all times, they were represented by legal counsel representing its interests and Borrower and Guarantor have had ample opportunity to consult one. Borrower's and Guarantor's decision is at will and solely based on its independent judgment. Borrower and Guarantor have evaluated all risks independently and did not rely on representations made by Lender, if any. Lender does not discriminate based on sex, race, nationality, or religion. Lender is not a broker-dealer or financial advisor. This disclosure provides full transparency of risks involved. Neither Borrower nor Lender will participate in or engage in any money laundering scheme. Lender does not provide investment advice and its loan officers and sales staff are prohibited from doing so. Borrower must ensure that the Pledged Collateral stays within Lender's value requirement following this Agreement. Loan is non-recourse to Borrower or to Guarantor and recourse will be against Collateral only. Lender has recommended that Borrower consult a professional tax advisor to determine the tax implications of a loan under the terms of this agreement before proceeding. Lender will not be liable for the devaluation of securities during the term of Loan. Lender is not an insider of the securities being pledged by Guarantor and Lender does not and has not offered to buy or sell advice to Borrower. Lender utilizes independent third-party compliance consultants in risk management analyses and underwriting recommendations. A default of Loan will curtail Lender's obligation to Borrower and to Guarantor. Neither Borrower nor Guarantor will undermine or interfere with securities of Issuer. Borrower will not use Loan proceeds for any illegal activity, including without limitation to, use of Loan proceeds in the drug trade or support of terrorist groups. Borrower is to consult a tax professional for any tax advice. Guarantor represents that Guarantor has full ownership of the securities and legal custody and as of the date of this agreement, is not a defendant in any lawsuit where the ownership and control of the pledged shares are challenged because Lender will not be a Party to any such challenge. Borrower will not transact with any entity on any international sanctioned list using the Loan proceeds. Lender is not affiliated with any government agency. Lender may readjust loan criterion due to adverse market conditions, Borrower's lack of cooperation or devaluation of securities. Borrower agrees that Loan is suitable for Borrower's needs. Lender has the right, but not the obligation, to refinance or increase Loan amount if the value of securities increases during the term of Loan. Borrower and Guarantor have risk-tolerance and the financial ability and liquid assets to post margin in the Event of Default. Lender is not and does not hold itself out to be a tax advisor. This is not an offer to or solicitation to purchase or sell securities. Loan will be based on all applicable laws, present Underwriting, and market conditions at the time of funding. Borrower and Guarantor agree to provide information necessary to the contemplated transaction in a timely, complete, and accurate manner. The Borrower and Guarantor further represent and warrant that all statements and documentation provided about Loan are true and complete and do not omit or forgo any material facts or information. Borrower understands that funding correlates and is relative to most current market conditions at time of funding or force majeure, and may cause Lender to advance Loan in tranches, adjust or postpone funding. Due to market dynamics, at all times throughout, the loan is subject to re-analysis and Underwriting reassessment prior to funding. During the Loan Term, all benefits and proceeds of Pledged Collateral inure to Lender. Lender reserves the right to maintain dominion over the Collateral during the Loan Term, which affords Lender the right to deal-in, dispose or convert over the Pledged Collateral. Lender may not sell the Loan before Maturity Date unless a default has occurred. The Cash Collateral to be deposited in to Borrower's own account shall be solely computed by the Lender. No notice of any type is due to Borrower or to Guarantor other than the notices described herein. During the pendency of the Loan, neither Borrower nor Guarantor is entitled to receive or retain any benefits or rights not specifically stated or contemplated herein.

**IN WITNESS WHEREOF,** and after review, mutual preparation and consultation with respective legal counsel, the Parties have executed this Loan Agreement as of the date first written above.

<center>END OF TEXT</center>

Initials: _____ _____ _____
         Guarantor  Borrower

# Astor Capital Fund

**SIGNATORY PARTIES**
Astor Asset Management Ltd.        United States of America
**LENDER:** ~~Astor Asset Management 3 Limited, a Canadian corporation.~~

Signature                    Mariia Mitsa, Managing Member        07/25/2021
                             Name and Title                      Date

## BORROWER NOTARIZATION

**BORROWER:** Corporacion RBS SA de CV

Signature                    Ricardo Benjamin Salinas Pliego    July 14th 2021
                             Name and Title                      Date

Notary Seal

Attorney/Notary/Witness              Attorney/Notary/Witness

Signature               July 14th 2021    Signature              Date
                        Date


Astor Capital Fund

The Guarantor hereby attests and guarantees unconditionally the due, prompt and faithful performance and discharge by, and compliance with, all of the obligations, covenants, terms, conditions and undertakings under this Agreement in accordance with the terms hereof, including any such obligations, covenants, terms, conditions and undertakings that are required to be performed, discharged or complied with and that Guarantor has the capacity to full fill the full and faithful performance of Borrower as stipulated herein.

**GUARANTOR:** Ricardo Benjamin Salinas Pliego

_____         Ricardo Benjamin Salinas Pliego    July 14th 2021
Signature                        Name                               Date

_____
Notary Seal

_____         Eduardo Gonzalez Salcedo
Attorney/Notary/Witness          Attorney/Notary/Witness

_____  July 14th, 2021    Eduardo Gonzalez Salcedo
Signature                Date               Signature                Date

 **Astor Capital Fund**

## SCHEDULE A
### BANKING INFORMATION

**BORROWER BANKING INFORMATION (CORPORATE):**

**Bank/Institution Name:**

**Swift Code No/Routing No:**
**Account Number:**

**Account Name:**          Corporacion RBS SA de CV

**Bank Code:**
**Branch Code:**
**Address of Account:**

**CASH AND STOCK TOP UP ACCOUNT INFORMATION (CORPORATE):**

**Institution's Name:**          Weiser Global Capital Markets

**Account Number:**          200-804762 ; 200-804763

**Account Name:**          Corporacion RBS SA de CV

**Address of Account:**

 Astor Capital Fund

## BORROWER BANKING INFORMATION (INDIVIDUAL):

**Bank/Institution** Name:

**Swift Code No/Routing No:**
**Account Number:**

**Account Name:**          Ricardo Benjamin Salinas Pliego

**Bank Code:**
**Branch Code:**

**Address of Account:**

## CASH AND STOCK TOP UP ACCOUNT INFORMATION (INDIVIDUAL):

**Institution's Name:**          Weiser Global Capital Markets

**Account Number:**          200-804764 ; 200-804765

**Account Name:**          Ricardo Benjamin Salinas Pliego

**Address of Account:**

## INTEREST, PRINCIPAL AND PAYMENT INFORMATION;

**Please make payment payable to:**
~~Astor Asset Management 3 Limited~~  Astor Asset Management Ltd.
~~777 Dunsmuir Street, Suite 1400~~
~~Vancouver, British Columbia, V7Y 1K4~~  388 Market St, San Francisco, CA 94133, USA



www.astorcapitalfund.com

**Singapore**
Six Battery Road
Level 42
Singapore, 049909

asia.inquiries@astorcapitalfund.com
+65 800 492 2419

**Germany**
Niederrad business district
LYONER STRASSE 14
FRANKFURT, GERMANY, 60528

europe.inquiries@astorcapitalfund.com
+49 0800 1812772

**Hong Kong**
18 Westlands Road
Level 23
Hong Kong

asia.inquiries@astorcapitalfund.com
+852 800 964 226

**Australia**
330 Collins Street,
level 14
Melbourne, Australia, 3000

oceania.inquiries@astorcapitalfund.com
+613 8375 7172

**United Kingdom**
20 MIDTOWN
20 PROCTER STREET,
LONDON, UK, WC1V 6NX

europe.inquiries@astorcapitalfund.com
+44 2 0386 84 620

# EXHIBIT 11

<div align="right"><u>**Claim No: 2024-000450**</u></div>

<u>**IN THE HIGH COURT OF JUSTICE**</u>

<u>**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**</u>

<u>**COMMERCIAL COURT (KBD)**</u>

**B E T W E E N :**

<div align="center">

**(1) RICARDO BENJAMIN SALINAS PLIEGO**

**(2) CORPORACION RBS SA DE CV**

</div>

<div align="right"><u>**Claimants**</u></div>

<div align="center">

**-and-**

**(1) ASTOR ASSET MANAGEMENT 3 LIMITED**

**(2) WEISER GLOBAL CAPITAL MARKETS LTD**

**(3) TAVIRA MONACO SAM**

**(4) VLADIMIR "VAL" SKLAROV (a.k.a. MARK SIMON BENTLEY)**

**(5) CORNELIUS VANDERBILT CAPITAL MANAGEMENT LTD**

**(6) ASTOR CAPITAL FUND LIMITED**

</div>

<div align="right"><u>**Defendants**</u></div>

---

<div align="center">

**PARTICULARS OF CLAIM**

</div>

---

**A.**   <u>**PARTIES**</u>

**(1)**   <u>**Claimants**</u>

1.   The First Claimant ("**Mr Salinas**") is a wealthy individual who resides in Mexico. He is the founder and chairman of Grupo Salinas, a conglomerate of businesses operating in Mexico.

<div align="center">1</div>

2.   The companies within Grupo Salinas include Grupo Elektra SAB De CV ("**Elektra**"), a company incorporated in Mexico and listed on the Mexican stock exchange. Elektra operates a chain of retail stores which sell consumer goods and offer various financial services in Mexico and Central and South America. Leaving aside any effect of the facts and matters pleaded below, Mr Salinas is the direct or indirect beneficial owner or controller of 67,544,413 shares in Elektra, representing 30.47% of Elektra's total issued share capital.

3.   The Second Claimant ("**RBS**") is a company incorporated in Mexico. Mr Salinas is the ultimate beneficial owner and controller of RBS.

**(2)  Defendants**

4.   The First Defendant ("**Astor 3**") is a company incorporated in Quebec, Canada. At all material times, Astor 3 was controlled by Mr Sklarov.

5.   The Second Defendant ("**Weiser**") is a company incorporated in the Bahamas which carries on business as a broker and custodian of securities.

6.   The Third Defendant ("**Tavira**") is a company incorporated in Monaco which carries on business as a broker and custodian of securities.

7.   The Fourth Defendant ("**Mr Sklarov**") is an individual who conducts stock-backed lending frauds with the characteristics set out below.

8.   The Fifth Defendant ("**Vanderbilt**") is a company incorporated in Belize. At all material times, Vanderbilt was controlled by Mr Sklarov.

9.   The Sixth Defendant ("**Astor Fund**") is a company incorporated in the Bahamas. At all material times, Astor Fund was controlled by Mr Sklarov.

**B.   CONSPIRACY**

10.  On a date currently unknown to the Claimants, Mr Sklarov, Astor 3, Vanderbilt and Astor Fund (together, the "**Conspiracy Defendants**"), and others, with intent to defraud and injure the Claimants, conspired and combined together with the predominant purpose of defrauding and injuring the Claimants, alternatively with intent to defraud and injure the

2

Claimants by unlawful means (which the said Defendants intended and knew would be used), namely:

(1)    The making of fraudulent misrepresentations to the Claimants by Mr Sklarov, Astor Fund and/or Astor 3 to induce them to: (i) transfer shares in Elektra belonging to Mr Salinas (the "**Elektra Shares**") to Weiser and Tavira; and (ii) enter into contracts by which, as part of the security arrangements, Astor 3 would be given the power to instruct Weiser and Tavira to dispose of the Elektra Shares, as more particularly pleaded below; and

(2)    Disposals of the Elektra Shares and their proceeds in breach of trust, breach of fiduciary duty and/or breach of contract, as more particularly pleaded below.

11.    More particularly, the purpose and/or objective of the Conspiracy Defendants was to defraud and injure the Claimants by (*inter alia*) deceiving the Claimants into believing that they were dealing with a group of companies carrying on business as legitimate and reputable financial institutions ("**Astor**") which was associated with the wealthy Astor family from the United States (the "**Astor Family**"), in order to induce them to (i) transfer the Elektra Shares to Weiser and Tavira and (ii) as part of the security arrangements, provide Astor 3 with the power to instruct Weiser and Tavira to dispose of the Elektra Shares.

12.    In reality, Astor (which comprised many companies including Astor Fund, Astor Asset Management Limited ("**Astor Asset Management**") and Astor 3) was not a legitimate or reputable financial institution, and had no genuine connection with the Astor Family, but was instead a vehicle for the fraudulent designs and intentions of Mr Sklarov, a serial fraudster and convicted felon, who intended by his dishonest scheme to misappropriate the Elekta Shares by the use of fraudulent misrepresentations and other false pretences, as pleaded below.

13.    Astor 3 joined the conspiracy on its incorporation in July 2021.

14.    Vanderbilt joined the conspiracy by no later than December 2021 when it began to: (i) receive transfers of Mr Salinas's shares in Elektra; (ii) sell them; and (iii) dissipate the proceeds.

15.    Astor Fund joined the conspiracy by the date on which it provided the Term Sheet (as defined below) to the Claimants, alternatively by no later than 27 July 2021 when it began to: (i) receive transfers of the Elektra Shares; (ii) sell them; and (iii) dissipate the proceeds.

16.    References herein to the Conspiracy Defendants at any point in time are references to those of the Defendants which were participating in the conspiracy during the time in question.

## C.    <u>REPRESENTATIONS</u>

17.    In order to induce the Claimants to (i) transfer Elektra Shares to Weiser and Tavira and (ii) provide Astor 3 with the power to instruct Weiser and Tavira to dispose of the Elektra Shares, the following express representations were made to the Claimants by or on behalf of Mr Sklarov, Astor Fund and/or Astor 3:

(1)    Astor and the companies in its group (including Astor Fund and Astor Asset Management) were associated with the Astor Family and Astor 3 was a special purpose vehicle owned and controlled by Astor.

(2)    Astor, Astor Fund and Astor Asset Management had entered into many *bona fide* stock-lending transactions in the past.

(3)    The dealings and affairs of Astor, Astor Fund, Astor Asset Management and Astor 3 were controlled and/or overseen by individuals by the names of Thomas Mellon (a descendant of the Astor Family and the chief executive officer of Astor Asset Management) and/or Gregory Mitchell (the Managing Director of Astor Asset Management in North America and/or "Managing Director of North America" for Astor Fund).

18.    Further or alternatively, in order to induce the Claimants to (i) transfer Elektra Shares to Weiser and Tavira and (ii) provide Astor 3 with the power to instruct Weiser and Tavira to dispose of the Elektra Shares, the following implied representations were made to the Claimants by or on behalf of Mr Sklarov, Astor Fund and/or Astor 3:

(1)    Astor and the companies in its group (including Astor Fund and Astor Asset Management) were associated with the Astor Family and Astor 3 was a special purpose vehicle owned and controlled by Astor.

(2)    Astor and the companies in its group (including Astor Fund, Astor 3 and Astor Asset Management) were legitimate and honest financial institutions which carried on legitimate and honest stock-backed lending activities.

(3)    The dealings and affairs of Astor, Astor Fund, Astor Asset Management and Astor 3 were controlled and/or overseen by individuals by the names of Thomas Mellon (a descendant of the Astor Family and the chief executive officer of Astor Asset Management) and/or Gregory Mitchell (the Managing Director of Astor Asset Management in North America and/or "Managing Director of North America" for Astor Fund).

(4)    Astor, Astor Fund, Astor Asset Management and/or Astor 3 intended a member of the Astor group (in the event, Astor 3) to enter into a legitimate and *bona fide* contract of loan with the intention and ability to fund the loan with their own cash resources and not by selling any of the Elektra Shares.

(5)    The lender in respect of such a loan (in the event, Astor 3) would intend and/or (once incorporated) did intend to comply with its obligations in respect of the loan and security as it honestly understood them to be.

19.    The following particulars are the best particulars which the Claimants are presently able to provide of the said representations, pending further investigations by the Claimants (which are continuing) and disclosure by the Defendants herein.

20.    The express representation pleaded in paragraph 17(1) above was made by Mr Sklarov and/or his associates to the Claimants' financial adviser by the name of Alexandre Torti ("**Mr Torti**") during the course of a video-call in the spring of 2021 with an individual claiming to be Thomas Astor-Mellon ("**Mr Astor-Mellon**"). Mr Astor-Mellon was on board a yacht and claimed to be from the wealthy Astor Family who, he said, were behind Astor which was experienced in stock-lending transactions. Mr Torti communicated the same to Eduardo Salceda Sanchez ("**Mr Salceda**") who acts for the Claimants in matters pertaining to the borrowing of monies and the provision of security. Mr Sklarov and/or his associates and/or Astor Fund knew and intended that Mr Torti would communicate the same to the Claimants.

21.   Mr Sklarov and/or his associates and/or Astor Fund made the representation pleaded in paragraph 17(2) above in spring 2021 to a financial adviser by the name of Zara Akbar ("**Ms Akbar**"), knowing and intending that she would communicate the same to persons in the position of the Claimants or agents of such persons. In accordance with intentions of Mr Sklarov and/or his associates and/or Astor Fund, Ms Akbar communicated the substance of the representation pleaded in paragraph 17(2) above to Mr Torti, who communicated the same to Mr Salceda.

22.   Mr Sklarov and/or his associates and/or Astor Fund made the representations pleaded in paragraph 17(3) above in:

(1)   the video-call described at paragraph 20 above;

(2)   an in-person meeting between an individual purporting to be Mr Mitchell and Mr Torti during the spring of 2021; and

(3)   communications and documents relating to the proposed stock-lending agreement in which Mr Astor-Mellon and Mr Sklarov (under the alias "Gregory Mitchell") held themselves out as officers of Astor and/or Astor Asset Management and/or Astor Fund, including in emails from Astor Capital Fund to Mr Torti, Mr Salceda and/or Ms Akbar which were copied to thomas.mellon@astorassetgroup.com and gregory.mitchell@astorassetgroup.com, and in emails from Mr Sklarov (under the alias "Gregory Mitchell") to Mr Torti and/or Ms Akbar.

23.   The implied representations pleaded in paragraph 18(1) above were made by reason of the facts and matters described in paragraph 22 above, as well as the use of and association with the 'Astor' name by the business and its purported principal, Mr Astor-Mellon. Such usage and association was evident from the business's website, LinkedIn profiles, and communications and documents relating to the proposed stock-lending agreement.

24.   Such documents included (but are not limited to) a draft term sheet (the "**Term Sheet**") from Astor Capital Fund Ltd dated 29 March 2021, which was provided by Mr Sklarov and/or his associates and/or Astor Fund to Mr Salceda via Ms Akbar and Mr Torti. The Term Sheet stated that Astor Capital Fund was a subsidiary of Astor Trust Company. Astor Trust Company is the name of a bank which was associated with the Astor Family in the early twentieth century. In fact, none of the Defendants (or indeed any entity associated

with Astor or Mr Sklarov) is a subsidiary of Astor Trust Company. The Term Sheet set out the terms on which Astor Capital Fund was offering to provide a loan to Mr Salinas, secured over the Elektra Shares.  Among other things, the Term Sheet made clear that the Elektra Shares would be held by a custodian in an account in the name of Mr Salinas during the term of the loan and that the lender would not be able to sell or short-sell the Elektra Shares during that period.  The Term Sheet also provided that the lender would return the Elektra Shares to the borrower within three days of repayment of the loan in full on maturity.

25. The implied representations pleaded in paragraph 18(2) above were made by reason of the facts and matters described in paragraphs 20 to 24 above, and from the indicia of a reputable and legitimate financial business presented by Mr Sklarov, his associates, Astor Fund and/or Astor 3, including on the business's website, LinkedIn profiles, and communications and documents relating to the proposed stock-lending agreement.

26. The implied representations pleaded in paragraph 18(3) above were made by reason of the facts and matters described in paragraph 22 above.

27. The implied representations pleaded in paragraph 18(4) and 18(5) above were made by reason of the facts and matters described in paragraphs 20 to 26 above.

28. Further, the representations pleaded in paragraph 18(4) and 18(5) above are were made by reason of the fact that Mr Sklarov and/or his associates and/or Astor Fund and/or Astor 3 held out that a member of the Astor group (in the event, Astor 3) was prepared to execute and be bound by the SLA (as defined below), which involved the deposit of high-value shares as collateral for loans where counterparty honesty is highly significant and essential.

29. Astor 3 made the representations in paragraphs 17 and 18 following its incorporation when, with actual knowledge of the fact that the said representations had already been made (such knowledge being attributed to it on the basis that it is controlled by Mr Sklarov), it held itself out to be a member of the Astor group and offered to enter into a loan with the Claimants in accordance with the parties' previous communications and negotiations including the Term Sheet and/or on the terms set out in the SLA (as defined below).

30. The Claimants understood the said representations to have been made for the reasons set out above. Further, the representations pleaded above were continuing representations

and/or were repeated by Astor 3 upon the issuance of every "Closing Statement" in respect of each tranche of the loan advanced by Astor 3 to RBS.

**D.    INDUCEMENT AND RELIANCE**

31.    Induced by and in reliance upon the said representations, (i) the Claimants signed the SLA, the Weiser Agreement (as defined below) and the Tavira Agreement (as defined below); and (ii) Mr Salinas transferred Elektra Shares to Weiser and Tavira. The said representations were material in the sense that the Claimants would not have taken the actions pleaded in paragraphs 32 to 40 below if they had known that they were false.

**(1)    The SLA**

32.    On or around 28 July 2021, the Claimants signed a stock loan agreement (the "**SLA**") with Astor 3 in respect of the provision of a loan by Astor 3 to RBS, secured over the Elektra Shares. The SLA was signed on behalf of Astor 3 by "Mariia Mitsa". Pending disclosure by the Defendants herein, the Claimants do not accept that "Mariia Mitsa" is a real person. The signature of the SLA on behalf of Astor 3 was approved by Mr Sklarov acting within the scope of his authority. The material terms of the SLA are pleaded below.

33.    From 9 August 2021 to 15 September 2023, Astor 3 made five separate loans to RBS under the SLA in the total amount of MXN 2,154,218,522.55 (approximately US$ 115 million).

**(2)    The Weiser Agreement**

34.    Mr Salinas signed a custodian management agreement (the "**Weiser Agreement**") which entitled Weiser to take instructions from Astor 3 in respect of Elektra Shares. As to this:

(1)    Pursuant to clauses 1, 2 and 3 of the Weiser Agreement, Mr Salinas conferred authority on Astor 3 to act on Mr Salinas's behalf and in Mr Salinas's name in giving instructions to Weiser in relation to Elektra Shares held in accounts with Weiser in Mr Salinas's name.

(2)    Astor 3's authority to give instructions under the Weiser Agreement on Mr Salinas's behalf was subject to the terms of the SLA. Astor 3 had no authority to give instructions under the Weiser Agreement if those instructions were in breach of the SLA.

8

(3)    The Claimants understood that the purposes of the Weiser Agreement included enabling Astor 3 to give instructions to Weiser (i) in respect of Elektra Shares held by Weiser following the occurrence of an Event of Default (as defined) under the SLA and (ii) to return the Collateral Shares to the First Claimant within three Business Days of the Second Claimant satisfying its obligations under the SLA including repayment of the loan.

(4)    Astor 3 owed fiduciary duties to Mr Salinas in respect of the exercise of the powers and authority granted to it under the Weiser Agreement, including duties to exercise those powers and authority in good faith and for proper purposes.

**(3)    The Tavira Agreement**

35.    On or around 30 November 2021, Mr Salinas signed a control agreement (the "**Tavira Agreement**") which entitled Tavira to take instructions from Astor 3 in respect of Elektra Shares. As to this:

(1)    Pursuant to clause 1 of the Tavira Agreement, Mr Salinas conferred authority on Astor 3 to act on Mr Salinas's behalf and in Mr Salinas's name in giving instructions to Tavira in relation to Elektra Shares held in accounts with Tavira in Mr Salinas's name.

(2)    Astor 3's authority to give instructions under the Tavira Agreement on Mr Salinas's behalf was subject to the terms of the SLA. Astor 3 had no authority to give instructions under the Tavira Agreement if those instructions were in breach of the SLA.

(3)    The Claimants understood that the purposes of the Tavira Agreement included enabling Astor 3 to give instructions to Tavira (i) in respect of Elektra Shares held by Tavira following the occurrence of an Event of Default under the SLA and (ii) to return the Collateral Shares to the First Claimant within three Business Days of the Second Claimant satisfying its obligations under the SLA including repayment of the loan.

9

(4)    Astor 3 owed fiduciary duties to Mr Salinas in respect of the exercise of the powers and authority granted to it under the Tavira Agreement, including duties to exercise those powers and authority in good faith and for proper purposes.

**(4)    Transfer of Elektra Shares to Weiser and Tavira**

36.    On 18 June 2021, Mr Salinas transferred 3,600,000 Elektra Shares to Weiser, which moved 935,913 of them into a designated collateral account in the name of Mr Salinas.

37.    Mr Salinas transferred 6,268,383 Elektra Shares to Tavira: 2,350,000 on 15 December 2021; a further 314,087 on 20 January 2022; a further 1,431,700 on 22 June 2022; a further 128,207 on 3 April 2023; a further 1,600,000 on 4 April 2023; and a further 444,389 on 12 September 2023.

38.    As at 2 August 2024, the total of 7,204,296 shares held by Weiser and Tavira were worth MXN 7.6 billion, equivalent to US$ 415 million – significantly in excess of the loans made under the SLA.

**(6)    Payment of interest and custody fees**

39.    The Claimants paid interest to Astor 3 in accordance with the terms of the SLA.

40.    In addition, the Claimants paid custody fees to Weiser and Tavira in return for their provision of custody services in respect of the holding of Elektra Shares.

**E.    DISPOSALS OF ELEKTRA SHARES**

**(1)    Disposals of Elektra Shares by Tavira**

41.    Wrongfully, and in breach of trust, breach of fiduciary duty and/or breach of contract, as more particularly pleaded below, Astor 3 and/or Mr Sklarov instructed Tavira to transfer Elektra Shares from Mr Salinas's account to Vanderbilt.

42.    Tavira transferred the first tranche of 2,350,000 Elektra Shares from Mr Salinas's to Vanderbilt's account on the instruction of Astor 3 on 17 December 2021, just two days after Mr Salinas had transferred those shares to Tavira.

43. This pattern was repeated whenever Mr Salinas made further transfers of Elektra Shares to Tavira: Astor 3 and/or Mr Sklarov instructed Tavira to transfer them from Mr Salinas's account to Vanderbilt's account and Tavira complied with the instruction.

44. Thus, the further tranches of 314,087 Elektra Shares, 1,431,700 Elektra Shares, 128,207 Elektra Shares, 1,600,000 Elektra Shares and 444,389 Elektra Shares pleaded above were transferred into Vanderbilt's account on the instructions of Astor 3 and/or Mr Sklarov.

45. Following the transfer of Mr Salinas's shares to Vanderbilt, Vanderbilt sold those shares to third parties. More particularly, Vanderbilt sold small tranches of Elektra Shares (usually a few thousand at a time) on almost every trading day for a period of more than two and a half years.

46. It is to be inferred that the tactic of drip-feeding small tranches into the market on a near-daily basis was intended to ensure that the sales did not result in any sudden falls in the Elektra share price which might arouse suspicion.

47. In this way, Vanderbilt sold almost all of the Elektra Shares which Mr Salinas had previously transferred to Tavira to be held as collateral under the SLA.

48. Some of the proceeds of sale of Elektra Shares were used to fund the loans which Astor 3 was purporting to make to RBS. Mr Sklarov has admitted in witness statements dated 5 September 2024 and 16 September 2024 that the third, fourth and fifth tranches of the loan (MXN 510,000,000, MXN 592,871,767 and MXN 173,586,459) were funded in this way: Vanderbilt transferred the proceeds of sale of the Elektra Shares to Astor 3 which transferred them to RBS.

49. Vanderbilt and Astor 3 paid all some or all of the remaining proceeds of sale of the Elektra Shares to Jurist IQ, a law firm operated by Mr Sklarov's longstanding associate, Mr Singh.

50. Tavira has stated that the 6,268,383 Elektra Shares held by it were transferred from Mr Salinas's account to Astor 3's account on 29 July 2024. This is inconsistent with the information pleaded above showing that the said Elektra Shares had previously been transferred to Vanderbilt and sold by Vanderbilt to third parties. It may be that the purported "transfer" on 29 July 2024 was merely a series of book entries, with Vanderbilt notionally retransferring the Elektra Shares to Mr Salinas's account so that they could be notionally

11

transferred to Astor 3. The truth is unclear and the Claimants' position is reserved pending disclosure and further enquiries.

**(2)**   **Disposals by Weiser**

51.   Wrongfully, and in breach of trust, breach of fiduciary duty and/or breach of contract, as more particularly pleaded below, Astor 3 and/or Mr Sklarov instructed Weiser to transfer Elektra Shares from Mr Salinas's account to Astor Fund.

52.   According to information from Weiser, following the transfer of Elektra Shares to Astor Fund, Astor Fund sold 935,716 of those shares to third parties for a total price of MXN 1,208,118,232, equivalent to US$ 62,270,122.60 at current exchange rates. More particularly:

   (1)   On 27 July 2021, in two transactions, Astor Fund sold 187,000 Electra Shares for MXN 294,128,052 and 100,000 Elektra Shares for MXN 96,383,700. The total amount realised was MXN 390,511,752, equivalent to US$ 20,128,174.57 at current exchange rates.

   (2)   On 8 August 2021, in two transactions, Astor Fund sold 100,000 Elektra Shares for MXN 109,986,300 and 300,000 Elektra Shares for MXN 314,527,200. The total amount realised was MXN 424,513,500, equivalent to US$ 21,880,729.05 at current exchange rates.

   (3)   On 21 October 2021, in two transactions, Astor Fund sold 38,716 Elektra Shares for MXN 59,224,980 and 210,000 Elektra shares for MXN 333,868,000. The total amount realised was MXN 393,092,980 equivalent to US$ 20,261,218.98 at current exchange rates.

53.   The Claimants do not know if this information is true and their position is accordingly reserved. However, if it is true, it is to be inferred from the following facts and matters that Astor 3 used the proceeds of sale from the transactions in paragraph 52(1) and 52(2) above to fund, in whole or in part, the first and second tranches of the loan under the SLA:

   (1)   The proceeds of the sales of Elektra Shares on 27 July 2021 and 8 August 2021 amounted to MXN 815,025,252 – a sum marginally in excess of the first and second loan tranches under the SLA, which totalled MXN 800,000,000 (excluding fees).

(2)    As pleaded at paragraph 48 above, Mr Sklarov has admitted that he funded the third to fifth tranches of the loan in the same manner.

54.    Weiser has also stated that it sold the 935,716 shares held by it to Astor Fund on 30 July 2024 (on the instructions of Astor 3) for a total price of MXN 233,929,000, equivalent to US$ 12,604,476.49. This is inconsistent with the information pleaded above showing that the shares had previously been sold to fund the first and second tranches of the loan. It may be that the purported "transfer" on 30 July 2024 was merely a series of book entries, with Astor Fund notionally retransferring the Elektra Shares to Mr Salinas's account so that they could be notionally transferred back to Astor Fund. The truth is unclear and the Claimants' position is reserved pending disclosure and further enquiries. However, if the sale on 30 July 2024 occurred, it was a sale at a significant undervalue, in that the true market value of the said shares at that time was approximately MXN 982,501,800 (based on a share price on the open market was MXN 1,050 per share), equivalent to around US$ 52.1 million at current exchange rates.

55.    Weiser has said that it continues to hold the sum of US$ 12,604,476.49 and 197 Elektra shares in Astor 3's account.

**(3)    Unlawfulness of the said disposals**

56.    The said disposals of Elektra Shares were unlawful and took place in breach of trust, breach of fiduciary duty and/or breach of contract, as more particularly pleaded below.

57.    The SLA did not entitle Astor 3 to dispose of the Elektra Shares:

(1)    As pleaded below, the representations as to the identity of Astor 3, which induced the Claimants to enter into the SLA, were false to the knowledge of Astor 3. In the premises, the SLA was void *ab initio* due to a unilateral mistake by the Claimants (the existence of which was known to Astor 3) as to the identity of Astor 3.

(2)    Alternatively, the SLA, the Weiser Agreement and/or the Tavira Agreement were void *ab initio* by reason the fact that they were instruments of a fraud perpetrated on the Claimants by Astor 3 and Mr Sklarov.

(3)    Alternatively, if the SLA was not void *ab initio*, then, according to its proper construction, the SLA did not entitle Astor 3 to dispose of the Elektra Shares prior to

13

the occurrence of an Event of Default. More particularly, pursuant to the terms of the SLA, Astor 3 was not entitled to exercise its security rights thereunder (namely, its "Lien" and "Encumbrance rights" (as defined in the SLA)) prior to the occurrence of Event of Default (as defined in the SLA). Terms of the SLA on which the Claimants rely in this regard include (but are not limited to): (i) the terms Acceleration Notice, Cure Period, Default, Event of Default and Lender's Remedy; (ii) clause II.7; (iii) clause V.2; (iv) clause V.3; (v) clause V.4; (vi) clause V.5; (vii) clause V.6; and (viii) clause V.8. The clauses on which Astor 3 has said that it relies (namely, (i) the terms Lien and Encumbrance; (ii) clause V.4(a); (iii) clause II.1(a); and (iv) clause IV.7) do not have the meaning for which it contends. The fact that security rights exist does not mean that they are enforceable immediately, prior to the occurrence of an Event of Default. No Event of Default occurred under the SLA. Astor 3 did not notify the Claimants of the existence of any Event of Default until after the discovery of the fraud, when it wrongly announced that Events of Default had occurred without any or any proper foundation to justify the fact that it had previously engaged in the misappropriation of the Elektra Shares.

(4)     Alternatively, if the SLA was not void *ab initio* and did not expressly restrict Astor 3's ability to dispose of Elektra Shares prior to the occurrence of an Event of Default, it was an implied term of the SLA that:

 (i)     Astor 3 would not dispose of Elektra Shares for improper and/or dishonest purposes and/or in such a way as to prevent or disable Weiser and/or Tavira from being able to return them to Mr Salinas following repayment of the loan; and/or

 (ii)     Astor 3 would not dispose of Elektra Shares in order to fund the loans which it was making to RBS under the SLA.

(5)     Alternatively, if the SLA was not void *ab initio* and did not expressly or impliedly restrict Astor 3's ability to dispose of Elektra Shares, the terms of the SLA were subsequently varied so as to contain such a restriction. More particularly:

(i)     On 5 October 2021, Weiser informed Mr Salceda that the 935,913 shares had been transferred from Mr Salinas's account to an account in the name of Astor Fund.

(ii)    This was a cause of huge concern to Mr Salceda, who instructed Mr Torti to send an email to Weiser seeking clarification.

(iii)   In the absence of a satisfactory resolution to this issue, Mr Torti emailed Weiser on 19 October 2021 stating that the transfer to Astor Fund taken place in breach of the SLA. Mr Torti emailed Ms Akbar on 23 October 2021 to ask her to help him "*make Astor and Weiser understand that they are breaching and violating the contracts*".

(iv)    On 25 October 2021, Ms Akbar told Mr Torti that Astor 3 had agreed to arrange for the shares to be returned to Mr Salinas's account within 24 hours.

(v)     These events had two consequences. First, Mr Salinas insisted that any further tranches of collateral shares should be held by a different custodian in place of Weiser. Astor 3 agreed, resulting in the appointment of Tavira and the signature of the Tavira Agreement. Secondly, Astor 3 agreed to sign an addendum to the SLA ("**Addendum 2**") confirming that it would only issue instructions to the custodians in accordance with the terms of the SLA and not otherwise.

(vi)    Properly construed in the context of the factual matrix described above, which was known to the parties, Addendum 2 varied the SLA (if it did not already prevent Astor 3 from disposing of Elektra Shares prior to the occurrence of an Event of Default) so as to have the effect of preventing Astor 3 from disposing of Elektra Shares prior to the occurrence of an Event of Default.

(6)     In the final alternative, by reason of the events of October 2021 and the express or implied representation by Astor 3 that it would not in future give instructions for the disposal of Mr Salinas's shares prior to the occurrence of an Event of Default and the reliance by Mr Salinas on that representation to his detriment (in the form of the provision of further tranches of Elektra Shares to Tavira, as pleaded above), Astor 3 was estopped by representation (alternatively, convention) from exercising such contractual right as it might otherwise have had to dispose of Elektra Shares prior to

15

the occurrence of an Event of Default. As pleaded above, no Event of Default occurred.

## F.    FALSITY OF THE REPRESENTATIONS

58.    The said representations by or on behalf of Mr Sklarov, Astor Fund and/or Astor 3 were false.

59.    Astor and the companies in its group (including Astor Fund and Astor Asset Management) were not associated with the Astor Family.

60.    Astor, Astor Fund and Astor Asset Management had not entered into many *bona fide* stock-lending transactions in the past.

61.    Astor and the companies in its group (including Astor Fund, Astor 3 and Astor Asset Management) were not legitimate and honest financial institutions which carried on legitimate and honest stock-backed lending activities. Further Astor 3 was not owned and controlled by a legitimate and honest financial institution, nor was it owned any controlled by an institution associated with the Astor Family.

62.    In reality, at all material times, Astor Fund, Astor Asset Management and Astor 3 were vehicles for the fraudulent activities of Mr Sklarov, a convicted felon and serial fraudster who conducts his frauds by posing as legitimate financial institutions and operating through false identities, using misrepresentations to gain control of shares in listed companies in order to steal them.

63.    As regards Mr Sklarov's illegitimate use of well-known financial names:

(1)    In or around 2017, Mr Sklarov was sued by NYSE Group, Inc., the operator of the New York Stock Exchange, which objected to Mr Sklarov's attempts to masquerade under the name "NYSE". Mr Sklarov claimed that he was intending to launch a legitimate business under the name "New York Services Enterprise" but his arguments were rejected by the tribunal which held that he had been acting in bad faith.

(2)    In or around 2019, Mr Sklarov was sued by Rothschild & Co in respect of his attempts to masquerade under the Rothschild name. Rothschild & Co complained that his use of the Rothschild name to engage in fraud in connection with stock-

backed loans was damaging Rothschild & Co's reputation. The U.S. District Court, N.D. Georgia, Atlanta Division, granted a preliminary injunction against Mr Sklarov. Subsequently, Mr Sklarov signed a consent order which permanently enjoined him from using the Rothschild name.

(3)    On 9 October 2020, Barclays plc sued Mr Sklarov in respect of his attempts to masquerade under the Lehman name, which had been acquired by Barclays plc, alleging that Mr Sklarov was the ring-leader of a fraudulent scheme to mislead and to deceive members of the public by "*seeking to ... pass themselves off as the legitimate Lehman Brothers*". Barclays plc observed that Mr Sklarov had previously sought to operate under various other well-known names with which he had no genuine association, including (for example) Credit Suisse First Boston; BNP Paribas Fortis; PricewaterhouseCoopers; Bear Stearns; George Soros Capital; and Warren Buffet Capital. On 19 March 2021, Mr Sklarov signed a consent order enjoining him from using the Lehman name.

64.    Barclays plc described the frauds conducted by Mr Sklarov in the following terms:

"*Although Sklarov has used various shell companies to perpetuate each alleged fraud, the fact patterns underlying each of the schemes are nearly identical: a Sklarov-related entity promises to provide a loan to a borrower backed by securities owned by the borrower; the borrower pledges the shares as collateral to the Sklarov-controlled entity; the Sklarov-controlled entity provides little if any of the promised loan funds to the borrower and then sells or attempts to sell the shares proffered only as collateral, and retains the proceeds*".

65.    There are numerous examples of Mr Sklarov conducting such frauds:

(1)    Dr Brent Satterfield owned shares in a listed company called Co-Diagnostics, Inc ("**CDI**"). In early 2018, Dr Satterfield was introduced to Mr Sklarov who said that his company, America 2030, would make a loan to Dr Satterfield in the sum of US$ 3.5 million, secured over Dr Satterfield's shares in CDI, which were then worth more than US$ 7 million. Dr Satterfield handed over the shares, but America 2030 provided only US$ 67,000 of the loan. Dr Satterfield then discovered that America 2030 had already sold over US$ 1 million of his shares in CDI. On 13 March 2019, Dr

Satterfield commenced proceedings against Mr Sklarov in New York. The New York court referred the dispute to arbitration in New York, pursuant to an arbitration clause in the loan agreement. On 9 July 2021, the AAA tribunal issued an award in favour of Dr Satterfield, holding that Mr Sklarov had fraudulently induced Dr Satterfield to enter into the loan agreement by knowingly making false representations. The tribunal ordered Mr Sklarov to return the CDI shares to Dr Satterfield. However, Mr Sklarov failed to comply. On 12 November 2021, the New York court ordered Mr Sklarov to return the CDI shares. Again, Mr Sklarov did not comply. On 2 May 2022, the New York court held that Mr Sklarov was in contempt of court and directed him to purge his contempt, warning that an arrest warrant would be issued if he did not purge his contempt by 6 May 2022. Still Mr Sklarov failed to comply. On 3 June 2022, the New York court issued a warrant for Mr Sklarov's arrest. On 19 October 2023, the Supreme Court of the State of New York, Appellate Division, First Judicial Department, dismissed Mr Sklarov's appeal against the issuing of the arrest warrant.

(2)    Sunpower Business Group Pte Ltd and Tournan Trading Pte Ltd (the "**Sunpower Shareholders**") owned shares in Sunpower Group ("**Sunpower**"), a listed company in Singapore. They were introduced to Mr Sklarov (who seems to have been operating under the pseudonym "Mark Bentley"), who told them that his company, America 2030 Nevis, could make a loan on attractive terms, secured over their shares in Sunpower. They transferred their shares in Sunpower to Weiser to be held as security for the loan. Subsequently, they discovered that their shares had gone missing from the account. It became clear that Weiser had sold the shares on the instructions of Mr Sklarov. The Sunpower Shareholders commenced proceedings in Nevis accusing Mr Sklarov of fraud and obtained a worldwide freezing order against him. Mr Sklarov applied to strike out the claim but the Nevis court dismissed his application. Subsequently, Mr Sklarov ceased to participate in the proceedings, and, in June 2020, the Nevis court issued a judgment in default against him. Mr Sklarov sought to set aside the judgment in default, but his application was dismissed. The Nevis court held that Mr Sklarov had carried out a stock-backed loan fraud and that the loan agreements were vitiated due to fraud. Mr Sklarov's appeal was dismissed by the Court of Appeal of the Eastern Caribbean Supreme Court. On 9 August 2023,

18

the Supreme Court of the Bahamas made an order for the registration and enforcement of the Nevis judgment in the Bahamas.

(3)   Prescient Investment Limited ("**Prescient**") executed a loan agreement for US$ 117 million with Mr Sklarov's company, America 2030, and transferred shares worth US$ 200 million as collateral for the loan. Prescient alleged that Mr Sklarov had wrongfully ordered a broker to sell some of the shares and to pay the proceeds to America 2030. Prescient obtained an interlocutory injunction from the Hong Kong court to prevent any further disposals of the shares. Mr Sklarov responded by causing America 2030 to bring a claim in the United States District Court, N.D. Georgia, asserting that the loan agreement permitted America 2030 to sell the collateral immediately, even before it had advanced any of the loan monies. The federal court dismissed America 2030's claims with prejudice and sanctioned Mr Sklarov personally and enjoined him and his entities.

(4)   ZS Capital Fund SPC ("**ZS**") owned shares in Zhejiang Cangnan Instrument Group Limited ("**Zhejiang**"). During early 2020, ZS was introduced to Astor Asset Management 3 Limited ("**Astor Nevis**"); and, on 12 May 2020, ZS entered into a stock loan agreement with Astor Nevis for a loan of US$ 31.8 million, secured over the shares in Zhejiang. On 17 June 2020, ZS discovered that Astor Nevis had wrongfully dissipated almost 1 million of the shares in Zhejiang. ZS obtained an injunction to restrain Astor Nevis from disposing of any further shares. The dispute was referred to arbitration in Jamaica; and the arbitrator subsequently issued an award in favour of ZS.

(5)   Fortunate Drift Limited ("**FDL**") owned shares in Yangtze River Port & Logistics Limited ("**YRIV**"). Mr Sklarov's company, America 2030, agreed to lend US$ 8 million to FDL, secured over shares in YRIV. FDL pledged the shares to America 2030, but America 2030 did not provide the promised loan. FDL then cancelled the loan agreement. However, America 2030 refused to return the shares and instead began to sell them to third parties. FDL obtained a preliminary injunction to prevent America 2030 from disposing of the shares pending an arbitration in Hong Kong.

(6) Chenming Holdings (Hong Kong) Limited ("**Chenming**") owned shares in Shandong Chenming Paper Holdings Limited ("**Shandong Paper**"), which are listed on the Hong Kong Stock Exchange. Chenming was introduced to Astor Asset Management 2 Limited ("**Astor 2**"), which agreed to make loans secured over Chenming's shares in Shandong Paper, which were lodged with Weiser by way of collateral. The loan agreements were signed by Astor 2 using a fictitious name. Chenming repaid the loan in full, but Astor 2 refused to return the shares in Shandong Paper. Chenming obtained *Norwich Pharamal* relief from the Hong Kong court and discovered that almost all of its shares had been fraudulently transferred or sold by Astor 2 shortly after they were deposited with Weiser. On 8 February 2024, Chenming commenced proceedings against Astor 2 and others (including Vanderbilt) in the United States District Court Southern District of New York.

66. Other victims of Mr Sklarov's frauds include: Two Rivers Water & Farming Co, which obtained a temporary restraining order and a preliminary injunction on the basis that a loan agreement with America 2030 had been procured by fraud; and the CEO of Angus Energy, who resigned after transferring his shares to America 2030, which sold 10 million of them (with a value of over US$ 100 million) before the fraud was discovered.

67. In *USA v. Sklarov, et al*., 97-cr-00176 (DJL) (W.D. Pa.), Mr Sklarov was convicted of fraud and sentenced to one year in prison and US$ 14,000,000 restitution for Medicare fraud.

68. The dealing and affairs of Astor, Astor Fund, Astor Asset Management and Astor 3 have never been controlled and/or overseen by Thomas Mellon or Gregory Mitchell. The names Thomas Mellon and Gregory Mitchell are fictitious names used by Mr Sklarov and/or his associates to conduct frauds in such a way as to conceal Mr Sklarov's involvement.

69. Mr Sklarov has admitted in a witness statement dated 16 September 2024 that he has used the name Gregory Mitchell to conceal his own involvement. He also admitted in the said witness statement that he gave false instructions to his solicitors, DWF, in respect of the identity of Gregory Mitchell and instructed DWF to communicate the false information to the Claimants.

70. Mr Sklarov has said that Thomas Mellon is an alias used by Mr Sklarov's former associate, Alexei Skachkov, a man of Russian origin who lived in Atlanta, USA. It is the Claimants'

understanding that Mr Skachkov has a long criminal history. He was charged with forgery in the first degree for fraudulently prescribing medication under the alias Michael Thomas Virki. He pleaded guilty and was sentenced to three years of probation. His probation was revoked in January 2016 when he was again charged with forgery in an attempt to obtain drugs. In August 2017, he was charged for robbery from a jewellery store. He pleaded guilty and received six months confinement and 9.5 years' probation.

71.   The sole shareholder of Astor 3 is Oksana Hryn, an associate of Mr Sklarov who claims to be the managing director of Vanderbilt. The sole director is Jonathan Clifford Bibi, a former defender on the Seychelles national football team, who has been involved in dealings involving a company called Zulutoys, which was held to have been operating unlawfully in Missouri. As pleaded above, the controlling mind and will of Astor 3 is Mr Sklarov.

72.   Astor, Astor Fund, Astor Asset Management and/or Astor 3 never intended a member of the Astor group (in the event, Astor 3) to enter into a legitimate or *bona fide* contract of loan. Instead, the SLA was an instrument of fraud which was designed and intended to enable Mr Sklarov to misappropriate Elektra Shares.

73.   Further or alternatively, Astor 3, Astor Fund and Mr Sklarov were pursuing a dishonest scheme designed and intended to enable them to misappropriate Elektra Shares on the basis of fraudulent misrepresentations and other false pretences.

74.   Astor, Astor Fund, Astor Asset Management and Astor 3 never had the intention to fund a loan with their own cash resources. They only ever intended to make loans using the proceeds of sale of Elektra Shares.

75.   Astor 3 never intended to comply with its obligations in respect of the loan and security as it honestly understood them to be. Neither did Mr Sklarov nor Astor Fund anticipate that the lender (in the event, Astor 3) had, or would have, any such intention. In this regard:

(1)   At all material times Astor 3 intended to dispose of Elektra Shares prior to an Event of Default knowing that it had no lawful entitlement to do so and/or without honest belief that it had a lawful right to do so.

(2)    At all material times Astor 3 intended not to return the Elektra Shares to Mr Salinas following repayment of the loans, knowing that it was under an obligation to do so in such circumstances.

(3)    At all material times Astor 3 intended to take actions to prevent and/or disable itself and/or Weiser and/or Tavira from being able to return the Elektra Shares following repayment of the loans, knowing that such actions were contrary to its obligations in such circumstances.

(4)    At all material times Astor 3 intended to fund loans to RBS from the proceeds of sales of Elektra Shares, knowing that it had no lawful entitlement to do so and/or without honest belief that it had a lawful right to do so.

(5)    At all material times, Mr Sklarov and Astor Fund intended that the lender (in the event, Astor 3) would have the intentions identified in paragraphs 75(1)-(4), above.

## G.    **DISHONESTY**

76.    The said representations by Astor 3, Astor Fund and Mr Sklarov were made fraudulently, in that Astor 3, Astor Fund and Mr Sklarov (whose knowledge is to be attributed to Astor 3 and Astor Fund) knew that they were false.

<div align="center">PARTICULARS OF KNOWLEDGE</div>

(1)    Astor 3, Astor Fund and Mr Sklarov knew that:

(i)    Astor and the companies in its group (including Astor Fund and Astor Asset Management) were not associated with the Astor Family.

(ii)    Astor, Astor Fund and Astor Asset Management have not entered into numerous *bona fide* stock-lending transactions in the past.

(iii)    Astor and the companies in its group (including Astor Fund, Astor 3 and Astor Asset Management) were not legitimate and honest financial institutions which carried on legitimate and honest stock-backed lending activities.

(iv)    Astor 3 was not a special purpose vehicle owned and controlled by a legitimate and honest financial institution nor was it owned and controlled by an institution associated with the Astor Family.

(2)    Further or alternatively, Astor 3, Astor Fund and Mr Sklarov knew that Astor and the companies in its group (including Astor Fund, Astor 3 and Astor Asset Management) were (at all material times) vehicles for the fraudulent activities of Mr Sklarov, a convicted felon and serial fraudster, who conducts his frauds by posing as legitimate financial institutions and operating through false identities, using misrepresentations to gain control of shares in listed companies in order to misappropriate them.

(3)    Astor 3, Astor Fund and Mr Sklarov knew of the other such frauds committed by Mr Sklarov.

(4)    Astor 3, Astor Fund and Mr Sklarov knew that the dealing and affairs of Astor, Astor Fund, Astor Asset Management and Astor 3 have never been controlled and/or overseen by Thomas Mellon or Gregory Mitchell. Further or alternatively, Astor 3, Astor Fund and Mr Sklarov knew that the names Thomas Mellon and Gregory Mitchell are fictitious names used by Mr Sklarov and/or Mr Skachkov to conduct Mr Sklarov's frauds in such a way as to conceal their own involvement.

(5)    Astor 3, Astor Fund and Mr Sklarov knew that they never had an intention for the lender (in the event, Astor 3) to enter into a legitimate or *bona fide* contract of loan and/or knew that the SLA was an instrument of fraud which was designed and intended to enable Mr Sklarov to misappropriate the Elektra Shares.

(6)    Astor 3, Astor Fund and Mr Sklarov knew that they were pursuing a dishonest scheme designed and intended to enable them to misappropriate Elektra Shares on the basis of fraudulent misrepresentations and other false pretences.

(7)    Astor 3, Astor Fund and Mr Sklarov knew that Astor 3 never intended to fund a loan with their own cash resources and/or that Astor 3 never intended to make loans using the proceeds of sale of Elektra Shares. Astor 3, Astor Fund and Mr Sklarov also knew that they never intended that the lender (in the event Astor 3) would ever have such an intention.

(8)    Astor 3, Astor Fund and Mr Sklarov knew that Astor 3 was not entitled to dispose of Elektra Shares (i) because the SLA was an instrument of fraud and/or (ii) under the terms of the SLA prior to an Event of Default and that no Event of Default had occurred.

23

(9)    Further or alternatively, Astor 3, Astor Fund and Mr Sklarov knew that Astor 3 never intended to comply with its obligations in respect of the loan and security and/or that it always intended (i) to dispose of Elektra Shares prior to an Event of Default; (ii) not to return the Elektra Shares upon maturity and repayment of the loans; (iii) to take actions to prevent or disable Weiser and/or Tavira from being able to return the Elektra Shares to Mr Salinas; and/or (iv) to fund loans to RBS from the proceeds of sales of Elektra Shares, as more particularly pleaded above. Astor Fund and Mr Sklarov also knew that they never intended that the lender (in the event Astor 3) would ever have such intentions.

## H.    PROPRIETARY CLAIMS

### (1)    Express or implied trust

77.    Pursuant to clause 7 of Weiser's terms and conditions, Mr Salinas transferred Elektra Shares to Weiser on the express basis that Weiser would hold them on trust for him. Further or alternatively, the said shares were transferred into a designated account in the name of Mr Salinas with the intention that Weiser would hold them on trust for him.

78.    Further, Mr Salinas transferred Elektra Shares to Tavira (as more particularly pleaded above) on the express or implied basis that Tavira would hold them on trust for him. Further or alternatively, the said shares were transferred into a designated account in the name of Mr Salinas with the intention that Tavira would hold them on trust for him.

79.    To the extent that such trusts were not express, they are to be implied from the circumstances pleaded above in accordance with the intentions of the parties.

80.    In the premises, Mr Salinas retains beneficial ownership of the said Elektra Shares. None of the Defendants is a *bona fide* purchaser for value of the said Elektra Shares or their proceeds and accordingly each of the Defendants holds the same subject to Mr Salinas's equitable interest therein so as to be liable to account to Mr Salinas in respect of the same.

### (2)    Trust by reason of fiduciary duty

81.    Further or alternatively, Astor 3's power to give instructions to Weiser and Tavira in respect of Elektra Shares belonging to Mr Salinas was a fiduciary power which was to be exercised by Astor 3 only in good faith and for proper purposes and not otherwise.

82. Wrongfully, and in breach of fiduciary duty, Astor 3 gave instructions to Weiser and Tavira:

    (1)    in bad faith by requiring them to transfer Elektra Shares to Astor Fund and/or Vanderbilt in furtherance of the conspiracy pleaded herein; and/or

    (2)    in deliberate and knowing breach of Astor 3's obligations under the SLA; and / or

    (3)    knowingly in excess of the authority conferred by Mr Salinas on Astor 3 under the Weiser Agreement, the Tavira Agreements and the SLA.

83. Astor Fund and Vanderbilt were not *bona fide* purchasers for value of the said shares or their proceeds and accordingly received and continue to hold the same subject to Mr Salinas's equitable interest therein so as to be liable to account to Mr Salinas in respect of the same.

**(3)    Constructive trust**

84. Further or alternatively, by reason of the conspiracy, the fraud and/or the unlawful means pleaded above, the Defendants hold any Elektra Shares or proceeds thereof received by them as constructive trustees for Mr Salinas.

85. In the premises, the Defendants are liable to account to the Claimants for the said shares or the traceable proceeds thereof as constructive trustees.

**(4)    Purpose trust**

86. Further or alternatively, as pleaded above, Mr Salinas transferred the Elektra Shares to Weiser and Tavira for a specific purpose, namely the provision of collateral for the loan under the SLA, and in circumstances where the monies were not free to be used by any of the Defendants for their own general purposes. The said shares and/or any proceeds of the same were and are accordingly held on a *Quistclose* trust or purpose trust for Mr Salinas.

**(5)    Proprietary restitutionary claims**

87. Further or alternatively, Mr Salinas transferred the Elektra Shares to Weiser and Tavira under purported agreements induced by fraudulent misrepresentations.

25

88.    On or around 2 August 2024, the Claimants rescinded the agreements (including but not limited to the SLA), thereby re-vesting title to the said shares and/or their proceeds in Mr Salinas.

89.    In the premises, the Defendants are liable to account to Mr Salinas for the said shares or the traceable proceeds thereof as constructive trustees.

**(6)    Proprietary claims consequent upon a mistake**

90.    Further or alternatively, the said shares were transferred to Weiser and Tavira by virtue of a serious mistake as to the nature of the SLA and/or the identity of Astor 3.

91.    Astor 3 and Mr Sklarov had actual knowledge of the said mistake. Accordingly, the Defendants received and held the Elektra Shares on constructive trust for the Claimants.

92.    The Defendants are accordingly accountable to the Claimants in respect of the said shares and/or the traceable proceeds thereof.

**I.    PERSONAL CLAIMS**

**(1)    Damages for conspiracy**

93.    Pursuant to and in furtherance of the conspiracy pleaded above, the Conspiracy Defendants carried out and otherwise participated in a series of overt acts that had the foreseeable result of defrauding or otherwise harming the Claimants by causing the Claimants to suffer loss and damage. More particularly:

(1)    The Claimants have suffered loss and damage equal to the difference between:

(i)    the value of the Elektra Shares at 18 June 2021 when Mr Salinas transferred 3,600,000 Elektra Shares to Weiser (as described in paragraph 36 above) (alternatively the value of the said shares at the dates on which they were transferred by Mr Salinas to Weiser and Tavira, or further alternatively the value of the said shares on the dates on which they were removed from Mr Salinas's accounts); and

(ii)    the lower amount of the said loans.

(2)    Mr Salinas has suffered loss equal to the reduction in the value of his other shares in Elektra (held directly and indirectly) arising from the conspiracy including any reduction in value arising (i) by reason of the suspension of trading in Elektra shares on the Mexican stock exchange (which occurred as a result of the conspiracy), and (ii) from the Conspiracy Defendants' trading in Elektra shares in breach of the SLA. The quantum of said loss is to be determined by expert evidence at trial.

(3)    Further, the Claimants have incurred expenses in the investigation and mitigation of the conspiracy (including the expense of managerial and staff time), full particulars of which will be provided as soon as the same become available.

94.    In the premises, the Claimants claim and are entitled to damages for conspiracy to injure the Claimants, further or alternatively damages for conspiracy to defraud and/or injure the Claimants by unlawful means, as pleaded above.

**(2)    Damages for misrepresentation**

95.    By reason of the fraudulent misrepresentations by Astor 3 and Mr Sklarov, the Claimants have suffered and continue to suffer loss and damage. The Claimants rely on the particulars of loss and damage pleaded in paragraph 93 above.

96.    In the premises, the Claimants claim and are entitled to damages for deceit against Astor 3 and/or Mr Sklarov.

97.    In the alternative to the claim for damages for deceit, the Claimants claim the like sum from Astor 3 and/or Mr Sklarov under section 2(1) of the Misrepresentation Act 1967.

**(3)    Damages for breach of trust**

98.    As pleaded above, the Defendants held Elektra Shares and/or their proceeds on trust for Mr Salinas. To the extent that any of the Defendants has disposed of such shares or their proceeds in breach of trust, Mr Salinas is entitled to equitable compensation equal to the value of the shares or proceeds (as the case may be) for such breach of trust.

**(4)**    **Damages for breach of fiduciary duty**

99.    As pleaded above, Astor 3's power to give instructions to Weiser and Tavira in respect of the shares was a fiduciary power. Astor 3 acted in breach of fiduciary duty by giving instructions in bad faith in furtherance of the fraudulent scheme pleaded above.

100.    In the premises, the Claimants are entitled to equitable compensation from Astor 3 equal to the value of the shares for such breach of duty.

**(5)**    **Damages for breach of contract**

101.    If the SLA was not void *ab initio*, Astor 3 acted in breach of the SLA by giving instructions for the disposal of Elektra Shares in circumstances where it was not entitled to do so and thereby acted in breach of contract, causing loss and damage to Mr Salinas, as aforesaid.

102.    In the premises, the Claimants are entitled to damages for breach of contract as against Astor 3. The Claimants rely on the particulars of loss and damage pleaded above.

**(6)**    **Equitable compensation for knowing receipt**

103.    If and to the extent that any of the Conspiracy Defendants no longer holds the Elektra Shares or the traceable proceeds thereof previously received by them and held by them on trust as pleaded above, the Claimants seek equitable compensation against such Defendant for knowing receipt.

**(7)**    **Equitable compensation for dishonest assistance**

104.    By reason of the matters aforesaid, Mr Sklarov, Vanderbilt and Astor Fund dishonestly assisted Astor 3 to breach its fiduciary duty, as pleaded above.

105.    By reason thereof, the Claimants suffered loss and damage, as pleaded above.

106.    In the premises, each of each of Mr Sklarov, Vanderbilt and Astor Fund should be ordered to pay equitable compensation to the Claimants for their dishonest assistance of a breach of fiduciary duty.

**(8)**    **Restitution consequent upon rescission**

107.    As pleaded above, the Claimants have rescinded the SLA and associated contracts.

108. Alternatively, if and to the extent that the Claimants have not previously rescinded them, they are entitled to rescind and hereby rescind the same.

109. In the premises, the Claimants are entitled to and claim restitution of the shares transferred to Weiser and Tavira thereunder. The Claimants are willing and able to make counter-restitution.

**(9)    <u>Interest</u>**

110. Further, the Claimants claim and are entitled to interest, whether or not compounded, on all sums found to be due to them at such rates as the Court shall deem just pursuant to the Court's equitable jurisdiction and/or section 35A of the Senior Courts Act 1981.

AND THE CLAIMANTS CLAIM AGAINST THE DEFENDANTS:

(1)    Declarations that the Defendants hold the Elektra Shares and/or the proceeds thereof on trust for the Claimants together with such orders as may be necessary to compel the Defendants to transfer the said shares and/or proceeds to the Claimants and/or to account for the Claimants in respect of the same;

(2)    Such accounts and enquiries as may be necessary including an account of profits;

(3)    Damages for conspiracy (in the case of the Conspiracy Defendants);

(4)    Damages for fraudulent misrepresentation (in the case of the First, Fourth and Sixth Defendants only), alternatively (again in the case of the First, Fourth and Sixth Defendants only) damages pursuant to the Misrepresentation Act 1967;

(5)    Damages for breach trust, breach of contract and/or breach of fiduciary duty, as aforesaid;

(6)    Equitable compensation as aforesaid;

(7)    Restitution;

(8)    Interest; and

(9)    Costs.

<div align="right">

**STEPHEN ROBINS KC**

**HENRY PHILLIPS**

**MATTHEW ABRAHAM**

**RYAN PERKINS**

</div>

**Statement of truth**

I believe that the facts stated in these Particulars of Claim are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

**Signed:** _____

**Name:** _Ricardo B. Salinas Pliego._

**Dated:** _September 26, 2024._

30

STEPHEN ROBINS KC

HENRY PHILLIPS

MATTHEW ABRAHAM

RYAN PERKINS

The Second Claimant believes that the facts stated in these Particulars of Claim are true. The Second Claimant understands that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

I am duly authorised to sign this statement of truth on behalf of the Second Claimant.

Signed: _____

Name: Guillermo Eduardo Zubiaur

Position: Sole Administrator

Dated: September 26, 2024

31

# EXHIBIT 12

| From: | Eduardo Gonzalez Salceda Sanchez |
|---|---|
| To: | Zara Akbar |
| Cc: | Javier Gavo; Jean-Marc Tornare; Norma Elvira Urzua Villasenor; Alexandre Torti |
| Subject: | Re: ELEKTRA SLA/CMA Dated: July 28, 2021 |
| Attachments: | image013947.png.html |
| | image254452.png.html |
| | image384061.png.html |
| | image405170.png.html |
| | image286774.png.html |
| | image013947.png.html |
| | image254452.png.html |
| | image384061.png.html |
| | image405170.png.html |
| | image286774.png.html |

Dear Zara, hope everything is fine!

Please give us an update regarding the reversed of the collateralised shares

Best Regards,

On 25 Oct 2021, at 3:38, Zara Akbar <zara@enness.je> wrote:

Morning Eduardo,

Hope you are well. I am happy to advise that I have been informed by Astor that the instructions for the transfer of the 935,913 (collateralised) shares of Group Elektra S.A.B. de CV (ELEKTRA*:MX) shall be reversed back to the account # 200-804765 of Mr. Ricardo B. Salinas Pliego within the next 24 hours.

So we should see the shares reappear back into the account later today or tomorrow.

Please let me know if you have any further questions.

Kind regards,

Zara

**Zara Akbar**
HEAD OF SECURITIES BASED LENDING
+44 (0) 7999 043 065
zara@enness.je





# Unusual Property Finance

LEISURE DEVELOPMENT, RETAIL SPACES AND MORE

Enness (Jersey) Limited is registered with the Jersey Financial Services Commission with the company number 127668. Our address is; Office 17, First Floor, International Finance Centre 5, The Esplanade, St Helier, Jersey, JE2 3BY.

On 23 Oct 2021, at 18:01, Eduardo Gonzalez Salceda Sanchez <egsalceda@gruposalinas.com.mx> wrote:

**Attention:** This email originated outside Enness Ltd. Please be extra vigilant when opening attachments or clicking on links.

Dear Zara, hope everything is fine!

It is very important that you have the sensibility of the necessity for the shares to return to the collateral contract until no later than in this week, since if the account statement is issued without the shares there could be trigger an alienation with great tax implications!

Please we really need your help to make Astor and Weiser understand that they are breaching and violating the contracts.

Best Regards,

On 23 Oct 2021, at 1:18, Alexandre Torti <a.torti@fininvesta.com> wrote:

 Dear Zara,

In light with the bellow answer, it looks like the party which is the source of all this trouble is Astor. Could you kindly transmit this message to Astor and get their position and clear explanation as to what is causing all this mess?

Thanks and regards,
<2ECF3192-ECCE-4137-9BBD-47C0FB559438.gif>

Début du message réexpédié :

**De:** Weiser Compliance <compliance@weiser.com.bs>
**Objet: RE: ELEKTRA SLA/CMA Dated: July 28, 2021**
**Date:** 22 octobre 2021 à 21:49:23 UTC+2
**À:** Alexandre Torti <a.torti@fininvesta.com>
**Cc:** Zara Akbar <zara@enness.je>, Javier Gayo <javier.gayo@fininvesta.com>, Eduardo Gonzalez Salceda <egsalceda@gruposalinas.com.mx>, Collateral Services <collateralservices@weiser.com.bs>, Christos Liva <Christos.Liva@waml.ch>

Dear Mr. Torti,

In the order of your queries, Weiser Global Capital Markets ("WGCM") advises as follows;

1. Client instructions are always settled provided the client has the funds, shares, or margin as the case may be, and the account or corporation is up-to-date and in good standing.  WGCM cannot provide a representation to you in advance of receiving an instruction and on another party's account.

2. Instruction for any transaction on account(s) under a Custody Management Agreement (CMA) must come from the party that has been granted the rights of control. The CMA executed by your client grants such rights exclusively to Astor Asset Management 3.

3. Refer to Item #1.

Kind regards,

Weiser Compliance

**Weiser Global Capital Markets**
Unit A, Balmoral Corporate Center,
Balmoral Development

Nassau, Bahamas
**Tel: +1 242 698 6600**
**Mobile: +1 242 813 8571**
E: compliance@weiser.com.bs
www.weiser.com.bs

<image001.jpg>

---

**From:** Alexandre Torti <a.torti@fininvesta.com>
**Sent:** Tuesday, 19 October 2021 4:49 AM
**To:** Collateral Services <collateralservices@weiser.com.bs>; Shelby
Brice <sbrice@weiser.com.bs>; Christos Liva
<Christos.Liva@waml.ch>
**Cc:** Zara Akbar <zara@enness.je>; Javier Gayo
<javier.gayo@fininvesta.com>; Eduardo Gonzalez Salceda
<egsalceda@gruposalinas.com.mx>
**Subject:** ELEKTRA SLA/CMA Dated: July 28, 2021

Dear all,

Kindly review the bellow and provide me with an answer.

**Background**

- Astor Asset Management 3 Limited issued an Entitlement
  Order dated: October 5, 2021 for the transfer of 935, 913
  (Collateralised) shares of Group Elektra S.A.B. de CV
  (ELEKTRA*:MX) from account 200-804765 of Ricardo
  Benjamin Salinas Pliego to the account of Astor Capital
  Fund Ltd.

- This Entitlement Order was in breach of terms and
  conditions the SLA dated July 28, 2021, as per Section V
  Lender Warranties and Representations Cause 6 - Transfer
  of Securities of the SLA Dated July 28, 2021.

- Astor Asset Management 3 Limited has agreed to issue an
  Entitlement Order to transfer the
  935, 913 (Collateralised) shares of Group Elektra S.A.B.
  de CV (ELEKTRA*:MX) from the account of Astor
  Capital Fund Ltd to the account 200-804765 of Ricardo
  Benjamin Salinas Pliego.

We would like you to confirm the following:

1. Any Entitlement Order issued by Astor Asset Management 3
Limited to transfer the

935, 913 (Collateralised) shares of Group Elektra S.A.B. de CV
(ELEKTRA*:MX) from the account of Astor Capital Fund Ltd to
the account 200-804765 of Ricardo Benjamin Salinas Pliego
shall be upheld and completed without delay.

2. There are no restrictions on the transfer of the uncollateralised
shares (i.e. 2,664,087 shares) of

Group Elektra S.A.B. de CV (ELEKTRA*:MX) to any account
as instructed by Mr. Ricardo Benjamin Salinas Pliego.

3. There are no restrictions on the transfer of the

935,913 (Collateralised) shares of Group Elektra S.A.B. de CV
(ELEKTRA*:MX) from the account of Astor Capital Fund Ltd to

the account 200-804765 of Ricardo Benjamin Salinas Pliego.

Awaiting your urgent reply.

# EXHIBIT 13

# ADDENDUM TO STOCK LOAN AGREEMENT

Reference is made to multiple executed Stock Loan Agreement(s) ("SLA") specifically:

SLA #1 dated May 1, 2021 between Astor Asset Management 3 Limited, a Canadian corporation and Corporacion RBS SA de CV;

and

SLA #2 dated July 14, 2021 between Astor Asset Management Ltd, a USA corporation as the Lender and Corporacion RBS SA de CV as the Borrower and Ricardo Benjamin Salinas Pliego as Guarantor;

and

SLA #3 dated July 28, 2021 between Astor Asset Management 3 LTD, a Canadian corporation as the Lender and Corporacion RBS SA de CV as the Borrower and Ricardo Benjamin Salinas Pliego as Guarantor.

Terms used in this Addendum shall have their meaning ascribed to them in the SLA #3 and this Addendum is being made a part of SLA #3.

May it be known that the undersigned parties, for good, just, sufficient, equitable and valuable consideration, do hereby agree to make the following changes and clarification as are outlined below. These changes will be made valid as if they are included in the SLA #3.

1. It is mutually agreed that the SLA #1 dated May 1, 2021 between Astor Asset Management LTD, a USA corporation and Corporacion RBS SA de CV as the Borrower is hereby declared null and void.

2. It is mutually agreed that the SLA #2 dated July 14, 2021 between Astor Asset Management Ltd, a USA corporation as the Lender and Corporacion RBS SA de CV as the Borrower and Ricardo Benjamin Salinas Pliego as Guarantor is hereby declared null and void.

3. It is mutually agreed and understood that the Lender is Astor Asset Management 3 LTD, a company incorporated in Quebec Canada with the incorporation number 1176785997 and the only valid and binding surviving SLA between the Parties is that which is between Astor Asset Management 3 LTD, a company incorporated in Quebec Canada with the incorporation number 1176785997 and Corporacion RBS SA de CV as the Borrower and Ricardo Benjamin Salinas Pliego as Guarantor dated July 28, 2021 and herein referred to as SLA #3.

4.  It is mutually agreed and understood that the SLA #3 between Astor Asset Management 3 LTD and Corporacion RBS SA de CV as Borrower and Ricardo Benjamin Salinas Pliego as Guarantor is, has and will be in full force and effect beginning on July 28, 2021.

5.  It is mutually agreed and understood that the Custodian Management Agreement ("CMA") executed by and between the undersigned parties and Weiser Global Capital Markets will be in full force and effect beginning on July 28, 2021

6.  The terms and conditions of the SLA #3 dated July 28, 2021 by and between Astor Asset Management 3 LTD, a Quebec Canada corporation number 1176785997 as the Lender and Corporacion RBS SA de CV as the Borrower and Ricardo Benjamin Salinas Pliego as Guarantor is valid and will remain in full force and effect except and to the extent they are amended herein.

IN WITNESS WHEREOF, the Parties hereto after consultations with their respective attorneys have caused this Addendum to SLA #3 to be duly executed as of the day and year written below.

_____
Astor Asset Management 3 LTD

Mariia Mitsa
**Print Name of Signatory**

Managing Member
**Title of Signatory**

07/31/2021
**Date**

_____
Corporacion RBS SA de CV

Ricardo Benjamin Salinas Pliego
**Print Name of Signatory**

Power of attorney
**Title of Signatory**

7/31/2021
**Date**

_____
Ricardo Benjamin Salinas Pliego

Ricardo Benjamin Salinas Pliego
Print Name of Signatory

Title of Signatory

7/31/2021
Date

# EXHIBIT 14

# SECOND ADDENDUM TO STOCK LOAN AGREEMENT

Reference is made to multiple executed Stock Loan Agreement(s) ("SLA") specifically:

SLA #1 dated May 1, 2021 between Astor Asset Management 3 Limited, a Canadian corporation and Corporacion RBS SA de CV;

and

SLA #2 dated July 14, 2021 between Astor Asset Management Ltd, a USA corporation as the Lender and Corporacion RBS SA de CV as the Borrower and Ricardo Benjamin Salinas Pliego as Guarantor;

and

SLA #3 dated July 28, 2021 between Astor Asset Management 3 LTD, a Canadian corporation as the Lender and Corporacion RBS SA de CV as the Borrower and Ricardo Benjamin Salinas Pliego as Guarantor.

Terms used in this Addendum shall have their meaning ascribed to them in the SLA #3 and this Addendum is being made a part of SLA #3.

May it be known that the undersigned parties, for good, just, sufficient, equitable and valuable consideration, do hereby agree to make the following changes and clarification as are outlined below. These changes will be made valid as if they are included in the SLA #3.

1. It is mutually agreed, understood and represented that all Entitlement Orders issued by Lender in relation to the Custodian Management Agreement executed by and between the Lender, the Depository Broker, the Borrower and the Guarantor will be in accordance with the terms of the Loan Agreement.

## END OF CONTENT ON THIS PAGE

IN WITNESS WHEREOF, the Parties hereto after consultations with their respective attorneys have caused this Second Addendum to SLA #3 to be duly executed as of the day and year written below.

_____
Astor Asset Management 3 LTD

_____
Print Name of Signatory

_____
Title of Signatory

_____
Date

_____
Corporacion RBS SA de CV

*Ricardo Salinas Pliego*
Print Name of Signatory

_____
Title of Signatory

6th December 2021
Date

_____
Ricardo Benjamin Salinas Pliego

*Ricardo Salinas Pliego*
Print Name of Signatory

_____
Title of Signatory

6th December 2021
Date

# EXHIBIT 15

# THIRD ADDENDUM TO STOCK LOAN AGREEMENT

THIS THIRD ADDENDUM TO STOCK LOAN AGREEMENT (the "Third Addendum") is made and entered into by and between Astor Asset Management 3 Ltd, a Canadian Corporation, hereinafter referred to as the "Lender", Corporacion RBS SA de CV, hereinafter referred to as the "Borrower", and Ricardo Benjamin Salinas Pliego, hereinafter referred to as the "Guarantor".

**WHEREAS,** the Lender, Borrower, and Guarantor previously entered into multiple Stock Loan Agreements, including: (i) the First Stock Loan Agreement dated May 1, 2021 between Astor Asset Management 3 Limited, a Canadian corporation, as Lender and Corporacion RBS SA de CV as Borrower; (ii) the Second Stock Loan Agreement dated July 14, 2021 between Astor Asset Management Ltd, a USA corporation, as the Lender, and Corporacion RBS SA de CV as the Borrower, and Ricardo Benjamin Salinas Pliego as the Guarantor; and (iii) the Third Stock Loan Agreement dated July 28, 2021 between Astor Asset Management 3 LTD, a Canadian Corporation, as the Lender, and Corporacion RBS SA de CV as the Borrower, and Ricardo Benjamin Salinas Pliego as the Guarantor.

**WHEREAS,** the Parties subsequently entered into the Addendum to Stock Loan Agreement dated July 31, 2021 and the Second Addendum to Stock Loan Agreement dated December 6, 2021; each of which remains in full force and effect to date.

**WHEREAS,** the Parties now wish to enter into this Third Addendum for the purpose of lowering the Loan-To-Value, reducing the initial Margin Call threshold, and requiring the Borrower to pledge additional shares in exchange for an immediate and single loan disbursement of approximately Six Hundred Thirteen Million (613,000,000 MXN), less fees and costs as per previous disbursements and the Stock Loan Agreement.

**NOW, THEREFORE,** in consideration of the premises and the mutual covenants set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto covenant and agree to make the following amendments as outlined below, each amendment of which will be made as if it is included in the Third Stock Loan Agreement.

**I.    LOAN-TO-VALUE**

It is hereby mutually agreed, understood, and represented that the Loan-To-Value ("LTV") for the subject Loan will be reduced to thirty-five percent (35%) effective as of the date of execution of this Third Addendum.

**II.    MARGIN CALL THRESHOLD**

It is hereby mutually agreed, understood, and represented, that Section VI(2)(b) of the Third Stock Loan Agreement is hereby amended, in that the Margin Call threshold shall be reduced from seventy percent (70%) to sixty percent (60%) effective as of the date of execution of this Third Addendum. It is hereby mutually agreed, understood, and represented that the threshold for any incurable Margin Call is not amended and will remain at fifty percent (50%) as stated per the Third Stock Loan Agreement

## III.   ADDITIONAL DEPOSIT OF SHARES AND DISBURSEMENT

It is hereby mutually agreed, understood, and represented that Lender agrees to disburse to Borrower a single disbursement of Six Hundred Thirteen Million (613,000,000 MXN) in exchange for the immediate deposit of an additional One Million Four Hundred Thirty-One Thousand Seven Hundred (1,431,700) shares of Grupo Elektra SAB DE CV (ELEKTRA:MX) to the depository broker, at Tavira Monaco SAM, account TMC-63.

## IV.   ADDENDUM TERMS

It is hereby mutually agreed, understood, and represented that this Third Addendum includes terms and conditions in addition to those contained in the above referenced Stock Loan Agreements and subsequent Addendums. Parties agree that they have read this Addendum, have had the opportunity to review it with an attorney of their respective choice, and have willingly and voluntarily agreed to all its terms. Under these circumstances, the Parties agree that the rule of construction that a contract be construed against the drafter shall not be applied in interpreting this Addendum and that in the event of any ambiguity in any of the terms of conditions of this Addendum, such ambiguity shall inure to the benefit of the Lender. The terms used in this Third Addendum shall have the same meaning as ascribed to them in the Third Stock Loan Agreement. This Third Addendum does not obligate the Lender to agree to any further extension or any other modification of the Stock Loan Agreements regardless of any circumstance which may arise throughout the course of the Loan Term.

## V.   NOTICE

Any notice required to be given under this Third Addendum shall be given in writing, and shall be effective when actually delivered, if by mail, or when actually received, if by email, unless otherwise required by law. For notice purposes, the Borrower and Guarantor agree to keep the Lender informed at all times of Borrower's and Guarantor's current contact information including, but not limited to mailing address, telephone number, and email address.

## VI.    SEVERABILITY

Each provision, section, sentence, clause, phrase, and word of this Third Addendum is intended to be severable. If any provision, section, sentence, clause, phrase, and word hereof is held by a court with jurisdiction to be illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity of the remainder of this Third Addendum.

## VII.    HEADINGS

The headings contained in this Third Addendum are for reference purposes only and shall not affect in any way the meaning or interpretation of this Third Addendum.

## VIII.    ERRORS & OMISSIONS

Borrower and Guarantor expressly agree and acknowledges that they had reasonable opportunity to obtain the assistance of its own counsel to fully review and participate in the negotiation and revision of any of the terms, provisions, covenants, representations, warranties and conditions of this Third Addendum prior to its execution; and the decision of whether or not to seek advice of counsel with respect to this Third Addendum is the responsibility of the Borrower and Guarantor. Therefore, under no circumstances shall Lender be liable to Borrower or to Guarantor for any errors or omissions in this Third Addendum that may be disadvantageous to Borrower or Guarantor, or which may result in claims of actual or alleged or perceived harm to Borrower and Guarantor.

## IX.    GOVERNING LAW & DISPUTE RESOLUTION

This Third Addendum and any claim, controversy, dispute, or cause of action (whether in contract, tort or otherwise) based upon, arising out of, or relating to this Third Addendum and the other relevant loan documents including, but not limited to the Stock Loan Agreement and each executed Addendum, shall be governed by, and construed in accordance with the laws of England and Wales. Any claim, controversy, dispute, or cause of action (whether in contract, tort or otherwise) based upon, arising out of, or relating to this Third Addendum and the other relevant loan documents including, but not limited to the Stock Loan Agreement and any and all executed Addendums, shall be resolved in accordance with the dispute resolution clause provided for in the Third Stock Loan Agreement.

## X.    PRIOR AGREEMENTS

Each Party represents and warrants that it is not a party to or otherwise subject to or bound by any other agreement, understanding, or court order which in any manner limits or otherwise affects its ability to fully perform all obligations under this Third

Addendum and the other relevant loan documents including, but not limited to the Stock Loan Agreement and all other executed Addendums. Parties hereby mutually agree and acknowledge that all terms and conditions of the Third Stock Loan Agreement, and all other executed Addendums, remain in full force and effect except to the extent specifically modified by this Third Addendum.

## XI.    CONFIDENTIALITY

Parties agree that the terms and conditions of this Third Addendum, and any communications, information, or documents related thereto, are to be kept in the strictest confidence between the Parties to this Third Addendum; this restriction shall continue to apply after the expiration or termination of this Third Addendum without limit of time. These obligations shall cease to apply to any knowledge or information which may properly come into the public domain (through no fault of the Parties concerned) or is required by law to be disclosed.

## XII.   REPRESENTATIONS

Borrower and Guarantor represent and warrant that all statements and documentation provided to the Lender with respect to the Loans referenced herein are still true, accurate and complete, with no new material facts or information being omitted or misrepresented.

## XIII.  FORCE MAJEURE

A Party shall not be considered to be in default or breach of this Third Addendum, and shall be excused from performance or liability for damages to any other Party, if and to the extent that it shall be delayed in or prevented from performing or carrying out any of the provisions of this Third Addendum, arising out of or from any act, omission, or circumstance by or in consequence of any act of God, labor disturbance, sabotage, act of public enemy, war, invasion, insurrection, riot, fire, storm, flood, ice, earthquake, explosion, epidemic, breakage or accident to equipment, or any other cause or causes beyond such Party's reasonable control. A Force Majeure event does not include an act of negligence or intentional wrongdoing by a Party. Any Party claiming a Force Majeure event shall use reasonable diligence to remove the condition that prevents performance and shall not be entitled to suspend performance of its obligations in any greater scope or for any longer duration than is required by the Force Majeure event. Each Party shall use its best efforts to mitigate the effects of such Force Majeure event, remedy its inability to perform, and resume full performance of its obligations hereunder.

## XIV.    RIGHTS OF PARTIES

The Parties hereby fully agree and acknowledge that all rights, remedies, and privileges of the Lender hereunder are cumulative and not exclusive of any rights, remedies, or privileges which the Lender may have and may be exercised and enforced alternatively, successively, or concurrently, at the sole discretion of the Lender. If any provision hereof or if any provision contained in the above referenced Stock Loan Agreements or the application of such provision to any other person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, neither the application of such provision to any other person or circumstance, nor the remainder of the provisions contained in the Stock Loan Agreements shall be affected thereby, and all provisions shall be fully enforced to the greatest extent permitted by law.

## XV.    NO WAIVER

Except as expressly set forth in this Third Addendum, nothing contained in this Third Addendum, or any other communication by and between the Parties, shall be construed as a waiver by the Lender of any covenant or provision of the Stock Loan Agreements, subsequent Addendums, or any other contract or instrument by and between the Parties, or of any similar future transaction, and the failure of Lender at any time or times hereafter to require strict performance by either the Borrower or Guarantor of any provision thereof shall not waive, affect or diminish any right of the Lender to thereafter demand strict compliance therewith. Nothing contained in this Third Addendum shall directly or indirectly in any way whatsoever, whether known or unknown, either: (i) except as expressly provided herein, impair, prejudice or otherwise adversely affect the Lender's right at any time to exercise any right, any event, any cause, privilege, or remedy in connection with the Third Addendum or any other loan documents between the Parties, including, but not limited to the Stock Loan Agreements and any and all other executed Addendums, (ii) except as expressly provided herein, amend or alter any provision of the executed and existing Stock Loan Agreements and subsequent Addendums, or any other contract or loan instrument, or (iii) constitute any course of dealings or other basis for altering any obligation of any Party under this Third Addendum or any other loan documents, including, but not limited to the Stock Loan Agreements and any and all other executed Addendums, or any right, privilege or remedy of Lender under this Third Addendum or any other loan documents, including, but not limited to the Stock Loan Agreements and any and all other executed Addendums. The Lender hereby continues to reserve all rights, remedies, and privileges granted to it under this Third Addendum or any other loan documents, including, but not limited to the Stock Loan Agreements and any and all other executed Addendums.

XVI.    ALL TERMS ARE BINDING UPON THE PARTIES

The Parties acknowledge that, subject to the terms of this Third Addendum, all terms and provisions contained in the above referenced Stock Loan Agreements, and all executed Addendums, remain in full force and effect and are legally binding on the Parties. Moreover, no delay, failure, or forbearance on the part of the Lender in exercising any right, remedy, or privilege under this Third Addendum shall affect any such right, remedy, or privilege, nor shall any single or partial exercise thereof or any abandonment or discontinuance of steps to enforce such a right, remedy, or privilege preclude any further exercise thereof or the exercise of any other rights, remedies, or privileges under this Third Addendum or the related Stock Loan Agreements and Addendums. Lender has not waived any right or remedy under this Third Addendum or any other loan documents, including, but not limited to the Stock Loan Agreements and any and all other executed Addendums. Borrower and Guarantor agree and acknowledge that the execution of this Third Addendum by the Lender is not intended nor shall it be construed as (a) an actual or implied waiver of any default, whether known or unknown, under this Third Addendum or any other loan documents, including, but not limited to the Stock Loan Agreements and any and all other executed Addendums, or (b) an actual or implied waiver of any condition or obligation imposed on Borrower and Guarantor pursuant to this Third Addendum or any other loan documents, including, but not limited to the Stock Loan Agreements and any and all other executed Addendums, except to the extent, if any, specified herein. The Borrower and Guarantor shall be jointly and severally liable hereunder and under each of the loan documents, including, but not limited to the Stock Loan Agreement and all subsequent Addendums, to which it is a party with respect to all obligations. The Lender hereby reserves all rights, remedies, and privileges granted to it by the Stock Loan Agreements and subsequent Addendums.

XVII.    CONSENT

Whenever the consent of Lender is required under this Third Addendum, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of the Lender.

XVIII.    TIME OF ESSENCE

The Parties hereto acknowledge and agree that time is strictly of the essence with respect to the terms, conditions and provisions hereof, and that the failure to timely perform any of the obligations hereunder shall constitute a breach of, and a default under, this Third Addendum by the Party so failing to do so.

**XIX.    ASSIGNMENT**

This Addendum, its equities, and obligations shall be freely transferrable or assignable in whole or in part as the stated in the above referenced Stock Loan Agreements. Any transfer or assignment action by any Party shall be followed up by written notice to the other Parties.

**XX.    ENTIRE AGREEMENT**

This Third Addendum incorporated along with the Third Stock Loan Agreement and the executed Addendums constitutes the entire agreement and there are no oral or other representations regarding the subject of this agreement that are binding on either Party. All changes to this Third Addendum, or the Third Stock Loan Agreement and any and all executed Addendums, must be in writing, signed by both Parties. It is understood and agreed that email correspondence shall not constitute "a writing" to this agreement unless expressly included herein.

<div align="center">END OF TEXT ON THIS PAGE</div>

**IN WITNESS WHEREOF,** the Parties hereto after consultations with their respective attorneys and upon their advice, the Parties have caused this Third Addendum to the Third Stock Loan Agreement to be duly executed as of the day and year written below.

_____

Astor Asset Management 3 Ltd

_____

Print Name of Signatory

_____

Title of Signatory

_____

Date

_____

Corporacion RBS SA de CV

Ricardo Salinas Pliego
_____

Print Name of Signatory

_____

Title of Signatory

13/06/2022
_____

Date

_____

Ricardo Benjamin Salinas Pliego

Ricardo Salinas Pliego
_____

Print Name of Signatory

_____

Title of Signatory

13/06/2022
_____

Date

# EXHIBIT 16

## FOURTH ADDENDUM TO STOCK LOAN AGREEMENT

THIS FOURTH ADDENDUM TO STOCK LOAN AGREEMENT (the "Fourth Addendum") is made and entered into by and between Astor Asset Management 3 Ltd, a Canadian Corporation, hereinafter referred to as the "Lender", Corporacion RBS SA de CV, hereinafter referred to as the "Borrower", and Ricardo Benjamin Salinas Pliego, hereinafter referred to as the "Guarantor".

WHEREAS, the Lender, Borrower, and Guarantor previously entered into multiple Stock Loan Agreements ("SLA") including: (i) the First SLA dated May 1, 2021 between Astor Asset Management 3 Limited, a Canadian corporation, as Lender and Corporacion RBS SA de CV as Borrower; (ii) the Second SLA dated July 14, 2021 between Astor Asset Management Ltd, a USA corporation, as the Lender, and Corporacion RBS SA de CV as the Borrower, and Ricardo Benjamin Salinas Pliego as the Guarantor; and (iii) the Third SLA dated July 28, 2021 between Astor Asset Management 3 LTD, a Canadian Corporation, as the Lender, and Corporacion RBS SA de CV as the Borrower, and Ricardo Benjamin Salinas Pliego as the Guarantor.

WHEREAS, the Parties subsequently entered into the Addendum to Stock Loan Agreement dated July 31, 2021, the Second Addendum to Stock Loan Agreement dated December 6, 2021, and the Third Addendum to Stock Loan Agreement dated June 13, 2022; each of which remains in full force and effect to date.

WHEREAS, the Parties now wish to enter into this Fourth Addendum for the purpose of allowing a one-time exception to the SLA with respect to the distribution of dividends.

NOW, THEREFORE, in consideration of the premises and the mutual covenants set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto covenant and agree to make the following amendments as outlined below, each amendment of which will be made as if it is included in the Third SLA.

I.   DIVIDEND DISTRIBUTION

It is hereby mutually agreed and accepted that the Lender shall make a one-time special exception to the SLA with respect to the distribution of dividends. As such, the Lender shall authorize to release dividends in the amount of Eight Hundred Fifty-Seven Thousand Four Hundred Eleven Dollars and Forty-Four Cents ($857,411.44 USD) held at Tavira Monaco SAM ("Depository Broker") in the account of the Borrower, granting the right to Borrower to withdraw the subject dividend in the currency of USD or to convert to any other currency. This exception shall be one-time only and any further dividends to be released shall be released in accordance with the

terms of the SLA. Parties fully acknowledge that this one-time exception shall not be repeated during the term of the Loan.

II.    **ADDENDUM TERMS**

It is hereby mutually agreed, understood, and represented that this Fourth Addendum includes terms and conditions in addition to those contained in the above referenced Stock Loan Agreements and subsequent Addendums. Parties agree that they have read this Addendum, have had the opportunity to review it with an attorney of their respective choice, and have willingly and voluntarily agreed to all its terms. Under these circumstances, the Parties agree that the rule of construction that a contract be construed against the drafter shall not be applied in interpreting this Addendum and that in the event of any ambiguity in any of the terms of conditions of this Addendum, such ambiguity shall inure to the benefit of the Lender. The terms used in this Fourth Addendum shall have the same meaning as ascribed to them in the Third SLA. This Fourth Addendum does not obligate the Lender to agree to any further extension or any other modification of the Stock Loan Agreements regardless of any circumstance which may arise throughout the course of the Loan Term.

III.    **NOTICE**

Any notice required to be given under this Fourth Addendum shall be given in writing, and shall be effective when actually delivered, if by mail, or when actually received, if by email, unless otherwise required by law. For notice purposes, the Borrower and Guarantor agree to keep the Lender informed at all times of Borrower's and Guarantor's current contact information including, but not limited to mailing address, telephone number, and email address.

IV.    **SEVERABILITY**

Each provision, section, sentence, clause, phrase, and word of this Fourth Addendum is intended to be severable. If any provision, section, sentence, clause, phrase, and word hereof is held by a court with jurisdiction to be illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity of the remainder of this Fourth Addendum.

V.    **HEADINGS**

The headings contained in this Fourth Addendum are for reference purposes only and shall not affect in any way the meaning or interpretation of this Fourth Addendum.

VI.    **ERRORS & OMISSIONS**

Borrower and Guarantor expressly agree and acknowledges that they had reasonable opportunity to obtain the assistance of its own counsel to fully review and participate in the negotiation and revision of any of the terms, provisions, covenants, representations, warranties and conditions of this Fourth Addendum prior to its execution; and the decision of whether or not to seek advice of counsel with respect to this Fourth Addendum is the responsibility of the Borrower and Guarantor. Therefore, under no circumstances shall Lender be liable to Borrower or to Guarantor for any errors or omissions in this Fourth Addendum that may be disadvantageous to Borrower or Guarantor, or which may result in claims of actual or alleged or perceived harm to Borrower and Guarantor.

VII.   **GOVERNING LAW & DISPUTE RESOLUTION**

This Fourth Addendum and any claim, controversy, dispute, or cause of action (whether in contract, tort or otherwise) based upon, arising out of, or relating to this Fourth Addendum and the other relevant loan documents including, but not limited to the Stock Loan Agreement and each executed Addendum, shall be governed by, and construed in accordance with the laws of England and Wales. Any claim, controversy, dispute, or cause of action (whether in contract, tort or otherwise) based upon, arising out of, or relating to this Fourth Addendum and the other relevant loan documents including, but not limited to the Stock Loan Agreement and any and all executed Addendums, shall be resolved in accordance with the dispute resolution clause provided for in the Third SLA.

VIII.  **PRIOR AGREEMENTS**

Each Party represents and warrants that it is not a party to or otherwise subject to or bound by any other agreement, understanding, or court order which in any manner limits or otherwise affects its ability to fully perform all obligations under this Fourth Addendum and the other relevant loan documents including, but not limited to the Stock Loan Agreement and all other executed Addendums. Parties hereby mutually agree and acknowledge that all terms and conditions of the Third SLA, and all other executed Addendums, remain in full force and effect except to the extent specifically modified by this Fourth Addendum.

IX.    **CONFIDENTIALITY**

Parties agree that the terms and conditions of this Fourth Addendum, and any communications, information, or documents related thereto, are to be kept in the strictest confidence between the Parties to this Fourth Addendum; this restriction shall continue to apply after the expiration or termination of this Fourth Addendum without limit of time. These obligations shall cease to apply to any knowledge or

information which may properly come into the public domain (through no fault of the Parties concerned) or is required by law to be disclosed.

## X.   REPRESENTATIONS

Borrower and Guarantor represent and warrant that all statements and documentation provided to the Lender with respect to the Loans referenced herein are still true, accurate and complete, with no new material facts or information being omitted or misrepresented.

## XI.   MISCELLANEOUS

A Party shall not be considered to be in default or breach of this Fourth Addendum, and shall be excused from performance or liability for damages to any other Party, if and to the extent that it shall be delayed in or prevented from performing or carrying out any of the provisions of this Fourth Addendum, arising out of or from any act, omission, or circumstance by or in consequence of any act of God, labor disturbance, sabotage, act of public enemy, war, invasion, insurrection, riot, fire, storm, flood, ice, earthquake, explosion, epidemic, breakage or accident to equipment, or any other cause or causes beyond such Party's reasonable control. A Force Majeure event does not include an act of negligence or intentional wrongdoing by a Party. Any Party claiming a Force Majeure event shall use reasonable diligence to remove the condition that prevents performance and shall not be entitled to suspend performance of its obligations in any greater scope or for any longer duration than is required by the Force Majeure event. Each Party shall use its best efforts to mitigate the effects of such Force Majeure event, remedy its inability to perform, and resume full performance of its obligations hereunder. The Parties hereby fully agree and acknowledge that all rights, remedies, and privileges of the Lender hereunder are cumulative and not exclusive of any rights, remedies, or privileges which the Lender may have and may be exercised and enforced alternatively, successively, or concurrently, at the sole discretion of the Lender. If any provision hereof or if any provision contained in the above referenced Stock Loan Agreements or the application of such provision to any other person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, neither the application of such provision to any other person or circumstance, nor the remainder of the provisions contained in the Stock Loan Agreements shall be affected thereby, and all provisions shall be fully enforced to the greatest extent permitted by law. Except as expressly set forth in this Fourth Addendum, nothing contained in this Fourth Addendum, or any other communication by and between the Parties, shall be construed as a waiver by the Lender of any covenant or provision of the Stock Loan Agreements, subsequent Addendums, or any other contract or instrument by and between the Parties, or of any similar future transaction, and the failure of Lender at any time or times hereafter to require strict performance by either the Borrower of any provision thereof shall not waive, affect or diminish any right of the Lender to thereafter demand strict

compliance therewith. Nothing contained in this Fourth Addendum shall directly or indirectly in any way whatsoever either: (i) except as expressly provided herein, impair, prejudice or otherwise adversely affect the Lender's right at any time to exercise any right, privilege, or remedy in connection with the Fourth Addendum or any other loan documents between the Parties, including, but not limited to the Stock Loan Agreements and any and all other executed Addendums, (ii) except as expressly provided herein, amend or alter any provision of the executed and existing Stock Loan Agreements and subsequent Addendums, or any other contract or loan instrument, or (iii) constitute any course of dealings or other basis for altering any obligation of any Party under this Fourth Addendum or any other loan documents, including, but not limited to the Stock Loan Agreements and any and all other executed Addendums, or any right, privilege or remedy of Lender under this Fourth Addendum or any other loan documents, including, but not limited to the Stock Loan Agreements and any and all other executed Addendums. The Lender hereby continues to reserve all rights, remedies, and privileges granted to it under this Fourth Addendum or any other loan documents, including, but not limited to the Stock Loan Agreements and any and all other executed Addendums. The Parties acknowledge that, subject to the terms of this Fourth Addendum, all terms and provisions contained in the above referenced Stock Loan Agreements, and all executed Addendums, remain in full force and effect and are legally binding on the Parties. Moreover, no delay, failure, or forbearance on the part of the Lender in exercising any right, remedy, or privilege under this Fourth Addendum shall affect any such right, remedy, or privilege, nor shall any single or partial exercise thereof or any abandonment or discontinuance of steps to enforce such a right, remedy, or privilege preclude any further exercise thereof or the exercise of any other rights, remedies, or privileges under this Fourth Addendum or the related Stock Loan Agreements and Addendums. Lender may waive any right or remedy under this Fourth Addendum or any other loan documents, including, but not limited to the Stock Loan Agreements and any and all other executed Addendums, without notice to or consent from either the Borrower or Guarantor, and without incurring liability by doing so. Borrower and Guarantor agree and acknowledge that the execution of this Fourth Addendum by the Lender is not intended nor shall it be construed as (a) an actual or implied waiver of any default under this Fourth Addendum or any other loan documents, including, but not limited to the Stock Loan Agreements and any and all other executed Addendums, or (b) an actual or implied waiver of any condition or obligation imposed on Borrower and Guarantor pursuant to this Fourth Addendum or any other loan documents, including, but not limited to the Stock Loan Agreements and any and all other executed Addendums, except to the extent, if any, specified herein. The Borrower and Guarantor shall be jointly and severally liable hereunder and under each of the loan documents, including, but not limited to the Stock Loan Agreement and all subsequent Addendums, to which it is a party with respect to all obligations. None of the undertakings, agreements, covenants, and representations of Borrower contained in this Addendum or the Stock Loan Agreements, and subsequent addendums, and no Event of Default by Borrower under this Fourth Addendum and no defaults by Borrower under any of the other Loan

Documents, including, but not limited to the Stock Loan Agreements and Addendums, shall be deemed to have been suspended or waived by Lender, unless such suspension or waiver is by an instrument in writing signed by an officer of Lender and directed to Borrower and Guarantor specifying such suspension or waiver. The Lender hereby reserves all rights, remedies, and privileges granted to it by the Stock Loan Agreements and subsequent Addendums. Whenever the consent of Lender is required under this Fourth Addendum, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of the Lender.

## XII.   TIME OF ESSENCE

The Parties hereto acknowledge and agree that time is strictly of the essence with respect to the terms, conditions and provisions hereof, and that the failure to timely perform any of the obligations hereunder shall constitute a breach of, and a default under, this Fourth Addendum by the Party so failing to do so.

## XIII.   ASSIGNMENT

This Addendum, its equities, and obligations shall be freely transferrable or assignable in whole or in part as the Parties may see fit or as may be in their best interest. Any transfer or assignment action by any Party shall be followed up by written notice to the other Parties.

## XIV.   ENTIRE AGREEMENT

This Fourth Addendum incorporated along with the Third SLA and the executed Addendums constitutes the entire agreement and there are no oral or other representations regarding the subject of this agreement that are binding on either Party. All changes to this Fourth Addendum, or the Third SLA and any and all executed Addendums, must be in writing, signed by both Parties. It is understood and agreed that email correspondence shall not constitute "a writing" to this agreement unless expressly included herein.


IN WITNESS WHEREOF, the Parties hereto after consultations with their respective attorneys have caused this Fourth Addendum to the Third SLA to be duly executed as of the day and year written below.

[REST OF PAGE LEFT INTENTIONALLY BLANK]

Astor Asset Management 3 Ltd

Mariia Mitsa

Print Name of Signatory

Managing Member

Title of Signatory

July 19 2022

Date

Corporacion RBS SA de CV

Ricardo Salinas Pliego
Print Name of Signatory

Title of Signatory

July 19, 2022
Date

Ricardo Benjamin Salinas Pliego

Ricardo Salinas Pliego
Print Name of Signatory

Title of Signatory

July 19, 2022
Date

# EXHIBIT 17

June 10, 2024

**WEISER GLOBAL CAPITAL MARKETS**

*Private and Confidential*

Re: <u>Grupo Elektra, S.A.B. de C.V.</u>
Account: 200-804764

Ladies and gentlemen,

By this mean and in view of our existing transactions, you hold (directly or indirectly through any brokers and custodians) a significant interest in the shares of Grupo Elektra SAB de CV with Ticker Symbol: ELEKTRA* ("ELEKTRA*" or the "Shares").

We hereby request that you inform us of any recent trades of ELEKTRA* shares carried out by you, your brokers, custodians and sub-custodians relating to our transactions, as well as your and their current shareholding in ELEKTRA*.

We also understand that according to the contract We have celebrated with the financial institution you represent, it is forbidden for you to carry out trades, loan of Shares or any temporal or permanent transfer of such Shares.

For all the above mentioned, we formally require you to:

1. Confirm the number of Shares held in the Contract as of the Date of this Letter and provide with proper evidence of the said position. If the Shares are held by custodians and/or sub-custodians, please provide evidence of the number of Shares held by each of them.

2. Confirm that according to the contract it is expressly forbidden for WEISER GLOBAL CAPITAL MARKETS to carry out trades, loan of Shares or any temporal or permanent transfer of the Shares (the "Restrictions"). If the Shares are held by custodians and/or sub-custodians, please inform us if the Restrictions are also applicable to them.

3. Cease and desist from carrying out any trades, specially the lending of ELEKTRA* Shares or any other temporal or permanent transfer of the Shares because of the Restrictions and because they are against the spirit of our transactions,

4. Confirm, notify and require your custodians and sub-custodians my concern / requirement in numerals 1, 2 and 3 of this letter.

5. Confirm that you, your custodians and/or sub-custodians will not conduct any trades, transfer or lending of ELEKTRA* Shares, except as permitted by our Contract, including in case of a Termination Event or an Event of Default thereunder.

Any trades or lending of ELEKTRA* Shares in violation of the foregoing, will cause us irreparable damages and we will exercise all our rights and remedies under applicable law to protect our interest and recover all possible damages.

The intention of this letter is to prevent damages that the sale, loan or transfer of the Shares could cause us.

This communication does not constitute a novation of our agreements and we reserve all our rights to enforce them.

Sincerely,

RICARDO B. SALINAS PLIEGO

# EXHIBIT 18

**June 10, 2024**

**TAVIRA MONACO SAM**

*Private and Confidential*

Re: <u>Grupo Elektra, S.A.B. de C.V.</u>
Account: **TMC63**

Ladies and gentlemen,

By this mean and in view of our existing transactions, you hold (directly or indirectly through any brokers and custodians) a significant interest in the shares of Grupo Elektra SAB de CV with Ticker Symbol: ELEKTRA* ("ELEKTRA*" or the "Shares").

We hereby request that you inform us of any recent trades of ELEKTRA* shares carried out by you, your brokers, custodians and sub-custodians relating to our transactions, as well as your and their current shareholding in ELEKTRA*.

We also understand that according to the contract We have celebrated with the financial institution you represent, it is forbidden for you to carry out trades, loan of Shares or any temporal or permanent transfer of such Shares.

For all the above mentioned, we formally require you to:

1. Confirm the number of Shares held in the Contract as of the Date of this Letter and provide with proper evidence of the said position. If the Shares are held by custodians and/or sub-custodians, please provide evidence of the number of Shares held by each of them.

2. Confirm that according to the contract it is expressly forbidden for TAVIRA MONACO SAM to carry out trades, loan of Shares or any temporal or permanent transfer of the Shares (the "Restrictions"). If the Shares are held by custodians and/or sub-custodians, please inform us if the Restrictions are also applicable to them.

3. Cease and desist from carrying out any trades, specially the lending of ELEKTRA* Shares or any other temporal or permanent transfer of the Shares because of the Restrictions and because they are against the spirit of our transactions,

4. Confirm, notify and require your custodians and sub-custodians my concern / requirement in numerals 1, 2 and 3 of this letter.

5. Confirm that you, your custodians and/or sub-custodians will not conduct any trades, transfer or lending of ELEKTRA* Shares, except as permitted by our Contract, including in case of a Termination Event or an Event of Default thereunder.

Any trades or lending of ELEKTRA* Shares in violation of the foregoing, will cause us irreparable damages and we will exercise all our rights and remedies under applicable law to protect our interest and recover all possible damages.

The intention of this letter is to prevent damages that the sale, loan or transfer of the Shares could cause us.

This communication does not constitute a novation of our agreements and we reserve all our rights to enforce them.


Sincerely,


_____

RICARDO B. SALINAS PLIEGO

June 10, 2024

**TAVIRA MONACO SAM**

*Private and Confidential*

Re: <u>Grupo Elektra, S.A.B. de C.V.</u>
Account: **TMC64**

Ladies and gentlemen,

By this mean and in view of our existing transactions, you hold (directly or indirectly through any brokers and custodians) a significant interest in the shares of Grupo Elektra SAB de CV with Ticker Symbol: ELEKTRA* ("ELEKTRA*" or the "Shares").

We hereby request that you inform us of any recent trades of ELEKTRA* shares carried out by you, your brokers, custodians and sub-custodians relating to our transactions, as well as your and their current shareholding in ELEKTRA*.

We also understand that according to the contract We have celebrated with the financial institution you represent, it is forbidden for you to carry out trades, loan of Shares or any temporal or permanent transfer of such Shares.

For all the above mentioned, we formally require you to:

1. Confirm the number of Shares held in the Contract as of the Date of this Letter and provide with proper evidence of the said position. If the Shares are held by custodians and/or sub-custodians, please provide evidence of the number of Shares held by each of them.

2. Confirm that according to the contract it is expressly forbidden for TAVIRA MONACO SAM to carry out trades, loan of Shares or any temporal or permanent transfer of the Shares (the "Restrictions"). If the Shares are held by custodians and/or sub-custodians, please inform us if the Restrictions are also applicable to them.

3. Cease and desist from carrying out any trades, specially the lending of ELEKTRA* Shares or any other temporal or permanent transfer of the Shares because of the Restrictions and because they are against the spirit of our transactions,

4. Confirm, notify and require your custodians and sub-custodians my concern / requirement in numerals 1, 2 and 3 of this letter.

5. Confirm that you, your custodians and/or sub-custodians will not conduct any trades, transfer or lending of ELEKTRA* Shares, except as permitted by our Contract, including in case of a Termination Event or an Event of Default thereunder.

Any trades or lending of ELEKTRA* Shares in violation of the foregoing, will cause us irreparable damages and we will exercise all our rights and remedies under applicable law to protect our interest and recover all possible damages.

The intention of this letter is to prevent damages that the sale, loan or transfer of the Shares could cause us.

This communication does not constitute a novation of our agreements and we reserve all our rights to enforce them.

Sincerely,

_____
CORPORACIÓN RBS SA DE CV
RICARDO B. SALINAS PLIEGO

# EXHIBIT 19

# ASTOR ASSET MANAGEMENT 3 LIMITED

June 12, 2024

Corporacion RBS SA de CV
Ave. Ferrocarril de Rio Frio 419 A99
Cuchilla del Moral 1
Iztapalapa
09319 Ciudad de Mexico
Mexico
Tel: 0052551720[0089]
egonzalez@gruposalinas.com.mx

Ricardo Benjamin Salinas Pleigo
Cristobal Colon 79 INT C
Mexico 09360
Tel: +5215530091016
egsalceda@gruposalinas.com.mx

**RE: Weiser Global Capital Markets & Tavira Monaco SAM**

To Whom It May Concern,

We trust you are well. We send this correspondence as it has come to our attention that on June 10, 2024, you sent letters to Weiser Global Capital Markets ("Weiser") and Tavira Monaco Sam ("Tavira") (collectively, the "Custodians") requesting information related to certain shares of Grupo Elektra SAB de CV (ELEKTRA) (the "Collateral" or "Shares") which you pledged as collateral pursuant to the Stock Loan Agreement dated July 14, 2021 (the "SLA") by and between Astor Asset Management 3 Limited (the "Lender") and Corporacion RBS SA de CV ("Borrower"). While we acknowledge that you have requested information related to the Shares, you are kindly reminded that your letters to the Custodians constitute interference which is prohibited by the SLA.

The Lender continues to fully comply with the SLA. The Shares are accessible to the capital market per the express and unequivocal terms of the SLA and standards established by capital markets. Therefore, for the reasons set forth herein, we respectfully request your continued cooperation and adherence to the SLA. As such, any future requests and/or comments should be relayed directly to the Lender.

Pursuant to the SLA, and as a condition to funding, you granted the Lender an Encumbrance and Lien over the Shares. Section IV.7 states as follows:

# ASTOR ASSET MANAGEMENT 3 LIMITED

*As of the date of this Agreement, the securities constituting the Pledged Collateral are owned by Guarantor free and clear of any Liens, Encumbrance or contractual, statutory, or regulatory limitation or restriction of whatever nature; are in good standing in accordance with their country of issue; and are freely tradeable and transferable securities and Guarantor hereby grants absolute first position Security Interest as a Lien and Encumbrance rights to Lender in exchange for Borrower receiving a Loan.*

Thus, throughout the loan term, you granted the Lender a first position Security Interest in the Shares. Security Interest is defined in Section I(51) of the SLA:

*Security Interest shall mean a Lien or Encumbrance granted by Guarantor to Lender in real property such as securities as Collateral for a Loan to Borrower. The Security Interest granted to Lender prevents the Guarantor from disposing or transferring the property or securities until such time as the Loan is repaid by Borrower to Lender and all Obligations of Borrower to Lender are discharged.*

Encumbrance is defined in Section I(21) of the SLA:

*Lender's legal claim on Pledged Collateral that affects the Borrower's ability to transfer ownership to anyone or to dispose of the Pledged Collateral without Lenders prior written authorization. For purposes of this definition, Encumbrance shall mean lien, mortgage, charge, hypothecation, rehypothecation, rights, barter, pawn, trade, dispose, deal-in, pledge, re-pledge, repo, borrow or transfer of security interest in Collateral. The Pledged Collateral will be restricted to Guarantor and Encumbrance rights exclusively granted to Lender.*

Thus, the SLA is express and clear that you granted the Lender the right to exercise its Encumbrance rights over the Shares during the loan term. Indeed, this is further supported by the definition of Lien which the SLA states is "*any Encumbrance of any kind referenced herein concerning the Pledged Collateral of Guarantor. A lien is the Lender's right to retain possession of property belonging to Guarantor until a debt owed by that Borrower is fully discharged per this Agreement.*" As such, the Lender is fully authorized to exercise its Encumbrance rights until such time that your debt is fully repaid in due course in accordance with the SLA.

The Lender's rights in the Shares are further defined in Section V.4, *Dealing with Securities*, of the SLA. Specifically, Section V.4(c) states that "*the Borrower acknowledges and agrees that the Pledged Collateral will be utilized by Lender to assert its preferential Lien over it.*" Therefore, the Lender has the right to deal-in the Shares to the extent that is defined within the meaning of Encumbrance. The Lender has, <u>at all times,</u> fully complied with and adhered to the language within the SLA.

Moreover, Section X, *Required Disclosures*, states, in part, that:

# ASTOR ASSET MANAGEMENT 3 LIMITED

*During the Loan Term, all benefits and proceeds of the Pledged Collateral inure to Lender. Lender reserves the right to maintain dominion over the Collateral during the Loan Term, which affords Lender the right to deal-in, dispose, or convert over the Pledged Collateral.*

Therefore, by executing the SLA, you repeatedly re-affirmed the Lender's dominion and Encumbrance over the Collateral.

Finally, and notably, we remind you that this is a Hybrid Loan, meaning that the loan was structured as both an Investment and a Loan. Investment is defined in Section I(28) of the SLA, and states that "*this Loan may be construed as a speculative Investment. Borrower and Guarantor being considered a sophisticated professional investors, and both being aware of all risks associated with making a major Investment where the outcome is unpredictable.*"

Therefore, we respectfully request your continued cooperation and adherence to the SLA. We again remind you that interference, such as your recent request to the Custodians, constitutes a breach of the SLA as Section IV.10 states, in part, that "*During the pendency of this Loan, neither the Borrower nor the Guarantor will seek injunctive relief or interference from any court of law, regulatory body, Transfer Agent, custodian, sub-custodian, Depository Broker, central depository or stock exchange requesting to invalidate, suspend, limit, impede, terminate or restrict this Agreement or freeze the shares.*"

You were funded the sum 2,154,218,552.55 MXN and under no circumstance may you infringe or interfere in any way on the Collateral.

We trust this correspondence has been helpful and informative and appreciate your prompt attention thereto. We look forward to a continued successful business relationship and we hope to provide additional financing to you in the future. Should you have any questions, please do not hesitate to contact us. We reserve all of our rights.

Sincerely,

ASTOR ASSET MANAGEMENT 3 LTD

**EXHIBIT 20**

**From:** Astor Operations
**To:** javier.gayo@fininvesta.com; Eduardo Gonzalez Salceda Sanchez; rsalinas@gruposakinas.com.mx; Alex Torti
**Subject:** ELEKTRA
**Date:** 13 June 2024 13:26:21
**Attachments:** Astor - Elektra Interference Letters - June 11 2024.pdf

Dear interested parties,

Please see attached.

Regards,
Operations
AstorAssetGroup.com



Please note that while we do our best to respond all inquiries within 24-48 hours, a reply in some instances may take longer.

This e-mail, including attachments, is intended for the person(s) or company named and may contain confidential and/or legally privileged information. Unauthorised disclosure, copying or use of this information may be unlawful and is prohibited. If you are not the intended recipient, please delete this message immediately and notify the sender.

# EXHIBIT 21

Query    Reports    Utilities    Help    Log Out

CLOSED

# U.S. District Court
## Western District of Pennsylvania (Pittsburgh)
## CRIMINAL DOCKET FOR CASE #: 2:97-cr-00176-DJL-1

Case title: USA v. SKLAROV, et al

Date Filed: 10/31/1997

Date Terminated: 01/16/1998

---

Assigned to: Judge Donald J. Lee

**Defendant (1)**

**VLADIMIR SKLAROV**
*TERMINATED: 01/16/1998*

represented by **James A. Bruton , III**
Williams & Connolly
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000
*TERMINATED: 01/16/1998*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
Designation: Retained

**Kevin M. Downey**
Williams & Connolly
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000
*TERMINATED: 01/16/1998*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
Designation: Retained

**Pending Counts**

18:371 CONSPIRACY
(1)

**Disposition**

12 Months and 1 Day Imprisonment. 3
Years Supervised Release with conditions in
said sentence and Standard Conditions of
Release. $500,000.00 Fine. $50.00 Special
Assessment.

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**

None

**Disposition**

## Highest Offense Level (Terminated)

None

## Complaints                                                                    Disposition

None

---

## Plaintiff

**UNITED STATES OF AMERICA**          represented by   **Nelson P. Cohen**
United States Attorney's Office
700 Grant Street
Suite 4000
Pittsburgh, PA 15219
(412) 894 7336
Email: nelson.cohen@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/31/1997 | 1 | INFORMATION as to VLADIMIR SKLAROV (1) count(s) 1 (plh) (Entered: 11/03/1997) |
| 10/31/1997 | 2 | Information Memorandum as to VLADIMIR SKLAROV (plh) (Entered: 11/03/1997) |
| 10/31/1997 |  | Initial appearance as to VLADIMIR SKLAROV held on 10/31/97 before Judge Donald J. Lee [Reporter: none] (Defendant informed of rights.) (plh) (Entered: 11/03/1997) |
| 10/31/1997 | 3 | WAIVER OF INDICTMENT by VLADIMIR SKLAROV (plh) (Entered: 11/03/1997) |
| 10/31/1997 | 4 | WAIVER Plea Hearing held on 10/31/97 as to VLADIMIR SKLAROV before Judge Donald J. Lee [Reporter: Virginia Pease]; Plea Agreement (plh) (Entered: 11/03/1997) |
| 10/31/1997 |  | Special Assessment paid by defendant VLADIMIR SKLAROV in the amount of $ 50.00 (plh) (Entered: 11/03/1997) |
| 10/31/1997 |  | PLEA of Guilty: VLADIMIR SKLAROV (1) count(s) 1 on 10/31/97 before Judge Donald J. Lee ( with 1) (plh) (Entered: 11/17/1997) |
| 11/03/1997 | 5 | Sentencing Hearing set for 11:00 1/16/98 for VLADIMIR SKLAROV before Judge Donald J. Lee VLADIMIR SKLAROV (1) count(s) 1 (plh) (Entered: 11/03/1997) |
| 11/17/1997 | 6 | MOTION by VLADIMIR SKLAROV for Modification of the Conditions of Release with Proposed Order. (plh) (Entered: 11/17/1997) |
| 11/18/1997 |  | ORDER upon motion granting [6-1] motion for Modification of the Conditions of Release as to VLADIMIR SKLAROV (1) as stated more fully in order. (signed by Judge Donald J. Lee on 11/17/97) CM all parties of record. (plh) (Entered: 11/18/1997) |
| 12/19/1997 | 10 | Position by USA with respect to sentencing factors as to VLADIMIR SKLAROV (crw) (Entered: 12/19/1997) |
| 12/29/1997 | 11 | OBJECTION by VLADIMIR SKLAROV to Presentence Investigation Report as to VLADIMIR SKLAROV (plh) (Entered: 12/29/1997) |

| 01/15/1998 | 12 | TENTATIVE FINDINGS as to VLADIMIR SKLAROV. (signed by Judge Donald J. Lee on 1/15/98) CM all parties of record. (plh) (Entered: 01/16/1998) |
| 01/16/1998 | 13 | Sentencing Hearing held on 1/16/98 before Judge Donald J. Lee [Reporter: Virginia Pease] re: VLADIMIR SKLAROV (1) count(s) 1 with Deft's Exhibit attached (plh) (Entered: 01/16/1998) |
| 01/16/1998 | 14 | JUDGMENT as to VLADIMIR SKLAROV (1) count(s) 1. 12 Months and 1 Day Imprisonment. 3 Years Supervised Release with conditions in said sentence and Standard Conditions of Release. $500,000.00 Fine. $50.00 Special Assessment. (signed by Judge Donald J. Lee on 1/16/98) (Copy of Statement of Reasons to Bureau of Prisons) (tt) (Entered: 01/20/1998) |
| 07/21/1998 | 15 | Satisfaction of Judgment as to Fine, Special Assessment by VLADIMIR SKLAROV (plh) (Entered: 07/21/1998) |
| 07/08/1999 | 17 | MOTION by VLADIMIR SKLAROV for Foreign Travel with Proposed Order. (ces) (Entered: 07/08/1999) |
| 07/09/1999 | | ORDER upon motion granting [17-1] motion for Foreign Travel as to VLADIMIR SKLAROV (1); deft is authorzed to travel to Paris, France and surrounding European location during the period 7/19/99 thru 8/5/99 under terms and conditions to be set by his supervising probation officer at the U.S. probation Office for the Northern District of Illinois. (signed by Donald J. Lee on 7/9/99) CM all parties of record. (plh) (Entered: 07/09/1999) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 08/15/2024 13:24:22 | | |
| **PACER Login:** | nmrs0003 | **Client Code:** | 085167/01500-EV1 |
| **Description:** | Docket Report | **Search Criteria:** | 2:97-cr-00176-DJL |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

# EXHIBIT 22

Eric J. Shimanoff (ejs@cll.com)
Joelle A. Milov (jam@cll.com)
COWAN, LIEBOWITZ & LATMAN, P.C.
114 West 47th Street
New York, New York 10036
(212) 790-9200
*Attorneys for Plaintiffs Barclays PLC and Barclays Capital Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

BARCLAYS PLC and BARCLAYS CAPITAL INC. :     Civil Action No. 20-cv-8437

                      :

          Plaintiffs, :     **<u>COMPLAINT</u>**

    -against- :

                      :     **JURY TRIAL DEMANDED**

VLADIMIR "VAL" SKLAROV, individually and dba "SHEARSON LEHMAN BROTHERS," "SHEARSON LEHMAN," "LEHMAN BROTHERS," "SHEARSON LEHMAN BROTHERS INVESTMENT BANKING" and "SHEARSON LEHMAN INVESTMENT BANKING"; OSMAN QUREISHI, individually and dba "SHEARSON LEHMAN BROTHERS," "SHEARSON LEHMAN," "LEHMAN BROTHERS," "SHEARSON LEHMAN BROTHERS INVESTMENT BANKING" and "SHEARSON LEHMAN INVESTMENT BANKING"; BLACK ROCK CAPITAL LLC; NEWBURGH CAPITAL LTD.; LINCOLN CAPITAL LTD.; JAITEGH "JT" SINGH; JOHN DOES 1-10; and XYZ CORPORATIONS 1-10,

          Defendants.

-------------------------------------------------------------- x

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................................1

NATURE OF THE ACTION ...............................................................................................10

THE PARTIES.......................................................................................................................10

JURISDICTION AND VENUE ...........................................................................................13

FACTS ....................................................................................................................................14

    Lehman Brothers' Long Use of  the LEHMAN Names and Marks ........................................14

    Barclays' Use of the LEHMAN Names and Marks.................................................................21

    The LEHMAN Names and Marks Have Long Been and Still Are Famous ...........................24

    Barclays' Protection of the LEHMAN Names and Marks ......................................................30

    Defendant Sklarov's History of Criminal and Alleged Civil Fraud .......................................34

    The *Rothschild* Trademark Injunction against Sklarov and Black Rock ................................38

    Defendants' Unlawful Use of the LEHMAN Names and Marks ............................................43

    Defendants' Unlawful Registration of the  Infringing Names and Marks...............................56

    Defendants' Other Unlawful Acts that Seek to Create False Connections with
    Famous Financial Services Names and Brands ...................................................................63

    Defendants Have Refused to Stop their Unlawful Activities ..................................................68

CAUSES OF ACTION...........................................................................................................71

Plaintiffs Barclays PLC and Barclays Capital Inc. (collectively, "Plaintiffs"), by and through their undersigned counsel, as and for their Complaint against Vladimir "Val" Sklarov, individually and dba "Shearson Lehman Brothers," "Shearson Lehman," "Lehman Brothers," "Shearson Lehman Brothers Investment Banking" and "Shearson Lehman Investment Banking," Osman Qureishi, individually and dba "Shearson Lehman Brothers," "Shearson Lehman," "Lehman Brothers," "Shearson Lehman Brothers Investment Banking" and "Shearson Lehman Investment Banking," Black Rock Capital LLC, Newburgh Capital Ltd., Lincoln Capital Ltd., Jaitegh "JT" Singh and John Does 1-10 and XYZ Corporations (collectively, "Defendants"), allege as follows:

## INTRODUCTION

1. Lehman Brothers is one of the most famous firms and names associated with financial services.

2. Operating continuously for nearly 170 years under company names, domain names and trademarks containing or comprising LEHMAN, including at times LEHMAN BROTHERS and SHEARSON LEHMAN BROTHERS (collectively, the "LEHMAN Names and Marks"), Lehman Brothers was the nation's fourth largest investment bank with hundreds of billions of dollars' worth of assets when it filed for the largest bankruptcy in U.S. history in 2008.

3. As part of the bankruptcy, Barclays purchased many of Lehman Brothers' assets, including the LEHMAN Names and Marks, which Barclays then licensed back to Lehman Brothers for use in connection with the firm's continuing business and operations.

4. Since 2008, Lehman Brothers has continued to engage with clients, existing counterparties, market participants, creditors, employees and numerous others, all under the LEHMAN Names and Marks. Lehman Brothers' activities over the past 12 years have included

investing in, managing and selling its sizable real estate, equity, debt and other assets, settling its vast portfolio of derivative swaps, managing and reporting on its bankruptcy plan and maintaining and defending numerous litigations.

5.     While the LEHMAN Names and Marks had become household names prior to 2008, Lehman Brothers' financial troubles and bankruptcy in 2008 made the LEHMAN Names and Marks some of the most ubiquitous monikers thereafter.  Each and every detail of Lehman Brothers' pre-financial crisis activities, financial troubles, bankruptcy and subsequent business activities has been widely publicized in the press and reflected in popular culture, including as the subject of two recent Academy-award winning films and a recent Broadway play.

6.     Myriad articles concerning Lehman Brothers' continuing business operations and financial dealings since 2008 have consistently appeared in widely disseminated, major publications across the country.  One such article from *Bloomberg BusinessWeek* entitled "Welcome to Lehman Brothers. We're Open for Business" reported that Lehman Brothers "is an operating company" that "still controls tens of billions in assets" and "its lawyers and traders will gladly take your business."

7.     Public recognition of the LEHMAN Names and Marks in connection with financial services is just as strong today as it was at the time of Lehman Brothers' bankruptcy.

8.     Given this strong consumer recognition, several third parties have attempted to misappropriate the LEHMAN Names and Marks as their own and cause consumer confusion. Barclays thus has vigorously protected the LEHMAN Names and Marks against misuse by third parties worldwide.

9.      In one such recent action where a third party sought to register the mark LEHMAN BROTHERS in connection with its own goods and services, the United States Patent and Trademark Office rejected the application based on Barclays' prior rights, finding:

> Barclays has common law rights in the LEHMAN BROTHERS trademark and tradename [which are] still being used [pursuant to license] in connection with activities pertaining to winding down [Lehman Brothers] . . . . Moreover, in view of the well-known reputation established in LEHMAN BROTHERS by Barclays' predecessor, the more likely a sufficient residual goodwill remains in the LEHMAN BROTHERS trademark, especially when Barclays' acts have not been of such character as to cause the mark to lose its significance as an indication of origin. In view of the foregoing, we find that LEHMAN BROTHERS continues to function as a mark for Barclays.

10.      Intentionally seeking to take a free ride on the consumer recognition in the LEHMAN Names and Marks and to pass themselves off as the legitimate Lehman Brothers, Defendants have engaged in a scheme to mislead and to deceive consumers by purporting to offer financial services under names and marks containing or comprising "Lehman Brothers" and/or "Shearson Lehman" (collectively, the "Infringing Names and Marks").

11.      The Infringing Names and Marks misappropriated by Defendants include "Lehman Brothers," "Shearson Lehman Brothers," "Shearson Lehman," "Shearson Lehman Brothers Investment Banking," "Shearson Lehman Investment Banking" and <shearsonlehmanbrothers.com>.

12.      Defendants frequently present the Infringing Names and Marks in a font long used by the legitimate Lehman Brothers and in a stylization identical to that used and registered by Lehman Brothers when it was known as SHEARSON LEHMAN BROTHERS, including as shown below:









13.     Defendants have used the Infringing Names and Marks in connection with purported financial services, including securities-backed loans, *inter alia* on a website located at www.shearsonlehmanbrothers.com, in email and oral communications, in marketing and recruiting flyers and in press releases, including as shown below:















14.     To further deceive consumers and create a false connection with the legitimate Lehman Brothers, Defendants represent numerous times in various media that they are a "Lehman Brothers company," claim as their current address the former New York offices of Lehman Brothers and use language that would be associated with or would describe the legitimate Lehman Brothers and its long history of offering financial services, including: "We have managed billions of dollars of client assets . . . for more than 100 years" and "We invented investment banking."

15.     Although Defendants use some of the Infringing Names and Marks in connection with some aspect of their fraudulent scheme, and other Infringing Names and Marks in connection with other aspects of their fraudulent scheme, often inconsistently, for ease of reference, Plaintiffs shall refer herein to Defendants' purported companies simply as the "Fake 'Shearson Lehman Brothers.'"

16.     Defendant Vladimir "Val" Sklarov is a convicted felon for Medicare fraud.  A federal Court recently enjoined Sklarov against impersonating the famous financial services firm Rothschild & Co.  Several other third parties have sued Sklarov for fraud in connection with unlawfully and prematurely selling borrowers' public shares pledged as collateral for securities-backed loans that Sklarov never provided to the borrowers.  Sklarov is the apparent "ring-leader" of the fraudulent scheme to impersonate Lehman Brothers and has directed and controlled most if not all of the unlawful actions described herein.  Upon information and belied, Sklarov typically engages in his unlawful actions through one or more "shell" companies that he controls and directs, including Defendants Black Rock Capital LLC, Newburgh Capital Ltd., Lincoln Capital Ltd. Sklarov has used these shell companies here in an unlawful attempt to officially register as trademarks several of the Infringing Names and Marks, including in the U.S.

-7-

17.     Defendant Osman Qureishi, who previously worked for Sklarov at "America 2030," one of Sklarov's companies sued numerous times for fraud, is the "Senior Executive Vice President, Wealth Management" and the public face of Defendants' Fake "Shearson Lehman Brothers."  Qureishi responds to inquiries to the Fake "Shearson Lehman Brothers" including via the website at www.shearsonlehmanbrothers.com.  Qureishi also recruits potential brokers, agents and borrowers, and creates and distributes marketing materials, press releases and agreements for, the Fake "Shearson Lehman Brothers."

18.     Defendant Jaitegh "JT" Singh for many years has served as attorney for Sklarov and the companies he controls, including in defense of numerous litigations alleging fraud, and has represented himself as an officer of one or more of the corporate defendants.  Ostensibly to assist Sklarov and Qureishi in their impersonation of Lehman Brothers and in an attempt to provide an air of legitimacy to the Fake "Shearson Lehman Brothers," Singh filed trademark applications for the Infringing Names and Marks, knowing that Defendants were not entitled to register or use such names and marks and that the use and registration of such names and marks would cause consumers to mistakenly believe that Defendants were affiliated or associated with the legitimate Lehman Brothers.

19.     On behalf of Sklarov and his shell companies, Singh also filed trademark applications for myriad other trademarks containing or comprising famous names and marks associated with financial services, with which Defendants clearly have no affiliation or association, including: Credit Suisse First Boston; Samuel Walton Capital; UBS Paine Webber; Price Waterhouse Coopers; Arthur Andersen; John D. Rockefeller; Andrew Carnegie; Bear Stearns; George Soros Capital; Warren Buffet Capital; Dean Witter Reynolds and Salomon Smith Barney.

20.     Not surprisingly, the United States Patent and Trademark Office rejected each and every one of these trademark applications filed by Singh on behalf of Sklarov, finding the marks therein would deceive consumers and falsely suggest connections with unaffiliated third parties, including Lehman Brothers and Barclays.

21.     Not satisfied with merely impersonating Rothschild & Co and Lehman Brothers, Sklarov apparently is involved in a similar scheme to defraud consumers by impersonating the former financial services firm Bear Stearns, including by purporting to offer financial services under a logo that is identical to that long used by the legitimate firm:



22.     Despite numerous demands by Barclays, Defendants have refused to cease and desist from their unlawful activities.  Instead, with full knowledge of Barclays' rights in the LEHMAN Names and Marks, and Barclays' trademark and related claims, Defendants have actually increased their unlawful activities and doubled down on their efforts to deceive consumers and to pass themselves off as affiliated with the legitimate Lehman Brothers.

23.     Given Sklarov's history of criminal and civil fraud lawsuits and Defendants' blatant disregard for the intellectual property rights of third parties, consumers and the public at large are at a significant risk not only of likely confusion that Defendants are associated or affiliated with Lehman Brothers, but also that they will be defrauded by Defendants in their purported financial dealings.  As such, Defendants' unlawful actions must be stopped.

28827/162/3557472

## NATURE OF THE ACTION

24.     This is an action for false designation of origin, cybersquatting and trademark dilution under the Lanham Act of 1946, as amended, 15 U.S.C. § 1501 *et seq*. (the "Lanham Act") and trademark dilution, deceptive trade practices and unfair competition under the laws of the state of New York.

## THE PARTIES

25.     Plaintiff Barclays PLC is a public limited company organized and existing under the laws of England and Wales with offices at 1 Churchill Place, Canary Wharf, London E14 5HP, United Kingdom.

26.     Plaintiff Barclays Capital Inc. is a corporation organized and existing under the laws of the state of Connecticut with offices located at 745 Seventh Avenue, New York, New York 10019.

27.     Upon information and belief, Defendant Vladimir "Val" Sklarov ("Sklarov") is an individual currently residing in the state of Florida.  Upon information and belief, Sklarov is doing business under the names "Shearson Lehman Brothers," "Shearson Lehman," "Lehman Brothers," "Shearson Lehman Brothers Investment Banking" and "Shearson Lehman Investment Banking," including in the United States and in New York, New York, with a claimed address at 200 Vesey Street, New York, New York 10281.  Upon information and belief, Sklarov has directed, controlled, ratified, participated in, and/or was the moving force behind all the infringing and unlawful acts and activities alleged herein, and is therefore personally liable for such acts.

28.     Upon information and belief, Defendant Osman Qureishi ("Qureishi") is an individual currently residing in Texas.  Upon information and belief, Qureishi is doing business under the names "Shearson Lehman Brothers," "Shearson Lehman," "Lehman Brothers" and

-10-

"Shearson Lehman Investment Banking," including in the United States and in New York, New York, with a claimed address at 200 Vesey Street, New York, New York 10281.

29.     Upon information and belief, Defendant Black Rock Capital LLC ("Black Rock") is a limited liability company organized and existing under the laws of the Bahamas with an address at Old Fort #4 - Western Road, SP-63 771 Nassau, New Providence Bahamas.

30.     Upon information and belief, Defendant Newburgh Capital Ltd. ("Newburgh") is a limited company organized and existing under the laws of Belize with an address at New Horizon Building, Ground Floor, 3 ½ Miles Philip S.W. Goldson Highway, Belize City, Belize.

31.     Upon information and belief, Defendant Lincoln Capital Ltd. ("Lincoln") is a limited company organized and existing under the laws of Belize with an address at New Horizon Building, Ground Floor, 3 ½ Miles Philip S.W. Goldson Highway, Belize City, Belize.

32.     Upon information and belief, Black Rock, Newburgh and Lincoln are "shell" companies formed at the direction of and controlled by Sklarov as vehicles to perpetuate many of the infringing, deceptive and unlawful acts set forth herein.  Upon information and belief, Sklarov exercises dominion and control over Black Rock, Newburgh and Lincoln, and disregards the separateness of those legal entities to such an extent that these entities are used by Sklarov as a mere instrumentality for Sklarov to perpetrate his unlawful and deceptive schemes, as described below, and to evade liability for his acts.  Upon information and belief, all acts undertaken through Black Rock, Newburgh and Lincoln, including the infringing and wrongful acts alleged herein, were directed by Sklarov.  As such, the Court should disregard the independent existence of those entities, rendering such entities subject to this Court's personal jurisdiction if they are not otherwise subject thereto, and rendering Sklarov personally liable for acts purportedly undertaken through such corporate entities.

-11-

33.     Upon information and belief, Defendant Jaitegh "JT" Singh ("Singh") is an individual residing in the state of New York and an attorney licensed to practice in the state of New York with offices at 10 Grand Central, 155 E. 44th Street, 6th Floor, New York, New York 10017.  Upon information and belief, Singh materially contributed to, encouraged and actively participated in the other Defendants' unlawful acts and activities alleged herein, while specifically knowing such actions violated Barclays' intellectual property rights and were likely to deceive and confuse consumers, including by taking infringing actions as an officer of Black Rock, Lincoln and Newburgh and by continuing to facilitate and file infringing trademark application on behalf of the other Defendants, including Black Rock, Lincoln, Newburgh and Sklarov.

34.     Upon information and belief, Defendants John Does 1-10 are individuals who reside or do or transact business in this District, and have engaged and participated in, directly or contributorily, the unlawful acts set forth herein.  The true identities of Defendants John Does 1-10 are not presently known to Plaintiffs.  Plaintiffs will amend their complaint upon discovery of the identities of such Defendants.

35.     Upon information and belief, Defendants XYZ Corporations 1-10 are businesses that reside or do or transact business in this District, and have engaged and participated in, directly or contributorily, the unlawful acts set forth herein.  The true identities of Defendants XYZ Corporations 1-10 are not presently known to Plaintiffs.  Plaintiffs will amend their complaint upon discovery of the identities of such Defendants.

36.     Upon information and belief, Defendants, while engaging and participating in the unlawful acts set forth herein, were agents and collaborators of one another.  Indeed, as described herein, Defendants each knowingly and willfully materially contributed to a scheme to pass themselves off as affiliated or associated with the famous Lehman Brothers firm and the LEHMAN

-12-

Names and Marks and to mislead consumers about the source, affiliation and nature of their purported (and potentially fraudulent) financial services.

## JURISDICTION AND VENUE

37.     This Court has subject matter jurisdiction over the federal false designation of origin, trademark dilution and cybersquatting claims arising under the Lanham Act pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338.  The Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367.

38.     This Court has personal jurisdiction over Defendants pursuant to NY CPLR 301 because Defendants purport to do business and maintain offices in the state of New York, including in this District.  Moreover, upon information and belief, Defendant Singh resides in the state of New York, is a licensed attorney in New York and has offices in New York, including in this District.

39.     This Court has personal jurisdiction over Defendants pursuant to NY CPLR 302(a)(1) because Defendants purport to transact business in the state of New York, including in this District.

40.     This Court has personal jurisdiction over Defendants pursuant to NY CPLR 302(a)(2) because Defendants have committed torts of false designation of origin, unfair competition, trademark dilution, cybersquatting and deceptive trade practices within the state of New York, including in this District.

41.     This Court has personal jurisdiction over Defendants pursuant to NY CPLR 302(a)(3) because Defendants have committed torts of false designation of origin, unfair competition, trademark dilution, cybersquatting and deceptive trade practices without the state of New York, causing injury to Plaintiffs within the state of New York, including in this District.

-13-

Defendants also regularly do or solicit business in the state of New York, including in this District, have engaged in a persistent course of conduct within the state of New York, including in this District, should reasonably expect their tortious acts herein to have consequences in the state of New York, including in this District, and claim to derive substantial revenue from interstate or international commerce.

42.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) and (c).

## FACTS

### Lehman Brothers' Long Use of the LEHMAN Names and Marks

43.     Nearly 170 years before Defendants began their unlawful acts described herein, Lehman Brothers Holdings Inc. ("LBHI"), its present and former subsidiaries and affiliates, and/or each of their predecessors, licensees, assignors and assigns (collectively, "Lehman Brothers") began using the LEHMAN Names and Marks in connection with a wide variety of financial services, including investment banking, equity and fixed-income trading, credit and lending, research, investment management and private banking services.

44.     Founded by brothers Henry, Emmanuel and Mayer Lehman in 1850, Lehman Brothers became a member of the New York Stock Exchange in 1887 and underwrote its first public offering in 1889.

45.     Beginning many decades ago and continuing to the present, Lehman Brothers consistently and continuously has presented the LEHMAN Names and Marks in a serif font identical or similar to the font shown below:



(the "Lehman Font").

46.     During the mid-1980s through the mid-1990s, when Lehman Brothers was owned by American Express, the firm used and was referred to by names and marks containing or comprising SHEARSON LEHMAN, including SHEARSON LEHMAN and SHEARSON LEHMAN BROTHERS (collectively, the "SHEARSON LEHMAN Names and Marks"), including in the following stylizations:



These stylizations are referred to as the "Shearson Lehman Stylizations," and include the SHEARSON LEHMAN Names and Marks presented in an all caps version of the Lehman Font with the "S" at the beginning of "Shearson" dipping below the rest of the mark and a line underneath the mark.

47.     During this time, Lehman Brothers owned several federal trademark registrations for the SHEARSON LEHMAN Names and Marks, including in Shearson Lehman Stylizations, in connection with various financial services, including as follows:

| Mark | Registration No. | Services | Registration Date |
|---|---|---|---|
| SHEARSON LEHMAN BROTHERS | 1417691 | 36: securities brokerage, financial and investment consulting, and investment banking services | November 18, 1986 |
| SHEARSON LEHMAN BROTHERS | 1714151 | 36: securities brokerage, financial and investment consulting, and investment banking services | September 8, 1992 |

-15-

| | | | |
|---|---|---|---|
| SHEARSON LEHMAN BROTHERS | 1714152 | 36: securities brokerage, financial and investment consulting, and investment banking services | September 8, 1992 |
| SHEARSON LEHMAN HUTTON | 1534622 | 36: securities brokerage, financial and investment consulting, and investment banking services | April 11, 1989 |

48.     American Express spun off Lehman Brothers in or about 1994 and Lehman Brothers resumed operations under the name and mark LEHMAN BROTHERS, including in the Lehman Font.

49.     By 2008, Lehman Brothers had become the fourth largest investment bank in the United States, with hundreds of billions of dollars' worth of assets under management and over 25,000 employees in offices worldwide, including at its headquarters in a then recently-built thirty-two story office building located 745 Seventh Avenue, New York, New York 10019, which prominently displayed the LEHMAN Names and Marks, including as shown in the images below:

 

50.     Like other major financial firms that invested heavily in subprime mortgage backed securities, Lehman Brothers began experiencing financial difficulties in 2007.  Unable to satisfy its obligations, LBHI filed for Chapter 11 bankruptcy protection on September 15, 2008.  Several

LBHI subsidiaries and affiliates, including its brokerage subsidiary Lehman Brothers Inc. ("LBI"), filed for bankruptcy protection later in 2008 and in 2009.  The Lehman Brothers bankruptcy was and remains the largest bankruptcy in U.S. history.

51.     Plaintiff Barclays PLC (with its affiliates, including its ultimately wholly owned subsidiary Plaintiff Barclays Capital Inc., collectively, "Barclays") is one of the world's oldest and leading providers of financial and related services.  Founded over 300 years ago, Barclays operates in dozens of countries, including in the United States since 1932, and engages in a wide range of financial services, including commercial and corporate banking, retail banking, credit and lending, investment banking, research, private banking, cash management, credit and debit cards and mortgage banking.

52.     Pursuant to an asset purchase agreement dated September 16, 2008 (the "APA"), Barclays purchased several of Lehman Brothers' businesses and other assets for approximately $1.3 billion.  As part of the APA, Lehman Brothers assigned to Barclays all of Lehman Brothers' rights in the LEHMAN Names and Marks, including LEHMAN BROTHERS, all trademark applications and registrations therefor, and the goodwill associated therewith.

53.     Pursuant to the APA, as amended, Barclays granted Lehman Brothers a perpetual, worldwide, non-exclusive license to use the LEHMAN Names and Marks for any of Lehman Brothers' then-existing goods and services and in connection with Lehman Brothers' retained and continuing businesses and operations.  Under the APA, all goodwill and consumer recognition arising from Lehman Brothers' use of the LEHMAN Names and Marks inures to Barclays' benefit.

54.     Since 2008, Lehman Brothers continuously and consistently has maintained its operations and engaged in myriad financial and business activities and transactions, all under the LEHMAN Names and Marks.

55.  When Lehman Brothers filed for bankruptcy, the financial institution held hundreds of billions of dollars' worth of assets.

56.  Since 2008, Lehman Brothers has invested in, improved, maintained, managed and sold its sizable assets, including billions of dollars' worth of commercial real estate properties and securities.

57.  Since 2008, Lehman Brothers also has engaged in trades pursuant to, and is settling its vast portfolio of, derivative swap agreements and managed and reported its bankruptcy plan, in addition to its general corporate operations.

58.  Since 2008, Lehman also has maintained and sold its interests in various commercial loans and private equity investments.

59.  Since 2008, Lehman Brothers also has maintained and defended numerous litigations.

60.  Since 2008, Lehman Brothers has continued to engage with clients, existing counterparties, market participants, creditors, employees and numerous others in business and financial transactions.

61.  The LEHMAN Names and Marks, including LEHMAN BROTHERS, have surrounded every aspect of these dealings.

62.  LBHI has employed numerous employees over the past 12 years and has maintained corporate headquarters in various offices in New York City.

63.  Beginning in or about 2009 and continuing through in or about 2017, LBHI maintained offices in the Time & Life Building, 1271 Avenue of the Americas, New York, New York 10020.  These offices contained reception areas featuring prominent signage branded with the LEHMAN BROTHERS name and logo.

-18-



64.     When members of the public telephoned LBHI at these offices, the receptionist identified the company as LEHMAN BROTHERS HOLDINGS.

65.     In connection with its continuing business, LBHI's employees have utilized business cards, stationery and other forms and documents that contain the LEHMAN BROTHERS name and mark, including as shown below:

 

66.     LBHI employees also have utilized and continue to utilize email addresses that end with the domain name @lehmanholdings.com and have used the LEHMAN BROTHERS name and in their email signature blocks.

67.     Some employees at LBHI have worn uniforms branded with the LEHMAN BROTHERS name and logo.  LBHI employees also have carried and sometimes have worn security identification badges branded with the LEHMAN BROTHERS name and logo.

68.     When engaging in business and financial transactions since 2008, LBHI employees have represented themselves as such and frequently have utilized the LEHMAN Names and Marks, including LEHMAN BROTHERS, in both written and oral communications, contracts and other business materials.

69.     Since 2008, Lehman Brothers has maintained filings with various regulatory agencies and the states of New York and Delaware.

70.     Through a third-party vendor, Lehman Brothers maintains websites that prominently and frequently utilize the LEHMAN Names and Marks, including LEHMAN BROTHERS, and provide information about Lehman Brothers' business dealings, including the status of assets, derivative swap settlements, litigations, the bankruptcy proceedings and payments to creditors.    The websites are located at https://dm.epiq11.com/case/lehman/info and https://dm.epiq11.com/case/lehmantrustee/info.

71.     LBI owns and utilizes the domain name LEHMANTRUSTEE.COM, which resolves to the LBI bankruptcy website and has been used since 2008 in connection with numerous bankruptcy-related documents and communications.

72.     LBHI emerged from bankruptcy in 2012 and continues many of its above-described operations and financial and business activities and transactions today, with dozens of employees at offices at 277 Park Avenue, 46th Floor, New York, New York 10017.

73.     LBHI just signed a new multi-year lease for office space at 110 East 42nd Street, New York, New York 10017, to begin on or about November 1, 2020.

74.     All of the goodwill and consumer recognition derived from Lehman Brothers' continued use of the LEHMAN Names and Marks inures to Barclays, as the owner and licensor of the names and marks.

**Barclays' Use of the LEHMAN Names and Marks**

75.    Lehman Brothers is not the only entity that legitimately, continuously and consistently has used the LEHMAN Names and Marks since 2008.

76.    Since 2008, Barclays itself has used the LEHMAN Names and Marks in connection with its own financial services.

77.    Although Barclays rebranded most of the assets it acquired from Lehman Brothers, including the LEHMAN-branded indices, until about early-2010, Barclays continued to operate and provide clients with access to LEHMAN LIVE, an online portal offering research, analytics and other reports, guides and materials across a broad range of Barclays' financial divisions, including equities, commodities, securitization and indices.

78.    Since 2008, Barclays has maintained, utilized, offered and distributed to its clients and others in the financial industry legacy LEHMAN BROTHERS research, analytics and other reports, guides and materials, including the well-known *Guide to the Lehman Brothers Global Family of Indices*, a singular "super index primer" guide to all of the indices transferred from Lehman Brothers to Barclays.

  

79.    Since 2008, Barclays continuously has maintained: (a) until in or about 2020, a website at www.lehman.com, which provided information about and links to LBHI's bankruptcy

website and websites related to other transferred Lehman Brothers businesses; (b) the Market Participant Identifier (MPID) code LEHM, short for LEHMAN, in connection with executing broker trades regulated by the Financial Industry Regulatory Authority (FINRA); and (c) domain name registrations worldwide for the LEHMAN Names and Marks;

80.     Since 2008, Barclays continuously has maintained numerous trademark registrations worldwide for the LEHMAN Names and Marks, including in major jurisdictions such as the European Union, China, Brazil, Canada, Hong Kong, Japan, the United Kingdom, the United Aram Emirates and India.  Attached hereto as **Exhibit 1** is a list of Barclays' current trademark registrations and applications worldwide for the LEHMAN Names and Marks, most of which date back to the 1990s.

81.     In or about December 2015, Barclays agreed to sell to Bloomberg LP Barclays' bond indices business known as Barclays Risk Analytics and Index Solutions Ltd. (BRAIS), an asset Barclays mostly acquired from Lehman Brothers.  Pursuant to that agreement, Barclays maintained ownership of the LEHMAN Names and Marks and licensed such marks to Bloomberg for use in connection with the bond index business, including in connection with Bloomberg's own use and distribution of legacy LEHMAN BROTHERS research materials.

82.     Since Barclays' acquisition of the LEHMAN Names and Marks, at least one third party has approached Barclays seeking to license the LEHMAN BROTHERS mark.

83.     Lehman Brothers previously was the owner of two federal trademark registrations for the mark LEHMAN BROTHERS, including one in the Lehman Font, as shown below:

| Mark | Registration No. | Services | Registration Date |
|---|---|---|---|
| LEHMAN BROTHERS | 1717171 | 36: securities brokerage services; investment consulting services; investment banking services; and merchant banking services | September 15, 1992 |
| LEHMAN BROTHERS | 1755687 | 36: securities brokerage services; investment consulting services; investment banking services; and merchant banking services | March 02, 1993 |

(the "Prior LEHMAN BROTHERS Registrations").  Attached hereto as **Exhibit 2** are the official United States Patent and Trademark Office ("USPTO") status records for the Prior LEHMAN BROTHERS Registrations.  Barclays acquired the Prior LEHMAN BROTHERS Registrations in 2008 pursuant to the APA.

84.     Although the Prior LEHMAN BROTHERS Registrations lapsed due to oversight, on October 2, 2013, Barclays filed with the USPTO new Application Serial No. 86081143 to register the mark LEHMAN BROTHERS for "Securities brokerage services; investment consulting services; investment banking services; merchant banking services; financial and investment management services; financial planning and investment advisory services; financial research services; administration and valuation of financial investments; financial sponsorship of sporting, charitable and educational events; providing consultancy, information and advisory services relating to all the foregoing" in International Class 36 (the "New LEHMAN BROTHERS Application").

85.     Barclays overcame the USPTO's surname refusal under Section 2(e) of the Lanham Act, 15 U.S.C. § 1052(e), regarding the New LEHMAN BROTHERS Application, by establishing that the LEHMAN BROTHERS mark had significant acquired distinctiveness and consumer recognition as the source of financial services.

86.     The USPTO recently rejected a third-party challenge to the New LEHMAN BROTHERS Application and to Barclays' rights in the LEHMAN BROTHERS mark, finding:

> Barclays has common law rights in the LEHMAN BROTHERS trademark and tradename [which are] still being used [pursuant to license] in connection with activities pertaining to winding down [Lehman Brothers] . . . . Moreover, in view of the well-known reputation established in LEHMAN BROTHERS by Barclays' predecessor, the more likely a sufficient residual goodwill remains in the LEHMAN BROTHERS trademark, especially when Barclays' acts have not been of such character as to cause the mark to lose its significance as an indication of origin.  In view of the foregoing, we find that LEHMAN BROTHERS continues to function as a mark for Barclays.

Attached hereto as **Exhibit 3** is a copy of the USPTO's opinion.

**The LEHMAN Names and Marks Have Long Been and Still Are Famous**

87.     As a result of Leman Brothers' long-term, wide-spread and exclusive use and promotion of the LEHMAN Names and Marks in connection with a broad range of financial services, the LEHMAN Names and Marks had developed substantial public recognition among members of the consuming public and had become some of the most famous monikers among the general public in connection with financial services well prior to the early 2000s.

88.     Between 1850 and mid-2008, Lehman Brothers and its financial and other services offered under the LEHMAN Names and Marks were the subject of significant unsolicited media attention.  During this time period, various media organizations, including such prominent and widely circulated publications as *The New York Times* and *The Wall Street Journal*, published thousands of news articles about Lehman Brothers.  These articles detail numerous financial

services provided by Lehman Brothers under the LEHMAN Names and Marks.  Articles dating back as early as 1895 refer to Lehman Brothers as a "prominent" financial services firm.  A February 17, 1897 article from *The New York Times* referred to Lehman Brothers as "one of the wealthiest and best-known firms in the trade."  An August 3, 1913 article in *The New York Times* referred to Lehman Brothers as "one of New York's largest private banking firms."

89.    While the LEHMAN Names and Marks had been the subject of significant long-term and wide-spread media coverage during Lehman Brothers' first one-hundred and fifty-eight years of providing financial services, Lehman Brothers' financial troubles in 2007 through 2008, which culminated in its filing for the largest bankruptcy in U.S. history and selling much of its U.S. investment banking businesses to Barclays, exponentially heightened Lehman Brothers' presence in the media and recognition among consumers.

90.    During 2007-2008, a staggering number of news articles concerning Lehman Brothers and its services, financial difficulties, bankruptcy and asset sale to Barclays appeared in such highly-regarded and widely-circulated media outlets such as *The New York Times*, *The Wall Street Journal*, *The Washington Post*, *The Los Angeles Times* and *The Chicago Tribune*.  For significant periods of time, articles concerning Lehman Brothers and its financial services appeared on the front pages of these publications.

91.    Lehman Brothers' business operations, financial transactions, derivative swap deals, asset management and sales, payments to creditors, bankruptcy plans and reporting and litigations frequently have been reported in the media since 2008.  Thousands of articles concerning these topics have appeared in prominent and widely circulated media publications such as *The Wall Street Journal*, *The New York Times*, *The Washington Post*, *Bloomberg Businessweek*, *Fortune*, *CNN*, *The Los Angeles Times* and *The Chicago Tribune*.

-25-

92.     For example, a July 12, 2012 article in *Bloomberg Businessweek* reported:

> Today the offices of Lehman Brothers are tucked away on two floors in the Time & Life Building, half a block away, where about 430 workers labor to unwind derivatives trades and sell illiquid assets . . . . While Lehman Brothers' bankruptcy filing—the largest ever in the U.S.—froze credit markets and plunged the economy into the deepest slump since the Great Depression, it didn't kill the company.

Attached hereto as **Exhibit 4** is a copy of this article.

93.     On September 21, 2012, *Bloomberg BusinessWeek* published an article entitled "Welcome to Lehman Brothers. We're Open for Business," noting that Lehman Brothers "is an operating company" with "deals to do."  The article noted that Lehman Brothers "still controls tens of billions in assets, and if you would like to purchase any of it—a real estate property, say, or part of a private equity deal—its lawyers and traders will gladly take your business."  The article also described the conditions observed at Lehman Brothers' then New York offices:

> Lehman occupies one-and-a-half nondescript floors of the skyscraper, looking more or less like any other investment bank, minus some of the polish and most of the bustle.  Employees work in Excel spreadsheets on dual monitors.  Cubicles and offices are decorated with sports memorabilia, children's artwork, and the odd bit of gallows humor . . . . Private equity staffers, seen huddling in a conference room, have a portfolio of 200 investments to manage.  The real estate team tracks Lehman's $10 billion worth of properties around the world.  On Wednesday, Bloomberg reported that the company sold its interest in eight Texas office buildings.  In August, it filed papers to take its largest asset, the apartment building colossus Archstone, public.  The derivatives group works at unpacking a tangle of 8,000 contracts with 6,500 counterparties—a collection that once held a notional value of $39 trillion. The work is so complicated that at its peak, this was the bankrupt bank's largest division, with 250 employees.

Attached hereto as **Exhibit 5** is a copy of this article.

94.     On September 11, 2012, *The New York Times* published an article that begins:

> Lehman Brothers is having a great year.  The bank, which almost destroyed the global economy four years ago this week, recently emerged from bankruptcy, resolved a third of its debts and executed the largest U.S. real estate deal of the year.  Today, the company appears an awful lot like a normal investment bank.  Its trading floor — on one of the two floors Lehman occupies in the Time & Life Building in Midtown Manhattan — is filled with dozens of young people who stare at financial

-26-

graphs on Bloomberg terminals and talk in the hallways about the deals they're working on.

Attached hereto as **Exhibit 6** is a copy of this article.

95.     A September 16, 2013 article from *CNN Money* reported that "Lehman Brothers is still big," and similarly detailed Lehman Brothers' continued operations and business dealings. Attached hereto as **Exhibit 7** is a copy of this article.

96.     On September 30, 2014, *The New York Times* published an article on the front page of its Business section entitled "Revisiting the Lehman Brothers Bailout That Never Was," which chronicled Lehman Brothers' financial services, economic difficulties, bankruptcy and continued operations.  Attached hereto as **Exhibit 8** is a copy of this article.

97.     On September 18, 2015, *Fortune* published an article entitled "Here are the crazy stocks Lehman Brothers is still trading," which detailed Lehman Brothers' management and sales of significant equities holdings over the past years and also included a photo of Lehman Brothers' then New York headquarters.  Attached hereto as **Exhibit 9** is a copy of this article.

98.     Numerous articles about Lehman Brothers and its business and financial dealings still appear in many prominent and widely circulated media publications to this day.

99.     Millions of webpages reference Lehman Brothers and the LEHMAN Names and Marks, many of which webpages are devoted specifically to detailing Lehman Brothers' financial services, bankruptcy and history.  These webpages derive from popular websites such as those maintained by Wikipedia, Investopedia, Bloomberg and Harvard University.

100.    On LinkedIn, approximately 50,000 employee pages have listed Lehman Brothers in their employment history.

101.    A search of YouTube for "Lehman Brothers" has yielded over 44,000 videos that have been viewed by millions of people.

102.    Lexis-Nexis news database searches similarly have yielded many thousands of articles since 2008 concerning Lehman Brothers and its continued operations.

103.    Harvard Business School maintains the "Lehman Brothers Collection" as part of its permanent Contemporary Business Archives.  The collection consists of company business records and deal books, which document many of Lehman Brothers' investment projects from the 1920s to the 1980s.  Harvard describes the collection as "an important resource for the study of modern business history and provides scholars with a rare opportunity to access twentieth-century corporate records."

104.    Lehman Brothers and its financial services, business dealings, financial troubles and bankruptcy also have been the subject of several recent major films, television shows and plays, including: *Inside Job* (Sony Pictures Classics, 2010), which won an Academy Award for Best Documentary; *The Last Days of Lehman Brothers* (BBC/CNBC 2010);  *Too Big to Fail* (HBO 2011); *Margin Call* (Lionsgate 2011), which portrayed a fictionalized Wall Street firm based on and likened in the press to Lehman Brothers; *The Case Against Lehman Brothers* (CBS 60 Minutes 2012); *The Big Short* (Paramount, 2015), which was nominated for a 2016 Academy Award for Best Picture and won a 2016 Academy Award for Best Adapted Screenplay; and the recent off-Broadway play, *The Lehman Trilogy*, which was slated to open on Broadway in March 2020, but postponed its opening due to mandatory COVID-19 theatre closures in New York City.

105.    Since 2008, numerous books have been written about Lehman Brothers, including: *The Murder of Lehman Brothers, An Insider's Look at the Global Meltdown* (2009); *Lehman Brothers' Dance with Delusion: Wrestling Wall Street* (2010); *Lehman Brothers: Politics, Law & Business* (2010); *The Devil's Casino: Friendship, Betrayal, and the High Stakes Games Played Inside Lehman Brothers* (2011); *Street Freak: Money and Madness at Lehman Brothers* (2011);

-28-

*The Last of the Imperious Rich: Lehman Brothers, 1844-2008* (2012); and *Gorillas, markets and the search for economic values - Rethinking Lehman Brothers and the Global Financial Crises. A Nyenrode Perspective* (2013).

106.    Lehman Brothers consistently has been parodied in various media since 2008.  For example, a 2009 Black Eyed Peas lyric states: "Imma be a brother, but my name ain't Lehman." In the 2010 film *Despicable Me*, the lead character visits a bank for super-villains named the "Bank of Evil."  As he enters the bank, above the doors and beneath the name of the bank hangs a sign that states: "FORMERLY LEHMAN BROTHERS."  In 2012, a YouTube user published a video entitled "Lehman in too Deep (We could have had a bail-out)," set to the music of and sung in the style of Adele's "Rolling In The Deep," which satires Lehman Brothers' pre-bankruptcy business dealings and financial troubles.  In the 2016 animated film *Zootopia*, the primary characters visit the "Lemming Brothers Bank."  And the 2019 Showtime series *Black Monday* presented as recurring characters two fictional identical twin "Lehman" brothers, who head the real investment firm in the fictional series.

107.    Consumer recognition today of the LEHMAN Names and Marks, including LEHMAN BROTHERS, in connection with financial services is just as strong as (or even stronger than) it was at the time of the Lehman Brothers bankruptcy, when the firm was one of the largest financial institutions in the world.  The LEHMAN Names and Marks, which still are legitimately used today, are still famous among the general consuming public and operate as unique source identifiers associated with Barclays and its licensee Lehman Brothers.

108.    Moreover, the LEHMAN Names and Marks have been famous since long before Defendants began their unlawful activities as described herein.

109.     Even if Lehman Brothers and Barclays had not continuously and consistently used the LEHMAN Names and Marks since 2008, given the long-term and wide-spread use and promotion of the names and marks for over 150 years, culminating with the then-largest bankruptcy filing in U.S. history, the names and marks still would be famous to consumers and possess significant residual goodwill and serve as unique source identifiers in connection with financial services.

**Barclays' Protection of the LEHMAN Names and Marks**

110.     Because of the continuing world-wide fame and consumer recognition in the LEHMAN Names and Marks, various third parties have sought to unlawfully misappropriate the monikers to create a false connection with Lehman Brothers and/or sought to deprive Barclays of its legal right in such names and marks.  In response to these unlawful acts, Barclays has taken firm action to protect the LEHMAN Names and Mark and to avoid consumer confusion.

111.     For example, seeking to take a free-ride on the fame of the LEHMAN Names and Marks, third party Tiger Lily Ventures Ltd. ("Tiger Lily") filed in the USPTO Application Serial Nos. 85868892 and 86298069 to register the mark LEHMAN BROTHERS in connection with "Beer" in International Class 32, "Spirits" in International Class 33 and "Bar services; Restaurant services" in International Class 43 ("Tiger Lily's Applications").

112.     The USPTO twice rejected Application Serial Nos 85868892 (which Tiger Lily filed a year before filing Application Serial No. 86298069), finding the mark would falsely suggest a connection with the financial institution Lehman Brothers in violation of Section 2(a) of the Lanham Act, 15 U.S.C. § 1052(a).  The USPTO specifically found:

> In this case, the applied-for mark 'LEHMAN BROTHERS' appears in the identical spelling as the mark 'Lehman Brothers' used by the investment firm.  Therefore, the applied-for mark would be uniquely and unmistakably recognized by consumers to refer to the former investment firm.  Although the investment firm

did not distribute or produce beer or spirits, the institution associated with the 'Lehman Brothers' name is so famous that a connection to the firm would be presumed if the applicant were to use the mark in connection with its goods . . . . [T]he fact that Lehman Brothers has declared bankruptcy does not diminish the connection drawn to the investment firm . . . .

Attached hereto as **Exhibit 10** are copies of the USPTO's office actions initially refusing to register Tiger Lily's Application Serial No. 85868892 for the mark LEHMAN BROTHERS.

113.    After the USPTO eventually allowed Tiger Lily's Applications to proceed to publication, Barclays filed in the USPTO's Trademark Trial and Appeal Board ("TTAB") Opposition Nos. 91219477 (Parent) and 91219478 against both of Tiger Lily's Applications, including based on likelihood of confusion under Section 2(d) of the Lanham Act, 15 U.S.C. § 1052(d).

114.    On or about September 30, 2020, the TTAB issued final judgement in favor of Barclays, rejecting the Tiger Lily Applications.  Finding Tiger Lily's Applications were likely to cause confusion with the LEHMAN BROTHERS mark, the TTAB held that: (1) Barclays had continuing common law rights in the LEHMAN BROTHERS mark, including based on Lehman Brothers' continued use of the mark since 2008 as Barclays' licensee; and (2) "LEHMAN BROTHERS is still sufficiently known . . . such that Tiger Lily's use of LEHMAN BROTHERS would lead to a presumption that Barclays and Tiger Lily are somehow connected."  *See* Exhibit 3 hereto.

115.    The LEHMAN Names and Marks, including LEHMAN BROTHERS, are so well-known that the dispute with Tiger Lily has been the subject of several news articles, including a February 8, 2016, article on the front page of *The Wall Street Journal*.

116.    On or about November 11, 2014, third party Trademarkers N.V. filed a revocation proceeding against Barclays' European Trademark No. 83261 for Barclays' registered LEHMAN BROTHERS mark in the European Union Intellectual Property Office ("EUIPO") based on alleged abandonment.

117.    On or about September 30, 2016, the EUIPO denied the revocation against the LEHMAN BROTHERS mark in Class 36 for "Financial services; securities brokerage services; investment consulting services; investment banking services; merchant banking services," maintaining the registration for those services.  Finding "that genuine use was shown for all the services in Class 36," the Cancellation Division of the EUIPO held:

> The evidence filed not only proves that LBIE traded during the relevant period being in administration. It also shows that for every category of services in this class - financial services; securities brokerage services; investment consulting services; investment banking services; merchant banking services - (which actually overlap) the sign LEHMAN BROTHERS was genuinely used. It has been proved that the LEHMAN BROTHERS sign was used in connection with recovering and returning trust property, admitting unsecured creditor's claims and making distribution to creditors, recovering and/or realising House Assets on a managed basis, derivatives, financial transactions, prime brokerage accounts, securities trading and exchange traded derivatives etc. (e.g. the Administrators' report under VGM4) which are included in the listed services above and are generally classified as financial services and, as a subcategory, investment services.

Attached hereto as **Exhibit 11** is copy of the EUIPO's opinion.

118.    On or about September 5, 2017, Barclays filed oppositions in the Portuguese Institute of Industrial Property ("INPI") against applications to register the marks LEHMAN BROTHERS ASSET MANAGEMENT (Portugal Application No. 578171) and LEHMAN BROTHERS ENCORE (Portugal Application No. 578166), both filed by third party Fashion International Limited ("Fashion International") for financial services in International Class 36.  In both instances, the INPI issued decisions affirming Barclays' rights to the LEHMAN BROTHERS name and mark and sustaining the oppositions.  Attached hereto as **Exhibit 12** are copies of the INPI's opinions with certified translations.

119.    On or about February 20, 2018, Barclays filed an opposition in the United Kingdom Intellectual Property Office ("UKIPO") against an application to register the mark LEHMAN BROTHERS ENCORE filed by Fashion International for services in International Classes 38 and

43 (UK Application No. 3252222).  Fashion International failed to file its counterstatement to that opposition and, on or about May 8, 2018, and May 30, 2018, the UKIPO sustained the opposition as conceded.  Attached hereto as **Exhibit 13** are copies of the UKIPO's decisions.

120.    On or about January 29, 2018, Barclays filed an opposition in the Benelux Office for Intellectual Property ("BOIP") against an application to register the mark LEHMAN BROTHERS ASSET MANAGEMENT, filed by third party CKL Holdings N.V. ("CKL") for services in International Classes 35, 36, and 38 (Benelux Application No. 1359661). The application proceeded to registration after CKL deleted International Class 36 (financial services) from the application, but Barclays filed an application to invalidate the registration on or about May 13, 2020.  To date, Barclays continues its prosecution of that invalidation proceeding, which remains pending before the BOIP.

121.    On or about October 29, 2018, Barclays field an opposition in the Mexican Institute of Industrial Property ("MIIP") against an application to register the mark LEHMAN BROTHERS for financial services in International Class 36 (Mexico Application No. 2100116), filed by third party Carlos Megias ("Megias"), and later assigned to Marcelino Garcia Flores in an attempt to avoid liability after Barclays sent a cease and desist letter to Megias, a resident of Florida.

122.    On or about August 26, 2020, the MIIP sustained the opposition and refused to register the third-party application, finding:

> as is apparent from the proposed symbol, it consists of the name LEHMAN BROTHERS, that is, identical to the name of the financial institution LEHMAN BROTHERS founded by the Lehman brothers in 1850 in the United States and which in 2008 was purchased by the BARCLAYS CAPITAL, INC. company; In such a way, the inappropriateness of the registration is evident, since MARCELINO GARCIA FLORES is a person who does not have the corresponding rights for its legal use, since its symbol is likely to mislead or induce the public to make a mistake by constituting false indications as to the business origin of the services intended, consisting precisely of financial matters,

Attached hereto as **Exhibit 14** is a copy of the MIIP's opinion with a certified translation.

-33-

**Defendant Sklarov's History of Criminal and Alleged Civil Fraud**

123.    Defendant Sklarov is a convicted criminal, who served time in federal prison after pleading guilty to felony charges of fraud.  Attached hereto as **Exhibit 15** is a copy of the docket sheet for *USA v. Sklarov, et al.*, 97-cr-00176 (DJL) (W.D. Pa.).

124.    Sklarov also has been sued by multiple parties for civil fraud in connection with the purported offering of securities-backed loans.

125.    Although Sklarov has used various shell companies to perpetuate each alleged fraud, the fact patterns underlying each of the schemes are nearly identical: a Sklarov-related entity promises to provide a loan to a borrower backed by securities owned by the borrower; the borrower pledges the shares as collateral to the Sklarov-controlled entity; the Sklarov-controlled entity provides little if any of the promised loan funds to the borrower and then sells or attempts to sell the shares proffered only as collateral, and retains the proceeds.

126.    For example, in *Satterfield v. VStock Transfer*, Index No. 650311/2019 (Sup. Ct., N.Y. County), Brent Satterfield ("Satterfield") filed suit for fraud against Sklarov, his companies America 2030 Capital, LLC ("America 2030"), America 2030 Capital Ltd. ("America 2030 Ltd.") and Bentley Rothschild Capital Ltd. Corp. ("Bentley Rothschild"), and an unaffiliated broker, VStock Transfer LLC ("VStock").

127.    Satterfield alleged that, after he pledged 2 million shares of stock in Co-Diagnostics, Inc. as collateral for a $3.5 million loan, Sklarov and his related entities: began selling Satterfield's stock collateral before Satterfield received the loan; realized over $1.1 million from selling Satterfield's shares; provided to Satterfield less than $67,000 of the promised loan; and demanded more shares as collateral once the shares had decreased in value due to Sklarov's premature "dumping" of the shares.

128.     The *Satterfield* complaint further details legal proceedings in Hong Kong, Singapore and the United Kingdom, in which proceedings Sklarov allegedly perpetrated similar fraudulent securities-backed loan schemes.  Attached hereto as **Exhibit 16** is copy of the complaint in *Satterfield*.

129.     The *Satterfield* Court issued temporary restraining orders enjoining the transfer agent, America 2030 and/or Bentley Rothschild, were "from selling, transferring, assigning, encumbering or otherwise disposing of any shares of Co-Diagnostics, Inc."  Attached hereto as **Exhibit 17** are copies of the temporary restraining orders issued by the *Satterfield* Court.

130.     Despite the temporary restraining orders, Sklarov and his companies later allegedly attempted to dispose or transfer shares of the Satterfield's stock.   In granting a preliminary injunction against Sklarov and his companies and finding irreparable harm, the *Satterfield* Court found: "informing this Court's decision is the possibility that someone is not just threatening to do, but actually violating this Court's order and actually doing the thing that the plaintiff is asking them to not do."  Attached hereto as **Exhibit 18** are copies of the transcript on the hearing on the motion for preliminary junction and the Court's preliminary injunction order in the *Satterfield* case.

131.     In ruling on subsequent motions, the *Satterfield* Court found that Sklarov and his companies had engaged in actions that evidenced a fraudulent scheme: "[d]ocumentary evidence corroborates that the [stock loan agreement] was amended to avoid the SEC's jurisdiction over the shares and transactions here which evidences a fraudulent scheme;" "the court finds that the second addendum signed by Satterfield containing the St. Kitts & Nevis arbitration provision was permeated with fraud."  Attached hereto as **Exhibit 19** are copies of these decisions in *Satterfield*.

132.     In one of those decision, the *Satterfield* Court found it had personal jurisdiction over Sklarov acting as a principal through his corporate agents: "[t]he record indicates either explicitly or implicitly that Sklarov controls [America 2030] because he is the only individual directing the LLC's activities."  The Court additionally found that it had jurisdiction over Bentley Rothschild, a St. Kitts & Nevis corporation, because it allegedly conspired with America 2030 and Sklarov to commit torts in New York.

133.     Upon information and belief, the *Satterfield* litigation currently is stayed pending arbitration in New York.

134.     In *Two Rivers Water & Farming Co. v. America 2030 Capital Limited et al.*, No. 19-cv-1640 (D. Col.), Two Rivers Water & Farming Company ("TRWF") alleged that Sklarov's companies, America 2030 Ltd. and Bentley Rothschild Capital Limited, agreed to lend TRWF $1.1 million secured by 6.8 million shares of stock, that TRWF transferred the shares to Sklarov's companies, that the companies did not provide TRWF the loan and then the companies sought to remove the restricted legends on the stock certificates to prepare their liquidation.

135.     The Court issued two temporary restraining orders enjoining the removal of the restricted legend on the shares.  Finding that TRWF was likely to succeed on the merits of its fraud claims, the Court held it was likely that the "that [the loan] contract is void and unenforceable [as] procured through fraud" and that TRWF was a victim of "unfair trade practices."  Attached hereto as **Exhibit 20** are copies of the *Two Rivers Water & Farming* Court's temporary restraining orders. The Court eventually converted its temporary restraining orders into a preliminary injunction.

136.     In *America 2030 Capital Limited v. Prescient Investment Limited*, Case No. 1:18-cv-04875-AT (N.D. Ga.), a Sklarov-controlled company, America 2030 Ltd., filed suit against Prescient Investment Limited ("Prescient") and Maximum Success Capital Partners Brokerage

Ltd. ("Maximum Success") for breach of contract and related claims, alleging that Prescient executed a loan agreement for $117 million whereby Prescient was required to pledge as collateral $200 million in stocks.

137.    In response, Prescient claimed that, before the loan was made, America 2030 Ltd., through Sklarov, ordered a broker to sell shares deposited with Maximum Success and to place the proceeds in a brokerage account owned by America 2030 Ltd. and later to an America 2030 Ltd. bank account.

138.    Upon information and belief, Prescient received an interlocutory injunction from a Hong Kong Court to prevent Maximum Success from disposing of the shares, and Sklarov, through America 2030 Ltd., filed the federal lawsuit to harass Prescient and Maximum Success and avoid his legal obligations and the Hong Kong injunction.  Maximum Success moved to dismiss the complaint and moved for sanctions against America 2030 Ltd. and its counsel.

139.    In response to Maximum Success's motion to dismiss and for sanctions, the parties entered into a consent order, whereby the Court dismissed with prejudice America 2030 Ltd.'s claims against Maximum Success and granted in part Maximum Success's motion for sanctions. The Consent Order is signed by Sklarov as "Officer of Plaintiff America 2030 . . . Limited, and of Plaintiff's Affiliates, on behalf of himself personally and those entities."  Attached hereto as **Exhibit 21** is a copy of the Consent order.

140.    In support of the consent order, the parties jointly submitted a memorandum, which stated that "[t]he Plaintiff and the lender are both controlled by Val Sklarov . . . as part of the America 2030 group of companies. . . .  He signed the loan documents . . . and controls this litigation."  Attached hereto as **Exhibit 22** is a copy of that memorandum.

141.    In *Fortunate Drift Ltd. v. America 2030 Capital, LLC*, Index No. 652158/2018 (Sup. Ct., N.Y. County), Fortunate Drift Limited ("FDL") and Yangtze River Port and Logistics Limited ("YRIV") filed suit for fraud against America 2030 and third party broker VStock.  FDL, an investment company that was one of the largest YRIV shareholders, alleged that America 2030 agreed to lend FDL $8 million secured by 2 million shares in YRIV.  FDL averred that it pledged the shares to America 2030, but America 2030 did not provide the promised loan.  FDL then cancelled the loan agreement.  America 2030, however, then asked YRIV's agent, VStock, to transfer the shares to America 2030's account so America 2030 could sell them to third parties, causing YRIV's stock price to drop.  Attached hereto as **Exhibit 23** is a copy of the verified petition in the *Fortunate Drift Ltd.* action.

142.    FDL sought a preliminary injunction and temporary restraining order to prevent America 2030, VStock and related individuals and entities from disposing of the shares pending determination of an arbitration before the Hong Kong International Arbitration Center concerning the parties' dispute.

143.    The parties later entered into a Stipulation of Settlement whereby America 2030 and VStock agreed that America 2030 and VStock would not to dispose of YRIV shares pending the remainder of a 30-day contractual settlement negotiation period, or, should such negotiations be unsuccessful, a Hong Kong arbitration.  Attached hereto as **Exhibit 24** is a copy of that Stipulation.

## The *Rothschild* Trademark Injunction against Sklarov and Black Rock

144.    As noted above, in connection with some of his alleged fraudulent securities-backed loan schemes, Sklarov has acted through companies using names and marks containing or comprising ROTHSCHILD, including the corporate names "Bentley Rothschild Capital Limited"

and "Bentley Rothschild Financial LLC," the domain name bentleyrothschild.com (and the corresponding website www.bentleyrothschild.com) and the mark BENTLEY ROTHSCHILD (the "Bentley Rothschild Marks").

145.    Upon information and belief, names and marks containing or comprising ROTHSCHILD (the "ROTHSCHILD Marks") have been used for over 200 years by financial services firms associated with or traced back to the famous European Rothschild banking family (collectively, the "Rothschild Companies").

146.    Upon information and belief, Sklarov and his companies are not affiliated in any manner with the Rothschild Companies.

147.    After learning of Sklarov's use of the Bentley Rothschild Marks in connection with allegedly fraudulent financial services, several of the Rothschild Companies sued Sklarov, Black Rock and four other companies controlled by Sklarov for *inter alia* trademark infringement, trademark dilution, unfair competition and deceptive trade practices under federal and state law. Attached hereto as **Exhibit 25** is a copy of the complaint (without exhibits) in *Rothschild & Co Continuation Holdings A.G. v. Sklarov*, 19-cv-03561 (N.D. Ga.).

148.    Among other things, the Rothschild Companies alleged that Sklarov and his companies were: (1) offering purported financial services, including securities-backed loans, using the intentionally confusingly similar Bentley Rothschild Marks; and (2) making explicitly and/or impliedly false representations in marketing materials that Sklarov and his companies were affiliated or associated with the legitimate Rothschild Companies.

149.    For example, a purported term sheet for securities backed loans offered by the purported "Bentley Rothschild," stated:

> Rothschild family started offering securitized financing in the early part of the 19th century.  Bentley Rothschild Capital Limited is honored to continue to engage in

the tradition of global finance by offering loans against publicly traded securities for our high-net worth clients located throughout the world.  Our service is as exceptional now as it has been by the Rothschild dynasty during the past 250 years.

Attached hereto as **Exhibit 26** is a copy of the term sheet.

150.    The term sheet also listed in its copyright notice: "Rothschild Family of Companies ©1986-2019 All Rights Reserved."  Upon information and belief, the Rothschild Companies went public and reorganized under the name Rothschild & Cie in 1986, the first year in the copyright notice listed on the "Bentley Rothschild" term sheet.

151.    Upon information and belief, Sklarov made these false and misleading statements and used the Bentley Rothschild Marks with intent to usurp the goodwill and consumer recognition in the ROTHSCHILD Marks and to sow consumer confusion in the marketplace such that consumers would mistakenly believe that Sklarov and his companies are somehow affiliated or associated with the Rothschild Companies and/or its services, and/or the ROTHSCHILD Marks.

152.    Upon information and belief, in furtherance of his scheme to impersonate the Rothschild Companies, Sklarov instructed Defendant Singh to file (through Sklarov's foreign shell company Black Rock) USPTO Application Serial No. 88457938 to register the mark BENTLEY ROTHSCHILD for various financial services in International Class 36 (the "BENTLEY ROTHSCHILD Application").

153.    Upon information and belief, when filing the BENTLEY ROTHSCHILD Application, Sklarov, Black Rock and Singh copied and pasted therein the description of financial services as set forth exactly in the legitimate Rothschild Companies Trademark Registration No. 3447667 for the mark ROTHSCHILD, and merely added "stock loans," to create the false impression that the BENTLEY ROTHSCHILD Application was connected with the legitimate trademark registration owned by the Rothschild Companies.

-40-

154.    After the Rothschild Companies filed their complaint and their motion for a preliminary injunction, upon information and belief, Sklarov instructed Singh to file (through Sklarov's foreign shell company Lincoln) new USPTO Application Serial No. 88568356 for the mark MAYER AMSCHEL ROTHSCHILD CAPITAL for various financial services in International Class 36 (the "MAYER AMSCHEL ROTHSCHILD Application").

155.    Upon information and belief, MAYER AMSCHEL ROTHSCHILD is the name of the founder of the Rothschild banking dynasty that now does business as the Rothschild Companies under the ROTHSCHILD Marks.

156.    Upon information and belief, Sklarov, Lincoln and Singh filed the MAYER AMSCHEL ROTHSCHILD Application to usurp the goodwill and consumer recognition in the ROTHSCHILD Marks and to sow consumer confusion in the marketplace such that consumers would mistakenly believe that Sklarov and his companies are somehow affiliated or associated with the Rothschild Companies and/or its services, and/or the ROTHSCHILD Marks.

157.    During the hearing on the Rothschild Companies' motion for a preliminary injunction, the Court directly questioned Singh about his filing of the MAYER AMSCHEL ROTHSCHILD Application—especially since the mark in the application contained the exact name of the founder of the Rothschild Companies and the application was filed well after the Rothschild Companies had sent several demand letters, filed their complaint and sought preliminary injunctive relief.  Singh responded:

> With regards to what is in the application, it was asked by the company for me to put it that way.  I did advise them against it.  They wanted to continue forward with the language that is in there.  So therefore it was submitted.  However, after the fact, I do believe the company is looking to actually withdraw those applications. And it just hasn't been proceeded by my office yet.  But they are looking to withdraw those applications.

158.    Upon information and belief, neither Sklarov, Singh, Black Rock nor Singh expressly withdrew the MAYER AMSCHEL ROTHSCHILD Application or the BENTLEY ROTHSCHILD Application.  Instead, the USPTO rejected both applications, finding such marks were likely to cause confusion with the Rothschild Companies' registered ROTHSCHILD Marks.  The USPTO also found registration of the mark MAYER AMSCHEL ROTHSCHILD would falsely suggest a connection with the founder of the Rothschild Companies.  Attached hereto as **Exhibit 27** are copies of these office actions.

159.    The Court in the *Rothschild* litigation granted the Rothschild Companies' motion for a preliminary injunction, enjoining Sklarov's and his companies' and agents' use and registration of names, marks and domain names containing or comprising ROTHSCHILD. Attached hereto as **Exhibit 28** is a copy of the Court's Preliminary Injunction Order and Memorandum in the *Rothschild* litigation.

160.    Finding that the Rothschild Companies were likely to succeed on the merits of their trademark infringement and related claims, the Court found:

> substantial evidence in the record that Defendants Sklarov [and related entities] deliberately adopted and used the 'Bentley Rothschild' mark in order to profit from the substantial goodwill Plaintiffs have created in the ROTHSCHILD Marks . . . . [s]uch deliberately infringing conduct creates a substantial likelihood of confusion, tarnishment of the ROTHSCHILD Marks, and harm to Plaintiffs."

161.    The Court further found that "[i]rreparable injury and tarnishment also arise from the number of lawsuits charging Bentley Rothschild entities with allegedly having participated in stock loan fraud. . . . The risk of tarnishment of the 'Rothschild' name caused by association with allegations of fraud cannot be fully compensated for by money damages."

162.    Over the objections of Sklarov and his companies, the Court held the injunction should apply extraterritorially, including over Black Rock, which is a Bahamian company.  The Court found that such extraterritorial relief was available under the Lanham Act because Sklarov,

-42-

a participant in all acts of infringement, resided in the United States, and two U.S.-based Bentley Rothschild entities operated in conjunction with the foreign-based Bentley Rothschild entity; the Rothschild Companies sufficiently alleged that the Sklarov's and his shell companies' extraterritorial actions had a substantial impact on domestic commerce; and applying the injunction extraterritorially would not affect another country's sovereignty.  The Court further held that the Rothschild Companies' irreparable injury could only be stopped by an extraterritorial injunction.

163.    The Court also denied Black Rock's motion to dismiss for lack of personal jurisdiction, finding sufficient the Rothschild Companies' allegations that Black Rock transacted business in the state of Georgia.

164.    After the Court issued its preliminary injunction order, Sklarov, Black Rock and his other shell companies entered into a Consent Order for Permanent Injunction permanently enjoining their use of the ROTHSCHILD Marks.  Attached hereto as **Exhibit 29** is a copy of that Consent Order.

**Defendants' Unlawful Use of the LEHMAN Names and Marks**

165.    Undeterred by the injunctions in the *Rothschild* litigation and other civil fraud actions, Sklarov and his shell companies, along with Defendants Singh and Qureishi, are engaging in nearly identical unlawful activities in connection with the purported offering of securities-backed loans—this time using names and marks that are confusingly similar to, dilutive of and create a false association with the LEHMAN Names and Marks.

166.    Defendants have used in commerce in connection with purported financial services the Infringing Names and Marks, including: "LEHMAN BORTHERS," "SHEARSON LEHMAN BROTHERS," "SHEARSON LEHMAN," "SHEARSON LEHMAN BROTHERS

INVESTMENT BANKING," "SHEARSON LEHMAN INVESTMENT BANKING" and the domain name <shearsonlehmanbrothers.com>.

167.    Upon information and belief, Sklarov, either directly, or through one or more companies he directs and controls, registered the domain name <shearsonlehmanbrothers.com> in or about June 2019.  Upon information and belief, Sklarov utilized Domains By Proxy, LLC, a proxy service, to mask the true identity and contact information of the owner of the domain name in an effort to prevent discovery of his unlawful acts.  Attached hereto as **Exhibit 30** is a copy of the WhoIs records for the domain name <shearsonlehmanbrothers.com>.

168.    At some point thereafter, upon information and belief, Sklarov caused the domain name <shearsonlehmanbrothers.com> to resolve to an active website located at www.shearsonlehmanbrothers.com, for the Fake "Shearson Lehman Brothers" (the "Infringing Website").  The Infringing Website currently is active today.  Attached hereto as **Exhibit 31** are screenshots of the Infringing Website, an excerpt of which appears below:

**[REST OF PAGE INTENTIONALLY LEFT BLANK]**

28827/162/3557472



169.    The Infringing Website purports to offer financial services, including for wealth and investment management, financial advisory and asset management solutions, investment banking, securities and mutual funds, credit, lending and financing, including in the United States ("Defendants' Purported Services").

170.    In a clear attempt to pass itself off as the same as or affiliated with the legitimate Lehman Brothers and the legitimate LEHMAN Names and Marks owned by Barclays, the Infringing Website uses the name and mark "Shearson Lehman Brothers"—the former name and registered mark used by the legitimate Lehman Brothers for many years when the firm was owned by American Express—as well as other "Lehman" and "Shearson Lehman" formative names and marks, including "Lehman Brothers."

171.    The Infringing Website falsely claims that the Fake "Shearson Lehman Brothers" is "a Lehman Brothers Company."

172.    The Infringing Website presents several of the Infringing Names and Marks in the Lehman Font and Shearson Lehman Stylizations.



| Marks Used and Previously Registered by Lehman Brothers | The Infringing Names and Marks |
|---|---|

173.    The Infringing Website lists 200 Vesey Street, New York, New York 10281 as the United States address for the purported "Shearson Lehman Brothers," as shown below:

-46-



174.    As noted above, 200 Vesey Street, New York, New York 10281 is the former address of the legitimate Lehman Brothers when the firm was owned by American Express.

175.    The Infringing Website uses language that would be associated with or would describe the legitimate Lehman Brothers and its long history of offering financial services, including:

- "With more than 100 years of industry presence . . ."

- "We invented investment banking."

- "Decades of experience as a market leader, the old is behind us, the new is here.  The New Shearson Lehman Brothers Investment Banking. We invented investment banking."

- "We have managed billions of dollars of client assets and have provided consistent and secure portfolio management services for our clients for more than 100 years"

- "We have provided these and other wealth management services for our clients for more than 100 years."

176.     Upon information and belief, the Fake "Shearson Lehman Brothers" has not been active for more than 1-2 years, does not have billions of dollars' worth of assets under management and does not provide wealth management or investment banking services.

177.     Defendant Qureishi represents himself as "Senior Executive Vice President, Wealth Management," of the Fake "Shearson Lehman Brothers."  Qureishi also claims to have been a "Senior Loan Advisor" at the Sklarov-controlled America 2030 company.  Attached hereto as **Exhibit 32** is a copy of Qureishi's LinkedIn profile, an excerpt of which appears below:



178.     Upon information and belief, Qureishi responds to inquires made to the Fake "Shearson Lehman Brothers" via the Infringing Website, including from persons in the United States, and purports to represent the company and its purported business.

179.     Upon information and belief, Sklarov and Qureishi designed and provided all content for the Infringing Website, or expressly instructed others to do so and then approved of and endorsed the Infringing Website, its design and content, and adopted it as their own.

180.     Upon information and belief, Defendants Sklarov and Qureishi caused the Infringing Website to be programmed such that it would not be directly accessible from an IP address in the United States, in an effort to prevent Barclays and their attorneys in the United States

from discovering the site.  The site, however, is accessible from the United States using simple and common tools such as a VPN (virtual private network).

181.    Upon information and belief, Qureishi uses the below signature line and the email address Osman.Qureishi@ShearsonLehmanBrothers.com in email communications to prospective clients of and others interested in doing business with the fake "Shearson Lehman Brothers":

> **Osman Qureishi**
>
> *Senior Executive Vice President*
>
> Wealth Management Division
>
> Telephone: 332.228.0152
>
> Direct: 212.208.0900
>
> Yoll Free: 888.418.7999
>
> Cell Phone: 917.704.3276
>
> Fax: 212.428.6707
>
> Email:Osman.Qureishi@shearsonlehmanbrothers.com

182.    Upon information and belief, Qureishi has represented to prospective agents and brokers of the Fake "Shearson Lehman Brothers," including in the United States, that the firm currently **only** offers security loans borrowed against assets of investment portfolios and does not currently offer investment or wealth management services or any of the other of Defendants' Purported Services promoted and advertised on the Infringing Website.

183.    Upon information and belief, Qureishi has represented to prospective agents and brokers for the Fake "Shearson Lehman Brothers" that the firm:

- Offers security loans within the United States.

- Uses custodian accounts within the United States to facilitate loans.

- Has offices in New York, New York.

- Has the ability to do title transfer loans in the United States and recently secured a resource within the United States to assist with such transfers.

- Has been in business only for three years.

184. Upon information and belief, Qureishi has sent to prospective agents and brokers for the Fake "Shearson Lehman Brothers," including in the United States, a form "Securities Lending Referral Agreement" (the "SLRA"), which is attached hereto as **Exhibit 33**, the cover and back of which are shown below:



185. Upon information and belief, the purpose of the SLRA is to engage independent agents to refer "prospective borrowers to [the fake] Shearson Lehman for the purpose of obtaining Loans backed by Securities."

186. The SLRA uses multiple times the Infringing Names and Marks <shearsonlehmanbrothers.com>, "Shearson Lehman Brothers Investment Banking," "Shearson

-50-

Lehman" and "Lehman Brothers," the latter two marks presented prominently in the Lehman Font and Shearson Lehman Stylizations on the front and back covers and at the top of each page of the agreement.

187.  Upon information and belief, Qureishi has sent the SLRA to prospective agents and brokers who contact the Fake "Shearson Lehman Brothers" via the website www.shearonlehmanbrothers.com or via an email address using the domain name <shearsonlehmanbrothers.com>.

188.  The SLRA also lists on its front and back covers 200 Vesey Street, New York, New York 10281 as the United States address for the purported Fake "Shearson Lehman Brothers."  As noted above, this was the address for the legitimate Lehman Brothers when the firm was owned by American Express.

189.  The SLRA also lists a telephone number with a New York, New York area code and the email address us.office@shearsonlehmanbrothers.com.

190.  Upon information and belief, Sklarov and Qureishi designed and provided all content for the SLRA, or expressly instructed others to do so and then approved of and endorsed the SLRA, its design and content, and adopted it as their own.

191.  Upon information and belief, Qureishi also has published and distributed to potential referral agents for the Fake "Shearson Lehman Brothers," including in the United States, a Broker Affiliate Dealer flyer (the "Broker Flyer"), a copy of which is attached hereto as **Exhibit 34**, and which is reproduced below:



192.    Qureishi publicly posted the Broker Flyer on his LinkedIn account, including at the

URL    https://www.linkedin.com/posts/osman-qureishi-ab2434100_broker-dealers-world-wide-we-are-funding-activity-6663894856533979136-0gsS/.

193.    The Broker Flyer uses the Infringing Names and Marks "Shearson Lehman," "<shearsonlehmanbrothers.com> and "Shearson Lehman Investment Banking," the latter presented in the Lehman Font and Shearson Lehman Stylizations.

194.    The Broker Flyer also claims that that the fake "Shearson Lehman" is an "investment banking firm" that provides "wealth management" services "worldwide."

195.    Like the Infringing Website and the SLRA, the Broker Flyer lists telephone numbers with New York, New York area codes.

28827/162/3557472

196.     Upon information and belief, Sklarov and Qureishi designed and provided all content for the Broker Flyer, or expressly instructed others to do so and then approved of and endorsed the Broker Flyer, its design and content, and adopted it as their own.

197.     Upon information and belief, Qureishi has also distributed to potential agents, brokers and borrowers of the Fake "Shearson Lehman Brothers," including in the United States, a flyer entitled "Direct Lender for Global Securities Backed Lending Program" (the "Direct Lender Flyer"), a copy of which is attached as **Exhibit 35** hereto and which is reproduced below:



198.     The Direct Lender Flyer, which advertises and promotes purported securities backed lending services offered by Defendants, uses the Infringing Names and Marks "<shearshonlehmanbrothers.com>", "Shearson Lehman" and "Lehman Brothers," the latter two presented in the Lehman Font and Shearson Lehman Stylizations.

199.     The Direct Lender Flyer also claims the Fake "Shearson Lehman Brothers" is "A Lehman Brothers Company," lists the former address of the legitimate Lehman Brothers—200 Vesey Street, New York, New York 10281—as its own address and lists a telephone number with a New York area code.

200.     Upon information and belief, Sklarov and Qureishi designed and provided all content for the Direct Lender Flyer, or expressly instructed others to do so and then approved of and endorsed the Direct Lender Flyer, its design and content, and adopted it as their own.

201.     Upon information and belief, Qureishi has published, including in the United States, several press releases for the Fake "Shearson Lehman Brothers" and its purported financial services (the "Press Releases").  Attached hereto as **Exhibit 36** are copies of the Press Releases.

202.     The Press Releases—entitled "Shearson Lehman is Entering into Negotiations to Invest $250 million in Alternative Energy" (March 20, 2020), "Shearson Lehman Brothers Investment Banking Broker Dealer Affiliate Program is Available World Wide" (April 7, 2020), "Shearson Lehman Adds a New Local Custodian and Eases SBL Requirements in Hong Kong!" (May 1, 2020) and "Asia's Alternative Energy Sector Becomes Front-Page News as Shearson Lehman Vows to Invest Millions" (August 24, 2020)—purport to report on potential multi-million-dollar investments "Shearson Lehman" is making or has made in various industries and touts the company's purported wealth management and investment banking services.

203.     These Press Releases use the Infringing Names and Marks "Shearson Lehman Brothers Investment Banking," "Shearson Lehman," "Lehman Brothers" and "<shearsonlehmanbrothers.com>."

204.     Each of these Press Releases uses the Infringing Names and Marks "Shearson Lehman" and/or "Shearson Lehman Brothers Investment Banking" in its title and prominently

-54-

displays the Infringing Name and Mark "Shearson Lehman Brothers Investment Banking" in the Lehman Font and Shearson Lehman Stylizations, including as shown below:



205.   One of these Press Releases lists Qureishi as the "Media Contact" for the Fake "Shearson Lehman Brothers," each lists an email address of wealthmanagement@shearsonlehmanbrothers.com for the purported firm and one explicitly lists a web address of www.shearsonlehmanbrothers.com for the purported firm.

206.   One of the Press Releases refers twice to the Fake "Shearson Lehman Brothers" as "a Lehman Brothers company."

207.   Upon information and belief, Sklarov and Qureishi designed and provided all content for the Press Releases, or expressly instructed others to do so and then approved of and endorsed the Press Releases, their design and content, and adopted them as their own.

208.   Defendants do not have (and never have had) permission from Barclays or Lehman Brothers to use the Infringing Names and Marks or to engage in any of the unlawful activities described herein.

209.    Barclays established rights in the LEHMAN Names and Marks—including as assignee of Lehman Brothers' prior rights from use of the names and marks dating back to 1850 and licensor of Lehman Brothers' use since 2008 of the names and marks—long before Defendants began their unlawful activities described herein.

210.    Defendant's use the Infringing Names and Marks is likely to cause consumer confusion as to the source and origin of Defendants' Purported Services and to cause mistake, or to deceive the public by misleading consumers into believing that Defendants' Purported Services emanate from, are approved, authorized, endorsed or sponsored by, or are in some way associated or connected with Barclays and/or its services, Lehman Brothers and/or its services and/or the LEHMAN Names and Marks.

211.    Upon information and belief, Defendants acted with intent to usurp the goodwill and consumer recognition in the LEHMAN Names and Marks and to sow consumer confusion in the marketplace such that consumers would mistakenly believe that Defendants are somehow affiliated or associated with Barclays and/or its services, Lehman Brothers and/or its services and/or the LEHMAN Names and Marks.

212.    Upon information and belief, despite their representations to the contrary in commercial advertising, including in the Infringing Website, the SLRA, the Broker Flyer, the Direct Lending Flyer and the Press Releases, the Defendants do not provide any financial services other than security backed loans and have not made any of the investments set forth therein.

**Defendants' Unlawful Registration of the Infringing Names and Marks**

213.    Upon information and belief, in furtherance of their scheme to impersonate Lehman Brothers and to create a false association with the LEHMAN Names and Marks, and in an attempt to provide an air of legitimacy to Defendants' unlawful actions, Defendants have registered and

attempted to register the Infringing Names and Marks as trademarks in the United States and certain foreign jurisdictions.

214.   Upon information and belief, Sklarov, through his shell company Black Rock, caused Singh to file with the USPTO intent to use applications to register the following marks:

| Mark | Application No. | Services | Application Date |
|------|----------------|----------|------------------|
| SHEARSON LEHMAN | 88457946 | 36: Financial services, namely, advising corporations on debt and financial restructuring, bankruptcy reorganization and divestitures, namely, sales of entities and their stock and assets; strategic planning and capital raising for corporations, start-ups, emerging companies, private equity fund and other similar corporate entities; stock loans; arranging financing for start-ups, emerging companies, private equity funds and other similar corporate entities; merchant banking; investment banking; underwriting, namely, underwriting offers of securities as manager, co-manager or syndicate member; private placements; investment management and advice; financial consultancy, planning, research and appraisal of corporate entities; financial evaluation and other wealth management services, namely, for high net worth individuals, for pension and other institutional accounts; trading and dealing in stocks, securities and other financial products, namely, bonds and advisory services relating thereto; brokerage and dealer services in the field of stocks and securities; providing financial news and information via a global communication network; financial investment and financial advisory services in the field of real estate; leasing of real estate; real estate acquisition services; real estate appraisal; real estate equity sharing, namely, managing and arranging for co-ownership of real estate; | June 3, 2019 |

| | | and real estate investment and real estate management | |
| SHEARSON LEHMAN HUTTON | 88536436 | 36: Financial services, namely, corporate workout, debt restructuring, receivership, and loan resolution for commercial loans | July 25, 2019 |

(the "Infringing Applications").   Attached hereto as **Exhibit 37** are copies of the Infringing Applications.

215.     Singh signed both Infringing Applications as "General Counsel" of Black Rock.

216.     Singh also listed his own name as affiliated with the Black Rock name and address as Correspondent of Record for the Infringing Application Serial No. 88536436.

217.     Thus, upon information and belief, when filing the Infringing Applications, Singh was acting as an officer of Black Rock.

218.     At the time Singh filed each of the Infringing Applications, he was required to sign a declaration that:

> the applicant believes the applicant is entitled to use the mark in commerce on or in connection with the goods or services specified in the application [and t]o the best of the signatory's knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive.

(the "Trademark Declaration").

219.     Upon information and belief, at the time Singh signed the Trademark Declaration for each of the Infringing Applications, Singh knew of Barclays' superior and prior rights in the LEHMAN Names and Marks and that Black Rock's and Sklarov's registration and use of the marks SHEARSON LEHMAN and SHEARSON LEHMAN HUTTON would cause consumers to mistakenly believe that BlackRock and Sklarov were somehow affiliated or associated with Lehman Brothers, Barclays and/or the LEHMAN Names and Marks.

-58-

220. Indeed, as discussed below, Barclays already had sent a cease and desist letter to Singh before he filed Infringing Application Serial No. 88536436 for the mark SHEARSON LEHMAN HUTTON. Moreover, the LEHMAN Names and Marks are some of the most famous names and marks associated with financial services and still are used today by Lehman Brothers and Barclays, as would be evidenced by a simple Internet search. It would be implausible for any of the Defendants, including Singh, to claim ignorance of Barclays' and Lehman Brothers' prior and current rights in the LEHMAN Names and Marks.

221. As noted above, Singh has admitted in at least one other context that he knowingly filed a trademark application with the USPTO when he knew another party had superior rights and that the mark in the application was likely to cause confusion with that senior mark and/or create a false suggestion of a connection with that other party. Specifically, Singh willingly testified before the Court in the *Rothschild* litigation that he knew of Rothschild's superior rights in the ROTHSCHILD Marks when Sklarov instructed him to file the infringing application for MAYER AMSCHEL ROTHSCHILD CAPITAL, advised Sklarov that he should not file the application, yet filed it anyway.

222. Thus, upon information and belief, in furtherance of Defendants' scheme to impersonate Lehman Brothers and to commit fraud upon the public and on the USPTO, Singh made material misrepresentations to the USPTO with the intent to deceive the USPTO into granting registration of the SHEARSON LEHMAN and SHEARSON LEHMAN HUTTON marks in the Infringing Applications, which Black Rock and Sklarov were not entitled to register.

223. Shortly after Singh filed the Infringing Applications, Singh, upon information and belief, at the direction and instruction of Sklarov, sought to amend Infringing Application Serial No. 88457946 to list Sklarov's shell company Lincoln as the current applicant. The USPTO did

not accept this amendment. Upon information and believe, Singh was acting as an officer of Lincoln when he attempted to amend Application Serial No. 88457946.

224. Barclays filed Letters of Protest against the Infringing Applications, accompanying each of which were news and Internet articles about Lehman Brothers, including its former use of the SHEARSON LEHMAN Names and Marks, and information about Barclays' prior-filed pending Application Serial No. 86081143 for the mark LEHMAN BROTHERS in International Class 36 (the "Letters of Protest").

225. The USPTO accepted the Letters of Protest and referred Barclays' news and Internet articles to the examining attorneys for the Infringing Applications, noting "evidence submitted by the protestor is relevant and may support a reasonable ground for refusal in ex parte examination," namely, "[p]ossible false association" with Barclays and/or Lehman Brothers.

226. The USPTO also instructed the examining attorney to consider Barclays' prior-filed pending Application Serial No. 86081143 for the mark LEHMAN BROTHERS in International Class 36 as a potential obstacle to Infringing Application Serial No. 88536436 for the mark SHEARSON LEHMAN HUTTON.

227. The USPTO ultimately issued office actions rejecting the Infringing Applications. In each office action, the examining attorney cited Barclays' prior-filed pending application for the LEHMAN BROTHERS mark as a potential bar to registration based on a likelihood of confusion between the Barclays' LEHMAN BROTHERS marks and the marks in the Infringing Applications in violation of Section 2(d) of the Lanham Act, 15 U.S.C. § 1052(d).

228. Recognizing the fame of the SHEARSON LEHMAN and SHEARSON LEHMAN HUTTON marks, the USPTO also required Black Rock to provide information concerning its connection with Lehman Brothers:

> Due to the renown of the institution . . . named in the mark . . ., and the fact that there is no information in the application record regarding a connection with applicant, applicant must specify whether the . . . institution named in the mark has any connection with applicant's . . . services, and if so, must describe the nature and extent of that connection.

Attached hereto as **Exhibit 38** are copies of these office actions.

229.   Black Rock, Sklarov and Singh failed to respond to these office actions and the USPTO ultimately rejected the Infringing Applications as abandoned.  Attached hereto as **Exhibit 39** are copies of the current status records from the USPTO for the Infringing Applications.

230.   Undeterred by the USPTO's rejection of the Infringing Applications and Barclays' demand letters, Sklarov, through his shell companies, filed applications to register the marks LEHMAN BROTHERS, SHEARSON LEHMAN BROTHERS and SHEARSON LEHMAN in at least two foreign jurisdictions.

231.   Upon information and belief, Newburgh, at the direction of Sklarov, filed applications in the Office of Trademarks of the Principality of Andorra ("OTPA") to register the marks LEHMAN BROTHERS and SHEARSON LEHMAN for "Brokerage; repayment; loan (finance); secured loans; financing services" in International Class 36.  Upon information and belief, the OTPA does not publish trademark applications for opposition by third parties prior to granting registration.  Nor is Andorra a member of the EUIPO, which recently has recognized the continuing validity of Barclays' LEHMAN BROTHERS mark.  Upon information and belief, Sklarov and Newburgh intentionally chose to register marks in this jurisdiction to make it more difficult for Barclays to enforce its legitimate rights.

232.   Upon information and belief, in February 2020, the OTPA granted registration to Newberg to the marks LEHMAN BROTHERS (Andorra Registration No. 41125) and SHEARSON LEHMAN (Andorra Registration No. 41044 ) (the "Andorra Registrations").  Upon information and belief, the Andorra Registrations were first made public in or about March 2020,

a month after the applications matured to registrations.  Barclays first learned about the Andorra

Registrations on or about April 22, 2020.  Attached hereto as **Exhibit 40** are copies from the

official OTPA records showing the status of the Andorra Registrations.

233.    Upon information and belief, on or about January 30, 2020, Lincoln, at the direction

of Sklarov, filed Application Serial No. M279372-01 in the Directorate General of the Industrial

Property Registry - Ministry of Commerce and Industries in Panama ("DIGERPI") to register the

mark SHEARSON LEHMAN BROTHERS & Design (using the Lehman Font as follows:

**SHEARSON LEHMAN BROTHERS** ) for "Collateralized loans; financing services; securities brokerage;

stock brokerage" in International Class 36 (the "Panama Application").  Upon information and

belief, the Panama Application was first made public and published by the DIGERPI on or about

July 9, 2020.  Barclays first learned about the Panama Application on or about July 24, 2020.

Attached hereto as **Exhibit 41** are copies from the official DIGERPI records showing the status of

the Panama Application.  Barclays has filed an opposition against the Panama Application.

234.    Upon information and belief, Defendant Sklarov instructed and directed each of

these foreign trademark filings and Singh coordinated with and instructed local counsel in the

relevant jurisdictions to effectuate the filings, all as part of a continuing and intentional scheme to

deceive consumers and sow confusion in the marketplace.

235.    Defendants do not have (and never have had) permission from Barclays or Lehman

Brothers to file the Infringing Applications, the Andorra Registrations or the Panama Application.

236.    Barclays established rights in the LEHMAN Names and Marks—including as

assignee of Lehman Brothers' prior rights from use of the names and marks dating back to 1850

and licensor of Lehman Brothers' use since 2008 of the names and marks—long before Defendants

first sought to file the Infringing Applications, the Andorra Registrations or the Panama Application.

237.    Defendants' filing of and attempts to file the Infringing Applications, the Andorra Registrations and the Panama Application, are likely to cause consumer confusion as to the source and origin of Defendants' Purported Services and to cause mistake, or to deceive the public by misleading consumers into believing that Defendants' Purported Services emanate from, are approved, authorized, endorsed or sponsored by, or are in some way associated or connected with Barclays and/or its services, Lehman Brothers and/or its services and/or the LEHMAN Names and Marks.

238.    Upon information and belief, Defendants filed the Infringing Applications, the Andorra Registrations and the Panama Application with intent to usurp the goodwill and consumer recognition in the LEHMAN Names and Marks and to sow consumer confusion in the marketplace such that consumers would mistakenly believe that Defendants are somehow affiliated or associated with Barclays and/or its services, Lehman Brothers and/or its services and/or the LEHMAN Names and Marks.

**Defendants' Other Unlawful Acts that Seek to Create False Connections with
Famous Financial Services Names and Brands**

239.    The LEHMAN Names and Marks and the ROTHSCHILD Marks are not the only famous financial services names and marks with which Defendants have falsely sought to associate themselves in an apparent attempt to cause confusion in the marketplace and mislead consumers.

240.    At or about the same time Singh filed the Infringing Applications on behalf of Black Rock and at the direction of Sklarov, Singh also filed applications in the names of Black Rock, Lincoln and Newburgh, seeking to register trademarks containing or comprising famous names

and marks associated with financial services, with which those defendants clearly had no affiliation or association, including:

Lincoln:    CREDIT SUISSE FIRST BOSTON; BNP PARIBAS FORTIS; FORTIS N.V.; ASTOR CAPITAL; MAYER AMSCHEL ROTHSCHILD CAPITAL; SAMUEL WALTON CAPITAL; LAZARD FRERES & CO.

Black Rock: UBS PAINE WEBBER; PRICE WATERHOUSE COOPERS; ARTHUR ANDERSEN; CORNELIUS VANDERBILT; JOHN D. ROCKEFELLER; ANDREW CARNEGIE; SAL. OPPENHEIM; OPPENHEIM; BENTLEY ROTHSCHILD; PENN STATE FINANCIAL; WASHINGTON MUTUAL; BEAR STEARNS; DREYFUS FINANCIAL.

Newburgh:   GEORGE SOROS CAPITAL; WARREN BUFFET CAPITAL; DEAN WITTER REYNOLDS; SALOMON SMITH BARNEY; PRUDENTIAL – BACHELOR; DL & J DONALDSON, LUFKIN, & JENRETTE; BACHE & CO.

(the "Other Infringing USPTO Marks").  Attached hereto as **Exhibit 42** are copies of the USPTO status records for the applications for the Other Infringing USPTO Marks.

241.    Upon information and belief, Sklarov directed Singh to file applications for the Other Infringing USPTO Marks on behalf of Black Rock, Lincoln and Newburgh.

242.    When filing each of the applications for the Other Infringing USPTO Marks, Singh listed his own name as affiliated with the respective shell company name and address as Correspondent of Record.  He signed several of the applications for the Other Infringing USPTO Marks Infringing Applications as "General Counsel" of the respective shell company.  Thus, upon information and belief, when filing the Other Infringing USPTO Marks, Singh was acting as an officer of the respective company in whose name the application was filed.

243.    As with the Infringing Applications, at the time Singh filed each of the applications for the Other Infringing USPTO Marks, he was required to sign the Trademark Declaration.

-64-

244.    Upon information and belief, at the time Singh signed the Trademark Declaration for each of applications for the Other Infringing USPTO Marks, he knew of third parties' superior and prior rights in those name and marks and that Black Rock's, Newburgh's, Lincoln's and Sklarov's registration and use of Other Infringing USPTO Marks would cause consumers to mistakenly believe that BlackRock, Newburgh, Lincoln and Sklarov were somehow affiliated or associated with each of those third parties.

245.    Thus, upon information and belief, in furtherance of Defendants' scheme to commit fraud upon the public and the USPTO, Singh made material misrepresentations to the USPTO with the intent to commit fraud and to deceive the USPTO into granting the registration for the Other Infringing USPTO Marks, to which Black Rock, Newburgh, Lincoln and Sklarov were not entitled to register.

246.    The USPTO rejected each and every one of the applications for the Other Infringing USPTO Marks based on potential or actual likely confusion or false suggestion of a connection with the name or brand that each of the Other Infringing USPTO Marks sought to impersonate.

247.    Upon information and belief, Sklarov, through his shell companies Lincoln and Newburgh, also filed applications to register in foreign jurisdictions, including Andorra and Panama, trademarks containing or comprising famous names and marks associated with financial services, with which Defendants' clearly have no legitimate affiliation or association.

248.    Many of these applications are identical or nearly identical to the Other Infringing USPTO Marks rejected by the USPTO, and include:

Andorra:    ANDREW CARNEGIE GLOBAL CAPITAL LT; BEAR STEARNS COMPANIES; CORNELIUS VANDERBILT CAPITAL MANAGEMENT LT; DREYFUS CORPORATION; EUROBANC FINANCIAL; FIDELITY INVESTMENTS; JOHN D ROCKEFELLER INVESTMENTS LIMITED LTD; LUXEMBOURG CAPITAL PARTNERS; SALOMON BROTHERS; WARREN

-65-

> BUFFET CAPITAL; ARTHUR ANDERSEN FINANCIAL; BACHE & CO SECURITIES; BANC ONE FINANCIAL; BENTLEY ROTHSCHILD CAPITAL LIMITED; DLJ, DONALDSON, LUFKIN & JENRETTE AND DESIGN; GUGGENHEIM; J. PAUL GETTY; PRICE WATERHOUSE COOPERS; SAL. OPPENHEIM; WESTINGHOUSE

Panama:   BEAR STEARNS COMPANIES; DREYFUS CORPORATION; SAL. OPPENHEIM

Benelux:   BENTLEY ROTHSCHILD CAPITAL LIMITED

Chile:   CORNELIUS VANDERBILT

Ireland:   SAL. OPPENHEIM

(the "Other Foreign Infringing Marks").

249.   Upon information and belief, Defendant Sklarov instructed and directed each of the trademark filings for the Other Foreign Infringing Marks and Singh coordinated with and instructed local counsel in the relevant jurisdictions to effectuate these filings, all as part of a continuing and intentional scheme to deceive consumers and sow confusion in the marketplace.

250.   Upon information and belief, Defendant Sklarov, either directly, or through a company he directs and controls, also is purporting to do business as "Bear Stearns" and attempting to intentionally mislead consumers to mistakenly believe that he and his purported services are affiliated with or originate from the global investment bank The Bear Stearns Companies, Inc. ("Bear Stearns"), which was acquired by JPMorgan Chase in 2008.

251.   Upon information and belief, Sklarov, either directly, or through a company he directs and controls, registered the domain name <bearstearnscompanies.com> in or about June 2019.  Upon information and belief, Sklarov utilized Domains By Proxy, LLC, a proxy service, to mask the true identity and contact information of the owner of the <bearstearnscompanies.com> domain name in an effort to shield himself from liability for his unlawful acts.  Attached hereto as **Exhibit 43** is a copy of the WhoIs records for the domain name <bearstearnscompanies.com>.

-66-

252.    The <bearstearnscompanies.com> and the <shearsonlehmanbrothers.com> domain names were registered on the same date with the same registrar, utilize the same proxy service to mask the true identity of the registrant, use the same nameservers, and resolve to websites hosted by the same Internet service provider.

253.    At some point thereafter, upon information and belief, Sklarov caused the <bearstearnscompanies.com> domain to resolve to a currently active website located at www.bearstearnscompanies.com, for a financial services company that purports to be named "Bear Stearns" (the "Fake Bear Stearns Website").

254.    Attached hereto as **Exhibit 44** are screenshots from the Fake Bear Stearns Website, an excerpt of which appears below:



255.    A pop-up window on the home page of the Fake Bear Stearns Website falsely claims the owners of the site have a registered trademark for BEAR STEARNS in the United States and cite to USPTO Application Ser. No. 88457949, which is the application filed by Sklarov, Black Rock and Singh that was rejected by the USPTO.

> Registration: Bear Stearns is a registered trademark applicant with the United States of America
> Patent and Trademark Office, registration number 88457949

256.    The Fake Bear Stearns Website purports to offer financial services, including investment banking and asset management, references numerous times the legitimate Bear Stearns, calls itself the "New Bear Stearns" and utilizes a logo identical to that long used and previously registered by the legitimate Bear Stearns:

| Logo Used and Previously Registered by Bear Stearns | Defendants' Logo |
|---|---|
|  |  |

257.    Defendants' registration of and/or attempts to register the Other USPTO Infringing Marks and the Other Foreign Infringing Marks, Defendants' current impersonation of Bear Stearns and Defendants' prior impersonation of Rothschild all are strong evidence of Defendants' bad faith intent and pattern to usurp the goodwill and consumer recognition in existing famous financial names and trademarks with which Defendants' have no legitimate affiliation and to sow consumer confusion in the marketplace, including with respect to Lehman Brothers and the LEHMAN Names and Marks.

**Defendants Have Refused to Stop their Unlawful Activities**

258.    Despite Barclays' multiple demands, Defendants have refused to cease and desist from, and instead have intentionally increased, their unlawful activities.

-68-

259.     Shortly after learning that Black Rock and Singh had filed the first of the Infringing Applications with the USPTO (Application Serial No. 88457946 for the mark SHEARSON LEHMAN), on or about July 22, 2019, Barclays sent a letter to Black Rock and Singh demanding that they cease and desist from all attempts to register and use any mark containing, comprising or confusingly similar to the LEHMAN Names and Marks, including SHEARSON LEHMAN, and abandon Application Serial No. 88457946.

260.     Instead of complying with Barclays' demands, three days later, Black Rock and Singh increased their infringing activities by filing the second of the Infringing Applications with the USPTO (Application Serial No. 88536436 for the mark SHEARSON LEHMAN HUTTON).

261.     When Black Rock and Singh formally responded to Barclays' demand letter on July 29, 2020, they falsely claimed that Lehman Brothers was no longer an active company, refused to comply with Barclays' demands and, in an astonishing display of bad faith, offered to sell the SHEARSON LEHMAN mark and application to Barclays.

262.     On August 8, 2020, Barclays reiterated its demands, with which Black Rock and Singh again refused to comply.

263.     After the USPTO accepted Barclays' Letters of Protest and rejected the Infringing Applications, in or about March 2020, Barclays saw no evidence that Defendants were using the Infringing Marks.

264.     Unbeknownst to Barclays at that time, Sklarov, though his shell companies, had already obtained the Andorra Registrations, filed the Panama Application and were using the Infringing Names and Marks in connection with purported financial services, all despite Barclays' notice and demands months prior.

265.    Shortly after Barclays learned about the Andorra Registrations, on or about April 28, 2020, Barclays sent a letter to Sklarov (and his shell companies) and Singh, demanding again that they cease and desist from all attempts to register and use any mark containing, comprising or confusingly similar to the LEHMAN Names and Marks, including LEHMAN BROTHERS and SHEARSON LEHMAN and abandon the Andorra Registrations.

266.    Despite several additional correspondence between the parties, Sklarov and Singh refused to comply with Barclays' demands.

267.    Attached hereto as **Exhibit 45** are copies of the correspondence between Barclays and Defendants concerning Barclays' demands.

268.    Upon information and belief, Sklarov and/or Singh informed Qureishi of Barclays' prior rights in the LEHMAN Names and Marks and demands to cease and desist from use and registration of the Infringing Names and Marks.

269.    Sklarov and Singh did not disclose in any correspondence, including a letter sent as recent as July 27, 2020, that Defendants actually were and for many months had been using the Infringing Names and Marks, including through the Infringing Website, the SLRA, the Broker Flyer, the Direct Lending Flyer, the Press Releases and Qureishi's actions and representations described above.  Upon information and belief, Defendants intentionally hid and attempted to conceal their unlawful activities from Barclays and its counsel.  Barclays independently learned about these activities shortly before initiating this action.

270.    Upon information and belief, unless and until Defendants are enjoined from any further unauthorized use and registration of the Infringing Names and Marks or any name or mark containing, comprising or confusingly similar to the LEHMAN Names and Marks, Defendants will continue to use and to register the Infringing Names and Marks, to intentionally attempt to

deceive, confuse and mislead consumers that they are affiliated with Lehman Brothers and to violate Barclays' valuable trademark rights.

271.   Upon information and belief, by virtue of their unlawful conduct described above, Defendants have made or will make substantial profits and gains to which they are not in law or equity entitled.

272.   Upon information and belief, Defendants' unlawful conduct described above has resulted caused damage to Barclays and its LEHMAN Names and Marks.

273.   Upon information and belief, as a result of Defendants' unlawful actions described above, Plaintiffs have been or will be damaged and have suffered, and will continue to suffer, immediate and irreparable injury for which Plaintiffs have no adequate remedy at law.

## CAUSES OF ACTION

### COUNT I
### (False Designation of Origin, Lanham Act, §43(a)(1)(A))

274.   Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-273 above with the same force and effect as if set forth fully herein.

275.   Defendants' conduct as described above constitutes false designations of origin in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. §1125(a)(1)(A).

### COUNT II
### (Cybersquatting, Lanham Act, §43(d))

276.   Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-275 above with the same force and effect as if set forth fully herein.

277.   Defendants have registered, trafficked in and used the domain name <shearsonlehmanbrothers.com>, which is identical to or confusingly similar to the LEHMAN Names and Marks.

28827/162/3557472

278.    The LEHMAN Names and Marks were distinctive at the time Defendants registered the domain name <shearsonlehmanbrothers.com>.

279.    As described herein, Defendants' acts were committed with a bad faith intent to profit from and to cause confusion with Plaintiffs' LEHMAN Names and Marks.

280.    Defendants' conduct as described above constitutes cybersquatting in violation of Section 43(d) of the Lanham Act, 15 U.S.C. §1125(d).

## COUNT III
### (Federal Dilution, Lanham Act §43(c))

281.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-280 above with the same force and effect as if set forth fully herein.

282.    The LEHMAN Names and Marks are famous among the general consuming public and distinctive and enjoyed such fame and distinctiveness since long prior to Defendants' use of the Infringing Names and Marks.

283.    Defendants' conduct as described above is likely to cause dilution of the distinctive quality of the famous and distinctive LEHMAN Names and Marks, in violation of Section 43(c) of the Lanham Act, 15 U.S.C. §1125(c).

284.    Defendants' conduct as described above also is likely to cause dilution by tarnishment by harming the reputation of the famous and distinctive LEHMAN Names and Marks, in violation of Section 43(c) of the Lanham Act, 15 U.S.C. §1125(c).

## COUNT IV
### (State Law Dilution, New York General Business Law §360-l)

285.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-284 above with the same force and effect as if set forth fully herein.

28827/162/3557472

286.    The LEHMAN Names and Marks are famous and distinctive in the state of New York and enjoyed such fame and distinctiveness in the state of New York since long prior to Defendants' use of the Infringing Names and Marks.

287.    Defendants' conduct as described above causes a likelihood of injury to Plaintiffs' business reputation and dilution of the distinctive quality of the LEHMAN Names and Marks in violation of New York General Business Law § 360-l.

**COUNT V**
**(Unfair Competition – New York Law)**

288.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-287 above with the same force and effect as if set forth fully herein.

289.    Defendants' conduct as described above constitutes unfair competition under the common law of the state of New York.

**COUNT VI**
**(Deceptive Trade Practices  – New York General Business Practices § 349)**

290.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-289 above with the same force and effect as if set forth fully herein.

291.    Defendants' conduct as described above constitutes a significant risk of harm to the public interest in the state of New York.

292.    Defendants' conduct as described above constitutes deceptive trade practices in violation of New York General Business Practices § 349.

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs' favor and against Defendants as follows:

28827/162/3557472

A.      Ordering that Defendants and their agents, servants, representatives, employees, successors and assigns, and all those persons or entities in active concert or participation with any of them who receive actual notice of the injunctive order: (1) be enjoined, preliminarily and permanently, from (a) using, registering or seeking to register the Infringing Names and Marks or any name or mark containing, comprising or confusingly similar to the LEHMAN Names and Marks worldwide; and (b) from making any statements or taking any actions likely to cause consumers to believe mistakenly that Defendants are affiliated or associated with Lehman Brothers and/or Barclays; (2) transfer to Plaintiffs the domain name <shearsonlehmanbrothers.com> and any other domain name containing, comprising or confusingly similar to the LEHMAN Names and Marks; and (3) expressly withdraw and abandon the Andorra Registrations and the Panama Application and any other trademark applications owned or controlled by Defendants for the Infringing Names and Marks or for marks that contain, comprise or are confusingly similar to the LEHMAN Names and Marks.

B.      Ordering that Defendants be directed to file with the Court and serve upon Plaintiffs, within 30 days after entry of final judgment, a report in writing and under oath setting forth in detail the manner and form in which Defendants have complied with the provisions set forth in Paragraph A above.

C.      Ordering Defendants to account to Plaintiffs for all gains, profits and advantages derived from Defendants' wrongful acts, together with interest therein.

D.      Ordering Defendants pay to Plaintiffs any damages sustained by Plaintiffs by reason of Defendants' wrongful acts in an amount to be determined at trial, together with interest thereon.

E.      Ordering Defendants pay to Plaintiffs trebled damages.

F.     Ordering that Plaintiffs recover their reasonable attorneys' fees from Defendants, together with the costs of this action.

G.     Ordering that Plaintiffs be granted such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all issues triable as such.

Dated:   October 9, 2020

Respectfully submitted,
COWAN, LIEBOWITZ & LATMAN, P.C.

By: _____

Eric J. Shimanoff (ejs@cll.com)
Joelle A. Milov (jam@cll.com)
114 West 47th Street
New York, New York 10036
(212) 790-9200
*Attorneys for Plaintiffs Barclays PLC and Barclays Capital Inc.*