# EXHIBIT 23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x
BARCLAYS PLC and BARCLAYS CAPITAL  :    No. 20-cv-8437 (LAK)
INC.
                                :

              Plaintiffs,       :    <u>**CONSENT JUDGMENT AND**</u>
                                   <u>**PERMANENT INJUNCTION**</u>
    -against-                  :

VLADIMIR "VAL" SKLAROV, individually   :
and dba "SHEARSON LEHMAN
BROTHERS," "SHEARSON LEHMAN,"     :
"LEHMAN BROTHERS," "SHEARSON
LEHMAN BROTHERS INVESTMENT       :
BANKING" and "SHEARSON LEHMAN
INVESTMENT BANKING"; OSMAN       :
QUREISHI, individually and dba "SHEARSON
LEHMAN BROTHERS," "SHEARSON       :
LEHMAN," "LEHMAN BROTHERS,"
"SHEARSON LEHMAN BROTHERS         :
INVESTMENT BANKING" and "SHEARSON
LEHMAN INVESTMENT BANKING";      :
BLACK ROCK CAPITAL LLC; NEWBURGH
CAPITAL LTD.; LINCOLN CAPITAL LTD.;   :
JAITEGH "JT" SINGH; JOHN DOES 1-10;
and XYZ CORPORATIONS 1-10,        :

                  Defendants.    :
------------------------------------------------------------- x

**WHEREAS**, Plaintiffs Barclays PLC and Barclays Capital Inc. (collectively,

"Plaintiffs") are the owners of record of names and trademarks containing or comprising

LEHMAN, including without limitation LEHMAN BROTHERS, in connection with financial

and related goods and services (the "LEHMAN Names and Marks").

**WHEREAS**, Defendants Vladimir "Val" Sklarov, individually and dba "Shearson

Lehman Brothers" "Shearson Lehman," "Lehman Brothers," "Shearson Lehman Brothers

Investment Banking" and "Shearson Lehman Investment Banking" ("Sklarov"), Osman

Qureishi, individually and dba "Shearson Lehman Brothers," "Shearson Lehman," "Lehman Brothers," "Shearson Lehman Brothers Investment Banking" and "Shearson Lehman Investment Banking" ("Qureishi"), Black Rock Capital LLC ("Black Rock"), Newburgh Capital Ltd. ("Newburgh"), Lincoln Capital Ltd. ("Lincoln"), Jaitegh "JT" Singh ("Singh") and XYZ Corporation 1, now identified as Cerebequity Holdings Ltd. ("Cerebequity") (collectively, "Defendants"), have directly and/or indirectly used, registered and/or sought to register names, trademarks and/or domain names containing or comprising "Lehman Brothers" and/or "Lehman" in connection with financial and related services, including without limitation "Lehman," "Lehman Brothers," "Shearson Lehman Brothers," "Shearson Lehman," "Shearson Lehman Brothers Investment Banking," "Shearson Lehman Investment Banking" and <shearsonlehmanbrothers.com>, including without limitation in the following stylizations:





2

# SHEARSON LEHMAN
## Brothers Investment Banking

# SHEARSON LEHMAN
## Investment Banking

(collectively, the "Infringing Names and Marks").

**WHEREAS**, Defendant Sklarov represents that he owns and controls Black Rock, Newburgh, Lincoln and Cerebequity and has the authority to execute this Consent Judgment and Permanent Injunction on their behalf.

**WHEREAS**, Plaintiffs commenced this action against Defendants for false designation of origin, cybersquatting and trademark dilution under the Lanham Act of 1946, as amended, 15 U.S.C. § 1501 *et seq.* and trademark dilution, deceptive trade practices and unfair competition under the laws of the state of New York.

**WHEREAS**, in this Consent Judgment and Permanent Injunction:

   a.   "Lehman Brothers" shall mean Lehman Brothers Holdings Inc., its present and former subsidiaries and affiliates, and/or each of their predecessors, licensees, assignors and assigns.

   b.   "Lehman Font" shall mean the following font:

# LEHMAN BROTHERS

   c.   "Shearson Lehman Stylizations" shall mean the following stylizations:

# SHEARSON LEHMAN BROTHERS

**SHEARSON LEHMAN BROTHERS**

d.  "Infringing Website" shall mean Defendants' website located at www.shearsonlehmanbrothers.com, excerpts from which are attached hereto as **Exhibit A**.

e.  "Querishi's LinkedIn Profile" shall mean the LinkedIn profile currently located at https://www.linkedin.com/in/osman-qureishi-ab2434100/, excerpts from which are attached hereto as **Exhibit B**.

f.  "SLRA" shall mean Defendants' document entitled "Securities Lending Referral Agreement," a copy of which is attached hereto as **Exhibit C**.

g.  "Broker Flyer" shall mean Defendants' document entitled "2020 Broker Dealer Affiliate Program," a copy of which is attached hereto as **Exhibit D**.

h.  "Direct Lender Flyer" shall mean Defendants' document entitled "Direct Lender for Global Securities Backed Lending Program," a copy of which is attached hereto as **Exhibit E**.

i.  "Press Releases" shall mean Defendants' press releases entitled "Shearson Lehman is Entering into Negotiations to Invest $250 million in Alternative Energy" (March 20, 2020), "Shearson Lehman Brothers Investment Banking Broker Dealer Affiliate Program is Available World Wide" (April 7, 2020), "Shearson Lehman Adds a New Local Custodian and Eases SBL Requirements in Hong Kong!" (May 1, 2020) and "Asia's Alternative Energy Sector Becomes Front-Page News as Shearson Lehman Vows to Invest Millions" (August 24, 2020), copies of which are attached hereto as **Exhibit F**.

j.  "Andorra Registrations" shall mean Trademark Registration No. 41125 for the mark LEHMAN BROTHERS and Trademark Registration No. 41044 for the mark SHEARSON LEHMAN, both filed in the name of Newburgh with the Office of Trademarks of the Principality of Andorra.

k.  "Panama Application" shall mean Trademark Application No. M279372-01 for the mark SHEARSON LEHMAN BROTHERS &

4

SHEARSON LEHMAN BROTHERS

Design (                           ), filed in the name of Lincoln with the Directorate General of the Industrial Property Registry - Ministry of Commerce and Industries in Panama.

l. "Serbia Application" shall mean Trademark Application No. 2020/0000906 for the mark LEHMAN filed in the name of Cerebequity with the Intellectual Property Office of the Republic of Serbia.

m. "Slovenia Application" shall mean Trademark Application No. 202070650 for the mark LEHMAN filed in the name of Cerebequity with the Slovenian Intellectual Property Office.

n. "Anguilla Application" shall mean Trademark Application No. 99312264 for the mark LEHMAN filed in the name of Cerebequity with the Commercial Registry the Government of Anguilla.

o. "Philippines Application" shall mean Trademark Application No. 42020513991 for the mark LEHMAN filed in the name of Cerebequity with the Intellectual Property Office of the Philippines.

p. "Cayman Islands Registration" shall mean Registration No. T0001738 for the mark LEHMAN filed in the name of Cerebequity with the Cayman Islands Intellectual Property Office.

q. "Nepal Application" shall mean Trademark Application No. 7667 for the mark SHEARSON LEHMAN BROTHERS field in the name of Newburgh with the Nepal Ministry of Industry.

r. "Belize Applications" shall mean Trademark Application No. 15947.20 for the mark SHEARSON LEHMAN BROTHERS filed by Black Rock and another application for the mark LEHMAN filed by Cerebequity with the Belize Intellectual Property Office.

**WHEREAS**, Plaintiffs and Defendants have reached an amicable agreement for resolution of this action;

**NOW, THEREFORE**, upon consent of the parties, it is hereby Ordered, Adjudged and Decreed as follows:

1. This Court has jurisdiction over the parties hereto and over the subject matter in issue, and venue is proper in this district.

5

2.　　Defendants and their agents, servants, representatives, employees, successors and assigns, and all those persons or entities in active concert or participation with any of them who receive actual notice of this Consent Judgment and Permanent Injunction, are and shall be permanently enjoined and restrained world-wide from:

      a.　　using, registering or seeking to register any name, designation, corporate name, domain name, URL, email address, social media handle, account name, trade name, trade mark or service mark containing, comprising or confusingly similar to the LEHMAN Names and Marks, SHEARSON, BARCLAYS or BARCLAY, including without limitation the Infringing Names and Marks, including without limitation orally and in all media, including without limitation the Infringing Website or any other website, Qureishi's LinkedIn profile or any other social media platform, emails and correspondence, agreements, including without limitation the SLRA, marketing and recruiting documents, including without limitation the Broker Flyer and the Direct Lender Flyer, the Press Releases and any other press release distributed by Defendants;

      b.　　making any statements or taking any actions likely to cause consumers to believe mistakenly that Defendants are affiliated or associated with Lehman Brothers or Barclays, including without limitation by: (i) using the address 200 Vesey Street, New York, New York or any other address previously or currently associated with Barclays or Lehman Brothers; (ii) using the Lehman Font or Shearson Lehman Stylizations; and (iii) using other names or marks previously or currently associated with Barclays or Lehman Brothers, including without limitation NOMURA, NEUBERGER, BERMAN, AURORA, CROSSROADS, KUHN, LOEB, AMERICAN EXPRESS, HUTTON and STIFEL; and

      c.　　encouraging, directing or assisting others to do the same.

3.　　Defendants and their agents, servants, representatives, employees, successors and assigns, and all those persons or entities in active concert or participation with any of them who receive actual notice of this Consent Judgment and Permanent Injunction, shall perform the following within thirty (30) calendar days of the entry of this Order :

      a.　　disable access world-wide to the Infringing Website;

6

  b.  transfer to Plaintiffs the domain name <shearsonlehmanbrothers.com>, and any other domain name in their possession, custody or control containing, comprising or confusingly similar to the LEHMAN Names and Marks;

  c.  retract the Press Releases and any other press releases by Defendants that use the LEHMAN Marks and/or the Infringing Names and Marks;

  d.  withdraw and permanently abandon or cause to withdraw and to permanently abandon all registrations or applications to register marks, within their possession, custody or control or over which they have authority, containing, comprising or confusing similar to the LEHMAN Marks world-wide, including without limitation the Andorra Registrations, the Panama Application, the Serbia Application, the Slovenia Application, the Anguilla Application, the Philippines Application, the Cayman Islands Registration, the Nepal Application and the Belize Applications.

4.  Defendants are directed to file with the Court and serve upon Plaintiffs, within sixty (60) calendar days after entry of this Consent Judgment and Permanent Injunction, a report in writing and under oath setting forth in detail the manner and form in which Defendants have complied with the provisions set forth above, including the deletion, removal, transfer, destruction, recall, withdrawal, abandonment or cancellation of any materials or documents as required herein.

5.  Each and every term of this Consent Judgment and Permanent Injunction shall be deemed to be separately enforceable.

6.  This Court shall retain jurisdiction over the subject matter in issue and the parties for the purpose of enforcement of this Consent Judgment and Permanent Injunction and each of the provisions hereof.

7.  No bond or posting of security is required in connection with the entry of this Consent Judgment and Permanent Injunction.

8.     Defendants agree to email service in any proceedings for contempt of or to enforce this Consent Judgment and Permanent Injunction.

9.     The parties waive their right to appeal or otherwise contest this Consent Judgment and Permanent Injunction, which may be entered without further notice to any party.

10.     This Consent Judgment and Permanent Injunction may be executed in multiple counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same instrument.  Faxed and/or emailed signatures will be valid and enforceable as if originals.

11.     The undersigned individuals hereby warrant and represent they have full authority to execute this Consent Judgment and Permanent Injunction on behalf of the party for which they signed.


**[REST OF PAGE INTENTIONALLY LEFT BLANK]**

28827/169/3701046

**AGREED AS TO FORM AND SUBSTANCE BY THE PARTIES:**

**BARCLAYS PLC**

By _____

Name: Marcus Southerden
Title: Head of IP Legal EME and APAC
Date: 5 March 2021

**BARCLAYS CAPITAL INC.**

By   /s/ Andrew Tannenbaum

Name: Andrew Tannenbaum
Title: Managing Director, Legal
Date: 2 March 2021

**BLACK ROCK CAPITAL LLC**

By _____

Name:
Title:
Date:

**NEWBURGH CAPITAL LTD.**

By _____

Name:
Title:
Date:

**LINCOLN CAPITAL LTD.**

By _____

Name:
Title:
Date:

**CEREBEQUITY HOLDINGS LTD.**

By _____

Name:
Title:
Date:

**VLADIMIR "VAL" SKLAROV**

_____

Date:

**OSMAN QUREISHI**

_____

Date:

**JAITEGH "JT" SINGH**

_____

Date:

9

**AGREED AS TO FORM AND SUBSTANCE BY THE PARTIES:**


**BARCLAYS PLC**

By_____

Name:
Title:
Date:


**BARCLAYS CAPITAL INC.**

By _Andrew Tannenbaum_____
    14BAFF14CA29199...

Name:   Andrew Tannenbaum
Title:   Managing Director, Legal
Date:  3/8/2021


**BLACK ROCK CAPITAL LLC**

By_____

Name:
Title:
Date:


**NEWBURGH CAPITAL LTD.**

By_____

Name:
Title:
Date:


**LINCOLN CAPITAL LTD.**

By_____

Name:
Title:
Date:


**CEREBEQUITY HOLDINGS LTD.**

By_____

Name:
Title:
Date:


**VLADIMIR "VAL" SKLAROV**

_____

Date:


**OSMAN QUREISHI**

_____

Date:


**JAITEGH "JT" SINGH**

_____

Date:

9

**AGREED AS TO FORM AND SUBSTANCE BY THE PARTIES:**


**BARCLAYS PLC**

By_____

Name:
Title:
Date:

**BARCLAYS CAPITAL INC.**

By_____

Name:
Title:
Date:


**BLACK ROCK CAPITAL LLC**

By_____

Name: Val Sklarov
Title: ~~Managing~~ Manager
Date: March 15, 2021

**NEWBURGH CAPITAL LTD.**

By_____

Name: Val Sklarov
Title: Manager
Date: March 15, 2021


**LINCOLN CAPITAL LTD.**

By_____

Name: Val Sklarov
Title: Manager
Date: March 15, 2021

**CEREBEQUITY HOLDINGS LTD.**

By_____

Name: Val Sklarov
Title: Manager
Date: March 15, 2021


**VLADIMIR "VAL" SKLAROV**

_____

Date: March 15, 2021

**OSMAN QUREISHI**

_____

Date:


**JAITEGH "JT" SINGH**

_____

Date: 03/15/2021

28827/169/3701046

AGREED AS TO FORM AND SUBSTANCE BY THE PARTIES:

**BARCLAYS PLC**                          **BARCLAYS CAPITAL INC.**

By _____               By _____

Name:                                     Name:
Title:                                    Title:
Date:                                     Date:


**BLACK ROCK CAPITAL LLC**                **NEWBURGH CAPITAL LTD.**

By _____               By _____

Name:                                     Name:
Title:                                    Title:
Date:                                     Date:


**LINCOLN CAPITAL LTD.**                  **CEREBEQUITY HOLDINGS LTD.**

By _____               By _____

Name:                                     Name:
Title:                                    Title:
Date:                                     Date:


**VLADIMIR "VAL" SKLAROV**                **OSMAN QUREISHI**

_____                   _____

Date:                                     Date:


**JAITEGH "JT" SINGH**

_____

Date:

9

**AGREED AS TO FORM AND SUBSTANCE BY COUNSEL FOR THE PARTIES:**

**COWAN, LIEBOWITZ & LATMAN, P.C.**

By:_____
     Eric J. Shimanoff, Esq.

114 West 47th Street
New York, NY 10036
(212) 790-9200
ejs@cll.com

*Attorneys for Plaintiffs*

Dated: _____03/17/2021_____

**LAW OFFICES OF MICHAEL D. T.
MCCRACKEN, PC**

By: _____
     Michael T. McCracken, Esq.

10 South LaSalle Street, Suite 1600
Chicago, IL 60603
(630) 926-5696
michael.t.mccracken@gmail.com

*Attorneys for Defendants*

Dated: 3/17/21

**APPROVED AND SO ORDERED** this $\frac{17^{th}}{}$ day of March, 2021.

_____
Lewis A. Kaplan, United States District Judge

10

28827/169/3701046

# EXHIBIT A

















# EXHIBIT B



Title: Osman Qureshi | LinkedIn
Link: https://www.linkedin.com/in/osman-qureshi...
Date: 08.14.2020

Osman's Activity

All activity | Articles | Posts | Documents

**Osman Qureshi** • 3rd+

Shearson Lehman Brothers investment banking is offering EMP method of payment for securities backed lending programs if you are interested to getting a free quote contact me today

Like | Comment | Share | Send

Most Relevant ▼

Aaron Moulin, CMT®, FCS

Please send me corporate website so I can look into it. Thanks

Like | Reply

**Osman Qureshi** ...
www.shearsonlehmanbrothers.com

Like | Reply

**Osman Qureshi** ...

Shearson Lehman Brothers investment banking is offering EMP method of payment for securities backed lending programs if you are interested to getting a free quote contact me today

Like | Comment | Share | Send

Osman Qureshi
John Eusebio

Have you heard? July 30 is International Day of Friendship! Designated by the UN it's a day we celebrate those relationships worldwide as they promote & encourage peace happiness and unity
Tag your International besties in the comments
#TexingConsultant

Like | Comment | Share | Send

Be the first to comment on this

**Osman Qureshi** ...

We are hiring!

If you are interested in working with a global investment Banking firm contact us
Shearson Lehman is currently recruiting Senior Securities Loan Representatives in Asia, Europe, Parts of Middle East and Central America. We are a direct lender and fund needs from 2.5 million USD to 500 million USD. Our brokers can earn a fee anywhere from 2-10% of the loan amount. Email us at:
wealthmanagement@shearsonlehmanbrothers.com please put in subject Securities loan representative and attach your resume #brokers #stockloans #worldwide

403 Access Denied

Like | Comment | Share | Send

Be the first to comment on this

Osman Qureshi
John Eusebio

#DidYouKnow?
95% of text messages are read within 15 minutes
Text marketing reaches your customers where they are: on the phone!
Find out more
https://bit.ly/2X4YTf4g
#TextingConsultant #Marketing #TextMarketing

---

Interests

Influencers

Bill Gates
+ Follow

Jack Welch
+ Follow

Gary Vaynerchuk
+ Follow

See all influencers

Companies

Shearson
+ Follow

PwC
+ Follow

Deutsche Bank
+ Follow

See all companies

Schools

Eastern Connecticut State University
+ Follow

Northwest HVAC/R Training Center
+ Follow

Three Rivers Community College - Company
+ Follow

Groups

Broker Dealer Services

Cryptocurrency

AMHP - American Muslim Health Professionals

See all groups

See More

LinkedIn Corporation © 20X





👍 Like    💬 Comment    ↪ Share    ➤ Send

Be the first to comment on this


Osman Qureshi
Broker Dealers

Check out our press release for our Broker Dealer Affiliate Marketing Program for securities backed funding. If you are interested to join our program contact me!
#BrokerDealers #securities #SonLiang #sons

 SON LI    Shearson Lehman Brothers Investment Banking Broker Dealer Affiliate Program is Available World Wide
others Investment

👍 Like    💬 Comment    ↪ Share    ➤ Send

Be the first to comment on this

Osman Qureshi



Tesla offers ventilators free of cost to hospitals, Musk says

👍 Like    💬 Comment    ↪ Share    ➤ Send

Osman Qureshi



Peter Edmundson



👍 Like    💬 Comment    ↪ Share    ➤ Send

+ Follow

**Osman Qureshi**

Broker Dealers

Shearson Lehman Brothers Investment Banking can help with block sale trades. We will provide more detail for your seniors subject to underwriting. We can offer DVP and fund deals too, than 14 business days. I would be glad to get you a quote please send me info at Osman.Qureshi@shearsonlehmanbrothers.com or send me a direct message on linkedin

👍 Like   💬 Comment   ↪ Share   ✈ Send

**Osman Qureshi**

Broker Leaders World Wide

Shearson Lehman Brothers Investment Banking is looking to develop key partnerships through out the world. We are a direct lender for securities backed lending. Our rates start at 3% and are load up to 10 years. There are no personal or corporate guarantees required. A simple streamlined process utilizing technology to monetize our clients results. We can fund deals from $2.1 Million-$500 Million less than 14 business days, if you are interested in learning more about our Affiliated broker dealer program contact me today! You may send me a direct message on LinkedIn. Also our affiliate broker dealers can earn an origination fee any where from 2.5%-3% of the loan amount. #brokerdealers #dealallows

#recommendlending

👍 | 1 Comment

👍 Like   💬 Comment   ↪ Share   ✈ Send

**Osman Qureshi**



Hong Kong Companies Have No Safety Net in Fight for Survival

👍 Like   💬 Comment   ↪ Share   ✈ Send

**Osman Qureshi**

**Mikel B., CPHR, MAHRI (LI O N) · 3rd ·**

#lifeisawincheck #hormoneboosters



# DOUBLE TAP

😊😮 | 74 3 Comments

👍 Like   💬 Comment   ↪ Share   ✈ Send

**Osman Qureshi**

Hello

Shearson Lehman Brothers Investment Banking is looking for talented business development professionals through out the following regions: Asia, Europe and parts of Middle East. If you are interested please send me a direct message. We offer lucrative commission where you can earn anywhere from 1%-3%. Vacancies are limited. If you have the experience and funds of business, contact me right away.

Shearson Lehman Brothers is a direct lender and we can fund deals from 2.5 Million dollars to 500 Million dollars world wide!

## SHEARSON LEHMAN

**DIRECT LENDER FOR GLOBAL SECURITIES BACKED LENDING PROGRAM**

**Osman Qureshi**
Senior Executive Vice President Wealth Management Division at Shearson Lehman Brothers Investment Banking
+ Follow

**Osman Qureshi**
Senior Executive Vice President Wealth Management Division at Shearson Lehman Brothers Investment Banking
+ Follow

**Osman Qureshi**
Senior Executive Vice President Wealth Management Division at Shearson Lehman Brothers Investment Banking
+ Follow

Messaging

Messaging

Messaging



👍 Like    💬 Comment    ↪ Share    ✈ Send

Be the first to comment on this

Osman Qureshi



China to inject $174 billion of liquidity on Monday as markets reopen

👍 Like    💬 Comment    ↪ Share    ✈ Send

Be the first to comment on this

Osman Qureshi

Global Citizen

If you have deals that require funding we would be happy to get you a quote We fund deals world wide our loans are non recourse ranging from 2.5 million to 500 million dollars. Earn referral fee anywhere from 2-4% See attached flyer for more details regarding our securities lending program! if you would like to get in touch with me please send me a direct message or message me on what's app at 917 704 1276 my email is enclosed in the flyer as well. Looking forward to working with you soon!



 Osman Qureshi





👍 Like    💬 Comment    ↪ Share    ✈ Send

Be the first to comment on this

Osman Qureshi

Hello Linkedin

Our wealth management division is currently expanding our securities lending program world wide. We are actively seeking sales professionals and broker dealers. Our loans range from 2.5million to 500 million dollars. We pay commissions







Osman Qureishi

... please contact me by sending me a direct message. We are currently servicing the following areas Canada, Asia, Parts of a Middle East and Europe

👍 Like   💬 Comment   ↪ Share   ✈ Send

Be the first to comment on this



Hello

Our firm is internationally recruiting business development professionals for our securities lending program. Commissions are paid out anywhere from 2-6%. Our loan range from $2,500,000 USD to $500,000,000 USD. If you are interested in learning more about our business development opportunity, especially in the Asian market, please send me a direct message. I am available on what's app at 917 704 3276. You may also send me a direct message on LinkedIn. I look forward to speaking with you soon!!

👍 Like   💬 Comment   ↪ Share   ✈ Send

Be the first to react




Good afternoon

Our firm is internationally recruiting business development professionals for our securities lending program. Commissions are paid out anywhere from 2-6%. Our loan range from $2,500,000 USD to $500,000,000 USD. If you are interested in learning more about our business development opportunity, especially in the Asian market, please send me a direct message. I am available on what's app at 917 704 3276. You may also send me a direct message on LinkedIn. I look forward to speaking with you soon!

403 Access Denied



👍 Like   💬 Comment   ↪ Share   ✈ Send

Be the first to react



Good afternoon

Our firm is internationally recruiting business development professionals for our securities lenders program. Commissions are paid out anywhere from 2-6%. Our loan range from $2,500,000 USD to $500,000,000 USD. If you are interested in learning more about our business development opportunity, especially in the Asian market, please send me your resume and let me know when would be a good time and day for us to talk. Please contact me at Osman.Qureishi@sherwoodlehmanmatters.com. I am available to talk on what's app at 917 704 3276. You may also send me a direct message on LinkedIn. I look forward to speaking with you soon!



👍 Like   💬 Comment   ↪ Share   ✈ Send

Be the first to comment on this

I am so excited to start my new journey at Sherwood Lehman as Senior Executive Vice President in the wealth management division working with high-net-worth and institutional clients in the Asian Market! I am going to share with the LinkedIn community with the success our firm has brought within the next couple of days!

👍 Like   💬 Comment   ↪ Share   ✈ Send

Be the first to react

I am in process of transitioning into a new firm that has great stock loan programs world wide. If you have ideas that need funding contact me immediately so we can get success. #stockloans #securitiesbacklending #businessloans #institutionallawyers

👍 Like   💬 Comment   ↪ Share   ✈ Send

Be the first to react




Cryptocurrency and bitcoin investors world wide

It doesn't matter if you're an expert or a beginner. If you have a passion for trading bitcoin and cryptocurrency let us show you an advanced AI platform that is automated where you can earn up to 80% in profits! See our live account statement and if you are interested in learning more journey contact me on what's app 917 704 6101 or send me a direct message. Looking forward to talking to you soon!

The prime reason of bitcoin is to revolutionize the way that independent and institutional investors are able to exchange and invest their money in the cryptocurrency market via our multi-platform approach. Our exchange merges all of the top global exchanges, such as Binance, Bittrex, Kucoin and over 20 others and create a fluid trading zone all in one place, allowing investors access to over 2,800 different coins. All investors can follow their favorite trades and organizations and spend from a number of trading strategies and options. Just allowing the non-professional trader an opportunity to fast track and watch the growth of the account. #bitcoin #cryptocurrency #trader #investor #coins #institutionalinvestors #tradingstrategies #digitalcurrency #cryptoadvancemarket



# EXHIBIT C

# SECURITIES LENDING REFERRAL AGREEMENT ("SLRA")

This Securities Lending Referral Agreement ("SLRA"), established as of _____
between Shearson Lehman Brothers Investment Banking ("Shearson Lehman"),      and
_____,                     a
Securities Lending

Agent ("Agent") who resides at _____
, both known hereafter in this SLRA, as the ("Parties") and individually as the ("Party").

In consideration of the mutual terms, premises, conditions, and covenants in this Agreement,
satisfaction of which is acknowledged, Shearson Lehman and Agent hereby agree to as follows:

## 1. Background and Engagement

Agent has expressed an interest in becoming an independent contractor to refer prospective
borrowers to Shearson Lehman for the purpose of obtaining Loans backed by Securities, and
Shearson Lehman has agreed to engage Agent as an independent contractor to identify and
introduce prospective borrowers interested in such Loans. Accordingly, Shearson Lehman hereby
engages Agent as an independent contractor for such purpose, pursuant to the terms and
conditions in this SLRA.

## 2. Agent Duties and Responsibilities

Agent shall identify and locate prospects and shall market Shearson Lehman's Securities Backed
Lending program to those borrowers. Agent shall forward all forms, applications, and prospective
client information to Shearson Lehman once a prospective borrower has firmly expressed an
interest in procuring a Loan backed by Securities. Agent shall not make any representations or
warranties to any borrowers, nor guarantee that Shearson Lehman will fund. Agent is expressly
prohibited from executing any documents on Shearson Lehman's behalf and is never allowed to
do so.

## 3. No Exclusive Relationship

Agent is not an exclusive Agent for the marketing of Shearson Lehman's Securities Backed
Lending Program. Shearson Lehman works with other referral sources, and nothing in this SLRA



precludes Agent from referring clients to other competing companies. If more than one agent refers the same prospective borrower to Shearson Lehman within a sixty-day period, Shearson Lehman shall inform and evaluate the multiple referrals and, to the extent that the borrower closes a Securities Loan with Shearson Lehman, Shearson Lehman will allocate commissions to one or several agents under its sole and absolute discretion, which decision shall not be contested.

## 4. Commissions

Shearson Lehman shall pay to Agent commission for each successful Securities Loan that Shearson Lehman closes for borrower referred by Agent, within five (5) business days of a Securities Loan closing and funding. Commissions are contingent upon borrower transferring publicly traded securities into a specified custodial account, funding of the transaction and disbursement of the loan proceeds.

Commissions shall be calculated as follows:

a) Shearson Lehman commission to Agent will be referred to as "Loan Origination Fee," and will be that which will be reflected as the Loan Origination Fee in the Term Sheet issued and Loan Contract between borrower and Shearson Lehman. The final commission payable will be solely based on amount funded to borrower and that which will result in a successful closing. Commissions will not be paid for Loans which are not successfully funded.

b) Agent will also earn an additional Back-End Commission ("BEC") of up to two and a half percent (2.5%) of the principal Loan amount successfully funded to borrower.

c) Shearson Lehman shall bear no responsibility or liability to payout any third-party affiliates that the Agent utilizes. Agent will defend, indemnify, and hold Shearson Lehman harmless for all third-party claims for compensations from persons or entities that Agent so retains.

d) Shearson Lehman shall make all commission payments to Agent via wire transfer into Agent's provided personal account. In the event that an Agent chooses not to proceed via wire transfer, commission will be held in a custodian account. All commission is paid as 1099 income from

3


independent contracting; therefore, taxes are not withheld. Agent shall bear the sole liability and responsibility for remitting taxes on all commissions that Shearson Lehman pays to Agent.

## 5. Duration of Agreement

This SLRA shall commence on the date of execution hereof and shall continue in full force and effect for three (3) years ("Term"). Shearson Lehman and Agent may by mutual agreement choose to extend this SLRA. If either Party desires to terminate this SLRA before its natural Term, a written notice is required at least seven (7) days in advance.

Shearson Lehman shall remain obligated for one hundred twenty (120) days after termination of this SLRA to pay any and all commissions due to the Agent with respect to Agent referred and procured successful Securities Loan(s) closed by Shearson Lehman.

## 6. Agent's Warranties and Representations

During the Term of this SLRA while Agent is an independent contractor for Shearson Lehman, Agent warrants that at all times it will comply with any and all statutes, rules, and regulations as promulgated by the U.S. Securities & Exchange Commission ("SEC"), the Securities Acts of 1933 (as amended), the Securities and Exchange Act of 1934 (as amended), and any other State and international securities regulatory authorities, and shall assume any and all costs associated with such compliance.

## 7. Shearson's Warranties and Representations

Shearson Lehman will use all reasonable efforts to close and fund any and all Securities Loans with prospective borrowers referred to Shearson Lehman by Agent, in accordance with and as contemplated by this SLRA and its underwriting policies.

## 8. Confidentiality

This (I) SLRA and the terms and conditions described herein, and (II) Shearson Lehman's business, business methods, internal affairs, results of operations, financial statements, services, trade sources, clients, contacts, vendors, subsidiaries, other prospective financial interests and investment information are confidential and proprietary information of Shearson Lehman, and


Agent may not disclose or reproduce this SLRA in whole or in part for any purpose other than to effectuate its terms.

## 9. Non-Interference

During the Term of this Agreement, and for three (3) years after its termination, the Agent shall not: (i) solicit, encourage, or cause any client, third party or individual not to do business with or to reduce any part of its business with Shearson Lehman Brothers, (ii) market, sell or provide to any client, third party or individual any services or products that are competitive with or a substitute for Shearson Lehman's services or products, (iii) solicit, contact, encourage, interfere with or cause others to solicit, contact or interfere with any securities custodian, broker dealer, trustee or sub-custodian which has a known relationship with Shearson Lehman Brothers, (iv) make inquiries with or to any securities custodian, broker dealer , trustee or sub-custodian which has a known relationship with Shearson Lehman Brothers, (v) make any disparaging comments about Shearson Lehman Brothers or its business, services, officers, managers, shareholders, directors or employees, whether in writing, verbally, or on any online forum, (vi) assist or encourage anyone else to engage in any of the conduct prohibited by this Section.

## 10. Liability and Indemnification

Agent agrees to defend, indemnify, and hold harmless Shearson Lehman and each of Shearson Lehman's respective directors, officers, contractors, and employees (the "Indemnified Parties") from any and all liabilities for any and all claims, damages, losses, and expenses, including counsel fees, which may occur or which may be asserted against any Indemnified Party due to the default or bad faith actions of Agent in connection with or arising out of, or relating to, the matters referred to in this SLRA.

Agent further and expressly agrees to defend, indemnify, and hold the Indemnified Parties harmless for, from, and against any intentional, reckless or grossly negligent tort, defamation, slander, libel, tortious interference with business and/or malicious act made against Shearson Lehman by Agent or as a result of Agent's conduct in respect of Shearson Lehman's business.



## 11. Dispute Resolution

The Parties hereby mutually agree to resolve any dispute, claim, or controversy between them arising out of any application, breach, interpretation, enforcement, performance, implementation, Termination or validity of this agreement at binding arbitration, as conducted by One (1) agreed-upon Arbitrator of the Conflict Resolution Service in St. Kitts & Nevis and which shall be construed in accordance with, covered by, and interpreted under, UNCITRAL Arbitration Rules, in force at the time as such Notice of Arbitration is submitted. The Arbitrator's decision shall be legally binding and non-appealable by either Party to this Agreement and shall be subject to enforcement in any courts having jurisdiction over the Parties thereto.

In the event of arbitration mandated to enforce any provision of this SLRA, the prevailing party thereto shall be entitled to recover reasonable attorneys' fees and expenses incurred therein, in addition to any substantive award made by the Arbitrator thereof.

## 12. Force Majeure

In the event that either Party is unable to perform its obligations under the terms and conditions of this Agreement because of Force Majeure, including, but not limited to acts of God, acts of war or terrorism, fire, floods, strikes, embargos, utility or communication disruption, omissions or delays in acting by any government authority, or other causes reasonably beyond its control, such Party shall not be liable for damages to the other for any damages resulting from such failure to perform or otherwise or otherwise from such clause.

## 13. General Provisions

All notices and communications to either of the Parties by the other shall be in writing, sent by government post, electronic mail, or by a reputable commercial carrier and shall be deemed duly given on the date any such notice is sent. Either Party may designate by notice in writing to the other an address to which notices, requests, and other communications hereunder shall be given.

Amendments to this SLRA (including the adding or updating of any annexes, appendices, or schedules) will not be enforced unless they are in writing and signed by authorized signatories on behalf of both Parties and added as an Addendum hereto.



This Agreement and any dispute or claim arising out of or in connection with it, its subject matter, validity, formation, and/or enforcement shall be governed by and construed in accordance with the laws of the Federation of St. Kitts & Nevis during the Term of this Agreement and thereafter.

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement regardless of the number in existence or the number of copies distributed.

The Parties shall not intentionally make, or intentionally cause any other Person to make any public statement that is intended to criticize or disparage the other Party, any of its affiliates, directors, nominees, agents, and/or any of their respective officers, managers or employees thereto.

Except as herein provided, each of the Parties' representations, warranties, waivers, obligations, releases, indemnities and covenants made in this SLRA, shall remain in full force and survive the execution, delivery, cancellation and termination of this SLRA.

If any of the provisions of this SLRA is found to be unlawful and/or void thereto, then such provisions shall be deemed to be excised from this SLRA and the remaining terms, provisions, conditions, and covenants of this SLRA shall remain in full force and effect.

No waiver of any provision of this Agreement shall be effective unless agreed to in writing by the Parties.

Agent is not an employee shall never become an employee of Shearson Lehman, and at no time shall represent itself as an employee of the Shearson Lehman. Agent shall at all times and under all conditions remain an independent contractor, and Agent shall not be entitled to any rights, remedies, or benefits that might otherwise be provided to Shearson Lehman's employees.

Agent is and shall be solely responsible for all taxes and withholdings, and all other statutory and/or contractual obligations of any sort with respect to their independent contractor status, as prescribed by law, regardless of jurisdiction.

This Agreement contains the entire Agreement between the Parties hereto, is legally binding upon them as of the date of the execution hereof, and supersedes all previous written and oral negotiations, commitments, and understandings by and between the Parties therein.

IN WITNESS WHERE OF the parties have executed this Securities Lending Referral Agreement as of the date first written above.

Dated: May 1, 2020

**SHEARSON LEHMAN BROTHERS**              **AGENT**

_____             _____
Signature                                   Signature

_____             _____
Signatory Name                         Signatory Name

_____             _____
Date                                       Date

# EXHIBIT D




# EXHIBIT E

# SHEARSON LEHMAN
## A Lehman Brothers Company

# DIRECT LENDER FOR GLOBAL SECURITIES BACKED LENDING PROGRAM

**ASIA | SOUTH AMERICA | EUROPE | MIDDLE EAST | AUSTRALIA | CANADA | CENTRAL AMERICA**

SHEARSON LEHMAN is dedicated and committed to providing unparallel client services around the globe. We can largely fund transactions from $2.5 million up to $500 million for international stock exchanges. We are flexibile and can accommodate loan origination in any currency with no conversion fees.

- FIXED LOW INTREST RATES STARTING AS LOW AS **3%**
- LOAN TERM AS LOW AS **1 YEAR**
- NON RECOURSE LOAN
- UP TO **65% LTV**
- QUICK LOAN CLOSING IN **14** BUSINESS DAYS

## NO UPFRONT FEES
## APPLY TODAY!

**ALL COLLATERAL SECURITIES MUST BE IN ELECTRONIC FORMAT AND UNRESTRICTED. ALL LOAN REQUESTS ARE SUBJECT TO UNDERWRITING.**

## WHY SECURITIES BACKED LENDING?

- It's a simple and transparent process that provides near immediate cash liquidity from your non marginable publicaly traded securities.

- There is NO credit check and personal or corporate guarantee required.

- It's a convenient alternative solution to maximize wealth with tax advantages.

- Borrower is entitled to earn all dividends as owner of record.

### SUBMIT ITEMS LISTED BELOW TO DETERMINE IF YOUR SECURITY QUALIFIES!

1. Security/Ticker Symbol

2. Stock Exchange

3. Number of Shares to be Pledged

4. Loan Amount



For more information please contact

### OSMAN QUREISHI

Senior Executive Vice President
Wealth Management Division

**Office:** 212.208.0900
**Toll to free:** 888.418.7999
**E-mail:** Osman.Qureishi@ShearsonLehmanBrothers.com

Telephone: 332.228.0152 | Direct: 212.208.0900 | Toll Free: 888.418.7999
NY, New York City - Brookfield Place, 200 Vesey Street, 24th Floor, New York, 10281, USA
www.shearsonlehmanbrothers.com

# EXHIBIT F

# PRLOG
Press Release Distribution

[ Search ]

## News By Tag
* Europe, Asia
* More Tags...

## Industry News
* Financial
* More Industries...

## News By Place
* New York City
* New York
* United States
* More Locations...

## Country(s)
United States
Australia
India
Hong Kong
England
China
- - -
More Countries

Industry News

[ All News ]

[ Exclusive News ]

### October 2020
| W⁻ | Tu | Wu | S⁻ | Sa | Fr | Th |
|---|---|---|---|---|---|---|
| 7 | 6 | 5 | 4 | 3 | 2 | 1 |

## SHEARSON LEHMAN
Brothers Investment Banking

# Shearson Lehman is Entering into Negotiations to Invest $250 million in Alternative Energy

By Shearson Lehman Brothers Investment Banking

NEW YORK - March 20, 2020 - PRLog —
Shearson Lehman Brothers Investment Banking
announces its plans to invest $250 million in
public and private international alternative energy
corporations. Shearson Lehman proposes to
inject $100 million in a European company
specializing in wind turbines operating in Europe,
Hong Kong, and Australia. An additional $150
million investment is projected with a leading
renewable energy firm in Spain, South America,
and Africa manufacturing and producing solar
and wind energy, and electrical engineering.

5 Best Stocks To
Invest In  >

Top Companies To
Invest In  >

Top 10 Startups To
Invest In  >

According to top executives of Shearson    *Sponsored*
Lehman,  he negotiations started earlier this year
in January 2020. The conglomerates are seeking to finalize the deal by
**Spread the Word**       the end of 3rd quarter

─ Listed Under ─

**Tag:**
• Europe, Asia

**Industry:**
• Financial

**Location:**
• New York City - New
York - US

Innova ion, changing technologies, and increase in demand for clean
energy throughout  he world offers tremendous growth opportunities for
Shearson Lehman as it develops strategic partners in the regions to
support clean, modern, sustainable energy solutions.

This venture will expand Shearson Lehman's portfolio including
investment banking products and services. Shearson Lehman has
received an overwhelming response towards its Securities Backed
Lending (SBL) program in various markets including Hong Kong,
Indonesia, Malaysia, Singapore, United Kingdom, Turkey, Latin
America and many more. SBL program is a very attractive, quick, and
easy solution for institutional investors, and high net-worth
shareholders of publicly traded companies to quickly arrange financing at compe itive annual interest
rates ranging from 2% to 6% for a term of 1 to 10 years.

The vast increase in demand has driven high recruitment ac ivity at Shearson Lehman. The company is
aggressively hiring Business Development Professionals throughout Asia, Europe and South America.

For further information visit www.shearsonlehmanbrothers.com

**Media Contact**
Osman Qureishi
wealthmanagement@shearsonlehmanbrothers.com

........ End ...............

[ Follow ] [ Embed ] [ PDF / Print ]

Email      : ***@shearsonlehmanbrothers com
Posted By  ***@shearsonlehmanbrothers com

Account Email Address ✓   Account Phone Number ✓   Disclaimer   Report Abuse

Page Updated Last on: Apr 24, 2020

## Most Viewed

Rossratnagiria Family to
Hold Press Conference,
Thursday October 1 - 1821
views

Rapper ALRIGHT puts
Antelope Valley on the map
auditions for Major Record
Label - 1097 views

Springmill Suites-
Albuquerque University
Area, New Mexico Opens -
754 Views

WMM Nepal Holdings,
Provides Update on PPE
Website Launch - 697 views

"The Central Authority"
Movie Wraps Production -
611 views

## Top Daily News

New Halloween Designs
Released - 177 views

Film Director Hezues R and
"Suicide Saint" Cast
Participate in Upcoming
World Mental Health Day
Event in NYC - 163 views

Remediation Products, Inc.
Petitioner Vs Innovative
Environmental Technologies,
Inc. Patent Owner - 160 views

Get Business Credit &
Financing For Your Business
- 151 views

Davontan Prepares For
Release Of New Single
"Brown Sugar Thang" - 147
views

## PTC News

Whitechapel Holdings,
Provides Update on PPE
Website Launch - 697 views

Journey Medical Corp kicks
Off "Journey with the
Experts" Educational
Initiative with Rama Rajna
MD - 375 views

Batman  Shadowhunters:
Bruce Campbell Last Fan
Standing Among New
Wizard World Virtual
Experiences - 300 views

Mar 20, 2020 News

**PRLOG**
Press Release Distribution

Search

**News By Tag**
* Broker Dealer, Stock Loans
* More Tags...

**Industry News**
* Loans
* More Industries...

**News By Place**
* New York City
  New York
  United States
* More Locations...

**Country(s)**
United States
Australia
India
Hong Kong
England
China
- - -
More Countries

Industry News

All News

Exclusive News

**October 2020**
| We | Tu | Mo | Su | Sa | Fr | Th |
|----|----|----|----|----|----|----|
| 7 | 6 | 5 | 4 | 3 | 2 | 1 |

**SHEARSON LEHMAN**
Shearson Investment Banking

# Shearson Lehman Brothers Investment Banking Broker Dealer Affiliate Program is Available World Wide

*By: Shearson Lehman Brothers Investment Banking*

**NEW YORK - April 7, 2020 -** *PRLog* — Shearson Lehman Brothers Investment Banking is proud to be building over 500 new Broker Dealer relationships worldwide to fund transactions anywhere from $2.5 Million to $500 Million. Shearson Lehman's distinguished Securities Backed Lending (SBL) program is rapidly gaining attraction in global markets as the demand for alternative financing rises. Shearson Lehman's Broker Dealer Affiliate program creates key business relations and provides lucrative financial opportunities.

One of  he top producing Brokers in Asia reveals, <sup>Sponsored</sup> "Shearson Lehman is one of the few direct lenders that has industry experts who value and understand the securities lending market landscape as well as the needs and cultures of their clients. Their loan process is transparent, simple, fast, and easy to follow."

Current market conditions make it the perfect opportunity to take advantage of record low interest rates. SBL program offers non-recourse loans up to 65% LTV wi h no personal or corporate guarantee. Shearson Lehman also provides  he flexibility of providing both Title Transfer Loan and Non-Title Transfer Loan.

Shearson Lehman is a global brand that appreciates different cultures and firmly believes in establishing keen contractual relationships. If you are interested to learn more about the Broker Dealer Affiliate program, please contact Shearson Lehman Brothers Investment Banking weal h management division at wealthmanagement@shearsonlehmanbrothers.com.

For information visit www.shearsonlehmanbrothers.com

**Contact**
Shearson Lehman Brothers Investment Banking
weal hmanagement@shearsonlehmanbrothers.com
----- End

Affiliate Marketing For Beginners ›

Best Investments For Seniors ›

High Yield Safe Investments ›

Follow | Embed | PDF / Print

Email : ***@shearsonlehmanbrothers.com ✔
Tags : Broker Dealer, Stock Loans
Industry : Loans
Location : New York City - New York - United States

Account Email Address ✔    Account Phone Number ✔    Disclaimer    Report Abuse

**Most Viewed**
Rusesabagina Family to Hold Press Conference, Thursday, October 1 - 1861 views

Rapper ALRIGHT puts Antelope Valley on the map auditions for Major Record Label - 1087 views

SpringHill Suites Albuquerque University Area, New Mexico Opens - 754 views

Whitechapel Holdings, Provides Update on PPE Website Launch - 697 views

"The Central Authority" Movie Wraps Production - 611 views

**Top Daily News**
New Halloween Designs Released - 177 views

Film Director Hezues R and "Suicide Saint" Cast Participate in Upcoming World Mental Health Day Event in NYC - 162 views

Remediation Products, Inc. Petitioner Vs. Innovative Environmental Technologies, Inc. Patent Owner - 160 views

Get Business Credit & Financing For Your Business - 151 views

Devontai Prepares For Release Of New Single "Brown Sugar Thang" - 147 views

**PTC News**
Whitechapel Holdings, Provides Update on PPE Website Launch - 697 views

Journey Medical Corp Kicks Off "Journey with the Experts" Educational Initiative with Rania Agha, MD - 575 views

Batman, Shadowhunters, Bruce Campbell Last Fan Standing Among New Wizard World Virtual Experiences - 200 views

Apr 07, 2020 News

# PRLOG
Press Release Distribution

| Search |

PR Home | Latest News | News Feeds | Subscribe | Submit Free Press Release | For Bloggers | PR Newswire Distribution |

**News By Tag**
- Securities, financing
- More Tags...

**Industry News**
- Banking
- More Industries...

**News By Place**
- Hong Kong
  Hong Kong Island
  Hong Kong
- More Locations...

**Country(s)**

United States
Australia
India
Hong Kong
England
China
- - -
More Countries

Industry News

All News

Exclusive News

**October 2020**

| We | Tu | Mo | Su | Sa | Fr | Th |
|----|----|----|----|----|----|----|
| 7 | 6 | 5 | 4 | 3 | 2 | 1 |

## SHEARSON LEHMAN
Brothers Investment Banking

## Shearson Lehman Adds a New Local Custodian and Eases SBL Requirements in Hong Kong!

*By: Shearson Lehman Brothers Investment Banking*

**HONG KONG - May 1, 2020** - *PRLog* —
Shearson Lehman Brothers Investment Banking has entered a new Broker Dealer relationship with ZD Securities. ZD Securities has officially agreed to be the Custodian for Shearson Lehman in Hong Kong. This new custodian is an addition to the existing business portfolio which includes financial institutions such as Citibank, HSBC, and Deutsche Bank to name a few. The recent ease of restrictions for Hong Kong based Securities Backed Lending (SBL) program at Shearson Lehman has increased popularity for SBL financing making it an energetic, aggressive market.

▷ ✕

### 3-Minute WACC Video

**2,301 Likes 464,403 Views**

Weighted Average Cost of Capital, Free Playlist of Selected Finance Videos
mbabull.com

OPEN

**Spread the Word**

**Listed Under**

**Tag:**
- Securities, financing

**Industry:**
- Banking

**Location:**
- Hong Kong - Hong Kong Island - Hong Kong

Recently, Shearson Lehman has funded multiple transactions in Hong Kong ranging from $10 Million - $150 Million. Fixed Interest rates start at 2% and loan terms range from 1-10 years. Shearson Lehman now offers SBL program to both restricted and non-restricted securities in Hong Kong. Boldly, Shearson Lehman waives daily trading volume requirement to ease eligibility and qualification process.

Additionally, Shearson Lehman's SBL program offers non-recourse loans up to 65% LTV with no personal or corporate guarantee. Shearson Lehman also allows the flexibility of providing both Title Transfer Loan and Non-Title Transfer Loan. Shearson Lehman's recognized SBL program is a very attractive and simple solution compared to traditional financing methods for institutional investors and ultra-high net-worth clients to quickly obtain access to funds from their investment portfolio.

Shearson Lehman understands and values building healthy client relationships in the Hong Kong region that will grow with this new local venture with ZD Securities as one of the Custodians. Shearson Lehman is an international investment banking boutique that appreciates different cultures and understands the importance of developing strong contractual bonds. To learn more, please contact Shearson Lehman Brothers Investment Banking at wealthmanagement@shearsonlehmanbrothers.com.

**Contact**
wealthmanagement@shearsonlehmanbrothers.com

--- End ---

| Follow | Embed | PDF / Print |

Email : ***@shearsonlehmanbro hers.com ✔

Account Email Address ✔   Account Phone Number ✔   Disclaimer   Report Abuse

**Most Viewed**

Rusesabagina Family to Hold Press Conference, Thursday, October 1 - 1860 views

Rapper ALRIGHT puts Antelope Valley on the map auditions for Major Record Label - 1075 views

SpringHill Suites Albuquerque University Area, New Mexico Opens - 751 views

Whitechapel Holdings, Provides Update on PPE Website Launch - 696 views

"The Central Authority" Movie Wraps Production - 607 views

**Top Daily News**

New Halloween Designs Released - 175 views

Film Director Hezues R and "Suicide Saint" Cast Participate in Upcoming World Mental Health Day Event in NYC - 161 views

Get Business Credit & Financing For Your Business - 150 views

Devontai Prepares For Release Of New Single "Brown Sugar Thang" - 145 views

Remediation Products, Inc. Petitoner Vs. Innovative Environmental Technologies, Inc. Patent Owner - 87 views

**PTC News**

Whitechapel Holdings, Provides Update on PPE Website Launch - 696 views

Journey Medical Corp Kicks Off "Journey with the Experts" Educational Initiative with Rania Agha, MD - 588 views

Batman, Shadowhunters, Bruce Campbell Last Fan Standing Among New Wizard World Virtual Experiences - 200 views

May 01, 2020 News

**PRLOG**
Press Release Distribution

PR Home | Latest News | News Feeds | Subscribe | Submit Free Press Release | For Bloggers | PR Newswire Distribution |

**News By Tag**
* Investment
* More Tags...

**Industry News**
* Banking
* More Industries...

**News By Place**
* New York City
* New York
* United States
* More Locations...

**Country(s)**
United States
Australia
India
Hong Kong
England
China
- - -
More Countries

**Industry News**

[ All News ]

[ Exclusive News ]

**October 2020**

| We | Tu | Mu | Su | Sa | Fr | Th |
|----|----|----|----|----|----|----|
| 7  | 6  | 5  | 4  | 3  | 2  | 1  |

## SHEARSON LEHMAN
Boutique Investment Banking

# Asia's Alternative Energy Sector Becomes Front-Page News as Shearson Lehman Vows to Invest Millions

**Shearson Lehman eyes Asia for its next big renewable energy investment**

*By Shearson Lehman Brothers Investment Banking*

**NEW YORK - Aug. 24, 2020** - PRLog - In a move that the pundits in the energy investment industry have been expecting for a while now, Shearson Lehman – a Lehman Brother company that offers specialized and personalized wealth management solutions and services – has announced that it will soon be turning to the Asian markets for its next set of investments in alternative energy.

Earlier this year, the company announced a $250 million investment in international alternative energy, $100 million out of which went into a European company with wind turbines operations in Asia, Australia and Europe and the other $150 million were invested in a Spanish company for its solar and wind energy projects in South America and Africa.

According to company representatives, Shearson Lehman is already vetting project proposals and negotiating with multiple parties whose work in wind and solar energy has received praise from industry gurus.

It is expected that the over the next few months, as the effects of the COVID-19 pandemic recede, Shearson Lehman will go through a final round of project selection and negotiations before choosing the projects the company wants to back and announce the magnitude of its investment.

This series of investment decisions spanning over multiple continents is a strategic move by Shearson Lehman evidently aimed at expanding the company's presence in the multi-continental alternative energy markets and may add a new dimension to the company's already impressive portfolio of investment products and services to its prestigious clientele.

Shearson Lehman's clientele has recently shown immense interest in his new direction and the Securities Backed Lending (SBL) program in key markets on virtually all continents, including Hong Kong, Indonesia, Latin America, Malaysia, Singapore, Turkey, United Kingdom, among others.

The company aims to secure its investment for Asia's alternative energy projects from its growing portfolio of blue-chip enterprise and individual clients. It is expected that this new body of investments could also amount to over $150 million

Speaking about this direction for the company's imminent future, Senior Executive Vice President of Shearson Lehman's Wealth Management Division said, "We are headed towards another revolutionary change which requires investing into the proper channels to building a better and greater future of tomorrow filled with growth and prosperity."

**Company Contact Information**

Shearson Lehman is a Lehman Brothers company. It is a premier boutique investment banking firm offering direct financing solutions to a global clientele. More details about Shearson Lehman can be found on their business website (https://www.shearsonlehmanbrothers.com) or via email

**Spread the Word**

**Listed Under**

**Tag:**
* Investment

**Industry:**
* Banking

**Location:**
* New York City - New York - US

Best Energy Sector Stocks ›

5 Best Stocks To Invest In ›

Renewable Energy Stocks To Buy ›

**Most Viewed**

Russiahagira Family to Hold Press Conference, Thursday October 1 - 880 views

Rapper ALRIGHT puts Antelope Valley on the map auditions for Major Record Label - 1073 views

Springwill Suites Albuquerque University Area, New Mexico Opens - 731 views

WWMJ Legal Holdings, Provides Update on PPE Website Launch - 286 views

"The Central Authority" Movie Wraps Production - 607 views

**Top Daily News**

New Halloween Designs Released - 173 views

Film Director Heaven R and "Suicide Saint" Cast Participate in Upcoming World Mental Health Day Event in NYC - 151 views

Get Business Credit & Financing For Your Business - 150 views

Davorilal Prepares For Release Of New Single "Brown Sugar Thang" - 145 views

Remediation Products Inc. Fellhoner Vs. innovative Environmental Technologies Inc. Patent Owner - 37 views

**PTC News**

Whitechapel Holdings, Provides Update on PPE Website Launch - 696 views

Journey Medical Corp Kicks Off "Journey with the Experts" Educational Initiative with Rama Agha, MD - 596 views

Batman Shadowhunters Bruce Campbell Last Fan Standing Among New Wizard World Virtual Experiences - 289 views

Aug 24, 2020 News



# EXHIBIT 24



# DECISION

NYSE Group, Inc. v. Val Sklarov / BentleyTek / America 2030 Capital
Claim Number: FA1709001748855

## PARTIES

Complainant is **NYSE Group, Inc.** ("Complainant"), represented by **Richard L. Cruz** of **DLA Piper LLP**, Pennsylvania, USA. Respondent is **Val Sklarov / BentleyTek / America 2030 Capital** ("Respondent"), Ukraine.

## REGISTRAR AND DISPUTED DOMAIN NAMES

The domain names at issue are **<nyseloan.com>**, **<nyse-loan.com>**, **<nyseloans.com>**, **<nyse-loans.com>**, **<nyse.tips>**, **<nysetrading.net>**, **<nysemarket.net>**, **<nyse.email>**, **<nyse.vip>**, **<nyse.pro>**, **<nyse-exchange.com>**, **<nyse.technology>**, **<nyse-trading.org>**, **<nyse.cloud>**, **<nyse.directory>**, **<nyse.rocks>**, **<nyse-stocks.com>**, **<nyse-trader.net>**, **<nyse-trading.net>**, **<nyse-trader.com>**, and **<nyse.solutions>**, registered with **GoDaddy.com, LLC**.

## PANEL

The undersigned certifies that he or she has acted independently and impartially and to the best of his or her knowledge has no known conflict in serving as Panelist in this proceeding.

Daniel B. Banks, Jr., as Panelist.

## PROCEDURAL HISTORY

Complainant submitted a Complaint to the FORUM electronically on September 13, 2017; the FORUM received payment on September 14, 2017.

On Sep 14, 2017, GoDaddy.com, LLC confirmed by e-mail to the FORUM that the **<nyseloan.com>**, **<nyse-loan.com>**, **<nyseloans.com>**, **<nyse-loans.com>**, **<nyse.tips>**, **<nysetrading.net>**, **<nysemarket.net>**, **<nyse.email>**, **<nyse.vip>**, **<nyse.pro>**, **<nyse-exchange.com>**, **<nyse.technology>**, **<nyse-trading.org>**, **<nyse.cloud>**, **<nyse.directory>**, **<nyse.rocks>**, **<nyse-stocks.com>**, **<nyse-trader.net>**, **<nyse-trading.net>**, **<nyse-trader.com>**, and **<nyse.solutions>** domain names are registered with GoDaddy.com, LLC and that Respondent is the current registrant of the names. GoDaddy.com, LLC has verified that Respondent is bound by the GoDaddy.com, LLC registration agreement and has thereby agreed to resolve domain disputes brought by third parties in accordance with ICANN's Uniform Domain Name Dispute Resolution Policy (the "Policy").

On September 18, 2017, the FORUM served the Complaint and all Annexes, including a Written Notice of the Complaint, setting a deadline of October 10, 2017 by which Respondent could file a Response to the Complaint, via e-mail to all entities and persons listed on Respondent's registration as technical, administrative, and billing contacts, and to postmaster@nyseloan.com, postmaster@nyse-loan.com,

postmaster@nyseloans.com, postmaster@nyse-loans.com, postmaster@nyse.tips, postmaster@nysetrading.net, postmaster@nysemarket.net, postmaster@nyse.email, postmaster@nyse.vip, postmaster@nyse.pro, postmaster@nyse-exchange.com, postmaster@nyse.technology, postmaster@nyse-trading.org, postmaster@nyse.cloud, postmaster@nyse.directory, postmaster@nyse.rocks, postmaster@nyse-stocks.com, postmaster@nyse-trader.net, postmaster@nyse-trading.net, postmaster@nyse-trader.com, postmaster@nyse.solutions. Also on September 18, 2017, the Written Notice of the Complaint, notifying Respondent of the e-mail addresses served and the deadline for a Response, was transmitted to Respondent via post and fax, to all entities and persons listed on Respondent's registration as technical, administrative and billing contacts.

A timely Response was received and determined to be complete on October 9, 2017.

On October 13, 2017, pursuant to Complainant's request to have the dispute decided by a single-member Panel, the FORUM appointed Daniel B. Banks, Jr., as Panelist.

Having reviewed the communications records, the Administrative Panel (the "Panel") finds that the FORUM has discharged its responsibility under Paragraph 2(a) of the Rules for Uniform Domain Name Dispute Resolution Policy (the "Rules") "to employ reasonably available means calculated to achieve actual notice to Respondent" through submission of Electronic and Written Notices, as defined in Rule 1 and Rule 2.

**RELIEF SOUGHT**

Complainant requests that the domain names be transferred from Respondent to Complainant.

**PARTIES' CONTENTIONS**

A. Complainant

Complainant, NYSE Group, Inc., operates the leading global exchange for trading in securities under its iconic brand. In connection with this business, Complainant uses the NYSE mark. Complainant has rights in the NYSE mark based upon multiple registrations with the United States Patent and Trademark Office ("USPTO") as well as other national trademark agencies (*e.g.* Reg. No. 909,350, registered Mar. 2, 1971). Respondent's domain names are confusingly similar to the NYSE mark, as they each contain the mark in its entirety, to which generic terms such as "loans," "trading," "stock," "market," and "exchange" have been added. In some instances, the additional generic terms are part of the domain name and the generic top-level domain ("gTLD") ".com," ".org," or ".net" is added; in other instances, the domain name consists exclusively of Complainant's NYSE mark, and the only change is the addition of a descriptive gTLD.

Respondent has no rights or legitimate interests in the disputed domain names. Respondent is not commonly known by the domain names, nor has Complainant licensed or authorized Respondent to use the NYSE mark for any reason. Respondent's use of the domain names does not amount to a *bona fide* offering of goods or services or a legitimate noncommercial or fair use. Rather, each of the domain names resolves to a parked page.

Respondent has registered and is using the disputed domain names in bad faith. Respondent exhibits a pattern of bad faith registration of domain names containing well-known marks. Respondent also registered and is using the disputed domain names to confuse and attract Internet users. Also, Respondent is failing to actively use the names. Finally, due to the fame and notoriety of Complainant's NYSE mark, and the fact that many of the disputed domain names were registered within minutes of Respondent responding to a cease-and-desist letter from Complainant; Respondent clearly registered the domain names opportunistically in bad faith.

B. Respondent

Complainant does not have rights in the NYSE mark throughout the world, specifically in Ukraine, where Respondent resides. Complainant does not conduct business in Ukraine, and does not target Ukrainian customers. Ukraine is a sovereign country which has its own Trademark and Patent Office and does not adhere to trademark protection on its territory afforded to third parties in other countries. Further, the letters "Y" and "S" do not exist in the Cyrillic alphabet, so Ukrainian consumers would not be confused by the domain names.

Respondent intends to launch a website named "New York Services Enterprise" ("NYSE") which will offer mortgages, business and real estate loans, auto loans, insurance, credit cards, financial consulting, real estate sales and construction services to customers in Ukraine. Respondent has been offering these services since March 2015 under the name "America 2030 Capital, LLC."

Respondent did not and could not have bought the domain names in bad faith because Complainant has no trademark protection in Ukraine. Respondent did not purchase the domain names in order to disrupt the business of Complainant, because Complainant does not do business in Ukraine, and Respondent is involved in a different business than Complainant. Respondent could not have known of Complainant's NYSE mark, because the mark does not exist in Ukraine.

**FINDINGS**

1 - The disputed domain names are identical or confusingly similar to a trademark or service mark in which Complainant has rights.
2 - Respondent has no rights or legitimate interests in respect of the domain names.
3 - The domain names have been registered and are being used in bad faith.

**DISCUSSION**

Paragraph 15(a) of the Rules instructs this Panel to "decide a complaint on the basis of the statements and documents submitted in accordance with the Policy, these Rules and any rules and principles of law that it deems applicable."

Paragraph 4(a) of the Policy requires that Complainant must prove each of the following three elements to obtain an order that a domain name should be cancelled or transferred:

(1) the domain name registered by Respondent is identical or confusingly similar to a trademark or service mark in which Complainant has rights; and
(2) Respondent has no rights or legitimate interests in respect of the domain name; and
(3) the domain name has been registered and is being used in bad faith.

**Identical and/or Confusingly Similar**

Complainant claims rights in the NYSE mark based upon registration of the mark with the USPTO (*e.g.* Reg. No. 909,350, registered Mar. 2, 1971). Registration of a mark with the USPTO is sufficient to establish rights in that mark. *See Home Depot Product Authority, LLC v. Samy Yosef / Express Transporting*, FA 1738124 (FORUM July 28, 2017) (finding that registration with the USPTO was sufficient to establish the complainant's rights in the HOME DEPOT mark). The fact that the mark is not registered in the jurisdiction of Respondent is not dispositive in a Policy ¶ 4(a)(i) analysis. *See Viber Media S.à r.l. v. Kristaps Sirmais / SIA "FUN FACTORY"*, FA 1626671 (FORUM Aug. 4, 2015) ("Accordingly, even though Respondent reportedly resides in Latvia, the Panel finds that Complainant's USPTO registration is sufficient under Policy ¶ 4(a)(i)."). The Panel finds that Complainant's registration of the NYSE mark with the USPTO is sufficient to establish rights in the mark under Policy ¶ 4(a)(i).

Complainant also complains that the disputed domain names are identical or confusingly similar to the NYSE mark:

Complainant contends the **<nyse.tips>**, **<nyse.email>**, **<nyse.vip>**, **<nyse.pro>**, **<nyse.technology>**, **<nyse.cloud>**, **<nyse.directory>**, **<nyse.rocks>**, and **<nyse.solutions>** are identical to the NYSE mark, as they each consist entirely of the mark and merely add various gTLDs to the mark. Addition of a gTLD to mark is insufficient to distinguish the domain name from the mark for the purposes of Policy ¶ 4(a)(i). *See Marquette Golf Club v. Al Perkins*, FA 1738263 (FORUM July 27, 2017) ("When a respondent's domain name incorporates a mark in its entirety and merely adds a generic top-level domain (gTLD), ".com", then the Panel may find that the disputed domain name is identical to Complainant's mark."). Complainant contends that some of the gTLDs chosen by respondent are descriptive and may enhance the confusing similarity. The Panel therefore finds the nine domain names to be identical to the NYSE mark for the purposes of Policy ¶ 4(a)(i).

Complainant also asserts that the **<nyseloan.com>**, **<nyse-loan.com>**, **<nyseloans.com>**, **<nyse-loans.com>**, **<nysetrading.net>**, **<nysemarket.net>**, **<nyse-exchange.com>**, **<nyse-trading.org>**, **<nyse-stocks.com>**, **<nyse-trader.net>**, **<nyse-trading.net>**, and **<nyse-trader.com>** domain names are confusingly similar to the mark, as they each contain the NYSE mark in its entirety and merely adds one of the descriptive terms "loan," "loans," "trading," "market," "exchange," "stocks," or "trader;" and a gTLD. Some also add a hyphen. Addition of a descriptive or generic term and a gTLD are insufficient to distinguish a mark from a domain name per Policy ¶ 4(a)(i). *See Microsoft Corporation v. Thong Tran Thanh*, FA 1653187 (FORUM Jan. 21, 2016) (determining that confusing similarity exists where [a disputed domain name] contains Complainant's entire mark and differs only by the addition of a generic

or descriptive phrase and top-level domain, the differences between the domain name and its contained trademark are insufficient to differentiate one from the other for the purposes of the Policy.). Also, the addition of hyphens is irrelevant in a Policy ¶ 4(a)(i) confusing similarity analysis. *See Health Devices Corp. v. Aspen S T C*, FA 158254 (FORUM July 1, 2003) ("[T]he addition of punctuation marks such as hyphens is irrelevant in the determination of confusing similarity pursuant to Policy ¶ 4(a)(i)."). The Panel therefore finds that the remaining twelve domain names are confusingly similar to the NYSE mark for the purposes of Policy ¶ 4(a)(i).

## Rights or Legitimate Interests

The Panel finds that Complainant has made a *prima facie* case that Respondent lacks rights and legitimate interests in the disputed domain names under Policy ¶ 4(a)(ii). The burden then shifts to Respondent to show it does have rights or legitimate interests. *See Hanna-Barbera Prods., Inc. v. Entm't Commentaries*, FA 741828 (FORUM Aug. 18, 2006) (holding that the complainant must first make a *prima facie* case that the respondent lacks rights and legitimate interests in the disputed domain name under UDRP ¶ 4(a)(ii) before the burden shifts to the respondent to show that it does have rights or legitimate interests in a domain name); *see also AOL LLC v. Gerberg,* FA 780200 (FORUM Sept. 25, 2006) ("Complainant must first make a prima facie showing that Respondent does not have rights or legitimate interest in the subject domain names, which burden is light.  If Complainant satisfies its burden, then the burden shifts to Respondent to show that it does have rights or legitimate interests in the subject domain names.").

Complainant argues that Respondent has no rights or legitimate interests in the disputed domain names, as Respondent is not commonly known by the disputed domain names, nor has Complainant authorized Respondent to use the NYSE mark in any way. In a Policy ¶ 4(c)(ii) analysis, WHOIS information can support a finding that the respondent is not commonly known by a disputed domain name. *See Chevron Intellectual Property LLC v. Fred Wallace*, FA1506001626022 (FORUM July 27, 2015) (finding that the respondent was not commonly known by the <chevron-europe.com> domain name under Policy ¶ 4(c)(ii), as the WHOIS information named "Fred Wallace" as registrant of the disputed domain name). The WHOIS information of record identifies Respondent as "Val Sklarov." Additionally, lack of evidence in the record to indicate that the respondent had been authorized to register a domain name using a complainant's mark supports a finding that Respondent does not have rights or legitimate interests in said domain name. *See Navistar International Corporation v. N Rahmany*, FA1505001620789 (FORUM June 8, 2015) (finding that the respondent was not commonly known by the disputed domain name where the complainant had never authorized the respondent to incorporate its NAVISTAR mark in any domain name registration). The Panel finds, under Policy ¶ 4(c)(ii), that Respondent has not been commonly known by the disputed domain names.

Complainant argues that Respondent's lack of rights and legitimate interests in the disputed domain names is demonstrated by its failure to use the names to make a *bona fide* offering of goods or services or for a legitimate noncommercial or fair use. Rather, Complainant contends each of the domain names resolves to a parked page,

which is not a use indicative of rights or legitimate interests per Policy ¶¶ 4(c)(i) or (iii). *See Kohler Co. v xi long chen*, FA 1737910 (FORUM Aug. 4, 2017) ("Respondent has not made a *bona fide* offering of goods or services, or a legitimate non-commercial or fair use of the domain. Respondent's <kohler-corporation.com> resolves to an inactive webpage displaying the message "website coming soon!"). Respondent's domain names each resolve to a page which only states "website coming soon!" The Panel therefore finds that Respondent lacks rights and legitimate interests per Policy ¶¶ 4(c)(i) and (iii).

## Registration and Use in Bad Faith

Complainant argues that Respondent has registered the disputed domain names in bad faith as part of a pattern of such bad faith registrations. Bad faith registration and use can be demonstrated under Policy ¶ 4(b)(ii) through a showing of a history of such registrations, or multiple registrations containing a complainant's mark. *See Australian Stock Exch. v. Cmty. Internet (Australia) Pty Ltd*, D2000-1384 (WIPO Nov. 30, 2000) (finding bad faith under Policy ¶ 4(b)(ii) where the respondent registered multiple infringing domain names containing the trademarks or service marks of other widely known Australian businesses); *see also Microsoft Corporation and Skype v. zhong biao zhang / Unknown company / zhong zhang*, FA1401001538218 (FORUM Feb. 20, 2014) (holding that the respondent's registration of three domain names incorporating variants of the complainant's SKYPE mark reflected a pattern of bad faith registration under Policy ¶ 4(b)(ii)). Complainant claims Respondent has registered domain names incorporating the well-known marks of other companies in the financial sector. *See* Compl. Annexes Z–AA. The Panel notes that Respondent has registered 21 domain names containing the NYSE mark. The Panel therefore finds that Respondent registered and used the domain names in bad faith per Policy ¶ 4(b)(ii).

Complainant also contends that Respondent registered the disputed domain names in order to confuse and attract Internet users. Such use can demonstrate bad faith per Policy ¶ 4(b)(iv). *See DatingDirect.com Ltd. v. Aston*, FA 593977 (FORUM Dec. 28, 2005) ("the Panel finds the respondent is appropriating the complainant's mark in a confusingly similar domain name for commercial gain, which is evidence of bad faith registration and use pursuant to Policy ¶4(b)(iv)."); *see also Phat Fashions, LLC v. Kruger*, FA 96193 (FORUM Dec. 29, 2000) (finding bad faith under Policy ¶ 4(b)(iv) even though the respondent has not used the domain name because "it makes no sense whatever to wait until it actually 'uses' the name, when inevitably, when there is such use, it will create the confusion described in the Policy"). Complainant contends that its NYSE mark is so notorious that any use of the domain names by Respondent would be infringing. The Panel agrees and find Respondent to have registered and used the domain names in bad faith per Policy ¶ 4(b)(iv).

Complainant also asserts, along the same lines, that Respondent's registration and use of the domain names was opportunistic. Opportunistic bad faith can be found when a complainant can show the registration of a domain name was done in order to take advantage of the complainant's famous mark. *See Twitch Interactive, Inc. v. Jason Hardwick*, FA1501001601323 (FORUM Feb. 25, 2015) (finding that the respondent had

engaged in opportunistic bad faith pursuant to Policy ¶ 4(a)(iii), where the respondent registered the <twitchtv.net> domain name just two days after the complainant's launch announcement for TwitchTV (which received widespread news coverage)); *see also Arizona Board of Regents, for and on behalf of Arizona State University v. Weiping Zheng*, FA1504001613780 (FORUM May 28, 2015) (finding that the respondent had acted in opportunistic bad faith according to Policy ¶ 4(a)(iii), when it registered the disputed domain name just one week after the complainant filed applications to register the SUB DEVIL LIFE mark, and just days after those applications became public through the USPTO's website). The Panel finds that Respondent originally registered four domain names—**<nyseloan.com>**, **<nyse-loan.com>**, **<nyseloans.com>**, and **<nyse-loans.com>**—and registered the remaining seventeen domain names at issue the same day it received and responded to a letter acknowledging Complainant's rights in the NYSE mark. The Panel therefore finds Respondent to have registered and used the disputed domain names in bad faith per Policy ¶ 4(a)(iii).

Complainant also contends that Respondent is not actively using the disputed domain names, which further demonstrates its bad faith. Inactive holding of a domain name can demonstrate bad faith per Policy ¶ 4(a)(iii). *See VideoLink, Inc. v. Xantech Corporation*, FA1503301608735 (FORUM May 12, 2015) ("Failure to actively use a domain name is evidence of bad faith registration and use pursuant to Policy ¶ 4(a) (iii)."). The evidence establishes that the disputed domain names do not resolve to active websites. The Panel finds that Respondent's failure to make an active use of the domain names demonstrates its bad faith per Policy ¶ 4(a)(iii).


**DECISION**

Having established all three elements required under the ICANN Policy, the Panel concludes that relief shall be **GRANTED**.

Accordingly, it is Ordered that the **<nyseloan.com>**, **<nyse-loan.com>**, **<nyseloans.com>**, **<nyse-loans.com>**, **<nyse.tips>**, **<nysetrading.net>**, **<nysemarket.net>**, **<nyse.email>**, **<nyse.vip>**, **<nyse.pro>**, **<nyse-exchange.com>**, **<nyse.technology>**, **<nyse-trading.org>**, **<nyse.cloud>**, **<nyse.directory>**, **<nyse.rocks>**, **<nyse-stocks.com>**, **<nyse-trader.net>**, **<nyse-trading.net>**, **<nyse-trader.com>**, and **<nyse.solutions>** domain names be **TRANSFERRED FROM RESPONDENT TO COMPLAINANT.**


Daniel B. Banks, Jr., Panelist
Dated: October 23, 2017

Click Here to return to the main Domain Decisions Page.

Click Here to return to our Home Page

# EXHIBIT 25

too infrequent to constitute a violation of either provision. Furthermore, there was a lack of additional harassing conduct, such as continued calls after an oral request from Plaintiff that Defendant cease calling or Defendant calling at inconvenient times. Additionally, Plaintiff did not present authority that it was harassment for Defendant to call him after Plaintiff declared he could not pay the debt or after he told Defendant that he does not speak to debt collection services. As a result, nothing about Defendant's calls "represent[ ] the type of coercion and delving into the personal lives of debtors that the FDCPA in general, and § 1692d in particular, was designed to address." *Middlebrooks*, 775 F. App'x. at 597 (citing *Miljkovic*, 791 F.3d at 1305).

## SUMMARY

It is **RECOMMENDED** that Defendant Nationwide Recovery Service's motion for summary judgment (Doc. 17) be **GRANTED.**

**IT IS SO REPORTED AND RECOMMENDED** this <u>16th</u> day of <u>December</u>, 2019.



**ROTHSCHILD & CO. CONTINUATION HOLDINGS A.G., et al., Plaintiffs,**

**v.**

**Val SKLAROV, et al., Defendants.**

**Civil Action No. 1:19-cv-03561-AT**

United States District Court,
N.D. Georgia, Atlanta Division.

Signed February 13, 2020

**Background:** Trademark holder, a provider of corporate finance, financial advisory, and general investment banking services, brought action against alleged infringer and companies he controlled for trademark infringement-related claims under Lanham Act and Georgia state law. Trademark holder also moved for preliminary injunction, seeking to enjoin defendants from engaging in allegedly infringing use of mark. Defendants moved to dismiss for lack of personal jurisdiction.

**Holdings:** The District Court, Amy Totenberg, J., held that:

(1) St. Kitts and Nevis entity and Wyoming limited liability company transacted business in Georgia sufficient to satisfy Georgia's long-arm statute, and thus district court's exercise of personal jurisdiction over them was proper;

(2) limited liability company created under laws of Bahamas transacted business in Georgia sufficient to satisfy Georgia's long-arm statute, and thus district court's exercise of personal jurisdiction over it was proper; and

(3) trademark holder was entitled to opportunity to discover facts that would support its allegations that district court had personal jurisdiction over Colorado corporation and Colorado limited liability company.

Motion denied.

**1. Federal Courts ⬡2791**

The plaintiff bears the burden of establishing personal jurisdiction.

**2. Federal Courts ⬡2792**

In the context of a motion to dismiss for lack of personal jurisdiction in which no evidentiary hearing is held, the plaintiff bears the burden of establishing a prima

**1386**          **440 FEDERAL SUPPLEMENT, 3d SERIES**

facie case of jurisdiction over the movant, non-resident defendant. Fed. R. Civ. P. 12(b)(2).

**3. Constitutional Law ⟺3964**
   **Federal Courts ⟺2721, 3025(4)**

A federal court undertakes a two-step inquiry to determine whether personal jurisdiction exists: the exercise of jurisdiction must (1) be appropriate under the state long-arm statute and (2) not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution. U.S. Const. Amend. 14.

**4. Constitutional Law ⟺3964**
   **Federal Courts ⟺2721, 3025(4)**

District courts in Georgia cannot conflate the two steps of the inquiry for determining whether personal jurisdiction exists, i.e., whether the exercise of jurisdiction is appropriate under the Georgia long-arm statute and does not violate the Due Process Clause, because Georgia's long-arm statute does not provide jurisdiction that is coextensive with due process. U.S. Const. Amend. 14; Ga. Code Ann. § 9-10-91.

**5. Courts ⟺13.2**

Georgia's long-arm statute imposes independent obligations that a plaintiff must establish for the exercise of personal jurisdiction that are distinct from the demands of procedural due process. U.S. Const. Amend. 14; Ga. Code Ann. § 9-10-91.

**6. Federal Courts ⟺2791**

A court considering a motion to dismiss for lack of personal jurisdiction construes the allegations in the complaint as true to the extent that they are uncontroverted by defendant's evidence. Fed. R. Civ. P. 12(b)(2).

**7. Federal Courts ⟺2791**

If a defendant who moves to dismiss for lack of personal jurisdiction submits

affidavits challenging the allegations in the complaint, the burden shifts back to the plaintiff to produce evidence supporting jurisdiction. Fed. R. Civ. P. 12(b)(2).

**8. Federal Courts ⟺2791**

Where the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, a court deciding a motion to dismiss for lack of personal jurisdiction must construe all reasonable inferences in favor of the plaintiff. Fed. R. Civ. P. 12(b)(2).

**9. Courts ⟺13.2**

Federal courts interpret the Georgia long-arm statute literally. Ga. Code Ann. § 9-10-91.

**10. Courts ⟺13.3(11)**

There is a three-part test to determine whether long-arm jurisdiction exists under the provision of the Georgia long-arm statute allowing the exercise of personal jurisdiction over a nonresident who transacts any business within Georgia: the first part asks whether the nonresident defendant has purposefully done some act or consummated some transaction in Georgia; the second part examines whether the cause of action arises from or is connected with such act or transaction; and the third part is whether the exercise of jurisdiction by the courts of the state does not offend traditional fairness and substantial justice. Ga. Code Ann. § 9-10-91.

**11. Constitutional Law ⟺3964**

In determining whether the exercise of jurisdiction over a nonresident defendant would violate the Due Process Clause, a court considers: (1) whether the plaintiff's claims arise out of or relate to at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant purposefully availed himself of the privilege of conducting activities within the forum state, thus invoking the benefit of

the forum state's laws; and (3) whether the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice.  U.S. Const. Amend. 14.

**12. Federal Courts** ⇐2734, 2760(1)

First company, a St. Kitts and Nevis entity, and second company, a Wyoming limited liability company, transacted business in Georgia sufficient to satisfy Georgia's long-arm statute, and thus district court's exercise of personal jurisdiction over them was proper, where companies' website offered to supply broad range of financial services from United States to non-United States residents from Atlanta office, term sheet issued by companies identified Atlanta office as only United States address for companies, and second company transacted business in Georgia through its agent, who was resident of Georgia.  Ga. Code Ann. § 9-10-91(1).

**13. Federal Courts** ⇐2760(1)

Limited liability company created under laws of Bahamas transacted business in Georgia sufficient to satisfy Georgia's long-arm statute, and thus district court's exercise of personal jurisdiction over it was proper, where company applied and authorized business use of allegedly infringing trademark in Georgia, and company was closely associated with other defendants over which court had personal jurisdiction, as its counsel, who filed application to register with United States Patent and Trademark Office (USPTO), also represented other defendants in pre-litigation correspondence with counsel for plaintiffs, whose trademark was allegedly infringed, and had appeared as co-counsel for defendants.  Ga. Code Ann. § 9-10-91(1).

**14. Federal Civil Procedure** ⇐1275.5

Trademark holder, which alleged that Colorado corporation and Colorado limited

liability company infringed on its trademarks, was entitled to opportunity to discover facts that would support its allegations that federal district court in Georgia had personal jurisdiction over defendants, where holder had shown evidence of concerted interaction between at least one of the defendants and other entities over which court had jurisdiction and discovery could show Georgia contacts by defendants sufficient to meet Georgia long-arm statute's requirements, and as result of contradictory or confusing statements regarding location and organization of defendants, it was unclear whether there was any meaningful distinction between them.  Ga. Code Ann. § 9-10-91.

**15. Federal Civil Procedure** ⇐1275.5

A qualified right to take jurisdictional discovery exists where the jurisdictional question is genuinely in dispute.

**16. Federal Civil Procedure** ⇐1275.5

Where the jurisdictional question is genuinely in dispute, a plaintiff should be given the opportunity to discover facts that would support his allegations of jurisdiction.

————

Andrew L. Deutsch, DLA Piper LLP, Los Angeles, CA, Christopher G. Campbell, Delia Gervin Frazier, DLA Piper LLP, Atlanta, GA, Kerry Anne O'Neill, DLA Piper LLP, New York, NY, for Plaintiffs.

Michael Thomas McCracken, The Law Offices of Michael T. McCracken, Chicago, IL, Timothy F. Coen, TFCoen Law Firm, Atlanta, GA, for Defendant Val Sklarov.

Michael Thomas McCracken, The Law Offices of Michael T. McCracken, Chicago, IL, for Defendants Bentley Rothschild Capital Limited, Bentley Rothschild Fi-

nancial LLC, America 2030 Capital, LLC, America 2030 Capital Limited, Black Rock Capital LLC.

## MEMORANDUM OPINION ON JURISDICTIONAL RULING

AMY TOTENBERG, UNITED STATES DISTRICT JUDGE

On October 10, 2019, the Court dismissed Defendants' Motion to Dismiss (Doc. 23) in an Order from the bench. (*See* Transcript, Doc. 34 at 4–5, 46–47.) The Court issues this written memorandum to address in further detail its exercise of jurisdiction over the Defendants and to clarify and modify the Court's Bench Order that encompassed Defendants America 2030 LLC, and America 2030 Capital Limited.

### I.  Background

On August 6, 2019, Plaintiffs filed a Complaint against Defendants, alleging trademark infringement-related claims under the Lanham Act, as well as under Georgia state law. (Complaint, Doc. 1.) Plaintiffs are part of the Rothschild & Co. Group, which provides financial services throughout the world. (Doc. 1 at ¶ 27.) The Rothschild & Co. Group is controlled by members of the Rothschild family, "one of the most important and successful banking families in the world." (*Id.*)

The Rothschild & Co. Group in the United States includes (1) Plaintiff Rothschild & Co. US Inc., a registered broker-dealer that provides corporate finance, financial advisory, and general investment banking services, including to clients in Georgia; (2) Plaintiff Rothschild & Co. Asset Management US Inc., which provides financial in-

vestment services to individuals and institutions, including clients in Georgia; and (3) Plaintiff Rothschild & Co. Continuation Holdings AG, a Swiss joint-stock company that directly or indirectly owns the other Rothschild Plaintiffs. (*Id.* at ¶¶ 32–33.) Rothschild & Co. Continuation Holdings AG is the registered owner of two U.S. trademark registrations for financial services.[1] This entity also licenses other Rothschild & Co. entities to use the marks. (Doc. 1 at ¶ 36.)

The Complaint alleges the Rothschild marks have acquired substantial reputation and good will, distinctiveness, fame, and secondary meaning, and have become associated in the U.S. and the world with the financial services businesses of the Rothschild Group members operating in the U.S. (Doc. 1 at ¶ 38.) The Complaint further alleges that Defendant Val Sklarov and companies he controls (including several named defendants in this case) have been involved in litigation in the U.S. and Hong Kong in which Sklarov and his companies are alleged to have engaged in fraud in connection with stock loans. (*Id.* at ¶¶ 44–52.) The Complaint alleges Sklarov controls and directs the corporate defendants, caused the corporate defendants to be organized, and that he was the moving force behind the alleged infringements. (*Id.* at ¶¶ 18–19.) The Plaintiffs also filed a Motion for Preliminary Injunction (Doc. 6-1) seeking to enjoin Defendants from engaging in the allegedly infringing use of the ROTHSCHILD mark, anywhere in the world.

The main allegation in the Complaint – and the basis for seeking injunctive relief – is that Sklarov and the other Defendants have been infringing on Plaintiffs' trade-

---

1.  ROTHSCHILD (U.S. Reg. No. 3447667); and ROTHSCHILD & CO (U.S. Reg. No. 5614371). (Doc. 1 at ¶ 36.)

mark rights by using the mark "Bentley Rothschild" to identify financial services offered within the U.S.[2]

On October 1, 2019, in lieu of an Answer, Defendants filed what was styled "Defendants' Rule 12(b) Motions." (Doc. 23.) Defendants argued (1) the Complaint against Defendants Bentley Rothschild Capital Limited (St. Kitts and Nevis), Bentley Rothschild Financial LLC, America 2030 Capital Limited, and Black Rock Capital LLC, should be dismissed for lack of personal jurisdiction; (2) the Complaint failed to allege facts showing personal liability of Defendant Sklarov; (3) Count IV of the Complaint, alleging violation of O.G.C.A. § 10-1-451(b), should be dismissed because Plaintiffs did not allege a mark registered with the State of Georgia; (4) Count V, to the extent it seeks recovery of damages, should be dismissed with prejudice because O.C.G.A. § 10-1-370 allows only injunctive relief; (5) the Complaint should be dismissed or a more definitive statement required because the Complaint is a "shotgun pleading"; (6) allegations relating to the Term Sheet should be stricken because the Court lacks subject matter jurisdiction over alleged acts of infringement occurring outside of the United States; and (7) certain allegations in the Complaint relating to Sklarov's alleged history of criminal conviction and "cybersquatting" should be stricken as scandalous. During the October 10, 2019 hearing, the Court denied Defendants' motion from the bench. (Doc. 34 at 4–5, 46–47.)

## II.  Standard of Review

**[1, 2]**  A plaintiff's complaint is subject to dismissal if there is a lack of personal jurisdiction over the defendant. Fed. R. Civ. P. 12(b)(2). Plaintiff bears the burden of establishing jurisdiction in this Court. *Consolidated Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291 (11th Cir. 2000); *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1257 (11th Cir. 2010). "In the context of a motion to dismiss for lack of personal jurisdiction in which no evidentiary hearing is held, the plaintiff bears the burden of establishing a *prima facie* case of jurisdiction over the movant, non-resident defendant." *Morris v. SSE, Inc.*, 843 F.2d 489, 492 (11th Cir. 1988).

**[3–5]**  A federal court "undertakes a two-step inquiry to determine whether personal jurisdiction exists: the exercise of jurisdiction must (1) be appropriate under the state long-arm statute and (2) not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *Diamond Crystal*, 593 F.3d at 1257–58 (citation and quotations omitted). District courts in Georgia cannot conflate these two inquiries because Georgia's long-arm statute[3] does not provide jurisdiction that is coextensive with due process. *Id.* at 1259. Instead, the long-arm statute "imposes independent obligations that a plaintiff must establish for the exercise of personal jurisdiction that are distinct from the demands of procedural due process." *Id.* (footnote omitted).

**[6–8]**  The Court construes the allegations in the complaint as true to the extent that they are uncontroverted by defendant's evidence. *Morris*, 843 F.2d at 492; *Allegiant Physicians Services, Inc. v. Sturdy Memorial Hosp.*, 926 F. Supp. 1106, 1112 (N.D. Ga. 1996); *Foxworthy v. Custom Tees, Inc.*, 879 F. Supp. 1200, 1207 n.10 (N.D. Ga. 1995). If the defendant submits affidavits challenging the allegations

---

**2.**  For more on the Plaintiffs' allegations and basis for seeking injunctive relief, see the Motion for Preliminary Injunction. (Doc. 6.)

**3.**  O.C.G.A. § 9-10-91.

in the complaint, the burden shifts back to the plaintiff to produce evidence supporting jurisdiction. *Diamond Crystal Brands, Inc.*, 593 F.3d at 1257; *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir. 2002). "Where the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff." *Diamond Crystal*, 593 F.3d at 1257 (internal quotation marks omitted) (quoting *Meier*, 288 F.3d at 1269).

Four of the Defendants (termed the "Corporate Defendants") claim that the Court does not have personal jurisdiction over them. The first is Bentley Rothschild Capital Limited ("BRC SK"), which is a St. Kitts and Nevis entity.[4] The second entity is Bentley Rothschild Financial LLC ("BRF"), alleged to be a Wyoming limited liability company. The third entity is Black Rock Capital LLC ("Black Rock"), alleged to be a limited liability company created under the laws of the Bahamas.[5] The fourth entity is America 2030 Capital Limited ("America 2030 Corp."), alleged to be a Colorado corporation. A fifth entity, America 2030 Capital, LLC ("America 2030 LLC"), alleged to be a Colorado limited liability company, did not challenge exercise of personal jurisdiction over it, and did not join the Motion to Dismiss. However, since it appears on the basis of the record that America 2030 LLC is closely intertwined with America 2030 Corp., the Court examined its exercise of jurisdiction over both America 2030 entities.

Defendant Val Sklarov is alleged to be a Georgia resident (Doc. 1 at 6.), and Corporate Defendant Bentley Rothschild Capital Limited (Georgia) is alleged to be an entity formed and operating in Georgia (Doc. 1 at 6–7.). The Complaint plainly alleges adequate facts to support the Court's exercise of personal jurisdiction over these Defendants.

## A. The Court Exercises Jurisdiction Over Corporate Defendants BRC SK, BRF, and Black Rock

BRC SK's opposition to the Court's exercise of personal jurisdiction over it is based largely on the decision in *RMS Titanic, Inc. v. Zaller*, 978 F. Supp. 2d 1275 (N.D. Ga. 2013), in which Judge Duffey considered the exercise of personal jurisdiction over foreign defendants, and ultimately followed the analytical framework from a First Circuit decision *McBee v. Delica Co., Ltd.*, 417 F.3d 107 (1st Cir. 2005) rather than the framework applied by the Eleventh Circuit. *Int'l Café, S.A.L. v. Hard Rock Cafe Int'l (U.S.A.), Inc.*, 252 F.3d 1274 (11th Cir. 2001) (applying framework from *Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.2d 633, 640 (2d Cir. 1956)).

*RMS Titanic, Inc.* involved a Lanham Act claim against an individual defendant and entities he controlled, which allegedly infringed on the trade dress of the plaintiff in exhibiting artifacts from the salvage of the Titanic. *See RMS Titanic, Inc. v. Zaller*, 978 F. Supp. 2d 1275 (N.D. Ga. 2013). Judge Duffey found there was no personal jurisdiction in Georgia over a Singapore company where the plaintiff did not allege any infringing activity by that company in the U.S. or any substantial effect on U.S. commerce caused by the Defendant's conduct. *Id.* at 1290–91. The

---

**4.** This entity is not the same as a different Defendant, Bentley Rothschild Capital Limited ("BRC GA"), which is alleged to be a Georgia corporation.

**5.** Black Rock is named in the suit because it filed an application with the USPTO to register BENTLEY ROTHSCHILD as a U.S. trademark.

Court viewed the fact that the Singapore company maintained an office in the U.S. and managed some accounting functions from that office as an insufficient predicate for the exercise of personal jurisdiction. *Id.* Judge Duffey also rejected the plaintiffs' "reverse alter ego" theory. *Id.* at 1302 (applying *Home-Stake Prod. v. Talon Petroleum*, 907 F.2d 1012 (10th Cir. 1990)). However, Judge Duffey deferred a ruling on personal jurisdiction over another defendant incorporated in Nevada and instead permitted limited jurisdictional discovery as to that entity. *Id.* Plaintiffs contend they do not rely on a "reverse alter ego" theory of personal jurisdiction over the Corporate Defendants. (Doc. 28 at 6–7, 10–11.) They maintain the Complaint alleges that each of the Corporate Defendants transacts business in Georgia and that each of them use the allegedly infringing "Bentley Rothschild" mark in Georgia, either directly or through Sklarov acting as their agent. (*Id.* at 11.) The Complaint adequately alleges that some of the Corporate Defendants transact business in Georgia, including using the allegedly infringing mark here in connection with their business.

In *Int'l Café*, the Eleventh Circuit found that jurisdiction was appropriate "over extraterritorial disputes involving trademark infringement and unfair competition when: 1) Defendant is a United States corporation; 2) the foreign activity had substantial effects in the United States; and 3) exercising jurisdiction would not interfere with the sovereignty of another nation." *Int'l Café, S.A.L. v. Hard Rock Cafe Int'l (U.S.A.), Inc.*, 252 F.3d 1274, 1278 (11th Cir. 2001) (citing *Steele v. Bulova Watch Co.*, 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 319 (1952)). Although the Eleventh Circuit does not explicitly adopt the framework of the Second Circuit's *Vanity Fair* decision, that framework is employed throughout the Eleventh Circuit's opinion and is clear-

ly the cornerstone of the Court's analysis. *See, e.g., Int'l Café, S.A.L.*, 252 F.3d at 1278 (citing *Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.2d 633, 643 (2nd Cir. 1956) ("[T]he absence of one of the [*Bulova*] factors might well be determinative and [ ] the absence of both is certainly fatal."). All three factors are met here. The Corporate Defendants are either incorporated in the United States, or are alleged to be the alter egos of Sklarov, a Georgia resident, who allegedly disregards the separateness of the various entities in a way that abuses the corporate form. *See RMS Titanic, Inc. v. Zaller*, 978 F. Supp. 2d 1275, 1291 (N.D. Ga. 2013) (quoting *Rasheed v. Klopp Enters., Inc.*, 276 Ga. App. 91, 95 n. 4, 622 S.E.2d 442 (Ga. Ct. App. 2005)). Even Defendants' counsel is unclear on the various corporate entities, and why they are organized the way that they are. (*See* Transcript, Doc. 34 at 28 ("I also share the Court's confusion concerning what is the interplay between all of these corporations.").) Lastly, there is simply no evidence or claim made whatsoever that the sovereignty of another nation might be interfered with by this Court's exercise of jurisdiction, or that there exists another case concerning this controversy elsewhere outside of the United States.

In support of their challenge, Defendants submit the affidavit of Val Sklarov, in which Mr. Sklarov flatly denies the allegations in the Complaint and attests that he does not "exercise dominion and control over Defendants or . . . disregard the separateness of those legal entities to such an extent that these entities are used by me as a mere instrumentality." (Doc. 23-2 at 2–3.) Plaintiffs submitted numerous exhibits in support of their Motion for Preliminary Injunction, as well as their Reply. (*See, generally*, Doc. 6 & Doc. 26.) Accordingly, where the evidence supplied in these declarations (and from other sources) con-

flicts, the Court construes them in the light most favorable to Plaintiff. *Diamond Crystal Brands, Inc.*, 593 F.3d at 1257.

The question is therefore whether, on the basis of these facts and inferences, the Court has personal jurisdiction over the nonresident Corporate Defendants. This requires examination of the Georgia long-arm statute.

**[9]** The first step in the two-step inquiry under *Diamond Crystal* is to determine whether the exercise of personal jurisdiction is appropriate under the Georgia long-arm statute. *Diamond Crystal*, 593 F.3d at 1257–58. Subsection 1 of the Georgia long-arm statute allows the exercise of personal jurisdiction over a nonresident when he or she "[t]ransacts any business within this state." O.C.G.A. § 9-10-91 (1). Federal courts interpret the long-arm statute literally. *Diamond Crystal*, 593 F.3d at 1264.

**[10]** There is a three-part test to determine whether long-arm jurisdiction exists under subsection (1). The first part asks whether "the nonresident defendant has purposefully done some act or consummated some transaction in this state . . . ." *Meyn Am., LLC v. Tarheel Distribs., Inc.*, 36 F. Supp. 3d 1395, 1402–03 (M.D. Ga. 2014) (citing *Amerireach.com, LLC v. Walker*, 290 Ga. 261, 269, 719 S.E.2d 489, 496 (Ga. 2011)). The second part examines whether the cause of action "arises from or is connected with such act or transaction," and the third part is whether "the exercise of jurisdiction by the courts of the state does not offend traditional fairness and substantial justice." *See Aero Toy Store, LLC v. Grieves*, 279 Ga. App. 515, 518–519, 631 S.E.2d 734 (Ga. Ct. App. 2006).

**[11]** The second step of the two-step inquiry under *Diamond Crystal* is to determine whether the exercise of personal jurisdiction would violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Diamond Crystal*, 593 F.3d at 1257–58. Due Process considers,

> (1) whether the plaintiff's claims "arise out of or relate to" at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant "purposefully availed" himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws; and (3) whether the exercise of personal jurisdiction comports with "traditional notions of fair play and substantial justice."

*Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339 (11th Cir. 2013) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472–73, 474–75, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 413–14, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *see also Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1220–21 (11th Cir. 2009); *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 630–31 (11th Cir. 1996)).

**[12]** The Court is satisfied that Defendants Bentley Rothschild Capital Limited – St. Kitts and Nevis (BRC SK) and Bentley Rothschild Financial LLC – Wyoming (BRF), transact business in Georgia sufficient to satisfy the long-arm statute, and therefore the Court's exercise of personal jurisdiction over them is proper. The Complaint sufficiently alleges that these companies hold themselves out as doing business and using a trademark in providing financial services from a location in Georgia, and this constitutes transacting business in Georgia within the meaning of O.C.G.A. § 9-10-91(1). The documents submitted by Plaintiffs show that BRC SK and BRC GA, the two entities carrying on

business as "Bentley Rothschild Capital Limited," transact business in Georgia. These include (1) the Website, which offers to supply a broad range of financial services from the U.S. to non-U.S. residents from an Atlanta office (Doc. 27-4), and (2) the Term Sheet, identifying the lender as "Bentley Rothschild Capital Limited, member of Rothschild family of companies" and the Atlanta office as the only U.S. address for "Bentley Rothschild Capital Limited." (Doc. 1-14). Screenshots of the Bentley Rothschild website show that Defendants boast "325 Active Clients" across "6 Headquarters Worldwide" for a "96 Satisfaction Rate." (Doc. 1-11 at 3–4.) Another portion of the website boasts that "BENTLEY ROTHSCHILD is one of the largest infrastructure fund managers globally, having raised more than $10 billion of capital since the inception of the business in 2006." (Doc. 1-13 at 29–30.) The Complaint alleges that the Defendants' allegedly infringing activities have a substantial effect on commerce in the United States, and the materials supplied by the Plaintiffs – materials allegedly created by Defendants – support this claim.

Defendants offered only the affidavit of Val Sklarov to rebut the allegations relating to personal jurisdiction, but the affidavit is merely a series of denials from Mr. Sklarov, and does not tend to disprove any of the allegations in the Complaint. For example, Mr. Sklarov denies that he controls the Defendant companies, or that they all have connections to Georgia, and he says that that Term Sheet was "issued to a citizen of Indonesia residing in Indonesia for Indonesian stock prepared by Bentley Rothschild Capital Limited, a St.

Kitts and Nevis entity and there is no nexus whatsoever to the United States of America." (Doc. 23-2 at 3.) But the Term Sheet itself lists four different office locations under Contacts: Bahamas, Offshore; Nevis, Offshore, USA; and United Kingdom. (Doc. 1-14.) The "USA" address is in Atlanta, Georgia. (*Id.*) Although Defendants want the Court to view the two "Bentley Rothschild Capital Limited" entities as distinct, this document – which is held out to potential customers – clearly combines them.[6] There is no specification on the Term Sheet as to whether the "Bentley Rothschild Capital Limited" entity making this offer is incorporated in St. Kitts and Nevis (as Sklarov claims) or in Georgia (as Plaintiff alleges). What's more, the Term Sheet lists addresses for both locations, indicating strongly that these entities are used interchangeably, and are held out as one and the same. Despite Mr. Sklarov's statement, the nexus between the Term Sheet and the United States of America is clear: the company was, at the very least, holding itself out as doing business from Georgia, among other locations.

The Plaintiffs have provided detailed factual allegations reflecting that BRF is transacting business in Georgia through its agent, Sklarov, who in turn does not dispute he is a resident of Georgia. The Plaintiffs thus have sufficiently alleged that Sklarov took actions on behalf of BRF and BRC SK entities in Georgia as their agent, and therefore this Court may exercise personal jurisdiction over BRF and BRC SK. *See* O.G.C.A. § 9-10-91(1).

**[13]**  The Complaint further sufficiently alleges Defendant Black Rock's transac-

---

**6.**  *Cf. RMS Titanic, Inc. v. Zaller,* 978 F. Supp. 2d 1275, 1291 (N.D. Ga. 2013) ("To justify piercing the corporate veil, 'the plaintiff must show [that] the owner abused the corporate form by disregarding the separateness of legal entities by commingling [funds] on an inter-

changeable or joint basis or confusing the otherwise separate properties, records, or control.' ") (quoting *Rasheed v. Klopp Enters., Inc.,* 276 Ga. App. 91, 95 n. 4, 622 S.E.2d 442 (Ga. Ct. App. 2005)).

tion of business in Georgia, through its attempt to register BENTLEY ROTHS-CHILD as a U.S. trademark for financial services virtually identical to those furnished by Plaintiffs under the ROTHS-CHILD Marks. Black Rock is closely associated with the other Defendants over which the Court has personal jurisdiction: its General Counsel, JT Singh, who filed the application to register with the USPTO (Doc. 1-1), also represented Sklarov, BRC SK, and BRF in pre-litigation correspondence with counsel for Plaintiffs (Doc. 1-17), and has appeared as co-counsel for Defendants in this action. (Transcript, Doc. 34 at 3–4). Black Rock seeks to register rights in the BENTLEY ROTHSCHILD mark for use by the Bentley Rothschild entities in U.S. commerce, which they conduct from Georgia. Any use of the BENT-LEY ROTHSCHILD mark by the Bentley Rothschild entities in Georgia inures to the benefit of the claimed owner of the mark, Black Rock. *See* 15 U.S.C. § 1055 ("Where a . . . mark sought to be registered is or may be used legitimately by related companies, such use shall inure to the benefit of the . . . applicant for registration . . ."). By filing the application and authorizing the business use of the BENTLEY ROTHSCHILD mark in Georgia by the Bentley Rothschild Defendants, Black Rock has transacted business in the state and is subject to personal jurisdiction under O.C.G.A. § 9-10-91(1).

### B.  Limited Jurisdictional Discovery Regarding Defendants America 2030 Capital, LLC, and America 2030 Capital Limited is Warranted

**[14]**   In *America 2030 Capital Limited v. Prescient Investment Ltd., et al.*, Case No. 1:18-cv-04875-AT (N. D. Ga. 2018) ("*Prescient*"), a case currently before this Court, a defendant alleged that Sklarov used different corporations with some vari-

ation of the name "America 2030 Capital" (incorporated in either Colorado, Hong Kong, or the United Kingdom) in a "shell game" to falsely create diversity in the litigation. (*Prescient*, D.'s Resp., Doc. 7-1 at 4–5). In a consent order presented to the Court by the parties, counsel for the Plaintiff, America 2030 Capital Limited, acknowledged that Val Sklarov controls the America 2030 Group of companies. (*Prescient*, Doc. 16, at 4–5 ("The Plaintiff [America 2030 Capital Limited - Colorado] and the lender [America 2030 Capital Limited – Hong Kong] are both controlled by Val Sklarov (also known as Vladimir Sklarov) as part of the America 2030 group of companies.").) It is apparent that the America 2030-related Defendants have at least once legally stipulated to the statement that Val Sklarov controls the companies.

The allegations in the Complaint and the Motion for Preliminary Injunction adequately allege that Sklarov controls the Bentley Rothschild group of companies and has created multiple "Bentley Rothschild" companies, similarly to how he has structured the America 2030 group of companies. For purposes of personal jurisdiction, the Court considers all of the Bentley Rothschild companies to be acting as a single enterprise and to transact business in Georgia through their principal agent, Val Sklarov.

The Plaintiffs contend that the America 2030 Defendants have participated in the U.S. activities of the Defendants over which the Court has personal jurisdiction. For example, "America 2030 Capital" is identified as registrant of the domain www.bentleyrothschild.com. (Doc. 1-10.) Defendant America 2030 LLC issued a press release on January 12, 2019, in which it announced "Stock Loan Financing in . . . USA," and that America 2030 LLC "is utilizing Bentley Rothschild Capital Ltd. of

Nevis and Bahamas to structure and fund several of its global stock loan transactions. The executives at America 2030 Capital believe that the Bentley Rothschild name will be a major player in structuring and funding publicly traded companies and its major shareholders for years to come." (Doc. 1-15). But the Court finds the foregoing limited facts insufficient to provide a foundation for the Court's exercise of personal jurisdiction over America 2030 LLC and America 2030 Corp. at this time.

**[15, 16]** The Plaintiffs assert that the Complaint adequately alleges facts which support the Court's exercise of personal jurisdiction over all of the Defendants, but the Plaintiffs also sought leave to conduct limited jurisdictional discovery in the event the Court did not find an adequate basis for exercising personal jurisdiction over some of the Defendants. (Doc. 28 at 11 n.3.) A qualified right to take jurisdictional discovery exists where the jurisdictional question is "genuinely in dispute[.]" *Eaton v. Dorchester Dev., Inc.*, 692 F.2d 727, 729 (11th Cir. 1982). In such circumstances, a plaintiff "should be given [the] opportunity to discover facts that would support his allegations of jurisdiction." *Majd-Pour v. Georgiana Cmty. Hosp., Inc.*, 724 F.2d 901, 903 (11th Cir. 1984). Plaintiffs have shown some evidence of concerted interaction between at least one of the America 2030 Capital defendants and the BRC entities, and discovery may show Georgia contacts by the America 2030 Capital defendants sufficient to meet the Georgia long-arm statute's requirements. What's more, in the *Prescient* litigation, the America 2030 group seeks to bring that case in this same Court, stating in the Complaint, "[t]he Plaintiff America 2030 is an international Lending Company incorporated in Colorado but domiciled in Georgia with principal address at 1301 Shiloh Rd, Suite 1231, Kennesaw[,] Georgia, 30144." (*Prescient*, Doc. 1 at 1.) Plaintiff in that case further states that jurisdiction is proper in this Court because "the case is international between the Plaintiff, a Corporation domicile[d] in Georgia and . . . foreign corporations domiciled in Hong Kong." (*Prescient*, Doc. 1 at 2.) In that same Complaint, Plaintiff alleges, "[v]enue is proper as [a] substantial transaction regarding this contract was carried out between the Plaintiff and the Defendants in Georgia over the Internet." (*Id.*) The "substantial transaction" referred to in that portion of the Complaint involved emails sent from Val Sklarov concerning the contract in question in that matter. (*See Prescient*, Doc. 21-1 at 11–16 (emails).) As a result of the contradictory or confusing statements regarding the location and organization of America 2030, it is unclear to the Court whether there is any meaningful distinction between the various America 2030 entities, as well as whether the facts as alleged are sufficient for the Court to exercise personal jurisdiction over the America 2030 group of companies.

While Plaintiffs' Complaint does not yet set forth an adequate factual basis upon which the Court can definitively exercise personal jurisdiction over the America 2030 Defendants, the Court finds that jurisdictional discovery is appropriate given the facts currently alleged as well as evidence adduced in Plaintiffs' Motion for Preliminary Injunction.

**III.  Conclusion**

For the reasons stated above, the Court finds that the Complaint sets forth an adequate factual basis upon which the Court may exercise personal jurisdiction over Defendants Val Sklarov (Georgia), Bentley Rothschild Capital Limited (Georgia), Bentley Rothschild Capital Limited (St. Kitts and Nevis), Bentley Rothschild Fi-

**1396**        **440 FEDERAL SUPPLEMENT, 3d SERIES**

nancial LLC (Wyoming), and Black Rock Capital LLC (Bahamas).

While Plaintiffs' Complaint does not yet set forth an adequate factual basis upon which the Court can definitively exercise personal jurisdiction over Defendants America 2030 LLC, and America 2030 Capital Limited, the Court finds that jurisdictional discovery is appropriate given the facts currently alleged as well as evidence adduced in Plaintiffs' Motion for Preliminary Injunction. The Court therefore **GRANTS** limited jurisdictional discovery in connection with these specific defendants (America 2030 LLC, and America 2030 Capital Limited) for a period not to exceed **sixty (60) days**. No later than **fourteen (14) days** after the conclusion of this jurisdictional discovery period or at any time prior to that date, Plaintiffs **SHALL** file a brief addressing the factual and legal basis for their assertion that jurisdiction over these Defendants (America 2030 LLC, and America 2030 Capital Limited) may be properly invoked in this Court, with supporting record evidence as appropriate. Defendants' response, with record evidence as appropriate, shall be due within **fourteen (14)** days of the filing of Plaintiffs' brief. Plaintiffs' Reply brief is due **ten (10)** days after the filing of Defendants' brief.

**IT IS SO ORDERED** this 13th day of February, 2020.



---

**O'NEAL CONSTRUCTORS, LLC, Plaintiff,**

**v.**

**DRT AMERICA, LLC, Defendant.**

**CIVIL ACTION FILE NO. 1:19-CV-1640-SCJ**

United States District Court, N.D. Georgia, Atlanta Division.

Signed February 14, 2020

**Background:** Contractor brought action against client in state court seeking the confirmation of an arbitration award in favor of sub-contractor and against client in the amount of $650,090, which remained on the award after client made a partial payment. Client removed the case to federal court. Contractor moved to confirm arbitration award and client moved to vacate part of arbitration award.

**Holdings:** The District Court, Steve C. Jones, J., held that:

(1) contractor was a resident of the district in which arbitration took place for purposes of determining what methods of service were appropriate for motion to vacate arbitration award;

(2) contractor did not consent to electronic service of client's motion to vacate arbitration award in contract with client;

(3) even if contractor expressly consented to electronic service, client's e-mail to contractor did not qualify as service of the motion;

(4) client's filing of its application to vacate arbitration award in the district court's docketing software did not constitute valid service upon contractor; and

(5) contractor was not estopped from denying that it had been timely served with notice of client's motion to vacate arbitration award.

# EXHIBIT 26

AMERICAN ARBITRATION ASSOCIATION

AAA Case No. 01-20-0007-5777

BRENT SATTERFIELD V. VAL SKLAROV, AMERICA 2030 CAPITAL, LLC, BENTLEY
ROTHSCHILD FINANCIAL LLC, AND BENTLEY ROTHSCHILD CAPITAL LIMITED CORP.

---

DECISION AND ORDER ON MOTION OF THE UNITED STATES SUPREME COURT OF THE
STATE OF NEW YORK

---

30 April 2022

View the document on jusmundi.com

Table of Contents

- Decision and Order on Motion of the United States Supreme Court of the State of New York................................................... 0
- Background ................................................................................................................................................................................ 1
- Contempt Hearing ..................................................................................................................................................................... 3
- Legal Standard............................................................................................................................................................................ 4
- Discussion ................................................................................................................................................................................... 5

# Decision and Order on Motion of the United States Supreme Court of the State of New York

[1].

    Upon the foregoing documents, it is

[2].

    In motion sequence number 020, plaintiff Brent Satterfield moves, by order to show cause, for enforcement of this court's November 12, 2021 Decision and Order (Prior Order) (NYSCEF Doc. Nos. [NYSCEF] 449 and 450, Decision and Order [mot. seq. nos. 010 and 011]), and for an order of contempt and sanctions against defendants Val Sklarov, Bentley Rothschild Financial LLC (Rothschild), Bentley Rothschild Capital Limited Corp. (BRCLC), and America 2030 Capital, LLC (A2030C). Specifically, plaintiff seeks an order directing defendants to:

1. Immediately pay to plaintiff the $15,327.58 in interest accrued since the January 3, 2022 Judgment;

2. Immediately pay to Brent Satterfield $39,000 in reimbursement of plaintiff's post-Judgment attorneys' fees;[1]

3. Immediately pay to plaintiff $1,000,000 in damages incurred by plaintiff as a result of the judgment defendants' contempt;

4. Immediately return to plaintiff all of the Shares of CoDiagnostics (NASDAQ: CODX) (the Shares) in the possession, custody, or control, directly or indirectly, of the judgment defendants, including any such shares held at Dolfin Financial (Dolfin) in London (Dolfin Shares) or wherever else they may be, including Shares held at defendant VStock Transfer, LLC (VStock) (VStock Shares);

5. Immediately facilitate, expedite, and, as necessary, execute any paperwork that may be necessary or expedient to effectuate the return of the shares to plaintiff including but not limited to changing the ownership of the shares held at Dolfin from the A2030C U.K entity (or whatever name is holding CODX shares) to plaintiff, instructing the appropriate officials at Dolfin or the Special Administrators in charge of the Dolfin liquidation to transfer the CODX shares to plaintiff's personal account at Stifel, New York; and

6. Immediately provide irrevocable transfer instructions to Dolfin to effect the transfer of ownership and accounts to Brent Satterfield.

(NYSCEF 559, Order to Show Cause [mot. seq. no. 020].)

# Background

---

[1]  At the time of this application, "Plaintiff's February bill ha[d] not been finalized, but Plaintiff incurred over $39,000 in attorneys' fees between January 3, 2022 and February 10, 2022. January's final bill was $22,000 ... and so far in February, Plaintiff has incurred another $19,000." (NYSCEF 550, Salisbury affirmation ¶ 18 [Feb. 11, 2022].) Plaintiff has since submitted additional invoices. (NYSCEF 659, Invoices.)

[3].

The background of this case is set forth in this court's decision of motion sequence number 004 and will not be repeated here except as relevant to this decision finding defendants in contempt of court. (NYSCEF 200, Decision and Order [mot. seq. no. 004].) Sklarov is the principal of and controls all of the defendants. (NYSCEF 418, Final Arbitration Award at 58[2].) The court's reference to Sklarov encompasses all of the defendants.

[4].

In January 2021, Dolfin informed A2030C, Sklarov's U.K. entity holding the Dolfin Shares, that since it was no longer registered with the U.K. corporate registrar, the shares could be forfeited. (*See* NYSCEF 656, Plaintiff's Exhibit 7, Anne Salisbury Email to all defendants [Jan. 4, 2022] at 21-22.[3])

[5].

On February 4, 2021, the American Arbitration Association (AAA) Panel directed the parties to put the Shares in escrow at Stifel Trust Company, N.A. (Stifel) to which the parties stipulated on May 20, 2021. (NYSCEF 285, Stipulation.) The stipulation was so ordered by the court on June 8, 2021. (NYSCEF 286, So Ordered Stipulation.) The shares were never transferred.

[6].

On July 9, 2021, the AAA Panel issued its award directing defendants: (1) to pay plaintiff within 30 days $1,152,538.70 for the improper sale of 905,926 Shares; (2) to return to plaintiff the Shares held at VStock; and (3) to return to plaintiff the Dolfin Shares. (NYSCEF 418, Final Award at 70.) Defendants failed to comply.

[7].

Dolfin went into insolvency, freezing defendants' account. (NYSCEF 550, Salisbury aff ¶ 8.) On January 4, 2021, plaintiff provided defendants with the paperwork necessary to restore A2030C UK. *(Id.* ¶ 10.) There is no evidence before the court that defendants paid the franchise tax to avoid forfeiture before or after Dolfin went into insolvency or took any steps to release the Dolfin Shares to plaintiff.

[8].

On November 21, 2021, the court ordered defendants to
"immediately return to Plaintiff Brent Satterfield all of the First Tranche of shares in the possession, custody, or control, directly or indirectly, of [the Judgment Defendants] including such shares held at Dolfin Financial in London or wherever else they may be and to immediately facilitate, expedite, and, as necessary, execute any paperwork that may be necessary or expedient to effectuate the return of said shares to said plaintiff."

(NYSCEF 449, Prior Order [mot. seq. no. 010].)

[9].

---

[2]  Pages refer to NYSCEF generated pagination.
[3]  Plaintiff is reminded to file each exhibit separately in NYSCEF, as by doing so, each of plaintiff's exhibits are assigned their own electronic docket number. Plaintiff must also identify the internal exhibit number and describe the exhibit when uploading each exhibit separately. Failure to do so will result in delay.

On February 14, 2022, the VStock Shares were returned to plaintiff as a result of plaintiff's efforts to get a court order. (NYSCEF 536, So Ordered Stipulation [mot. seq. no. 015].)

[10].

On February 25, 2022, Jaitegh Singh, Esq., filed a notice of appearance as counsel to defendants when all other counsel to defendants asked to be relieved. (NYSCEF 581.)

[11].

On February 26, 2022, Singh received Sklarov's subpoena. (NYSCEF 592.) While there were motions to quash other subpoenas, including a subpoena on Singh, defendants failed to make such a motion. *(CVL Real Estate Holding Co., LLC v Weinstein,* 74 AD3d 565, 566 [1st Dept 2010] [when defendant refused to appear in court in response to plaintiff's motion to hold defendant in contempt, the court found proper service where defendant failed to move to quash the subpoena].)

[12].

On March 2, 2022, Singh, executed a stipulation with plaintiff, so ordered on March 21, 2022, reiterating the court's Prior Order that plaintiff is the rightful owner of the Dolfin Shares and agreeing that the Shares should be returned to plaintiff. (NYSCEF 640, So Ordered Stipulation.) To date, the Dolfin Shares have not been returned to plaintiff.

## Contempt Hearing

[13].

On February 14, 2022, the court directed the parties to appear for argument on this motion for contempt on February 17, 2022 and scheduled an in-person hearing on contempt for March 4, 2022. (NYSCEF 560, Order to Show Cause.) On March 2, 2022, at 4:11 p.m., Sklarov's counsel filed an affirmation saying that his client could not appear for the contempt hearing against him. (NYSCEF 599, Singh aff ¶ 4.) The court rejected counsel's affirmation as counsel failed to disclose the whereabouts of his client and had no personal knowledge of any factual assertions in his affirmation. On March 3, 2022, at 9:11 am, Sklarov filed an affidavit allegedly notarized by a notary in Butler County, Pennsylvania on March 3, 2022. (NYSCEF 609, Sklarov affidavit [Mar. 3, 2022].) Again, without disclosing his whereabouts, Sklarov claimed to be too busy to appear because of the war in Ukraine. *(Id.)* In his affidavit, Sklarov additionally represented to the court that "[i]n an effort not to prolong this matter indefinitely, I am willing to appear via video conference at any future date and time which this Court determines is acceptable with the exception of this Friday, March 4, 2022." (*Id.*)

[14].

On March 3, 2022, the court granted Sklarov's request, noted the Pennsylvania notarization, and adjourned the in-person contempt hearing to April 1, 2022 at 10:00 a.m. (NYSCEF 620, Order.) Next, the court was informed that Sklarov was not in Pennsylvania and his attorney had no idea where he was located. (*See* NYSCEF 621, Order.) The court then immediately ordered Sklarov to disclose his location so the court could determine if his affidavit was valid. (*Id.*)

[15].

Pursuant to court's order, in a March 4, 2022 affidavit, Sklarov claimed to be in the Maldives. (NYSCEF 622, Sklarov aff [Mar. 4, 2022].) His affidavit was again notarized in Pennsylvania with no indication that the notary knew where Sklarov was or whether the notarization complies with the law where Sklarov was purportedly located. Pennsylvania notary law allows Pennsylvania notaries to notarize individuals even if the individual is not presently in Pennsylvania. (57 Pa Stat Ann § 306.1 [b] [4] [ii].) However, the Pennsylvania law is contingent on the law where the individual is located; the notarization must be consistent with the law in that jurisdiction. (*See id.*) There is no evidence before this court that the Pennsylvania notary complied with the law of the Maldives, if that is actually where Sklarov was located. Indeed, there is no indication that the notary knew where Sklarov was at the time of the notarization to comply with the strictures of Pennsylvania law; this is accentuated by the admission that Sklarov's own attorney had no idea where he was. Further, Sklarov has failed to provide the court with any proof demonstrating that the notarization is consistent with the law of the Maldives or proof that Sklarov was actually located there. Accordingly, the court finds the documents (NYSCEF 609 and 622), to be unsworn and unreliable.

[16].

In a March 23, 2022 email to the court, Sklarov's counsel informed the court that Sklarov would not be appearing at the contempt hearing against him on April 1, 2022 either because he had allegedly complied with the court's Prior Order and returned the shares, which was not true, or because his family was in Ukraine, though Sklarov's whereabouts were again undisclosed.[4] On March 25, 2022, the court agreed to Sklarov's virtual appearance on April 1, 2022. At the hearing, Sklarov failed to appear virtually; this failure to appear not only constituted his default, but also another instance of contempt of court.

[17].

After the court found Sklarov in default, and on April 4, 2022 at 1:45 p.m., Sklarov contacted the court by email to object to any penalty for the default and finding of contempt. Again, Sklarov failed to offer any proof as to his whereabouts.

## Legal Standard

[18].

Under the Judiciary Law, the court has the power to punish a party for contempt by fine, imprisonment, or both. (Judiciary Law § 753 [A][3].) Under CPLR 5104, any "final judgment or order ... may be enforced by serving a certified copy of the judgment or order upon the ... person required ... to obey it and, if he refuses or wilfully neglects to obey it, by punishing him for a contempt of the court." The purpose of civil contempt is "the vindication of a private right of a party to litigation and any penalty imposed upon the contemnor is designed to compensate the injured private party for the loss of or interference with that right." *(McCormick v Axelrod,* 59 NY2d 574, 583 [1983].) Judiciary Law § 773 authorizes the Court to impose a fine on the contemnor for the civil contempt for an amount that is sufficient to indemnify the aggrieved

---

[4]  Counsel is directed to file all emails with the court in NYSCEF, including emails sent to the court on March 3, 2022 and on April 4, 2022.

party. (*Id.*) The contemnor is entitled to an opportunity to purge himself of the contempt within ten days after service of the order. (*Id.*; *Davidowitz v Hamroff*, 196 Misc 209 [Sup Ct, Kings County 1949] [service on attorney for a party suffices; personal service is required for a nonparty].) The contemnor may be committed to prison until the fine, plus costs and expenses, is paid or until he is discharged according to law. (Judiciary Law § 773.) When the contemnor willfully refuses to make a court-ordered payment, incarceration as a coercive remedy is justified. *(Melanie C. v Carlo B.,* 192 AD3d 624, 624 [1st Dept 2021] [father who willfully violated his child support obligations could be incarcerated up to six months or suspension of commitment].) The imprisonment ends with the performance of the act and the payment of the fine. (Judiciary Law § 774 [1]; *N.A. Dev. Co. Ltd. v Jones,* 99 AD2d 238, 240 [1st Dept 1984].) "Where it is in the power of the offender to perform the act directed, it is immaterial that he may be imprisoned for a long time, for he has it in his power to perform the act ordered." (*Id.*) If the imprisonment is indefinite or for more than three months, the imprisoned contemnor must be brought before the sentencing judge at least once every 90 days to determine whether the offender should be discharged from prison. (Judiciary Law § 774 [2].) Finally, "subsequent obedience does not discharge liability for previous disobedience" or the damage caused by each contempt. *(Root v Conkling,* 108 Misc 234, 235 [Sup Ct, Otsego County 1919], *aff'd* 199 AD 90 [3d Dept 1921].)

# Discussion

[19].

> At the hearing on April 1, 2022, plaintiff established by clear and convincing evidence the elements necessary for a finding of civil contempt under Judiciary Law § 753(A)(3). "First, 'it must be determined that a lawful order of the court, clearly expressing an unequivocal mandate, was in effect.'" *(El-Dehdan v El-Dehdan,* 26 NY3d 19, 29 [2015] [citation omitted].) This is an action for fraud in which plaintiff has, since 2018, sought return of the Shares he pledged for an alleged loan. (*See* NYSCEF 130, Complaint.) Since February 4, 2021, defendants have been ordered to transfer the shares either to escrow or to plaintiff; the orders are all simple and could not be clearer. (*See* NYSCEF 286, Stipulation; NYSCEF 418, Final Award; NYSCEF 449, Decision and Order [mot. seq. no. 010; NYSCEF 450, Decision and Order [mot. seq. no. 010].)

[20].

> "Second, '[i]t must appear, with reasonable certainty, that the order has been disobeyed.'" *(El-Dehdan v El-Dehdan,* 26 NY3d 19, 29 [2015]) [citation omitted].) The VStock Shares were not transferred to plaintiff until February 14, 2022, in excess of three months from issuance of the court's Prior Order, while the Dolfin Shares have never been returned to plaintiff. Likewise, the damage award of $1,152,538.70 remains unpaid and there is no claim of indigence. Indeed, there is some evidence that defendants have upwards of $80 million and a line of credit for $150 million. (NYSCEF 454, Salisbury tr at 29:6, 30:18 [mot. seq. nos. 010 and 011] [referencing defendants' testimony at the arbitration].)

[21].

> Defendants made it crystal clear that they had the ability to comply with the court's order but chose not to after plaintiff refused to capitulate to defendants' demand cloaked as a "confidential

settlement offer." On January 6, 2022, counsel to defendants emailed plaintiff threatening to file for bankruptcy and offered to comply with the court's Prior Order by transferring the VStock Shares "without delay" to plaintiff in exchange for defendants keeping the Dolfin Shares. (NYSCEF 656, Plaintiff's exhibit 24 at 63.) CPLR 4547, the provision governing the admissibility of compromise and offers to compromise, states that "[e]vidence of (a) furnishing, or offering or promising to furnish, or (b) accepting, or offering or promising to accept, any valuable consideration in compromising or attempting to compromise a claim *which is disputed as to either validity or amount of damages,* shall be inadmissible as proof of liability for or invalidity of the claim or the amount of damages." (Emphasis added.) Critically, the language of CPLR 4547 imposes the requirement that the claim must be in dispute, as to validity or amount of its damages. A settlement negotiation or offer to settle a claim that is not disputed, either as to its validity or amount of damages, is thus admissible. *(Java Enters. v Loeb, Block & Partners LLP,* 48 AD3d 383, 384 [1st Dept 2008].) Here, the claim is <u>unequivocally</u> not in dispute because of the parties' Stipulation, (NYSCEF 286), AAA Panel's Final Award, (NYSCEF 418), and this court's Prior Order (NYSCEF 449; NYSCEF 450). The email is admissible. The mere inclusion of the words "settlement negotiation," or variations thereof, do not make it an offer to compromise barred by CPLR 4547. *(Nineteen Eighty-Nine, LLC v Ichan,* 96 AD3d 603, 607 [1st Dept 2012].) Here, it matters not that defendants' counsel included a disclaimer at the bottom of his email which stated in part: "This correspondence is directly related to settlement negotiations and, as such, any and all information contained herein is protected." The inclusion of this superfluous disclaimer is ineffective and contrary to law.

[22].

"Third, 'the party to be held in contempt must have had knowledge of the court's order.'" *(El-Dehdan v El-Dehdan,* 26 NY3d 19, 29 [2015].) Defendants had knowledge of the court's order and the ability to comply; defendants have been represented by counsel throughout this entire proceeding. The court's orders are publicly filed in NYSCEF. As to the VStock Shares, defendants did nothing to comply with the orders despite at least six emails from plaintiff requesting assistance. (NYSCEF 656, Plaintiff's Exhibits at 34, 38-61.) As to Dolfin, the alleged settlement offer confirms that defendants understood the orders. (*Id.* at 63 ["Clients propose that the shares held at V-Stock would be transferred to Mr. Satterfield without delay and my clients will cooperate in any sort of way necessary to help expedite that transfer. In return, Mr. Satterfield relinquishes the right to any of the shares at Dolfin in the UK, which would be retained by clients."]; *see also* NYSCEF 569, Singh email to Salisbury [Feb. 16, 2022] ["I've been able to reach the client for a short period. He's agreed to cooperate on a vstock and dolphin."].) And, for what it is worth, Sklarov's affidavit (NYSCEF 609, Sklarov aff [Mar. 3, 2022]), demonstrate that he is fully aware of the court's Prior Order and that there was a contempt hearing for his disobedience.

[23].

"Fourth, 'prejudice to the right of a party to the litigation must be demonstrated.' *(El-Dehdan v El-Dehdan,* 26 NY3d 19, 29 [2015] [citation omitted].) Since the order issued, the price of the Shares has plummeted, fluctuating from a $8.67 (close price on November 22, 2021) to $4.68 (open price on April 25, 2022). Over the last year, the stock has ranged from a high price of $11.82 and to a low price of $4.66.[5]

[24].

---

[5]  This is publicly available information, available at https://finance.yahoo.com/quote/CODX/.

The court heard testimony from plaintiff and Anne Salisbury, plaintiff's attorney, who both testified credibly. The court directed Sklarov to appear on March 4, 2022, and adjourned the March 4, 2022 proceeding, at Sklarov's request, to April 1, 2022. Again, Sklarov was ordered to appear in person, but failed to do so.[6] "[A] party may be held in contempt upon his default in appearing at the contempt hearing." (*See Green v Green,* 288 AD2d 436 [2d Dept 2001] [holding failure to appear at a contempt hearing, resulting in a default, also constitutes a waiver of any due process rights].) The facts of this case are analogous to the facts presented in *CVL Real Estate Holding Co. v Weinstein.* (74 AD3d 565, 565 [1 st Dept 2010].) There, a judgment debtor was found in contempt and an arrest warrant issued after the judgment debtor failed to comply with prior court orders and failed to appear at his contempt hearing even though his counsel was present. (*Id.* [affirming trial court order granting contempt motion and directing a warrant for arrest and finding no violation of due process].)

[25].

"The right to arrest in a civil action is a drastic remedy, regarded as penal in nature. Owing to the severity of the relief, the courts do not look with favor upon its pursuit, except where it is necessary to protect the interests of plaintiff." *(Burns v Newman,* 274 AD301, 302 [1st Dept 1948] [citations omitted].) The court in *Burns* opined that the requisite necessity could be found when the plaintiff has suffered damage by reason of defendant's false representations in a case involving claims for loss of property by false representation. *(Id., citing Peterson v* Kirby, 192 AD 707 [1st Dept 1920].) Here, Sklarov's utter disregard and contempt for this court could not be any clearer. Plaintiff has been damaged, maybe even irreparably damaged as evidenced by the difference in share price from November 22, 2021 until today. Sklarov shall have five (5) business days to comply with the Prior Order, or no later than May 3, 2022 at 12 noon EST. If he fails to comply, a warrant will issue. A daily financial penalty would be ineffectual based on this record. Sklarov shall be incarcerated until such time as the Shares are transferred.

[26].

Plaintiff's request for attorneys' fees and expenses is denied without prejudice for failure to explain the services provided and failure to file an affirmation of services. There was no explanation as to why the court should grant attorneys' fees related to work performed in connection to opposing motions to withdraw as counsel. (*See e.g.,* NYSCEF 659, Invoices at 3 ["1/ 25/2022 AWS Prepared and served opposition to counsel withdrawal."].)

[27].

Accordingly, it is

ORDERED that plaintiff's motion for an order adjudicating defendants Val Sklarov, Bentley Rothschild Financial LLC, Bentley Rothschild Capital Limited Corp., and America 2030 Capital, LLC, in civil contempt is granted; and it is further

ORDERED that plaintiff is directed to submit the April 1, 2022 transcript to be so ordered; and it is further

ORDERED that defendants' disobedience has defeated, impaired, impeded and prejudiced plaintiff's rights under the court's Prior Order dated November 12, 2021 and subsequent orders,

---

[6] In addition to the court having personal jurisdiction over the parties, Sklarov and his entities were also served with subpoenas or service was attempted at last known addresses. (NYSCEF 592, Salisbury email [Feb. 26, 2022].)

and the misconduct of the defendants is further found to have consisted of an omission to perform an act or duty which it was within defendants' power to perform and plaintiff has no alternative effective remedies available; and it is further

ORDERED that defendants are held in Civil Contempt and are directed within five business days of this order to purge the contempt, such period ending on May 6, 2022 no later than 12 noon EST, by immediately returning to plaintiff all of the CODX shares in the possession, custody, or control, directly or indirectly, of the defendants including such shares held at Dolfin Financial in London or wherever else they may be and to immediately facilitate, expedite, and, as necessary, execute any paperwork that may be necessary or expedient to effectuate the return of said shares to said plaintiff; and it is further

ORDERED in the event defendants fail to comply with this order to purge, within five business days, such period ending on May 6, 2022 no later than 12 noon EST, a civil arrest warrant shall issue for Sklarov's arrest; and it is further

ORDERED that if defendants fail to comply, then plaintiff shall submit an affidavit to the court by email and filed in NYSCEF and a warrant of arrest shall issue; and it is further

ORDERED that any relief not expressly addressed has nonetheless been considered and is denied without prejudice; and it is further

ORDERED that plaintiff shall submit an affirmation detailing the services performed and identifying all timekeepers including brief descriptions of their jobs and level of experience on NYSCEF and by email (SFC-Part48@nycourts.gov) within ten days of this order.

DATE 4/30/2022

# EXHIBIT 27

# EXHIBIT 16



SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------X  Index No.: 650311/2019

BRENT SATTERFIELD,

                          Plaintiffs,             **COMPLAINT**

          - against –

VSTOCK TRANSFER, LLC, AMERICA 2030 CAPITAL,
LLC, (a/k/a BENTLEY ROTHSCHILD
CAPITAL LTD CORP.), BENTLEY ROTHSCHILD
CAPITAL LTD CORP., AMERICA 2030 CAPITAL,
LIMITED, BENTLEY ROTHSCHILD INVESTMENTS,
XYZ CORPORATION (1-10 fictitious names), and VAL
SKLAROV,

                         Defendants.

-------------------------------------------------------------------X

       Plaintiff Dr. Brent Satterfield ("Satterfield" or "Plaintiff"), by and through his counsel,

Guzov, LLC, as and for his complaint against the above-named defendants, states as follows:

<u>**Introduction**</u>

       1.      This action seeks redress for an increasingly prevalent form of fraud:  a Stock

Loan Fraud.  In this form of fraud, an individual owning shares in a corporation is induced to

pledge those shares as collateral for a loan.  Rather than making the loan, however, the purported

"lender" immediately sells the pledged collateral and pockets the proceeds, leaving the

"borrower" with neither cash nor shares.

       2.       This is precisely what befell Satterfield in this case.  Defendant Val Sklarov,

together with Sklarov's corporate affiliates, defendants America 2030 Capital, LLC ("America

2030"), America 2030 Capital, Limited ("America 2030 Limited") Bentley Rothschild Capital

Ltd. Corp. ("Bentley Rothschild"), Bentley Rothschild Investments, ("BR Investments")

(collectively the "Sklarov Corporate Defendants" and with Sklarov, the "Sklarov Defendants"),

1

each participated in a scheme to defraud Satterfield by convincing him to pledge over 2 million shares in non-party Co-Diagnostics, Inc. ("Co-Diagnostics") (the "Shares") as security for a loan of up to $3.5 million.

3.      Of course, the Sklarov Defendants never had any intention of making a loan to Satterfield: their only goal was to obtain control over Satterfield's Shares and sell them as soon as they possibly could. The Sklarov Defendants proceeded to do exactly that, and in fact began to sell the purported "collateral" before providing Satterfield with a penny in "loan" proceeds. All told, the Sklarov Defendants realized over $1.1 million in proceeds from sales of the shares, while providing Satterfield with only $66,709.00 of his "loan."

4.      Satterfield brings this action for injunctive relief against defendant VStock Transfer, LLC, the transfer agent used by the Sklarov Defendants, to obtain control over the remainder of his Shares. Satterfield also seeks damages based on fraud and conversion against each of the Sklarov Defendants, as well as, in the alternative, rescission of his purported loan agreements.

## The Parties

5.      Plaintiff Dr. Brent Satterfield is a natural person residing in Wichita County, Texas. He is the Chief Technology Officer of non-party Co-Diagnostics, a publicly traded company which provides molecular diagnostic tools for use in the medical and agricultural industries.

6.      Defendant Val Sklarov ("Sklarov") is a natural person who, on information and belief, resides in Chicago Illinois.

7.      Defendant America 2030 is a limited liability company organized and existing under the laws of the State of Colorado with offices located in Kennesaw, Georgia. Defendant

2

America 2030 represents itself on LinkedIn.com as maintaining an office on 48th Street, New York, NY.

8.      On information and belief, Defendant America 2030 Limited is a corporation organized and existing under the laws of the country of St. Kitts & Nevis.

9.      Defendant Bentley Rothschild. is a corporation organized and existing under the laws of the country of St. Kitts & Nevis.

10.     On information and belief, Defendant BR Investments is a corporation organized and existing under the laws of the country of St. Kitts & Nevis.

11.     Defendant VStock Transfer, LLC, is a limited liability corporation organized and existing under the laws of the State of Delaware with its principal offices located in Woodmere, New York.

12.     On information and belief, Sklarov exercises dominion and control over America 2030, America 2030 Limited, Bentley Rothschild, and BR Investments, and disregards the corporate form of those entities to such an extent that the independent existence of those entities should be disregarded, and the corporate veil pierced, rendering Sklarov personally liable for acts purportedly undertaken through such corporate entities.

13.     Defendants XYZ Corp. 1-10 are corporations, limited liability corporations, partnerships, or limited partnerships who are owned or controlled by one or more of Sklarov or the Sklarov Defendants.  At present, Plaintiff is unable to provide additional details concerning the identity or existence of these fictitious defendants, but expects to be in a position to do so in the future, and at that time will amend or supplement this Complaint.

## Jurisdiction and Venue

14.     The amount in controversy in this action exceeds the jurisdictional minimum

3

Case 1:20-cv-09347 Document 1-3 Filed 02/28/24 Page 88 of 500

required for subject-matter jurisdiction in this Court.

15.     This Court has personal jurisdiction over defendant Sklarov pursuant to CPLR 302(a) (2) based upon his commission of tortious acts within the State of New York.

16.     This Court has personal jurisdiction over defendants, VStock, and America 2030 based upon CPLR 301, in that such defendants are present within this State.  In particular, America 2030 maintains an office for the conduct of its business on 48th Street in Manhattan, and defendant VStock maintains its principal place of business at 18 Lafayette Place, Woodmere, NY.

17.     This Court may exercise personal jurisdiction over the remaining defendants other than Sklarov, America 2030, and VStock because such remaining defendants participated, along with Sklarov, and America 2030, in a conspiracy to defraud Plaintiff.  Each defendant committed particular acts in furtherance of the conspiracy as set forth in detail below.

18.     This Court may exercise in rem jurisdiction based upon CPLR 314 over that portion of Plaintiff's Shares (as defined below) which are in the custody of VStock within the State of New York, including without limitation entering judgments against any Defendant adjudicating such Defendant's right, title and interest to the Shares held by VStock.

19.     Venue is proper in this county pursuant to CPLR based upon CPLR 503 because defendant America 2030 maintains an office in New York county, and because a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in New York county.

### Statement of Facts

### Plaintiff Is Introduced to Defendant Sklarov

20.     Plaintiff is a resident of Wichita Falls, Texas. He is the Chief Technology Officer

4

of Co-Diagnostics.

21.    On or about July 12, 2017, Co-Diagnostics became a publicly traded company, traded on the NASDQ Exchange in New York. As part of the initial public offering of Co-Diagnostics, Plaintiff received approximately 2 million restricted shares.  As required by federal securities regulations, these shares were restricted from being traded, and bore legends to that effect.

22.    During the restricted period Plaintiff could not sell any Shares. However, it was brought to his attention that it was possible to obtain a loan using those shares as collateral if he required cash flow while the Shares were restricted.

23.    Plaintiff was introduced to a "finder" in New York City, non-party Leib Schaeffer, who then introduced Plaintiff to defendant Sklarov. Sklarov told Plaintiff he was the head of a company named America 2030 Capital, LLC, located in Georgia, but with offices in New York City.

24.    Plaintiff personally dealt extensively with Sklarov, who claimed to be connected with America 2030's New York City office on 48th Street.  Sklarov would often refer to America 2030 and other Sklarov Corporate Defendants as a "Wall Street Firm."

25.    When Plaintiff began dealing with Sklarov, he did not know that Sklarov had been convicted of Medicare fraud and money laundering, and had served time in federal prison. Nor was Plaintiff aware that the Sklarov Defendants were being sued by other individuals and corporate entities claiming to have been defrauded in connection with stock loan transactions. Had Plaintiff been aware of these facts, he would not have dealt with Sklarov.

5

**Defendants' Fraudulent Scheme**

26.     In the spring of 2018, Sklarov's proposal was as follows: his company, America 2030 would loan Plaintiff up to $1.5 million which was later revised to be up to $3.5 million. This money could be repaid over the course of a five-year period. The first interest payment would be due three months after the loan funded. As security for this loan, Plaintiff would use the Shares, which were worth over $7 million at that time.  The Shares were, at that time, still with the transfer agent, defendant VStock, because they were still restricted.

27.     During emails and telephone calls in the spring of 2018, Defendant Sklarov made a variety of representations to Plaintiff in order to induce him to pledge his shares as collateral. These representations are also summarized on America 2030's website, as follows:

- Annual interest of only 4%-6%.
- Loan to Value (LTV) up to 80% of value of stock.
- The stock shares are kept in a bank custodian account in your home country.
- The stock shares are never short traded, sold, reassigned, transferred or traded.
- The stock shares remain in the name of company or client in local custodian bank.
- Loan will be closed in borrower's country and funds can be disbursed in any currency and free to be transferred anywhere. No restriction whatsoever on use of funds.
- No borrower requirement. Securities are the collateral. Loan is against stock & securities, not borrower.
- Loan proceeds to be used for any purpose and not restricted in any way.
- No ownership transfer of stock or securities.
- Dividends are paid to stock & securities owner because owner is still official owner of record.
- Simple interest is paid quarterly.

28.     On or about March 30, 2018, and in reliance on these representations, Plaintiff, without the assistance of an attorney, executed a document provided by Sklarov entitled "Master Loan Agreement," (the "MLA"). When Plaintiff asked if he needed an attorney, Sklarov said it was a simple, standard loan document, that his firm relied on their international reputation, and there is no need to consult an attorney.

29.     Plaintiff relied upon defendant Sklarov for assistance in completing the MLA and

6

related documents. For instance, Plaintiff completed America 2030's "Know Your Customer" application. When filling out the "Know Your Customer" form, Plaintiff continually expressed his lack of understanding of securities terms and regulations. Plaintiff was instructed to just fill out his name, and America 2030 or non-party Schaeffer would "work on the missing pieces of the forms."

30. On or about March 9, 2018 before filling in the Know Your Customer booklet, Plaintiff called non-party Schaeffer to ask questions about how to fill in the information. Schaeffer again indicated what he told Plaintiff on or about March 6 – that the stock would be free-trading by the time the loan was done, and that Plaintiff should so indicate on the Know Your Customer form.

31. Plaintiff also reminded Sklarov that the "freely tradeable" shares mentioned in 4.2 of the MLA were still paper certificates in need of a legal opinion to be tradeable, which legal opinion may or may not be complicated by the fact that Plaintiff was a 10% shareholder, officer, and director of Co-Diagnostics. Sklarov said it was not a problem and that the language was just a legal formality; the shares would be freely tradeable before the loan was finalized

32. Subsequently Mr. Sklarov provided Plaintiff with several Addenda to the MLA. The first Addendum changed the form of the transaction from a transfer of shares, to a pledge, as is required by the restrictive legend on the shares.

33. No matter what the designation, ownership of Plaintiff's shares were never to be actually transferred to any Defendant- that would not have even be possible, as the Shares were restricted. They were to be held as collateral for the loan reflected in the MLA.

34. Under the Sklarov Defendants' fraudulent scheme, approximately half of Plaintiff's shares would have become freely tradeable on or around December 11, 2018, and the

7

Case 1:20-cv-09837   Document 1-3   Filed 07/30/24   Page 92 of 500

other half on or around January 17, 2019. As the first half of Plaintiff's Shares were set to go

unrestricted in December 2018, Plaintiff started hearing from Sklarov in late November. Sklarov

pressured Plaintiff for help in removing the transfer restrictions on the Shares, explaining that he

could not fund the "loan" without doing so. Plaintiff was unfamiliar with the loan process, and

Sklarov represented that this was a procedural requirement.

35.     Whenever Plaintiff inquired about the loan process, his inquiries were met with

threats. In particular, in late 2018, Sklarov began to threaten to sell half of Plaintiff's shares if

Plaintiff did not sign additional addenda to the MLA.

36.     Plaintiff told non-party Schaeffer that he did not like the threatening way Sklarov

was starting to conduct business and that there was no way Plaintiff was going to agree to

Sklarov's requests if Plaintiff was going to have to sue to get half of his stock back in two weeks.

Schaeffer said that Plaintiff should call Sklarov directly.

37.     In a phone call with Sklarov, Plaintiff repeated to Sklarov what he told Schaeffer

and said that he saw no reason to execute the requested addenda. Sklarov said he needed to make

the changes for administrative reasons. He then asked if Plaintiff was worried about being

screwed out of his stock in two weeks, and said that if they were going to screw Plaintiff, they

would have done it six months ago, as they had had the Shares this whole time. In effect, Sklarov

was telling Plaintiff that the Sklarov Defendants were trustworthy since they had access to his

shares and had not "yet" stolen them. Sklarov then added the implicit threat that Plaintiff was

already in default because the Shares were not free-trading. Plaintiff protested, reminding

Sklarov that both he and Schaeffer knew that the stock was not free-trading and had promised

they could get it to be free-trading. Sklarov eventually promised to make changes to the addenda,

and Plaintiff agreed to execute them.

8

## The Purported "Closing" and Defendants' Sales of Shares Prior Thereto

38.     The supposed transaction at issue had a projected "closing" date of December 15, 2018, on which date Plaintiff signed documents purporting to be closing documents. Prior to the "closing," Plaintiff arranged to have the Shares transferred to what he assumed to be an escrow account, in preparation for the "closing".

39.     On or about December 11, 2018, Sklarov notified Plaintiff by email that the legend had been removed from the Shares used as the collateral for the loan.

40.     Between about December 13, 2018 (on or about the date the restriction on the first half of the Shares was removed and the shares reached the broker) and December 27, 2018 (the date the Defendants sent Satterfield their Notice of Default, discussed more fully herein below), and thus a period of only about two weeks, the price of Co-Diagnostics shares dropped precipitously, from $2.18 to $1.15.  This is a nearly 50% drop.  The company's stock is thinly traded and has shown volatility in the past, but this type and magnitude of a price drop was wholly unprecedented.  However, unbeknownst to Plaintiff, the decline in price was being caused by the Sklarov Defendants' sales of his collateral.

41.     On or about December 17, 2018, America 2030 countersigned the "Closing Statement and Addendum" form.  Plaintiff, having played no part in the drafting of that document and at this point being unaware of the fraud scheme that was being perpetrated, signed the closing documents and awaited funding of the loan.

42.     On December 26, 2018, Plaintiff received a "First Disbursement Statement" dated December 25, 2018 from America 2030.  The Statement indicated that America 2030 was providing a "Disbursement Amount" of $100,000, but had deducted fees, expenses and interest of $33,291. This left a "Balance Payment Due to Borrower" of $66,709. A wire transfer for this

token amount was sent to Plaintiff.

43.     The next day, only just over a week after the "closing", on or about December 27, 2018, America 2030 Limited sent Plaintiff document dated December 27, 2018 entitled "Margin Call." In it, the Defendants demand a "top-up" of their collateral under the MLA based on the share price for the Co-Diagnostics stock having fallen to below $1.50 per share over the previous three trading days, i.e., December 21, 24 (Christmas Eve) and 26 (the Day after Christmas Day). Unbeknownst to Plaintiff, Defendants had caused this price drop by dumping the Shares, thereby manipulating the stock price, during the prior weeks.

44.     The details and timing of this critical period reveal that the Defendants had meticulously planned and timed this fraud scheme and their execution of it.

45.     After receipt of third-party discovery, Plaintiff now knows that the Defendants actually took and sold the Shares before the purported closing even took place, and before a single cent was loaned to Plaintiff.  Plaintiff also knows that the Sklarov Defendants continued to sell the shares, even after Plaintiff expended enormous effort and resources to get a preliminary injunction in this case.

46.     On information and belief, the drop in the price of Co-Diagnostics shares to below $1.50 was caused, in whole or in part, by the Sklarov Defendants' sales of the Shares.

47.     Records subpoenaed in connection with this action from Bank of NY show that the 2030 Defendants actually took, and sold, 10,760 shares on December 13, 2018 (for $23,120.24) and 28,900 shares on December 14, 2018 (for $58,447.93)—days before the "closing" was supposed to take place.

48.     They continued selling on almost every trading day since then in ever increasing manner:

10

Case Case 1:20-cv-09585 Document 1-3 Filed 12/09/2024 Page 12 of 500

| Trade Date | Principal Amount | Shares/Par | Local Price |
|---|---|---|---|
| 12/13/2018 | 23,120.24 | -10,760.00 | 2.1509 |
| 12/14/2018 | 58,447.93 | -28,800.00 | 2.0315 |
| 12/17/2018 | 18,193.90 | -9,434.00 | 1.9305 |
| 12/18/2018 | 9,118.75 | 5,000.00 | 1.8256 |
| 12/19/2018 | 8,852.02 | -5,000.00 | 1.7722 |
| 12/20/2018 | 8,219.16 | -5,000.00 | 1.643832 |
| 12/21/2018 | 7,520.97 | -5,000.00 | 1.5057 |
| 12/27/2018 | 5,660.07 | -4,100.00 | 1.3854 |
| 12/28/2018 | 6,231.42 | -5,000.00 | 1.2503 |
| 1/2/2019 | 10,243.03 | -7,521.00 | 1.3646 |
| 1/4/2019 | 36,653.75 | -29,341.00 | 1.2505 |
| 1/3/2019 | 38,774.69 | -30,000.00 | 1.2938 |
| 1/7/2019 | 49,065.09 | -40,810.00 | 1.2022811 |
| 1/8/2019 | 61,917.21 | -50,000.00 | 1.2396 |
| 1/8/2019 | 52,672.29 | -43,705.00 | 1.2064 |
| 1/10/2019 | 31,722.59 | -26,311.00 | 1.2069 |
| 1/11/2019 | 64,580.08 | -57,249.00 | 1.1292 |
|  |  | - |  |
| 1/14/2019 | 323,585.71 | 246,416.00 | 1.3145 |
| 1/15/2019 | 74,082.70 | -64,761.00 | 1.1451 |
| 1/16/2019 | 77,697.76 | -71,982.00 | 1.0805 |
| **1/18/2019** | **41,478.34** | **-37,315.00** | **1.1127** |
| 1/17/2019 | 68,662.66 | -62,100.00 | 1.1068 |
| **1/22/2019** | **76,038.34** | **-70,321.00** | **1.0824** |
|  | $1,152,538.70 | -905,926 |  |

49.     The trades indicated in red on the above chart were initiated *after* this Court granted temporary restraining orders against America 2030 and Bentley Rothschild enjoining them from further sales of the Shares.

50.     So far, the Sklarov Defendants have now pocketed **$1,152,000** as a result of fraudulent sales of Plaintiff's shares. Plaintiff received a loan of $66,709, but over $1,152,000 in supposed "collateral" for that loan has been disposed of, and the proceeds pocketed by Defendants.

51.     Approximately 1,134,897 restricted shares of Co-Diagnostics are currently held

11

by Defendant VStock pursuant to a preliminary injunction entered by this Court on February 4, 2019.

**Defendants' Prior Fraudulent Schemes**

52.     The Sklarov Defendants have been involved with the same stock-loan scheme in the recent past, and, according to court filings and press reports, are currently the subject of injunctions in Hong Kong and Singapore restraining America 2030 and Sklarov from continuing to trade shares that were supposed to be held as "collateral".

**Hong Kong**

53.     The docket and filings in a District Court of Georgia action, styled *America 2030 Capital Limited v. Prescient Investment Limited, et.al*, 1:18-cv-04875-AT (the "Georgia Case"), reveal that an injunction is currently in effect in Hong Kong restraining America 2030 and Sklarov from transferring and trading shares in a company whose shares were obtained in the exact same way as here (indeed the "MLA" in that case appears to be identical).

54.     In the Georgia Case, the Hong Kong executives pledged their shares as collateral as part of an MLA with America 2030. When America 2030 tried to liquidate and transfer the shares, the Borrower objected because, like here, America 2030 had not yet made the loan. The borrower obtained an injunction from a Hong Kong court prohibiting the transfer agent from transferring the shares. In response, America 2030 filed the Georgia Case. In that case, America 2030 claims that the loan documents permitted it, to sell the collateral in the absence of making the loan. See Georgia case, 1:18-cv-04875-AT, Document 16.

55.     The case was dismissed on jurisdictional grounds, and America 2030 was sanctioned. In a Rule 11 Sanctions Order issued last week in the District Court in Georgia, the

12

Case Case 1:20-cv-09348 Document 1-3 Filed 01/29/2024 Page 97 of 500

Court sanctioned Val Sklarov personally and enjoined him and the following entities the judge deemed affiliated entities;

- America 2030 Capital Limited (incorporated in Hong Kong);

- America 2030 Capital Limited (incorporated in the United Kingdom);

- America 2030 Capital Limited (incorporated in Colorado)

- America 2030 Capital LLC (incorporated in Colorado)

- Any company doing business as America 2030 Capital Limited or America 2030 Capital Limited Co. and associated with the plaintiff or its officers; and

- All affiliates of the plaintiff.

### Singapore

56.     In late 2018, in a press release, a Singapore company named Sunpower Group, announced it had to halt trading in its shares after two of its substantial shareholders had informed the company that, on November 3, 2018:

> …they had placed 14 million shares each with a lender, America 2030 Capital Ltd., as collateral for a loan, and said the shares were no longer in the depository broker account.

57.     After these executives commenced legal action in Singapore, America 2030 announced it was bringing an arbitration against these two executives in Nevis against:

> …entities owned by two key executives of Sunpower Business Group LTD for amongst other things, breach of contract, default, tortuous [sic]interference, defamation and slander.

58.     This is after, like here, these executives had gone into Court in Singapore to restrain trading in shares that had been essentially stolen from them.

59. The two executives have launched a complaint with regulatory agencies in Singapore: https://www.businesstimes.com.sg/companies-markets/sunpowers-exec-chairman-exec-director-lodge-report-with-cad-over-unauthorised.

### United Kingdom

60. In the UK, the CEO of a company named Angus Energy had to step down, after the company disclosed he had transferred his Angus Energy shares to a company called America 2030 Capital Limited for "nil consideration". It was said to be "in contemplation of a possible equity linked loan against his shareholding". Unbelievably, the company reports that America 2030 sold 10 million shares (a value of over $100 million) before it was discovered.

### Sklarov's Prior Criminal History

61. This action is only one of many in which Sklarov personally and his company America 2030 and its affiliates have been accused of fraud, conspiracy, antitrust collusion, LIBOR manipulation and stock-loan fraud.

62. In a case entitled *USA v. Sklarov, et al.,* 97-cr-00176 (DJL) (W.D. Pa.), Sklarov was convicted of fraud and sentenced to one year in prison and $14,000,000 restitution, stemming from Medicare fraud.

### AS AND FOR A FIRST CAUSE OF ACTION
(Fraud as against Defendant Sklarov)

63. Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 62 above as if set forth in full herein.

64. Sklarov made repeated misrepresentations of material fact concerning, *inter alia,* the nature of the transaction he was proposing to Plaintiff, his intent to provide loan funding to

Case Case 1-20-01006-MC Document 163 Filed 03/12/2024 Page 16 of 20

Plaintiff, and his intent to safeguard Plaintiff's collateral.  These misrepresentations were made via emails and telephone calls from Sklarov to Plaintiff.

65.     At the time Sklarov made these representations he knew they were false, and he intended that Plaintiff would rely upon them.  Plaintiff also caused the Sklarov Corporate Defendants to sell the Shares prior to the closing, and after the closing but before providing any funds to Plaintiff, in order to manipulate the price of the Shares.

66.     Plaintiff did in fact rely upon Sklarov's misrepresentations by executing the MLA, executing the addenda to the MLA, executing the purported closing documents, and providing the Shares to Sklarov and the Sklarov Defendants.

67.     Plaintiff's reliance was justifiable.

68.     Plaintiff has suffered damages caused by Sklarov's fraud in an amount to be proven at trial but believed to be in excess of $1.1 million.  In addition, Sklarov's actions were wanton, reprehensible, and egregious, so as to warrant the imposition of punitive damages in an amount to be determined at trial but believed to be in excess of $2,000,000.

### AS AND FOR A SECOND CAUSE OF ACTION
(Aiding and Abetting Fraud as against the Sklarov Corporate Defendants)

69.     Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 68 above as if set forth in full herein.

70.     Defendant Sklarov executed a fraudulent scheme against Plaintiff as described above.

71.     Each of the Sklarov Corporate Defendants knew of Sklarov's fraudulent scheme and intended to materially assist Sklarov in perpetrating it.

72.     The Sklarov Corporate Defendants provided substantial assistance to Sklarov in perpetrating his fraudulent scheme against Plaintiff, as follows:

15

Case 1:20-cv-08437   Document 1-3   Filed 10/09/24   Page 102 of 500

a. America 2030 provided documentation to Plaintiff in furtherance of the scheme, including but not limited to the purported closing documents;

b. America 2030 Limited provided documentation to Plaintiff in furtherance of the scheme, including but not limited to the purported margin call notice;

c. Bentley Rothschild and BR Investments sold the Shares at issue, despite the lack of a default by Plaintiff and despite the fact that only a fraction of the value of the loan was ever funded.

73.     Plaintiff has suffered damages caused by Sklarov's fraud as aided and abetted by the Sklarov Corporate Defendants in an amount to be proven at trial but believed to be in excess of $1.1 million.  In addition, the Sklarov Corporate Defendants' actions were wanton, reprehensible, and egregious, so as to warrant the imposition of punitive damages in an amount to be determined at trial but believed to be in excess of $2,000,000.

### AS AND FOR A THIRD CAUSE OF ACTION
(Conversion as against Sklarov and the Sklarov Corporate Defendants)

74.     Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 73 above as if set forth in full herein.

75.     Plaintiff has a current possessory right and interest in the Shares.

76.     The Shares constitute separate and identifiable property.

77.     Sklarov and the Sklarov Defendants have exercised, and are continuing to exercise, dominion over the shares in derogation of Plaintiff's rights.

78.     Plaintiff has been damaged by this conversion in an amount to be proven at trial but believed to be in excess of $1.1 million.  In addition, Sklarov and the Sklarov Corporate Defendants' actions were wanton, reprehensible, and egregious, so as to warrant the imposition of punitive damages in an amount to be determined at trial but believed to be in excess of

16

$2,000,000.  Alternatively, Plaintiff is entitled to the return of the Shares wrongfully taken by Defendants, including but not limited to the shares currently held by Defendant VStock.

## AS AND FOR A FOURTH CAUSE OF ACTION
(Conspiracy to commit fraud and conversion as against Sklarov and the Sklarov Corporate Defendants)

79.     Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 78 above as if set forth in full herein.

80.     Sklarov has committed fraud against Plaintiff, aided and abetted by the Sklarov Corporate Defendants.

81.     Sklarov and the Sklarov Corporate Defendants have committed conversion against Plaintiff.

82.     An agreement to conspire to commit the torts of fraud and conversion existed between and among Sklarov and the Sklarov Corporate Defendants.

83.     Each of Sklarov and the Sklarov Corporate Defendants committed overt acts in furtherance of the conspiracy as alleged in detail above.

84.     By reason of the foregoing, Plaintiff has been damaged in an amount to be proven at trial but believed to be in excess of $1.1 million.  In addition, Sklarov and the Sklarov Corporate Defendants' actions were wanton, reprehensible, and egregious, so as to warrant the imposition of punitive damages in an amount to be determined at trial but believed to be in excess of $2,000,000.

## AS AND FOR A FIFTH CAUSE OF ACTION
(Preliminary and Permanent Injunctive Relief as against VStock

85.     Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through

17

Case 1:23-md-03082-RGK Document 1-3 Filed 01/09/24 Page 102 of 500

62 above as if set forth in full herein.

86. VStock currently holds more than 1.1 million of the Shares pursuant to this Court's Preliminary Injunction dated February 4, 2019.

87. Plaintiff's right, title and interest in the Shares held by VStock is superior to VStock's, or that of any other Defendant.

88. Plaintiff lacks an adequate remedy at law.

89. By reason of the foregoing, Plaintiff is entitled to temporary, preliminary and permanent injunctive relief directing VStock to return all Shares in its possession, custody or control to Plaintiff.

## AS AND FOR A SIXTH CAUSE OF ACTION
(Unjust Enrichment against Sklarov and the Sklarov Corporate Defendants)

90. Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 62 above as if set forth in full herein.

91. Defendants Sklarov and the Sklarov Corporate Defendants have wrongfully sold Shares which belong to Plaintiff, and have refused to turn over any portion of the proceeds of such sales to Plaintiff.

92. The above-named defendants would be unjustly enriched if they are permitted to retain the proceeds of their wrongful sale of the Shares.

93. Plaintiff lacks an adequate remedy at law.

94. Plaintiff has been damaged in an amount to be proven at trial but believed to be in excess of $1.1 million.

WHEREFORE, Plaintiff demands a judgment as follows:

18

1. On the first cause of action, a judgment in favor of Plaintiff against Defendant Sklarov awarding damages in an amount to be proven at trial but believed to be in excess of $1,100,000.00, plus punitive damages in an amount to be determined at trial but believed to be in excess of $2,000,000.

2. On the second cause of action, a judgment in favor of Plaintiff against the Sklarov Corporate Defendants awarding damages, jointly and severally, in an amount to be proven at trial but believed to be in excess of $1,100,000.00, plus punitive damages in an amount to be determined at trial but believed to be in excess of $2,000,000.

3. On the third cause of action, a judgment in favor of Plaintiff against Defendant Sklarov, and the Sklarov Corporate Defendants awarding damages in an amount to be proven at trial but believed to be in excess of $1,100,000.00, plus punitive damages in an amount to be determined at trial but believed to be in excess of $2,000,000, or, in the alternative, an order directing Defendants Sklarov and the Sklarov Corporate Defendants to return any and all Shares in their possession to Plaintiff.

4. On the fourth cause of action, a judgment in favor of Plaintiff against Defendants Sklarov, and the Sklarov Corporate Defendants awarding damages in an amount to be proven at trial but believed to be in excess of $1,100,000.00, plus punitive damages in an amount to be determined at trial but believed to be in excess of $2,000,000.

5. On the fifth cause of action, an order constituting a preliminary and permanent injunction directing Defendant VStock to transfer any Shares currently in its possession to Plaintiff.

6. On the sixth cause of action, a judgment in favor of Plaintiff against Defendants Sklarov, and the Sklarov Corporate Defendants awarding damages in an amount to be proven at trial but believed to be in excess of $1,100,000.00.

19

7. Together with interest, attorneys' fees, and such other and further relief as the Court may deem just and proper, including the costs and disbursements of this action.

## DEMAND FOR A JURY TRIAL

Plaintiff respectfully demands a trial by jury for all issues so triable in this action.

Dated: New York, New York
March 13, 2019

GUZOV, LLC

By:_____ _____
Debra J. Guzov, Esq.
Anne W. Salisbury, Esq.
805 Third Avenue, 8th Floor
New York, N.Y. 10022
Tel:    (212) 371-8008
dguzov@guzovllc.com
*Attorneys for Plaintiff*

20

# EXHIBIT 28

**EASTERN CARIBBEAN SUPREME COURT**
**SAINT CHRISTOPHER AND NEVIS**
**(NEVIS CIRCUIT)**

**IN THE HIGH COURT OF JUSTICE**

**CLAIM NO: NEVHCV2019/141**

**BETWEEN:**

**(1)  SUNPOWER BUSINESS GROUP PTE LTD**
**(2)  TOURNAN TRADING PTE LTD**

Claimants

- and-

**(1)  AMERICA 2030 CAPITAL LIMITED**
**(2)  MARK SIMON BENTLEY (also known as VAL SKLAROV)**
**(3)  WEISER GLOBAL CAPITAL MARKETS LTD (formerly known as WEISER ASSET MANAGEMENT LTD.)**

Defendants

**AND**

**CLAIM NO: NEVHCV2019/0023**

**IN THE MATTER OF THE ARBITRATION ACT CAP. 3.01**
**BETWEEN:**

**(1)  SUNPOWER BUSINESS GROUP PTE LTD**
**(2)  TOURNAN TRADING PTE LTD**
**(3)  GUO HONG XIN**
**(4)  MA MING**

Claimants

-and-

**(1)  AMERICA 2030 CAPITAL LIMITED**

1st Defendant

**(2)  KAREN HILL-HECTOR**

2nd Defendant

**Appearances:**

Mr. Nicholas Peacock with Ms. Elizabeth Harper of counsel for the claimants
Mrs. Angela Cozier of counsel for the 1st defendant in case NEVHCV2019/0023 and the defendants in case number NEVHCV2019/0141
Mr. Michael Hayton of counsel for the 2nd defendant in case NEVHCV2019/0023

-----------------------------------------------------------------------
**2020:  June 15th**
**July, 10th**
-----------------------------------------------------------------------

**Reasons for Decision**

[1]    **Moise, J.:** On 15th June, 2020, the court dismissed two applications for the strike out of cases NEVHCV2019/0023 and 0141. I undertook to give written reasons for my decision. I do so now. However, before addressing the substance of the applications it is important to highlight a number of facts which are relevant to both cases. I also wish to note that the cases are consolidated solely for the purpose of providing my reasons to the parties as promised on 15th June, 2020.

**The Facts**

[2]    The 1st and 2nd claimants (hereinafter referred to as SBG and Tournan respectively) are both limited liability companies incorporated in Singapore. In claim NEVHCV2019/0023, the 3rd and 4th claimants are shareholders of SBG and Tournan respectively. The 1st defendant (hereinafter referred to as America 2030(N)) is a company registered in Nevis. The 2nd defendant in claim NEVHCV2019/0141 (hereinafter referred to as Mr. Sklarov) is a citizen of the United States of America of Ukrainian origin and is the principal owner and operator of the America 2030(N). NEVHCV2019/0141 was also brought against Weiser Asset Management Ltd (hereinafter referred to as Weiser) which is a company registered in the Bahamas as a registered broker dealer.

[3]    The claimants assert that in or about May, 2018, they were introduced to Mr. Sklarov and his America 2030 companies, one of which was registered in Hong Kong. SBG and Tournan were in need of finance and Mr. Sklarov presented America 2030 as a specialist in stock loan agreements. Essentially, as I understand it, America 2030 agreed to loan up to an amount of $25,000,000.00US to SBG and Tournan in return for a deposit of pledged collateral to a depository broker. This agreement was dated 12th June, 2018 and referred to as the "master loan agreement". The agreement contained the express terms that:

(a) America 2030 would maintain its full ability to return the pledged collateral upon satisfaction of the borrower's obligations to repay the loan;

2

(b) The pledged collateral would remain with America 2030 until all outstanding loans and interests were repaid, when it would be returned to the borrower; and

(c) America 2030 would not sell or trade in the shares for any reason whatsoever unless the borrower was in default or a material event occurred.

[4] Essentially, the allegation is that the shares deposited with the broker were to be used solely for the purpose of providing collateral for the loans. They were not to be used by America 2030 in anyway, save in the event of a default on the part of the claimants. The agreement also dictated that America 2030 was entitled to trade in a small number of shares for the sole purpose of testing the market price. The claimants however complain, in their statement of claim in case NEVHCV2019/0141, that there were significant disclaimers contained in the master loan agreement. In addition to that, the agreement contained a breakup fee of 5% of the fair market value of the approved loan in the event that the claimants failed to deliver up the pledged collateral.

[5] The claimants assert that following the execution of the master loan agreement they requested loans of up to $3,000,000.00US. Mr. Sklarov responded to this by indicating that if there were to be any amount loaned under the agreement, the breakup fee would be calculated on the maximum loan contemplated in the amount of $25,000,000.00US. He stated further that there had to be novation of the rights and obligations of America 2030 in favour of America 2030(N) and that the governing law had to be changed to Saint Kitts and Nevis law and the arbitration provisions under the original contract were to be amended to provide for arbitration by "The Arbitrator Conflict Resolution Service of Saint Kitts and Nevis." The claimants assert that despite their protestations, they eventually relented and on 3rd September, 2018 the parties entered into a Supplemental Agreement.

[6] On 19th September, 2018, the claimants, America 2030(N) and Wieser entered into a Power of Attorney and Custodian Management Agreement. This agreement conferred control of an omnibus account into which the claimants each deposited 14,000,000 shares in Sunpower Business Group PTE Ltd. These shares were deposited into the account on 16th and 17th October, 2018. The claimants assert that Mr. Sklarov was aware of this transfer no later than

3

21st October, 2018. It was also asserted that as at 23rd October, 2018 the value of the shares by far exceeded the amount to be loaned to the claimants. However, between 22nd October and 2nd November, 2018 some 15,290,500 shares were sold leaving a balance of 12,709,500. It is alleged that this high volume of trading led to queries being raised by the Singapore exchange and resulted in a significant reduction in the value of the shares. It is also important to note that, as the claimants assert, at this time no funds had been transferred to them from America 2030(N) in keeping with the loan agreement.

[7]  The claimants also assert that the selloff of the shares took place on Mr. Sklarov's instruction. Despite this, America 2030(N) issued a default and acceleration notice to the claimants. It claimed an entitlement to terminate the agreement and to demand payment of the breakup fee in the sum of $1,250,000.00US. The claimants refused this request and sought and obtained injunctive relief in the High Court in Singapore in addition to filing a substantive action in that jurisdiction (The Singapore Proceedings). Subsequent to that, America 2030(N) commenced arbitration proceedings in Nevis in which it sought a declaration of its entitlement to forfeit the Sunpower shares. The arbitration proceedings were to be conducted by Ms. Karen Hill-Hector. In addition to that, arbitration proceedings were also commenced against the claimants seeking substantial sums in damages for defamation.

**The Fixed Date Claim**

[8]  On 15th February, 2019 the claimants commenced an action in Nevis by way of Fixed Date Claim seeking various orders against the validity of the arbitration proceedings, or in the alternative the removal of Ms. Karen Hill-Hector as the Arbitrator and injunctive relief against the defendants as it relates to proceeding with the arbitration. Together with the Fixed Date Claim, the claimants lodged an application for an interim injunction with a certificate of urgency. They sought from this court an injunction prohibiting the arbitration proceedings from taking place until the final determination of the case. Along with the Claim Form and the Notice of Application, the claimants also filed an affidavit of Guo Hong Xin. Mr. Xin indicated that he made *"this affidavit in support of the Claimant's applications in the claim form and notice of application herein."* On 27th February, 2019, the court ordered a stay of the arbitration proceedings and granted leave to America 2030(N) to file evidence and submissions in

4

opposition to the application. On 3rd May, 2019 the parties appeared before the court and agreed that the interim injunction granted on 27th February, 2019 would remain in effect with a full hearing of the application to take place on 5th June, 2019. Ms. Hill-Hector indicated that she would play no formal part in the proceedings and undertook to abide by any decision which the court makes in the outcome of this case.

[9] The Fixed Date Claim came up for hearing on 5th June, 2019 before Justice Raulston Glasgow. At that hearing the parties agreed that the interim injunction would remain in place until the final disposal of the matter. Glasgow J identified 6 issues to be tried and gave further case management directions. The claimants however assert that subsequent to this they became aware that they had fallen victim to a broader fraud scheme perpetuated by Mr. Sklarov. On the basis of information they claim to have received, the claimants lodged a separate claim in this court on 5th December, 2019 in which they sought to rescind the agreement altogether on account of fraud, misrepresentation and breach of contract. They applied for an obtained a worldwide freezing order against America 2030(N), Mr. Sklarov and Weiser.

**The Singapore Proceedings**

[10] It is important to outline the facts presented to this court which relate directly to the proceedings in Singapore. The applications to strike out were supported by affidavit evidence sworn to by Mr. Dwight Cozier. Mr. Cozier is an employee with the law firm of Cozier & Associates. He states in his affidavit that he read the chamber file in these matters and concluded that:

> "… it is clear from my reading of the Fixed Date Claim Form that the injunctive relief from arbitration is the central issue therein, but I am aware from my reading of the Chamber file that the issue of arbitration in Nevis was already determined by the High Court in Singapore and I am advised by Counsel and do verily believe that this issue is therefore barred from being litigated again here in Nevis."

[11] Mr. Cozier exhibited an order from the court in Singapore which stated that *"all proceedings in this action brought by the 2nd applicant against the respondent are stayed pursuant to section 6 of the International Arbitration Act"*. That was the full extent of the evidence presented in the application as it relates to the Singapore proceedings. I note that this evidence was presented to support the proposition that the claims should be struck out on the basis of issue estoppel and res judicata. During the course of the hearing I expressed some reservation as to whether this was sufficient evidence on which to base such an assertion. The order contains no reason for the decision of the court apart from its reliance on section 6 of the legislation in force in that jurisdiction. Mr. Cozier's affidavit relays no information whatsoever concerning these proceedings and the issues which were under consideration in Singapore. He claims to have been able to swear to this affidavit on the basis of instructions from counsel on behalf of the applicants and on the basis of what he had read in the court's file. I cannot help but to comment that this is entirely deficient information upon which such an application can be based.

[12]  However, in response to the application, the claimants relied on affidavit evidence filed by Ms. Michelle Slack which shed some further light on the Singapore proceedings. Ms. Slack informs the court that there were two motions filed with the court in Singapore. These proceedings were commenced by Ma Ming and Tournan against America 2030 and Guo Hong Xin and SBG against America 2030. Neither Mr. Sklarov nor Weiser is a party to those proceedings. The originating summonses in Singapore sought the following declarations:

(a)  That America 2030 is not entitled to a breakup fee under clause 2.4(d) of the agreements between the parties;

(b)  That there has been no event of default under clause 7 of the agreement;

(c)  That Tournan and SGB are entitled to terminate the agreements;

(d)  An injunction restraining America 2030 from selling, forfeiting, transferring or otherwise dealing with the pledged collateral;

(e)  An order for the return of the pledged collateral; and

(f)  Any other relief which the court deems fit

[13]  According to the evidence presented by Ms. Slack, an interim injunction was granted as prayed for by the claimants in the Singapore proceedings. However, on 1st March, 2019, subsequent to the commencement of the Nevis proceedings, America 2030 issued a summons in the High Court in Singapore. The summons sought a discharge of various orders made by the court in Singapore and in the alternative an order for a stay of the proceedings pursuant to section 6 of the Singapore International Arbitration Act. I understand this section to oblige the court in Singapore to grant a stay of proceedings where there is a valid arbitration clause contained in a commercial contract. The affidavit in support of that summons was sworn to by Mr. Sklarov. As Ms. Slack puts it, America 2030 was unable to obtain a stay of the proceedings against Ma Ming and Guo Hong Xin as neither of these claimants was party to the contract.

[14]  In submissions filed on behalf of America 2030 in the Singapore proceedings, the court was made aware of the proceedings which were commenced by Fixed Date claim in Nevis. By that time the court in Nevis had in fact granted injunctive relief restraining the arbitration proceedings pending the outcome of the claim. It is also worth noting that in his evidence before the Singapore court, Mr. Sklarov did point out that the proceedings in that jurisdiction did not seek orders rendering the contract null and void. In fact, it appears to be rather clear to me that the issues raised in the Fixed Date Claim, especially as it relates to the impartiality of the arbitrator and the process in general, were not before the court in Singapore. In the end on 26th March, 2019, the court in Singapore granted a stay of the originating motion pursuant to section 6 of the International Arbitration Act of that jurisdiction. The injunctive relief granted in that court nonetheless remained in effect. At that time case NEVHCV2019/0141 had not yet been filed. I turn now to examine the issues relating to that case.

7

**NEVHCV2019/0141 – The Fraud Case**

[15]  On 5th December, 2019, the claimants filed a separate claim in the High Court in Nevis on the basis of information they state were discovered subsequent to the lodging of the Fixed Date Claim. At paragraphs 5 to 17 of this claim, the claimants provide a summary of what they claim to have discovered were a number of unscrupulous actions on the part of Mr. Sklarov. They claim to have discovered that Mr. Sklarov has a long history of criminal convictions and dishonest business practices. They claim that his most recent activity centered on an elaborate stock loan fraud scheme carried out through a number of companies incorporated in a number of jurisdictions. These companies all contain variations of the names America 2030 or Bentley Rothchild. The claimants assert in their Statement of Claim that the schemes entail Sklarov's representations, through a number of commercial entities under his control, purporting to offer substantial non-recourse loan facilities on attractive terms to shareholders of listed companies, secured against the shares of those companies.

[16]  The claimants assert that these shareholders are induced into depositing these shares with a depository broker in advance of disbursement of loan financing by representations and/or warranties that the shares stand as security for repayment of the loans once made and would not be traded save to test the market price or in the event of default of payment. However, the claimants assert, that once the shares are deposited they are heavily traded on Mr. Sklarov's instructions, causing a dramatic drop in share price. At that point Mr. Sklarov seeks to establish inadequacy of the security provided for the loans and an entitlement to both withhold disbursement of the loans and demand payment of a financial penalty or a forfeiture of the shares.

[17]  In their Statement of Claim, the claimants assert that the contracts negotiated between the parties are "uncommercial", one sided agreements, which are subsequently amended to incorporate provisions for arbitration in Nevis by "The Arbitrator Conflict Service of Saint Kitts and Nevis." According to the claimant, the Nevis jurisdiction is one which is relatively unknown to the parties. At paragraphs 30 to 45 of the Statement of Claim, the claimants have highlighted what they claim to be a number of examples of Mr. Sklarov's alleged schemes. These include evidence of criminal convictions in the United States and other examples of

8

fraud. In cases similar to the present, courts in the United States have ordered injunctions against arbitration, notwithstanding the clauses contained in some of these contracts. It is also alleged that Mr. Sklarov adopts significant tactics of intimidation against victims, for example by lodging actions for defamation claiming ruinous sums in damages.

[18] The claimants also plead what they claim to be evidence of Mr. Sklarov's representations in other jurisdiction of his impecuniosity; despite his representations to the parties to his agreements of his ability to provide substantial amounts of money in loans. The claimants go on to plead the particular circumstances of their dealings with Mr. Sklarov and seek remedies such as the rescission of the agreements, a declaration that the agreements are void for uncertainty, a return and account of the shares deposited with Weiser and their traceable proceeds, damages for breach of contract, relief from forfeiture and damages for deceit and fraud. It is of note that the claimants have also pleaded their case on the basis of the court's powers pursuant to section 24(2) and (3) of the UK Arbitration Act of 1950. It is also important to note that neither defendant has filed a defence to this case. In fact, by decision delivered on 7th February, 2020 this court had already ruled that the claimants were entitled to judgment in default against the 1st defendant and 3rd defendants. The settlement of the terms of that judgment was deferred pursuant to the provisions of rule 12.9 and 12.10(4) and (5) of the CPR given that the 2nd defendant had not yet been served with the claim. In addition to this, the court had invited submissions from the parties as to whether case NEVHCV2019/0023 should be stayed in light of the developments in case NEVHCV2019/0141.

[19] In addition to the Claim Form and Statement of Claim, the claimants also filed an application for a worldwide freezing order. This application was supported by an affidavit of Mr. Guo Hong Xin. Mr. Xin indicated that as a result of the events which unfolded, a decision was taken to investigate Mr. Sklarov. In his affidavit he states that following extensive research over several months, a wealth of information and evidence was uncovered. In that very affidavit, Mr. Xin repeats the allegations contained in the statement of claim. He specifically exhibits a number of documents which he claims were discovered in order to substantiate his allegations. It would suffice to say at this stage that the worldwide freezing order was granted and remains in effect to date. The applicants also seek to have this injunction set aside but have however, presented no evidence or submissions as to why the court should exercise this discretion.

**The Applications to Strike Out**

[20] The application to strike out claim NEVHCV2019/0023 was based on the following:

(a) The Fixed Date Claim is in breach of rules 8.1(4) and (5) of the CPR2000 as it does not satisfy any of the circumstances for filing such a form;

(b) This defect in the Fixed Date Claim is incurable as it discloses a blatant disregard for the rules displayed by the respondents in bringing a Fixed Date Claim in the manner it was filed and cannot be set right at this late stage without causing great prejudice to the applicant;

(c) Any attempt to correct this abuse at this stage in the proceedings would be prejudicial to the applicant's rights to natural justice and contrary to the overriding objective in rule 1.1 of the CPR2000;

(d) The breach is therefore fatal to the survival of the claim and the damage to the process of the court is irreparable at this stage so that the court has no alternative but to order the Fixed Date Claim be struck out with costs to the applicant on this ground alone;

(e) The Fixed Date Claim is in contravention of Part 11 of the CPR in that where affidavits are produced significant parts of the affidavits are scandalous and irrelevant, in breach of rule 30.3(3) of the CPR2000;

(f) Accordingly the Fixed Date claim should be struck out pursuant to rule 26.3(1) (a) of the CPR;

(g) The claims made in the Fixed Date Claim are clearly unsubstantiated, contrary to rule 8.6 of the CPR and the Fixed Date Claim should be struck out pursuant to rule 26.3(1) (b) of the CPR as it fails to disclose any reasonable ground for bringing the claim at bar;

(h) The Fixed Date Claim is barred from the proceedings disclosed therein by the principle of res judicata and party estoppel, as the issue of arbitration in Nevis was determined between the same parties by a Singapore High Court of parallel jurisdiction; and

10

(i)   Accordingly, the Fixed Date Claim is an abuse of process and is likely to obstruct the just disposal of the proceedings, pursuant to rule 26.3(1)(c) of the CPR.

[21]  The application to strike out claim NEVHCV2019/0141 was based on the following:

(a)   The Claim Form and Statement of Claim filed by the respondents on the 5th December 2019 are in breach of Rules 26. 3 (a), (b), (c) and (d) of the CPR 2000 as the claim seeks to relitigate an issue, (namely the jurisdiction for determination of breach of contract) that has been ordered stayed by the Singapore High Court, a court of parallel jurisdiction to this Honourable court, pursuant to section 6 of the International Arbitration Act Cap. 143A, and which is to be determined by arbitration proceedings;

(b)   This defect in the Statement of Claim is incurable as it discloses no other cause for bringing or defending the claim filed on the 5th December 2019 and cannot be set right unless the entire claim is re-written which is not permitted by the rules of court;

(c)   Any attempt to amend the breach would amount to a new claim being brought which would be prejudicial to the applicants' rights to natural justice and contrary to the overriding objective in Rule 1.1 (1) of the CPR 2000;

(d)   The breach is therefore fatal to the survival of the claim and the damage to the process of the court is irreparable at this stage so that the court has no alternative but to order the Statement of Claim to be struck out with costs to the applicants on this ground alone;

(e)   Additionally, the Statement of Claim is in contravention of Rule 30.3 (3) of the CPR 2000 in that it is prolix and parts of it are scandalous and irrelevant and accordingly, the Statement of Claim should be struck out pursuant to 26.3 (1) (c) and (d) of the CPR 2000 on these grounds;

(f)   The allegations made in the Statement of Claim are clearly unsubstantiated, contrary to Rule 8. 6 of the CPR 2000, and the Statement of Claim should be struck out pursuant to Rule 26.3(1) (b) of the CPR 2000, as the Statement of Claim fails to disclose any reasonable ground for bringing the claim at bar;

11

(g) The Statement of Claim is barred from raising the of issue of the determination of contractual breach in the proceedings disclosed therein, by the principle of res judicata, both issue and party estoppel, as the issue of arbitration of a contractual dispute was determined by a Singapore High Court of parallel jurisdiction to be an issue to be determined by arbitration pursuant to the International Arbitration Act Cap 143A;

(h) Accordingly, the Statement of Claim is an abuse of the process of the court, and is likely to obstruct the just disposal of the proceedings, pursuant to Rule 26.3 (1) (c) of the CPR 2000 and should be struck out on this ground also

[22] In addition to the issues raised above, the applicant has identified what was described as 24 grounds on which the application was based. In my view however, many of these appear to be legal submissions rather than outright grounds for the application per se and will not be repeated here in their entirety.

[23] To my mind, the issues raised in the application in both cases can be summarized into two broad headings. The first is the issue of res judicata and whether the claimants are entitled to raise the issues in the Fixed Date and Fraud claims on the basis of issue estoppel. The defendants also raise the issue of whether the claims amount to an abuse of the court's process, given the stay of the proceedings in the Singapore Court. The grounds for these submissions are largely the same as in res judicata and I propose to deal with them as one issue. Finally, the court must consider the question of whether there are procedural defects in the claims which warrant the nuclear option of striking out the claims. It must be observed that these are not applications to stay the proceedings pending arbitration, but rather to strike them out altogether.

**Res Judicata/Issue Estoppel**

**The Defendant's submissions**

[24] In written submissions filed on 10th June, 2020 counsel for the defendants argues that the claims claim contravenes of rule 26.3 (a), (b), (c) and (d) of the CPR2000. which grants the court powers to strike out a statement of case if:

(a)  *there has been a failure to comply with a rule, practice direction, order or direction given by the court in the proceedings;*

(b)  *the statement of case or the part to be struck out does not disclose any reasonable ground for bringing or defending a claim;*

(c)  *the statement of case or the part to be struck out is an abuse of the process of the court or is likely to obstruct the just disposal of the proceedings; or*

(d)  *the statement of case or the part to be struck out is prolix or does not comply with the requirements of Part 8 or 10.*

[25] Counsel goes on to submit that the claimants are seeking to relitigate an issue which has been ordered stayed by the High Court in Singapore. That issue, according to counsel, is that of breach of contract. Counsel argues that the court in Singapore determined that there was no jurisdiction to litigate that issue in light of the arbitration agreement in force between the parties. Accordingly, it is argued that the claimant is barred from raising this issue as the need for arbitration of the contractual dispute was determined by the court in Singapore. In addition to that, it is argued that claim NEVHCV2019/0141 seeks to relitigate issues in claim NEVHCV2019/0023 in this very jurisdiction. These defects, according to counsel, are fatal to the claim and cannot now be cured. Counsel goes on to argue that *"all the paragraphs and sub-paragraphs of the claim form and statement of claim are res judicata and an abusive collateral attack on the decision of the Singapore High Court, which the claimants are barred by law from doing."* For these same reasons it is argued that the claim is an abuse of the court's process.

[26] Counsel for the defendants refers the court to the UK Arbitration Act of 1950 and, quite rightfully, pointed out that this act is the applicable legislation in force in Nevis. Counsel goes

on to state that on the basis of that legislation the court has no jurisdiction over the arbitration proceedings until a decision is made by the arbitrator. Despite this very forceful submission, counsel does not point the court to any section in the Act which substantiates this assertion. In fact, for reasons which I will explain later on, counsel seemed to have completely ignored certain express powers granted to the court under the Act.

[27]  Counsel goes on to refer the court to the case of **Premium Nafta Products Limited et al (Respondents) v. Fili Shipping Company Limited et al (Appellants)[1]**. In that case, the UK House of Lords came to consider the question of whether the court should entertain a claim notwithstanding the fact that the parties had entered into an arbitration agreement. Of particular significance was the question of whether the court should determine the matter on the basis of an allegation that one party had induced the other into the agreement on account of bribery. The court noted the following a paragraphs 9 and 10 of that judgment:

> 9. *There was for some time a view that arbitrators could never have jurisdiction to decide whether a contract was valid. If the contract was invalid, so was the arbitration clause. In Overseas Union Insurance Ltd v AA Mutual International Insurance Co Ltd [1988] 2 Lloyd's Rep 63, 66 Evans J said that this rule "owes as much to logic as it does to authority". But the logic of the proposition was denied by the Court of Appeal in Harbour Assurance Co (UK) Ltd v Kansa General International Insurance Co Ltd [1993] QB 701 and the question was put beyond doubt by section 7 of the Arbitration Act 1996:*
>
>> *"Unless otherwise agreed by the parties, an arbitration agreement which forms or was intended to form part of another agreement (whether or not in writing) shall not be regarded as invalid, non-existent or ineffective because that other agreement is invalid, or did not come into existence or has become ineffective, and it shall for that purpose be treated as a distinct agreement."*

---

[1] [2007] UKHL 40

> ***10. This section shows a recognition by Parliament that, for the reasons I have given in discussing the approach to construction, businessmen frequently do want the question of whether their contract was valid, or came into existence, or has become ineffective, submitted to arbitration and that the law should not place conceptual obstacles in their way.***

[28] Counsel's argument is simply that the parties had agreed that any dispute between them would be settled by arbitration in Saint Kitts and Nevis. As a result of that, there is no basis for a claim against the defendants. Counsel also states that in accordance with section 6 of the legislation in Singapore, such proceedings were stayed. The particular section states as follows:

> ***"… where any party to an arbitration agreement to which this Act applies institutes any proceedings in any court against any other party to the agreement in respect of any matter which is the subject of the agreement, any party to the agreement may, at any time after appearance and before delivering any pleading or taking any other step in the proceedings, apply to that court to stay the proceedings so far as the proceedings relate to that matter."***

[29] I take counsel's argument to suggest, that given the order of the Singapore court, the claimants are not entitled to seek the relief which they seek in Nevis. The argument is that the High Court of Singapore is a court of concurrent jurisdiction and has already decided that the matter should be subject to arbitration.

**The claimants' submissions**

[30] The respondents make 3 broad submissions in response to the Applications. Firstly, it is argued that the issue of res judicata and issue estoppel cannot arise as there was no final order on the merits of the case in Singapore. Secondly, it is argued that, in any event, the issues raised by the claims in Nevis are entirely different from what was before the court in Singapore.

[31]  Counsel refers the court to the case of **Desert Sun Loan Corp v Hill**[2] where the following was stated:

> *There is no reason in principle why such an issue should not be decided in a decision on a procedural matter as opposed to the final determination of the cause of action or proceedings. But the decision must be final and conclusive and not provisional or subject to revision. The expression 'interlocutory' is used in two distinct senses in English law, which can give rise to confusion unless the distinction is borne in mind. Some decisions or orders are interlocutory in the sense that they are made pending final determination of the case. The obvious example of this is an interlocutory injunction pending trial. Such a decision cannot give rise to an issue estoppel because it is not final. The other use is to distinguish between those decisions where leave to appeal to the Court of Appeal is required and those where it is not. Some of the former decisions can determine finally the issue which is raised. I prefer therefore to use the expression procedural in the sense that I have defined, rather than interlocutory.*

[32]  Counsel also referred the court to the case of **The Sennar (No 2)** [3] where it was decided that in order to give rise to issue estoppel the decision must be **"one that cannot be varied, reopened or set aside by the court that delivered it or any other court of co-ordinate jurisdiction although it may be subject to appeal to a court of higher jurisdiction".** The argument put forward is that all the Singapore court did was to stay the proceedings on account of the arbitration exercise in Nevis. This was not a final order on the merits of the case in any way and therefore cannot give rise to issue estoppel.

[33]  Counsel for the claimants also go on to argue that, in any event, the court must proceed with caution on such an application to strike out and give due regard to three issues which were cited by Lord Reid in the case of **Carl-Zeiss**[4] and cited with approval in **Desert Sun Loan v. Hill**[5] these are*:*

---

[2] [1996] 2 All ER 847
[3] [1985] 1 WLR 490
[4] [1967] 1 AC 853
[5] [1996] All ER 847

(1) the differences in modes of procedure between this Court and those in foreign countries;

(2) the practical difficulties encountered by a defendant who might not have been required to put forward his full case before the foreign court; and

(3)  whether the issue was finally disposed of, so that the matter cannot be raised again in the foreign court, which is a question of foreign law

[34] It is argued further, that even if the order in Singapore was final, the defendants would have to show that the specific fact in issue in these proceedings were raised before, and decidedly by, the Singapore court. It is therefore submitted that the court in Singapore was simply not considering the same issues which were brought before this court and that the parties to these proceedings are, to some extent, different. As such there could therefore be no issue estoppel which arises.

[35] Counsel for the claimants argue that the proceedings in Singapore sought declarations as to the contractual effect, or lack thereof, of the Master Loan Agreements and Supplemental Agreements made between SBG, Tournan and America 2030, an injunction restraining America 2030 from dealing with the pledged collateral and an order for the return of the shares. On the other hand, the Fixed Date Claim in this jurisdiction seeks declarations with respect to the arbitration and the removal of Ms. Hill-Hector as the Arbitrator. The claim also seeks an injunction retraining the future conduct of the arbitration. The fraud claim seeks to invoke the court's jurisdiction by virtue of section 24(2) and (3) of the Arbitration Act in a claim for fraud, fraudulent misrepresentation, deceit and breach of contract. These it is argued are different proceedings, not adjudicated on by the court in Singapore.

[36] The claimants also argue that the jurisdiction being exercised by the Singapore Court was fundamentally different from those in Nevis. By virtue of the very agreement between the parties, Nevis is in fact the seat of the arbitration and seized with supervisory jurisdiction over the conduct of the arbitration. The court is also being asked to exercise a power which is specific to this jurisdiction as contained in section 24(2) and (3) of the Act. In fact the issues

17

raised in the fraud claim are all issues discovered subsequent to the Singapore proceedings and not raised in that jurisdiction.

### The Court's Conclusions

[37] I generally agree with the submissions put forward by counsel for the claimants, although in my view some issues must be placed into context. I take the arguments of counsel for the defendants to be that the question of whether the parties should be subject to arbitration has already been decided by the court in Singapore. The issue raised may very well not be whether the claims are substantively the same, but whether the question of the parties being subject to the arbitration proceedings have already been decided to the extent that they should no longer be litigated here in Nevis. Despite this distinction, I am of the view that the distinguishing elements of the various cases are important in the general discussion on whether an issue estoppel arises. There is also an argument being made here that claim NEVHCV2019/0141 re-litigates issues contained in claim NEVHCV2019/0023 right here in Nevis.

[38] If I may firstly address the issue of the Fixed Date Claim. I am in agreement with the submission of counsel for the claimants that no issue estoppel arises. I am of that view for a number of reasons. Firstly, it appears from the facts presented that the court in Singapore was fully aware that the claimants had in fact commenced proceedings in Nevis when it came to consider the application for a stay in that jurisdiction. That court was also made aware of the interim injunctions granted in the case in Nevis. The order of that court however, did not seek in any way to trouble the process in Nevis; and I rather doubt that it had the jurisdiction to do so. All that was done was to stay the Singapore proceedings pending the outcome of the arbitration in Nevis.

[39] One possible outcome was that of a potential success on the claimants' part in seeking to put an end to these arbitration proceedings altogether or to have the arbitrator replaced. This is perhaps one of the reasons why courts are encouraged to stay proceedings pending arbitration, rather than striking out the proceedings altogether. The court's desire to honour arbitration agreements are not designed to oust its jurisdiction over disputes, but rather to

seek an alternative form of resolution and to honour contractual arrangements entered into freely by the parties. By staying the proceedings it is possible for the litigation to be recommenced. Arbitration clauses are not designed to deny access to justice in a broad sense.

[40] Further, I agree with the submissions of the claimants where it is argued that it is this court which is seized with supervisory jurisdiction over the arbitration proceedings in Nevis. Although courts are encouraged into a position of non-interference in the arbitration of disputes, that principle does not detract from the court's power, either under the Supreme Court Act or its inherent jurisdiction, to grant injunctions restraining arbitration proceedings if it is just and convenient to do so. As Chief Justice Pereira has noted *"it would be astonishing to say the least, if the statement to the effect that the Act is founded on the principle that 'the court shall not interfere in the arbitration of a dispute' is to be construed as having thereby, without any specifically expressed and clear language, swept away the court's jurisdiction to grant injunctive relief where warranted."*[6] This inherent jurisdiction to grant injunctive relief, as the claimants seek in the Fixed Date Claim, is an important part of the court's jurisdiction to relieve a litigant against *"unconscionable conduct, or conduct the aim of which is to undermine the court's lawful process."*[7]

[41] Though the courts are cautious in ensuring, and perhaps demanding, that parties honour their agreements to arbitrate their disputes, what it never does is to abandon its equitable jurisdiction to grant injunctions against arbitration if to do so would meet the ends of justice. When one examines the allegations made in the Fixed Date Claim and the parties to that claim, it is clear that the claim seeks injunctive relief and the court would therefore not be minded to strike it out altogether at this stage in the proceedings. In addition to that I am not of the view that this is an issue which was considered by the court in Singapore sufficient to find that the claimants are prohibited from raising these issues on the basis of issue estoppel or res judicata in this court.

---

[6] BVIHCMAP2015/0005
[7] Ibid

[42] Further, to my mind, the issues raised here are similar to those raised in relation to 'anti-suit injunction' orders. As Lord Hobhouse noted in the case of ***Turner v. Grovit and Others***[8] ***"when an English Court ... makes a restraining order, it is making an order which is addressed only to a party which is before it. The order is not directed against a foreign court."*** An order of this nature cannot demand that a ***"foreign court desist from exercising the jurisdiction given to it by its own domestic law."*** In my view therefore, when the court in Singapore ordered a stay of its own proceedings, it did so on the basis of its own domestic law. That in no way takes away from the jurisdiction of this court to consider the claimants' claim as outlined in the Fixed Date Claim; especially as this is the seat of the arbitration and that the proceedings in Nevis were well underway when the Court in Singapore granted a stay of its own proceedings. I doubt very much that the court in Singapore could have decided to bring an end to proceedings in Nevis while presiding over its own exclusive jurisdiction.

[43] In any event, when a court stays proceedings pending arbitration, it does so on the assumption that the arbitration would be fair and observe the rules of natural justice. As Anderson JCCJ noted in the case of ***Belize Natural Energy Ltd. v. Maranco Ltd***[9] ***"the courts do retain residual responsibility for guaranteeing the integrity of the arbitral process in ensuring, for example, the application of the principles of natural justice…"*** A party is therefore entitled to seek relief from the court if it is of the view that the process would undermine these principles. Given the court's supervisory role as the seat of this arbitration I am not of the view that the order in the Singapore court ousts the jurisdiction in Nevis to consider the issues raised in the Fixed Date Claim. This is not subject to an estoppel in any way. In light of that I refer to Mustill and Boyd in their publication ***Commercial Arbitration***[10] where they state:

> ***"with the exercise of common sense a situation should never arise in which the arbitrator's personal impartiality is put in question. A person who is approached to act and knows that he has some kind of relationship with one of the parties should remember that there is no keener sense of injustice that is felt by someone who has doubts about whether the arbitrator is doing his***

---

[8] [2002] 1 WLR 107
[9] CCJ Apeal BZCV2014/004
[10] Lexis Nexis Butterworths

20

*honest best. He should also bear in mind that the question is not just whether*
*he really is impartial but whether a reasonable outsider might take this view."*

[44] This passage was cited with approval in the case of **Eckhart v. the Attorney General**[11] in
which the court came to consider an application for the removal of an arbitrator on account of
bias. In the present case apart from the injunctive relief being sought in the Fixed the Claim,
the claimants also seek the removal of the arbitrator. This court is seized with the power to do
so and the order in the court in Singapore does not take away the right of the claimants to
seek this specific relief. No issue estoppel can therefore arise in the present circumstances.

[45] As it relates to the fraud case, I am also not of the view that the case should be struck out on
the basis of res judicata or issue estoppel. Although the claim does repeat in some way the
issues of breach of contract, these are, to a great extent, predicated on difference issues. The
claimants claim to have discovered a significant history of fraud on the part of Mr. Sklarov,
who by the way was not a party to the Singapore proceedings. The fraud case, unlike the case
in Singapore, seeks to rescind the agreement altogether, rather than enforce it. What the
claimants seek to do in this jurisdiction is to invoke the powers of this court pursuant to section
24(2) and (3) of the 1950 UK Arbitration Act to determine this dispute despite the arbitration
clause in the agreement on the basis of fraud. It is noteworthy that the very contracts
established Saint Kitts and Nevis law as what is applicable to its interpretation.

[46] The defendant's reliance on the case of **Premium Nafta Products Limited et al
(Respondents) v. Fili Shipping Company Limited et al (Appellants)**[12] is not of much
assistance to this court as it does not consider the issue of the peculiar powers conferred on
this court by section 24(2) and (3) of the 1950 Arbitration Act. As the claimants have rightly
pointed out, the case of **Cunningham-Reid et al v. Buchanan-Jardine**[13] is authority for the
proposition that this is a discretion which the court has and should consider carefully.
However, the decision of the Court of Appeal in that case is also worth some analysis.

---

[11] DOMHCV1992/0570
[12] [2007] UKHL 40
[13] [1981] 1 WLR 678

[47] In *Cunningham-Reid et al v. Buchanan-Jardine,* the English Court of Appeal came to consider an appeal against an order denying a stay of the proceedings in provisions similar to those currently in force in Nevis. The judge at first instance allowed an appeal against the decision of a master who had himself granted a stay of the proceedings notwithstanding the fact that the claimant had pleaded fraud. The judge took the view that the plaintiffs had made an allegation of fraud and that there was strong and convincing evidence which led him to the conclusion that it was not appropriate that there should be an arbitration. The court of appeal overturned that decision and determined that in a case where a party to a contract which incorporates an arbitration clause has commenced an action on the contract alleging fraud, the court would, on an application brought by the party against whom fraud has been alleged, normally exercise its discretion under sections 4 and 24(3) of the Act of 1950 by granting a stay of the proceedings pending arbitration. This would be the normal course to follow, unless a good reason against arbitration existed. The court also found that even strong prima facie evidence of fraud would not on its own be a sufficient reason for refusing a stay.

[48] In that case extensive arguments were led on a particular statement of Lord Wilberforce in the case of *Camilla Cotton Oil Co. v. Granadex S.A[14]* where he said that "*the fraud relied on must be fraud by the party opposing the stay: see Russell v. Russell, 14 Ch.D. 471, so that any alleged fraud by the appellants is irrelevant.*" The difficulty with this statement by Lord Wilberforce is that he relied on the case of *Russell v. Russell* as precedent for that proposition. A close reading of the case of *Russell v. Russell* clearly shows that Lord Wilberforce's statement was not compatible with what was decided in that case. In *Russell v. Russell* what was stated was as follows:

> "*Where the party charged with the fraud desires it, I can perfectly understand the court saying, 'I will not refer your character against your will to a private arbitrator.' It seems to me in that case it is almost a matter of course to refuse the reference, but I by no means think the same consideration follows when the publicity is desired by the person charging the fraud. His character is not at stake, and the other side may say, 'The very object that I have in desiring the arbitration is that*

---

[14] [1976] 2 Lloyd's Rep. 10

*the matter shall not become public. It p is very easy for you to trump up a charge of fraud against me, and damage my character, by an investigation in public."*

[49]  The judge in ***Russell v. Russell*** also went on to state the following:

*"The next question I have to consider is, what foundation there is for the charges, because, if the mere making of a charge of fraud would entitle the person making it to call upon the court, in the exercise of its discretion, to refuse to refer to arbitration, there would be a very easy way of getting rid of all these clauses of arbitration. I am satisfied that the mere making of a charge will not do that, even in a case where the court ought to exercise its discretion by refusing to refer the case to arbitration. There must be sufficient prima facie evidence of fraud, not conclusive or final evidence, because it is not the trial of the action, but sufficient C prima facie evidence."*

[50]  In light of these it is difficult to conclude that Lord Wilberforce was correct when he stated that ***Russell v. Russell*** was authority for the proposition that "***the fraud relied on must be fraud by the party opposing the stay… so that any alleged fraud by the appellants is irrelevant.***" It seems to me that the legislation does not limit the court's discretion to deny a stay of the proceedings on account of a pleading of fraud by either party. Wolf LJ was somewhat critical of Lord Wilberforce's statement but felt bound by it, although it was argued that it may have been said obiter as it was found in that case that there was no basis for an allegation of fraud. Wolf LJ nonetheless concluded that in relying on ***Russell v. Russell*** there was nothing in Lord Wilberforce's statement which sought to indicate that he was dissenting or differing from the views expressed therein. He concluded that:

*I do not believe Lord Wilberforce was suggesting that in no circumstances could a charge of fraud be of any relevance where the fraud was being Q relied on by the party making the allegation of fraud, rather than the person charged with fraud, in support of a contention that an action should not be stayed. The passage does, however, give some support for the view that, in circumstances where the party charging fraud is seeking to oppose a stay, the court's normal*

> ***approach will not be to accede to arguments advanced on his behalf against a
> stay when the sole matter relied on is the charge of fraud.***

[51] The proper approach therefore is that where a party seeks to stay the proceedings on account
of an arbitration clause, the court would normally accede to that request if it is made by the
party against whom fraud has been alleged. This retains the court's discretion to try the case
notwithstanding the arbitration clause, but there must be good reason, other than a mere
allegation of fraud for doing so[15] if the party opposing the stay is the one who has made the
allegation of fraud.

[52] I thought it important to place the case of ***Cunningham-Reid*** into context, given the claimants'
reliance on it in opposition to the application to strike out. What is important to note is that
rather than seeking a stay of the proceedings, the defendants seek to strike the claim out
altogether. These calls for different considerations. As I have stated earlier, the legislation
regarding arbitration encourages the court to stay proceedings pending arbitration, rather than
striking them out. This is because the court retains general supervision over the arbitration
process within its jurisdiction. An arbitration clause is therefore not a basis upon which a claim
is to be struck out but rather stayed pending arbitration. The legislation does not deny either
party the right to bring an action in court, but rather grants powers to the court to stay the
proceedings if one or all of the parties wish to invoke the arbitration clause. Commencing an
action in these circumstances does not amount to an abuse of process.

[53] This court is not of the view that the issues raised in this fraud claim are similar to those raised
in Singapore, save and except the issues of breach of contract, which, as I indicated, was
based on a different premise. Even then, these issues have not been fully litigated given the
fact that the proceedings in that jurisdiction are stayed. Here Mr. Sklarov is a party to the
proceedings in Nevis, unlike the claim in Singapore. Significant allegations of fraud are made
against him directly. Weiser is also not a party to the proceedings in Singapore. This
defendant has not even so much as filed an acknowledgement of service in this claim. If the
court were to have considered a stay in accordance with the decision in ***Cunningham-Reid***

---

[15] See also the judgment of Belle J in ***Baron Gabriel van der Elst v LPA International Inc. SLUHCV2008/0158***

then a proper application of that nature had to have been brought with evidence upon which the court could have exercised its discretion pursuant to sections 4 and 24(2) and (3) of the 1950 Arbitration Act. This was not pursued and the court is not minded to strike out the claims brought by the claimants as it is not of the view that the issues contained therein have been decided by the court in Singapore, neither has that court's order prohibited the claimants from bringing such an action in Nevis. For these same reasons I am also not of the view that there has been an abuse of the court's process in any way.

***The Procedural Issues***

[54]  During the course of the oral hearing, the court made it clear that it was not minded to elevate form over substance in the manner which was pursued by counsel for the defendants. It is important however, to elaborate on the court's reasons to deny the strike out applications on the procedural defects complained of by the defendants.

[55]  Firstly, it is alleged that the Fixed Date Claim process ought not to have been used to commence claim NEVHCV2019/0023. I understand that this was an issue raised before Justice Glasgow during case management. He nonetheless proceeded to manage this case pursuant to the CPR. In any event, I would certainly not be minded to strike out a case on this basis. As counsel for the claimants have rightly pointed out, it is not unusual for cases of this nature to be commenced by way of Fixed Date Claim in the jurisdictions of the Eastern Caribbean Supreme Court. Further, the court would have been empowered to put matters right pursuant to rule 26.3 of the CPR. It would certainly be an unjust exercise of its powers for the court to strike out the claim on that basis.

[56]  It was also argued by the defendants that the Fixed Date Claim was not supported by an affidavit as required by rule 8 of the CPR. This is factually inaccurate. As I indicated earlier, on the very day of the filing of the Fixed Date Claim, the claimants also filed an application for an injunction. An affidavit was also filed by Guo Hong Xin which clearly indicated that the claimants were also relying on that affidavit in support of the Fixed Date Claim. On that premise the matter had gone through its case management stages to the extent that the 1st defendant had in fact filed affidavit evidence in response. Justice Glasgow had given clear

case management directions identifying 6 issues to be tried. Yet the 1st defendant comes at this stage to say that there is no affidavit evidence in support of the claim. I do not accept that this is the case and would certainly not be minded to strike out the case on that basis as the parties are well aware of the pleadings on which the claimants rely.

[57] As it relates to claim NEVHCV2019/0141, it is alleged that the claimants have failed to attach the documents on which they rely in their Statement of Claim. I note that in addition to the fraud claim an application had also been made for an interim worldwide freezing order. That application was supported by an affidavit which, to a great extent, duplicates much of the information contained in the Statement of Claim. The claimants attached the documentation on which they relied to that affidavit. Insofar as that is the case it would seem that any breach of the rules was limited to the claimants simply not duplicating the exhibition of the documents in the Statement of Claim. That can hardly be a reason on which to base an application to strike out the claim. The documents are clearly exhibited in the claim in general and served on the defendants. In any event, as I pointed out to counsel, if the defendants were concerned with the lack of documentation then a request for information could have certainly been made. This is not a basis on which the claim should be struck out.

[58] Lastly, and perhaps somewhat substantively, the defendants assert that the claims should be struck out for breach of rule 8.6 of the CPR in that the entirety of claim NEVHCV2019/0141 raises no reasonable basis for bringing the claim and that claim number 23 does not raise any issue against the 1st defendant. In addition it is argued that both claims are a prolix and raise a number of scandalous and irrelevant issues against the defendants in breach of rule 30.3 of the CPR. I do not agree with these submissions.

[59] Firstly, it seems very clear to me that claim NEVHCV2019/0023 raises issues such as the validity of the arbitration proceedings commenced by America 2030(N) and whether these proceedings should be brought to an end by the court. The claimants also seek orders relating to the impartiality of the arbitrator and an order revoking her authority. If America 2030(N) wished to play no part in these proceedings then it was free to do so but the case was substantive enough to have gone through the entire case management process. I do not propose to discuss the substance of the case in its entirety but it would suffice to say that I am

of the view that the 6 issues identified by Justice Glasgow are substantive and valid issues which would not warrant the nuclear option of being struck out at this stage on the basis put forward by counsel for the defendants.

[60] Secondly, as it relates to case NEVHCV2019/0141 I am of the view that there are substantive allegations of fraud, misrepresentation and breach of contract raised in this case. Insofar as it relates to counsel's arguments that the substance of the case is a prolix and unnecessarily scandalous I do not agree with them. To my mind, the Statement of Claim goes into some detail of facts which the claimants claim to have discovered even subsequent to the lodging of the Fixed Date Claim and the proceedings in Nevis. The claim seems to center on the fact that Mr. Sklarov has represented himself as a reputable businessman with the capability of providing loans to the claimants. The facts which they claim to have discovered are alleged to have undermined this view of Mr. Sklarov. Insofar as there may have been damaging information I am not of the view that this amounts to a prolix given the peculiar circumstances of this case. In any event, as I pointed out to counsel during the oral hearing of this matter, even if the court were to exclude all of the evidence which the defendants find offensive, there would still remain a substantive claim against the defendants. The court is not minded to strike out this claim.

**Conclusions**

[61] In the circumstances, this court does not find that the issues raised in either case are barred by the doctrine of res judicata, neither are the matters an abuse of the process of the court. Further, the procedural issues raised by the defendants are not bases upon which the court would be minded to exercise the nuclear option of striking out these claims.

[62] In the circumstances I make the following orders:

(a) The application to strike out case number NEVHCV2019/0023 is dismissed;

(b) The application to strike out case number NEVHCV2019/0141 is dismissed;

(c) Insofar as the applications have requested an order setting aside the injunctive relief granted in both claims, these are also dismissed;

(d)  Given the nature of the applications and the manner in which they were litigated I make a consolidated order for costs against the applicants on these applications;

(e)  If the parties are unable to agree on reasonable costs within 21 days from the date of delivery of this judgment, the claimants are entitled to bring an application for the assessment of those costs within the provisions of the CPR.

**Ermin Moise**
High Court Judge

**By the Court**

**Registrar**

# EXHIBIT 29

**COMMONWEALTH OF THE BAHAMAS**
**IN THE SUPREME COURT**

**COMMON LAW AND EQUITY DIVISION**

**2022/CLE/gen/00120**

**In the Matter of** the Reciprocal Enforcement of Judgments Act, 1924

**And**

**In The Matter of** a Judgment of the High Court of Justice of the Federation of Saint Christopher and Nevis dated 16 June, 2020 and obtained on 18 June, 2020, in proceedings numbered NEVHCV2019/141

**Entitled**

**(1) SUNPOWER BUSINESS GROUP PTE LTD**
**(2) TOURNAN TRADING PTE LTD**

Claimants/Applicants

- and -

**(1) AMERICA 2030 CAPITAL LIMTED**
**(2) MARK SIMON BENTLEY (also known as VAL SKLAROV)**
**(3) WEISER GLOBAL MARKETS LTD (formerly known as WEISER ASSET MANAGEMENT LTD.)**

Defendants/Respondents

**BETWEEN**

Sunpower Business Group Pte Ltd.

First Plaintiff

Tournan Trading Pte Ltd

Second Plaintiff

And

America 2030 Capital Limited

First Defendant

Weiser Global Capital Markets Ltd

Second Defendant

1

| | |
|---|---|
| **Before:** | **Her Ladyship The Honourable Madam Senior Justice** |
| | **Deborah Fraser** |
| **Appearances:** | **Mrs. Courtney Pearce-Hanna for the First and Second Plaintiffs/Applicants** |
| **Judgment Date:** | **09 August 2023** |

**Registration of a Foreign Judgment – Section 3 of the Reciprocal Enforcement of Judgments Act, 1924 – Just and Convenient - Extension of Time**

## JUDGMENT

1. This is an ex-parte application on behalf of Sunpower Business Group Pte Ltd ("**SBG**") and Tournan Trading Pte Ltd ("**Tournan**" and collectively "**Applicants**") pursuant to section 3 of the Reciprocal Enforcement of Judgments Act, 1924 ("**Act**") to register a Judgment Order made by the High Court of St. Christopher and Nevis on 16 June 2020 and filed on 18 June 2020 ("**Nevis Judgment**").

2. There is also an application for extension of time to make the application for registration.

### *Background*

3. The Applicants are both Bermudan companies publicly listed on the Singapore stock exchange since 2005.

4. America 2030 Capital Limited was an international business corporation incorporated in the island of Nevis operating as an investment company ("**America 2030**"). America 2030 has property in The Bahamas, namely the shares (defined below) held by Weiser Global Capital Markets Limited, formerly known as Weiser Asset Management Limited, ("**Weiser**") in its capacity as Custodian.

5. Weiser is a regulated financial services firm in The Bahamas which, at all material times, acted as depository broker in a transaction involving the Applicants and America 2030.

6. In June of 2018, the Applicants entered into Master Loan Agreement ("**MLA**") with America 2030 whereby the Applicants, respectively, would deposit

2

14,000,000 shares in Sunpower Group Limited as collateral ("**Shares**") in exchange for loans of up to USD$25,000,000.00 from America 2030.

7. Custodian Management Agreements provided for Tournan and SBG respectively to deposit the pledged collateral into depository accounts held by Weiser.

8. Materially identical Supplemental Loan Agreements ("**SMLA's**") amended the terms of the MLA's to, inter alia, reduce the loan amount to USD$3,000,000.00 and substituted America 2030 with America 2030 (N)(the Nevis Entity) as the lender. Accordingly, America 2030 was meant to advance loans of USD$3,000,000.00 each to Tournan and SBG and the Shares were to stand as security for repayment.

9. However, no funds were ever advanced and, almost immediately, upon deposit of the Shares (which were to remain in Sunpower and Tournan's respective names via a non-title transfer), America 2030 instructed Weiser to sell a large portion of same.

10. Consequently, the Applicants sought injunctive relief. America 2030 responded by purporting to commence arbitration proceedings in Nevis, relying on arbitration clauses contained in the agreements. The Applicants challenged the validity of the arbitration proceedings in the Nevis court proceedings.

### _The Nevis Proceedings_

11. Following an investigation into America 2030 and its principal, Val Sklarov (also known as Mark Bentley)("**Sklarov**"), the Applicants initiated court proceedings in Nevis against America 2030, Sklarov and Wieser for fraud ("**Fraud Claim**") and obtained a worldwide freezing order against America 2030 and Sklarov and an asset preservation order against Weiser restraining it from dealing with or disposing of the Shares or any sales proceeds of same.

12. The Fraud Claim was not resisted by any of the defendants and none of them complied with disclosure directions under the aforesaid orders, despite being served with such orders.

13. Accordingly, Judgement in Default was obtained against all of the defendants. An appeal by America 2030 and Sklarov to set aside the Judgment in Default was dismissed by the Court of Appeal of the Eastern Caribbean Supreme Court. The judgment was served on the attorneys for America 2030 and Weiser as well as the registered offices of the two companies.

14. The Nevis Court ruled that America 2030 carried out a stock loan fraud against each of the Applicants; that all agreements were vitiated due to the fraud; that the Applicants are entitled to return of the Shares and all proceeds of sale thereof held by Weiser in favor of America 2030; and that America 2030 and Weiser

3

must provide an account to the Applicant of all dealings with the Shares and their sale proceeds.

15. No further appeal was lodged by America 2030 nor Weiser.

*The Bahamian Proceedings*

16. On 01 April 2019, Weiser initiated proceedings in the Supreme Court of the Commonwealth of The Bahamas and secured an injunction to maintain the status quo of the Shares and their proceeds pending resolution of the dispute between the parties ("**Bahamian Proceedings**").

17. On 11 November 2020, the Applicants filed an ex-parte application in the Bahamian Proceedings to vary/discharge the freezing injunction made on 01 April 2019. The Summons was subsequently amended to seek additional relief, namely, that the Court recognize the Judgment Order ("**Amended Summons**").

18. The Amended Summons was initially heard on 30 April 2021. While the Court made an order with respect to certain of the reliefs sought, questions concerning the discharge and recognition of the Judgment Order remained extant.

19. Arguments concerning the extant matters raised in the Amended Summons were heard in July and August of 2021. On 26 April 2022, the Honourable Justice Neil Braithwaite made a ruling ("**Brathwaite Ruling**") at which time he refused the reliefs sought by the Applicants and found that recognition by a Bahamian Court of the Nevis Judgment could only be effected by registration under the Act or by initiation of a common law action.

20. The Applicants then made the instant application under the Act to register the Nevis Judgment.

21. The Applicants also seek an extension of time to make their application for registration as the application has been brought more than twelve months after the Nevis Judgment was made.

## Issues

22. The issues that the Court must decided are: (i) Whether the Court will grant an extension of time to make the application for registration of the Judgment Order? (ii) Whether the Court will grant the order sought by the Applicants and register the Judgment Order?

## Discussion

***Whether the Court will grant an extension of time to make the application for registration of the Judgment Order?***

4

23. By virtue of **section 3 of the Reciprocal Enforcement of Judgments Act, 1924**, the Court is permitted to register judgments made outside of the jurisdiction. Section 3(1) provides:

> **"3. (1) Where a judgment has been obtained in a superior court outside The Bahamas the judgment creditor may apply to the Supreme Court, at any time within twelve months after the date of the judgment, or such longer period as may be allowed by the court, to have the judgment registered in the court, and on any such."**

24. It is noted that the Nevis Judgment was made on 16 June 2020 and subsequently filed on 18 June 2023. This instant application for registration was made some two (2) years later. The Applicants rely on the case of ***Ogelegbanweir and ors v President of the Federal Republic of Nigeria and ors [2016] WEHC 8*** ("**Ogelegbanweir**") for the proposition that extension of time can be granted once there is no prejudice caused by such extension. There, an extension of time was granted to make an application for registration where the application was made some seventeen (17) months late.

25. In that case, the Applicants sued the President of Nigeria, the Attorney General and a Major-General of a task force due to the government deploying a military task force against the inhabitants of the Gbaramatu Kingdom of Warri South West Local Governement Area of Delata State in Nigeria. The deployment of the military task force caused the decimation of the Applicants' communities causing destruction of property and displacement of members of the community. As a result, the Applicants brought proceedings in the High Court of Nigeria and were awarded the equivalent of £400 million. They were unable to satisfy the debt in Nigeria and sought to enforce the award in the United Kingdom (as the defendants were known to have assets there). In the circumstances and based on the evidence, the court acceded to the application as against the Major-General only.

26. The ***Ogelegbanweir*** case can, however, be distinguished from the instant case. First, in that case, the defendants who were ordered to make payments to the applicants made a number of assurances for payment, hence why the applicants delayed in pursuing enforcement of the award made. Second, the Court had evidence confirming that the defendants were in a much stronger position than the applicants and were ultimately in charge of any enforcement proceedings that the applicants were able to pursue. The circumstances are not similar in the instant case.

27. The Applicants' counsel submits that there is no prejudice as an injunction remains in place restraining the Defendants' access to the Shares or the proceeds of same.

28. The Applicant's counsel contends, however, that there would be prejudice suffered if the Applicants are unable to register the judgment for enforcement as they have been deprived of the value and benefit of the shares for nearly five (5) years while the Second Defendant continues to draw down fees and disbursements from the proceeds of the wrongful sale of a portion of the Shares.

29. It is noted that the Applicants have also brought an application for extension of time under **Order 3 rule 4 of the Rules of the Supreme Court, 1978** ("**RSC**"), which provides:

> **"4. (1) The Court may, on such terms as it thinks just, by order extend or abridge the period within which a person is required or authorised by these Rules, or by any judgment, order or direction, to do any act in any proceedings.**
>
> **(2) The Court may extend any such period as is referred to in paragraph (1) although the application for extension is not made until after the expiration of that period.**
>
> **(3) The period within which a person is required by these Rules, or by any order or direction, to serve, file or amend any pleading or other document may be extended by consent (given in writing) without an order of the Court being made for that purpose"**

30. The rule permits the court to grant an extension of time within which to comply with a rule under the RSC, a judgment, order or direction. The Applicants seek an extension of time to bring this application, which is governed by an entirely different piece of legislation – The Reciprocal Enforcement of Judgments Act, 1924. Accordingly, this excerpt from the RSC does not apply.

31. Section 3(1) of the Act does, however, state that the Court may grant a longer period of time to register the Nevis Judgment. As the Defendants have not attempted to appeal the Nevis Judgment and the Applicants have made several applications attempting to move the Court in as timely a manner as possible to have the Nevis Judgment registered, the Court hereby grants the requested extension.

### *Whether the Court will grant the order sought by the Applicants and register the Judgment Order*

32. In relation to whether the Court will permit the registration of the Nevis Order, **section 2 of the Act** states:

> **"judgment" means any judgment or order given or made by a court in any civil proceedings whether before or after the passing of this Act and includes an award in proceedings on an arbitration if the award has, in pursuance of the law in force in the place where it was made, become enforceable in the same manner as a judgment given by a court in that place;"**

33. **Section 6(1) of the Act** provides:

> **"6. (1) Where the Governor-General is satisfied that reciprocal provisions have been made by the legislature of any country for the enforcement within that other country of judgments obtained in the Supreme Court, the Governor-General may by Order declare that this Act shall extend to judgments obtained in a superior court in that country, and on any such Order being made this Act shall extend accordingly."**

34. Orders under section 6 of the Act include the Leeward Islands of the Caribbean, which includes St. Kitts and Nevis (which is where the Nevis Judgment was made). Accordingly, the Nevis Judgment is deemed a judgment under the Act as it is an order emanating from a court in civil proceedings from one of the Leeward Islands.

35. Based on evidence before the Court, the Nevis Judgment has not been set aside nor appealed and the matter is thus, *res judicata*. The Judgment Order, thus remains valid and enforceable.

36. The Court must also consider if any of the exclusions under **section 3(2) of the Act** applies. The section reads:

> **"(2) No judgment shall be ordered to be registered under this section if —**
>
> **(a) the original court acted without jurisdiction;**
>
> **(b) the judgment debtor, being a person who was neither carrying on business nor ordinarily resident within the jurisdiction of the original court, did not voluntarily appear or otherwise submit or agree to submit to the jurisdiction of that court;**
>
> **(c) the judgment debtor, being the defendant in the proceedings, was not duly served with the process of the original court and did not appear, notwithstanding that he was ordinarily resident or was carrying on business within the jurisdiction of that court or agreed to submit to the jurisdiction of that court;**
>
> **(d) the judgment was obtained by fraud;**
>
> **(e) the judgment debtor satisfies the registering court either that an appeal is pending or that he is entitled or intends to appeal against the judgment;**
>
> **(f) the judgment was in respect of a cause of action which for reasons of public policy or for some other similar reason could not have been entertained by the registering court."**

37. Based on the circumstances of the case and the evidence provided, none of the exclusions under section 3(2) of the Act apply to the instant case. The Nevis

Court did have jurisdiction as America 3030 made representations and applications at that time before that court and jurisdiction was not challenged.

38. Further, it was noted at the Court of Appeal in St. Christopher and Nevis that all defendants made certain assertions in the court below and that Weiser was indeed a party to the Fraud Claim. The Court of Appeal in St. Christopher and Nevis also noted that Weiser participated in Striking Out proceedings in the lower court of St. Christopher and Nevis.

39. In addition, the Nevis Judgment was duly served on the First and Second Defendants and none of the Defendants sought to have the Nevis Judgment set aside for fraud.

40. The Court does note, however, that there are presently two separate injunctions over the Shares in differently constituted proceedings. As the Court observed in **The Public Institution for Social Security v Fahad Maziad Rajaan Al-Rajann 2020/CLE/gen/00976**:

> **"The test to be applied in determining whether to register a foreign judgment or order is whether in the circumstances of the case, "it is just and convenient" that the judgment or order be enforced in The Bahamas: section 3 of the [Reciprocal Enforcement of Judgments] Act."**

41. The Court relies on the "*just and convenient*" element as expressly stated in section 3(1) of the Act. According to the Affidavit of Elizabeth Harper filed on 23 August 2022, there is presently an injunction over the Shares and its sale proceeds in another court matter before a different judge. The Court notes there are, in fact, two injunctions regarding the Shares and their sale proceeds. The Nevis Judgment, however, covers more than just the Shares and the sale proceeds of same – it also includes, *inter alia*, several awards of damages.

42. I have also reviewed the injunctions. Based on the wording, the injunctions remain in effect to this day and shall remain so until final determination of proceedings in Singapore. It mentions that the injunctions are also subject to the St. Christopher and Nevis proceedings, but that matter has already been determined.

43. As this application is merely to register the Nevis Judgment in this jurisdiction, I am prepared to grant such relief.

44. In the circumstances, I hereby grant leave to register the Nevis Judgment in accordance with the Reciprocal Enforcement of Judgments Act, 1924 and the Rules of Court (Reciprocal Enforcement of Judgments), 1952.

**Senior Justice Deborah Fraser**

**Dated this 09th day of August 2023**

# EXHIBIT 30



AMERICAN ARBITRATION ASSOCIATION

AAA Case No. 01-20-0007-5777

**BRENT SATTERFIELD V. VAL SKLAROV, AMERICA 2030 CAPITAL, LLC, BENTLEY ROTHSCHILD FINANCIAL LLC, AND BENTLEY ROTHSCHILD CAPITAL LIMITED CORP.**

---

**FINAL AWARD**

---

09 July 2021

Tribunal:
Charles J. Moxley, Jr. (President)
Edna Sussman (Co-Arbitrator)
Richard F. Ziegler (Co-Arbitrator)

View the document on jusmundi.com

Table of Contents

- Final Award ........................................................................................................................... 0
- I. FACTUAL AND PROCEDURAL BACKGROUND ......................................................... 1
- A. Nature of the Case .......................................................................................................... 1
- B. The Shares ...................................................................................................................... 2
- C. The Agreement ............................................................................................................... 3
- 1. Master Loan Agreement .................................................................................................. 4
- 2. April 3, 2018 Addendum ................................................................................................. 4
- 3. May 29, 2018 Addendum ................................................................................................ 5
- 4. November 30, 2018 Addendum ....................................................................................... 7
- 5. December 15, 2018 Closing Statement and Addendum ................................................. 8
- D. Parties and Related Entities ........................................................................................... 8
- E. Justice Masley's Decisions and Orders ........................................................................ 10
- 1. June 20, 2019 Decision and Order ............................................................................... 11
- 2. October 30, 2019 Decision and Order .......................................................................... 11
- 3. December 5, 2019 Decision and Order ......................................................................... 12
- F. Disagreement as to Justice Masley's October 30, 2019 Decision and Order and the Transaction ......................... 12
- 1. Summary ........................................................................................................................ 12
- 2. Disagreement as to the October 30, 2019 Decision and Order ................................... 12
- 3. Disagreement as to Nature of the Transaction ............................................................ 12
- G. Sklarov's Actions Following Receipt of First Tranche of Shares .............................. 14
- 1. Execution of Master Loan Agreement .......................................................................... 14
- 2. Sklarov's Putting First Tranche Shares into Name of America 2030 UK .................... 14
- 3. Sales of the Shares ........................................................................................................ 15
- 4. December 25, 2018 First Disbursement Statement ...................................................... 16
- 5. December 27, 2018 Margin Call ................................................................................... 16
- 6. January 18, 2019 Notice of Default .............................................................................. 17
- H. Detailed Provisions of the Agreement ......................................................................... 18
- 1. Duty to Loan ................................................................................................................. 18
- 2. Duty to Preserve and Protect Collateral ...................................................................... 21
- 3. Duty to Return Collateral Upon Repayment ................................................................ 21
- 4. Transfer or Pledge of Collateral .................................................................................. 22
- 5. Disbursement Date for Loan ......................................................................................... 23
- 6. Term Sheet for the Transaction ..................................................................................... 23
- I. The Parties' Allegations ................................................................................................ 24
- J. Evidentiary Hearing and Procedural History ............................................................... 26
- K. Analysis and Conclusions ............................................................................................ 27
- 1. Summary ........................................................................................................................ 27
- 2. Contract Unenforceability ............................................................................................ 28
- 4. Fraud ............................................................................................................................. 32
- 5. Conversion .................................................................................................................... 39
- 6. Unjust Enrichment ........................................................................................................ 40
- 7. Conspiracy .................................................................................................................... 41
- 8. Unclean Hands .............................................................................................................. 41
- 9. Joint and Several Liability ............................................................................................ 42
- 10. Relief ........................................................................................................................... 43
- 11. Counterclaims ............................................................................................................. 43
- 12. Alleged Prior Bad Acts ............................................................................................... 44
- 13. Charges of the AAA and Arbitrators .......................................................................... 44
- 14. Other ........................................................................................................................... 44
- II. FINAL AWARD .......................................................................................................... 45

# Final Award

[1].

WE, THE UNDERSIGNED ARBITRATORS, having been duly designated in accordance with the arbitration agreement entered into on or about April 2, 2018, between Claimant Brent Satterfield and Respondent America 2030 Capital, LLC; and Respondent Bentley Rothschild Capital Limited having become a party to said arbitration agreement by the "Second Addendum" thereto dated November 30, 2018; and Respondents Val Sklarov and Bentley Rothschild Financial LLC having submitted to this arbitration by consent; and Claimant Brent Satterfield having been represented by Anne W. Salisbury, Esq. and David J. Kaplan, Esq., of Guzov LLC and on the papers by John B. Kinchen, Esq., and Luis Fabrega, Esq. of Hughes Arrell Kinchen LLP; Respondent Val Sklarov, having been represented by Jonathan P. Bach, Esq., Eric S. Olney, Esq., and Amelia Courtney Hritz, Esq., of Shapiro Arato Bach LLP; Respondent America 2030 Capital, LLC, having been represented by Michael Conway and Louis M. Tambaro, Esq., of Offit Kurman P.A.; Respondents Bentley Rothschild Financial LLC, and Bentley Rothschild Capital Limited Corp., having been represented by Jason M. Koral, Esq. of Press Koral LLP; said Respondents having also been previously represented in the case by Jaitegh T. Singh, Esq., and Emily Garner, Esq., of the Singh Law Firm, P.A., and M. Salman Ravala, Esq., and Ross E. Pitcoff, Esq. of Criscione Ravala, LLP before said attorneys and firms were replaced as counsel by the above-named counsel for said Respondents, as described; and having been duly sworn; and having heard the allegations, proofs, and arguments of the parties, do hereby issue this FINAL AWARD.

# I. FACTUAL AND PROCEDURAL BACKGROUND

# A. Nature of the Case

[2].

This is a dispute between Claimant Brent Satterfield ("Satterfield") and Respondents Val Sklarov ("Sklarov"), America 2030 Capital, LLC ("America 2030"), Bentley Rothschild Financial LLC ("Bentley Rothschild Financial"), and Bentley Rothschild Capital Limited Corp. ("Bentley Rothschild Nevis") (Bentley Rothschild Financial and Bentley Rothschild Nevis are at times referred to herein as the "Bentley Rothschild Entities "), arising out of a stock loan transaction (the "Stock Loan Transaction" or the "Transaction") set forth in an agreement, the Master Loan Agreement (the "Master Loan Agreement") as revised pursuant to various Addenda (collectively, the "Agreement").

[3].

The Stock Loan Transaction was initially between Satterfield and America 2030 and thereafter between Satterfield and the following entities controlled by Sklarov as assignees: Bentley



Rothschild Nevis and non-party America 2030 Capital Limited ("America 2030 Nevis") (America 2030, Bentley Rothschild Nevis, and America 2030 Nevis are at times collectively referred to herein as the "Lenders" and Satterfield is at times referred to herein as the "Borrower").

[4].

Pursuant to the Stock Loan Transaction, the Lenders were to loan Satterfield some $3.5 million (depending on stock values at the time of funding) (the "Loan"), based on collateral (the "Collateral") consisting of 2,269,795 shares of stock Satterfield held in Co-Diagnostics, Inc. ("Co-Diagnostics") (the "Shares"), a public company of which Satterfield was a founder, executive, board member, and, at 18%, the largest shareholder, with Satterfield turning the Shares over to America 2030 following his execution of the Master Loan Agreement.

[5].

Except for the net amount of $66,709 after fees, Respondents did not fund the Loan, but nonetheless, Respondents, because of Satterfield's alleged breaches of the underlying loan agreement, asserted the right to retain and, subject to certain preliminary injunctions described hereinafter, have retained the Collateral and Respondents' proceeds of selling Shares held as the Collateral.

## B. The Shares

[6].

Once Satterfield delivered the Shares at Sklarov's direction to American 2030 as Collateral on or about April 27, 2018, Sklarov caused the Shares to be deposited into an account of America 2030 at Co-Diagnostics' transfer agent, VStock, LLC ("VStock").

[7].

On December 6, 2018, America 2030 transferred 1,134,898 of the Shares (the "First Tranche") from its account at VStock to an account of one of Sklarov's entities, non-party America 2030 Capital Limited ("America 2030 UK"), shortly after those Shares, as hereinafter described, became freed of restrictions and freely tradeable.

[8].

As further described hereinafter, Sklarov thereupon, in the period from December 13, 2018 through January 22, 2019, sold 905,926 of the 1,134,898 First Tranche Shares, receiving $1,152,538.70 in proceeds (the "Proceeds") in the foregoing account of America 2030 UK at the Daniel Stewart & Company securities firm in London ("Daniel Stewart"). At the evidentiary hearing in this matter (the "Hearing"), Sklarov, as hereinafter described, testified he did not know or remember where the Proceeds of $1,152,538.70 went or where they are now.

[9].

Sklarov returned 70,000 of the First Tranche Shares to Satterfield apparently because of certain issues having to do with certain TROs and preliminary injunctions described hereinafter. The remaining approximately 158,972 of the First Tranche Shares apparently remain in the



referenced account of America 2030 UK at Dolfin Financial ("Dolfin") in London, which took over the account when Daniel Stewart went out of business. Given Sklarov's control over America 2030 UK, such Shares appear to be subject to the preliminary injunction that, as hereinafter described, Justice Andrea Masley ("Justice Masley"), Supreme Court, New York County, issued on December 5, 2019 against Sklarov, enjoining and restraining him from "selling, transferring, assigning, encumbering or otherwise disposing of any shares of Co-Diagnostics, Inc, which are the subject of this action."

[10].

As to the 1,134,897 Shares making up the second half of the Collateral (the "Second Tranche"), America 2030, as hereinafter described, transferred those Shares to an account of another Sklarov entity, Bentley Rothchild Financial at VStock on July 18, 2018. Given Sklarov's control over Bentley Rothchild Financial and the presence of those Shares in a VStock account, those Shares appear to be subject to the preliminary injunction against Sklarov issued by Justice Masley on December 5, 2019 and to the further preliminary injunction against VStock issued by Justice Masley on January 23, 2019 (collectively, the "Preliminary Injunctions").

## C. The Agreement

[11].

The Parties' Agreement with respect to the Stock Loan Transaction consists of the following:
• The Master Loan Agreement between Satterfield and America 2030 dated on or about April 2, 2018 (the "Master Loan Agreement");

• The April 3, 2018 Addendum between Satterfield and America 2030 to the Master Loan Agreement one day later (the "April 3, 2018 Addendum");

• The May 29, 2018 Addendum between Satterfield and America 2030 to the Master Loan Agreement (the "May 29, 2018 Addendum");

• The November 30, 2018 "Second" Addendum among Satterfield, America 2030, America 2030 Nevis, as "Assignee," and Bentley Rothschild Nevis, as Second Assignee, to the Master Loan Agreement (the "November 30, 2018 Addendum");[1] and

• The December 15, 2018 Closing Statement and Addendum between Satterfield and America 2030 Nevis to the Master Loan Agreement (the "December 15, 2018 Closing Statement and Addendum").

[12].

The Master Loan Agreement, the April 3, 2018 Addendum, the May 29, 2018 Addendum, the November 30, 2018 Addendum (subject to the hereinafter described dispute as to the content and effect of Justice Masley's October 30, 2019 Decision and Order), and the December 15, 2018 Closing Statement and Addendum, as noted above, are referred to herein as the "Agreement."

---

[1]  As hereinafter described, the status of this addendum is disputed, given the parties' differing interpretation as to the content and effect of Justice Masley's October 30, 2019 Decision and Order finding the November 30, 2018 Addendum "permeated with fraud."

Sklarov signed the Master Loan Agreement, the April 3, 2018 and May 29, 2018 Addenda on behalf of America 2030. Sklarov signed the November 30, 2018 Addendum on behalf of America 2030, America 2030 Nevis, and Bentley Rothschild Nevis. Sklarov signed the December 15, 2018 Closing Statement and Addendum on behalf of America 2030 Nevis.

[13].

Following is a description of the various documents making up the Agreement.

# 1. Master Loan Agreement

[14].

This was the original agreement between Satterfield and America 2030. It purported to set forth the parties' overall agreement as to the Transaction, including the parties' respective rights and obligations and extensive disclaimers of the Lenders. We discuss below how, if at all, the Master Loan Agreement and the Addenda thereto address such matters as whether the Lenders have a duty to loan thereunder and whether they have a duty to preserve the Collateral and to return it to Satterfield at the end of the Term of Agreement if and when Satterfield were to repay the Loans. We also address various of the extensive disclaimers the Lenders make in the Master Loan Agreement as well as in the Addenda.

# 2. April 3, 2018 Addendum

[15].

This Addendum increased the amount of the Loan from $1.5 million to $3.5 million, while providing that the Lender would return to Satterfield any Pledged Collateral "not used by Lender."

[16].

This Addendum followed discussions between Sklarov and Satterfield that Sklarov would determine the amount of the Loan, pursuant to Section 2.1(b) of the Master Loan Agreement, based on 45% of the market value of the Collateral at the time of funding of the Loan, and would return any "unused" Collateral. While the Master Loan Agreement had referred to the Collateral as "Transferred Collateral," the April 3, 2018 Addendum referred to it as "Pledged Collateral." As to returning unused Collateral, the April 3, 2018 Addendum provided, "Lender shall undertake to return to Borrower any excess shares of [Co-Diagnostics] not used by Lender as a Pledged Collateral in accordance with the [Master Loan Agreement]."

[17].

This Addendum also provided that voting rights for the Shares would be reassigned back to Satterfield.

# 3. May 29, 2018 Addendum

[18].

> While Satterfield and Sklarov disagree, as hereinafter described, as to whether Satterfield disclosed to Sklarov before entering into the Master Loan Agreement that the Shares were restricted, it is undisputed that the Shares were in fact restricted, that is, not eligible under the federal securities laws to be traded on a public exchange, when Satterfield turned them over to Sklarov and put them into an account of America 2030 at VStock.

[19].

> The restricted nature of the Shares created a delay in the Transaction. Both Sattterfield and Sklarov still wanted to proceed with the Transaction, but Sklarov would not close on or fund the Loan until the restrictions were lifted. This led to an extended period essentially from around May 16, 2018 to around December 12, 2018 during which Sklarov, directly and through attorneys and others, and Satterfield attempted to convince VStock to recognize the Shares as eligible for public trading.

[20].

> During this period, Sklarov continuously and repeatedly told Satterfield he would fund the Loan once the Shares were released from restrictions and became freely tradeable. He did this verbally and in writing, including in chats with Satterfield and Leib Schaeffer ("Schaeffer"), the intermediary who had introduced Satterfield to Sklarov and continued throughout the Transaction to deal with Satterfield on Sklarov's behalf in attempting to get the Shares freed of restrictions and in communicating Sklarov's intentions as to the Transaction to Satterfield.

[21].

> Perhaps the most memorable expression by Sklarov of his intent to fund the Loan once the restrictions on the Shares could be lifted was his statement on June 1, 2018 in a three way chat among Sklarov, Schaeffer, and Satterfield, that, if the restrictions on the Shares were lifted that day, Sklarov would fund a loan in the amount of $6 million.[2]

[22].

> Thus, in real time when the issue of the restricted nature of the Shares surfaced, Satterfield and Sklarov at least appeared to have a common interest—to get the restriction on the Shares removed. The obstacle, the entity that had to be convinced, was VStock. As transfer agent for Co-Diagnostics at which the Shares were held in an account in the name of America 2030, VStock, as a practical matter, controlled whether and, if so, in what circumstances, the Shares could or would be deemed unrestricted. While Sklarov and Satterfield discussed trying to get Co-Diagnostics to change transfer agents, this never happened. As transfer agent, VStock appeared to take its responsibilities in this regard very seriously.

---

[2]  According to the statement of stock value of Co-Diagnostics put in the record by Respondents, the stock reached a high of 5.94 on that day, yielding a value of $13,482,582 for Satterfield's 2,269,795 Shares. Using the loan to value ratio (LTV) of 45% set forth at Section 2.1(b) of the Master Loan Agreement, the lendable amount would have been some $6,067,000, although the market price for the stock for that day closed at $4.79 per share, which would have yielded a somewhat lower loan amount.



[23].

VStock saw several obstacles to the release of the restrictions. First, VStock read the Master Loan Agreement as providing that Satterfield had transferred the Shares, ostensibly as a gift, to America 2030, and not merely turned them over as collateral for a loan. On this basis, VStock concluded that under the U.S. securities laws America 2030 could not take advantage of Satterfield's six month holding period, but rather was subject to its own six month period before it, as owner, could conduct trades in the Shares.

[24].

Secondly, VStock, because of the volume of shares involved, saw America 2030 as having become an affiliate of Co-Diagnostics under the securities laws, subjecting itself to various reporting requirements and restrictions since the transfer of the Shares to America 2030 constituted the transfer of over 10% of the outstanding shares of Co-Diagnostics.

[25].

The May 29, 2018 Addendum was designed by Sklarov to address these obstacles. It provided that Satterfield had turned the Shares over to America 2030 under the Master Loan Agreement as a *bona fide* pledge of security for a loan and not as a transfer. It further provided that those of the Shares that exceeded 9.99% of Co-Diagnostics' outstanding shares would be assigned to another "third party lender" of America 2030's choice, thereby "bifurcating the Loan."

[26].

VStock, however, did not accept the premise of the May 29, 2018 Addendum that Satterfield had only pledged and not transferred the Shares to America 2030 under the Master Loan Agreement. In VStock's view, the May 29, 2018 Addendum was not effective in this regard, since the horses were already out of the barn: By the Master Loan Agreement Satterfield had already transferred the Shares to America 2030 and this could not be papered over by the retroactive recharacterization attempted by the May 29, 2018 Addendum

[27].

VStock thus stuck with its conclusion that America 2030 was required under the securities laws to hold the Shares for an additional six months. As a result, it was only in late November 2018, some six months later, as reflected in Sklarov's November 30, 2018 email to his broker at the Daniel Stewart securities firm in London, that VStock recognized or was about to recognize the First Tranche Shares as unrestricted and free-trading. *See* Claimant's Exh. 32. According to Dolfin, the successor firm for Daniel Stewart when the latter went out of business, the 1,134,898 in First Tranche Shares were received in the account on December 10, 2018. *See* Claimant's Exh. 34.[3]

[28].

In a point that becomes relevant later in this narrative, Sklarov further told his London broker in the November 30, 2018 email that the Shares (the First Tranche Shares) soon to arrive would be in the name of America 2030, but would be deposited into the account of America 2030 Capital Limited. As hereinafter discussed, the latter is the name we have referenced and defined herein as America 2030 Nevis. However, it developed in the course of Sklarov's testimony at the Hearing that this America 2030 Capital Limited in London was a different America 2030 Capital Limited

---

[3]  Although the parties did not request findings of fact and conclusions of law in this case, the Tribunal includes herein some illustrative rfeferences to the record in the case.

than the one he had previously identified to Satterfield as an entity to whom the Agreement was being assigned. Specifically, the America 2030 Capital Limited in London to which Sklarov transferred the First Tranche Shares was an entity with the same name that was organized in the UK. *See* Tr. at 575. It thus appears that the First Tranche Shares as of that time had been assigned by America 2030 to America 2030 Nevis, but nonetheless remained in the account of America 2030 at VStock, and Sklarov then transferred them to America 2030 UK in London.

## 4. November 30, 2018 Addendum

[29].

Given further issues with VStock in connection with its non-acceptance of the intended effect of the May 29, 2018 Addendum to enable America 2030 to take advantage of Satterfield's six month holding period, Sklarov decided to take the Transaction off-shore purportedly in order to avoid further problems under the U.S. securities laws. As discussed above, it was already contemplated by the May 29, 2018 Addendum that America 2030 would be bifurcating the Loan by having an affiliated entity extend to Satterfield so much of the Loan as was over 9.99% of the outstanding shares of Co-Diagnostics.

[30].

Sklarov thus told Satterfield in connection with the November 30, 2018 Addendum that he wanted to assign both bifurcated tranches of the Loan to offshore entities affiliated with America 2030, one-half to America 2030 Nevis and one-half to Bentley Rothschild Nevis, substituting them as the Lenders. Sklarov, however, told Satterfield this did not mean that the Shares would be moved to Nevis, but rather only that the Lenders would have been incorporated there. *See* Claimant's Exh. 28.

[31].

Satterfield balked at taking the Transaction offshore, telling Sklarov he was not comfortable with it. Satterfield testified and presented documentary evidence at the Hearing that Sklarov pressured him into accepting the November 30, 2018 by threatening that, if he didn't, Sklarov would declare him in default of the Agreement and retain the First Tranche of Shares— that he would simply retain them totally and not return them to Satterfield even though America 2030 had not yet by that time made any loan under the Agreement.

[32].

This threat was conveyed to Satterfield by Schaeffer in a November 14, 2018 chat. Schaeffer told Satterfield Sklarov was offering Satterfield "half your stock back," if Satterfield would not agree to take the Transaction offshore and that Sklarov would keep the balance: "He keeps the balance." *See* Claimant's Exh. 22. Schaeffer told Satterfield Sklarov was saying that, however, if Satterfield agreed to take the Transaction offshore and thereby avoid the U.S. securities laws and the SEC, Sklarov would "start monetizing it all." *Id.*

[33].

Satterfield testified that, after Schaeffer told him that, if he didn't agree to take the Transaction



offshore, Sklarov would take half of the Shares, he (Satterfield) telephoned Sklarov about the matter. Satterfield testified that, in the call, Sklarov enlarged the threat, telling him he was already technically in default—that "we could seize all of your shares today, 100 percent of them." Tr. at 378. Satterfield testified that he objected and Sklarov reassured him he wanted to make the Loan and the only issue was that Satterfield had to agree to the November 30, 2018 Addendum taking the Transaction offshore and Sklarov would fund the Loan. Tr. at 379-380

[34].

Satterfield contends he signed onto the November 30, 2018 Addendum as a result of this threat and pressure by Sklarov, believing that, if he did so, and the Shares became tradeable, Sklarov would make the Loan. Sklarov denies coercing Satterfield, contending that Satterfield badly wanted the Loan and readily agreed to this Addendum.

[35].

Satterfield thus signed the November 30, 2018 Addendum, whereby America 2030 assigned the first half of the Shares, the First Tranche, to America 2030 Nevis and the second half to Bentley Rothschild Nevis.

## 5. December 15, 2018 Closing Statement and Addendum

[36].

This Addendum provided that America 2030 Nevis would be making a Loan based on 45% of the market value of the First Tranche, which amounted to a loan of $1,113,334.00, but that that loan amount would be paid out in tranches of $100,000-300,000 every two-three weeks, provided the Shares "maintains current support level and does not experience significant downward pressure or price adjustment."

[37].

The December 15, 2018 Closing Statement and Addendum differs substantially from the Form of Closing Statement attached to the Master Loan Agreement. By way of example, the December 15, 2018 Closing Statement adds substantial disclaimers, including the statement that "LENDER DOES NOT GUARANTEE FUNDING and ALL FUNDING IS AT LENDERS DISCRETION UNTIL DISBURSEMENT." It also adds the statement, "IN THE EVENT OF ANY INCONSISTENCY WITH THE MLA, THIS CLOSING STATEMENT WILL BE THE CONTROLLING DOCUMENT."

## D. Parties and Related Entities

[38].

Satterfield is the Claimant. Sklarov conducted the Transaction with Satterfield through various entities ("Sklarov Entities") that Sklarov controlled, some of which Satterfield included as Respondents in this arbitration and some of which he did not. Following is a summary



description of the roles of such Sklarov Entities focused on in this matter:

• **America 2030 Entities**[4]

o America 2030 Capital, LLC ("America 2030"): original Lender under the Master Loan Agreement.

o America 2030 Capital Limited ("America 2030 Nevis"): Entity established under the laws of Nevis to which, pursuant to the November 30, 2018 Addendum, Sklarov through America 2030 purported to assign America 2030's interest as Lender in the Master Loan Agreement with respect to the First Tranche of Shares.

o America 2030 Capital Limited ("America 2030 UK"): Entity of the same name but, according to Sklarov (see Tr. at 575), established under the laws of the "UK," to which Sklarov through America 2030 Nevis transmitted the First Tranche of UK Shares to be sold in the entity's UK securities account, also controlled by Sklarov, at the Daniel Stewart securities firm in London, which was later replaced by the Dolfin securities firm in London, when Daniel Steward went out of business (Dolfin apparently had been clearing for Daniel Steward and inherited the account when Daniel Stewart went out of business.

• **Bentley Rothschild Entities**

o Bentley Rothschild Capital Limited Corp. ("Bentley Rothschild Nevis"): entity established under the laws of Nevis to which, pursuant to the November 30, 2018 Addendum, Sklarov through America 2030 purported to assign the role of America 2030 as Lender under the Master Loan Agreement with respect to the Second Tranche of Shares and to which Sklarov purported to have transferred the Second Tranche of Shares.

o Bentley Rothschild Financial LLC ("Bentley Rothschild Financial"): Entity to which Sklarov appears to have actually transmitted the Second Tranche of Shares (the record does not appear to reflect the jurisdiction in which this entity was organized).

[39].

As noted, the Bentley Rothschild Respondents in this case are Bentley Rothschild Nevis and Bentley Rothchild Financial. As discussed during at the Hearing (Tr. 527-528), these are the Bentley Rothschild Respondents who appeared at the Hearing and are Respondents in this arbitration.[5]

[40].

The Tribunal had previously had the impression that only Bentley Rothschild Financial was a Respondent in the case and raised the question at the opening of the Hearing (Tr. at 7-8), requesting further input from the Parties. When the parties did not come back to the Tribunal on the matter in the ensuing days, the Tribunal further reviewed the record of the case and advised

---

[4] Justice Masley in her June 20, 2019 Decision and Order lamented the "imprecision of the parties," noting that "[b]oth parties fail to distinguish one entity from another with identical names." This lack of precision continued in this arbitration, including through the Hearing.

[5] By orders of the Tribunal that came out of prior conferences with Counsel, the Tribunal, in advance of the Hearing, had understood that Bentley Rothschild Financial was the only Bentley Rothschild entity proceeded against as a Respondent in the arbitration (see Pre-Hearing Order No. 14, dated March 21, 2021; Pre-Hearing Order No. 1, dated November 16,2020, although, as noted above, at the Hearing it became evident that Bentley Rothschild Capital, as well as Bentley Rothschild Nevis, is a Respondent in the case and the matter was not disputed by Bentley Rothschild Capital at the Hearing.

the parties of its understanding, based on that review, that both Bentley Rothschild Nevis and Bentley Rothschild Financial are Respondents in the case and again invited counsel to advise if this understanding was in any way different from theirs (Tr. at 527-528).

[41].

No disagreement with the Tribunal's stated conclusion in this regard was thereafter expressed by either of the Bentley Rothschild Entities, in a context where both of them were represented at the hearing. Accordingly, the Tribunal concludes that Bentley Rothschild Nevis and Bentley Rothschild Financial have subjected themselves to the jurisdiction of this Tribunal and are Respondents in this case.

[42].

As to the two America 2030 entities other than America 2030 itself – America 2030 Nevis and America 2030 UK – Satterfield has not included those entities as respondents in the case, although, notably, Sklarov did not distinguish between the Entities in his defense of the case. While Satterfield initially named America 2030 Nevis as a Respondent in the case and continued at times to use a caption in the case that named America 2030 Nevis, Satterfield did not press the matter when Respondents objected to the inclusion of America 2030 Nevis and that entity was not overtly represented by counsel in the case, including at the Hearing.

[43].

Satterfield did, however, broadly assert—and present evidence at the Hearing for the proposition—that the various America 2030 and Bentley Rothschild Entities involved in the Transaction are all entities through whom Sklarov acted at relevant times with respect to the Transaction and are essentially interchangeable without regard to any purported corporate form they may have and were used as vehicles by Sklarov in defrauding Satterfield. Respondents dispute the foregoing assertions by Satterfield. They contend that each such entity is a separate legal entity, although Sklarov was only able or willing at the Hearing to identify one other person associated with them, his stepdaughter, who was at the time between 19-20 years old.

# E. Justice Masley's Decisions and Orders

[44].

Justice Masley issued several decisions identified in this arbitration as relevant to the case, including the following:
• June 20, 2019 Decision and Order

• October 30, 2019 Decision and Order

• December 5, 2019 Decision and Order

[45].

Following is a description of such Decisions and Orders.



## 1. June 20, 2019 Decision and Order

[46].

By Decision and Order dated June 20, 2019, Justice Masley, following a two day hearing, *inter alia*, enjoined Sklarov, America 2030 and Bentley Rothchild Nevis from participating in an arbitration in Nevis that America 2030 Nevis and Bentley Rothchild Nevis had initiated in Nevis pursuant to the November 30, 2018 Addendum. Justice Masley found that Satterfield had shown a likelihood that he would be successful in establishing that the Nevis arbitration provision in the November 30, 2018 Addendum was permeated by fraud, but stated she was not reaching the issue of whether the overall Agreement was permeated with fraud. *See* Decision and Order at 14. Justice Masley stated, "Due to the expedited nature of the proceeding, the court confines its finding of success on the merits to the Nevis arbitration provision. The issue of whether the [Master Loan Agreement] and addendums are permeated with fraud must await the court's decision on the Defendants' motion to dismiss." *Id.*

[47].

In enjoining America 2030, Bentley Rothchild Nevis, and Sklarov from proceeding with arbitration against Satterfield in Nevis pursuant to the provision of the November 30, 2018 Addendum providing for arbitration in Nevis of any dispute under the Agreement, Justice Masley found, "[Satterfield] established with credible testimony a likelihood of success on the merits that the Nevis arbitration is permeated with fraud." *Id.* at 13.

## 2. October 30, 2019 Decision and Order

[48].

This Decision and Order addressed the motion of America 2030, America 2030 Nevis, Bentley Rothchild Nevis, and Sklarov (1) to dismiss for lack of jurisdiction and, in the alternative, (2) to compel arbitration. Finding that America 2030 Nevis had not been served, Justice Masley upheld personal jurisdiction over Sklarov, America 2030 and Bentley Rothchild Nevis and directed them to arbitrate this dispute in New York pursuant to the arbitration clause in the Master Loan Agreement. Justice Masley further stated, "[T]he court finds that the [November 30, 2018 Addendum] was permeated with fraud." *See* p. 19 in the last conclusory paragraph.

[49].

While this Decision and Order was based in part on allegations which mirror Satterfield's complaint in the case, it also relied on testimony, apparently testimony that had been taken in the hearing underlying Justice Masley's Decision and Order dated June 20, 2019 discussed above. *See, e.g.,* Decision and Order dated October 30, 2019 at 18, including fn. 6 discussing Justice Masley's Decision and Order dated June 20, 2019.



## 3. December 5, 2019 Decision and Order

[50].

By her December 5, 2019 Decision and Order, Justice Masley, *inter alia*, enjoined Sklarov from selling or otherwise disposing of the Shares.

## F. Disagreement as to Justice Masley's October 30, 2019 Decision and Order and the Transaction

### 1. Summary

[51].

The Parties disagree as to the meaning, status, and enforceability of the Agreement and as to the meaning and effect of Justice Masley's findings as to the November 30, 2018 Addendum. Satterfield contends the Agreement is unenforceable as a matter of law, including, *inter alia*, based on its alleged illusory character, lack and failure of consideration, and fraud, as well as based on theories of conversion and unjust enrichment. Respondents deny any wrongdoing and contend the Agreement is enforceable and that Satterfield breached it in multiple respects.

### 2. Disagreement as to the October 30, 2019 Decision and Order

[52].

As to Justice Masley's October 30, 2019 Decision and Order, Satterfield contends Justice Masley in that order preclusively found the November 30, 2018 Addendum to be fraudulent and that this Tribunal is bound by that determination. Respondents deny that Justice Masley made any such finding and contend that, in any event, such a finding by Justice Masley under the Federal Arbitration Act would not be binding on the Tribunal.

### 3. Disagreement as to Nature of the Transaction

[53].

The Parties disagree as to the fundamental character of the Transaction. Satterfield contends the Transaction was supposed most fundamentally to consist of a secured loan transaction with the



following main components:
• America 2030 was supposed to loan Satterfield the agreed amount specified in the Agreement subject to the market value of the Shares at the time of funding;

• Satterfield was supposed to transmit the Shares to America 2030 as collateral;

• America 2030 was supposed to preserve and protect that collateral during the Term of the Loan; and

• America 2030 was supposed to return the Shares to Satterfield at the end of the Term of the Loan when and if Satterfield repaid the Loan.

[54].

Sklarov presents multiple characterizations of the Transaction, with such characterizations being inconsistent with one another and with Satterfield's characterization. Sklarov's formal position before its evolution at the Hearing appeared to be essentially the following:
• America 2030 was supposed to loan Satterfield the agreed amount provided for in the Agreement;

• Satterfield was supposed to transfer the Shares to America 2030, giving America 2030 full ownership, dominion and control over them without limitation and could sell the stock at his discretion

• America 2030 was supposed to return an equal number of shares of Co- Diagnostics to Satterfield or the value thereof when and if Satterfield paid off the Loan at the end of its Term.

[55].

As the Hearing proceeded, Sklarov's position evolved, including as follows:
• Sklarov could not point to any place in the Agreement and there appears to be none that required America 2030 or the other Lenders to actually loan any particular amount to Satterfield, even any amount *vis-à-vis* the value of the Shares at the time the Loan was funded. In addition, while there was language in the Agreement that Sklarov asserted obligated America 2030 to make the Loan to Satterfield, there was extensive other language in the Agreement that limited and ultimately negated any obligation of America 2030 or the other Lenders to make any loan whatsoever to Satterfield;

• Sklarov could not point to any place in the Agreement and there appears to be none that required America 2030 to return the Shares or comparable shares or the value thereof to Satterfield when and if Satterfield paid off the Loan at the end of the Term of the Agreement.

[56].

The Agreement, upon examination, does not reflect the foregoing characterizations of the Transactions by either Satterfield or Sklarov. Specifically, as hereinafter discussed, the Agreement is quite different in substance from what Satterfield says he understood he was getting and what Sklarov says he (through his Entities) was providing Satterfield.



## G. Sklarov's Actions Following Receipt of First Tranche of Shares

## 1. Execution of Master Loan Agreement

[57].

      Satterfield and Sklarov signed the Master Loan Agreement on March 30, 2018 and April 2, 2018 respectively, with, as noted, Sklarov signing on behalf of America 2030. Satterfield was not represented by counsel. The parties disagree, as also noted, as to whether Satterfield disclosed to Sklarov before signing the Master Loan Agreement that the Shares were restricted and not freely tradeable.

[58].

      Satterfield contends he told Schaeffer the Shares were not yet with a broker, by which he meant they were restricted, and that Schaeffer told him not to worry about it, notwithstanding that the Master Loan Agreement provided that the Shares would be free trading, since America 2030 would handle the paperwork to get the Shares free trading and they would be free-trading when the Transaction closed. Satterfield testified this was a big benefit to him that Sklarov would handle the paperwork to get the restriction removed, one less thing he would have to do.

[59].

      Sklarov denies knowing in advance that the Shares were restricted. Schaeffer in his deposition testified he did not remember Satterfield's telling him in advance the Shares were restricted. An exchange of emails on March 26, 2018 confirms Schaeffer's telling Satterfield to fill out as much of the application (the Know Your Customer Questionnaire) as he could and send it on, seeming to confirm that Schaeffer had a role in Satterfield's filling out the form. *See* Claimant's Exh. 44.

[60].

      Once Satterfield delivered the Shares on April 27, 2018, it became evident they were restricted. There then ensued, as described above, a long period of time essentially from May 16, 2018, when Sklarov told Satterfield that VStock had advised that the Shares were not registered, to December 11, 2018, when Sklarov advised Satterfield that VStock had released the restriction on the First Tranche. During this period, Sklarov worked with Satterfield and with VStock to try to get VStock to recognize the Shares as free and clear for trading.

## 2. Sklarov's Putting First Tranche Shares into Name of America 2030 UK

[61].



By December 11, 2018, VStock, according to an email of that date from Sklarov to Satterfield, had recognized the First Tranche of Shares as released from the restrictions and eligible to be traded. As of that point in time, the Shares, notwithstanding purportedly having been assigned to America 2030 Nevis through the November 30, 2018 Addendum, were held in an account of America 2030 at VStock. Upon VStock's recognition of the ending of the restrictions, Sklarov, as noted above, transferred these Shares to an account he maintained in the name of yet another America 2030 entity, America 2030 UK at Daniel Stewart in London.

## 3. Sales of the Shares

[62].

Once the Shares were in his UK account for America 2030 UK, Sklarov immediately started selling them. This was before the December 15, 2018 Closing Statement and Addendum and in the absence of any loan having been made.

[63].

Based on Satterfield's Exhibits 35 and 77 and Respondents' Exhibit 48, Sklarov's sales of Shares from the First Tranche and the volume of those trades *vis-à-vis* total trades for the given days were as follows, pursuant to trading information not in dispute among the parties, with such sales starting shortly after Sklarov's December 11, 2018 email to Satterfield notifying him that the restrictions on the First Tranche Shares had been released:

| Trade Date | Principal Amount (US $) | Number of Shares Sold | Price per Share[6] | Percentage of Daily Volume Sold |
|---|---|---|---|---|
| 12/13/2018 | 23,120.24 | 10,760.00 | 2.1509 | 70% |
| 12/14/2018 | 58,447.93 | 28,800.00 | 2.0315 | 30% |
| 12/17/2018 | 18,193.90 | 9,434.00 | 1.9305 | 41% |
| 12/18/2018 | 9,118.75 | 5,000.00 | 1.8256 | 41% |
| 12/19/2018 | 8,852.02 | 5,000.00 | 1.7722 | 24% |
| 12/20/2018 | 8,219.16 | 5,000.00 | 1.643832 | 25% |
| 12/21/2018 | 7,520.97 | 5,000.00 | 1.5057 | 18% |
| 12/27/2018 | 5,660.07 | 4,100.00 | 1.3854 | 15% |
| 12/28/2018 | 6,231.42 | 5,000.00 | 1.2503 | 16% |

---

[6] This is the price per share used by Satterfield in the chart submitted to Justice Masley and to this Tribunal. The numbers are generally but not precisely consistent with those reflected in Respondents' Exhibit 48, a listing of stock prices for Co-Diagnostics for the period July 13, 2017 through March 12, 2021. The numbers in the above chart were not challenged by Respondents at the Hearing as being in any way inaccurate.

View the document on jusmundi.com



| | | | |
|---|---|---|---|
| 1/2/2019 | 10,243.03 | 7,521.00 | 1.3646 | 26% |
| 1/4/2019 | 36,653.75 | 29,341.00 | 1.2505 | 64% |
| 1/3/2019 | 38,774.69 | 30,000.00 | 1.2938 | 52% |
| 1/7/2019 | 49,065.09 | 40,810.00 | 1.2022811 | 69% |
| 1/8/2019 | 61,917.21 | 50,000.00 | 1.2396 | 59% |

| | | | |
|---|---|---|---|
| 1/8/2019 | 52,672.29 | 43,705.00 | 1.206455% |
| 1/10/2019 | 31,722.59 | 26,311.00 | 1.206952% |
| 1/11/2019 | 64,580.08 | 57,249.00 | 1.129250% |
| 1/14/2019 | 323,585.71 | 246,416.00 | 1.314522% |
| 1/15/2019 | 74,082.70 | 64,761.00 | 1.145122% |
| 1/16/2019 | 77,697.76 | 71,982.00 | 1.080525% |
| 1/18/2019 | 41,478.34 | 37,315.00 | 1.112719% |
| 1/17/2019 | 68,662.66 | 62,100.00 | 1.10688% |
| 1/22/2019 | 76,038.34 | 70,321.00 | 1.082414% |
| | $1,152,538.70 | 905,926 | |

[64].

Based upon the evidence adduced at the Hearing, it appears that the remaining approximately 158,972 First Tranche Shares, made up of the original 1,134,898 First Tranche shares minus the 905,926 shares Sklarov sold and the 70,000 shares he returned to Satterfield, remain in the account of America 2030 UK at Dolfin in London and are subject to Justice Masley's December 5, 2019 Preliminary Injunction.

[65].

As to the $1,152,538.70 in Proceeds Sklarov received from selling the above First Tranche Shares, the whereabouts of such Proceeds, as noted above, are unknown. Sklarov professes not to remember where they went or where they are now. *See* Tr. at 599-601.

## 4. December 25, 2018 First Disbursement Statement

[66].

Some twelve days after he started selling the Shares, Sklarov issued the First Disbursement Statement dated December 25, 2018 and on December 26, 2018 transmitted to Satterfield the net amount of $66,709, purporting to represent a loan of $100,000 net of fees. By this point in time, America 2030, as reflected in the above chart, had received over $130,000 in proceeds from selling First Tranche Shares.

## 5. December 27, 2018 Margin Call

[67].

Two days after the First Disbursement Statement, Sklarov sent Satterfield a Margin Call dated December 27, 2018, demanding that Satterfield "top-up" the number of Shares he had transferred as security under the Agreement, claiming that the price of the stock had declined to less than 75% of its value ($2.50 per share) on the date the $100,000 principal advance was made under the Loan. The letter advised that the stock was trading on average for less than $1.63 on the three preceding consecutive business days and that such circumstances constituted a "Valuation Event" under Section 7.1(g) of the Master Loan Agreement, which entitled the Lenders to demand a "top-up" of the Collateral by a payment in funds or stock equal to 25% of the Collateral's fair market value on the day of the principal advance. Satterfield testified that the requested top-up amounted to some $750,000 (Tr. at 73, 225); Sklarov does not appear to have provided a top-up number.

[68].

Satterfield declined to pay the Margin Call. Satterfield's rejection of a demand to deliver an additional $750,000 in value is understandable, as Sklarov was purporting to apply the "Valuation Event" provision of the Master Loan Agreement to circumstances in which only $100,000 ($66,709 net of fees) had been funded by Sklarov and the Lenders were in possession of stock worth, even at the new low price, well over $2 million.[7] On December 31, 2018 Satterfield offered instead to repay the $100,000 plus fees, for a total of $105,909, in exchange for a consensual rescission of the Loan. Sklarov responded by declaring the Loan in default.

## 6. January 18, 2019 Notice of Default

[69].

By his Notice of Default dated January 18, 2019, Sklarov declared Satterfield in default, *inter alia*, on the following grounds:

• That the Shares, as delivered to Sklarov and his Entities, were restricted and not free and clear, as required by Sections 4.2 and 7.1(b) of the Master Loan Agreement; and

• That Satterfield failed to top-up the Collateral in response to the Margin Call, as required by Section 7.1(g).

[70].

The Notice of Default declared that under the Agreement the Shares were transferred and not pledged and hence belong to America 2030 Nevis and Bentley Rothschild Nevis and that Satterfield knew at all times that he had transferred ownership of the Shares to Sklarov's Entities and no longer owned them himself. The Notice of Default further declared that, as a result of

---

[7]  Satterfield alleges in this proceeding that Sklarov's stock sales starting on December 11 had resulted in the decline in the stock price. Amended Statement of Claim ¶¶ 33, 36. Although that allegation appears plausible since Respondents' sales of Co-Diagnostics stock accounted for a significant percentage of the trades in the stock in the period immediately preceding the margin call (ranging from 15% - 70% of the daily trading volume, as shown in the chart above), Satterfield did not offer any expert testimony to establish that fact. Respondents called expert Jordan Milev, who opined that the stock sales did not materially affect the stock's trading price. The Tribunal did not find his analysis persuasive, however, as it omitted consideration of several important issues. *See, e.g.*, Tr. at 764-780. The Tribunal has reached its determination without regard to Sklarov's alleged responsibility for the decline in the stock price.



Satterfield's non-compliance with Sections 4.2, 7.1(b), and 7.1(g) of the Master Loan Agreement, the Sklarov Entities were released from any further obligation to Satterfield.

[71].

Satterfield and Sklarov thereafter ended up in arbitration in Nevis initiated by Sklarov, America 2030 Nevis and Bentley Rothschild Nevis, in litigation before Justice Masley initiated by Satterfield, and then in this arbitration.

## H. Detailed Provisions of the Agreement

[72].

Following is a review of applicable provisions of the Agreement, with particular reference to such questions as the following:
• <u>Duty to Loan</u>: Whether the Lenders were obligated to loan any monies to Satterfield?

• <u>Duty to Preserve and Protect Collateral:</u> Whether the Lenders had any obligation to preserve and protect the Collateral during the term of the Loan?

• <u>Duty to Return Collateral upon Repayment:</u> Whether the Lenders had any obligation under the Agreement to return the Collateral or the value thereof to Satterfield at the end of the Term of the Agreement if and when Satterfield repaid the Loan?

• <u>Transfer or Pledge of Collateral:</u> Whether the Collateral was provided as a transfer or a pledge?

## 1. Duty to Loan

[73].

Section 2.1 of the Master Loan Agreement provides as follows as to the Loan to be made by the Lenders under the Master Loan Agreement.
2.1 <u>Loan Principal Amount.</u>

(a) Subject to all of the terms and conditions of this Agreement, Lender agrees to lend to Borrower funds equal to up to One and a Half Million ($1,500,000.00) USD of the current FMV of the Transferred Collateral. The Loan Principal Amount shall typically be funded within three (3) Business Days of the receipt by Lender of a confirmation that the Transferred Collateral has been deposited with the Depository Broker and shall be memorialized in a Closing Statement as example [*sic*] in the form of <u>Exhibit 1</u> hereto, which is hereby incorporated by reference.

(b) For purposes of Section 2.l(c), the amount that Lender may make available under the Loan shall be calculated by multiplying (i) forty five percent (45%) of the Transferred Collateral by (ii) the FMV.



(c) Lender reserves the right not to fund the Loan at any one time more than four and nine tenths of one percent (4.9%) of the total shares outstanding of CO-DIAGNOSTICS (CODX:NASDAQ).

[74].

The Master Loan Agreement, in addressing the subject of "Loan Principal Amount," thus refers to a loan of "up to" $1.5 million, with the April 3, 2018 Addendum increasing that amount to $3.5 million. The question arises as to what it means under the Agreement that America 2030 agreed to loan Satterfield an amount "up to" the $1.5 million and, later, $3.5 million.

[75].

Sklarov testified at the Hearing that Section 2.1(a) required America 2030 to loan Satterfield $1.5 million, subject to the other terms of the Agreement. When it was pointed out to him that Section 2.1(a) said "up to" $1.5 million and he was asked whether America 2030 was required by the Agreement to loan Satterfield any specific amount, he was unable to point to any provision in the Agreement so providing (*see* Tr. at 1003-1006), notwithstanding his generally manifesting at the Hearing a deep familiarity with the provisions of the Agreement. Respondents have not identified any provision of the Agreement actually requiring the Lenders to loan any specific amount, even any amount *vis-à-vis* the value of the Shares at the time of the funding of a loan.

[76].

A similar issue arose in connection with the reference in Section 2.1(b) of the Master Loan Agreement to the loan amount that America 2030 "may make available." After testifying that Section 2.1(b), like Section 2.1(a), required America 2030 to loan the $1.5 million to Satterfield (*see* Tr. at 824, 1001-1005), Sklarov, when asked to focus on Section 2.1(b), recognized it imposed no such requirement and, as noted above, could point to no provision in the Agreement so requiring. *See* Tr. 1003-1006.

[77].

As to Section 2.1(c) of the Master Loan Agreement to the effect that America 2030 reserves the right not to fund a loan more than 4.9% of the total shares of Co-Diagnostics, Sklarov testified that that meant that America 2030 would not be required by the Master Loan Agreement to fund a loan based on shares that constituted more than 4.9% of the outstanding shares of Co-Diagnostics.[8] *See* Tr. at 1000. It is clear that the Shares Satterfield tendered to Sklarov as security for the Loan represented some 18% of the outstanding shares of Co-Diagnostics. *See, e.g.,* Tr. at 86.

[78].

Section 1.3 of the Master Loan Agreement makes the lack of obligation on the part of the Sklarov Entities express, "**Lender's Discretion**. Lender has the discretion and right to elect to not proceed with this Agreement at any time up until the Closing Date."

[79].

The Agreement contains numerous other provisions limiting or negating any obligation of America 2030 to make any loan thereunder. For example, Section 10.9 of the Master Loan

---

[8] While Sklarov did no shed light on what the "at any one time" provision of Section 2.1(c) means, his testimony seemed clear that the focus of the Section was on the Lenders not being obligated to lend based on Shares that constituted more than 4.9% of the outstanding shares of Co-Diagnostics.



Agreement provides as follows:

<u>Force Majeure.</u> Notwithstanding any provision of this Agreement, neither Party shall be liable for its inability in performing any of its obligations hereunder if such inability is caused by or arises as a result of circumstances beyond its reasonable control **(Force Majeure Event")**. For the purposes of this Clause, a Force Majeure Event shall include, without limitation, inability or delay in performance caused through acts of God, fire, flood, riot, *degradation in stock value, stock market crash and other adverse market conditions*, lightning, explosion, civil commotion, malicious damage, storm, tempest, electronic malfunctions, acts or omissions of telecommunications carriers, acts of government or other regulatory authority, acts or omissions of persons or bodies for whom the Party affected thereby is not responsible, and any other circumstances beyond the reasonable control of the relevant Party.

(emphasis supplied).

[80].

Section 10.13, a long single-spaced difficult-to-penetrate seemingly boilerplate block disclaimer extending over some three pages at the end of the Master Loan Agreement provides in bold, "MARKET CONDITIONS OR FORCE MAJEURE MAY CAUSE LENDER TO ADVANCE THE LOAN IN DISBURSEMENTS OR POSTPONE FUNDING."

[81].

The December 15, 2018 Closing Statement and Addendum provides in bold, "LENDERS UNDERWRITING MAY CHANGE AT ANY TIME UP-UNTIL FUNDING.*"*

[82].

The December 15, 2018 Closing Statement and Addendum further provides in bold, "LENDER MAY AT ITS SOLE AND ABSOLUTE DISCRETION POSTPONE FUNDINGS OR ORDER FUNDING IN TRANCHES. IF LOAN PROCEEDS ARE PAID IN TRANCHES, THEY ARE CALCULATED ON LTV TO MARKET PRICE OF THE SECURITY AT TIME OF DISBURSEMENT AND PAID AT LENDER'S DISCRETION."

[83].

The December 15, 2018 Closing Statement and Addendum further provides in bold, "LENDER DOES NOT GUARANTEE FUNDING AND ALL FUNDING IS AT LENDERS DISCRETION UNTIL DISBURSEMENT." This Addendum further provides in bold that, in the event of any inconsistency with the Master Loan Agreement, the Addendum "WILL BE THE CONTROLLING DOCUMENT."

[84].

As to the amount of the loan to be made under the December 15, 2018 Closing Statement and Addendum, that document, as noted, provides that disbursements would take place every two to three weeks, "provided the stock maintains current support level and does not experience significant downward pressure or price adjustment."

[85].

Further addressing the issue of whether the Lender under the Master Loan Agreement had any obligation to actually lend funds, Section 6.2, Market Conditions, provides, "Should the



Transferred Collateral experience a material Valuation Event or material change in average daily trading volume, Lender shall have the right to cease the funding of the Loan until the circumstances are dissipated or cured. The Transferred Collateral to remain with Lender."

## 2. Duty to Preserve and Protect Collateral

[86].

Section 5.2 of the Master Loan Agreement provides as follows:
5.2 <u>Risk Management.</u> In order to conform with governmental regulations and regulatory protocol regarding lender reserve requirements and risk management, Lender will take those actions warranted to safeguard and preserve Lender's Transferred Collateral as part of its compliance program and general risk management strategy.

[87].

Sklarov made it clear in his testimony at the Hearing that Section 5.2 in his view imposed no restraints on his ability or that of his companies to do whatever they wanted whenever they wanted with the Shares as a general matter at any time under any circumstances. Once Satterfield turned the Shares over to Sklarov and his Entities, the Shares belonged to them and Satterfield had no remaining ownership interest in them. *See* Tr. 1014-1020. Sklarov testified he and his companies were subject to no accountability and could spend the Collateral the next day after receiving it. Tr. 1014-1015.

[88].

When asked at the Hearing what he or his Entities in fact did with the $1,152,538.70 in Proceeds from selling the First Tranche Shares, Sklarov professed not to know, saying they went into general funds and then he didn't know what happened to them. *See* Tr. 1016.

## 3. Duty to Return Collateral Upon Repayment

[89].

Section 2.5 of the Master Loan Agreement provides as follows as to what happens at the end of the Term of the Loan:
2.5 <u>Term of Loan and Maturity Date of Loan</u>

(a) The Loan shall mature, and the Loan Principal Amount together with all accrued Interest thereon shall be due and payable, five (5) years subsequent to the occurrence of the Closing Date (the "**Maturity Date**" or "**Maturity**").

(b) The Maturity Date may be extended by the Lender if agreed to by the Lender in writing. A fee in the amount of two percent (2%) of the Loan Principal Amount (the "**Extension Fee**") shall be



due and payable on the original Maturity Date if the Lender agrees to extend such Maturity Date.

(c) No later than sixty (60) calendar days prior to the Maturity Date, Borrower shall communicate to Lender in writing whether it intends to repay the Loan Principal Amount on the Maturity Date. No later than thirty (30) calendar days prior to the Maturity Date, Borrower shall provide proof of funds to repay the Loan Principal Amount plus any other obligations due to Lender (as detailed in Section 2.9) on the Maturity Date (the "**Proof of Funds**").

[90].

Notably missing from this Section addressing Satterfield's potential repayment of the Loan is any provision requiring the Lenders to return the Collateral to Satterfield upon loan repayment. While Sklarov testified that Respondents had a duty to return the Collateral or the value thereof at the end of the Transaction upon repayment of the Loan, when asked by the Tribunal where the Agreement requires such a return, he was unable to identify any such contractual provision. *See* Tr. at 998. Respondents did not thereafter identify any provision in the Agreement so providing and there does not appear to be any such provision.

## 4. Transfer or Pledge of Collateral

[91].

The Master Loan Agreement repeatedly states that Satterfield is transferring the Shares to Respondents and not merely pledging them. Indeed, the title page of the Master Loan Agreement bears the heading "Non-Recourse Title Transfer Loan." Similarly, the Maser Loan Agreement defines the Shares provided by Satterfield to America 2030 as "Transferred Collateral."

[92].

Section 3.3 of the Master Loan Agreement provides, "Borrower acknowledges that Lender has all the rights associated with the Transferred Collateral, including title and beneficial ownership, and any rights, offerings, options, warrants, dividends, or other distributions associated with the Transferred Collateral."

[93].

Section 10.13 at Page 16 of the Master Loan Agreement, as part of the long run-on "disclaimer" section provides in bold, "LENDER HAS THE PRIVILEGE TO SAID TRANSFERRED COLLATERAL AND LENDER IS NOT ESTOPPED FROM ASSERTING ITS RIGHTS TO SAID COLLATERAL IN ACCORDANCE WITH LENDER'S RISK MANAGEMENT POLICY AND IN ORDER TO PROTECT ITS INTERESTS."

[94].

Section 10.13 provides at Page 17 as follows in bold: "LENDER MAY EXERCISE DOMINION OVER THE TRANSFERRED COLLATERAL IN ACCORDANCE WITH THIS AGREEMENT. BORROWER CONCEDES TO LENDER'S RIGHT TO TRANSACT IN THE TRANSFERRED COLLATERAL."



[95].

    The Master Loan Agreement further provides in bold in Section 10.13, "WHETHER AS A RESULT OF DEFAULT OR OTHERWISE, LENDER IS AUTHORIZED TO CONVERT COLLATERAL IN ORDER TO PROTECT LENDER'S INTEREST AND INDUCE LENDER TO PROVIDE FINANCING."

[96].

    As noted above, however, the April 3, 2018 and May 29, 2018 Addenda refer to the Shares as "Pledged" Collateral and the May 29, 2018 Addendum provides at several places that the Shares provided by Satterfield as the Collateral were provided as a pledge and were not transferred.

[97].

    As we also saw above, the November 30, 2017 Addendum again referred to the Shares as "Transferred" and not as "Pledged."

[98].

    Satterfield contends he believed the Shares were only pledged and that the April 3 and May 29, 2018 Addenda confirm this. He further contends that, while the November 30, 2018 Addendum purported to reverse this, he was pressured into signing that Addendum and Justice Masley found it to be fraudulent.

## 5. Disbursement Date for Loan

[99].

    As to the timing of the Loan, Section 2.6 of the Master Loan Agreement provides that the Closing Date will be no later than three Business Days after the Verification Day, which is defined in Section 1.1 as the Business Day after the Transferred Collateral is received and posted to Lender's account prior to the Closing Date. Section 2.6 provides that the net Loan Principal Amount shall be paid within three Business Days of the Lender's receipt of a confirmation that the Transferred Collateral has been deposited with the Depository Broker.

## 6. Term Sheet for the Transaction

[100].

    Sklarov's Term Sheet (the "Term Sheet") memorializing the anticipated terms of the Agreement set forth such terms as the following:
• "Lender guarantees return of shareholders shares at loan expiration." [Line 12]

• "Shareholder to receive all share appreciation if any, subject to loan agreement." [Line 13]

• "The Lender shall not, at any time, short sell the securities, pledge or lend to others." [Line 7]



[101].

As to the "transfer" of the Co-Diagnostics shares to be the subject of the Transaction, the Term Sheet provided, "Shares will be deposited with Lender at Fidelity Investments USA." [Line 14]

[102].

In its description of "TYPICAL LOAN PROCEDURE," the Term Sheet provided at Step 8 "client transfers shares to custodian account," and at Step 9 "share transfer is confirmed." The Term Sheet, at Line 4, states, "[T]he Co-Diagnostics shares to be provided would be free-trading, unrestricted and unencumbered."

# I. The Parties' Allegations

[103].

The parties' claims and legal theories evolved over the course of the case. In his Amended Statement of Claim, Satterfield alleged the following causes of action:
• Fraud as against Sklarov;

• Aiding and abetting fraud as against the entity Respondents;

• Conversion as against Sklarov and the entity Respondents;

• Conspiracy to commit fraud and conversion as against Sklarov and the entity Respondents;

• Turnover of shares; and

• Unjust enrichment as against Sklarov and the entity Respondents.

[104].

Respondents, by their Answer and Counterclaims, denied Satterfield's claims. Addressing the underlying facts, Respondents admitted Satterfield's central contention that the Shares were only provided by Satterfield as pledged collateral. Respondents alleged:
4. On or about March 30, 2018, Claimant and Respondent duly executed a Master Loan Agreement (MLA) which provided that Respondent would loan Claimant $1.5 Million USD for the exchange of pledged collateral in the form of shares of Co-Diagnostics.

[105].

Through their counterclaims (the "Counterclaims"), Respondents alleged Satterfield's breach of the Agreement, based on three alleged "Violations," alleging, as Respondents contended at the Hearing, that these violations entitle Respondents to retain the Shares held as the Collateral and the Proceeds of Sklarov's sales of First Tranche Shares:
• Violation I: No Liens or Restriction, alleging that Satterfield was supposed to have delivered unrestricted shares, but instead delivered restricted shares;



• Violation II: Events of Default, alleging that Satterfield failed to top-up, i.e., to provide additional collateral when required to do so by the Margin Call; and

• Violation III: Waivers, alleging that Satterfield breached the Agreement by filing an action for injunctive relief before Justice Masley.

[106].

By his Reply to Respondents' Counterclaims, Satterfield denied them, contending that the Agreement is null and void, essentially an instrument of fraud. Satterfield asserted eight Affirmative Defenses:
• First Affirmative Defense, alleging the Agreement's voidness *ab initio* based on fraud, including fraud in the inducement;

• Second Affirmative Defense, alleging that the Counterclaims were barred because Respondents' conduct was fraudulent and criminal;

• Third Affirmative Defense, alleging unclean hands;

• Fourth Affirmative Defense, alleging that Respondents never made the Loan, which Satterfield characterized as being of a fictional nature;

• Fifth Affirmative Defense, alleging frustration of purpose;

• Sixth Affirmative Defense, alleging estoppel;

• Seventh Affirmative Defense, alleging breach of the covenant of good faith and fair dealing; and

• Eighth Affirmative Defense, alleging impossibility of performance.

[107].

By the time of their pre-hearing briefs, the Parties' claims or characterizations thereof had evolved. Satterfield proceeded to the Hearing on essentially the following legal theories:
• That the Agreement does not actually contain a commitment by Respondents, rendering it void, invalid, and unenforceable for such reasons as:

o Illusory agreement;

o Lack of consideration;

o Failure of consideration;

o Fraudulent agreement; and

o criminal/illegal agreement;

• Fraud, including fraud in the inducement and continuing misrepresentations during the course of Sklarov's alleged performance of the Agreement; and



• Violation of the requirements of the UCC, including the requirement that a secured lender safeguard collateral and account for any amount by which the proceeds received through disposition of the collateral exceed the loan amount.

[108].

Respondents in their pre-hearing briefs contended that the Agreement is fully valid and enforceable, that Satterfield is an experienced businessperson, and that unsecured stock loans are very risky for lenders, justifying Respondents in having onerous provisions in their agreements.

[109].

Most fundamentally, Respondents contended that the Transaction was an entirely valid and appropriate one in which the Lenders' had a duty to lend Satterfield the $1.5 million and later the $3.5 million, subject to the provisions of the Agreement and were obligated to return the Shares in kind or the value thereof to Satterfield if and when he paid off the Loan. Respondents contended they were prepared to proceed to loan Satterfield the agreed amount under the Agreement, subject to the terms of the Agreement, but that Satterfield prevented this from happening by his breaches of the Agreement, including particularly his failure to top-up pursuant to the Margin Call to him and his going to court to seek an injunction.

[110].

Satterfield, in his Closing Memorandum of Law focused primarily on the following legal theories
• That the Agreement is fraudulent and should be overturned; and

• That, even if the Agreement is enforceable, Respondents have no right to either bar Claimant from obtaining the balance of the Shares held at V-Stock and Dolfin or to keep the proceeds of the Shares Sklarov has already sold.

[111].

In his Reply Memorandum of Law in Closing, Satterfield contended the Agreement is void and unenforceable based on Respondents' fraud, conversion and unjust enrichment.

[112].

Respondents in their post- hearing briefs focused heavily on what they characterized as Satterfield's lack of credibility and improper motivation and conduct in connection with the Transaction and on their denial of any wrongdoing by themselves.

## J. Evidentiary Hearing and Procedural History

[113].

The Hearing was held in this matter on March 30, 2021 through April 2, 2021 and was conducted by agreement of the parties on the Zoom remote videoconference platform hosted by the Veritext

court reporting service. Satterfield testified and presented expert witness Duncan Levin, Esq. Sklarov testified on behalf of Respondents, along with Respondents' expert witness, Jordan Milev, and non-party witness Chris Livadas of Weiser Asset Management.

[114].

This case was heavily litigated by the Parties throughout. Based on issues presented by the parties, the Tribunal issued some 14 pre-hearing orders, addressing such matters as applications concerning the admissibility of an expert witness's anticipated testimony; discovery disputes; requests for adjournments; schedule changes based upon Respondents' substitution of new counsel several times; considerations as to how best to conduct the hearing on a virtual basis through Zoom, pursuant to the parties' agreement; evidentiary issues; and other such matters.

[115].

Based upon extensive briefing by the Parties, the Tribunal granted Respondents a contested adjournment and rescheduling, leading to the final agreed hearing dates. Considerable attention was focused on discovery issues, including issues concerning document production by Respondents and the deposition of Sklarov, which he made challenging to schedule even though it was limited to four hours and was conducted over remote videoconference.

[116].

Throughout the proceeding, the Tribunal was available, essentially on a 24-hour basis, to address applications and concerns of the parties. The Hearing was only closed after each side confirmed on the record that it had had a full and complete opportunity to present all the witnesses and make all the arguments it wanted and consented to the closing of the Hearing, subject to the submission of post-hearing memoranda. *See* Tr. at 1098-1099.

[117].

Following the parties' submissions of two rounds of post-hearing briefing, the hearing was closed on May 24, 2021 and July 9, 2021 was agreed by the parties as to the due date for the Final Award in this matter.

## K. Analysis and Conclusions

## 1. Summary

[118].

Satterfield has established that the Agreement is unenforceable as illusory and lacking in consideration running from the Lenders to Satterfield. Satterfield has also established Respondents' fraud, conversion of the Shares and the Proceeds, and unjust enrichment through taking and retaining the Shares and Proceeds.

[119].

> Based on such wrongdoing by Respondents, Respondents are liable and hereby directed, jointly and severally, to deliver and restore to Satterfield the Shares held by Respondents or in their name or under their control and the Proceeds in the amount of $1,152,538.70, along with interest at the rate of 9% per annum, simple interest, calculated from December 31, 2018 through the earlier of satisfaction of this Final Award or entry of judgment

## 2. Contract Unenforceability

[120].

> The Agreement is unenforceable as a matter of law. It was illusory and lacking in consideration. Contrary to the impression Sklarov and his Entities created in the term sheet and their description of the Transaction to Satterfield and even to the Tribunal, the Agreement imposed no obligation upon the Sklarov Entities used by Sklarov as "Lenders," including, most centrally, no duty to loan and no duty to return the Collateral or the value thereof at the end of the Term upon Satterfield's repayment of the Loan.

[121].

> While Section 2.1(a) of the Agreement, as amended by the April 3, 2018 Addendum, may appear to require the Lenders to loan Satterfield $3.5 million and Sklarov testified that that is what it does, a closer reading discloses that the "obligation" is only to loan "up to" that amount. Similarly, while Section 2.1(b), again as amended by the April 3, 2018 Addendum, may appear to require the Lender to lend the $3.5 million and, again, Sklarov testified that that is what it does, a closer reading discloses that the $3.5 million is only the amount that the Lender "may make available."

[122].

> Similarly, as to the meaning of Section 2.1(c) of the Master Loan Agreement, it is evident that, while, under the Agreement, Sklarov received from Satterfield some 2,269,795 shares of Co-Diagnostics constituting some 18% of the outstanding shares of the company, he, at the same time, provided through Section 2.1(c) that the Lenders had no obligation to make any loan based on such shares exceeding the first 4.9%.

[123].

> No doubt, if one, like Satterfield, thought he was entering into a legitimate loan agreement that obligated the Lenders to make a loan, as Sklarov and his Entities claim is the case here, one could reasonably read Section 2.1 as setting forth such an obligation, thinking that the limiting language was some kind of hedging boilerplate, as, in effect, Sklarov suggested by his characterization of the Section.

[124].

> Yet that is not what Section 2.1 provides. Section 2.1(a) imposes no obligation on Sklarov's Entities to loan any amount, nor does Section 2.1(b). And Section 2.1(c) greatly limits any potential obligation of the Lenders, even if there otherwise were such an obligation, to make a loan. It means that Sklarov's Entities had no obligation to loan based on the bulk of the Shares Satterfield



provided as Collateral.

[125].

Thus, it is clear that the Agreement, in the place where the topic of the "Loan Principal Amount" is addressed in the Master Loan Agreement—at Section 2.1—does not require the Lenders to make any loan to Satterfield. However, even if one were to read Section 2.1 otherwise, as Sklarov urges, as containing the normal provision in a loan agreement that the lender will make a loan, other provisions of the Agreement, including of the Master Loan Agreement and the Addenda thereto, negate—totally eviscerate—any such obligation on the part of the Lenders. Specifically, other provisions of the Agreement when reviewed with particular care make it clear that whether the Lenders make a loan under the Agreement is totally subject to the unbridled discretion of the Lenders—in effect, of Sklarov.

[126].

Specifically, if there were any question about the fact that the Agreement is illusory and lacking in consideration, it is removed by the many other provisions of the Agreement that provide that the Lenders have no such obligation. Section 10.9 of the Master Loan Agreement provides that the Lender is excused from any obligation thereunder, *inter alia*, by "adverse market conditions," broad and undefined provisions. The December 15, 2018 Closing Statement and Addendum provides that the Lender may change its underwriting standards "at any time up until funding."

[127].

That the Lender is not obligated to make any loan and that any loans are at the Lender's discretion was also evident from the provisions of the December 15, 2018 Closing Statement and Addendum that "LENDER MAY AT ITS SOLE AND ABSOLUTE DISCRETION POSTPONE FUNDINGS OR ORDER FUNDINGS IN TRANCHES. IF LOAN PROCEEDS ARE PAID IN TRANCHES, THEY ARE CALCULATED ON LTV TO MARKET PRICE OF THE SECURITY AT TIME OF DISBURSEMENT AND PAID AT LENDER'S DISCRETION."

[128].

And lest there be any doubt that the Lender is not obligated to do anything, the December 15, 2018 Closing Statement and Addendum provided expressly, "LENDER DOES NOT GUARANTEE FUNDING AND ALL FUNDING IS AT LENDER'S DISCRETION UNTIL DISBURSEMENT." This Addendum further provided that, in the event of any inconsistency with the Master Loan Agreement, the Addendum "WILL BE THE CONTROLLING DOCUMENT."

[129].

The same is true as to the absence of any obligation of the Sklarov Entities to return the Collateral to Satterfield upon his repayment of the Loan at the end of the Term of the Agreement. Section 2.5 of the Agreement addresses Satterfield's repayment of the Loan, but contains no provision requiring the Sklarov Entities to return the Collateral upon Satterfield's repayment of any Loan under the Agreement at the end of the Term, nor does any other provision of the Agreement impose such any such obligation on the Sklarov Entities as Lenders.

[130].

As Satterfield argues, New York law makes illusory agreements that impose no obligation on a contract party unenforceable for lack of mutual obligation. Quite simply, a contract term that is



of a "I'll do it if I feel like it" nature does not constitute a contractual obligation or constitute genuine consideration. The fact that the obligations of Sklarov's Entities under the Agreement are entirely at the discretion of the Lenders, in effect, Sklarov's discretion, precludes the enforceability of the Agreement. *See, e.g., Curtis Properties Corp. v. Greif Companies,* 212 A.D.2d 259, 265, 628 N.Y.S.2d 628 (2nd Dept. 1995); *Dorman v. Cohen,* 66 A.D.2d 411, 415, 413 N.Y.S.2d 377 (1st Dept. 1979); Strong v. Sheffield, 144 N.Y. 392, 396, 39 N.E. 330 (1895); *Structured Capital Solutions, LLC v. Commerzbank AG,* 177 F. Supp. 3d 816 (S.D. N.Y. 2016); *Chiapparelli v. Baker, Kellog & Co.,* 252 N.Y. 192, 200 (1929).

[131].

As the Court said in *Cohen,* mutuality of obligation exists only where "each party [is] bound to some extent." 66 A.D.2d at 415.

[132].

Similarly, as the Court found in *Strong,* a creditor's statement that he would refrain from putting a promissory note out for collection until he wanted payment did not constitute an enforceable agreement:

The [creditor] testified that there was an express agreement on his part to the effect that he would not pay the note away, nor put it in any bank for collection, but (using the words of the [creditor]) I will hold it until such time as I want my money, I will make a demand on you for it. And again: No, I will keep it until such time as I want it. Upon this alleged agreement the [guarantor] indorsed the note. It would have been no violation of the [creditor's] promise if, immediately on receiving the note, he had commenced suit upon it. Such a suit would have been an assertion that he wanted the money and would have fulfilled the condition of forbearance. The debtor and the [guarantor], when they became parties to the note, may have had the hope or expectation that forbearance would follow, and there was forbearance in fact. But there was no agreement to forbear for a fixed time or for a reasonable time, but an agreement to forbear for such time as the plaintiff should elect. The consideration is to be tested by the agreement, and not by what was done under it. It was a case of mutual promises, and so intended. We think the evidence failed to disclose any consideration for the defendant's indorsement, and that the trial court erred in refusing so to rule.

144 N.Y. at 395-396.

[133].

The situation presented in this case falls squarely within this category of purported agreements where a party's promise, the "consideration" it purports to provide, is essentially that it will "perform if it so desires." The Agreement, insofar as concerns the obligations of the Sklarov Entities, is a quintessential situation of parties' agreement to perform—in this instance, to make a loan—if they want to.

[134].

Nor, as is evident from the *Strong* case, does it change this conclusion that Sklarov made the "Loan" of $66,709 to Satterfield on December 26, 2018 from the over $130,000 in Proceeds his Entities had received, as of that time, from selling First Tranche Shares Satterfield had presented to America 2030 as the Collateral for the Loan. As the Court made clear in *Strong,* whether a



purported contract provides for consideration turns on what that contract provides, not on what the purported obligor did. As the Court in *Strong* stated, "The consideration is to be tested by the agreement, and not by what was done under it." 144 N.Y. at 396.

[135].

Indeed, on the evidence presented at the Hearing, under both measures of consideration, the Agreement and what was done, the conclusion is compelling that Sklarov disbursed the $66,709 as part of his fraudulent scheme described hereinafter. Based on the evidence presented, that disbursement was intended to appear to provide some patina of legitimacy and support to Sklarov's soon-to-be announced call for Satterfield to top-up the Collateral and the follow-up Notice of Default to Satterfield.

[136].

New York law similarly makes contracts lacking in consideration, as well as illusory contracts, unenforceable. *See Weiner v. McGraw-Hill, Inc.,* 57 N.Y.2d 458, 464, 443 N.E.2d 441, 444 (1982); *NCSPlus Inc. v WBR Mgt. Corp.,* 37 Misc. 3d 227, 236 (Sup. Ct. N.Y. Cty. 2012); *Granite Partners, L.P. v Bear, Stearns & Co. Inc.,* 58 F Supp 2d 228, 252 (S.D.N.Y. 1999); *Matter of Anchorage Boat Sales, Inc.,* 29 B.R. 275 (Bankr. E.D.N.Y. 1983). Although Respondents argue correctly that New York law disfavors interpreting a contract to be illusory (*see* Respondents' Supplemental Letter-Brief, March 26, 2021), here the illusory nature of the Agreement does not turn on an interpretation of ambiguous terms but on the plain language of the numerous provisions quoted above that make clear the Lenders had no obligation to fund a loan.

[137].

Justice Masley in her June 20, 2019 Decision and Order identified the question of whether Satterfield, in accepting the $66,709, did so knowing the Agreement was fraudulent. Decision and Order at 12. The evidence at the Hearing established that he did not. Satterfield was not aware at that time of Sklarov's sales of his stock and, even at that late date, Satterfield still believed that Sklarov was a legitimate operator and was going to make the Loan, albeit, per the December 15, 2018 Closing Statement and Addendum pursuant to a drawn out schedule of $100,000-300,000 every two-three weeks.

[138].

For example, Satterfield in a December 20, 2018 email to Sklarov shortly before the disbursement, thanked him for updating information and effusively expressed wishes that he have a wonderful holiday season. Satterfield wanted to monetize his Shares and it was starting to happen, he thought, and that was his focus—to get the Loan funded, with the specific timing of disbursements being secondary. He still thought he was dealing with a legitimate lender who was going to lend him the agreed amount.

[139].

The Agreement is similarly unenforceable under the Uniform Commercial Code (UCC), which is clearly applicable to the Transaction. Under the UCC, lenders are required to preserve and protect collateral and generally to return collateral upon the repayment of the loan, failing which a loan is unenforceable. *See, e.g.,* N.Y. U.C.C. Law §§ 9-207, 9-615(d)(1) and 9-602(e)(McKinney). On the evidence presented in the Hearing in this matter, the Lenders failed to comply with such requirements in that the Agreement contained no such obligations on the Lenders to preserve



and protect and ultimately return the Collateral upon repayment and, in addition, because, as discussed hereinafter, Respondents acted fraudulently and in bad faith in the Transaction, an utter lack of the good faith required of creditors under the UCC.

[140].

Respondents' arguments that Satterfield did not allege breach of contract in his Amended Statement of Claim and did not sufficiently raise the issue in the course of this arbitration and that, to the extent he raised the issue, it was only in defense of the Counterclaims, is unfounded. As described above, by the time of the pre-hearing papers, at the Hearing, and in his post-hearing papers, Satterfield repeatedly contended that the Agreement was unenforceable based, *inter alia*, on its illusory nature and a lack of consideration, and that this entitled him to have the Transaction rescinded, such that Respondents should be ordered, *inter alia*, to return the Shares and Proceeds to him.

[141].

The issue of the unenforceability of the Agreement was fully briefed by the parties—both sides—and addressed by them at the Hearing, as well as in their post-hearing papers. At the Hearing, the Tribunal gave both sides considerable leeway to present testimony of their witnesses—essentially Satterfield and Sklarov themselves—as to their respective views as to the language of the Agreement, including what, in their respective views, the Agreement was supposed to provide and did provide.

[142].

Thus, Respondents' argument that the issue of the enforceability of the Agreement is not fully in contention in this arbitration and has not been fairly alleged and developed is unfounded. It is also noteworthy that, in arbitration, including under the Commercial Rules of the American Arbitration Association, pleadings are considerably less important a part of a case than in court, whether under the CPLR or the Federal Rules of Civil Procedure. In arbitration, broad allegations of a few paragraphs or even sentences are all that is required in many cases, although the areas of dispute are generally fleshed out, *inter alia*, as cases proceed through discovery, motion practice, and pre-hearing briefing, as happened in this case.

[143].

Accordingly, Sklarov personally, both directly and through entities or other contrivances he may control, along with the other Respondents in this arbitration, are required and hereby directed to return the Shares and Proceeds to Satterfield.

## 4. Fraud

[144].

Satterfield focused heavily in the case, including at the Hearing, on his contention that Respondents, including Sklarov personally, defrauded him through the Transaction, including through the use of the Agreement and that the Respondents aided and abetted one another in this regard. Satterfield's overriding argument is that the entire Transaction—the Agreement itself— is



a fraud. Satterfield further argues to the Tribunal that it need not actually decide the issue of Respondents' alleged fraud because Justice Masley in her October 30, 2019 Decision and Order found that the November 30, 2018 Addendum was "permeated with fraud." Satterfield contends that this finding by Justice Masley, as he sees it, is binding on this Tribunal.

[145].

Respondents deny any fraud, contest that Justice Masley made any such finding, and argue that, in any event, any such finding, under U.S. Supreme Court precedent, would not be binding on this Tribunal.

[146].

The Tribunal, based on the evidence presented Hearing, has reached its own decision on the issue. Because that decision appears to be consistent with Justice Masley's October 30, 2019 Decision and Order, we do not reach the issue of the meaning of that Decision and Order in this regard or whether it is binding on us in this arbitration.

[147].

Specifically, based upon our independent evaluation of the matter, we have concluded that Satterfield is correct that the Transaction and Respondents' implementation of the Agreement were permeated by fraud which each of the Respondents committed and aided and abetted. Sklarov and through him the other Respondents fraudulently induced Satterfield to enter into the Agreement and to cooperate with Sklarov in convincing VStock to permit Sklarov and his Entities to trade in the Shares.

[148].

Most fundamentally, Sklarov, on his own behalf and that of the other Respondents, falsely represented to Satterfield repeatedly and continuously that Respondents intended to make the Loan to Satterfield if VStock could be convinced to release the Shares for trading. Respondents knew this representation was false when they made it. Satterfield reasonably relied on the representation. Based on this reliance, he (1) worked with Respondents and their lawyers to convince VStock to release the Shares or some of them and (2) agreed to and signed the May 29, November 30 and December 15, 2018 Addenda. As a result of his reliance, Satterfield was damaged by Respondents' said misrepresentations in that he lost control of the Shares and the Proceeds and did not get the Loan except for the $66,709 that Respondents disbursed to him as part of the fraud. Sklarov was able, *inter alia*, to sell most of the First Tranche Shares off-shore and take and hide the Proceeds thereof through his Entities and gain potential access to the Second Tranche Shares except for the Preliminary Injunctions.

[149].

Satterfield's testimony establishes Respondents' above representations and that Sklarov's denials were not credible. There is also ample documentary evidence of the representations. A memorable example was Sklarov's telling Satterfield on June 1, 2018 that, if the Shares could be freed up for trading that day, Respondents would make the Loan to him in the amount of $6 million. Schaeffer told Satterfield in the chat, "$6M to you as of today is riding on this" and Sklarov told him. "We can fund in lump sum if this was received today."

[150].



Similarly, by email dated May 22, 2018, one of Sklarov's attorneys, Paul Crockett, sent Satterfield what was apparently a draft of the May 29, 2018 Addendum, telling him in effect that he should sign the Addendum so as to get the Loan: "This document should aid in us getting approval from VStock and thereby fund the loan." There had been prior discussion of Sklarov's possibly declaring Satterfield in default based on the restricted nature of the Shares, and applying a regulatory exception that permits pledged collateral to be sold despite restrictions. Sklarov's lawyer told Satterfield in this email, in language that seemed to confirm that Sklarov did not intend to declare a default, "It is not our intention to use the default method to fund the loan ...." *See* Claimant's Exh. 48 at 833.

[151].

The next day, Adam Simon, another representative of Sklarov, in an email to VStock on which Sklarov, but not Satterfield was copied, stated, at a time when no Loan had been made, "[T]he shareholder is a lender who received the stock as a pledge for a loan. The loan is now in default." Claimant's Exh. 25.

[152].

Respondents' deceit here is blatant. To induce Satterfield's cooperation in trying to convince VStock to release the Shares for trading, Respondents are telling Satterfield they intend to fund the Loan and will not invoke a default, while, in separate discussions with VStock, they are contending Satterfield is in default—one of the grounds on which they later send Satterfield the Default Notice once they obtained access to the Shares with Satterfield's help.

[153].

Sklarov reiterated his intent to fund in his May 29, 2018 email to Satterfield, transmitting the May 29, 2018 Addendum for signature, stating, "I also see the stock is up today and funding is of course based on the LTV, so this little delay actually helped us, assuming the stock price will stay up." Respondents' Exh. 14.

[154].

Sklarov similarly restated the representation that he would fund the Loan in a July 19, 2018 email to Satterfield and Schaeffer, "Just to update you that we have bifurcated the Securities with one of our affiliate company's and the first 1.1M shares should be free trading in little over 3 months and then we can fund." Respondents' Exh. 43 at 854.

[155].

The falsity of Respondents' representations in this regard was clear from Sklarov's testimony at the Hearing and actions with respect to the Transaction. Most memorable is that, even as he was inducing Satterfield to cooperate with him and his lawyers by telling him that was the way to get the Loan, Sklarov had no intent to make the Loan. Sklarov could not have been clearer at the Hearing that he regarded Satterfield as having breached the Agreement by providing restricted Shares and saw himself as having no obligation to make the Loan. See Tr. at 632-635. His testimony was also clear that he viewed himself as entitled to sell Satterfield's Shares as he wished, regardless of the amount of any loan he actually funded.

[156].

For example, when asked by the Tribunal about the meaning of Section 5.2 of the Master Loan



Agreement, which contains language suggesting that the Lenders have some obligation to "safeguard and preserve" the Collateral, Sklarov pushed back. He said, "So the way I'm reading this is we have no obligation whatsoever to keep funds, because it's ours...." Tr. at 1014.

[157].

Sklarov went on to deny that the Lenders have to "produce any sort of accountability." *Id.* Referring to Section 2.7 of the Master Loan Agreement, Sklarov went on to say, "We don't have any obligation to Mr. Satterfield, we can spend the money the next day if we wanted to according to 2.7." Tr. at 1015.

[158].

Lest there be any question, Sklarov further added, "We don't owe the borrower anything. No accountability." *Id.* Asked whether Respondents were under any constraints by Justice Masley's TRO on January 23, 2019, Sklarov testified that it only blocked them from selling— and, as drafted, imposed no requirement that Respondents "segregate funds or keep funds in any way so we could do whatever we want." Tr. at 1017.

[159].

As to the nature of the Collateral, Sklarov testified:
So under books it's transferred collateral. We can call it whatever we want to but it's transferred collateral, we're the owners of it. Legally under the federal law we are the owners of this collateral.

Tr. at 1020.

[160].

This lack of obligation on Sklarov's part and that of his Entities, as he viewed the matter, and his intent to sell Satterfield's stock and convert the Proceeds is dispositive. From Sklarov's actions as to the Transaction, the inference is inescapable that, at a minimum, if he wasn't obligated to make the Loan, he certainly would not do it but would instead sell Satterfield's shares as quickly as possible.

[161].

Satterfield's reliance on Sklarov's representations—his trust, albeit misplaced, in Sklarov's legitimacy—was evident at the Hearing and from the documentary evidence in the case. It could be seen not only by Satterfield's action in reliance on the representations, but also, for example, from his telling Sklarov in a May 30, 2018 email to him that he appeared to be a "fairly straight shooter." *See* Respondents' Exh. 42 at 170.

[162].

It was even more evident in Satterfield's willingness to take Sklarov's word that, even though the May 29, 2018 Addendum provided that the Loan was a recourse loan, subjecting Satterfield to personal liability, neither Sklarov nor his other Lender entities would go after Satterfield personally in the event of a default: "[W]e will not pursue collections beyond the pledged collateral." *See* Respondents' Exh. 48 at 838.



[163].

    This email also substantiates Satterfield's contention that Sklarov characterized the Shares as pledged as collateral and not as the property of Sklarov or his Entities. In this email, Sklarov tells Satterfield, "[W]e will retain the pledged collateral in the event of a default; that's the recourse."

[164].

    The circumstances around the Transaction made it reasonable for Satterfield to rely on Sklarov's fundamental and consistent representations that he was entering into a loan transaction in which he would borrow money and would get his stock back if he timely repaid the loan. Sklarov, by his website, the Term Sheet, his Linked-in account, his purported membership in a worldwide network of stock loan providers, the proliferation of law firms and lawyers representing him throughout the Transaction, certain language of the Agreement, and his apparent expertise, along with his continuing email and verbal assurances, made it reasonable for Satterfield to rely on Sklarov at least to the limited extent of believing (a) Sklarov's entity would lend him money, and (b) his Shares would serve as "Collateral" to secure the loan and would not be sold except as warranted to address a default.

[165].

    The Tribunal thus finds Satterfield's testimony credible that, in entering into the Transaction, he believed he was entering into a loan agreement and that the Lenders would actually make the Loan to him and would return the stock to him if he repaid the Loan. Indeed, such credibility is buttressed by Sklarov's own testimony, even as late as at the Hearing, that this was the case: that, under the Agreement, the Lenders were obligated to make the Loan and return the Collateral to Satterfield at the end of the Term upon repayment. The Tribunal finds that, in such circumstances, it was reasonable for Satterfield to believe Sklarov's characterization of the Transaction as a legitimate loan transaction and accordingly to be induced to turn over the Shares to Sklarov for purposes of the Transaction.

[166].

    It is noteworthy—and further illustrative of the faith and trust Satterfield placed in Sklarov, believing him to be a high level and respectable professional in the stock loan area— that Satterfield, although, as a senior executive of a public company, he had lawyers available to him, did not consult or otherwise get the advice of an attorney in entering into the Agreement. Satterfield's testimony (*see, e.g.*, Tr.at 248-249) that he thought he was entering into a standardized form of agreement, like a credit card application or a mortgage, with essentially no room to negotiate, was credible.

[167].

    While, as Respondents argue and Sklarov testified at length at the Hearing, there are numerous places where the collateral is referred to as "Transferred Collateral" and numerous places in the Master Loan Agreement where it is stated that America 2030 gets full ownership and rights of ownership in the Shares, the evidence clearly shows that Sklarov, including in other parts of the Agreement and in emails, also repeatedly told Satterfield that the Shares were merely pledged as collateral for the Loan—and that at all times Sklarov and his Entities and documents referred to them as "collateral." Given the totality of Sklarov's communications to Satterfield concerning the Transactions, it is clear that, given Sklarov's true view of the nature of the collateral, as expressed at the Hearing (that it was all and totally his without qualification), Sklarov falsely



misrepresented the nature of the Collateral under the Agreement.

[168].

At bottom, it was not unreasonable for Satterfield to believe, on the basis of Sklarov's and Sklarov's lawyer's statements and conduct and the written characterization of the Agreements as providing for a "Loan" and describing the Shares as "Collateral," and notwithstanding the seeming boilerplate in the Agreement that clearly disclaimed any actual obligation for the Loan to be funded, that he was not at material risk of losing his pledged stock, if he timely repaid any loan amount he received. This is particularly the case because the Loan was to be non-recourse to any of Satterfield's assets beyond the collateral, while the default was predicated in part on Satterfield's failure to pay a margin call amount that, as discussed above, he understood to be approximately $750,000 and that Sklarov appears not to have calculated.

[169].

It is also clear that Satterfield was harmed by Respondents' fraud, including the losses resultant of Sklarov's being able to take control of the First Tranche of Shares and sell most of them and the enabling of Sklarov's taking the Transaction off-shore and putting them in the names of off-shore entities, as well as the general loss of the Shares and Proceeds to Sklarov and his Entities.

[170].

Sklarov's attack on Satterfield's credibility was unpersuasive and ironic. Unpersuasive because Satterfield was clear about what he thought he was doing: pledging the Shares as security for a stock loan based on a .45 LTV, based on the market value of the applicable Shares and the amount of the Loan, the very Transaction Respondents purport to recognize they were required to provide him under the Agreement. And ironic, because the very idea of a stock loan as providing a way for an insider in a public company to monetize part of the share value without having to sell or be perceived by shareholders or management as selling the shares and thereby showing a lack of confidence in his company—this type of transaction, which Respondents now characterize as nefarious and inappropriate of Satterfield to have wanted to have entered into, is the very transaction that Sklarov offered to Satterfield and purports to have delivered.

[171].

Indeed, the Tribunal finds that it is the credibility of Sklarov that, based upon the evidence presented at the Hearing, is suspect, including his numerous misrepresentations to Satterfield to induce him to help convince VStock to recognize the Shares as unrestricted and free and clear for trading and his continuing misrepresentations, including even at the Hearing, that he was obligated under the Agreement and intended to make a Loan and to return the Shares upon Satterfield's repayment of the Loan at the end of the Term.

[172].

Our finding that Sklarov's testimony was not credible in material respects is further buttressed by the disclosure on cross-examination that he had executed an affidavit in a Georgia state court proceeding in which he was the plaintiff, in which he stated:
Plaintiff is indigent with no economic resources whatsoever and is struggling to survive on a daily basis.



Plaintiff has been surviving by selling off his personal belongings and borrowing money.

Plaintiff, along with his family, are indeed on the imminent verge of moving to a shelter and becoming a public charge and a burden on society.

Claimant's Exh. 66.

[173].

Sklarov executed this affidavit on April 13, 2018, when he was in the midst of negotiating the Loans with Satterfield. Sklarov admitted having signed the affidavit and testified in this proceeding that its contents were true (Tr. at 700-701, 943) at the time, emphasizing that the affidavit pertained to his personal assets and that he, like many people—many billionaires—chooses not to have assets in his own name. He testified:
As I mentioned yesterday, I do not own assets under my name. I do not, and most of my life have not, owned assets under my name. I am one of those individuals that chooses not to have assets under my name.

7 There are billionaires who do not own assets under my name and I do not own assets under my name when that affidavit was filed.

Tr. at 942; *see also* 702, 946.

[174].

This testimony and Sklarov's earlier affidavit undermine Sklarov's credibility in asserting that he had large amounts of money available to do the stock loans he was purportedly doing and purported to intend to do and to be prepared to do with Satterfield. It also undermines the impression Sklarov created in his sworn statements to the Tribunal that he had substantial personal funds with which to make the Loan to Satterfield.

[175].

In his witness statement setting forth his direct testimony, he told us, "My business requires me to have funds and facilities available to meet my obligations as a lender, and I make it my practice to do so." Witness statement at ¶6. Then, after asserting that he had substantial financing available and has successfully drawn down on it, he further told us, "In addition, I have substantial independent funds well in excess of my obligations to Mr. Satterfield." *Id.*

[176].

He further acknowledged this point in his initial testimony on cross-examination before he knew Satterfield's counsel had the affidavit:
You put in your direct testimony a statement that you also had personal assets, significant personal assets at that time; is that true? A True.

Tr. at 696-697.

[177].



Also undermining Sklarov's credibility was his refusal, even when asked repeatedly by the Tribunal, to disclose what assets America 2030 had at times when he would have funded the Loans to Satterfield, with Sklarov refusing to answer the question on the ground that Satterfield's attorneys would use the information to go after such assets. *See* Tr. at 704-711. At one point, he testified America 2030, aside from financing sources, had approximately $85 million of "its own assets" as of the time of the Master Loan Agreement. Tr. at 710-711. However, Sklarov again refused to disclose where such alleged funds are. Tr. at 711-715.

[178].

Accordingly, based on their fraud and aiding and abetting fraud, Sklarov personally, both directly and through entities or other contrivances he may control, along with the other Respondents in this arbitration, are required and hereby directed to return the Shares and Proceeds to Satterfield.

[179].

The Tribunal notes that, in reaching the above conclusions, it has not considered the testimony of Satterfield's expert witnesses, Duncan Levin, a former prosecutor with extensive experience in prosecuting fraud cases. The central thrust of Mr. Levin's report and testimony largely related to how to characterize Respondents' actions and omissions at issue in this case, matters quintessentially the responsibility of the Tribunal.

## 5. Conversion

[180].

Satterfield alleges that Sklarov and the other Respondents converted the Shares and Proceeds. Respondents defend, *inter alia*, on the basis that they are not subject to liability for conversion because they hold the Shares and Proceeds as a matter of right under the Agreement. The Master Loan Agreement provides in Section 10.13 at page 16 in bold, "WHETHER AS A RESULT OF DEFAULT OR OTHERWISE, LENDER IS AUTHORIZED TO CONVERT COLLATERAL IN ORDER TO PROTECT LENDER'S INTEREST AND TO INDUCE LENDER TO PROVIDE FINANCING."

[181].

Because, however, the Tribunal has found that the Agreement is unenforceable as illusory and lacking in consideration and on the ground of fraud, such contract-based defenses of Respondents and their contention that they hold the Shares and Proceeds as a matter of right are unfounded. As a result, Satterfield's claim of conversion against Respondents must be determined based on the requirements under New York law for such a claim.

[182].

As Satterfield demonstrated in his papers, "Conversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights," citing *State of New York v. Seventh Regiment Fund*, 98 N.Y.2d 249, 259 (2002). The evidence establishes that this is what Respondents did in this instance with respect to the Shares and the Proceeds. They have no contractual or legal right to them and are wrongly holding them



and withholding them from Satterfield.

[183].

Satterfield has established these elements of his conversion claim. Sklarov, both personally and through the Entity Respondents, obtained dominion and control over the Shares and Proceeds through wrongfully inducing Satterfield to turn them over on the pretense that they would be used as Collateral for the Loan. This was a false pretense and accorded Respondents no legal right to possession of the Shares and accordingly their taking and retention of the Shares and Proceeds are without legal basis and constitute conversion.

[184].

The Tribunal makes this finding against Sklarov personally, as well as against the Entity Respondents, since the evidence establishes that Sklarov, through his personal activities and those of his Entities, exercised dominion and control over the Shares, as did the Entities, moving them around seamlessly from one paper entity to another without being subject to any formalities as to the different Entities.

[185].

For example, when, through the November 30, 2018 Addendum, Sklarov purported to make Bentley Rothschild Nevis the assignee of the Second Tranche Shares, he, in fact, put those shares in an account of Bentley Rothschild Financial, even while providing in the Addendum that, as of the date thereof, Bentley Rothschild Nevis was "in possession" of said 1,134,897 Shares of Co-Diagnostics. and while signing that Addendum on behalf of Bentley Rothschild Nevis.

[186].

Similarly, while, pursuant to the November 30, 2018 Addendum, the First Tranche of the Transaction was assigned to America 2030 Nevis, Sklarov, once the First Tranche Shares were released from restrictions, as noted above, sold most of them through an account of yet a third America 2030 entity of similar name, America 2030 UK, and thereafter moved the Proceeds to some other account(s) or location, the identify of which, even at the Hearing, Sklarov refused to disclose (his testimony of not remembering where over $1 million went being less than credible), nor did Sklarov in his testimony otherwise meaningfully distinguish between the various America 2030 and Bentley Rothschild Entities.

[187].

Accordingly, Sklarov personally, both directly and through entities or other contrivances he may control, and the other Respondents in this arbitration are required and hereby directed to return the Shares and Proceeds to Satterfield.

## 6. Unjust Enrichment

[188].

The standard for a claim of unjust enrichment under New York law is as follows:



To prevail on an unjust enrichment claim under New York law, plaintiff must show: "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.,*373 F.3d 296, 306 (2d Cir. 2004).

*Structured Capital Solutions,* 177 F. Supp. 3d at 831.

[189].

Satterfield has established each of these elements. Except (1) as restrained by Justice Masley's Preliminary Injunctions and (2) for the $66,709 disbursed to Satterfield, Respondents have been enriched by receiving and retaining the Shares and the Proceeds. The Shares belong to Satterfield and he is entitled to the Proceeds from Sklarov's sales of some 905,926 of them. There is no basis in equity or good conscience for Respondents or any of them to retain the Shares or the Proceeds.

[190].

In short, Respondents' retention of the Shares and Proceeds is without any entitlement in contract, law, or equity and hence is unjust, requiring that Respondents return the Shares and Proceeds to Satterfield. Contrary to their contentions, Respondents were at all times on notice, after Satterfield refused to go along with the demand for the top-up, that Satterfield regarded their retention of the Shares and Proceeds as wrongful, including as a product of fraud, and was demanding their return to him.

# 7. Conspiracy

[191].

Satterfield asserted as his fourth cause of action a claim against Respondents for conspiracy to commit fraud and conversion. As Respondents argue, New York law does not provide a private cause of action for civil conspiracy, however, so we deny that claim.

# 8. Unclean Hands

[192].

Respondents have failed to establish their asserted defense that Satterfield has unclean hands in the Transaction and is thereby precluded from recovering the relief set forth herein. The Tribunal finds on the evidence presented that Satterfield at all times acted fairly and appropriately with Respondents with respect to the Transaction. He wanted the stock loan from Respondents, believed it to be lawful and legitimate, trusted Sklarov, and thought Respondents were going to provide the Loan to him but, as described herein, the reality was to the contrary due to the wrongdoing of Respondents led and controlled by Sklarov and participated in by all of them.



# 9. Joint and Several Liability

[193].

The evidence in this matter is clear that, acting through Sklarov, the entity Respondents in this arbitration, along with Sklarov personally, committed the fraud, along with related aiding and abetting, and conversion and are beneficiaries of the unjust enrichment described above. Each of the entity Respondents in the case acted through Sklarov, who was the dominant actor for each of them insofar as concerns the Transaction, and performed actions that constitute bases of the Tribunal's findings of fraud, conversion, and unjust enrichment and each of them aided and abetted said fraud.

[194].

For example, acting through Sklarov, America 2030 and the Bentley Rothschild Entities induced Satterfield to accept and sign the May 29, 2018 Addendum through holding out the prospect that this would lead to getting the Loan funded. These actions by the entity Respondents enabled the events that followed, including the release of the First Tranche Shares to Sklarov for trading and his trading in them and concealing the location of the Proceeds. They also led to the "bifurcation" of the Loan to America 2030 Nevis and Bentley Rothschild Nevis and to Sklarov's putting the Shares in accounts of America 2030 UK and Bentley Rothschild Financial.

[195].

The May 29, 2018 Addendum purported, *inter alia*, to make the Loan of a recourse nature, as opposed to the non-recourse nature provided for in the Master Loan Agreement, and to bifurcate loan into the two Tranches. Speaking on behalf of the America 2030 and the Bentley Rothschild Entities that were purportedly to become Lenders, Sklarov, in order to induce Satterfield's acceptance of the Addendum. promised that none of them would proceed against Satterfield personally for any default notwithstanding the Addendum's provision as to recourse.

[196].

For example, in a May 30, 2018 email to Satterfield, Sklarov stated, *inter alia*, "We can also represent that the other lender will also waive any deficiency and you are hereby indemnified against any claim or loss by us in case they will attempt to pursue for any such deficiency, but as a matter of course and policy they will not." Claimant's Exh. 48. Sklarov's attorney, Paul Crockett, told Satterfield, "[The May 29, 2018 Addendum] should aid in us getting approval from VStock and thereby fund the loan." *Id.* Based on these and other inducements, Satterfield signed the May 29, 2018 Addendum on May 31, 2018. *Id.*; Respondents' Exh. 100.

[197].

Acting on behalf of the entity Respondents, Sklarov also represented to Satterfield in this series of communications in a May 30, 2018 email, "The fact that I already stated in the previous email what we will not pursue any deficiency, is legally binding and enforceable. Emails are legally binding forms of communication and contract." *See* Claimant's Exh. 48. Such actions of the entity Respondents through Sklarov constitute their active performance of actions that are bases of the Tribunal's findings, as described above of fraud, aiding and abetting fraud, conversion, and unjust enrichment.



[198].

The Tribunal accordingly finds Respondents jointly and severally liable to Satterfield on the grounds of fraud, aiding and abetting fraud, conversion and unjust enrichment.

## 10. Relief

[199].

Based upon the Tribunal's findings as to the unenforceability of the Agreement and Respondents' wrongdoing described herein, Satterfield is entitled to have Respondents turn the Shares and Proceeds over to him—and Respondents are directed to do so. This includes (a) the approximately 158,972 First Tranche Shares held at Dolfin, (b) the $1,152,538.70 in Proceeds from the sale by Sklarov of the 905,926 First Tranche Shares in the period December 13, 2018 through January 22, 2019, with interest at 9% per annum, simple interest, calculated from December 31, 2018 through the earlier of satisfaction of this Final Award or entry of judgment and (b) the 1,134,897 Second Tranche Shares held at VStock. Respondents are further directed to immediately facilitate, expedite, and, as necessary, execute any paperwork that may be necessary or expedient to effectuate the turn-over of the Shares to Satterfield.

[200].

Satterfield is not granted damages or other relief beyond than set forth herein. While he alleged generally an entitlement to damages beyond recovery of the Shares and Proceeds, along with interest, he did not establish his entitlement to such damages or any particular amount of damages, nor were Respondents provided fair notice of any such claims.

## 11. Counterclaims

[201].

Respondents' Counterclaims, which are based on Satterfield's alleged breaches of the Agreement, are unfounded, *inter alia*, because, for the reasons set forth above, the Agreement is unenforceable.

[202].

Indeed, Sklarov's assertions in his testimony in this matter that the Transaction was a legitimate one requiring the Lenders to loan the agreed amount to Satterfield and to return the Collateral to Sklarov upon his repayment of the Loans was a continuation of the fraud. The Agreement, as noted above, lacks any such obligations on the part of the Lenders. The inference from the evidence presented at the Hearing is compelling that Sklarov and his Entities never intended to make the Loans or return the Collateral at an appropriate time. Quite to the contrary, Sklarov saw the Transaction as a way to convert and otherwise take from Satterfield his substantial shareholder interest in Co-Diagnostics. Accordingly, the Counterclaims have no merit.



## 12. Alleged Prior Bad Acts

[203].

Satterfield, in support of his claims in this arbitration, relied on certain alleged bad acts of Satterfield, including a prior conviction years ago and alleged wrongdoing by Sklarov in other stock loan transactions. However, other than as to the prior conviction, Satterfield's assertions in this regard were predominantly based upon *allegations* against Sklarov and/or entities associated with him. The Tribunal, in reaching its conclusions in this arbitration, has not relied upon or even considered such allegations relating to other stock loan transactions, nor have we given any weight to Sklarov's criminal conviction of many years ago. Nor have we considered or given weight to Satterfield's prior criminal conviction of many years ago or allegations asserted against him in other cases.

## 13. Charges of the AAA and Arbitrators

[204].

The Tribunal has discretion under [Rule 47(c) of the AAA Commercial Rules](#) to allocate the administrative costs and arbitrators' fees incurred in this proceeding. Since Satterfield is unquestionably the prevailing party, and in the context of the findings herein of Respondents' fraud and other violations of law and the overall nature of Respondents' conduct concerning the Transaction, the Tribunal is awarding Satterfield the fees and other charges of the AAA and compensation of the Arbitrators in this matter. The Tribunal accordingly directs that Respondents pay the fees and other charges of the AAA and the compensation of the Arbitrators.

[205].

Because the arbitration agreement does not authorize the Tribunal to award attorneys' fees and expenses to the prevailing party, and only one party (Satterfield) requested such fee-shifting, Satterfield has predicated his request for fee-shifting on the exception to the "American Rule" where the adverse party engages in bad faith in the conduct of the proceeding, citing *Reliastar Life Ins. Co. of N.Y. v. EMC National Life Co.,* 564 F.3d 81 (2d. Cir. 2009). Although, as noted, we are troubled by Sklarov's testimony and Counterclaims that in effect sought the Tribunal's assistance to enforce his fraudulent scheme, we conclude that Sattterfield has not established his entitlement to recover attorneys' fees under that exception. Consequently, each side is to bear its own attorneys' fees and disbursements other than the fees and charges of the AAA and the compensation of the Arbitrators addressed above.

## 14. Other

[206].



All claims, defenses and arguments of the parties not specifically addressed herein have been determined by the Tribunal to be without merit, consistent with the conclusions set forth herein, or mooted by such conclusions.

## II. FINAL AWARD

[207].

For the foregoing reasons, we award as follows:

1. Within 30 days from the date hereof, Respondents Val Sklarov, America 2030 Capital, LLC, Bentley Rothschild Financial LLC, and Bentley Rothschild Capital Limited Corp. are directed, jointly and severally, to pay to Claimant Brent Satterfield the $1,152,538.70 received from the sale of the 905,926 Shares of Co-Diagnostics included within the First Tranche Shares, along with interest on said amount at the rate of 9 percent per annum, simple interest, calculated from December 31, 2018 through the earlier of satisfaction of this Final Award or entry of judgment.

2. Respondents Val Sklarov, America 2030 Capital, LLC, Bentley Rothschild Financial LLC, and Bentley Rothschild Capital Limited Corp. are directed, jointly and severally, to immediately return to Claimant Brent Satterfield all of the First Tranche Shares in the possession, custody, or control, directly or indirectly, of said Respondents, including any such shares held at Dolfin Financial in London or wherever else they may be. Said Respondents are further directed to immediately facilitate, expedite, and, as necessary, execute any paperwork that may be necessary or expedient to effectuate the return of said Shares to said Claimant.

3. Respondents Val Sklarov, America 2030 Capital, LLC, Bentley Rothschild Financial LLC, and Bentley Rothschild Capital Limited Corp., are directed, jointly and severally, to immediately return to Claimant Brent Satterfield the 1,134,897 Second Tranche Shares held at VStock, Inc or wherever else they may be. Said Respondents are further directed to immediately facilitate, expedite, and, as necessary, execute any paperwork that may be necessary or expedient to effectuate the return of said Shares to said Claimant.

4. The Counterclaims of Respondents Val Sklarov, America 2030 Capital, LLC, Bentley Rothschild Financial LLC, and Bentley Rothschild Capital Limited Corp., are denied and dismissed with prejudice.

5. The fees and expenses of the American Arbitration Association totaling $16,175.00 and the compensation and expenses of the Arbitrators totaling $315,005.00 shall be borne, jointly and severally, by Respondents Val Sklarov, America 2030 Capital, LLC, Bentley Rothschild Financial LLC, and Bentley Rothschild Capital Limited Corp. Therefore, Respondents Val Sklarov, America 2030 Capital, LLC, Bentley Rothschild Financial LLC, and Bentley Rothschild Capital Limited Corp shall reimburse Claimant Brent Satterfield the sum of $170,977.50, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by Claimant Brent Satterfield.

6. This Final Award is in final settlement of all claims, counterclaims, affirmative defenses, and set-offs submitted to this Arbitration. All claims, counterclaims, affirmative defenses, and set-offs

not expressly granted herein are hereby denied.

7. This Final Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which together shall constitute this Final Award.

[208].

We hereby certify that, for purposes of Article I of the New York Convention of 1958 on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award is made in New York, New York, USA.

Date July 9, 2021

# EXHIBIT 31

Home  >  Enforcement  >  Early Intervention  >  Investment Caution List  >  2020  >  Astor Capital Fund Limited (Astor)

◀ **Enforcement**

Find more about
**Early Intervention**

# Astor Capital Fund Limited (Astor)

**Date:**

2020-04-09

**Contact:**

http://www.astorcapitalfund.com

**Background:**

Astor claims to have an office in Vancouver, British Columbia (BC), and offers wealth management and advisory services.

Astor is not registered to trade in, or advise on, securities or derivatives in BC.

We urge BC residents to exercise caution when dealing with firms that are not registered to trade or advise in BC.

For information on how to become better informed about investment products and services, please visit InvestRight at https://www.investright.org.



About    Who We Are    What We Do    News & Events    Careers    Contact Us

**Subscribe to our updates**

Reception: 604-899-6500
Contact Centre: 604-899-6854 or
1-800-373-6393
Fax: 604-899-6506



701 West Georgia Street
P.O. Box 10142, Pacific Centre
Vancouver, BC V7Y 1L2

© 2024 BC Securities Commission

Privacy    |    Sitemap    |    Legal

# EXHIBIT 32



# Rechercher une entreprise au registre

## État de renseignements d'une personne morale au registre des entreprises

Renseignements en date du 2024-07-23 07:39:24

## État des informations

### Identification de l'entreprise

| | |
|---|---|
| Numéro d'entreprise du Québec (NEQ) | 1176785997 |
| Nom | GESTION D'ACTIF ASTOR 3 LTÉE |
| Version du nom dans une autre langue | ASTOR ASSET MANAGEMENT 3 LTD |

### Adresse du domicile

| | |
|---|---|
| Adresse | 18C-3107 av. des Hôtels<br>Québec (Québec) G1W4W5<br>Canada |

### Adresse du domicile élu

| | |
|---|---|
| Adresse | Aucune adresse |

### Immatriculation

| | |
|---|---|
| Date d'immatriculation | 2021-07-27 |
| Statut | Immatriculée |
| Date de mise à jour du statut | 2021-07-27 |
| Date de fin d'existence prévue | Aucune date de fin d'existence n'est déclarée au registre. |

### Forme juridique

| | |
|---|---|
| Forme juridique | Société par actions ou compagnie |
| Date de la constitution | 2021-07-26 Constitution |
| Régime constitutif | QUÉBEC : Loi sur les sociétés par actions (RLRQ, C. S-31.1) |
| Régime courant | QUÉBEC : Loi sur les sociétés par actions (RLRQ, C. S-31.1) |

### Dates des mises à jour

| | |
|---|---|
| Date de mise à jour de l'état de renseignements | 2024-01-05 |
| Date de la dernière déclaration de mise à jour annuelle | 2024-01-05 2023 |

| | |
|---|---|
| Date de fin de la période de production de la déclaration de mise à jour annuelle de 2024 | 2025-02-01 |
| Date de fin de la période de production de la déclaration de mise à jour annuelle de 2023 | 2024-02-01 |

### Faillite

L'entreprise n'est pas en faillite.

### Fusion, scission et conversion

Aucune fusion ou scission n'a été déclarée.

### Continuation et autre transformation

Aucune continuation ou autre transformation n'a été déclarée.

### Liquidation ou dissolution

Aucune intention de liquidation ou de dissolution n'a été déclarée.

### Activités économiques et nombre de salariés

### 1$^{er}$ secteur d'activité

| | |
|---|---|
| Code d'activité économique (CAE) | 9999 |
| Activité | Autres services |
| Précisions (facultatives) | provide business and management consultation and improvement services to clients to implement successfully business strategies and techniques |

### 2$^e$ secteur d'activité

Aucun renseignement n'a été déclaré.

### Nombre de salariés

Nombre de salariés au Québec

Aucun

Proportion de salariés qui ne sont pas en mesure de communiquer en français au travail

Non tenue de déclarer cette information

## Convention unanime, actionnaires, administrateurs, dirigeants, bénéficiaires ultimes et fondé de pouvoir

### Actionnaires

**Premier actionnaire**
Le premier actionnaire est majoritaire.

| | |
|---|---|
| Nom de famille | Bibi |
| Prénom | Jonathan Clifford |
| Adresse du domicile | Ile Perseverance S12-56-4 Mahe Seychelles |
| Adresse professionnelle | |

23/07/2024, 13:46 — Registraire des entreprises : État des renseignements d'une personne morale au registre des entreprises

Case 1:24-mi-00119-VMC   Document 1-3   Filed 12/10/24   Page 199 of 500

## Convention unanime des actionnaires

Il n'existe pas de convention unanime des actionnaires conclue en vertu d'une loi du Québec ou d'une autre autorité législative du Canada.

### Liste des administrateurs

| | |
|---|---|
| Nom de famille | Bibi |
| Prénom | Jonathan Clifford |
| Date du début de la charge | 2021-07-26 |
| Date de fin de la charge | |
| Fonctions actuelles | Administrateur |
| Adresse du domicile | Ile Perseverance S12-56-4 Mahe Seychelles |
| Adresse professionnelle | |

### Dirigeants non membres du conseil d'administration

Aucun dirigeant non membre du conseil d'administration n'a été déclaré.

### Déclaration relative aux bénéficiaires ultimes

Tous les bénéficiaires ultimes de l'entreprise ont été retracés et identifiés.

### Liste des bénéficiaires ultimes

| | |
|---|---|
| Nom de famille | Hryn |
| Prénom | Oksana |
| Autres noms utilisés | |
| Date du début du statut | 2021-07-26 |
| Date de fin du statut | |
| Situations applicables au bénéficiaire ultime | Plus de 75 % des droits de vote |
| Adresse du domicile | Street Kos-Anatolskoho Building 4, Flat 225, Lviv 79066 Ukraine |
| Adresse professionnelle | |

### Fondé de pouvoir

Aucun fondé de pouvoir n'a été déclaré.

### Administrateurs du bien d'autrui

Aucun administrateur du bien d'autrui n'a été déclaré.

## Établissements

Aucun établissement n'a été déclaré.

### Documents en traitement

Aucun document n'est actuellement traité par le Registraire des entreprises.

**Index des documents**

### Documents conservés

| Type de document | Date de dépôt au registre |
|---|---|
| DÉCLARATION DE MISE À JOUR ANNUELLE 2023 | 2024-01-05 |
| DÉCLARATION DE MISE À JOUR ANNUELLE 2022 | 2022-12-15 |
| Déclaration initiale | 2021-08-24 |
| Certificat de constitution | 2021-07-27 |

## Index des noms

| Date de mise à jour de l'index des noms | 2021-07-26 |
|---|---|

### Nom

| Nom | Versions du nom dans une autre langue | Date de déclaration du nom | Date de déclaration du retrait du nom | Situation |
|---|---|---|---|---|
| GESTION D'ACTIF ASTOR 3 LTÉE | ASTOR ASSET MANAGEMENT 3 LTD | 2021-07-26 | | En vigueur |

### Autres noms utilisés au Québec

Aucun autre nom utilisé au Québec n'a été déclaré.

Québec

© Gouvernement du Québec

# EXHIBIT 33

Case 1:24-mi-00119-VMC  Document 1-3  Filed 12/10/24  Page 202 of 500

# Cookies on Companies House services

We use some essential cookies to make our services work.

We'd also like to use analytics cookies so we can understand how you use our services and to make improvements.

Accept analytics cookies          Reject analytics cookies

**View cookies (/help/cookies)**

## ⚜ GOV.UK

# Find and update company information

Companies House does not verify the accuracy of the information filed (http://resources.companieshouse.gov.uk/serviceInformation.shtml#compInfo)
Advanced company search (/advanced-search)

# Jonathan Clifford BIBI

## Filter appointments

☐

Current appointments

Apply filter

# Total number of appointments 1

Date of birth
July 1984

---

**PRIME CONSULTING SOLUTIONS LTD (14720169)**

Company status  **Active**

Correspondence address  **House No 04, Ile Perseverance, Mahe, Seychelles**

Role Active  **Director**

Appointed on  **11 September 2023**

Nationality  **Citizen Of Seychelles**

Country of residence  **Seychelles**

Occupation  **Technician**

Tell us what you think of this service (https://www.smartsurvey.co.uk/s/getcompanyinformation/) Is there anything wrong with this page? (/help/feedback?sourceurl=https://find-and-update.company-information.service.gov.uk/officers/yTu2qGnLX7DbvX1nQhrAbTwPWmo/appointments)

Policies Link opens in new tab

Cookies (https://beta.companieshouse.gov.uk/help/cookies)

Contact us Link opens in new tab

Accessibility statement (https://beta.companieshouse.gov.uk/help/accessibility-statement)

Developers Link opens in new tab

Built by Companies House

© Crown copyright

# EXHIBIT 34



# Jonathan Bibi

**Jonathan Bibi** (born 28 July 1984) is a Seychellois football player. He is a defender on the Seychelles national football team.

Bibi helped Seychelles win the football tournament at the 2011 Indian Ocean Games in August 2011.[1]

## References

1. "Seychelles win first football gold medal" (https://web.archive.org/web/20180806054953/http://www.nation.sc/index.php?art=24570). Seychelles Nation. 13 August 2011. Archived from the original (http://www.nation.sc/index.php?art=24570) on 6 August 2018. Retrieved 19 December 2011.

## External links

- Jonathan Bibi (https://web.archive.org/web/20150905/http://www.fifa.com/fifa-tournaments/players-coaches/people=196459/index.html) – FIFA competition record (archived)
- Jonathan Bibi (https://www.national-football-teams.com/player/5889.html) at National-Football-Teams.com

Retrieved from "https://en.wikipedia.org/w/index.php?title=Jonathan_Bibi&oldid=1217957823"

# EXHIBIT 35

This is the html version of the file https://www.sos.mo.gov/CMSImages/Securities/orders/AP-16-18.pdf. Google automatically generates html versions of documents as we crawl the web.

Tip: To quickly find your search term on this page, press **Ctrl+F** or ⌘-**F** (Mac) and use the find bar.

**Page 1**

STATE OF MISSOURI

OFFICE OF SECRETARY OF STATE

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | |
| | ) | |
| ZULUTOYS LIMITED, d/b/a RBOptions.com; | ) | |
| JORDAN GATSBY; and JOSEPH WOLF, | ) | |
| | ) | |
| *Respondents.* | ) | AP-16-18 |
| | ) | |
| Serve: | ) | |
| | ) | |
| Zulutoys Limited, d/b/a RBOptions | ) | |
| Trust Company Complex | ) | |
| Ajeltake Road, Ajeltake Island | ) | |
| Majuro, MH96960 Marshall Islands | ) | |
| | ) | |
| Jordan Gatsby | ) | |
| Trust Company Complex | ) | |
| Ajeltake Road, Ajeltake Island | ) | |
| Majuro, MH96960 Marshall Islands | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Joseph Wolf | ) | |
| Trust Company Complex | ) | |
| Ajeltake Road, Ajeltake Island | ) | |
| Majuro, MH96960 Marshall Islands | ) | |

)

and via e-mail: legal@rboptions.com                                    )

## ORDER TO CEASE AND DESIST AND ORDER TO SHOW CAUSE WHY RESTITUTION, CIVIL PENALTIES, AND COSTS SHOULD NOT BE IMPOSED

On April 11, 2016, the Enforcement Section of the Missouri Securities Division of the Office of Secretary of State ("Enforcement Section"), through Director of Enforcement John R. Phillips, submitted a Petition for Order to Cease and Desist and Order to Show Cause why Restitution, Civil Penalties, and Costs Should not be Imposed. After reviewing the petition, the Commissioner issues the following order:

1

---

**Page 2**

### I. ALLEGATION OF FACTS

The petition alleges the following facts:

#### A. Respondents and Related Parties

1. RBOptions.com ("RBOptions") is a website that is purported to be owned by Zulutoys Limited ("Zulutoys"), Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands, MH96960.

2. Joseph Wolf ("Wolf") is listed as the Canada & Europe Desk Manager on RBOptions website.

3. Jordan Gatsby ("Gatsby") is purported to be a broker at RBOptions.

4. As used herein, the term "Respondents" refers to Wolf, Gatsby, and Zulutoys d/b/a RBOptions.

5. RB Secured Processing LTD ("RBSP") is a private limited company in the United Kingdom, which was incorporated on November 16, 2015. The registered office address of RBSP is Office 3.11, Nwms Center 3rd Floor, 31 Southampton Row, London, UK, WC1B 5HJ. The director is listed as Jonathan Bibi, who has an address of S1256, Ft. No. 4 ILE Perseverance, Vitoria Mahe, Seychelles, 0000. Zulutoys is listed as the only member with share capital on the registration documents.

6. Michael Furlong was purported to be a Legal Officer for RBOptions Legal Department, 161 Bay Street, 26th Floor, Toronto, Canada M5J 2S1.

7. At all times relevant to this matter, Respondents have never been registered in Missouri as investment advisers, investment adviser representatives, broker-dealers, broker-dealer agents, and/or issuer agents.

8.    At all times relevant to this matter, there was no registration, granted exemption, or notice filing indicating status as a "federal covered security" for the securities offered and/or sold by Respondents.

9.    According to the National Futures Association's BASIC database, at all times relevant to this matter, Respondents were not registered as any type of commodity merchant or intermediary in connection with futures trading.[1]

### B.    Enforcement Section Investigation

10.   From in or around January 14, 2016 through March 31, 2016, the Enforcement Section was in contact with and received information from an 82-year-old Chesterfield, Missouri

[1] BASIC is a database containing information regarding the registration status of futures commission merchants or intermediaries with the Commodities Futures Trading Commission.

2

---

**Page 3**

resident ("MR"). Information received from MR revealed the following:

a.    In or around July 2014, MR began looking for a way to make money by trading online. MR was not looking to purchase and hold stocks;

b.    MR wanted to find a company that would assist MR in making trades, because MR did not understand all of the different kinds of investments;

c.    On or about July 22, 2014, after reviewing RBOptions' website, MR contacted RBOptions via telephone at 647-846-8237 to discuss making an investment. During the telephone call, an RBOptions representative told MR that if she did not know how to make trades, a broker could make all of the trades for MR;

d.    Gatsby was assigned as MR's broker; and told MR "there was something happening the next week" and Gatsby could make MR "some good money";

e.    Gatsby told MR that RBOptions would match any investment amount made by MR, and that RBOptions would "guarantee to cover any losses, if that happened";

f.    MR's intention was to only invest $250, which was the minimum amount one could invest with RBOptions, but Gatsby "pitched a hard sale" and tried to persuade MR to invest an additional $10,000;

g.    MR declined to invest the additional $10,000, but Gatsby charged MR's credit card for $10,000, without authorization from MR;

h.    MR complained to Gatsby's supervisor and MR's $10,000 was refunded;

i.      In or around September 2014, MR's RBOptions account statement showed multiple $5,000 trades, all of which had made $3,800 in profit, except for one trade that lost $750;

j.      Since MR's investment appeared to be doing well, MR decided to invest for a second time with RBOptions, on or about November 17, 2014 for $10,000, via MR's credit card;

k.      A few weeks later, when some of MR's "trades were about end," MR began having serious health issues and attempted to withdraw MR's money;

l.      MR contacted RBOptions via telephone and was told Gatsby no longer worked there and was assigned a new broker;

m.      RBOptions switched MR to a total of six different brokers. MR asked each different broker to withdraw MR's investment money, but they would not release MR's funds;

3

Page 4

n.      Wolf was the last broker assigned to MR;

o.      In or around January 2015, MR discovered that RBOptions had withdrawn $5,000 from MR's credit card without MR's authorization;

p.      MR has not been able to contact RBOptions via phone since early 2015;

q.      MR has requested a refund of all investment monies both via telephone and e-mail without success; and

r.      Including fees, MR has lost a total of $15,450 investing with RBOptions.

### C.      Bank Records

11.      A review of MR's bank records confirms MR's expenditures of $15,450 with RBOptions.

### D.      RBOptions.com

12.      As of March 31, 2016, RBOptions' website states and/or contains the following:

a.      "The website is owned by Zulutoys Limited in Marshall Islands…";

b.      "The clearing services with respect to the website and the Company [Zulutoys]

are provided by RB Secured Processing LTD. UK company number 09872729…";

c.     "Call us +1-647-846-8231";

d.     "RBOptions offers over 100 tradable assets including Forex, Stocks, Commodities and Indices.";

e.     "Keep up to date with Market movement and indicators with RBOptions' daily market review.";

f.     "At the heart of RBoptions' core values are honesty and straight forward trading experience. We believe any trader should have immediate access to any invested funds. That's why RBOptions is the *only* binary options broker to offer *same day* withdrawal approvals! Once your account is verified (See compliance policy here) you will receive your funds as early as 24 hours (with Skrill) after a withdrawal request was submitted. No hassle. No questions asked. This is the RBOptions Guarantee.";

g.     "RBoptions is proud to be the first and ONLY binary options broker to GUARANTEE same day withdrawal approvals!";

4

---

**Page 5**

h.     "After the economic crises of recent years, we feel that transparent pricing, straight forward trading, and responsible financial handling is of the utmost importance. That's why we've assembled a team of uncompromisingly professional traders, investors, and financial gurus to offer the highest level of trading experience. You never have to worry about any thing [sic] other than your trades. We take care of the rest.";

i.     "RBoptions offers the highest paying platform in the industry - Up to 88% profit per successful trade, where most broker [sic] out there fall behind with a 70% payout average. Additionally, RBoptions offers an exclusive Stop-Loss feature allowing you to sell your position before expiry to cap potential losses if your understanding of the market had changed mid-trade.";

j.     "All traders at RBoptions will have access to 24/7 live chat support from our customer service team. For customers wishing to trade in higher volumes, a 24/7 dedicated management team is available, consisting of 2 senior brokers and a dedicated customer service representative to ensure your inquiries and trading requirements are met 24/7.";

k.  A "USA Toll Free" phone number of 866-443-4797;

l.  A world map depicting RBOption's locations under the "Contact Us" tab. The map has dots over what appear to be New York and Toronto in North America;

m.  "All personal information and financial transactions are secured by a cutting edge 256 Bit SSL Encryption. The same used in leading financial institutions such as HSBC, J.P. Morgan Chase and TD Waterhouse."; and

n.  An investigator from the Enforcement Section, clicked on the "Open Account" button at RBOptions.com and the following message was displayed; "Unfortunately RBOptions does not accept registration or traders from your country of residence."

13.  Respondents both offered commodity contracts and securities, and acted as a broker-dealer and a commodity merchant or board of trade for transactions. Respondents offered a profit and guaranteed against any losses, through the trading of binary options on their platform. These binary options derived their value from currencies or commodities. If a currency or commodity performs as the investor speculated, the investor gains some amount of money (up to 100% of the investment), but loses the entire investment if the currency or commodity does not perform as the investor speculated.

14.  On February 5, 2016, the Enforcement Section sent a letter of inquiry to Respondent RBOptions via US Post Office international mail and e-mail. The letter requested a claim of exemption from registration or exception from definition upon which Respondents relied in offering unregistered securities in the State of Missouri. The letter also requested additional information about offers to any other Missouri residents.

5

Page 6

15.  Between February 5, 2016 and March 24, 2016, the Enforcement Section was in contact with RBOptions via e-mail, in regards to its letter of inquiry, and an incomplete response was received from RBOptions. RBOption's initial response and the subsequent e-mails transpired as follows:

a.  On February 5, 2016, the Enforcement Section received an e-mail from the "Compliance Department" at compliance@rboptions.com, stating a reference number had been created to track our inquiry, ticket number 39173;

b.  On February 8, 2016, the Enforcement Section received an e-mail from the "Legal Department" at legal@rboptions.com, stating "…that for the last 12 months RBOptions trading as Zulu Toys has not accepted, and still does not accept, any clients from Missouri and the USA as a whole…All USA IPs are blocked and USA customers cannot open up trading accounts…Further we have no customers that are resident [sic] of Missouri." The e-mail was written by Michael Furlong,

Legal Officer at RBOptions. The e-mail listed RBOptions' Legal Department as having an address of 161 Bay Street, 26 th Floor, Toronto, Canada;

c.    On February 8, 2016, the Enforcement Section sent an e-mail to RBOptions' Legal Department that contained the following:

    i.    a statement that it has supporting documents regarding MR's account;

    ii.    the name and e-mail address associated with MR's account;

    iii.    a request for all account and transaction information related to MR's account; and

    iv.    another request to provide all information from the Enforcement Section's February 5 th letter of inquiry;

d.    On February 9, 2016, the Enforcement Section received an e-mail from the Legal Department/Michael Furlong at RBOptions that stated, among other things, the following:

    i.    MR's account "was opened before last year when we blocked USA funds";

    ii.    MR's "account was not been logged into [sic] and nor has there been any transactions or requests since March of last year"; and

    iii.    that MR's account does not have a valid credit card associated with it so no funds in the account can be refunded until wire details have been received from MR;

6

**Page 7**

e.    On February 9, 2016, the Enforcement Section sent an e-mail to RBOptions Legal Department which stated:

"If RBOptions is seeking a method to refund money to Missouri investors, the Missouri Securities Division has a Restitution Fund which may be used for such a process. Please send a detailed description of all accounts that have been closed for Missouri clients and for which RBOptions is holding money, including but not limited to the one for MR. The Missouri Securities Division can then contact investors and distribute the money. Please advise if this is acceptable. If so, we will supply you with appropriate wire instructions";

f.      On February 22, 2016, the Enforcement Section sent an e-mail to RBOptions Legal Department asking the status of their response;

g.      On March 24, 2016, the Enforcement Section sent an e-mail to RBOptions Legal Department stating "We still have not received a response to our offer to assist RPOptions.com [sic] in refunding investment monies to Missouri investors/clients. Please let us know how you would like to proceed as soon as possible."; and

h.      After February 9, 2015, the Enforcement Section has not received any further communications from RBOptions.

### E.    Additional Findings

16.    The phone number on RBOptions website, 647-846-8231 is to a "pay as you go" cell phone based in Toronto, Ontario, Canada.

17.    The Ontario Securities Commission added RBOptions to their Investors Warning List on March 18, 2014. The Warning List is located on the Commission's website, and contains individuals and companies that appear to be engaging in activities that may pose a risk to investors. Specific RBOptions information from the list states:

> "RBOptions doing business as www.rboptions.com is not registered to engage in the business of (i) trading in securities or (ii) advising anyone with respect to investing in, buying or selling securities."

18.    On February 19, 2016, the Financial and Consumer Affairs Authority of Saskatchewan, Canada issued a decision that contained among other things, the following findings and orders:

a.      Zulutoys and RBOptions acted as dealers by engaging in the business of trading in securities or exchange contracts or holding themselves out as engaging in the business of trading in securities or exchange contracts in Saskatchewan;

7

**Page 8**

b.      At no time were Zulutoys and RBOptions registered as a dealer in accordance with *The Securities Act, 1988;*

c.      All exemptions in the Saskatchewan securities law do not apply to Zulutoys and RBOptions;

d.      Zulutoys and RBOptions shall cease trading and/or acquiring securities or

            exchange contracts;

    e.      Zulutoys and RBOptions shall pay an administrative penalty in the amount of $25,000;

    f.      Zulutoys and RBOptions shall pay compensation to each person or company found to have sustained financial loss as a result, in whole or in part, of Zulutoys and RBOptions contraventions of the Act, in an amount to be determined; and

    g.      Zulutoys and RBOptions shall pay the costs relating to the hearing in this matter.

19.     In connection with the offer and/or sale of securities, Respondents failed to disclose to MR, among other things, the following:

    a.      Respondents were not registered to offer or sell securities in the State of Missouri;

    b.      that the securities were not registered or exempt from registration in the State of Missouri; and

    c.      Respondents were not registered with the Commodity Futures Trading Commission.

## II. COMMISSIONER'S DETERMINATION AND FINDING

### Multiple Violations of Offering and Selling Unregistered, Non-Exempt Securities

**THE COMMISSIONER DETERMINES** that Respondents offered and sold unregistered, non-exempt securities in the State of Missouri to MR when Respondents offered and sold binary options to MR.

20.     This activity constitutes the offer to sell and sale as those terms are defined in Section 409.1-102 (26), RSMo (Cum. Supp. 2013). [2]

21.     "[P]ut, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency" is enumerated in the list of items that are securities in Section 409.1-102(28).

---

[2] Unless otherwise specified, all statutory references are to the 2013 cumulative supplement to the Revised Statutes of Missouri.

8

---

**Page 9**

22.     The investments Respondents offered and sold to MR, are either binary options deriving whatever value may have existed from an underlying asset, or a commodity or foreign currency. The investments offered and sold were securities as that term is defined in Section 409.1-102(28).

23.   At all times relevant to this matter, there was no registration, granted exemption, or notice filing indicating status as a "federal covered security" for the securities offered and sold by Respondents.

24.   Respondents offered and sold securities in Missouri without these securities being (1) a federal covered security, (2) exempt from registration under Sections 409.2-201 or 409.2-203, or (3) registered under the Missouri Securities Act of 2003.

25.   At the time Respondents engaged in the conduct set forth above, MR was over sixty years old and was an elderly person as that term is defined under Section 409.6-604(d)(3)(B).

26.   Respondents offered and sold unregistered securities in violation of Section 409.3-301.

27.   Respondents' conduct in violation of Section 409.3-301 constitutes an illegal act, practice, or course of business, and such conduct is, therefore, subject to the Commissioner's authority under Section 409.6-604.

**Multiple Violations of Transacting Business as an Unregistered Broker-Dealer**

28.   **THE COMMISSIONER FURTHER DETERMINES** that Respondent RBOptions transacted business as an unregistered, non-exempt broker-dealer in the State of Missouri by:

   a.   opening a trading account for MR; and

   b.   effecting transactions in the account on behalf of MR.

29.   These activities constitute transacting business as a broker-dealer in the State of Missouri under Section 409.1-102(4).

30.   At all times relevant to this matter, Respondent RBOptions was not registered as a broker-dealer in the State of Missouri.

31.   Respondent RBOptions transacted business in Missouri without being registered or exempt from registration as a broker-dealer in violation of Section 409.4-401(a).

32.   Respondent RBOptions' conduct in violation of Section 409.4-401(a) constitutes an illegal act, practice, or course of business, and such conduct is, therefore, subject to the Commissioner's authority under Section 409.6-604.

9

**Page 10**

**Multiple Violations of Employing Unregistered Broker-Dealer Agents**

33.   **THE COMMISSIONER FURTHER DETERMINES** that Respondent RBOptions employed or associated with multiple agents, who on behalf of the Respondent RBOptions offered and/or sold securities to MR.

34.   Respondent RBOptions' activities constitute employing or associating with an agent in the State of Missouri under Section 409.4-402(d).

35.   At all times relevant to this matter, the agents who Respondent RBOptions employed or with whom Respondent RBOptions was associated were not registered as a broker-dealer agents in the State of Missouri.

36.   Respondent RBOptions employed or associated with unregistered agents who transacted business in the State of Missouri in violation of Section 409.4-402(d).

37.   Respondent RBOptions' conduct in violation of Section 409.4-402(d) constitutes an illegal act, practice, or course of business, and such conduct is, therefore, subject to the Commissioner's authority under Section 409.6-604.

**Multiple Violations of Section 409.5-501 - Securities Fraud**

38.   **THE COMMISSIONER FURTHER DETERMINES** that in connection with the offer, sale or purchase of a security, Respondents employed a device, scheme, or artifice to defraud, made untrue statements of material fact or omitted to state a material fact necessary in order to make the statement made, in light of the circumstances under which it is made, not misleading, and engaged in multiple acts, practices, or courses of business that would operate as a fraud or deceit upon another person by, among other things, the following:

   a.   In connection with the offer, sale or purchase of a security, Respondents made untrue statements of material fact or omitted to state a material fact necessary in order to make the statement made, in light of the circumstances under which it is made, not misleading by, among other things:

      i.   Telling MR that "there was something happening the next week" and Gatsby could make MR "some good money";

      ii.   Telling MR that RBOptions would match any investment amount made by MR, and that RBOptions would "cover any losses, if that happened";

      iii.   Creating an account statement for MR that showed multiple $5,000 trades, all of which had made $3,800 in profit, except for one trade that lost $750;

      iv.   Telling MR when MR sought a withdrawal via phone that Gatsby no longer worked there and was assigned a new broker;

10

v.      Switching MR to a total of six different brokers in an effort to keep MR from attempting to withdraw MR's investment money;

vi.      Not releasing MR's funds when MR requested such a withdrawal on at least seven occasions;

vii.      Making an unauthorized charge of $5,000 on MR's credit card;

viii. Ceasing to communicate with MR after MR made multiple attempts to withdraw MR's investment funds; and

ix.      Stating on the RBOptions.com website the following:

       1.      "At the heart of RBoptions' core values are honesty and straight forward trading experience. We believe any trader should have immediate access to any invested funds. That's why RBOptions is the *only* binary options broker to offer *same day* withdrawal approvals! Once your account is verified (See compliance policy here) you will receive your funds as early as 24 hours (with Skrill) after a withdrawal request was submitted. No hassle. No questions asked. This is the RBOptions Guarantee.";

       2.      "RBoptions is proud to be the first and ONLY binary options broker to GUARANTEE same day withdrawal approvals!";

       3.      "After the economic crises of recent years, we feel that transparent pricing, straight forward trading, and responsible financial handling is of the utmost importance. That's why we've assembled a team of uncompromisingly professional traders, investors, and financial gurus to offer the highest level of trading experience. You never have to worry about any thing [sic] other than your trades. We take care of the rest."; and

       4.      "RBoptions offers the highest paying platform in the industry - Up to 88% profit per successful trade, where most broker [sic] out there fall behind with a 70% payout average. Additionally, RBoptions offers an exclusive Stop-Loss feature allowing you to sell your position before expiry to cap potential losses if your understanding of the market had changed mid-trade."

b.      Any and all of the above statements are either untrue or misleading because of omissions of material fact, including, but not limited to:

i.      Omitting that Respondents were not registered nor exempt from registration as a broker-dealer firm in the State of Missouri even though they are required to be registered or exempt;

11

Page 12

    ii.    Omitting that the securities Respondents purported to sell to MR were not registered nor exempt from registration in the State of Missouri, even though the securities required registration or exemption;

    iii.    Failing to inform MR as to the risks associated with the investment, including but not limited to:

        1.    The fact that currency, currency option, and binary option trading are highly volatile investments; and

        2.    The volatility of the securities offered through RBOptions may greatly reduce the funds in investor's RBOptions accounts;

    iv.    In addition, Respondents failed to provide any substantiation or documentation for promised returns.

    c.    Further, in connection with the offer, sale or purchase of a security, Respondents employed a device, scheme, or artifice to defraud and engaged in multiple acts, practices, or courses of business that would operate as a fraud or deceit upon another person, when they engaged in lulling MR in order avoid or delay detection by:

    i.    Telling MR when MR sought a withdrawal via phone that Gatsby no longer worked there and was assigned a new broker;

    ii.    Switching MR to a total of six different brokers in an effort to keep MR from attempting to withdraw MR's investment money;

    iii.    Not releasing MR's funds when MR requested such a withdrawal on at least seven occasions;

    iv.    Making an unauthorized charge of $5,000 on MR's credit card; and

    v.    Ceasing to communicate with MR after MR made multiple attempts to withdraw MR's investment funds.

39.    At the time Respondents engaged in this conduct, MR was over sixty years old and was an elderly person as that term is defined under Section 409.6-604(d)(3)(B).

40.    Respondents employed a device, scheme, or artifice to defraud, made untrue statements of material fact or omitted to state a material fact necessary in order to make the statement made, in light of the circumstances under which it is made, not misleading and engaged in multiple acts, practices, or courses of business that would operate as a fraud or deceit upon MR in violation of Section 409.5-501.

12

41.     Respondents' actions in violation of Section 409.5-501 constitute an illegal act, practice, or course of business, and such conduct is, therefore, subject to the Commissioner's authority under Section 409.6-604.

**Multiple Violations of Offering and Entering into Prohibited Commodities Contracts**

42.     **THE COMMISSIONER FURTHER DETERMINES** that Respondents offered to enter into, entered into, or confirmed the execution of, foreign currency commodity contracts and foreign currency commodity option contracts with MR, without being exempt or excluded pursuant to Sections 409.803.2 and 409.806 RSMo (2000), when, among other things, they:

a.      Solicited investments in accounts where currency and currency options trading was to occur;

b.      Accepted payment for currency and currency options trades;

c.      Confirmed investments in accounts meant for currency and currency options trading via phone; and/or

d.      Logged purchases of currency and currency options trades in customer accounts.

43.     This activity constitutes an offer to sell and sale as those terms are defined in Sections 409.800(11) and (14), RSMo (2000).

44.     Respondents offered and sold commodity contracts and commodity option contracts as those terms are defined in Sections 409.800(5) and (9), RSMo (2000).

45.     Respondents offered to enter into, entered into, or confirmed the execution of, foreign currency commodity contracts and foreign currency commodity option contracts in violation of Section 409.803.1, RSMo (2000).

46.     The actions of Respondents in offering and entering into prohibited commodities contracts constitute an illegal act or practice and thus such actions are subject to the Commissioner's authority under Section 409.823, RSMo (2000).

**Multiple Violations of Engaging in Unregistered and/or Unlicensed Commodity Merchant Business**

47.     **THE COMMISSIONER FURTHER DETERMINES** that Respondents engaged in the commodity merchant business with, among others, MR, when, among other things, they failed to register with the Commodity Futures Trading Commission as required to qualify

as a registered commodity merchant.

48.     This activity constitutes engaging in a trade or business or otherwise acting as a
        commodity merchant as that term is defined in Section 409.800(8), RSMo (2000).

13

**Page 14**

49.     **THE COMMISSIONER FURTHER DETERMINES** that Respondents created and
        maintained a board of trade, or place for the trading of commodity contracts or
        commodity option contracts required to be traded on or subject to the rules of a contract
        market designated by the Commodity Futures Trading Commission and which had not
        been so designated, when, among other things, they engaged in buying or selling
        commodities or receiving the same for sale.

50.     This activity constitutes acting as a board of trade as that term is defined in Section
        409.800(2), RSMo (2000).

51.     Respondents conducted unregistered commodity merchant business in violation of
        Sections 409.808.1 and 409.808.2, RSMo (2000).

52.     The actions of Respondents in conducting unregistered commodity merchant business
        constitute an illegal act or practice and thus such actions are subject to the
        Commissioner's authority under Section 409.823, RSMo (2000).

### Multiple Violations of Engaging in Prohibited Acts in Connection with the Sale of Commodity Contracts – Commodities Fraud

53.     **THE COMMISSIONER FURTHER DETERMINES** that in connection with the
        purchase or sale of, the offer to sell, the offer to enter into, or the entry into of, a
        commodity contract or commodity option contract related to foreign currency as
        described above, Respondents cheated or defrauded, attempted to cheat or defraud, or
        employed a device, scheme or artifice to cheat or defraud a Missouri investor, made one
        or more of the following untrue statements of material fact, or engaged in a transaction,
        act, practice or course of business which would operate as a fraud or deceit upon a
        Missouri investor, or misappropriated or converted the funds, security or property of a
        Missouri investor by, among other things:

        a.      Making one or more of the following untrue statements of material fact, or
                engaging in a transaction, act, practice or course of business which would operate
                as a fraud or deceit upon a Missouri investor, or misappropriated or converted the
                funds, security or property of a Missouri investor by, among other things:

                i.      Telling MR that "there was something happening the next week" and
                        Gatsby could make MR "some good money";

ii.     Telling MR that RBOptions would match any investment amount made by
        MR, and that RBOptions would "cover any losses, if that happened";

iii.    Creating an account statement for MR that showed multiple $5,000 trades,
        all of which had made $3,800 in profit, except for one trade that lost $750;

14

iv.     Telling MR when MR sought a withdrawal via phone that Gatsby no
        longer worked there and was assigned a new broker;

v.      Switching MR to a total of six different brokers in an effort to keep MR
        from attempting to withdraw MR's investment money;

vi.     Not releasing MR's funds when MR requested such a withdrawal on at
        least seven occasions;

vii.    Making an unauthorized charge of $5,000 on MR's credit card;

viii.   Ceasing to communicate with MR after MR made multiple attempts to
        withdraw MR's investment funds; and

ix.     Stating on the RBOptions.com website the following:

        1.      "At the heart of RBoptions' core values are honesty and straight
                forward trading experience. We believe any trader should have
                immediate access to any invested funds. That's why RBOptions is
                the *only* binary options broker to offer *same day* withdrawal
                approvals! Once your account is verified (See compliance policy
                here) you will receive your funds as early as 24 hours (with Skrill)
                after a withdrawal request was submitted. No hassle. No questions
                asked. This is the RBOptions Guarantee.";

        2.      "RBoptions is proud to be the first and ONLY binary options
                broker to GUARANTEE same day withdrawal approvals!";

        3.      "After the economic crises of recent years, we feel that transparent
                pricing, straight forward trading, and responsible financial
                handling is of the utmost importance. That's why we've assembled
                a team of uncompromisingly professional traders, investors, and
                financial gurus to offer the highest level of trading experience. You
                never have to worry about any thing [sic] other than your trades.

We take care of the rest."; and

4.    "RBoptions offers the highest paying platform in the industry - Up to 88% profit per successful trade, where most broker [sic] out there fall behind with a 70% payout average. Additionally, RBoptions offers an exclusive Stop-Loss feature allowing you to sell your position before expiry to cap potential losses if your understanding of the market had changed mid-trade."

b.    Any and all of the above statements are either untrue or misleading because of omissions of material fact, including, but not limited to:

15

i.    Failing to inform MR as to the risks associated with the investment, including but not limited to:

1.    The fact that currency, currency option, and binary option trading are highly volatile investments; and

2.    The volatility of the securities offered through RBOptions may greatly reduce the funds in investor's RBOptions accounts;

ii.    Failing to honor MR's repeated requests for withdrawals; and

iii.    Failing to provide any substantiation or documentation for promised returns.

c.    Further, Respondents cheated or defrauded, employed a device, scheme, or artifice to defraud and engaged in multiple acts, practices, or courses of business that would operate as a fraud or deceit upon another person, and misappropriated or converted funds when they engaged in lulling MR in order avoid or delay detection by:

i.    Telling MR when MR sought a withdrawal via phone that Gatsby no longer worked there and was assigned a new broker;

ii.    Switching MR to a total of six different brokers in an effort to keep MR from attempting to withdraw MR's investment money;

iii.    Not releasing MR's funds when MR requested such a withdrawal on at least seven occasions;

iv.    Making an unauthorized charge of $5,000 on MR's credit card; and

v. Ceasing to communicate with MR after MR made multiple attempts to withdraw MR's investment funds.

54. Respondents' cheated or defrauded, attempted to cheat or defraud, made untrue statements of material fact, employed any device, scheme artifice to cheat or defraud, any other person, engaged in any transaction, act, practice or course of business, including, without limitation, any form of advertising or solicitation, which operated or would operate as a fraud or deceit upon any Missouri investor, or misappropriated or converted the funds, security or property of any Missouri investor in violation of Section 409.810, RSMo (2000), and such actions constitute illegal acts or practices, and thus such actions are subject to the Commissioner's authority under Section 409.823, RSMo (2000).

55. This order is in the public interest and is necessary to carry out the provisions of the Missouri Securities Act of 2003 and Sections 409.800 to 409.863, RSMo (2000).

16

**Page 17**

## III. ORDER

**NOW, THEREFORE,** it is hereby ordered that Respondents, their agents, employees and servants, and all other persons participating in or about to participate in the above-described violations with knowledge of this order be prohibited from violating or materially aiding in any violation of:

A. Section 409.3-301 by offering or selling any securities as defined by Section 409.1-102(28), in the State of Missouri unless those securities are registered with the Securities Division of the Office of the Secretary of State in accordance with the provisions of Section 409.3-301;

B. Section 409.4-401(a) by transacting business as an unregistered broker-dealer firm;

C. Section 409.4-402(d) by employing or associating with an unregistered broker-dealer agent;

D. Section 409.5-501 by, in connection with the offer or sale of securities, making an untrue statement of a material fact or omitting to state a material fact necessary in order to make the statement made, in light of the circumstances under which it is made, not misleading or engaging in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person;

E. Section 409.803, RSMo (2000) by selling or purchasing, or offering to sell or purchase any commodity contract or any commodity option while not being

registered with the applicable regulatory bodies;

F.       Sections 409.808.1 and 409.808.2, RSMo (2000) by engaging in the trade or business or otherwise acting as a commodity merchant while not being registered or temporarily licensed with the Commodities Futures Trading Commission; and

G.       Section 409.810, RSMo (2000) by, directly or indirectly, cheating or defrauding, attempting to cheat or defraud, or employing any device scheme or artifice to cheat or defraud any other person, making untrue statements of material fact, engaging in any transaction, act, practice or course of business including advertising or solicitation, which operates or would operate as a fraud or deceit upon any person, or misappropriating or converting the funds of any other person, all in the connection with the purchase or sale of, the offer to sell, the offer to enter into, or the entry into of any commodity contract or commodity option contract.

## IV. STATEMENT

Pursuant to Section 409.6-604(b), the Commissioner hereby states that he will determine whether to grant the Enforcement Section's requests for:

17

**Page 19**

## STATE OF MISSOURI
## OFFICE OF SECRETARY OF STATE

| | |
|---|---|
| IN THE MATTER OF: | ) |
| | ) |
| ZULUTOYS LIMITED, d/b/a RBOptions.com; | ) |
| JORDAN GATSBY; and JOSEPH WOLF, | ) |
| | ) |
|                               *Respondents.* | )      AP-16-18 |
| | ) |
| Serve: | ) |
| | ) |
| Zulutoys Limited, d/b/a RBOptions | ) |
| Trust Company Complex | ) |
| Ajeltake Road, Ajeltake Island | ) |
| Majuro, MH96960 Marshall Islands | ) |

Jordan Gatsby                        )
Trust Company Complex                )
Ajeltake Road, Ajeltake Island       )
Majuro, MH96960 Marshall Islands     )
                                     )
and                                  )
                                     )
Joseph Wolf                          )
Trust Company Complex                )
Ajeltake Road, Ajeltake Island       )
Majuro, MH96960 Marshall Islands     )
                                     )
and via e-mail: legal@rboptions.com  )

### NOTICE

**TO: Respondents and any unnamed representatives aggrieved by this Order:**

You may request a hearing in this matter within thirty (30) days of the receipt of this Order pursuant to Sections 409.6-604(b), RSMo (Cum. Supp. 2013), 409.843 RSMo (2000), and 15 CSR 30-55.020.

19

**Page 20**

Within fifteen (15) days after receipt of a request in a record from a person or persons subject to this order, the Commissioner will schedule this matter for a hearing.

A request for a hearing must be mailed or delivered, in writing, to:

**Andrew M. Hartnett, Commissioner of Securities**
**Office of the Secretary of State, Missouri**
**600 West Main Street, Room 229**
**Jefferson City, Missouri, 65102**

20

---

**Page 21**

# EXHIBIT 36



Supreme Elegance and Ar

DISCLAIMER

---

## ABOUT US

**Astor Wealth Group** functions as a premier asset management and securities finance company in Singapore, operating specifically with high-net-worth individuals, corporate and institutional clientele spread across Asia, Oceania and Middle East. Our long-standing financing and wealth management clientele are comprised of prominent institutions such as sovereign wealth funds, investment banks, multi-national corporations, family offices, and private equity groups.

We provide our clientele both traditional and alternative financing solutions- securities, real estate, digital assets and rare art and collectibles- ethical, responsible risk-management, and a full suite of origination and advisory services.

---

# WHAT OUR WEALTH MANAGEMENT FIRM OFFERS

7/31/24, 8:56 PM
Case 1:24-mi-00119-VMC    Document 1-3    Filed 12/10/24    Page 231 of 500
Asset Management and Finance Company in Singapore



# ASSET MANAGEMENT AND ADVISORY

As a global asset management firm, we have progressively honed our focus on Oceania, Asia, and the Middle East. This strategic emphasis enables us to deliver specialized Discretionary Asset Management, Wealth Advisory, and Foundation and Legacy solutions to our select clients within these regions.



# FINANCING

Our suite of financing solutions encompasses both traditional and non-traditional avenues, offering financing against a diverse range of collateral including stock lending, real estate, digital assets, transportation systems, and rare art and collectibles. We excel in devising innovative and efficient strategies to leverage our clients' assets, thereby facilitating creation of liquidity.





# MERGERS AND ACQUISITIONS

We provide comprehensive advisory and transactional services in the realm of mergers and acquisitions (M&A) to our distinguished clientele across Singapore, various regions in Asia, and the Middle East. We specialize in delivering financing and capital solutions that are seamlessly integrated with merger and acquisition activities, aiming to furnish customized strategies that support business expansion, industry consolidation, and the acquisition of new business segments.





# INTELLECTUAL PROPERTY AND INTANGIBLES

We are adept at delivering finance and consulting services to clients whose primary value is derived from intangible and intellectual property assets, including patents, trademarks, brands, and other proprietary intellectual property forms.

---

# OUR GLOBAL ASSET MANAGEMENT TEAM



Thomas Mellon

Chief Executive Officer





Tim Grayson

Executive Director of Finance





Nathanial Strickland

Director of Legal and Ethics





Christopher Hunt

Regulatory Compliance





Niklaus Zürcher

Chief Risk Officer







---

## LATEST NEWS AND ARTICLES



### The Paradox of Securities Lending: A Critical Look

February 26, 2024

Securities lending, a cornerstone in the edifice of modern financial...

Read More »





## The Double-Edged Sword of Securities Lending: Navigating the Profits and Pitfalls

February 25, 2024

The Double-Edged Sword of Securities lending, the often-arcane engine behind...

Read More »



## Charting CBDCs: Navigating Digital Currency's Future

November 16, 2023

In a world where technological advancements and financial innovations are...

Read More »

**LOAD MORE**

# JOIN OUR NEWSLETTER

Email Address

☐ I consent to receive promotional emails about your products and services.

Subscribe Now

By subscribing, you agree with our privacy policy and our terms of service.



## Our Addresses

79 Robinson Rd, #25-01,
Singapore 068897

12 Marina View, Asia Square
Tower 2 Singapore, 018961

## Want to send us an email?

Info@AstorWealthGroup.com

## Phone

+65 3158 3625

+65 3158 2834



TERMS AND CONDITIONS                    PRIVACY POLICY

©All Rights Reserved.              Designed by **ASTOR WEALTH GROUP LTD**



# EXHIBIT 37



Astor Asset Management: The History of Astor

# Astor Asset Management: The History of Astor

**Agencies**
3 September 2021 · 6-min read



Astor Asset Management, in addition to being a top financial company in North America, Asia and Europe, also bears the heavy responsibility of carrying on the family name and legacy.

**Also Read |** **Benjamin Herzog Continues His Legacy – Business, Love and New Projects**

Thomas Mellon, CEO of Astor Asset Management, is a descendent of the famed Astor family, a fact not lost on the prestigious financier. As Mellon worked his way up to the top of the financial game, he never lost sight of the fact that he stood on the shoulders of giants before him. With a financial legacy dating back 200 years, the Astor name is legendary. That

## yahoo!life

HOME     MAIL     NEWS     FINANCE     SPORT     ENTERTAINMENT     LIFE     SEARCH     SHOPPING     MORE...

Sign in                    Mail

Life     Shopping     Travel     Health     Style     Celebrity     Entertainment     Parenting     Watch

✕

### Humble Beginnings

**Also Read |** **How To Get the Perfect Tan With Byrokko Best Selling 'Shine Brown'**

The story begins with John Jacob Astor. For without John Astor, there would be no Astor Asset Management.

One of the most successful entrepreneurs of his time, John Jacob Astor was a fur trader and real estate investor and built the foundation of the legacy that we still know today. Astor birthed an American dynasty, but also set the bar high for so many entrepreneurs who would follow his example. To understand the legacy, one must not ignore the humble beginnings.

John Jacob Astor was born on July 17, 1763, in Waldorf, Germany. Astor was not born with a silver spoon or considered generationally wealthy in any way. He was the son of a butcher. Although he came from somewhat humble circumstances, the seeds of mercantilism were planted early. He worked hard until eventually achieving mega-wealth status in New York City; but it didn't come easily.

In his late teens, Astor journeyed to London to begin working for his older brother George, who made musical instruments. By 1784, only a few short years after arriving in London, he made the decision to venture out on his own. Arriving with only twenty-five dollars and a self-possessed confidence, he emigrated to the United States to start a new life.

After arriving in Baltimore, Astor moved North to New York City where he joined his older brother, Henry. On September 19, 1785, Astor married Sarah Cox Todd. Throughout the marriage, he'd often recognize her as the backbone of the business. It was Sarah, when Astor would travel, who would manage all the financial affairs while he was away on expeditions.

With the emergence of the fur trade, Astor opened his own fur shop in 1786. Often, he'd make the trek to desolate areas in the Great Lakes and Canada, to procure the best fur pelts for his New York

store. With a solid decade behind him, it finally paid off. The Astor empire began a major expansion from New York to the American West. Once his fur business was thriving, Astor sought to invest in real estate. Later, he would export furs to China as well as import Chinese silk and tea. Finally, in 1808, he merged all the fur businesses into the American Fur Company. With that, he became the first multi- millionaire in the United States.



end of the century, he owned much of the landscape that made up New York City back then.

During their marriage, John Jacob Astor and Sarah Cox Todd had eight children. Among them, John Jacob Astor Jr. and William Backhouse were two of the most well-known. Sarah died in 1834, leaving the elder Astor utterly bereft. However, at his death in 1848, he was still known as the wealthiest individual in the United States. His estate was reported to be worth at least $20 million. Today, that valuation would translate into the hundreds of millions.

He was always a philanthropist. So, he bequeathed $400,000 to build the Astor Library in New York (now the New York Public Library). Astor left the bulk of his fortune to his second son William as his son, John Jr., a poet, was not mentally stable. William became an American business magnate, and besides being heir to a fortune, he acquired much of his wealth through Manhattan real estate acquisitions like his father.

John Jacob "Jack" Astor IV, born July 13, 1864, was the youngest of five. He was the only son of a businessman, collector, and racehorse breeder William Backhouse Astor, Jr. He was the nephew of financier/philanthropist John Jacob Astor III, and great-nephew of occasional poet and disabled, John Jacob Astor Jr.

Jack, albeit a very wealthy mogul in his own right, was notorious for his death on the sinking of the Titanic in 1912. Notably, the richest passenger aboard the ship at the time of his death, he was estimated to be among the wealthiest people in the world. His net worth was $87 million. At his death, he was survived by his pregnant (second) wife, Madeleine, and first child, Vincent.

John Jacob "Jakey" Astor VI was born in August 1912, four months after his father's passing on the fated voyage in April of that year. Destined to follow in his name sakes' footsteps, Jakey became an American socialite and shipping magnate.

John Astor's entrepreneurial spirit is attached to so many significant landmarks still today. His name is recognized all over the Big Apple in places like Astor Place, The Waldorf Astoria, and the familiar Astoria, Queens neighborhood just outside Manhattan. As the New York Public Library founder, the famous lions that stand guard at the entrance were once affectionately named Leo Astor and Leo Lenox (after cofounder James Lenox). Later nicknamed Lord Astor and Lady Lenox, the proud Leos sit

Case 1:24-mi-00119-VMC     Document 1-3     Filed 12/10/24     Page 246 of 500

years after a young John Astor dared to dream of more.

The Astor Legacy Continues

As the CEO of Astor Asset Management, Thomas Mellon has continued the bold legacy built by his ancestors over 200 years ago. In 2013, Mellon led the company through a significant expansion in China, Europe, and North America. Branded initially as Astor Capital Fund, the SEC objected to any abbreviation of the name, so Mellon launched a rebranding in 2020 after posting excellent send quarter growth even amid a pandemic. Today, Mellon is one of the decade's most influential financial leaders.



yahoo!life

---

### LATEST STORIES

**USA TODAY**



**His son died by suicide. He wants every parent to know what he found on his kid's phone.**
His 23-year-old son died by suicide in February. What he saw on his son's phone was horrifying: "If he hadn't seen this, he would be alive today."

a day ago

**The Daily Beast**

yahoo!life

HOME    MAIL    NEWS    FINANCE    SPORT    ENTERTAINMENT    LIFE    SEARCH    SHOPPING    MORE...

Sign in    Mail

Life    Shopping    Travel    Health    Style    Celebrity    Entertainment    Parenting    Watch

Ad • eToro



The Top 5 Stocks To Watch In H2 2024 [Start Today]

The Guardian



**South Korea's 'coolest' markswoman Kim Yeji shoots to fame after Paris Olympics**

Social media erupts over 'main character energy' and cool demeanour of pistol shooter Kim Yeji, who won silver at Paris 2024 Games

14 hours ago

Cosmo



**Blake Lively's nude floral lace dress is a subtle nod to flower fashion**

Blake Lively wore a Michael Kors nude leather laser-cut lace-effect floral pattern dress and flower-stem Christian Louboutin heels to promote 'It Ends With Us.'

a day ago

Cinema Online



**Jenny Tseng makes fun of Na Ying's "Singer 2024" win**

The opinionated singer expresses her annoyance over the result that matched what she had previously speculated

2 days ago

Ad • UltraCut



**Use This and Never Have to Change Your Whipper Snipper Line Again**

The Independent



**Prince William 'banned' Meghan Markle from wearing Princess Diana's jewellery**

Prince William reportedly wanted Meghan Markle to know her rank

a day ago

The Telegraph



**Pictured: 'Curious kiss' between Macron and French sports minister**

Photos of Emmanuel Macron's sports minister planting a kiss close to his neck at the Olympic Games opening ceremony have caused a stir in France.

a day ago

Associated Press



**Hamas' top political leader is killed in Iran in strike that risks triggering all-out regional war**

Hamas' top political leader was killed Wednesday by a predawn airstrike in the Iranian capital, Iran and the militant group said, blaming Israel for a shock assassination that risked escalating into an all-out regional war. Iran's supreme leader vowed revenge against Israel. Israeli Prime Minister Benjamin...

17 hours ago

☰ HOME    MAIL    NEWS    FINANCE    SPORT    ENTERTAINMENT    LIFE    SEARCH    SHOPPING    MORE...

yahoo!life

Sign in    Mail

Life    Shopping    Travel    Health    Style    Celebrity    Entertainment    Parenting    Watch

✕



**Hello!**

### Princess Kate's rule-breaking sheer dress she could never wear now

The Princess of Wales showed off her daring pre-royal wardrobe in London, wearing a sheer backless dress weeks after she rekindled her romance with Prince William in 2007.

a day ago



**Kotaku**

### Olympics Sharpshooter Looks Like A Cool Video Game Character And People Are Obssessed

The 2024 Paris Olympics are in full swing right now and they're already generating some real heat. Just the other day, some fencer was jumping in his opponent's face like he was in a fighting game, and now there's a sharpshooter that could very well be the next agent added to Valorant. It's a wild world we live...

a day ago



**The Telegraph**

### Xi Jinping's lackeys 'hid behind Chinese flags to beat up protesters in San Francisco'

Pro-Communist supporters allegedly used China's national flag to hide that they were beating protesters during a summit between Xi Jinping and Joe Biden in San Francisco last year.

a day ago

Ad • New Energy Findings    •••



### Forget Metformin, This Household Item Helps Your Blood Sugar! Try It!



**The Independent**

### Suspect got away with Hawaii's most famous cold-case murder for decades. A hospital bed sheet closed the case

Dana Ireland, a 23-year-old tourist from Virginia, was kidnapped, raped and left for dead in the Kapoho area of Hawaii on Christmas Eve 1991

a day ago



**People**

### "Top Chef" Alum Shirley Chung Diagnosed with Stage 4 Tongue Cancer: 'I Have a Tough Long Road to Recovery'

The celebrity chef said she opted to keep her tongue after doctors suggested "100% removal" to increase her survival rate

23 hours ago



**Associated Press**

### 1 dead and dozens sickened after eating roasted eel from a Japanese department store

One person died and nearly 150 others were sickened after eating grilled eel prepared by a restaurant chain and sold at a department store near Tokyo, officials said. Keikyu Department Store said 147 customers as of Monday had reported symptoms such as vomiting and diarrhea after eating grilled eel...

a day ago

Ad • Experts In Savings | Over 50s    •••



### Born Before 1974? You May Be Eligible For This £10/Month Funeral Cover

Astor Asset Management The history of Astor

# yahoo!life

Sign in    Mail

Life    Shopping    Travel    Health    Style    Celebrity    Entertainment    Parenting    Watch

✕



**HuffPost**

**Hillary Clinton Gives Trump And His GOP Cronies Some Brutally Honest Election Advice**

The former secretary of state mocked Republicans with some unsolicited advice.

2 days ago



**Associated Press**

**Chinese women beat reigning Olympic champion United States in volleyball**

The U.S. women's volleyball team had a bad enough start in its Olympic title defense. The Americans lost the first two sets to China on Monday in a pool play format where total points and sets won can become playoff tiebreakers. "We obviously didn't have the start that we wanted, but the third, fourth and fifth...

2 days ago



Ad · Health Advice Today    ...

**Dr: Alleviate Knee Pain (Takes 15 Minutes)**



**SETHLUI.COM**

**Private dining Chef Kang's closing down after 8 consecutive years of Michelin stars**

The post Private dining Chef Kang's closing down after 8 consecutive years of Michelin stars appeared first on SETHLUI.com.

18 hours ago



**HuffPost**

**'Daily Show' Spots The Odd Moment Trump 'Lost A Debate With Himself'**

Ronny Chieng mocked the former president's back-and-forth comments about debating Kamala Harris.

8 hours ago



**Associated Press**

**Another Chinese doping controversy pops up during Olympic swimming competition**

The New York Times reported Tuesday that two top Chinese swimmers — including one on this year's Olympic team — tested positive for a banned steroid in 2022 but were eventually cleared to compete by Chinese officials. The World Anti-Doping Agency accepted the results of the Chinese investigations. "I sa...

a day ago



# EXHIBIT 38

Case 1:24-mi-00119-VMC   Document 1-3   Filed 12/10/24   Page 253 of 500

# Thomas Mellon: The Driving Force Behind Astor Wealth Group

 Thomas R · Follow

2 min read · Aug 29, 2023

 Listen     Share



 

Open in app ↗                                          Sign up    Sign in

Medium        Search



Astor Wealth Group

At the helm of the Astor Wealth Group, pioneering financial innovations and market supremacy, stands Thomas Mellon. Serving as the CEO, Mellon is instrumental in steering the sails of this asset management entity. A subsidiary of the Astor Capital

Fund, Astor Wealth Group distinctly zeroes in on Asian and emerging market investments, a territory oft-described as challenging by peers in the industry.

Under the astute leadership of Thomas Mellon, Astor Wealth Group has blossomed as a premier asset management firm. Their core competencies lie in servicing high-net-worth individuals, multinational corporations, institutional clients.

The cornerstone of Astor Wealth Group's success lies in its enduring relationships with iconic financial institutions, investment banks, private equity groups, family offices, and sovereign wealth funds. It's through these steadfast partnerships that Astor Wealth Group has cultivated an unwavering trust that enables it to identify and swiftly act on market imperfections across a myriad of rapidly evolving sectors and industries with unparalleled agility and precision.

Astor Wealth Group's ability to tread the path of financial innovation allows them to present an extensive array of services to their clientele. Their financing prowess, always supported by relentless ethical guidelines and responsible risk-management mechanisms, helps their clients explore and readily capitalize on opportunities in emerging markets.

Highlighting the multifaceted services of Astor Wealth Group is their distinguished lending platform. Being perpetually at the forefront of dynamic financial shifts, they skillfully cater to non-traditional avenues that are revolutionizing market channels, including securities, real estate and digital asset-backed lending platforms.

Under the guidance of Thomas Mellon, Astor Wealth Group has established a strong presence in both Asian and emerging markets, setting the standard for excellence in the asset management industry. Mellon's strategic approach leverages the immense potential of these regions, reflecting a blueprint of intelligent diversification and sustained growth.

The Astor Wealth Group takes pride in one of its key specialties- Digital Asset and Securities-Backed Lending. The firm profound engagement in all aspects of digital asset and security backed finance, including cryptocurrency investments, blockchain technology, asset-backed securities, financial engineering and structuring, as well as risk management and regulatory compliance. Find more information at AstorWealthGroup.com

Thomasmellon    Mellon    Astorwealthgroup    Finance



 Follow    

## Written by Thomas R

0 Followers

Finance world is my world ;)

---

## Recommended from Medium

Amazon.com                                                    Seattle, WA
*Software Development Engineer*                           Mar. 2020 – May 2021
  - Developed Amazon checkout and payment services to handle traffic of 10 Million daily global transactions
  - Integrated Iframes for credit cards and bank accounts to secure 80% of all consumer traffic and prevent CSRF, cross-site scripting, and cookie-jacking
  - Led Your Transactions implementation for JavaScript front-end framework to showcase consumer transactions and reduce call center costs by $25 Million
  - Recovered Saudi Arabia checkout failure impacting 4000+ customers due to incorrect GET form redirection

### Projects

**NinjaPrep.io** (React)
  - Platform to offer coding problem practice with built in code editor and Written + video solutions in React
  - Utilized Nginx to reverse proxy IP address on Digital Ocean hosts
  - Developed using Styled-Components for 95% CSS styling to ensure proper CSS scoping
  - Implemented Docker with Seccomp to safely run user submitted code with < 2.2s runtime

**HeatMap** (JavaScript)
  - Visualized Google Takeout location data of location history using Google Maps API and Google Maps heatmap code with React
  - Included local file system storage to reliably handle 5mb of location history data
  - Implemented Express to include routing between pages and jQuery to parse Google Map and implement heatmap overlay

 Alexander Nguyen in Level Up Coding

## The resume that got a software engineer a $300,000 job at Google.

7/31/24, 8:58 PM                    Thomas Mellon: Driving Force Behind Astor Wealth Group | by Nadouh | Medium

1-page. Well-formatted.

 Jun 1    👏 15.3K    💬 235                                    🔖+



 Karolina Kozmana

## Common side effects of not drinking

By rejecting alcohol, you reject something very human, an extra limb that we have collectively grown to deal with reality and with each…

Jan 21    👏 42K    💬 1115                                    🔖+

## Lists

 **Self-Improvement 101**
20 stories · 2433 saves

 **Business 101**
25 stories · 1076 saves

 **Work 101**
26 stories · 158 saves

 **Leadership**
53 stories · 394 saves



![Michelle Teheux] Michelle Teheux 🔷 in Minds Without Borders

## We Could Learn a Lot About Sex From the Dutch

My Dutch relative's views shocked me, but I immediately realized she was right

✦  Jul 17   👏 23K   💬 289                                          🔖+



![Sufyan Maan] Sufyan Maan, M.Eng in ILLUMINATION

## What Happens When You Start Reading Every Day

Think before you speak. Read before you think. — Fran Lebowitz

✦  Mar 12   👏 28K   💬 644                                          🔖+

Case 1:24-mi-00119-VMC   Document 1-3   Filed 12/10/24   Page 258 of 500



 Khyati Jain in In Fitness And In Health

## You Destroy Your Brain Health Rapidly With These 4 Stupid Daily Habits

Your lifestyle is the main culprit for a distracted brain.



⭐  Apr 25   👏 11.4K   💬 183                                          🔖⁺



 Unbecoming

## 10 Seconds That Ended My 20 Year Marriage

It's August in Northern Virginia, hot and humid. I still haven't showered from my morning trail run. I'm wearing my stay-at-home mom…

⭐  Feb 16, 2022   👏 83K   💬 1137                                          🔖⁺

See more recommendations

# EXHIBIT 39

X

Home

Explore

Notifications

Messages

Grok

Bookmarks

Communities

Premium

Verified Orgs

Profile

More

**Post**

← **Thomas Mellon**
92 posts



WEALTH GROUP

• • •    **Follow**

**Thomas Mellon**
@Thomas_Mellon82

Chief Executive Officer, Astor Wealth Group
Supreme Elegance and Artistry in Contemporary Investing; Wealth Management, Advisory and Financing

📍 United States    🔗 AstorWealthGroup.com    📅 Joined March 2019

**9** Following    **12.6K** Followers

Not followed by anyone you're following

**Posts**    Replies    Media

📌 Pinned
**Thomas Mellon** @Thomas_Mellon82 · Oct 31, 2023    • • •
We are the artificers of fortunes, seers endowed with not just sight, but insight; indebted to the wisdom passed down through our Astor lineage.



ASTOR WEALTH GROUP

0:09

💬    🔁 34    ♡ 4    439    🔖    ⬆️

🔁 Thomas Mellon reposted
**Tucker Carlson** ✓ 🎙 @TuckerCarlson · Feb 6    • • •
Why I'm interviewing Vladimir Putin.



💬 57K    🔁 168K    ♡ 625K    119M    🔖    ⬆️

**Thomas Mellon** @Thomas_Mellon82 · Feb 4    • • •
The true essence of wealth management lies in understanding the nuanced tapestry of global economics. At **#AstorWealthGroup**, we're weaving a masterpiece. **#GlobalPerspective #WealthManagement**

🔍 Search

**You might**

Rajesh
@Rajes

Aslend
@aslen

SaChi
@SslSa

**Show more**

**What's ha**


WATCH LIVE

Trending in Unite
**#EndBadGov**
76.3K posts

Trending in Unite
**RIP Derek**

Trending in Unite
**Southport**
Trending with #

Trending in Unite
**Downing Stre**
74.1K posts

**Show more**

Terms of Service
Accessibility  A


**Matthew Bradly**
@matthe_brad    • • •

# EXHIBIT 40

**From:** **Consulting Specialists** consultingspecialists1111@gmail.com
**Subject:** Re: URL Removal Request
**Date:** August 23, 2023 at 8:27 PM
**To:** Emily Garner egarner@singhfirm.com, Offshore Alert editor@offshorealert.com
**Cc:** editor@offshorealert.com, marchant@offshorealert.com



Dear Offshore Alert Editor,

We are prepared to pay the sum of $25K USD for removal.

Please advise.

Thank you

Best Regards,

Consulting Specialists

On Aug 5, 2023, at 4:14 AM, Emily Garner <egarner@singhfirm.com> wrote:

Dear Mr. Marchant,

We trust you are well. Please find the attached letter of today's date.

We look forward to hearing from you.

Thank you,

--

 **SINGH**
LAW FIRM, P.A.

**Emily Garner**
*Attorney at Law*

📞 866-SINGH-LAW
✉ egarner@singhfirm.com
🌐 www.singhfirm.com

This e-mail and any attachments are confidential and legally privileged. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you have received this in error, please notify the sender by reply e-mail and then delete the e-mail completely from your system.
<OffshoreAlert Removal Request - August 4 2023.pdf>



**SINGH LAW FIRM, P.A.**
305 Broadway
Floor 7
New York, NY 10007

701 Brickell Avenue,
Suite 1550
Miami, FL 33131

Tel: 866 SINGH LAW
www.singhfirm.com

August 4, 2023

Offshore Alert
Attn: David Marchant
113 SE 1st Ave, #173
Miami, FL 33131
editor@offshorealert.com
marchant@offshorealert.com

*Sent Via Email Only*

**RE: Removal Request**

Dear Mr. Marchant:

We trust you are well. We represent Ms. Oksana Hryn, and several of the other plaintiffs whose names appear in Civil Case No. 1:21-cv-08437, Hryn et al v Weiser Global Capital Markets Ltd et al, the lawsuit which is the subject of the following URL: https://www.offshorealert.com/tag/weiser-global-capital-markets/ (the "URL"). As you are likely aware, and as is clear from the content of the URL, the subject lawsuit was voluntarily dismissed on October 18, 2021 by the plaintiffs. To date, no other related actions have been filed.

Thus, given that the URL information is outdated and no longer relevant or useful to the general public, we would respectfully request that such content be removed from your website. We recognize that any removal likely requires time and resources, and as such, we would be more than willing to compensate Offshore Alert for said removal.

We thank you for your prompt attention to this matter, and look forward to hearing from you.

Sincerely,

Jaitegh Singh, Esq.
Partner at Singh Law Firm, P.A.
Licensed in (NY, NJ, FL & CO)
jsingh@singhfirm.com

# EXHIBIT 41



AUGUST 23, 2023

# 'We'll pay you $25K to remove content', writes rep. for Ukraine's Oksana Hryn, 'Bear Stearns' et al

An email offering OffshoreAlert $25,000 for the removal from our website of an article and documents about a bizarre and seemingly-frivolous lawsuit filed by four Ukraine citizens and 35 suspiciously-named firms purportedly domiciled in some of the seediest offshore jurisdictions, including "Bear Stearns Companies", "Blackrock Capital", "Cornelius Vanderbilt Capital", "Dreyfus Corporation", and "State Street Global Advisors", against Bahamas-domiciled securities broker Weiser Global Capital Markets Ltd. and others.



DOCUMENT.PDF
File Size: 263.99 KB

---

PAGES:

3

DATE:

August 23, 2023

---

**RELATED CONTENT**

- Oksana Hryn et al v. Weiser Global Capital Markets Ltd. et al: Voluntary Dismissal <https://www.offshorealert.com/oksana-hryn-et-al-v-weiser-global-capital-markets-ltd-et-al-voluntary-dismissal/>
- Bizarre lawsuit by 'Bear Stearns' alleges '$450M fraud' by Bahamas-licensed securities broker <https://www.offshorealert.com/bizarre-lawsuit-by-bear-stearns-and-others-alleges-450m-by-bahamas-licensed-securities-broker/>
- Oksana Hryn et al v. Weiser Global Capital Markets Ltd. et al: Complaint <https://www.offshorealert.com/oksana-hryn-et-al-v-weiser-global-capital-markets-ltd-et-al-complaint/>
- Oksana Hryn et al v. Weiser Global Capital Markets Ltd. et al: TRO Motion <https://www.offshorealert.com/oksana-hryn-et-al-v-weiser-global-capital-markets-ltd-et-al-tro-motion/>



7/31/24, 9:23 PM
Case 1:24-mi-00119-VMC   Document 1-3   Filed 12/10/24   Page 268 of 500
We'll pay you $25k to remove content, writes rep. for Ukraine's Oksana Hryn, 'Bear Stearns' et al - OffshoreAlert

Copyright© 1997-2021 OffshoreAlert. All Rights Reserved. www.offshoreelert.com



# EXHIBIT 42

## Cookies on Companies House services

We use some essential cookies to make our services work.

We'd also like to use analytics cookies so we can understand how you use our services and to make improvements.

Accept analytics cookies    Reject analytics cookies

**View cookies (/help/cookies)**


# GOV.UK

## Find and update company information

Companies House does not verify the accuracy of the information filed (http://resources.companieshouse.gov.uk/serviceInformation.shtml#compInfo)

Advanced company search (/advanced-search)

# LUXFIN CAPITAL LTD

Company number **10285479**

Follow this company

File for this company
(https://beta.companieshouse.gov.uk/company/10285479/authorise?
return_to=/company/10285479/officers)

| Overview | Filing history | People | More |
|---|---|---|---|

- Officers
- Persons with significant control (/company/10285479/persons-with-significant-control)

## Filter officers

☐

7/31/24, 9:25 PM
MVMC IN CA - Overview - Find and update company information - GOV.UK
Case 1:24-mi-00119-VMC   Document 1-3   Filed 12/10/24   Page 271 of 500

Current officers

Apply filter

# 6 officers / 3 resignations

## ROLE, Santa

Correspondence address **124 City Road, London, England, EC1V 2NX**

Role Active **Director**

Date of birth **September 1984**

Appointed on **1 September 2023**

Nationality **Latvian**

Country of residence **England**

Occupation **Director**

## SINGH, Jaitegh, Dr

Correspondence address **155e., 44th Street, 6th Floor, New York, United States, 10017**

Role Active **Director**

Date of birth **December 1987**

Appointed on **22 April 2021**

Nationality **American**

Country of residence **United States**

Occupation **Lawyer**

## YUEN, Albert Chi Chin

Correspondence address **124 City Road, London, England, EC1V 2NX**

Role Active **Director**

Date of birth **November 1980**

Appointed on **22 June 2021**

Nationality **American**

Country of residence **United States**

Occupation **Director**

## JENNINGS, Shelley Anne

Correspondence address  **124 City Road, London, England, EC1V 2NX**

Role Resigned  **Director**

Date of birth  **November 1983**

Appointed on  **1 July 2021**

Resigned on  **16 June 2023**

Nationality  **South African**

Country of residence  **England**

Occupation  **Director**

---

### SADDIQI, Gulzamir

Correspondence address  **26 Leigh Road, Eastleigh, United Kingdom, SO50 9DT**

Role Resigned  **Director**

Date of birth  **January 1977**

Appointed on  **19 July 2016**

Resigned on  **22 April 2021**

Nationality  **British**

Country of residence  **United Kingdom**

Occupation  **Entrepreneur**

---

### ZIMMERMAN, Ray James, Dr

Correspondence address  **124 City Road, London, England, EC1V 2NX**

Role Resigned  **Director**

Date of birth  **September 1958**

Appointed on  **6 July 2021**

Resigned on  **16 June 2023**

Nationality  **American**

Country of residence  **England**

Occupation  **Director**

---

Tell us what you think of this service (https://www.smartsurvey.co.uk/s/getcompanyinformation/) Is there anything wrong with this page? (/help/feedback?sourceurl=https://find-and-update.company-information.service.gov.uk/company/10285479/officers)

Policies Link opens in new tab

Cookies (https://beta.companieshouse.gov.uk/help/cookies)

Contact us Link opens in new tab

Accessibility statement
(https://beta.companieshouse.gov.uk/help/accessibility-
statement)

Developers Link opens in new tab

Built by Companies House



© Crown copyright

# EXHIBIT 43



**[2024] JMCC Comm 23**

**IN THE SUPREME COURT OF JUDICATURE OF JAMAICA**

**COMMERCIAL DIVISION**

**CLAIM NO: SU2021CD00543**

| BETWEEN | ASTOR ASSET MANAGEMENT 3 LIMITED | CLAIMANT |
|---|---|---|
| AND | ZS CAPITAL FUND SPC | 1ˢᵗ DEFENDANT |
| AND | MA DANYU | 2ⁿᵈ DEFENDANT |
| AND | ZHANG NINGNING | 3ʳᵈ DEFENDANT |
| AND | ZHOU YIHUI | 4ᵗʰ DEFENDANT |

**IN CHAMBERS BY VIDEO-CONFERENCE**

**Appearances: Mrs. Trudy - Ann Dixon - Frith & Ms. Samantha Grant instructed by DunnCox Attorneys-at-Law for the Respondent/Claimant**

**Mrs. Tana'ania Small Davis KC & Ms. Analiese Minott instructed by Livingston Alexander & Levy for Applicants/Defendants**

**Heard: 18ᵗʰ December 2023 and 9ᵗʰ May 2024**

**Arbitration Act – Jurisdiction of Court to intervene in Arbitral proceedings – Whether S. 55 is a mandatory provision – Setting aside Arbitral Award– Summary Judgment**

**BROWN BECKFORD J**

**INTRODUCTION**

*Oh, what a journey, full of strife,*

*As the lender fights for their presumed rights.*

*Will they succeed? Only time will tell,*

*In this legal dance, where twists compel.*

*What a curfuffle!*

[1]     The dispute in this claim arose from a story as old as time, a loan agreement gone south. The parties, as businesses are wont to do in the modern era, made their own arrangements for the settlement of any dispute arising between them. They chose arbitration, with the seat of arbitration being in Jamaica, to resolve their disputes. In due

- 2 -

course, a dispute having arisen, arbitral proceedings were commenced. The Arbitral Tribunal decided against the lender, which has sought the aid of the Court with a view, it seems, to a more amenable decision. The borrowers have given short shrift to the claim by the lender and by this application seeks to bring an end to this venture. The lender and the borrowers will be referred to herein as the "Claimant" and "the Defendants" respectively.

**[2]**    The Claimant, Astor Asset Management 3 Limited, instituted its claim by Claim Form filed 13th December 2021 as amended 18th March 2022  against ZS Capital Fund Spc, Ma Danyu, Zhang Ningning, Zhou Yihui, the 1st, 2nd, 3rd and 4th Defendants, respectively, for the setting aside of arbitral proceedings. The Claimant sought the following declarations:

1. The Final Award and or the Costs Award deals with a dispute not contemplated by or not falling within the terms of the submission to arbitration or contains decisions on matters beyond the scope of the submission to arbitration; and or
2. The subject matter of the dispute between the parties was not capable of settlement by arbitration under the laws of Jamaica; and or
3. The Final Award and or the Cost Award is in conflict with the public policy of Jamaica.

**[3]**    The Defendants have by way of Notice of Application for Court Orders sought the following orders:

1. A declaration that the Court has no jurisdiction [for alternatively, declines to exercise its jurisdiction] with respect to the Claim.
2. An order striking out the Claim.
3. Alternatively, summary judgement in favour of the Defendants.
4. If the court permits the claim to stand, an order that the Claimant provide security for the Defendants' cost of and occasioned by these proceedings and this Application in the sum of Fifty-Seven Thousand One Hundred United States Dollars ($57,100.00) within fourteen days of the date of this Order.
5. The abovementioned sum shall be paid into an interest-bearing account at a licensed financial institution in the joint names of DunnCox and Livingston, Alexander & Levy, the Attorneys-at-Law for the parties, and held in escrow as security for the Defendants' costs of this action until the determination of the claim herein or further order of this Honourable Court.
6. The Claimant's claim shall be stayed until such time as the security for costs as ordered above is provided in accordance with paragraphs 4 and 5.
7. In the event the said sum of Fifty-Seven Thousand One Hundred United States Dollars (US $57,100.00) is not paid by the Claimant in accordance with the terms of

- 3 -

this Order, this claim against the Defendants shall stand as struck out, with costs to the Defendants.

8.  Costs to the Defendants to be taxed if not agreed.

9.  Such further and other relief as this Honourable Court deems just.

**BACKGROUND**

**[4]**    On 12th May 2020, the Defendants contracted with the Claimant, to borrow in total the sum of Thirty-One Million Eight Hundred Thousand United States Dollars **(USD $31,800,000.00)**. The Defendants each executed identical Stock Loan Agreements **("SLAs")**, save for the name of the borrower and the sum agreed to be advanced to that Defendant. Pursuant to the SLAs, the Defendants offered security and collateral for the loan in the form of shares in a company called Zhejiang Cangnan Instrument Group Limited **("Cangnan Shares")**, a company incorporated in China.

**[5]**    Subsequently, the parties executed four Collateral Management Agreements **("CMAs")** which permitted the Cangnan Shares to be held within the custody of a Depository (Custodian) Broker, Zundiao Securities Limited, **("Zundiao")** a licensee of the Securities and Futures Commission in Hong Kong. The respective Cangnan Shares were deposited by the Defendants with Zundiao on 25th May 2020. Clause VI of the CMAs provides for the forfeiture of the Cangnan Shares in the event of an incurable default of the terms by the Defendants.

**[6]**    The Claimant disbursed the loan to each Defendant in tranches. However, before the full amount of the loan was disbursed, a dispute arose between the parties. To date, the aggregate sum advanced to the Defendants is Two Million Seven Hundred and Fifty Thousand United States Dollars **(USD$2,750,000.00)**.

**[7]**    Following checks conducted by the Defendants at the Central Clearing and Settlement System **("CCASS")** of the Hong Kong Stock Exchange, the Defendants discovered that between 1st June 2020 and 17th June 2020, a total of 926,800 of the Cagnan shares were transferred to Phillip Securities (Hong Kong) Ltd., DBS Vickers (Hong Kong) Ltd. and Citibank N.A. Consequently, the Defendants applied successfully for an *ex parte* injunction to restrain the Claimant from disposing of the Cangnan Shares.

**[8]**    Pursuant to Clause VII of the SLAs, on 4th July 2020, the Claimant issued Notices of Arbitration to the Defendants referring the matter to arbitration. On 15th November 2021, the Arbitral tribunal, M. Georgia Gibson Henlin KC, handed down her Final Award in respect to the dispute between the parties, and on 21st February 2022 delivered her final award in respect of costs. The Claimant seeks to set aside both awards in the instant claim.

**SUBMISSIONS ON BEHALF OF THE DEFENDANTS/APPLICANTS**

- 4 -

**[9]**    Counsel on behalf of the Defendants, Mrs. Tana'ania Small Davis KC, argued that the Court has no jurisdiction to hear the Claimant's challenge to the arbitral awards, as the parties agreed that the arbitration is final and conclusive. She asserted that similarly to **Article 34 of the UNCITRAL Model Law on International Commercial Arbitration**, **S. 55 of the Arbitration Act** was not manadatory; therefore the parties, by virture of Clause VII of the Stock Loan Agreement, could contract out of **S. 55**. She drew support from the writers of the *Handbook of UNICITRAL Arbitration, Sweet & Maxwell* and the case of **Noble China Inc. v Lei** 1998 42 OR (3d) 69.

**[10]**    On that basis it was contented that the claim is an abuse of process, and should be struck out. She also submitted that the grounds for challenging the award was a mere disguise for a second attempt to argue the issues determined in the arbitration. To this end, she relied on **Johnson v Gore Wood & Co** 2 A.C. 1.

**[11]**    Counsel further submitted that the application for Summary Judgment ought to be granted on the basis that **S. 55 of the Act**  gives a limited scope for challenging an arbitral award, and such scope does not include recourse against an award on the ground of errors of law. She relied on, in support of this argument, **S. 103 of the 1996 UK Arbitration Act**, **Swain and Hillman** *(supra)*, **Sagicor Bank Jamaica Limited v Marvalyn Taylor Wright** [2018] UKPC 12, **Somerset Enterprises Limited and anor v National Export Import Bank** [2021] JMCA Civ 12, **Kabab-Ji Sal (Lebanon) v Kout Food Group (Kuwait)** [2021] UKSC 48.

**[12]**    Counsel submitted in the alternative, that if it is found that the Court has jurisdiction to hear the claim and/or does not strike out the claim, the Defendants should be awarded security for costs. Counsel mounted this argument on the inference that the Claimant is impecunious, owing to the fact that the Claimant was struck off the register of companies in Nevis for failing to pay its annual fees. Further, the Claimant has not identified its assets, therefore neither the Defendants nor the Court has any material to assess obstacles to enforcement against those assets. This argument was supported by **Part 24 of the CPR**, **Symsure Limited v Kevin Moore** *(supra)* and **Pisante and others v Logothetis and others** [2020] EWHC 332 (Comm).


**SUBMISSIONS ON BEHALF OF THE CLAIMANT/RESPONDENT**

**[13]**    Counsel on behalf of the Claimant, Mrs. Dixon-Frith, contended that the Acknowledgment of Service filed 30th August 2022, which did not indicate that the jurisdiction of the Court was being challenged, in conjunction with the letter dated 20th September 2022, seeking security for costs, and the filling of the application seeking summary judgment and striking out, all constitute the Defendants' submission to the jurisdiction of the Court. To this end, Counsel relied on **Rules 9.5 and 9.6 of the Civil Procedure Rules ("CPR") 2002 (as amended on the 3rd of August 2020)**, **Global**

**Multimedia International Limited v Ara Media Services and Another** [2007] 1 ALL ER (COMM) 1160, **Hoddinot & Others v Persimmon Homes (Wessex) Limited** [2008] 1 WLR 806, **B & J Equipment Rental Limited v Joseph Nanco** [2013] JMCA Civ 2 and **Hunter v Richards & Anor** [2020] JMCA Civ 17.

**[14]**    Mrs. Dixon-Frith accepted that arbitral awards are unappealable, but held the view that this does not mean they are immune to challenge on prescribed statutory grounds as posited by the writers in *Butterworth's Challenges in Arbitration: a Guide to Challenges against Arbitrators, Awards and Enforcement*. She submitted that in accordance with **S. 2 of the Arbitration Act**, the seat of arbitration is in Jamaica, therefore the **Arbitration Act** is applicable to these proceedings. The Claimant's application to set aside the arbitral award, being grounded on **S. 55 of the Arbitration Act**, overrides the provision of the SLAs relative to the decision of the Arbitral Tribunal being final and not capable of being challenged. She argued that, **S. 55 of the Act** is mandatory and cannot be waived by the parties. Reliance was placed on **Universal Petrochemicals Limited v Rajasthan State Electricity** (2001) 2 CALLT 417 HC.

**[15]**    It was also submitted that the Court not only derives it jurisdiction from statute, but also has a common law and inherent jurisdiction to set aside the final award of the Arbitral Tribunal. The cases of **National Transport Co-operative Society Limited v Attorney General of Jamaica** [2010] JMCA Civ 48, **Construction Developers Associates Limited v Attorney General of Jamaica et al** [2014] JMCC Com 3 and **Josa Investments Limited v Promotions and Print Essentials Limited** [2018] JMCC Comm 37. Further, Mrs. Dixon-Frith argued that if the Court finds that it has jurisdiction to try the claim, it should not decline to exercise its jurisdiction as the Defendants have not pleaded forum non conveniens or lis alibi pendens. She relied on **IMS SA & Others v Capital Oil & Gas Industries Ltd** [2016] 4 WLR 163.

**[16]**    It was also Counsel's contention that Clause VII of the Stock Loan Agreements, which precludes the Court from reviewing the decision of the Arbitral Tribunal, amounts to an ouster clause. On this basis it was submitted that Clause VII is void and contrary to public policy. She relied on the cases of **Scott Avery** [1843-60] All ER Rep 1, **Doleman and Sons v Ossette Corporation** [1912] 3 KB 257, **Jack Bradley Maritimes Limited v Modern Construction Limited** [1966] NBJ No. 8, **Ford v Clarkson Holiday Limited** [1971] 1 WLR 1412, **CLLS Power System Sdn Bhd v Sara Timer Sdn Bhd** [2015] 11 MLJ 455 and **Uber Technologies Inc and others v Heller (Attorney General of Ontario and others intervening)** 2020 SCC 16.

**[17]**    Mrs. Dixon-Frith's advanced the argument that the Arbitral Tribunal made the Final Award without any appreciation that the issue of jurisdiction by virtue of Preliminary Award No. 3 was *res judicata* between the parties, and/or that an issue of estoppel arose in favour of the Claimant. Therefore evidence on the issue was inadmissible at the

substantive hearing. This argument was buttressed by reference to the cases of **Gbangbola and another v Smith & Sherriff Ltd.** [1998] 3 All ER 730, **PJSC National Bank Trust and another v Mints and others** [2022] 1 WLR 3099, **Western Australia of CBI Constructors Pty Ltd. V Chevron Australia Pty Ltd** [2023] BC202300111.

**[18]**    Further, she submitted, the Arbitral Tribunal, in finding that the Claimant was a *"money lender"*, failed to consider whether the Claimant is entitled to benefit from an exemption under the Money Lending Ordinance of Hong Kong. This failure, Counsel sumitted, was a breach of natural justice as found in **Front Row Investments v Daimler South East Asia** [2010] SGHC 80, **AKN & Anor v ALC & Others** [2015] SGCA 15 and **Oil & Natural Gas Corpn. Ltd vs Western Geco International Ltd.** AIR 2015 Supreme Court 363.

**[19]**    Counsel also argued that the  Arbitral Tribunal  acted ultra vires to **S. 49(1) of the Arbitration Act** when it ruled that costs were payable by the losing party at arbitration, the Claimant. She bolstered this argument on the cases of **Fitzsimmons v Lord Mostyn** [1904] AC 46 and **Mansfield v Robinson** [1928] 2 KB 353.

**[20]**    On these premises, she urged the Court that the Defendants have not demonstrated that the statutory grounds have not been engaged. Therefore, the Claimant does have a reasonable prospect of succeeding on the claim. Support was drawn from the cases of **Cecelia Laird v Critchlow & Anor** [2012] JMSC Civ 157.

**[21]**    Consequently, Counsel submitted that Summary Judgment would be inappropriate in these circumstances as the Court would be conducting a mini-trial and forming preliminary views of evidence which is incomplete before the Court.  In furtherance of this Counsel relied on **Cammock (Deceased and substituted by Nephew, Fitzroy Phillips) and Another v Hemmings and another** [2014] JMSC Civ 184 and **Lewis & Others v NCB Ja Ltd** [2018] JMSC Civ 40.

**[22]**    Mrs. Dixon-Frith's position was also that the Defendants' orders seeking striking out of the claim ought not to be granted on the basis that the Claimant is exercising a statutory right of action granted by the **Arbitration Act**. Accordingly, the claim is neither frivolous nor vexatious as the claim would not bring the administration of justice into disrepute. She relied on **Civil Court Practice (The Green Book)**, **Douglas et al v National Commercial Bank Jamaica Limited** [2013] JMSC Civ 85, **West Indies Petroleum Limited v Wilkinson and Levy** [2023] JMCA Civ 2. In this light Counsel argued that it cannot be said that the cause of action, on the face of the pleadings, is unsustainable or does not plead a complete claim. To this end, she relied on **Trillian Dougals v the Commissioner of Police** [2017] JMSC Civ. Further, a striking out order should not be granted in an area of developing jurisprudence as noted in **Farah v British Airways PLC and another PLC and another [2000] Times, 26th of January CA** and **Equitable Life Assurance Society v Ernst Young** [2003] 2 BCLC 603.

**[23]**    Lastly, Counsel contended that in light of the fact that the Defendants have displayed no intention to repay the disbursements, the order for security for costs should not be granted. To bolster this argument, Counsel relied on **Rule 24.2 (1) of the CPR**, **White Book 2004**, **Leyvand v Barasch**, **The Times, March 23, 2000**, **Symsure Limited v Kevin Moore** [2016] JMCA Civ. 8 and **Ras Al Khaimah Investment Authority v Farhad Azima and others** [2022] EWHC 1295 (Ch). However, if the Court is minded to find in the contrary, Counsel urged the Court to reduce the sum being claimed for security for costs. Reliance was placed on **Blackstone's Civil Practice 2005** and **Carey – Hazell v Getz Bros & Co (Aus) Pty Ltd** [2004] FCA 1334.


## ISSUES

**[24]**    The issues raised in this application are reflected in the questions posed below:

(1) What is the jurisdiction of the court to intervene in an arbitral award?

(2) Whether **S.55 of the Arbitration Act** is a mandatory provision from which the parties may not by agreement derogate?

(3) Whether the Claimant can successfully invoke any of the grounds under **S.55 of the Arbitration Act** to set aside the arbitral award?


## LAW AND ANALYSIS

*JURISDICTION*

**[25]**    Contrary to the submissions of Counsel for the Claimant, this matter does not engage **CPR Rule 9.6**, and the usual discourse involved in disputing the court's jurisdiction. Rather, the matter is centred around the court's jurisdiction to review an award made by an arbitral tribunal. **The Arbitration Act 2017 ("the Act")** incorporates the **UNCITRAL Model Law on International Commercial Arbitration (1985)**, with amendments as adopted in 2006 (**UNCITRAL Model Law)** into domestic law. A central feature of the **UNCITRAL Model Law** is the limit placed on the court's ability to intervene in arbitral disputes. **Article 5** of the **Model Law**, dealing with the extent of the court's intervention, states, *"no court shall intervene except where so provided in this Law."* In the **Explanatory Note by the UNCITRAL Secretariat on the 1985 Model Law on International Commercial Arbitration as amended in 2006**, limiting a court's intervention in arbitral proceedings is said to be a salient feature of the **Model Law**. It says:[1]

---

[1] UNCITRAL secretariat on the 1985 Model Law on International Commercial Arbitration as amended in 2006, para 17

- 8 -

> *Article 5 thus guarantees that all instances of possible court intervention are found in the piece of legislation enacting the Model Law, except for matters not regulated by it (for example, consolidation of arbitral proceedings, contractual relationship between arbitrators and parties or arbitral institutions, or fixing of costs and fees, including deposits). Protecting the arbitral process from unpredictable or disruptive court interference is essential to parties who choose arbitration (in particular foreign parties).*

The Claimant argued that the Court has inherent and or common law jurisdiction to review arbitral awards. The cases relied on by Counsel all predate the **Arbitration Act** which came into effect in 2017. With respect, this argument can be shortly answered by reference to **S.8 of the Act**. It follows **Article 5 of the Model Law**. It provides that:

> **8.** In matters governed by this Act, no court shall intervene except where so provided in this Act.

Consequently, since **the Act** came into effect, the court's jurisdiction to intervene in arbitral awards is solely conferred by **the Act**.

*SECTION 55 OF THE ARBITRATION ACT*

**[26]**    The claim invokes **S.55 of the Act** which mirrors **Article 34 of the UNCITRAL Model Law**. **S. 55** gives the court jurisdiction to set aside an arbitral award in specific circumstances. (There are other provisions in **the Act** giving the court jurisdiction which are not relevant to this judgment.)[2] The relevant portions read as follows:

> 55.- (1) Recourse to the Court against an arbitral award may be made only by an application for setting aside in accordance with subsections (2) and (3).
>
> (2) An arbitral award may be set aside by the Court only
>
> If-
>
> (a) the party making the application furnishes proof that-
>
> > (i) a party to the arbitration agreement referred to in section 10 was under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of Jamaica;
> >
> > (ii) the party making the application was not given proper notice of the appointment of an arbitrator or of the arbitral proceedings or was otherwise unable to present his case;

---

[2] **S.9 of the Arbitration Act**

- 9 -

(iii) the award deals with a dispute not contemplated by or not falling within the terms of the submission to arbitration, or contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, only that part of the award which contains decisions on matters not submitted to arbitration may be set aside; or

(iv) the composition of the arbitral tribunal or the arbitral procedure was not in accordance with the agreement of the parties, unless such agreement was in conflict with a provision of this Act from which the parties cannot derogate, or, failing such agreement, was not in accordance with this Act; or

(b) the Court finds that-

(i) the subject-matter of the dispute is not capable of settlement by arbitration under the laws of Jamaica; or

(ii) the award is in conflict with the public policy of Jamaica.

**[27]** Underpinning **S.55** are some underlying principles found in **S.4(1)** and **(2)**; **S.5(a),(b)** and **(c)** and **S.8** of **the Act**. The relevant sections read as follows:

**4.–** (1) In the interpretation of this Act, regard shall be had to its international origin and to the need to promote uniformity in its application and the observance of good faith.

(2) Questions concerning matters governed by this Act which are not expressly settled in it are to be settled in conformity with the principles set out in section 3(5).

**5.** The objects of this Act are to-

(a) facilitate domestic and international trade and commerce by encouraging the use of arbitration as a method of resolving disputes;

(b) facilitate and obtain the fair and speedy resolution of disputes by arbitration without unnecessary delay and expense;

(c) facilitate the use of arbitration agreements made in relation to domestic and international trade and commerce;

…

**8.–** In matters governed by this Act, no court shall intervene except where so provided in this Act.

- 10 -

**[28]**    These principles were elucidated in **Betamax Ltd v State Trading Corp (Mauritius)** [2021] UKPC 14 **("Betamax")** by the Privy Counsel, which stated:[3]

> *18. A number of principles relevant to the issue in the appeal are clearly set out in the International Arbitration Act:*
>
> > *(1) **Very limited court intervention.** Section 2A enacts the principle of very limited court intervention as set out in article 5 of the Model Law:*
> >
> > > *"In matters governed by this Act, no Court shall intervene except where so provided in this Act."*
> >
> > *(2) **Finality**. Section 36(7), modelled on section 19B of Singapore's International Arbitration Act and reflecting discussions within the UNCITRAL working group, provides:*
> >
> > > *"An award shall be final and binding on the parties and on any person claiming through or under them with respect to the matters determined therein, and may be relied upon by any of the parties in any proceedings before any arbitral tribunal or in any Court of competent jurisdiction."*
> >
> > *This provision is reinforced by section 39(1) (enacting part of article 34 of the Model Law) which makes clear that **applications to set aside the award are strictly confined:***
> >
> > > *"Any recourse against an arbitral award under this Act may be made only by an application to the Supreme Court for setting aside in accordance with this section."*
> >
> > *(3) **Exclusion of appeals on questions of law.** The International Arbitration Act requires specific consent for an appeal on a question of law. Under section 3B, the parties must expressly agree to opt in to such an appeal under provisions made in the First Schedule to the International Arbitration Act.*
> >
> > *(4) **Jurisdiction and Separability**. In accordance with modern international arbitration law, section 20, enacting article 16 of the Model Law with one change not material to the present appeal, provides for **the arbitral tribunal's ability to rule on its own jurisdiction** (referred to in the Travaux Préparatoires as "competence competence") and for **the separability of the arbitration clause:***
> >
> > > *"(1) An arbitral tribunal may rule on its own jurisdiction, including on any objection with respect to the existence or validity of the arbitration agreement.*
> > >
> > > *(2) An arbitration clause which forms part of a contract shall be treated for the purposes of subsection (1) as an agreement independent of the other terms of the contract, and a decision by the arbitral tribunal that the contract is null and void shall not entail ipso jure the invalidity of the arbitration clause."*
> >
> > *Procedural provisions for these issues are set out in the Act.*

---

[3] 2021] UKPC 14, paras 18-21

*19. Section 2B of the International Arbitration Act sets out the applicable **principles of interpretation**. It provides that in interpreting the Act and in developing the law applicable to international arbitration in Mauritius:*

*"(a) regard shall be had to the origin of the Amended Model Law, the corresponding provisions of which are set out in the Third Schedule, and to the need to promote uniformity in the application of the Model Law and the observance of good faith;*

*(b) any question concerning matters governed by the Amended Model Law which is not expressly settled in that Law shall be settled in conformity with the general principles on which that Law is based; and*

*(c) recourse may be had to international materials relating to the Amended Model Law and to its interpretation, including –*

*(i) relevant reports of UNCITRAL;*

*(ii) relevant reports and analytical commentaries of the UNCITRAL Secretariat;*

*(iii) relevant case law from other Model Law jurisdictions, including the case law reported by UNCITRAL in its CLOUT database; and*

*(iv) textbooks, articles and doctrinal commentaries on the Amended Model Law."*

*20. The Travaux Préparatoires made clear at para 17(a) that:*

*"First and foremost, the success of Mauritius as a jurisdiction of choice for international arbitration will be largely dependent on the uniform and consistent application by the Mauritian Courts of modern international arbitration law, and (in particular) on their **strong adhesion to the principles of non-interventionism which is at the heart thereof**. To this end:*

*(i) The Act strictly adopts the Amended Model Law's very limited voie de recours against arbitral awards: see section 39, which reproduces article 34 of the Amended Model Law…"*

*Section 39 is described as enacting "the all-important provisions of article 34 of the Amended Model Law without any significant modifications". The modifications are effected by the addition of the provisions in section 39(2)(b)(iii) and (iv) (fraud or corruption, and breach of the rules of natural justice). These provisions are akin to those enacted in Singapore in section 24 of Singapore's International Arbitration Act.*

*21. Article 34 of the Model Law, as the UNCITRAL Explanatory Note to the Model Law makes clear, contains **an exclusive list of grounds for setting aside an award**. This is essentially the same list as that contained in the provision in article 36 of the Model Law for the recognition and enforcement of arbitral awards which was itself taken from article V of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards 1958 (the "New York Convention"). As "public policy" is determined in the courts of the state before which proceedings are brought, there may well be differences in the view taken as to the nature and scope of the public policy between a supervisory court which is considering setting aside the award and a court enforcing the award in a different state. However, there is no reason for difference as to the extent of a court's right of intervention in respect of public policy under articles 34 and 36 and the decisions in this respect on enforcement are applicable in respect of applications to set aside. (Emphases mine)*

- 12 -

**[29]**    The first attack on the claim by the Defendants is that the Court has no jurisdiction to entertain the claim. This was as the parties to the SLAs themselves chose to exclude any intervention by a court into an arbitral award by virtue of Clause VII of the agreements. Clause VII states:

> *There will be no appeal from the decision of the Arbitral Tribunal on questions of fact, error, public policy, impartiality, process, jurisdiction, or law, nor will any court deviate from this paragraph, it's (sic) provisions and wish of the Parties. The arbitration award will be final and binding in resolving any controversy.*

The question which thus arises first for the Court's determination is whether the parties could contract out of **S. 55 of the Act**. If a valid term of the contract, then it is a complete answer to the Claimant's claim. If it is a mandatory provision which the parties could not contract out of, then the provisions of **S.55** are applicable.

### Is **S.55 of the Arbitration Act** a mandatory provision?

**[30]**    **S. 4 of the Act** specifically stipulates that it should be interpreted in accordance with its international origin, with one objective being to give effect to the **UNCITRAL Model Law**[4]. There being no decided cases in this jurisdiction on this issue, it is useful to look to the interpretation of **Article 34 of the UNCITRAL Model Law** or its equivalent in model law jurisdictions in the interpretation **of S.55**.

**[31]**    The Defendants referred the Court to the Canadian case of **Noble China Inc. v Lei** 1998 42 OR (3d) 69 **("Noble China")** in support of their argument that parties to an arbitration agreement can contract out of **Article 34 of Model Law**. In **Noble China**, the Ontario Superior Court of Justice had before it for determination, inter alia, an application to dismiss the setting aside of an arbitral award. This application was grounded on the premise that the parties had limited the grounds for review of the award through the inclusion of an exclusion clause in the arbitration agreement. Justice Lax upheld the exclusion clause on the basis that the parties could agree to contract out of **Article 34** so long as the agreement did not conflict with a mandatory provision of **Model Law** or is contrary to public policy. Justice Lax noted that arbitral proceedings were a consensual process which was designed with the intention of the parties in mind, and that a court should give effect to such intentions. She stated:[5]

> *In summary, art. 34 is not a mandatory provision of the Model Law. Parties may therefore agree to exclude any rights they may otherwise have to apply to set aside an award under this article. They may do so as long as their agreement does not conflict with a mandatory provision of the Model Law. The arbitration agreement here does not conflict with any mandatory provision of the Model Law, nor does it confer powers on the arbitration tribunal which is in conflict with Ontario public policy.*

Justice Lax made it known that her interpretation of **Article 34** was being made obiter.

---

[4] **S.5(e) of the Arbitration Act**
[5] 1998 42 OR (3d) 69, para 98

**[32]**    The decision in **Noble China** was considered, and it appears rejected, in **Popack v Lipszyc** 2015 Carswell Ont 8001, 2015 ONSC 3460 **("Popack")**, another Canadian case from a court of equal jurisdiction. In **Popack**, the parties also attempted to contract out of **Article 34**. In **Popack** Justice Matheson concluded that **Article 34** was a mandatory provision which the parties could not contract out of. She reasoned that if **Article 34** could be derogated from, then there would be no remedy for the breach of any of the mandatory provisions of the Model Law. In considering **Noble China**, she said:[6]

> The respondents rely on the decision in Noble China Inc. v. Cheong (1998), 42 O.R. (3d) 69 (Gen. Div.) in support of their position that Article 34 is not a mandatory provision of the Model Law and therefore can be excluded by agreement. In that case, in self-described obiter, the Court did say that Article 34 is not mandatory. However, to focus on that statement in isolation mis-describes the Court's findings. The Court identified a number of circumstances in which an attempt to exclude Article 34 by agreement would be ineffective. The Court found that Article 34(2)(a)(i)(ii) and (iii) are "independent grounds" to bring an application to set aside an award "without regard to the effect of any agreement." Next, the Court found that if the parties purported to agree in a manner that derogated from a mandatory provision of the ICAA such as Article 18, that agreement would be "ineffective" and not stand in the way of an application under Article 34. Similarly, with respect to the second part of Article 34, the Court concluded that an arbitration agreement may not confer powers on a tribunal to conduct an arbitration in a manner contrary to public policy. These findings are all different ways of showing that parties cannot effectively contract out of Article 34 for all purposes.

The finding of Justice Matheson in **Popack** was that **Article 34** is immune from contractual opt-out. She stated:[7]

> 46. … if parties can contract out of Article 34 for all purposes, there would be no jurisdiction for a court to set aside an award as a remedy for breach of these admittedly mandatory provisions. Noble China illustrates that this is not the case.

> 47. I conclude that the proper approach is to consider to what extent the Arbitration Agreement seeks to exclude Article 34, and if it does, to what extent it is effective in doing so given the specific matters at issue.

**[33]**    This approach is not unheard of in our jurisprudence. In **Peterkin, Arlene v Natural Resources Conservation Authority, Town and Country Planning Authority and National Housing Trust** [2022] JMSC Civ. 153 Anderson  K. J posited:[8]

> In Matthews v The State [2000] 60 WIR 390, a decision of Trinidad and Tobago's Court of Appeal, which has been consistently applied in our jurisdiction, the court considered the use of the word 'shall' in a statutory context. It is cited at page 403 as follows: 'Turning to the argument based on the language of s 18, courts no longer accept that it is possible merely by looking at the language used by the legislature, to distinguish between mandatory or imperative provisions, the penalty for breach of which is nullification, and provisions that are merely directory for breach of which the legislation is deemed to have intended a less drastic consequence. The fact of the matter is that most directions given by the legislature in statutes are in a form that is mandatory. It is now accepted that in order to determine what is the result of failure to comply with something prescribed by a statute, one has to look beyond the language and consider such matters

---

[6] 2015 Carswell Ont 8001, 2015 ONSC 3460, para 44
[7] Ibid. paras 46 - 47
[8] [2022] JMSC Civ. 153, paras 57-58

- 14 -

> *as the consequences of the breach and the implications of nullification in the circumstances of the particular case.'*
>
> *[58] The word 'may' does not always connote a discretionary scenario, but may also, be an imperative.*

**[34]**    **Popack** was followed and **Noble China** was rejected by the Supreme Court of British Columbia in **lululemon athletica canada Inc v Industrial Color Productions Inc** 2021 BCSC 15. The introduction is sufficient for these purposes to establish the relevance of the case.[9]

> *1.    lululemon athetica canada inc. ("lululemon") seeks an order pursuant to s. 34(2)(a)(iv) of the International Commercial Arbitration Act, R.S.B.C. 1996, c. 233 [ICA Act] to set aside the portion of a commercial arbitration award requiring it to pay Industrial Color Productions Inc. ("ICP") $1,081,967 (USD) plus interest.*
>
> *2.    In particular, lululemon claims the arbitrator went beyond the scope of the submission to arbitration in making an award that it says was not pleaded by ICP.*

After referring to paragraphs 44 to 47 of **Popack**, the chambers judge concluded that,[10] *"In short, a party cannot waive the statutory right to apply to set aside an arbitral award."* On appeal, in upholding the decision of the chambers judge, this issue was not addressed.[11]

**[35]**    **Article 34** distinguishes itself from other provisions that influence ongoing arbitral proceedings, as its operational scope is exclusively post-award. The importance of **Article 34** lies in its provision of the supervisory jurisdiction of the Court on the grounds enumerated. In my estimation, **Article 34** must in most, if not in all, circumstances, be construed as a mandatory provision, indispensable to the integrity of the arbitral process.

**[36]**    I find support for these conclusions from the fact that the drafters of the Model Law included certain provisions which gave parties the ability to derogate from them. Commentary was made on this observation by Thomas G. Heintzman O.C., Q.C., FCIArb in an article titled, **Can The Parties Contract Out Of The UNCITRAL Model Law?**. There Mr. Heintzman stated:

> *… the Model Law does expressly state in numerous articles that the parties can otherwise agree. Thus, Articles 3(1), 10(1), 11(2), 13(1), 17, 19(1), 21, 23(2), 24(1), 25, 28(1)-(3), 29, 31(2), 33(1). 33(1)(b) and 33(32) expressly state that the Article applies "unless the parties agree otherwise" or that the "parties are free to agree upon" other provisions, or words to the same effect. Article 4 refers to "a provision of this Law from which the parties may derogate", and requires a party to make a timely complaint about the non-compliance, failing which that party is deemed to waive the objection. The words "unless the parties agree otherwise", "the parties are free to agree" and "may derogate" imply that the parties may not agree otherwise or derogate from other provisions. Having stated in about 18 separate Article and sub-Articles that the parties may "otherwise agree" or are "free to agree upon" other provisions, it seems that the drafters thought they had stated*

---

[9] 2021 BCSC 15, paras 1-2
[10] Ibid., para 54
[11] **lululemon athletica canada inc. v. Industrial Color Productions Inc**. 2021 BCCA 428

> *which Articles and sub-Articles were non-mandatory and had thereby delineated between the mandatory and non-mandatory sections, and most unlikely they would have intended that the parties could contract out of the other provisions. If that is not so, and if the line between the two is not drawn by reference to those Articles and sub-Articles, then no clear line between the mandatory and non-mandatory Articles is apparent.*

**[37]**   On closer examination, in addressing whether the provisions of **S.55** are mandatory, there is no real difference between **Noble China** and **Popack**, in that what is sought to be excluded determines whether the provisions of **S.55** are mandatory or discretionary. The Court must look to the Arbitration Agreement  to see to what extent it purports to exclude **S.55**. The relevant section of the agreement reads:[12]

> *There will be no appeal from the decision of the arbitral tribunal on questions of fact, error, public policy, impartiality, process, jurisdiction, or law, nor will any court deviate from this paragraph, its provisions and wish of the Parties. The arbitration award will be final and binding in resolving any controversy.*

Though this Court has a preference for the reasoning in **Popack**[13], if the Court were to adopt either the approach of Justice Lax in **Noble China** or Justice Matheson in **Popack**, the result would be the same. The wide-sweeping attempt to exclude the court's statutory jurisdiction, which may include breaches of the mandatory provisions, including public policy, must be ineffective. In **Betamax**, it was held that the determination of the nature and extent of public policy was a question of law (of Singapore) for determination by the courts (of Singapore).

*Clause VII: Ouster of court's jurisdiction*

**[38]**   Counsel for the Claimant argued that Clause VII of the SLA amounted to an ouster clause and was illegal, void and contrary to public policy and therefore could not serve to oust the Court's jurisdiction to set aside the award. Having regard to the Court's finding in respect of **S. 55**, it is not necessary to deliberate further on this issue. In any event, the agreement provided that such a clause could be severed from the agreement.

*Whether statutory grounds to set aside award were made out?*

**[39]**   On this premise, the Court is now free to consider the bases on which the Claimant seeks to set aside the arbitral award.

**[40]**   The threshold requirement to bring an application under **S. 55** is that it is time bound. **S.55(3)**  mandates the time by which the application to set aside the arbitral award must be made. The section reads:

―――――――――――――――

[12] Clause VII of the SLAs

[13] Justice Matheson also found that what was excluded was an appeal and not as was before her an application to set aside the award.

(3) An application for setting aside may not be made after three months have elapsed from the date on which the party making that application had received the award or, if a request had been made under section 48, from the date on which that request had been disposed of by the arbitral tribunal.

In the case at bar, there is no dispute that the application to set aside the arbitral award was made in time.

**[41]**    The bases on which the Claimant seeks to set aside the arbitral award are set out in the three grounds adumbrated in the Claim Form which will form the subheadings for the discussion below.

 (a)    *The Final Award and or the Costs Award deals with a the dispute not contemplated by or not falling within the terms of the submission to arbitration or contains decisions on matters beyond the scope of the submission to arbitration.*

**[42]**    The Particulars of Claim discloses that challenged under this ground is the Arbitrator's failure to make findings of fact on matters in dispute; failure to make findings on the substantive merits of the issues in the proceedings; acting in excess of jurisdiction in granting the cost award and acting ultra vires **S49(1) of the Act** in granting the cost award.

**[43]**    **S.55(2)(a)(iii) of the Arbitration Act** mirrors **Article 34(2)(a)(iii) of the UNCITRAL Model Law**. This article concerns the setting aside of an arbitral award on the basis that the arbitrator acted in excess of his jurisdiction. In interpreting what is meant by exceeding jurisdiction in the context of arbitration proceedings, I refer to the case of **Lesotho Highlands Development Authority v Impregilo SpA and others** [2005] UKHL 43 **("Lesotho")**. In that case the provision in question was S.68(2)(B) of the Arbitration Act which provided for the setting aside of an arbitral award on the ground that the arbitrator had exceeded his jurisdiction. S.68(2)(B) also mirrored **Article 34 of the UNCITRAL Model Law**. In **Lesotho**, the House of Lords had to determine whether the arbitral tribunal exceeded its jurisdiction when it concluded that it had the power to order payment in any currency it deemed appropriate. This ground was also raised by the respondents in relation to the tribunal's conclusion that the "otherwise" agreed provisions in the agreement, which concerned interest, did not exclude the tribunal's powers to award interest. In coming to the determination of the court, Lord Steyn stated:

> *[29] It will be observed that the list of irregularities under s 68 may be divided into those which affect the arbitral procedure, and those which affect the award. But nowhere in s 68 is there any hint that a failure by the tribunal to arrive at the "correct decision" could afford a ground for challenge under s 68. On the other hand, s 68 has a meaningful role to play. An example of an excess of power under s 68(2)(b) may be where, in conflict with an agreement in writing of the parties under s 37, the tribunal appointed an expert to report to it. At the hearing of the appeal my noble and learned friend, Lord Phillips of Worth Matravers MR, also gave the example where an arbitration agreement expressly permitted only the award of simple interest and the arbitrators in disregard of the agreement*

*awarded compound interest. There is a close affinity between s 68(2)(b) and s 68(2)(e). The latter provision deals with the position when an arbitral institution vested by the parties with powers in relation to the proceedings or an award exceeds its powers. The institution would exceed its power of appointment by appointing a tribunal of three persons where the arbitration agreement specified a sole arbitrator.*

*…*

*[31] By its very terms s 68(2)(b) assumes that the tribunal acted within its substantive jurisdiction. It is aimed at the tribunal exceeding its powers under the arbitration agreement, terms of reference or the 1996 Act. Section 68(2)(b) does not permit a challenge on the ground that the tribunal arrived at a wrong conclusion as a matter of law or fact. It is not apt to cover a mere error of law. This view is reinforced if one takes into account that a mistake in interpreting the contract is the paradigm of a "question of law" which may in the circumstances specified in s 69 be appealed unless the parties have excluded that right by agreement. In cases where the right of appeal has by agreement, sanctioned by the Act, been excluded, it would be curious to allow a challenge under s 68(2)(b) to be based on a mistaken interpretation of the underlying contract. Moreover, it would be strange where there is no exclusion agreement, to allow parallel challenges under s 68(2)(b) and s 69.*

*[32] In order to decide whether s 68(2)(b) is engaged it will be necessary to focus intensely on the particular power under an arbitration agreement, the terms of reference, or the 1996 Act which is involved, judged in all the circumstances of the case. In making this general observation it must always be borne in mind that the erroneous exercise of an available power cannot by itself amount to an excess of power. A mere error of law will not amount to an excess of power under s 68(2)(b).*

*[33] For these reasons the Court of Appeal erred in concluding that the tribunal exceeded its powers on the currency point. If the tribunal erred in any way, it was an error within its power. [emphasis mine]*

This decision also makes it clear that **Article 34(2)(a)(iii)** must be construed restrictively so as not to re-examine the merits of the award.

(i)   <u>Did the Arbitrator's failure to determine several issues amount to a failure to arbitrate?</u>

**[44]**   The Claimant's assertion that the Arbitrator's failure to arbitrate and exceeding her jurisdiction by failing to render factual findings on contested issues that precipitated the arbitration, failing to consider numerous issues and showing a lack of regard for the party's submissions amounted to a breach of natural justice, and was accordingly a breach of public policy is misconceived. The Arbitrator is not required to determine every issue between the parties.

**[45]**   I find guidance on this from the case of **Secretary of State for the Home Department v Raytheon Systems Ltd** [2014] Bus LR 626, where the court, in determining whether to set aside an arbitral award, reviewed several authorities and distilled the following principles:[14]

---

[14] [2014] Bus LR 626, para 33

- 18 -

*(iv) However, there will be a failure to deal with an 'issue' where the determination of that 'issue' is essential to the decision reached in the award (World Trade Corporation v C Czarnikow Sugar Ltd [2005] 1 Lloyd's Rep 422 at paragraph 16). An essential issue arises in this context where the decision cannot be justified as a particular key issue has not been decided which is critical to the result and there has not been a decision on all the issues necessary to resolve the dispute or disputes (Weldon Plan Ltd v The Commission for the New Towns [2000] BLR 496 at paragraph 21).*

*…*

***(x) A tribunal does not fail to deal with issues if it does not answer every question that qualifies as an "issue". It can "deal with" an issue where that issue does not arise in view of its decisions on the facts or its legal conclusions. A tribunal may deal with an issue by so deciding a logically anterior point such that the other issue does not arise…***

*(xi) It is up to the tribunal how to structure an award and how to address the essential issues; if the issue does not arise because of the route the tribunal has followed for the purposes of arriving at its conclusion, Section 68(2)(d) will not be engaged. [Emphasis mine]*

**[46]**    In the present case, the dispute central to the case concerned the Claimant's status as a money lender pursuant to the MLO. That question having been found in the affirmative, the Arbitral Tribunal went on to conclude that it lacked jurisdiction to grant the reliefs sought as any relief could only be granted by the Hong Kong High Court pursuant to the proviso of the MLO. Thus, further factual and legal findings became moot. The issues not addressed in the arbitration were matters relevant to the consideration of the question of whether the Claimant is entitled to relief pursuant to the proviso.

**[47]**    The Particulars of the Failure to Arbitrate and Acting in Excess of Jurisdiction in the Particulars of Claim do not disclose in any way that there was a failure by the Arbitral Tribunal to decide on the relevant issues. What is contended is that the arbitral tribunal came to an incorrect decision which as shown above would not engage **S.55(2)(a)(iii)** of the **Arbitration Act.**

(ii)    <u>Did the Arbitrator exceed her jurisdiction when she awarded Costs to the Defendants?</u>

**[48]**    The Claimant argued that the Arbitrator acted in excess of her jurisdiction when she ruled that costs were payable to the losing party contrary to **S.49 of the Arbitration Act** and the terms of the SLAs. **S. 49 of the Act** conferred upon the parties the autonomy to negotiate and determine their own costs arrangments. Pursuant to the section, the SLAs provided for all costs to be borne by the Defendants irrespective of the party who was successful at the arbitration.

**[49]**    The Claimant relied on the cases of **Mansfield v Robinson** [1928] 2 K.B. 353 **("Mansfield")** and **Fitzsimmons And Lord Mostyn** [1904] A.C. 46 **("Fitzsimmons")** to support its argument that the agreed terms in the SLAs in relation to costs should supersede the discretion of the arbitrator to grant costs. However, these cases are

distinguishable from the case at bar. In both cases the parties maintained their position in relation to their prior agreements as to the costs of proceedings.

**[50]**    In **Mansfield**, the parties had previously agreed that the prevailing party would be entitled to costs on the High Court scale. However, this agreement was not disclosed to the arbitrator. Consequently, the arbitrator ruled in favor of the claimant but ordered each party to bear its own costs. On appeal, the Claimant sought to enforce the original agreement, and the court ultimately upheld the appeal, deeming the agreement valid and enforceable, notwithstanding the arbitrator's discretion under the Act. Noteworthy, the court in that case referenced the case of **Walter v. Bewicke, Moreing & Co**. 90 L. T. 410 in stating that costs orders could be overridden by the agreement of the parties.

**[51]**    In **Fitzsimmons v Lord Mostyn** [1904] A.C. 46 **("Fitzsimmons")** the subject of the dispute between the parties involved a lease which included a renewal covenant requiring the lessor to renew at the lessee's request and expense, with a fine based on the term's remaining years and property value. When the parties disagreed on the fine, they referred the issue to arbitration. The court held that the lessee must pay the arbitration costs as part of the renewal expenses.

**[52]**    In **Mansfield and Fitzsimmons** none of the parties opted to deviate from or modify the terms of the prior agreed cost arrangements. In the case at bar, following a preliminary meeting on 13th August 2021, the subsequent order was made with the consent of the parties, *"Costs are to be awarded by the Tribunal to the successful party."* The arbitrator commented on this by stating:[15]

> *This award was sent to the parties by email of the 18th of August 2021. There was no application for correction on the basis now indicated. As indicated the order was made with the consent of the parties. The Tribunal found itself bound by the terms of this order coming as it did, after the agreement evidenced by the SLAs. The Claimant's motion for costs is therefore refused.*

**[53]**    The Arbitrator's commentary aligns with the obiter of the court in **Mansfield**, which established that prior cost arrangements can be superseded by the mutual agreement of the parties. In accordance with this, I find that the Claimant explicitly waived its right under the prior cost arrangements stipulated in the SLAs. Consequently, the Claimant is now precluded from taking a position that the Arbitrator's ruling, based on the subsequent agreement as to costs, was in excess of  the arbitrator's jurisdiction.

*(b)*    *The subject matter of the dispute between the parties was not capable of settlement by arbitration under the laws of Jamaica*

**[54]**    Under this ground, the Claimant takes issue that contravention of the criminal law was a matter of the public forum for a court of law. The Claimant also contended that

---

[15] Reasons for Award on Counerclaim and Costs, paras 25-26

issues of fraud and fraud related acts are criminal offences and are matters of the public forum and one for a court of law.

**[55]**    The Claimant asserted that the dispute was not capable of arbitration as the determination of a breach of the MLO was exclusive to the criminal jurisdiction of Hong Kong and thus outside of the jurisdiction of the Arbitrator. The Defendants are on good ground when they argue that the Arbitrator was not exercising criminal jurisdiction. A similar issue arose in **London Steamship Owners' Mutual Insurance Association Ltd v Kingdom of Spain and another** [2015] EWCA Civ 333. The dissertation on the issue is comprehensive and I adopt it.[16]

> *E. Are the claims arbitrable?*
>
> *[77] Mr Smouha submitted that the claims made by the Appellants in the Spanish proceedings were inherently incapable of being determined by arbitration because a conviction in the proceedings was an essential element of the cause of action against the insurer. Since an arbitrator cannot convict a person of a criminal offence, the claim cannot be constituted in arbitration proceedings.*
>
> *[78] It was not disputed that in the ordinary way an arbitrator has jurisdiction to find facts which constitute a criminal offence (fraud being an all too common example) or that in an appropriate case an arbitrator also has jurisdiction to find that a criminal offence has been committed. As the judge pointed out, however, it is necessary to distinguish between a finding of criminal conduct and a conviction which provides the basis for a penal sanction. It may also be important in this context to distinguish between a claim and a dispute or difference.*
>
> *[79] Before the judge, as before us, the central plank of the Appellants' argument was that liability under art 117 depends on a conviction. The text of arts 109, 116 and 117, to which I have already referred, suggests that the liability is civil in nature and that a conviction is merely a precondition to the right to pursue such claims in criminal proceedings. Any doubt about that, however, is in my view removed by paras 106 and 107 of the judgment below. In para 106 the judge found that although claims of this kind are brought under the Penal Code, the relevant provisions are civil in nature and are construed according to civil principles of law. Although the Public Prosecutor has a right to bring claims on behalf of third parties, they remain the third parties' claims, with the result that any judgment is rendered in favour of the third party.*
>
> *[80] The judge dealt with the Appellants' argument in the following way:*
>
>> *"107 . . . whether the claim is brought under Article 76 or Article 117, the right to recover from the insurer depends on proof of an insured liability under the insurance contract and does not require a finding of criminal liability. Even if it did, it would not be a finding involving criminal responsibility or criminal penal consequences. It would simply be a step towards establishment of a civil law monetary claim. Further, it would be remarkable if civil claims advanced in criminal proceedings were inarbitrable, whereas if the same claims had been advanced in civil proceedings they would not have been, so that arbitrability would effectively be at the option of the Claimant."*

---

[16] [2015] EWCA Civ 333, paras 77-82

*[81] In my view this passage amounts to a finding that a conviction is not an integral element of the cause of action. The distinction is important, because even if a conviction were a pre-condition to the right to recover against the insurer, there would be no reason why an arbitrator should not determine a claim of this kind, taking into account whether the condition has or has not been satisfied. He cannot, on the other hand, formally convict any person of a criminal offence.*

*[82] The argument does not end there, however, because the arbitration agreement is not concerned with claims as such but with differences and disputes. The principal disputes between the Appellants and the Club were whether the Appellants were bound by the arbitration clause in the Club's rules and whether the "pay to be paid" clause was effective to defeat their claims. Those were the disputes which the Club referred to arbitration and the grounds on which it sought declaratory awards confirming that it was under no liability. They could be determined by the arbitrator without having to decide whether any of the accused in the Spanish criminal proceedings had committed any offences, since in those proceedings neither of the Appellants was seeking to enforce any right against the Club. In my view the matters referred to the arbitrator were capable of being the subject of an award, although the court is entitled to have the final word on jurisdiction. I would grant the Appellants permission to appeal on this additional ground, but in my view it does not provide a basis for allowing the appeal.*

[56]    The instant case is even clearer. The Arbitrator found, as she was entitled to, that the SLAs were in breach of the MLO, and that though a criminal offence, the Hong Kong courts have the power to grant relief to the lender. The Arbitrator did not make a finding of criminal responsibility. Put another way, if the possibility of relief was not given to the lender in the MLO, the Arbitrator could have made a finding that the loans were in breach of the MLO, and deny the relief sought, which would have in effect settled the dispute between the parties without any finding of criminal liability by the lender.

*(c)    The Final Award and or the Cost Award is in conflict with the Public Policy of Jamaica*

[57]    It was contended by the Claimant that the Final Award was in breach of the principles of natural justice. The purported breaches were a regurgitation of the allegations of the failure to arbitrate. In the alternative, it was argued that they were errors of law. For the reasons previously given, this argument is without merit

[58]    It was also submitted that in granting the Costs Award, the Arbitral Tribunal acted in breach of the principles of natural justice when she failed to apply the terms of the arbitration agreement contained in the SLAs. Again for reasons given earlier, this submission cannot succeed.

[59]    I refer to the decision of the court in **Betamax**. In this case, Betamax Ltd**,** the appellant, entered into a contract with the State Trading Corporation, the respondent, for the supply of petroleum products. The Government of Mauritius announced that it would terminate the agreement on the basis that the agreement was in contravention with the country's public procurement laws and was therefore illegal and unenforceable. Betamax Ltd. referred the matter to arbitration. The arbitral tribunal ruled in Betamax Ltd's favour,

- 22 -

on the premise that the agreement did not breach the procurement laws. On the State Trading Corporation's application to the Supreme Court to set aside the award, the Supreme Court found that the agreement was illegal and on that premise, the award of the arbitral tribunal should be set aside as it conflicted with Mauritian public policy. On appeal to the Privy Council, the Board found that the interpretation of the procurement laws did not give rise to an issue of public policy. On this premise the appeal was allowed. The Privy Council after reviewing cases referred to it stated:[17]

> *The intervention of the court is specifically limited to setting aside the award on the grounds set out in section 39(2) of the International Arbitration Act. In relation to the issue of whether the award conflicts with public policy, the court's intervention proceeds on the court's application of public policy to the findings (whether of fact or law) made in the award. To read section 39(2)(b) more widely would be contrary to the clear provisions as to the finality of awards. The provision can be given full application by respecting the finality of the matters determined by the award and confining the ambit of the section to the public policy of the state in relation to the award. **The question for the court under section 39(2)(b)(ii) is whether, on the findings of law and fact made in the award, there is any conflict between the award and public policy. For example, if the Arbitrator had held that the COA had been concluded in breach of the PP Act, but the contract was enforceable as it was not contrary to public policy, the court would be entitled to determine under section 39(2)(b)(ii) whether that decision by the Arbitrator conflicted with the public policy of Mauritius. The effect of section 39(2)(b)(ii) is simply to reserve to the court this limited supervisory role which requires the court to respect the finality of the award. It cannot, under the guise of public policy, reopen issues relating to the meaning and effect of the contract or whether it complies with a regulatory or legislative scheme.** [Emphasis mine]*

**[60]**　　The case of **Betamax** serves to affirm the paramountcy of upholding arbitral awards, maintaining their finality and the enforceability of arbitration decisions. Moreover, it provides valuable insight as to the scope of the public policy ground to set aside an award. Notably, the case also makes strikingly clear that public policy and errors of law are two distinct concepts in the context of arbitration. The key difference between them is that public policy refers to the principles and values that underscore the legal system and society as a whole. It is concerned with ensuring that awards do not offend against fundamental principles of illegality, immorality, or unconscionability. Errors of law refer to mistakes made by the arbitrator in the interpretation and application of the law. It is concerned with ensuring that the arbitrator has correctly applied the relevant legal principles. It is clear that there is no issue that the award is in conflict with the public policy of Jamaica.

*STRIKE OUT*

**[61]**　　**Rule 26.3 (1) of the CPR** provides the circumstances in which the court may strike out a litigant's statement of case. The rule provides:

---

[17] [2021] UKPC 14, para 49

> *26.3 (1) In addition to any other powers under these Rules, the court may strike out a statement of case or part of a statement of case if it appears to the court –*
>
> > a) *that there has been a failure to comply with a rule or practice direction or with an order or direction given by the court in the proceedings;*
> >
> > b) *that the statement of case or the part to be struck out is an abuse of the process of the court or is likely to obstruct the just disposal of the proceedings;*
> >
> > c) *that the statement of case or the part to be struck out discloses no reasonable grounds for bringing or defending a claim; or*
> >
> > d) *that the statement of case or the part to be struck out is prolix or does not comply with the requirements of Parts 8 or 10.'*

**[62]** As the Court has found in favour of the Claimant on the jurisdiction issue, it is only ground c that would be applicable. This is the same basis on which the Court will consider the application for summary judgment.

*SUMMARY JUDGMENT*

**[63]** **Part 15 of the CPR** empowers the court to grant summary judgment on a claim, or on a particular issue, where the court considers that the claimant, or the defendant, has no real prospect of successfully defending the claim or issue. The relevant law is well trod in several cases so it is sufficient to set out the applicable principles here. In the oft-cited case of **Swain v Hillman and another** [2001] 1 All ER 91, Lord Woolf MR defined what is meant by *"no real prospect of succeeding"* as:[18]

> *… The words 'no real prospect of succeeding' do not need any amplification, they speak for themselves. The word 'real' distinguishes fanciful prospects of success … they direct the court to the need to see whether there is a 'realistic' as opposed to a 'fanciful' prospect of success.*

The burden of proof lies on the applicant to prove that the respondent has no real prospect of successfully defending the claim. In **Howell (Delroy) v Royal Bank of Canada et al and Ocean Chimo Ltd v Royal Bank of Canada et al** [2021] JMCA Civ 19 **("Howell")**, Phillips JA said:[19]

> *It appears to be well settled now that the burden of proof on an application for summary judgment rests on the applicant to prove that the respondent's case has no real prospect of success. However, once the applicant asserts their belief on credible grounds, a respondent seeking to resist an application for summary judgment is required to show that he has a case that is better than merely arguable (**ED&F Man Liquid Products Ltd v Patel and another [2003] EWCA Civ 472**).*

The respondent is not required to prove the certainty of success.

---

[18] [2001] 1 All ER 91 at pg 92
[19] [2021] JMCA Civ 19, para 114

- 24 -

**[64]**   In **Somerset Enterprises Limited and anor v National Export Import Bank** [2021] JMCA Civ 12 **("Somerset")**, Brooks P, summed up these requirements and gave guidance for a court considering an application for summary judgment. He stated: [20]

> *[25] The party that seeks the summary judgment must assert that the respondent's case has no real prospect of success. If that party asserts that belief, on credible grounds, a respondent seeking to resist an application for summary judgment is required to show that he has a case "which is better than merely arguable". In order to successfully resist the other party's assertion, the respondent must prove that its case has "a 'realistic' as opposed to a 'fanciful' prospect of success" (see paragraphs [14] and [15] of **ASE Metals NV v Exclusive Holiday of Elegance Limited** [2013] JMCA Civ 37). **In determining whether there is any real prospect of succeeding, the judge should not conduct a mini-trial.***
>
> *[26] The Privy Council has also offered guidance on the matter, in **Sagicor Bank Jamaica Limited v Marvalyn Taylor Wright** [2018] UKPC 12. Lord Briggs stated that summary judgment allows the court to determine whether the matter requires a trial. **He added that if a trial of the issues between the parties does not affect the claimant's entitlement to the relief sought then the trial is unnecessary** (see paragraphs 16-21).*
>
> *[27] **Although the judge considering a summary judgment application is not to conduct a mini-trial, he must carefully examine each party's statement of case and the supporting documents, in order to determine the merits.** It is against this background that this matter is to be viewed.* (Emphasis mine)

**[65]**   Despite the Court not finding favour with the Defendants' submissions that the jurisdiction of the Court to set aside the arbitral award is ousted by Clause VII of the Arbitration Agreement, the Defendants' assertion that the claim has no real prospect of success is sound. The Claimant has failed to show that it can establish any of the grounds under **S.55** for the Court to exercise its jurisdiction to set aside the arbitral award. The Claimant therefore has no real prospect of succeeding on the claim.


**ORDERS**

1. Summary judgment is hereby granted in favour of the Applicants/Defendants against the Respondent/Claimant on the basis that it has no real prospect of succeeding on the claim.
2. Verbal Notice of Leave to Appeal given.
3. Parties to file and serve written submissions in respect of the notice of leave to appeal by 24th May 2024
4. Parties to file and serve written submissions on Costs by 24th May 2024
5. Applicant's attorney to prepare, file and serve Orders.

_____

Judge

---

[20] [2021] JMCA Civ 12, paras 25-27

# EXHIBIT 44

First Defendant
Witness Statement of Mr Val Sklarov
Fourth
Exhibit "VS4"
16 September 2024

**IN THE HIGH COURT OF JUSTICE**                    **CLAIM NO. CL-2024-000450**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (KBD)**

**BETWEEN:**

**(1) RICARDO BENJAMIN SALINAS PLIEGO**

**(2) CORPORACION RBS SA DE CV**

**Claimants**

**- v -**

**(1) ASTOR ASSET MANAGEMENT 3 LIMITED**

**(2) WEISER GLOBAL CAPITAL MARKETS LTD**

**(3) TAVIRA MONACO SAM**

**(4) VLADIMIR "VAL" SKLAROV**

**(5) CORNELIUS VANDERBILT CAPITAL MANAGEMENT LTD**

**(6) ASTOR CAPITAL FUND LIMITED**

**Defendants**

_____

**FOURTH WITNESS STATEMENT OF VAL
SKLAROV**

_____

I, **VAL SKLAROV** of 142 Gold Springs Court, Canton, Georgia 30114, **WILL SAY AS FOLLOWS:**

1.  I make this statement on behalf of myself and the First, Fourth, Fifth and Sixth Defendants ("the Astor Parties"), in response to the fourth witness statement of Mr Salceda of 9 September 2024 ("Salceda 4") served on behalf of the Claimants opposing the Astor Parties' application to set aside

1

the freezing orders and proprietary injunctions granted without notice on 2, 7 and 13 August 2024.

2. The facts and matters set out in this statement are within my own knowledge unless otherwise stated, and I believe them to be true. Where I refer to information supplied by others or documents I have reviewed, the source of the information is identified; facts and matters derived from other sources are true to the best of my knowledge and belief.

3. There is now produced and shown to me a paginated bundle of true copy documents marked "**Exhibit VS4**". Unless otherwise stated, all references to documents in this statement are to Exhibit VS4 and all specific page references are marked "**[VS4/##]**".

## A. Introduction

4. I strongly deny any fraud by myself or by the other Astor Parties. Indeed, the allegations against me and the other Astor Parties make no sense. The Claimants' case is that I committed a fraud which had the following characteristics:

   a. It involved doing exactly what the contract contemplates and authorises. As the WhatsApp messages demonstrate, Mr Salinas and his advisers fully appreciated that this was the contract which he had entered into, but for reasons of their own have pretended otherwise. The messages also show that the Claimants' allegations of recent discovery of the supposed fraudulent dealings in Elektra shares are a complete fiction. The Claimants have created a fictitious story and deceived the Court with it.

   b. The supposed fraud involved doing exactly what was notified to the Claimants' representative by an email at the outset of the transaction. The Claimants now say that they never received the email, although it was sent to their representative (Alexandre Torti) in response to a query they had themselves initiated, and they cannot explain his supposed oversight. Regardless of the truthfulness or adequacy of these explanations, they do not deny the email, nor do they explain how it can be consistent with my alleged dishonesty.

   c. Also importantly, the supposed fraud involved acting with the full cooperation and knowledge of independent broker-dealers (the custodians Weiser and Tavira) who are significant industry players. They are regulated broker dealers in their respective jurisdictions. They also have to maintain relations with major international banks who would not deal with a counterparty suspected of fraud. Tellingly, the Claimants suggested in their without notice applications that the custodians might be creatures of mine. This absurd suggestion has never since been pursued, but it shows the lengths to which the Claimants have to go in order to try and construct a case.

   d. It involved advancing over US$110 million to the alleged victim, at the risk of the Astor Parties.

2

e. It was implemented by transactions which were all recorded by the same broker-dealers in their capacity as custodians. There was no attempt to hide anything.

f. The majority of the proceeds of those transactions were either returned to the broker-dealer, where they largely remain, or were paid to the Claimants, or were taken as commission by the broker-dealer. There was no attempt to dissipate the proceeds over almost three years.

5. The case against me and the other Defendants is built on the central allegations that the pledged shares should never have been traded; that Mr Salinas and his advisers did not believe the shares were being traded; and that they had no reason to believe that the Defendants thought differently until Astor 3's letter of 12 June 2024, after which they caused to be made an investigation, the fruits of which resulted in an urgent application to Court at the end of July. This is a false and unreal view of the case. The reality of what Mr Salinas and his team understood appears from a WhatsApp exchange between me (using the name Gregory Mitchell) and Ms Zara Akbar, whom the Claimants used to communicate with Astor 3, in June 2024:



APP/460



annoying.
Fri, Jun 14

~ Zara Akbar
I agree it's soo annoying as I feel like a
repeating cycle

Shares are not frozen and it's clear in
the loan agreement. Hence why I
asked you the other day if they had in
fact read the loan agreement.

If anyone, you, Salinas or Elon Musk
or Jeff Bezos has shares in the
market, they are accessible to any
third party. Any BD of bank can have
access to shares. We are stunned
Salinas doesn't know that. Alex knows
that. Why are we constantly having
this disconnect with them.

~ Zara Akbar
Honestly Gregory I've got no idea.
One month they are happy as Larry
and the next they are having panic
attacks

Anyone can borrow anyone's shares.
This is how markets work.



Fri, Jun 14

Anyone can borrow anyone's shares.
This is how markets work.

Call any BD and ask to borrow
ELEKTRA shares, they will ask you
"how many do you want"

The float which is number of tradable
shares can be borrowed and traded
by anyone.

The loan agreement is very clear.
Astor does not sell. But we can't
control 6 billion people on this planet
who may choose to trade ELEKTRA
shares.

Salinas owns a bank and has advisors.
Surely they can't be that naive.

~ Zara Akbar
Forwarded
I did exactly this yesterday, spent 1
hour over the phone with him about
this matter and strongly suggested he
reviews the SLA with his legal team so

4

APP/461



**Fri, Jun 14**

~ Zara Akbar

I did exactly this yesterday, spent 1 hour over the phone with him about this matter and strongly suggested he reviews the SLA with his legal team so he does not trigger any negative impact. He said he would, but then a few hours later he sent this email

Hi Gregory as you can see Alex gets it. Eduardo is a little bit of a loose cannon. Anyway we have a call with him later today

Are we copied on emails ? I don't see any.

~ Zara Akbar
You mean from Weiser?

We see no emails from anyone on this issue.

~ Zara Akbar
Oh did you not get the email from



impact. He said he would, but then a few hours later he sent this email

Hi Gregory as you can see Alex gets it. Eduardo is a little bit of a loose cannon. Anyway we have a call with him later today

Are we copied on emails ? I don't see any.

~ Zara Akbar
You mean from Weiser?

We see no emails from anyone on this issue.

~ Zara Akbar
Oh did you not get the email from Noemi - Salinas's lawyer?

The only other email in this discussion is the one from Weiser - but I do not have a copy of that

Will ask for that for you

5

APP/462

6.   (For clarification, the penultimate message in this chain was one which Ms Akbar forwarded to me. I believe it was sent to her by "Alex" (as her next message indicates), i.e. Alexandre Torti. The "him" with whom Mr Torti said he had spent an hour speaking appears to be either Mr Salinas or Mr Salceda.   "Eduardo" is Mr Salceda. Ms Akbar refers to the fact that Mr Salinas was changing his mind from one month to another (she also says "repeating cycle") about whether he was happy with the shares being rehypothecated. This is entirely consistent with my belief (then and now) that he was aware all along of what was going on, contrary to the impression he now seeks to give via Mr Salceda.

7.   The true position is that this was a regularly executed deal, following standard industry practices, and on terms that expressly enabled rehypothecation (onward stock lending) by the cash lender Astor 3. This was in return for providing Mr Salinas with (in his own adviser's words) a *"new huge loan"* - liquidity which he was unable or unwilling to access by openly disposing of his shares.

8.   Mr Salinas has refused to provide any evidence himself. He has hidden behind others, not only in relation to his own understanding of the arrangements, but even to demonstrate his supposed (but in fact highly dubious) wealth, or to establish the reasons behind the recent share suspension which was presented to the court as part of the "discovery" of the supposed fraud. Nor has Mr Salinas provided any evidence to explain or mitigate the numerous deficiencies in the application made on his behalf to obtain draconian relief against me and the other Astor Parties. In fact, and as appears below, it appears all too likely that Mr Salinas has realised the consequences of the terms on which he entered into the deal. He is seeking to accuse me of fraud when (at best) his own advisers were at fault in what they communicated to him and (at worst) he is using his allegations as a convenient way to escape the consequences of his own breaches of relevant securities laws and to stem the drastic decline in the price of Elektra shares.

   **B.   Overview of this statement**

9.   This statement is structured as follows:

   a.   In <u>Section C</u>, I respond to paragraphs 9 to 15 of Salceda 4 in which he seeks to explain the deal and makes various assertions about stock lending practices. What Mr Salceda says cannot be reconciled with the terms of the arrangements entered into in this case.

   b.   In <u>Section D</u>, I explain the commercial background to this deal and how it progressed properly and in accordance with its terms until the suspension trading in Elektra shares (which Salceda 4 now admits was requested by Elektra, i.e. by Mr Salinas) and until the bringing of these proceedings.

6

c.  In <u>Section E</u>, I set out further details of the proceeds of the transactions in Elektra shares. Having now been able to investigate the position more thoroughly, it can be seen that the amounts now held at Tavira and Weiser, and frozen by them, exceed any damages which the Claimants could claim (even if they had any claim). In particular, the Claimants' figure is based on an out-of-date share price which arbitrarily and unjustifiably increases their claim.

d.  In <u>Section F</u>, I deal with Mr Salceda's evidence about the suspension of Elektra shares and about Mr Salinas's personal position, both of which the Astor Parties contend were the subject of serious failures in the duty of full and frank disclosure.

e.  In <u>Section G</u>, I give further details about the background to this transaction.

**C.  Stock lending**

10.  Salceda 4 accepts that there is some stock-lending where lenders (i.e. the stock borrower) may have the ability to use the stock in further transactions, even prior to an event of default (paragraph 10).  What the Claimants' evidence fails to do is: (1) explain how widespread this practice is - in fact, it is very common; or (2) set out why Mr Salceda, or Mr Salinas (who was personally party to the SLA), believed that the terms of the arrangements they had entered into were any different.

11.  Instead, Salceda 4 refers, without any specifics, to prior transactions in which it is claimed by Mr Salceda that Mr Salinas had always refused to allow the (cash) lender to rehypothecate (lend out) the stock. I and the Astor Parties obviously had not the slightest knowledge of Mr Salinas's alleged practices. An obvious answer to Mr Salceda's point is therefore that, regardless of Mr Salinas's prior transactions' terms, the critical question is, whatever might have been one party's preferred outcome of negotiations, what <u>this</u> transaction permitted. Nonetheless, given the Claimants' own reliance on those transactions, the Astor Parties' solicitors wrote on 11 September 2024 to seek disclosure of a limited sample of the earlier transactions referred to. On 16 September 2024, the Claimants' solicitors refused, arguing that no specific previous transactions had been mentioned for the purposes of CPR 31.14.  Whether this argument of law is technically correct is a matter I leave for submission.  Mr Salinas's unwillingness to provide details of prior transactions whose supposed terms he himself relies on is very telling.

12.  The stock lending industry is very large and at the top end involves the major banks, JP Morgan, Goldman Sachs etc. They handle blue chip stocks. At the top end of the market, the stockholders want to hold long, e.g. pension funds. In the meantime, they are content to allow major institutions to trade in the stock. The major institutions will have custody agreements which allow them as custodians to engage in such trading by lending or rehypothecating the stock out to others. The effect is to allow securities which would otherwise sit in accounts earning nothing to be used to

7

APP/464

support short-term financing for the owner of the securities, and generally to increase liquidity in the markets.

13. At the bottom end of the market, where I operate, the stock is closer to junk stock where the market may well be manipulated and where borrowers often default. The stockholder may be motivated to enter into a stock lending arrangement because it does not want to be seen to be disposing of or borrowing against the stock (for example because they are a director and public and/or regulatory announcements would have to be made) and/or does not want to pay tax on any disposal. However, as with all stock lending, the basic motivation applies as stated in paragraph 10 above. In the case where onward stock lending is permitted:-

   a. The stockholder raises cash because the shares which he has put into custody can be traded and this is a valuable opportunity for the counterparty.

   b. To that end, custodians generally have terms and conditions which entitle them to effect transactions in shares which are deposited with them. I understood this to apply to both Tavira and Weiser, the custodians in this case, as it was common market practice. Tavira and Weiser in turn had the shares on deposit at larger custodians, for example Deutsche Bank or Citibank. These custodians would also have had terms and conditions authorising them to trade in the stock. All the custodians take a commission.

14. The lender will make money if the stock can be traded at a profit, i.e. if the proceeds exceed the loan (if the borrower defaults and does not repay the loan, as is very often the case) or the cost of repurchasing equivalent shares to return collateral to the cash borrower at the end of the loan term (if the borrower does not default). My experience is that borrower defaults are much more typical.

15. The lower end of the market is a risky business. Particularly in Asia, the stock has often been pumped up by market manipulation. In those cases, a loan even at a low LTV may exceed the true value of the stock. The lender can be left with worthless stock. I typically assume that 25-30% of deals will end in a dispute. I have therefore taken great care over the years in which I have been involved in this business to develop and refine standard terms with the benefit of legal advice and which reflect experiences with borrowers. . The standard terms which I use, of which the SLA in this case is an example, are deliberately framed so as to give the cash lender (such as Astor 3) the maximum freedom to put the shares it has taken as collateral into the stock lending market, and to make clear to the cash borrower that (to use one of the many phrases to this effect in the agreement) that the cash lender has *"dominion"* over the shares during the term of the loan, as well as on an event of default.

8

**D.  The Elektra deal**

16.  The Elektra deal followed the normal commercial logic for this type of transaction:

   a.   The cash loan extended to the borrower has a relatively low interest rate (in this case, 1.15% per annum).  This reflects the fact that from the lender's perspective, the opportunity to make money from the transaction overall derives from its ability to use the shares posted as collateral by the borrower to undertake profitable trading strategies or to re-hypothecate the shares to another entity which might undertake such strategies. (This was explained in the email exchange between Astor 3 and Mr Salinas's adviser/representative Alexandre Torti of 10 September 2021.[1])

   b.   In order for that opportunity to be available to the lender, it is essential that the lender should benefit from a contractual mechanism in the loan/security agreement which permits those shares to be used (rather than being left untouched in custody).  Such a mechanism can be one where title is not transferred but where the lender has a right of use.  The SLA provides for such rights, and this was my and the Astor Parties' understanding.

17.  From the lender's perspective, the starting point from the outset in 2021 was an expectation that the price of the relevant shares (in Elektra) was too high. I had a firm conviction (which has been fully borne out by later events) that Elektra's share price was unsustainable. The stock price had increased noticeably in the period prior to the loan request, which you often see in manipulated cases. And financials – such as the p/e ratio which had fluctuated significantly – did not justify the high price. Elektra stock seemed like a typical "pump and dump".

18.  I therefore confidently believed that the business strategy for the Astor Parties would work as follows:

   a.   The lender (Astor 3) would lend funds to the borrower (RBS, a company owned by Mr Salinas which appeared to have been set up to receive the funds obtained by using his shares) having first obtained collateral for that loan in the form of shares, pursuant to a loan agreement which specifically provided for the right to use those shares by onward lending of them.

   b.   The cash lender (Astor 3) would lend the shares to another entity (in this case, Vanderbilt) pursuant to Astor 3's rights under the SLA, under a rehypothecation agreement entered into between the (cash) lender and that entity **[Exhibit VS1/472-476]**.

   c.   The share-borrowing entity (Vanderbilt) would then sell the shares it has borrowed into the market in the expectation that the price will fall. Under the agreement between it and Astor 3,

---

[1] VS1/327-328.

the share borrower assumes an obligation to return equivalent shares to the cash lender at the end of the term of the loan.

d.  Given that obligation, the stock borrower (Vanderbilt) faced the risk that the value of the shares could increase, resulting in it having to expend significant sums re-purchasing equivalent shares to return them to Astor 3 at the end of the term. Equally, the lender (Astor 3) took the risk of having to re-acquire shares to return from a chain of counterparties, or at worst by going into the market, in order to satisfy its obligation to the cash borrower (RBS) to give back the same quantity of shares that it originally received.

e.  However, I believed that Astor 3 and Vanderbilt stood to make a profit because:-

   i.  If the cash borrower, RBS, defaulted, then under the SLA the collateral would accrue to Astor 3. In turn, under its rehypothecation agreement with the stock borrower (Vanderbilt), Astor 3's rights to the shares would accrue to Vanderbilt (there are back-to-back default provisions). Vanderbilt's obligation to return equivalent stock to Astor 3 would fall away. The profit to Astor 3 / Vanderbilt taken together is the difference between the funds raised by Vanderbilt selling the collateral shares into the market, and the loaned sum that (in this default scenario) would remain unpaid by RBS to Astor 3.

   ii.  If the cash borrower (RBS) did repay the loan at the end of the term, it has a right to be returned shares equivalent to the shares it deposited with the cash borrower as collateral. (As I explain below, not only is this the correct construction of the SLA but it was also recorded in explicit terms in Closing Statements sent to RBS, without any comment from RBS or Mr Salinas.) The lender (Astor 3) in that situation has a right to be returned such shares from the stock borrower (Vanderbilt) which, having sold them into the market, has to re-purchase equivalent shares. If – as I and the Astor Parties expected - the price of those shares was then lower than the price at which Vanderbilt originally sold the collateral shares into the market, Vanderbilt would make a profit. (Vanderbilt would then be obliged to share the profit with Astor 3 under the rehypothecation agreement between those two parties.)

19.  From the perspective of Mr Salinas, the commercial logic was that he was able to obtain a "huge" cash sum (in the words of his own adviser) from his shares in circumstances where he was not seen by the wider market to be selling or otherwise raising money against the shares. Such transactions by major stockholders may undermine market confidence, or require certain public announcements or regulatory reports to be made, and it is often desirable for them to avoid such issues.

20.  Central to the implementation of this strategy is the role of the custodian or broker-dealer (i.e. Tavira / Weiser). The role of the custodian is to provide custody services to both the borrower

10

APP/467

(RBS) and the lender and any related entities (Astor 3 and Vanderbilt) in relation to the collateral shares.  If the custodian is prepared to declare that as a matter of its accounting, the borrower has a positive balance of the relevant shares (which certain custodians will do on the basis that the borrower has the benefit of a promise from a chain of third parties to return equivalent shares to it), then the cash borrower gets what it needs – liquidity from the shares - without having to disclose the transactions or run the risk of triggering a tax event on a disposition of those shares.

21. I also note an email of 4 May 2021 from Mr Torti of Fininvesta to Zara Akbar, with Mr Salceda in copy [**Exhibit EGSS1/224**]. Mr Torti expressed congratulation on *"this huge new loan"* and stated that the client *"wants to ahead with this loan asap."* He then identified various points including

> *"1) Due diligence on Astor to be done by myself: as agreed and even if we have a high image on the lender, I should either have a personal meeting or a Zoom with the relevant officers of Astor to understand the group better, who the shareholders are, etc*

> *2) …considering the volume of Elektra shares, we want to make sure that not only the lender, but also the custodian has a formal restriction on short selling or lending Elektra stock"*.

22. I did not of course see this internal email at any time until these proceedings. I do not recall and am not aware of the Claimants having done any due diligence on Astor. However, this email also suggests that Mr Salinas and his team were well aware of the role of custodians in facilitating securities lending (hence the suggestion of asking for a formal restriction on custodians). Moreover, it would have been obvious to Mr Torti and to all Mr Salinas's representatives that the eventual agreements did not achieve the aspiration in the 4 May email. In particular:-

23. The eventual agreement did not contain an unqualified restriction on selling or short selling, but only on the "*Lender*"[2] doing so *"on any publicly traded securities exchange"* (clause V.4(b) of the SLA).

24. As to the agreements entered into by the custodians Weiser and Tavira:

  a.  There was no restriction on Weiser.  The "Weiser Account Agreement Terms and Conditions" provide that:

    i.  Clause 7 **[Exhibit VS1/202]**: Mr Salinas agreed that *""WEISER" may lend any securities held by "WEISER" for you or on your Account via its custodian*."

---

[2] "Lender" is defined in the SLA in the following terms (clause I.31): "'*Lender' shall mean specifically the Lender described herein and not any other for purposes of this Agreement.*" **[VS1/39-69]**

11

    ii.  Clause 9 **[Exhibit VS1/203]**: Mr Salinas authorised Weiser to "*manage and control collateralized securities in any manner it deems appropriate… Such control includes and is not limited to transfers, hypothecation, repurchase contracts, and transacting in the securities in any manner.*"

  b.  Those terms were included in the Weiser account opening form signed by Mr Salinas **[Exhibit VS1/194-209],** and Mr Salceda appears to acknowledge that they formed part of the contract between Mr Salinas / RBS and Weiser in his first affidavit at paragraph 60.

  c.  Tavira was entitled (and indeed required) to undertake any transactions in the pledged shares it was instructed to undertake by Astor 3 (as lender) – whether such instructions directed it to "*sell, transfer, pledge, hypothecate, lend, withdraw or redeem*" any such shares (clause 1 of the Control Agreement ("the Tavira Agreement") **[Exhibit VS1/188]**).

  d.  Both the agreements with Tavira and Weiser refer to the SLA in numerous places.

  e.  Tavira and Weiser were both therefore entitled to carry out the trades they did, and appear to have carried them out with knowledge of the terms of the agreement reached between Astor 3 and Mr Salinas / RBS and the extent of the rights granted to Astor 3 under it; i.e. the SLA.

25.  The email exchange of 10 September 2021 was directly inconsistent with any notion that Elektra's shares would not be traded [**Exhibit VS1/327-329**].

26.  Mr Salinas's representatives did not state why he wanted to go ahead with the loan "asap". The intermediaries Astor dealt with, including Ms Akbar, often emphasised the need to proceed quickly. I am now aware from media reports **[Exhibit VS4/71-77]** that it was around this time in 2021 that Mr Salinas acquired the 105 metre "superyacht", the 'Lady Moura' (of which he is still the owner), for a sum similar to that lent by Astor 3.

27.  Astor 3 was set up as a new company with full visibility of Mr Salinas's team. They did not want to use existing Astor companies for tax reasons due to those companies' jurisdictions. With their knowledge, as Mr Salceda now accepts, Astor 3 was incorporated in Canada at their request as a vehicle for the lending to RBS. This took place after two previous vehicles proposed for the deal (in respectively the US and in St Kitts & Nevis) did not go forward as the Claimants considered them unsuitable. [**Exhibit VS1/460-461**]

28.  Because Astor 3 was a new company and an unknown quantity, the Claimants obviously needed to take steps to secure their position. In each case of a loan tranche, therefore, they deposited shares with the custodian on an escrow basis (as, for example, an email from Mr Torti dated 23 July 2021 indicates **[Exhibit VS4/21-22]** with Weiser confirming 3.6 million shares were deposited

12

APP/469

on 30 July 2021 **[Exhibit VS4/23-24]**) and in return Astor 3 deposited cash (for example, the first tranche was released on or around 9 August 2021 as I mentioned in my first witness statement at paragraph 48). The two deposits were then released.

29. I have seen paragraph 48 of Salceda 4 in which he accepts that the recent incorporation of Astor 3 was not a red flag but was something specifically demanded by Mr Salinas. Mr Salceda seeks to excuse the contrary assertions which were strongly made in obtaining the *ex parte* injunctions as due to an unexplained "oversight" on his part in his first affidavit. (His first affidavit supported each of the injunctions sought on 2, 7 and 12 August 2024.)

30. I do not accept that this was an innocent and non-culpable oversight. I also note that his first affidavit claimed that no legal advice was taken and generally suggested that the Claimants were somehow unable to protect their interests by negotiation or otherwise (paragraph 33 of Mr Salceda's first affidavit). The reality is that:

31. As only one example, there was negotiation about (among other things) the governing law and jurisdiction clause [**Exhibit VS4/25**]:

    a.  In an email dated 1 May 2021, Ms Akbar raised the issue (along with a number of other negotiating points), suggesting that Mr Salinas and RBS "*would prefer UK law as the governing law and jurisdiction. Should any issues arise then it would go to litigation rather than Arbitration.*"

    b.  By June 2021, the issue was still open. Astor 3's email of 24 June 2021 to Ms Akbar stated:

        > *"Only issue left unresolved is dispute resolution. Our legal will not accept UK, does not want Bahamas or Canada. They want Singapore if it's court. If it's arbitration, they want Singapore, St Kitts & Nevis or Jamaica."*

    c.  However, ultimately the signed agreement contained an English governing law and jurisdiction clause, in line with Mr Salinas's / RBS's preference.

32. The interest rate of 1.15% under the SLA was a rate proposed by Mr Salinas / RBS themselves through their advisors (and ultimately accepted by Astor 3). I have now been shown an internal email sent by Mr Torti at **[EGSS4/3-4]** in which he refers to some alternative terms apparently offered to RBS by BNP Paribas involving a slightly higher interest rate. I did not see that email at the time. I assume that the interest rate proposal made to Astor 3 by the Claimants was made with that apparently alternative potential loan in mind. The loan-to-value ratio offered by Astor 3 was significantly greater than that offered by BNP Paribas; i.e. the loan from Astor 3 was much larger than the BNP offer. In this regard, I note that media reports indicated that the asking price for Mr Salinas's super-yacht "Lady Moura" was US$125 million **[Exhibit VS4/71-77]**.

13

33.   As I noted in my first witness statement, the SLA itself contains confirmations that the Borrower and Guarantor have taken legal advice as to the effect of the SLA (clause X), that the Borrower and Guarantor are sophisticated investors (clause IV(1)), and requires to be (and was) initialled on each page [**Exhibit VS1/39-69**].  The Closing Statements each contain similar confirmations.  For example, the first Closing Statement dated 9 August 2021 states: "*Any and all arrangements between Lender, Borrower and Guarantor have been negotiated and determined by and between their respective counsel.*" **[Exhibit VS1/280]**

34.   Following entry into the SLA, the initial advances to RBS and receipt of shares as collateral proceeded smoothly.  Shortly after the SLA and its First Addendum were signed, a Closing Statement dated 9 August 2021 was signed and Astor 3 immediately advanced a sum of MXN 501,591,693 (US$25 million) to RBS, secured over 563,569 Elektra shares, which were deposited in Mr Salinas's personal account with Weiser.[3]  On 10 September 2021, the second Closing Statement was signed and Astor 3 advanced another sum of MXN 327,497,030 to RBS, secured by 372,344 Elektra shares deposited in Mr Salinas's account with Weiser.[4]

35.   In November / December 2021, Tavira was appointed as custodian for the final three tranches of lending.  An agreement was executed on 13 December 2021 **[Exhibit VS1/188-193]**, though it is stated to be effective as of 1 November 2021.  I note that Mr Salceda addresses the reason for the transfer from Weiser to Tavira again in his fourth witness statement at paragraphs 27 to 29.  As regards what I had said about it in my first witness statement, he says:

> "27.   In particular, Mr Sklarov appears to suggest that the Claimants instigated the transfer because they needed to "provide a statement or custodial representation confirming Mr Salinas" was the owner of the Collateral Shares even where those shares had been rehypothecated by Astor 3.""

36.   Mr Salceda then goes on purportedly to quote paragraphs 57 and 58 of my first witness statement, saying the explanation in those paragraphs is "not correct and is materially misleading".  I do not accept this characterisation of my evidence.

37.   First, the manner in which the passage in my witness statement is quoted is itself misleading and incomplete as it omits two sentences from my paragraph 57.

38.   Mr Salceda suggests I said the following in my witness statement (and I note there is no indication that any words have been omitted):

> "57.   On 7 October 2021, Ms. Akbar contacted Astor 3 as a result of Weiser

---

[3] VS1/274-282, 325-326.  Closing Statement at EGSS1/153-160.
[4] VS1/283-291.  Closing Statement at EGSS1/161-169.

14

> *stating that Astor 3's rehypothecation of shares had resulted in Weiser's records showing a change in beneficial ownership of the shares [**Exhibit VS1/332**].*
>
> *58. As reflected in a later e-mail from Ms. Akbar of 19 October 2021, the position was resolved by opening a custody account with Tavira in the name of Mr. Salinas but "for the benefit of" Astor 3 [**Exhibit VS1/333-334**]. I understand that Tavira's practice was not to transfer shares from Mr. Salinas's account when shares were rehypothecated from that account by Astor 3 to Vanderbilt."*

39. In fact, I said (with the part omitted by Mr Salceda underlined):-

> *"57. On 7 October 2021, Ms. Akbar contacted Astor 3 as a result of Weiser stating that Astor 3's rehypothecation of shares had resulted in Weiser's records showing a change in beneficial ownership of the shares [Exhibit VS1/332]. The Borrower was concerned about this because "they would not be in a position to provide a statement or custodial representation confirming Mr Salinas is the owner of the shares". I assume that Mr. Salinas needed such a statement available to him in order to provide an explanation for why he had made no disclosures to the market.*
>
> *58. As reflected in a later e-mail from Ms. Akbar of 19 October 2021, the position was resolved by opening a custody account with Tavira in the name of Mr. Salinas but "for the benefit of" Astor 3 [Exhibit VS1/333-334]. I understand that Tavira's practice was not to transfer shares from Mr. Salinas's account when shares were rehypothecated from that account by Astor 3 to Vanderbilt."*

40. Second, as will be apparent from the passage omitted by Mr Salceda, the assertion he says was incorrect – that the Claimants needed "*to provide a statement or custodial representation confirming Mr Salinas was the owner of the shares*" – is simply what Ms Akbar (the Claimants' representative) said in the email I quoted. I understood Ms Akbar to be saying that Mr Salinas's concern was that he needed an account statement showing that he was the owner of the shares for tax purposes, because the email I had seen from her said the following:-

> *"Dear All*
>
> *Hope you are well. I've just had a lengthy call with Mr. Salinas and co. and I would like to convey the following:*
>
> *It is very important you have the sensibility of the necessity for the shares to return to the collateral contract until no later than in this week, since if the account statement is issued without the shares there will be trigger for an alienation which has a great tax implication for us. It is vital we have the shares back in the pledged account.*
>
> *Please we really need your help to make Astor and Weiser understand.*
>
> *Is there anything you can do to assist? This is a serious issue for the borrower and one which needs to be resolved before the end of October as they need to print a statement for October showing he is still the beneficiary.*

15

> *We are progressing with Taviras account opening but I'm unsure if that will happen in time."*

41. Third, I went on to say in paragraph 57 of my first witness statement that "*I assume*" Mr Salinas needed a statement to provide an explanation for why he had made no disclosures to the market. That is the conclusion I drew from the email correspondence to which I have referred. I do not know Mr Salinas's true motivation, and never suggested my understanding was more than an inference. Mr Salceda says that the true explanation is that the Claimants were concerned that Weiser had transferred Collateral Shares from Mr Salinas's account to the account of Astor Capital in breach of the SLA (paragraph 28 of his fourth witness statement). But the allegation of breach of the SLA was never stated in any of the correspondence which I saw, and would have been inconsistent with the exchange of correspondence in September 2021.

42. In December 2021 I decided that trading in the shares held with Tavira should start – I am reminded by the disclosure provided by Tavira that the first trade by Vanderbilt in Elektra shares was on 16 December 2021 [**Exhibit LH1/16**]. I therefore contacted Tavira. Tavira requested sight of the agreement with RBS and Mr Salinas, which I provided, first by WhatsApp on 16 December 2021 and then (as requested by Tavira) by email: see [**Exhibit VS4/30-31**]. It was standard practice for Tavira to see the underlying agreement between the lending entity and the borrower. I understood that this gave them comfort that the share dealings were authorised.

43. I had no difficulty whatsoever in providing the SLA to Tavira, since I had no doubt that the SLA authorised Astor 3 to hypothecate the shares to Vanderbilt and, in turn, that Vanderbilt was permitted to trade in the shares. Tavira must have understood the SLA in the same way, since they accepted Vanderbilt's instructions to trade in Elektra's shares and did so over an extended period.

44. Vanderbilt's authorisation to trade the shares was derived from a rehypothecation agreement between Astor 3 (as stock lender) and Vanderbilt (as stock borrower) dated 17 December 2021 [**Exhibit VS4/4-8**], clause III of which stated:-

> *"III. AUTHORIZATIONS*
>
> *The Lender* [i.e. Astor 3] *hereby authorizes the Borrower* [i.e. Vanderbilt] *to act as set forth in this Section.*
>
> *1.    The rehypothecated Securities will be lent to Borrower by Lender as agreed;*
>
> *2.    The Lender hereby authorizes the Borrower to execute with other third parties securities loan agreements and engage in any and all dealings, or trades, including derivatives, options, puts and calls as the Borrower may deem appropriate at Borrowers sole discretion;*
>
> *3.    The Lender hereby authorizes and permits the subject Securities to be rehypothecated to Borrower, pursuant to this Agreement."*

16

45. Further versions of the rehypothecation agreement between Astor 3 and Vanderbilt were later signed on 15 June 2022, 5 April 2023 **[Exhibit VS1/472-476]**, and 13 September 2023 **[Exhibit VS4/14-20]**.  Clause III is identical in each version.

46. On or around 4 February 2022, the third Closing Statement was signed and Astor 3 advanced MXN 532,484,020 to RBS, secured over 1,299,497 Elektra shares deposited in Mr Salinas's account with Tavira.[5] Having now had more time to review the documents, I draw to the Court's attention that the third and later Closing Statements all included a provision stating that the "*LENDER WILL AT ALL TIMES MAINTAIN ITS ABILITY TO RETURN AN <u>EQUIVALENT</u> NUMBER OF ISSUER SECURITIES VALUED AT FAIR MARKET VALUE.*" The words "return an equivalent number of shares" are obviously inconsistent with any notion that the shares pledged as collateral would remain untouched and be returned on repayment of the loan – yet that was the central contention made to the Court in order to obtain the without notice injunctions.

47. On or around 22 June 2022, the fourth Closing Statement was signed and Astor 3 advanced MXN 613 million to RBS, secured over 2,796,290 Elektra shares deposited in Mr Salinas's account with Tavira.[6]

48. On or around 15 September 2022, the fifth Closing Statement was signed and Astor 3 advanced MXN 179,645,808 to RBS secured over 444,389 Elektra shares deposited in Mr Salinas's account with Tavira.[7]

49. On 23 March 2023, Astor 3 made a margin call for 1,728,207 additional Elektra shares.  Mr Salinas complied with that margin call and transferred the relevant shares to his account with Tavira.

50. In total, MXN 2,154,218,552.55 was advanced to RBS by Astor 3.  7,204,296 Elektra shares were pledged by Mr Salinas – of which 935,913 were deposited with Weiser and 6,268,383 deposited with Tavira.

### E.    The transactions in Elektra shares

51. Over the total period to 26 July 2024, Tavira conducted trades on behalf of Vanderbilt, and Weiser conducted trades on behalf of Astor Capital **[VS4/115-311]**. As explained in my previous evidence,

---

[5] Closing Statement at EGSS1/170-177.
[6] Closing Statement at EGSS1/178-188
[7] Closing Statement at EGSS1/189-198.

Astor 3, Astor Capital and Vanderbilt did not keep their own records of transactions but left this to the broker-dealer. As I indicated above, I am now in a position as a result of information being supplied by Tavira and Weiser to set out further details of the proceeds of the trades undertaken. Having now been able to investigate the position more thoroughly with my advisors, and as I set out below, the amounts now held by Tavira and Weiser and frozen by them exceed the sums which the Claimants could claim (even if they had any claim).

52. Since the commencement of the proceedings, the following information has been provided by Tavira:

   a. PDFs sent on 5 August 2024 and again exhibited in the witness statement of Mr Harris of 13 August 2024. Those documents set out details of each trade undertaken by Tavira for Vanderbilt in Elektra shares, including: the trade date; the settlement date; the nature of the order; the volume traded on each occasion; the price; a code identifying a broker used for the trade; and the commission amount charged by Tavira (I refer to exhibit LH1/16-24).

   b. Excel spreadsheets provided to me by Mr Harris on or about 2 September 2024. These contain entries for multiple deals, not limited to Elektra.

53. DWF (who have an internal forensic accounting team) have begun to analyse this data and have sought, so far as they can, to identify Elektra trading entries. DWF have then analysed the information which I understand shows as follows as regards the cashflows:

   a. The equivalent of approximately US$359.4 million was received by Vanderbilt into its account at Tavira from sales of Elektra shares during the period 20 December to 29 July 2024, noting that the transaction currency was in Mexican pesos. This sum was derived by my advisors from the trading data exhibited by Tavira [**LH1/16-24**].

   b. The third, fourth and fifth loan tranches of the loan by Astor 3 to RBS were funded from the proceeds of those disposals, totalling approximately MXN 1.27 billion, which equates to around US$64.5 million. These amounts (being MXN 510,000,000; MXN 592,871,767 and MXN 173,586,459) are shown as "cash received" in RBS's Tavira Account TMC 63 **[EGSS2/41]**.

   c. US$271,685,472 million from those disposals was transferred from Tavira to client accounts controlled by JT Singh through his international law practice, Jurist IQ, or his US practice, Singh Law Firm. (See my first affidavit at paragraphs 8, 13(a), 20, 26(a) and 35(c).) This amount was derived by a summation of the balances included in **EGSS2/35-36**.

54. I understand from bank information provided to DWF by Mr Singh that US$216,069,214 was transferred back from the Singh client accounts to Tavira **[VS4/78-114].** (In addition, further sums were transferred from the Singh client account in respect of tranches 1 and 2 of the loan, being US$25,426,012.85 on 17 August 2021; and US$15,237,011.72 on 17 September 2021.) In other words a total sum of c. US$40.66 million. In a table below I set out details of the transfers that made up that total, including their dates, the Chase Bank transaction references and the Tavira account numbers ("TMC ref"):-

| Date | Amount (US$) | Chase Bank transaction reference | TMC ref. |
|---|---|---|---|
| Tuesday, 5 April 2022 | 40,000,000 | 3663572094Es | TMC 50 |
| Friday, 15 April 2022 | 8,000,000 | 3408852105Es | TMC 87 |
| Friday, 15 April 2022 | 8,000,000 | 3411792105Es | TMC 83 |
| Friday, 15 April 2022 | 9,000,000 | 3420872105Es | TMC 86 |
| Monday, 13 June 2022 | 5,000,000 | 3310132164Es | TMC 99 |
| Monday, 13 June 2022 | 10,000,000 | 3290042164Es | TMC 87 |
| Monday, 13 June 2022 | 10,000,000 | 3284842164Es | TMC 94 |
| Monday, 13 June 2022 | 10,000,000 | 3300852164Es | TMC 50 |
| Monday, 27 June 2022 | 2,079,214 | 3521252178Es | TMC 57 |
| Thursday, 20 October 2022 | 20,000,000 | 3365992293Es | TMC 121 |
| Monday, 5 December 2022 | 8,000,000 | 3325762339Es | TMC 121 |
| Monday, 5 December 2022 | 7,000,000 | 3344252339Es | TMC 119 |
| Monday, 5 December 2022 | 7,000,000 | 3345652339Es | TMC 84 |
| Monday, 5 December 2022 | 8,000,000 | 3327162339Es | TMC 83 |
| Friday, 24 February 2023 | 1,990,000 | 3350583055Es | TMC 53 |
| Thursday, 28 March 2024 | 2,000,000 | 3549134088Es | TMC 139 |
| Monday, 22 July 2024 | 15,000,000 | 3496674204Es | TMC 139 |
| Monday, 22 July 2024 | 15,000,000 | 3520684204Es | TMC 140 |
| Monday, 22 July 2024 | 15,000,000 | 3523374204Es | TMC 144 |

APP/476

| Date | Amount (US$) | Chase Bank transaction reference | TMC ref. |
|---|---|---|---|
| Monday, 22 July 2024 | 15,000,000 | 3515994204Es | TMC 143 |
| **TOTAL** | **216,069,214** | | |

55.  In addition to those sums, there are also several smaller sums which were paid from funds which may have been traceable proceeds of sales in Elektra shares:

56.  Mr Singh has identified that between 28 July 2021 and the date of the injunction (2 August 2024) US$9,149,781 of traceable proceeds was paid to me from the Singh Law and JIQ Accounts.  I cannot confirm that this is correct, but I do not dispute it.  Of this amount, $4,388,736 was paid to Bank Hapoalim in Israel.  I have disclosed the sums that remain unspent in that account in my first affidavit.

57. Without any waiver of privilege, Mr Singh has also identified sums that Jurist IQ and Singh Law have been paid which he considers may potentially derive from Traceable Proceeds.  I do not know how he has identified whether payments received may or may not derive from traceable proceeds but note that he has identified the figure US$ 4,534,752.64.  These payments were made in respect of legal fees, disbursements (e.g. external legal fees, support services, travel reimbursement etc) and other additional costs.

58. I recall there were commissions to be paid to Zara Akbar, through her entities Enness Global Mortgages and Thalia Capital Corporation.  These commissions were in respect of origination and other fees and payments and total some US$4.9 million.  As far as I am aware Mr Salinas and RBS were aware of these commissions (and I note Mr Torti referred to them in an email to Mr Salceda at **[EGSS4/3-6])**. I cannot confirm whether all of these sums were in fact paid as DWF have so far only been able to identify US$1,063,623.21 that was paid to Thalia and Enness.  It is likely that some or all of these funds constitute traceable proceeds.

59. As to the cash and other assets that remain on accounts at Tavira and Weiser, based on the spreadsheets, account statements and other witness statements (from Tavira and Weiser) which have been provided to the Court, it now appears to me that there are the following cash and assets which are in principle subject to the proprietary injunction obtained by the Claimants dated 2 August 2024:-

20

APP/477

a. Cash and other assets worth US$227,492,214 in Tavira. This comprises assets derived from the US$216,069,214 sent to Tavira from the Singh client accounts, together with existing cash balances of US$10,460,000 and US$963,000 held by Tavira for Vanderbilt and Astor 3 respectively.

b. US$ 12,604,476.49 in an account in Astor 3's name at Weiser **[VS4/312-319]**. This arose from a sale of 935,176 shares in Elektra to Astor Capital. (The account balance in total is US$ 12,613,929.45.)

c. US$ 7,588,082.08 in an account in Astor Capital's name at Weiser. (In paragraph 37(a) of my first affidavit I had estimated this figure to be US$ 7.6 million.)

d. US$ 107,663.19 in an account in Vanderbilt's name at Weiser. (In paragraph 25(d) of my first affidavit I had estimated this figure to be USD 108,000.)

e. In addition, there are the following shares in Elektra held at Tavira and Weiser:-

    i. Tavira holds 336,475 shares. At the current market price of MXN 944.95, those shares have a value of MXN 317,952,051 or approximately USD 16.5 million.

    ii. Weiser holds 197 shares with a value of approximately USD 9,600 in Astor 3's account **[VS4/312-319]**.

60. Tavira also holds other shares in an account for Vanderbilt worth around US$6.7 million.

61. In the circumstances, the various statements and other documents provided by Tavira and Weiser demonstrate that there are assets worth approximately US$262.5 million which have been frozen as potentially the proceeds of trading in Elektra shares.

62. Under the worldwide freezing order obtained by the Claimants dated 2 August 2024 against Astor 3, Weiser, Tavira and me ("the WFO"), the sum frozen is MXN 5,411,000,00 (which equates to around USD 273.8 million based on the rates as at 13 September 2024 on www.xe.com).

63. The Claimants seem to have arrived at that figure in the following way (according to paragraphs 47 and 146 of their skeleton argument for the hearing on 2 August 2024):-

a. The Claimants stated that the value of the 7,204,296 shares was MXN 7,565,879,616. I note that they based that valuation on the market price of shares in Elektra on 23 July 2024, which was MXN 1050. In fact, by the time they applied to Court over a week later, that share price was already out of date. The market price of Elektra shares had fallen by 10% to MXN 944.95, which would have resulted in a valuation of MXN 6,807,699,505.20. The choice the Claimants

21

made to give the shares a value based on an out of date price from a date apparently chosen arbitrarily was not explained to the Court in obtaining the without notice injunctions.

b.   The Claimants then subtracted from the valuation they gave those shares the principal amount due from RBS to Astor 3 under the loan agreement between them of MXN 2,154,218,552.55.

c.   Rounding the result of that calculation down to the nearest 1 million resulted in a figure of MXN 5,411,000,000.

64.  In reality, because of the fall in price of Elektra shares, I am advised that the figure sought to be frozen by the Claimants ought to have been lower.  Based on the market price at the time of suspension, the Elektra shares were worth (at most) MXN 6,807,699,505.20.  Indeed, if trading in the shares had not been suspended, it seems likely that their value would be less than MXN 944.95 per share, perhaps significantly so.  But even on this favourable assumption to the Claimants, deducting from that MXN 6.8 billion figure the principal amount due from RBS to Astor 3 under the loan agreement of MXN 2,154,218,552.55 results in a figure of MXN 4,653,480,952.65 (or rounded down to the nearest 1 million, MXN 4,653,000,000). In dollar terms, this is US$235 million.

65.  The value of the Claimants' claim is therefore at most US$235 million - significantly less than the value (approximately US$262.5 million) of the assets which have been identified and which are presently frozen at Tavira and Weiser. The WFO is on any view unjustifiable.

## F.  The alleged discovery of fraud

66.  Paragraph 32 of Salceda 4 suggests that "*it was only following Astor 3's letter received on 13 June 2024 (dated 12 June 2024) that I became increasingly concerned that Astor 3 might have disposed of a significant quantity of the Collateral Shares*".  This does not make sense to me because, quite apart from the WhatsApp exchange referred to at the beginning of this statement, I understood that both Zara Akbar and Alexandre Torti had always been clear that the Elektra shares would be rehypothecated – I (using the name Gregory Mitchell) had repeatedly discussed this with them.  I would speak to Mr Torti at least once a year, in or around the fall of 2021, in the spring or summer 2022, and the spring or summer of 2023.  I distinctly recall he understood that the stock would be rehypothecated by Astor 3 and that he made statements to the effect that "I know what you are doing, lending the stock out, and it's fine because it is in the SLA and we know how the business works.  So long as you follow the contract we do not have an issue."   I also recall Ms Akbar telling me that both Mr Torti and Mr Salinas thought the arrangements were fine but that Mr Salceda was making waves.  I repeatedly emphasised that all Mr Salinas's team needed to do was read the SLA, which Astor was complying with.

22

# APP/479

67. Leaving aside the fact that it is the Claimants' own case that they had concerns about trading of Elektra shares in September and October 2021 (about which they did little), I note that in early April 2024 the Claimants initiated a chain of correspondence in which they sought information about attendance at the Elektra shareholders' meeting to be held on 16 April 2024.  This is exhibited to Mr Salceda's first statement at [**EGSS1/398-425**].  Among other things, Mr Torti sought clarification as to the identity of the sub-custodian of the Elektra shares, suggesting a failure to answer his question would be "*worrisome and will lead to negative consequences*" [**EGSS1/398-399**]. The impression sought to be conveyed by the Claimants' evidence that they moved promptly to investigate their supposed concerns is a false one. I believe Mr Salinas's concern was simply to ensure that he could continue to present himself as the owner of the same number of shares as before.  I note that Mr Salceda continues to assert that the suspension of trading in Elektra shares is referable to the "discovery of the fraud" and not Elektra's disastrous Q2 2024 results [**Salceda4/39**]. As I indicated in my first witness statement, Elektra reported its Q2 2024 on 24 July 2024.  Elektra shares then fell by 10% on 26 July 2024 to MXN 944.95.  Indeed, the price had already been falling steadily for some time.  In March 2024 it had been as high as MXN 1,200.

68. To the extent it is alleged by the Claimants, it is entirely implausible to suggest that the supposed "disruption" in the share price of Elektra immediately prior to the suspension of trading can have had anything to do with the trades in Elektra shares undertaken by Vanderbilt. DWF have prepared a graph **[Exhibit VS4/32]** which compares (for the period December 2021 to 26 July 2024) the volume of trading in Elektra shares generally in the market place with the volume of shares traded by Vanderbilt.  The trades undertaken by Vanderbilt throughout were a small fraction of daily trading volumes.  On certain occasions there were particularly large volumes traded in the market, but as can be seen from the graph this was not attributable to Vanderbilt's activities.

69. Furthermore, there is reason to believe that Elektra shares have been consistently over-valued for some time due to manipulation by Mr Salinas and Elektra of the market for its shares.

*Non-disclosures by Elektra and Mr Salinas contrary to Mexican securities law*

70. It appears that Mr Salinas and Elektra have failed to disclose significant transactions to the market, including the Loan.  By concealing these transactions from the market, Mr Salinas was able to pledge significant volumes of Elektra shares without alerting the market. Had he disclosed such transactions, it would have created a negative market perception as to the company's stability and the price of Elektra shares would have fallen.

71. Without any waiver of privilege, I am informed by Mexican counsel that Mr Salinas and Elektra have positive obligations to disclose significant transactions or events to the Mexican authorities.

72. Pursuant to Article 50 of the Mexican Securities Issuers' Regulations **[Exhibit VS4/33-47]**, Elektra

23

is required to disclose any transaction that represents, at a minimum, 5% of the issuer's consolidated assets, liabilities or total capital, or 3% of its total consolidated sales from the previous fiscal year. If this threshold value is reached, the transaction is deemed to be a "relevant" transaction and Elektra must disclose this transaction to the regulator, the *Comisión Nacional Bancaria y de Valores* ("the CNBV"). According to Article 89 of those Regulations, a failure to disclose such transactions shall permit CNBV to apply sanctions in accordance with the Market Securities Law.

73. Further, pursuant to Article 363 of the Mexican Market Securities Law **[Exhibit VS4/50-54]**, Mr Salinas is deemed to be an insider with access to privileged information because he is a shareholder who holds, directly or indirectly, 5% or more of Elektra's share capital. As an insider, Mr Salinas is prohibited from entering into or instructing the execution of transactions, directly or indirectly, of any kind unless he discloses the transaction to the public.

74. In light of these obligations, Elektra and Mr Salinas were obliged to disclose the Loan to the CNBV and the public as:

    a.  Mr Salinas directly and indirectly owned more than 5% of Elektra's share capital.

    b.  Mr Salinas pledged 7,204,296 million Elektra shares as collateral for the Loan.

    c.  As per the fifth Closing Statement, the fair market value of the collateralised shares at the time totalled MXN 6,324,937,555.89 **[VS1/315]**, which exceeded 5% of Grupo Elektra's total equity capital in each year from 2021-2023 and 3% of its total consolidated sales from the previous fiscal years.

75. I understand that neither Elektra nor Mr Salinas made any such disclosures regarding the Astor Loan.

76. Further, at paragraph 11 of Mr Salceda's Fourth Witness Statement, he claims to have arranged "*numerous stock lending transactions on behalf of Mr Salinas over two decades*". Without the benefit of the information underlying these transactions, it is unclear whether Elektra or Mr Salinas have complied with their disclosure obligations for those transactions.

77. Mr Salinas has identified one stock lending transaction at paragraph 13 of his witness statement, the BNP Paribas loan of 2021 (the "**BNP Loan**"). Notably, Mr Salinas's BNP Paribas Portfolio Management Report of April 2021 shows that 6,900,000 Elektra shares held blocked positions **[VS1/364-382]**. Although it is unclear whether these shares were used as the collateral for the BNP Loan, Mr Salinas (as an insider) would have been obligated to disclose the pledging of this collateral. However, the Elektra's 2021 annual reports show no such disclosure.

24

78. As I stated in my first witness statement, Mr Salinas and his companies have previously been fined by CNBV for a failure to disclose relevant transactions:-

   a. According to Forbes Mexico, on 2 February 2022, CNBV imposed a fine on Grupo Elektra for MXN 2,264,700 for the failure to disclose information to the public on investment activity from 2017, which had not been disputed by Grupo Elektra as of the date of the fine **[Exhibit VS4/55-64]**.

   b. According to *La Jornada*, on 11 July 2024, CNBV imposed a fine of MXN 844,900 on Mr Salinas for failing to report a sale of Elektra shares without a public offering or authorised auction **[VS1/430-432]**.

79. Shares of Elektra also trade on the Spanish stock exchange and Article 19 of the European Securities Regulations require any and all sales, purchases or share pledges to be publicly disclosed and this was not done either.

*The Repurchase Fund*

80. Paragraph 17 of Salceda 4 states that, within Grupo Salinas (the overall umbrella group for Mr Salinas's various interests), he operates a Repurchase Fund, whose function is to be a "*market-maker in Elektra shares, in accordance with Mexican company law*", buying or selling Elektra shares that exceed the availability in the market. Mr Salceda explains that his involvement within the Repurchase Fund allowed him to be "*aware of the volume of Elektra shares being traded in the market at any given time*". He suggests in paragraph 19 that the Repurchase Fund was purchasing "*an unusually high number of shares*" in early September 2021.

81. Without any waiver of privilege, I have been informed by Mexican counsel that although repurchase of Elektra's own shares is not *per se* prohibited under Mexican law, there are certain restrictions under Mexican law. For example, the sale and acquisition of shares must be disclosed to the CNBV, the stock exchange and to the public. Further, if the Repurchase Fund buys or sells stock for market stabilisation purposes (which appears from Mr Salceda's evidence to be the case), any repurchase would be deemed to be a "relevant event" and therefore subject to mandatory disclosure obligations. Failing such disclosures, the Repurchase Fund would be in violation of Mexican law and subject to sanctions by the CNBV.

82. I have reviewed Elektra's annual reports from 2021-2023 and found that Elektra has only disclosed three repurchase transactions since 2007 **[Exhibit VS4/65-67]**:-

   a. On 17 July 2007, through an extraordinary shareholders' meeting, the shareholders approved that the company would acquire 8% of the shares held by each shareholder at MXN 238 per

25

share, which represented a 22% premium over the average market price of the stock in the previous 20 business days.

b.  On 9 December 2016, 12,177,285 shares were acquired by the Repurchase Fund, which exceeded 5% of the outstanding shares in circulation. These shares became the company's treasury shares.

c.  On 28 December 2022, 11,680,000 shares were acquired by the Repurchase Fund, which exceeded 5% of the outstanding shares in circulation. These shares became the company's treasury shares.

d.  Aside from these three transactions, I have not seen any other disclosures by Elektra regarding the repurchase of shares by the Repurchase Fund, whether for the purposes of market stabilisation or otherwise. If Mr Salceda's statement that an "unusually high" number of shares were being repurchased in September 2021, these should have been disclosed to the market and the CNBV.

**G.  Further details about the background to the transaction**

83.  I understand that the Claimants have contended that Thomas Mellon is fictitious and simply my alter ego. This is untrue. He is a real person. I exhibit at **[ - ]** a copy of a US passport which he sent me. I believe he sent it by Signal in the autumn of 2021. I took a picture of it on my phone but I no longer have the Signal message itself.  I am uncertain if the messages were deleted when my phone was updated, or because they are old, or because Thomas set the settings for messages to be deleted.

84.  For the avoidance of doubt, I cannot verify the authenticity of the passport but can say that the photograph is accurate. By contrast, some other images of Thomas which the Claimants' investigators Forward Risk have found are not accurate and (so far as I can judge) appear to use the top half of his head but to have altered the bottom half **[Exhibit EGSS1/9-10]**. The Astor Wealth Group pages which the Claimants have put forward **[Exhibit EGSS1/650-662]** are not connected with Astor 3. They relate to a new outfit which I understand Thomas has apparently been trying to launch since 2023. He asked me to become involved but nothing has come of it and I have not heard from him for some time.

85.  Thomas Mellon was first known to me as Aleksei Skachkov. He was (so I understood) of Russian origin but lived in Atlanta. We started doing deals together in around 2019. We discussed the name of the company that he would use – he wanted to use the name Astor. He used the name Thomas Mellon for his business activity.

26

86. Around the end of September 2021 or beginning of October 2021, Thomas and I had a disagreement. He started to demand payment of his share in the profits from the deal with RBS / Mr Salinas. He was not entitled to payment at that stage as no profits had been realised – as I have described above, these depended on the outcome of the loan (including whether it was repaid or defaulted on, and on the market price of Elektra shares). Ultimately, around the beginning of October 2021 we reached agreement on the terms of his departure  and Thomas ceased to be involved with Astor 3. From that point on, I handled all communications and dealings of Astor 3 with Mr Salinas's / RBS's representatives and intermediaries. Although Thomas was in contact with me again last year about possible new business, I have not heard from him for some time.

87. Throughout the period in which I dealt with Mr Salinas's / RBS's representatives through Astor, I did so under an assumed name – Gregory Mitchell. This was a name I had been using in business deals since around 2018, and continued to use since then. I have never thought that there was anything inappropriate about this, and I always felt I have good reasons for it. I was born in Ukraine and I have been discriminated against throughout my life, initially as a Jew in the Soviet Union, and then as a Russian when I moved to the USA as a child. The fact my name was 'Vladimir' made life difficult for me at school, and later in life in business. The memories of the treatment I suffered remain painful. So I adopted a Western pseudonym. I saw this as no different from an actor using a different name, or a doctor of Chinese ethnicity using a Western name to practice in the USA. Without waiving privilege, I took advice from Mr Singh who said that it was not a problem so long as I did not sign contracts in that name.

88. On, 5 September 2024, DWF wrote a letter to Enyo Law **[VS4/69-70]** on my instructions saying among other things that: "*Mr Sklarov never dealt directly with Mr Mitchell but understood he was someone who worked with Mr Mellon*." I accept that the instructions I gave DWF were not accurate. This was wrong and I apologise to the Court. I have never thought there was anything wrong about corresponding under an assumed name, but the Claimants have made very serious allegations against me, among other things suggesting there was something wrong with that practice, and I was scared to admit it.

## STATEMENT OF TRUTH

I believe that the facts stated in this statement are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

**VAL SKLAROV**    ....................................................

**16 September 2024**    Signed



APP/484

# EXHIBIT 45

Grupo Elektra SAB de CV

# Grupo Elektra Announces Material Fact

JUL 26 2024 19:31 BST

MEXICO CITY , July 26, 2024 /PRNewswire/ -- Grupo Elektra, S.A.B. de C.V. (BMV: ELEKTRA* Latibex: XEKT), Latin America's leading specialty retailer and financial services company, and the largest non-bank provider of cash advance services in the United States, informs investors that it has received information from its controlling group regarding a possible fraud by depositaries of their shares, which could cause unusual movements of its share price on the stock markets.

Thereafter, the company informs that it has made contact with the corresponding authorities to determine the applicable measures.

As of the second quarter 2024, the company has reported solid performance on its financial and commercial businesses, and its operation continues as usual.

**Company Profile:**

Grupo Elektra is Latin America's leading financial services company and specialty retailer and the largest non-bank provider of cash advance services in the United States.  The group operates more than 6,000 points of contact in Mexico, the United States, Guatemala, Honduras, and Panama.

Grupo Elektra is a Grupo Salinas company (www.gruposalinas.com), a group of dynamic, fast-growing, and technologically advanced companies focused on creating economic value through market innovation and goods and services that improve standards of living; social value to improve community well-being; and environmental value by reducing the negative impact of its business activities. Created by Mexican entrepreneur Ricardo B. Salinas (www.ricardosalinas.com), Grupo Salinas operates as a management development and decision forum for the top leaders of member companies. These companies include TV Azteca (www.TVazteca.com; www.irtvazteca.com), Grupo Elektra (www.grupoelektra.com.mx), Banco Azteca (www.bancoazteca.com.mx), Purpose Financial (havepurpose.com), Afore Azteca (www.aforeazteca.com.mx), Seguros Azteca (www.segurosazteca.com.mx), Punto Casa de Bolsa (www.puntocasadebolsa.mx), Total Play (irtotalplay.mx;

www.totalplay.com.mx) and Total Play Empresarial (totalplayempresarial.com.mx). TV Azteca and Grupo Elektra trade shares on the Mexican Stock Market and in Spain's Latibex market. Each of the Grupo Salinas companies operates independently, with its own management, board of directors and shareholders. Grupo Salinas has no equity holdings. The group of companies shares a common vision, values, and strategies for achieving rapid growth, superior results, and world-class performance.

*Except for historical information, the matters discussed in this press release are concepts about the future that involve risks and uncertainty that may cause actual results to differ materially from those projected. Other risks that may affect Grupo Elektra and its subsidiaries are presented in documents sent to the securities authorities.*

**Investor Relations:**

| | |
|---|---|
| **Bruno Rangel** | **Rolando Villarreal** |
| Grupo Salinas | Grupo Elektra, S.A.B. de C.V. |
| Tel. +52 (55) 1720-9167 | Tel. +52 (55) 1720-9167 |
| jrangelk@gruposalinas.com.mx | rvillarreal@elektra.com.mx |

**Press Relations:**

Luciano Pascoe

Tel. +52 (55) 1720 1313 ext. 36553

lpascoe@grup osalinas.com.mx

⌐ View original content:https://www.prnewswire.com/news-releases/grupo-elektra-announces-material-fact-302207819.html

SOURCE Grupo Elektra, S.A.B. de C.V.

# EXHIBIT 46

**From:** Global Operations <global.operations@astorassetgroup.com>
**Date:** July 30, 2024 at 02:01:55 PDT
**To:** egonzalez@gruposalinas.com.mx, Eduardo Gonzalez Salceda Sanchez <egsalceda@gruposalinas.com.mx>
**Subject: Notice of Default Letter**

Good Day,

Please see attached letter containing Notice of Default.

This is a Notice of Default and we reserve the right to amend it at any time and will be doing so.

According to the Loan Agreement, the Loan is now Accelerated and all sums thereunder are now due, which includes loan amount, custody fees, maintenance fees, collateral transfer fees and any other fees and costs imposed by the Custodian Brokers or Astor Asset Management 3 Ltd.

We bring to your attention that the default interest rate according to the Loan Agreement is 1.5% per month and will accrue for all outstanding debts effective immediately. This represents an annual fee of 18%.

Should you wish to discuss an informal settlement without prejudice and avoid the publicity surrounding your default, you may do so by contacting us. If your preference is to litigate, we will in the courts of England and Wales seek full remedy afforded to us under the Loan Agreement, including the return of all monies and fees computed at a monthly 1.5% default interest rate until such time as you make full settlement of all debts owed.

We would also be willing to enter into a a "Confidential Forbearance Agreement", whereby this Event of Default will be stayed indefinitely confidentially.

This Notice of Default and proposed confidential settlement discussion is being served upon you without prejudice and we reserve all rights afforded to us under the Loan Agreement and subsequent Addendums executed by the Lender, Borrower and Guarantor.

**Global Operations**
777 Dunsmuir Street, Suite 1400, Vancouver, BC V7Y 1K4
+1 888 823 0028
Canadian Business #790932503RC0001
Money Service License # M21136919
AstorAssetGroup.com



Please note that while we do our best to respond all inquiries within 24-48 hours, a reply in some instances may take longer.

This e-mail, including attachments, is intended for the person(s) or company named and may contain confidential and/or legally privileged information. Unauthorised disclosure, copying or use of this information may be unlawful and is prohibited. If you are not the intended recipient, please delete this message immediately and notify the sender.

# EXHIBIT 47

# ASTOR ASSET MANAGEMENT 3 LIMITED

July 27, 2024

Corporacion RBS SA de CV
Ave. Ferrocarril de Rio Frio 419 A99
Cuchilla del Moral 1
Iztapalapa
09319 Ciudad de Mexico
Mexico
Tel: 0052551720[0089]
egonzalez@gruposalinas.com.mx


Ricardo Benjamin Salinas Pleigo
Cristobal Colon 79 INT C
Mexico 09360
Tel: +5215530091016
egsalceda@gruposalinas.com.mx


### NOTICE OF DEFAULT

To Whom It May Concern,

     This Notice of Default is being served upon you by Astor Asset Management 3 Ltd (the "Lender" or "Astor"). As such, this correspondence shall serve as formal notice that you are in default of the Stock Loan Agreement (the "SLA") that was duly executed between Astor and Corporacion RBS SAD de CV (the "Borrower") on July 14, 2021. The basis for this default is as follows: 1) the failure to timely pay interest and other fees and costs of the Loan; 2) the government investigations related to the Issuer of certain shares of Grupo Elektra SAB DE CV (ELECTRA:MX); 3) your non-payment/failure to comply with local tax requirements which constitutes a Material Event as defined; 4) your failure to disclose material information and provide requisite notification to the Lender that assets of Salinas/Grupo Elektra had been threatened with confiscation; 5) your failure to comply with Annual Notice Provisions you owed

# ASTOR ASSET MANAGEMENT 3 LIMITED

to the Lender; 6) your repeated interference in the custody of the Pledged Collateral; 7) tax liability to government of Mexico of Four Billion Eight Hundred Million United States Dollars and your refusal to pay it (US$4,800,000,000); 8) material degradation on Issuer earnings; 9) government confiscation of assets of Guarantor; 9) failure to make a regulatory announcement; 10) Fitch downgrade of Issuer on concerns of mismanagement; and 11) a Material Event upon the financial condition of Borrower, Guarantor or Issuer.  Therefore, for the reasons contained herein, you are hereby notified that you are in default of the SLA which has resulted in the Lender terminating the SLA and accelerating any and all amounts due thereunder together with any other remedy which may be afforded to the Lender.

## Failure to Pay Interest and Fees & Costs of the Loan

As you are aware, the SLA provided that the Loan would bear interest at the rate of one and fifteen hundredths of a percent (1.15%) per year to be paid to Lender in monthly installments (with the first interest payment being deducted from the Loan proceeds at the time of funding), and subsequent interest to be paid on the first Business Day of each month.  See, Section 2(a) and 2(c) of the SLA, the applicable parts of which are set forth below:

### 2. *Interest Rate*

*2(a)  All outstanding amounts of the Loan shall bear an interest rate in an amount equal to one and fifteen one hundredths of a percent (1.15%) per year.*

*2(c)  The first interest payment shall be subtracted from Loan proceeds at the time of the funding.  Further interest payments for the Loan shall be due timely on the first Business Day of each month following the Closing Date, and such payment schedule shall be based on twelve months per calendar year, regardless of the actual number of days between the applicable Closing Date and the date such first interest payment is due.*

# ASTOR ASSET MANAGEMENT 3 LIMITED

It is significant that in 2022, 2023 and 2024, you repeatedly failed to make timely interest payments more than two (2) dozen times. In May 2023, you finally (and only after numerous collection attempts on Lender's part) paid interest which had been overdue for at least seven months. Earlier in 2024 you paid for interest due for the entire preceding year in a lump sum as

opposed to monthly. Failing to pay interest when due is an Event of Default under Section VI, subsection 3(a) of the SLA which reads as follows:

> *Failure by Borrower or Guarantor to pay the interest and all applicable frees or charges when due as stipulated or the Approved Loan Amount when due, or any other default in the performance of an obligation that is not cured within the applicable Cure Period.*

As you are also aware, you were required to pay a Maintenance Fee of 0.0625% of the Loan Principal Amount every three (3)months of the Loan Term. See, Section 3(b) of the SLA which is set forth below:

> *Maintenance Fee. Borrower shall pay Lender every three (3)month's the maintenance fee of six and twenty-five hundredths basis points (0.0625%) of the Loan Principal Amount ("Lender's Maintenance Fee"). The Lender is authorized to deduct the Maintenance Fee in advance from the Loan Principal Amount for the first period, it shall be memorialized in the Closing Statement and the same exact amount shall be paid by Borrower, automatically and without further demand, every four months thereafter for all the years constituting the Term of the Loan. Lender's Maintenance Fee is non-refundable and will be paid in advance.*

You repeatedly failed to pay Maintenance Fees when due as required under the SLA, and as such, an Event of Default has occurred under Section VI(3)(a) as set forth above.

Additionally, the SLA required you to pay an annual Custodian Management Charge based on the cumulative net asset value of all Dedicated Depository Account(s) at time of delivery of the Pledged Collateral and limited to fifteen hundredths of one (0.15%) percent. See, Section 3(d) of the SLA which states, in applicable part, as follows:

777 Dunsmuir Street, Suite 1400
Vancouver, British Columbia, Canada V7Y 1K4

# ASTOR ASSET MANAGEMENT 3 LIMITED

**Expenses.** *For the services provided, the Depository Brokers engaged in the performance of this Agreement are entitled to an annual custodian management charge to be paid by Borrower based on the cumulative net asset value of all Dedicated Depository Account(s) at time of delivery of the Pledged Collateral and limited to fifteen hundredths of one (0.15%) percent. The annual custodian management charge is exclusive of any transaction fee, transfer fee, exit fee, or other administrative costs and fees which Depository Broker may possibly impose. Such fee shall be nonrefundable and shall be paid one (1) year in advance. First year's fee may be deducted from the Loan proceeds or charged to Borrowers account directly by the Depository Broker. In subsequent years, the Borrower will remit to Lender the exact same fee every year at least fourteen (14) days prior to the Effective Date, to be remitted by Lender to Depository Broker.*

The failure to timely pay the Custodian Management Charge constitutes an additional Event of Default under Section VI(3)(a) as set forth above. You have ignored repeated demands to pay the Custodian Management Charge.

## Government Investigation

As you are aware, on November 30, 2022, the Federal Court of Administrative Justice ordered the Issuer[1] to pay nearly Five Billion Pesos (5,000,000,000) in taxes (the "November 30th Order" or "Order"); this Order was made in direct response to the Issuer's improperly generated tax losses. No doubt, such an Order is the culmination of an investigation into the Issuer and its reported tax losses. Section VI.3(f) states that an Event of Default occurs if:

*A governmental agency which controls the actions of Issuer has commenced an investigation of the Issuer.*

We have recently determined thru media that there are 17 open court tax cases against the Guarantor.

---

[1] Grupo Elektra

# ASTOR ASSET MANAGEMENT 3 LIMITED

Therefore, given that there was an investigation into the Issuer by a government agency that most certainly can and does control the actions of the Issuer, an Event of Default has occurred for which there is no cure.

## Material Event – Non-Payment of Taxes

Moreover, the aforementioned November 30th, 2022 Order constitutes a Material Event given that an order to pay nearly Five Billion Pesos (5,000,000,000) is certainly an event which may, and in all likelihood, will, undermine or alter the value of the Collateral. The SLA defines a "Material Event" as "*any event of possible outcome which may undermine or alter the value of the Collateral or prejudice Lender's standing Lien"*. Given this, the Order undoubtedly constitutes a Material Event as defined which is an Event of Default under Section VI.3(g) of the SLA. Section VI.3(g) states:

> *A Material Event upon the financial condition of the Borrower, Guarantor, or Issuer.*

On or about March 20th, 2024 the tax authorities of government of Mexico stated that Ricardo Salinas owes the Mexican government Sixty Three Billion Pesos (63,000,000,000) or Three Billion Eight Hundred Million United States Dollars (US$3,800,000,000), has 17 open and unresolved tax lawsuits and proceed to seize a golf course owned by Ricardo Salinas. Some media outlets report that a number of companies, including the Issuer may be seized and confiscated by the Mexican tax authorities. We deem this to be a Material Event as defined and an Event of Default under Section VI.3(g) of the SLA.

Mr. Ricardo Salinas had immediately stated publicly that he will not pay the tax obligations and will challenge them in court. According to public articles, a threat of further confiscation of assets is a possibility, including his shares of ELEKTRA:MX as Mr. Ricardo Salinas continues to demonstrate his defiance to pay taxes due. We deem this to be a Material Event as defined and an Event of Default under Section VI.3(g) of the SLA.

# ASTOR ASSET MANAGEMENT 3 LIMITED

On or about June 13th, 2024 it is publicly reported that the Mr. Ricardo Salinas has been ordered to pay One Billion United States Dollars (US$1,000,000,000) in taxes. The court rulings are not final and represent a substantial amount of Mr. Ricardo Salinas assets. We deem this to be a Material Event as defined and an Event of Default under Section VI.3(g) of the SLA.

Therefore, yet another Event of Default has occurred for which there is no cure.

**Misrepresentation on Know Your Client Form**

On the KYC Form, you had misrepresented that there are no lawsuits, arbitrations, claims or demands for damages.

**Failure to Make Regulatory Announcement**

As an "Affiliate Entity/Insider" you were obligated to make a regulatory announcement as to this loan, yet you had failed to do so. We deem this to be a Material Event as defined and an Event of Default under Section IV.2 of the SLA.

**Suspension of Trading of Issuer**

On Friday July 26th, 2024 you had requested of Mexican Stock Exchange that the securities of Issuer are suspended from trading. This undermines the Collateral and is a breach of the SLA. We deem this to be a Material Event as defined and an Event of Default under Section VI.3(g) of the SLA.

**Public Announcement as to Fraud of Issuer**

# ASTOR ASSET MANAGEMENT 3 LIMITED

On Friday July 26th, 2024 you had released a public announcement declaring that you had learned of a "possible fraud by depositories of your shares". We deem this to be a Material Event as defined and an Event of Default under Section VI.3(g) of the SLA.

### Downgrade of Issuer by Fitch

On March 11th, 2024 Fitch downgrades Issuer and states; "The downgrade reflects Fitch's concerns about corporate governance practices at Grupo Salinas, which controls Elektra, Total Play and TV Azteca".

### History of Non-Payment of Liabilities

The Guarantor has a history of failing to pay his creditors as it the case with TV Azteca, threat of bankruptcy and Guarantor releasing public statements that his firm is "too poor to pay US bondholders the tens of millions owed". We deem this to be a Material Event as defined and an Event of Default under Section VI.3(g) of the SLA.

### Failure to Disclose Material Information and Provide Requisite Notification to Lender

It has come to our attention that Mexican tax authorities had threated to confiscate assets of Salinas/Grupo Elektra which you failed to disclose to the Lender. Such information involving the confiscation of the Borrower's assets is deemed a "Material Event" pursuant to Section I subsection 40 of the SLA because if the Borrower's Collateral were to be confiscated, it would undoubtedly affect the Lender's lien:

> *"Material Event"* shall mean any event or possible outcome which may undermine or alter the value of Collateral or prejudice Lender's standing Lien.

A Material Event upon the financial condition of Borrower, Guarantor or Issuer is an Event of Default pursuant to Section VI.3(g) of the SLA.

# ASTOR ASSET MANAGEMENT 3 LIMITED

Moreover, your failure to disclose the threatened confiscation of assets to the Lender is a direct violation of the Material Information clause contained in Section III, subsection 3 of the SLA which is set forth below:

> **Material Information.**  Borrower and Guarantor have tendered any and all relevant and material information regarding the Pledged Collateral and of the Issuer and all such relevant and material information has been disclosed and provided by Borrower and Guarantor to Lender.  During the Loan Term, Borrower and Guarantor will continue to voluntarily provide all such relevant and material information to Lender and not withhold information deemed to be Material.

The aforementioned lack of disclosures also constitutes a breach of the "Full Disclosure" provisions contained in Section IV.3 of the of the SLA as follows:

> **Full Disclosure**.  Borrower and Guarantor further represents and warrants that all statements and documentation it has provided to Lender directly or through its agents in connection this Agreement are true, complete, and do not omit any material facts or information, which if provided, would have impacted Underwriting prudency.  Borrower and Guarantor consent to provide to Lender any and all relevant material information which is necessary for any Lender to conduct a prudent risk assessment evaluation of Issuer, Guarantor and Borrower.

Additionally, Section IV of the SLA contains *"Borrower's Warranties and Obligations" and*  subsection 9 therein requires the Borrower and Guarantor to promptly inform the Lender in writing if any creditor has sought or is threatening to seek confiscation of the Borrower or Guarantor's property.  See, Section IV, subsection 9 of the SLA set forth below:

> **Notification to Lender.**  Upon occurrence of any of any of the foregoing events or whenever they shall occur, the Borrower or Guarantor shall promptly inform Lender in writing if a) Borrower or Guarantor has filed for Bankruptcy or filed any petition seeking creditor protection; b) any creditor of Borrower or Guarantor has

# ASTOR ASSET MANAGEMENT 3 LIMITED

*taken legal action against Borrower or Guarantor to recover debts owed to it; c) any creditor has sought or is threatening to seek confiscation or garnishment of property of Borrower or Guarantor.  Absent of the preceding events, Borrower and Guarantor will once per year, on each anniversary of the Effective Date, submit a written attestation to Lender representing that to the best of Borrower's knowledge none of the preceding events had taken place.*

Pursuant to Section IV, subsection 9 of the SLA, the Borrower unequivocally should have provided written notification to the Lender that the Mexican tax authorities had threatened to confiscate the assets of Salinas/Grupo Elektra. At no time had you contacted the Lender to provide material information as required. The Borrower's failure to provide such written notification is obviously an "omission" intended to mislead the Lender, and as such, it is an Event of Default under Section VI(d) of the SLA.

*If any representation or warranty made by Borrower or Guarantor in this Agreement or in any statement furnished in contemplation of obtaining a Loan shall prove to have been knowingly untrue, omitted or misleading in any material respect.*

## Failure to Comply with Annual Notice Provision

Section IX.23 of the SLA required the Borrower and Guarantor to provide an annual statement on the anniversary of the Effective Date throughout the Term of the Loan, declaring whether Borrower or Guarantor had obtained other loans from any third parties by pledging securities of the same Issuer; whether there has been a material change in the Borrower's or Guarantor's financial condition such as bankruptcy or insolvency; or if any material lawsuits had been filed against them.  See, Section IX.23 of the SLA, which is set forth below:

*Notice.  Borrower and Guarantor further represent and warrant that they will yearly, on the anniversary of the Effective Date, submit a written statement to Lender by means of declaration stating whether Borrower or Guarantor obtained*

# ASTOR ASSET MANAGEMENT 3 LIMITED

*any other loans from any third parties pledging securities of same Issuer and whether there has been a material change in Borrowers or Guarantors financial condition, such as bankruptcy or insolvency filing of Borrower or Guarantor or of any entity controlled by Borrower or Guarantor.  Borrower and Guarantor must also declare if any material lawsuit has been filed against it.*

The Borrower and Guarantor were mandated to produce the requisite annual statement. They have completely and utterly failed to provide this to the Lender as required under Section IX.23 of the SLA for any year. We deem this to be a Material Event as defined and a breach of Section IX.23 of the SLA.

## Material Earnings Event

Simply Wall Street has released an analysis on July 26, 2024 that the Issuer's earnings have declined by 34% per year over the past 5 years and deemed this to be a major risk. Second Quarter earnings for Issuer are reported as MXN$2.90 loss per share, versus MX$N22.34 profit Second Quarter of 2023.

The Issuer reported a MXN$7.3 billion loss versus a profit of MXN$4.94 billion for the same period last year.

On Friday July 26, 2024 the stock of the Issuer dropped ten percent (10%), which according to Bloomberg Financial News is the "biggest intraday drop since June of 2017".

We deem this to be a Material Event upon the Issuer as defined and an Event of Default under Section VI.3(g) of the SLA.

A Material Event is defined within the SLA as:

777 Dunsmuir Street, Suite 1400
Vancouver, British Columbia, Canada V7Y 1K4

# ASTOR ASSET MANAGEMENT 3 LIMITED

*Material Event"* shall mean any event or possible outcome which may undermine or alter value of Collateral or prejudice Lender's standing Lien.

## Custody of Collateral Interference

On multiple occasions you and your agents have contacted the Custodian Brokers interfering in the custody of the Collateral and dictating to Lender where and how the Collateral should be custodied. This conduct has been consistent and started in the Fourth Quarter of 2021 when you demanded that the Collateral move from Weiser Global Capital Markets ("Weiser") elsewhere. We accommodated your request and moved the uncollateralized portion of the Collateral to Tavira Monaco SA ("Tavira"). You continued in years 2022 and 2023 and 2024 to question where and how the Collateral is custodied, demanding to know where and how and who the sub-custodians are of Weiser and Tavira and what they should and should not be doing with the Collateral. We reference your letter to Lender and Custodian Brokers dated June 10th, 2024 which contains numerous breaches of the SLA, demanding that the Collateral not be lent out, when in the SLA you expressly agreed and understood that the Collateral will be subject to provisions of the Encumbrance Clause and your agents were repeatedly told to read the SLA and its provisions.

Your June 10th, 2024 letter to Custodian Brokers contains numerous demands and threats which are very serious, are deemed as interference and are contrary to the Terms and Conditions of the SLA which you had willingly executed while being represented by counsel.

The Know Your Client form which you had completed for both the Borrower and for the Guarantor, you had ticked the box that you were being represented by an attorney. Thus, you were aware and advised of your contractual obligations under the SLA. That, together with the fact that the Guarantor is a highly seasoned and sophisticated professional investor who commands perfect knowledge of the English language, there is no basis for you to repeatedly defy the SLA and its Terms and Conditions.

You repeatedly continued to demand that the Collateral from Weiser and Tavira is moved to a brand new Custodian, despite being repeatedly told that custody and selection of Custodian Broker is not for Borrower or Guarantor to decide as is clearly stated in Section IV.10 of the SLA, thus

# ASTOR ASSET MANAGEMENT 3 LIMITED

continuing to defy and challenge your contractual obligations. We deem this to be a Material Event as defined and a breach.

The SLA is very clear that the Lender selects the Custodian Broker, yet you continue to demand how and where the Collateral is custodied demanding to know who the sub-custodians are, making demands upon the sub-custodians and what should happen to the Collateral which is in the control of Lender and the Custodian Brokers, in violation of the SLA. Interference is strictly prohibited under the SLA Section III.4 and Section IV.10 which states:

> *During the pendency of this Loan, neither the Borrower nor Guarantor will seek injunctive relief or interference from any court of law, regulatory body, Transfer Agent, custodian, sub-custodian, Depository Broker, central depository or stock exchange requesting to invalidate, suspend, limit, impede, terminate or restrict this Agreement or freeze the shares. Injunctive relief by Borrower or Guarantor or any interference by Borrower or Guarantor, central depository or regulatory agency shall be an immediate and an incurable Event of Default. Neither Borrower nor Guarantor will interfere in any way or challenge the validity or enforceability of this Agreement, and the same shall be a Breach thereof.*

Amongst other provisions, the SLA states:

> *Neither Borrower nor Guarantor will undermine or interfere with securities of Issuer.*

> *Lender reserves the right to maintain dominion over the Collateral during the Loan Term, which affords Lender the right to deal-in, dispose or convert over the Pledged Collateral.*

## **Lock-Up Breach**

In the month of July 2024, you have repeatedly demanded to repay the Loan early, despite being repeatedly told that the SLA does not provide for an early repayment. This is a breach of Section VI(3)(e)(f) and Section II(5) and Section IV.3 prohibiting early termination

# ASTOR ASSET MANAGEMENT 3 LIMITED

**Lender's Remedy**

It is important to note that Pursuant to Section VI.2 of the SLA, the Lender is not obligated to complete the Loan transaction to Maturity if the Borrower and Guarantor fail to comply with the terms and conditions of the SLA.

> ***Valid Transactions and Events of Default****.  In order for the transaction to be completed to Maturity by the Borrower, the Borrower and Guarantor must fulfill in the performance of and observance of any covenant, representation, provision or agreement contained herein and not default in any other loan document or provision.*

This letter has set forth in detail some but not all of the breaches of the SLA and Events of Default that have occurred. Ultimately, as you have failed to cure the Events of Default detailed herein and not able to cure them, the Lender hereby declares an Event of Default and hereby accelerate all costs and fees due thereunder.

This letter is without prejudice to all of Astor's rights and remedies in accordance with the SLA.  We reserve the right to amend this Notice of Default at any time of our choosing.

Sincerely,

*Astor Asset Management* 3 *Ltd*

Astor Asset Management 3 Ltd.
Global Operations Department

# EXHIBIT 48

**From:** Ayaz Rashid <ayaz.rashid@tavira.group>
**Date:** August 1, 2024 at 03:27:52 AKDT
**To:** Javier Gayo <javier.gayo@fininvesta.com>, Luke Harris
<luke.harris@tavira.group>, INTL Operations
<INTLOperations@tavirasecurities.com>
**Cc:** Alexandre Torti <alexandretorti@hotmail.com>, Zara Akbar <zara@enness.je>,
Eduardo Gonzalez Salceda Sanchez <egsalceda@gruposalinas.com.mx>
**Subject: RE: TMC63 end of month statement**

Dear Javier

Under the terms of the CMA the lender (Astor) instructed us to move the shares to
Astor's account.

Thanks

**From:** Javier Gayo <javier.gayo@fininvesta.com>
**Sent:** Thursday, 1 August 2024 1:37 PM
**To:** Ayaz Rashid <ayaz.rashid@tavira.group>; Luke Harris <luke.harris@tavira.group>; INTL Operations <INTLOperations@tavirasecurities.com>
**Cc:** Alexandre Torti <alexandretorti@hotmail.com>; Zara Akbar <zara@enness.je>; Eduardo Gonzalez Salceda Sanchez <egsalceda@gruposalinas.com.mx>
**Subject:** Fwd: TMC63 end of month statement
**Importance:** High

Good morning,

Please confirm us where did you transferred the shares?

Nominal of 6,268,383shs

Regards
JGS

## FININVESTA
Javier Gayo Somoza
javier.gayo@fininvesta.com
Cell: +41.78.657.25.86

Début du message réexpédié :

**De:** Ayaz Rashid <ayaz.rashid@tavira.group>
**Objet: TMC63 end of month statement**
**Date:** 1 août 2024 à 12:21:46 UTC+2
**À:** Javier Gayo <javier.gayo@fininvesta.com>
**Cc:** alexandre torti <alexandretorti@hotmail.com>, Zara Akbar <zara@enness.je>, Luke Harris <luke.harris@tavira.group>, INTL Operations <INTLOperations@tavirasecurities.com>

Good Morning

Pls see attached the end of month statement for TMC63.

Thanks

# EXHIBIT 49



**31/07/2024  21:00:00 PM**

**Client Information**

| | | | | | |
|---|---|---|---|---|---|
| **Name** | TMC63- Ricardo Salinas | **Address** | Cristobal Colon 79 Int c | **Account ID TMClient63** | |
| | | | Mexico '09360 | **Trade Date 20240731** | |

**Positions Overview**

| ACCOUNT | SECURITY | DESCRIPTION | ISIN | SEDOL | QUANTITY | PRICE | CURRENCY | VALUE LOCAL CCY | VALUE |
|---|---|---|---|---|---|---|---|---|---|
| TMClient63 | CASH MXN | MXN CASH BALANCE | | | 20,000.00 | - | MXN | 20,000.00 | 1,091.80 |
| TMClient63 | CASH USD | USD CASH BALANCE | | | 1,223.90 | - | USD | 1,223.90 | 1,223.90 |
| | | | | | | | TOTAL | | 2,315.70 |

Tavira Monaco Sam
6 BD des Moulins 9800 Monaco
RCI 09 S 05059

31/07/2024  21:00:00 PM

**Trades Overview**

| TRADE DATE | SETTLE DATE | ACCOUNT ID | ISIN | SECURITY DESCRIPTION | ORDER | Gross Price | Quantity | NOTIONAL AMOUNT | COMMISH AMT | FEES AMT | SEC CCY | NET PRICE | SEC CCY AMT | SETTLE CCY | SETTLE CCY AMT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 15/12/2021 | 15/12/2021 | TMClient63 | MX01EL000003 | GRUPO ELEKTRA SAB DE CV | FOP Receive | 0 | 2,350,000.00 | - | - | - | MXN | - | - | MXN | 0 |
| 18/01/2022 | 20/01/2022 | TMClient63 | MX01EL000003 | GRUPO ELEKTRA SAB DE CV | FOP Receive | 0 | 186,078.00 | - | - | - | MXN | - | - | MXN | 0 |
| 18/01/2022 | 20/01/2022 | TMClient63 | MX01EL000003 | GRUPO ELEKTRA SAB DE CV | FOP Receive | 0 | 128,000.00 | - | - | - | MXN | - | - | MXN | 0 |
| 19/01/2022 | 19/01/2022 | TMClient63 | | MXN Cash Debit | Cash Paid | 0 | 7,395,224.00 | 7,395,224.00 | - | - | MXN | - - | 7,395,224.00 | MXN | -7395224 |
| 25/02/2022 | 25/02/2022 | TMClient63 | | MXN Cash Received | Cash Received | 0 | 7,395,224.00 | 7,395,224.00 | - | - | MXN | - | 7,395,224.00 | MXN | 7395224 |
| 14/06/2022 | 22/06/2022 | TMClient63 | MX01EL000003 | GRUPO ELEKTRA SAB DE CV | FOP Received | 0 | 1,431,700.00 | - | - | - | MXN | - | - | MXN | 0 |
| 14/06/2022 | 14/06/2022 | TMClient63 | | MXN Cash Debit | Cash Paid | 0 | 3,309,489.09 | 3,309,489.09 | - | - | MXN | - - | 3,309,489.09 | MXN | -3309489 |
| 28/06/2022 | 28/06/2022 | TMClient63 | | Elektra Dividend | Cash Received | 0 | 21,298,092.40 | 21,298,092.40 | - | - | MXN | - | 21,298,092.40 | MXN | 21298092 |
| 08/07/2022 | 07/08/2022 | TMClient63 | | MXN Cash Withdrawal Fee | Cash Paid | 0 | 1,000.00 | 1,000.00 | - | - | MXN | - - | 1,000.00 | MXN | -1000 |
| 14/07/2022 | 18/07/2022 | TMClient63 | | MXN/USD FX | Sell | 0 | 17,968,000.00 | 857,411.43 | - | - | MXN | 0.047719 - | 17,968,000.00 | USD | 857411 |
| 20/07/2022 | 20/07/2022 | TMClient63 | | USD Cash Debit | Cash Paid | 0 | 857,411.44 | 857,411.44 | - | - | USD | - - | 857,411.44 | USD | -857411 |
| 07/09/2022 | 07/09/2022 | TMClient63 | | USD Cash Debit | Cash Paid | 0 | 237,973.00 | 237,973.00 | - | - | USD | - | 237,973.00 | USD | -237973 |
| 07/09/2022 | 07/09/2022 | TMClient63 | | USD Received | Cash Received | 0 | 237,973.07 | 237,973.00 | - | - | USD | - | 237,973.00 | USD | 237973 |
| 15/12/2022 | 15/12/2022 | TMClient63 | | MXN Cash Debit | Cash Paid | 0 | 6,346,114.77 | 6,346,114.77 | - | - | MXN | - | 6,346,114.77 | MXN | -6346115 |
| 03/04/2023 | 03/04/2023 | TMClient63 | MX01EL000003 | GRUPO ELEKTRA SAB DE CV | FOP Receive | 0 | 128,207.00 | - | - | - | MXN | - | - | MXN | 0 |
| 04/04/2023 | 04/04/2023 | TMClient63 | MX01EL000003 | GRUPO ELEKTRA SAB DE CV | FOP Receive | 0 | 1,600,000.00 | - | - | - | MXN | - | - | MXN | 0 |
| 24/04/2023 | 24/04/2023 | TMClient63 | | Elektra Dividend | Cash Received | 0 | 30,284,768.00 | 30,284,769.00 | - | - | MXN | - | 30,284,769.00 | MXN | 30284769 |
| 12/09/2023 | 14/09/2023 | TMClient63 | MX01EL000003 | GRUPO ELEKTRA SAB DE CV | FOP Receive | 0 | 340,000.00 | - | - | - | MXN | - | - | MXN | 0 |
| 12/09/2023 | 14/09/2023 | TMClient63 | MX01EL000003 | GRUPO ELEKTRA SAB DE CV | FOP Receive | 0 | 2,000.00 | - | - | - | MXN | - | 2,000.00 | MXN | 0 |
| 12/09/2023 | 12/09/2023 | TMClient63 | | MXN Cash Debit | Cash Paid | 0 | 2,000.00 | - | - | - | MXN | - | - | MXN | -15644 |
| 21/09/2023 | 21/09/2023 | TMClient63 | | MXN Cash Debit | Cash Paid | 0 | 30,262,768.80 | 30,262,768.80 | - | - | MXN | - | 30,262,768.80 | MXN | -30262769 |
| 15/12/2023 | 15/12/2023 | TMClient63 | | USD Cash Debit | Cash Paid | 0 | 157,644.35 | 157,644.35 | - | - | USD | - | 157,644.35 | USD | -157644 |
| 23/01/2024 | 23/01/2024 | TMClient63 | | USD Received | Cash Received | 0 | 157,644.15 | 157,644.35 | - | - | USD | - | 157,644.35 | USD | 157644 |
| 18/01/2024 | 18/01/2024 | TMClient63 | | USD Cash Debit | Cash Paid | 0 | 21,210.00 | 21,210.00 | - | - | USD | - | 21,210.00 | USD | -21210 |
| 27/03/2024 | 27/03/2024 | TMClient63 | | USD Received | Cash Received | 0 | 22,000.00 | 22,000.00 | - | - | USD | - | 22,000.00 | USD | 22000 |
| 25/04/2024 | 25/04/2024 | TMClient63 | | Elektra Dividend | Cash Received | 0 | 32,595,591.60 | 32,595,591.60 | - | - | MXN | - | 32,595,591.60 | MXN | 32595592 |
| 14/05/2024 | 14/05/2024 | TMClient63 | | MXN Sale | Cash Paid | 0 | 32,595,591.60 | 32,595,591.60 | - | - | MXN | - | 32,595,591.60 | MXN | -32595592 |
| 14/05/2024 | 14/05/2024 | TMClient63 | | USD Buy | Cash Received | 0 | 1,936,847.33 | 1,936,847.33 | - | - | USD | - | 1,936,847.33 | USD | 1936847 |
| 14/05/2024 | 14/05/2024 | TMClient63 | | Transfer to TMC64 | Cash Paid | 0 | 1,771,080.04 | 1,771,080.04 | - | - | USD | - | 1,771,080.04 | USD | -1771080 |
| 14/05/2024 | 14/05/2024 | TMClient63 | | USD Cash Debit | Cash paid | 0 | 166,849.55 | 166,849.55 | - | - | USD | - | 166,849.55 | USD | -166850 |
| 29/07/2024 | 29/07/2024 | TMClient63 | MX01EL000003 | GRUPO ELEKTRA SAB DE CV | FOP Delivery Out | 0 - | 6,268,383.00 | - | - | - | MXN | - | - | MXN | 0 |

Tavira Monaco Sam
6 BD des Moulins 9800 Monaco
RCI 09 S 05059

# EXHIBIT 50

Claim No: CL-2024-000450

02 Aug 2024

CL-2024-000450

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (KBD)**

**IN PRIVATE**

**On 2 August 2024**

**Before the Honourable Mr Justice Jacobs**


**BETWEEN:**

### (1) RICARDO BENJAMIN SALINAS PLIEGO

### (2) CORPORACION RBS SA DE CV

**Applicants/Claimants**

### -and-

### (1) ASTOR ASSET MANAGEMENT 3 LIMITED

### (2) WEISER GLOBAL CAPITAL MARKETS LTD

### (3) TAVIRA MONACO SAM

### (4) VLADIMIR "VAL" SKLAROV

**Respondents/Defendants**

-------------------------------------------------------

### FREEZING AND PROPRIETARY ORDER
-------------------------------------------------------


**PENAL NOTICE**


IF YOU ASTOR ASSET MANAGEMENT 3 LIMITED, WEISER GLOBAL CAPITAL MARKETS LTD, TAVIRA MONACO SAM AND VLADIMIR "VAL" SKLAROV DISOBEY THIS ORDER YOU MAY BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE YOUR ASSETS SEIZED.

ANY OTHER PERSON WHO KNOWS OF THIS ORDER AND DOES ANYTHING WHICH HELPS OR PERMITS THE RESPONDENTS TO BREACH THE TERMS OF THIS ORDER

**MAY ALSO BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE THEIR ASSETS SEIZED.**

**THIS ORDER**

1.   This order contains a freezing injunction made against: (1) the First Respondent, Astor Asset Management 3 Limited; and (2) the Fourth Respondent, Vladimir "Val" Sklarov. This Order also contains proprietary injunctions and orders for associated relief against: (1) the First Respondent; (2) the Second Respondent, Weiser Global Capital Markets Ltd; (3) the Third Respondent, Tavira Monaco SAM; and (4) the Fourth Respondent (together, "**the Respondents**"). This order was made on 2 August 2024 by Mrs/Mr Justice Jacobs on the application of: (1) Ricardo Benjamin Salinas Pliego; and (2) Corporacion RBS SA DE CV ("**the Applicants**"). The Judge read the Affidavit listed in Schedule A and accepted the undertakings set out in Schedule B at the end of this Order.

2.   This order was made at a hearing without notice to the Respondents, at which the Court was satisfied that it was in the interests of justice to sit in private. Pursuant to CPR rule 39.2(5), this order is not to be published on the judiciary website. The Respondents have a right to apply to the Court to vary or discharge the order—see paragraph 18 below.

3.   There will be a further hearing in respect of this order on 29 August 2024 with a time estimate of 1½ hours ("**the return date**").

4.   This order is effective against any Respondent on whom it is served or who is given notice of it.

**FREEZING INJUNCTION AGAINST THE FIRST AND FOURTH RESPONDENTS**

5.   Until after the return date or further order of the Court, each of the First and Fourth Respondent must not:

(a)  remove from England and Wales any of its or his assets which are in England and Wales up to the value of MXN 5,411,000,000 ("**the Limit**"); or

(b)  in any way dispose of, deal with or diminish the value of any of its or his assets which are in or outside England and Wales up to the Limit.

6.   Paragraph 5 applies to all of the First and Fourth Respondents' assets whether or not they are in its or his own name and whether they are solely or jointly owned. For the purpose of this order, the First and Fourth Respondents' assets include any asset which it or he has the power, directly or indirectly, to dispose of or deal with as if it were its or his own.

7.   The prohibition at paragraph 5 includes the following assets in particular:

   (a)  Any money standing to the credit of the First or Fourth Respondents in any bank account including the amount of any cheque drawn on such accounts which has not been cleared.

   (b)  Any interest under any trust or similar entity including any interest which can arise by virtue of the exercise of any power of appointment, discretion or otherwise howsoever.

   (c)  Any shareholdings beneficially owned by the First or Fourth Respondents or the proceeds of sale if any of them have been sold.

8.   If the total value free of charges or other securities ("**unencumbered value**") of each of the First and Fourth Respondents' assets in England and Wales exceeds the Limit, the relevant Respondent may remove any of those assets from England and Wales or may dispose of or deal with them so long as the total unencumbered value of the Respondent's assets still in England and Wales remains above the Limit.

9.   If the total unencumbered value of each of the First and Fourth Respondent's assets in England and Wales does not exceed the Limit, the relevant Respondent must not remove any of those assets from England and Wales and must not dispose of or deal with any of them. If the relevant Respondent has other assets outside England and Wales, he or it may dispose of or deal with those assets outside England and Wales so long as the total unencumbered value of all its or his assets whether in or outside England and Wales remains above the Limit.

**PROPRIETARY INJUNCTION AGAINST ALL OF THE RESPONDENTS**

10.  Until the return date or further order of the court, the Respondents must not in any way dispose of, diminish, deal with, charge, pledge or in any way howsoever deal with the

legal or equitable title to or diminish the value of any of the Collateral Shares or their proceeds if they have been sold or otherwise disposed of. The term "Collateral Shares" is defined in paragraph 21 below.

**PROVISION OF INFORMATION BY ALL OF THE RESPONDENTS**

11.    Subject to paragraph 13 below:

    (a)    each of the First and Fourth Respondents must by 5pm London time on 6 August 2024 and to the best of their ability inform the Applicants' solicitors in writing of:

        (i)    all their assets worldwide exceeding £10,000 in value whether in their own name or not and whether solely or jointly owned, giving the value, location and details of all such assets;

        (ii)    whether they hold any Collateral Shares and/or their traceable proceeds and if so the value of said shares or proceeds; and

    (b)    each of the Second and Third Respondents must by 5pm London time on 5 August 2024 and to the best of their ability inform the Applicants' solicitors in writing of whether they hold any Collateral Shares and/or their traceable proceeds and if so the value of said shares or proceeds.

12.    Subject to paragraph 13 below, within 7 days of being served with this order, each of the Respondents must swear and serve on the Applicants' solicitors an affidavit providing the information requested in paragraph 11 above and Schedule C below.

13.    If the provision of any of this information is likely to incriminate the Respondent, she or he may be entitled to refuse to provide it, but is recommended to take legal advice before refusing to provide the information. Wrongful refusal to provide the information is contempt of Court and may render the Respondent liable to be imprisoned, fined or have its, her or his assets seized.

**EXCEPTIONS TO THIS ORDER**

14.    This order does not prohibit the Respondents from dealing with or disposing of any of its assets in the ordinary and proper course of business and does not prevent the Respondents from spending a reasonable sum on legal advice and representation (so

long as this money does not come from the assets set out in paragraph 10 of this order). Further, this order does not prohibit the Fourth Respondent from spending £10,000 a month towards his ordinary living expenses.

15.    The Respondents may agree with the Applicants' legal representatives that the above spending limit should be increased or that this order should be varied in any other respect, but any agreement must be in writing.

16.    The order will cease to have effect as against each Respondent if it or he:

(a)    provides security by paying an amount equivalent to the Limit (as set out in paragraph 5 of this order) into Court, to be held to the order of the Court; or

(b)    makes provision for security in that sum by another method agreed with the Applicants' legal representatives.

**COSTS**

17.    The costs of this application are reserved to the Judge hearing the application on the return date.

**VARIATION OR DISCHARGE OF THIS ORDER**

18.    Anyone served with or notified of this order may apply to the Court at any time to vary or discharge this order (or so much of it as affects that person), but they must first give the Applicants' solicitors three working days' notice of their intention to do so. If any evidence is to be relied upon in support of the application, the substance of it must be communicated in writing to the Applicants' solicitors.

**INTERPRETATION OF THIS ORDER**

19.    A Respondent who is an individual who is ordered not to do something must not do it herself or himself or in any other way. She or he must not do it through others acting on her or his behalf or on her or his instructions or with her or his encouragement.

20.    A Respondent which is not an individual which is ordered not to do something must not do it itself or by its directors, officers, partners, employees or agents or in any other way.

21.   The term "Collateral Shares" shall mean any shares (or interests in shares) in the capital of Grupo Elektra SAB De CV held or formerly held by or for the First Applicant (and includes, for the avoidance of doubt, the traceable proceeds thereof if they have been sold or otherwise disposed of).

## PARTIES OTHER THAN THE APPLICANTS AND RESPONDENTS

22.   **Effect of this order**

It is a contempt of Court for any person notified of this order knowingly to assist in or permit a breach of this order. Any person doing so may be imprisoned, fined or have their assets seized.

23.   **Set off by banks**

This injunction does not prevent any bank from exercising any right of set of it may have in respect of any facility which it gave to the respondent before it was notified of this order.

24.   **Withdrawals by the Respondents**

No bank need enquire as to the application or proposed application of any money withdrawn by the Respondents if the withdrawal appears to be permitted by this order.

25.   **Persons outside England and Wales**

(a)   Except as provided in paragraph 25(b) below, the terms of this order do not affect or concern anyone outside the jurisdiction of this Court.

(b)   The terms of this order will affect the following persons in a country or state outside the jurisdiction of this Court:

(i)  the Respondents or their officers or their agents appointed by power of attorney;

(ii)  any person who–

1.     is subject to the jurisdiction of this Court;

2.     has been given written notice of this order at its, her or his residence or

place of business within the jurisdiction of this Court; and

3.  is able to prevent acts or omissions outside the jurisdiction of this Court which constitute or assist in a breach of the terms of this order; and

(iii)  any other person, only to the extent that this order is declared enforceable by or is enforced by a Court in that country or state

26.  **Assets located outside England and Wales**

Nothing in this order shall, in respect of assets located outside England and Wales, prevent any third party from complying with:

(a)  what it reasonably believes to be its obligations, contractual or otherwise, under the laws and obligations of the country or state in which those assets are situated or under the proper law of any contract between itself and the Respondent; and

(b)  any orders of the Courts of that country or state, provided that reasonable notice of any application for such an order is given to the Applicants' solicitors.

## SEALING OF THE COURT FILE

27.  Until the Applicants inform the Court in writing that this order has been served on the Respondents, pursuant to CPR 5.4B and 5.4C(4):

(a)  the documents on the Court file shall not be open to inspection on the Court file by any person, and shall be kept sealed;

(b)  the documents on the Court file shall not appear on any Electronic Working Case File (as defined in paragraph 2.4 of Practice Direction 510) or on any part of the Website (as defined in paragraph 2.3(a) of Practice Direction 51O);

(c)  no person other than the Applicants shall be entitled to inspect or obtain copies of any of the documents on the Court file.

## COMMUNICATIONS WITH THE COURT

All communications to the Court about this order should be sent to the Admiralty and Commercial Court Listing Office, 7 Rolls Building, Fetter Lane, London, EC4A 1NL quoting

the case number. The telephone number is 020 7947 6826.

The offices are open between 10 a.m. and 4.30 p.m. Monday to Friday.

Dated 2 August 2024

**NAME AND ADDRESS OF APPLICANTS' LEGAL REPRESENTATIVES**

The Applicants' legal representatives are-

Paul, Weiss, Rifkind, Wharton & Garrison LLP
20 Air Street
London
W1B 5AN, U.K.

Attn: Stefan J. Arnold-Soulby

Telephone: +44 207 367 1613

Email: SArnoldSoulby@paulweiss.com

## SCHEDULE A — AFFIDAVITS

The Applicants relied on the following affidavit:

(1)      The First Affidavit of EDUARDO GONZALEZ SALCEDA SANCHEZ.

## SCHEDULE B — UNDERTAKINGS GIVEN TO THE COURT BY THE APPLICANT

(1)     If the Court later finds that this order has caused loss to the Respondents (or any of them), and decides that the relevant Respondent should be compensated for that loss, the Applicants will comply with any order the Court may make.

(2)     As soon as practicable the Applicants will issue a claim form and application notice seeking the relief in this order in the form of the draft produced to the Court and serve in accordance with the order of this Court regarding service of documents on the Respondents dated 2 August 2024.

(3)     The Applicants will serve upon the Respondents in addition to this order as soon as reasonably practicable:

    1.   copies of the affidavits and exhibits containing the evidence relied upon by the Applicant, and any other documents provided to the Court on the making of the application;

    2.   the claim form;

    3.   the Applicants' skeleton argument and a transcript (if available) or note of the hearing; and

    4.   an application notice for continuation of the order.

(4)     Anyone notified of this order will be given a copy of it by the Applicants' legal representatives.

(5)     The Applicants will pay the reasonable costs of anyone other than the Respondents which have been incurred as a result of this order including the costs of finding out whether that person holds any of the Respondents' assets and if the Court later finds that this order has caused such person loss, and decides that such person should be compensated for that loss, the Applicants will comply with any order the Court may make.

(6)     If this order ceases to have effect (for example, if the Respondents provide security as provided for above) the Applicants will immediately take all reasonable steps

to inform in writing anyone to whom they have given notice of this order, or who they have reasonable grounds for supposing may act upon this order, that it has ceased to have effect.

(7)    The Applicants will not without the permission of the Court use any information obtained as a result of this order for the purpose of any civil or criminal proceedings, either in England and Wales or in any other jurisdiction, other than this claim.

(8)    The Applicants will not without the permission of the Court seek to enforce this order in any country outside England and Wales or seek an order of a similar nature including orders conferring a charge or other security against the Respondents or the Respondents' assets.

## SCHEDULE C — INFORMATION REQUESTS

Requests of the First Respondent:

1.　If and insofar as you hold any of the Collateral Shares, please identify:

　　(a)　The dates on which the Collateral Shares were transferred to you; and

　　(b)　The basis on which the Collateral Shares were transferred to you;

2.　If and insofar as you held but have subsequently disposed of or transferred away any of the Collateral Shares:

　　(a)　Identify the date of every such disposal/transfer and the name of the transferee.

　　(b)　Please identify the location of the proceeds of any Collateral Shares that have been disposed of.

Requests of the Second and Third Respondents:

1.　If and insofar as you held but no longer hold any of the Collateral Shares, please:

　　(a)　Identify who you transferred the shares to and the dates of each transfer.

　　(b)　Identify the basis on which you transferred the shares, including by answering the following questions:

　　　　(i)　On whose instructions you were acting?

　　　　(ii)　If known, who is the specific human person who gave the relevant instructions?

Requests of the Fourth Respondent:

1.　Have you directly or indirectly caused the Collateral Shares to be disposed of?

2.　If the answer to question (1) is "yes":

　　(a)　Identify the date of every such disposal and the name of the transferee.

　　(b)　What has happened to the proceeds of any Collateral Shares that have been disposed of? Full and complete details must be provided.

# EXHIBIT 51

Claim No: CL-2024-000450

02 Aug 2024

CL-2024-000450

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (KBD)**

**IN PRIVATE**

**On 2 August 2024**

**Before the Honourable Mr Justice Jacobs**

**BETWEEN:**

**(1) RICARDO BENJAMIN SALINAS PLIEGO**

**(2) CORPORACION RBS SA DE CV**

**Applicants/Claimants**

**-and-**

**(1) ASTOR ASSET MANAGEMENT 3 LIMITED**

**(2) WEISER GLOBAL CAPITAL MARKETS LTD**

**(3) TAVIRA MONACO SAM**

**(4) VLADIMIR "VAL" SKLAROV**

**Respondents/Defendants**

**ORDER**

**UPON** the Claimants' claim (the **Claim**) filed by way of claim form dated 2 August 2024 (the **Claim Form**)

**AND UPON** the Claimants' application (the **Service Application**) for permission to serve the Claim Form and all other documents in these proceedings out of the jurisdiction (including for the avoidance of doubt the Claimants' application for interim relief dated 2 August 2024 and any order the Court makes on that application (the **Injunction Application**))

**AND UPON** the Court reading the evidence filed

**AND UPON** this order being made at a hearing without notice to the Respondents

**AND UPON** hearing Stephen Robins KC, counsel for the Claimants

**IT IS ORDERED THAT:**

1.  The Claimant has permission pursuant to CPR 6.36 to serve the Claim Form on the Defendants out of the jurisdiction.

2.  The Claimant has permission pursuant to CPR 6.37(5)(b)(ii) to serve any other documents in these proceedings on the Defendants without obtaining further permission of the Court under CPR 6.36.

3.  The Claimant has permission pursuant to CPR 6.37(5)(b)(i) to serve all documents in these proceedings on the Defendants by email at the following email addresses:

    (a)  Astor Asset Management 3 Limited and Vladimir "Val" Sklarov: albert.yuen@astorassetgroup.com; gregory.mitchell@astorassetgroup.com; operations@astorassetgroup.com; investments18@msn.com; boychic@tivejo.com

    (b)  Weiser Global Capital Markets Ltd: Collateralservices@weiser.com.bs; info@weiser.com.bs; openaccount@weiser.com.bs

    (c)  Tavira Monaco SAM: INTLOperations@tavirasecurities.com; Patrick@fietje.com; patrick.fietje@tavirasecurities.com; eliotgoodfellow@gmail.com; eliot.goodfellow@taviramonaco.com; eliot.goodfellow@tavirasecurities.com; compliance@tavirasecurities.com; backup@tavirasecurities.com; simon.mason@tavirasecurities.com

    Service of documents by email as provided for in this paragraph is to be deemed as served on the relevant Defendant at the time the relevant email is sent, even if there is a bounce back from any one or more of the emails.

4.  The following time periods apply following service of the Claim Form in accordance with paragraph 3 above on the Defendants:

    (1)  within 14 days, the Defendants must file an acknowledgment of service and, if appropriate, file and serve an admission;

(2)    within 28 days of the filing of an acknowledgment of service which indicates an intention to defend, the Claimants must serve particulars of claim; and

(3)    within 28 days from the service of the particulars of claim, the Defendants must file and serve a defence.

5.    The costs of this application are costs in the case.

**Service of the order**

The Court has provided a sealed copy of this Order to the serving party:

The Claimant, care of its solicitors, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 20 Air St, London W1B 5AN

# EXHIBIT 52

**Alex Jenkins**

| | |
|---|---|
| **From:** | Conformité Tavira Monaco <conformite@taviramonaco.com> |
| **Sent:** | 05 August 2024 16:12 |
| **To:** | Arnold-Soulby, Stefan J |
| **Subject:** | CLAIM NUMBER: CL-2024-000450 - WORLDWIDE FREEZING INJUNCTION - Tavira Monaco SAM |
| **Attachments:** | Elektra.xlsx; AA Redemptions.xlsx; CV Redemptions.xlsx; JIQ Wiring Instructions.pdf; TMC63 Trade Report 20240731.pdf; TMC64 Trade Report 20240731.pdf |

Dear Paul, Weiss, Rifkind, Wharton & Garrison LLP

We refer to the Freezing and Proprietary Order of Mr Justice Jacobs issued and served on 2 August 2024 (the Order).

We are writing in our capacity as the Third Respondent to the Order.

Please find below and attached, pursuant to paragraph 11(b) of the Order, the following information:

Tavira currently holds in custody 336,475 shares of Grupo Elektra SAB De CV valued at USD 15,709,093.

Astor Asset Management 3 Limited rehypothecated the shares to Cornelius Vanderbilt Capital Management Ltd.

The attached Excel file (Elektra.xlsx) shows the dates and amounts of share sales undertaken by Cornelius Vanderbilt Capital Management Ltd.

Astor Asset Management 3 Limited currently has in custody with Tavira USD 963k in cash in its account.

Cornelius Vanderbilt Capital Management Ltd holds in custody with Tavira USD 10.46m in cash plus USD 6.7m worth of other shareholdings.

Attached are the cash redemptions for both Astor Asset Management 3 Limited (AA Redemptions) and Cornelius Vanderbilt Capital Management Ltd (CV Redemptions).

These redemption proceeds were sent to their lawyers' trust account held at JP Morgan Chase (see attached JIQ Wiring Instructions)

Also attached are the trade reports for both Ricardo Salinas and Corporacion RBS SA de CV which show the share and cash movements in the accounts.

In relation to Schedule C of the Order:

19

If and insofar as you held but no longer hold any of the Collateral Shares, please:

(a) Identify who you transferred the shares to and the dates of each transfer.

6,268,383 shares were transferred from Ricardo Benjamin Salinas Pliego's account to Astor Asset Management 3 Limited's account on 29th July 2024.

(b) Identify the basis on which you transferred the shares, including by answering

the following questions:

(i) On whose instructions you were acting? Tavira was instructed by Astor Asset Management 3 Limited. Astor Asset Management 3 Limited informed Tavira that there had been a loan agreement default and issued an entitlement order under the terms of the Custodian Management Agreement to transfer the shares.

(ii) If known, who is the specific human person who gave the relevant instructions? Elizaveta Lata

Further to paragraph 12 of the Order, please provide us with a draft of the affidavit we are required to submit on behalf of the Third Respondent.

Yours sincerely

Tavira Monaco SAM

(the Third Respondent)

2

20

# EXHIBIT 53

| TRADE DATE | SETTLE DATE | ORDER | SECURITY | PORT QTTY | PRICE |
|---|---|---|---|---|---|
| 12/16/2021 | 12/20/2021 | Sell | ELEKTRA*.MX | 2,871.00 | 1,384.6486 |
| 12/17/2021 | 12/21/2021 | Sell Short | ELEKTRA*.MX | 28,667.00 | 1,386.4112 |
| 12/20/2021 | 12/22/2021 | Sell Short | ELEKTRA*.MX | 1,711.00 | 1,398.9724 |
| 12/21/2021 | 12/23/2021 | Sell | ELEKTRA*.MX | 11,655.00 | 1,389.9535 |
| 12/22/2021 | 12/24/2021 | Sell Short | ELEKTRA*.MX | 1,041.00 | 1,391.9327 |
| 12/23/2021 | 12/27/2021 | Sell Short | ELEKTRA*.MX | 9,614.00 | 1,393.1417 |
| 12/24/2021 | 12/28/2021 | Sell Short | ELEKTRA*.MX | 16,284.00 | 1,391.4193 |
| 12/27/2021 | 12/29/2021 | Sell Short | ELEKTRA*.MX | 57,000.00 | 1,386.7296 |
| 12/28/2021 | 12/30/2021 | Sell Short | ELEKTRA*.MX | 50,000.00 | 1,383.2595 |
| 12/28/2021 | 12/30/2021 | Sell Short | ELEKTRA*.MX | 17,155.00 | 1,384.2849 |
| 12/29/2021 | 12/31/2021 | Sell Short | ELEKTRA*.MX | 29,068.00 | 1,398.9195 |
| 12/30/2021 | 1/3/2022 | Sell Short | ELEKTRA*.MX | 50,000.00 | 1,431.5900 |
| 12/31/2021 | 1/4/2022 | Sell Short | ELEKTRA*.MX | 60,000.00 | 1,516.2300 |
| 1/3/2022 | 1/5/2022 | Sell Short | ELEKTRA*.MX | 8,574.00 | 1,472.0200 |
| 1/4/2022 | 1/6/2022 | Sell Short | ELEKTRA*.MX | 11,689.00 | 1,424.1355 |
| 1/5/2022 | 1/7/2022 | Sell Short | ELEKTRA*.MX | 1,651.00 | 1,401.4500 |
| 1/6/2022 | 1/10/2022 | Sell Short | ELEKTRA*.MX | 19,054.00 | 1,384.2130 |
| 1/7/2022 | 1/11/2022 | Sell Short | ELEKTRA*.MX | 10,846.00 | 1,385.9100 |
| 1/10/2022 | 1/12/2022 | Sell Short | ELEKTRA*.MX | 14,083.00 | 1,395.1400 |
| 1/11/2022 | 1/13/2022 | Sell Short | ELEKTRA*.MX | 16,000.00 | 1,423.3600 |
| 1/12/2022 | 1/14/2022 | Sell Short | ELEKTRA*.MX | 15,694.00 | 1,449.2000 |
| 1/13/2022 | 1/17/2022 | Sell | ELEKTRA*.MX | 100,000.00 | 1,399.0200 |
| 1/13/2022 | 1/17/2022 | Sell Short | ELEKTRA*.MX | 40,800.00 | 1,402.1200 |
| 1/13/2022 | 1/17/2022 | Sell Short | ELEKTRA*.MX | 20,000.00 | 1,417.3600 |
| 1/14/2022 | 1/18/2022 | Sell Short | ELEKTRA*.MX | 10,785.00 | 1,399.5000 |
| 1/17/2022 | 1/19/2022 | Sell Short | ELEKTRA*.MX | 1,448.00 | 1,409.7450 |
| 1/18/2022 | 1/20/2022 | Sell Short | ELEKTRA*.MX | 17,002.00 | 1,391.5600 |
| 1/19/2022 | 1/21/2022 | Sell Short | ELEKTRA*.MX | 20,395.00 | 1,391.1258 |
| 1/20/2022 | 1/24/2022 | Sell Short | ELEKTRA*.MX | 28,653.00 | 1,354.4160 |
| 1/21/2022 | 1/25/2022 | Sell Short | ELEKTRA*.MX | 10,393.00 | 1,352.3300 |
| 1/24/2022 | 1/26/2022 | Sell Short | ELEKTRA*.MX | 4,978.00 | 1,359.1559 |
| 1/25/2022 | 1/27/2022 | Sell Short | ELEKTRA*.MX | 5,303.00 | 1,359.5620 |
| 1/26/2022 | 1/28/2022 | Sell Short | ELEKTRA*.MX | 5,996.00 | 1,355.2325 |
| 1/27/2022 | 1/31/2022 | Sell Short | ELEKTRA*.MX | 7,725.00 | 1,348.0630 |
| 1/28/2022 | 2/1/2022 | Sell Short | ELEKTRA*.MX | 19,519.00 | 1,341.9927 |
| 1/31/2022 | 2/2/2022 | Sell Short | ELEKTRA*.MX | 6,071.00 | 1,347.9600 |
| 2/2/2022 | 2/4/2022 | Sell Short | ELEKTRA*.MX | 9,398.00 | 1,348.6155 |
| 2/2/2022 | 2/4/2022 | Sell Short | ELEKTRA*.MX | 8,673.00 | 1,346.8476 |
| 2/3/2022 | 2/8/2022 | Sell Short | ELEKTRA*.MX | 1,970.00 | 1,353.3680 |
| 2/4/2022 | 2/9/2022 | Sell Short | ELEKTRA*.MX | 7,771.00 | 1,340.5759 |
| 2/8/2022 | 2/10/2022 | Sell Short | ELEKTRA*.MX | 10,517.00 | 1,336.0519 |
| 2/9/2022 | 2/11/2022 | Sell Short | ELEKTRA*.MX | 13,045.00 | 1,343.7739 |
| 2/10/2022 | 2/14/2022 | Sell Short | ELEKTRA*.MX | 7,993.00 | 1,345.6400 |
| 2/11/2022 | 2/15/2022 | Sell Short | ELEKTRA*.MX | 17,356.00 | 1,336.5600 |
| 2/14/2022 | 2/16/2022 | Sell Short | ELEKTRA*.MX | 20,498.00 | 1,335.4930 |

| | | | | | |
|---|---|---|---|---|---|
| 2/15/2022 | 2/17/2022 | Sell Short | ELEKTRA*.MX | 5,580.00 | 1,345.4500 |
| 2/16/2022 | 2/18/2022 | Sell Short | ELEKTRA*.MX | 3,715.00 | 1,348.0494 |
| 2/17/2022 | 2/21/2022 | Sell Short | ELEKTRA*.MX | 2,017.00 | 1,352.0400 |
| 2/18/2022 | 2/22/2022 | Sell Short | ELEKTRA*.MX | 10,045.00 | 1,338.5856 |
| 2/21/2022 | 2/23/2022 | Sell Short | ELEKTRA*.MX | 1,111.00 | 1,343.3190 |
| 2/22/2022 | 2/24/2022 | Sell Short | ELEKTRA*.MX | 3,060.00 | 1,347.5854 |
| 2/23/2022 | 2/25/2022 | Sell Short | ELEKTRA*.MX | 10,852.00 | 1,338.6566 |
| 2/24/2022 | 2/28/2022 | Sell Short | ELEKTRA*.MX | 27,090.00 | 1,305.1400 |
| 2/28/2022 | 3/2/2022 | Sell Short | ELEKTRA*.MX | 2,578.00 | 1,335.5774 |
| 3/1/2022 | 3/3/2022 | Sell Short | ELEKTRA*.MX | 22,352.00 | 1,320.2400 |
| 3/2/2022 | 3/4/2022 | Sell Short | ELEKTRA*.MX | 18,655.00 | 1,326.6488 |
| 3/3/2022 | 3/7/2022 | Sell Short | ELEKTRA*.MX | 13,449.00 | 1,319.9400 |
| 3/4/2022 | 3/8/2022 | Sell Short | ELEKTRA*.MX | 6,170.00 | 1,321.8121 |
| 3/7/2022 | 3/9/2022 | Sell Short | ELEKTRA*.MX | 4,736.00 | 1,314.4000 |
| 3/8/2022 | 3/10/2022 | Sell Short | ELEKTRA*.MX | 23,003.00 | 1,299.8100 |
| 3/9/2022 | 3/11/2022 | Sell Short | ELEKTRA*.MX | 20,327.00 | 1,279.9600 |
| 3/10/2022 | 3/14/2022 | Sell Short | ELEKTRA*.MX | 17,355.00 | 1,276.7100 |
| 3/11/2022 | 3/15/2022 | Sell Short | ELEKTRA*.MX | 6,300.00 | 1,279.0300 |
| 3/14/2022 | 3/16/2022 | Sell Short | ELEKTRA*.MX | 10,600.00 | 1,277.8868 |
| 3/15/2022 | 3/17/2022 | Sell Short | ELEKTRA*.MX | 10,097.00 | 1,286.1814 |
| 3/16/2022 | 3/18/2022 | Sell Short | ELEKTRA*.MX | 16,000.00 | 1,287.1291 |
| 3/17/2022 | 3/22/2022 | Sell Short | ELEKTRA*.MX | 10,970.00 | 1,283.2300 |
| 3/18/2022 | 3/23/2022 | Sell Short | ELEKTRA*.MX | 40,000.00 | 1,292.1900 |
| 3/22/2022 | 3/24/2022 | Sell Short | ELEKTRA*.MX | 10,416.00 | 1,291.6516 |
| 3/23/2022 | 3/25/2022 | Sell Short | ELEKTRA*.MX | 8,266.00 | 1,279.6600 |
| 3/24/2022 | 3/28/2022 | Sell Short | ELEKTRA*.MX | 7,880.00 | 1,277.0712 |
| 3/28/2022 | 3/30/2022 | Sell Short | ELEKTRA*.MX | 1,000.00 | 1,281.4670 |
| 3/31/2022 | 4/4/2022 | Sell Short | ELEKTRA*.MX | 7,152.00 | 1,290.6176 |
| 4/1/2022 | 4/5/2022 | Sell Short | ELEKTRA*.MX | 4,500.00 | 1,291.4347 |
| 4/4/2022 | 4/6/2022 | Sell Short | ELEKTRA*.MX | 12,000.00 | 1,286.1203 |
| 4/5/2022 | 4/7/2022 | Sell Short | ELEKTRA*.MX | 8,610.00 | 1,275.8471 |
| 4/6/2022 | 4/8/2022 | Sell Short | ELEKTRA*.MX | 12,590.00 | 1,268.8743 |
| 4/7/2022 | 4/11/2022 | Sell | ELEKTRA*.MX | 12,000.00 | 1,269.5129 |
| 4/8/2022 | 4/12/2022 | Sell Short | ELEKTRA*.MX | 5,406.00 | 1,254.5141 |
| 4/11/2022 | 4/13/2022 | Sell Short | ELEKTRA*.MX | 7,645.00 | 1,254.5819 |
| 4/12/2022 | 4/18/2022 | Sell Short | ELEKTRA*.MX | 8,115.00 | 1,253.3896 |
| 4/13/2022 | 4/19/2022 | Sell Short | ELEKTRA*.MX | 9,730.00 | 1,253.5043 |
| 4/18/2022 | 4/20/2022 | Sell Short | ELEKTRA*.MX | 14,300.00 | 1,269.4849 |
| 4/19/2022 | 4/21/2022 | Sell Short | ELEKTRA*.MX | 4,641.00 | 1,269.2700 |
| 4/20/2022 | 4/22/2022 | Sell Short | ELEKTRA*.MX | 6,800.00 | 1,268.1200 |
| 4/21/2022 | 4/25/2022 | Sell Short | ELEKTRA*.MX | 5,397.00 | 1,259.7300 |
| 4/22/2022 | 4/26/2022 | Sell Short | ELEKTRA*.MX | 15,190.00 | 1,255.4400 |
| 4/25/2022 | 4/27/2022 | Sell Short | ELEKTRA*.MX | 13,763.00 | 1,253.8400 |
| 4/26/2022 | 4/28/2022 | Sell Short | ELEKTRA*.MX | 14,264.00 | 1,249.7400 |
| 4/27/2022 | 4/29/2022 | Sell Short | ELEKTRA*.MX | 16,012.00 | 1,245.0500 |
| 4/28/2022 | 5/2/2022 | Sell Short | ELEKTRA*.MX | 16,000.00 | 1,241.8100 |
| 4/29/2022 | 5/3/2022 | Sell Short | ELEKTRA*.MX | 23,066.00 | 1,225.6300 |

22

| | | | | | |
|---|---|---|---|---|---|
| 5/2/2022 | 5/4/2022 | Sell Short | ELEKTRA*.MX | 13,885.00 | 1,183.9906 |
| 5/3/2022 | 5/5/2022 | Buy Cover | ELEKTRA*.MX | 15,000.00 | 1,191.0266 |
| 5/4/2022 | 5/6/2022 | Sell Short | ELEKTRA*.MX | 2,432.00 | 1,142.8487 |
| 5/9/2022 | 5/11/2022 | Sell Short | ELEKTRA*.MX | 5,720.00 | 1,099.0077 |
| 5/10/2022 | 5/12/2022 | Sell Short | ELEKTRA*.MX | 9,266.00 | 1,083.8600 |
| 5/11/2022 | 5/13/2022 | Sell Short | ELEKTRA*.MX | 10,343.00 | 1,074.1628 |
| 5/12/2022 | 5/16/2022 | Sell Short | ELEKTRA*.MX | 7,645.00 | 1,077.6500 |
| 5/13/2022 | 5/17/2022 | Sell Short | ELEKTRA*.MX | 15,975.00 | 1,066.9400 |
| 5/16/2022 | 5/18/2022 | Sell Short | ELEKTRA*.MX | 16,491.00 | 1,068.3200 |
| 5/17/2022 | 5/19/2022 | Sell Short | ELEKTRA*.MX | 24,187.00 | 1,050.9800 |
| 5/18/2022 | 5/20/2022 | Sell Short | ELEKTRA*.MX | 23,511.00 | 1,049.3285 |
| 5/19/2022 | 5/23/2022 | Sell | ELEKTRA*.MX | 24,667.00 | 1,084.0688 |
| 5/20/2022 | 5/24/2022 | Sell Short | ELEKTRA*.MX | 23,199.00 | 1,107.6053 |
| 5/23/2022 | 5/25/2022 | Sell Short | ELEKTRA*.MX | 17,789.00 | 1,108.4396 |
| 5/24/2022 | 5/26/2022 | Sell Short | ELEKTRA*.MX | 13,529.00 | 1,133.8535 |
| 5/25/2022 | 5/27/2022 | Sell Short | ELEKTRA*.MX | 40,335.00 | 1,144.9874 |
| 5/26/2022 | 5/30/2022 | Sell Short | ELEKTRA*.MX | 26,295.00 | 1,147.8051 |
| 5/27/2022 | 5/31/2022 | Sell Short | ELEKTRA*.MX | 15,820.00 | 1,149.9400 |
| 5/30/2022 | 6/1/2022 | Sell Short | ELEKTRA*.MX | 11,180.00 | 1,156.1426 |
| 5/31/2022 | 6/2/2022 | Sell Short | ELEKTRA*.MX | 20,642.00 | 1,157.9386 |
| 6/1/2022 | 6/3/2022 | Sell | ELEKTRA*.MX | 17,208.00 | 1,147.1536 |
| 6/2/2022 | 6/6/2022 | Sell | ELEKTRA*.MX | 7,506.00 | 1,155.0004 |
| 6/3/2022 | 6/7/2022 | Sell | ELEKTRA*.MX | 10,081.00 | 1,159.7000 |
| 6/6/2022 | 6/8/2022 | Sell | ELEKTRA*.MX | 14,435.00 | 1,157.1596 |
| 6/7/2022 | 6/9/2022 | Sell | ELEKTRA*.MX | 13,535.00 | 1,160.3800 |
| 6/8/2022 | 6/10/2022 | Sell | ELEKTRA*.MX | 11,276.00 | 1,162.5272 |
| 6/9/2022 | 6/13/2022 | Sell | ELEKTRA*.MX | 21,221.00 | 1,155.9662 |
| 6/10/2022 | 6/14/2022 | Sell | ELEKTRA*.MX | 18,857.00 | 1,153.3000 |
| 6/13/2022 | 6/15/2022 | Sell | ELEKTRA*.MX | 20,700.00 | 1,156.3800 |
| 6/14/2022 | 6/16/2022 | Sell | ELEKTRA*.MX | 15,631.00 | 1,154.7218 |
| 6/15/2022 | 6/17/2022 | Sell | ELEKTRA*.MX | 15,869.00 | 1,152.6033 |
| 6/16/2022 | 6/20/2022 | Sell | ELEKTRA*.MX | 24,074.00 | 1,141.7800 |
| 6/17/2022 | 6/21/2022 | Sell | ELEKTRA*.MX | 37,975.00 | 1,118.0300 |
| 6/20/2022 | 6/22/2022 | Sell | ELEKTRA*.MX | 8,092.00 | 1,103.8336 |
| 6/21/2022 | 6/23/2022 | Sell | ELEKTRA*.MX | 9,156.00 | 1,147.5879 |
| 6/22/2022 | 6/24/2022 | Sell | ELEKTRA*.MX | 14,068.00 | 1,152.4373 |
| 6/23/2022 | 6/27/2022 | Sell | ELEKTRA*.MX | 9,134.00 | 1,151.7300 |
| 6/24/2022 | 6/28/2022 | Sell | ELEKTRA*.MX | 32,233.00 | 1,141.8200 |
| 6/27/2022 | 6/29/2022 | Sell | ELEKTRA*.MX | 12,354.00 | 1,135.5315 |
| 6/28/2022 | 6/30/2022 | Sell | ELEKTRA*.MX | 13,319.00 | 1,124.2900 |
| 6/29/2022 | 7/1/2022 | Sell | ELEKTRA*.MX | 14,031.00 | 1,104.1200 |
| 6/30/2022 | 7/4/2022 | Sell | ELEKTRA*.MX | 9,004.00 | 0.0000 |
| 7/1/2022 | 7/5/2022 | Sell | ELEKTRA*.MX | 8,991.00 | 1,118.5500 |
| 7/4/2022 | 7/6/2022 | Sell | ELEKTRA*.MX | 1,230.00 | 1,115.8157 |
| 7/5/2022 | 7/7/2022 | Sell | ELEKTRA*.MX | 8,217.00 | 1,113.8345 |
| 7/6/2022 | 7/8/2022 | Sell | ELEKTRA*.MX | 17,053.00 | 1,102.1300 |
| 7/13/2022 | 7/15/2022 | Sell | ELEKTRA*.MX | 8,396.00 | 1,102.1479 |

23

| | | | | | |
|---|---|---|---|---|---|
| 7/14/2022 | 7/18/2022 | Sell | ELEKTRA*.MX | 9,251.00 | 1,079.7072 |
| 7/14/2022 | 7/18/2022 | Sell | ELEKTRA*.MX | 2,247.00 | 1,075.5549 |
| 7/15/2022 | 7/19/2022 | Sell | ELEKTRA*.MX | 10,883.00 | 1,081.0244 |
| 7/18/2022 | 7/20/2022 | Sell Short | ELEKTRA*.MX | 7,717.00 | 1,091.8924 |
| 7/19/2022 | 7/21/2022 | Sell Short | ELEKTRA*.MX | 7,933.00 | 1,101.5500 |
| 7/20/2022 | 7/22/2022 | Sell Short | ELEKTRA*.MX | 11,845.00 | 1,131.1859 |
| 7/21/2022 | 7/25/2022 | Sell Short | ELEKTRA*.MX | 10,339.00 | 1,146.1341 |
| 7/22/2022 | 7/26/2022 | Sell Short | ELEKTRA*.MX | 7,967.00 | 1,138.0919 |
| 7/25/2022 | 7/27/2022 | Sell Short | ELEKTRA*.MX | 2,518.00 | 1,156.7700 |
| 7/26/2022 | 7/28/2022 | Sell Short | ELEKTRA*.MX | 4,437.00 | 1,172.1288 |
| 7/27/2022 | 7/29/2022 | Sell Short | ELEKTRA*.MX | 9,345.00 | 1,171.4031 |
| 7/28/2022 | 8/1/2022 | Sell Short | ELEKTRA*.MX | 2,198.00 | 1,179.5300 |
| 7/29/2022 | 8/2/2022 | Sell Short | ELEKTRA*.MX | 5,065.00 | 1,194.5498 |
| 8/1/2022 | 8/3/2022 | Sell Short | ELEKTRA*.MX | 3,660.00 | 1,174.0700 |
| 8/2/2022 | 8/4/2022 | Sell Short | ELEKTRA*.MX | 12,473.00 | 1,171.6763 |
| 8/3/2022 | 8/5/2022 | Sell Short | ELEKTRA*.MX | 8,718.00 | 1,171.8298 |
| 8/4/2022 | 8/8/2022 | Sell | ELEKTRA*.MX | 3,772.00 | 1,173.3794 |
| 8/5/2022 | 8/9/2022 | Sell | ELEKTRA*.MX | 8,295.00 | 1,168.8663 |
| 8/8/2022 | 8/10/2022 | Sell Short | ELEKTRA*.MX | 8,975.00 | 1,168.8700 |
| 8/9/2022 | 8/11/2022 | Sell Short | ELEKTRA*.MX | 2,723.00 | 1,168.6683 |
| 8/10/2022 | 8/12/2022 | Sell Short | ELEKTRA*.MX | 11,509.00 | 1,165.1800 |
| 8/11/2022 | 8/15/2022 | Sell Short | ELEKTRA*.MX | 10,619.00 | 1,149.4800 |
| 8/15/2022 | 8/17/2022 | Sell Short | ELEKTRA*.MX | 11,637.00 | 1,150.4103 |
| 8/16/2022 | 8/18/2022 | Sell Short | ELEKTRA*.MX | 5,700.00 | 1,150.3867 |
| 8/17/2022 | 8/19/2022 | Sell Short | ELEKTRA*.MX | 8,820.00 | 1,147.4600 |
| 8/18/2022 | 8/22/2022 | Sell | ELEKTRA*.MX | 34.00 | 1,154.1259 |
| 8/19/2022 | 8/23/2022 | Sell Short | ELEKTRA*.MX | 8,787.00 | 1,147.2462 |
| 8/22/2022 | 8/24/2022 | Sell Short | ELEKTRA*.MX | 11,081.00 | 1,140.3000 |
| 8/23/2022 | 8/25/2022 | Sell Short | ELEKTRA*.MX | 12,100.00 | 1,131.5600 |
| 8/24/2022 | 8/26/2022 | Sell Short | ELEKTRA*.MX | 15,473.00 | 1,105.3200 |
| 8/25/2022 | 8/29/2022 | Sell Short | ELEKTRA*.MX | 13,135.00 | 1,076.4616 |
| 8/29/2022 | 8/31/2022 | Sell Short | ELEKTRA*.MX | 10,735.00 | 1,040.6577 |
| 8/30/2022 | 9/1/2022 | Sell Short | ELEKTRA*.MX | 1,392.00 | 1,056.2100 |
| 8/31/2022 | 9/2/2022 | Sell Short | ELEKTRA*.MX | 13,807.00 | 1,029.2835 |
| 9/1/2022 | 9/5/2022 | Sell Short | ELEKTRA*.MX | 10,071.00 | 1,029.6900 |
| 9/2/2022 | 9/6/2022 | Sell Short | ELEKTRA*.MX | 11,250.00 | 1,026.7140 |
| 9/5/2022 | 9/7/2022 | Sell Short | ELEKTRA*.MX | 580.00 | 1,036.2112 |
| 9/6/2022 | 9/8/2022 | Sell Short | ELEKTRA*.MX | 16,456.00 | 1,020.8300 |
| 9/7/2022 | 9/9/2022 | Sell Short | ELEKTRA*.MX | 11,686.00 | 1,015.4200 |
| 9/12/2022 | 9/14/2022 | Sell Short | ELEKTRA*.MX | 15,400.00 | 1,019.8200 |
| 9/13/2022 | 9/15/2022 | Sell Short | ELEKTRA*.MX | 8,800.00 | 1,010.7170 |
| 9/14/2022 | 9/19/2022 | Sell Short | ELEKTRA*.MX | 16,058.00 | 1,004.4300 |
| 9/15/2022 | 9/20/2022 | Sell Short | ELEKTRA*.MX | 8,012.00 | 1,019.4400 |
| 9/19/2022 | 9/21/2022 | Sell Short | ELEKTRA*.MX | 6,412.00 | 1,032.8744 |
| 9/20/2022 | 9/22/2022 | Sell Short | ELEKTRA*.MX | 4,766.00 | 1,043.2182 |
| 9/21/2022 | 9/23/2022 | Sell Short | ELEKTRA*.MX | 6,450.00 | 1,046.7800 |
| 9/22/2022 | 9/26/2022 | Sell Short | ELEKTRA*.MX | 3,887.00 | 1,046.0100 |

24

| | | | | | |
|---|---|---|---|---:|---:|
| 9/23/2022 | 9/27/2022 | Sell Short | ELEKTRA*.MX | 10,630.00 | 1,040.5000 |
| 9/26/2022 | 9/28/2022 | Sell Short | ELEKTRA*.MX | 9,286.00 | 1,024.9884 |
| 9/27/2022 | 9/29/2022 | Sell Short | ELEKTRA*.MX | 9,050.00 | 1,009.4875 |
| 10/3/2022 | 10/5/2022 | Sell | ELEKTRA*.MX | 5,502.00 | 1,011.6661 |
| 10/4/2022 | 10/6/2022 | Sell Short | ELEKTRA*.MX | 5,134.00 | 1,007.9800 |
| 10/5/2022 | 10/7/2022 | Sell Short | ELEKTRA*.MX | 2,678.00 | 1,006.3390 |
| 10/6/2022 | 10/10/2022 | Sell Short | ELEKTRA*.MX | 10,290.00 | 1,011.4600 |
| 10/7/2022 | 10/11/2022 | Sell Short | ELEKTRA*.MX | 2,239.00 | 1,009.7800 |
| 10/10/2022 | 10/12/2022 | Sell Short | ELEKTRA*.MX | 2,453.00 | 1,004.2421 |
| 10/11/2022 | 10/13/2022 | Sell Short | ELEKTRA*.MX | 7,081.00 | 995.4300 |
| 10/12/2022 | 10/14/2022 | Sell Short | ELEKTRA*.MX | 11,030.00 | 993.3900 |
| 10/13/2022 | 10/17/2022 | Sell Short | ELEKTRA*.MX | 21,689.00 | 984.7100 |
| 10/14/2022 | 10/18/2022 | Sell Short | ELEKTRA*.MX | 15,000.00 | 999.7400 |
| 10/14/2022 | 10/18/2022 | Sell Short | ELEKTRA*.MX | 4,625.00 | 999.2700 |
| 10/17/2022 | 10/19/2022 | Sell | ELEKTRA*.MX | 4,549.00 | 997.0281 |
| 10/18/2022 | 10/20/2022 | Sell Short | ELEKTRA*.MX | 13,849.00 | 996.0000 |
| 10/19/2022 | 10/21/2022 | Sell Short | ELEKTRA*.MX | 4,500.00 | 999.0600 |
| 10/20/2022 | 10/24/2022 | Sell Short | ELEKTRA*.MX | 26,662.00 | 988.2300 |
| 10/21/2022 | 10/25/2022 | Sell Short | ELEKTRA*.MX | 20,527.00 | 995.0400 |
| 10/24/2022 | 10/26/2022 | Sell Short | ELEKTRA*.MX | 12,416.00 | 1,006.0000 |
| 10/25/2022 | 10/27/2022 | Sell Short | ELEKTRA*.MX | 18,713.00 | 1,024.4900 |
| 10/26/2022 | 10/28/2022 | Sell Short | ELEKTRA*.MX | 6,493.00 | 1,047.3700 |
| 10/27/2022 | 10/31/2022 | Sell Short | ELEKTRA*.MX | 13,327.00 | 1,032.8420 |
| 10/28/2022 | 11/1/2022 | Sell Short | ELEKTRA*.MX | 21,790.00 | 995.1100 |
| 10/31/2022 | 11/3/2022 | Sell Short | ELEKTRA*.MX | 15,930.00 | 992.5700 |
| 11/1/2022 | 11/4/2022 | Sell Short | ELEKTRA*.MX | 10,224.00 | 982.7100 |
| 11/3/2022 | 11/7/2022 | Sell Short | ELEKTRA*.MX | 20,321.00 | 980.0700 |
| 11/4/2022 | 11/8/2022 | Sell Short | ELEKTRA*.MX | 28,889.00 | 957.2762 |
| 11/4/2022 | 11/8/2022 | Sell Short | ELEKTRA*.MX | 15,550.00 | 955.4820 |
| 11/7/2022 | 11/9/2022 | Sell Short | ELEKTRA*.MX | 17,433.00 | 957.4237 |
| 11/7/2022 | 11/9/2022 | Sell Short | ELEKTRA*.MX | 16,386.00 | 955.0600 |
| 11/9/2022 | 11/11/2022 | Sell Short | ELEKTRA*.MX | 42,660.00 | 948.4800 |
| 11/10/2022 | 11/14/2022 | Sell Short | ELEKTRA*.MX | 16,689.00 | 966.9200 |
| 11/11/2022 | 11/15/2022 | Sell Short | ELEKTRA*.MX | 40,731.00 | 963.6300 |
| 11/14/2022 | 11/16/2022 | Sell Short | ELEKTRA*.MX | 17,068.00 | 969.3800 |
| 11/15/2022 | 11/17/2022 | Sell Short | ELEKTRA*.MX | 15,933.00 | 986.3797 |
| 11/16/2022 | 11/18/2022 | Sell Short | ELEKTRA*.MX | 21,031.00 | 994.4930 |
| 11/17/2022 | 11/22/2022 | Sell Short | ELEKTRA*.MX | 8,803.00 | 992.7920 |
| 11/18/2022 | 11/23/2022 | Sell Short | ELEKTRA*.MX | 20,733.00 | 1,003.0700 |
| 11/22/2022 | 11/24/2022 | Sell Short | ELEKTRA*.MX | 5,686.00 | 993.2600 |
| 11/23/2022 | 11/25/2022 | Sell Short | ELEKTRA*.MX | 11,553.00 | 986.3600 |
| 11/24/2022 | 11/28/2022 | Sell Short | ELEKTRA*.MX | 7,438.00 | 987.1900 |
| 11/25/2022 | 11/29/2022 | Sell Short | ELEKTRA*.MX | 13,104.00 | 1,010.2400 |
| 11/28/2022 | 11/30/2022 | Sell Short | ELEKTRA*.MX | 9,415.00 | 1,026.5400 |
| 11/29/2022 | 12/1/2022 | Sell Short | ELEKTRA*.MX | 12,007.00 | 1,020.6900 |
| 11/30/2022 | 12/2/2022 | Sell Short | ELEKTRA*.MX | 8,417.00 | 1,016.4000 |
| 12/1/2022 | 12/5/2022 | Sell Short | ELEKTRA*.MX | 11,666.00 | 1,023.0000 |

| | | | | | |
|---|---|---|---|---|---|
| 12/2/2022 | 12/6/2022 | Sell Short | ELEKTRA*.MX | 12,312.00 | 1,038.4973 |
| 12/5/2022 | 12/7/2022 | Sell Short | ELEKTRA*.MX | 8,261.00 | 1,038.4048 |
| 12/6/2022 | 12/8/2022 | Sell Short | ELEKTRA*.MX | 9,264.00 | 1,023.8978 |
| 12/7/2022 | 12/9/2022 | Sell Short | ELEKTRA*.MX | 15,401.00 | 1,018.3656 |
| 12/8/2022 | 12/13/2022 | Sell Short | ELEKTRA*.MX | 11,633.00 | 1,030.6800 |
| 12/9/2022 | 12/14/2022 | Sell Short | ELEKTRA*.MX | 14,095.00 | 1,047.2400 |
| 12/13/2022 | 12/15/2022 | Sell Short | ELEKTRA*.MX | 14,660.00 | 1,044.1200 |
| 12/14/2022 | 12/16/2022 | Sell Short | ELEKTRA*.MX | 11,631.00 | 1,049.8108 |
| 12/15/2022 | 12/19/2022 | Sell Short | ELEKTRA*.MX | 22,115.00 | 1,047.6200 |
| 12/16/2022 | 12/20/2022 | Sell Short | ELEKTRA*.MX | 21,279.00 | 1,033.4500 |
| 12/19/2022 | 12/21/2022 | Sell Short | ELEKTRA*.MX | 17,126.00 | 1,033.7900 |
| 12/20/2022 | 12/22/2022 | Sell Short | ELEKTRA*.MX | 15,176.00 | 1,050.8779 |
| 12/21/2022 | 12/23/2022 | Sell Short | ELEKTRA*.MX | 21,860.00 | 1,079.9568 |
| 12/22/2022 | 12/26/2022 | Sell Short | ELEKTRA*.MX | 13,001.00 | 1,081.9788 |
| 12/23/2022 | 12/27/2022 | Sell Short | ELEKTRA*.MX | 6,701.00 | 1,068.9793 |
| 12/27/2022 | 12/29/2022 | Sell Short | ELEKTRA*.MX | 13,400.00 | 1,097.8700 |
| 12/28/2022 | 12/30/2022 | Sell Short | ELEKTRA*.MX | 15,294.00 | 1,097.4600 |
| 12/29/2022 | 1/2/2023 | Sell Short | ELEKTRA*.MX | 587.00 | 1,101.5200 |
| 12/30/2022 | 1/3/2023 | Sell Short | ELEKTRA*.MX | 990.00 | 1,097.0900 |
| 1/2/2023 | 1/4/2023 | Sell Short | ELEKTRA*.MX | 636.00 | 1,100.2700 |
| 1/3/2023 | 1/5/2023 | Sell Short | ELEKTRA*.MX | 6,420.00 | 1,077.3200 |
| 1/4/2023 | 1/6/2023 | Sell Short | ELEKTRA*.MX | 1,897.00 | 1,090.6400 |
| 1/5/2023 | 1/9/2023 | Sell Short | ELEKTRA*.MX | 1,691.00 | 1,102.9600 |
| 1/6/2023 | 1/10/2023 | Sell Short | ELEKTRA*.MX | 3,001.00 | 1,089.4918 |
| 1/9/2023 | 1/11/2023 | Sell Short | ELEKTRA*.MX | 9,925.00 | 1,080.7228 |
| 1/10/2023 | 1/12/2023 | Sell Short | ELEKTRA*.MX | 9,925.00 | 1,084.6500 |
| 1/12/2023 | 1/16/2023 | Sell Short | ELEKTRA*.MX | 850.00 | 1,071.2400 |
| 1/13/2023 | 1/17/2023 | Sell Short | ELEKTRA*.MX | 2,500.00 | 1,059.3325 |
| 1/16/2023 | 1/18/2023 | Sell Short | ELEKTRA*.MX | 2,125.00 | 1,065.9567 |
| 1/17/2023 | 1/19/2023 | Sell Short | ELEKTRA*.MX | 9,128.00 | 1,051.1905 |
| 1/18/2023 | 1/20/2023 | Sell Short | ELEKTRA*.MX | 8,148.00 | 1,045.0079 |
| 1/18/2023 | 1/20/2023 | Sell Short | ELEKTRA*.MX | 1,401.00 | 1,093.3400 |
| 1/19/2023 | 1/23/2023 | Sell Short | ELEKTRA*.MX | 1,407.00 | 1,057.9500 |
| 1/20/2023 | 1/24/2023 | Sell Short | ELEKTRA*.MX | 8,278.00 | 1,052.5400 |
| 1/23/2023 | 1/25/2023 | Sell Short | ELEKTRA*.MX | 11,181.00 | 1,046.9043 |
| 1/24/2023 | 1/26/2023 | Sell Short | ELEKTRA*.MX | 9,720.00 | 1,074.4235 |
| 1/26/2023 | 1/30/2023 | Sell Short | ELEKTRA*.MX | 8,902.00 | 1,074.7257 |
| 1/27/2023 | 1/31/2023 | Sell Short | ELEKTRA*.MX | 8,311.00 | 1,067.2600 |
| 1/30/2023 | 2/1/2023 | Sell | ELEKTRA*.MX | 11,307.00 | 1,047.7823 |
| 1/31/2023 | 2/2/2023 | Sell | ELEKTRA*.MX | 1,348.00 | 1,032.4829 |
| 2/1/2023 | 2/3/2023 | Sell Short | ELEKTRA*.MX | 1,160.00 | 1,018.9029 |
| 2/2/2023 | 2/7/2023 | Sell Short | ELEKTRA*.MX | 10,890.00 | 1,002.8333 |
| 2/3/2023 | 2/8/2023 | Sell Short | ELEKTRA*.MX | 3,818.00 | 998.2600 |
| 2/7/2023 | 2/9/2023 | Sell Short | ELEKTRA*.MX | 13,926.00 | 1,014.4300 |
| 2/8/2023 | 2/10/2023 | Sell Short | ELEKTRA*.MX | 2,221.00 | 1,004.2000 |
| 2/9/2023 | 2/13/2023 | Sell Short | ELEKTRA*.MX | 9,394.00 | 992.5000 |
| 2/10/2023 | 2/14/2023 | Sell Short | ELEKTRA*.MX | 10,856.00 | 966.0516 |

26

| | | | | | |
|---|---|---|---|---|---|
| 2/13/2023 | 2/15/2023 | Sell Short | ELEKTRA*.MX | 10,488.00 | 961.7137 |
| 2/14/2023 | 2/16/2023 | Sell Short | ELEKTRA*.MX | 2,611.00 | 937.9800 |
| 2/23/2023 | 2/27/2023 | Sell Short | ELEKTRA*.MX | 4,700.00 | 931.3779 |
| 2/24/2023 | 2/28/2023 | Sell Short | ELEKTRA*.MX | 1,722.00 | 969.5784 |
| 2/27/2023 | 3/1/2023 | Sell Short | ELEKTRA*.MX | 3,563.00 | 964.4049 |
| 2/28/2023 | 3/2/2023 | Sell Short | ELEKTRA*.MX | 5,756.00 | 960.5714 |
| 3/1/2023 | 3/3/2023 | Sell Short | ELEKTRA*.MX | 4,276.00 | 952.0049 |
| 3/2/2023 | 3/6/2023 | Sell Short | ELEKTRA*.MX | 7,500.00 | 938.1600 |
| 3/3/2023 | 3/7/2023 | Sell Short | ELEKTRA*.MX | 8,801.00 | 968.6000 |
| 3/6/2023 | 3/8/2023 | Sell Short | ELEKTRA*.MX | 7,261.00 | 956.5088 |
| 3/7/2023 | 3/9/2023 | Sell Short | ELEKTRA*.MX | 5,290.00 | 942.9000 |
| 3/8/2023 | 3/10/2023 | Sell Short | ELEKTRA*.MX | 8,965.00 | 940.2000 |
| 3/9/2023 | 3/13/2023 | Sell Short | ELEKTRA*.MX | 3,243.00 | 943.5558 |
| 3/10/2023 | 3/14/2023 | Sell Short | ELEKTRA*.MX | 7,806.00 | 941.3300 |
| 3/13/2023 | 3/15/2023 | Sell Short | ELEKTRA*.MX | 5,144.00 | 954.5700 |
| 3/14/2023 | 3/16/2023 | Sell Short | ELEKTRA*.MX | 3,812.00 | 945.2300 |
| 3/15/2023 | 3/17/2023 | Sell Short | ELEKTRA*.MX | 6,400.00 | 935.0400 |
| 3/17/2023 | 3/22/2023 | Sell Short | ELEKTRA*.MX | 19,552.00 | 937.4100 |
| 3/21/2023 | 3/23/2023 | Sell Short | ELEKTRA*.MX | 3,901.00 | 940.5244 |
| 3/22/2023 | 3/24/2023 | Sell Short | ELEKTRA*.MX | 11,447.00 | 932.7230 |
| 3/23/2023 | 3/27/2023 | Sell Short | ELEKTRA*.MX | 11,596.00 | 933.9114 |
| 3/24/2023 | 3/28/2023 | Sell Short | ELEKTRA*.MX | 9,255.00 | 948.5600 |
| 3/27/2023 | 3/29/2023 | Sell Short | ELEKTRA*.MX | 3,222.00 | 965.8988 |
| 3/28/2023 | 3/30/2023 | Sell Short | ELEKTRA*.MX | 5,881.00 | 961.4214 |
| 3/29/2023 | 3/31/2023 | Sell Short | ELEKTRA*.MX | 2,198.00 | 967.2500 |
| 3/30/2023 | 4/3/2023 | Sell Short | ELEKTRA*.MX | 625.00 | 991.8500 |
| 3/31/2023 | 4/4/2023 | Sell Short | ELEKTRA*.MX | 1,600.00 | 1,020.0910 |
| 4/3/2023 | 4/5/2023 | Sell Short | ELEKTRA*.MX | 5,730.00 | 1,019.8300 |
| 4/4/2023 | 4/10/2023 | Sell Short | ELEKTRA*.MX | 6,870.00 | 1,054.2652 |
| 4/5/2023 | 4/11/2023 | Sell Short | ELEKTRA*.MX | 2,568.00 | 1,062.5132 |
| 4/13/2023 | 4/17/2023 | Sell Short | ELEKTRA*.MX | 4,289.00 | 1,106.8900 |
| 4/17/2023 | 4/19/2023 | Sell Short | ELEKTRA*.MX | 3,214.00 | 1,116.1900 |
| 4/18/2023 | 4/20/2023 | Sell Short | ELEKTRA*.MX | 3,062.00 | 1,111.3300 |
| 4/19/2023 | 4/21/2023 | Sell Short | ELEKTRA*.MX | 3,700.00 | 1,115.3200 |
| 4/20/2023 | 4/24/2023 | Sell Short | ELEKTRA*.MX | 7,055.00 | 1,120.7600 |
| 4/21/2023 | 4/25/2023 | Sell Short | ELEKTRA*.MX | 4,123.00 | 1,110.0200 |
| 4/24/2023 | 4/26/2023 | Sell Short | ELEKTRA*.MX | 1,500.00 | 1,106.0284 |
| 4/25/2023 | 4/27/2023 | Sell Short | ELEKTRA*.MX | 1,967.00 | 1,100.6600 |
| 4/26/2023 | 4/28/2023 | Sell Short | ELEKTRA*.MX | 12,114.00 | 1,103.2600 |
| 4/27/2023 | 5/2/2023 | Sell Short | ELEKTRA*.MX | 2,718.00 | 1,119.3168 |
| 4/28/2023 | 5/3/2023 | Sell Short | ELEKTRA*.MX | 7,935.00 | 1,129.7545 |
| 5/2/2023 | 5/4/2023 | Sell Short | ELEKTRA*.MX | 6,717.00 | 1,142.9603 |
| 5/3/2023 | 5/5/2023 | Sell Short | ELEKTRA*.MX | 3,771.00 | 1,141.3023 |
| 5/4/2023 | 5/8/2023 | Sell Short | ELEKTRA*.MX | 6,656.00 | 1,142.9603 |
| 5/5/2023 | 5/9/2023 | Sell Short | ELEKTRA*.MX | 7,107.00 | 1,158.9200 |
| 5/8/2023 | 5/10/2023 | Sell Short | ELEKTRA*.MX | 1,889.00 | 1,145.8301 |
| 5/9/2023 | 5/11/2023 | Sell Short | ELEKTRA*.MX | 2,755.00 | 1,148.1100 |

| | | | | | |
|---|---|---|---|---|---|
| 5/10/2023 | 5/12/2023 | Sell Short | ELEKTRA*.MX | 7,785.00 | 1,149.9900 |
| 5/11/2023 | 5/15/2023 | Sell Short | ELEKTRA*.MX | 7,423.00 | 1,175.4105 |
| 5/12/2023 | 5/16/2023 | Sell Short | ELEKTRA*.MX | 1,013.00 | 1,202.6500 |
| 5/15/2023 | 5/17/2023 | Sell Short | ELEKTRA*.MX | 3,444.00 | 1,204.7139 |
| 5/16/2023 | 5/18/2023 | Sell Short | ELEKTRA*.MX | 6,684.00 | 1,210.8329 |
| 5/17/2023 | 5/19/2023 | Sell Short | ELEKTRA*.MX | 3,378.00 | 1,196.6245 |
| 5/18/2023 | 5/22/2023 | Sell Short | ELEKTRA*.MX | 2,996.00 | 1,181.5900 |
| 5/22/2023 | 5/24/2023 | Sell Short | ELEKTRA*.MX | 7,109.00 | 1,191.6364 |
| 5/22/2023 | 5/24/2023 | Sell Short | ELEKTRA*.MX | 4,311.00 | 1,177.8604 |
| 5/23/2023 | 5/25/2023 | Sell Short | ELEKTRA*.MX | 7,137.00 | 1,152.2800 |
| 5/24/2023 | 5/26/2023 | Sell Short | ELEKTRA*.MX | 7,911.00 | 1,134.7292 |
| 5/25/2023 | 5/29/2023 | Sell Short | ELEKTRA*.MX | 7,400.00 | 1,132.5100 |
| 5/26/2023 | 5/30/2023 | Sell Short | ELEKTRA*.MX | 2,200.00 | 1,139.9765 |
| 5/29/2023 | 5/31/2023 | Sell Short | ELEKTRA*.MX | 520.00 | 1,146.5400 |
| 5/30/2023 | 6/1/2023 | Sell Short | ELEKTRA*.MX | 3,029.00 | 1,154.2200 |
| 5/31/2023 | 6/2/2023 | Sell Short | ELEKTRA*.MX | 9,164.00 | 1,146.9890 |
| 6/1/2023 | 6/5/2023 | Sell Short | ELEKTRA*.MX | 8,360.00 | 1,157.7810 |
| 6/2/2023 | 6/6/2023 | Sell Short | ELEKTRA*.MX | 1,916.00 | 1,151.1700 |
| 6/5/2023 | 6/7/2023 | Sell Short | ELEKTRA*.MX | 703.00 | 1,148.5700 |
| 6/6/2023 | 6/8/2023 | Sell Short | ELEKTRA*.MX | 3,500.00 | 1,148.2100 |
| 6/7/2023 | 6/9/2023 | Sell Short | ELEKTRA*.MX | 6,240.00 | 1,159.4600 |
| 6/8/2023 | 6/12/2023 | Sell Short | ELEKTRA*.MX | 1,520.00 | 1,147.1900 |
| 6/9/2023 | 6/13/2023 | Sell Short | ELEKTRA*.MX | 7,845.00 | 1,144.6900 |
| 6/12/2023 | 6/14/2023 | Sell Short | ELEKTRA*.MX | 2,100.00 | 1,138.4400 |
| 6/13/2023 | 6/15/2023 | Sell Short | ELEKTRA*.MX | 7,685.00 | 1,129.5400 |
| 6/15/2023 | 6/19/2023 | Sell Short | ELEKTRA*.MX | 12,872.00 | 1,149.6621 |
| 6/15/2023 | 6/19/2023 | Sell Short | ELEKTRA*.MX | 3,135.00 | 1,157.1770 |
| 6/16/2023 | 6/20/2023 | Sell Short | ELEKTRA*.MX | 7,693.00 | 1,125.7600 |
| 6/19/2023 | 6/21/2023 | Sell Short | ELEKTRA*.MX | 7,739.00 | 1,120.5400 |
| 6/20/2023 | 6/22/2023 | Sell Short | ELEKTRA*.MX | 9,515.00 | 1,128.8300 |
| 6/21/2023 | 6/23/2023 | Sell Short | ELEKTRA*.MX | 7,459.00 | 1,120.8175 |
| 6/22/2023 | 6/26/2023 | Sell Short | ELEKTRA*.MX | 6,252.00 | 1,117.0137 |
| 6/23/2023 | 6/27/2023 | Sell Short | ELEKTRA*.MX | 1,056.00 | 1,121.8354 |
| 6/26/2023 | 6/28/2023 | Sell Short | ELEKTRA*.MX | 1,236.00 | 1,121.3528 |
| 6/27/2023 | 6/29/2023 | Sell Short | ELEKTRA*.MX | 1,624.00 | 1,120.4800 |
| 6/28/2023 | 6/30/2023 | Sell Short | ELEKTRA*.MX | 3,024.00 | 1,121.8500 |
| 6/29/2023 | 7/3/2023 | Sell Short | ELEKTRA*.MX | 8,989.00 | 1,122.0900 |
| 6/30/2023 | 7/4/2023 | Sell Short | ELEKTRA*.MX | 9,546.00 | 1,147.9500 |
| 7/3/2023 | 7/5/2023 | Sell Short | ELEKTRA*.MX | 591.00 | 1,155.1970 |
| 7/4/2023 | 7/6/2023 | Sell Short | ELEKTRA*.MX | 1,121.00 | 1,165.0000 |
| 7/5/2023 | 7/7/2023 | Sell Short | ELEKTRA*.MX | 5,665.00 | 1,165.1775 |
| 7/6/2023 | 7/10/2023 | Sell Short | ELEKTRA*.MX | 9,472.00 | 1,148.6600 |
| 7/7/2023 | 7/11/2023 | Sell Short | ELEKTRA*.MX | 1,371.00 | 1,160.8843 |
| 7/10/2023 | 7/12/2023 | Sell Short | ELEKTRA*.MX | 8,646.00 | 1,180.4388 |
| 7/11/2023 | 7/13/2023 | Sell | ELEKTRA*.MX | 9,722.00 | 1,187.8920 |
| 7/12/2023 | 7/14/2023 | Sell | ELEKTRA*.MX | 1,344.00 | 1,214.4360 |
| 7/14/2023 | 7/18/2023 | Sell Short | ELEKTRA*.MX | 9,208.00 | 1,197.8100 |

28

| | | | | | |
|---|---|---|---|---|---|
| 7/17/2023 | 7/19/2023 | Sell Short | ELEKTRA*.MX | 1,253.00 | 1,200.7755 |
| 7/18/2023 | 7/20/2023 | Sell Short | ELEKTRA*.MX | 8,125.00 | 1,208.2239 |
| 7/19/2023 | 7/21/2023 | Sell Short | ELEKTRA*.MX | 8,856.00 | 1,207.9394 |
| 7/20/2023 | 7/24/2023 | Sell Short | ELEKTRA*.MX | 1,936.00 | 1,227.5800 |
| 7/21/2023 | 7/25/2023 | Sell Short | ELEKTRA*.MX | 7,625.00 | 1,218.3900 |
| 7/24/2023 | 7/26/2023 | Sell Short | ELEKTRA*.MX | 1,659.00 | 1,231.0400 |
| 7/25/2023 | 7/27/2023 | Sell Short | ELEKTRA*.MX | 1,111.00 | 1,236.4148 |
| 7/26/2023 | 7/28/2023 | Sell Short | ELEKTRA*.MX | 1,260.00 | 1,263.1570 |
| 7/27/2023 | 7/31/2023 | Sell Short | ELEKTRA*.MX | 8,627.00 | 1,243.6400 |
| 7/28/2023 | 8/1/2023 | Sell Short | ELEKTRA*.MX | 1,617.00 | 1,253.4700 |
| 7/31/2023 | 8/2/2023 | Sell Short | ELEKTRA*.MX | 8,977.00 | 1,253.1700 |
| 8/2/2023 | 8/4/2023 | Sell Short | ELEKTRA*.MX | 2,056.00 | 1,239.3771 |
| 8/2/2023 | 8/4/2023 | Sell Short | ELEKTRA*.MX | 1,455.00 | 1,252.0133 |
| 8/3/2023 | 8/7/2023 | Sell Short | ELEKTRA*.MX | 1,936.00 | 1,219.5200 |
| 8/4/2023 | 8/8/2023 | Sell Short | ELEKTRA*.MX | 8,245.00 | 1,206.7700 |
| 8/7/2023 | 8/9/2023 | Sell Short | ELEKTRA*.MX | 5,041.00 | 1,215.4500 |
| 8/8/2023 | 8/10/2023 | Sell Short | ELEKTRA*.MX | 8,042.00 | 1,192.1500 |
| 8/9/2023 | 8/11/2023 | Sell Short | ELEKTRA*.MX | 8,107.00 | 1,168.5300 |
| 8/10/2023 | 8/14/2023 | Sell Short | ELEKTRA*.MX | 1,547.00 | 1,179.8862 |
| 8/11/2023 | 8/15/2023 | Sell Short | ELEKTRA*.MX | 10,512.00 | 1,162.5323 |
| 8/14/2023 | 8/16/2023 | Sell Short | ELEKTRA*.MX | 718.00 | 1,167.7461 |
| 8/15/2023 | 8/17/2023 | Sell Short | ELEKTRA*.MX | 8,380.00 | 1,164.9500 |
| 8/16/2023 | 8/18/2023 | Sell Short | ELEKTRA*.MX | 8,100.00 | 1,168.1800 |
| 8/17/2023 | 8/21/2023 | Sell Short | ELEKTRA*.MX | 1,271.00 | 1,157.3882 |
| 8/18/2023 | 8/22/2023 | Sell Short | ELEKTRA*.MX | 2,928.00 | 1,165.0389 |
| 8/21/2023 | 8/23/2023 | Sell Short | ELEKTRA*.MX | 10,727.00 | 1,140.8348 |
| 8/22/2023 | 8/24/2023 | Sell Short | ELEKTRA*.MX | 2,375.00 | 1,145.4283 |
| 8/23/2023 | 8/25/2023 | Sell Short | ELEKTRA*.MX | 1,384.00 | 1,139.7897 |
| 8/24/2023 | 8/28/2023 | Sell Short | ELEKTRA*.MX | 7,439.00 | 1,140.0700 |
| 8/25/2023 | 8/29/2023 | Sell Short | ELEKTRA*.MX | 8,275.00 | 1,149.8100 |
| 8/28/2023 | 8/30/2023 | Sell Short | ELEKTRA*.MX | 7,624.00 | 1,153.4800 |
| 8/29/2023 | 8/31/2023 | Sell Short | ELEKTRA*.MX | 13,202.00 | 1,161.9928 |
| 8/30/2023 | 9/1/2023 | Sell Short | ELEKTRA*.MX | 3,030.00 | 1,179.7285 |
| 8/31/2023 | 9/4/2023 | Sell Short | ELEKTRA*.MX | 971.00 | 1,169.5100 |
| 9/1/2023 | 9/5/2023 | Sell Short | ELEKTRA*.MX | 1,997.00 | 1,163.4300 |
| 9/4/2023 | 9/6/2023 | Sell Short | ELEKTRA*.MX | 461.00 | 1,161.1421 |
| 9/5/2023 | 9/7/2023 | Sell Short | ELEKTRA*.MX | 10,365.00 | 1,152.2309 |
| 9/6/2023 | 9/8/2023 | Sell Short | ELEKTRA*.MX | 9,472.00 | 1,158.7801 |
| 9/7/2023 | 9/11/2023 | Sell Short | ELEKTRA*.MX | 1,175.00 | 1,157.4724 |
| 9/8/2023 | 9/12/2023 | Sell Short | ELEKTRA*.MX | 2,860.00 | 1,155.1660 |
| 9/11/2023 | 9/13/2023 | Sell Short | ELEKTRA*.MX | 10,439.00 | 1,149.0300 |
| 9/12/2023 | 9/14/2023 | Sell Short | ELEKTRA*.MX | 12,087.00 | 1,148.7296 |
| 9/14/2023 | 9/18/2023 | Sell Short | ELEKTRA*.MX | 2,476.00 | 1,157.9665 |
| 9/14/2023 | 9/18/2023 | Sell Short | ELEKTRA*.MX | 1,600.00 | 1,160.5000 |
| 9/15/2023 | 9/19/2023 | Sell Short | ELEKTRA*.MX | 8,249.00 | 1,165.7121 |
| 9/18/2023 | 9/20/2023 | Sell Short | ELEKTRA*.MX | 6,068.00 | 1,152.7226 |
| 9/19/2023 | 9/21/2023 | Sell Short | ELEKTRA*.MX | 2,954.00 | 1,161.8299 |

| | | | | | |
|---|---|---|---|---|---|
| 9/20/2023 | 9/22/2023 | Sell Short | ELEKTRA*.MX | 10,264.00 | 1,174.5700 |
| 9/21/2023 | 9/25/2023 | Sell Short | ELEKTRA*.MX | 1,753.00 | 1,170.1100 |
| 9/22/2023 | 9/26/2023 | Sell Short | ELEKTRA*.MX | 10,214.00 | 1,169.9100 |
| 9/26/2023 | 9/28/2023 | Sell Short | ELEKTRA*.MX | 10,992.00 | 1,158.8700 |
| 9/27/2023 | 9/29/2023 | Sell Short | ELEKTRA*.MX | 14,020.00 | 1,152.1400 |
| 9/28/2023 | 10/2/2023 | Sell Short | ELEKTRA*.MX | 2,052.00 | 1,150.9693 |
| 9/29/2023 | 10/3/2023 | Sell Short | ELEKTRA*.MX | 4,540.00 | 1,149.0239 |
| 10/2/2023 | 10/4/2023 | Sell Short | ELEKTRA*.MX | 3,304.00 | 1,154.1577 |
| 10/3/2023 | 10/5/2023 | Sell Short | ELEKTRA*.MX | 13,576.00 | 1,165.3800 |
| 10/4/2023 | 10/6/2023 | Sell Short | ELEKTRA*.MX | 12,970.00 | 1,150.0500 |
| 10/6/2023 | 10/10/2023 | Sell Short | ELEKTRA*.MX | 12,442.00 | 1,166.9600 |
| 10/9/2023 | 10/11/2023 | Sell Short | ELEKTRA*.MX | 1,791.00 | 1,165.1000 |
| 10/10/2023 | 10/12/2023 | Sell Short | ELEKTRA*.MX | 14,650.00 | 1,178.2300 |
| 10/11/2023 | 10/13/2023 | Sell Short | ELEKTRA*.MX | 13,679.00 | 1,182.2111 |
| 10/12/2023 | 10/16/2023 | Sell Short | ELEKTRA*.MX | 14,026.00 | 1,178.5100 |
| 10/13/2023 | 10/17/2023 | Sell Short | ELEKTRA*.MX | 1,780.00 | 1,182.4006 |
| 10/16/2023 | 10/18/2023 | Sell Short | ELEKTRA*.MX | 13,082.00 | 1,185.9487 |
| 10/17/2023 | 10/19/2023 | Sell Short | ELEKTRA*.MX | 12,978.00 | 1,183.2231 |
| 10/19/2023 | 10/23/2023 | Sell Short | ELEKTRA*.MX | 2,860.00 | 1,185.0745 |
| 10/19/2023 | 10/23/2023 | Sell Short | ELEKTRA*.MX | 1,674.00 | 1,179.0874 |
| 10/20/2023 | 10/24/2023 | Sell Short | ELEKTRA*.MX | 3,827.00 | 1,177.2756 |
| 10/23/2023 | 10/25/2023 | Sell Short | ELEKTRA*.MX | 2,255.00 | 1,175.7900 |
| 10/24/2023 | 10/26/2023 | Sell Short | ELEKTRA*.MX | 1,718.00 | 1,170.3248 |
| 10/25/2023 | 10/27/2023 | Sell Short | ELEKTRA*.MX | 15,420.00 | 1,157.5320 |
| 10/26/2023 | 10/30/2023 | Sell Short | ELEKTRA*.MX | 12,088.00 | 1,158.1832 |
| 10/27/2023 | 10/31/2023 | Sell Short | ELEKTRA*.MX | 3,011.00 | 1,155.0400 |
| 10/30/2023 | 11/1/2023 | Sell Short | ELEKTRA*.MX | 1,175.00 | 1,152.7200 |
| 10/31/2023 | 11/3/2023 | Sell Short | ELEKTRA*.MX | 15,228.00 | 1,150.8229 |
| 11/1/2023 | 11/6/2023 | Sell Short | ELEKTRA*.MX | 1,755.00 | 1,149.4700 |
| 11/3/2023 | 11/7/2023 | Sell Short | ELEKTRA*.MX | 2,168.00 | 1,150.5100 |
| 11/6/2023 | 11/8/2023 | Sell Short | ELEKTRA*.MX | 1,154.00 | 1,150.0500 |
| 11/7/2023 | 11/9/2023 | Sell Short | ELEKTRA*.MX | 2,798.00 | 1,149.8100 |
| 11/8/2023 | 11/10/2023 | Sell Short | ELEKTRA*.MX | 1,025.00 | 1,151.3100 |
| 11/9/2023 | 11/13/2023 | Sell Short | ELEKTRA*.MX | 985.00 | 1,153.0604 |
| 11/10/2023 | 11/14/2023 | Sell Short | ELEKTRA*.MX | 678.00 | 1,154.7243 |
| 11/13/2023 | 11/15/2023 | Sell Short | ELEKTRA*.MX | 706.00 | 1,158.8916 |
| 11/14/2023 | 11/16/2023 | Sell | ELEKTRA*.MX | 8,124.00 | 1,155.7197 |
| 11/15/2023 | 11/17/2023 | Sell Short | ELEKTRA*.MX | 2,141.00 | 1,160.7447 |
| 11/16/2023 | 11/21/2023 | Sell Short | ELEKTRA*.MX | 8,264.00 | 1,166.0823 |
| 11/17/2023 | 11/22/2023 | Sell Short | ELEKTRA*.MX | 7,888.00 | 1,162.3000 |
| 11/21/2023 | 11/23/2023 | Sell Short | ELEKTRA*.MX | 12,555.00 | 1,173.0960 |
| 11/22/2023 | 11/24/2023 | Sell Short | ELEKTRA*.MX | 11,185.00 | 1,184.7679 |
| 11/23/2023 | 11/27/2023 | Sell Short | ELEKTRA*.MX | 8,629.00 | 1,184.6898 |
| 11/24/2023 | 11/28/2023 | Sell Short | ELEKTRA*.MX | 12,060.00 | 1,192.9100 |
| 11/27/2023 | 11/29/2023 | Sell Short | ELEKTRA*.MX | 9,515.00 | 1,189.1322 |
| 11/28/2023 | 11/30/2023 | Sell Short | ELEKTRA*.MX | 12,487.00 | 1,180.7592 |
| 11/29/2023 | 12/1/2023 | Sell Short | ELEKTRA*.MX | 11,599.00 | 1,167.8400 |

| | | | | | |
|---|---|---|---|---|---|
| 11/30/2023 | 12/4/2023 | Sell Short | ELEKTRA*.MX | 12,027.00 | 1,180.4591 |
| 12/1/2023 | 12/5/2023 | Sell Short | ELEKTRA*.MX | 3,697.00 | 1,163.5340 |
| 12/4/2023 | 12/6/2023 | Sell Short | ELEKTRA*.MX | 2,047.00 | 1,165.9047 |
| 12/5/2023 | 12/7/2023 | Sell Short | ELEKTRA*.MX | 9,859.00 | 1,164.7700 |
| 12/6/2023 | 12/8/2023 | Sell Short | ELEKTRA*.MX | 5,349.00 | 1,173.3580 |
| 12/7/2023 | 12/11/2023 | Sell Short | ELEKTRA*.MX | 11,575.00 | 1,166.2400 |
| 12/7/2023 | 12/11/2023 | Sell Short | ELEKTRA*.MX | 2,000.00 | 1,166.1100 |
| 12/8/2023 | 12/13/2023 | Sell Short | ELEKTRA*.MX | 2,043.00 | 1,161.9100 |
| 12/11/2023 | 12/14/2023 | Sell Short | ELEKTRA*.MX | 10,359.00 | 1,156.3898 |
| 12/13/2023 | 12/15/2023 | Sell Short | ELEKTRA*.MX | 10,662.00 | 1,149.8800 |
| 12/14/2023 | 12/18/2023 | Sell Short | ELEKTRA*.MX | 4,074.00 | 1,153.7900 |
| 12/15/2023 | 12/19/2023 | Sell Short | ELEKTRA*.MX | 7,613.00 | 1,150.2300 |
| 12/15/2023 | 12/19/2023 | Sell Short | ELEKTRA*.MX | 2,000.00 | 1,149.7400 |
| 12/18/2023 | 12/20/2023 | Sell Short | ELEKTRA*.MX | 2,567.00 | 1,150.5300 |
| 12/19/2023 | 12/21/2023 | Sell Short | ELEKTRA*.MX | 6,845.00 | 1,149.7900 |
| 12/21/2023 | 12/26/2023 | Sell Short | ELEKTRA*.MX | 2,716.00 | 1,168.4090 |
| 12/22/2023 | 12/27/2023 | Sell | ELEKTRA*.MX | 1,031.00 | 1,169.6158 |
| 12/26/2023 | 12/28/2023 | Sell Short | ELEKTRA*.MX | 11,432.00 | 1,171.0012 |
| 12/27/2023 | 12/29/2023 | Sell Short | ELEKTRA*.MX | 15,450.00 | 1,172.1900 |
| 12/28/2023 | 1/2/2024 | Sell Short | ELEKTRA*.MX | 12,295.00 | 1,164.1700 |
| 12/29/2023 | 1/3/2024 | Sell Short | ELEKTRA*.MX | 2,958.00 | 1,172.1000 |
| 1/2/2024 | 1/4/2024 | Sell Short | ELEKTRA*.MX | 1,449.00 | 1,161.6200 |
| 1/3/2024 | 1/5/2024 | Sell Short | ELEKTRA*.MX | 10,209.00 | 1,170.8853 |
| 1/4/2024 | 1/8/2024 | Sell Short | ELEKTRA*.MX | 10,874.00 | 1,163.0300 |
| 1/5/2024 | 1/9/2024 | Sell Short | ELEKTRA*.MX | 1,862.00 | 1,170.9900 |
| 1/8/2024 | 1/10/2024 | Sell Short | ELEKTRA*.MX | 14,714.00 | 1,161.7363 |
| 1/9/2024 | 1/11/2024 | Sell Short | ELEKTRA*.MX | 4,128.00 | 1,150.0500 |
| 1/10/2024 | 1/12/2024 | Sell Short | ELEKTRA*.MX | 12,608.00 | 1,149.8900 |
| 1/11/2024 | 1/15/2024 | Sell Short | ELEKTRA*.MX | 1,975.00 | 1,166.9000 |
| 1/12/2024 | 1/16/2024 | Sell Short | ELEKTRA*.MX | 11,252.00 | 1,158.9389 |
| 1/15/2024 | 1/17/2024 | Sell Short | ELEKTRA*.MX | 12,614.00 | 1,150.9600 |
| 1/16/2024 | 1/18/2024 | Sell Short | ELEKTRA*.MX | 14,167.00 | 1,150.1600 |
| 1/17/2024 | 1/19/2024 | Sell Short | ELEKTRA*.MX | 6,978.00 | 1,151.7800 |
| 1/18/2024 | 1/22/2024 | Sell Short | ELEKTRA*.MX | 1,985.00 | 1,157.9200 |
| 1/19/2024 | 1/23/2024 | Sell Short | ELEKTRA*.MX | 3,941.00 | 1,150.4797 |
| 1/22/2024 | 1/24/2024 | Sell Short | ELEKTRA*.MX | 1,541.00 | 1,149.8600 |
| 1/23/2024 | 1/25/2024 | Sell Short | ELEKTRA*.MX | 9,937.00 | 1,149.0700 |
| 1/24/2024 | 1/26/2024 | Sell Short | ELEKTRA*.MX | 15,098.00 | 1,149.2200 |
| 1/25/2024 | 1/29/2024 | Sell Short | ELEKTRA*.MX | 17,789.00 | 1,150.4556 |
| 1/26/2024 | 1/30/2024 | Sell Short | ELEKTRA*.MX | 11,192.00 | 1,155.9200 |
| 1/29/2024 | 1/31/2024 | Sell Short | ELEKTRA*.MX | 6,739.00 | 1,156.2201 |
| 1/30/2024 | 2/1/2024 | Sell Short | ELEKTRA*.MX | 17,079.00 | 1,149.3400 |
| 1/31/2024 | 2/2/2024 | Sell Short | ELEKTRA*.MX | 2,358.00 | 1,150.4669 |
| 2/1/2024 | 2/6/2024 | Sell Short | ELEKTRA*.MX | 4,838.00 | 1,150.9192 |
| 2/2/2024 | 2/7/2024 | Sell Short | ELEKTRA*.MX | 10,943.00 | 1,155.1200 |
| 2/6/2024 | 2/8/2024 | Sell Short | ELEKTRA*.MX | 16,607.00 | 1,174.3000 |
| 2/7/2024 | 2/9/2024 | Sell Short | ELEKTRA*.MX | 15,185.00 | 1,176.3800 |

31

| | | | | | | |
|---|---|---|---|---|---|---|
| 2/8/2024 | 2/12/2024 | Sell Short | ELEKTRA*.MX | | 12,052.00 | 1,175.4900 |
| 2/9/2024 | 2/13/2024 | Sell Short | ELEKTRA*.MX | | 15,587.00 | 1,166.3500 |
| 2/12/2024 | 2/14/2024 | Sell Short | ELEKTRA*.MX | | 2,429.00 | 1,168.2100 |
| 2/13/2024 | 2/15/2024 | Sell Short | ELEKTRA*.MX | | 11,890.00 | 1,164.5800 |
| 2/14/2024 | 2/16/2024 | Sell Short | ELEKTRA*.MX | | 1,474.00 | 1,160.0100 |
| 2/15/2024 | 2/19/2024 | Sell Short | ELEKTRA*.MX | | 12,810.00 | 1,157.0700 |
| 2/16/2024 | 2/20/2024 | Sell Short | ELEKTRA*.MX | | 13,750.00 | 1,170.7100 |
| 2/19/2024 | 2/21/2024 | Sell Short | ELEKTRA*.MX | | 638.00 | 1,182.0112 |
| 2/20/2024 | 2/22/2024 | Sell Short | ELEKTRA*.MX | | 2,883.00 | 1,194.0500 |
| 2/21/2024 | 2/23/2024 | Sell Short | ELEKTRA*.MX | | 16,698.00 | 1,195.6900 |
| 2/22/2024 | 2/26/2024 | Sell Short | ELEKTRA*.MX | | 11,298.00 | 1,180.7900 |
| 2/23/2024 | 2/27/2024 | Sell | ELEKTRA*.MX | | 12,500.00 | 1,197.6107 |
| 2/26/2024 | 2/28/2024 | Sell Short | ELEKTRA*.MX | | 2,458.00 | 1,195.2499 |
| 2/27/2024 | 2/29/2024 | Sell Short | ELEKTRA*.MX | | 4,449.00 | 1,196.4876 |
| 2/28/2024 | 3/1/2024 | Sell Short | ELEKTRA*.MX | | 2,352.00 | 1,189.4783 |
| 2/29/2024 | 3/4/2024 | Sell Short | ELEKTRA*.MX | | 6,584.00 | 1,187.1600 |
| 3/1/2024 | 3/5/2024 | Sell Short | ELEKTRA*.MX | | 3,113.00 | 1,191.3700 |
| 3/4/2024 | 3/6/2024 | Sell Short | ELEKTRA*.MX | | 11,709.00 | 1,182.2379 |
| 3/5/2024 | 3/7/2024 | Sell Short | ELEKTRA*.MX | | 4,265.00 | 1,175.3915 |
| 3/6/2024 | 3/8/2024 | Sell Short | ELEKTRA*.MX | | 13,437.00 | 1,186.2446 |
| 3/7/2024 | 3/11/2024 | Sell Short | ELEKTRA*.MX | | 2,803.00 | 1,175.1600 |
| 3/8/2024 | 3/12/2024 | Sell Short | ELEKTRA*.MX | | 3,089.00 | 1,160.4300 |
| 3/11/2024 | 3/13/2024 | Sell Short | ELEKTRA*.MX | | 3,036.00 | 1,150.6454 |
| 3/12/2024 | 3/14/2024 | Sell | ELEKTRA*.MX | | 5,593.00 | 1,148.6706 |
| 3/13/2024 | 3/15/2024 | Sell Short | ELEKTRA*.MX | | 3,770.00 | 1,146.5712 |
| 3/14/2024 | 3/19/2024 | Sell Short | ELEKTRA*.MX | | 4,095.00 | 1,148.6935 |
| 3/15/2024 | 3/20/2024 | Sell | ELEKTRA*.MX | | 14,582.00 | 1,149.6624 |
| 3/19/2024 | 3/21/2024 | Sell | ELEKTRA*.MX | | 18,819.00 | 1,150.5723 |
| 3/20/2024 | 3/22/2024 | Sell | ELEKTRA*.MX | | 13,267.00 | 1,148.5200 |
| 3/21/2024 | 3/25/2024 | Sell | ELEKTRA*.MX | | 17,969.00 | 1,149.5900 |
| 3/22/2024 | 3/26/2024 | Sell | ELEKTRA*.MX | | 14,404.00 | 1,149.7100 |
| 3/25/2024 | 3/27/2024 | Sell | ELEKTRA*.MX | | 11,036.00 | 1,149.4400 |
| 3/26/2024 | 4/1/2024 | Sell | ELEKTRA*.MX | | 17,940.00 | 1,151.3499 |
| 3/27/2024 | 4/2/2024 | Sell | ELEKTRA*.MX | | 9,958.00 | 1,150.9211 |
| 2024-04-01 | 2024-04-03 | Sell | ELEKTRA* MF Equity | 11,276 | | 1,150.06 |
| 2024-04-02 | 2024-04-04 | Sell | ELEKTRA* MF Equity | 3,779 | | 1,148.63 |
| 2024-04-03 | 2024-04-05 | Sell | ELEKTRA* MF Equity | 10,063 | | 1,150.35 |
| 2024-04-04 | 2024-04-11 | Sell | ELEKTRA* MF Equity | 1,940 | | 1,150.16 |
| 2024-04-05 | 2024-07-05 | Sell | ELEKTRA* MF Equity | 1,105 | | 1,149.38 |
| 2024-04-08 | 2024-04-10 | Sell | ELEKTRA* MF Equity | 1,322 | | 1,149.17 |
| 2024-04-09 | 2024-04-11 | Sell | ELEKTRA* MF Equity | 2,097 | | 1,148.91 |
| 2024-04-11 | 2024-04-15 | Sell | ELEKTRA* MF Equity | 1,589 | | 1,148.99 |
| 2024-04-12 | 2024-04-16 | Sell | ELEKTRA* MF Equity | 9,851 | | 1,150.25 |
| 2024-04-15 | 2024-04-17 | Sell | ELEKTRA* MF Equity | 3,239 | | 1,149.13 |
| 2024-04-16 | 2024-01-05 | Sell | ELEKTRA* MF Equity | 5,913 | | 1,148.62 |
| 2024-04-17 | 2024-04-19 | Sell | ELEKTRA* MF Equity | 12,788 | | 1,149.35 |
| 2024-04-18 | 2024-04-22 | Sell | ELEKTRA* MF Equity | 10,953 | | 1,149.00 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 2024-04-19 | 2024-04-23 | Sell | ELEKTRA* MF Equity | 2,057 | | 1,153.40 |
| 2024-04-22 | 2024-04-24 | Sell | ELEKTRA* MF Equity | 2,507 | | 1,149.34 |
| 2024-04-23 | 2024-05-20 | Sell | ELEKTRA* MF Equity | 13,449 | | 1,116.91 |
| 2024-04-24 | 2024-04-26 | Sell | ELEKTRA* MF Equity | 12,531 | | 1,101.31 |
| 2024-04-25 | 2024-05-16 | Sell | ELEKTRA* MF Equity | 13,501 | | 1,098.32 |
| 2024-04-26 | 2024-04-30 | Sell | ELEKTRA* MF Equity | 1,805 | | 1,107.59 |
| 2024-04-29 | 2024-05-22 | Sell | ELEKTRA* MF Equity | 12,592 | | 1,110.41 |
| 2024-04-30 | 2024-03-05 | Sell | ELEKTRA* MF Equity | 13,200 | | 1,105.64 |
| 2024-05-02 | 2024-05-22 | Sell | ELEKTRA* MF Equity | 3,703 | | 1,111.43 |
| 2024-05-03 | 2024-06-03 | Sell | ELEKTRA* MF Equity | 9,172 | | 1,109.88 |
| 2024-05-06 | 2024-05-08 | Sell | ELEKTRA* MF Equity | 9,581 | | 1,108.99 |
| 2024-05-07 | 2024-05-09 | Sell | ELEKTRA* MF Equity | | 911.00 | 1,109.18 |
| 2024-05-07 | 2024-05-09 | Sell | ELEKTRA* MF Equity | | 655.00 | 1,109.25 |
| 2024-05-08 | 2024-06-03 | Sell | ELEKTRA* MF Equity | 8,493 | | 1,104.21 |
| 2024-05-09 | 2024-05-13 | Sell | ELEKTRA* MF Equity | 12,497 | | 1,107.24 |
| 2024-05-13 | 2024-05-15 | Sell | ELEKTRA* MF Equity | 9,906 | | 1,109.01 |
| 2024-05-14 | 2024-05-16 | Sell | ELEKTRA* MF Equity | 1,301 | | 1,104.28 |
| 2024-05-15 | 2024-06-17 | Sell | ELEKTRA* MF Equity | 9,948 | | 1,102.80 |
| 2024-05-16 | 2024-05-20 | Sell | ELEKTRA* MF Equity | 1,628 | | 1,101.15 |
| 2024-05-17 | 2024-05-21 | Sell | ELEKTRA* MF Equity | 1,266 | | 1,101.79 |
| 2024-05-20 | 2024-05-22 | Sell | ELEKTRA* MF Equity | | 990.00 | 1,104.47 |
| 2024-05-21 | 2024-05-23 | Sell | ELEKTRA* MF Equity | 11,357 | | 1,099.80 |
| 2024-05-22 | 2024-05-24 | Sell | ELEKTRA* MF Equity | 3,279 | | 1,098.83 |
| 2024-05-23 | 2024-05-27 | Sell | ELEKTRA* MF Equity | 2,229 | | 1,099.47 |
| 2024-05-24 | 2024-05-28 | Sell | ELEKTRA* MF Equity | 8,345 | | 1,102.85 |
| 2024-05-27 | 2024-05-28 | Sell | ELEKTRA* MF Equity | 9,876 | | 1,098.02 |
| 2024-05-28 | 2024-05-29 | Sell | ELEKTRA* MF Equity | 11,990 | | 1,095.57 |
| 2024-05-29 | 2024-05-30 | Sell | ELEKTRA* MF Equity | 7,900 | | 1,098.92 |
| 2024-05-30 | 2024-06-03 | Sell | ELEKTRA* MF Equity | 7,093 | | 1,095.28 |
| 2024-05-31 | 2024-06-03 | Sell | ELEKTRA* MF Equity | 8,279 | | 1,094.77 |
| 2024-06-03 | 2024-06-04 | Sell | ELEKTRA* MF Equity | 16,521 | | 1,080.98 |
| 2024-06-03 | 2024-06-04 | Sell | ELEKTRA* MF Equity | 1,000 | | 1,078.12 |
| 2024-06-04 | 2024-06-06 | Sell | ELEKTRA* MF Equity | 6,557 | | 1,095.61 |
| 2024-06-05 | 2024-06-06 | Sell | ELEKTRA* MF Equity | 4,292 | | 1,080.47 |
| 2024-06-06 | 2024-06-07 | Sell | ELEKTRA* MF Equity | 5,245 | | 1,078.84 |
| 2024-06-07 | 2024-06-10 | Sell | ELEKTRA* MF Equity | 9,628 | | 1,062.42 |
| 2024-06-10 | 2024-06-11 | Sell | ELEKTRA* MF Equity | 12,324 | | 1,065.18 |
| 2024-06-11 | 2024-06-12 | Sell | ELEKTRA* MF Equity | 10,817 | | 1,076.37 |
| 2024-06-12 | 2024-06-14 | Sell | ELEKTRA* MF Equity | 9,903 | | 1,069.91 |
| 2024-06-13 | 2024-06-14 | Sell | ELEKTRA* MF Equity | 1,925 | | 1,082.48 |
| 2024-06-14 | 2024-06-17 | Sell | ELEKTRA* MF Equity | 1,603 | | 1,073.63 |
| 2024-06-17 | 2024-06-18 | Sell | ELEKTRA* MF Equity | 2,639 | | 1,078.84 |
| 2024-06-18 | 2024-06-19 | Sell | ELEKTRA* MF Equity | 8,222 | | 1,093.58 |
| 2024-06-19 | 2024-06-20 | Sell | ELEKTRA* MF Equity | 1,574 | | 1,080.83 |
| 2024-06-20 | 2024-06-21 | Sell | ELEKTRA* MF Equity | 5,507 | | 1,064.70 |
| 2024-06-21 | 2024-06-24 | Sell | ELEKTRA* MF Equity | 43,512 | | 1,064.54 |
| 2024-06-24 | 2024-06-25 | Sell | ELEKTRA* MF Equity | 5,476 | | 1,069.47 |

33

| | | | | | |
|---|---|---|---|---|---|
| 2024-06-25 | 2024-06-26 | Sell | ELEKTRA* MF Equity | 8,249 | 1,070.71 |
| 2024-06-26 | 2024-06-27 | Sell | ELEKTRA* MF Equity | 10,889 | 1,065.85 |
| 2024-06-27 | 2024-06-28 | Sell | ELEKTRA* MF Equity | 6,396 | 1,058.59 |
| 2024-06-28 | 2024-07-01 | Sell | ELEKTRA* MF Equity | 3,380 | 1,054.97 |
| 2024-07-01 | 2024-07-02 | Sell | ELEKTRA* MF Equity | 8,647 | 1,055.05 |
| 2024-07-02 | 2024-07-03 | Sell | ELEKTRA* MF Equity | 7,436 | 1,050.85 |
| 2024-07-03 | 2024-07-04 | Sell | ELEKTRA* MF Equity | 9,052 | 1,052.60 |
| 2024-07-04 | 2024-07-05 | Sell | ELEKTRA* MF Equity | 205.00 | 1,050.61 |
| 2024-07-08 | 2024-07-09 | Sell | ELEKTRA* MF Equity | 2,668 | 1,054.39 |
| 2024-07-09 | 2024-07-10 | Sell | ELEKTRA* MF Equity | 5,426 | 1,048.79 |
| 2024-07-09 | 2024-07-10 | Sell | ELEKTRA* MF Equity | 4,222 | 1,049.08 |
| 2024-07-10 | 2024-07-12 | Sell | ELEKTRA* MF Equity | 12,190 | 1,048.45 |
| 2024-07-11 | 2024-07-12 | Sell | ELEKTRA* MF Equity | 10,991 | 1,049.50 |
| 2024-07-12 | 2024-07-15 | Sell | ELEKTRA* MF Equity | 2,919 | 1,052.40 |
| 2024-07-15 | 2024-07-16 | Sell | ELEKTRA* MF Equity | 3,112 | 1,048.98 |
| 2024-07-16 | 2024-07-17 | Sell | ELEKTRA* MF Equity | 14,047 | 1,048.64 |
| 2024-07-17 | 2024-07-18 | Sell | ELEKTRA* MF Equity | 14,274 | 1,047.93 |
| 2024-07-18 | 2024-07-19 | Sell | ELEKTRA* MF Equity | 12,520 | 1,048.76 |
| 2024-07-19 | 2024-07-22 | Sell | ELEKTRA* MF Equity | 8,345 | 1,049.12 |
| 2024-07-22 | 2024-07-23 | Sell | ELEKTRA* MF Equity | 12,940 | 1,050.48 |
| 2024-07-23 | 2024-07-24 | Sell | ELEKTRA* MF Equity | 15,178 | 1,048.03 |
| 2024-07-24 | 2024-07-25 | Sell | ELEKTRA* MF Equity | 4,337 | 1,043.05 |
| 2024-07-25 | 2024-07-26 | Sell | ELEKTRA* MF Equity | 16,128 | 1,046.92 |
| 2024-07-26 | 2024-07-29 | Sell | ELEKTRA* MF Equity | 5,409 | 988.93 |

# EXHIBIT 54

| TRADE DATE | SETTLE DATE | ORDER | SECURITY | PORT QTTY | PRICE | NOTES |
|---|---|---|---|---|---|---|
| 1/31/2022 | 1/31/2022 | Cash Paid | CASH USD | 23,229,156 | 1.0000 | Client Redemption |
| 10/17/2022 | 10/17/2022 | Cash Paid | CASH USD | 17,995,892 | 1.0000 | Client Redemption |
| 7/10/2023 | 7/10/2023 | Cash Paid | CASH USD | 1,800,000 | 1.0000 | Client Redemption |

# EXHIBIT 55

| TRADE DATE | SETTLE DATE | SECURITY | PORT QTTY | NOTES |
|---|---|---|---|---|
| 1/31/2022 | 1/31/2022 | CASH USD | 16,580,424 | Client Redemption |
| 5/12/2022 | 5/12/2022 | CASH USD | 35,000,000 | Client Redemption |
| 7/15/2022 | 7/15/2022 | CASH USD | 9,000,000 | Client Redemption |
| 8/10/2022 | 8/10/2022 | CASH USD | 6,280,000 | Client Redemption |
| 11/22/2022 | 11/22/2022 | CASH USD | 22,000,000 | Client Redemption |
| 12/14/2022 | 12/14/2022 | CASH USD | 7,000,000 | Client Redemption |
| 3/23/2023 | 3/23/2023 | CASH USD | 25,000,000 | Client Redemption |
| 7/5/2023 | 7/5/2023 | CASH USD | 15,300,000 | Client Redemption |
| 10/31/2023 | 10/31/2023 | CASH USD | 9,000,000 | Client Redemption |
| 12/7/2023 | 12/7/2023 | CASH USD | 18,000,000 | Client Redemption |
| 3/21/2024 | 3/21/2024 | CASH USD | 33,500,000 | Client Redemption |
| 4/29/2024 | 4/29/2024 | CASH USD | 17,000,000 | Client Redemption |
| 7/5/2024 | 7/5/2024 | CASH USD | 15,000,000 | Client Redemption |

# EXHIBIT 56



**JURISTIQ**

World-Wide Legal Services
Provider

Jurist IQ Corp
530 Fifth Ave
9th Floor
New York, NY 10036

We are Open 24/7 at:
+1 (888) 380-0088
+1 (212) 656-1524 (Fax)

www.JuristIQ.com

**INCOMING WIRING INSTRUCTIONS**

Beneficiary's Bank Information:
JP Morgan Chase Bank NA
270 Park Ave
New York, NY 10017

ABA Number (Domestic): 021000021
SWIFT Code (International): CHASUS33

Bank Phone Number: (212) 819-2743

Beneficiary Information:
Jurist Iq Corp Attorney Trust Account IOLA
530 Fifth Ave
9th Floor
New York, NY 10036

Bank Account Number: 695365152

Jurist IQ and their Attorneys are Currently
Licensed to Practice in Alabama, Florida,
Colorado, New Jersey & New York.

# EXHIBIT 57



**31/07/2024  21:00:00 PM**

**Client Information**

| | | | | | | |
|---|---|---|---|---|---|---|
| **Name** | TMC63- Ricardo Salinas | | **Address** | Cristobal Colon 79 Int c | **Account ID** | **TMClient63** |
| | | | | Mexico '09360 | **Trade Date** | **20240731** |

**Positions Overview**

| ACCOUNT | SECURITY | DESCRIPTION | ISIN | SEDOL | QUANTITY | PRICE | CURRENCY | VALUE LOCAL CCY | VALUE |
|---|---|---|---|---|---|---|---|---|---|
| TMClient63 | CASH MXN | MXN CASH BALANCE | | | 20,000.00 | - | MXN | 20,000.00 | 1,091.80 |
| TMClient63 | CASH USD | USD CASH BALANCE | | | 1,223.90 | - | USD | 1,223.90 | 1,223.90 |
| | | | | | | | TOTAL | | 2,315.70 |

TAVIRA

31/07/2024  21:00:00 PM

## Trades Overview

| TRADE DATE | SETTLE DATE | ACCOUNT ID | ISIN | SECURITY DESCRIPTION | ORDER | Gross Price | Quantity | NOTIONAL AMOUNT | COMMISH AMT | FEES AMT | SEC CCY | NET PRICE | SEC CCY AMT | SETTLE CCY | SETTLE CCY AMT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 15/12/2021 | 15/12/2021 | TMClient63 | MX01EL000003 | GRUPO ELEKTRA SAB DE CV | FOP Receive | 0 | 2,350,000.00 | - | - | - | MXN | - | - | MXN | 0 |
| 18/01/2022 | 20/01/2022 | TMClient63 | MX01EL000003 | GRUPO ELEKTRA SAB DE CV | FOP Receive | 0 | 186,078.00 | - | - | - | MXN | - | - | MXN | 0 |
| 18/01/2022 | 20/01/2022 | TMClient63 | MX01EL000003 | GRUPO ELEKTRA SAB DE CV | FOP Receive | 0 | 128,000.00 | - | - | - | MXN | - | - | MXN | 0 |
| 19/01/2022 | 19/01/2022 | TMClient63 | | MXN Cash Debit | Cash Paid | 0 | 7,395,224.00 | 7,395,224.00 | - | - | MXN | - - | 7,395,224.00 | MXN | -7395224 |
| 25/02/2022 | 25/02/2022 | TMClient63 | | MXN Cash Received | Cash Received | 0 | 7,395,224.00 | 7,395,224.00 | - | - | MXN | - | 7,395,224.00 | MXN | 7395224 |
| 14/06/2022 | 22/06/2022 | TMClient63 | MX01EL000003 | GRUPO ELEKTRA SAB DE CV | FOP Receive | 0 | 1,431,700.00 | - | - | - | MXN | - | - | MXN | 0 |
| 14/06/2022 | 14/06/2022 | TMClient63 | | MXN Cash Debit | Cash Paid | 0 | 3,309,489.09 | 3,309,489.09 | - | - | MXN | - - | 3,309,489.09 | MXN | -3309489 |
| 28/06/2022 | 28/06/2022 | TMClient63 | | Elektra Dividend | Cash Received | 0 | 21,298,092.40 | 21,298,092.40 | - | - | MXN | - | 21,298,092.40 | MXN | 21298092 |
| 08/07/2022 | 07/08/2022 | TMClient63 | | MXN Cash Withdrawal Fee | Cash Paid | 0 | 1,000.00 | 1,000.00 | - | - | MXN | - - | 1,000.00 | MXN | -1000 |
| 14/07/2022 | 18/07/2022 | TMClient63 | | MXN/USD FX | Sell | 0 | 17,968,000.00 | 857,411.43 | - | - | MXN | 0.047719 - | 17,968,000.00 | USD | 857411 |
| 20/07/2022 | 20/07/2022 | TMClient63 | | USD Cash Debit | Cash Paid | 0 | 857,411.44 | 857,411.44 | - | - | USD | - - | 857,411.44 | USD | -857411 |
| 07/09/2022 | 07/09/2022 | TMClient63 | | USD Cash Debit | Cash Paid | 0 | 237,973.00 | 237,973.00 | - | - | USD | - | 237,973.00 | USD | -237973 |
| 07/09/2022 | 07/09/2022 | TMClient63 | | USD Received | Cash Received | 0 | 237,973.07 | 237,973.00 | - | - | USD | - | 237,973.00 | USD | 237973 |
| 15/12/2022 | 15/12/2022 | TMClient63 | | MXN Cash Debit | Cash Paid | 0 | 6,346,114.77 | 6,346,114.77 | - | - | MXN | - | 6,346,114.77 | MXN | -6346115 |
| 03/04/2023 | 03/04/2023 | TMClient63 | MX01EL000003 | GRUPO ELEKTRA SAB DE CV | FOP Receive | 0 | 128,207.00 | - | - | - | MXN | - | - | MXN | 0 |
| 04/04/2023 | 04/04/2023 | TMClient63 | MX01EL000003 | GRUPO ELEKTRA SAB DE CV | FOP Receive | 0 | 1,600,000.00 | - | - | - | MXN | - | - | MXN | 0 |
| 24/04/2023 | 24/04/2023 | TMClient63 | | Elektra Dividend | Cash Received | 0 | 30,284,768.80 | 30,284,769.00 | - | - | MXN | - | 30,284,769.00 | MXN | 30284769 |
| 12/09/2023 | 14/09/2023 | TMClient63 | MX01EL000003 | GRUPO ELEKTRA SAB DE CV | FOP Receive | 0 | 340,000.00 | - | - | - | MXN | - | - | MXN | 0 |
| 12/09/2023 | 14/09/2023 | TMClient63 | MX01EL000003 | GRUPO ELEKTRA SAB DE CV | FOP Receive | 0 | 104,389.00 | - | - | - | MXN | - | - | MXN | 0 |
| 12/09/2023 | 12/09/2023 | TMClient63 | | MXN Cash Debit | Cash Paid | 0 | 2,000.00 | - | - | - | MXN | - | 2,000.00 | MXN | -2000 |
| 21/09/2023 | 21/09/2023 | TMClient63 | | MXN Cash Debit | Cash Paid | 0 | 30,262,768.80 | 30,262,768.80 | - | - | MXN | - | 30,262,768.80 | MXN | -30262769 |
| 15/12/2023 | 15/12/2023 | TMClient63 | | USD Cash Debit | Cash Paid | 0 | 157,644.35 | 157,644.35 | - | - | USD | - | 157,644.35 | USD | -157644 |
| 23/01/2024 | 23/01/2024 | TMClient63 | | USD Received | Cash Received | 0 | 157,644.35 | 157,644.35 | - | - | USD | - | 157,644.35 | USD | 157644 |
| 18/01/2024 | 18/01/2024 | TMClient63 | | USD Cash Debit | Cash Paid | 0 | 21,210.00 | 21,210.00 | - | - | USD | - | 21,210.00 | USD | -21210 |
| 27/03/2024 | 27/03/2024 | TMClient63 | | USD Received | Cash Received | 0 | 22,000.00 | 22,000.00 | - | - | USD | - | 22,000.00 | USD | 22000 |
| 25/04/2024 | 25/04/2024 | TMClient63 | | Elektra Dividend | Cash Received | 0 | 32,595,591.60 | 32,595,591.60 | - | - | MXN | - | 32,595,591.60 | MXN | 32595592 |
| 14/05/2024 | 14/05/2024 | TMClient63 | | MXN Sale | Cash Paid | 0 | 32,595,591.60 | 32,595,591.60 | - | - | MXN | - | 32,595,591.60 | MXN | -32595592 |
| 14/05/2024 | 14/05/2024 | TMClient63 | | USD Buy | Cash Received | 0 | 1,936,847.33 | 1,936,847.33 | - | - | USD | - | 1,936,847.33 | USD | 1936847 |
| 14/05/2024 | 14/05/2024 | TMClient63 | | Transfer to TMC64 | Cash Paid | 0 | 1,771,080.04 | 1,771,080.04 | - | - | USD | - | 1,771,080.04 | USD | -1771080 |
| 14/05/2024 | 14/05/2024 | TMClient63 | | USD Cash Debit | Cash paid | 0 | 166,849.55 | 166,849.55 | - | - | USD | - | 166,849.55 | USD | -166850 |
| 29/07/2024 | 29/07/2024 | TMClient63 | MX01EL000003 | GRUPO ELEKTRA SAB DE CV | FOP Delivery Out | 0 - | 6,268,383.00 | - | - | - | MXN | - | - | MXN | 0 |

# EXHIBIT 58

**TAVIRA**

**31/07/2024 21:00**

**Client Information**

| | | | | |
|---|---|---|---|---|
| **Name** | TMC64- Corporacion RBS SA de CV | **Address** | AV FFCC de Rio Frio 419 V Cuchilla De Moral 1 | |
| | | | Iztapalapa, '09319, Ciudad de Mexico | |
| | | **Account ID** | TMClient64 | |
| | | **Trade Date** | 20240731 | |

**Positions Overview**

| ACCOUNT | SECURITY | DESCRIPTION | ISIN | SEDOL | QUANTITY | PRICE | CURRENCY | VALUE LOCAL CCY | VALUE |
|---|---|---|---|---|---|---|---|---|---|
| TMClient64 | CASH USD | USD CASH BALANCE | | | 5.29 | 1.00 | USD | 5 | 5.29 |
| | | | | | | | | TOTAL | 5.29 |

Tavira Monaco Sam
6 BD des Moulins 9800 Monaco
RCI 09 S 05059

**TAVIRA**

31/07/2024

**Trades Overview**

| TRADE DATE | SETTLE DATE | ACCOUNT ID | ISIN | SECURITY DESCRIPTION | ORDER | QUANTITY | GROSS PRICE | NOTIONAL AMOUNT | COMMISH AMT | FEES AMT | SEC CCY | NET PRICE | SEC CCY AMT | SETTLE CCY | SETTLE CCY AMT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 25/02/2022 | 25/02/2022 | TMClient64 | | MXN CASH BALANCE | Transfer | 7,395,224 | - | 7,395,224 | - | - | MXN | - | -7395224 | MXN | -7,395,224 |
| 25/02/2022 | 25/02/2022 | TMClient64 | | MXN CASH BALANCE | Received | 510,000,000 | - | 510,000,000 | - | - | MXN | - | 510000000 | MXN | 510,000,000 |
| 28/02/2022 | 28/02/2022 | TMClient64 | | MXN CASH BALANCE | Cash Paid | 10,000 | - | 10,000 | - | - | MXN | - | -10000 | MXN | -10,000 |
| 02/03/2022 | 02/03/2022 | TMClient64 | | MXN CASH BALANCE | Cash Paid | 502,594,776 | - | 502,594,776 | - | - | MXN | - | -502594776 | MXN | -502,594,776 |
| 02/03/2022 | 02/03/2022 | TMClient64 | | USD CASH BALANCE | Cash Paid | 120 | - | 120 | - | - | USD | - | -120 | USD | -120 |
| 27/06/2022 | 27/06/2022 | TMClient64 | | MXN CASH BALANCE | Cash Received | 592,871,767 | - | 592,871,767 | - | - | MXN | - | 592871767 | MXN | 592,871,767 |
| 28/06/2022 | 28/06/2022 | TMClient64 | | MXN CASH BALANCE | Cash Paid | 25,000 | - | 25,000 | - | - | MXN | - | 25000 | MXN | -25,000 |
| 30/06/2022 | 30/06/2022 | TMClient64 | | MXN CASH BALANCE | Cash Paid | 592,844,267 | - | 592,844,267 | - | - | MXN | - | -592844267 | MXN | -592,844,267 |
| 30/06/2022 | 30/06/2022 | TMClient64 | | MXN CASH BALANCE | Cash Paid | 2,500 | - | 2,500 | - | - | MXN | - | -2500 | MXN | -2,500 |
| 05/07/2022 | 05/07/2023 | TMClient64 | | USD CASH BALANCE | Cash Received | 120 | - | 120 | - | - | USD | - | 120 | USD | 120 |
| 11/05/2023 | 11/05/2023 | TMClient64 | | USD CASH BALANCE | Cash Received | 1,832,470 | - | 1,832,470 | - | - | USD | - | 1832470 | USD | 1,832,470 |
| 15/05/2023 | 15/05/2023 | TMClient64 | | USD CASH BALANCE | Cash Paid | 1,832,465 | - | 1,832,465 | - | - | USD | - | -1832465 | USD | -1,832,465 |
| 21/09/2023 | 21/09/2023 | TMClient64 | | MXN CASH BALANCE | Cash Received | 173,586,459 | - | 173,586,459 | - | - | MXN | - | 173586459 | MXN | 173,586,459 |
| 22/09/2023 | 22/09/2023 | TMClient64 | | MXN CASH BALANCE | Cash Paid | 173,586,459 | - | 173,586,459 | - | - | MXN | - | -173586459 | MXN | -173,586,459 |
| 14/05/2024 | 14/05/2024 | TMClient64 | | USD CASH BALANCE | Cash Received | 1,771,080 | - | 1,771,080 | - | - | USD | - | 1771080 | USD | 1771080 |
| 17/05/2024 | 17/05/2024 | TMClient64 | | USD CASH BALANCE | Cash paid | 1,771,080 | - | 1,771,080 | - | - | USD | - | -1771080 | USD | -1771080 |

# EXHIBIT 59A

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

20 AIR STREET
LONDON W1B 5AN
TELEPHONE +44 (0) 20 7367 1600

| | |
|---|---|
| NEW YORK | SAN FRANCISCO |
| BEIJING | TOKYO |
| BRUSSELS | TORONTO |
| HONG KONG | WASHINGTON, DC |
| LOS ANGELES | WILMINGTON |

HFW
Friary Court
65 Crutched Friars
London
EC3N 2AE

6 August 2024

By email to: andrew.williams@hfw.com and frazer.watt@hfw.com

Dear HFW

**Ricardo Benjamin Salinas Pliego & Another v Astor Asset Management 3 Limited and Others – CL-2024-00045**

We refer to your letters of 5 August 2024, and our email of 2 August 2024 sent at 16:31.

As set out in our email of yesterday, you have now received further documents pursuant to Schedule B(3) of the Freezing and Proprietary Injunction dated 2 August 2024 (the Freezing Order). Sealed documents will be provided to you in due course, but this should not impact your ability to advise your client.

Whilst we appreciate that the period between your client being served with the Freezing Order and the time for a response is short, it is not oppressive. Your client is a depository broker, it should know how many shares it is holding and the other relevant information. The requested information should therefore be readily available. It is absurd to suggest that four to eight weeks may be required to investigate the position. By way of indication, the Third Defendant, Tavira Monaco SAM, was able to provide its response to us by the deadline as set out in the Freezing Order.

Your client was to provide its response by 5pm yesterday and it failed to do so, it is therefore in breach of the Freezing Order, and consequently the Penal Notice. Your client should therefore apply to the Court for relief from sanctions.

In the circumstances, our clients would not object to a short extension until noon tomorrow for the information to be provided. If your client fails to so, we reserve our clients' rights to seek to enforce the terms of the Freezing Order.

Your proposal that a confidentiality club should be formed in respect of the disclosure of information by your client is unnecessary. Adequate protections are provided by the collateral use restriction set out in the CPR.

The requirements of the Freezing Order are clear, please now provide the information.

Yours faithfully,
**Paul, Weiss, Rifkind, Wharton & Garrison**

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP IS A LIMITED LIABILITY PARTNERSHIP ESTABLISHED IN THE STATE OF DELAWARE AND IS AUTHORISED AND REGULATED BY THE SOLICITORS REGULATION AUTHORITY (SRA) (UNDER SRA NUMBER 8006840). THE LLP'S REGISTERED ADDRESS IS 20 AIR STREET, LONDON W1B 5AN. THE TERM "PARTNER" REFERS TO A MEMBER OF THE LLP OR AN EMPLOYEE OR A CONSULTANT WITH EQUIVALENT STANDING AND QUALIFICATIONS. A LIST OF THE PARTNERS AND THEIR PROFESSIONAL QUALIFICATIONS CAN BE INSPECTED ON OUR WEBSITE OR AT THE REGISTERED OFFICE. FOR FURTHER INFORMATION ABOUT OUR REGULATORY POSITION PLEASE REFER TO OUR WEBSITE: HTTPS://WWW.PAULWEISS.COM/NOTICES/LEGAL-NOTICE. TO FIND OUT MORE ABOUT HOW WE COLLECT, USE, AND PROTECT DATA, PLEASE SEE OUR PRIVACY POLICY.

# EXHIBIT 59B



**HFW**
Friary Court
65 Crutched Friars
London EC3N 2AE
United Kingdom

**T** +44 (0)20 7264 8000
**F** +44 (0)20 7264 8888
DX1069 London City EC3

hfw.com

Paul, Weiss, Rifkind, Wharton & Garrison LLP
20 Air Street
London
United Kingdom
W1B 5AN

**By email to**: nsachdev@paulweiss.com; sarnoldsoulby@paulweiss.com; jaycohen@paulweiss.com; and asohanpall@paulweiss.com;

| **Your Ref**: | TBC | **Direct Line:** | 020 7264 8364 | **Date:** | 7 August 2024 |
|---|---|---|---|---|---|
| **Our Ref:** | AZW/ADT/106608/1 | **Email:** | andrew.williams@hfw.com frazer.watt@hfw.com | | |

Dear Sirs

**Claim No. CL-2024-000450 – Ricardo Benjamin Salinas Pliego & Another v Astor Asset Management 3 Limited and Others**

1.      We refer to your letter dated 6 August 2024.

2.      Our client is endeavouring to investigate fully and urgently the position as to the Collateral Shares and is keen to continue to comply with the requirements of the WFO. However, our client is also concerned to ensure that it complies with its contractual and/or regulatory obligations, including as to customer account confidentiality.

3.      Our client will endeavour to respond further to your clients' information requests as soon as it is in a position to do so. This is notwithstanding that:

   (a)      our client is yet to receive a copy of the Claim Form (notwithstanding the undertaking provided by your clients in paragraph 2 of Schedule B of the WFO. We would appreciate it if an unsealed version could be provided if a sealed version is not yet available; and

   (b)      in any event, on the basis of the documents available:

      (i)      it is not clear what cause of action is alleged against our client; and

      (ii)      our client does not appear to be accused of any wrongdoing.

4.      Finally, we would request that your clients provide a transcript (in addition to the hearing note) of the without notice hearing on 2 August 2024.

5.      We reserve all of our client's rights, including in respect of jurisdiction.

Yours faithfully



**HFW**

**Americas | Europe | Middle East | Asia Pacific**

HFW is Holman Fenwick Willan LLP, which is a limited liability partnership registered in England and Wales (with registered number OC343361) and is authorised and regulated by the UK Solicitors Regulation Authority, with registered number 509977. A list of members' names is open to inspection at the registered office, Friary Court, 65 Crutched Friars, London EC3N 2AE.

VAT No GB 243 4838 55

# EXHIBIT 59C

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

20 AIR STREET
LONDON W1B 5AN
TELEPHONE +44 (0) 20 7367 1600

NEW YORK          SAN FRANCISCO
BEIJING           TOKYO
BRUSSELS          TORONTO
HONG KONG         WASHINGTON, DC
LOS ANGELES       WILMINGTON

8 Bishopsgate,
London
EC2N 4BQ

7 August 2024

Dear HFW

**Ricardo Benjamin Salinas Pliego & Another v Astor Asset Management 3 Limited and Others – CL-2024-000450**

We refer to our letter of 6 August 2024.

In our letter we notified you that your client was in breach of the Freezing Order and the Penal Notice, and that consequently your client should apply to the Court for relief from sanctions. We also noted that our clients would not object to a short extension to noon today for your client to provide us with the information that it is obligated to provide pursuant to paragraph 11(b) of the Freezing Order.

Your client has provided no response to us in respect of these matters. Our clients will now take appropriate steps to enforce the terms of the Freezing Order, without further reference to you or your client.

Yours faithfully

**Paul, Weiss, Rifkind, Wharton & Garrison**

Paul, Weiss, Rifkind, Wharton & Garrison LLP is a limited liability partnership established in the State of Delaware and is authorised and regulated by the Solicitors Regulation Authority (SRA) (under SRA number 8006840). The LLP's registered office address is 20 Air Street, London W1B 5AN. The term "partner" refers to a member of the LLP or an employee or a consultant with equivalent standing and qualifications. A list of the partners and their professional qualifications can be inspected on our website or at the registered office. For further information about our regulatory position please refer to our website: https://www.paulweiss.com/notices/legal-notice. To find out more about how we collect, use, and protect data, please see our Privacy Policy.

# EXHIBIT 60

An official website of New York State.
<u>Here's how you know</u> ⌄



🔍

# Department of State
## Division of Corporations

## Entity Information

---

Return to Results    Return to Search

**Entity Details** ⌃

**ENTITY NAME:** JURIST IQ CORP

**DOS ID:** 5911770

**FOREIGN LEGAL NAME:**

**FICTITIOUS NAME:**

**ENTITY TYPE:** DOMESTIC BUSINESS CORPORATION

**DURATION DATE/LATEST DATE OF DISSOLUTION:**

**SECTIONOF LAW:** 402 BCL - BUSINESS CORPORATION LAW

**ENTITY STATUS:** ACTIVE

**DATE OF INITIAL DOS FILING:** 01/07/2021

**REASON FOR STATUS:**

**EFFECTIVE DATE INITIAL FILING:** 01/07/2021

**INACTIVE DATE:**

**FOREIGN FORMATION DATE:**

**STATEMENT STATUS:** CURRENT

**COUNTY:** NEW YORK

**NEXT STATEMENT DUE DATE:** 01/31/2025

**JURISDICTION:** NEW YORK, UNITED STATES

**NFP CATEGORY:**

ENTITY DISPLAY    NAME HISTORY    FILING HISTORY    MERGER HISTORY    ASSUMED NAME HISTORY

Service of Process on the Secretary of State as Agent

**The Post Office address to which the Secretary of State shall mail a copy of any process against the corporation served upon the Secretary of State by personal delivery:**

**Name:** DAVINCI

**Address:** 530 5TH AVE FL 9, NEW YORK, NY, UNITED STATES, 10036

**Electronic Service of Process on the Secretary of State as agent: Not Permitted**

Chief Executive Officer's Name and Address

**Name:** JT SINGH

**Address:** 530 5TH AVE FL 9, NEW YORK, NY, UNITED STATES, 10036

Principal Executive Office Address

**Address:** 530 5TH AVE FL 9, NEW YORK, NY, UNITED STATES, 10036

Registered Agent Name and Address

**Name:** DAVINCI

**Address:** 530 5TH AVE FL 9, NEW YORK, NY, 10036

Entity Primary Location Name and Address

**Name:**

**Address:**

Farmcorpflag

**Is The Entity A Farm Corporation:** NO

Stock Information

| Share Value | Number Of Shares | Value Per Share |
| --- | --- | --- |
| PAR VALUE | 1,500 | $0.01000 |

Agencies App Directory Counties Events Programs Services

# EXHIBIT 61

Applicants
Affidavit of Eduardo Gonzalez Salceda Sanchez
Third
Exhibit "EGSS3"
12 August 2024

Claim No: CL-2024-000450

# IN THE HIGH COURT OF JUSTICE

# BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES

# COMMERCIAL COURT (KBD)

BETWEEN:

(1) RICARDO BENJAMIN SALINAS PLIEGO

(2) CORPORACION RBS SA DE CV

<u>Applicants</u>

-and-

(1) ASTOR ASSET MANAGEMENT 3 LIMITED

(2) WEISER GLOBAL CAPITAL MARKETS LTD

(3) TAVIRA MONACO SAM

(4) VLADIMIR "VAL" SKLAROV

(5) CORNELIUS VANDERBILT CAPITAL MANAGEMENT LTD

(6) ASTOR CAPITAL FUND LTD

<u>Respondents</u>

---

## THIRD AFFIDAVIT OF EDUARDO GONZALEZ SALCEDA SANCHEZ

---

I, EDUARDO GONZALEZ SALCEDA SANCHEZ, OF PERIFÉRICO SUR 4121 COLONIA FUENTES DEL PEDREGAL 14140, CDMX, MEXICO, STATE ON OATH AS FOLLOWS:

A.  Introduction

1.  I hold the position of Vice President (Financial Investment & Analysis) in a group of companies called Grupo Salinas.

2.  I have previously made two affidavits in these proceedings, both of which were originally executed as witness statements because they were produced on an urgent basis. My first affidavit was signed as a witness statement on 1 August 2024 and subsequently affirmed on 5 August 2024 ("First Affidavit"). My second affidavit was signed as a witness statement on 8 August 2024 and subsequently affirmed on 9 August 2024 ("Second Affidavit"). Due to the urgency of these applications, I am adopting the same approach in relation to this, my third affidavit.

3.  Defined terms used below are those used in my First Affidavit and Second Affidavit, unless otherwise stated.

4.  I make this third affidavit in support of three applications by the Applicants (together the "Applications"):

    (1)  An application for permission to amend the amended claim form in these proceedings to add the Sixth Respondent as the Sixth Defendant and make further amendments consequential of so doing (the "Amendment Application").

    (2)  An application for urgent interim relief against the Sixth Respondent, including an interim proprietary injunction, a worldwide freezing injunction and various heads of ancillary relief (the "Injunction Application").

    (3)  An application for permission to serve the Sixth Respondent out of the jurisdiction and for service by an alternative method (the "Service Application").

5.  This affidavit has been prepared through a privileged process of email correspondence with the Applicants' solicitors and counsel. Nothing in this affidavit constitutes a waiver of privilege.

6.  Save where otherwise stated, the facts and matters set out in this affidavit are within my own knowledge and I believe them to be true. Where I refer to information supplied by others, the source of the information is identified. Facts and matters derived from other sources are true to the best of my knowledge and belief.

7.  My first language is Spanish, but I am fluent in English, and I have made this affidavit in English

8.  The Applications are made on an *ex parte* basis. I am aware that the Applicants have a duty of full and frank disclosure. I have discussed this duty with the Applicants' solicitors (Paul Weiss) and I

understand that a number of points will be addressed in legal submissions to ensure that this duty is properly complied with. I have sought to comply with this duty throughout my affidavit.

9. At the same time, I should also make it clear that this affidavit has been prepared under circumstances of urgency, and I respectfully ask that the Court bears this in mind when reading the matters set out below.

10. There is now produced and shown to me a paginated bundle of true copy documents marked "EGSS3". All references to documents in this affidavit are to the documents contained in Exhibit EGSS3.

B.    **Factual background**

11. The relevant background was set out at paragraphs 7 – 87 of my First Affidavit and I do not repeat that background here.

12. At its simplest, in late July 2024, I discovered that there were credible *prima facie* grounds for suspecting that the First to Fourth Respondents are engaged in a fraudulent scheme to misappropriate the Collateral Shares (i.e. shares in the Mexican company Grupo Elektra SAB De CV) belonging to Mr Salinas with a value of up to MXN 7,565,879,616 (Mexican peso), equivalent to approximately US$390 million at current exchange rates. Below I describe the subsequent events.

C.    **The hearing on 2 August 2024**

13. The discovery of the suspected fraud ultimately culminated in urgent without notice applications being made and an *ex parte* hearing taking place before Mr Justice Jacobs on 2 August 2024, following which two orders were granted in relation to the First to Fourth Respondents:

    (1)    A freezing and proprietary injunction order (the "First Freezing Order").

    (2)    An order permitting service of documents out of the jurisdiction (the "First Service Order").

14. Copies of the First Freezing Order and the First Service Order are exhibited hereto (Documents 1 and 2). These documents were served on the First to Fourth Respondents on 2 August 2024.

15. Pursuant to paragraph 11 of the First Freezing Order, the First to Fourth Respondents were obliged to provide certain information to the Applicants' solicitors by 5pm on 6 August 2024 (in the case of the First and Fourth Respondents) and by 5pm on 5 August 2024 (in the case of the Second and Third Respondents).

16. By virtue of paragraph 12 of the First Freezing Order, an affidavit was also required on behalf of each of the Respondents to provide certain information. These affidavits needed to be served within 7 days of being served with the First Freezing Order.

17. Information provided by the Respondents until the granting of the Second Freezing Order.

**First Respondent**

17. No steps have been taken by the First Respondent to discharge its obligations to provide information pursuant to the terms of the First Freezing Order. Therefore, Paul Weiss have written to the First Respondent to explain that it will take steps to enforce the freezing order (Document 3).

18. However, the First Respondent has sent two documents relating to the SLA since the First Freezing Order was granted:

    (1) An amended notice of default dated 3 August 2024 (Document 4). This supplements the email sent by the First Respondent on 30 July 2024 (Document 5) asserting, for the first time, Events of Default by the Applicants under the SLA (described at paragraph 132 of my First Affidavit). These are matters which will need to be addressed if the First Respondent acknowledges service of the Applicants' claims and seeks to defend the proceedings in this jurisdiction. However, I do not consider that the arguments asserted in the amended notice have any basis, and simply amount to a brazen attempt to deflect away from the First Respondent's own fraudulent conduct.

    (2) An email demanding payment dated 5 August 2024 (Document 6).

**Second Respondent**

19. The Second Respondent is represented by English solicitors, Holman Fenwick Willan LLP ("HFW").

20. The correspondence between HFW and Paul Weiss has developed as follows:

    (1) On 5 August 2024, HFW notified Paul Weiss that they represented the Second Respondent and sought various documents (Document 7).

    (2) Later that day, HFW responded in relation to the information the Second Respondent had been directed to provide on an urgent basis pursuant to paragraph 11(b) of the First Freezing Order:

    > "In accordance with paragraph 10 of the WFO, our client confirms that it will not in any way dispose off, diminish, deal with, charge, pledge or in any way howsoever deal with the legal or equitable title to or diminish the value of any of the Collateral Shares or their proceeds if they have been sold or otherwise disposed off.
    >
    > Paragraph 11(b) of the WFO requires our client, by 5pm London time today and to the best of its ability, to inform you (as the Applicants/Claimants' solicitors) in writing whether

*it holds any Collateral Shares and/or their traceable proceeds and if so the value of said shares.*

*As you will appreciate, the period between our client being served with the WFO and the time for responding to you in accordance with the terms of the WFO is oppressively short. We confirm that our client is currently taking steps to investigate fully the status of any Collateral Shares. However, it may potentially take four to eight weeks for our client to undertake this investigation properly. In the meantime, our client confirms that it has frozen the relevant accounts whilst it undertakes the investigation.*

*Our client intends to comply fully with any orders of courts of competent jurisdiction. Without prejudice to this, our client is concerned to protect customer account confidentiality, particularly in circumstances where the Court is yet to have heard both sides in relation to the issues at hand and determined whether there has indeed been a fraud perpetrated on your clients.*

*In the circumstances, please confirm if your clients would agree to the formation of a confidentiality club in respect of the disclosure of information by our client to your clients (a "Confidentiality Club"). Under this proposal, you would identify those solicitors and counsel qualified and resident in England and Wales with responsibility for this matter, each of whom would undertake not to disclose the relevant information outside of the Confidentiality Club until further Order of the Court"* (Document 8).

(3) On <u>6 August 2024</u>, Paul Weiss responded seeking compliance with the First Freezing Order (Document 9).

(4) On <u>7 August 2024</u>, HFW responded stating that the Second Respondent was *"endeavouring to investigate fully and urgently the position as to the Collateral Shares and is keen to continue to comply with the requirements of the WFO"* and that it *"will endeavour to respond further to your clients' information requests as soon as it is in a position to do so"* (Document 10).

(5) Later that day, Paul Weiss again notified that Second Respondent that it was in breach of the terms of the First Freezing Order (Document 11).

(6) HFW responded stating:

*"Should your clients take steps to enforce the terms of the Freezing Order against our client, please ensure that the attached letter is disclosed to the Court.*

*As stated in our letter sent earlier today, our client is keen to comply with the requirements of the WFO. However, it is also concerned to ensure that it complies with its contractual and regulatory obligations regarding customer account confidentiality. We would refer you to paragraph 13 of the WFO in this regard.*

*At present, the claims against our client are vague and unparticularised. The Brief Details of Claim provide little assistance in this regard. We await provision of your clients' Particulars of Claim as well as the documents referenced in the Exhibit to the Affidavit of Mr Eduardo Sanchez to understand the specific claims against our client.*

*We would encourage your clients to adopt a less oppressive approach to ensure that excess costs are not incurred on unnecessary correspondence. Our client has already confirmed that it has frozen the relevant accounts, whilst it undertakes its investigation. This should provide sufficient comfort to your clients.*" (Document 12).

(7) The following day, Paul Weiss replied making it again clear that the Second Respondent was in breach of the terms of the First Freezing Order. In summary, they stated:

*Your correspondence betrays a fundamental misunderstanding of the situation. Your client is not being asked to respond to optional "information requests". Nor is it relevant whether your client is "keen" to comply or whether any "comfort" can be drawn from the very limited steps your client has taken to date. The obligations under the Freezing Order are mandatory requirements of the English Court with which your client is obliged to comply. As a result of your client's noncompliance, your client is currently in breach of the Freezing Order, in contempt of the English Court, and is accordingly exposed to the severe consequences set out in the Penal Notice on the face of the order*" (Document 13).

(8) On 2 August 2024, HFW served a signed but unsworn affidavit purporting to comply with the Second Respondent's obligations under the First Freezing Order (Document 14). In summary:

(a) The affidavit was sworn by Christos Livados, a director of the Second Respondent (paragraph 2).

(b) He explained that the Second Respondent currently holds 197 Collateral Shares (paragraph 14) and has currently identified traceable proceeds of such shares of USD 12,604,476.49 (paragraph 15.1).

(c) Notwithstanding the terms of the First Freezing Order, Mr Livados explained that the Second Respondent is:

*"still in the process of identifying if there are any other Traceable Proceeds. I estimate it would take between four to eight weeks for Weiser to undertake this investigation properly because the proceeds of any sale of [Collateral] Shares may have been used to purchase alternative shares / securities. I do not presently know whether that investigation will yield any results."* (paragraph 15.2)

(d) The Second Respondent has frozen the accounts of the First Respondent and its related entities whilst it undertakes the investigation" (paragraph 15.3).

(e) Critically for the purposes of the Applications, Mr Livados explained that

*"Astor 3 sold 955,7116 Relevant Elektra Shares to Astor Capital Fund Ltd on 30 July 2024 for the price of NOK 238,929,000, which equates to the Traceable Proceeds amount stated above i.e. USD 12,604,476.49"* (paragraph 17)

I refer to this share transfer of 30 July 2024 as the "Astor Capital Transfer"

(f) Mr Livedbs stated that the Aston Capital Transfer was executed upon instructions it received from the First Respondent. However, he refused — in breach of the terms of Schedule C of the First Freezing Order — to disclose the identity of the individual providing such instructions, citing concerns about *"client confidentiality in respect of the accounts that it manages"* (paragraph 118).

## Third Respondent

21. The position regarding the Third Respondent is explained at paragraphs 16 to 19 of my Second Affidavit.

22. In summary, the Third Respondent has purportedly provided the information it was required to supply on an urgent basis on 5 August 2024. It has yet to provide the more detailed affidavit required under the First Freezing Order.

23. The initial information provided on 5 August 2024 revealed that the First Respondent had rehypothecated some of the Collateral Shares to the Fifth Respondent who currently holds in custody with the Third Respondent USD 10.46 million in cash and USD 6.7m of *"other shareholdings"* (Document 15).

24. The supporting information included a document purportedly setting out the details of the bank account for which the cash redemptions for the Collateral Shares were paid on behalf of the First and Fifth Respondents. The account is with *'Jurist Iq Corp Attorney Trust Account IOLA"* held by JP Morgan Chase Bank NA in New York. This is a law firm associated with Jaitegh *"JT"* Singh, who is listed as the CEO of Jurist IQ Corp on the New York State Division of Corporations (Document 16). As I explained in my First Affidavit, Mr Singh is an attorney who has *represented* the *Fourth* Respondent and appears to have become mixed up in his client's wrongdoing (*see paragraph 93*).

25. Prior to this information, I had no knowledge of the involvement of the Fifth Respondent in the relevant transactions, and the email caused me considerable concern that the Fifth Respondent appears to have held and then sold a significant number of Collateral Shares.

26. The Third Respondent also revealed that, on 29 July 2024, one of the Fourth Respondent's associates (Elizabeta Lata) authorised the transfer of 6,268,383 Collateral Shares from the First Applicant's account to the First Respondent. The Third Respondent states that it had been informed that there had been a loan agreement default (Document 15).

27. In light of this information, the Applicants made the following *ex parte* applications:

(1)    An application for urgent interim relief against the Fifth Respondent, including an interim proprietary injunction, a worldwide freezing injunction and various heads of ancillary relief.

(2)    An application for permission to serve the Fifth Respondent out of the jurisdiction and for service by an alternative method.

28.    I understand from Paul Weiss that the Applicants were not required to seek permission to amend the claim form since a sealed copy had yet to be served on the First to Fourth Respondents.

29.    These applications were issued on 8 August 2024, and there was a short hearing (again) before Mr Justice Jacobs, following which two orders were granted in relation to the Fifth Respondent:

(1)    A freezing and proprietary injunction order (the "Second Freezing Order").

(2)    An order permitting service of documents out of the jurisdiction (the "Second Service Order").

30.    I exhibit these orders hereto (Documents 17 and 18).

Fourth Respondent

31.    No response has been received from the Fourth Respondent. Therefore, Paul Weiss have written to the Fourth Respondent to explain that it will take steps to enforce the freezing order (Document 3).

Fifth Respondent

32.    The Fifth Respondent was served with the Second Freezing Order, Second Service Order and associated documents (including the amended claim form) on 7 August 2024 (Document 19). No response has yet been received to this communication

D.     Evidence of fraud by the Sixth Respondent

Wider fraudulent scheme

33.    At paragraphs 87 to 123 of my First Affidavit, I set out the details of the evidence of fraud in relation to the First to Fourth Respondents. I do not repeat that evidence here, but I rely on what I have said previously for the purpose of supporting these Applications. I understand from Paul Weiss that my First Affidavit will be included in the hearing bundle and I would respectfully request that the Court read this section in its entirety.

34.    The further information which has subsequently come to light in relation to the rehypothecation of some of the Collateral Shares to the Fifth Respondent has only confirmed that the Applicants have been the victims of a fraudulent scheme.

Information provided by Second Respondent

35. The information provided by the Second Respondent in relation to the Astor Capital Transfer is troubling in a number of respects, including:

    (1)   The identity of the Sixth Respondent.

    (2)   Previous involvement of the Sixth Respondent in the transfer of Collateral Shares.

    (3)   The timing and nature of the Astor Capital Transfer.

36. I address these points below, with the assistance of information produced on an urgent basis by a forensic investigation firm (Forward Risk) (Document 20).

The identity of the Sixth Respondent

37. There are a number of indicia which suggest that the Sixth Respondent forms part of the group of companies used by the Fourth Respondent to conduct stock-lending frauds.

38. First, the Fourth Respondent seems to use the names of famous American magnates (e.g. Astor, Rothschild, Mellon, Lehman and Vanderbilt) to create the impression of respectability in relation to his companies despite having no connection to the names. The Sixth Respondent was initially called JCMellon Equities before being renamed Astor Capital Fund Ltd in April 2019. Both names conform to this *modus operandi*.

39. Second, I understand that Indiana corporate records show that the Sixth Respondent (which is a Bahamian company) was registered in the state as a foreign corporation in June 2019. When this entity was registered, Fourth Respondent was listed as its CEO and Ms Lata as a director (Document 21). I understand from Forward Risk that Ms Lata has been a principal of several other entities relating to the First Respondent, including America 2030 Capital Limited, Bentley Rothschild Financial LLC, and Blackrock Capital LLC.

40. Third, by April 2020, 'Thomas Mellon' had replaced the Fourth Respondent in the corporate records and became the CEO, director, and registered agent of the Sixth Respondent. Forward Risk conclude that 'Thomas Mellon' is likely to be an alias for the Fourth Respondent. A document authorising these changes was signed by JT Singh as the legal representative of the Sixth Respondent (Document 21). As mentioned above, JT Singh is an attorney who appears to have been mixed up in his client's wrongdoing. As explained in my First Affidavit, it appears that 'Thomas Mellon' does not exist. Further, as Forward Risk explain in their latest report, there appear to be a number of other fake employees (e.g. Mitchell Langley and Diyen Wathyono)

41. Fourth, Forward Risk also question the veracity of the Sixth Respondent's press releases which they consider have been faked to provide the Sixth Respondent with an "*air of legitimacy*." For example,

the press releases refer to transactions (actual or contemplated) but I forward I Risk have been unable to identify any corroborating evidence for such deals.

42. Fifth, as I explain in paragraph 93 of my First Affidavit, the Fourth Respondent has impersonated financial institutions such as the New York Stock Exchange, Barclays and Rothschild. For example, in a complaint filed by Barclays against the Fourth Respondent in New York dated October 2020, the Fourth Respondent was sued for impersonating a lengthy list of entities associated with Barclays (Document 22). On 19 March 2021, Judge Kaplan (in the United States District Court for the Southern District of New York) entered a permanent injunction against the Fourth Respondent and J T Singh (Document 23). As part of this complaint, I am aware that the Fourth Respondent (via J T Singh) attempted to register a trademark in the name of "Astor Capital". This incident is described in paragraph 240 of Barclays' complaint (Document 22).

43. Sixth (and as mentioned at paragraph 104 of my First Affidavit), it became apparent during the Applicants' recent investigations that the British Columbia Securities Commission issued an Early Intervention Alert on 9 April 2020 as follows:

> "Astor Capital Fund Limited (Astor) Astor claims to have an office in Vancouver, British Columbia (BC), and offers wealth management and advisory services. Astor is not registered to trade in, or advise on, securities or derivatives in BC. We urge BC residents to exercise caution when dealing with firms that are not registered to trade or advise in BC" (Document 24).

44. Therefore, it seems to me clear that the Sixth Respondent forms part of the Fourth Respondent's web of companies used to facilitate fraudulent transactions.

### Previous involvement by the Sixth Respondent in the transfer of Collateral Shares

45. The Astor Capital Transfer is not the first instance of which I am aware whereby it received Collateral Shares.

46. For ease, I replicate below my understanding as set out in paragraphs 62 to 67 of my First Affidavit:

> In summary, the Applicants were notified by Weiser in an email dated 5 October 2021 that Astor 3 had issued an Entitlement Order to transfer 935,913 Collateral Shares held by Weiser to the account of Astor Capital Fund Ltd, which appears to be the entity affiliated with Astor 3. The Applicants asked Mr Tonti to raise a complaint with Weiser, which he did on 19 October 2021. Weiser responded on 22 October 2021 that it was required to comply with any Entitlement Order given by Astor 3. On 23 October 2021, Mr Tonti wrote to Mr Athor as follows:
>
>> "… It looks like the party which is the source of all this trouble is Astor. Could you kindly transmit this message to Astor and get their position and clear explanation as to what is causing all this mess?"

Later that day, Mr Tonti chased Ms Akbar for a response:

> "It is very important that you have the sensibility of the necessity for the shares to return to the collateral contract until no later than in this week, since if the account statement is issued without the shares there could be trigger an alienation with great tax implications. Please we really need your help to make Astor and Weiser understand that they are breaching and violating the contracts."

On 25 October 2021, Ms Akbar responded as follows:

> "I am happy to advise that I have been informed by Astor that the instructions for the transfer of the 935,913 (collateralised) shares of Group Elektra S.A.B. de CV (FLEKTRA*:MX) shall be reversed back to the account # 200-804765 of Mr. Ricardo B. Salinas Pliego within the next 24 hours. So we should see the shares reappear back into the account later today or tomorrow. Please let me know if you have any further questions."

I was reassured to learn that Astor 3 had returned the shares. I assumed that there was a mistake or misunderstanding (perhaps involving Weiser) rather than a fraud. Furthermore, Astor 3 appears to have accepted that it was not entitled to take the shares for itself, which is presumably why it returned the shares.

In light of what I have learned in recent days, it is no longer clear to me whether Astor 3 did in fact return any shares in October 2021, and I also believe that Astor 3 has misappropriated a large quantity of additional shares. However, I did not realise these matters at the time.

In any event, the Applicants insisted that Weiser should be replaced with another Depository Broker for all future tranches of lending, and that is why Tavira was appointed. Tavira was introduced to the Applicants by Astor 3, and I now appreciate that this was simply another way for Astor 3 to continue the fraud. Again, however, I did not realise this at the time."

47    Therefore, not only is the Sixth Respondent clearly connected to the Fourth Respondent and his various fraudulent schemes, but appears to have been the recipient in a previous transaction of the Applicants' Collateral Shares which – in light of the information I now know – appears to have formed part of the fraudulent scheme which is the subject-matter of these proceedings.

## The timing and nature of the Astor Capital Transfer

48    As I explained at paragraphs 124 and 125 of my First Affidavit, on 26 July 2024, Elektra issued a press release "regarding a possible fraud by depositaries of their shares, which could cause unusual movements of its share price on the stock markets" (Document 25). On the same date, Elektra's shares were suspended from trading by the Mexican stock exchange.

49    I believe that this may have led to the Fourth Respondent to take urgent steps to misappropriate some of the Collateral Shares and the proceeds thereof. This is why:

(1) On 29 July 2024, Ms Lam authorised the transfer of 6,268,383 Collateral Shares from the Third Respondent to the First Respondent.

(2) The First Respondent executed the Aston Capital Transfer on 30 July 2024 by way of an intra-group sale of 935,716 Collateral Shares from the Second Respondent to the Sixth Respondent.

(3) In parallel with this, the First Respondent sent a default notice purporting to accelerate the SLA as a consequence of a bogus event of default by the borrower and offered to enter into settlement discussions (Document 5).

50. I am aware of no legitimate reason for Aston Capital Transfer. It appears to me a clear step to seek to misappropriate Collateral Shares in the days after the fraud allegations became public.

## E. The Applicants' substantive claims and Amendment Application

51. On 2 August 2024, the Applicants issued a claim form against the First to Fourth Respondents. Prior to service of that version of the claim form, it was amended on 6 August 2024 so as to add the Fifth Respondent as a party, and the amended claim form was filed on 6 August 2024 and served on the First to Fourth Respondent on 7 August 2024 (Document 26). It was served on the Fifth Respondent on 7 August 2024 (Document 19).

52. I understand from the Applicants' solicitors that, since the amended claim form has been served on the First to Fifth Respondents, in order to further amend the claim form to add the Sixth Respondents, the Applicants require permission of the Court pursuant to CPR 19.4.

53. I exhibit hereto the draft re-amended claim form (Document 27).

54. The claims brought against the Sixth Respondent are for the return of the First Applicant's property or its traceable proceeds and the economic tort of unlawful means conspiracy.

55. In terms of the case against the Sixth Respondent, the Sixth Respondent forms part of a fraudulent scheme to misappropriate the property of Mr Salinas, which is worth hundreds of millions of US dollars. I understand that the merits of the Applicants' case will be a matter for legal submissions. I certainly believe that the Applicants have a good arguable case.

56. Finally, it should be noted that additional defendants may be joined as parties to the proceedings (and that interim relief may be sought against them) as the Applicants' investigation continues.

## F. Relief sought by the Injunction Application

### Introduction

57.  ·There are three key heads of relief sought by the Injunction Application: (1) an interim proprietary injunction; (2) a worldwide freezing injunction; and (3) various disclosure orders.

58.  The Injunction Application has been made on an *ex parte* basis, and the Applicants understand that a return date will be listed (on full notice to the Sixth Respondent) for the matter to be given further consideration. The immediate purpose of the Injunction Application is to 'hold the ring' in the hope of blocking the Sixth Respondent from continuing their fraudulent scheme for a few weeks until the return date hearing and also to enable the provision of information to further the Applicants' endeavours to uncover the extent of the fraudulent scheme and trace the Collateral Shares and proceeds thereof. I am advised that the return date hearing in relation to the First Freezing Order and Second Freezing Order is taking place on 29 August 2024 and that it would make sense for this hearing to also serve as the return date in relation to the equivalent application against the Sixth Respondent.

Interim proprietary Injunction

59.  The Applicants seek an interim proprietary injunction to restrain the Sixth Respondent from dealing with or disposing of the Collateral Shares or the proceeds thereof. The Collateral Shares (and their proceeds) belong, and have always belonged, to Mr Salinas. Injunctive relief is necessary to ensure that the Collateral Shares and their proceeds are not the subject of any further misappropriation.

Worldwide freezing injunction

60.  The Applicants also seek a worldwide freezing injunction against the Sixth Respondent.

61.  As mentioned in paragraph 55 above, I believe that the Applicants have a good arguable case.

62.  Further, it is likely that the Sixth Respondent has assets against which the Applicants could enforce. After all, the Sixth Respondents has (on the Applicants' case) been party to an enormous fraud, and the fruits of that fraud must be found somewhere. It is *possible* that any assets held by the Sixth Respondent are held on trust for the Applicants, but that is not necessarily the case. The Applicants could easily find themselves in a position where they need to execute a sizeable judgment against the Sixth Respondent's assets.

63.  It is unknown where the Sixth Respondent's assets are located, but they could be anywhere around the world. In this regard, I understand from Forward Risk that:

(1)  The Sixth Respondent is a Bahamian company:

(2)  It has a registered address in Canada.

(3)  It was also registered in Indiana until this was revoked in December 2023.

(4)     The Sixth Respondent's 2023 annual report was signed-off by Christos Sgoumpopoulos, who has provided a Greek telephone number. Further, it lists Michael Siaterlis as a point-of-contact on its website, who also had Greek contact details.

(5)     The owner for the trade mark application for 'Astor Capital' was Lincoln Capital Ltd, a Belize-based entity and which is linked with the Fourth Respondent.

64      There is a real risk of dissipation. This is a risk that must necessarily arise in circumstances where the Sixth Respondent has conspired to commit a large-scale international fraud against the Applicants.

65.     For the same reasons, I believe that it is just and convenient for a worldwide freezing injunction to be granted.

## Disclosure orders

66.     I understand that the Court has jurisdiction to order the disclosure of information in connection with a proprietary injunction or a freezing injunction.

67.     The Court is asked to require the Sixth Respondent to provide information regarding their assets (in the standard form of disclosure order accompanying this application).

68.     In addition, certain bespoke disclosure orders are required in the present case as reflected in the draft order, which itself mirrors the First Freezing Order and Second Freezing Order. I understand that the precise disclosure orders will be identified in legal submissions. They are essentially designed to enable the Applicants to identify what has happened to the Collateral Shares and where the proceeds are to be found.

G.      **Relief sought by the Service Application**

69.     By the Service Application, the Applicants seek (1) an order giving them permission to serve the claim form on the Sixth Respondent out of the jurisdiction; and (2) an order permitting service of the claim form (and all other documents in the proceedings) by an alternative method.

## Service out of the jurisdiction

70.     I am advised by Paul Weiss that the Applicants' counsel team will explain in legal submissions why the Court should grant permission to serve the claim form on the Sixth Respondent out of the jurisdiction. I understand that this involves the identification of a 'gateway' under Practice Direction 6B. These matters are beyond my knowledge.

## Service by an alternative method

71. In light of the fact that the present case involves a massive international fraud orchestrated by an experienced fraudster (the Fourth Respondent), it is important to identify a sensible method of serving documents on the Sixth Respondent that cannot readily be evaded, and which does not take months to carry out (such as service through diplomatic channels).

72. I understand that the appropriate method of service will be addressed in legal submissions. The Applicants propose to use the following email addresses (both taken from Forward Risk's report) for service: (1) support@astorcapitalfund.ca and (2) registrations@mslogic.eu.

**H.   Reasons why the Applications have been made on an *ex parte* basis, and details of the Applicants' cross-undertaking in damages**

73. The Applicants are willing to give an unlimited cross-undertaking in damages (in the standard form set out in the Commercial Court Guide, which has been shown to me).

74. I note that Mr Salinas will be personally liable under the cross-undertaking, which provides a particularly high level of protection to the Sixth Respondent. Mr Salinas is one of the wealthiest individuals in Mexico.

75. The Applications have been made on an *ex parte* basis both to obtain permission to serve out of the jurisdiction and because the urgency to try to prevent further misappropriation of the Collateral Shares (or the proceeds thereof). I appreciate that, the First Freezing Order and Second Freezing Order having both been made and the alleged wrongdoers having been notified of the same, steps may already have been taken by the Sixth Respondent to move assets and/or conceal its wrongdoing. However, having become aware of the role played by the Sixth Respondent, I believe that the Applications are reasonable and proportionate responses thereto.

76. That is also the reason why the Applications are urgent and need to be heard as quickly as possible. In this regard, I note that the Applicants have acted promptly to issue the Applications. The Applicants and their legal team moved as quickly as possible after receiving the unsworn affidavit from the Second Respondent on 9 August 2024.

77. Once the Applications have been issued, I understand the Applicants' solicitors will notify the Sixth Respondent by emailing the Applications and draft re-amended claim form to the two email addresses referred to in paragraph 72 above. Therefore, the Sixth Respondent will have notice of the steps which have been, albeit such notice will

necessarily be short. The Applicants' solicitors will also provide the Sixth Respondent with details of the hearing of the Applications.

I.    Reason why this Affidavit has not been sworn or affirmed

78.    Due to the urgent nature of this matter, I have not been able to make the necessary arrangements so as to affirm it in the limited time available. I will therefore sign a statement of truth (in the form appropriate for a normal witness statement), and I will undertake to file a sworn or affirmed copy of this affidavit within 7 days.

### Statement of truth

I believe that the facts stated in this affidavit are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

**EDUARDO GONZALEZ SALCEDA SANCHEZ**

Dated:  12 August 2024

STATE OF TEXAS
COUNTY OF HARRIS

AFFIRMED TO AND SUBSCRIBED at 139 Rockwell Park Dr, Spring TX 77389, Texas, United States

This 8ᵗʰ day of August 2024                                        Signed

AFFIRMED TO AND SUBSCRIBED before me, the undersigned authority, on the 8ᵗʰ day of August 2024 by Eduardo Gonzalez Salceda Sanchez:

JANIERO HUNTER
MY COMMISSION EXPIRES
07/07/2026
NOTARY ID: 129876062

Notary Public, State of Texas

16

# EXHIBIT 62

# ASTOR ASSET MANAGEMENT 3 LIMITED

August 3, 2024

Corporacion RBS SA de CV
Ave. Ferrocarril de Rio Frio 419 A99
Cuchilla del Moral 1
Iztapalapa
09319 Ciudad de Mexico
Mexico
Tel: 0052551720[0089]
egonzalez@gruposalinas.com.mx

Ricardo Benjamin Salinas Pleigo
Cristobal Colon 79 INT C
Mexico 09360
Tel: +5215530091016
egsalceda@gruposalinas.com.mx

## **AMENDED NOTICE OF DEFAULT**

To Whom It May Concern,

This Notice of Default is being served upon you by Astor Asset Management 3 Ltd (the "Lender" or "Astor"). As such, this correspondence shall serve as formal notice that you are in default of the Stock Loan Agreement (the "SLA") that was duly executed between Astor and Corporacion RBS SAD de CV (the "Borrower") on July 14, 2021. The basis for this default is as follows: 1) the failure to timely pay interest and other fees and costs of the Loan; 2) the government investigations related to the Issuer of certain shares of Grupo Elektra SAB DE CV (ELECTRA:MX); 3) your non-payment/failure to comply with local tax requirements which constitutes a Material Event as defined; 4) your failure to disclose material information and provide requisite notification to the Lender that assets of Salinas/Grupo Elektra had been threatened with confiscation; 5) your failure to comply with Annual Notice Provisions you owed

# ASTOR ASSET MANAGEMENT 3 LIMITED

to the Lender; 6) your repeated interference in the custody of the Pledged Collateral; 7) tax liability to government of Mexico of Four Billion Eight Hundred Million United States Dollars and your refusal to pay it (US$4,800,000,000); 8) material degradation on Issuer earnings; 9) government confiscation of assets of Guarantor; 9) failure to make a regulatory announcement; 10) Fitch downgrade of Issuer on concerns of mismanagement; 11) a Material Event upon the financial condition of Borrower, Guarantor or Issuer; 12) Fraud and securities manipulation; 13) suspension or halting of trading of Collateral; and 14) implication of bribery of US Congressman by bank owned by Gurantor.  Therefore, for the reasons contained herein, you are hereby notified that you are in default of the SLA which has resulted in the Lender terminating the SLA and accelerating any and all amounts due thereunder together with any other remedy which may be afforded to the Lender.

## Failure to Pay Interest and Fees & Costs of the Loan

As you are aware, the SLA provided that the Loan would bear interest at the rate of one and fifteen hundredths of a percent (1.15%) per year to be paid to Lender in monthly installments (with the first interest payment being deducted from the Loan proceeds at the time of funding), and subsequent interest to be paid on the first Business Day of each month. See, Section 2(a) and 2(c) of the SLA, the applicable parts of which are set forth below:

## 2. *Interest Rate*

*2(a)  All outstanding amounts of the Loan shall bear an interest rate in an amount equal to one and fifteen one hundredths of a percent (1.15%) per year.*

*2(c)  The first interest payment shall be subtracted from Loan proceeds at the time of the funding.  Further interest payments for the Loan shall be due timely on the first Business Day of each month following the Closing Date, and such payment schedule shall be based on twelve months per calendar year, regardless of the actual number of days between the applicable Closing Date and the date such first interest payment is due.*

# ASTOR ASSET MANAGEMENT 3 LIMITED

It is significant that in 2022, 2023 and 2024, you repeatedly failed to make timely interest payments more than two (2) dozen times. In May 2023, you finally (and only after numerous collection attempts on Lender's part) paid interest which had been overdue for at least seven months. Earlier in 2024 you paid for interest due for the entire preceding year in a lump sum as opposed to monthly. Failing to pay interest when due is an Event of Default under Section VI, subsection 3(a) of the SLA which reads as follows:

> *Failure by Borrower or Guarantor to pay the interest and all applicable frees or charges when due as stipulated or the Approved Loan Amount when due, or any other default in the performance of an obligation that is not cured within the applicable Cure Period.*

As you are also aware, you were required to pay a Maintenance Fee of 0.0625% of the Loan Principal Amount every three (3)months of the Loan Term. See, Section 3(b) of the SLA which is set forth below:

> ***Maintenance Fee***. *Borrower shall pay Lender every three (3)month's the maintenance fee of six and twenty-five hundredths basis points (0.0625%) of the Loan Principal Amount ("Lender's Maintenance Fee"). The Lender is authorized to deduct the Maintenance Fee in advance from the Loan Principal Amount for the first period, it shall be memorialized in the Closing Statement and the same exact amount shall be paid by Borrower, automatically and without further demand, every four months thereafter for all the years constituting the Term of the Loan. Lender's Maintenance Fee is non-refundable and will be paid in advance.*

You repeatedly failed to pay Maintenance Fees when due as required under the SLA, and as such, an Event of Default has occurred under Section VI(3)(a) as set forth above.

Additionally, the SLA required you to pay an annual Custodian Management Charge based on the cumulative net asset value of all Dedicated Depository Account(s) at time of delivery of the Pledged Collateral and limited to fifteen hundredths of one (0.15%) percent. See, Section 3(d) of the SLA which states, in applicable part, as follows:

# ASTOR ASSET MANAGEMENT 3 LIMITED

*Expenses. For the services provided, the Depository Brokers engaged in the performance of this Agreement are entitled to an annual custodian management charge to be paid by Borrower based on the cumulative net asset value of all Dedicated Depository Account(s) at time of delivery of the Pledged Collateral and limited to fifteen hundredths of one (0.15%) percent. The annual custodian management charge is exclusive of any transaction fee, transfer fee, exit fee, or other administrative costs and fees which Depository Broker may possibly impose. Such fee shall be nonrefundable and shall be paid one (1) year in advance. First year's fee may be deducted from the Loan proceeds or charged to Borrowers account directly by the Depository Broker. In subsequent years, the Borrower will remit to Lender the exact same fee every year at least fourteen (14) days prior to the Effective Date, to be remitted by Lender to Depository Broker.*

The failure to timely pay the Custodian Management Charge constitutes an additional Event of Default under Section VI(3)(a) as set forth above. You have ignored repeated demands to pay the Custodian Management Charge.

## Government Investigation

As you are aware, on November 30, 2022, the Federal Court of Administrative Justice ordered the Issuer[1] to pay nearly Five Billion Pesos (5,000,000,000) in taxes (the "November 30th Order" or "Order"); this Order was made in direct response to the Issuer's improperly generated tax losses. No doubt, such an Order is the culmination of an investigation into the Issuer and its reported tax losses. Section VI.3(f) states that an Event of Default occurs if:

*A governmental agency which controls the actions of Issuer has commenced an investigation of the Issuer.*

We have recently determined thru media that there are 17 open court tax cases against the Guarantor.

---

[1] Grupo Elektra

# ASTOR ASSET MANAGEMENT 3 LIMITED

Therefore, given that there was an investigation into the Issuer by a government agency that most certainly can and does control the actions of the Issuer, an Event of Default has occurred for which there is no cure.

## Material Event – Non-Payment of Taxes

Moreover, the aforementioned November 30th, 2022 Order constitutes a Material Event given that an order to pay nearly Five Billion Pesos (5,000,000,000) is certainly an event which may, and in all likelihood, will, undermine or alter the value of the Collateral. The SLA defines a "Material Event" as *"any event of possible outcome which may undermine or alter the value of the Collateral or prejudice Lender's standing Lien"*. Given this, the Order undoubtedly constitutes a Material Event as defined which is an Event of Default under Section VI.3(g) of the SLA. Section VI.3(g) states:

> *A Material Event upon the financial condition of the Borrower, Guarantor, or Issuer.*

On or about March 20th, 2024 the tax authorities of government of Mexico stated that Ricardo Salinas owes the Mexican government Sixty Three Billion Pesos (63,000,000,000) or Three Billion Eight Hundred Million United States Dollars (US$3,800,000,000), has 17 open and unresolved tax lawsuits and proceed to seize a golf course owned by Ricardo Salinas. Some media outlets report that a number of companies, including the Issuer may be seized and confiscated by the Mexican tax authorities. We deem this to be a Material Event as defined and an Event of Default under Section VI.3(g) of the SLA.

Mr. Ricardo Salinas had immediately stated publicly that he will not pay the tax obligations and will challenge them in court. According to public articles, a threat of further confiscation of assets is a possibility, including his shares of ELEKTRA:MX as Mr. Ricardo Salinas continues to demonstrate his defiance to pay taxes due. We deem this to be a Material Event as defined and an Event of Default under Section VI.3(g) of the SLA.

# ASTOR ASSET MANAGEMENT 3 LIMITED

On or about June 13th, 2024 it is publicly reported that the Mr. Ricardo Salinas has been ordered to pay One Billion United States Dollars (US$1,000,000,000) in taxes. The court rulings are not final and represent a substantial amount of Mr. Ricardo Salinas assets. We deem this to be a Material Event as defined and an Event of Default under Section VI.3(g) of the SLA.

Therefore, yet another Event of Default has occurred for which there is no cure.

**Misrepresentation on Know Your Client Form**

On the KYC Form, you had misrepresented that there are no lawsuits, arbitrations, claims or demands for damages.

**Failure to Make Regulatory Announcement**

As an "Affiliate Entity/Insider" you were obligated to make a regulatory announcement as to this loan, yet you had failed to do so. We deem this to be a Material Event as defined and an Event of Default under Section IV.2 of the SLA.

**Suspension of Trading of Issuer**

On Friday July 26th, 2024 you had requested of Mexican Stock Exchange that the securities of Issuer are suspended from trading. The securities of Issuer have not traded now for six (6) trading days. This undermines the Collateral and is a breach of the SLA. We deem this to be a Material Event as defined and an Event of Default under Section VI.3(c) of the SLA which states:

*If the class of securities provided as Pledged Collateral is delisted or trading is halted for five (5) or more Business Days by a regulatory agency or otherwise.*

# ASTOR ASSET MANAGEMENT 3 LIMITED

**Public Announcement as to Fraud of Issuer**

On Friday July 26th, 2024 you had released a public announcement declaring that you had learned of a "possible fraud by depositories of your shares". We deem this to be a Material Event as defined and an Event of Default under Section VI.3(g) of the SLA.

**Downgrade of Issuer by Fitch**

On March 11th, 2024 Fitch downgrades Issuer and states; "The downgrade reflects Fitch's concerns about corporate governance practices at Grupo Salinas, which controls Elektra, Total Play and TV Azteca".

**History of Non-Payment of Liabilities**

The Guarantor has a history of failing to pay his creditors as it the case with TV Azteca, threat of bankruptcy and Guarantor releasing public statements that his firm is "too poor to pay US bondholders the tens of millions owed". We deem this to be a Material Event as defined and an Event of Default under Section VI.3(g) of the SLA.

**Failure to Disclose Material Information and Provide Requisite Notification to Lender**

It has come to our attention that Mexican tax authorities had threated to confiscate assets of Salinas/Grupo Elektra which you failed to disclose to the Lender. Such information involving the confiscation of the Borrower's assets is deemed a "Material Event" pursuant to Section I subsection 40 of the SLA because if the Borrower's Collateral were to be confiscated, it would undoubtedly affect the Lender's lien:

> ***"Material Event"*** *shall mean any event or possible outcome which may undermine or alter the value of Collateral or prejudice Lender's standing Lien.*

# ASTOR ASSET MANAGEMENT 3 LIMITED

A Material Event upon the financial condition of Borrower, Guarantor or Issuer is an Event of Default pursuant to Section VI.3(g) of the SLA.

Moreover, your failure to disclose the threatened confiscation of assets to the Lender is a direct violation of the Material Information clause contained in Section III, subsection 3 of the SLA which is set forth below:

> ***Material Information.*** *Borrower and Guarantor have tendered any and all relevant and material information regarding the Pledged Collateral and of the Issuer and all such relevant and material information has been disclosed and provided by Borrower and Guarantor to Lender. During the Loan Term, Borrower and Guarantor will continue to voluntarily provide all such relevant and material information to Lender and not withhold information deemed to be Material.*

The aforementioned lack of disclosures also constitutes a breach of the "Full Disclosure" provisions contained in Section IV.3 of the of the SLA as follows:

> ***Full Disclosure.*** *Borrower and Guarantor further represents and warrants that all statements and documentation it has provided to Lender directly or through its agents in connection this Agreement are true, complete, and do not omit any material facts or information, which if provided, would have impacted Underwriting prudency. Borrower and Guarantor consent to provide to Lender any and all relevant material information which is necessary for any Lender to conduct a prudent risk assessment evaluation of Issuer, Guarantor and Borrower.*

Additionally, Section IV of the SLA contains *"Borrower's Warranties and Obligations" and* subsection 9 therein requires the Borrower and Guarantor to promptly inform the Lender in writing if any creditor has sought or is threatening to seek confiscation of the Borrower or Guarantor's property. See, Section IV, subsection 9 of the SLA set forth below:

> ***Notification to Lender.*** *Upon occurrence of any of any of the foregoing events or whenever they shall occur, the Borrower or Guarantor shall promptly inform*

# ASTOR ASSET MANAGEMENT 3 LIMITED

*Lender in writing if a) Borrower or Guarantor has filed for Bankruptcy or filed any petition seeking creditor protection; b) any creditor of Borrower or Guarantor has taken legal action against Borrower or Guarantor to recover debts owed to it; c) any creditor has sought or is threatening to seek confiscation or garnishment of property of Borrower or Guarantor. Absent of the preceding events, Borrower and Guarantor will once per year, on each anniversary of the Effective Date, submit a written attestation to Lender representing that to the best of Borrower's knowledge none of the preceding events had taken place.*

Pursuant to Section IV, subsection 9 of the SLA, the Borrower unequivocally should have provided written notification to the Lender that the Mexican tax authorities had threatened to confiscate the assets of Salinas/Grupo Elektra. At no time had you contacted the Lender to provide material information as required. The Borrower's failure to provide such written notification is obviously an "omission" intended to mislead the Lender, and as such, it is an Event of Default under Section VI(d) of the SLA.

*If any representation or warranty made by Borrower or Guarantor in this Agreement or in any statement furnished in contemplation of obtaining a Loan shall prove to have been knowingly untrue, omitted or misleading in any material respect.*

### Failure to Comply with Annual Notice Provision

Section IX.23 of the SLA required the Borrower and Guarantor to provide an annual statement on the anniversary of the Effective Date throughout the Term of the Loan, declaring whether Borrower or Guarantor had obtained other loans from any third parties by pledging securities of the same Issuer; whether there has been a material change in the Borrower's or Guarantor's financial condition such as bankruptcy or insolvency; or if any material lawsuits had been filed against them. See, Section IX.23 of the SLA, which is set forth below:

*Notice. Borrower and Guarantor further represent and warrant that they will yearly, on the anniversary of the Effective Date, submit a written statement to Lender by means of declaration stating whether Borrower or Guarantor obtained*

777 Dunsmuir Street, Suite 1400
Vancouver, British Columbia, Canada V7Y 1K4

# ASTOR ASSET MANAGEMENT 3 LIMITED

*any other loans from any third parties pledging securities of same Issuer and whether there has been a material change in Borrowers or Guarantors financial condition, such as bankruptcy or insolvency filing of Borrower or Guarantor or of any entity controlled by Borrower or Guarantor. Borrower and Guarantor must also declare if any material lawsuit has been filed against it.*

The Borrower and Guarantor were mandated to produce the requisite annual statement. They have completely and utterly failed to provide this to the Lender as required under Section IX.23 of the SLA for any year. We deem this to be a Material Event as defined and a breach of Section IX.23 of the SLA.

## Material Earnings Event

Simply Wall Street has released an analysis on July 26, 2024 that the Issuer's earnings have declined by 34% per year over the past 5 years and deemed this to be a major risk. Second Quarter earnings for Issuer are reported as MXN$2.90 loss per share, versus MX$N22.34 profit Second Quarter of 2023.

The Issuer reported a MXN$7.3 billion loss versus a profit of MXN$4.94 billion for the same period last year.

On Friday July 26, 2024 the stock of the Issuer dropped ten percent (10%), which according to Bloomberg Financial News is the "biggest intraday drop since June of 2017".

We deem this to be a Material Event upon the Issuer as defined and an Event of Default under Section VI.3(g) of the SLA.

A Material Event is defined within the SLA as:

# ASTOR ASSET MANAGEMENT 3 LIMITED

*Material Event"* shall mean any event or possible outcome which may undermine or alter value of Collateral or prejudice Lender's standing Lien.

## Custody of Collateral Interference

On multiple occasions you and your agents have contacted the Custodian Brokers interfering in the custody of the Collateral and dictating to Lender where and how the Collateral should be custodied. This conduct has been consistent and started in the Fourth Quarter of 2021 when you demanded that the Collateral move from Weiser Global Capital Markets ("Weiser") elsewhere. We accommodated your request and moved the uncollateralized portion of the Collateral to Tavira Monaco SA ("Tavira"). You continued in years 2022 and 2023 and 2024 to question where and how the Collateral is custodied, demanding to know where and how and who the sub-custodians are of Weiser and Tavira and what they should and should not be doing with the Collateral. We reference your letter to Lender and Custodian Brokers dated June 10th, 2024 which contains numerous breaches of the SLA, demanding that the Collateral not be lent out, when in the SLA you expressly agreed and understood that the Collateral will be subject to provisions of the Encumbrance Clause and your agents were repeatedly told to read the SLA and its provisions.

Your June 10th, 2024 letter to Custodian Brokers contains numerous demands and threats which are very serious, are deemed as interference and are contrary to the Terms and Conditions of the SLA which you had willingly executed while being represented by counsel.

The Know Your Client form which you had completed for both the Borrower and for the Guarantor, you had ticked the box that you were being represented by an attorney. Thus, you were aware and advised of your contractual obligations under the SLA. That, together with the fact that the Guarantor is a highly seasoned and sophisticated professional investor who commands perfect knowledge of the English language, there is no basis for you to repeatedly defy the SLA and its Terms and Conditions.

You repeatedly continued to demand that the Collateral from Weiser and Tavira is moved to a brand new Custodian, despite being repeatedly told that custody and selection of Custodian Broker is not for Borrower or Guarantor to decide as is clearly stated in Section IV.10 of the SLA, thus

# ASTOR ASSET MANAGEMENT 3 LIMITED

continuing to defy and challenge your contractual obligations. We deem this to be a Material Event as defined and a breach.

The SLA is very clear that the Lender selects the Custodian Broker, yet you continue to demand how and where the Collateral is custodied demanding to know who the sub-custodians are, making demands upon the sub-custodians and what should happen to the Collateral which is in the control of Lender and the Custodian Brokers, in violation of the SLA. Interference is strictly prohibited under the SLA Section III.4 and Section IV.10 which states:

> *During the pendency of this Loan, neither the Borrower nor Guarantor will seek injunctive relief or interference from any court of law, regulatory body, Transfer Agent, custodian, sub-custodian, Depository Broker, central depository or stock exchange requesting to invalidate, suspend, limit, impede, terminate or restrict this Agreement or freeze the shares. Injunctive relief by Borrower or Guarantor or any interference by Borrower or Guarantor, central depository or regulatory agency shall be an immediate and an incurable Event of Default. Neither Borrower nor Guarantor will interfere in any way or challenge the validity or enforceability of this Agreement, and the same shall be a Breach thereof.*

Amongst other provisions, the SLA states:

> *Neither Borrower nor Guarantor will undermine or interfere with securities of Issuer.*

> *Lender reserves the right to maintain dominion over the Collateral during the Loan Term, which affords Lender the right to deal-in, dispose or convert over the Pledged Collateral.*

## **Lock-Up Breach**

In the month of July 2024, you have repeatedly demanded to repay the Loan early, despite being repeatedly told that the SLA does not provide for an early repayment. This is a breach of Section VI(3)(e)(f) and Section II(5) and Section IV.3 prohibiting early termination

# ASTOR ASSET MANAGEMENT 3 LIMITED

## Repudiation of Loan Agreement

On August 2nd, 2024, acting for and on behalf of Borrower and Guarator, Mr. Eduardo Gonzalez Salceda Sanchez had sent an email rescinding the Loan Agreement, the Closing Statements and the Custodian Management Agreement. This is a breach of Section VI(2)(e) which states:

*If any of the Loan Documents shall at any time after their execution and delivery for any reason, cease to be in full force and effect or shall be declared invalid, null or void or the validity, obligations hereunder or enforceability thereof shall be contested, repudiated, disaffirmed or challenged by Borrower or Guarantor, its agents or counsel or by any other person or entity acting on behalf of or for the Borrower or Guarantor.*

Further, by sending the subject email, you had breached Section IX.31 which states:

*Early termination or rescission is not permitted under the Agreement, regardless of the reason or need to do so, and this Agreement will be valid and in full force and effect after its execution for its full Term, provided it can only be terminated after its maturity, jointly by both Parties in written form only and memorialized as an Addendum or mutual written release, or as stipulated herein and for no other reason. If the Loan Documents shall, at any time after their execution and delivery for any reason, cease to be in full force and effect or shall be cancelled, declared invalid or enforceability thereof shall be contested or challenged by Borrower, Guarantor or by any other person for or on the Borrower's or Guarantor's behalf, the Loan will be considered in default. The Lender retains the right to convert the Collateral during the Loan Term, and thereafter should Borrower or Guarantor default.*

## Fraud and Deception

The Lender has recently learned that Ricardo Benjamin Salinas Pleigo ("Guarantor") directly and indirectly has been manipulating the price of ELEKTRA shares for years. Substantial part of Guarantors net worth is tied to the shares of ELEKTRA and Guarantor has

# ASTOR ASSET MANAGEMENT 3 LIMITED

deployed various tactics to artificially prop-up shares of ELEKTRA and withhold this information from the general public and the Mexican regulators. Lender believes public disclosure of this will cause the value of Collateral to drastically diminish, thus undermining the Collateral.

The Lender has recently learned that in addition to the above, the Guarantor has in 2005 was charged with fraud and swindling investors by the United States Securities and Exchange Commission in an elaborate scheme to conceal Guarantors role in a series of transactions through which he personally profited US$109,000,000 USD. Executives of TV Azteca who directly worked under the direction of Guarantor were also charged with fraud in the "elaborate scheme'. According to SEC, the charges are the first against a Mexican company trading on a US stock exchange.

The United States Securities and Exchange Commission ("SEC") charged Guarantor with filing false reports with respect to TV Azteca, who's US counsel resigned due to the concealment and false reporting. As part of a settlement with the United States Securities and Exchange Commission, the Guarantor agreed to a fine of US$7,500,000 USD and was barred for life to serve in a position of officer or director in any United States public company.

Also, as a result, TV Azteca was delisted from the United States public securities exchange. The SEC stated that it will use the proceeds of the fine to compensate investors who were defrauded by the Guarantor.

Mexican Finance Minister Francisco Gil Diaz asked prosecutors to bring criminal charges against the Guarantor for insider trading and stock manipulation. In 2005 the Guarantor paid a fine of US$2,300,000 to Mexican regulators for insider trading and securities law violations.

We deem this to be a Material Event upon the Issuer as defined and an Event of Default under Section VI.3(g) of the SLA.


**Bribery Allegation**


In May of 2024 a bank owned by the Guarantor has been accused of bribing a US congressman, Representative Henry Cuellar. As a result, the congressman has been charged by the US Justice Department. An investigation is under way by the US Justice Department to determine any involvement by the Guarantor himself. We deem this to be a Material Event upon the Issuer as defined and an Event of Default under Section VI.3(g) of the SLA.

# ASTOR ASSET MANAGEMENT 3 LIMITED

**Lender's Remedy**

It is important to note that Pursuant to Section VI.2 of the SLA, the Lender is not obligated to complete the Loan transaction to Maturity if the Borrower and Guarantor fail to comply with the terms and conditions of the SLA.

*Valid Transactions and Events of Default. In order for the transaction to be completed to Maturity by the Borrower, the Borrower and Guarantor must fulfill in the performance of and observance of any covenant, representation, provision or agreement contained herein and not default in any other loan document or provision.*

This letter has set forth in detail some but not all of the breaches of the SLA and Events of Default that have occurred. Ultimately, as you have failed to cure the Events of Default detailed herein and not able to cure them, the Lender hereby declares an Event of Default and hereby accelerate all costs and fees due thereunder.

This letter is without prejudice to all of Astor's rights and remedies in accordance with the SLA. We reserve the right to amend this Notice of Default at any time of our choosing.

Sincerely,

*Astor Asset Management 3 Ltd*

Astor Asset Management 3 Ltd.
Global Operations Department

# EXHIBIT 63

**From:** Global Operations <global.operations@astorassetgroup.com>
**Date:** August 5, 2024 at 14:22:22 CDT
**To:** Eduardo Gonzalez Salceda Sanchez <egsalceda@gruposalinas.com.mx>,
Ricardo Benjamin Salinas Pliego <rsalinas@gruposalinas.com>
**Subject: Notice of Default Letter**


Good Day,

You are hereby advised that your loan has now Accelerated and you owe the
amount funded plus various costs, fees, charges and expenses which you
failed to pay. This is how the loan agreement reads, which you executed at the
advise of counsel which represented you at the time.

You have until third Friday August  9, 2024 to resolve this, after which we
will no longer afford any settlement resolution and we will pursue all sums
owed according to the Loan Agreement.

At the present time, we estimate that your debt to us is approximately $120M
USD, which will accrue at the default interest rate of 18% annually. We intend
to vigorously prosecute our right to these funds and we intend to do so in the
court of law.

The Loan Agreement clearly states that a default will cause Loan Acceleration
plus forfeiture of the Pledged Collateral. Hence, we have a contractual right to
all the loan proceeds disbursed to you plus the Collateral.

This email is being sent without prejudice and we reserve all of our rights
according to the Loan Documents.

**Global Operations**
777 Dunsmuir Street, Suite 1400, Vancouver, BC V7Y 1K4
+1 888 823 0028
Canadian Business #790932503RC0001
Money Service License # M21136919
AstorAssetGroup.com



Please note that while we do our best to respond all inquiries within 24-48 hours, a reply in some instances may take longer.

This e-mail, including attachments, is intended for the person(s) or company named and may contain confidential and/or legally privileged information. Unauthorised disclosure, copying or use of this information may be unlawful and is prohibited. If you are not the intended recipient, please delete this message immediately and notify the sender.

# EXHIBIT 64

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHENMING HOLDINGS (HONG KONG)
LIMITED, *a Hong Kong limited company,*

                                            Plaintiff,

                        -against-

JOHN DOES 1-10, individuals and/or entities
whose names are currently unknown to Plaintiff,

                                            Defendants.

Civil Case No. 24-cv-935

**VERIFIED COMPLAINT AND
JURY TRIAL DEMANDED**

Plaintiff Chenming Holdings (Hong Kong) Limited ("Chenming" or "Plaintiff"), by and
through its attorneys, King & Wood Mallesons LLP, as and for its Verified Complaint against
Defendants John Does 1-10 (collectively "Defendants"), alleges as follows:

<u>**NATURE OF THE ACTION**</u>

1.      This is a civil action for conversion, unjust enrichment, fraudulent inducement,
and conspiracy to defraud, arising under the laws of the State of New York.

2.      Plaintiff seeks relief under the laws of the State of New York, including equitable
and monetary relief, punitive damages, costs, legal expenses and reasonable attorneys' fees, and
all other appropriate relief to which it is entitled under law.

<u>**PARTIES**</u>

3.      Chenming is a company organized under the laws of the Hong Kong Special
Administrative Region ("Hong Kong") with its registered address at No. C, 16/F., Chinaweal
Centre, 414-424 Jaffe Road, Wanchai, Hong Kong.

4.      The true name and capacity of Defendants are unknown to Plaintiff at this time.
Upon information and belief, Defendants are the ultimate beneficiary owners and/or alter egos of

1

Union Pacific Capital 1 Ltd. ("UPC1"), Astor Asset Management 2 Limited ("Astor2"), Cornelius Vanderbilt Capital Management LTD ("Vanderbilt," together with UPC1 and Astor2, "Lenders").  Acting under the direction and on behalf of the Defendants, the Lenders entered into three separate loan transactions underlining the fraudulent scheme with Plaintiff.

5.      Upon information and belief, Defendants reside in or have their principal places of business in the following States: New York, California, North Carolina, and/or Georgia.

6.      Plaintiff reasonably believes that information obtained through discovery will lead to the identification of Defendants' true names, identities, and locations.  Plaintiff reserves its right to amend the Complaint upon ascertaining the identities of Defendants and the nature and extent of their involvement in the fraudulent scheme.

## JURISDICTION AND VENUE

7.      Jurisdiction is proper in this Judicial District pursuant to 28 U.S.C. § 1332. Complete diversity exists in this action as Plaintiff is a Hong Kong company and Defendants are citizens and/or subjects of the States of New York, California, North Carolina, and/or Georgia. In addition, the amount in controversy exceeds $75,000.

8.      Venue in this Judicial District is proper under 28 U.S.C. § 1391(b).  Although the true identity of Defendants is unknown to Plaintiff at this time, Defendants, upon information and belief, may be found in this District, and/or a substantial part of the acts complained on herein occurred in this District.  Upon information and belief, personal jurisdiction in this District is also proper, because Defendants are the ultimate beneficiary owners of multiple bank accounts including, but not limited to, JPMorgan Chase Bank NA; Citibank, NA, New York; and Community Federal Savings Bank accounts, which are established within this District and Defendants, through the Lenders, directed Plaintiff to send deposits, interest, maintenance fees,

and/or custody fees in connection with the loan transactions to these bank accounts located in this District.

## FACTUAL BACKGROUND

9.     Between January 2020 and April 2021, Defendants, under the cover of separate shell companies, entered into three separate securities loan transactions with Plaintiff and loaned a sum of approximately $67.5 million ("Loans") to Plaintiff.

10.     Plaintiff is the shareholder of a public company Shandong Chenming Paper Holdings Limited ("ListCo"), whose shares are listed on the Shenzhen Stock Exchange and Hong Kong Stock Exchange.  To secure the Loans, Plaintiff provided 210,717,563 Class B shares and 153,414,000 Class H shares of the ListCo (200488:SZ; 01812:HK) as collateral ("Collateral") to the Loans.

11.     Upon information and belief, the Lenders executed the loan agreements under different fictitious names: Michael Romanoff (Astor2), Christopher Warner (Vanderbilt), Winstone Carrington (UPC1).  Plaintiff has never communicated with or met any individual with these names.  These fictitious names had never appeared in any communication between Plaintiff and the Lenders *prior to* the execution of the loan agreements, and have never appeared in any subsequent communications.

12.     Plaintiff diligently performed its obligations under the loan agreements, including by making payments of principal and interest as required, and "topping up" a substantial amount of additional shares of the ListCo as well as cash, following repeated threats by Lenders that the Collateral was subject to immediate forfeiture due to its alleged drop in market price and Lenders would declare Events of Default unless Plaintiff deposited additional shares or cash.

3

13.     On or about February 10, 2023, upon full repayment of the loan principal under the Astor2 Agreements (defined below), Plaintiff demanded that Astor2 return the shares provided to secure the Astor2 Loan pursuant to the parties' agreement.  Astor2, however, ignored Plaintiff's multiple requests in February and March 2023, and refused to return the shares or refund additional cash deposited by Plaintiff following Margin Calls[1].

14.     This was the first time Plaintiff realized that Lenders, acting under the direction of Defendants, never intended to return the Collateral to Plaintiff.

15.     By that time, however, Plaintiff had already substantially paid off the principal amount of the Vanderbilt Loan (defined below) and had been making regularly scheduled payments relating to the UPC1 Loan (defined below).

16.     Concerned about the security of the Collateral, Plaintiff withheld further repayments on the UPC1 and Vanderbilt Loans and demanded that UPC1 and Vanderbilt provide proof that the shares it deposited under the respective loan agreements remained safe in custody with the custodian broker appointed by the parties and reassurances that UPC1 and Vanderbilt intend to return the shares upon the full repayment of the UPC1 Loan and Vanderbilt Loan.

17.     UPC1 refused to disclose the whereabouts of the Collateral and refused to provide any reassurance.  Instead, UPC1 accused Plaintiff of breaching the UPC1 Agreement (defined below) by failing to make further repayments and used that as an excuse to issue notices of default against Plaintiff.  Vanderbilt, on the other hand, never responded to Plaintiff's requests.

---

[1] "Margin Calls" is defined in the Astor2 Agreements and requires Chenming to top up shares or cash equal to 20% more than the fair market price of the Collateral in the event the Collateral falls to less than 60% of its fair market price.

4

18.     Left with no choice, Plaintiff had to resort to other means to locate the Collateral, including by making an application to the High Court of Hong Kong, only to find out, to its complete surprise, that almost all of the shares had been fraudulently transferred or sold by Lenders shortly after they were deposited with the custodian broker.

19.     What is even more concerning is the fact that Lenders procured significant revenues—in amounts substantially higher than the face value of the Loans—from the fraudulent sale of the Collateral.  Nonetheless, Lenders and Defendants intentionally withheld these facts and relentlessly demanded repayments and additional deposits from Plaintiff.

20.     This action therefore involves a carefully designed scheme by Defendants to enter into sham loan transactions with Plaintiff under the cover of separate shell companies, and fabricate defaults by Plaintiff under the loan agreements, in order to ultimately take possession and control of the Collateral and deprive Plaintiff of its rights to and interest in the same.

### The Astor2 Agreements

21.     On January 17 and September 17, 2020, Plaintiff entered into two Stock Loan Agreements ("Astor2 Agreements") with Astor2, pursuant to which Astor2 agreed to loan Plaintiff up to $35,000,000 ("Astor2 Loan").  The agreements are governed by Hong Kong law.

22.     To secure the Astor2 Loan, Plaintiff provided 110,000,000 Class B shares of the ListCo under the first agreement ("Astor2 B Shares Agreement"), and 95,000,000 Class H shares of the ListCo under the second agreement ("Astor2 H Shares Agreement").  The value of the Class B and H shares provided to Astor2, based on their trading prices at the time the shares were deposited with the custodian broker, was approximately $88,662,546.86.

23.     Plaintiff also entered into two Custodian Management Agreements and deposited those shares with a custodian broker designated by Astor2, i.e., Weiser Global Capital Markets,

an entity registered in Bahamas ("Weiser"). Because Weiser was not a qualified holder of B or H shares, it in turn appointed China Merchants Securities (HK) Co., Ltd ("CMS") and ICBC International Securities Limited ("ICBCI"), who are qualified holders, as custodians. Weiser subsequently opened accounts with CMS and ICBCI and instructed Chenming to deposit shares into these accounts.

24.     A person with the name "Michael Romanoff" whose title appears to be "Managing Member" signed the agreements on behalf of Astor2. Plaintiff had never heard of or met this person prior to the signing of the Astor2 Agreements and has never received any communication from this person.

25.     Plaintiff drew a total of $40,292,899.39 in loan principal under the Astor2 Agreements, consisting of $15,593,873.64 under the Astor2 B Shares Agreement and $24,699,025.75 under the Astor2 H Shares Agreement.

26.     On or about May 9, 2022, Astor2 issued a Margin Call Notice, demanding Chenming to deposit additional shares and cash. On or about May 15, 2022, Chenming proposed full repayment of the Astor2 Loan in exchange for the return of the Collateral. Astor2 declined Chenming's proposal.

27.     On or about May 19, 2022, pressed by Astor2's threats to forfeit the Collateral, Plaintiff deposited additional cash in the amount of $8,105,800 and $7,866,000 as further security under the Astor2 B Shares Agreement and Astor2 H Shares Agreement, respectively, into the bank account designated by Astor2.

28.     Between January and April 2023, Astor2 intentionally and fraudulently induced Plaintiff to make full repayment on the Astor2 Loan by repeatedly reassuring Plaintiff that it would ask its "loan committee" to approve and "swift[ly]" process the return of the Collateral

6

upon the full satisfaction of all loan amounts. Relying on these promises, Plaintiff fully repaid the Astor2 Loan funds on February 10, 2023. However, Astor2 repeatedly invented new excuses to delay the return of the Collateral, such as that the weekly loan committee meeting did not take place. On April 17, 2023, Astor2 issued a letter notifying Plaintiff that its "loan committee" decided to reject Plaintiff's request for the return of the shares and declare the immediate acceleration of the loan, and considered the "filed closed."

29. Plaintiff was outraged and devastated. As explained *supra*, Plaintiff had fully repaid the Astor2 Loan by February 2023. Specifically, in addition to paying off the loan principal, Plaintiff made interest and fee payments on the Astor2 Loan in the following amounts: (a) $2,178,386.31 in interest, $116,992.56 as maintenance fees, $243,174.00 as custody fees, $864,465.90 as origination fees, and $1,000 in legal expenses under the Astor2 B Shares Agreement; and (b) $1,312,023.79 in interest, $136,329.52 as maintenance fees, $281,867.59 as custody fees, $486,348.00 as origination fees, and $1,000 in legal expenses under the Astor2 H Shares Agreement.

30. Astor2 directed Plaintiff to send payments to the following bank accounts in this District:

> Deltec Bank and Trust Limited
> Deltec House Lyford Cay, P.O. Box N-3229, Nassau, Bahamas
> Bank: Citibank, NA, New York
> Beneficiary Account Number: 25602100
> Beneficiary Bank ABA: 021000089
> Beneficiary Bank SWIFT: CITIUS33XXX
>
> Sierra Universal Corp
> 5830 E. 2nd Street, Ste. 7000 #2419 Casper, WY 82609
> Bank: JPM Chase
> Beneficiary Account Number: 675179672
> Beneficiary Bank: JPM Chase
> Beneficiary Bank Address: 270 Park Ave 31st Floor, New York, NY 10017, United States

Beneficiary Bank ABA: 021000021
Beneficiary Bank SWIFT: CHASUS33XXX

31.     To date, Astor2 has refused to return the shares and the additional deposits.

**The UPC1 Agreement**

32.     On October 19, 2020, Plaintiff and UPC1 entered into a Securities Loan Agreement ("UPC1 Agreement")[2].  Pursuant to the UPC1 Agreement, UPC1 agreed to loan Plaintiff up to $17,000,000.00 ("UPC1 Loan").  The UPC1 Agreement is governed by the laws of England & Wales.

33.     A person with the name "Winstone Carrington" whose title appears to be "Senior Vice President" signed the UPC1 Agreement on behalf of UPC1.  Plaintiff had never heard of or met this person prior to the signing of the UPC1 Agreement and has never received any communication from this person.

34.     UPC1 loaned Plaintiff $14,674,492.77 under the UPC1 Agreement.  To secure the loan, Plaintiff provided a total of 80,000,000 Class B shares of the ListCo and deposited the same with the same custodian broker Weiser pursuant to a similar Custodian Management Agreement. The value of the Class B shares, based on their trading prices at the time the shares were deposited with the custodian broker, was approximately $31,729,653.04.

35.     Plaintiff had been making regular and timely payments on the UPC1 Loan until around April 2023, when it discovered the fraudulent scheme by Defendants.  As of the end of 2023, Plaintiff had paid off $2,037,307.53 in loan principal, plus $992,651.36 in interest,

---

[2] The UPC1 Agreement was dated September 18, 2020, but it was executed by Chenming on October 19, 2020.

$122,760.00 as maintenance fees, $371,372.64 as custody fees, $440,234.79 in loan generation fees, and $5,000 in closing costs.

36.     UPC1 directed Plaintiff to send payments to the following bank accounts in this District:

> Deltec Bank and Trust Limited
> Deltec House Lyford Cay, P.O. Box N-3229, Nassau, Bahamas
> Beneficiary Bank: Citibank, NA, New York,
> Beneficiary Account Number: 25602100
> Beneficiary Bank ABA: 021000089
> Beneficiary Bank SWIFT: CITIUS33XXX
>
> UPC Holdings Ltd.
> 155 E. 44th Street
> New York, NY 10017, USA
> Bank: Community Federal Savings Bank
> Beneficiary Bank Address: 89-16 Jamaica Ave
> Woodhaven, NY 11421, USA
> Beneficiary Account Number: 822000317861
> Beneficiary bank SWIFT: CMFGUS33
>
> Lviv Estate Holdings Ltd
> 142 Gold Springs Ct
> Canton, GA 30114, USA
> Bank: JP Morgan Chase Bank NA
> Beneficiary Bank Address: 270 Park Ave
> New York, NY 10017, USA
> Beneficiary Account Number: 727275510
> Beneficiary bank SWIFT: CHASUS33

37.     In or around early May 2023, Plaintiff began to investigate into the whereabouts of the B Shares provided as collateral under UPC1 Agreement. Plaintiff requested the complete transaction records held by the shareholders of those shares from China Securities Depository and Clearing Co. Ltd., a central securities depository. Based on the records disclosed by the central depository, Plaintiff was unable to identify accounts that could possibly hold the 80 million shares.

38.     Concerned about the security of the shares, Plaintiff wrote to UPC1 on May 5, 2023, seeking disclosure of the whereabouts of the shares and proposing a conference call with UPC1.  Several hours later, UPC1 sent Plaintiff a Margin Call Notice purportedly pursuant to the drop of the share price, demanding additional shares or cash as further security, but otherwise refused to disclose the whereabouts of the shares or hold a conference call with Plaintiff.

### The Vanderbilt Agreement

39.     On April 17, 2021, Plaintiff entered into a Collateralized Securities Loan Agreement ("Vanderbilt Agreement")[3] with Vanderbilt, pursuant to which Vanderbilt agreed to loan Plaintiff up to $45,000,000 ("Vanderbilt Loan").  The Vanderbilt Agreement is governed by Singapore law.

40.     A person with the name "Christopher Warner" whose title appears to be "Executive Vice President" signed the agreement on behalf of Vanderbilt.  Plaintiff had never heard of or met this person prior to the signing of the Vanderbilt Agreement and has never received any communication from this person.

41.     Vanderbilt issued $12,572,187.35 in loan funds to Plaintiff.  To secure the Vanderbilt Loan, Plaintiff pledged 58,414,000 Class H shares of the ListCo and deposited the same with Weiser as the custodian broker, pursuant to a similar Custodian Management Agreement.

42.     In response to Margin Call Notices issued by Vanderbilt on August 2, 2021 and June 16, 2022, Plaintiff deposited additional cash in the amount of $5,640,000 and $5,851,421.50, respectively, as further security to the Vanderbilt Loan.  In or around February

---

[3] The Vanderbilt Agreement was dated April 12, 2021.

10

2023, Plaintiff further deposited an additional 20,717,563 shares of Class B stock of the ListCo

with another broker appointed by Vanderbilt, Armira Capital Limited, pursuant to a separate

Custodian Management Agreement.  The value of the Class B and H shares provided to

Vanderbilt, based on their trading prices at the time the shares were deposited with the custodian

broker, was approximately $48,594,383.04.

43.    As of April 2023, Plaintiff has paid off $6,150,327.92 in loan principal and the

following amounts in interest and fees: $439,614.77 in interest, $62,860.94 as maintenance fees,

$182,602.45 as custody fees, $408,596.09 in loan generation fees, and $5,000 in closing costs.

44.    Vanderbilt directed Plaintiff to send payments to the following bank accounts in

this District:

> Deltec Bank and Trust Limited
> Deltec House Lyford Cay, P.O. Box N-3229, Nassau, Bahamas
> Beneficiary Bank: Citibank, NA, New York,
> Beneficiary Account Number: 25602100
> Beneficiary Bank ABA: 021000089
> Beneficiary Bank SWIFT: CITIUS33XXX
>
> C Vanderbilt Management Ltd.
> 600 Broadway Albany, NY 12207
> Beneficiary Bank: JP Morgan Chase Bank NA
> Beneficiary Bank Address: 270 Park Ave
> New York, NY 10017, USA
> Beneficiary Account Number: 856519621
> Beneficiary Bank SWIFT: CHASEUS33
>
> C Vanderbilt Management Ltd.
> 600 Broadway Albany, NY 12207
> Beneficiary Bank: Community Federal Savings
> Beneficiary Bank Address: 89-16 Jamaica Ave
> Woodhaven, NY 11421, USA
> Beneficiary Account Number: 822000321912
> Beneficiary Bank SWIFT: CMFGUS33

45.    Moreover, the value of the additional cash and shares deposited by Plaintiff in

June 2022 far exceeds the outstanding amount of the Vanderbilt Loan. Vanderbilt continues to

withhold these substantial assets, including $5,851,421.50 in cash, and refuses to return the same

to Plaintiff in accordance with the Vanderbilt Agreement.

**UPC1 Further Impedes Plaintiff's Efforts to Recover the Collateral by Filing Arbitration**

46.     On or about June 14, 2023, UPC1 commenced arbitration proceedings in the

London Court of International Arbitration ("LCIA") against Plaintiff, seeking declaratory

judgment and damages for alleged disparaging statements made by Plaintiff, among other things

("LCIA Arbitration"), even though UPC1's remedy under the agreement is strictly limited.

Section 4.2 of the UPC1 Agreement provides:

> Limited Recourse. Lender's sole recourse for nonpayment of the
> Loan is the Collateral and *Lender shall make no claim against*
> *Borrower* or any affiliate, successor, or assign of Borrower
> ("Borrower's Affiliates") or institute any litigation or claim
> (however described) against Borrower or any of Borrower's
> Affiliates in the event the value of the Collateral is insufficient to
> cover amounts due Lender hereunder.

*See* UPC1 Agreement § 4.2.

47.     The LCIA Arbitration is but another concerted attempt by the Lenders and

Defendants to further their fraudulent scheme and delay Plaintiff's efforts in recovering the

Collateral.  The alleged "disparaging statements" UPC1 complained of are those statements in

Plaintiff's demand letters that UPC1 has unreasonably refused to disclose the whereabouts of the

shares and fraudulently disposed of the same in violation of the UPC1 Agreement.  Those

statements are accurate and true.

48.     Plaintiff asserted counterclaims, seeking redemption of the UPC1 Collateral, or,

in the alternative, monetary damages equal to the difference between the value of the shares

provided to UPC1 and the face value of the UPC1 Loan, as at the date of the appropriation of the

Collateral or the Award, and the return of paid interests and fees.

49.     On August 17, 2023, UPC1 suddenly changed its position and revised the estimated value of its claims in the arbitration from $264,423,911.01 to $1.00.  The explanation offered by UPC1 was that it decided to lower the amount of its claimed damages "based solely upon the par value of the shares pledge by the [Plaintiff] as collateral for the loan" and "given the shares have no par value, this claim should now be valued as a nominal amount of $1.00 USD."

50.     On October 31, 2023, UPC1 changed course again by further adjusting the amount of its claims.  Among other things, UPC1 claimed for forfeiture of the Collateral and monetary damages in the amount of $1,000,000.

51.     Remarkably, UPC1 has resisted discovery in the LCIA Arbitration, including by refusing to produce any fact witness. Although the tribunal has ordered the parties to complete document production by June 2024, it is doubtful whether and to what extent UPC1 would obey in view of how it conducted itself throughout and the tactics it has employed in the arbitration.

52.     This action is therefore imperative and, the only viable alternative, for Plaintiff to discover the true identity of the fraudulent actors behind the so-called Lenders.

**Further Evidence of Defendants' Fraudulent Scheme**

53.     In July 2023, Plaintiff made an application before the High Court of Hong Kong, seeking a Norwich Pharmacal Order requiring non-party disclosures from the two custodian banks CMS and ICBCI regarding the transaction documents of the accounts that received the Collateral under the Loan Agreements.

54.     On October 4, 2023, CMS and ICBCI disclosed certain transaction documents to Plaintiff upon the orders by the High Court of Hong Kong.  Plaintiff's suspicion and concern regarding the fraudulent scheme was further corroborated by the disclosures it received, which

conspicuously show that Defendants began transferring or trading the pledged shares shortly after the shares were deposited and *before* the occurrence of any Event of Default.

55. The disclosures indicate that the first share transfer by Astor2 occurred on May 15, 2020, merely 38 days after the shares were deposited, when it transferred 5,000,000 Class B shares to DBS Vickers Securities. By no later than December 8, 2020, Astor2 had fraudulently sold or transferred the entirety of 110,000,000 Class B shares that were deposited as Collateral. By no later than January 27, 2021, Astor2 had fraudulently sold or transferred the entirety of the 95,000,000 Class H shares that were deposited as Collateral.

56. In the case of UPC1, by January 21, 2021, it had transferred or sold the entirety of the 80,000,000 Class B shares that were deposited as Collateral on November 27, 2020 and January 7, 2021.

57. As to Vanderbilt, by August 4, 2021, it had transferred or sold 58,414,000 Class H shares that were deposited as Collateral. Upon information and belief, 414,000 Class H shares were and may remain in the custody of Weiser, and 20,717,563 Class B shares, valued at approximately $6,561,884.58, were and may remain in the custody of Amira Capital Limited.

58. Upon information and belief, all of these transfers and sales were carried out unilaterally and fraudulently by the Lenders, pursuant to instructions by Defendants, without Plaintiff's knowledge or consent and without or prior to any purported breach by Plaintiff under the Loan Agreements.

59. Significantly, Lenders and Defendants procured a tremendous amount of proceeds from the unauthorized fraudulent sale of the shares, totaling HK$540,983,978.63, approximately $69,280,000, by trading a total of 185,000,000 Class B shares. The remaining 5,000,000 Class B

shares, valued at approximately $1,812,903.23, have been transferred to a third-party custodian (DBS Vickers Securities).

60.     Moreover, Lenders and Defendants received HK$321,027,564.16, approximately over $41,110,000 in proceeds, by trading a total of 77,462,000 Class H shares. They have further transferred 75,538,000 Class H shares, valued at approximately $47,204,452.82,[4] to third-party custodians Citibank, Zundiao Securities Limited, and Fidelity Clearing Canada.

**Plaintiff Discovers the Relationship among the Lenders**

61.     Upon information and belief, all three Lenders are closely affiliated, owned, and controlled by the same Defendants and used as instruments of Defendants' fraudulent scheme.

*Astor2 and UPC1 Are Represented by the Same U.S. Law Firm*

62.     In relation to the Astor2 Loan, in or around January 2023, Astor2 directed Plaintiff to send loan payments to its law firm's "client escrow account," the name of that law firm is Jurist IQ Corp ("Jurist IQ"). Jurist IQ has a New York-based business address at 530 Fifth Ave, 9th Floor, New York, NY 10036.

63.     On August 17, 2023, the same law firm Jurist IQ served a demand letter on Plaintiff on behalf of UPC1 demanding the return of loan funds under the UPC1 Agreement.

64.     More recently, in the LCIA Arbitration commenced by UPC1 against Plaintiff, UPC1's counsel, Fred W. Freitag IV, Esq., submitted a letter from Jurist IQ confirming Jurist IQ's payment of the deposit of arbitration fees on behalf of UPC1. In that letter, Jurist IQ explicitly stated that it "regularly acts as general counsel for UPC." Based on information

_____

[4] The average share price was calculated by dividing total value of the Class H shares deposited by the total number of Class H shares deposited under each agreement.

published by the Disciplinary Board of the Supreme Court of Pennsylvania,[5] Mr. Freitag is an

active member of the State Bar of Pennsylvania with a business address at 1041 Applejack Drive,

Gibsonia, PA 15044.

65.     Moreover, on October 19, 2023, in his communication with the LCIA, Mr. Freitag

inadvertently attached documents from what appears to be another arbitration concerning a

similar loan dispute, where Astor Asset Management 1 Limited ("Astor1") was the claimant.

Upon information and belief, Astor1 and Astor2 are affiliated entities.  Mr. Freitag represents

both Astor entities.

66.     Astor2 is established under the laws of St Kitts & Nevis whereas UPC1 is

established under the laws of Belize.  Neither Lender has any apparent connection with the

United States.  The fact that they are represented by the same U.S.-based law firms in separate

transactions and/or arbitration proceedings governed by different foreign laws indicates that the

individuals or entities behind the Lenders reside or are located in the United States.

*UPC1 and Vanderbilt*

67.     On or about May 5, 2023, Plaintiff received an email from UPC1 with an

attachment titled "Vanderbilt Chenming MOU Addendum – May 3, 2023 – 6-42 PM.pdf."  The

document, however, is an addendum to the UPC1 Agreement and does not concern Vanderbilt.

---

[5] On June 28, 2019, Mr. Freitag received a Public Reprimand from the Disciplinary Board of the
Supreme Court of Pennsylvania, for engaging in professional misconduct by failing to segregate
client-entrusted funds and personal funds and misappropriating client funds.  The Disciplinary
Board also found that Mr. Freitag "has a substantial history of professional discipline," which
constitutes "an aggregating factor" warranting a Public Reprimand.  *See* DB Order No. 188 DB
2017, available at https://www.pacourts.us/assets/opinions/DisciplinaryBoard/out/188DB2017-
Freitag.pdf (last visited November 29, 2023).

This further confirms Plaintiff's belief that all three Lenders are affiliated and controlled by the same Defendants.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

#### Fraud in the Inducement
(Against All Defendants)

68.　Plaintiff repeats and realleges paragraphs 1 through 67 as if fully set forth herein.

69.　Plaintiff executed the Loan Agreements and delivered the Collateral in reliance on material misrepresentations by Defendants, including material misrepresentations made through Lenders, that they would return the Collateral to Plaintiff upon full repayment of the Loan funds.

70.　Those material misrepresentations and false promises are distinct and separate from UPC1's, Astor2's, and Vanderbilt's representations or obligations under the separate Loan Agreements.

71.　Defendants intentionally made those misrepresentations and false promises designed to induce Plaintiff to enter into the Loan Agreements and to deliver the Collateral to and for the benefit of Defendants.

72.　Defendants acted with scienter by making knowingly false representations and promises that they would return the Collateral upon Plaintiff's performance of its obligations under the Loan Agreements, when in fact they had no intention, from day one, of honoring these false representations and promises. Defendants made the material misrepresentations and false promises as part of a fraudulent scheme to deprive Plaintiff of its rights to and interest in the Collateral.

73.    Plaintiff had no reason to doubt the truthfulness of Defendants' false representations and promises about their intention to return the Collateral upon Plaintiff's performance of its contractual obligations.

74.    Plaintiff relied to its detriment on those material misrepresentations and false promises by entering into the Loan Agreements and delivering the Collateral to Defendants.

75.    As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiff has suffered monetary damages in an amount to be determined at trial, but not less than $121,697,216.41.

76.    Defendants' actions were wanton, willful, and malicious, and thus Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### Fraud
(Against All Defendants)

77.    Plaintiff repeats and realleges paragraphs 1 through 76 as if fully set forth herein.

78.    Defendants imposed upon Plaintiff a fraudulent scheme, with concerted efforts from Lenders, by intentionally and falsely representing to Plaintiff that they were willing to provide financing to Plaintiff in exchange for Plaintiff's execution of Loan Agreements and delivery of the Collateral as security under the Loans.

79.    Upon information and belief, Defendants never intended to provide financing to Plaintiff.  Their plan all along was to keep the Collateral for themselves and make profits by trading the Collateral, while requiring Plaintiff to repay the Loan principal and interest in full.

80.    Following the execution of the Loan Agreements, Defendants repeatedly threatened to forfeit the Collateral by manufacturing Events of Default and pressured Plaintiff into depositing additional shares and cash as security under the agreements.  While Plaintiff

18

reluctantly obliged, due to fear of forfeiture of the Collateral, Defendants secretly and fraudulently transferred and sold a majority of the Collateral, in some cases immediately after they were deposited and in most cases before the occurrence of any alleged default had occurred.

81.     Defendants exerted enormous economic gain in trading the Collateral. Nonetheless, it continued to require Plaintiff to pay off the Loan principal and interest by knowingly and deliberately misrepresenting to Plaintiff that they were prepared to return the Collateral upon full payment of the Loans.  They never intended to return the Collateral.  In fact, they *cannot* return the Collateral, because a significant majority of the shares have already been disposed of by the Defendants.

82.     Defendants' scheme was successful.  Relying on their material misstatements, Plaintiff entered into the Loan Agreements, delivered the Collateral, deposited additional shares and cash, and paid off the entirety of the principal of the Astor2 Loan and a significant portion of the principal of the UPC1 and Vanderbilt Loans.

83.     To this date, Defendants continue to refuse to return the Collateral to Plaintiff.

84.     As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiff has suffered monetary damages in an amount to be determined at trial, but not less than $121,697,216.41.

85.     Defendants' actions were wanton, willful, and malicious, and thus Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

### Conspiracy to Defraud
(Against All Defendants)

86.     Plaintiff repeats and realleges paragraphs 1 through 85 as if fully set forth herein.

87.     Upon information and belief, Defendants are the ultimate beneficiary owners and/or alter egos of Lenders UPC1, Astor2, and Vanderbilt.

88.     Further, upon information and belief, Defendants are the beneficiary owners of various bank accounts (described *supra* in paragraphs 30, 36 and 44), which received deposits and payments from Plaintiff.

89.     Defendants made an agreement and conspired with Lenders to fraudulently induce Plaintiff to enter into sham loan transactions with Lenders, by wrongfully exercising dominion over and taking possession of the Collateral, among other things, Defendants acted in furtherance of the fraudulent scheme to deprive Plaintiff of its rights to and interest in the Collateral.

90.     Defendants knowingly and voluntarily participated in the fraudulent scheme, by fraudulently, including through Lenders, inducing Plaintiff into signing the Loan Agreements and Custodian Management Agreements.

91.     As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiff has suffered monetary damages in an amount to be determined at trial, but not less than $121,697,216.41.

92.     Defendants' actions were wanton, willful, and malicious, and thus Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION

### Conversion
(Against All Defendants)

93.     Plaintiff repeats and realleges paragraphs 1 through 92 as if fully set forth herein.

94.     Plaintiff is the legal owner of the Collateral, which is a specific identifiable property.  Plaintiff had ownership, possession and control over the Collateral before its conversion by Defendants.

20

95.     Defendants exercised an unauthorized dominion over the Collateral to the exclusion of Plaintiff's rights and deprived Plaintiff of its interest in the same, by, among other things, refusing to return the Collateral and coercing Plaintiff into forfeiting the same through wrongfully manufacturing an Event of Default under the Loan Agreements.

96.     As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiff has suffered monetary damages in an amount to be determined at trial, but not less than $121,697,216.41.

## FIFTH CAUSE OF ACTION

### Unjust Enrichment
(Against Defendants)

97.     Plaintiff repeats and realleges paragraphs 1 through 96 as if fully set forth herein.

98.     Defendants have wrongfully and unjustly been enriched through its exercise of unauthorized dominion over the Collateral, by, among other things, refusing to return the Collateral to Plaintiff and fraudulently transferring and selling the Collateral for their own financial gain.

99.     As alleged herein, Plaintiff has conferred a benefit upon Defendants and Defendants have obtained and retained such benefit without adequately compensating Plaintiff. It is against equity and good conscience to permit Defendants to retain the benefit.

100.     As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiff has suffered monetary damages in an amount to be determined at trial, but not less than $121,697,216.41.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Chenming demands judgment in its favor against Defendants as follows:

21

A. As to the First, Second and Third Causes of Action, awarding Plaintiff compensatory and punitive damages against Defendants, including interest thereon, in an amount to be determined at trial, but in any event not less than $121,697,216.41;

B. As to the Fourth Cause of Action, permanently enjoining and restraining all Defendants, their agents, servants, employees, representatives, and all persons acting in concert or participating with Defendants or any one of them, from further trading, transferring, or otherwise disposing of the Collateral;

C. As to the Fourth and Fifth Causes of Action, ordering all Defendants to immediately return the Collateral to Plaintiff or, to the extent the Collateral is no longer retrievable, awarding Plaintiff compensatory and punitive damages against all Defendants, including interest thereon, in an amount to be determined at trial, but in any event, not less than $121,697,216.41;

D. As to the First, Second, and Fifth Causes of Action, ordering Defendants to disgorge any proceeds and profits procured from wrongfully transferring, selling, and trading the Collateral, in an amount to be determined at trial, but in any event, not less than $121,697,216.41;

E. As to all Causes of Action, awarding Plaintiff its costs, legal expenses, and reasonable attorneys' fees incurred in connection with this action; and

F. As to all Causes of Action, awarding Plaintiffs such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable pursuant to Federal Rule of Civil

Procedure 38.


Dated:  New York, New York
         February 8, 2024

Respectfully submitted,

KING & WOOD MALLESONS LLP

By:   _/s/ Vincent Filardo, Jr._
        Vincent Filardo, Jr.
        Aaron T. Wolfson
        500 Fifth Avenue, 50th Floor
        New York, NY 10110
        (212) 319-4755
        vincent.filardo@us.kwm.com
        aaron.wolfson@us.kwm.com

**VERIFICATION**

SHANDONG PROVINCE )

                           ) ss.:

PEOPLE'S REPUBLIC OF CHINA )

Zheng Chunxing, declare pursuant to 28 U.S.C. § 1746 under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. I am an employee of Chenming Holdings Co., Ltd., Plaintiff Chenming Holdings (Hong Kong) Limited's sole shareholder, in the above captioned case and have authorized the filing of this complaint. I have reviewed the allegations made in the complaint, and to those allegations of which I have personal knowledge, I believe them to be true. As to those allegations of which I do not have personal knowledge, I rely on information and documents kept by Plaintiff in the ordinary course of business, and I believe them to be true.

                                        _____

                                        Zheng Chunxing

                                        Chenming Holdings (Hong Kong) Limited

24

# EXHIBIT 65



Neutral Citation Number: [2024] EWHC 2522 (Comm)

Case No: CL-2024-000450

**IN THE HIGH COURT OF JUSTICE**
**KING'S BENCH DIVISION**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**COMMERCIAL COURT**

Royal Courts of Justice, Rolls Building
Fetter Lane, London, EC4A 1NL

Date: 07/10/2024

**Before** :

**MR JUSTICE CALVER**
- - - - - - - - - - - - - - - - - - - -
**Between :**

|  |  |
|---|---|
| **(1) RICARDO BENJAMIN SALINAS PLIEGO**<br>**(2) CORPORACION RBS SA DE CV** | **Claimants** |
| **- and -** |  |
| **(1) ASTOR ASSET MANAGEMENT 3 LIMITED**<br>**(2) WEISER GLOBAL CAPITAL MARKETS LTD**<br>**(3) TAVIRA MONACO SAM**<br>**(4) VLADIMIR "VAL" SKLAROV**<br>**(5) CORNELIUS VANDERBILT CAPITAL**<br>**MANAGEMENT LTD**<br>**(6) ASTOR CAPITAL FUND LIMITED** | **Defendants** |

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**Charles Béar KC, Edward Levey KC and Tom De Vecchi** (instructed by **DWF Law LLP**)
for the **First, Third, Fifth and Sixth Defendants / the Applicants**
**Rajesh Pillai KC and Gretel Scott (**instructed by **Holman Fenwick Willan)** for the **Second**
**Defendant**
**Stephen Robins KC, Henry Phillips and Matthew Abraham** (instructed by **Enyo Law LLP**)
for the **Claimants / the Respondents**

Hearing dates: 20 September 2024
- - - - - - - - - - - - - - - - - - - -

# JUDGMENT

**This judgment was handed down by the Judge remotely by circulation to the parties' representatives by email and release to The National Archives. The date and time for hand-down is deemed to be 10:00 on Monday 07 October 2024.**

**Mr Justice Calver :**

### *The Discharge Application: Introduction*

1.   This is the application dated 20 August 2024 of D1 ("**Astor 3**"), D4 ("**Mr. Sklarov**"), D5 ("**Vanderbilt**") and D6 ("**Astor Capital**") (together, the "**Sklarov Defendants**") by which they seek to discharge or set aside the worldwide freezing and proprietary injunctions granted by Mr. Justice Jacobs on 2 August 2024 and 7 August 2024 and by HHJ Pelling KC on 13 August 2024 (together, the "**Injunctions**") by reason of the Claimants' alleged breach of their duty of full and frank disclosure (the "**Discharge Application**").

2.   The application before Jacobs J on 2 August 2024 was made without notice to Astor 3, D2 ("**Weiser**"), D3 ("**Tavira**") and Mr. Sklarov; the application on 7 August 2024 before Jacobs J was made on very short notice to Vanderbilt (who did not attend); and the application on 13 August 2024 before HH Judge Pelling KC was made against Astor Capital (who did not attend but who were given informal notice of the hearing). Before me, the parties have proceeded on the basis that each of the defendants should be treated in the same way for the purpose of determining whether or not the injunctions were wrongly obtained on the ground of breach of the Claimants' duty of full and frank disclosure. For that purpose, both parties focussed upon the presentation of the Claimants' case before Mr. Justice Jacobs on 2 August 2024.

3.   The Claimants' case, when they obtained the Injunctions, was that as a result of fraudulent misrepresentations, the First Claimant ("**Mr. Salinas**") was persuaded to transfer his shares in a Mexican company called Grupo Elektra SAB De CV ("**Elektra**"), which is listed on the Mexican stock exchange and which were worth more than US$400 million ("**the Collateral**") to two custodians, Weiser and Tavira, as security for loans ("**the Loans**") which were to be advanced by Astor 3 to the Second Claimant ("**RBS**") under a Stock Loan Agreement dated 28 July 2021 ("**the SLA**"). As part of the security, the custody documents entitled Astor 3 to give instructions in respect of the Collateral. Unbeknownst to the Claimants, Mr. Sklarov began to misappropriate and sell the Collateral, using a large portion of the proceeds thereof to fund the very Loans which were to be made to RBS under the SLA and paying away the remainder of the proceeds of sale to himself and various third parties.

4.   The Claimants maintain that as soon as Mr. Salinas discovered that Astor 3 was not (as he had been led to believe) a reputable financial institution associated with the well-known Astor family from the United States but was instead a vehicle for fraud by Mr. Sklarov, they applied for the Injunctions.

5.   The Sklarov Defendants take issue with this. They maintain that they were entitled to trade the Collateral under the terms of the SLA and in September 2021 they told Mr. Salinas's financial adviser that this was what they would do, as is customary in the stock lending market. They further argue that the Claimants delayed in seeking their injunctive relief, because their real motive in urgently seeking it was to justify to the market the sudden fall in the value of the Elektra shares.

### *The factual background*

6.   The relevant factual background to the Discharge Application is as follows.

   *(i) The negotiations and the alleged representations*

7.  During the spring of 2021, Mr. Salinas wanted to refinance a loan from BNP Paribas. Mr. Salceda of Grupo Salinas was responsible for dealing with this. He had been liaising with Mr. Torti of Fininvesta, who acted as a financial adviser for Mr. Salinas. In turn, Mr. Torti dealt with Ms Akbar, a financial adviser liaising with Mr. Sklarov. In his first affidavit (subsequently dated 5 August 2024) which was before Jacobs J at the without notice hearing, Mr. Salceda stated as follows at [30]:

> *"During the course of the negotiations of the SLA, I believed that Astor was a legitimate lending firm. I was told by Mr. Torti that Astor was owned by the wealthy Astor family in the United States (and I understood that he had been told this by Ms Akbar)."*

8.  Mr. Salceda also explained how the key personnel were identified to him as being Thomas Mellon and Gregory Mitchell, said to be respectively the CEO and Managing Director of Astor Wealth Group. During and after the negotiations for the SLA, emails from Astor Capital Fund to Mr. Torti and Ms Akbar were copied to <u>thomas.mellon@astorassetgroup.com</u> and <u>gregory.mitchell@astorassetgroup.com</u>. Before Jacobs J, the Claimants maintained that neither of these individuals in fact exists (this is now admitted by Mr. Sklarov, at least so far as Mr. Mitchell is concerned – see further below).

9.  Before me, the Claimants drew attention to what they called "an internet puff-piece" which they reasonably suggested is likely to have been derived from the Sklarov Defendants themselves (a point with which Mr. Béar KC (leading Edward Levey KC and Tom De Vecchi) for the Sklarov Defendants did not take issue), which states that Astor Asset Management is a "*top financial company*" which "*bear the heavy responsibility of carrying on the family name and legacy. Thomas Mellon ... is a descendent of the famed Astor family, a fact not lost on the prestigious financier*"; "*With a financial legacy dating back 200 years, the Astor name is legendary. That legend comes with privilege, but also carries a great responsibility. Thomas Mellon works tirelessly on behalf of his loyal clients and investors. But it is never far from his mind, that he has a duty also, to live up to the name and the legacy*"; "*As the CEO of Astor Asset Management, Thomas Mellon has continued the bold legacy built by his ancestors over 200 years ago*".

10. There is clearly a good arguable case that prior to entering into the SLA, the Claimants made clear through Mr. Torti that they would provide the Elektra shares as the Collateral for the proposed loan but the shares should not be lent or sold absent a default on the part of the Claimants. That is clear from an email sent on 6 April 2021 by Mr. Torti to Mr. Salceda in which he confirmed the parameters for the loan which had been agreed with the Sklarov Defendants ("*prohibited to sell (unless there is a default) and lend the shares as collateral*"); and an email from Mr. Torti to Ms Akbar dated 4 May 2021 ("*securities lending restriction and short selling restriction considering the volume of Electra shares, we want to make sure that not only the lender, but also the custodian has a formal restriction on short selling or lending Electra stock. As discussed, a clause referring to this in the pledge document could probably meet this purpose*").

11. The Term Sheet dated 29 March 2021 for the proposed lending, which Mr. Salceda stated in paragraph 45 of his first affidavit was circulated to him in April 2021 and was the basis upon which he decided to pursue a stock-backed lending arrangement with Astor Fund, also stated as follows:

> **"Custodian**
>
> A fully licenced and regulated brokerage firm shall serve as the custodian, with the pledged securities deposited into the Borrower's brokerage account on a per-tranche

basis. <u>Lender, in its sole and absolute discretion, shall identify a custodian broker dealer that shall retain and hold the collateral during the loan term</u>"

**Restrictions on Lender**

<u>During the loan term and while the loan remains in full force and effect, Lender shall not engage in short selling or selling of the Securities</u>.

**Loan Termination and Return of Collateral**

Within three (3) business days after the end of the Loan Term and upon Borrower's payment in full of the Principal Balance and any outstanding Interest Payments and any other costs and fees, <u>Lender shall return the Collateral to the Borrower in the same format as the collateral was originally delivered to Lender</u>." (emphasis added)

12. The Claimants' case is that it was accordingly led to believe that the relevant Astor company which entered into the SLA (Astor 3) would not sell or trade in the Collateral prior to maturity of the loan or an event of default, and that the collateral would be safeguarded.

13. The SLA was drafted by Mr Sklarov and it was concluded on 28 July 2021 between Astor 3 (as Lender), RBS (as Borrower) and Mr. Salinas (as Guarantor). Consistently with the Term Sheet, in the "Lender Warranties and Representations" section (Clause V) it is expressly provided as follows:

(i) In clause 4b:

 "***Dealing with Securities***

*During the Loan Term, provided that there has not been an Event of Default, the Lender will not sell or short-sell the shares of the Pledged Collateral on any publicly traded securities exchange. However, upon the occurrence of an incurable Event of Default, the Lender reserves the right to dispose of the Collateral on any publicly traded securities exchange but is not obligated in doing so*."

 (ii) In clause 6:

"***Transfer of Securities***. *The Lender will not transfer the securities to its own account unless an incurable Event of Default has taken place*…"

14. Mr. Salceda stated in his first affidavit that these provisions of the SLA (which are the provisions upon which the Claimants particularly rely) and the statements in the Term Sheet (set out above) were very important to him and Mr. Salinas (so that the Elektra share collateral was safeguarded) and without them they would not have entered into the SLA.

15. In his first affidavit, Mr. Salceda concluded as follows:

"*42. In light of the matters set out above, I understood Astor 3 to have made the following representations (prior to the execution of the SLA on 28 July 2021):*

*(1) that Astor 3 was a legitimate and honest financial institution which engaged in legitimate and honest stock-lending activities; and*

*(2) that Astor 3 intended to comply with its obligations under the SLA including in particular its obligations not to sell the Elektra shares prior to maturity or default.*

*(Together, the "Key Representations".)*

*43. The Applicants executed the SLA on 28 July 2021 in reliance on the Key Representations.*"

*(ii) The events of September/October 2021*

16. The Claimants maintain that their belief that these alleged representations were being adhered to was reinforced by the events of September/October 2021, shortly after the SLA was concluded.

17. On 10 September 2021 at 2.32pm, Mr. Torti emailed Weiser, Ms Akbar and Astor 3. He stated "*Based on some activity in Elektra shares [on the securities exchange], we would like to confirm by return of email that none of the Elektra shares pledged by Weiser has been lent (securities lending) as per our agreement.*"

18. Gregory Mitchell (whom it is now known is in fact Mr. Sklarov himself) replied at 8.53pm on the same date. His response was, as Mr. Robins KC (leading Henry Phillips and Matthew Abraham) for the Claimants described it, "jargon filled":

   "*Astor will merge or pool collateral rights as a portfolio and underwrites derivatives to hedge its risk and liquidity leverage. This leads to collateral shares being made available for lending to its liquidity providers and other financial institutions who wish to borrow the shares. As we had discussed previously, the shares may be rehypothecated which is standard practice (share borrow-lending between institutions). This can't be stopped or restricted in all cases where the shares are free trading. Otherwise, the shares are restricted and we don't lend against restricted shares. I have never heard of free trading shares being restricted to borrow. When you custody shares with major banks, they all can and do engage in share borrow to each other.*

   *…*

   *Also, our loan agreement is transparent, the "Encumbrance" clause explains what can potentially take place with the stock, most of which we have no confirm over.*

   *If you log into the account at Weiser, you will see that all the stock is there. We have not sold any of it, which is in accordance with the loan agreement.*

   *Please speak to Mr. Salinas and advise us if this is not an issue. If it is an issue, we would need to revisit internally how to proceed, cause we can't stop or restrict others from borrowing free-trading unrestricted stock.*" (emphasis added)

19. Whilst Mr. Sklarov spoke about "rehypothecation" being standard practice, Mr. Torti was also told that the stock had not been sold; it was all there. He appears to have been reassured by this as he responded by email later that same evening, stating:

   "*As long as all the terms of the contracts signed are duly respected, we are fine.*"

20. The Claimants maintain that they were further reassured that the representations were being adhered to by reason of the events of October 2021 (being one month later) as follows.

21.    On 5 October 2021 Weiser informed Mr. Salceda that the 935,913 shares which Mr. Salinas had transferred to Weiser after the signing of the SLA, had been transferred from Mr. Salinas's account to an account in the name of Astor Capital.

22.    This was a cause of concern to Mr. Salceda, who instructed Mr. Torti to send an email to Weiser seeking clarification, which Mr. Torti did. In the absence of a satisfactory resolution to this issue, Mr. Torti emailed Weiser on 19 October 2021 stating that the transfer to Astor Fund had taken place in breach of clause V of the SLA[1] and that the shares should be transferred back to Mr. Salinas's account without delay. Weiser responded on 22 October 2021 but merely stated that they had acted upon Astor 3's instructions under their Custodian Management Agreement. Mr. Torti then emailed Ms Akbar on 23 October 2021 in which he stated as follows:

"*It is very important that you have the sensibility of the necessity for the shares to return to the collateral contract until no later than in this week since if the account statement is issued without the shares there could be trigger an alienation with great tax implications.*

*Please we really need your help to make Astor and Weiser understand that they are breaching and violating the contracts*".

23.    Significantly, on 25 October 2021, Ms Akbar told Mr. Torti that Astor 3 had agreed to reverse the instructions to Weiser and to arrange for the shares to be returned to Mr. Salinas's account within 24 hours.

24.    The consequence of this was that Astor 3 agreed to sign an addendum to the SLA on 6 December 2021 ("**Addendum 2**") confirming that it would only issue instructions to the custodians in accordance with the terms of the SLA and not otherwise. It is strongly arguable that this would have reinforced the impression in Mr. Salceda's mind that Astor 3 would not deal in the shares in such a manner during the term of the loan (in the absence of an event of default).

25.    In light of this incident, Mr. Salinas then insisted that any further tranches of collateral shares should be held by a different custodian in place of Weiser, and Tavira was appointed for that purpose under a control agreement dated 30 November 2021 between (i) RBS; (ii) Astor 3; (iii) Mr. Salinas and (iv) Tavira.

*(iii) The transfer of the Collateral tranches by Mr. Salinas*

26.    As stated, the parties had entered into the SLA on 28 July 2021. Thereafter, Mr. Salinas transferred the Collateral for the Loans as follows:

(1)    935,913 shares to Weiser;

(2)    2,350,000 shares to Tavira on 15 December 2021;

(3)    314,087 shares to Tavira on 20 January 2022;

---

[1] It may also have been a breach of clause V6 of the SLA

(4)    1,431,700 shares to Tavira on 22 June 2022;

(5)    128,207 shares to Tavira on 3 April 2023;

(6)    1,600,000 shares to Tavira on 4 April 2023;

(7)    444,389 shares to Tavira on 12 September 2023.


*(iv) The fate of the Collateral which was transferred to Tavira*

27.    This made a total of 6,268,383 shares transferred to Tavira. The evidence of Mr. Salceda was that as at 2 August 2024 a combined total of 7,204,296 shares were held by Weiser and Tavira which were worth Mexican Pesos (MXN) 7.6 billion or US$415m, in respect of Loans of only MXN 2,154,218, 522 or US$115m.

28.    It is now apparent from paragraph 19 of Mr. Sklarov's first affidavit of 2 September 2024 (sworn on 5 September 2024), which he was ordered to swear by way of asset disclosure pursuant to the worldwide freezing injunction, that as soon as the Collateral was transferred to Tavira in the six tranches set out in paragraph 26 above, Astor 3 immediately rehypothecated[2] each tranche of Collateral on to Vanderbilt pursuant to "Rehypothecation Agreements" between them as follows:

a. On 17 December 2021, Astor 3 rehypothecated 2,350,000 Collateral Shares to Vanderbilt.

b. On 18 January 2022, Astor 3 "rehypothecated" 314,087 Collateral Shares to Vanderbilt.

c. On 15 June 2022, Astor 3 "rehypothecated" 1,431,700 Collateral Shares to Vanderbilt.

d. On 5 April 2023, Astor 3 "rehypothecated" 1,728,207 Collateral Shares to Vanderbilt.

e. On 13 September 2023, Astor 3 "rehypothecated" 444,389 Collateral Shares to Vanderbilt.

29.    It is the Claimants' case that these "rehypothecations" to Vanderbilt were not, however, reflected in the monthly account statements sent by Tavira to the Claimants; and that it was only in an account statement provided to the Claimants on 1 August 2024 by Tavira that the Claimants were informed that on 29 July 2024 all 6,268,383 shares were subject to "FOP Delivery Out" (meaning "free of payment" by Vanderbilt) "*to Astor's account as per Astor's instructions*". In paragraph 11d of his first affidavit Luke Harris of Tavira appears to accept that this transfer out took place, although he appears to suggest that the transfer out of the shares to Astor 3's account only took place on 29 July 2024, which the Claimants dispute. Either way, Mr. Sklarov admits, in paragraph 20 of his first affidavit, that "*from the shares rehypothecated to Vanderbilt, Astor 3 received proceeds from Vanderbilt's sale and short sale of these shares. From these proceeds, Astor 3*

---

[2] Mr. Sklarov's (disputed) evidence in paragraph 58 of his first witness statement is that he understood that "*Tavira's practice was not to transfer shares from Mr. Salinas's account when shares were rehypothecated from that account by Astor 3 to Vanderbilt.*"

*withdrew USD 43,025,048 by way of a cash redemption, which … was then transferred to the Juris IQ account*" (which is referred to in paragraph 33 below).

30.    It appears from Mr. Sklarov's affidavit evidence that Vanderbilt began selling ~~trading in~~ the Collateral on to third parties immediately upon receipt in small tranches on and continued to do so on almost every trading day between 16 December 2021 and 2 April 2024 via many different Mexican brokers. Mr. Robins KC suggested that these were sales on a publicly traded securities exchange. Mr. Béar KC did not deny that and it seems likely that at least some of them were, as Mr. Sklarov accepts in paragraph 25 of his first witness statement of 1 September 2024 that:

"…*Vanderbilt, to which Astor 3 lent the shares for a period of 60 months, instructed that the shares be traded but does not know whether these trades were executed by Tavira on-market (i.e. on-exchange) or privately in an OTC (or block) trade since those trades were executed by Tavira.*"

31.    Mr. Sklarov suggests in paragraph 24 of that witness statement that this was not a breach of clause V(4)(b) of the SLA because it was not Astor 3 which sold the Collateral; rather it was Vanderbilt. But it is clearly arguable that Astor 3 instigated the sale of the Collateral, not least because a substantial part of the proceeds made their way back to Mr. Sklarov (see paragraphs 33-34 below).

32.    Significantly, in paragraph 53 of his 4th witness statement of 16 September 2024, Mr. Sklarov admits that as a result of the sales of the Collateral between 20 December 2021 to 29 July 2024 referred to above, a total sum of almost US$360m was received by Vanderbilt into its account at Tavira (which is no longer there). *He also accepts that the 3rd, 4th and 5th tranches of the Loans, which were provided to RBS, were funded from the very proceeds of the disposals of Mr. Salinas' own shares (ie. the Collateral) by Vanderbilt, being around $64.5m.*

33.    In paragraph 53c and 54 of his 4th witness statement, Mr. Sklarov states that the balance of the proceeds of the sale of the Collateral was disposed of by way of a transfer of US$271,685,472 from Tavira to client accounts controlled by Mr. JT Singh through his company Jurist IQ or his US Law Firm. Mr. Singh is an associate of Mr. Sklarov. Mr. Singh then apparently transferred back US$216,069,214 to Tavira and some of these monies were, according to paragraph 5 of Mr. Sklarov's second affidavit dated 5 September 2024, paid into different accounts of different companies for which Mr. Sklarov says he provides "consulting services".

34.    Further still, Mr. Sklarov also admits that between 28 July 2021 and 2 August 2024 (when the Injunction was granted), US$9,149,781 was paid to him personally from the Singh Law Firm and Jurist IQ accounts. Of this sum, US$4,388,736 was paid to Bank Hapoalim in Israel.

35.    Mr. Sklarov states in his first affidavit that this left Astor 3 holding about $13.5m, being US$963,000 in cash with Tavira and US$12,604,476 with Weiser.

36.    Meanwhile, Vanderbilt is left with virtually no assets: see paragraph 25 of Mr. Sklarov's first affidavit.

*(v) The fate of the Collateral which was transferred to Weiser*

37.    On 9 August 2024 Weiser served an affidavit of Christos Livadas in which Mr. Livadas stated (in paragraph 17) that Astor 3 had sold 935,716 of the Elektra shares held by Weiser

to Astor Capital on 30 July 2024 for MXN 233,929,000, equivalent to US$12,604,476.49. The Claimants maintain that this was a sale at a significant undervalue, in that the true market value of the said shares at that time was approximately MXN 982,501,800 (based on a share price on the open market was MXN 1,050 per share), equivalent to around US$ 52.1 million. Weiser has disclosed that it holds US$12,604,476.49 for Astor 3.

38. However, it is not clear what Astor Capital has done with the 935,716 shares. Mr. Sklarov has failed to explain satisfactorily what happened.

39. It is difficult to reconcile the evidence of Mr. Livadas with the Weiser account statements exhibited by Mr. Sklarov to his fourth witness statement. Those statements appear to show that Astor Capital sold a total of 687,000 shares in Elektra between 27.07.21 and 15.08.21, generating total cash proceeds of MXN 815,025,252. That is equal to 98% of the principal sums advanced to RBS by Astor 3 under the first two tranches of the loan. *On that basis, the Claimants contend that the first two tranches of the loan were, it seems, funded in the same way as the third, fourth and fifth tranches – namely, by selling the Collateral belonging to Mr. Salinas*. (This also makes it difficult to see how it can be true that 935,716 of the shares held by Weiser were sold in July 2024, as asserted by Mr. Livadas). Mr. Béar did not dispute this.

*(vi) Conclusions concerning the transfer of the Collateral*

40. Accordingly, the foregoing evidence (including in particular that of Mr. Sklarov himself) suggests as follows:

(1) Upon receipt of the Collateral, Astor 3 immediately started "rehypothecating" or transferring it to Vanderbilt, who then immediately started selling it to third parties, likely in at least some cases on a publicly traded securities exchange;

(2) Astor 3 does not appear to have provided the Loans itself; rather it sold Mr. Salinas's own Collateral via Vanderbilt and used those funds to provide the Loans.

(3) A significant tranche of the proceeds of the sale of the Collateral was paid over to Mr. Sklarov himself (including US$9,149,781 being paid to him personally from the Singh Law Firm and Jurist IQ accounts).

### The case as presented before Mr Justice Jacobs

41. Before Jacobs J, the Claimants sought both an interim proprietary injunction and a worldwide freezing injunction against the Sklarov Defendants. They accepted, and the parties agreed before me, that it was necessary for the Claimants to satisfy the court that their claims against the Sklarov Defendants raise a serious issue to be tried (for the purposes of the proprietary injunctions) and that they are good arguable claims (for the purposes of the freezing injunctions).

42. The Claimants made their urgent application to Jacobs J having been informed by Tavira on 1 August 2024 that, as described in paragraph 29 above, on 29 July 2024 all 6,268,383 shares of which Tavira was custodian were subject to "FOP Delivery Out" "*to Astor's account as per Astor's instructions*".

43. In their skeleton argument before Jacobs J, the Claimants put their case on the following bases:

(1)    Fraudulent misrepresentation;

(2)    Breach of contract;

(3)    An intention to cause harm by unlawful means and/or conspiracy to cause harm using unlawful means;

(4)    A proprietary injunction to restrain the Sklarov Defendants from dealing with or disposing of the Collateral shares or the proceeds thereof.

44.    Mr. Béar KC submitted that Jacobs J granted the Injunctions against the Sklarov Defendants based on the central propositions that trading in the Collateral had occurred and constituted a dishonest misappropriation of those shares, and that the Claimants had only recently discovered this. He submitted that those propositions were false and that the two orders of Jacobs J, as well as that of HHJ Pelling KC were granted "*because of serial and egregious misrepresentations and non-disclosures of both fact and law by Mr. Salinas through his witness ... Mr. Salceda ... and, regrettably, by [the Claimants'] counsel.*"

45.    Mr. Béar KC submitted that the entire claim of fraud was and is based on Astor 3 putting the Collateral into circulation, resulting in them being traded on the market. The Claimants' case is that this contravenes the terms of the SLA and that, absent an Event of Default, Astor 3 was permitted only to retain the shares *as collateral* – to keep them in a 'locked box' which could not be opened. On that approach, any step by Astor 3 which led to the shares being traded would be a breach of the SLA.

46.    But, Mr. Béar KC submits, an allegation of a simple breach of contract, however fundamental, is not enough for a claim of fraud, or for the proprietary claim to the shares which depends entirely on rescission for the alleged fraud.

47.    Indeed, Mr. Béar KC maintains that Astor 3 is not in breach of the SLA at all. As Astor 3 stated in its letter to RBS and Mr. Salinas dated 12 June 2024 ("**the 12 June letter**"), it advances a different construction of the SLA by reference to different provisions, which construction it relies upon as justifying its trading in the collateral in this case. It stated as follows in the 12 June letter:

"Pursuant to the SLA, and as a condition to funding, you granted the Lender an Encumbrance and Lien over the Shares. Section IV.7 states as follows:

*As of the date of this Agreement, the securities constituting the Pledged Collateral are owned by Guarantor free and clear of any Liens, Encumbrance or contractual, statutory, or regulatory limitation or restriction of whatever nature; are in good standing in accordance with their country of issue; and are freely tradeable and transferable securities and Guarantor hereby grants absolute first position Security Interest as a Lien and Encumbrance rights to Lender in exchange for Borrower receiving a Loan.*

Thus, throughout the loan term, you granted the Lender a first position Security Interest in the Shares. Security Interest is defined in Section I(51) of the SLA:

*Security Interest shall mean a Lien or Encumbrance granted by Guarantor to Lender in real property such as securities as Collateral for a Loan to Borrower. The Security interest granted to Lender prevents the Guarantor from disposing or transferring the*

*property or securities until such time as the Loan is repaid by Borrower to Lender and all Obligations of Borrower to Lender are discharged.*

 Encumbrance is defined in Section I(21) of the SLA:

*Lender's legal claim on Pledged Collateral that affects the Borrower's ability to transfer ownership to anyone or to dispose of the Pledged Collateral without Lenders prior written authorization. For purposes of this definition, Encumbrance shall mean lien, mortgage, charge, hypothecation, rehypothecation, rights, barter, pawn, trade, dispose, deal-in, pledge, re-pledge, repo, borrow or transfer of security interest in Collateral. The Pledged Collateral will be restricted to Guarantor and Encumbrance rights exclusively granted to Lender.*

Thus, the SLA is express and clear that you granted the Lender the right to exercise its Encumbrance rights over the Shares during the loan term. Indeed, this is further supported by the definition of Lien which the SLA states is "*any Encumbrance of any kind referenced herein concerning the Pledged Collateral of Guarantor. A lien is the Lender's right to retain possession of property belonging to Guarantor until a debt owed by that Borrower is fully discharged per this Agreement.*" As such, the Lender is fully authorized to exercise its Encumbrance rights until such time that your debt is fully repaid in due course in accordance with the SLA.

The Lender's rights in the Shares are further defined in Section V.4, Dealing with Securities, of the SLA. Specifically, Section V.4(c) states that "*the Borrower acknowledges and agrees that the Pledged Collateral will be utilized by Lender to assert its preferential Lien over it.*" Therefore, the Lender has the right to deal-in the Shares to the extent that is defined within the meaning of Encumbrance. The Lender has, at all times, fully complied with and adhered to the language within the SLA.

Moreover, Section X, Required Disclosures, states, in part, that:

*During the Loan Term, all benefits and proceeds of the Pledged Collateral inure to Lender. Lender reserves the right to maintain dominion over the Collateral during the Loan Term, which affords Lender the right to deal-in, dispose, or convert over the Pledged Collateral.*

Therefore, by executing the SLA, you repeatedly re-affirmed the Lender's dominion and Encumbrance over the Collateral."

48. On any view the SLA is ambiguously worded. However, it is the Claimants' case that it is deliberately so worded, being an instrument designed to allow Mr. Sklarov to perpetrate one of his trade-mark stock-lending frauds (as to which see below), this time against Mr. Salinas.

### *The alleged non-disclosures*

49. Before me, Mr. Béar KC argued that in obtaining the injunctions the Claimants were in breach of their duty of full and frank disclosure in respect of the following six separate matters:

    (1)    The way in which the Claimants' case was put concerning the key representations;

    (2)    The way in which the Claimants presented the terms of the SLA;

(3)   The failure to explain that it is Astor 3's understanding of the contractual terms which matters;

(4)   The Claimants' case on there having been no delay in seeking the relief;

(5)   The Claimants' failure to inform the court of its true motive for applying for injunctive relief

(6)   The Claimants' case as to Mr. Salinas's wealth and probity.

(1)/(2)/(3)   *The Claimants' case concerning the key representations; presentation of the terms of the SLA/failure to explain relevance of Astor's subjective understanding of the terms*

50.   I shall take these three points together as they overlap.

51.   The misrepresentation case advanced before Jacobs J in the Claimants' skeleton argument was as follows:

"*(1) Misrepresentation*

*97. The Applicants have rescinded the SLA on the basis that it was induced by fraudulent misrepresentations, and they seek to recover the Elektra shares on a proprietary basis. They also seek damages against Astor 3 and Mr. Sklarov for the tort of deceit.*

*...*

*99. In the present case, the key representations were:*

*(1) that Astor 3 was a legitimate and honest financial institution which engaged in legitimate and honest stock-lending activities[3]; and*

*(2) that Astor 3 intended to comply with its obligations under the SLA including in particular its obligations not to sell the Elektra shares prior to maturity or default[4].*

*100. The first of those representations was implicit in the circumstances of Astor holding itself out as a legitimate and honest financial institution which engaged in legitimate and honest stock-lending activities when offering to enter into the SLA.*

*101. As regards the second of these representations, Chitty explains at [10-14] (by reference to Kingscroft Insurance v Nissan Fire & Marine Co [2000] 1 All ER (Comm) 272 and SK Shipping Europe Ltd v Capital VLCC 3 [2022] EWCA Civ 23): "Making an offer may amount to a representation that in general terms the offeror intends and has the ability to perform the proposed contract, as they understand it". See Civil Fraud at [1-045] ("by entering into the contract the company impliedly represents that it has the present intention, and capacity, to perform its obligations"). In Kingscroft Insurance, for example, Moore-Bick J held that "the representation is likely in most cases to come down to no more than one of honesty in entering into the bargain". Males LJ confirmed in SK Shipping at [51]: "There are some circumstances where an offer to contract on certain terms carries with it an implied representation as to the party's honesty in relation to the proposed transaction. It is not necessary to see why this should*

---

[3] "key representation 1"
[4] "key representation 2"

*be so. Such honesty is the necessary substratum for all commercial dealings. It goes without saying". See, e.g., Property Alliance Group v Royal Bank of Scotland plc [2018] 1 WLR 3529 at [132]-[144]; UBS AG v CWL [2014] EWHC 3615 at [733]-[740]; and Lindsay v O'Loughane [2010] EWHC 529 at [103].*

*102. As set out above, the SLA involved the deposit of high-value shares as collateral for loans. Counterparty honesty is obviously highly important in such circumstances. A representation that the lender, who is given control over those shares, has the intention of complying honestly with its contractual obligations, including his obligation not to dispose of them wrongfully, is so obvious that it goes without saying and will therefore be readily implied. Indeed, no one would contract on any other basis.*"

52. Mr. Béar KC submitted that the 'key representations' are not based on anything alleged to have been specifically said or done by Astor 3, but merely on the fact that what became cl. V of the SLA was put forward as part of the pre-contractual discussions.

53. He argued that to establish fraud the Claimants needed to show not just that these purported misrepresentations were made, but that they were made dishonestly, and that the Claimants accordingly allege that the Sklarov Defendants must always have known that the contract prohibited the dealings which later took place and which they always intended. Accordingly, Mr. Béar KC submitted that the Claimants' case requires them to establish as follows:

    (1) the SLA, and in particular cl. V, prohibited the share dealings of which the Claimants now complain;

    (2) The Claimants understood the contract in that way;

    (3) the Sklarov Defendants (or at least D1 and D4) also understood the contract in that way; and

    (4) the Sklarov Defendants never intended to comply with the terms (allegedly) prohibiting the share dealings.

    Mr. Béar KC submits that each of these propositions begs the question as to whether the SLA is to be construed as the Claimants suggest. He argues that the existence of a reasonable alternative interpretation of the SLA is fatal to the Claimants' case that Astor 3 could not have honestly believed that its dealing in the shares was permitted.

54. I do not accept Mr. Béar KC's submissions. Jacobs J had before him not only the fact that the parties had entered into the ambiguously worded SLA (which was drafted and put forward by Astor 3); the Claimants also relied upon the following features of the transaction in support of its fraudulent misrepresentation case.

55. First, Mr. Torti was led to believe (by Ms Akbar who had been liaising with Mr Sklarov) that the Claimants were negotiating and contracting with a company owned by the wealthy Astor family in the United States and accordingly that it was a legitimate and honest financial institution.

56. In fact, it was nothing of the sort. Rather (and there is strong evidence to suggest that), Mr. Sklarov used the Astor name precisely in order to mislead the Claimants into believing that this was so, and this was his *modus operandi* for stock-lending frauds perpetrated by him.

57. Second, there was evidence before Jacobs J that Astor 3 was controlled by Mr. Sklarov: see paragraphs 71-87 of the Claimants' skeleton argument for the hearing before Jacobs J).

58. Indeed, subsequent to the hearing before Jacobs J, in paragraph 12 of his witness statement of 1 September 2024 Mr. Sklarov sought to distance himself from the alleged fraud by suggesting that he was merely a "technical consultant" for Astor 3, Vanderbilt and Astor Capital and so on a day to day basis he had "limited knowledge" of the precise transactions entered into by those entities and limited access to their correspondence. He said he was "*not an owner, beneficiary nor employee or officer of those entities*". But that arguably appears to have been false, as he then swore two affidavits on 5 September 2024 on behalf of each of those companies as to their respective assets which he states is within his own knowledge. Similarly, his 4th witness statement of 16 September 2024 demonstrates that the "Elektra deal" as he calls it was his idea and his "business strategy."

59. Third, before Jacobs J the Claimants maintained that Mr. Mellon and Mr. Mitchell (with whom the Claimants dealt in their correspondence with Astor 3 /Astor Capital) did not exist. Significantly, Mr. Sklarov was forced to admit in paragraph 87 of his 4th witness statement that Gregory Mitchell was in fact Mr. Sklarov himself. His purported explanation for this lacks any credibility. He states that he used this pseudonym because the use of his name "Vladimir" had led to him being discriminated in business. But that makes no sense in circumstances where the Claimants have discovered that he legally changed his name to Mark Simon Bentley on 22 April 2018, being long before the SLA was concluded. Indeed, Mr. Sklarov was also compelled to admit in paragraph 88 of the same witness statement that he had given his own solicitors false instructions in this regard, which led them (falsely) to inform the Claimants' solicitors by letter dated 5 September 2024 that "*Mr. Sklarov never dealt directly with Mr. Mitchell but understood he was someone who worked with Mr. Mellon.*" It is clearly arguable that using this pseudonym was an attempt of Mr. Sklarov to distance himself from the company through which he perpetrated the alleged fraud.

60. So far as Mr. Mellon is concerned, who was the other person with whom the Claimants dealt in respect of this transaction, he too does not appear to exist, with the name being an alias for a Mr. Aleskei Skachkov, a business associate of Mr. Sklarov, as Mr. Sklarov now admits in paragraph 85 of his 4th witness statement. Mr. Allen explains in his 3rd witness statement dated 18 September 2024, served on behalf of the Claimants, that Mr. Skachkov is someone with a significant criminal record.

61. It appears likely therefore – and certainly there is a good arguable case to such effect - Astor 3 and Astor Capital are creatures of Mr. Sklarov, rather than being legitimate and honest financial institutions which engaged in legitimate and honest stock-lending activities, as Mr. Sklarov sought to portray them as being[5].

62. Perhaps most significantly, there was evidence before Jacobs J (as there is now before me) that, consistently with his use of the Astor name, Mr. Sklarov has gained some notoriety for setting up companies to which he then gives misleading names (being the

---

[5] Accordingly I do not consider that the Sklarov Defendants can draw any support for their case by reference to the Supreme Court's summary of a typical, bona fide stock lending practice in *Coal Staff Scheme v HMRC* [2022] 1 WLR 2359.

names of well known, reputable financial companies) and which he then uses to perpetrate stock-backed loan frauds. There are numerous instances of this, as follows.

63.  Dr Brent Satterfield owned shares in a listed company called Co-Diagnostics, Inc ("**CDI**"). In early 2018, Dr Satterfield was introduced to Mr. Sklarov who said that his company, America 2030, would make a loan to Dr Satterfield in the sum of US$3.5 million, secured over Dr Satterfield's shares in CDI, which were then worth more than US$7 million. Dr Satterfield handed over the shares, but America 2030 provided only US$67,000 of the loan. Dr Satterfield then discovered that America 2030 had already sold over US$1million of his shares in CDI. On 13 March 2019 Dr Satterfield commenced proceedings against Mr. Sklarov in New York. The New York court referred the dispute to arbitration in New York, pursuant to an arbitration clause in the loan agreement. On 9 July 2021 the AAA tribunal issued an award in favour of Dr Satterfield, holding that Mr. Sklarov had fraudulently induced Dr Satterfield to enter into the loan agreement by knowingly making false representations. The tribunal ordered Mr. Sklarov to return the CDI shares to Dr Satterfield. However, Mr. Sklarov failed to comply. On 12 November 2021 the New York court ordered Mr. Sklarov to return the CDI shares. Again Mr. Sklarov did not comply. On 2 May 2022 the New York court held that Mr. Sklarov was in contempt of court and directed him to purge his contempt, warning that an arrest warrant would be issued if he did not purge his contempt by 6 May 2022. Still Mr. Sklarov failed to comply. On 3 June 2022 the New York court issued a warrant for Mr. Sklarov's arrest. On 19 October 2023 the Supreme Court of the State of New York, Appellate Division, First Judicial Department, dismissed Mr. Sklarov's appeal against the issuing of the arrest warrant, which remains outstanding.

64.  In or around 2019, Mr. Sklarov was sued by Rothschild & Co in respect of his attempts to masquerade under the Rothschild name. Rothschild & Co complained that his use of the Rothschild name to engage in fraud in connection with stock-backed loans was damaging Rothschild & Co's reputation. The U.S. District Court, N.D. Georgia, Atlanta Division, granted a preliminary injunction against Mr. Sklarov. Subsequently, Mr. Sklarov signed a consent order which permanently enjoined him from using the Rothschild name.

65.  On 9 October 2020, Barclays plc sued Mr. Sklarov in respect of his attempts to masquerade under the Lehman name, which had been acquired by Barclays plc, alleging that Mr. Sklarov was the ring-leader of a fraudulent scheme to mislead and to deceive members of the public by "*seeking to … pass themselves off as the legitimate Lehman Brothers*". Barclays observed that Mr. Sklarov had previously sought to operate under various other well-known names with which he had no genuine association, including Credit Suisse First Boston; BNP Paribas Fortis; PricewaterhouseCoopers; Bear Stearns; George Soros Capital; and Warren Buffet Capital. On 19 March 2021 Mr. Sklarov signed a consent order enjoining him from using the Lehman name.

66.  Barclays plc described the nature of the frauds conducted by Mr. Sklarov:

> "*Although Sklarov has used various shell companies to perpetuate each alleged fraud, the fact patterns underlying each of the schemes are nearly identical: a Sklarov-related entity promises to provide a loan to a borrower backed by securities owned by the borrower; the borrower pledges the shares as collateral to the Sklarov-controlled entity; the Sklarov-controlled entity provides little if any of the*

*promised loan funds to the borrower and then sells or attempts to sell the shares proffered only as collateral, and retains the proceeds*".

67.    In 2020 Sunpower Business Group Pte Ltd and Tournan Trading Pte Ltd (the "**Sunpower Shareholders**") owned shares in Sunpower Group ("**Sunpower**"), a listed company in Singapore. They were introduced to Mr. Sklarov (who appears to have been operating under the name "Mark Bentley", presumably as a result of his name change in April 2018), who told them that his company, America 2030 Nevis, could make a loan on attractive terms, secured over their shares in Sunpower. They transferred their shares in Sunpower to Weiser to be held as security for the loan. Subsequently, they discovered that their shares had gone missing from the account. It became clear that Weiser had sold the shares on the instructions of Mr. Sklarov. The Sunpower Shareholders commenced proceedings in Nevis accusing Mr. Sklarov of fraud and obtained a worldwide freezing order against him. Mr. Sklarov applied to strike out the claim but the Nevis court dismissed his application. Subsequently, Mr. Sklarov ceased to participate in the proceedings, and, in June 2020, the Nevis court issued a judgment in default against him. Mr. Sklarov sought to set aside the judgment in default, but his application was dismissed. The Nevis court held that Mr. Sklarov had carried out a stock-backed loan fraud and that the loan agreements were vitiated due to fraud. Mr. Sklarov's appeal was dismissed by the Court of Appeal of the Eastern Caribbean Supreme Court. On 9 August 2023 the Supreme Court of the Bahamas made an order for the registration and enforcement of the Nevis judgment in the Bahamas.

68.    To similar effect, Prescient Investment Limited ("**Prescient**") executed a loan agreement for $117 million with Mr. Sklarov's company, America 2030, and transferred shares worth £200 million as collateral for the loan. Prescient alleged that Mr. Sklarov had wrongfully ordered a broker to sell some of the shares and to pay the proceeds to America 2030. Prescient obtained an interlocutory injunction from the Hong Kong court to prevent any further disposals of the shares. Mr. Sklarov responded by causing America 2030 to bring a claim in the United States District Court, N.D. Georgia, asserting that the loan agreement permitted America 2030 to sell the collateral immediately, even before it had advanced any of the loan monies. The federal court dismissed America 2030's claims with prejudice and sanctioned Mr. Sklarov personally and enjoined him and his entities.

69.    Again to similar effect, ZS Capital Fund SPC ("**ZS**") owned shares in Zhejiang Cangnan Instrument Group Limited ("**Zhejiang**"). During early 2020 ZS was introduced to an entity named Astor Asset Management 3 Limited (incorporated in St Kitts and Nevis ("**Astor Nevis**") but for the avoidance of doubt, not Astor 3); and, on 12 May 2020 ZS entered into a stock loan agreement with Astor Nevis for a loan of US$31.8 million, secured over the shares in Zhejiang. On 17.06.20 ZS discovered that Astor Nevis had wrongfully dissipated almost 1 million of the shares in Zhejiang. ZS obtained an injunction to restrain Astor Nevis from disposing of any further shares. The dispute was referred to arbitration in Jamaica; and the arbitrator subsequently issued an award in favour of ZS.

70.    Again to similar effect, Fortunate Drift Limited ("**FDL**") owned shares in Yangtze River Port & Logistics Limited ("**YRIV**"). Mr Sklarov's company, America 2030, agreed to lend US$8 million to FDL, secured over shares in YRIV. FDL pledged the shares to America 2030, but America 2030 did not provide the promised loan. FDL then cancelled the loan agreement. However, America 2030 refused to return the shares and instead

began to sell them to third parties. FDL obtained a preliminary injunction to prevent America 2030 from disposing of the shares pending an arbitration in Hong Kong.

71. And finally to similar effect, Chenming Holdings (Hong Kong) Limited ("**Chenming**") owned shares in Shandong Chenming Paper Holdings Limited ("**Shandong Paper**"), which is listed on the Hong Kong Stock Exchange. Chenming was introduced to Astor Asset Management 2 Limited ("**Astor 2**"), which agreed to make loans secured over Chenming's shares in Shandong Paper, which were lodged with Weiser by way of collateral. The loan agreements were signed by Astor 2 using a fictitious name. Chenming repaid the loan in full, but Astor 2 refused to return the shares in Shandong Paper. Chenming obtained *Norwich Pharmacal* relief from the Hong Kong court and subsequently discovered that almost all of its shares had been fraudulently transferred or sold by Astor 2 shortly after they were deposited with Weiser. On 08.02.24, Chenming commenced proceedings against Astor 2 and others (including Vanderbilt) in the United States District Court Southern District of New York, stating: "*This action … involves a carefully designed scheme by Defendants to enter into sham loan transactions with Plaintiff under the cover of separate shell companies, and fabricate defaults by Plaintiff under the loan agreements, in order to ultimately take possession and control of the Collateral and deprive Plaintiff of its rights to and interest in the same*". These proceedings are ongoing.

72. It can be seen therefore that Mr. Sklarov and his companies appear to have a well-established *modus operandi* in the case of stock-based loan fraud.

73. In summary, I consider that there is (and was before Jacobs J) clearly a good arguable case that it was impliedly represented to the Claimants, through Mr. Torti and Ms Akbar, that Astor 3 was a legitimate and honest financial institution which engaged in legitimate and honest stock-lending activities (i.e. key representation 1); that that representation was false and the Claimants were induced as a result to enter into the SLA (as to which, the evidence is summarised in paragraph 108 of the Claimants' skeleton argument before Jacobs J). The fact that (as Mr. Béar KC points out) Astor 3 was a newly-formed company specifically incorporated in Canada at the request of Mr. Salinas for the purposes of this transaction does not undermine the fact that, on the Claimants' case, it was led to believe that it was part of the highly reputable and well-known Astor group of companies engaged in honest stock-lending activities, when it was not.

74. I also consider that there is a good arguable case, particularly in the light of the pre-contractual negotiations set out above, that it was impliedly represented to the Claimants that Astor 3 intended to comply with its obligations under the SLA including in particular its obligation not to sell the Elektra shares prior to maturity or default (i.e. key representation 2).

75. As Mr. Robins KC submitted to Jacobs J at the without notice hearing on 2 August 2024 (transcript, p.10G), "*In summary, it appears from the facts that Astor 3 is not a legitimate and honest financial institution and it is to be inferred, particularly in light of Mr. Sklarov's prior stock lending frauds and his modus operandi, that Astor 3 never honestly intended to comply with its obligations under the SLA, including in particular its obligations to sell or otherwise deal with the Elektra shares prior to maturity or default.*"

76. Contrary to Mr. Béar KC's submission, the Claimants' case before Jacobs J was not simply that a representation that Astor 3 would comply with its obligations under the

SLA follows from the fact that it entered into the SLA on the terms which it did. It was that Mr. Sklarov's use of the Astor name, and his track record of similar stock lending frauds (whereby he disposed of collateral and failed to return it), allowed the court to infer that Astor 3 (Sklarov's company) did not intend to comply with his obligations under the SLA, in particular that it would not sell or short sell the Collateral on any publicly traded securities exchange, as it was clearly the case that Astor 3 understood that it could not do that under the terms of the SLA.  I consider that the Claimants had, and have, a good arguable case to that effect.

77.    Accordingly, Mr. Béar KC is wrong to submit that the way the case is put by the Claimants "is a naked attempt to turn a breach of contract claim into a (fraudulent) misrepresentation claim." It goes much further than that.

78.    Mr. Béar KC also criticised the Claimants' summary of the law contained in paragraph 101 of its skeleton argument before Jacobs J., in which they stated as follows:

> "*101.  …  In Kingscroft Insurance, for example, Moore-Bick J held that "the representation is likely in most cases to come down to no more than one of honesty in entering into the bargain".  Males LJ confirmed in SK Shipping at [51]: "There are some circumstances where an offer to contract on certain terms carries with it an implied representation as to the party's honesty in relation to the proposed transaction.  It is not necessary to see why this should be so.  Such honesty is the necessary substratum for all commercial dealings.  It goes without saying."*"

79.    Mr. Béar KC argued that the authorities "do <u>not</u> support the existence of such wide and, indeed, vague representations of the kind alleged by the Claimants in paragraph 101". He contended that by selectively quoting from *SK Shipping Europe v. Capital VLCC 3* [2022] 2 All ER (Comm) 784 in the manner set out above, the Claimants' counsel inexplicably:

(1)    omitted a critical part of the sentence quoted from [51] of Males LJ's judgment (underlined below):

> "51.  <u>While these cases illustrate a general principle that, in the absence of words of representation, the mere offer of contractual terms will not amount to any representation</u>, there are some circumstances where an offer to contract on certain terms carries with it an implied representation as to the party's honesty in relation to the proposed transaction."; and

(2)    failed to mention that at [48] of *SK Shipping*, Males LJ specifically <u>disagreed</u> with Moore-Bick J's suggestion in *Kingscroft* of a general rule that a party represents that it is able and willing to perform the contract.

80.    Moreover, Mr. Béar KC referred to the fact that in [52] of *SK Shipping* (also omitted by the Claimants), Males LJ emphasised that any implied representation made by a party about its honesty or integrity is limited to the transaction in question.  Referring to *Property Alliance Group v. Royal Bank of Scotland* [2018] 1 WLR 3529, Males LJ explained at [52] (emphasis added):

> "… the implied representation made by the bank was limited to sterling LIBOR (the currency of the proposed swap) and did not extend to a representation as to the bank's honesty, either in relation to other LIBOR currencies or generally.  <u>It</u>

was the bank's honesty in relation to the particular transaction proposed which mattered."

81.    I agree with Mr. Béar KC's analysis of the relevant authorities, namely that merely by offering to contract, a party does not (without more) thereby impliedly represent that it is able and willing to perform the contract as he understands it. However, *in some circumstances* an offer to contract on certain terms may carry with it an implied representation as to the party's honesty in relation to the proposed transaction.

82.    Whilst the Claimants very properly referred to the three relevant authorities on this question in their skeleton argument before Jacobs J (*Kingscroft*; *SK Shipping* and *Property Alliance Group*) it would have been preferable had their skeleton argument made the point in paragraph 81 above clear (in particular the first sentence). However, I do not think it matters in this case. As Mr. Robins KC made clear in his submissions to Jacobs J,  the Claimants' case is that on the facts of this case, the Claimants' offer to contract on the terms of the SLA *did* carry with it an implied representation as to Astor 3's honesty in respect of the stock-lending transaction, in particular that it did not intend to dispose of the Collateral wrongfully (see paragraph 102 of the Claimants' skeleton argument before the Judge). That representation, upon which the Claimants relied, was false. Evidence of falsity was provided by Mr. Sklarov's numerous other, similar stock-lending frauds and his use of the Astor name. The vehicle of Astor 3 was being used by Mr. Sklarov to perpetrate a stock-lending fraud.  The Claimants had (and have) a good arguable case to this effect. Of course, it is now known by the Claimants that not only was the Collateral sold but Mr. Sklarov used the sales proceeds to fund the Loans themselves to RBS, as well as retaining substantial sums for himself.

83.    Mr. Béar KC also submitted before me that the Claimants failed to explain to the Judge that a party cannot act dishonestly by doing what it subjectively understands the contract to permit. But that is wrong; the Claimants expressly dealt with this point in paragraphs 214-216 of their skeleton argument, in the "Full and Frank Disclosure" section:

"*(3) No dishonesty*

*214. Astor 3 and Mr. Sklarov may take the position that there was no dishonesty in a representation that Astor 3 intended to comply with the terms of the SLA insofar as it relates to the use of the shares in Elektra.*

*215. In particular, they may contend that they honestly believed that the SLA permitted Astor 3 to cause the Pledged Collateral to be sold or disposed of at any time.*

*216. However, any such contention would be a factual allegation which would have to be established by them at trial in due course. On the basis of information available, and having regard to the evidence suggesting the involvement of Mr. Sklarov (a convicted felon) in the transaction, it is submitted that there is a good arguable case of dishonesty.*"

84.    Nor do I accept Mr. Béar KC's criticism of the Claimants that they failed to draw the Judge's attention to the Sklarov Defendants' alternative construction of the SLA, as entitling them to do what they did with the Collateral. On the contrary, in the section on "Full and Frank Disclosure" in the Claimants' skeleton argument before Jacobs J, the Claimants expressly drew the Judge's attention to the 12 June Letter and sufficiently

explained the likely gist of the alternative construction arguments advanced by Astor 3 (see for example paragraphs 184-194).

*Summary*

85.  In short, I do not consider that there was any breach of the Claimants' duty of full and frank disclosure in respect of (i) their implied misrepresentation case; (ii) their explanation as to the contractual arguments open to Astor 3 under the SLA; or (iii) whether they adequately explained that a party cannot be said to have acted dishonestly by doing what it subjectively understands the contract to permit.

*(4) Delay*

86.  Nor do I consider that the Claimants delayed in seeking their injunctive relief. The evidence demonstrates that the factual background to the making of the application before Jacobs J was as follows.

87.  On 1 April 2024, in advance of the Elektra shareholders' meeting on 16 April 2024, Mr. Gayo of Fininvesta emailed Tavira to ask it to obtain passes permitting entry to the shareholders' meeting. Tavira delayed in responding but eventually said that this was impossible.

88.  This gave rise to a concern on the part of the Claimants as to whether Tavira was still actually holding the shares (and accordingly able to grant such passes). Accordingly, on 5 April 2024 Mr. Salceda emailed Tavira stating: "*We need now the evidence of the custody of the 6,263,994 Elektra shares that we deposit in Tavira, without excuses!*"

89.  In response, on 5 April 2024 Tavira provided him with an account statement for Mr. Salinas's account as at 28 March 2024, showing that 6,268,383 Elektra shares were supposedly still held in Mr. Salinas's account.

90.  Luke Harris of Tavira confirmed in an email dated 5 April 2024 that "*Your shares are held in custody at Tavira and as per your statement you have visibility on the positions you hold with Tavira*". None of the matters in paragraphs 28, 30 and 32-35 appear to have been made known to Mr. Salceda.

91.  Tavira's inability to provide any *independent* corroboration of this fact continued to be a cause of concern to the Claimants. As a result, on 10 June 2024 Mr. Salinas sent letters to Tavira and Weiser pointing out that under the contracts "*it is forbidden for you to carry out trades, loan of Shares or any temporal or permanent transfer of such Shares*" and requiring Tavira and Weiser to "*confirm the number of Shares held in the Contract as of the Date of this Letter and provide with proper evidence of the said position. If the Shares are held by custodians and/or sub-custodians, please provide evidence of the number of Shares held by each of them*".

92.  Neither Tavira nor Weiser responded to these letters. Instead, on 12 June 2024 Astor 3 responded to Mr. Salinas, asserting that the "*letters to the Custodians constitute interference which is prohibited by the SLA*" and contending that Astor 3's lien or encumbrance over the Elektra shares gave it the right to "*deal-in, dispose, or convert*" them.

93.  Thereafter, Mr. Salceda explained in paragraphs 84-86 of his first affidavit that:

> "*84. On 2 July 2024, I contacted Gregory Mitchell (of Astor 3) by telephone and explained that the Applicants wished to prepay all sums owing to Astor 3 (in exchange for the return of the Collateral Shares). I followed up with Mr. Mitchell by email on 5 July 2024… where I reiterated the same proposal in writing. Albert Yuen provided a vague response on 8 July 2024: "Your request will be forwarded to the committee as appropriate for consideration".*
>
> *85. I chased for a response on 12 July 2024. On 15 July 2024, Albert Yuen (of Astor 3) responded as follows: "The request we received from you was sent onward and we are currently waiting for further information/instructions. We will be sure to follow up".*
>
> *86. I felt that I was being fobbed off. A few days later, the Applicants instructed Paul Weiss to provide legal advice on this situation, and Paul Weiss instructed Counsel. On Thursday 25 July 2024, I attended a (privileged) consultation with Paul Weiss and Counsel. This resulted in the immediate appointment of Forward Risk…*"

94. Forward Risk, who were investigators, reported to Mr. Salceda on 31 July 2024. They informed him amongst other matters that companies in the Astor Group appeared to belong to Mr. Sklarov and that Mr. Sklarov had been guilty of numerous stock-backed loan frauds (set out above). The Claimants were also informed on 1 August 2024 by Tavira that on 29 July 2024 all 6,268,383 shares of the collateral of which Tavira was custodian were subject to "FOP Delivery Out" "*to Astor's account as per Astor's instructions*".

95. The Claimants then sought their urgent injunctive relief before Jacobs J on 2 August 2024.

96. In the circumstances, I do not consider that the Claimants delayed in seeking their injunctive relief.

97. The Sklarov Defendants contend, however, that the Claimants delayed for more than three years (since September 2021) before seeking the Injunctions and that this inexplicable delay "*was glossed over in their evidence and not properly drawn to the Court's attention*" (Sklarov 1, [5f] and [61]).

98. I do not accept this criticism.

99. The criticism is based upon the alleged fact that in the email sent by "Gregory Mitchell" (Mr. Sklarov) to Mr. Torti on 10 September 2021 (referred to above), he was told "*in the clearest possible terms—that: (a) Astor 3 intended to do the <u>very thing</u> now alleged to be dishonest; and (b) that this was entirely in accordance with the terms of the SLA*". And yet, submits Mr. Béar KC, Jacobs J was not even told about this email.

100. The short answer to this point is that, as Mr. Salceda states in paragraph 16-26 of his 4th witness statement, he and the Claimants were unaware of the material parts of this email exchange and the information contained in it until Mr. Sklarov referred to it in his 1st witness statement of 1 September 2024. Mr. Torti failed to forward it to Mr. Salceda at the time. There was, therefore, no reason for the Claimants to have been aware of it 3 years later when seeking their urgent freezing relief.

101. Mr. Béar KC submits that this is a "wholly inadequate explanation" and "inherently unlikely and not credible". But the court plainly cannot make a finding at this interlocutory stage that the Claimants did receive this email, despite Mr. Salceda's denial

in his witness statement, or that they failed to make reasonable enquiries of Mr. Torti and had they done so they would have discovered it. It may very well have been, for example, that Mr. Torti did not forward the email because he was reassured by the contents of the 10 September 2021 email that Astor 3 was not selling the Collateral and that it was all still in Weiser's account ("*If you log into the account at Weiser, you will see that all the stock is there. We have not sold any of it, which is in accordance with the loan agreement*"); whereas a few weeks later the stock began to be moved out of Weiser's account, sold, and the proceeds used to make the Loans or paid away to third parties including Mr. Sklarov. Either way, the Claimants have given sworn evidence through Mr. Salceda that he and they did not know that the email existed. It is not open to the court to infer otherwise at the interlocutory stage simply because in the email Mr. Torti was told to "*speak to Mr. Salinas and advise us if this is not an issue*".

102.  As set out above, Mr. Torti and the Claimants were also reassured that the Sklarov Defendants were not doing anything untoward with the Collateral as a result of the events of October 2021. When the Claimants complained to Astor 3 and Ms Akbar about the transfer of 935,913 shares by Weiser to Astor Capital in October 2021, their concerns were assuaged at that time by Astor 3's agreement (i) to return the shares to Mr. Salinas's account, (ii) that further tranches of shares would be held with a different custodian and (iii) to the terms of Addendum 2 which confirmed that Astor 3 would comply with the terms of the SLA.

103.  Subsequently the Claimants were provided with regular account statements from Weiser and Tavira showing that the shares were in Mr. Salinas's account and had not been moved. They had no reason to believe at the time that the account statements were inaccurate.

104.  In short, the Claimants have a good arguable case that there was no reason for Mr. Torti or the Claimants to believe that Astor 3 was acting dishonestly in all the circumstances; nor that there was reason to believe that the Collateral was being sold. It follows that the 10 September 2021 email accordingly does not undermine the Claimants' case on key representation 2 in any event, viz that the stock-backed loan transaction was a vehicle for Mr. Sklarov's well-practised fraud and in particular that Astor 3 never intended to comply with its obligation not to sell the Elektra shares prior to maturity or an event of default.

105.  Contrary to Mr. Béar KC's submission, this conclusion is not affected by the WhatsApp messages referred to in the 4th witness statement of Mr. Sklarov which passed between Ms Akbar and Mr. Sklarov on 14 June 2024. These are exchanges to which the Claimants and Mr. Torti were not even parties and so obviously the Claimants could not have disclosed them at the hearing before Jacobs J. Moreover, they apparently concern the Claimants' complaint that Astor 3 was short selling or engaging with third parties to sell. Ms Akbar asks Mr. Sklarov if this is indeed true. Mr. Sklarov responds that "*We already made it clear that Astor is not selling*" – although by this stage it arguably appears that it was. Ms Akbar then tells Mr. Sklarov that Mr Torti spent an hour on the telephone with Mr. Salceda on the 13th June and advised him to review the SLA, and that whilst Mr. Torti "*gets it*", Mr. Salceda is "*a little bit of a loose cannon*". However, precisely what she discussed with Mr. Salceda and/or Mr. Torti in this regard will clearly be a matter for trial.

106.  It follows that I reject Mr. Béar KC's submission that these email and WhatsApp exchanges demonstrate that it was misleading for the Claimants to suggest to Jacobs J that they only discovered the fraud at the consultation with their legal advisers on 25 July

2024 and that rather "there has been an extraordinary and unexplained failure to act or investigate their own purported concerns for almost 3 years."

107. In any event, there was (before Jacobs J) and is (before me) plainly a risk of dissipation in the present case and the injunction granted by Jacobs J has managed to preserve a substantial portion of the assets and/or their proceeds. In these circumstances, I consider that any delay in bringing the application (which I do not accept occurred) would not have led to the injunction being refused. In *Madoff Securities International Ltd v Raven* [2011] EWHC 3102 (Comm) at [156], Flaux J (as he then was) stated (approved in *JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev* [2015] EWCA Civ 906 per Bean LJ at [34]):

> "*The mere fact of delay in bringing an application for a freezing injunction or that it has first been heard inter partes, does not, without more, mean there is no risk of dissipation. If the court is satisfied on other evidence that there is a risk of dissipation, the court should grant the order, despite the delay, even if only limited assets are ultimately frozen by it.*"

108. Furthermore, in the context of an application for a proprietary injunction (which the Claimants sought and obtained here), the potential relevance of delay is even more limited because it is not necessary to show that there is any risk of dissipation: see *Madoff* at [128].

*(5) The Claimant's failure to inform the court of its true motive for applying for injunctive relief*

109. Mr. Béar KC further submitted that the Claimants came to court on 2 August 2024 under the pretext that they had only discovered the alleged fraud at consultation with their legal advisers on 25 July 2024. He suggested that, in fact, what motivated Elektra to make the market announcement on 26 July 2024, which led (at Elektra's request) to the suspension of trading in the shares by the Mexican Stock Exchange on the same day, was the decline in Elektra's share price. He pointed to the fact that on 26 July 2024 *Simply Wall Street* (a market-leading financial app with c. 6m users) reported that Elektra's earnings had been in decline over a 5-year period, and declared Elektra to be an investment risk. This came on the back of reports of Elektra's poor results for Q2 (announced on 24 July 2024) recording a net loss of MXN 643 million (about US$34 million) versus a profit of MXN 4.94 billion (about US$250 million) for the same period in 2023.

110. Mr. Béar KC said that none of this commercial background was drawn to the court's attention and that it is beyond dispute that the duty of full and frank disclosure requires a 'fair presentation' of the facts. He submitted that in this case, a 'fair presentation' required the Claimants to explain what else had been happening in the critical period prior to the alleged discovery of the fraud on 26 July 2024 and that this provided the motive for the application for injunctive relief.

111. I reject Mr. Béar KC's speculative submission. The Claimants could not reasonably have anticipated at the hearing before Jacobs J that the Sklarov Defendants would subsequently advance such an argument concerning their motive. Moreover, Mr. Béar KC's submission concerning the financial health of Elektra and the Claimants' motivation for bringing its injunction applications is highly contentious: see paragraphs 126-129 of the Claimants' skeleton argument. This is also a case, therefore, where the

court cannot and will not embark upon a trial within a trial to establish whether or not facts existed which are alleged to be material.

112. As to that, the duty of full and frank disclosure "*cannot mean that a party must rehearse before the judge at the without notice application a detailed analysis of the range of possible inferences which the defendant may seek to draw ... That is particularly so when both the existence and the relevance of the underlying facts are in dispute*" (*Kazakhstan Kagazy plc v Arip* [2014] EWCA Civ 381 per Elias LJ at [70]).

113. As Slade LJ held in *The Electric Furnace Co v Selas Corporation of America* [1987] RPC 23 at 29, "*it would be unreasonable to expect a plaintiff ... to anticipate all the arguments, or all the points, which might be raised against his case*". Similarly, Cockerill J held in *Arcadia Energy Petroleum Ltd v Bosworth* [2017] EWHC 3160 (Comm) at [135] that "*it is wrong for the court to expect that every iteration of a defence should be anticipated or that the detail which emerges in the longer phases of preparing the case should be drawn to the attention of the judge*".

114. It is also important to bear in mind in a case such as the present the sensible observations of Slade LJ in *Brink's Mat Ltd v Elcombe* [1988] 1 WLR 1350 at 1359:

"*By their very nature, ex parte applications usually necessitate the giving and taking of instructions and the preparation of the requisite drafts in some haste. Particularly, in heavy commercial cases, the borderline between material facts and non-material facts may be a somewhat uncertain one. While in no way discounting the heavy duty of candour and care which falls on persons making ex parte applications, I do not think the application of the principle should be carried to extreme lengths*".

115. To the same effect, Christopher Clarke J (as he then was) observed in *OJSC ANK Yugraneft v Sibir Energy plc* [2008] EWHC 2614 (Ch) at [106], "*In complicated cases it may be just to allow some margin of error. It is often easier to spot what should have been disclosed in retrospect, and after argument from those alleging non-disclosure, than it was at the time when the question of disclosure first arose*".

116. In the circumstances of this case, I do not consider that the Claimants can sensibly be criticised as to their presentation of the facts.

*(6) Mr. Salinas's wealth*

117. The same point can be made in response to Mr. Béar KC's submission concerning Mr. Salinas's wealth.

118. Mr. Béar KC referred to the fact that in support of the Claimants' application, it was said that Mr. Salinas is "*one of the wealthiest individuals in Mexico with a net worth of several billion US dollars*": see paragraph 6 of Mr. Salceda's first affidavit 1 and paragraph 11 of the Claimants' skeleton argument before Jacobs J. He observes that both Jacobs J and HHJ Pelling KC took this at face value and "*did not even require the normal precaution for a foreign party obtaining injunctive relief of fortification of the cross-undertaking*".

119. Mr. Béar KC submits that the Mr Salinas's wealth was relevant not only to the adequacy of the cross-undertaking in damages and fortification, but also to whether the Claimants are entitled to the *substantive relief* to which they claim to be entitled, namely rescission of the SLA and the consequent need to make counter-restitution – it being the Claimants'

assertion that they are "*ready, willing and able to repay all sums owing to Astor 3* [i.e. approx. US$113.9m] *immediately*": see paragraph 135 of Mr. Salceda's first affidavit.

120.  In fact, Mr. Béar KC suggests that Mr. Salinas is not a wealthy individual and that he has had massive financial woes, been beset by scandal, and is guilty of tax evasion.

121.  Once again, this is all highly contentious (see Mr. Salceda's 4th witness statement at [45]) and the court cannot and will not embark upon a trial within a trial to establish whether or not facts existed which are alleged to be material.

122.  Indeed, it is notable that in his first witness statement of 1 September 2024 Mr. Sklarov sought to rely upon three letters dated 21 July 2022, 23 March 2023 and 3 June 2023 in which he said that Astor 3 had raised these issues with the Claimants concerning Mr. Salinas's financial probity and issues with the Mexican tax authorities and regulators. However, Mr. Salceda's evidence (in his 4th witness statement of 8 September 2024) is that the Claimants never received those letters. Despite this, (as the Claimants point out in paragraph 133 of their skeleton argument) Mr. Sklarov has refused to explain how those letters are said to have been sent to the Claimants; and the Claimants allege that the metadata appears to be inconsistent with Mr. Sklarov's evidence. Mr. Sklarov's solicitors have recently confirmed that the Sklarov Defendants no longer rely on the letters.

123.  So far as fortification of the cross-undertaking is concerned, Jacobs J observed at the *ex parte* hearing that fortification, if it arose, would be an issue for the Sklarov Defendants to raise on the return date (transcript, p. 19F-G).

124.  A respondent who seeks fortification must show that there is a sufficient risk that the injunction will cause loss and the likely amount of any such loss: see *Sectrack NV v Satamatics Ltd* [2007] EWHC 3003 (Comm) per Flaux J at [99], applying and approving Harley Street Capital ltd v Tchigirinski [2005] EWHC 2471 (Ch) at [17]-[18] (Mr. Michael Briggs QC, sitting as a Deputy Judge of the High Court).

125.  As Mr. Robins KC submits, the Sklarov Defendants have not applied for fortification nor have they demonstrated, by evidence, that there is any satisfactory basis for requiring the undertaking to be fortified, particularly in the light of (i) Mr. Sklarov's asset disclosure in his affidavit of 2 September 2024 (which suggests very limited assets aside from the Collateral and the sale proceeds thereof); and (ii) the fact that the Collateral transferred under the SLA was worth as much as US$415m, being worth much more than the amount of the Loans: see paragraph 27 above.

*Conclusion*

126.  As Mr. Robins KC pointed out, the Sklarov Defendants do not seek to discharge the freezing injunction on the ground that there is no good arguable case in conspiracy or deceit; nor on the ground that there is no risk of dissipation of assets. They do not seek to discharge the proprietary injunction on the ground that there is no serious issue to be tried. They seek to set the injunctions aside solely on the ground that the Claimants were in breach of their duty of full and frank disclosure.

127.  I do not consider that the Claimants were in breach of that duty in any of the respects alleged by Mr. Béar KC, despite his skilful submissions. Indeed, stepping back and looking at the matter in the round, it is plain that the Claimants had to act swiftly once (i) they discovered the alleged fraud in mid to late July 2024; (ii) they received the significant information provided to them by Forward Risk on 31 July 2024; and (iii) they

were informed by Tavira on 1 August 2024 that on 29 July 2024 all 6,268,383 shares of which Tavira was custodian were subject to "FOP Delivery Out" "*to Astor's account as per Astor's instructions*". They did indeed move swiftly and made their application on 2 August 2024. The full and frank disclosure section of their skeleton argument before Jacobs J, contained in paragraphs 181-221, supplemented as it was by Mr. Robins KC's oral submissions, was a sufficiently fair and accurate summary, under pressure of time, of the arguments which they anticipated the Sklarov Defendants might put forward in answer to the application.

128.  The Sklarov Defendants contest the conclusions which the Claimants invited Jacobs J to draw from the evidence, but there is clearly a good arguable case that the representations alleged by the Claimants were made to them, were relied upon by them, and were false and I am not satisfied that the Claimants were guilty of any of the non-disclosures which it is alleged occurred at the hearings before Jacobs J and HHJ Pelling KC. I consider that the remarks of Toulson J (as he then was) in *Crown Resources AG v Vinogradsky* (unreported, 15 June 2001) are apposite in a case such as this[6]:

> "*it is inappropriate to seek to set aside a freezing order for non-disclosure where proof of non-disclosure depends on proof of facts which are themselves in issue in the action, unless the facts are truly so plain that they can be readily and summarily established, otherwise the application to set aside the freezing order is liable to become a form of preliminary trial in which the judge is asked to make findings (albeit provisionally) on issues which should be more properly reserved for the trial itself*".

129.  In all the circumstances the Sklarov Defendants' Discharge Application is dismissed.

---

[6] in a passage approved in *Kazakhstan Kagazy plc v Arip* [2014] EWCA Civ 381 at [36] and followed in *National Bank Trust v Yurov* [2016] EWHC 1913 (Comm) per Males J at [20] and *Petroceltic Resources Limited* [2018] EWHC 671 (Comm) per Cockerill J.