# Exhibit B

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| *In re* Application of RICARDO BENJAMIN SALINAS PLIEGO & CORPORACIÓN RBS S.A. de C.V., for an Order Pursuant to 28 U.S.C. § 1782 Authorizing Discovery for Use in a Foreign Proceeding | Case No._____ |

## <u>DECLARATION OF EDWARD ALLEN</u>

I, Edward John Whitney Allen, declare under penalty of perjury under the laws of the United States and pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge, information, and belief:

1.      I am admitted to practice law, as a solicitor, before the Senior Courts of England and Wales. I am the Managing Partner of Enyo Law LLP ("**Enyo**"), a law firm located in London, United Kingdom. My firm acts for Ricardo Benjamin Salinas Pliego and Corporación RBS S.A. de C.V. ("**RBS**") (together, the "**Claimants**"), in relation to a case in England and Wales entitled: (1) Ricardo Benjamin Salinas Pliego (2) Corporación RBS S.A. de C.V., vs (1) Astor Asset Management 3 Limited ("**Astor 3**") (2) Weiser Global Capital Markets Ltd ("**Weiser**") (3) Tavira Monaco SAM ("**Tavira**") (4) Vladimir "Val" Sklarov, and (5) Cornelius Vanderbilt Capital Management Ltd ("**Vanderbilt**"), bearing claim

1

number CL-2024-000450 (the "**English Action**"). The English Action is being conducted in the Commercial Court, a division of the English High Court.

2.     I respectfully submit this declaration in support of the Claimants' application and petition for an order to conduct discovery for use in foreign proceedings pursuant to 28 U.S.C. § 1782 (the "**1782 Application**") to seek certain information and testimony and/or to discover and confirm the whereabouts of certain assets from (a) Aleksei Skachkov;[1] (b) Wells Fargo Bank, N.A. Inc. & Company; and (c) Discover Bank, Inc. in aid of the English Action.

3.     I filed a similar declaration in support of the application filed in the United States District Court for the Southern District of New York titled *In Re Application Ricardo Benjamin Salinas Pliego & Corporación RBS S.A., for an Order Pursuant to 28 U.S.C. § 1782 Authorizing Discovery for Use in a Foreign Proceeding*, No. 1:24-mc-00394 (S.D.N.Y. Aug. 23, 2024) (the "**New York Application**").

4.     Nothing in this statement is intended, and I am not authorized, to waive any legal privilege on behalf of the Claimants. I am authorized by the Claimants to make this declaration on their behalf.

---

[1] I note that there appear to be variant spellings of Mr Skachkov's first name.

5.    Unless otherwise indicated, all facts set forth in this declaration are based upon: (a) my personal knowledge, (b) my review of relevant documents, and (c) information supplied to me by the Claimants or professionals retained by the Claimants. Where the facts are not within my own knowledge, but from other sources of information or belief, they are true to the best of my knowledge, information and belief.

## I.    <u>INTRODUCTION</u>

6.    I qualified as a solicitor of England and Wales in 2005 into the litigation department of an international law firm. I was part of the group which founded Enyo in 2010, a specialist disputes only law firm based in London. I became a partner at Enyo in 2012 and Managing Partner in 2022. My practice has been primarily focused on large-scale commercial disputes, generally with an international element. Further details of my qualifications and experience can be found on my profile at my firm's website.[2]

7.    During my career, I have been involved in a number of cases before the English Court where one or more of the parties has sought evidence in the United States pursuant to 28 U.S.C. § 1782 ("**Section 1782**") applications. Based upon my

---

[2]    https://enyolaw.com/team/edward-allen/

experience, I am aware that the English Courts will generally admit evidence that has been obtained using the Section 1782 procedure and I believe that it would do so in this case.

8.    The admission of evidence obtained using the Section 1782 procedure is well-established in English case-law. The House of Lords (as it was then called prior to being reconstituted as the Supreme Court in 2009) held in South Carolina Insurance Co v Assurantie Maatschappij "de Zeven Provincien" [1987] A.C. 24 that there was nothing necessarily improper in using foreign procedures to obtain pre-trial discovery for the ultimate purpose of use in concurrent English proceedings (**Exhibit 1**). Further, it held that use of information obtained from a Section 1782 application was not inherently objectionable and abusive because it interfered with the court's control of its own procedure. In that case an injunction had been granted by the lower courts restraining the claimants from proceeding with a Section 1782 application. The House of Lords discharged the injunction, holding that it was up to a party to obtain by his own means the evidence it required to support its own case provided those means were lawful in the country in which they were used.

9.    A similar decision was reached in Nokia Corporation v. Interdigital Technology Corp [2004] EWHC 2920 (Pat) (**Exhibit 2**). There the English court

4

denied a request to restrain a party from making a Section 1782 application in the

United States and stated that:

> *it cannot be said a priori or that the material which would be obtained on discovery in this case, as sought in the section 1782 proceedings, would not be capable of being deployed in these proceedings.*"  The court further stated that: "*the English court should not seek to circumscribe the discretion possessed by the* [US District Court] *by imposing its own view as to the appropriateness of the classes of documents sought by reference to the issues in proceedings as they stand. It is legitimate for the requesting party to use the* [Section 1782 procedure to] *request to ascertain facts and obtain documents of which the requesting party is unaware, but which may be in the future deployed in the English proceedings, if necessary after appropriate amendment.*

10.    On rare occasions, the English court has granted injunctions to prevent

Section 1782 applications where they have been held to be "*abusive, unconscionable*

*or vexatious*," which I do not consider the present Section 1782 application to be.

## II.    BACKGROUND TO THE ENGLISH ACTION

11.    I summarise briefly below the key background facts that are relevant to

the English Action, addressing first the key documents:

12.    First, a stock-lending agreement was executed on 28 July 2021 (the

"**SLA**") between (a) Astor 3 as lender, (b) RBS as borrower, and (c) Mr. Salinas as

guarantor, pursuant to which Astor 3 agreed to advance loans of up to MXN

3,008,580,000 (c.USD 161 million) to RBS, secured over shares in Grupo Elektra S.A.B. de C.V. ("**Elektra**") owned by Mr Salinas.

13. <u>Second</u>, a custodian management agreement dated 28 July 2021 was entered into between Weiser, RBS, Mr Salinas and Astor 3 (the "**Weiser Agreement**").

14. <u>Third</u>, a control agreement dated 1 November 2021 between Tavira, RBS, Mr Salinas and Astor 3 (the "**Tavira Agreement**") (together with the Weiser Agreement, the "**Depository Agreements**").

15. Pursuant to the SLA and Depository Agreements, Astor 3 advanced a total of five loans to RBS with a total principal amount of MXN 2,154,218,552.55 (c.USD 116 million). These loans were secured over a total of 7,204,296 Elektra shares belonging to Mr Salinas (the "**Collateral Shares**"). 935,913 Collateral Shares should be held by Weiser, and 6,268,383 should be held by Tavira pursuant to the Depository Agreements.

16. The Claimants say that they were induced to enter into the above agreements on the basis of representations (express or implied) by Mr Sklarov, Astor 3, and Astor Capital. These are set out in paragraphs 17 and 18 of the Claimants' particulars of claim in the English Action (**Exhibit 3**) as follows:

> *17. In order to induce the Claimants to (i) transfer Elektra Shares to Weiser and Tavira and (ii) provide Astor 3 with the power to instruct Weiser and*

6

*Tavira to dispose of the Elektra Shares, the following express representations were made to the Claimants by or on behalf of Mr Sklarov, Astor Fund and/or Astor 3:*

> *(1) Astor and the companies in its group (including Astor Fund and Astor Asset Management) were associated with the Astor Family and Astor 3 was a special purpose vehicle owned and controlled by Astor.*

> *(2) Astor, Astor Fund and Astor Asset Management had entered into many bona fide stock-lending transactions in the past.*

> *(3) The dealings and affairs of Astor, Astor Fund, Astor Asset Management and Astor 3 controlled and/or overseen by individuals by the names of Thomas Mellon (a descendant of the Astor Family and the chief executive officer of Astor Asset Management) and/or Gregory Mitchell (the Managing Director of Astor Asset Management in North America and/or "Managing Director of North America" for Astor Fund).*

*18. Further or alternatively, in order to induce the Claimants to (i) transfer Elektra Shares to Weiser and Tavira and (ii) provide Astor 3 with the power to instruct Weiser and Tavira to dispose of the Elektra Shares, the following implied representations were made to the Claimants by or on behalf of Mr Sklarov, Astor Fund and/or Astor 3:*

> *(1) Astor and the companies in its group (including Astor Fund and Astor Asset Management) were associated with the Astor Family and Astor 3 was a special purpose vehicle owned and controlled by Astor.*

> *(2) Astor and the companies in its group (including Astor Fund, Astor 3 and Astor Asset Management) were legitimate and honest financial institutions which carried on legitimate and honest stock-backed lending activities.*

> *(3) The dealings and affairs of Astor, Astor Fund, Astor Asset Management and Astor 3 were controlled and/or overseen by individuals by the names of Thomas Mellon (a descendant of the Astor Family and the chief executive officer of Astor Asset Management)*

7

*and/or Gregory Mitchell (the Managing Director of Astor Asset Management in North America and/or "Managing Director of North America" for Astor Fund).*

*(4) Astor, Astor Fund, Astor Asset Management and/or Astor 3 intended a member of the Astor group (in the event, Astor 3) to enter into a legitimate and bona fide contract of loan with the intention and ability to fund the loan with their own cash resources and not by selling any of the Elektra Shares.*

*(5) The lender in respect of such a loan (in the event, Astor 3) would intend and/or (once incorporated) did intend to comply with its obligations in respect of the loan and security as it honestly understood them to be*" (together the "**Representations**").

17.    In 2024, the Claimants developed concerns about the conduct of Astor 3 and associated parties and started to investigate the position. The Claimants are now aware that: (a) Astor 3 is controlled by Mr Sklarov who has a long history of fraudulent schemes; and (b) Astor 3 is an entity used by Mr Sklarov to perpetrate stock-lending fraud.

18.    As the existence of the fraud has been revealed, it appears that Mr Sklarov directed Astor 3 to instruct Weiser and/or Tavira to misappropriate at least some of the Collateral Shares. For example: (a) on 29 July 2024, one of Mr Sklarov's associates (Ms Elizabeta Lata) authorised the transfer of 6,268,383 Collateral Shares to Astor 3, and (b) on 30 July 2024, Weiser executed sale at a significant undervalue of 935,716 Collateral Shares to another of Mr Sklarov's companies, Astor Capital Fund Ltd ("**Astor Capital**" and the "**Astor Capital Transaction**").

19.    The Claimants believe that they have been victims of a major international stock-lending fraud conducted by Mr Sklarov via his companies and that the Representations were fraudulent.

## III.    THE ENGLISH ACTION

**Introduction**

20.    Since the fraudulent scheme was uncovered, the Claimants have taken urgent steps in the English Action: (a) to commence legal proceedings with a view to obtaining judgments which can be enforced against the perpetrators for the recovery of the Collateral Shares and their proceeds as well as damages and other relief, (b) to obtain freezing orders and proprietary injunctions seeking to secure and prevent further dissipation of the Collateral Shares and their proceeds, and (c) to seek information from the parties involved as to the location of the Collateral Shares and their proceeds, with a view being able to secure those assets and identify further individuals who may have been involved in the fraudulent scheme and/or hold the Collateral Shares and their proceeds.

**The claims**

21.    In terms of the claims themselves: (a) Astor 3 is being sued for fraudulent misrepresentation (also known as the tort of deceit), and (b) Astor 3, Mr Sklarov, Vanderbilt, and  Astor Capital are being sued for economic tort claims of

intention to cause harm through unlawful means and/or conspiracy to cause harm through unlawful means and/or alternatively damages for a breach of trust and/or breach of contract and/or breach of fiduciary duty. The Claimants have not issued personal claims seeking damages for wrongdoing against Tavira and Weiser (but reserve the right to do so) but are seeking proprietary remedies in relation to the Collateral Shares and the proceeds thereof arising from the recession of the SLA and its supporting transaction documents. I exhibit hereto the Claimants' re-amended claim form and re-amended brief details of claim (**Exhibit 6**), as well as its Particulars of Claim **(Exhibit 3)** which provide further information.

**<u>Injunctive relief</u>**

22.    There are two principal aspects to the injunctive relief obtained by the Claimants to date: (a) freezing orders over the assets of Astor 3, Mr Sklarov, Vanderbilt, and Astor Capital, and (b) proprietary injunctive relief to secure and prevent further dissipation of the Collateral Shares and their proceeds obtained against the same parties as well as Tavira and Weiser. I briefly address the legal basis for both aspects below.

23.    In order to obtain a freezing order, the applicant needs to establish two key elements which I summarize below. Paragraphs 137–149 of the Claimants'

skeleton argument for the hearing on 2 August 2024 address these elements in more detail (**Exhibit 5**).

24.    First, an applicant must show that he has a 'good arguable case' on the merits. There are different formulations as to what this means in the authorities. Some cases refer to the applicants having to show the better of the argument on the merits of the claim, taking into account what is known at this early stage of the litigation process. Other cases place the threshold slightly lower, stating that the claims have to be more than capable of serious argument but not necessarily claims which a judge would consider will succeed on the balance of probabilities. In the English Action, the Claimants have established that their claims meet either threshold. Therefore, the English court has been satisfied that the Claimants' claims have real merit.

25.    Second, the applicant must also satisfy the court that there is a good arguable case that there is, without an injunction, a real risk that a judgment in favour of the applicant would go unsatisfied, in the sense that - unless restrained by an injunction - the defendant will dissipate or dispose of his assets other than in the ordinary course of business. Further, it is not necessary to show that a judgment would be completely defeated. It is enough to show that the enforcement of any judgment would be more difficult. It is this risk of dissipation which necessitates

most freezing orders to be issued without notice to the respondents with the result that the order is obtained on an ex parte basis. Once served, the respondent has the ability to apply to the court to discharge or vary the terms of the freezing order.

26.    The requirements for a proprietary injunction are different to those for a freezing order. An applicant must show that: (a) there is a serious issue to be tried, (b) damages would not be an adequate remedy, and (c) the balance of convenience, or balance of justice, favour the granting of an injunction. Unlike the granting of a freezing order, the test does not require a real risk of the relevant assets being disposed of, although this is relevant to the court's assessment of whether to grant such injunction. Paragraphs 133–136 of the Claimants' skeleton argument for the hearing on 2 August 2024 address the legal test in more detail (Ex. 5).

27.    A freezing order and proprietary injunction are amongst the most draconian of the remedies available to the English court in civil proceedings. As such, they bear a penal notice making it clear that: (a) if a respondent to the order breaches their terms, the respondent may be held in contempt of court and may be imprisoned, fined or have their assets seized, and (b) any third party who knows of the order and does anything which helps or permits the respondents to breach their terms may be held in contempt of court and may be imprisoned, fined or have their assets seized.

28.     As a matter of English legal theory, a worldwide freezing order and a proprietary injunction are extra-territorial orders, in that they apply throughout the world.

29.     However, in practice, there are limits to the territorial jurisdiction of the English court, and it is usually necessary for a claimant to commence proceedings in other relevant jurisdictions in order to enforce the English court's orders, or obtain comparable or supporting relief, in those other jurisdictions.

30.     Further, the form of order also includes what is known as the 'Baltic proviso' (after Baltic Shipping Co Ltd v Translink Shipping Ltd [1995] 1 Lloyd's Rep 673) making it clear that the order does not prevent any non-party from complying with: (a) what it reasonably believes to be its obligations, contractual or otherwise, under the laws and obligations of the country or state in which those assets are situated or under the proper law of any contract between itself and the respondent, and (b) any orders of the courts of that country or state, provided that reasonable notice of any application for such an order is given to the applicant's solicitors (**Exhibit 7**).

31.     Finally, I note that freezing orders and proprietary injunctions, as is the case in relation to injunctions obtained in the English Action, are generally accompanied by directions requiring the respondents to provide certain disclosure to

allow the applicant and English court to police the terms of such orders. The respondents are generally directed to provide such information informally at the first instance and then in the form of an affidavit a short period of time after the application is granted.

**Chronology of key events**

32.    I set out below a summary of the progress of the English Action to date which, as is frequently the case in such situations, has developed as further information has come to light.

33.    On 2 August 2024, the Claimants commenced the English Action against Astor 3, Weiser, Tavira, and Mr Sklarov seeking the substantive relief described above (**Exhibit 8**).

34.    The same day, on the urgent ex parte application of the Claimants, Mr Justice Jacobs granted the Claimants: (a) a worldwide freezing order against the assets of Astor 3 and Mr Sklarov up to the sum of MXN 5,411,000,000 (c.USD 264.6 million) (b) a proprietary injunction against each of Astor 3, Weiser, Tavira, and Mr Sklarov prohibiting dealing with the Collateral Shares, and (c) directions for disclosure of information about the whereabouts of the Collateral Shares and their proceeds (the "**2 August Order**," **Exhibit 9**).

35.    With regard to the worldwide freezing order, I set out below how this was summarized in the Claimants' skeleton argument:

> 140.   _On the Applicants' case, Astor 3 and Mr Sklarov have carried out a fraudulent scheme to misappropriate the property of Mr Salinas, worth many hundreds of millions of US dollars. It is submitted that the Applicants have a good arguable case._
>
> 141.   _Further, it is likely that the Respondents have assets against which the Applicants could enforce. After all, the Respondents have (on the Applicants' case) carried out an enormous fraud, and the fruits of that fraud must be found somewhere._ It is possible that any assets held by Respondents are held on trust for the Applicants, but that is not necessarily the case. The Applicants could easily find themselves in a position where they need to execute a sizeable judgment against the Respondents' assets.
>
> 142.   Accordingly, there are grounds for believing that the Respondents own assets that will be caught by the proposed worldwide freezing order and that any such order will not be futile: see Ras Al Khaimah Investment Authority v Bestfort Development LLP [2017] EWCA Civ 1014; [2018] 1 WLR 1099 at [39].
>
> 143.   _It is unknown where the Respondents' assets are located, but they could be anywhere around the world._ To take Astor 3 as an example, this is an entity incorporated in Canada with a sole purported director in the Seychelles and a sole purported beneficial owner in Ukraine. Tavira is incorporated in Monaco and Weiser is incorporated in the Bahamas. Mr Sklarov is said to be resident in either the United States or Ukraine. This illustrates why a worldwide freezing order is required.
>
> 144.   _There is a real risk of dissipation. This is a risk that must necessarily arise in circumstances where the Respondents have conspired to commit a large-scale international fraud against the Applicants._
>
> 145.   For the same reasons, the Applicants submit that it is just and convenient for a worldwide freezing injunction to be granted.

15

146. *The draft Order provides that the freezing order is limited to the sum of MXN 5,411,000,000 which is the value of the shares (MXN 7,565,879,616) less the principal amount of the loans (MXN 2,154,218,552), rounded down to the nearest MXN 1 million.*

147. *The Applicants are willing to give an unlimited cross-undertaking in damages (in the standard form set out in the Commercial Court Guide). As noted above, Mr Salinas is one of the wealthiest individuals in Mexico.*

148. *The Applications have been made without notice to the Respondents because the Respondents are carrying out a scheme to defraud the Applicants. Mr Sklarov is an experienced and sophisticated fraudster. It is necessary for interim relief to be granted against the Respondents before they have a chance to misappropriate any remaining Collateral Shares (or the proceeds thereof.*

149. *That is also the reason why the Applications are urgent and need to be heard as quickly as possible. In this regard, the Applicants have acted promptly to issue the Applications. The Applicants and their legal team moved as quickly as possible after the privileged report from Forward Risk was received on Wednesday 31 July 2024, and that report was commissioned on the very same day (Thursday 26 July 2024) that the Applicants were advised by their legal team that a fraud was potentially being committed. Further, the recent correspondence with Tavira that suggests that the entirety of the Collateral Shares formerly held by it have now been transferred to Astor 3 it is imperative that the Applicants obtain interim protection urgently to prevent any further misappropriation of the Collateral Shares or their proceeds*" (emphasis added, Ex. 6).

36.    Mr Justice Jacobs also granted the Claimants permission to serve documents in the English Action out of the jurisdiction to specified email addresses (the "**2 August Service Order**").

37.    On 7 August 2024, the Claimants amended the Claim Form to add Vanderbilt as a defendant on the basis that it appeared to have been actively involved in the fraudulent scheme (**Exhibit 10**). On the same day, Mr Justice Jacobs granted a freezing order, a proprietary injunction and directions for disclosure against Vanderbilt (the "**7 August Order**," **Exhibit 11**). He also granted the Claimants permission to serve documents in the English Action out of the jurisdiction on Vanderbilt (the "**7 August Service Order**"), which the Claimants duly did.

38.    On 9 August 2024, Weiser provided information pursuant to the 2 August Order that identified for the first time the Astor Capital Transaction. Astor Capital appears to be a further company controlled by Mr Sklarov.

39.    On 13 August 2024, His Honour Judge Pelling KC granted a freezing order, a proprietary injunction and directions for disclosure against Astor Capital (the "**13 August Order**," **Exhibit 12**). He also granted the Claimants permission to serve documents in the English Action out of the jurisdiction on Astor Capital (the "**13 August Service Order**"), which the Claimants duly did.

40.    On 15 August 2024, His Honour Judge Pelling KC made minor corrections to the 2 August Service Order, the 7 August Service Order, and the 13 August Service Order to correct the time for the Defendants to file a court form called an 'acknowledgment of service' (described further below) (**Exhibit 13**).

41.    On 20 August 2024, Astor 3, Mr Sklarov, Vanderbilt, and Astor Capital (the "**Sklarov Parties**") filed an application (the "**Discharge Application**"), with an accompanying letter to the court from their lawyers (DWF Law LLP) requesting that the English court discharge (*i.e.*, set aside) the 2 August Order, the 7 August Order and the 13 August Order (the "**Injunction Orders**"), on the basis that the Claimants had not complied with their duties of full and frank disclosure to the court (*i.e.*, the duty to present the case fairly to the court).

42.    The Discharge Application was supported by a witness statement from Mr Sklarov (**Exhibit 14**). In that evidence, Mr Sklarov openly admitted that the Sklarov Parties were in deliberate breach of the Injunction Orders stating at paragraph 9:

> "*Given the blatant abuse of the Court's process, including obtaining a draconian order against me and the other Respondents without any sort of hearing beforehand, it has been very difficult for me to accept that I should provide Mr Salinas with information which might enable him to inflict yet further damage beyond what the Injunction Orders have already enabled. **I have been advised (without waiving privilege) as to the risks involved in not complying with an order of the Court...**" (emphasis added).*

43.    At a hearing on 29 August 2024, Mr Justice Bryan ordered *inter alia* that (without prejudice to any existing breaches of the Injunction Orders) the Sklarov Parties be given until 4pm on 2 September 2024 to comply with their obligations

under the information provision obligations in the Injunction Orders. The court also continued the Injunction Orders until the hearing of the Discharge Application which was listed for 20 September 2024 **(Exhibit 15)**.

44.    On 5 September 2024, the Sklarov Parties served two sworn affidavits from Mr Sklarov in purported belated compliance with the information provision obligations in the Injunction Orders. These statements have since been shown to be incomplete and misleading. For example, Mr Sklarov disclosed only eight assets, two of which the Claimants identified were in fact owned by Mr Sklarov's wife. Further, Mr Sklarov failed to disclose that he owns a residential property in Marousi, Greece, which he purchased in December 2021 in his own name. In subsequent correspondence, Mr Sklarov stated that he had "*inadvertently omitted*" to disclose this property due to an "*oversight*".

45.    The hearing of the Sklarov Parties' Discharge Application took place on 20 September 2024 before Mr Justice Calver. Mr Justice Calver handed down a detailed judgment on 7 October 2024, dismissing the Discharge Application in its entirety, including any suggestion that the Claimants had breached their duties of full and frank disclosure. The judge ordered that the Sklarov Parties pay the Claimants' costs of the application (although, in breach of that order, the Sklarov Parties have to date failed to do make any such payment) **(Exhibit 16)**.

46.    In his judgment, Mr Justice Calver set out what he described as the "*following features of the transaction*" relied on by the Claimants, and from which he was able to conclude that the Claimants had a good arguable case in fraudulent misrepresentation:

> 55. First, Mr. Torti was led to believe (by Ms Akbar who had been liaising with Mr Sklarov) that the Claimants were negotiating and contracting with a company owned by the wealthy Astor family in the United States and accordingly that it was a legitimate and honest financial institution.
>
> 56. In fact, it was nothing of the sort. Rather (and there is strong evidence to suggest that), Mr. Sklarov used the Astor name precisely in order to mislead the Claimants into believing that this was so, and this was his modus operandi for stock-lending frauds perpetrated by him.
>
> 57. Second, there was evidence before Jacobs J that Astor 3 was controlled by Mr. Sklarov: see paragraphs 71-87 of the Claimants' skeleton argument for the hearing before Jacobs J).
>
> 58. Indeed, subsequent to the hearing before Jacobs J, in paragraph 12 of his witness statement of 1 September 2024 Mr. Sklarov sought to distance himself from the alleged fraud by suggesting that he was merely a "technical consultant" for Astor 3, Vanderbilt and Astor Capital and so on a day to day basis he had "limited knowledge" of the precise transactions entered into by those entities and limited access to their correspondence. He said he was "not an owner, beneficiary nor employee or officer of those entities". But that arguably appears to have been false, as he then swore two affidavits on 5 September 2024 on behalf of each of those companies as to their respective assets which he states is within his own knowledge. Similarly, his 4th witness statement of 16 September 2024 demonstrates that the "Elektra deal" as he calls it was his idea and his "business strategy."

20

59. *Third, before Jacobs J the Claimants maintained that Mr. Mellon and Mr. Mitchell (with whom the Claimants dealt in their correspondence with Astor 3 /Astor Capital) did not exist. Significantly, Mr. Sklarov was forced to admit in paragraph 87 of his 4th witness statement that Gregory Mitchell was in fact Mr. Sklarov himself. His purported explanation for this lacks any credibility. He states that he used this pseudonym because the use of his name "Vladimir" had led to him being discriminated in business. But that makes no sense in circumstances where the Claimants have discovered that he legally changed his name to Mark Simon Bentley on 22 April 2018, being long before the SLA was concluded. Indeed, Mr. Sklarov was also compelled to admit in paragraph 88 of the same witness statement that he had given his own solicitors false instructions in this regard, which led them (falsely) to inform the Claimants' solicitors by letter dated 5 September 2024 that "Mr. Sklarov never dealt directly with Mr. Mitchell but understood he was someone who worked with Mr. Mellon." It is clearly arguable that using this pseudonym was an attempt of Mr. Sklarov to distance himself from the company through which he perpetrated the alleged fraud.*

60. *So far as Mr. Mellon is concerned, who was the other person with whom the Claimants dealt in respect of this transaction, he too does not appear to exist, with the name being an alias for a Mr. Aleskei Skachkov, a business associate of Mr. Sklarov, as Mr. Sklarov now admits in paragraph 85 of his 4th witness statement. Mr. Allen explains in his 3rd witness statement dated 18 September 2024, served on behalf of the Claimants, that Mr. Skachkov is someone with a significant criminal record.*

61. *It appears likely therefore – and certainly there is a good arguable case to such effect - Astor 3 and Astor Capital are creatures of Mr. Sklarov, rather than being legitimate and honest financial institutions which engaged in legitimate and honest stock-lending activities, as Mr. Sklarov sought to portray them as being.*

62. *Perhaps most significantly, there was evidence before Jacobs J (as there is now before me) that, consistently with his use of the Astor name, Mr. Sklarov has gained some notoriety for setting up companies to*

> *which he then gives misleading names (being the names of well known, reputable financial companies) and which he then uses to perpetrate stock-backed loan frauds...*"

47.    I exhibit Mr Sklarov's first and fourth witness statements in the English Action (**Exhibit 17** and **Exhibit 18**) and my third witness statement in those proceedings (**Exhibit 19**), referred to in paragraphs 59 and 60 respectively of the above quoted passage from the judgment of Mr Justice Calver.

48.    On 28 October 2024, the Sklarov Parties issued an application seeking permission to appeal against Mr Justice Calver's judgment dismissing their Discharge Application. It is not yet known whether permission to appeal will be granted by the Court of Appeal.

49.    All but one of the Defendants have indicated an intention to defend the claims. However, Weiser has issued on 6 November 2024 an application challenging the jurisdiction of the English Court. That application is likely to be heard in the first half of next year. **(Exhibit 20)**.

50.    On 27 September 2024 and 15 November 2024, the Claimants filed their Particulars of Claim in the proceedings against the Sklarov Parties and Tavira respectively (Ex. 3). The next stage in the proceedings is for those parties to file their defence, the current deadline for which is 10 January 2025.

51.

## IV.    DISCLOSURE FROM THIRD PARTIES

### Information provided by Tavira

52.    As mentioned above, Tavira was directed to provide certain information about the Collateral Shares and their proceeds in the 2 August Order.

53.    On 5 August 2024, the Claimants' English solicitors (who, at that point, were Paul, Weiss, Rifkind, Wharton & Garrison LLP) received an email from Tavira purporting to discharge its disclosure obligations (**Exhibit 21**). This information was subsequently attested to in the form of an affidavit from Mr Luke Harris (**Exhibit 22**).

54.    The information revealed that the Astor 3 had rehypothecated some of the Collateral Shares to Vanderbilt who currently holds in custody with the Tavira USD 10.46 million in cash and USD 6.7 million of "*other shareholdings.*"

55.    The supporting information included a document purportedly setting out the details of the bank account for which the cash redemptions for the Collateral Shares were paid on behalf of the Astor 3 and Vanderbilt. The account is with *"Jurist Iq Corp Attorney Trust Account IOLA"* held by JPMorgan Chase ("**JPMC**") in New York. Jurist IQ is a law firm associated with Mr Singh. He is listed as the CEO of Jurist IQ on the New York State Division of Corporations (**Exhibit 23**).

**Information Discovered in the New York Application**

56.    On 23 August 2024, Claimants sought information from Mr Singh, the Singh Law Firm, Jurist IQ Corp., and from JPMC by filing the New York Application.  On 9 September 2024, United States District Court Judge Lewis A. Kaplan granted the New York Application and allowed subpoenas to issue to Mr Singh and the other respondents named in the New York Application.

57.    JPMC produced thousands of pages of bank records that revealed extensive transfers of proceeds believed to stem from Claimants' funds by Mr Sklarov and his associates, including to finance Mr Sklarov's and Mr Singh's lavish personal lifestyle and other expenses.  Among this activity are various payments over a three-year period totaling ▮▮▮▮▮▮▮▮▮▮ $USD in wire payments from the Jurist IQ Account to an individual identified as "Alexi Skachkov" located in Canton, Georgia. This appears to be the same person who, under the alias "Thomas Mellon", was "*...the other person with whom the Claimants dealt in respect of this transaction*" and was "*a business associate of Mr Sklarov*" (see paragraph 60 of Mr Justice Calver's judgment, quoted at paragraph 47, above). Records produced pursuant to the New York Application subpoenas also indicate wire payments of ▮▮▮▮▮▮▮▮ to a Wells Fargo checking account held by Mr Sklarov at 142 Gold Springs Road, Canton, Georgia.  These payments, among

24

hundreds of others, may well be related to proceeds received by sale of the Collateral Shares.

58.    In their efforts to (a) discover the location of the Collateral Shares and their proceeds, and (b) uncover the fraud perpetrated upon them, the Claimants wish to seek information from Mr Skachkov and Wells Fargo and Discover, and, in the case of Wells Fargo and Discover, none of whom are parties or are expected to be parties in the English Action, (c) any further information available to them about the location of the assets of Mr Sklarov, Astor 3, Astor Capital and Vanderbilt, particularly where there are ongoing doubts about those Defendants' representations and compliance to date in the English Action. This information will be of utility both in relation to the identification of the Collateral Shares (or any proceeds arising from their sale or conversion and in respect of the claims being brought) and revealing details of the fraud perpetrated against the Claimants, both of which will assist to particularise fully and support the Claimants' claims in England.

**Limitations under English law**

59.    Under English law, the English courts have jurisdiction to make orders requiring third parties mixed up in wrongdoing to provide information. Such orders are known as Norwich Pharmacal orders after Norwich Pharmacal Co v Customs and Excise Commissioners [1974] AC 133 (**Exhibit 24**). There is also a separate

equitable jurisdiction known as a Bankers Trust order after <u>Bankers Trust Co v</u> <u>Shapira</u> [1980] 1 W.L.R. 1274 (**Exhibit 25**). Whilst a separate jurisdiction, the same considerations apply, in particular in relation to their extra-territorial effect (described below).

60.    In principle, the English court has power to order a person over whom it has jurisdiction to provide documents held abroad. For example, the English court could order a London branch of a foreign bank to provide documents held by the bank's head office abroad. However, the granting of such relief is discretionary, and the English court will be careful not to make any orders which are oppressive. Further, in the cross-border context, the English court will act with restraint to avoid creating any conflict with foreign laws or authorities.

61.    In <u>Scenna v Persons Unknown and Others</u> [2023] EWHC 799 (Ch), the English court considered whether it should make a Bankers Trust disclosure order against a foreign bank. (**Exhibit 26**). I believe that same or similar considerations would also apply in relation to a Norwich Pharmacal order against an individual situated abroad.

62.    <u>Scenna</u> confirmed that the English court could, in the appropriate case, make a Bankers Trust order against a foreign bank. As regards the discretionary

considerations, the court cited the decision of Hoffmann J in <u>Mackinnon v</u> <u>Donaldson, Lufkin & Jenrette Corp</u> [1986] Ch 482 (**Exhibit 27**):

> *In principle and on authority it seems to me that the court should not, save in exceptional circumstances, impose such a requirement upon a foreigner, and, in particular, upon a foreign bank. The principle is that a state should refrain from demanding obedience to its sovereign authority by foreigners in respect of their conduct outside the jurisdiction... (493G)*
>
> *The need to exercise the court's jurisdiction with due regard to the sovereignty of others is particularly important in the case of banks. Banks are in a special position because their documents are concerned not only with their own business but with that of their customers. They will owe their customers a duty of confidence regulated by the law of the country where the account is kept... (494B-D)*
>
> *International law generally recognises the right of a state to regulate the conduct of its own nationals even outside its jurisdiction, provided that this does not involve disobedience to the local law. But banks, as I have already said, are in a special position. The nature of banking business is such that if an English court invokes its jurisdiction even over an English bank in respect of an account at a branch abroad, there is a strong likelihood of conflict with the bank's duties to its customer under the local law. It is therefore not surprising that any bank, whether English or foreign, should as a general rule be entitled to the protection of an order of the foreign court before it is required to disclose documents kept at a branch or head office abroad... (496)*
>
> *It seems to me that in a case like this, where alternative legitimate procedures are available, an infringement of sovereignty can seldom be justified except perhaps on the grounds of urgent necessity... (499F)*

63.    In <u>Scenna</u>, the court held that it should therefore take into account: (a) whether there was a real risk that in providing such disclosure, the respondent bank

would put itself in breach of local law, (b) whether there was a viable alternative method of obtaining the disclosure in the local courts where the respondent bank was located, and (c) whether the applicant was in 'hot pursuit' of information in urgent attempts to discover what has happened to its assets.

64.     In the circumstances of this case, I believe that the Claimants remain in 'hot pursuit' of information about the significant international fraud of which they have been victims (which I address further below in the context of urgency). However, where the 'targets' for the purposes of further disclosure involve a Georgia individual and bank account, it appears likely that the English court would be concerned by the prospect of compliance with the English court order amounting to a breach of US laws. Further, the English court would be unlikely to make any order that could potentially result in a breach of US laws if there were other means available in the US to obtain the same or substantially the same information. In the present case, there is a well-trodden path available to the Claimants in the form of a Section 1782 application, particularly where a court already granted Claimants' New York Application. Therefore, I consider the more appropriate legal remedy for the Claimants to be the Section 1782 application. As such, the Claimants are not attempting to circumvent any foreign proof-gathering restrictions or other policies

of England or the United States but pursuing the appropriate path open to them regarding information-gathering.

**Urgency**

65.    I believe that the Section 1782 application is urgent and would request that it is heard as soon as possible. This is because the Claimants are in hot pursuit of the Collateral Shares, their proceeds, assets which have been frozen and information about the fraud perpetrated upon them.

66.    It may well be the case that, if granted, the information provided by the Section 1782 Application leads to: (a) further chains of enquiry which need to be pursued rapidly, (b) the discovery of the Collateral Shares or their proceeds, or assets of those parties subject to the freezing orders in relation steps to which can be taken to preserve such assets, and/or (c) other information which assists the Claimants in prosecuting the English Action, including potentially leading to the joinder of further parties.

67.    I also note that the Claimants have acted promptly upon the discovery of the fraud. Without waiver of privilege, I note that the Claimants concluded on 26 July 2024 that they may have been victims of a fraud. The same day, investigators (Forward Risk) were appointed. As described above, this led to the English Action being issued on 2 August 2024 and the granting of the 2 August Order. Following

these initial steps, further orders were obtained on 7 and 13 August 2024. On 5 August 2024, information was provided by Tavira which has been the catalyst for the 1782 Application. On 23 August 2024, Claimants filed the New York Application, where respondents like Mr Singh have failed to fully comply with that court's deadlines and productions remain ongoing. It was not until review of the records produced following the New York Application, in late October, that payments to Mr Skachkov and the relevant Wells Fargo and Discover Accounts were even known. Therefore, I do not think it can fairly be suggested that the Claimants have been dilatory in pursuing the legal remedies available to them. To the contrary, they have moved with very significant expedition.

Executed this 10th day of December, 2024

_____

EDWARD ALLEN

# EXHIBIT 1

24

Lord Mackay
of Clashfern                    Reg. v. Shivpuri (H.L.(E.))                    [1987]

with the Lord Chancellor's view. Otherwise I agree with the reasons    A
given by my noble and learned friend, Lord Bridge.

*Appeal against conviction dismissed.*
*Costs of appellant and respondent to*
*be paid out of central funds.*

Solicitors: *Francis & Co., Cambridge; Solicitor, Customs and Excise.*    B

C. T. B.

C

[HOUSE OF LORDS]

SOUTH CAROLINA INSURANCE CO.        .        .    RESPONDENTS

AND                                    D

ASSURANTIE MAATSCHAPPIJ "DE ZEVEN
    PROVINCIEN" N.V.    .    .    .    .    .    APPELLANTS

SOUTH CAROLINA INSURANCE CO.        .    .    RESPONDENTS

AND

AL AHLIA INSURANCE CO. AND ANOTHER    .    APPELLANTS    E

1986  May 6, 7;            Lord Bridge of Harwich, Lord Brandon of Oakbrook,
      July 29                      Lord Brightman, Lord Mackay of Clashfern and
                                                Lord Goff of Chieveley

*Injunction—Jurisdiction    to    grant—Foreign    proceedings—Action*    F
    *brought in England—Defendants lodging petition in United States*
    *court for pre-trial discovery—Whether defendants to be restrained*
    *from proceeding with petition under court's inherent jurisdiction*

    The plaintiffs were an American insurance company, and,
having reinsured the liability of another American insurance
company, U.N.I., they reinsured the risk with the defendants in
London. The plaintiffs claimed under the contract of reinsurance
and, when the defendants disputed liability, they brought    G
proceedings in the Commercial Court. Before the defence was
served, the defendants lodged a petition in a United States
district court seeking, *inter alia,* an order for pre-trial discovery
of documents relevant to the claim and the plaintiffs' contract of
reinsurance with U.N.I., against persons resident in the United
States, who were not parties to the English action. On the
plaintiffs' application in the Commercial Court, the judge made    H
an order restraining the defendants from taking any further step
in the American proceedings or enforcing any order made
therein. On appeal by the defendants, the Court of Appeal
dismissed the appeal.

1 A.C.                    South Carolina Co. v. Assurantie N.V. (H.L.(E.))

**A**

On appeal by the defendants:—

*Held,* allowing the appeal, that although the power of the
High Court to grant injunctions, which was a statutory power
conferred by section 37(1) of the Supreme Court Act 1981, was
very wide it was limited, save for two exceptions irrelevant to
the present proceedings, to the situations (Lord Mackay of
Clashfern and Lord Goff of Chieveley dubitante) (i) where one
party to an action could show that the other party had either

**B**

invaded, or threatened to invade, a legal or equitable right of
the former for the enforcement of which the latter was amenable
to the jurisdiction of the court, and (ii) where one party to an
action had behaved, or threatened to behave, in an unconscion-
able manner; that in the circumstances the plaintiffs had failed
to show either that the defendants' conduct towards the plaintiffs
was amenable to the jurisdiction of the court, or that it was
unconscionable in the sense that it interfered with the due

**C**

process of the High Court's jurisdiction, and that, accordingly,
the injunctions granted would be discharged (post, pp. 31c–d,
39h—40d, 41a–d, 44a–b, c–d, e, f).

*Siskina (Owners of cargo lately laden on board) v. Distos
Compania Naviera S.A.* [1979] A.C. 210, H.L.(E.); *Castanho v.
Brown & Root (U.K.) Ltd.* [1981] A.C. 557, H.L.(E.) and
*British Airways Board v. Laker Airways Ltd.* [1985] A.C. 58,

**D**

H.L.(E.) applied.

*Per* Lord Goff of Chieveley. I am reluctant to accept the
proposition that the power of the court to grant injunctions is
restricted to certain exclusive categories. That power is unfettered
by statute and it is impossible at the present time to foresee
every circumstance in which it may be thought right to make
the remedy available (post, p. 44g).

**E**

Decision of the Court of Appeal [1986] Q.B. 348; [1985] 3
W.L.R. 739; [1985] 2 All E.R. 1046 reversed.

The following cases are referred to in their Lordships' opinions:

*Bank of Tokyo Ltd. v. Karoon (Note),* post, p. 45; [1986] 3 W.L.R. 414;
[1986] 3 All E.R. 468, C.A.

*British Airways Board v. Laker Airways Ltd.* [1985] A.C. 58; [1984] 3

**F**

W.L.R. 413; [1984] 3 All E.R. 39, H.L.(E.)

*Castanho v. Brown & Root (U.K.) Ltd.* [1981] A.C. 557; [1980] 3 W.L.R.
991; [1981] 1 All E.R. 143, H.L.(E.)

*Court of Commissioner of Patents for Republic of South Africa, In re* (1980)
88 F.R.D. 75

*Deere (John) Ltd. and Deere & Co. v. Sperry Corporation* (1985) 754 F. 2d
132

**G**

*MacShannon v. Rockware Glass Ltd.* [1978] A.C. 795; [1978] 2 W.L.R. 362;
[1978] 1 All E.R. 625, H.L.(E.)

*Siskina (Owners of cargo lately laden on board) v. Distos Compania Naviera
S.A.* [1979] A.C. 210; [1977] 3 W.L.R. 818; [1977] 3 All E.R. 803,
H.L.(E.)

The following additional cases were cited in argument:

**H**

*Armstrong v. Armstrong* [1892] P. 98
*Erhmann v. Ehrmann* [1896] 2 Ch. 611, C.A.
*Mike Trading and Transport Ltd. v. R. Pagnan & Fratelli (The Lisboa)*
[1980] 2 Lloyd's Rep. 546, C.A.
*North Carolina Estate Co. Ltd., In re* (1889) 5 T.L.R. 328

South Carolina Co. v. Assurantie N.V. (H.L.(E.))                    **[1987]**

*Straker Brothers & Co. v. Reynolds* (1889) 22 Q.B.D. 262
*Westinghouse Electric Corporation Uranium Contract Litigation M.D.L.*
    *Docket No. 235 (Nos. 1 and 2), In re* [1978] A.C. 547; [1978] 2 W.L.R.
    81; [1978] 1 All E.R. 434, H.L.(E.)

A

APPEAL from the Court of Appeal.

This was an appeal by leave of the House of Lords (Lord Scarman,
Lord Templeman and Lord Mackay of Clashfern) dated 19 November
1985 by the defendants, Assurantie Maatschappij "De Zeven Provincien"
N.V., in the first action, and by the first defendants, Al Ahlia Insurance
Co., and by the second defendants, Arabian Seas Insurance Co. Ltd., in
the second action brought by the plaintiffs, South Carolina Insurance
Co. from the judgment dated 23 May 1985 of the Court of Appeal
(Griffiths, Slade and Lloyd L.JJ.) which affirmed orders made on 25
April 1985 by Hobhouse J., the effect of which was to restrain the
defendants from taking any further steps in proceedings before a Federal
District Court of the United States for production and inspection of
documents against a number of companies and individuals not party to
the present actions.

The facts are set out in the opinion of Lord Brandon of Oakbrook.

B

C

D

*Robert Alexander Q.C.* and *Jonathan Sumption Q.C.* for the
defendants. The point raised by this appeal is novel. The question can
be stated in this way: in what circumstances (if any) may the English
courts restrain a party to an English action from availing himself of the
process of a foreign court for the purpose of obtaining evidence relevant
to the English action? The most authoritative decisions in this branch of
the law are those of this House in *Siskina (Owners of cargo lately laden
on board) v. Distos Compania Naviera S.A.* [1979] A.C. 210; *Castanho
v. Brown & Root (U.K.) Ltd.* [1981] A.C. 557 and *British Airways
Board v. Laker Airways Ltd.* [1985] A.C. 58.

In the present case the defendants against whom injunctive relief is
sought availed themselves of a right open to them under the federal law
of the United States and applied to a United States district court for an
order requiring persons resident in the United States, but who were not
parties to the English proceedings, to give pre-trial discovery of
documents relevant to the English action. The particular issue, therefore,
in this appeal is whether in the present circumstances it is right for the
English court to restrain the defendants from prosecuting further the
proceedings in the United States district court.

The rules of procedure in England provide a means whereby
discovery can be obtained between parties to an action and witnesses
can be subpoenaed to appear at the trial with relevant documents in
their possession. The rules of procedure do not provide an exhaustive or
exclusive code which prohibit a party from obtaining documents in any
way other than those provided by the rules. For example, if a stranger
to the action is prepared to give documents voluntarily to a party, that
party is entitled to receive them without obtaining a subpoena. Further,
a party may use the facilities of the courts of a friendly foreign state if
that state is willing for them so to do. The defendants concede that

E

F

G

H

A  there are limits to this principle. Thus, it is inapplicable where it would be unconscionable for a party to obtain discovery, for example, of documents which in this country are subject to professional privilege.

    The documents sought are relevant to the defences pleaded in the action which in turn reflect enquiries which were pursued before the action was brought. The plaintiffs obtained the injunction in spite of refusing the defendants consent to have access to the documents in
B  question. Since then they have granted the defendants access but it is the view of the defendants' solicitors that the strangers to the action have not made proper disclosure. The documents are not in the power or possession or control of the plaintiffs; therefore it is difficult to see why they object to disclosure. If the strangers to the action were in this country they could be required to produce the documents by subpoena duces tecum. As to any suggestion that the defendants could have
C  applied for letters rogatory under R.S.C., Ord. 39, r. 2, the procedure is cumbersome and expensive and they can be issued only where other efforts have been made to obtain the documents in question.

    As stated previously, after the Court of Appeal gave judgment the plaintiffs did arrange for the defendants to have controlled access to certain documents in the possession of certain third parties resident in
D  the United States. This was a facility which the defendants hoped would make the prosecution of the present appeal unnecessary. However, the restrictions imposed upon the defendants' inspection of documents made the facilities which were offered to them most unsatisfactory. They have therefore with regret concluded that certain documents have been withheld in a manner which can be remedied only by the compulsory
E  procedure of the United States district court.

    28 United States Code, section 1782, is a clear provision enabling parties to an English action to obtain from the courts of the United States documents for use in proceedings in this country. That being the rule, the question then arises: on what principle should the English court prevent disclosure where the United States courts would allow disclosure directed to a company which is subject to the jurisdiction of the United
F  States courts? It is the plaintiffs' contention that in the circumstances it is unconscionable for the defendants to apply for disclosure of these documents. The Court of Appeal held that in principle a party to litigation in this country should not avail itself of 28 United States Code, section 1782, against non-parties resident in the United States.

    Reliance is placed on the following propositions: (i) In principle it is
G  open to the defendants to seek material to enable them to conduct their case and to obtain that material as early as possible. A party can gather evidence for use in litigation either through the use of English procedures or through other means. (ii) There is no objection to these other means including means provided by United States proceedings. This does not, as the Court of Appeal suggested, deprive the English court of control over the proceedings. (iii) Caution is required before the conduct of any
H  foreign proceedings is restrained. (iv) The use of the United States processes could be restrained by injunction if it involved the breach of some legal or equitable right of the party claiming the injunction or was unjust or unconscionable to that other party but not otherwise. The

South Carolina Co. v. Assurantie N.V. (H.L.(E.))                [1987]

A

defendants dissent from the general approach of the Court of Appeal in the present case.

As to the authorities, reliance is placed on *Siskina (Owners of cargo lately laden on board) v. Distos Compania Naviera S.A.* [1979] A.C. 210, 211c–d, 255f–g, 256e–257, *per* Lord Diplock. As to *Castanho v. Brown & Root (U.K.) Ltd.* [1981] A.C. 557, see *per* Lord Scarman, at pp. 572f–g, and 574d. It is to be noted that that was a forum conveniens case. In *British Airways Board v. Laker Airways Ltd.* [1985] A.C. 58,

B

the observations of Lord Diplock at pp. 80a–b et seq., and Lord Scarman at p. 95c, show that the category of cases there under discussion have no relevance to the issue in the present case. The defendants would apply by analogy to the present case the observations of Dunn L.J. in *Mike Trading and Transport Ltd. v. R. Pagnan & Fratelli (The Lisboa)* [1980] 2 Lloyd's Rep. 546, 551.

C

On the facts of the present case it is not unreasonable or unjust for the defendants to apply for the documents in question. It is said that the documents would be obtained earlier than if they were obtained by subpoena in the English proceedings. But this is only a quirk of English procedure. The advantage of being able to obtain the documents at an earlier stage of the proceedings is in no way unconscionable to the plaintiffs. This is particularly so since otherwise they are not likely to be

D

obtained at all. The defendants do not accept that the procedure by way of letters rogatory is open to them. Further, it is an expensive procedure. It cannot be unjust or unconscionable for the defendants to take the "direct route" for obtaining these documents.

As to the United States authorities cited by Griffiths L.J. [1986] Q.B. 348, 357, those authorities are not contemplating the situation

E

which has arisen in the present case. The principles laid down by the Court of Appeal here it may be said to act unconscionably against the defendants rather than the plaintiffs. [Reference was also made to *In re North Carolina Estate Co. Ltd.* (1889) 5 T.L.R. 328; *Straker Brothers & Co. v. Reynolds* (1889) 22 Q.B.D. 262, and *Bank of Tokyo Ltd. v. Karoon (Note)* [1987] A.C. 45.]

F

*Kenneth Rokison Q.C., Christopher Symons* and *Thomas Weitzman* for the plaintiffs. Attention is drawn to the width of the inquiry requested by the defendants in the United States proceedings. They are seeking third party discovery which would not be allowed at all in England. The United States court will not allow that which would not be allowed by the court hearing the substantive issue between the parties. The defendants are in effect seeking to take part of the English

G

proceedings out of the jurisdiction and control of the English court. The difference between the disclosure of documents as a result of letters of request and the present case is that the defendants here have first gone to the foreign court and requested that court to make an order in English proceedings.

*In re Westinghouse Electric Corporation Uranium Contract Litigation M.D.L. Docket No. 235 (Nos. 1 and 2)* [1978] A.C. 547, is the antithesis

H

of the present case. The House there held that an English court will not, even when so requested by a foreign court, make an order in respect of an English person or company requiring that person or company to give

A  documentary or testamentary discovery for the purposes of the foreign proceedings. The present case is the reverse position since although the American court is being asked to assist the English court, the American court is being asked to admit a wider class of documents than is allowable under English procedure. It is thus an even stronger case than the *Westinghouse* case. The correct way for the defendants to proceed in the present issue is under R.S.C., Ord. 39, r. 1. Further, Ord. 38, r. 9

B  specifically relates to depositions in any cause or matter and links them to those under Ord. 39, r. 1.

The approach of Griffiths L.J. in the Court of Appeal is adopted. The plaintiffs are prejudiced by the American procedure because the defendants can obtain documents which could not be obtained under English procedure. Further, the plaintiffs are necessarily prejudiced by

C  the costs and expense of the American proceedings for they are bound to take part in those proceedings to protect their interests. The question also arises whether, if the English court would not make an order for third party discovery as sought by the defendants, the American court would make any order at all. It is plain from the American decisions in *In re Court of Commissioner of Patents for Republic of South Africa* (1980) 88 F.R.D. 75, 77, and *John Deere Ltd. and Deere & Co. v.*

D  *Sperry Corporation* (1985) 754 F. 2d 132, 135, 136, that a United States court will only grant an applicant an order under 28 United States Code, section 1782, if it is satisfied that an order of the same nature would be made in like circumstances by the foreign court seised of the dispute at that stage of the proceedings. The effect of those decisions is that any American court properly advised as to English law on discovery would deny the defendants' request as being for third party discovery which is

E  not allowable under English procedure. If it be said that this question can be left for the United States district court to decide, the answer is that it is better for the English court to deal with the matter and "nip it in the bud." It may be that the United States court would not be properly advised as to the relevant English law.

The English court has jurisdiction to restrain a party to proceedings

F  pending in England from seeking or continuing to seek interlocutory orders in a foreign jurisdiction for the purposes of those proceedings. The English court has an inherent jurisdiction to control its own proceedings. Further, it is well established that where proceedings are pending before the English court, and proceedings are brought in a foreign jurisdiction which concern the same issues, the English court has

G  a discretionary jurisdiction either to stay the English proceedings or to restrain by injunction a party to those proceedings from continuing to proceed in the foreign court. This jurisdiction was recognised by this House in *British Airways Board v. Laker Airways Ltd.* [1985] A.C. 58, 80D–F *per* Lord Diplock. This jurisdiction is commonly invoked in the so-called "forum conveniens" cases, where there is a choice of forum for determination of substantive issues between the parties. See *per* Lord

H  Scarman, at p. 95D. This jurisdiction must also exist where the foreign proceedings are of a purely interlocutory nature, but which overlap with the normal interlocutory processes before the English court. Indeed, it is an obvious and an "a fortiori" case. Thus here the United States

South Carolina Co. v. Assurantie N.V. (H.L.(E.))                    [1987]

proceedings are only ancillary proceedings and therefore there is no    A
reason why the English court should not have granted the injunction
appealed against.

*The Lisboa* [1980] 2 Lloyd's Rep. 546 is distinguishable because that
was a case where proceedings were started in Venice in order to obtain
security if the action was subsequently instituted in Italy. That case
cannot be described as one of a foreign court's interlocutory jurisdiction
being invoked in English proceedings. It was not an interlocutory    B
application for the purposes of English proceedings. The line of cases
cited by Robert Goff L.J. in *Bank of Tokyo Ltd. v. Karoon (Note)*
[1987] A.C. 45, is closer to the present case. The present case is one
where it is proper to grant an injunction to protect the jurisdiction of
the English court.

*Armstrong v. Armstrong* [1892] P. 98 lays down the correct approach    C
to the present problem; the principles stated there are applicable to the
present case. The essential question is: who should have control over the
present matter? The true answer is that it should be the English court
which should have control.

Suppose that in the present case the plaintiffs had attempted in the
United States Court to obtain pre-trial depositions from the defendants'
employees. Such an application would surely be restrained because it    D
would be so alien to English procedure. So also third-party discovery is
alien to English procedure. The matter can be tested by the following
example. If a party went to an English court and asked it to issue letters
rogatory in relation to third parties' documents under Order 39, such an
application would be dismissed. If the party then went to the United
States court and requested it under 28 United States Code, section 1782,    E
the English court should intervene on the ground that it was vexatious;
the party having failed before the English court, it cannot obtain the
evidence by utilising a foreign jurisdiction. But the answer cannot be
any different merely because the party in question goes to the United
States court first as in the present case.

*Erhmann v. Ehrmann* [1896] 2 Ch. 611, shows that the English court
will not grant letters rogatory except in relation to evidence which is    F
directly relevant to the issues in the case. Wider "discovery" will not be
made the subject of letters rogatory—let alone in respect of documents
held by a third party.

In conclusion, it is the plaintiffs' contention that they have a legal or
equitable right which it is appropriate for the English court to protect by
injunction, namely the right, as parties to proceedings in the English    G
court, to have those proceedings conducted in accordance with the
procedural laws and practices of England, and of no other jurisdiction.
Moreover, it is their contention that the defendants' application for
interlocutory relief in the United States is unconscionable and unjust to
the plaintiffs. If granted, it would allow the defendants to take advantage
of procedural steps and remedies available under English procedural
law, while at the same time avoiding some of the restrictions on those    H
steps and remedies which would nevertheless continue to impinge upon
the plaintiffs.

*Symons* followed.

A    *Alexander Q.C.* in reply. In the present case it is accepted that there is an advantage under the foreign proceedings which cannot be obtained in the English proceedings. It is this factor which distinguishes the present case from *Armstrong v. Armstrong* [1892] P. 98, as applied by Robert Goff L.J. in the *Tokyo Bank* case *(Note)* [1987] A.C. 45. The defendants rely on the principle on which they opened this appeal, namely, that the plaintiffs can only succeed if they can show that the

B    defendants' application before the United States court is unconscionable. As to the principle adumbrated by Griffiths L.J. below, the manner in which a party gathers evidence is for that party. It may gather it voluntarily or in pursuance of a contract. These methods do not deprive the English court in any way of control of its own proceedings.

    [Reference was also made to *In re Westinghouse Electric Corporation*

C    *Uranium Contract Litigation M.D.L. Docket No. 235 (Nos. 1 and 2)* [1978] A.C. 547, 562B–F.]

    Their Lordships took time for consideration.

    *29 July.* Lord Bridge of Harwich. My Lords, for the reasons

D    given in the speech of my noble and learned friend, Lord Brandon of Oakbrook, with which I agree, I would allow this appeal.

    Lord Brandon of Oakbrook. My Lords, the question for decision in this appeal is a novel one and can be stated in this way. An action between A and B is pending before an English court. While it is pending B, exercising a statutory right potentially available to him under

E    the federal law of the United States, applies to a district court of the United States for an order that persons resident in the United States, who are not parties to the action before the English court, should give him pre-trial discovery of documents relevant to the issues in that action. In those circumstances, is it right for the English court, on the application of A, to grant an injunction against B prohibiting him from prosecuting further his proceedings in the United States district court?

F    Hobhouse J. at first instance, and the Court of Appeal (Griffiths, Slade and Lloyd L.JJ.) on appeal from him, have held that it is right for such an injunction to be granted. The parties enjoined (for in the instant case there are three of them) now bring a further appeal with the leave of your Lordships' House.

    The background of the case is to be found in what can conveniently

G    be described as a three-tier insurance arrangement. The company which first insured the relevant risks was a United States company, United National Insurance Co. ("United National"). United National re-insured the risks which it had insured with another United States company, South Carolina Insurance Co. ("South Carolina"). South Carolina in turn re-re-insured the risks which it had re-insured with a number of other insurance companies in the London market. These other insurance

H    companies included a Dutch company, Assurantie Maatschappij "De Zeven Provincien" (Seven Provinces) and two Middle or Far Eastern companies, Al Ahlia Insurance Co. ("Al Ahlia") and Arabian Seas Insurance Co. ("Arabian Seas"). In or about 1984 South Carolina called

upon Seven Provinces, Al Ahlia and Arabian Seas to pay substantial    A
sums which South Carolina claimed to be due from them under the
contracts of re-re-insurance concerned. Seven Provinces, Al Ahlia and
Arabian Seas refused to make the payments asked for, denying that they
were liable to do so.

As a result South Carolina brought two actions in the Commercial
Court here in order to recover the sums which they claimed to be
payable, together with interest on such sums. In the first action, which    B
was begun on 12 December 1984, Seven Provinces is the sole defendant.
In the second action, which was begun on 28 February 1985, Al Ahlia is
the first defendant and Arabian Seas is the second defendant. It was the
original intention of the solicitors acting for South Carolina to seek
summary judgment in both actions under R.S.C., Order 14. However,
at an application to fix a date for the hearing of the Order 14    C
proceedings against Seven Provinces, counsel for the latter indicated that
a number of substantial defences would be raised to South Carolina's
claim. These defences included (1) misrepresentation or non-disclosure
regarding the retention position on the part of South Carolina; (2) non-
disclosure of a previous bad loss record on the business concerned; (3)
excessive deductions from premiums; and (4) payment of claims outside
the limits of the relevant treaty.    D

The underwriting agent for United National through whom business
was placed with it was Pacific General Agency Inc. ("P.G.A."). The loss
adjusters who investigated the claims made against United National
were Arthur Campbell-Husted and Co. ("Campbell-Husted"). The
principal place of business of both P.G.A. and Campbell-Husted is in
the State of Washington.    E

My Lords, Seven Provinces, Al Ahlia and Arabian Seas ("the re-re-
insurers") are, by reasons of their position, remote from the facts in
dispute, and obliged to rely for detailed information about them on such
documents as they can obtain from South Carolina or P.G.A. and
Campbell-Husted. The latter two, however, were not the agents of
South Carolina in connection with the relevant transactions; it follows
that discovery of documents by South Carolina in the two actions in    F
England would not extend to relevant documents held by them. In this
situation, if the re-re-insurers are to achieve their legitimate object of
inspecting and copying where necessary, relevant documents held by
P.G.A. and Campbell-Husted, some other means have to be found to
enable them to do so.

In November 1984, after South Carolina had put forward its claims
against the re-re-insurers, but before the two actions in England were    G
begun, the latter had asked P.G.A. if they could inspect the documents
in which they were interested at Seattle on 7 December 1984. P.G.A.
referred the request to their principal, United National, which in turn
consulted South Carolina. It appears that, on the advice of South
Carolina's English solicitors, the request for inspection was, in effect,
refused. The two actions in England were subsequently begun.    H

My Lords, 28 United States Code, section 1782, provides:

"Assistance to foreign and international tribunals and to litigants
before such tribunals. (a) The district court of the district in

33

**1 A.C.**          South Carolina Co. v. Assurantie N.V. (H.L.(E.))          Lord Brandon
                                                                            of Oakbrook

A   which a person resides or is found may order him to give his
testimony or statement or to produce a document or other thing
for use in a foreign or international tribunal. The order may be
made pursuant to a letter rogatory issued, or request made, by a
foreign or international tribunal or upon the application of any
interested person and may direct that the testimony or statement
be given, or the document or other thing be produced, before a
B   person appointed by the court. By virtue of his appointment, the
person appointed has power to administer any necessary oath and
take the testimony or statement. The order may prescribe the
practice and procedure, which may be in whole or in part the
practice and procedure of the foreign country or the international
tribunal, for taking the testimony or statement or producing the
document or other thing. To the extent that the order does not
C   prescribe otherwise, the testimony or statement shall be taken,
and the document or other thing produced, in accordance with
the Federal Rules of Civil Procedure."

D   On 28 March 1985, before the re-re-insurers had served their points
of defence and counterclaim in the two actions against them in England,
they applied by motion to the district court of the United States,
Western District of Washington, at Seattle, for an order under section
1782 above. The motion, the title of which referred to the two actions in
England, asked for an order against P.G.A. and Campbell-Husted
involving two matters. The first matter was the production and inspection
of numerous specified classes of documents of the kind which could
E   reasonably be expected to have come into being in the course of the
transaction of the insurance business which had led to United National,
having settled claims itself, to recover from South Carolina as its re-
insurers, and to South Carolina then claiming to recover over from the
re-re-insurers. The second matter was the appearance of three named
persons from P.G.A. and Campbell-Husted to give testimony by
deposition. The motion was supported by a memorandum and an
F   affidavit.

Notice of the re-re-insurers' motion was served on P.G.A. and
Campbell-Husted. South Carolina was also served with notice of the
motion, or otherwise made aware of its having been lodged. Neither
P.G.A. nor Campbell-Husted appeared before the district court to resist
the application. South Carolina, however, did so appear, and having
G   indicated their objection to it, was given until 29 April 1985 to file its
affidavit in opposition. It is to be inferred from the foregoing that
neither P.G.A. nor Campbell-Husted objects to producing the documents
listed in the motion for inspection, and where necessary for copying, by
the re-re-insurers, and that it is only the objection of South Carolina
that has stood in the way of their doing so.

H   On 24 April 1985, before the date fixed for filing its affidavit in
opposition in the United States district court, South Carolina issued
summonses in the two actions in England. By their summonses South
Carolina sought (1) an order that the re-re-insurers should withdraw
their application to the United States district court, (2) an injunction

34

A

restraining the re-re-insurers from proceeding further with such application, and (3) a declaration that the application was an abuse of the process of the English court.

My Lords, the summonses were heard by Hobhouse J. on 25 April 1985. He declined to make the declaration asked for, but granted South Carolina injunctions restraining the re-re-insurers until further order from taking any further steps in their motion before the United States district court and from enforcing any order made by that court on such motion. The main ground on which Hobhouse J. decided to grant such injunctions appears from pp. 10 and 11 in Appendix I to the printed case. Having set out what he called the framework of the matter, he said:

B

"It involves a question of principle as to whether or not the English court should retain the control of its own procedure and the proceedings that are before it. I have no doubt that the answer to be given to that question is that the English court should retain that control."

C

The decision of Hobhouse J. was, as I indicated earlier, affirmed by the Court of Appeal [1986] Q.B. 348. Griffiths L.J. gave the principal judgment, with which Slade and Lloyd L.JJ. both agreed. The main reason which Griffiths L.J. gave for his decision was similar to that relied on by Hobhouse J. He said, at p. 358:

D

"Once the parties have chosen or accepted the court in which their dispute is to be tried they must abide by the procedure of that country and that court must be master of its own procedure. Litigation is expensive enough as it is, and if a party fighting a case in this country has to face the prospect of fighting procedural battles in whatever other jurisdiction his opponent may find a procedural advantage it may impose intolerable burdens, and encourage the worst and most oppressive form of procedural forum shopping. We should set our face against any such situation developing.

E

"Severe dislocation to the timetable of the English litigation is a readily foreseeable consequence of unrestrained access to foreign procedural remedies. This is likely to cause hardship or inconvenience not only to the other party to that litigation but will also affect other litigants whose cases are listed upon forecasts dependent upon litigation being conducted in accordance with our own rules of procedure. As the judge said, the court will lose control of its own proceedings. Furthermore, one party might be able to gain a very unfair advantage in the English procedure if he was able to take the deposition of and cross-examine a witness whom he would never call on his own behalf at the trial, for example, the employees or business associates of his opponent. I think Mr. Sumption [counsel for the re-re-insurers] recognised this when he said he would be content to accept the stay in respect of his application to take the depositions of the witnesses from P.G.A. and Arthur Campbell-Husted & Co. I am therefore satisfied that as a matter of principle the court must have an inherent jurisdiction to make any necessary

F

G

H

A          order to ensure that the litigation is conducted in accordance with
its own procedures."

My Lords, before examining the question whether Hobhouse J. and
the Court of Appeal were right or wrong to grant the injunctions now
appealed against, it is necessary to draw attention to a number of
preliminary matters.

B          The first matter to which attention needs to be drawn is the existence
of an essential difference between the civil procedures of the High Court
in England on the one hand, and of courts of the United States on the
other, with regard to what may be compendiously described as pre-trial
discovery. Under the civil procedure of the High Court in England, pre-
trial discovery may take two forms. The first form, which is far and
away the more common, is by way of disclosure and inspection of
C          relevant documents under R.S.C., Ord. 24. The second form, which is
comparatively rare, is by way of the asking and answering on oath of
interrogatories under R.S.C., Ord. 26. Such discovery is, however,
subject to two important limitations, one relating to its scope and the
other to the stage of an action at which it normally takes place. So far as
the scope of discovery is concerned, it is limited to the disclosure and
inspection of documents in the possession or power of the parties to the
D          action, or to the asking and answering on oath of interrogatories as
between such parties. So far as the stage of an action at which discovery
normally takes place is concerned, it is the general rule that the two
forms of discovery to which I have referred do not take place until the
formal pleadings by both sides have been completed and the issues in
disputes thereby fully and clearly defined. In this connection, however,
E          it is right to say that the court has power to order either form of
discovery at any stage of an action, including a stage earlier than the
completion of pleadings; but such power is rarely exercised and then
only on special grounds, for instance when discovery is needed in order
that justice may be done in interlocutory proceedings.

F          Because of the first limitation to which I have referred, there is no
way in which a party to an action in the High Court in England can
compel pre-trial discovery as against a person who is not a party to such
action, either by way of the disclosure and inspection of documents in
his possession or power, or by way of giving oral or written testimony. I
would, however, stress the word "compel" which I have used in the
preceding sentence, for there is nothing to prevent a person who is not a
G          party to an action from voluntarily giving to one or other or both parties
to it either disclosure and inspection of documents in his possession or
oral or written testimony.

The procedure of the High Court in England, while not enabling
parties to an action to compel pre-trial discovery as against a person
who is not a party to such action, nevertheless affords ample means by
which such a person, provided that he is within the jurisdiction of the
H          court, can be compelled either to give oral testimony, or to produce
documents in his possession or power, at the trial of the action itself.
Under R.S.C., Ord. 38, Part II, such a person may be compelled to give
oral testimony at the trial by the issue and service on him of a subpoena

36

**Lord Brandon**
**of Oakbrook**          South Carolina Co. v. Assurantie N.V. (H.L.(E.))          **[1987]**

ad testificandum, or to produce documents in his power or possession
(so long as they are adequately described and defined) by the issue and
service on him of a subpoena duces tecum. The issue of such subpoenas
is in the first instance a ministerial rather than a judicial act, and a party
may therefore issue subpoenas of either kind as he thinks fit; the court,
however, has power to set aside any subpoena on proper grounds, for
instance, irregularity of form, irrelevance, oppressiveness or abuse of the
process.

The procedure of the High Court in England includes a further
power of the court, conferred on it by R.S.C., Ord. 38, r.13, to order
any person to attend any proceedings in a cause or matter and produce
any document to be specified or described in the order, the production
of which appears to the court to be necessary for the purpose of that
proceeding. It has, however, long been established that this rule is not
intended to be used, and cannot properly be used, to enable a party to
an action to obtain pre-trial disclosure and inspection of documents in
the possession or power of a person who is not a party to such action. It
is a rule of limited application, involving the production of a document
or documents to the court itself rather than to either of the parties to an
action.

My Lords, the civil procedure of courts in the United States differs
essentially from that in the High Court in England in that under it
parties to an action can compel, as against persons who are not parties
to it, a full measure of pre-trial discovery, including both the disclosure
and production for inspection and copying of documents, and also the
giving of oral or written testimony. This power of compulsion can be,
and regularly is, used at an early stage of an action.

The second matter to which attention needs to be drawn is that 28
United States Code, section 1782, as appears from its terms which I set
out earlier, expressly provides that an order made under it may prescribe
the practice and procedure, which may be in whole or in part the
practice and procedure of the foreign country or the international
tribunal, for taking the testimony or statement or producing the
document or other thing; and that, to the extent that the order does not
prescribe otherwise, the testimony or statement shall be taken, and the
document or other thing produced, in accordance with the Federal Rules
of Procedure.

Reference was made in the two courts below and again in your
Lordships' House to certain United States authorities which bear on the
exercise of a district court's powers under section 1782. In a decision of
the United States District Court of Pennsylvania, *In re Court of the
Commissioner of Patents for Republic of South Africa* (1980) 88 F.R.D.
75, 77, Judge Newcomer said:

"[1, 2] It is of great concern to this court that counsel for opponent
has not been able to represent to this court that the documents and
testimony for which opponents request a discovery order are
discoverable under South African law. Indeed, *discussions with*
counsel lead this court to suspect that these materials would *not* be
available through South African procedures. Clearly, this court
should not by its exercise of the discretion allowed it under section

A  1782 allow litigants to circumvent the restrictions imposed on
discovery by foreign tribunals. Few actions could more significantly
impede the development of international co-operation among courts
than if the courts of the United States operated to give litigants in
foreign cases processes of law to which they are not entitled in the
appropriate foreign tribunals."

B  Further in *John Deere Ltd. and Deere & Co. v. Sperry Corporation*
(1985) 754 F.2d 132, 135, Judge Garth, giving the judgment of the
United States Court of Appeals for the Third Circuit, said:

"As a co-operative measure, section 1782 cannot be said to ignore
those considerations of comity and sovereignty that pervade
international law. A grant of discovery that trenched upon the
clearly established procedures of a foreign tribunal would not be
C  within section 1782."

My Lords, it was contended for South Carolina, on the basis of these
authorities, that the re-re-insurers' application to the district court of the
United States was bound to fail. The ground relied on was that, since
the procedure of the High Court in England did not enable parties to an
action to compel pre-trial discovery against persons not parties to it, the
D  district court would not permit the re-re-insurers to circumvent that
limitation by granting them an order for such discovery under section
1782.

It appears to me that there may well be considerable force in this
contention. It is not possible, however, for your Lordships, on the
limited material before you, to decide for yourselves in advance how the
E  United States district court would see fit to exercise the discretion
conferred on it by section 1782, in the particular circumstances of this
case, and having regard to the characteristics of civil procedure in the
High Court in England which I endeavoured to summarise earlier.

The third matter to which attention needs to be drawn concerns
certain changes in the positions of the parties which have occurred since
the original hearing of South Carolina's two summonses before
F  Hobhouse J. The first change of position relates to the memorandum
lodged in support of the re-re-insurers' application to the United States
district court, in which they asserted:

"As evidenced by the attached affidavit of Francis Otley Mackie the
petitioners herein are seeking this court's assistance in obtaining
information and documentation which is necessary, material and
G  relevant to litigation pending in the courts of England for use in
those proceedings. The affidavit further establishes that were all the
parties residents of England, the requested discovery would be
permitted pursuant to the rules of procedure and discovery in
England. Accordingly, the petitioners' motion for taking of testimony
and the production of documents should be granted."

H  Mr. Mackie, whose affidavit is referred to at the beginning of the
above passage, is a partner in the firm of solicitors acting for the re-re-
insurers in the two actions in England. The relevant part of that affidavit
is paragraph 12, in which Mr. Mackie deposed, inter alia, as follows:

Lord Brandon
of Oakbrook       South Carolina Co. v. Assurantie N.V. (H.L.(E.))       [1987]

"Discovery of such documentation and testimony is permitted       A
according to the English rules of procedure . . . . Petitioners would
be able to obtain writs of subpoena duces tecum issued by the High
Court of England . . . directing these entities to produce the
documents requested and directing them individually to appear and
give testimony at depositions."

These statements in the re-re-insurers' memorandum and Mr.       B
Mackie's affidavit were criticised by Hobhouse J. and by Griffiths L.J. in
the Court of Appeal as giving such an incomplete and inaccurate
account of the procedure of the High Court in England with regard to
discovery as seriously to mislead the United States district court. Griffiths
L.J., however, expressly acquitted Mr. Mackie of any deliberate intention
to mislead. Before your Lordships Mr. Robert Alexander, who appeared       C
as leading counsel for the appellant re-re-insurers, accepted unreservedly
that the passages in question were incomplete and inaccurate, and as a
consequence liable to mislead. The main error, as will be apparent, is
the failure to distinguish clearly between compelling a person not a party
to an action to give pre-trial discovery on the one hand, and compelling
him to give oral evidence and produce documents at the trial itself on
the other hand. I think that it is right for your Lordships to say that the       D
criticisms of that error made by the two courts below were fully justified
and that it is most unfortunate that it should ever have occurred. That
said, however, having regard to the admission of such error freely made
by Mr. Alexander for the re-re-insurers, and having regard further to
the summary which I endeavoured to give earlier of the relevant
procedure of the High Court in England, it seems to me that the error is
no longer of significance in the consideration of this appeal.       E

The second change of position concerns the scope of the re-re-
insurers' application to the United States district court. As I indicated
earlier, that application as originally framed covered two distinct matters:
first, the production and inspection of specified classes of documents;
and, secondly, the appearance of three named persons from P.G.A. and
Campbell-Husted to give testimony by depositions. On the face of the       F
motion it appeared that what the re-re-insurers were seeking in relation
to the second of these matters was the taking of oral evidence from the
persons named relevant to the issues in the English actions, such
evidence to be recorded in depositions. Before the Court of Appeal,
however, Mr. Sumption for the re-re-insurers expressly abandoned any
intention to achieve this end, and before your Lordships Mr. Alexander       G
made it clear that the appearance of the named persons was only sought
for the purpose of their producing and identifying the relevant documents
held by P.G.A. and Campbell-Husted, and in no way for the purpose of
their giving oral evidence to be recorded in depositions with regard to
issues of fact arising in the English actions.

The third change of position arises from the stage which the two
actions in England have now reached. At the time when South Carolina's       H
applications first came before Hobhouse J. the re-re-insurers had not yet
served their points of defence and counterclaim, so that the issues
between the parties had not yet been defined by pleadings and no

A    discovery of documents as between the parties had yet taken place.
Hobhouse J. regarded this as a significant matter in exercising the
discretion to grant injunctions which he held that he had. During the
hearing before the Court of Appeal, however, the re-re-insurers served
points of defence and counterclaim, and since then discovery of
documents as between the parties has taken place. The actions in
England are, therefore, much further advanced than they were when
B    South Carolina's applications first came before the judge.

The fourth change of position is this. Following the decision of the
Court of Appeal South Carolina arranged for the re-re-insurers to have
controlled access to certain documents held by P.G.A. and Campbell-
Husted. According to the re-re-insurers, however, substantial restrictions
were imposed by South Carolina on the documents which they were
allowed to inspect under this arrangement. It is the re-re-insurers' case,
C    therefore, that their application to the United States district court
remains necessary in order to enable them to have inspection of other
documents to which, by reason of the control exercised by South
Carolina, they have not so far had access. Your Lordships were not
asked to go into the details of these matters, which are in dispute
between the parties, and it is right, I think, for the purposes of this
D    appeal for your Lordships to proceed on the basis that the re-re-insurers
have at least an arguable case with regard to them.

The fifth and final matter to which attention should be drawn is that
the judge of the United States district court before whom the re-re-
insurers' application under section 1782 is pending has helpfully directed
that further proceedings in that application should be stayed until the
determination first of the re-re-insurers' appeal to the Court of Appeal,
E    and then of their further appeal to your Lordships' House.

My Lords, having drawn attention to these various preliminary
matters, I turn to consider whether the injunctions granted by
Hobhouse J. and affirmed by the Court of Appeal should be allowed to
stand. I put the question in that form because of the various ways
described by me above in which the positions of the parties have
F    changed since the original hearing before Hobhouse J.

As appears from the passages from the judgments of Hobhouse J.
and Griffiths L.J. which I set out earlier, both courts below treated
South Carolina's applications for injunctions as raising matters of
principle for decision. I have no doubt that they were right so to treat
them. Putting the point differently, the question which your Lordships
G    have to decide is whether the circumstances of the case are such as to
give the court power to grant the injunctions at all, and not whether,
there being such power, it was a proper exercise of discretion to grant
them rather than to refuse them.

In considering the question which I have formulated, it will be
helpful in the first place to state certain basic principles governing the
grant of injunctions by the High Court. The first basic principle is that
H    the power of the High Court to grant injunctions is a statutory power
conferred on it by section 37(1) of the Supreme Court Act 1981, which
provides that "the High Court may by order (whether interlocutory or
final) grant an injunction in all cases in which it appears to the court to

Lord Brandon
of Oakbrook        South Carolina Co. v. Assurantie N.V. (H.L.(E.))        [1987]

A

be just and convenient to do so." That provision is similar to earlier provisions of which it is the successor, namely, section 45(1) of the Supreme Court of Judicature (Consolidation) Act 1925 and section 25(8) of the Supreme Court of Judicature Act 1873. The second basic principle is that, although the terms of section 37(1) of the Act of 1981 and its predecessors are very wide, the power conferred by them has been circumscribed by judicial authority dating back many years. The nature of the limitations to which the power is subject has been considered in a number of recent cases in your Lordships' House: *Siskina (Owners of cargo lately laden on board) v. Distos Compania Naviera S.A.* [1979] A.C. 210; *Castanho v. Brown & Root (U.K.) Ltd.* [1981] A.C. 557; and *British Airways Board v. Laker Airways Ltd.* [1985] A.C. 58. The effect of these authorities, so far as material to the present case, can be summarised by saying that the power of the High Court to grant injunctions is, subject to two exceptions to which I shall refer shortly, limited to two situations. Situation (1) is when one party to an action can show that the other party has either invaded, or threatens to invade, a legal or equitable right of the former for the enforcement of which the latter is amenable to the jurisdiction of the court. Situation (2) is where one party to an action has behaved, or threatens to behave, in a manner which is unconscionable. The third basic principle is that, among the forms of injunction which the High Court has power to grant, is an injunction granted to one party to an action to restrain the other party to it from beginning, or if he has begun from continuing, proceedings against the former in a foreign court. Such jurisdiction is, however, to be exercised with caution because it involves indirect interference with the process of the foreign court concerned.

B

C

D

E

The latter form of injunction may be granted in such circumstances as to constitute an exception to the second basic principle stated above. This may occur where one party has brought proceedings against another party in a foreign court which is not the forum conveniens for the trial of the dispute between them, as that expression was defined and applied in *MacShannon v. Rockware Glass Ltd.* [1978] A.C. 795. In such a case the party who has brought the proceedings in the foreign court may not, by doing so, have invaded any legal or equitable right of the other party, nor acted in an unconscionable manner. The court nevertheless has power to restrain him from continuing his foreign proceedings on the ground that there is another forum in which it is more appropriate, in the interests of justice, that the dispute between the parties should be tried. The present case, however, is not concerned with a choice between two competing forums for the trial of a dispute, and the exception to which I have just referred is therefore not relevant to it.

F

G

The power of the court to grant *Mareva* injunctions may also, before it was statutorily recognised, have been a further exception to the second basic principle stated above. That power, however, has now been expressly recognised by section 37(3) of the Supreme Court Act 1981, and again the present case is in no way concerned with it.

H

Ignoring these exceptions, therefore, and applying the basic principles which I have stated to the present case, the first question for consideration is whether South Carolina has shown that what I have

1 A.C.        South Carolina Co. v. Assurantie N.V. (H.L.(E.))        Lord Brandon
                                                                      of Oakbrook

A  described above as situation (1) exists. Has South Carolina shown that
the re-re-insurers, by beginning and intending to prosecute their
application to the United States district court, has invaded, or threatened
to invade, a legal or equitable right of South Carolina for the
enforcement of which the re-re-insurers are amenable to the jurisdiction
of the court? It was contended by Mr. Rokison on behalf of South
Carolina that South Carolina did indeed have such a legal or equitable
B  right, but it appeared to me that he had great difficulty in formulating
the legal or equitable right on which he relied. Neither of the courts
below decided as they did on the basis that the re-re-insurers had by
their conduct invaded a legal or equitable right of South Carolina, and I
cannot see how such a case can be made out. I would therefore hold
that South Carolina has not shown that situation (1) exists.

C     The second question for consideration is whether South Carolina has
shown that what I have described above as situation (2) exists. Has
South Carolina shown that the re-re-insurers, by beginning and intending
to prosecute their application to the United States district court, have
acted in a manner which is unconscionable? It is difficult, and would
probably be unwise, to seek to define the expression "unconscionable
conduct" in anything like an exhaustive manner. In my opinion, however,
D  it includes, at any rate, conduct which is oppressive or vexatious or
which interferes with the due process of the court.

     Although neither Hobhouse J. at first instance, nor Griffiths L.J. in
the Court of Appeal, stated in terms that they thought it right to grant
injunctions on the ground that the conduct of the re-re-insurers in
making their application to the United States district court was
unconscionable, it seems to me to be implicit in their reasons that they
E  regarded it as being so. Hobhouse J. based his decision expressly on the
need for the court to retain control of its own process, with the
necessary implication that the re-re-insurers' conduct was an interference
with such control and therefore an interference with the due process of
the court. Griffiths L.J. based his decision on three grounds: first (like
Hobhouse J.), that the court must retain control of its own process;
F  secondly, that the civil procedure of United States courts is significantly
different from that of English courts, and the parties, by submitting to
the jurisdiction of an English court, must be taken to have accepted its
procedure; and, thirdly, that unrestricted access to foreign procedural
remedies was liable to produce hardship in the form of increased costs
and inconvenience. I shall consider each of these grounds in turn.

G     I consider, first, the ground that the re-re-insurers' conduct was an
interference with the court's control of its own process. It is not clear to
me why this should be so. Under the civil procedure of the High Court
the court does not, in general, exercise any control over the manner in
which a party obtains the evidence which he needs to support his case.
The court may give him help, certainly; for instance by discovery of
documents inter partes under R.S.C., Ord. 24; by allowing evidence to
H  be obtained or presented at the trial in various ways under Orders 38
and 39; and by the issue of subpoenas under Part II of Order 38, to
which I referred earlier. Subject, however, to the help of the court in
these various ways, the basic principle underlying the preparation and

42

**Lord Brandon
of Oakbrook**          South Carolina Co. v. Assurantie N.V. (H.L.(E.))          **[1987]**

A

presentation of a party's case in the High Court in England is that it is
for that party to obtain and present the evidence which he needs by his
own means, provided always that such means are lawful in the country
in which they are used. It was not in dispute that, if P.G.A. and
Campbell-Husted, uninfluenced by the control exercised over them by
South Carolina on the advice of the latter's English solicitors, had freely
and voluntarily allowed the re-re-insurers to inspect, and where necessary
to copy, all the documents referred to in the latter's application, it could
not possibly have been said that there had been any interference with
the English court's control of its own process. That being so, I cannot
see why, since the Federal law of the United States authorises an
application of the kind made by the re-re-insurers in this case, the
making of such application, which may or may not succeed in whole or
in part, should be regarded as being such an interference either. I
cannot, therefore, agree with the first ground of decision relied on by
the Court of Appeal.

B

C

I consider, secondly, the ground that the procedure of United States
courts is significantly different from that of English courts, and the
parties, by submitting to the jurisdiction of an English court, must be
taken to have accepted its procedure. It is, no doubt, true that the re-re-
insurers, by entering unconditional appearances in the two English
actions, can be said in a certain sense to have accepted the procedure of
that court. Your Lordships were not, however, informed of any ground
on which the re-re-insurers could, with any prospect of success, have
contested the jurisdiction of the High Court in England in respect of the
disputes which are the subject matter of the two actions concerned. Be
that as it may, I cannot see that the re-re-insurers, by seeking to
exercise a right potentially available to them under the Federal law of
the United States, have in any way departed from, or interfered with,
the procedure of the English court. All they have done is what any party
preparing his case in the High Court here is entitled to do, namely to try
to obtain in a foreign country, by means lawful in that country,
documentary evidence which they believe that they need in order to
prepare and present their case. It was said that the re-re-insurers could
have applied to the High Court under R.S.C., Ord. 39, r. 2, for letters
of request to issue to the proper judicial authorities in the United States.
But 28 United States Code, section 1782, allows an application to be
made either indirectly by the foreign court concerned or directly by an
interested party, and I can see no good reason why the re-re-insurers
should not have chosen whichever of these two alternatives they
preferred. It is, I think, of the utmost importance to appreciate that the
reason why English procedure does not permit pre-trial discovery of
documents against persons who are not parties to an action is for the
protection of those third parties, and not for the protection of either of
the persons who are parties to the action. I cannot, therefore, agree
with the second ground of decision relied on by the Court of Appeal.

D

E

F

G

H

I consider, thirdly, the ground that unrestrained access to foreign
procedural remedies was liable to cause hardship in the form of increased
costs and inconvenience. So far as increased costs are concerned,
Griffiths L.J. was referring to increased costs incurred or to be incurred

A by South Carolina in contesting the proceedings in the United States district court. If, however, the re-re-insurers are right in their contention that they have not yet, by reason of the control exercised by South Carolina, had access to all the documents to which they believe that they need access in order to prepare their case in the two English actions, it can reasonably be said that any liability for increased costs incurred by South Carolina is in a sense self-imposed. If they had been

B willing to permit P.G.A. and Campbell-Husted to allow the re-re-insurers to inspect, and where necessary copy, all the documents to which the latter had sought access, the making or prosecution of the re-re-insurers' application to the United States district court would not have been necessary. In this connection it is right to stress what I have already stated earlier, that P.G.A. and Campbell-Husted, left to

C themselves, would voluntarily have given the re-re-insurers permission to inspect, and where necessary copy, all the documents to which the latter sought access. It was said for South Carolina that the documents not so far disclosed were not relevant to the issues in the two English actions. If that is so, I cannot help asking myself why South Carolina has gone to such lengths to prevent the disclosure of such documents. So far as inconvenience is concerned, it is apparent that Griffiths L.J. had two

D kinds of inconvenience in mind: first inconvenience in relation to the two actions immediately concerned in the form of delay in getting them tried and possible prolongation of the trial when it took place; and, secondly, inconvenience to other litigants by reason of the consequent dislocation of the time-table for the trial of other cases in the congested list of the Commercial Court. So far as delay is concerned, it is perhaps

E ironical that the only result of South Carolina seeking to obtain injunctions against the re-re-insurers has been to increase greatly whatever delay the re-re-insurers' application, if allowed to proceed unopposed, might otherwise have caused. I recognise that the re-re-insurers' application may result in some increased costs to South Carolina, but these could, as I indicated earlier, have easily been avoided by a different attitude on South Carolina's part. I recognise also

F that some inconvenience of the two kinds to which I have referred may arise from the re-re-insurers' application; but, if there is a reasonable possibility that such inconvenience is the price of justice being fully done at the trial of the two English actions, then it seems to me to be a price which must necessarily be paid. In any event, I cannot see how the re-re-insurers' application, made in what may prove to be a just cause, can,

G solely on the ground that it occasions the extra costs and inconvenience under discussion, be categorised as an interference with the court's control of its own process. The court can control any excessive delay by fixing such date for the trial of the two actions as may be just, and nothing which the re-re-insurers can do can take away or interfere with the court's control in this respect. As to increased costs these will, no doubt, be a matter for the consideration of the Commercial judge at the

H conclusion of the trial, and I do not think it would be right for your Lordships to express any views, one way or the other, about such matter. For these reasons I cannot agree with the third ground of decision relied on by the Court of Appeal.

44

A

My Lords, the result of the views which I have expressed is that there was, in my opinion, no such interference with the procedure of the English High Court by the re-re-insurers as would amount to unconscionable conduct on their part, and so justify, in accordance with the basic principles which I stated earlier, the exercise of the court's power to grant injunctions against them. It follows that I would allow the appeal and set aside the orders of Hobhouse J. dated 25 April 1985 and of the Court of Appeal dated 23 May 1985. As regards costs in your Lordships' House, I have no doubt that South Carolina should pay the costs of the re-re-insurers. As regards costs in the two courts below, different considerations may apply, first, because of the breadth of the re-re-insurers' application to the United States district court as originally framed, and, secondly, because of the misleading nature, in the respect to which I referred earlier, of the memorandum and affidavit lodged in support of such application. I therefore think it desirable that, in relation to those costs, your Lordships should have the assistance of further argument from counsel on either side.

B

C

LORD BRIGHTMAN. My Lords, in this appeal I respectfully differ from the conclusion reached by the Court of Appeal. I have had the privilege of studying in advance the speech of my noble and learned friend, Lord Brandon of Oakbrook, and I find myself wholly convinced by his reasons for moving that this appeal should be allowed. I agree with the orders that he proposes should be made.

D

LORD MACKAY OF CLASHFERN. My Lords, I have had the advantage of reading in draft the speeches prepared by my noble and learned friends, Lord Brandon of Oakbrook and Lord Goff of Chieveley. I agree that it would be wise to make the reservation on the matter to which Lord Goff of Chieveley has drawn attention but, like him, I agree with the conclusion reached by Lord Brandon of Oakbrook and with the reasons he has given for reaching that conclusion.

E

LORD GOFF OF CHIEVELEY. My Lords, I find myself to be in respectful agreement with the conclusion reached by my noble and learned friend, Lord Brandon of Oakbrook, on this appeal, and with the reasons given by him for reaching that conclusion. I wish, however, to draw attention to one matter upon which I have certain reservations, and to which I attach importance.

F

I am reluctant to accept the proposition that the power of the court to grant injunctions is restricted to certain exclusive categories. That power is unfettered by statute; and it is impossible for us now to foresee every circumstance in which it may be thought right to make the remedy available. In particular, I do not regard the exercise of the power to restrain a person from commencing or continuing proceedings in a foreign forum as constituting an exception to certain limited categories of case in which it has been said that the power may alone be exercised. In my opinion, restraint of proceedings in a foreign forum simply provides one example of circumstances in which, in the interests of justice, the power to grant an injunction may be exercised. I have

G

H

1 A.C.                South Carolina Co. v. Assurantie N.V. (H.L.(E.))        Lord Goff
                                                                             of Chieveley

A   elsewhere explained in detail, for reasons which it is unnecessary for me
    to repeat in the present case, why, on the basis of a line of established
    authority, I am at present inclined to the opinion that an injunction has
    generally been granted in such circumstances for the purpose of
    protecting the English jurisdiction, and why I doubt, with all respect,
    whether the speech of my noble and learned friend, Lord Scarman, in
B   *Castanho v. Brown & Root (U.K.) Ltd.* [1981] A.C. 557, contains the
    last word on the subject. I refer, in this connection, to my judgment in
    *Bank of Tokyo Ltd. v. Karoon* (Note) [1987] A.C. 45.
        Even so, I can see no basis for the grant of an injunction in the
    present case. In particular, in agreement with my noble and learned
    friend Lord Brandon of Oakbrook, and respectfully differing from
    Hobhouse J. and the Court of Appeal, I do not consider that the grant
C   of the injunction can be justified as necessary to protect the English
    jurisdiction on the facts of the present case. In this, I find myself
    entirely in agreement with the reasons expressed in the speech of my
    noble and learned friend, Lord Brandon of Oakbrook. I therefore agree
    that the appeal should be allowed.

                                                          *Appeal allowed with costs.*

D
        Solicitors: *Clyde & Co.; Herbert Smith & Co.*

                                                                          J. A. G.

E                                      ─────────

F                                        NOTE

                                 [COURT OF APPEAL]

                       BANK OF TOKYO LTD. v. KAROON AND ANOTHER

    1984   April 3, 4, 5;                        Ackner and Robert Goff L.JJ.
           May 24
G
    *Injunction—Jurisdiction to grant—Foreign proceedings—Interpleader
        proceedings to determine ownership of money held by bank in
        England—Bank's subsidiary in New York providing information
        concerning claimant and his accounts—Claimant bringing pro-
        ceedings in New York against subsidiary—Whether bank entitled
        to injunction to restrain proceedings in New York*

H       APPEAL from Bingham J.
        In 1983 Mr. Majid Karoon started proceedings in New York against the
    Bank of Tokyo Ltd., a Japanese bank carrying on business in London, and also
    against a wholly-owned subsidiary of that bank, the Bank of Tokyo Trust Co.

# EXHIBIT 2

Case No: **HC 04 C01952**
Neutral Citation Number: **[2004] EWHC 2920 (Pat)**
IN THE HIGH COURT OF JUSTICE
CHANCERY DIVISION
PATENTS COURT

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: **Wednesday, 8th December 2004**
B e f o r e :

THE HONOURABLE MR. JUSTICE PUMFREY

-

**NOKIA CORPORATION**
(a company incorporated under the laws of Finland)
Claimant
- and -
**INTERDIGITAL TECHNOLOGY CORPORATION**
(a company incorporated under the laws of the State of Delaware, USA)
Defendant

MR. MICHAEL SILVERLEAF QC, MR. HENRY WHITTLE and MR. BRIAN NICHOLSON
(instructed by Messrs. Bird & Bird) for the Claimant
MR. GUY BURKILL QC and MR. COLIN BIRSS (instructed by Messrs. Milbank, Tweed,
Hadley & McCloy) for the Defendant

Approved Judgment

Transcript of the Stenographic Notes of Marten Walsh Cherer Ltd.,
Midway House, 27/29 Cursitor Street, London EC4A 1LT.
Telephone No: 020 7405 5010.  Fax No: 020 7405 5026

Mr. Justice Pumfrey:

1. In this action Nokia seek revocation of three United Kingdom patents owned
by InterDigital Technology Corporation ("InterDigital").  InterDigital is a
patent holding and licensing company for InterDigital Communications
Corporation ("ICC").  The patents in suit are 2,174,571 ("571"), 2,208,774

("774") and 2,224,114 ("414"). They relate to aspects of the transmission of telephony signals over a wireless loop using time-division multiplexing techniques.

2. The significance of these patents to Nokia is that at least two of them are alleged by InterDigital to be not only relevant but actually "essential" to the practice of the GSM standards for digital cellular mobile telephones and infrastructure. Nokia are leading manufacturers in this field. These are international standards with which all manufacturers of GSM mobile telephones and associated infrastructure must necessarily comply. ETSI (the European Telecommunication Standards Institute) requires notification to it of any patents believed to be essential for compliance with its standards or proposed standards. InterDigital notified the three patents in suit in 2001 (long after the standard was formulated) but had been asserting them to be essential from about 1993.

3. The three patents in suit have equivalents in numerous territories throughout the world, all of which have been notified by InterDigital to ETSI as essential to GSM. The claimants say that the patents in suit are representative of over 140 corresponding patents (or pending applications) worldwide, which are the core patents of those said to be essential to GSM.

4. There are before me two applications. The first is the case management conference sought by Nokia. The second is an application by InterDigital seeking four heads of relief as set out in the notice of application dated 27th October 2004. The relief sought is:
(a) an injunction to restrain Nokia from pursuing applications made in the US courts under 28 USC, section 1782 for documents and other evidence from Ericsson Inc. and Sony Ericsson Mobile Communications AB;
(b) a declaration that the discovery sought in the above applications is irrelevant to any issue in the present proceedings;
(c) an order striking out parts of the claimant's pleadings which relate to construction of the claims of the patents in suit;
(d) a stay of the proceedings until after the outcome of an ICC arbitration presently taking place between the parties to this action in New York.

5. The background to the action and the present applications may be briefly outlined as follows. As I have indicated, since the early 1990s, InterDigital have been representing to the mobile communications industry that they require licences under InterDigital's patent portfolio for GSM. InterDigital has pursued an aggressive licensing policy, threatening litigation if licences are not taken and making it clear that its portfolio of patents is so geographically and technically extensive that it is uneconomic to resist.

6. After several years of negotiation with InterDigital, Nokia took a lump sum licence in 1999, but is allowed by the terms of the licence to bring this action. The licence is split into two periods – 1 and 2. Period 1 ran up to the end of 2001 and Nokia paid a royalty of $31.5 million for that period. For period 2 (from the beginning of 2002, until the expiry of the licence) no royalty is payable unless certain conditions are satisfied. One of those is that a "major competitor" of Nokia has taken a licence. There is a dispute between the parties as too whether further royalties have become due for period 2 under the licence, and if so what royalties are payable. InterDigital relies, as I understand it, upon a licence taken by Ericsson and a joint venture company, Sony-Ericsson, in settlement of a ten-year long action originally commenced in 1993 between InterDigital and Ericsson in the United

States for infringement of a number of InterDigital's patents.  One of the
terms of the settlement between InterDigital and Ericsson was that Ericsson and
its joint venture company took a licence under InterDigital's patent
portfolio.  This dispute, that is to say the dispute between Nokia and
InterDigital as to the payability of royalty, is the subject of an ICC
arbitration in New York.

7. Some of InterDigital's patents have been the subject of litigation.  Action
was brought against Motorola who was largely successful in its resistance to
the claims.  Nokia's contention is that the basket of patents under which a
licence is available contains a number that are either invalid or not infringed
by a manufacturer who seeks to comply with the GSM standards.  Part of the
motive for these proceedings is to obtain a judgment on validity which can be
deployed in the arbitration; although if the timetable for the arbitration
remains as it is, then any use of a putative judgment on invalidity will be
impossible.  The arbitration is due to be heard in January 2005.

8. Surprisingly, perhaps, for patents of the age of those in suit that have
been licensed, the patentee's response to this action is to apply to amend all
three.  Some of the amendments are not mere deletion of claims accepted to be
invalid but involve the rewriting of new claims.  Nokia plead a number of
grounds they say would justify the court in holding that the amendments should
not be allowed in the exercise of the court's discretion.  They plead, inter
alia, that the patents have been known by InterDigital to be invalid and that
the licence with Ericsson (which is, with all the negotiations leading up to
it, entirely secret until disclosure in this action) was entered into at least
in part in bad faith and with a view to putting Nokia at a disadvantage in the
setting of the period 2 royalties which InterDigital publicly estimate to be
about $130 million year on the basis of the Ericsson settlement.
The application for a stay

9. With that brief introduction, I can turn to InterDigital's application for a
stay.  I can discern no basis for a stay of these proceedings whatever.  It is
not suggested that these proceedings are subject to a mandatory stay under the
Arbitration Act 1996.  It is also accepted that by section 72 of the Patents
Act 1977, any person may bring proceedings to revoke a patent.  But it is said
that the underlying motive of these proceedings is to produce what InterDigital
call an advisory opinion on the validity of the patents, that the court should
encourage alternative dispute resolution, and that the arbitration already on
foot involves alternative resolution of this dispute without a
disproportionately expensive recourse to the court, whose decision cannot much
affect the outcome of what is said to be the "real" or "commercial" dispute
between the parties. InterDigital rely also upon the fact that Nokia decided to
take a licence in 1999, albeit one which permitted them to challenge the
validity of the patents.

10. There is no dispute that there is a wide power to stay proceedings whenever
the court thinks fit.  Of course, an action which is an abuse of process will
be stayed or struck out.  Multiplicity of proceedings will be discouraged if
possible and there are numerous specific statutory provisions providing for the
staying of proceedings in certain defined circumstances.  There is also a long
list of specific circumstances in which the Civil Procedure Rules provide for a
staying of proceedings.
11. The case management powers contained in CPR 3.1(1)(f)  apply generally, and
these powers must be exercised with a view to achieving the so-called
overriding objective.  However, when in a properly-constituted action the

claimant seeks appropriate relief, the dispute is not the subject to an arbitration agreement and the action itself cannot be said to be an abuse of process, it seems to me that the primary duty of the court is to bring it on for trial as fairly and  as quickly as the circumstances permit and not to stay it.

12. Validity and infringement of the three patents in suit were removed from purview of the arbitrators by the agreement of Nokia and InterDigital.  Indeed, this appears to have been the result of an objection by InterDigital (see clause 4(vi) of the terms of reference in the arbitration.

13. Having objected to the issues of infringement and validity being considered by the arbitrators in the existing arbitration, InterDigital could not, before me, identify any form of alternative dispute resolution that could even dispose of the issues of infringement and validity inter partes.  It goes without saying that in the absence of an agreement to surrender a patent or consent to its revocation, no private dispute resolution could result in revocation of one or more of the patents if it were found to be invalid.  There is no offer of any such agreement; so the arguments relating to proportionality and alternative dispute resolution have no foundation and must fail.  There is no other basis advanced for a stay.
The Section 1782 application

14. The application which is made in the appropriate district court in the United States is said to relate to these proceedings.  It seeks both evidence on deposition and discovery of documents in specified classes as follows.  The application after formal matters proceeds as follows:
"Nokia is a party to a court proceeding in England before the High Court of Justice, Chancery Division, Patents Court, in which Nokia seeks to revoke certain United Kingdom patents that have been granted to InterDigital Technology Corporation ('InterDigital').  These UK patents are the counterparts of certain US patents that are presently at issue in an arbitration between InterDigital and Nokia in the United States.  Nokia believes that Ericsson, a Delaware corporation that is found in this district [the East District of Texas, Sherman Division] has evidence relevant to the validity and scope of the patents that are at issue in the English patent proceeding.  Nokia submits this application to obtain this evidence from Ericsson by means of an order for discovery from this Court."

15. Without reading through the whole of the application, it is difficult to give a proper flavour of the basis upon which the application is brought, but it is necessary to pay attention first to the description of the Ericsson and InterDigital lawsuit on printed page 3, which is as follows:
"The Ericsson/InterDigital lawsuit continued following the Motorola verdict. Ericsson and InterDigital eventually settled their dispute, but only after ten years of litigation.  During the course of the litigation, the parties extensively litigated the scope of InterDigital's US patents and exchanged evidence regarding the prior art."

16. On printed page 4:
"InterDigital's patent portfolio includes patents granted by the United Kingdom Patent Office, of which two are counterparts of the US patents involved in the Ericsson/InterDigital litigation.  On June 14, 2004, Nokia initiated a proceeding before the High Court of Justice, Chancery Division, Patents Court, to revoke these UK patents, together with a third InterDigital patent, the Swedish equivalent of which Ericsson opposed in the Swedish Patent Office.  The

UK proceeding will address many of the same issues addressed in the litigation and opposition between Ericsson and InterDigital, and in the licensing discussions between Ericsson and InterDigital, namely the scope and validity of InterDigital's patents.  InterDigital may try to place some reliance upon the fact that other companies have taken licenses to its patents."

17. Then the application seeks to justify the request on the basis of the terms of section 1782.  On page 12 it says this:
"Allowing Nokia to obtain discovery from Ericsson would equitably and efficiently assist Nokia's efforts in the English proceeding.  Nokia seeks to revoke certain of InterDigital's patents that InterDigital contends covered Nokia's technology.  During the course of Ericsson's ten years of United States litigation with InterDigital over the validity and scope of InterDigital's US patents together with many years of opposing InterDigital's Swedish patents, and during the licensing discussions with InterDigital, it amassed a universe of knowledge and evidence relevant to the validity and scope of InterDigital's patents.  It is undisputable that during the protracted litigation, opposition and licensing discussions with InterDigital, Ericsson either provided or received evidence pertinent to the scope and validity of InterDigital's patents.  The patents that were at issue in the Ericsson/InterDigital litigation are the counterparts of the patents Nokia seeks to revoke in the UK revocation proceeding.  The third patent at issue in the UK revocation proceeding was opposed by Ericsson in Sweden.  Moreover, when the litigation ended in early 2003, Ericsson agreed to licence InterDigital's entire patent portfolio.  Ericsson's decision to take a licence to InterDigital's portfolio is, and of itself, a source of evidence material to Nokia's revocation proceeding.  Therefore, for all these reasons, Nokia believes that Ericsson has evidence that can assist Nokia.
Nokia's discovery of this evidence will assist Nokia's efforts in the United Kingdom proceeding.  Many of the same issues present in the Ericsson/InterDigital lawsuit, or close corollaries, may arise in the context of the UK proceeding.  Allowing Nokia's requested discovery will allow the English court, and the parties to that proceeding, to benefit from the ten year effort spent in resolving such issues in the US litigation, the Swedish opposition and from any evidence arising in connection with the licensing discussions.  This request also obviates the need for letters rogatory, or other lengthy and cumbersome procedures, to obtain this evidence from Ericsson, a US resident and a non-participant to the UK proceeding."

18. The relief sought in the district court against Ericsson is set out in two exhibits to the application, exhibit A and exhibit B.  Exhibit A seeks depositions on certain specified deposition topics in a manner which I understand to be usual in the ordinary United States litigation.  As always, it is necessary to read what is already a very broad order with regard to exhibit C, which contains the definitions which render terms which, on their face, are broad into terms which are very wide indeed.  The order is to Ericsson to designate one or more officers, directors, or managing agents, or other persons who consent to testify on Ericsson's behalf, with respect to the following matters.  Four classes of matter are set out.
"1.  Prior art to UK Patent No. 2,174,571, UK Patent No.  2,208,774 or UK Patent 2,224,414 or any prior art to any counterparts within the same patent families of these patents in other jurisdictions, including information concerning the publication date of the said prior art.
2.  Ericsson's claim construction and invalidity contentions in the Ericsson/InterDigital lawsuit and any oppositions carried out by Ericsson against the counterparts of the UK Patents referred to in paragraph 1 above,

and the identity of relevant prior art and factual support for all those
contentions.
3.  The negotiation of the 2003 Patent Licences including efforts by Ericsson,
Sony-Ericsson, or InterDigital to negotiate, execute, or structure any
agreements that were made in connection with, at the time of, or as part of,
the resolution of the Ericsson/InterDigital Lawsuit or the execution of the
2003 Patent Licences.
4.  The performance under the 2003 Patent Licences, including of any amendments
or modifications (whether oral, written or by conduct) to the 2003 Patent
Licences, to the agreements resolving the Ericsson/InterDigital Lawsuit, or to
any other agreements within the scope of topic 3 above."

19. The request for documents, which is contained in exhibit B, is that upon
which the discussion before me principally turned, but in fact the documents
are complimentary to the depositions which are sought in exhibit A.  I need not
read paragraph 1, which again seeks prior art in relation to the patents in
suit, counterparts of the patents in suit within the same patent families and
documents relative to publication dates.  Then paragraph 2 specifies certain
classes of documents in relation to the Ericsson/InterDigital lawsuit,
including witness expert reports and declarations, affidavits or witness
statements relating to construction.  Paragraph 3 relates to the negotiation
and execution of the Ericsson settlement agreement, and paragraph 4 relates to
any amendments or modifications, rather surprisingly, whether, oral, written or
by conduct, which were made to the patents licences and the agreements
resolving the Ericsson lawsuit.

20. I am asked to restrain the claimants from further continuing with this
application against Ericsson and Sony Ericsson, or in the alternative for the
declaratory relief, which I have already set out, indicating that the classes
of documents in question are irrelevant in this action.  There is no doubt that
I have jurisdiction to restrain the section 1782 proceedings and this
jurisdiction is described in the decision of the House of Lords in South
Carolina Insurance Co v Assurantie Maatschappij "De Zeven Provincien NV" [1987]
AC 24.  The speech of Lord Brandon, with whom the remainder of their Lordships
largely concurred, sets out the principles upon which the English court will
interfere by injunction with an application made under the United States
provision by a party to litigation in this country, and I am bound by it.
Before turning to the principles established by this decision, however, I
should refer both to Title 28 section 1782 and to the leading case on
the exercise of power arising under section 1782, the recent decision of the
United States Supreme Court in a case called Intel Corporation v. AMD.

21. In its present form, what I will call subsection (a) of section 1782, which
has the cross-head "Assistance to foreign and international tribunals and to
litigants before such tribunals" is as follows:
"The district court of the district in which a person resides are is found may
order him to give his testimony or statement or to produce a document or other
thing for use in a proceeding in a foreign or international tribunal, including
criminal investigations conducted before formal accusation.  The order may be
made pursuant to a letter rogatory issued, or request made, by a foreign or
international tribunal or upon the application of any interested person and may
direct that the testimony or statement be given, or the document or other thing
be produced, before a person appointed by the court.  By virtue of his
appointment, the person appointed has power to administer any necessary oath
and take the testimony or statement.  The order may prescribe the practice and
procedure, which may be in whole or in part the practice and procedure of the

foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing.  To the extent the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure".

22. Intel v. AMD itself concerned an application under section 1782 for documents with a view to providing them to the European Commission for the purpose of a complaint under Articles 81 and 82 of the EC Treaty.  Justice Ginsburg delivered the majority opinion.  I believe that the following propositions may be derived from that opinion that are directly relevant to the issues which arise before me today.
(a) Section 1782 authorizes but does not require the federal district court to grant discovery in aid of the foreign proceedings.
(b) The proceeding in question must be within reasonable contemplation, but need not be pending or imminent.  I infer from this that the provision may be used to obtain evidence prior to issue of proceedings in this country.
(c) There is no requirement that the discovery sought in section 1782 proceedings be discoverable in the foreign jurisdiction if located there.
(d) Considerations of comity between jurisdictions and parity between litigants may be legitimate touchstones for the district court's exercise of discretion in a particular case, but that is no reason for imposing a general foreign-discoverability rule.  For example, a foreign court's reluctance to order discovery of particular documents may be no indication at all of a reluctance to receive them in evidence -- the example given by Justice Ginsburg is the South Carolina case itself.  The foreign tribunal may itself place such limitations as it thinks appropriate on the admission of material obtained pursuant to section 1782.
(e) In exercising the discretion, a number of factors need to be borne in mind:
 (i) Where the parties to the section 1782 proceedings are the same as those in the foreign proceedings, the need for aid is not as apparent as it is when evidence is sought from a non-participant in the matter arising abroad, when the foreign tribunal can itself decide whether to order the parties to produce evidence.
(ii)  The stature of the foreign tribunal, the character of the proceedings underway abroad and the receptivity of the foreign court to federal court judicial assistance must also be considered.
(iii) Whether the section 1782 request "conceals an attempt to circumvent foreign proof-gathering limits or other policies of a foreign country or of the United States is also relevant.
(iv) (iv)  Unduly burdensome requests may be rejected or trimmed.

23. It is clear that the jurisdiction will be exercised having regard to the attitude that the foreign court will take to the material produced by the section 1782 request.  As is well known, the attitude of this court, that is to say the English court, towards disclosure is regulated by the Civil Procedure Rules and the scope of disclosure is essentially circumscribed by the pleaded issues.  At the same time, the court is generally indifferent as to the source of admissible material.  Let me give a simple example.  In a patent action, the validity of the patent is challenged on the grounds of anticipation or obviousness on the basis of a single prior publication.  The scope of disclosure is limited to documents advancing the parties' respective cases, including their attacks on the other's case, within the time window of four years around the priority date:  see paragraph 5.1(2) of the Practice Direction under Part 63 of the CPR.

24. This means there will be no disclosure relating to other grounds of invalidity, for example, prior use by the patentee, and the defendant must himself uncover at least the possible existence of such prior uses by the patentee for himself before he can obtain the court's assistance in compelling disclosure from the patentee.  On the other hand, if he does obtain evidence of prior use by the patentee, the court is not generally concerned as to how that evidence was obtained.  As I understand the decision of the House of Lords in the South Carolina case, to which I now turn, one possible route is by way of a section 1782 request.

25. Mr. Silverleaf QC, who appears on behalf of Nokia, submits that the following propositions may be derived from Lord Brandon's speech in the South Carolina case.
(a) The English courts do not, in general, exercise any control over the way in which a party obtains the evidence it wishes to present to support its case: See [1987] AC 41 G-H.
(b) If a third party voluntarily assists a party by providing evidence, there can be no objection to that evidence being used by the party.  The provision of material in this way does not interfere with the court's control of its own process.  (Page 42 A).
(c) Consequently, by exercising a right potentially available to it under US law to obtain documents or evidence from a third party, a party to litigation is not departing from or interfering with the procedure of the English court. (Page 42 C).
(d) Accordingly, a party should normally be permitted to exercise its rights under Title 28 of the US Code section 1782.
(e) It is for the US court hearing the section 1782 application to decide upon the merits of the application under US law and to determine the nature and scope of the relief to be granted.  The fact that a party is enabled by exercising those rights to obtain documents and evidence which would not otherwise be available to it is not a ground for interference by the English court.
(f) Before the court should restrain a party's use of the section 1782 procedure, it has to be satisfied that the use being made is either a breach of some legal or equitable right of the objecting party (page 41, B to C) or is vexatious or oppressive or is in some other way unconscionable.  (Page 41 D).

26. This summary seems to me to be correct and it shows why the decision whether or not to restrain section 1782 proceedings is not a mere case management decision.  There can be no doubt that leaving express or implied obligations aside, the jurisdiction to interfere is based on the need to show that the application is abusive in its context in the English proceedings. This is confirmed by Banker's Trust international PLC v PT Dharmala (unreported, 1st December 1995, Mance J, as he then was) and Omega v Viktor Kozeny [2002] CLC 132 (Mr. Peter Gross QC, as he then was).  In the former case, the application under section 1782 was made after trial but before judgment, no doubt with a view to improving the evidence in the proceedings and making an application to re-open the trial.  Mance J appears to have found little difficulty in concluding that such an application was abusive.  In the latter case, Mr. Gross QC was confronted by an application to depose individuals who would be giving evidence in this country, thereby exposing them twice to the burden of cross-examination, which he considered to be abusive in the context of the English proceedings.

27. Mr. Burkill's submission on behalf of InterDigital is that the depositions sought on the present application and the classes of documents sought are of

undue width and purely fishing.  The definitions of the classes make no attempt to distinguish that which is relevant from that which is not, and are for that reason objectionable.  The fact that the second, third and fourth classes closely mirror the terms of a subpoena issued by the arbitrators against Ericsson reveals, he submits, that the real purpose of the section 1782 application is to produce documents in aid of the arbitration and that this is confirmed by the unwillingness of Nokia's advisers to agree to protective orders preventing the employment of the documents in the arbitration.

28. Accordingly, he says that the application is oppressive and is an abuse of process and should be restrained by this court.

29. It is necessary to make a number of elementary observations before turning to Mr. Burkill's contentions.  First, the issues in the English proceedings are defined by the pleadings.  Second, documents and other evidence are not admissible unless either relevant to an issue so defined or (although relevant to the issues in the case) as tending to go impugn the credit of a witness.  The court will not compel production of documents going only to credit.  Third, disclosure will only be ordered on the basis set out in the Civil Procedure Rules, which is to say, that a party will only be required to make a search ultimately as is reasonable and proportionate.

30. I agree with Mr. Burkill that the classes of documents as drawn would not be ordered by way of disclosure in the present proceedings.  As he correctly observes, the first class (all prior art to the three patents) covers prior art that has not pleaded and this class is, from the perspective of this court, too broad.  I am equally satisfied, however, that any new prior art discovered could, in principle, be introduced by amendment of the pleadings into the action.

31. If any document obtained in the second, third and fourth categories could be relevant to these proceedings, in the sense that it would be disclosable if in the possession, custody or power of InterDigital, it could only be because it related to Nokia's contention that the court should not exercise its discretion to permit the amendments sought to the three patents in suit.  InterDigital is under a duty to disclose documents in its power (a term defined in the relevant provisions of the Civil Procedure Rules) that are disclosable in the light of the pleaded case.  While I might be privately sceptical as to the likelihood that the discovery by Ericsson will turn up material in addition to that which must be disclosed in these proceedings in any event, I certainly cannot say that it will not do so.

32. It follows that it cannot be said a priori or that the material which would be obtained on discovery in this case, as sought in the section 1782 proceedings, would not be capable of being deployed in these proceedings.  This approach, which is quite different from the approach which I would take to a request for specific disclosure of class of documents in the context of English proceedings, is appropriate for the following reasons:
(a) Subject to the restrictions placed on the jurisdiction by Federal law, the request is not circumscribed by the issues at stake in the foreign proceedings.  There do not even have to be any proceedings on foot for the request to be considered.  It is therefore in part investigatory in nature.
(b) It follows that the English court should not seek to circumscribe the discretion possessed by the district court by imposing its own view as to the appropriateness of the classes of documents sought by reference to the issues in proceedings as they stand.  It is legitimate for the requesting party to use

the request to ascertain facts and obtain documents of which the requesting party is unaware, but which may be in the future deployed in the English proceedings, if necessary, after appropriate amendment.

(c) The question of the extent to which the district court should accede to the request is a matter for it alone, on the evidence made available, and the English court should only interfere if the invocation of the jurisdiction is either contrary to some legal or equitable right of the other party to the English litigation or is otherwise oppressive or vexatious or tends to interfere with the due process of the English court.  In my judgment it should also, if possible, express a view as to the likely deployability of the documents sought if that is possible and if such an expression will be of assistance to the district court.

(d) The final decision on admissibility will be in any event for the English court, in the light of the issues as defined in the pleadings, and the English court should not, subject to the caveat set out above, concern itself with the manner in which the material sought matters sought to be admitted is obtained.

(e) This is a different problem from the problem of ordering disclosure of a class of documents of which it can be said that a substantial proportion are irrelevant. The court will not order disclosure of such a class because the English court will not exercise its coercive powers to compel the production of material irrelevant on the pleadings as they stand.  But it is for the district court to form its own view in the United States, having regard to the nature of the jurisdiction and to the fact that it is not circumscribed by the pleaded issues in pending litigation, as to the material the production of which should be compelled.

33. The position in respect of the depositions is more difficult.  Experience of the use of transcripts of deposition evidence in other cases suggests that it is most unusual for deposition evidence which is not focused on the issues in the English proceedings to be of any practical utility at all.  Again, it is possible, but the possibility is a remote one.  In this connection I say nothing about depositions ancillary to the document request whose only purpose is to locate relevant documents.

34. On the whole, I conclude that while it does not seem likely that the material requested in the 1782 proceedings will be of utility in this action, that possibility cannot in any circumstances be excluded.  If I am to restrain Nokia from pursuing their request, InterDigital must satisfy me that in the context of these proceedings the request is not merely an of doubtful utility but an abuse of process.  If it were the case that the request would be automatically complied with by the district court in the United States, then I would be prepared to confer a wide ambit on the term "abuse of process".  But it is clear from the Intel case that the district court is required to exercise a judicial consideration in considering the request and the factors urged on me are equally considerations which can be, and in fact are being, urged upon it as reasons for not exceeding to the request or, in the words of the Supreme Court, trimming it.

35. Accordingly, it seems to me that I must be able to identify abusive behaviour in the sense that the request is intended to, or at least will have the effect of, causing unfair prejudice to the opposing party in the present proceedings.  This I cannot do.  In this connection, I have not overlooked the question whether the real purpose of the request is to assist in the arbitration.  This, it seems to me, is preeminently a matter for the district court.  The extent to which a collateral purpose is an objection to a section

1782 request is a matter for the district court in the light of the guidance provided to it by Intel and other cases.  It is not a matter for me.

36. Since there is nothing in the request that could be described as abusive in the context of the English proceedings, I must refuse the injunction sought.

37. Finally, I should mention the question of costs of the section 1782 request.  Dr. Laakkonen from Nokia suggests in his evidence (for some reason) that if successful Nokia will seek its costs of the section 1782 proceedings from InterDigital.  I cannot pre-empt the exercise of this discretion by the judge who ultimately deals with the question, and for present purposes I should only say that this risk is not of itself oppressive of InterDigital and is not enough to justify me in restraining the section 1782 application by injunction.


Declaratory relief

38. While pressing his application for injunctive relief, Mr. Burkill QC submits that in the alternative I should declare that the classes of documents specified in the 1782 request are irrelevant to the action as presently constituted.  For the reasons that I have set out, I agree that the great majority of the documents falling within the second, third and fourth classes are, or are likely to be, irrelevant.  But for the reasons I have also stated, I cannot say that they all are.  For this reason, I cannot make a declaration in the categorical terms that Mr. Burkill requests.  I accept that, as I have indicated, I would not have made an order for disclosure in the current proceedings on the present state of the pleadings of the classes of documents which are specified in the request under section 1782, but for the reasons that I have also stated, that consideration seems to me to be irrelevant to the present question.

Amendment

39. I turn, finally, to an application to amend the pleadings which is made by Nokia.  As pleaded, it is clear that Nokia's case on invalidity of the patents is in part contingent on the allegation that lies at the commercial heart of this dispute, which is that use of the inventions of the patents in suit, among others, is essential at least to G2 and G2.5 mobile digital cellular telephony.  The patents have been notified to ETSI on the basis that the "proprietor believes that the [patents] may be considered essential" to the specified standards.  InterDigital say most emphatically that a notification is not an assertion of essentiality, but only of possible or potential essentiality.  In my view, something is only possibly or potentially essential to compliance with the standard during the period before the question of essentiality has been determined, whereafter it is either optional or essential.

40. Before me, InterDigital were initially unwilling to state whether they considered that use of any of the inventions the subject matter of the patents in suit was in fact essential to compliance with the relevant standards.  In response to a direct question from me, Mr. Burkill QC took instructions and then informed me that essentiality was not asserted in relation to 571, use of which was therefore optional, but was asserted in relation to 774 and 414.

41. Once the assertion of essentiality is made, it seems to me that it is open to Nokia to argue that the contents of the standard will force a particular construction of the claims on the patentee if the invention is to be essential

to compliance.  Whether the argument is compelling is not for me to say at this stage, but it is clearly possible without the need for examination of any particular embodiment.  Where the employment of the invention is alleged to be optional, then if there is an assertion of infringement sufficient to support a prayer for a declaration of non-infringement under the inherent jurisdiction of the court, that may also be sufficient.  It depends upon the terms of the assertion

42. Conscious of the difficulties of merely applying to revoke the patents on the basis of a construction which may be disputed in respect of a standard which may or may not be relevant, Nokia seek to amend their claim by adding a declaration of non-infringement in respect (put shortly) of equipment complying with the standards.  InterDigital object on the basis that the claims relate to apparatus; that the specifications do not describe apparatus; and that to grant a declaration of non-infringement (or, I suppose, non-essentiality) in respect of the standard is potentially embarrassing

43. The draft pleading is as follows.  Passing over the matters which are merely common form, I can pick it up as amended at paragraph 4.
"4.  The Defendant's publicly stated position is that the manufacturer of and commercial dealing in mobile telephone equipment which complies with GSM standards infringes the Patents (and corresponding patents worldwide).  'GSM standards' refers to the standards issued by the European Telecommunications Standards Institute (ETSI) relating to the European digital cellular telecommunications systems, known as Global System for Mobile Communications (GSM).
(i) The Defendant has notified ETSI in accordance with the ETSI IPR Policy, that the Patents are 'Essential IPR' in respect of the GSM standards.  A copy of the relevant entries in the database maintained and published by ETSI is attached hereto as Annex 1.
(ii) The Defendant has licensed the Patents (and corresponding patents elsewhere in the world) to manufacturers of equipment falling within the GSM standards, on the basis that such licences are necessary for compliance with those standards.  The Claimant, amongst others, has entered into such a licence.
(iii) 'Essential IPR' under the ETSI IPR Policy, a copy of which is attached as Annex 2 hereto, is defined by clause 15(6) thereof in the following terms:
'ESSENTIAL' as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardisation, to make, sell, lease, otherwise dispose of, repair, use or operate equipment or methods which comply with a standards without infringing that IPR.  For the avoidance of doubt in exceptional cases where a standard can only be implemented by technical solutions, all of which are infringements of IPR, all such IPRs shall be considered ESSENTIAL.'"

44. The particular (iii) under paragraph 4 which is sought to be added by amendment pleads the meaning of the word "essential" upon which Nokia rely, and paragraph 6, which is added by amendment, seeks in the alternative, or in any event, a declaration of non-infringement in relation to all Nokia equipment complying with the relevant standards.  It is claimed that InterDigital have made a general assertion of infringement in relation to all three patents in relation to the handsets and other infrastructure manufactured by Nokia, and it is sought to add to the prayer for relief a declaration that importation, manufacture, sales, supply, offer for sale or supply, and keeping of the relevant hardware in compliance with the specified standards without the consent of the defendant, InterDigital does not require infringement of the

identified patents and that the patents in each of them are not essential IPR for GSM Release 4.

45. That in terms is not a declaration of non-infringement: it is a declaration of non-essentiality. What Nokia are seeking to do is to keep open the possibility which I think Mr. Silverleaf articulated by saying if they are not saying it is essential, we are not worried.

46. I have been in two minds as to whether this is a possible approach to a patent action. However, having regard to the assertion of essentiality which was made to me by Mr. Burkill, I am satisfied, for the reasons that I have endeavoured to express, that the court should, if at all possible, resolve the commercial issue in the terms that it is understood by the parties. The position is far more difficult in relation to the patent whose use is said to be optional. It does seem to me that on ordinary principles the question of non-infringement becomes an entirely theoretical one. Non-essentiality is accepted, and in those circumstances it seems to me that either there must be a clear assertion of infringement identified or a specimen hardware in respect of which InterDigital seek royalty should be identified.

47. It is not clear to me, as at present, whether that has happened and for this reason I will hear further submissions in the light of these observations in relation to the patent whose use is said to be optional. Subject as aforesaid, however, InterDigital's applications fail.

Mr. Justice Pumfrey
Approved JudgmentNokia – v – Interdigital.

Marten Walsh Cherer Ltd

This judgment will be made available on the Court Service web site: http://www.courtservice.gov.uk under the heading "judgments"

# EXHIBIT 3

<u>Claim No: 2024-000450</u>

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (KBD)**

**B E T W E E N :**

**(1) RICARDO BENJAMIN SALINAS PLIEGO**

**(2) CORPORACION RBS SA DE CV**

<u>Claimants</u>

**-and-**

**(1) ASTOR ASSET MANAGEMENT 3 LIMITED**

**(2) WEISER GLOBAL CAPITAL MARKETS LTD**

**(3) TAVIRA MONACO SAM**

**(4) VLADIMIR "VAL" SKLAROV (a.k.a. MARK SIMON BENTLEY)**

**(5) CORNELIUS VANDERBILT CAPITAL MANAGEMENT LTD**

**(6) ASTOR CAPITAL FUND LIMITED**

<u>Defendants</u>

---

**PARTICULARS OF CLAIM**

---

**A.    PARTIES**

**(1)    Claimants**

1.    The First Claimant ("**Mr Salinas**") is a wealthy individual who resides in Mexico. He is the founder and chairman of Grupo Salinas, a conglomerate of businesses operating in Mexico.

1

2.  The companies within Grupo Salinas include Grupo Elektra SAB De CV ("**Elektra**"), a company incorporated in Mexico and listed on the Mexican stock exchange. Elektra operates a chain of retail stores which sell consumer goods and offer various financial services in Mexico and Central and South America. Leaving aside any effect of the facts and matters pleaded below, Mr Salinas is the direct or indirect beneficial owner or controller of 67,544,413 shares in Elektra, representing 30.47% of Elektra's total issued share capital.

3.  The Second Claimant ("**RBS**") is a company incorporated in Mexico. Mr Salinas is the ultimate beneficial owner and controller of RBS.

**(2)  <u>Defendants</u>**

4.  The First Defendant ("**Astor 3**") is a company incorporated in Quebec, Canada. At all material times, Astor 3 was controlled by Mr Sklarov.

5.  The Second Defendant ("**Weiser**") is a company incorporated in the Bahamas which carries on business as a broker and custodian of securities.

6.  The Third Defendant ("**Tavira**") is a company incorporated in Monaco which carries on business as a broker and custodian of securities.

7.  The Fourth Defendant ("**Mr Sklarov**") is an individual who conducts stock-backed lending frauds with the characteristics set out below.

8.  The Fifth Defendant ("**Vanderbilt**") is a company incorporated in Belize. At all material times, Vanderbilt was controlled by Mr Sklarov.

9.  The Sixth Defendant ("**Astor Fund**") is a company incorporated in the Bahamas. At all material times, Astor Fund was controlled by Mr Sklarov.

**B.  <u>CONSPIRACY</u>**

10. On a date currently unknown to the Claimants, Mr Sklarov, Astor 3, Vanderbilt and Astor Fund (together, the "**Conspiracy Defendants**"), and others, with intent to defraud and injure the Claimants, conspired and combined together with the predominant purpose of defrauding and injuring the Claimants, alternatively with intent to defraud and injure the

Claimants by unlawful means (which the said Defendants intended and knew would be used), namely:

(1)  The making of fraudulent misrepresentations to the Claimants by Mr Sklarov, Astor Fund and/or Astor 3 to induce them to: (i) transfer shares in Elektra belonging to Mr Salinas (the "**Elektra Shares**") to Weiser and Tavira; and (ii) enter into contracts by which, as part of the security arrangements, Astor 3 would be given the power to instruct Weiser and Tavira to dispose of the Elektra Shares, as more particularly pleaded below; and

(2)  Disposals of the Elektra Shares and their proceeds in breach of trust, breach of fiduciary duty and/or breach of contract, as more particularly pleaded below.

11.  More particularly, the purpose and/or objective of the Conspiracy Defendants was to defraud and injure the Claimants by (*inter alia*) deceiving the Claimants into believing that they were dealing with a group of companies carrying on business as legitimate and reputable financial institutions ("**Astor**") which was associated with the wealthy Astor family from the United States (the "**Astor Family**"), in order to induce them to (i) transfer the Elektra Shares to Weiser and Tavira and (ii) as part of the security arrangements, provide Astor 3 with the power to instruct Weiser and Tavira to dispose of the Elektra Shares.

12.  In reality, Astor (which comprised many companies including Astor Fund, Astor Asset Management Limited ("**Astor Asset Management**") and Astor 3) was not a legitimate or reputable financial institution, and had no genuine connection with the Astor Family, but was instead a vehicle for the fraudulent designs and intentions of Mr Sklarov, a serial fraudster and convicted felon, who intended by his dishonest scheme to misappropriate the Elekta Shares by the use of fraudulent misrepresentations and other false pretences, as pleaded below.

13.  Astor 3 joined the conspiracy on its incorporation in July 2021.

14.  Vanderbilt joined the conspiracy by no later than December 2021 when it began to: (i) receive transfers of Mr Salinas's shares in Elektra; (ii) sell them; and (iii) dissipate the proceeds.

15.　Astor Fund joined the conspiracy by the date on which it provided the Term Sheet (as defined below) to the Claimants, alternatively by no later than 27 July 2021 when it began to: (i) receive transfers of the Elektra Shares; (ii) sell them; and (iii) dissipate the proceeds.

16.　References herein to the Conspiracy Defendants at any point in time are references to those of the Defendants which were participating in the conspiracy during the time in question.

## C.　**REPRESENTATIONS**

17.　In order to induce the Claimants to (i) transfer Elektra Shares to Weiser and Tavira and (ii) provide Astor 3 with the power to instruct Weiser and Tavira to dispose of the Elektra Shares, the following express representations were made to the Claimants by or on behalf of Mr Sklarov, Astor Fund and/or Astor 3:

(1)　Astor and the companies in its group (including Astor Fund and Astor Asset Management) were associated with the Astor Family and Astor 3 was a special purpose vehicle owned and controlled by Astor.

(2)　Astor, Astor Fund and Astor Asset Management had entered into many *bona fide* stock-lending transactions in the past.

(3)　The dealings and affairs of Astor, Astor Fund, Astor Asset Management and Astor 3 were controlled and/or overseen by individuals by the names of Thomas Mellon (a descendant of the Astor Family and the chief executive officer of Astor Asset Management) and/or Gregory Mitchell (the Managing Director of Astor Asset Management in North America and/or "Managing Director of North America" for Astor Fund).

18.　Further or alternatively, in order to induce the Claimants to (i) transfer Elektra Shares to Weiser and Tavira and (ii) provide Astor 3 with the power to instruct Weiser and Tavira to dispose of the Elektra Shares, the following implied representations were made to the Claimants by or on behalf of Mr Sklarov, Astor Fund and/or Astor 3:

(1)　Astor and the companies in its group (including Astor Fund and Astor Asset Management) were associated with the Astor Family and Astor 3 was a special purpose vehicle owned and controlled by Astor.

(2)   Astor and the companies in its group (including Astor Fund, Astor 3 and Astor Asset Management) were legitimate and honest financial institutions which carried on legitimate and honest stock-backed lending activities.

(3)   The dealings and affairs of Astor, Astor Fund, Astor Asset Management and Astor 3 were controlled and/or overseen by individuals by the names of Thomas Mellon (a descendant of the Astor Family and the chief executive officer of Astor Asset Management) and/or Gregory Mitchell (the Managing Director of Astor Asset Management in North America and/or "Managing Director of North America" for Astor Fund).

(4)   Astor, Astor Fund, Astor Asset Management and/or Astor 3 intended a member of the Astor group (in the event, Astor 3) to enter into a legitimate and *bona fide* contract of loan with the intention and ability to fund the loan with their own cash resources and not by selling any of the Elektra Shares.

(5)   The lender in respect of such a loan (in the event, Astor 3) would intend and/or (once incorporated) did intend to comply with its obligations in respect of the loan and security as it honestly understood them to be.

19.   The following particulars are the best particulars which the Claimants are presently able to provide of the said representations, pending further investigations by the Claimants (which are continuing) and disclosure by the Defendants herein.

20.   The express representation pleaded in paragraph 17(1) above was made by Mr Sklarov and/or his associates to the Claimants' financial adviser by the name of Alexandre Torti ("**Mr Torti**") during the course of a video-call in the spring of 2021 with an individual claiming to be Thomas Astor-Mellon ("**Mr Astor-Mellon**"). Mr Astor-Mellon was on board a yacht and claimed to be from the wealthy Astor Family who, he said, were behind Astor which was experienced in stock-lending transactions. Mr Torti communicated the same to Eduardo Salceda Sanchez ("**Mr Salceda**") who acts for the Claimants in matters pertaining to the borrowing of monies and the provision of security. Mr Sklarov and/or his associates and/or Astor Fund knew and intended that Mr Torti would communicate the same to the Claimants.

21.   Mr Sklarov and/or his associates and/or Astor Fund made the representation pleaded in paragraph 17(2) above in spring 2021 to a financial adviser by the name of Zara Akbar ("**Ms Akbar**"), knowing and intending that she would communicate the same to persons in the position of the Claimants or agents of such persons. In accordance with intentions of Mr Sklarov and/or his associates and/or Astor Fund, Ms Akbar communicated the substance of the representation pleaded in paragraph 17(2) above to Mr Torti, who communicated the same to Mr Salceda.

22.   Mr Sklarov and/or his associates and/or Astor Fund made the representations pleaded in paragraph 17(3) above in:

(1)   the video-call described at paragraph 20 above;

(2)   an in-person meeting between an individual purporting to be Mr Mitchell and Mr Torti during the spring of 2021; and

(3)   communications and documents relating to the proposed stock-lending agreement in which Mr Astor-Mellon and Mr Sklarov (under the alias "Gregory Mitchell") held themselves out as officers of Astor and/or Astor Asset Management and/or Astor Fund, including in emails from Astor Capital Fund to Mr Torti, Mr Salceda and/or Ms Akbar which were copied to thomas.mellon@astorassetgroup.com and gregory.mitchell@astorassetgroup.com, and in emails from Mr Sklarov (under the alias "Gregory Mitchell") to Mr Torti and/or Ms Akbar.

23.   The implied representations pleaded in paragraph 18(1) above were made by reason of the facts and matters described in paragraph 22 above, as well as the use of and association with the 'Astor' name by the business and its purported principal, Mr Astor-Mellon. Such usage and association was evident from the business's website, LinkedIn profiles, and communications and documents relating to the proposed stock-lending agreement.

24.   Such documents included (but are not limited to) a draft term sheet (the "**Term Sheet**") from Astor Capital Fund Ltd dated 29 March 2021, which was provided by Mr Sklarov and/or his associates and/or Astor Fund to Mr Salceda via Ms Akbar and Mr Torti. The Term Sheet stated that Astor Capital Fund was a subsidiary of Astor Trust Company. Astor Trust Company is the name of a bank which was associated with the Astor Family in the early twentieth century. In fact, none of the Defendants (or indeed any entity associated

with Astor or Mr Sklarov) is a subsidiary of Astor Trust Company. The Term Sheet set out the terms on which Astor Capital Fund was offering to provide a loan to Mr Salinas, secured over the Elektra Shares. Among other things, the Term Sheet made clear that the Elektra Shares would be held by a custodian in an account in the name of Mr Salinas during the term of the loan and that the lender would not be able to sell or short-sell the Elektra Shares during that period. The Term Sheet also provided that the lender would return the Elektra Shares to the borrower within three days of repayment of the loan in full on maturity.

25.  The implied representations pleaded in paragraph 18(2) above were made by reason of the facts and matters described in paragraphs 20 to 24 above, and from the indicia of a reputable and legitimate financial business presented by Mr Sklarov, his associates, Astor Fund and/or Astor 3, including on the business's website, LinkedIn profiles, and communications and documents relating to the proposed stock-lending agreement.

26.  The implied representations pleaded in paragraph 18(3) above were made by reason of the facts and matters described in paragraph 22 above.

27.  The implied representations pleaded in paragraph 18(4) and 18(5) above were made by reason of the facts and matters described in paragraphs 20 to 26 above.

28.  Further, the representations pleaded in paragraph 18(4) and 18(5) above are were made by reason of the fact that Mr Sklarov and/or his associates and/or Astor Fund and/or Astor 3 held out that a member of the Astor group (in the event, Astor 3) was prepared to execute and be bound by the SLA (as defined below), which involved the deposit of high-value shares as collateral for loans where counterparty honesty is highly significant and essential.

29.  Astor 3 made the representations in paragraphs 17 and 18 following its incorporation when, with actual knowledge of the fact that the said representations had already been made (such knowledge being attributed to it on the basis that it is controlled by Mr Sklarov), it held itself out to be a member of the Astor group and offered to enter into a loan with the Claimants in accordance with the parties' previous communications and negotiations including the Term Sheet and/or on the terms set out in the SLA (as defined below).

30.  The Claimants understood the said representations to have been made for the reasons set out above. Further, the representations pleaded above were continuing representations

and/or were repeated by Astor 3 upon the issuance of every "Closing Statement" in respect of each tranche of the loan advanced by Astor 3 to RBS.

**D.    INDUCEMENT AND RELIANCE**

31.    Induced by and in reliance upon the said representations, (i) the Claimants signed the SLA, the Weiser Agreement (as defined below) and the Tavira Agreement (as defined below); and (ii) Mr Salinas transferred Elektra Shares to Weiser and Tavira. The said representations were material in the sense that the Claimants would not have taken the actions pleaded in paragraphs 32 to 40 below if they had known that they were false.

**(1)    The SLA**

32.    On or around 28 July 2021, the Claimants signed a stock loan agreement (the "**SLA**") with Astor 3 in respect of the provision of a loan by Astor 3 to RBS, secured over the Elektra Shares. The SLA was signed on behalf of Astor 3 by "Mariia Mitsa". Pending disclosure by the Defendants herein, the Claimants do not accept that "Mariia Mitsa" is a real person. The signature of the SLA on behalf of Astor 3 was approved by Mr Sklarov acting within the scope of his authority. The material terms of the SLA are pleaded below.

33.    From 9 August 2021 to 15 September 2023, Astor 3 made five separate loans to RBS under the SLA in the total amount of MXN 2,154,218,522.55 (approximately US$ 115 million).

**(2)    The Weiser Agreement**

34.    Mr Salinas signed a custodian management agreement (the "**Weiser Agreement**") which entitled Weiser to take instructions from Astor 3 in respect of Elektra Shares. As to this:

(1)    Pursuant to clauses 1, 2 and 3 of the Weiser Agreement, Mr Salinas conferred authority on Astor 3 to act on Mr Salinas's behalf and in Mr Salinas's name in giving instructions to Weiser in relation to Elektra Shares held in accounts with Weiser in Mr Salinas's name.

(2)    Astor 3's authority to give instructions under the Weiser Agreement on Mr Salinas's behalf was subject to the terms of the SLA. Astor 3 had no authority to give instructions under the Weiser Agreement if those instructions were in breach of the SLA.

(3)   The Claimants understood that the purposes of the Weiser Agreement included enabling Astor 3 to give instructions to Weiser (i) in respect of Elektra Shares held by Weiser following the occurrence of an Event of Default (as defined) under the SLA and (ii) to return the Collateral Shares to the First Claimant within three Business Days of the Second Claimant satisfying its obligations under the SLA including repayment of the loan.

(4)   Astor 3 owed fiduciary duties to Mr Salinas in respect of the exercise of the powers and authority granted to it under the Weiser Agreement, including duties to exercise those powers and authority in good faith and for proper purposes.

**(3)   The Tavira Agreement**

35.   On or around 30 November 2021, Mr Salinas signed a control agreement (the "**Tavira Agreement**") which entitled Tavira to take instructions from Astor 3 in respect of Elektra Shares. As to this:

(1)   Pursuant to clause 1 of the Tavira Agreement, Mr Salinas conferred authority on Astor 3 to act on Mr Salinas's behalf and in Mr Salinas's name in giving instructions to Tavira in relation to Elektra Shares held in accounts with Tavira in Mr Salinas's name.

(2)   Astor 3's authority to give instructions under the Tavira Agreement on Mr Salinas's behalf was subject to the terms of the SLA. Astor 3 had no authority to give instructions under the Tavira Agreement if those instructions were in breach of the SLA.

(3)   The Claimants understood that the purposes of the Tavira Agreement included enabling Astor 3 to give instructions to Tavira (i) in respect of Elektra Shares held by Tavira following the occurrence of an Event of Default under the SLA and (ii) to return the Collateral Shares to the First Claimant within three Business Days of the Second Claimant satisfying its obligations under the SLA including repayment of the loan.

(4)    Astor 3 owed fiduciary duties to Mr Salinas in respect of the exercise of the powers and authority granted to it under the Tavira Agreement, including duties to exercise those powers and authority in good faith and for proper purposes.

**(4)    Transfer of Elektra Shares to Weiser and Tavira**

36.    On 18 June 2021, Mr Salinas transferred 3,600,000 Elektra Shares to Weiser, which moved 935,913 of them into a designated collateral account in the name of Mr Salinas.

37.    Mr Salinas transferred 6,268,383 Elektra Shares to Tavira: 2,350,000 on 15 December 2021; a further 314,087 on 20 January 2022; a further 1,431,700 on 22 June 2022; a further 128,207 on 3 April 2023; a further 1,600,000 on 4 April 2023; and a further 444,389 on 12 September 2023.

38.    As at 2 August 2024, the total of 7,204,296 shares held by Weiser and Tavira were worth MXN 7.6 billion, equivalent to US$ 415 million – significantly in excess of the loans made under the SLA.

**(6)    Payment of interest and custody fees**

39.    The Claimants paid interest to Astor 3 in accordance with the terms of the SLA.

40.    In addition, the Claimants paid custody fees to Weiser and Tavira in return for their provision of custody services in respect of the holding of Elektra Shares.

**E.    DISPOSALS OF ELEKTRA SHARES**

**(1)    Disposals of Elektra Shares by Tavira**

41.    Wrongfully, and in breach of trust, breach of fiduciary duty and/or breach of contract, as more particularly pleaded below, Astor 3 and/or Mr Sklarov instructed Tavira to transfer Elektra Shares from Mr Salinas's account to Vanderbilt.

42.    Tavira transferred the first tranche of 2,350,000 Elektra Shares from Mr Salinas's to Vanderbilt's account on the instruction of Astor 3 on 17 December 2021, just two days after Mr Salinas had transferred those shares to Tavira.

43. This pattern was repeated whenever Mr Salinas made further transfers of Elektra Shares to Tavira: Astor 3 and/or Mr Sklarov instructed Tavira to transfer them from Mr Salinas's account to Vanderbilt's account and Tavira complied with the instruction.

44. Thus, the further tranches of 314,087 Elektra Shares, 1,431,700 Elektra Shares, 128,207 Elektra Shares, 1,600,000 Elektra Shares and 444,389 Elektra Shares pleaded above were transferred into Vanderbilt's account on the instructions of Astor 3 and/or Mr Sklarov.

45. Following the transfer of Mr Salinas's shares to Vanderbilt, Vanderbilt sold those shares to third parties. More particularly, Vanderbilt sold small tranches of Elektra Shares (usually a few thousand at a time) on almost every trading day for a period of more than two and a half years.

46. It is to be inferred that the tactic of drip-feeding small tranches into the market on a near-daily basis was intended to ensure that the sales did not result in any sudden falls in the Elektra share price which might arouse suspicion.

47. In this way, Vanderbilt sold almost all of the Elektra Shares which Mr Salinas had previously transferred to Tavira to be held as collateral under the SLA.

48. Some of the proceeds of sale of Elektra Shares were used to fund the loans which Astor 3 was purporting to make to RBS. Mr Sklarov has admitted in witness statements dated 5 September 2024 and 16 September 2024 that the third, fourth and fifth tranches of the loan (MXN 510,000,000, MXN 592,871,767 and MXN 173,586,459) were funded in this way: Vanderbilt transferred the proceeds of sale of the Elektra Shares to Astor 3 which transferred them to RBS.

49. Vanderbilt and Astor 3 paid all some or all of the remaining proceeds of sale of the Elektra Shares to Jurist IQ, a law firm operated by Mr Sklarov's longstanding associate, Mr Singh.

50. Tavira has stated that the 6,268,383 Elektra Shares held by it were transferred from Mr Salinas's account to Astor 3's account on 29 July 2024. This is inconsistent with the information pleaded above showing that the said Elektra Shares had previously been transferred to Vanderbilt and sold by Vanderbilt to third parties. It may be that the purported "transfer" on 29 July 2024 was merely a series of book entries, with Vanderbilt notionally retransferring the Elektra Shares to Mr Salinas's account so that they could be notionally

11

transferred to Astor 3. The truth is unclear and the Claimants' position is reserved pending disclosure and further enquiries.

**(2)     Disposals by Weiser**

51.     Wrongfully, and in breach of trust, breach of fiduciary duty and/or breach of contract, as more particularly pleaded below, Astor 3 and/or Mr Sklarov instructed Weiser to transfer Elektra Shares from Mr Salinas's account to Astor Fund.

52.     According to information from Weiser, following the transfer of Elektra Shares to Astor Fund, Astor Fund sold 935,716 of those shares to third parties for a total price of MXN 1,208,118,232, equivalent to US$ 62,270,122.60 at current exchange rates. More particularly:

(1)     On 27 July 2021, in two transactions, Astor Fund sold 187,000 Electra Shares for MXN 294,128,052 and 100,000 Elektra Shares for MXN 96,383,700. The total amount realised was MXN 390,511,752, equivalent to US$ 20,128,174.57 at current exchange rates.

(2)     On 8 August 2021, in two transactions, Astor Fund sold 100,000 Elektra Shares for MXN 109,986,300 and 300,000 Elektra Shares for MXN 314,527,200. The total amount realised was MXN 424,513,500, equivalent to US$ 21,880,729.05 at current exchange rates.

(3)     On 21 October 2021, in two transactions, Astor Fund sold 38,716 Elektra Shares for MXN 59,224,980 and 210,000 Elektra shares for MXN 333,868,000. The total amount realised was MXN 393,092,980 equivalent to US$ 20,261,218.98 at current exchange rates.

53.     The Claimants do not know if this information is true and their position is accordingly reserved. However, if it is true, it is to be inferred from the following facts and matters that Astor 3 used the proceeds of sale from the transactions in paragraph 52(1) and 52(2) above to fund, in whole or in part, the first and second tranches of the loan under the SLA:

(1)     The proceeds of the sales of Elektra Shares on 27 July 2021 and 8 August 2021 amounted to MXN 815,025,252 – a sum marginally in excess of the first and second loan tranches under the SLA, which totalled MXN 800,000,000 (excluding fees).

(2)    As pleaded at paragraph 48 above, Mr Sklarov has admitted that he funded the third to fifth tranches of the loan in the same manner.

54.    Weiser has also stated that it sold the 935,716 shares held by it to Astor Fund on 30 July 2024 (on the instructions of Astor 3) for a total price of MXN 233,929,000, equivalent to US$ 12,604,476.49. This is inconsistent with the information pleaded above showing that the shares had previously been sold to fund the first and second tranches of the loan. It may be that the purported "transfer" on 30 July 2024 was merely a series of book entries, with Astor Fund notionally retransferring the Elektra Shares to Mr Salinas's account so that they could be notionally transferred back to Astor Fund. The truth is unclear and the Claimants' position is reserved pending disclosure and further enquiries. However, if the sale on 30 July 2024 occurred, it was a sale at a significant undervalue, in that the true market value of the said shares at that time was approximately MXN 982,501,800 (based on a share price on the open market was MXN 1,050 per share), equivalent to around US$ 52.1 million at current exchange rates.

55.    Weiser has said that it continues to hold the sum of US$ 12,604,476.49 and 197 Elektra shares in Astor 3's account.

**(3)    Unlawfulness of the said disposals**

56.    The said disposals of Elektra Shares were unlawful and took place in breach of trust, breach of fiduciary duty and/or breach of contract, as more particularly pleaded below.

57.    The SLA did not entitle Astor 3 to dispose of the Elektra Shares:

(1)    As pleaded below, the representations as to the identity of Astor 3, which induced the Claimants to enter into the SLA, were false to the knowledge of Astor 3. In the premises, the SLA was void *ab initio* due to a unilateral mistake by the Claimants (the existence of which was known to Astor 3) as to the identity of Astor 3.

(2)    Alternatively, the SLA, the Weiser Agreement and/or the Tavira Agreement were void *ab initio* by reason the fact that they were instruments of a fraud perpetrated on the Claimants by Astor 3 and Mr Sklarov.

(3)    Alternatively, if the SLA was not void *ab initio*, then, according to its proper construction, the SLA did not entitle Astor 3 to dispose of the Elektra Shares prior to

the occurrence of an Event of Default. More particularly, pursuant to the terms of the SLA, Astor 3 was not entitled to exercise its security rights thereunder (namely, its "Lien" and "Encumbrance rights" (as defined in the SLA)) prior to the occurrence of Event of Default (as defined in the SLA). Terms of the SLA on which the Claimants rely in this regard include (but are not limited to): (i) the terms Acceleration Notice, Cure Period, Default, Event of Default and Lender's Remedy; (ii) clause II.7; (iii) clause V.2; (iv) clause V.3; (v) clause V.4; (vi) clause V.5; (vii) clause V.6; and (viii) clause V.8. The clauses on which Astor 3 has said that it relies (namely, (i) the terms Lien and Encumbrance; (ii) clause V.4(a); (iii) clause II.1(a); and (iv) clause IV.7) do not have the meaning for which it contends. The fact that security rights exist does not mean that they are enforceable immediately, prior to the occurrence of an Event of Default. No Event of Default occurred under the SLA. Astor 3 did not notify the Claimants of the existence of any Event of Default until after the discovery of the fraud, when it wrongly announced that Events of Default had occurred without any or any proper foundation to justify the fact that it had previously engaged in the misappropriation of the Elektra Shares.

(4)    Alternatively, if the SLA was not void *ab initio* and did not expressly restrict Astor 3's ability to dispose of Elektra Shares prior to the occurrence of an Event of Default, it was an implied term of the SLA that:

(i)    Astor 3 would not dispose of Elektra Shares for improper and/or dishonest purposes and/or in such a way as to prevent or disable Weiser and/or Tavira from being able to return them to Mr Salinas following repayment of the loan; and/or

(ii)    Astor 3 would not dispose of Elektra Shares in order to fund the loans which it was making to RBS under the SLA.

(5)    Alternatively, if the SLA was not void *ab initio* and did not expressly or impliedly restrict Astor 3's ability to dispose of Elektra Shares, the terms of the SLA were subsequently varied so as to contain such a restriction. More particularly:

(i) On 5 October 2021, Weiser informed Mr Salceda that the 935,913 shares had been transferred from Mr Salinas's account to an account in the name of Astor Fund.

(ii) This was a cause of huge concern to Mr Salceda, who instructed Mr Torti to send an email to Weiser seeking clarification.

(iii) In the absence of a satisfactory resolution to this issue, Mr Torti emailed Weiser on 19 October 2021 stating that the transfer to Astor Fund taken place in breach of the SLA. Mr Torti emailed Ms Akbar on 23 October 2021 to ask her to help him "*make Astor and Weiser understand that they are breaching and violating the contracts*".

(iv) On 25 October 2021, Ms Akbar told Mr Torti that Astor 3 had agreed to arrange for the shares to be returned to Mr Salinas's account within 24 hours.

(v) These events had two consequences. First, Mr Salinas insisted that any further tranches of collateral shares should be held by a different custodian in place of Weiser. Astor 3 agreed, resulting in the appointment of Tavira and the signature of the Tavira Agreement. Secondly, Astor 3 agreed to sign an addendum to the SLA ("**Addendum 2**") confirming that it would only issue instructions to the custodians in accordance with the terms of the SLA and not otherwise.

(vi) Properly construed in the context of the factual matrix described above, which was known to the parties, Addendum 2 varied the SLA (if it did not already prevent Astor 3 from disposing of Elektra Shares prior to the occurrence of an Event of Default) so as to have the effect of preventing Astor 3 from disposing of Elektra Shares prior to the occurrence of an Event of Default.

(6) In the final alternative, by reason of the events of October 2021 and the express or implied representation by Astor 3 that it would not in future give instructions for the disposal of Mr Salinas's shares prior to the occurrence of an Event of Default and the reliance by Mr Salinas on that representation to his detriment (in the form of the provision of further tranches of Elektra Shares to Tavira, as pleaded above), Astor 3 was estopped by representation (alternatively, convention) from exercising such contractual right as it might otherwise have had to dispose of Elektra Shares prior to

the occurrence of an Event of Default. As pleaded above, no Event of Default occurred.

**F.**   **FALSITY OF THE REPRESENTATIONS**

58.   The said representations by or on behalf of Mr Sklarov, Astor Fund and/or Astor 3 were false.

59.   Astor and the companies in its group (including Astor Fund and Astor Asset Management) were not associated with the Astor Family.

60.   Astor, Astor Fund and Astor Asset Management had not entered into many *bona fide* stock-lending transactions in the past.

61.   Astor and the companies in its group (including Astor Fund, Astor 3 and Astor Asset Management) were not legitimate and honest financial institutions which carried on legitimate and honest stock-backed lending activities. Further Astor 3 was not owned and controlled by a legitimate and honest financial institution, nor was it owned any controlled by an institution associated with the Astor Family.

62.   In reality, at all material times, Astor Fund, Astor Asset Management and Astor 3 were vehicles for the fraudulent activities of Mr Sklarov, a convicted felon and serial fraudster who conducts his frauds by posing as legitimate financial institutions and operating through false identities, using misrepresentations to gain control of shares in listed companies in order to steal them.

63.   As regards Mr Sklarov's illegitimate use of well-known financial names:

(1)   In or around 2017, Mr Sklarov was sued by NYSE Group, Inc., the operator of the New York Stock Exchange, which objected to Mr Sklarov's attempts to masquerade under the name "NYSE". Mr Sklarov claimed that he was intending to launch a legitimate business under the name "New York Services Enterprise" but his arguments were rejected by the tribunal which held that he had been acting in bad faith.

(2)   In or around 2019, Mr Sklarov was sued by Rothschild & Co in respect of his attempts to masquerade under the Rothschild name. Rothschild & Co complained that his use of the Rothschild name to engage in fraud in connection with stock-

backed loans was damaging Rothschild & Co's reputation. The U.S. District Court, N.D. Georgia, Atlanta Division, granted a preliminary injunction against Mr Sklarov. Subsequently, Mr Sklarov signed a consent order which permanently enjoined him from using the Rothschild name.

(3)    On 9 October 2020, Barclays plc sued Mr Sklarov in respect of his attempts to masquerade under the Lehman name, which had been acquired by Barclays plc, alleging that Mr Sklarov was the ring-leader of a fraudulent scheme to mislead and to deceive members of the public by "*seeking to ... pass themselves off as the legitimate Lehman Brothers*". Barclays plc observed that Mr Sklarov had previously sought to operate under various other well-known names with which he had no genuine association, including (for example) Credit Suisse First Boston; BNP Paribas Fortis; PricewaterhouseCoopers; Bear Stearns; George Soros Capital; and Warren Buffet Capital. On 19 March 2021, Mr Sklarov signed a consent order enjoining him from using the Lehman name.

64.    Barclays plc described the frauds conducted by Mr Sklarov in the following terms:

"*Although Sklarov has used various shell companies to perpetuate each alleged fraud, the fact patterns underlying each of the schemes are nearly identical: a Sklarov-related entity promises to provide a loan to a borrower backed by securities owned by the borrower; the borrower pledges the shares as collateral to the Sklarov-controlled entity; the Sklarov-controlled entity provides little if any of the promised loan funds to the borrower and then sells or attempts to sell the shares proffered only as collateral, and retains the proceeds*".

65.    There are numerous examples of Mr Sklarov conducting such frauds:

(1)    Dr Brent Satterfield owned shares in a listed company called Co-Diagnostics, Inc ("**CDI**"). In early 2018, Dr Satterfield was introduced to Mr Sklarov who said that his company, America 2030, would make a loan to Dr Satterfield in the sum of US$ 3.5 million, secured over Dr Satterfield's shares in CDI, which were then worth more than US$ 7 million. Dr Satterfield handed over the shares, but America 2030 provided only US$ 67,000 of the loan. Dr Satterfield then discovered that America 2030 had already sold over US$ 1 million of his shares in CDI. On 13 March 2019, Dr

Satterfield commenced proceedings against Mr Sklarov in New York. The New York court referred the dispute to arbitration in New York, pursuant to an arbitration clause in the loan agreement. On 9 July 2021, the AAA tribunal issued an award in favour of Dr Satterfield, holding that Mr Sklarov had fraudulently induced Dr Satterfield to enter into the loan agreement by knowingly making false representations. The tribunal ordered Mr Sklarov to return the CDI shares to Dr Satterfield. However, Mr Sklarov failed to comply. On 12 November 2021, the New York court ordered Mr Sklarov to return the CDI shares. Again, Mr Sklarov did not comply. On 2 May 2022, the New York court held that Mr Sklarov was in contempt of court and directed him to purge his contempt, warning that an arrest warrant would be issued if he did not purge his contempt by 6 May 2022. Still Mr Sklarov failed to comply. On 3 June 2022, the New York court issued a warrant for Mr Sklarov's arrest. On 19 October 2023, the Supreme Court of the State of New York, Appellate Division, First Judicial Department, dismissed Mr Sklarov's appeal against the issuing of the arrest warrant.

(2)  Sunpower Business Group Pte Ltd and Tournan Trading Pte Ltd (the "**Sunpower Shareholders**") owned shares in Sunpower Group ("**Sunpower**"), a listed company in Singapore. They were introduced to Mr Sklarov (who seems to have been operating under the pseudonym "Mark Bentley"), who told them that his company, America 2030 Nevis, could make a loan on attractive terms, secured over their shares in Sunpower. They transferred their shares in Sunpower to Weiser to be held as security for the loan. Subsequently, they discovered that their shares had gone missing from the account. It became clear that Weiser had sold the shares on the instructions of Mr Sklarov. The Sunpower Shareholders commenced proceedings in Nevis accusing Mr Sklarov of fraud and obtained a worldwide freezing order against him. Mr Sklarov applied to strike out the claim but the Nevis court dismissed his application. Subsequently, Mr Sklarov ceased to participate in the proceedings, and, in June 2020, the Nevis court issued a judgment in default against him. Mr Sklarov sought to set aside the judgment in default, but his application was dismissed. The Nevis court held that Mr Sklarov had carried out a stock-backed loan fraud and that the loan agreements were vitiated due to fraud. Mr Sklarov's appeal was dismissed by the Court of Appeal of the Eastern Caribbean Supreme Court. On 9 August 2023,

the Supreme Court of the Bahamas made an order for the registration and enforcement of the Nevis judgment in the Bahamas.

(3)     Prescient Investment Limited ("**Prescient**") executed a loan agreement for US$ 117 million with Mr Sklarov's company, America 2030, and transferred shares worth US$ 200 million as collateral for the loan. Prescient alleged that Mr Sklarov had wrongfully ordered a broker to sell some of the shares and to pay the proceeds to America 2030. Prescient obtained an interlocutory injunction from the Hong Kong court to prevent any further disposals of the shares. Mr Sklarov responded by causing America 2030 to bring a claim in the United States District Court, N.D. Georgia, asserting that the loan agreement permitted America 2030 to sell the collateral immediately, even before it had advanced any of the loan monies. The federal court dismissed America 2030's claims with prejudice and sanctioned Mr Sklarov personally and enjoined him and his entities.

(4)     ZS Capital Fund SPC ("**ZS**") owned shares in Zhejiang Cangnan Instrument Group Limited ("**Zhejiang**"). During early 2020, ZS was introduced to Astor Asset Management 3 Limited ("**Astor Nevis**"); and, on 12 May 2020, ZS entered into a stock loan agreement with Astor Nevis for a loan of US$ 31.8 million, secured over the shares in Zhejiang. On 17 June 2020, ZS discovered that Astor Nevis had wrongfully dissipated almost 1 million of the shares in Zhejiang. ZS obtained an injunction to restrain Astor Nevis from disposing of any further shares. The dispute was referred to arbitration in Jamaica; and the arbitrator subsequently issued an award in favour of ZS.

(5)     Fortunate Drift Limited ("**FDL**") owned shares in Yangtze River Port & Logistics Limited ("**YRIV**"). Mr Sklarov's company, America 2030, agreed to lend US$ 8 million to FDL, secured over shares in YRIV. FDL pledged the shares to America 2030, but America 2030 did not provide the promised loan. FDL then cancelled the loan agreement. However, America 2030 refused to return the shares and instead began to sell them to third parties. FDL obtained a preliminary injunction to prevent America 2030 from disposing of the shares pending an arbitration in Hong Kong.

(6)    Chenming Holdings (Hong Kong) Limited ("**Chenming**") owned shares in Shandong Chenming Paper Holdings Limited ("**Shandong Paper**"), which are listed on the Hong Kong Stock Exchange. Chenming was introduced to Astor Asset Management 2 Limited ("**Astor 2**"), which agreed to make loans secured over Chenming's shares in Shandong Paper, which were lodged with Weiser by way of collateral. The loan agreements were signed by Astor 2 using a fictitious name. Chenming repaid the loan in full, but Astor 2 refused to return the shares in Shandong Paper. Chenming obtained *Norwich Pharamal* relief from the Hong Kong court and discovered that almost all of its shares had been fraudulently transferred or sold by Astor 2 shortly after they were deposited with Weiser. On 8 February 2024, Chenming commenced proceedings against Astor 2 and others (including Vanderbilt) in the United States District Court Southern District of New York.

66.    Other victims of Mr Sklarov's frauds include: Two Rivers Water & Farming Co, which obtained a temporary restraining order and a preliminary injunction on the basis that a loan agreement with America 2030 had been procured by fraud; and the CEO of Angus Energy, who resigned after transferring his shares to America 2030, which sold 10 million of them (with a value of over US$ 100 million) before the fraud was discovered.

67.    In *USA v. Sklarov, et al*., 97-cr-00176 (DJL) (W.D. Pa.), Mr Sklarov was convicted of fraud and sentenced to one year in prison and US$ 14,000,000 restitution for Medicare fraud.

68.    The dealing and affairs of Astor, Astor Fund, Astor Asset Management and Astor 3 have never been controlled and/or overseen by Thomas Mellon or Gregory Mitchell. The names Thomas Mellon and Gregory Mitchell are fictitious names used by Mr Sklarov and/or his associates to conduct frauds in such a way as to conceal Mr Sklarov's involvement.

69.    Mr Sklarov has admitted in a witness statement dated 16 September 2024 that he has used the name Gregory Mitchell to conceal his own involvement. He also admitted in the said witness statement that he gave false instructions to his solicitors, DWF, in respect of the identity of Gregory Mitchell and instructed DWF to communicate the false information to the Claimants.

70.    Mr Sklarov has said that Thomas Mellon is an alias used by Mr Sklarov's former associate, Alexei Skachkov, a man of Russian origin who lived in Atlanta, USA. It is the Claimants'

understanding that Mr Skachkov has a long criminal history. He was charged with forgery in the first degree for fraudulently prescribing medication under the alias Michael Thomas Virki. He pleaded guilty and was sentenced to three years of probation. His probation was revoked in January 2016 when he was again charged with forgery in an attempt to obtain drugs. In August 2017, he was charged for robbery from a jewellery store. He pleaded guilty and received six months confinement and 9.5 years' probation.

71. The sole shareholder of Astor 3 is Oksana Hryn, an associate of Mr Sklarov who claims to be the managing director of Vanderbilt. The sole director is Jonathan Clifford Bibi, a former defender on the Seychelles national football team, who has been involved in dealings involving a company called Zulutoys, which was held to have been operating unlawfully in Missouri. As pleaded above, the controlling mind and will of Astor 3 is Mr Sklarov.

72. Astor, Astor Fund, Astor Asset Management and/or Astor 3 never intended a member of the Astor group (in the event, Astor 3) to enter into a legitimate or *bona fide* contract of loan. Instead, the SLA was an instrument of fraud which was designed and intended to enable Mr Sklarov to misappropriate Elektra Shares.

73. Further or alternatively, Astor 3, Astor Fund and Mr Sklarov were pursuing a dishonest scheme designed and intended to enable them to misappropriate Elektra Shares on the basis of fraudulent misrepresentations and other false pretences.

74. Astor, Astor Fund, Astor Asset Management and Astor 3 never had the intention to fund a loan with their own cash resources. They only ever intended to make loans using the proceeds of sale of Elektra Shares.

75. Astor 3 never intended to comply with its obligations in respect of the loan and security as it honestly understood them to be. Neither did Mr Sklarov nor Astor Fund anticipate that the lender (in the event, Astor 3) had, or would have, any such intention. In this regard:

(1) At all material times Astor 3 intended to dispose of Elektra Shares prior to an Event of Default knowing that it had no lawful entitlement to do so and/or without honest belief that it had a lawful right to do so.

(2)   At all material times Astor 3 intended not to return the Elektra Shares to Mr Salinas following repayment of the loans, knowing that it was under an obligation to do so in such circumstances.

(3)   At all material times Astor 3 intended to take actions to prevent and/or disable itself and/or Weiser and/or Tavira from being able to return the Elektra Shares following repayment of the loans, knowing that such actions were contrary to its obligations in such circumstances.

(4)   At all material times Astor 3 intended to fund loans to RBS from the proceeds of sales of Elektra Shares, knowing that it had no lawful entitlement to do so and/or without honest belief that it had a lawful right to do so.

(5)   At all material times, Mr Sklarov and Astor Fund intended that the lender (in the event, Astor 3) would have the intentions identified in paragraphs 75(1)-(4), above.

### G.   **DISHONESTY**

76.   The said representations by Astor 3, Astor Fund and Mr Sklarov were made fraudulently, in that Astor 3, Astor Fund and Mr Sklarov (whose knowledge is to be attributed to Astor 3 and Astor Fund) knew that they were false.

PARTICULARS OF KNOWLEDGE

(1)   Astor 3, Astor Fund and Mr Sklarov knew that:

(i)    Astor and the companies in its group (including Astor Fund and Astor Asset Management) were not associated with the Astor Family.

(ii)   Astor, Astor Fund and Astor Asset Management have not entered into numerous *bona fide* stock-lending transactions in the past.

(iii)  Astor and the companies in its group (including Astor Fund, Astor 3 and Astor Asset Management) were not legitimate and honest financial institutions which carried on legitimate and honest stock-backed lending activities.

(iv)   Astor 3 was not a special purpose vehicle owned and controlled by a legitimate and honest financial institution nor was it owned and controlled by an institution associated with the Astor Family.

(2)  Further or alternatively, Astor 3, Astor Fund and Mr Sklarov knew that Astor and the companies in its group (including Astor Fund, Astor 3 and Astor Asset Management) were (at all material times) vehicles for the fraudulent activities of Mr Sklarov, a convicted felon and serial fraudster, who conducts his frauds by posing as legitimate financial institutions and operating through false identities, using misrepresentations to gain control of shares in listed companies in order to misappropriate them.

(3)  Astor 3, Astor Fund and Mr Sklarov knew of the other such frauds committed by Mr Sklarov.

(4)  Astor 3, Astor Fund and Mr Sklarov knew that the dealing and affairs of Astor, Astor Fund, Astor Asset Management and Astor 3 have never been controlled and/or overseen by Thomas Mellon or Gregory Mitchell. Further or alternatively, Astor 3, Astor Fund and Mr Sklarov knew that the names Thomas Mellon and Gregory Mitchell are fictitious names used by Mr Sklarov and/or Mr Skachkov to conduct Mr Sklarov's frauds in such a way as to conceal their own involvement.

(5)  Astor 3, Astor Fund and Mr Sklarov knew that they never had an intention for the lender (in the event, Astor 3) to enter into a legitimate or *bona fide* contract of loan and/or knew that the SLA was an instrument of fraud which was designed and intended to enable Mr Sklarov to misappropriate the Elektra Shares.

(6)  Astor 3, Astor Fund and Mr Sklarov knew that they were pursuing a dishonest scheme designed and intended to enable them to misappropriate Elektra Shares on the basis of fraudulent misrepresentations and other false pretences.

(7)  Astor 3, Astor Fund and Mr Sklarov knew that Astor 3 never intended to fund a loan with their own cash resources and/or that Astor 3 never intended to make loans using the proceeds of sale of Elektra Shares. Astor 3, Astor Fund and Mr Sklarov also knew that they never intended that the lender (in the event Astor 3) would ever have such an intention.

(8)  Astor 3, Astor Fund and Mr Sklarov knew that Astor 3 was not entitled to dispose of Elektra Shares (i) because the SLA was an instrument of fraud and/or (ii) under the terms of the SLA prior to an Event of Default and that no Event of Default had occurred.

23

(9)     Further or alternatively, Astor 3, Astor Fund and Mr Sklarov knew that Astor 3 never intended to comply with its obligations in respect of the loan and security and/or that it always intended (i) to dispose of Elektra Shares prior to an Event of Default; (ii) not to return the Elektra Shares upon maturity and repayment of the loans; (iii)  to take actions to prevent or disable Weiser and/or Tavira from being able to return the Elektra Shares to Mr Salinas; and/or  (iv) to fund loans to RBS from the proceeds of sales of Elektra Shares, as more particularly pleaded above. Astor Fund and Mr Sklarov also knew that they never intended that the lender (in the event Astor 3) would ever have such intentions.

**H.     PROPRIETARY CLAIMS**

**(1)     Express or implied trust**

77.     Pursuant to clause 7 of Weiser's terms and conditions, Mr Salinas transferred Elektra Shares to Weiser on the express basis that Weiser would hold them on trust for him. Further or alternatively, the said shares were transferred into a designated account in the name of Mr Salinas with the intention that Weiser would hold them on trust for him.

78.     Further, Mr Salinas transferred Elektra Shares to Tavira (as more particularly pleaded above) on the express or implied basis that Tavira would hold them on trust for him. Further or alternatively, the said shares were transferred into a designated account in the name of Mr Salinas with the intention that Tavira would hold them on trust for him.

79.     To the extent that such trusts were not express, they are to be implied from the circumstances pleaded above in accordance with the intentions of the parties.

80.     In the premises, Mr Salinas retains beneficial ownership of the said Elektra Shares. None of the Defendants is a *bona fide* purchaser for value of the said Elektra Shares or their proceeds and accordingly each of the Defendants holds the same subject to Mr Salinas's equitable interest therein so as to be liable to account to Mr Salinas in respect of the same.

**(2)     Trust by reason of fiduciary duty**

81.     Further or alternatively, Astor 3's power to give instructions to Weiser and Tavira in respect of Elektra Shares belonging to Mr Salinas was a fiduciary power which was to be exercised by Astor 3 only in good faith and for proper purposes and not otherwise.

82. Wrongfully, and in breach of fiduciary duty, Astor 3 gave instructions to Weiser and Tavira:

    (1)    in bad faith by requiring them to transfer Elektra Shares to Astor Fund and/or Vanderbilt in furtherance of the conspiracy pleaded herein; and/or

    (2)    in deliberate and knowing breach of Astor 3's obligations under the SLA; and / or

    (3)    knowingly in excess of the authority conferred by Mr Salinas on Astor 3 under the Weiser Agreement, the Tavira Agreements and the SLA.

83. Astor Fund and Vanderbilt were not *bona fide* purchasers for value of the said shares or their proceeds and accordingly received and continue to hold the same subject to Mr Salinas's equitable interest therein so as to be liable to account to Mr Salinas in respect of the same.

**(3)  Constructive trust**

84. Further or alternatively, by reason of the conspiracy, the fraud and/or the unlawful means pleaded above, the Defendants hold any Elektra Shares or proceeds thereof received by them as constructive trustees for Mr Salinas.

85. In the premises, the Defendants are liable to account to the Claimants for the said shares or the traceable proceeds thereof as constructive trustees.

**(4)  Purpose trust**

86. Further or alternatively, as pleaded above, Mr Salinas transferred the Elektra Shares to Weiser and Tavira for a specific purpose, namely the provision of collateral for the loan under the SLA, and in circumstances where the monies were not free to be used by any of the Defendants for their own general purposes. The said shares and/or any proceeds of the same were and are accordingly held on a *Quistclose* trust or purpose trust for Mr Salinas.

**(5)  Proprietary restitutionary claims**

87. Further or alternatively, Mr Salinas transferred the Elektra Shares to Weiser and Tavira under purported agreements induced by fraudulent misrepresentations.

88. On or around 2 August 2024, the Claimants rescinded the agreements (including but not limited to the SLA), thereby re-vesting title to the said shares and/or their proceeds in Mr Salinas.

89. In the premises, the Defendants are liable to account to Mr Salinas for the said shares or the traceable proceeds thereof as constructive trustees.

**(6)** **Proprietary claims consequent upon a mistake**

90. Further or alternatively, the said shares were transferred to Weiser and Tavira by virtue of a serious mistake as to the nature of the SLA and/or the identity of Astor 3.

91. Astor 3 and Mr Sklarov had actual knowledge of the said mistake. Accordingly, the Defendants received and held the Elektra Shares on constructive trust for the Claimants.

92. The Defendants are accordingly accountable to the Claimants in respect of the said shares and/or the traceable proceeds thereof.

**I.** **PERSONAL CLAIMS**

**(1)** **Damages for conspiracy**

93. Pursuant to and in furtherance of the conspiracy pleaded above, the Conspiracy Defendants carried out and otherwise participated in a series of overt acts that had the foreseeable result of defrauding or otherwise harming the Claimants by causing the Claimants to suffer loss and damage. More particularly:

(1) The Claimants have suffered loss and damage equal to the difference between:

(i) the value of the Elektra Shares at 18 June 2021 when Mr Salinas transferred 3,600,000 Elektra Shares to Weiser (as described in paragraph 36 above) (alternatively the value of the said shares at the dates on which they were transferred by Mr Salinas to Weiser and Tavira, or further alternatively the value of the said shares on the dates on which they were removed from Mr Salinas's accounts); and

(ii) the lower amount of the said loans.

(2)    Mr Salinas has suffered loss equal to the reduction in the value of his other shares in Elektra (held directly and indirectly) arising from the conspiracy including any reduction in value arising (i) by reason of the suspension of trading in Elektra shares on the Mexican stock exchange (which occurred as a result of the conspiracy), and (ii) from the Conspiracy Defendants' trading in Elektra shares in breach of the SLA. The quantum of said loss is to be determined by expert evidence at trial.

(3)    Further, the Claimants have incurred expenses in the investigation and mitigation of the conspiracy (including the expense of managerial and staff time), full particulars of which will be provided as soon as the same become available.

94.    In the premises, the Claimants claim and are entitled to damages for conspiracy to injure the Claimants, further or alternatively damages for conspiracy to defraud and/or injure the Claimants by unlawful means, as pleaded above.

**(2)    Damages for misrepresentation**

95.    By reason of the fraudulent misrepresentations by Astor 3 and Mr Sklarov, the Claimants have suffered and continue to suffer loss and damage. The Claimants rely on the particulars of loss and damage pleaded in paragraph 93 above.

96.    In the premises, the Claimants claim and are entitled to damages for deceit against Astor 3 and/or Mr Sklarov.

97.    In the alternative to the claim for damages for deceit, the Claimants claim the like sum from Astor 3 and/or Mr Sklarov under section 2(1) of the Misrepresentation Act 1967.

**(3)    Damages for breach of trust**

98.    As pleaded above, the Defendants held Elektra Shares and/or their proceeds on trust for Mr Salinas. To the extent that any of the Defendants has disposed of such shares or their proceeds in breach of trust, Mr Salinas is entitled to equitable compensation equal to the value of the shares or proceeds (as the case may be) for such breach of trust.

**(4)    Damages for breach of fiduciary duty**

99.    As pleaded above, Astor 3's power to give instructions to Weiser and Tavira in respect of the shares was a fiduciary power. Astor 3 acted in breach of fiduciary duty by giving instructions in bad faith in furtherance of the fraudulent scheme pleaded above.

100.    In the premises, the Claimants are entitled to equitable compensation from Astor 3 equal to the value of the shares for such breach of duty.

**(5)    Damages for breach of contract**

101.    If the SLA was not void *ab initio*, Astor 3 acted in breach of the SLA by giving instructions for the disposal of Elektra Shares in circumstances where it was not entitled to do so and thereby acted in breach of contract, causing loss and damage to Mr Salinas, as aforesaid.

102.    In the premises, the Claimants are entitled to damages for breach of contract as against Astor 3. The Claimants rely on the particulars of loss and damage pleaded above.

**(6)    Equitable compensation for knowing receipt**

103.    If and to the extent that any of the Conspiracy Defendants no longer holds the Elektra Shares or the traceable proceeds thereof previously received by them and held by them on trust as pleaded above, the Claimants seek equitable compensation against such Defendant for knowing receipt.

**(7)    Equitable compensation for dishonest assistance**

104.    By reason of the matters aforesaid, Mr Sklarov, Vanderbilt and Astor Fund dishonestly assisted Astor 3 to breach its fiduciary duty, as pleaded above.

105.    By reason thereof, the Claimants suffered loss and damage, as pleaded above.

106.    In the premises, each of each of Mr Sklarov, Vanderbilt and Astor Fund should be ordered to pay equitable compensation to the Claimants for their dishonest assistance of a breach of fiduciary duty.

**(8)    Restitution consequent upon rescission**

107.    As pleaded above, the Claimants have rescinded the SLA and associated contracts.

108. Alternatively, if and to the extent that the Claimants have not previously rescinded them, they are entitled to rescind and hereby rescind the same.

109. In the premises, the Claimants are entitled to and claim restitution of the shares transferred to Weiser and Tavira thereunder. The Claimants are willing and able to make counter-restitution.

**(9)**    **Interest**

110. Further, the Claimants claim and are entitled to interest, whether or not compounded, on all sums found to be due to them at such rates as the Court shall deem just pursuant to the Court's equitable jurisdiction and/or section 35A of the Senior Courts Act 1981.

AND THE CLAIMANTS CLAIM AGAINST THE DEFENDANTS:

(1)    Declarations that the Defendants hold the Elektra Shares and/or the proceeds thereof on trust for the Claimants together with such orders as may be necessary to compel the Defendants to transfer the said shares and/or proceeds to the Claimants and/or to account for the Claimants in respect of the same;

(2)    Such accounts and enquiries as may be necessary including an account of profits;

(3)    Damages for conspiracy (in the case of the Conspiracy Defendants);

(4)    Damages for fraudulent misrepresentation (in the case of the First, Fourth and Sixth Defendants only), alternatively (again in the case of the First, Fourth and Sixth Defendants only) damages pursuant to the Misrepresentation Act 1967;

(5)    Damages for breach trust, breach of contract and/or breach of fiduciary duty, as aforesaid;

(6)    Equitable compensation as aforesaid;

(7)    Restitution;

(8)    Interest; and

(9)    Costs.

**STEPHEN ROBINS KC**

**HENRY PHILLIPS**

**MATTHEW ABRAHAM**

**RYAN PERKINS**

**Statement of truth**

I believe that the facts stated in these Particulars of Claim are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

**Signed:** _____

**Name:** _Ricardo B. Salinas Pliego._

**Dated:** _September 26, 2024._

STEPHEN ROBINS KC

HENRY PHILLIPS

MATTHEW ABRAHAM

RYAN PERKINS

The Second Claimant believes that the facts stated in these Particulars of Claim are true. The Second Claimant understands that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

I am duly authorised to sign this statement of truth on behalf of the Second Claimant.

Signed: _____

Name: Guillermo Eduardo Zubraur

Position: Sole Administrator

Dated: September 26, 2024

31

# EXHIBIT 5

Claim No: _____

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (KBD)**

**B E T W E E N :**

**(1) RICARDO BENJAMIN SALINAS PLIEGO**

**(2) CORPORACION RBS SA DE CV**

**Applicants**

**-and-**

**(1) ASTOR ASSET MANAGEMENT 3 LIMITED**

**(2) WEISER GLOBAL CAPITAL MARKETS LTD**

**(3) TAVIRA MONACO SAM**

**(4) VLADIMIR "VAL" SKLAROV**

**Respondents**

---

### APPLICANTS' SKELETON ARGUMENT

---

| | |
|---|---|
| **Time estimate for hearing:** | 2 hours |
| **Time estimate for pre-reading:** | 1 hour |
| **Suggested reading list:** | (1) This skeleton argument; |
| | (2) The first affidavit of Eduardo Salceda Sanchez |

**HEARING IN PRIVATE:** For the reasons addressed in this skeleton argument, it is requested that this hearing take place in private and that, until the Applicants inform the Court in writing that any order made has been served on the Respondents, the Court file be kept sealed.

The Applicants have filed a draft claim form and draft application notices with the Court and undertake to issue the same as soon as possible after the hearing.

1

A.  **<u>INTRODUCTION</u>**

1.  This skeleton argument has been lodged on behalf of Richardo Benjamin Salinas Pleigo ("**Mr Salinas**") and Corporacion RBS SA de CV ("**RBS**") (together, the "**Applicants**") for the urgent *ex parte* without notice hearing of the Applicants' applications for:

    (1)  An interim proprietary injunction against Astor Asset Management 3 Limited ("**Astor 3**"), Weiser Global Capital Market ("**Weiser**"), Tavira Monaco SAM ("**Tavira**") and Vladimir 'Val' Sklarov ("**Mr Sklarov**") in respect of 7,204,296 shares in Grupo Elektra SAB De CV ("**Elektra**") and/or their traceable proceeds;

    (2)  A worldwide freezing order ("**WFO**") against Astor 3 and Mr Sklarov;

    (3)  Ancillary disclosure orders against Astor 3, Weiser, Tavira and Mr Sklarov; and

    (4)  An order permitting the Claimants to serve the Claim Form and any subsequent documents in the Claim on the Respondents out of the jurisdiction by an alternative method.

2.  Mr Sklarov is a convicted felon who has carried out numerous similar frauds. His modus operandi is to set up entities which pose as legitimate and honest financial institutions to gain control of shares by way of collateral before misappropriating them.

3.  In the present case, Mr Sklarov and his company, Astor 3, have sought to misappropriate Elektra shares belonging to Mr Salinas with a value of MXN 7,565,879,616 (approximately US$416,394,035 at current exchange rates).

4.  Those shares in Elektra should be held by Weiser and Tavira under custodian management agreements. However, it appears that Astor 3 has given instructions to Weiser and/or Tavira to dispose of at least some of those shares.

5.  The Applicants wrote to Weiser and Tavira on 10 June 2024 to say that they should not dispose of the shares. Further, on 26 July 2024, Elektra issued a press release stating that it had become aware of a possible fraud in respect of the shares.

6.  Astor 3's response to these developments was to commit further misappropriations which have recently come to light. On 1 August 2024, Tavira informed the Applicants that it had transferred the 6,268,383 Elektra shares "*to Astor's account, as per Astor's instructions*". According to a trade report supplied by Tavira, this transfer to Astor took

place on 29 July 2024. Thus, it seems that Astor 3 responded to the discovery of the fraud by attempting to misappropriate appropriately 86% of shares with a value of approximately US$358 million.

7.   The application is urgent. It is unclear how many of the shares remain in the custody of Weiser, Tavira and Astor 3 and what has happened to the proceeds of any sole shares.

8.   The Applicants fear that, unless restrained by the court, the Respondents may dispose of further shares and/or the proceeds of sale of shares and that Astor 3 and Mr Sklarov may take steps in respect of their assets to frustrate the enforcement of any judgment that the Applicants may obtain against them in due course in these proceedings.

9.   The immediate purpose of the application is to "hold the ring" until a return date hearing can take place in a few weeks' time (on full notice to the Respondents).

10.  In the Applicants' submission, this is plainly a case in which the giving of notice to the Respondents could defeat the purpose of the Applicants' application. Accordingly, it is appropriate for the application to be heard ex parte without notice: see, for example, *Re First Express Ltd* [1991] BCC 782 per Hoffmann J at 785 and *National Commercial Bank Jamaica Ltd v Olint Corp Ltd* [2009] 1 WLR 1405 (PC) at [13]. Further, the Applicants seek an order pursuant to CPR 39.2(3)(a), that the present application be heard in private on the basis that publicity would defeat the object of the hearing; *White Book*, [39.2.3] at p.1224. The Applicants also seek an order, with the same objective, pursuant to CPR 5.4B, 5.4C(4) and 39.2(5) and pending its notifying the court that any order made on this application has been served on the Defendants, (a) the court file shall be kept sealed, (b) the documents on the court file shall not appear on any Electronic Working file, (c) no person shall be permitted to inspect the court file, and (d) the court not publish any judgment given or order made on this application on the judiciary website.

## B.   **BACKGROUND**

### (1)   **Mr Salinas**

11.  The First Applicant, Mr Salinas, is one of the wealthiest individuals in Mexico with a net worth of several billion U.S. dollars. He is the founder and chairman of Grupo Salinas, a conglomerate with interests in many different businesses in Mexico including financial services, retail, media, telecommunications and the internet.

12. Mr Salinas is the direct or indirect beneficial owner or controller of approximately 67,544,413 shares in Elektra, representing 30.47% of Elektra's share capital (disregarding the impact of the fraudulent scheme referred to below).

13. Elektra forms part of Grupo Salinas. It is incorporated in Mexico and is listed on the Mexican stock exchange. It which operates a chain of retail stores selling consumer goods and providing financial services in Mexico and Central and South America.

**(2)** **The Astor group**

14. During the summer of 2021, Eduardo Gonzalez Salceda Sanchez ("**Mr Salceda**"), the Vice President (Financial Investment & Analysis) of Grupo Salinas, began to investigate the possibility of raising finance secured over Elektra shares.

15. Alexandre Torti ("**Mr Torti**") of Fininvesta, a financial advisory firm, introduced Mr Salceda to the Astor group, which he said was owned by the well-known Astor family. (It seems that Mr Torti had been introduced to the Astor group by Zara Akbar ("**Ms Akbar**") of Enness (Jersey) Limited, a financial advisory firm based in Jersey.)

16. Subsequently, Mr Salceda dealt with Gregory Mitchell, who was said to be a managing director of the Astor group, in emails copied to Thomas Mellon of the Astor group. (As explained below, it now seems that neither of these individuals actually exists.)

**(3)** **The SLA**

17. In summary, the proposal was for an entity within the Astor group to make a loan to the Second Applicant, RBS, a company incorporated in Mexico which is beneficially owned and controlled by Mr Salinas, on terms which required Mr Salinas to lodge shares in Elektra with a custodian, Weiser, as collateral for the loan. A term sheet provided by the Astor group identified the key terms of the proposal, including that the lender would not engage in selling or short selling of the collateral shares during the loan term and while the loan remains in full force and effect.

18. At the outset, it was envisaged that the lender would be Astor Asset Management Ltd, which executed two agreements dated 1 May 2021 and 14 July 2021.

19. However, Mr Mitchell stated that Astor 3 should be the lender. Therefore, on 28 July 2021, Astor 3 executed a stock-lending agreement (the "**SLA**").

20. The parties executed an addendum (the "**1st Addendum**") to record that the agreements dated 1 May 2021 and 14 July 2021 had been cancelled.

**(4)** **Terms of the SLA**

21. Pursuant to the SLA, Astor 3 (the "Lender") agreed to advance loans of up to MXN 3,008,580,000 to RBS (the "Borrower"), secured over Elektra shares owned by Mr Salinas (the "Guarantor"). In summary of the key terms of the SLA:

    (1) By Clause II.1(a), RBS (as Borrower) was entitled to request loan advances in a "Loan Principal Amount" of up to MXN 3,008,580,000 from Astor 3 (as Lender).

    (2) These loans were to be secured by a "Lien" over the "Pledged Collateral", which was to consist of Elektra shares belonging to Mr Salinas (as Guarantor).

    (3) By Clause II.1(c), the maximum available lending amount would be equal to 55% of the fair market value ("FMV") of the Pledged Collateral. (The loan-to-value ratio was subsequently reduced to 35%, as explained below.)

    (4) By Clause II.1(a), the normal interest rate was to be 1.15% per annum. After an Event of Default, the interest rate would be 1.5% per month): see Clause II.1(b).

    (5) By Clause II.6(a), the Loan Principal Amount would be repayable on the date falling 5 years after the "Loan Term" begins (the "Maturity Date").

    (6) By Clause III.1, the SLA was to be a non-recourse lending arrangement, such that Astor 3 could not bring proceedings against the Borrower or the Guarantor in the event of non-payment and could have recourse only to the Pledged Collateral.

    (7) By Clause III.4, the Pledged Collateral (i.e. the shares in Elektra) was to be held with a "Depository Broker" appointed by the Lender.

    (8) By Clause VII, the SLA is governed by English law and is subject to the exclusive jurisdiction of the English Court.

22. Importantly, the SLA contained restrictions on dealings in the Elektra shares during the Loan Term (as defined) prior to the occurrence of an Event of Default (as defined):

    (1) Clause II.7 states that the Astor 3 "*confirms and will maintain its full ability to release and discharge the Lien and return the Pledged Collateral, to Guarantor,*

5

*free of any Encumbrance within three (3) Business Days of Borrower's satisfaction of its Obligations … A return of identical securities means a return of the Pledged Collateral as modified as a result of any split-up, revision, conversion, reclassification, degradation, or other like change of the Pledged Collateral*". The term "*Pledged Collateral*" is defined as meaning (with emphasis added) "*the total **<u>actual</u>** shares pledged by the Guarantor to Lender as consideration for the Loan to Borrower and any shares or proceeds resulting from any transaction, split-up, revision, reclassification or other like change that may take place of the Pledged Collateral during the Term of the loan*". In other words, "*the total actual shares pledged by the Guarantor to the Lender*" must be returned to the Guarantor. It is hard to see how that requirement can be reconciled with any suggestion that some other (albeit equivalent) securities could be returned instead.

(2)  By Clause V.2, Astor 3 represented and warranted that it would deposit "Cash Collateral" into an account held by RBS at the Depository Broker, which would then be released at "Closing" to fund the Loan Principal Amount. This provision was designed to ensure that Astor 3 would fund the lending from its own cash resources (and not by selling the Pledged Collateral belonging to Mr Salinas).

(3)  By Clause V.3, Astor 3 represented and warranted that all dividends on the Pledged Collateral would be credited to Mr Salinas. This presupposes that Astor 3 would retain the shares in accordance with the SLA and not dispose of them prior to the maturity date or any earlier event of default, as such disposal would prevent Astor 3 from receiving dividends paid on the shares and crediting them to Mr Salinas.

(4)  By Clause V.4(b), Astor represented and warranted as follows: "*During the Loan Term, provided that there has not been an Event of Default, the Lender will not sell or short-sell the shares of the Pledged Collateral on any publicly traded securities exchange. However, upon the occurrence of an incurable Event of Default, the Lender reserves the right to dispose of the Collateral on any publicly traded securities exchange, but is not obligated in doing so*". This wording makes expressly clear that Astor 3 was obliged to retain the shares (and was not permitted to sell them) save on the occurrence of an incurable Event of Default.

(5)  By Clause V.5, Astor 3 represented and warranted as follows: "*Payments received from sale of Collateral upon Event of Default shall be applied in the following*

*order: (i) firstly, to all outstanding Principal balance, interest and fees ...*" This wording again makes clear that Astor 3 was not to realise collateral save upon the occurrence of an Event of Default: proceeds of such realisation were to be applied in discharge of the principal and interest that would be due in those circumstances.

(6)  By Clause V.6, Astor 3 represented and warranted as follows: "*The Lender will not transfer the securities to its own account unless an incurable Event of Default has taken place. Only upon an incurable Event of Default will Lender request the Depository Broker to transfer securities in the Guarantor's account to Lender's sole control and custody in order to satisfy Obligations of Borrower and Guarantor*". This wording made clear that Astor 3 could not transfer the Collateral Shares to its own account (and would instead be required to leave them in the custody of Weiser and/or Tavira, as appropriate) unless and until the occurrence of an incurable Event of Default. Astor 3 would not be permitted to transfer them to its own account only upon the occurrence of an incurable Event of Default.

(7)  By Clause V.8, Astor 3 represented and warranted that "*it will fully cooperate with the registered owner of the securities of Issuer* [Elektra] *in exercising its Voting Rights ...*" This presupposes that Astor 3 will retain the shares in accordance with the SLA and not dispose of them prior to the maturity date or any earlier event of default, as such disposal would make it impossible to exercise voting rights.

**(5)   The Weiser Agreement**

23.  Weiser is understood to be incorporated in the Bahamas.

24.  Weiser signed a custodian management agreement dated 28 July 2021 (the "**Weiser Agreement**"). The purpose of the Weiser Agreement was to ensure that Weiser could take instructions from Astor 3 (rather than Mr Salinas) in relation to the shares in Elektra.  The Weiser Agreement defines the term "Entitlement Order" to mean any form of instruction by Astor 3 (as Lender) to Weiser for the purpose of disposing of the Collateral Shares. Under the Weiser Agreement, Weiser is required to comply with any Entitlement Order given by Astor 3, without regard to any dispute between Astor 3 and the Applicants as to whether Astor 3 had the right to give the Entitlement Order.

**(6)    Tranches 1 and 2 of the loan**

25.    Pursuant to a Closing Statement dated 9 August 2021, Astor 3 advanced a sum of MXN 501,591,693 to RBS, secured over 563,569 shares in Elektra owned by Mr Salinas. These shares were held in an account maintained by Weiser.

26.    Pursuant to a Closing Statement dated 10 September 2021, Astor 3 advanced a sum of MXN 327,497,030 to RBS, secured over an additional 372,344 shares in Elektra owned by Mr Salinas. These shares were held in an account maintained by Weiser.

**(7)    The events of October 2021**

27.    On 5 October 2021, Weiser notified the Applicants that Astor 3 had issued an Entitlement Order to transfer 935,913 Collateral Shares held by Weiser to the account of Astor Capital Fund Ltd, which appears to be entity affiliated with Astor 3.

28.    The Applicants asked Mr Torti to raise a complaint with Weiser, which he did on 19 October 2021. Weiser responded on 22 October 2021 that it was required to comply with any Entitlement Order given by Astor 3.

29.    On 23 October 2021, Mr Torti emailed Ms Akbar to ask her to obtain an explanation from the Astor group. He complained that Astor 3 and Weiser were acting in breach of contract.

30.    On 25 October 2021, Ms Akbar responded: "*I am happy to advise that I have been informed by Astor that the instructions for the transfer of the 935,913 (collateralised) shares of Group Elektra S.A.B. de CV (ELEKTRA\*:MX) shall be reversed back to the account # 200-804765 of Mr. Ricardo B. Salinas Pliego within the next 24 hours*".

31.    Mr Salceda was reassured to learn that Astor 3 accepted that it was not entitled to take the shares for itself and had returned them. He assumed that there was a mistake or misunderstanding, perhaps involving Weiser.

32.    In these circumstances, the Applicants insisted that Weiser should be replaced with another Depository Broker for all future tranches of lending. As explained below, Weiser was replaced by Tavira in respect of further Elektra shares provided as collateral for subsequent tranches of the loan.

33. On 6 December 2021, in response to the Applicants' concerns as to whether Astor 3 and/or Weiser had wrongfully disposed of the Collateral Shares, the parties executed a further addendum (the "**2nd Addendum**") which states as follows:

> "*It is mutually agreed, understood and represented that all Entitlement Orders issued by Lender in relation to the Custodian Management Agreement executed by and between the Lender, the Depository Broker and the Guarantor will be in accordance with the terms of the Loan Agreement*".

**(8)    The Tavira Agreement**

34. Tavira is incorporated in Monaco.

35. Tavira entered into a custodian management agreement (the "**Tavira Agreement**") which is stated to be effective as of 1 November 2021. As stated above, the purpose was to enable Tavira to replace Weiser in respect of any further collateral.

36. The Tavira Agreement has the same basic provisions as the Weiser Agreement (and it includes the same concept of an "Entitlement Order").

37. By Clause 10, the Tavira Agreement is governed by English law and is subject to the exclusive jurisdiction of the English court.

**(9)    Tranches 3, 4 and 5 of the loan**

38. Pursuant to a Closing Statement dated 4 February 2022, Astor advanced a sum of MXN 532,484,020 to RBS, secured over an additional 1,299,497 shares in Elektra owned by Mr Salinas. These shares were held in an account maintained by Tavira.

39. On 13 June 2022, the parties executed a further addendum (the "**3rd Addendum**") to reduce the LTV ratio to 35%. Clause II contains provisions in respect of margin calls.

40. Pursuant to a fourth Closing Statement dated 22 June 2022, Astor 3 advanced a sum of MXN 613,000,000 to RBS, secured over an additional 2,796,290 shares in Elektra owned by Mr Salinas. These shares were held in an account maintained by Tavira.

41. On 19 July 2022, the parties executed a further addendum (the "**4th Addendum**") to deal with the release of a dividend to the Borrower.

42. Pursuant to a Closing Statement dated 15 September 2022, Astor 3 loaned a sum of MXN 179,645,808 to RBS, secured over an additional 444,389 shares in Elektra owned by Mr Salinas. These shares were held in an account maintained by Tavira.

43. On 24 March 2023, Astor 3 made a margin call for 1,728,207 additional Elektra shares. Mr Salinas complied with that margin call and transferred the relevant shares to his account with Tavira.

**(10)  Summary of the loans and collateral**

44. In summary, therefore, Astor 3 has advanced a total of five loans to RBS pursuant to the SLA, with a total principal amount of MXN 2,154,218,552.55 (approximately US$113,892,457.76 at current exchange rates).

45. These loans were secured over a total of 7,204,296 Elektra shares belonging to Mr Salinas as collateral for the loans advanced by Astor 3 under the SLA (the "**Collateral Shares**"), of which 935,913 should be held by Weiser, and 6,268,383 should be held by Tavira.

46. As explained above, the Collateral Shares were to be held in securities accounts with Weiser and Tavira pursuant to the Depository Agreements.

47. As at 23 July 2024, the Collateral Shares had an aggregate market value of approximately MXN 7,565,879,616 (approximately US$416,394,035 at current exchange rates) – a very significant surplus over the total amount of the five loans.

**(11)  Initial evidence of sales of Elektra shares**

48. Although Elektra is a listed company, it is largely concentrated in private hands. Mr Salinas is the direct or indirect beneficial owner or controller of approximately 67,544,413 shares in Elektra, representing 30.47% of Elektra's share capital (disregarding the impact of the fraudulent scheme perpetrated by the Respondents).

49. Mr Salinas and his team receive a significant amount of data concerning the trading of the Elektra shares (including matters such as trading volume).

50. At the end of November 2021, Mr Salceda became aware of a seller of Elektra shares in the Mexican market, selling and participating with a significant percentage of the daily trading volume. It started with a 30% of the volume and at the end of July 2024, it was participating with the 18% of the volume. The sales were always made through different Mexican brokers, changing every day.

51. Mr Salceda feared that the cause of this unusual situation might be Astor 3, which had the practical ability (even if it lacked the legal right) to sell the Collateral Shares.

52.  On 10 June 2024, Mr Salinas wrote to Weiser and Tavira stating that Weiser and Tavira should not dispose of the Collateral Shares.

53.  Weiser and Tavira did not respond by way of letter. However, on 13 June 2024, Astor 3 responded by way of a letter dated 12 June 2024. It was not written on a normal corporate letterhead and did not identify any individual who sent the letter. The letter itself was sent by email from the "Operations" department at Astor Asset Management Group and the email did not identify any individual who could be contacted to discuss the letter.

54.  In the letter, Astor 3 asserted that it had an unrestricted right to dispose of the Collateral Shares. Astor 3 did not assert that any Event of Default had occurred under the SLA. Instead, Astor 3 stated that Mr Salinas should cease to "interfere" with the Depository Brokers. This letter gave rise to concerns that Astor 3 had disposed of a significant quantity of the Collateral Shares. Far from denying that disposals had taken place, Astor 3 effectively accepted that this had occurred (but sought to justify the disposals).

**(12)  The Applicants' investigations**

55.  These concerns led the Applicants to seek legal advice (privilege in which is not waived) and to appoint investigators to enquire into the affairs of the Astor group.

56.  The results of these investigations are summarised below. In short, it appears that the companies in the Astor group are controlled by Mr Sklarov, a fraudster who commits a particular type of fraud known as stock-lending fraud by which he seeks to gain control of valuable collateral before misappropriating it and/or its proceeds of sale.

57.  The investigators appointed by the Applicants, Forward Risk, have prepared a memorandum summarising their findings (the "**Forward Risk Report**"), which is in the hearing bundle.

**(13)  Mr Sklarov**

58.  Mr Sklarov has a long history of fraud. In the 1990s, for example, Mr Sklarov was convicted of felony charges in respect of Medicare fraud. He was sentenced to one year in prison and ordered to pay US$14 million in restitution.

59.  More recently, Mr Sklarov has been engaged in stock-lending fraud. His *modus operandi* often involves impersonating legitimate financial institutions such as the New York Stock Exchange, Barclays and Rothschild.

60.   For example, in a complaint filed by Barclays against Mr Sklarov in New York dated October 2020 (the "**Barclays Complaint**"), Mr Sklarov was sued for impersonating a lengthy list of entities associated with Barclays including Shearson Lehman.

61.   On 19 March 2021, Judge Kaplan (in the United States District Court for the Southern District of New York) entered a permanent injunction against Mr Sklarov and his attorney, an individual known as Jaitegh "JT" Singh ("**Mr Singh**"). Notably, the order was made with the consent of Mr Sklarov and Mr Singh, who signed the consent order.

62.   Mr Sklarov's long-standing practice of impersonating legitimate and reputable entities is also apparent from the decisions made in the cases involving the New York Stock Exchange (the "**NYSE Decision**") and Rothschild.

63.   The entities controlled by Mr Sklarov, which hold themselves out as being legitimate financial institutions, routinely seek to obtain control of valuable shares with a view to misappropriating those shares and/or their proceeds of sale.

64.   These dishonest activities have given rise to a substantial amount of litigation in various jurisdictions worldwide in which numerous victims of Mr Sklarov's frauds have sought to recover their assets from him.

65.   For example, the Barclays Complaint states as follows (at paragraphs 124 to 125):

> "*[124] Sklarov also has been sued by multiple parties for civil fraud in connection with the purported offering of securities-backed loans.*
>
> *[125] Although Sklarov has used various shell companies to perpetuate each alleged fraud, the fact patterns underlying each of the schemes are nearly identical: a Sklarov-related entity promises to provide a loan to a borrower backed by securities owned by the borrower; the borrower pledges the shares as collateral to the Sklarov-controlled entity; the Sklarov-controlled entity provides little if any of the promised loan funds to the borrower and then sells or attempts to sell the shares proffered only as collateral, and retains the proceeds*".

66.   A summary of the stock-lending frauds perpetrated by Mr Sklarov can be found in paragraphs 126 to 143 of the Barclays Complaint and paragraphs 52 to 62 of a complaint filed against Mr Sklarov by Brent Satterfield (the "**Satterfield Complaint**").

67.   In July 2021, the tribunal dealing with Mr Satterfield's claim against Mr Sklarov held that Mr Sklarov had committed a stock-backed lending fraud (the "**Satterfield Award**").

68. In the Satterfield Award, the tribunal provided a detailed description of Mr Sklarov's fraudulent scheme and held that he gave false and dishonest evidence to the tribunal: see e.g. paragraphs 177 and 178 of the Satterfield Award.

69. It is apparent from the Satterfield Award that the lending documentation in that case was drafted in very similar terms to the SLA in the present case.

70. It is unclear how many of Mr Sklarov's associates or accomplices are fictitious creations of Mr Sklarov's own mind and how many of them are real people. Mr Sklarov deploys an extensive range of pseudonyms, aliases and alter egos. For example, the High Court of St Kitts and Nevis ruled that Mr Sklarov had conspired to commit a stock-backed loan fraud under the alias "Mark Simon Bentley".

**(14)  Evidence that Astor 3 is controlled by Mr Sklarov**

71. The evidence indicates that Astor 3 is controlled by Mr Sklarov.

72. As a preliminary point, it is clear that Astor 3 is not a conventional financial institution: **(i)** Astor 3's letter dated 12 July 2024 is not on a normal corporate letterhead and does not identify any individual person who sent the letter. **(ii)** The website and email addresses set out in the SLA for Astor 3 appear to be invalid. **(iii)** Page 31 of the SLA identifies five offices around the world where Astor 3 is said to be located, but these all appear to be serviced offices. There is no evidence that Astor 3 has any meaningful physical presence anywhere. **(iv)** The SLA itself is very poorly drafted and there is no evidence that Astor 3 has conventional legal representation.

73. In those circumstances, it is difficult to believe that Astor 3 could fund loans worth hundreds of millions of dollars from its own capital (or by borrowing the money from legitimate third parties).

74. The SLA suggests that Astor 3 is registered in Vancouver, British Columbia. However, this does not appear to be correct. Furthermore, the British Columbia Securities Commission issued an Early Intervention Alert on 9 April 2020 stating:

> "*Astor Capital Fund Limited (Astor)*
>
> *Astor claims to have an office in Vancouver, British Columbia (BC), and offers wealth management and advisory services.*
>
> *Astor is not registered to trade in, or advise on, securities or derivatives in BC.*

*We urge BC residents to exercise caution when dealing with firms that are not registered to trade or advise in BC*".

75.   The Tavira Agreement states that Astor 3 is registered in Quebec. It appears that this is correct. An extract from Astor 3's entry on the Quebec company registry purports to identify Astor 3's directors and beneficial owners, but the information gives rise to serious questions as to the propriety of the company: **(i)** According to the register, Astor 3 has a single director/administrator known as Jonathan Clifford Bibi, a former defender on the Seychelles national football team who has been involved in a series of cryptocurrency scams and was named as a fraudster by the State of Missouri in 2018. **(ii)** The SLA and the other contractual documents are ostensibly signed by "Mariia Mitsa" on behalf of Astor 3. She is described as a Managing Member of Astor 3. However, no such person is identified in the Quebec register, and the name "Mariia Mitsa" returns no Google search results. This name is likely to be a pseudonym. **(iii)** The register also states that the beneficial owner of Astor 3 is a person known as Oksana Hryn, who is said to be resident in Ukraine. As noted below, Oksana Hryn is a known associate of Mr Sklarov.

76.   Astor 3's logo (as shown in the SLA) is the same as the logo of "Astor Wealth Group" which claims to have been founded by Thomas Mellon. As noted above, Thomas Mellon is one of the individuals who was copied to various emails when the SLA was being negotiated. However, it seems that Mr Mellon does not exist: the name is an alias of Mr Sklarov.  The court is referred to the Forward Risk Report on this point.

77.   Astor 3 (and "Astor Wealth Group") have names which are similar to a legitimate mutual fund manager known as Astor Investment Management LLC. However, the latter entity appears to have completely different ownership from the Astor entities that are involved in the SLA. It seems that Mr Sklarov is again seeking to trade off the name of an existing legitimate investment manager.

78.   There are a number of reasons to believe that Mr Sklarov is the true beneficial owner and controller of Astor 3.

79.   Firstly, Indiana corporate records show that an entity called Astor Capital Fund Ltd was registered in the state as a foreign corporation in June 2019. When this entity was registered, Mr Sklarov was listed as the CEO. By April 2020, "Thomas Mellon" had replaced Mr Sklarov in the corporate records and became the CEO, director, and registered agent of Astor Capital Fund Ltd. Mr Sklarov's attorney, Mr Singh, was the

14

legal representative of Astor Capital Fund Ltd who signed the document authorizing "Thomas Mellon" as head of the company.

80. Secondly, the sole beneficial owner of Astor 3 (namely the supposed Ukraine resident described as "Oksana Hryn") is a known associate of Mr Sklarov. As to this:

81. In October 2021, "Oksana Hryn" was named as a co-plaintiff in a lawsuit alongside numerous other shell companies controlled by Mr Sklarov. Weiser was one of the defendants, and damages of US$450 million were sought. The lawsuit was described as "bizarre and seemingly frivolous" by OffshoreAlert. It was dismissed voluntarily after only 4 days.

82. In August 2023, Mr Singh wrote a letter to OffshoreAlert on behalf of "Oskana Hryn" offering to pay US$25,000 for the removal of an unfavourable article. The letters and emails from Mr Singh to OffshoreAlert are available online and are very surprising.

83. Thirdly, Mr Sklarov (via Mr Singh) attempted to register a trademark in the name of Astor Capital. This incident is described in paragraph 240 of the Barclays Complaint.

84. Fourthly, at least one of Astor 3's employees (namely "Albert Yuen") is a known associate of Mr Sklarov. Albert Yuen and Mr Singh are co-directors of an English company.

85. Fifthly, several online videos and blog posts suggest that "Astor Asset Management" is one of the shell companies used by Mr Sklarov. These blog posts appear to have been created by other victims of Mr Sklarov.

86. Sixthly, the SLA is notably similar to the contractual documents used in other reported cases where Mr Sklarov has been found liable for stock-backed lending fraud. The Satterfield Award is a particularly good example. In that case, the key operative provisions were essentially the same as the SLA in the present case (see paragraph 73); the contract contained a similar lengthy disclaimer at Clause 10 (see paragraph 80); the same "Closing Statements" were used (see paragraphs 82ff); and there were numerous other distinctive words and phrases which are the same or materially the same as those found in the SLA.

87. Seventhly, there is at least one reported case (from the Supreme Court of Jamaica) in which Astor 3 appears to have engaged in a stock-backed lending fraud. Injunctive relief was apparently granted in Hong Kong to restrain Astor 3 from disposing of the shares

(although the case was ultimately resolved on the basis that Astor 3 had operated in breach of the Hong Kong regulatory regime): see paragraph 7. The underlying facts of that case have all the hallmarks of a Sklarov fraud, and the contractual arrangements bear a striking similarity to the present case.

**(15)** **The Applicants' reaction to the discovery of the fraud**

88.    In light of the above, the Applicants believe that they have been victims of a stock-lending fraud conducted by Mr Sklarov via his company Astor 3. Through this fraud, Astor 3 has gained control of the Elektra shares owned by Mr Salinas and is wrongfully disposing of them contrary to the terms of the SLA and the Applicants' intentions.

89.    On 26 July 2024, Elektra issued the following press release:

> "*MEXICO CITY, July 26, 2024 /PRNewswire/ -- Grupo Elektra, S.A.B. de C.V. (BMV: ELEKTRA* Latibex: XEKT), Latin America's leading specialty retailer and financial services company, and the largest non-bank provider of cash advance services in the United States, informs investors that it has received information from its controlling group regarding a possible fraud by depositaries of their shares, which could cause unusual movements of its share price on the stock markets.*
>
> *Thereafter, the company informs that it has made contact with the corresponding authorities to determine the applicable measures*".

90.    On the same date, Elektra's shares were suspended from trading by the Mexican stock exchange. This has provided some limited protection to the Applicants, since it is now more difficult for Astor 3 to continue selling the Collateral Shares (if there are any left). Nevertheless, the protection created by the trading suspension is temporary (since the suspension could be lifted by the Mexican stock exchange) and Astor 3 may be able to continue misappropriating the Collateral Shares (or their proceeds of sale).

**(16)** **Astor 3's response**

91.    On 30 July 2024, Mr Salceda received an email from "Global Operations" at Astor 3. The email enclosed a letter (erroneously dated 27 July 2024) asserting, for the first time, that the Applicants had committed numerous alleged Events of Default under the SLA. The covering email stated as follows:

> "*According to the Loan Agreement, the Loan is now Accelerated and all sums thereunder are now due, which includes loan amount, custody fees, maintenance*

*fees, collateral transfer fees and any other fees and costs imposed by the Custodian Brokers or Astor Asset Management 3 Ltd.*

*We bring to your attention that the default interest rate according to the Loan Agreement is 1.5% per month and will accrue for all outstanding debts effective immediately. This represents an annual fee of 18%.*

*Should you wish to discuss an informal settlement without prejudice and avoid the publicity surrounding your default, you may do so by contacting us. If your preference is to litigate, we will in the courts of England and Wales seek full remedy afforded to us under the Loan Agreement, including the return of all monies and fees computed at a monthly 1.5% default interest rate until such time as you make full settlement of all debts owed.*

*We would also be willing to enter into a a "Confidential Forbearance Agreement", whereby this Event of Default will be stayed indefinitely confidentially.*

*This Notice of Default and proposed confidential settlement discussion is being served upon you without prejudice and we reserve all rights afforded to us under the Loan Agreement and subsequent Addendums executed by the Lender, Borrower and Guarantor".*

92.  In fact, the Applicants are ready and able to repay all sums owing to Astor 3 immediately, and this would be their preferred course of action. The obvious problem is that Astor 3 has misappropriated Mr Salinas's shares, and Astor 3 might well take any money repaid by the Applicants without returning the shares. That is the whole point of the fraud that Astor 3 appears to be committing.

93.  As stated above, on 1 August 2024, Tavira informed the Applicants that it had transferred the 6,268,383 Elektra shares "*to Astor's account, as per Astor's instructions*".

94.  According to a trade report supplied by Tavira, this transfer to Astor took place on 29 July 2024. Thus, it seems that Astor 3 responded to the discovery of the fraud by attempting to misappropriate a very substantial proportion (approximately 86%) of the total shares with a value of approximately US$358 million at current exchange rates.

95.  Significantly, the transfer to Astor's account is said to have taken place **before** Astor 3 wrote to the Applicants to say that Events of Default had occurred and to demand repayment. This order of events is revealing. Needless to say, if Astor 3 had been operating as a legitimate and honest lender, it would have provided notice of any events of default and demanded repayment **before** taking any steps to appropriate the collateral.

C.  **THE CLAIMS**

96.   It is necessary for the Applicants to satisfy the court that the Applicants' claims against the Respondents raise a serious issue to be tried (for the purposes of the proprietary injunctions and leave to serve out of the jurisdiction) and are good arguable claims (for the purposes of the freezing injunctions). Accordingly, the Applicants' claims against the Respondents are set out in this section of the Applicants' skeleton argument.

**(1)   <u>Misrepresentation</u>**

97.   The Applicants have rescinded the SLA on the basis that it was induced by fraudulent misrepresentations, and they seek to recover the Elektra shares on a proprietary basis. They also seek damages against Astor 3 and Mr Sklarov for the tort of deceit.

(i)   <u>The representations</u>

98.   Representations may be express or they may be implied from words or conduct: *Marme Inversiones 2007 SL v NatWest Markets plc* [2019] EWHC 366 (Comm) at [123] per Picken J. In the case of implied representations, "*the court has to consider what a reasonable person would have inferred was being implicitly represented from the words used in the conduct and context in which they were used*": *IFE v Goldman Sachs* [2007] 1 Lloyd's Rep 264 at [50] (in a passage applied subsequently in numerous cases including *Marme Inversiones* at [115] per Picken J and *Ivy Technology Ltd v Martin* [2022] EWHC 1218 (Comm) at [348] per Henshaw J). Whether or not a representation is implied is ultimately a question of fact to be determined in the circumstances of the particular case: see *Marme Inversiones 2007 SL* at [123] per Picken J and *Deutsche Bank AG v Unitech Global Ltd* [2013] EWCA Civ 1372 per Longmore LJ at [25].

99.   In the present case, the key representations were:

(1)   that Astor 3 was a legitimate and honest financial institution which engaged in legitimate and honest stock-lending activities; and

(2)   that Astor 3 intended to comply with its obligations under the SLA including in particular its obligations not to sell the Elektra shares prior to maturity or default.

100.  The first of those representations was implicit in the circumstances of Astor holding itself out as a legitimate and honest financial institution which engaged in legitimate and honest stock-lending activities when offering to enter into the SLA.

18

101.    As regards the second of these representations, *Chitty* explains at [10-14] (by reference to *Kingscroft Insurance v Nissan Fire & Marine Co* [2000] 1 All ER (Comm) 272 and *SK Shipping Europe Ltd v Capital VLCC 3* [2022] EWCA Civ 23): "*Making an offer may amount to a representation that in general terms the offeror intends and has the ability to perform the proposed contract, as they understand it*". See *Civil Fraud* at [1-045] ("*by entering into the contract the company impliedly represents that it has the present intention, and capacity, to perform its obligations*"). In *Kingscroft Insurance*, for example, Moore-Bick J held that "*the representation is likely in most cases to come down to no more than one of honesty in entering into the bargain*". Males LJ confirmed in *SK Shipping* at [51]: "*There are some circumstances where an offer to contract on certain terms carries with it an implied representation as to the party's honesty in relation to the proposed transaction. It is not necessary to see why this should be so. Such honesty is the necessary substratum for all commercial dealings. It goes without saying*". See, e.g., *Property Alliance Group v Royal Bank of Scotland plc* [2018] 1 WLR 3529 at [132]-[144]; *UBS AG v CWL* [2014] EWHC 3615 at [733]-[740]; and *Lindsay v O'Loughane* [2010] EWHC 529 at [103].

102.    As set out above, the SLA involved the deposit of high-value shares as collateral for loans. Counterparty honesty is obviously highly important in such circumstances. A representation that the lender, who is given control over those shares, has the intention of complying honestly with its contractual obligations, including his obligation not to dispose of them wrongfully, is so obvious that it goes without saying and will therefore be readily implied. Indeed, no one would contract on any other basis.

(ii)    <u>Inducement</u>

103.    It is necessary for the claimant to establish that the representor intended to induce him to act on the representation and that he did, in fact, rely on the representation in the sense intended by the representor: *Ivy Technology* at [361] per Henshaw J and *Marme Inversiones 2007 SL* at [281]-[286] per Picken J.

104.    The representee must therefore establish that the misrepresentation operated on his mind and caused him, or helped to cause him, to act as he did. It is necessary for the claimant to establish that he was "*materially influenced*" by the representations in the sense that it was "*actively present to his mind*": *NIVE v Rembrandt Enterprises Inc* [2019] EWCA Civ 596 at [32] per Longmore LJ.

105. It is not necessary to show that the false representation was the sole influence: see *Barton v County Natwest Ltd* [1999] Lloyd's Rep Bank 408 at 421.

106. If the representation in question would likely play a part in the decision of a reasonable person to enter into a contract, there is an evidential presumption that the representation induced the representee: *Marme Inversiones 2007 SL* at [291] per Picken J and *NIVE v Rembrandt Enterprises Inc* at [25] per Longmore LJ.

107. However, the legal burden remains with the claimant, and the court must ultimately determine whether the representee was induced by the representation on the basis of all the evidence available to it: see *Ivy Technology* at [366] and [367].

108. In the present case:

    (1) Mr Salceda has explained in his affidavit that he understood Astor 3 to have made those representations (prior to the execution of the SLA on 28 July 2021) and that the Applicants executed the SLA on 28 July 2021 in reliance on those representations.

    (2) Mr Salceda has also explained that the Applicants were induced by those representations into executing the SLA and providing the Elektra shares to Weiser and Tavira. The Applicants also entered into the Closing Statements and the Depository Agreements in reliance on the representations made by Astor 3.

    (3) Mr Salceda has explained in his affidavit that the provisions of Clause V of the SLA were expressly discussed in pre-contractual negotiations and that the representations and warranties to be given by Astor 3 in Clause V were of great importance to him and Mr Salinas. He has made clear that, without those representations and warranties, the Applicants would not have entered into the SLA.

(iii) <u>Falsity</u>

109. In light of the facts and matters set out above, the representations were false:

    (1) Astor 3 is not a legitimate and honest financial institution which engages in legitimate and honest stock-lending activities. To the contrary, it is a creature of Mr Sklarov, a fraudster, which exists to commit stock-lending fraud.

(2) It is to be inferred that Astor 3 never honestly intended to comply with its obligations under the SLA including in particular its obligations not to sell the Elektra shares prior to maturity or default. Rather, in accordance with the established modus operandi of Mr Sklarov, it intended from the outset to get control of the Elektra shares with a view to misappropriating them. This must always have been Astor 3's intention. There is no credible reason to believe that Astor 3 ever had any honest intention to act in accordance with its contractual obligations in relation to the Collateral Shares.

(iv) <u>Rescission</u>

110. Rescission for fraudulent misrepresentation is a self-help remedy. The role of the court is to decide whether a notice of rescission was validly given. See, generally, *Civil Fraud* at [22-029], [22-033]-[22-035] and [22-038]-[22-040].

111. In the present case, on 1 August 2024, the Applicants sent a notice to Astor 3 rescinding the SLA, the Closing Statements and the Depository Agreements.

112. The Applicants seek a declaration that the SLA, the Closing Statements and the Depository Agreements have been rescinded.

(v) <u>Proprietary claim</u>

113. As a result of rescission for fraudulent misrepresentation, Mr Salinas has a proprietary claim to recover the Collateral Shares: see *Shalson v Russo* [2005] Ch 281 at [106]-[120] per Rimer J and *Civil Fraud* at [22-061]-[22-063].

114. The Applicants seek a declaration that Mr Salinas is the beneficial owner of the Collateral Shares and the traceable proceeds of the Collateral Shares and an order requiring the First to Third Respondents to return the Collateral Shares (comprising 5,476,089 Elektra shares) or their proceeds to Mr Salinas forthwith.

115. The Applicants will of course provide *restitutio in integrum* to the First to Third Respondents in an amount equal to the loans advanced under the SLA, and they are willing and able to do so (against the return of the Collateral Shares in full).

(vi) <u>Damages for deceit</u>

116. The Applicants seek damages for the tort of deceit from Astor 3.

21

117. The basic ingredients in a claim for the tort of deceit are that: (i) the defendant made a false representation to the claimant; (ii) the defendant knew the representation to be false, or had no belief in its truth, or was reckless as to whether it was true or false; (iii) the defendant intended the claimant to rely on the representations; (iv) the claimant did rely on the representation; and (v) as a result the claimant has suffered loss and damage.

118. The factual position in the present case has been set out above. In the circumstances, Astor 3 will have known that the representations were false.

119. The Applicants will have suffered loss and damage equal to the value of any Elektra shares which are not recovered by them on a proprietary basis.

120. Accordingly, Astor 3 is liable to pay damages to the Applicants for the tort of deceit in respect of any losses sustained by the Applicants in consequence of entering into the SLA, the Closing Statements and the Depository Agreements.

**(2)** **Contractual claims**

121. In the alternative, if (but only if) the SLA has not been (and cannot be) rescinded, the Applicants seek: (i) an order for redemption; and (ii) damages for breach of contract.

(i) Order for redemption

122. The redemption action is part of equity's long-standing determination to ensure that a mortgagor or chargor is always able to exercise his right to redeem the security. The courts have explained repeatedly that the policy of courts of equity is always to ensure that there is nothing to prevent redemption. See, for example, *Noakes v Rice* [1902] AC 24. The redemption action has been "*well-known to equity for hundreds of years*": see *Shearer v Spring Capital Limited* [2013] EWHC 3148 (Ch) at [123]. A redemption action is brought for the specific purpose of determining how much is due to the lender and facilitating repayment to rid the charged property of any encumbrances: see *Adonis Investments Ltd v Ansbacher Bankers Ltd* [1997] 3 WLUK 619. Typically, redemption actions are brought where the mortgagee fails or refuses to provide a redemption statement or to accept payment or where the mortgagee cannot be found.

123. In the present case, if the SLA cannot be rescinded for misrepresentation, the court will be asked to make an order for redemption of the security held by Astor 3 over the

Collateral Shares. This would involve the delivery up of the Collateral Shares to Mr Salinas against the payment of all sums owing to Astor 3 under the SLA.

124.   As mentioned above, the Applicants are willing and able to repay everything owing to Astor 3 (but only against the return of the Collateral Shares in full). Astor 3 purports to have accelerated the loans, such that they are due and payable immediately. Accordingly, Astor 3 cannot validly object to repayment; and, on such repayment, it will be obliged to return the Collateral Shares to Mr Salinas in full.

125.   On this basis, it is apparent that Astor 3 cannot have any defence to the Applicants' claim to recover the shares. Either (as the Applicants say) the SLA has been rescinded, such that Astor 3 must return the Collateral Shares as part of the requisite *restitutio in integrum*, or (as Astor 3 contends) the SLA is valid and binding, in which case Astor 3 must return the Collateral Shares on repayment of the loan in full.

126.   In short, whether or not the SLA subsists as a valid agreement, Astor 3 must accept repayment of the amount of the five loan tranches and return the Collateral Shares.

(ii)   <u>Damages for breach of contract</u>

127.   To the extent that Astor 3 has wrongly sold or otherwise dealt with Collateral Shares contrary to the terms of the SLA, it will be liable to the Applicants in damages for breach of contract. (As noted above, this is a claim which will lie against Astor 3 only in the event that the SLA cannot be rescinded by the Applicants.)

**(3)   Economic torts**

128.   Further or alternatively, the Applicants seek damages from Astor 3 and Mr Sklarov for the torts of: (i) intention to cause harm using unlawful means; and/or (ii) conspiracy to cause harm using unlawful means.

129.   As regards the former (intention to cause harm using unlawful means), see *Clerk & Lindsell on Torts*, 24th ed., Chapter 23, Section 4. As regards the latter (conspiracy to cause harm using unlawful means), see *Clerk & Lindsell on Torts*, 24th ed., Chapter 23, Section 5. The key difference for present purposes is that the former tort may be committed by one person alone whereas the latter requires a combination of persons. Otherwise, the torts are substantially similar. There must be an intention on the part of

the defendant(s) to cause harm to the claimant using unlawful means and the claimant must suffer harm as a result of the use of those unlawful means against him.

130. In the present case, Astor 3 and Mr Sklarov pursued a course of conduct which they knew would be bound to be injurious to the interests of the Applicants. In other words, the loss to the Applicants was the other side of the coin from gain to Astor 3 and Mr Sklarov: see *OBG Ltd v Allen* [2007] UKHL 21, [2008] 1 AC 1 at [134] and [167].

131. The unlawful means comprised: (i) the making of fraudulent misrepresentations; and/or (ii) breach of contract. These two ingredients of this claim have been addressed above.

132. As matters stand, it is unclear whether the relevant intention was held by anyone other than Mr Sklarov. As explained above, there are indications that some of the individuals who purport to act for Astor 3 are in fact figments of Mr Sklarov's imagination or alter egos. However, this ultimately makes no difference to his liability. If he acted alone, both he and Astor 3 will be liable for the tort of causing harm using unlawful means; whereas, if he acted in concert with other individuals, he and Astor 3 will be liable for the tort of conspiracy to cause harm using unlawful means. The debate as to whether a director of a one-man company can enter into a conspiracy with his own company (see, for example, *R v McDonnell* [1966] 1 QB 233 and the discussion in *Clerk & Lindsell on Torts*, 24th ed., [23-106]) does not have any relevance in the present case.

### D. <u>PROPRIETARY INJUNCTION</u>

133. The Applicants seek an interim proprietary injunction to restrain each of the Respondents from dealing with or disposing of the Collateral Shares or the proceeds of the Collateral Shares. As set out above, it is the Applicants' position that the Collateral Shares (and their proceeds) belong, and have always belonged, to Mr Salinas, *a fortiori* after rescission of the SLA. Injunctive relief is necessary to ensure that the Collateral Shares and their proceeds are not the subject of any further misappropriations.

### (1) <u>The law in respect of proprietary injunctions</u>

134. The relevant principles on the granting of a proprietary injunction were set out by Morgan J in *Sukhoruchkin v Van Bekestein* [2013] EWHC 1993 (Ch) at [7] to [8]:

> "*[7] The established view is that the requirements for a proprietary injunction are not identical to those for a freezing injunction. The principles to be applied are the normal American Cyanamid principles. These are that the Claimants must show*

*that there is a serious issue to be tried, that damages would not be an adequate remedy for the Claimants and that the balance of convenience or balance of justice favours the grant of an injunction. This formulation of the relevant principles refers to a claimant showing a serious issue to be tried rather than showing a good arguable case. It is generally understood that a requirement to show a good arguable case is more onerous than showing only a serious issue to be tried. Nonetheless, it has been said in relation to the American Cyanamid principles that where the scales are evenly balanced in relation to the balance of convenience, one can take into account the relative strengths of the parties' cases ...*

*[8] The above statement of the principles, in relation to a claim for a proprietary injunction, does not expressly include a requirement that the Claimants must show that there are substantial grounds for concluding that there is a real risk of the relevant assets being disposed of, so that a judgment in favour of the claimants would go unsatisfied. In this context, the court is considering something which the claimant may establish at the trial is its asset or an asset in which it has an interest and not just the defendant's asset. Nonetheless, the reality of any threat to interfere with the property in which the claimant says that it has a proprietary interest must be relevant to the court's decision whether to intervene by granting an injunction*".

135. As Flaux J explained in *Madoff Securities International Ltd v Raven* [2011] EWHC 3102 (Comm) at [128]:

"*In other words, both the basis for a proprietary injunction and the circumstances in which it will be granted are different from the case of a freezing injunction ... In particular, unlike in the case of a freezing injunction, it is not necessary to show any risk of dissipation of assets and, even if there has been delay in making an application which might lead to refusal of a freezing injunction, a proprietary injunction may nonetheless be granted*".

136. See also *Keane v Herbert Reeves & Co* [2015] EWHC 3208 (QB) at [42]:

"*The test for obtaining a proprietary injunction is whether there is a serious issue to be tried rather than, as in the case of a freezing injunction, whether the claimant has a good arguable case. There is good reason for this difference. A claimant who asks for a proprietary injunction is seeking to freeze what he claims is his property. A claimant who seeks a freezing injunction by contrast is seeking to interfere with the property rights of others*".

**(2)    Proprietary injunction in the present case**

137. In the present case, the Applicants submit that:

(1)    The proprietary claim meets the 'serious issue to be tried' threshold. The factual and legal grounds of the proprietary claims have been set out above.

(2)    Damages would not be an adequate remedy, because an unsecured damages claim is plainly no substitute for the recovery of assets on a proprietary basis. Further, there must be (at the very least) serious doubt as to whether Mr Sklarov, a known fraudster with a long track record of dishonest dealings, and his company, Astor 3, would be able to pay, or would pay, any award of damages in full.

(3)    The balance of convenience or balance of justice favours the grant of an injunction. The Collateral Shares or their traceable proceeds in the hands of the Respondents should be preserved until trial to provide the Applicants with an opportunity to vindicate their proprietary claims. Proprietary injunctions will enable the Court to preserve the status quo pending the determination of the Applicant's proprietary claim and prevent prejudice to the Applicants.

138.    The assets to be covered by the proprietary injunction have been set out clearly and precisely in the draft proprietary injunction.

### E.    WORLDWIDE FREEZING ORDERS

139.    The Applicants also seek a worldwide freezing injunction against Astor 3 and Mr Sklarov.

### (1)    The law in respect of worldwide freezing orders

(i)    Good arguable case

137.    An applicant must show that he has a "*good arguable case*" on the merits.

138.    The test for a good arguable case in the context of freezing injunctions is not a particularly onerous one (*Lakatamia Shipping Co Ltd v Morimoto* [2019] EWCA Civ 2203 per Haddon-Cave LJ at [35]).

139.    However, following the decision of Bright J in *Unitel v UIH* [2023] EWHC 3231 (Comm), and pending clarification by the Court of Appeal, it appears necessary to address the threshold test for good arguable case on two bases:

(1)    On the basis enunciated by Mustill J in *Ninemia Martitime Corp v Trave Schiffahrtsgesellschaft GmbH ('The Niedersachsen')* [1983] 1 WLR 1412, namely that the Applicants' case is "*more than barely capable of serious argument, but not necessarily one which the judge considers would have a better than 50 per cent*

*chance of success*" (as applied in (for example) *Magomedov v TGP Group Holdings (SBS) LP* [2023] EWHC 3134 (Comm) (Butcher J)); and

(2)   On the basis that the Applicants are required to show the better of the argument; e.g., in *Harrington & Charles Trading Co Ltd v Mehta* [2022] EWHC 2960 (Ch) (Edwin Johnson J), "*It is perfectly proper for a court, in applying the test of good arguable case, to adopt the yardstick of considering whether one party or the other has the better of the argument, both on a particular issue and on the relevant case as a whole*"; see *Unitel* at [39]-[43] and also *Chowgule & Co Pte Ltd v Shire* [2023] EWHC 2815 (Comm) per Dias J.

140.   In particular, in *Unitel*, Bright J. noted a tension in the authorities ("*I cannot help but note that the law is in a confused state, which cries out for a definitive answer from the Court of Appeal ...* " at [37]), and therefore proceeded to determine the application before him applying both possible threshold tests, with a view to granting permission to appeal if the issue had proved to be determinative (which it did not); see [38] [62] and [69].

141.   It is submitted that this approach should be adopted on this application. Whichever test is adopted in terms of good arguable case, it is plainly met.

(ii)   <u>Real risk of dissipation</u>

142.   The applicant must also satisfy the Court that there is a good arguable case that there is, without an injunction, a real risk that a judgment in favour of the applicant would go unsatisfied, in the sense of a real risk that, unless restrained by an injunction, the defendant will dissipate or dispose of his assets other than in the ordinary course of business (*Ninemia Maritime Corp v Trave Schiffahrtsgesellschaft GmbH (The Niedersachsen)* [1983] 1 WLR 1412 per Kerr LJ at 1422; *Thane Investments Ltd v Tomlinson (No 1)* [2003] EWCA Civ 1272 per Peter Gibson LJ at [21]).

143.   See also *Holyoake v Candy* [2017] EWCA Civ 92; [2018] Ch 297 at [34] per Gloster LJ and *Lakatamia Shipping Company Limited v Toshiko Morimoto* [2019] EWCA Civ 2203; [2020] All ER (Comm) 259 at [33]-[34] per Haddon-Cave LJ.

144.   An applicant for a freezing order does not need to establish the existence of a risk of dissipation on the balance of probabilities. It is sufficient for the applicant to prove a

danger of dissipation to the 'good arguable case' standard (*Lakatamia Shipping Co Ltd v Morimoto* [2019] EWCA Civ 2203 per Haddon-Cave LJ at [36]).

145.  Further, it is not necessary to show that a judgment would be completely defeated. In order to establish jurisdiction, it is enough to show that the enforcement of any judgment would be more difficult (*Congentra AG v Sixteen Thirteen Marine* [2008] EWHC 1615 (Comm) per Flaux J at [49]; see also *Metropolitan Housing Trust Ltd v Taylor* [2015] EWHC 2897 (Ch) per Warren J at [28]).

146.  The relevant considerations were summarised by Males J in *National Bank Trust v Yurov* [2016] EWHC 1913 (Comm) at [69]-[70]:

> "*(a) The claimant must demonstrate a real risk that a judgment against the defendant may not be satisfied as a result of unjustified dealing with a defendant's assets.*
> *(b) That risk can only be demonstrated with solid evidence; mere inference or generalised assertion is not sufficient.*
> *(c) It is not enough to rely solely on allegations that a defendant has been dishonest; rather it is necessary to scrutinise the evidence to see whether the dishonesty in question does justify a conclusion that assets are likely to be dissipated.*
> *(d) The relevant inquiry is whether there is a current risk of dissipation; past events may be evidentially relevant, but only if they serve to demonstrate a current risk of dissipation of the assets now held.*
> *(e) The nature, location and liquidity of the defendant's assets are important considerations.*
> *(f) Whether or to what extent the assets are already secured or incapable of being dealt with is also relevant.*
> *(g) So too is the defendant's behaviour in response to the claim or anticipated claim*".

147.  The relevant considerations were also usefully summarised by Popplewell J in *Fundo Soberano de Angola v Jose Filomeno dos Santos* [2018] EWHC 2199 (Comm) at [86] (approved in *Lakatamia Shipping Co Ltd v Morimoto* [2019] EWCA Civ 2203 subject to the amendment marked in square brackets below) as including the following:

> "*(1) The claimant must show a real risk, judged objectively, that a future judgment would not be met because of an unjustified dissipation of assets. In this context dissipation means putting the assets out of reach of a judgment whether by concealment or transfer.*
> *(2) The risk of dissipation must be established by solid evidence; mere inference or generalised assertion is not sufficient.*
> *(3) The risk of dissipation must be established separately against each respondent.*
> *(4) It is not enough to establish a sufficient risk of dissipation merely to establish a good arguable case that the defendant has been guilty of dishonesty; it is necessary to scrutinise the evidence to see whether the dishonesty in question points to the*

*conclusion that assets [may] be dissipated. It is also necessary to take account of whether there appear at the interlocutory stage to be properly arguable answers to the allegations of dishonesty.*

*(5) The respondent's former use of offshore structures is relevant but does not itself equate to a risk of dissipation. Businesses and individuals often use offshore structures as part of the normal and legitimate way in which they deal with their assets. Such legitimate reasons may properly include tax planning, privacy and the use of limited liability structures.*

*(6) What must be threatened is unjustified dissipation. The purpose of a freezing order is not to provide the claimant with security; it is to restrain a defendant from evading justice by disposing of, or concealing, assets otherwise than in the normal course of business in a way which will have the effect of making it judgment proof. A freezing order is not intended to stop a corporate defendant from dealing with its assets in the normal course of its business. Similarly, it is not intended to constrain an individual defendant from conducting his personal affairs in the way he has always conducted them, providing of course that such conduct is legitimate. If the defendant is not threatening to change the existing way of handling their assets, it will not be sufficient to show that such continued conduct would prejudice the claimant's ability to enforce a judgment. That would be contrary to the purpose of the freezing order jurisdiction because it would require defendants to change their legitimate behaviour in order to provide preferential security for the claim which the claimant would not otherwise enjoy.*

*(7) Each case is fact specific and relevant factors must be looked at cumulatively*".

148. Where an applicant for a freezing injunction relies on the respondent's dishonesty, the authorities make clear that the court must scrutinise with care whether what is alleged to have been the dishonesty of the person against whom the order is sought in itself really justifies the inference that that person has assets which he is likely to dissipate unless restricted (*Thane Investments Ltd v Tomlinson* [2003] EWCA Civ 1272 per Peter Gibson LJ at [28]). However, where the dishonesty alleged is at the heart of the claim against the relevant defendant, the court may well find itself able to draw the inference that the making out, to the necessary standard, of that case against the defendant also establishes sufficiently the risk of dissipation of assets (*VTB Capital Plc v Nutritek International Corp* [2012] 2 Lloyd's Rep 313 (CA) at [169]-[178], citing *Madoff Securities International Ltd v Raven* [2011] EWHC 3102 (Comm) per Flaux J at [163]-[167]).

149. As Haddon-Cave LJ explained in *Lakatamia*, *supra*, at [51]:

"*(1) Where the court accepts that there is a good arguable case that a respondent engaged in wrongdoing against the applicant relevant to the issue of dissipation, that holding will point powerfully in favour of a risk of dissipation.*
*(2) In such circumstances, it may not be necessary to adduce any significant further evidence in support of a real risk of dissipation; but each case will depend upon its own particular facts and evidence*".

29

**(2)    Worldwide freezing orders in the present case**

140.    On the Applicants' case, Astor 3 and Mr Sklarov have carried out a fraudulent scheme to misappropriate the property of Mr Salinas, worth many hundreds of millions of US dollars. It is submitted that the Applicants have a good arguable case.

141.    Further, it is likely that the Respondents have assets against which the Applicants could enforce. After all, the Respondents have (on the Applicants' case) carried out an enormous fraud, and the fruits of that fraud must be found somewhere. It is possible that any assets held by Respondents are held on trust for the Applicants, but that is not necessarily the case. The Applicants could easily find themselves in a position where they need to execute a sizeable judgment against the Respondents' assets.

142.    Accordingly, there are grounds for believing that the Respondents own assets that will be caught by the proposed worldwide freezing order and that any such order will not be futile: see *Ras Al Khaimah Investment Authority v Bestfort Development LLP* [2017] EWCA Civ 1014; [2018] 1 WLR 1099 at [39].

143.    It is unknown where the Respondents' assets are located, but they could be anywhere around the world. To take Astor 3 as an example, this is an entity incorporated in Canada with a sole purported director in the Seychelles and a sole purported beneficial owner in Ukraine. Tavira is incorporated in Monaco and Weiser is incorporated in the Bahamas. Mr Sklarov is said to be resident in either the United States or Ukraine. This illustrates why a worldwide freezing order is required.

144.    There is a real risk of dissipation. This is a risk that must necessarily arise in circumstances where the Respondents have conspired to commit a large-scale international fraud against the Applicants.

145.    For the same reasons, the Applicants submit that it is just and convenient for a worldwide freezing injunction to be granted.

146.    The draft Order provides that the freezing order is limited to the sum of MXN 5,411,000,000 which is the value of the shares (MXN 7,565,879,616) less the principal amount of the loans (MXN 2,154,218,552), rounded down to the nearest MXN 1 million.

147. The Applicants are willing to give an unlimited cross-undertaking in damages (in the standard form set out in the Commercial Court Guide). As noted above, Mr Salinas is one of the wealthiest individuals in Mexico.

148. The Applications have been made without notice to the Respondents because the Respondents are carrying out a scheme to defraud the Applicants. Mr Sklarov is an experienced and sophisticated fraudster. It is necessary for interim relief to be granted against the Respondents before they have a chance to misappropriate any remaining Collateral Shares (or the proceeds thereof)

149. That is also the reason why the Applications are urgent and need to be heard as quickly as possible. In this regard, the Applicants have acted promptly to issue the Applications. The Applicants and their legal team moved as quickly as possible after the privileged report from Forward Risk was received on Wednesday 31 July 2024, and that report was commissioned on the very same day (Thursday 26 July 2024) that the Applicants were advised by their legal team that a fraud was potentially being committed. Further, the recent correspondence with Tavira that suggests that the entirety of the Collateral Shares formerly held by it have now been transferred to Astor 3 it is imperative that the Applicants obtain interim protection urgently to prevent any further misappropriation of the Collateral Shares or their proceeds.

## F.    DISCLOSURE ORDERS

150. The court is asked to require the Respondents to provide information regarding their assets (in the standard form of disclosure order set out in the Commercial Court Guide).

151. In addition, certain bespoke disclosure orders are required in the present case to support the injunctive relief by assisting the Applicants in identifying the location of Mr Salinas' shares.  The relevant questions, which the Respondents should be ordered to answer, have been set out in Schedule C of the draft order.

## G.    SERVICE

152. By the Service Application, the Applicants seek (i) an order giving them permission to serve the claim form on the Respondents out of the jurisdiction under CPR 6.36 as well as any other subsequent documents arising within the claim pursuant to CPR 6.37(5)(b)(ii); and (ii) an order permitting service of the claim form (and all other documents in the proceedings) by an alternative method under CPR r 6.37(5)(b)(i). In

such circumstances the Court must consider first whether to order service out of the jurisdiction and secondly whether to order alternative service (*Marashen Ltd v Kenvett Ltd* [2017] EWHC 1706 (Ch); [2018] 1 WLR 288 at [17]-[18]).

**(1)  Service out of the jurisdiction**

(i)  The law in respect of service out of the jurisdiction

153.  The Privy Council confirmed in *Altimo Holdings & Investment Ltd v Kyrgyz Mobil Tel Ltd* [2012] 1 WLR 1804 at [71] that there are three requirements:

(1)  The first requirement is that the claimant must satisfy the court that in relation to the foreign defendant there is a serious issue to be tried on the merits, i.e. a substantial question of fact or law or both: *Altimo* at [71]. This is the same as the test for summary judgment under Part 24 of the CPR, namely whether the claimant has a real prospect of success: see *De Molestina v Ponton* [2002] 1 Lloyd's Rep 271 at 281 per Colman J; *MRG v Engelhard Metals Japan* [2004] 1 Lloyd's Rep 731 at 732 per Toulson J; and C*arvill America Incorporated v Camberdown UK Ltd* [2005] 2 Lloyd's Rep 457 at [24] per Clarke LJ.

(2)  The second requirement is that the claimant must satisfy the court that there is a good arguable case that the claim falls within one of the gateways in paragraph 3.1 of Practice Direction 6B: *Altimo* at [71]. See also *Seaconsar Far East Ltd v Bank Markazi Jomhouri Islam Iran* [1994] 1 AC 438 at 453 per Lord Goff. (It has been held that a serviceable test for "good arguable case" in this context is that the party seeking permission to serve out has the better of the argument on the materials available (*Brownlie v Four Seasons Holdings Inc* [2017] UKSC 80; [2018] 1 WLR 192, per Lord Sumption at [7]).)

(3)  The third requirement is that the claimant must satisfy the court that England is the appropriate forum for the trial of the dispute, i.e. the forum conveniens: *Altimo* at [71]. In the familiar phrase, this is the place where the claim may be tried "*suitably for the interests of all the parties and for the ends of justice*": see *Spiliada Maritime Corporation v Cansulex* [1987] AC 460 at 482. (The Supreme Court held in *Vedanta Resources plc v Lungowe* [2020] AC 1045 at [68] that the claimant is required to establish that England is the proper place in which the claims against all of the defendants are most suitably tried together.)

(ii)    The position in the present case

a.    *Serious issue to be tried*

154.    For the reasons set out above it is submitted that there is a serious issue to be tried on the merits, i.e. a substantial question of fact or law or both.

b.    *Jurisdictional gateways*

155.    In the present case, the Applicants rely on three jurisdictional gateways.

156.    First, in respect of their primary claim (for a declaration that the SLA has been rescinded and relief consequent upon rescission) and their alternative claim (for redemption and damages for breach of contract), the Applicants rely on para 3.1(6) and (8) of PD6B:

> "*(6) A claim is made in respect of a contract where the contract –*
> *(a) was (i) made within the jurisdiction or (ii) concluded by the acceptance of an offer, which offer was received within the jurisdiction;*
> *(b) was made by or through an agent trading or residing within the jurisdiction or*
> *(c) is governed by the law of England and Wales.*
> *...*
> *(8) A claim is made for a declaration that no contract exists where, if the contract was found to exist, it would comply with the conditions set out in paragraph (6)*".

157.    Secondly, in respect of their tort claims against Astor (seeking damages for the torts of deceit, causing harm by unlawful means and/or conspiracy to cause harm using unlawful means), the Applicants rely on para 3.1(4A) of PD6B:

> "*(4A) A claim is made against the defendant which—*
> *...*
> *(c) falls within one or more of paragraphs ... (6) to (16A) ... and a further claim is made against the same defendant which arises out of the same or closely connected facts*".

158.    Third, in respect of their tort claims against Mr Sklarov (seeking damages for the torts of causing harm by unlawful means and/or conspiracy to cause harm using unlawful means), the Applicants rely on paragraph 3.1(3) of PD6B:

> "*(3) A claim is made against a person ('the defendant') on whom the claim form has been or will be served (otherwise than in reliance on this paragraph) and –*
> *(a) there is between the claimant and the defendant a real issue which it is reasonable for the court to try; and*
> *(b) the claimant wishes to serve the claim form on another person who is a necessary or proper party to that claim*".

159. Although there are textual differences between paragraph 3.1(3) of Practice Direction 6B and the former provisions of RSC Ord.11, "*the differences are not intended to reflect any change in the underlying principles*": see *MRG v Engelhard Metals Japan* [2004] 1 Lloyd's Rep 731 per Toulson J at 732 and *United Film Distribution Ltd v Chhabria* [2001] 2 All ER (Comm) 865 (CA). Accordingly, the older authorities remain relevant.

160. The 'necessary or property party' test has two limbs.

161. First, the Court must be satisfied that there is a "*real issue*" between the claimant and the anchor defendant which is "reasonable for the court to try". In substance the "real issue" aspect of the test is the same as the test for summary judgment under Part 24: see *Altimo* at para 82 ("*There is no practical difference between the two tests*"). In *Ellinger v Guinness, Mahon & Co* [1939] 4 All ER 16, Morton J said at 22 (in a passage cited with approval by the Privy Council in *Altimo* at para 65):

> "*I do not think it is part of the function of the court, in considering whether an action is 'properly brought' against a party within the jurisdiction, to arrive at a conclusion as to whether the plaintiff will or will not succeed against that party. It is enough if the court is satisfied that there is a real issue between the plaintiff and that party which the plaintiff may reasonably ask the court to try*".

162. The question whether it is reasonable for the English court to try the claim between the claimant and the anchor defendant is an objective one: it is not the same question as whether it was reasonable for the claimant to start proceedings against that defendant in the jurisdiction: *Erste Group Bank AG v JSC "VMZ Red October"* [2015] 1 CLC 706. It may not be reasonable for the English court to try a claim even if it plainly has jurisdiction (e.g, because of an exclusive jurisdiction clause): *Erste* at [78 (vii)]. As explained in *Gunn v Diaz* [2017] EWHC 157 "*the court will have to consider, among other matters, if there is any utility in trying the claims against the anchor defendant. If the claimant has nothing to gain from a trial of those issues here, even a trial to the stage of obtaining summary judgment (other than using the claim against the anchor defendant as a vehicle for bringing in the target defendant) the second limb* [i.e. reasonable for the English court to try the claim] *will not be satisfied*".

163. Secondly, the Court must be satisfied (to the 'good arguable case' standard) that the foreign defendant is a "*necessary or proper party*" to the claimant's claim against the anchor defendant. The meaning of "*necessary or proper party*" was authoritatively explained by Lord Esher MR in *Massey v Heynes & Co* (1888) 21 QDB 330 at p. 338:

"*The question, whether a person out of the jurisdiction is a 'proper party' to an action against a person who has been served within the jurisdiction, must depend on this – supposing both parties had been within the jurisdiction, would they have been proper parties to the action? If they would, and only one of them is in this country, then the rule says that the other may be served, just as if he had been within the jurisdiction*".

164. This test has been applied repeatedly. See, for example, *Qatar Petroleum Producing Authority v Shell Internationale* [1983] 1 Lloyd's Rep 35 per Ackner LJ at p.41, *Barings plc v Coopers & Lybrand* [1997] I L PR 12 per Chadwick J at paras 14 and 15 and *Nilon Limited v Royal Westminster Investments SA* [2015] UKPC 2 at 15(8).

165. It is accordingly necessary to consider the rules for joinder in CPR 19.2(2):

"*(2) The court may order a person to be added as a new party if –*

*(a) it is desirable to add the new party so that the court can resolve all the matters in dispute in the proceedings; or*

*(b) there is an issue involving the new party and an existing party which is connected to the matters in dispute in the proceedings, and it is desirable to add the new party so that the court can resolve that issue*".

166. A person who could be joined as a new party within CPR 19.2(2) will be a proper party for the purposes of paragraph 3.1(3) of PD6B: see *United Film Distribution Ltd v Chhabria* [2001] EWCA Civ 416 at paras 36 to 38. See also *Barings plc v Coopers & Lybrand* [1997] I L PR 12 per Chadwick J at para 18 and *889457 Alberta Inc v Katanga Mining Ltd* [2008] EWHC 2679 (Comm) per Tomlinson J at para 26.

167. For this reason, it has been said that a foreign defendant will be a 'necessary or proper party' to a claim against a defendant within the jurisdiction "*when the liability of several persons depends on one investigation*" (*Massey v Heynes & Co* (1888) 21 QDB 330 per Lindley LJ at 338; *Petroleo Brasiliero SA v Mellitus Shipping Inc (The Baltic Flame)* [2001] 2 Lloyd's Rep 203 per Potter LJ at para 33); or when the claims "*give rise to common questions of fact*" (*United Film Distribution Ltd v Chhabria* [2001] 2 All ER (Comm) 865 (CA) per Blackburne J at para 40); or when the claimant's claim against the foreign defendant is "*closely bound up*" with the claimant's claim against the defendant within the jurisdiction (*Carvill America Incorporated v Camberdown UK Ltd* [2005] 2 Lloyd's Rep 457 per Clarke LJ at para 46).

35

168. In the Applicants' submission, the gateway in paragraph 3.1(3) of PD6B is applicable. Claims are being made against Astor 3 (on whom the claim form will be served other than in reliance on para 3.1(3) of PD6B) and that claim gives rise to real issues which it is reasonable for the court to try. Mr Sklarov is a necessary or proper party to the claim against Astor 3. In respect of the claims for causing harm by unlawful means and conspiracy to cause harm by unlawful means, this is a case in which "*the liability of several persons depends on one investigation*" (*Massey v Heynes & Co* (1888) 21 QDB 330 per Lindley LJ at 338). Further, the claims "*give rise to common questions of fact*" (*United Film Distribution Ltd v Chhabria* [2001] 2 All ER (Comm) 865 (CA) per Blackburne J at para 40); and the claims against Mr Sklarov are "*closely bound up*" with the claim against Astor 3.

*c.    Forum conveniens*

169. It is submitted that England is the place where the claim may be tried "*suitably for the interests of all the parties and for the ends of justice*": see *Spiliada Maritime Corporation v Cansulex* [1987] AC 460 at 482.

170. First, and significantly, Astor 3 agreed to the following clauses in the SLA:

(1) "*This Agreement and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement and the transactions contemplated hereby shall be governed by, and construed in accordance with, the laws of England and Wales*" (Clause VII.a)

(2) "*Each party hereto irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind whatsoever, whether in law or equity, or whether in contract or tort or otherwise, against any other party hereto in any way relating to this Agreement or the transactions contemplated hereby, **in any forum other than the courts of England and Wales, and any appellant court from any thereof**. Each of the parties hereto irrevocably and unconditionally submits to the exclusive jurisdiction of such courts and agrees that any such action, litigation or proceeding may be brought in any England and Wales court to the fullest extent permitted by applicable law*" (Clause VII.b; emphasis added)

(3) "***Each party hereto irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court referred to in [this] Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, the defence of an inconvenient forum to the maintenance of such action or proceeding in any such court***" (Clause VII.c; emphasis added).

171. Although the Applicants say that they have rescinded the SLA, the existence and terms of the SPA, the fact that Astor 3 was prepared to agree to such terms in the first place, conferring jurisdiction on the English court and waiving any defence of an inconvenient forum, makes it very difficult for Astor 3 to take any point on *forum conveniens*.

172. Further, the Tavira Agreement is expressly governed by English law and subject to the jurisdiction of the courts of England and Wales.

173. The parties themselves are located in numerous different jurisdictions around the world, including Quebec, the Bahamas, Monaco and the United States. No other forum is more clearly or distinctly more suitable than England and Wales.

174. It is also highly relevant any contractual claim against Astor 3 (in the event that the SLA has not been validly rescinded) will have to proceed in England in any event, given the contractual terms relating to jurisdiction. If the other claims against Astor 3 or claims against Mr Sklarov cannot proceed in England, there will be a risk of a multiplicity of parallel proceedings and a risk of inconsistent judgments, which courts have regarded as a "*potential disaster from a legal point of view*" (see *Aratra Potato Co Ltd v Egyptian Navigation Co* [1981] 2 Lloyd's Rep 119 per Brandon LJ at p.128). See also *Aiglon Ltd v Gau Shan Co Ltd* [1993] 2 Lloyd's Rep 164 per Hirst J at 172 ("the *Court would inevitably have regard to the fact that the ... claims against Ltd and SA respectively were inextricably interlinked and that ... in the interests of justice they would be heard together, so as to save costs and avoid inconsistent results*"); *Citi-March Ltd v Neptune Orient Lines Ltd* [1996] 1 WLR 1367 per Colman J at 1375F-G ("*there is a risk, if actions in respect of the same loss must be brought in different jurisdictions, that there will be inconsistent decisions on the facts*"); *Barings plc v Coopers & Lybrand* [1997] I L PR 12 per Chadwick J at para 55 ("*The potential for different decisions by different courts on the same underlying facts ought to be avoided if possible*"); *889457 Alberta Inc v Katanga Mining Ltd* [2008] EWHC 2679 (Comm) per Tomlinson J at para 25 (referring to "*the desirability of concentrating proceedings in one jurisdiction so as to avoid the possibility of inconsistent decisions*"); and *JSC BTA Bank v Granton Trade Ltd* [2011] 2 All ER (Comm) 542 per Christopher Clarke J at para 17 ("*If the proceedings ... against the applicants are heard in Kazakhstan ... there is an obvious risk of inconsistent judgments and of waste and duplication of costs. That is a powerful factor in favour of*

*having the applicants as parties to this litigation*"); cf. *Vedanta Resources plc v Lungowe* [2019] UKSC 20 at paras 75 and 79.

**(2)   Service by an alternative method**

175.   It is necessary to demonstrate a "good reason" for ordering alternative service.

176.   Where the court grants injunctive relief against a defendant, the fact that an injunction has been made against the defendant will be a good reason for allowing alternative service. See *Interbunker Holdings SA v W SrL* [2021] EWHC 2649 (Comm) at [15]:

> "*In those circumstances, nonetheless, there has to be a good reason why there must be service by an alternative means. **I am satisfied that in the circumstances of this case there would be a good reason for ordering alternative means namely those which have been relied upon consistently in the authorities, namely that such an order will be appropriate in cases where proceedings have been begun and an injunction granted on a without notice application because injunctions have to be served immediately or in short order if injustice is not to result or potentially result.** The underlying rationale for such an approach was that identified by Mr Justice Calver in <u>Griffin Underwriting Limited v Varouxakis</u> [2021] EWHC 226 at para 57 in these terms: '… in a case … where a party seeks [an] … injunction, because the court is making a number of coercive orders with a risk of committal for contempt, as well as the claimant giving an undertaking in damages, it is important that the proceedings be constituted formally as soon as possible which, in my judgment, fully justifies an order for alternative service, despite this being a Hague Convention case*'*" (emphasis added).

177.   In the present case, if the court grants injunctions, this will constitute a good reason.

178.   Further, given the fact that the present case involves a massive international fraud committed by an experienced fraudster (Mr Sklarov), it is important to identify a sensible method of serving documents on the Respondents that cannot readily be evaded, and which does not take months to carry out (such as service through diplomatic channels).

179.   Mr Salceda has communicated with the First to Third Respondents by email at all times, and the Applicants submit that they should all be served by email. Forward Risk have sought to find additional email addresses which are identified in the Service Report that has been prepared by Forward Risk. The Applicants propose to use all available email addresses for the Respondents as set out in the draft order on the Service Application. These include, *inter alia*, the following:

(1)   First Respondent:

- albert.yuen@astorassetgroup.com
- gregory.mitchell@astorassetgroup.com
- operations@astorassetgroup.com

(2)    Second Respondent:

- Collateralservices@weiser.com.bs
- info@weiser.com.bs
- openaccount@weiser.com.bs

(3)    Third Respondent:

- INTLOperations@tavirasecurities.com

180.    In light of the factual evidence set out above, the Applicants believe that emails to operations@astorassetgroup.com and gregory.mitchell@astorassetgroup.com will come to the attention of Mr Sklarov. As noted above, the Applicants believe (and have reason to believe) that Mr Sklarov has made use of both email addresses to communicate on behalf of Astor 3. Further, based on information supplied by Forward Risk in their Service Report, the Applicants believe that Mr Sklarov can also be contacted on investments18@msn.com and boychic@tivejo.com.

## H.    FULL AND FRANK DISCLOSURE

181.    The Applicants are aware of their duty of full and frank disclosure on an *ex parte* without notice. The Applicants and their legal representatives have sought to identify those points that the Respondents might plausibly wish to raise if they were on notice of the hearing.

182.    Whilst ultimately the Applicants believe that there is nothing that could be raised by the Respondents which might persuade the court to dismiss the application, the Applicants are conscious that materiality is a matter for the court, not the Applicants.

183.    The Applicants therefore draw the court's attention specifically to the following points.

## (1)    Dealings in Collateral Shares

184.    Astor 3 might seek to contend that it was entitled under the SLA to deal with the Collateral Shares and that (i) the dealings in the Collateral Shares about which the Applicants complain were not a breach of contract and/or (ii) to the extent that Astor 3

always intended to dispose of Collateral Shares, such an intention on the part of Astor 3 does not falsify any implied representation that it intended to comply with the SLA.

185.  The Applicants have identified four provisions of the SLA which could conceivably be relied on by the Respondents to say that Astor 3 was entitled to deal with the shares. However, as explained below, the provisions in question are ambiguous or confusing or both and they sit in tension with the substantive provisions of the SLA which the Applicants submit prevents Astor 3 from dealing in the shares prior to the maturity date save in the event of an incurable Event of Default.

186.  **First,** Clause V.4(a) states that Astor 3 "*has Lien and Encumbrance rights in the Pledged Collateral (ii) including the power to transfer rights in such Pledged Collateral as may be contemplated by the Lender, in accordance with the herein agreement*". Clause V.4(a) itself does not, in terms, confer a general right on the part of Astor 3 to deal with the Pledged Collateral. It does, however, suggest that a power to "t*ransfer rights in such Pledged Collateral*" may be found elsewhere in the SLA. On the Applicants' case that power exists under the SLA only where there has been an incurable Event of Default (as explained above). However, it may be suggested by Astor 3 that Clause V.4(a) contemplates broader powers of disposal which are found elsewhere in the agreement (specifically, in the provisions identified below). Whilst the Applicants submit that any such submission by Astor would be wrong (and would not in any event prevent the Applicants from meeting the 'good arguable case' and/or 'serious issue to be tried' thresholds), the Applicants specifically draw this point to the court's attention.

187.  **Second,** Astor 3 has suggested in its letter dated 12 June 2024 that Clause V.4(c) of the SLA conferred a legal entitlement to deal with the Pledged Collateral. In particular, in that letter Astor 3 stated as follows: "*The Lender's rights in the Shares are further defined in Section V.4, Dealing with Securities, of the SLA. Specifically, Section V.4(c) states that "the Borrower acknowledges and agrees that the Pledged Collateral will be ultilised by the Lender to assert its preferential Lien over it". Therefore, the Lender has the right to deal-in the Shares to the extent that is defined within the meaning of Encumbrance. The Lender has, at all times, fully complied with and adhered to the language within the SLA*".

188.  It is not entirely clear if, in that letter, Astor 3 is asserting that Clause V.4(c) of the SLA conferred a general right to deal with the Shares in the absence of an Event of Default. If that is what is being suggested, then it is very difficult to understand how Clause V.4(c)

could be said to give rise to such a right. The term "Lien" which appears in Clause V4(c) is defined in the SLA to mean "*any Encumbrance of any kind referenced herein concerning the Pledged Collateral of Guarantor. A lien is the Lender's right to retain possession of property belonging to Guarantor until a debt owed by that Borrower is fully discharged by per this Agreement*". The term "*Encumbrance*" is defined as follows (with emphasis added): "*Lender's legal claim on Pledged Collateral that affects the Borrower's ability to transfer ownership to anyone or to dispose of the Pledged Collateral without Lenders prior written authorization. For purposes of this definition, **Encumbrance shall mean lien, mortgage, charge, hypothecation, re-hypothecation, rights, barter, pawn, trade, dispose, deal in, pledge, re-pledge, repo, borrow or transfer of security interest in Collateral.** The Pledged Collateral will be restricted to Guarantor and Encumbrance rights exclusively granted to Lender*".

189.  It may be that Astor 3 would argue, by reference to these provisions that: (a) it is entitled to "*use*" the Pledged Collateral to assert its Lien over it; (b) Lien means "*Encumbrance*"; and (c) Encumbrance is defined to mean "*dispose*" or "*deal in*" the Pledged Collateral.

190.  However, a sensible reading of Clause V.4(c) in combination with the definitions of Lien and Encumbrance does not confer a clear or unequivocal right of Astor 3 to dispose of the Shares whenever it wishes to do so.  Clause V.4(c) simply provides that "*the Pledged Collateral will be utilized by the Lender to assert its preferential Lien over it*". There is nothing on the face of that provision which suggests that Astor 3 has a general right to deal in the Shares. Further, the definition of "*Lien*" includes the explanation that "*a lien is the Lender's right to retain possession of property belonging to Guarantor until a debt owed by that Borrower is fully discharged by per this Agreement*". A right to "*retain possession*" of the Shares is obviously very different from a right to dispose of the Shares unilaterally at the lender's whim. Further, the drafting of the definition of "*Encumbrance*" is extremely difficult to follow. It certainly operates to prohibit the Borrower from disposing of the Shares, but it makes very little sense to describe a right of disposal of a secured asset as an "*Encumbrance*" (if that is what might be suggested by Astor 3). More generally, it would be highly surprising if such a commercially-important right could only be found by working through a series of confusing and innocuous-looking definitions.

191.  **Third**, Clause IX 27 is a long clause headed "Release and Waiver". It is principally concerned with a wide-ranging purported release of rights and claims by the Claimants

(addressed further below). However, embedded within that clause is the following passage: "*No waiver is asserted or claimed against the Lender which refutes Lenders' dominion and right to foreclose, deal-in or transact in the Pledged Collateral*". It might be argued by the Respondents that these words confers a general right on Astor 3 to sell the Pledged Collateral at any time. However, it is submitted that that is not a correct construction of the words in context. The provision is a "non-waiver" provision. It is not (and does not express itself to be) concerned with conferring rights on Astor 3. Instead, the rights which are the subject of the "non-waiver" need to be found elsewhere in the agreement and, in this regard, the SLA confers limited rights to deal-in or transact in the Pledged Collateral where there has been an incurable Event of Default. The non-waiver provision in Clause IX 27 can properly be understood in that context.

192. **Fourth**, Clause X is entitled "*Required Disclosures*". It takes the form of a lengthy series of apparently boilerplate provisions, typed in small font across nearly a full page of text. The following words are found towards the end of the clause: "*During the Loan Term, all benefits and proceeds of Pledged Collateral inure to Lender. Lender reserves the right to maintain dominion over the Collateral during the Term Loan, which affords Lender the right to deal-in, dispose or convert over the Pledged Collateral*". This provision was referred to by Astor in its letter dated 12 June 2024.

193. However, the provision is found at the end of seemingly boilerplate text within the final clause in the SLA entitled "Required Disclosures". This is a highly unlikely place to find a provision that confers an important and unrestricted power of disposal on Astor 3.

194. Further, insofar as it might be said that the quoted wording in Clause X provides a wide-ranging power of disposal on Astor 3 prior to maturity or any incurable Event of Default, Clause X would be inconsistent with the prior substantive provisions of the SLA. As noted above, Clause V.3 provides that the Astor 3 will credit all dividends on the Pledged Collateral to the Guarantor's account at the Depository Broker. That is inconsistent with any suggestion that "*during the Loan Term, all benefits and proceeds of Pledged Collateral inure to the Lender*". Clause V.8 states that the Lender shall instruct the Depositary Broker to exercise voting rights "*in accordance with the registered owner's instructions*". That is also inconsistent with the quoted wording of Clause X.

**(2)**    <u>**No representation, no reliance, no remedy and release clauses**</u>

195. The SLA contains a number of clauses purporting to limit liability or restrict liability or to prevent the Applicants for pursuing certain remedies before the Court. Astor 3 and Mr Sklarov might say that those provisions prevent the Applicants from bringing a claim for fraudulent misrepresentation, rescinding the contract or seeking injunctive relief.

196. The clauses in question can be grouped into four categories: (i) no representation and no reliance clauses; (ii) no remedy clauses; and (iii) release clauses.

(i)     <u>No representation and no reliance clauses</u>

197. The SLA contains the following representation and no reliance clauses:

    (1)     "*This SLA supersedes all previous term sheets, emails, representations, warranties and discussions and is the final documentation of the Parties' undertakings*" (first recital)

    (2)     "*Neither Borrower nor Guarantor have relied on any marketing materials or any other written or oral statements of fact or otherwise made by anyone prior to entering into this agreement, and any such materials and / or statements or representations, if any, written or oral, shall be purged from existence as if never having existed. All previous agreements, representations, statements both written or oral, express or implied with respect to the subject matter hereof, are superseded by this Agreement and hereby merged into this Agreement*" (Clause IV.7).

    (3)     "*This Agreement shall be final, controlling and fully merged with respect to any previous discussions, promises, understandings, representations or warranties made by Lender*" (Clause IX.11, last sentence).

198. First and foremost, if (as the Applicants contend) they are entitled to rescind the SLA, those clauses will cease to have effect: it will be as if they never existed.

199. Further, to the extent that any of those provisions purport to exclude liability on the part of Astor 3 or Mr Sklarov for fraud in inducing the contract, they are ineffective as a matter of public policy. More particularly, in *HIH Casualty & General Insurance Ltd v Chase Manhattan Bank* [2003] 1 All ER (Comm) 349, the House of Lords held that it is contrary to public policy for a contracting party to exclude its own liability for fraud in inducing a contract. Lord Bingham held at [15] that "*fraud unravels all: fraus omnia coorrumpit*":

"*Once fraud is proved, 'it vitiates judgments, contracts and all transactions whatsoever':*
*Lazarus Estates Ltd v Beasley [1956] 1 QB 702 at 712 per Denning LJ*".

200. Accordingly, "*the law, on public policy grounds, does not permit a contracting party to*
*exclude liability for his own fraud in inducing the making of the contract*" (ibid, [16]).

201. The same principle applies to entire agreement and non-reliance clauses. In *FoodCo LLP*
*v Henry Boot Development Ltd* [2010] EWHC 358, Lewison J held at [166]: "*Precisely*
*what statements are covered by a non-reliance clause is a question of construction of the*
*clause. But this is subject to the important principles that, as a matter of public policy, a*
*contracting party cannot exclude liability for his own fraud ...*"

202. Accordingly, the no-reliance and no representation clauses do not mean that the
Applicants do not have a good arguable case in fraudulent misrepresentation.

(ii)   <u>No remedy clauses</u>

203. The SLA also contains provisions purporting to prevent the Applicants from seeking
injunctive relief and/or exercising rights of rescission:

    (1)   "*During the pendency of this Loan, neither the Borrower nor guarantor will seek*
    *injunctive relief or interference from any court of law, regulatory body, Transfer*
    *Agent, custodian, sub-custodian, Depository Broker, central depository or stock*
    *exchange requesting to invalidate, suspend, limit, impede terminate or restrict this*
    *Agreement or freeze the shares. Injunctive relief by Borrower or Guarantor or any*
    *interference by Borrower or Guarantor, central depository or regulatory agency*
    *shall be an immediate and incurable Event of Default*" (Clause IV.10)

    (2)   "*No course of dealing between Borrower, Guarantor and Lender shall operate as*
    *a waiver of any rights of the Parties under this Agreement with the exception of any*
    *action for injunctive relief, which shall not be permitted or attempted and shall be*
    *nullified by the judicial body upon its application*" (Clause IX.27)

    (3)   "*All of the Lender's rights, benefits, enforcement covenants and secured interest*
    *into the collateral shall survive the termination of this Agreement*" (Clause IX.30)

    (4)   "*Early termination or rescission is not permitted under the Agreement regardless*
    *of the reason or need to do so, and this Agreement will be valid and in full force*
    *and effect after its execution for its full Term*" (Clause IX.31)

204. The Claimants' position in relation to these clauses is that they do not, as matter of
construction, purport to prevent and the Claimants from accessing the usual remedies and
relief associated with a claim for fraudulent misrepresentation. However, if that is wrong,
they are contrary to public policy and unenforceable.

205. As to the question of construction:

    (1)    The Claimants are not aware of a case which has considered the construction of clauses such as these, however it is submitted that an analogy can be drawn with cases considering the scope and meaning of release clauses.

    (2)    In this regard, in *BCCI v Ali* [2001] UKHL 8, Lord Nicholls at [26] emphasised that there are no special rules of interpretation in the case of general releases and that the meaning to be given to the words used is "*the meaning which ought reasonably to be ascribed to those words having due regard to the purpose of the contract and the circumstances in which the contract was made*". He went on to hold (at [28]): "*However widely drawn the language, the circumstance in which the release was given may suggest, and frequently they do suggest, that the parties intended, or more precisely, the parties are reasonably to be taken to have intended, that the release should only apply to claims, known or unknown, relating to a particular subject matter. The court has to consider, therefore, what was the type of claims at which the release was directed*".

    (3)    Applying that approach to the present case, the parties cannot reasonably be taken to have intended that the Applicants should be prevented by the terms of the SLA from accessing remedies and relief in the event that it became apparent that the SLA (including the non-relief provisions) had been procured or induced by fraud. As Lord Hoffman observed in *HIH Casualty & General Insurance Ltd v Chase Manhattan Bank*, ibid, at [76], "*parties do not contemplate fraud in a making of a contract; as observed by Lord Bingham, there would be no deal. But it is another thing altogether to say that the parties do not contemplate the risk of deliberate wrongdoing at some point in the performance of a valid contract*".

206. In any event, even if the Claimants are wrong as a matter of construction it is submitted that non-relief provisions in a contract are no more enforceable than no reliance provisions or no representation provisions insofar as they purport to prevent a party from accessing remedies in connection with a fraud in the making of that contract. See *Pearson* [1907] AC 351, 356: "*no subtlety of language, no craft or machinery in the form of contract, can estop a person who complains that he has been defrauded from having that question of fact submitted to a jury*". Further, if the Claimants are right that they are

entitled to (and have) rescinded the SLA, then the provision purporting to prevent them from seeking injunctive relief has already fallen away.

(iii) <u>Release clause</u>

207. Clause IX.27 of the SLA contains a release clause in the following terms:

> "*Borrower hereby releases, absolves and forever discharges Lender and their respective successors, assigns, partners, directors, shareholders, officers, beneficial owners, advisers, affiliates, agents, attorneys, transferees, and employees from any and all claims, legal fees, demands, torts, cross-actions controversies, omissions, inaccuracy, nonfulfillment of any representation or warranty, oversight, exclusion, negligence, causes of action, suits, damages, rights, outcomes, liabilities and obligations at law or in equity whatsoever, known or unknown, whether past, present or future, now held, owned or possessed by Borrower or Guarantor, or which Borrower or Guarantor may, as a result of any of Lenders actions, inactions, going concern status, assignments, dealings, failings to act, calculations or directives occurring on or prior or after the execution of this Agreement, and hereafter hold or claim to hold under any common law or statutory right arising, directly or indirectly out of the Loan or any of the Loan Documents or any of the documents, instruments or any other transactions contemplated thereby. Borrower and Guarantor understand and agree that this is a full, final and complete release and agrees that this release may be pled as an absolute and the final bar to any or all suit or suits pending, or which may hereafter be filed, claimed or prosecuted by Borrower or Guarantor, or anyone claiming by, through or under Borrower or Guarantor, in respect of any of the matters described herein and may hereafter be had from anyone whomsoever*."

208. As to this:

(1) Astor 3 and Mr Sklarov may argue that the Clause is framed in very wide terms, providing Astor 3 (and others) with a broad release from "*any and all claims*" whether "*known or unknown*" including "*non fulfilment of any representation*" and that it acts as an "*absolute and final bar to any or all suit or suits pending*" such that the language used in the clause therefore encompasses a release of claims for fraudulent misrepresentation inducing entry into the SLA.

(2) In this regard, in *Maranello v Lohomji* [2022] EWCA Civ 1667, the Court of Appeal held that the terms of a general release in a settlement agreement extended to unknown claims for fraud (see, too, *Riley v National Westminster Bank* [2023] EWHC 2401 (Ch), which also contains a helpful review of the authorities).

209. However, the case law emphasises the importance of the context in which a release is given such that "*however wide the language in which it is cast, it is always necessary to*

*understand the context in which the release was agreed in order to decide what the parties intended its true scope to be*": *MAN Nutzfahrzeuge AG v Freightliner Ltd* [2005] EWHC 2347 (Comm) at [207]. In that case, Moore-Bick LJ held (at [85]) (albeit on an *obiter* basis) that a generally-worded release clause in a settlement agreement in that case was not intended to grant a release from claims arising out of a party's own fraud since "*fraud is a thing apart because parties contract with one another in the expectation of honest dealing*". Similarly, in *Satyam Computer Services v Unpaid Systems* [2008] EWCA 487, Lawrence Collins LJ (with whom Waller and Rimer LJJ agreed) considered (*obiter*) that a generally worded release clause in a settlement agreement in that case did not release claims based on fraud: "*If a party seeking a release asked the other party to confirm that it would apply to claims based on fraud, it would not, in most cases, be difficult to anticipate the answer*" (at [85]).

210. As the Court of Appeal explained in *Maranello v Lohomji*, ibid, at [44], neither of those decisions involved a departure from the application of the ordinary principles of contractual construction in the case of fraud claims; "*Rather, consistently with those principles, they recognised that part of the commercial context to take into account was that parties would generally proceed on the basis of honest dealing and would not readily release unknown claims in respect of the fraud of their counterparties*".

211. There are two particularly important contextual considerations in the present case. First, the releases in this case are not contained in a settlement agreement but are contained in an agreement for stock-backed lending. That is important context because it cannot be said (as it was in *Marenello* at [46]) that the whole purpose of the agreement was to draw a line under events up to the date of the agreement. Second, parties contract with one another in the expectation of honest dealing. That makes it highly unlikely that the parties the release clause in the SLA to release claims for fraudulently inducing entry into the SLA in the first place. Such a suggestion is bizarre and inconceivable.

212. Further, and relatedly, while the authorities suggest that exclusion clause cases (i.e. such as *HIH v Chase Manhattan*) should not be automatically imported into the area of releases (*Satyam Computer Services v Unpaid Systems*, ibid., at [87]), that has tended to be in the context of considering the scope of a release in a settlement agreement which is not alleged to have been induced by fraud. It is at least arguable that public policy

prevents enforcement of a clause in a contract which purports to release claims for fraudulent misrepresentation inducing entry into that contract.

213. For all these reasons, it is submitted that the release clause does not mean that that Claimants do not have a good arguable case in deceit.

**(3)** **No dishonesty**

214. Astor 3 and Mr Sklarov may take the position that there was no dishonesty in a representation that Astor 3 intended to comply with the terms of the SLA insofar as it relates to the use of the shares in Elektra.

215. In particular, they may contend that they honestly believed that the SLA permitted Astor 3 to cause the Pledged Collateral to be sold or disposed of at any time.

216. However, any such contention would be a factual allegation which would have to be established by them at trial in due course. On the basis of information available, and having regard to the evidence suggesting the involvement of Mr Sklarov (a convicted felon) in the transaction, it is submitted that there is a good arguable case of dishonesty.

**(4)** ***Hollington v Hewthorn***

217. As explained above, the Applicants rely on a number of findings of courts in other jurisdictions relating to the conduct and activities of Mr Sklarov. The Applicants rely on that material to establish the existence of a good arguable claim in deceit against Astor 3 and Mr Sklarov.

218. Astor 3 and Mr Sklarov may take the position that those findings are inadmissible, relying on *Hollington v Hewthorn* [1943] KB 587.

219. However, the rule in *Hollington v Hewthorn* does not prevent the use of findings in other litigation at an interlocutory stage. This is because the rationale of the rule in *Hollington v Hewthorn* is to exclude findings that are no more than the opinion of another person, based on unknown facts, so as to preserve the fairness of the trail. There is no risk to fairness of a trial at an interlocutory stage. In *Tulip Trading Limited v Bitcoin Association* [2023] EWHC 2437 (Ch) at [40], Mellor J summarised the position (after a comprehensive review of the authorities) as follows:

> "*It seems to me that the common theme which is discernible through Medcalf, Berezovsky and Sabbagh is that there is a limited exception to the rule in Hollington*

*v Hewthorn which is applicable in situations where the case is at a preparatory stage yet the court has to consider what evidence at trial there might be. This exception plainly applies where the court is considering whether there is a serious issue to be tried (Berezovsky and Sabbagh) but also when the court has to consider whether counsel had sufficient material to justify a plea of fraud (Medcalf). The material (inadmissible at trial) can assist in identifying the evidence which can reasonable be expected to be available at trial, to which a court is entitled to have regard at the interlocutory stage*".

220.  Accordingly, the Applicants are entitled to rely on matters such as the Satterfield Award and the NYSE Decision at this stage of the proceedings.

**(5)    <u>Affirmation</u>**

221.  The Respondents might say that the Applicants had affirmed the SLA in particular by not rescinding it when they first had suspicions about unusual transactions in respect of Elektra shares and by instead providing further shares by way of collateral. However, as set out above, the Applicants have acted promptly by rescinding the SLA as soon as they had firm grounds for considering that it had been induced by fraudulent misrepresentations. Until very recently, the Applicants did not believe that Astor 3 was a front for fraud and continued to trust what Astor 3 had told them. When it comes to questions of affirmation: *there must be knowledge, not simply suspicion*": *SK Shipping Europe Plc v Capital VLCC 3 Corp* [2020] EWHC 3448 (comm) *per* Foxton J at [202(ii)].

**I.    <u>FORM OF DRAFT ORDER</u>**

222.  The draft order sought by the Applicants follows the standard wording contained in Appendix 11 to the Commercial Court Guide. A version of the order with modifications and additions to that standard wording shown in track changes will be available at the hearing. Those modifications and additions, and reasons for them, are as follows:

(1)    Paragraph 1 includes additional reference to the proprietary injunctions sought against the First, Second and Third Respondents.

(2)    Paragraph 3 includes addition of a time estimate of 1 day for the return date.

(3)    Paragraph 7 contains additional reference to two particular types of assets, namely: (a) any money standing to the credit of the First or Second Respondents in any bank account including the amount of any cheque down on such accounts which has not been cleared; and (b) any shareholdings held by the First or Second Respondents

or the proceeds of sale if any of them have been sold. The former has been included in circumstances where the Claimants are unaware of any particular bank account belonging to the First or Second Respondents. The latter has been included in light of the nature of the fraudulent activity which the Claimants believe to have been conducted by the First and Second Respondents.

(4)    Paragraph 10 contains the terms of the proprietary injunction sought against the Respondents. It is directed towards preventing the Respondents from dealing in the "Collateral Shares" shares or their traceable proceeds. The restrictions on dealing are in a standard form. The "Collateral Shares" are defined at paragraph 22 of the order as meaning any shares (or interests in shares) in the capital of Grupo Elektra SAB De CV held or formally held by or for Mr Salinas. Accordingly, the proprietary injunction is intended only to apply to the shares provided by Mr Salinas as Pledged Collateral and their traceable proceeds.

(5)    Paragraph 11(a) requires the First and Fourth Respondents to provide information to the Applicants' solicitors in writing within 72 hours of service. That information includes, in addition to the standard provision concerning assets:

(i)    whether they hold any Collateral Shares / their traceable proceeds and, if so, the value of the shares or proceeds. That provision has been included to support the injunctive relief by assisting the Applicants in identifying and the location of Mr Salinas' shares; and

(ii)    all their liabilities (including debts) above the value of £5,000; (c) any claims of which they have been notified above the value of £5,000 and (d) details of any pending legal proceedings or legal actions against them. These provisions have been included to support the injunctive relief by assisting the Applicants in understanding the net assets available to the First and Fourth Respondents.

(6)    Paragraph 11(b) requires the Second and Third Respondents to inform the Applicant's solicitors in writing, within 72 hours of service of the order, of whether they hold any Collateral Shares / their traceable proceeds and, if so, the value of the shares or proceeds. Again, that provision has been included to support the

injunctive relief by assisting the Applicants in identifying the location of Mr Salinas' shares.

(7)   Paragraph 12 has been modified to require the Respondents to swear and serve an affidavit within 7 days of service of the order providing (in addition to an affidavit providing the information requested in paragraph 11) certain additional categories information. The information requests are set out in Schedule C to the order. The purpose of those requests to support the proprietary injunction.

(8)   Paragraph 13 has been added to require the Respondents to preserve documents that evidence the existence, location or value of assets (including the Collateral Shares). The purpose of that provision is to support enforcement and policing of the injunctive relief contained in the order.

(9)   The standard wording to the exceptions to the prohibitions contained in the order at paragraph 15 has been modified so as to make it clear that the Respondents are not permitted to fund legal advice and representation from the Collateral Shares or their traceable proceeds.

(10)  Language has been introduced into paragraph 19 of the order to ensure that the Applicants' solicitors are given 3 working days' notice of any intention to apply to Court to vary or discharge the order.

(11)  Paragraphs 23 and 24 contain non-exhaustive definitions of "assets" and "details" of assets for the purposes of the order. Given Mr Sklarov's history of fraudulent activity it is considered that it would be better to fully set out the extent of assets that are subject to the world-wide freezing order and the spell out the extent of the information required to meet the information requests. The wording is based on a precedent on Westlaw from a case called *Re Walsham Chalet Park Ltd* – the order containing this wording was made by Mrs Justice Falk on 16 October 2019.

## J    CONCLUSION

223.  The Applicants seek orders in the terms of the draft orders provided to the court.

224.  One final point of housekeeping should be noted. The deponent (Mr Salceda) signed a near-final version of the affidavit in the early hours of the morning UK time. Some very minor changes were then made by the Applicants' legal team overnight (without affecting

the factual substance of the evidence). In those circumstances, the final version of the affidavit included in the hearing bundle is unsigned (as Mr Salceda, who is in a different time zone, is currently asleep). It is anticipated that a signed version of the affidavit will be provided shortly before or during the hearing. This will then be followed up by a sworn version, which the Applicants will undertake to provide.

**Stephen Robins KC**

**Henry Phillips**

**Matthew Abraham**

**Ryan Perkins**

South Square

Gray's Inn

London WC1R 5HP

Tel: 02076969900

stephenrobins@southsquare.com

henryphillips@southsquare.com

matthewabraham@southsquare.com

2 August 2024

# EXHIBIT 6



# Claim Form

In the **High Court of Justice**
Business and Property Courts of
England and Wales
King's Bench Division
Commercial Court

*for court only*

Amended Claim Form under CPR rule 17.1(1) dated 6 August 2024
Re-Amended Claim Form under CPR rule 17.1(2)(b) dated [**]
August 2024

| Claim no. | CL-2024-000450 |
|---|---|
| Issue date | 02 August 2024 |

**Claimant(s)**

(1)RICARDO BENJAMIN SALINAS PLIEGO
(2)CORPORACION RBS SA DE CV

SEAL

**Defendant(s)**

(1)ASTOR ASSET MANAGEMENT 3 LIMITED
(2)WEISER GLOBAL CAPITAL MARKETS LTD
(3)TAVIRA MONACO SAM
(4)VLADIMIR "VAL" SKLAROV
(5) Cornelius Vanderbilt Capital Management Ltd
(6) Astor Capital Fund Ltd

Name and address of Defendant receiving this claim form

See Annex A to this Claim Form

| | £ |
|---|---|
| Amount claimed | [**] More than £200,000 |
| Court fee | £10,000 |
| Legal representative's costs | |
| **Total amount** | |

The court office at the Admiralty and Commercial Court Listing Office, Rolls Building, 7 Rolls Buildings, Fetter Lane, London EC4A 1NL is open between
10 am and 4.30 pm Monday to Friday. When corresponding with the court, please address forms or letters to the Court Manager and quote the claim number.

© Crown copyright 2022

| Claim No. | CL-2024-000450 |
|-----------|----------------|

Brief details of claim

See Annex B to this Claim Form

Particulars of claim (*attached)(*will follow if an acknowledgment of service is filed that indicates an intention to defend the claim)

Paul, Weiss, Rifkind, Wharton & Garrison LLP
20 Air Sreett Street,
London
W1 B 5AN

Claimant's or legal representative's address to which documents or payments should be sent if different from overleaf including (if appropriate) details of DX, fax or e-mail.

## Statement of truth

**I understand that proceedings for contempt of court may be brought against a person who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.**

[ ] **I believe** that the facts stated in this claim form and any attached sheets are true.

[X] **The Claimant** believes that the facts stated in this claim form and any attached sheets are true. **I am authorised** by the claimant to sign this statement.

**Signature**

[ ]

[ ] Claimant

[ ] Litigation friend (where claimant is a child or protected party)

[X] Claimant's legal representative (as defined by CPR 2.3(1))

**Date**

| Day | Month | Year |
|-----|-------|------|
|     |       |      |

Full name

Stefan Arnold Soulby

Name of claimant's legal representative's firm

Paul, Weiss, Rifkind, Wharton & Garrison LLP

If signing on behalf of firm or company give position or office held

Partner

Amended Claim Form under CPR rule 17.1(1) dated 6 August 2024
Re-Amended Claim Form under CPR rule 17.1(2)(b) dated [**] August 2024

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (KBD)**

**B E T W E E N :**

**(1) RICARDO BENJAMIN SALINAS PLIEGO**

**(2) CORPORACION RBS SA DE CV**

**Claimants**

**-and-**

**(1) ASTOR ASSET MANAGEMENT 3 LIMITED**

**(2) WEISER GLOBAL CAPITAL MARKETS**

**(3) TAVIRA MONACO SAM**

**(4) VLADIMIR "VAL" SKLAROV**

**(5) CORNELIUS VANDERBILT CAPITAL MANAGEMENT LTD**

**(6) ASTOR CAPITAL FUND LTD**

**Defendants**

---

**RE-AMENDED ANNEX A – DEFENDANTS' NAMES AND ADDRESSES**

---

**(1)  ASTOR ASSET MANAGEMENT 3 LIMITED:**

    (a)   18C-3107 BC Quebec (Quebec) Hotels G1W4W5 Canada

    (b)   Perseverance Island S12-56-4 Mahe Seychelles

    (c)   Street Kos-Anatolskoho Building 4, Flat 225, Lviv 79066 Ukraine

    (d)   operations@astorassetgroup.com

    (e)   albert.yuen@astorassetgroup.com

    (f)   gregory.mitchell@astorassetgroup.com

**(2) WEISER GLOBAL CAPITAL MARKETS LTD:**

    (a)   Unit A - Balmoral Corporate Center, Balmoral Development, Sanford Drive, Nassau, Bahamas

    (b)   info@weiser.com.bs

    (c)   openaccount@weiser.com.bs

Amended Claim Form under CPR rule 17.1(1) dated 6 August 2024
Re-Amended Claim Form under CPR rule 17.1(2)(b) dated [**] August 2024

    (d)    Collateralservices@weiser.com.bs

**(3) TAVIRA MONACO SAM:**

    (a)    Le Montaigne, 6 BD Des Moulins, 1st Floor, Monaco, Monaco 98000

    (b)    INTLOperations@tavirasecurities.com

**(4) VLADIMIR "VAL" SKLAROV**:

    (a)    142 Gold Springs Court, Canton, GA 30114

    (b)    investments18@msn.com

    (c)    boychic@tivejo.com

    (d)    operations@astorassetgroup.com

    (e)    gregory.mitchell@astorassetgroup.com

**(5) CORNELIUS VANDERBILT CAPITAL MANAGEMENT LTD**

    (a)    4 Lombard Street, London, United Kingdom, EC3V9HD

    (b)    SK, Regina - Royal Bank Building, 2010 11th Avenue, 7th Floor, Regina, S4P 0J3, CanadaN

    (c)    info@vanderbilt.ltd

**(6) ASTOR CAPITAL FUND LTD**

    (a)    1730 ST. LAURENT BOULEVARD, OTTAWA, Ontario, Canada, K1G5L1

    (b)    support@astorcapitalfund.ca

    (c)    registrations@mslogic.eu

Amended Claim Form under CPR rule 17.1(1) dated 6 August 2024
Re-Amended Claim Form under CPR rule 17.1(2)(b) dated [**] August 2024

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (KBD)**

**B E T W E E N :**

**(1) RICARDO BENJAMIN SALINAS PLIEGO**

**(2) CORPORACION RBS SA DE CV**

**Claimants**

**-and-**

**(1) ASTOR ASSET MANAGEMENT 3 LIMITED**

**(2) WEISER GLOBAL CAPITAL MARKETS**

**(3) TAVIRA MONACO SAM**

**(4) VLADIMIR "VAL" SKLAROV**

**(5) CORNELIUS VANDERBILT CAPITAL MANAGEMENT LTD**

**(6) ASTOR CAPITAL FUND LTD**

**Defendants**

---

**RE-AMENDED ANNEX B – BRIEF DETAILS OF CLAIM**

---

The Claimants' re-amended claim arises out of and in connection with (amongst other documents) the following:

(i)     A stock-lending agreement executed on 28 July 2021 (the **SLA**) between Astor Asset Management 3 Limited (**Astor 3**) as lender, Corporacion RBS SA de CV (**RBS**) as borrower and Richard Benjamin Salinas Pliego (**Mr Salinas**) as guarantor, pursuant to which Astor agreed to advance loans of up to MXN 3,008,580,000 to RBS, secured over shares in Grupo Elektra SAB De CV (**Elektra**) owned by Mr Salinas;

(ii)    A custodian management agreement dated 28 July 2021 between Weiser Global Capital Market (**Weiser**) RBS, Mr Salinas and Astor 3 (the **Weiser Agreement**);

(iii)   A control agreement dated 1 November 2021 between Tavira Monaco SAM (**Tavira**), RBS, Mr Salinas and Astor 3 (the **Tavira Agreement** together with the Weiser Agreement the **Depository Agreements**)); and

Amended Claim Form under CPR rule 17.1(1) dated 6 August 2024

Re-Amended Claim Form under CPR rule 17.1(2)(b) dated [**] August 2024

(iv)    Five closing statements pursuant to which five tranches of loans were made available to RBS under the SLA (the **Closing Statements**).

The Claimants were induced to enter into the above agreements on the basis of representations (express or implied) by Astor 3 to the effect that:

1.    Astor 3 was a legitimate and honest financial institution which engaged in legitimate and honest stock-lending activities; and

2.    Astor 3 intended to comply with its obligations under the SLA, including in particular its obligations not to sell the Elektra shares prior to maturity or default.

(the **Representations**)

Astor 3 has advanced a total of five loans to RBS pursuant to the SLA, with a total principal amount of MXN 2,154,218,552.55 (approximately USD 114 million as at the date of this claim form). These loans are secured over a total of 7,204,296 Elektra shares belonging to Mr Salinas (the **Collateral Shares**), of which 935,913 should be held by Weiser, and 6,268,383 should be held by Tavira pursuant to the Depository Agreements.

It appears that Astor 3 has given instructions to Weiser and/or Tavira to dispose of at least some of the Collateral Shares. The Claimants wrote to Weiser and Tavira on 10 June 2024 to say that they should not dispose of the shares. Further, on 26 July 2024, Elektra issued a press release stating that it had become aware of a possible fraud in respect of the shares. On 1 August 2024, Tavira informed the Claimants that it had transferred the 6,268,383 Elektra shares "*to Astor's account, as per Astor's instructions*". According to a trade report supplied by Tavira, this transfer to Astor took place on 29 July 2024.

As a result of recent investigations, the Claimants are now aware that: (i) Astor 3 is controlled by Vladimir "Val" Sklarov (**Mr Sklarov**) who has a long history of fraud and who has been engaged in stock-lending fraud; and (ii) Astor 3 is not a conventional financial institution with the ability to fund loans worth hundreds of millions of dollars from its own capital (or by borrowing the money from legitimate third parties) but in fact an entity used by Mr Sklarov to perpetrate stock-lending fraud.

In the premises, the Representations were false (to the knowledge of Astor 3 and Mr Sklarov) in that: (i) Astor 3 was not a legitimate and honest financial institution and did not engage in legitimate and honest stock-lending activities; and (ii) from the outset, Astor 3 had no intention

Amended Claim Form under CPR rule 17.1(1) dated 6 August 2024

Re-Amended Claim Form under CPR rule 17.1(2)(b) dated [**] August 2024

of complying with its obligations under the SLA, including in particular its obligations not to sell the Elektra shares prior to maturity or default.

In light of the above, the Claimants consider that they have been victims of a stock-lending fraud conducted by Mr Sklarov via his company Astor 3 that fraudulently induced the Claimants to enter into the SLA, the Closing Statements and the Depository Agreements by knowingly making the Representations that were false. Through this fraud, Astor 3 has gained control of the Collateral Shares owned by Mr Salinas and is wrongfully disposing of them contrary to the terms of the SLA and the Claimants' intentions.

On or about 1 August 2024, the Applicants sent a notice to Astor 3 rescinding the SLA, the Closing Statements and the Depository Agreements on the basis that it entered into those agreements as a result of fraudulent misrepresentations.

On 2 August 2024, Mr Justice Jacobs granted the Claimants a freezing order against Astor 3 and Mr Sklarov; a proprietary injunction against each of Astor 3, Weiser, Tavira and Mr Sklarov and orders for associated relief (the **2 August Order**).

In accordance with the 2 August Order, Tavira wrote the Claimants informing them that, amongst other things, Astor 3 "*rehypothecated the shares* [the Collateral Shares] *to Cornelius Vanderbilt Capital Management Ltd.*"

As a result of recent investigations and publicly available information, the Claimants consider that Cornelius Vanderbilt Capital Management Ltd. is controlled by Mr Sklarov and used by Mr Sklarov as part of his fraudulent stock-lending schemes.

On 9 August 2024, Weiser served a witness statement from Mr Christos Livadas responding to information requests in the 2 August Order stating, amongst other things, that "*Astor 3 sold 935,716 Relevant Elektra Shares to Astor Capital Fund Ltd on 30 July 2024 for the price of MXN 233,929,000, which equates to the Traceable Proceeds amount stated above, i.e. USD 12,604,476.49*".

As a result of investigations, the Claimants consider that Astor Capital Fund Ltd (**Astor Capital**) is controlled by Mr Sklarov and used by Mr Sklarov as part of his fraudulent stock-lending schemes.

**(i) Relief arising from Fraudulent Misrepresentation**

Amended Claim Form under CPR rule 17.1(1) dated 6 August 2024

Re-Amended Claim Form under CPR rule 17.1(2)(b) dated [**] August 2024

*Recission*

1. The Claimants seek declarations that:

   (1) the SLA, the Closing Statements and the Depository Agreements have been validly rescinded by the Claimants; and

   (2) Mr Salinas is the beneficial owner of the Collateral Shares and the traceable proceeds of the Collateral Shares.

2. In addition, the Claimants seek an order requiring Astor 3, Weiser, ~~and~~ Tavira, ~~and~~ Cornelius Vanderbilt Capital Management Ltd. and Astor Capital to return the Collateral Shares (comprising 7,204,296 Elektra shares) or their proceeds to Mr Salinas forthwith.

*Damages for deceit*

3. The Claimants have suffered loss and damage equal to the value of any Elektra shares which are not recovered by them on a proprietary basis. Accordingly, Astor 3 is liable to pay damages to the Claimants for the tort of deceit in respect of any losses sustained by the Claimants in consequence of entering into the SLA, the Closing Statements and the Depository Agreements.

**(ii) Contractual Claims**

In the alternative, if (but only if) the SLA has not been (and cannot be) rescinded, the Claimants seek the following relief.

*Order for Redemption*

4. The Claimants seek an order that Astor 3, Weiser and Tavira delivery up the Collateral Shares to Mr Salinas against the payment of all sums owing to Astor 3 under the SLA.

*Damages for breach of contract*

5. To the extent that Astor 3 has wrongly sold or otherwise dealt with Collateral Shares contrary to the terms of the SLA, the Claimants seek damages from Astor 3 for the losses suffered as a result of breaches of the terms of the SLA.

**(iii) Economic Tort Claims**

Amended Claim Form under CPR rule 17.1(1) dated 6 August 2024

Re-Amended Claim Form under CPR rule 17.1(2)(b) dated [**] August 2024

Further or alternatively, the Claimants have the following causes of action (and seek the following relief) from Astor 3, and Mr Sklarov, and Cornelius Vanderbilt Capital Management Ltd and Astor Capital.

*Intention to cause harm using unlawful means*

6.     If Mr Sklarov alone intended to cause harm to the Claimants by unlawful means by making the fraudulent misrepresentations and/or breaching of the SLA, then the Claimants seek damages from Mr Sklarov equal to the value of any Collateral Shares Elektra shares which are not recovered by them on a proprietary basis.

*Conspiracy to cause harm using unlawful means*

7.     Alternatively, if Mr Sklarov acted in concert with Astor 3 and/or Cornelius Vanderbilt Capital Management Ltd. and/or Astor Capital and/or others with the intention of causing harm to the Claimants by unlawful means (namely the fraudulent misrepresentations and/or the breaches of the SLA), then the Claimants seek damages from both Astor 3, and Mr Sklarov, and Cornelius Vanderbilt Capital Management Ltd. and Astor Capital equal to the value of any Collateral Shares Elektra shares which are not recovered by them on a proprietary basis.

**(v) Other Relief**

8.     The Claimants claim such other relief as the Court thinks fit.

# EXHIBIT 7

Claim No: CL-2024-000450

02 Aug 2024

CL-2024-000450

IN THE HIGH COURT OF JUSTICE

BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES

COMMERCIAL COURT (KBD)

IN PRIVATE

On 2 August 2024

Before the Honourable Mr Justice Jacobs


BETWEEN:

#### (1) RICARDO BENJAMIN SALINAS PLIEGO

#### (2) CORPORACION RBS SA DE CV

**Applicants/Claimants**

#### -and-

#### (1) ASTOR ASSET MANAGEMENT 3 LIMITED

#### (2) WEISER GLOBAL CAPITAL MARKETS LTD

#### (3) TAVIRA MONACO SAM

#### (4) VLADIMIR "VAL" SKLAROV

**Respondents/Defendants**

------------------------------------------------------

#### FREEZING AND PROPRIETARY ORDER

------------------------------------------------------


#### PENAL NOTICE

IF YOU ASTOR ASSET MANAGEMENT 3 LIMITED, WEISER GLOBAL CAPITAL MARKETS LTD, TAVIRA MONACO SAM AND VLADIMIR "VAL" SKLAROV DISOBEY THIS ORDER YOU MAY BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE YOUR ASSETS SEIZED.

ANY OTHER PERSON WHO KNOWS OF THIS ORDER AND DOES ANYTHING WHICH HELPS OR PERMITS THE RESPONDENTS TO BREACH THE TERMS OF THIS ORDER

**MAY ALSO BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE THEIR ASSETS SEIZED.**

**THIS ORDER**

1.  This order contains a freezing injunction made against: (1) the First Respondent, Astor Asset Management 3 Limited; and (2) the Fourth Respondent, Vladimir "Val" Sklarov. This Order also contains proprietary injunctions and orders for associated relief against: (1) the First Respondent; (2) the Second Respondent, Weiser Global Capital Markets Ltd; (3) the Third Respondent, Tavira Monaco SAM; and (4) the Fourth Respondent (together, "**the Respondents**"). This order was made on 2 August 2024 by Mrs/Mr Justice Jacobs on the application of: (1) Ricardo Benjamin Salinas Pliego; and (2) Corporacion RBS SA DE CV ("**the Applicants**"). The Judge read the Affidavit listed in Schedule A and accepted the undertakings set out in Schedule B at the end of this Order.

2.  This order was made at a hearing without notice to the Respondents, at which the Court was satisfied that it was in the interests of justice to sit in private. Pursuant to CPR rule 39.2(5), this order is not to be published on the judiciary website. The Respondents have a right to apply to the Court to vary or discharge the order—see paragraph 18 below.

3.  There will be a further hearing in respect of this order on 29 August 2024 with a time estimate of 1½ hours ("**the return date**").

4.  This order is effective against any Respondent on whom it is served or who is given notice of it.

**FREEZING INJUNCTION AGAINST THE FIRST AND FOURTH RESPONDENTS**

5.  Until after the return date or further order of the Court, each of the First and Fourth Respondent must not:

    (a) remove from England and Wales any of its or his assets which are in England and Wales up to the value of MXN 5,411,000,000 ("**the Limit**"); or

    (b) in any way dispose of, deal with or diminish the value of any of its or his assets which are in or outside England and Wales up to the Limit.

6.     Paragraph 5 applies to all of the First and Fourth Respondents' assets whether or not they are in its or his own name and whether they are solely or jointly owned. For the purpose of this order, the First and Fourth Respondents' assets include any asset which it or he has the power, directly or indirectly, to dispose of or deal with as if it were its or his own.

7.     The prohibition at paragraph 5 includes the following assets in particular:

   (a)  Any money standing to the credit of the First or Fourth Respondents in any bank account including the amount of any cheque drawn on such accounts which has not been cleared.

   (b)  Any interest under any trust or similar entity including any interest which can arise by virtue of the exercise of any power of appointment, discretion or otherwise howsoever.

   (c)  Any shareholdings beneficially owned by the First or Fourth Respondents or the proceeds of sale if any of them have been sold.

8.     If the total value free of charges or other securities ("**unencumbered value**") of each of the First and Fourth Respondents' assets in England and Wales exceeds the Limit, the relevant Respondent may remove any of those assets from England and Wales or may dispose of or deal with them so long as the total unencumbered value of the Respondent's assets still in England and Wales remains above the Limit.

9.     If the total unencumbered value of each of the First and Fourth Respondent's assets in England and Wales does not exceed the Limit, the relevant Respondent must not remove any of those assets from England and Wales and must not dispose of or deal with any of them. If the relevant Respondent has other assets outside England and Wales, he or it may dispose of or deal with those assets outside England and Wales so long as the total unencumbered value of all its or his assets whether in or outside England and Wales remains above the Limit.

**PROPRIETARY INJUNCTION AGAINST ALL OF THE RESPONDENTS**

10.    Until the return date or further order of the court, the Respondents must not in any way dispose of, diminish, deal with, charge, pledge or in any way howsoever deal with the

legal or equitable title to or diminish the value of any of the Collateral Shares or their proceeds if they have been sold or otherwise disposed of. The term "Collateral Shares" is defined in paragraph 21 below.

**PROVISION OF INFORMATION BY ALL OF THE RESPONDENTS**

11.   Subject to paragraph 13 below:

(a)   each of the First and Fourth Respondents must by 5pm London time on 6 August 2024 and to the best of their ability inform the Applicants' solicitors in writing of:

(i)    all their assets worldwide exceeding £10,000 in value whether in their own name or not and whether solely or jointly owned, giving the value, location and details of all such assets;

(ii)   whether they hold any Collateral Shares and/or their traceable proceeds and if so the value of said shares or proceeds; and

(b)   each of the Second and Third Respondents must by 5pm London time on 5 August 2024 and to the best of their ability inform the Applicants' solicitors in writing of whether they hold any Collateral Shares and/or their traceable proceeds and if so the value of said shares or proceeds.

12.   Subject to paragraph 13 below, within 7 days of being served with this order, each of the Respondents must swear and serve on the Applicants' solicitors an affidavit providing the information requested in paragraph 11 above and Schedule C below.

13.   If the provision of any of this information is likely to incriminate the Respondent, she or he may be entitled to refuse to provide it, but is recommended to take legal advice before refusing to provide the information. Wrongful refusal to provide the information is contempt of Court and may render the Respondent liable to be imprisoned, fined or have its, her or his assets seized.

**EXCEPTIONS TO THIS ORDER**

14.   This order does not prohibit the Respondents from dealing with or disposing of any of its assets in the ordinary and proper course of business and does not prevent the Respondents from spending a reasonable sum on legal advice and representation (so

long as this money does not come from the assets set out in paragraph 10 of this order). Further, this order does not prohibit the Fourth Respondent from spending £10,000 a month towards his ordinary living expenses.

15.   The Respondents may agree with the Applicants' legal representatives that the above spending limit should be increased or that this order should be varied in any other respect, but any agreement must be in writing.

16.   The order will cease to have effect as against each Respondent if it or he:

(a)   provides security by paying an amount equivalent to the Limit (as set out in paragraph 5 of this order) into Court, to be held to the order of the Court; or

(b)   makes provision for security in that sum by another method agreed with the Applicants' legal representatives.

**COSTS**

17.   The costs of this application are reserved to the Judge hearing the application on the return date.

**VARIATION OR DISCHARGE OF THIS ORDER**

18.   Anyone served with or notified of this order may apply to the Court at any time to vary or discharge this order (or so much of it as affects that person), but they must first give the Applicants' solicitors three working days' notice of their intention to do so. If any evidence is to be relied upon in support of the application, the substance of it must be communicated in writing to the Applicants' solicitors.

**INTERPRETATION OF THIS ORDER**

19.   A Respondent who is an individual who is ordered not to do something must not do it herself or himself or in any other way. She or he must not do it through others acting on her or his behalf or on her or his instructions or with her or his encouragement.

20.   A Respondent which is not an individual which is ordered not to do something must not do it itself or by its directors, officers, partners, employees or agents or in any other way.

21.    The term "Collateral Shares" shall mean any shares (or interests in shares) in the capital of Grupo Elektra SAB De CV held or formerly held by or for the First Applicant (and includes, for the avoidance of doubt, the traceable proceeds thereof if they have been sold or otherwise disposed of).

**PARTIES OTHER THAN THE APPLICANTS AND RESPONDENTS**

22.    **Effect of this order**

It is a contempt of Court for any person notified of this order knowingly to assist in or permit a breach of this order. Any person doing so may be imprisoned, fined or have their assets seized.

23.    **Set off by banks**

This injunction does not prevent any bank from exercising any right of set of it may have in respect of any facility which it gave to the respondent before it was notified of this order.

24.    **Withdrawals by the Respondents**

No bank need enquire as to the application or proposed application of any money withdrawn by the Respondents if the withdrawal appears to be permitted by this order.

25.    **Persons outside England and Wales**

(a)  Except as provided in paragraph 25(b) below, the terms of this order do not affect or concern anyone outside the jurisdiction of this Court.

(b)  The terms of this order will affect the following persons in a country or state outside the jurisdiction of this Court:

(i)  the Respondents or their officers or their agents appointed by power of attorney;

(ii)  any person who–

1.    is subject to the jurisdiction of this Court;

2.    has been given written notice of this order at its, her or his residence or

place of business within the jurisdiction of this Court; and

    3.    is able to prevent acts or omissions outside the jurisdiction of this Court which constitute or assist in a breach of the terms of this order; and

(iii)  any other person, only to the extent that this order is declared enforceable by or is enforced by a Court in that country or state

26.    **Assets located outside England and Wales**

Nothing in this order shall, in respect of assets located outside England and Wales, prevent any third party from complying with:

(a)  what it reasonably believes to be its obligations, contractual or otherwise, under the laws and obligations of the country or state in which those assets are situated or under the proper law of any contract between itself and the Respondent; and

(b)  any orders of the Courts of that country or state, provided that reasonable notice of any application for such an order is given to the Applicants' solicitors.

**SEALING OF THE COURT FILE**

27.    Until the Applicants inform the Court in writing that this order has been served on the Respondents, pursuant to CPR 5.4B and 5.4C(4):

(a)  the documents on the Court file shall not be open to inspection on the Court file by any person, and shall be kept sealed;

(b)  the documents on the Court file shall not appear on any Electronic Working Case File (as defined in paragraph 2.4 of Practice Direction 510) or on any part of the Website (as defined in paragraph 2.3(a) of Practice Direction 51O);

(c)  no person other than the Applicants shall be entitled to inspect or obtain copies of any of the documents on the Court file.

**COMMUNICATIONS WITH THE COURT**

All communications to the Court about this order should be sent to the Admiralty and Commercial Court Listing Office, 7 Rolls Building, Fetter Lane, London, EC4A 1NL quoting

the case number. The telephone number is 020 7947 6826.

The offices are open between 10 a.m. and 4.30 p.m. Monday to Friday.

Dated 2 August 2024

**NAME AND ADDRESS OF APPLICANTS' LEGAL REPRESENTATIVES**

The Applicants' legal representatives are-

Paul, Weiss, Rifkind, Wharton & Garrison LLP
20 Air Street
London
W1B 5AN, U.K.

Attn: Stefan J. Arnold-Soulby

Telephone: +44 207 367 1613

Email: SArnoldSoulby@paulweiss.com

## SCHEDULE A — AFFIDAVITS

The Applicants relied on the following affidavit:

(1)     The First Affidavit of EDUARDO GONZALEZ SALCEDA SANCHEZ.

### SCHEDULE B — UNDERTAKINGS GIVEN TO THE COURT BY THE APPLICANT

(1)    If the Court later finds that this order has caused loss to the Respondents (or any of them), and decides that the relevant Respondent should be compensated for that loss, the Applicants will comply with any order the Court may make.

(2)    As soon as practicable the Applicants will issue a claim form and application notice seeking the relief in this order in the form of the draft produced to the Court and serve in accordance with the order of this Court regarding service of documents on the Respondents dated 2 August 2024.

(3)    The Applicants will serve upon the Respondents in addition to this order as soon as reasonably practicable:

1.    copies of the affidavits and exhibits containing the evidence relied upon by the Applicant, and any other documents provided to the Court on the making of the application;

2.    the claim form;

3.    the Applicants' skeleton argument and a transcript (if available) or note of the hearing; and

4.    an application notice for continuation of the order.

(4)    Anyone notified of this order will be given a copy of it by the Applicants' legal representatives.

(5)    The Applicants will pay the reasonable costs of anyone other than the Respondents which have been incurred as a result of this order including the costs of finding out whether that person holds any of the Respondents' assets and if the Court later finds that this order has caused such person loss, and decides that such person should be compensated for that loss, the Applicants will comply with any order the Court may make.

(6)    If this order ceases to have effect (for example, if the Respondents provide security as provided for above) the Applicants will immediately take all reasonable steps

to inform in writing anyone to whom they have given notice of this order, or who they have reasonable grounds for supposing may act upon this order, that it has ceased to have effect.

(7)    The Applicants will not without the permission of the Court use any information obtained as a result of this order for the purpose of any civil or criminal proceedings, either in England and Wales or in any other jurisdiction, other than this claim.

(8)    The Applicants will not without the permission of the Court seek to enforce this order in any country outside England and Wales or seek an order of a similar nature including orders conferring a charge or other security against the Respondents or the Respondents' assets.

## SCHEDULE C — INFORMATION REQUESTS

Requests of the First Respondent:

1.    If and insofar as you hold any of the Collateral Shares, please identify:

  (a)    The dates on which the Collateral Shares were transferred to you; and

  (b)    The basis on which the Collateral Shares were transferred to you;

2.    If and insofar as you held but have subsequently disposed of or transferred away any of the Collateral Shares:

  (a)    Identify the date of every such disposal/transfer and the name of the transferee.

  (b)    Please identify the location of the proceeds of any Collateral Shares that have been disposed of.

Requests of the Second and Third Respondents:

1.    If and insofar as you held but no longer hold any of the Collateral Shares, please:

  (a)    Identify who you transferred the shares to and the dates of each transfer.

  (b)    Identify the basis on which you transferred the shares, including by answering the following questions:

    (i)    On whose instructions you were acting?

    (ii)    If known, who is the specific human person who gave the relevant instructions?

Requests of the Fourth Respondent:

1.    Have you directly or indirectly caused the Collateral Shares to be disposed of?

2.    If the answer to question (1) is "yes":

  (a)    Identify the date of every such disposal and the name of the transferee.

  (b)    What has happened to the proceeds of any Collateral Shares that have been disposed of? Full and complete details must be provided.

# EXHIBIT 8



# Claim Form

In the **High Court of Justice**
**Business and Property Courts**
**England and Wales**    02 Aug 2024
**King's Bench Division**
**Commercial Court**

| Claim no. | CL-2024-000450 |
|---|---|
| Issue date | |

**SEAL**

Claimant(s)

(1) RICARDO BENJAMIN SALINAS PLIEGO
(2) CORPORACION RBS SA DE CV

Defendant(s)

(1) ASTOR ASSET MANAGEMENT 3 LIMITED
(2) WEISER GLOBAL CAPITAL MARKETS LTD
(3) TAVIRA MONACO SAM
(4) VLADIMIR "VAL" SKLAROV

Name and address of Defendant receiving this claim form

See Annex A to this Claim Form

| | | £ |
|---|---|---|
| Amount claimed | [**] | |
| Court fee | | |
| Legal representative's costs | | |
| **Total amount** | | |

The court office at the Admiralty and Commercial Court Listing Office, Rolls Building, 7 Rolls Buildings, Fetter Lane, London EC4A 1NL is open between 10 am and 4.30 pm Monday to Friday. When corresponding with the court, please address forms or letters to the Court Manager and quote the claim number.

**N1(CC)** Claim form (CPR Part 7) (09.22)                    © Crown copyright 2022

| Claim No. | |
|-----------|---|

Brief details of claim
See Annex B to this Claim Form

Particulars of claim (*attached)(*will follow if an acknowledgment of service is filed that indicates an intention to defend the claim)

Paul, Weiss, Rifkind, Wharton & Garrison LLP
20 Air Sreett,
London
W1B 5AN

Claimant's or legal representative's address to which documents or payments should be sent if different from overleaf including (if appropriate) details of DX, fax or e-mail.

## Statement of truth

**I understand that proceedings for contempt of court may be brought against a person who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.**

☐ **I believe** that the facts stated in this claim form and any attached sheets are true.

☑ **The Claimant** believes that the facts stated in this claim form and any attached sheets are true. **I am authorised** by the claimant to sign this statement.

**Signature**

☐ Claimant

☐ Litigation friend (where claimant is a child or protected party)

☑ Claimant's legal representative (as defined by CPR 2.3(1))

**Date**

| Day | Month | Year |
|-----|-------|------|
| 0 2 | 0 8 | 2 0 2 4 |

Full name

Stefan Arnold Soulby

Name of claimant's legal representative's firm

Paul, Weiss, Rifkind, Wharton & Garrison LLP

If signing on behalf of firm or company give position or office held

Partner

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (KBD)**

**B E T W E E N :**

**(1) RICARDO BENJAMIN SALINAS PLIEGO**

**(2) CORPORACION RBS SA DE CV**

<u>**Claimants**</u>

**-and-**

**(1) ASTOR ASSET MANAGEMENT 3 LIMITED**

**(2) WEISER GLOBAL CAPITAL MARKETS**

**(3) TAVIRA MONACO SAM**

**(4) VLADIMIR "VAL" SKLAROV**

<u>**Defendants**</u>

---

## ANNEX A – DEFENDANTS' NAMES AND ADDRESSES

---

**(1)  ASTOR ASSET MANAGEMENT 3 LIMITED:**

    (a)    18C-3107 BC Quebec (Quebec) Hotels G1W4W5 Canada

    (b)    Perseverance Island S12-56-4 Mahe Seychelles

    (c)    Street Kos-Anatolskoho Building 4, Flat 225, Lviv 79066 Ukraine

    (d)    operations@astorassetgroup.com

    (e)    albert.yuen@astorassetgroup.com

    (f)    gregory.mitchell@astorassetgroup.com

**(2) WEISER GLOBAL CAPITAL MARKETS LTD:**

    (a)    Unit A - Balmoral Corporate Center, Balmoral Development, Sanford Drive, Nassau, Bahamas

    (b)    info@weiser.com.bs

    (c)    openaccount@weiser.com.bs

    (d)    Collateralservices@weiser.com.bs

**(3) TAVIRA MONACO SAM:**

    (a)   Le Montaigne, 6 BD Des Moulins, 1st Floor, Monaco, Monaco 98000

    (b)   INTLOperations@tavirasecurities.com

**(4) VLADIMIR "VAL" SKLAROV:**

    (a)   142 Gold Springs Court, Canton, GA 30114

    (b)   investments18@msn.com

    (c)   boychic@tivejo.com

    (d)   operations@astorassetgroup.com;

    (e)   gregory.mitchell@astorassetgroup.com

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**COMMERCIAL COURT (KBD)**
**B E T W E E N :**

**(1) RICARDO BENJAMIN SALINAS PLIEGO**
**(2) CORPORACION RBS SA DE CV**

**Claimants**

**-and-**

**(1) ASTOR ASSET MANAGEMENT 3 LIMITED**
**(2) WEISER GLOBAL CAPITAL MARKETS**
**(3) TAVIRA MONACO SAM**
**(4) VLADIMIR "VAL" SKLAROV**

**Defendants**

---

**ANNEX B – BRIEF DETAILS OF CLAIM**

---

The Claimants' claim arises out of and in connection with (amongst other documents) the following:

(i)     A stock-lending agreement executed on 28 July 2021 (the **SLA**) between Astor Asset Management 3 Limited (**Astor 3**) as lender, Corporacion RBS SA de CV (**RBS**) as borrower and Richard Benjamin Salinas Pleigo (**Mr Salinas**) as guarantor, pursuant to which Astor agreed to advance loans of up to MXN 3,008,580,000 to RBS, secured over shares in Grupo Elektra SAB De CV (**Elektra**) owned by Mr Salinas;

(ii)    A custodian management agreement dated 28 July 2021 between Weiser Global Capital Market (**Weiser**) RBS, Mr Salinas and Astor 3 (the **Weiser Agreement**);

(iii)   A control agreement dated 1 November 2021 between Tavira Monaco SAM (**Tavira**), RBS, Mr Salinas and Astor 3 (the **Tavira Agreement** together with the Weiser Agreement the **Depository Agreements**)); and

(iv)    Five closing statements pursuant to which five tranches of loans were made available to RBS under the SLA (the **Closing Statements**).

The Claimants were induced to enter into the above agreements on the basis of representations (express or implied) by Astor 3 to the effect that:

1. Astor 3 was a legitimate and honest financial institution which engaged in legitimate and honest stock-lending activities; and

2. Astor 3 intended to comply with its obligations under the SLA, including in particular its obligations not to sell the Elektra shares prior to maturity or default.

(the **Representations**)

Astor 3 has advanced a total of five loans to RBS pursuant to the SLA, with a total principal amount of MXN 2,154,218,552.55 (approximately USD 114 million as at the date of this claim form). These loans are secured over a total of 7,204,296 Elektra shares belonging to Mr Salinas (the **Collateral Shares**), of which 935,913 should be held by Weiser, and 6,268,383 should be held by Tavira pursuant to the Depository Agreements.

It appears that Astor 3 has given instructions to Weiser and/or Tavira to dispose of at least some of the Collateral Shares. The Claimants wrote to Weiser and Tavira on 10 June 2024 to say that they should not dispose of the shares. Further, on 26 July 2024, Elektra issued a press release stating that it had become aware of a possible fraud in respect of the shares. On 1 August 2024, Tavira informed the Claimants that it had transferred the 6,268,383 Elektra shares "*to Astor's account, as per Astor's instructions*". According to a trade report supplied by Tavira, this transfer to Astor took place on 29 July 2024.

As a result of recent investigations, the Claimants are now aware that: (i) Astor 3 is controlled by Vladimir "Val" Sklarov (**Mr Sklarov**) who has a long history of fraud and who has been engaged in stock-lending fraud; and (ii) Astor 3 is not a conventional financial institution with the ability to fund loans worth hundreds of millions of dollars from its own capital (or by borrowing the money from legitimate third parties) but in fact an entity used by Mr Sklarov to perpetrate stock-lending fraud.

In the premises, the Representations were false (to the knowledge of Astor 3 and Mr Sklarov) in that: (i) Astor 3 was not a legitimate and honest financial institution and did not engage in legitimate and honest stock-lending activities; and (ii) from the outset, Astor 3 had no intention of complying with its obligations under the SLA, including in particular its obligations not to sell the Elektra shares prior to maturity or default.

In light of the above, the Claimants consider that they have been victims of a stock-lending fraud conducted by Mr Sklarov via his company Astor 3 that fraudulently induced the Claimants to enter into the SLA, the Closing Statements and the Depository Agreements by knowingly making the Representations that were false. Through this fraud, Astor 3 has gained control of the Collateral Shares owned by Mr Salinas and is wrongfully disposing of them contrary to the terms of the SLA and the Claimants' intentions.

On or about 1 August 2024, the Applicants sent a notice to Astor 3 rescinding the SLA, the Closing Statements and the Depository Agreements on the basis that it entered into those agreements as a result of fraudulent misrepresentations.

By this claim the Claimants seek the following relief:

**(i) Relief arising from Fraudulent Misrepresentation**

*Recission*

1.  The Claimants seek declarations that:

    (1) the SLA, the Closing Statements and the Depository Agreements have been validly rescinded by the Claimants; and

    (2) Mr Salinas is the beneficial owner of the Collateral Shares and the traceable proceeds of the Collateral Shares.

2.  In addition, the Claimants seek an order requiring Astor 3, Weiser and Tavira to return the Collateral Shares (comprising 7,204,296 Elektra shares) or their proceeds to Mr Salinas forthwith.

*Damages for deceit*

3.  The Claimants have suffered loss and damage equal to the value of any Elektra shares which are not recovered by them on a proprietary basis. Accordingly, Astor 3 is liable to pay damages to the Claimants for the tort of deceit in respect of any losses sustained by the Claimants in consequence of entering into the SLA, the Closing Statements and the Depository Agreements.

**(ii) Contractual Claims**

In the alternative, if (but only if) the SLA has not been (and cannot be) rescinded, the Claimants seek the following relief.

*Order for Redemption*

4.     The Claimants seek an order that Astor 3, Weiser and Tavira delivery up the Collateral Shares to Mr Salinas against the payment of all sums owing to Astor 3 under the SLA.

*Damages for breach of contract*

5.     To the extent that Astor 3 has wrongly sold or otherwise dealt with Collateral Shares contrary to the terms of the SLA, the Claimants seek damages from Astor 3 for the losses suffered as a result of breaches of the terms of the SLA.

**(iii) Economic Tort Claims**

Further or alternatively, the Claimants have the following causes of action (and seek the following relief) from Astor 3 and Mr Sklarov.

*Intention to cause harm using unlawful means*

6.     If Mr Sklarov alone intended to cause harm to the Claimants by unlawful means by making the fraudulent misrepresentations and/or breaching of the SLA, then the Claimants seek damages from Mr Sklarov equal to the value of any Elektra shares which are not recovered by them on a proprietary basis.

*Conspiracy to cause harm using unlawful means*

7.     Alternatively, if Mr Sklarov acted in concert with Astor 3 and/or others with the intention of causing harm to the Claimants by unlawful means (namely the fraudulent misrepresentations and/or the breaches of the SLA), then the Claimants seek damages from both Astor 3 and Mr Sklarov equal to the value of any Elektra shares which are not recovered by them on a proprietary basis.

**(v) Other Relief**

8.     The Claimants claim such other relief as the Court thinks fit.

# EXHIBIT 9

Claim No: CL-2024-000450

02 Aug 2024

CL-2024-000450

IN THE HIGH COURT OF JUSTICE

BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES

COMMERCIAL COURT (KBD)

IN PRIVATE

On 2 August 2024

Before the Honourable Mr Justice Jacobs


BETWEEN:

### (1) RICARDO BENJAMIN SALINAS PLIEGO

### (2) CORPORACION RBS SA DE CV

**Applicants/Claimants**

**-and-**

### (1) ASTOR ASSET MANAGEMENT 3 LIMITED

### (2) WEISER GLOBAL CAPITAL MARKETS LTD

### (3) TAVIRA MONACO SAM

### (4) VLADIMIR "VAL" SKLAROV

**Respondents/Defendants**

-------------------------------------------------------

### FREEZING AND PROPRIETARY ORDER
-------------------------------------------------------


### PENAL NOTICE

IF YOU ASTOR ASSET MANAGEMENT 3 LIMITED, WEISER GLOBAL CAPITAL MARKETS LTD, TAVIRA MONACO SAM AND VLADIMIR "VAL" SKLAROV DISOBEY THIS ORDER YOU MAY BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE YOUR ASSETS SEIZED.

ANY OTHER PERSON WHO KNOWS OF THIS ORDER AND DOES ANYTHING WHICH HELPS OR PERMITS THE RESPONDENTS TO BREACH THE TERMS OF THIS ORDER

**MAY ALSO BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE THEIR ASSETS SEIZED.**

**THIS ORDER**

1.  This order contains a freezing injunction made against: (1) the First Respondent, Astor Asset Management 3 Limited; and (2) the Fourth Respondent, Vladimir "Val" Sklarov. This Order also contains proprietary injunctions and orders for associated relief against: (1) the First Respondent; (2) the Second Respondent, Weiser Global Capital Markets Ltd; (3) the Third Respondent, Tavira Monaco SAM; and (4) the Fourth Respondent (together, "**the Respondents**"). This order was made on 2 August 2024 by Mrs/Mr Justice Jacobs on the application of: (1) Ricardo Benjamin Salinas Pliego; and (2) Corporacion RBS SA DE CV ("**the Applicants**"). The Judge read the Affidavit listed in Schedule A and accepted the undertakings set out in Schedule B at the end of this Order.

2.  This order was made at a hearing without notice to the Respondents, at which the Court was satisfied that it was in the interests of justice to sit in private. Pursuant to CPR rule 39.2(5), this order is not to be published on the judiciary website. The Respondents have a right to apply to the Court to vary or discharge the order—see paragraph 18 below.

3.  There will be a further hearing in respect of this order on 29 August 2024 with a time estimate of 1½ hours ("**the return date**").

4.  This order is effective against any Respondent on whom it is served or who is given notice of it.

**FREEZING INJUNCTION AGAINST THE FIRST AND FOURTH RESPONDENTS**

5.  Until after the return date or further order of the Court, each of the First and Fourth Respondent must not:

    (a)  remove from England and Wales any of its or his assets which are in England and Wales up to the value of MXN 5,411,000,000 ("**the Limit**"); or

    (b)  in any way dispose of, deal with or diminish the value of any of its or his assets which are in or outside England and Wales up to the Limit.

6.    Paragraph 5 applies to all of the First and Fourth Respondents' assets whether or not they are in its or his own name and whether they are solely or jointly owned. For the purpose of this order, the First and Fourth Respondents' assets include any asset which it or he has the power, directly or indirectly, to dispose of or deal with as if it were its or his own.

7.    The prohibition at paragraph 5 includes the following assets in particular:

   (a)  Any money standing to the credit of the First or Fourth Respondents in any bank account including the amount of any cheque drawn on such accounts which has not been cleared.

   (b)  Any interest under any trust or similar entity including any interest which can arise by virtue of the exercise of any power of appointment, discretion or otherwise howsoever.

   (c)  Any shareholdings beneficially owned by the First or Fourth Respondents or the proceeds of sale if any of them have been sold.

8.    If the total value free of charges or other securities ("**unencumbered value**") of each of the First and Fourth Respondents' assets in England and Wales exceeds the Limit, the relevant Respondent may remove any of those assets from England and Wales or may dispose of or deal with them so long as the total unencumbered value of the Respondent's assets still in England and Wales remains above the Limit.

9.    If the total unencumbered value of each of the First and Fourth Respondent's assets in England and Wales does not exceed the Limit, the relevant Respondent must not remove any of those assets from England and Wales and must not dispose of or deal with any of them. If the relevant Respondent has other assets outside England and Wales, he or it may dispose of or deal with those assets outside England and Wales so long as the total unencumbered value of all its or his assets whether in or outside England and Wales remains above the Limit.

**PROPRIETARY INJUNCTION AGAINST ALL OF THE RESPONDENTS**

10.   Until the return date or further order of the court, the Respondents must not in any way dispose of, diminish, deal with, charge, pledge or in any way howsoever deal with the

legal or equitable title to or diminish the value of any of the Collateral Shares or their proceeds if they have been sold or otherwise disposed of. The term "Collateral Shares" is defined in paragraph 21 below.

**PROVISION OF INFORMATION BY ALL OF THE RESPONDENTS**

11.    Subject to paragraph 13 below:

   (a)    each of the First and Fourth Respondents must by 5pm London time on 6 August 2024 and to the best of their ability inform the Applicants' solicitors in writing of:

   (i)    all their assets worldwide exceeding £10,000 in value whether in their own name or not and whether solely or jointly owned, giving the value, location and details of all such assets;

   (ii)    whether they hold any Collateral Shares and/or their traceable proceeds and if so the value of said shares or proceeds; and

   (b)    each of the Second and Third Respondents must by 5pm London time on 5 August 2024 and to the best of their ability inform the Applicants' solicitors in writing of whether they hold any Collateral Shares and/or their traceable proceeds and if so the value of said shares or proceeds.

12.    Subject to paragraph 13 below, within 7 days of being served with this order, each of the Respondents must swear and serve on the Applicants' solicitors an affidavit providing the information requested in paragraph 11 above and Schedule C below.

13.    If the provision of any of this information is likely to incriminate the Respondent, she or he may be entitled to refuse to provide it, but is recommended to take legal advice before refusing to provide the information. Wrongful refusal to provide the information is contempt of Court and may render the Respondent liable to be imprisoned, fined or have its, her or his assets seized.

**EXCEPTIONS TO THIS ORDER**

14.    This order does not prohibit the Respondents from dealing with or disposing of any of its assets in the ordinary and proper course of business and does not prevent the Respondents from spending a reasonable sum on legal advice and representation (so

long as this money does not come from the assets set out in paragraph 10 of this order). Further, this order does not prohibit the Fourth Respondent from spending £10,000 a month towards his ordinary living expenses.

15.    The Respondents may agree with the Applicants' legal representatives that the above spending limit should be increased or that this order should be varied in any other respect, but any agreement must be in writing.

16.    The order will cease to have effect as against each Respondent if it or he:

  (a)   provides security by paying an amount equivalent to the Limit (as set out in paragraph 5 of this order) into Court, to be held to the order of the Court; or

  (b)   makes provision for security in that sum by another method agreed with the Applicants' legal representatives.

**COSTS**

17.    The costs of this application are reserved to the Judge hearing the application on the return date.

**VARIATION OR DISCHARGE OF THIS ORDER**

18.    Anyone served with or notified of this order may apply to the Court at any time to vary or discharge this order (or so much of it as affects that person), but they must first give the Applicants' solicitors three working days' notice of their intention to do so. If any evidence is to be relied upon in support of the application, the substance of it must be communicated in writing to the Applicants' solicitors.

**INTERPRETATION OF THIS ORDER**

19.    A Respondent who is an individual who is ordered not to do something must not do it herself or himself or in any other way. She or he must not do it through others acting on her or his behalf or on her or his instructions or with her or his encouragement.

20.    A Respondent which is not an individual which is ordered not to do something must not do it itself or by its directors, officers, partners, employees or agents or in any other way.

21.   The term "Collateral Shares" shall mean any shares (or interests in shares) in the capital of Grupo Elektra SAB De CV held or formerly held by or for the First Applicant (and includes, for the avoidance of doubt, the traceable proceeds thereof if they have been sold or otherwise disposed of).

## PARTIES OTHER THAN THE APPLICANTS AND RESPONDENTS

22.   **Effect of this order**

It is a contempt of Court for any person notified of this order knowingly to assist in or permit a breach of this order. Any person doing so may be imprisoned, fined or have their assets seized.

23.   **Set off by banks**

This injunction does not prevent any bank from exercising any right of set of it may have in respect of any facility which it gave to the respondent before it was notified of this order.

24.   **Withdrawals by the Respondents**

No bank need enquire as to the application or proposed application of any money withdrawn by the Respondents if the withdrawal appears to be permitted by this order.

25.   **Persons outside England and Wales**

(a)  Except as provided in paragraph 25(b) below, the terms of this order do not affect or concern anyone outside the jurisdiction of this Court.

(b)  The terms of this order will affect the following persons in a country or state outside the jurisdiction of this Court:

(i)  the Respondents or their officers or their agents appointed by power of attorney;

(ii)  any person who–

1.   is subject to the jurisdiction of this Court;

2.   has been given written notice of this order at its, her or his residence or

place of business within the jurisdiction of this Court; and

3. is able to prevent acts or omissions outside the jurisdiction of this Court which constitute or assist in a breach of the terms of this order; and

(iii) any other person, only to the extent that this order is declared enforceable by or is enforced by a Court in that country or state

26. **Assets located outside England and Wales**

Nothing in this order shall, in respect of assets located outside England and Wales, prevent any third party from complying with:

(a) what it reasonably believes to be its obligations, contractual or otherwise, under the laws and obligations of the country or state in which those assets are situated or under the proper law of any contract between itself and the Respondent; and

(b) any orders of the Courts of that country or state, provided that reasonable notice of any application for such an order is given to the Applicants' solicitors.

**SEALING OF THE COURT FILE**

27. Until the Applicants inform the Court in writing that this order has been served on the Respondents, pursuant to CPR 5.4B and 5.4C(4):

(a) the documents on the Court file shall not be open to inspection on the Court file by any person, and shall be kept sealed;

(b) the documents on the Court file shall not appear on any Electronic Working Case File (as defined in paragraph 2.4 of Practice Direction 510) or on any part of the Website (as defined in paragraph 2.3(a) of Practice Direction 51O);

(c) no person other than the Applicants shall be entitled to inspect or obtain copies of any of the documents on the Court file.

**COMMUNICATIONS WITH THE COURT**

All communications to the Court about this order should be sent to the Admiralty and Commercial Court Listing Office, 7 Rolls Building, Fetter Lane, London, EC4A 1NL quoting

the case number. The telephone number is 020 7947 6826.

The offices are open between 10 a.m. and 4.30 p.m. Monday to Friday.

Dated 2 August 2024

**NAME AND ADDRESS OF APPLICANTS' LEGAL REPRESENTATIVES**

The Applicants' legal representatives are-

Paul, Weiss, Rifkind, Wharton & Garrison LLP
20 Air Street
London
W1B 5AN, U.K.

Attn: Stefan J. Arnold-Soulby

Telephone: +44 207 367 1613

Email: SArnoldSoulby@paulweiss.com

## SCHEDULE A — AFFIDAVITS

The Applicants relied on the following affidavit:

(1)    The First Affidavit of EDUARDO GONZALEZ SALCEDA SANCHEZ.

## SCHEDULE B — UNDERTAKINGS GIVEN TO THE COURT BY THE APPLICANT

(1)     If the Court later finds that this order has caused loss to the Respondents (or any of them), and decides that the relevant Respondent should be compensated for that loss, the Applicants will comply with any order the Court may make.

(2)     As soon as practicable the Applicants will issue a claim form and application notice seeking the relief in this order in the form of the draft produced to the Court and serve in accordance with the order of this Court regarding service of documents on the Respondents dated 2 August 2024.

(3)     The Applicants will serve upon the Respondents in addition to this order as soon as reasonably practicable:

    1.   copies of the affidavits and exhibits containing the evidence relied upon by the Applicant, and any other documents provided to the Court on the making of the application;

    2.   the claim form;

    3.   the Applicants' skeleton argument and a transcript (if available) or note of the hearing; and

    4.   an application notice for continuation of the order.

(4)     Anyone notified of this order will be given a copy of it by the Applicants' legal representatives.

(5)     The Applicants will pay the reasonable costs of anyone other than the Respondents which have been incurred as a result of this order including the costs of finding out whether that person holds any of the Respondents' assets and if the Court later finds that this order has caused such person loss, and decides that such person should be compensated for that loss, the Applicants will comply with any order the Court may make.

(6)     If this order ceases to have effect (for example, if the Respondents provide security as provided for above) the Applicants will immediately take all reasonable steps

to inform in writing anyone to whom they have given notice of this order, or who they have reasonable grounds for supposing may act upon this order, that it has ceased to have effect.

(7)     The Applicants will not without the permission of the Court use any information obtained as a result of this order for the purpose of any civil or criminal proceedings, either in England and Wales or in any other jurisdiction, other than this claim.

(8)     The Applicants will not without the permission of the Court seek to enforce this order in any country outside England and Wales or seek an order of a similar nature including orders conferring a charge or other security against the Respondents or the Respondents' assets.

## SCHEDULE C — INFORMATION REQUESTS

Requests of the First Respondent:

1.      If and insofar as you hold any of the Collateral Shares, please identify:

   (a)      The dates on which the Collateral Shares were transferred to you; and

   (b)      The basis on which the Collateral Shares were transferred to you;

2.      If and insofar as you held but have subsequently disposed of or transferred away any of the Collateral Shares:

   (a)      Identify the date of every such disposal/transfer and the name of the transferee.

   (b)      Please identify the location of the proceeds of any Collateral Shares that have been disposed of.

Requests of the Second and Third Respondents:

1.      If and insofar as you held but no longer hold any of the Collateral Shares, please:

   (a)      Identify who you transferred the shares to and the dates of each transfer.

   (b)      Identify the basis on which you transferred the shares, including by answering the following questions:

      (i)      On whose instructions you were acting?

      (ii)      If known, who is the specific human person who gave the relevant instructions?

Requests of the Fourth Respondent:

1.      Have you directly or indirectly caused the Collateral Shares to be disposed of?

2.      If the answer to question (1) is "yes":

   (a)      Identify the date of every such disposal and the name of the transferee.

   (b)      What has happened to the proceeds of any Collateral Shares that have been disposed of? Full and complete details must be provided.

# EXHIBIT 10



# Claim Form

In the High Court of Justice
Business and Property Courts of
England and Wales*
King's Bench Division
Commercial Court

06 Aug 2024

*for court use only*

Amended Claim Form under CPR rule 17.1(1) dated 6 August 2024

| Claim no. | CL-2024-000450  CL-2024-000450 |
| Issue date | 2 August 2024 |

## Claimant(s)

(1)RICARDO BENJAMIN SALINAS PLIEGO
(2)CORPORACION RBS SA DE CV

SEAL

## Defendant(s)

(1)ASTOR ASSET MANAGEMENT 3 LIMITED
(2)WEISER GLOBAL CAPITAL MARKETS LTD
(3)TAVIRA MONACO SAM
(4)VLADIMIR "VAL" SKLAROV
(5) Cornelius Vanderbilt Capital Management Ltd

Name and address of Defendant receiving this claim form

See Annex A to this Claim Form

|  | £ |
| Amount claimed | [**] More than £200,000 |
| Court fee | £10,000 |
| Legal representative's costs |  |
| **Total amount** |  |

The court office at the Admiralty and Commercial Court Listing Office, Rolls Building, 7 Rolls Buildings, Fetter Lane, London EC4A 1NL is open between 10 am and 4.30 pm Monday to Friday. When corresponding with the court, please address forms or letters to the Court Manager and quote the claim number.

© Crown copyright 2022

| Claim No. | CL-2024-000450 |

Brief details of claim

See Annex B to this Claim Form

Particulars of claim (*attached)(*will follow if an acknowledgment of service is filed that indicates an intention to defend the claim)

Paul, Weiss, Rifkind, Wharton & Garrison LLP
20 Air Sreett Street,
London
W1B 5AN

Claimant's or legal representative's address to which documents or payments should be sent if different from overleaf including (if appropriate) details of DX, fax or e-mail.

## Statement of truth

**I understand that proceedings for contempt of court may be brought against a person who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.**

☐ **I believe** that the facts stated in this claim form and any attached sheets are true.

☒ **The Claimant** believes that the facts stated in this claim form and any attached sheets are true. **I am authorised** by the claimant to sign this statement.

**Signature**

*S Arnold-Soulby*

☐ Claimant
☐ Litigation friend (where claimant is a child or protected party)
☒ Claimant's legal representative (as defined by CPR 2.3(1))

**Date**

| Day | Month | Year |
|-----|-------|------|
| 0 6 | 0 8 | 2 0 2 4 |

Full name

Stefan Arnold Soulby

Name of claimant's legal representative's firm

Paul, Weiss, Rifkind, Wharton & Garrison LLP

If signing on behalf of firm or company give position or office held

Partner

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (KBD)**

**B E T W E E N :**

**(1) RICARDO BENJAMIN SALINAS PLIEGO**

**(2) CORPORACION RBS SA DE CV**

**Claimants**

**-and-**

**(1) ASTOR ASSET MANAGEMENT 3 LIMITED**

**(2) WEISER GLOBAL CAPITAL MARKETS**

**(3) TAVIRA MONACO SAM**

**(4) VLADIMIR "VAL" SKLAROV**

**(5) CORNELIUS VANDERBILT CAPITAL MANAGEMENT LTD**

**Defendants**

---

**AMENDED ANNEX A – DEFENDANTS' NAMES AND ADDRESSES**

---

**(1)  ASTOR ASSET MANAGEMENT 3 LIMITED:**

    (a)    18C-3107 BC Quebec (Quebec) Hotels G1W4W5 Canada

    (b)    Perseverance Island S12-56-4 Mahe Seychelles

    (c)    Street Kos-Anatolskoho Building 4, Flat 225, Lviv 79066 Ukraine

    (d)    operations@astorassetgroup.com

    (e)    albert.yuen@astorassetgroup.com

    (f)    gregory.mitchell@astorassetgroup.com

**(2) WEISER GLOBAL CAPITAL MARKETS LTD:**

    (a)    Unit A - Balmoral Corporate Center, Balmoral Development, Sanford Drive, Nassau, Bahamas

    (b)    info@weiser.com.bs

    (c)    openaccount@weiser.com.bs

    (d)    Collateralservices@weiser.com.bs

**(3) TAVIRA MONACO SAM:**

    (a)    Le Montaigne, 6 BD Des Moulins, 1st Floor, Monaco, Monaco 98000

    (b)    INTLOperations@tavirasecurities.com

**(4) VLADIMIR "VAL" SKLAROV**:

    (a)    142 Gold Springs Court, Canton, GA 30114

    (b)    investments18@msn.com

    (c)    boychic@tivejo.com

    (d)    operations@astorassetgroup.com

    (e)    gregory.mitchell@astorassetgroup.com

**(5) CORNELIUS VANDERBILT CAPITAL MANAGEMENT LTD**

    (a)    4 Lombard Street, London, United Kingdom, EC3V9HD

    (b)    SK, Regina - Royal Bank Building, 2010 11th Avenue, 7th Floor, Regina, S4P 0J3, Canada

    (c)    info@vanderbilt.ltd

Amended Claim Form under CPR rule 17.1(1) dated 6 August 2024

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (KBD)**

**B E T W E E N :**

**(1) RICARDO BENJAMIN SALINAS PLIEGO**

**(2) CORPORACION RBS SA DE CV**

<u>**Claimants**</u>

**-and-**

**(1) ASTOR ASSET MANAGEMENT 3 LIMITED**

**(2) WEISER GLOBAL CAPITAL MARKETS**

**(3) TAVIRA MONACO SAM**

**(4) VLADIMIR "VAL" SKLAROV**

**(5) CORNELIUS VANDERBILT CAPITAL MANAGEMENT LTD**

<u>**Defendants**</u>

---

<u>**AMENDED**</u> **ANNEX B – BRIEF DETAILS OF CLAIM**

---

The Claimants' amended claim arises out of and in connection with (amongst other documents) the following:

(i) A stock-lending agreement executed on 28 July 2021 (the **SLA**) between Astor Asset Management 3 Limited (**Astor 3**) as lender, Corporacion RBS SA de CV (**RBS**) as borrower and Richard Benjamin Salinas Pliego (**Mr Salinas**) as guarantor, pursuant to which Astor agreed to advance loans of up to MXN 3,008,580,000 to RBS, secured over shares in Grupo Elektra SAB De CV (**Elektra**) owned by Mr Salinas;

(ii) A custodian management agreement dated 28 July 2021 between Weiser Global Capital Market (**Weiser**) RBS, Mr Salinas and Astor 3 (the **Weiser Agreement**);

(iii) A control agreement dated 1 November 2021 between Tavira Monaco SAM (**Tavira**), RBS, Mr Salinas and Astor 3 (the **Tavira Agreement** together with the Weiser Agreement the **Depository Agreements**)); and

(iv) Five closing statements pursuant to which five tranches of loans were made available to RBS under the SLA (the **Closing Statements**).

1

The Claimants were induced to enter into the above agreements on the basis of representations (express or implied) by Astor 3 to the effect that:

1.  Astor 3 was a legitimate and honest financial institution which engaged in legitimate and honest stock-lending activities; and

2.  Astor 3 intended to comply with its obligations under the SLA, including in particular its obligations not to sell the Elektra shares prior to maturity or default.

(the <strong>Representations</strong>)

Astor 3 has advanced a total of five loans to RBS pursuant to the SLA, with a total principal amount of MXN 2,154,218,552.55 (approximately USD 114 million as at the date of this claim form). These loans are secured over a total of 7,204,296 Elektra shares belonging to Mr Salinas (the **Collateral Shares**), of which 935,913 should be held by Weiser, and 6,268,383 should be held by Tavira pursuant to the Depository Agreements.

It appears that Astor 3 has given instructions to Weiser and/or Tavira to dispose of at least some of the Collateral Shares. The Claimants wrote to Weiser and Tavira on 10 June 2024 to say that they should not dispose of the shares. Further, on 26 July 2024, Elektra issued a press release stating that it had become aware of a possible fraud in respect of the shares. On 1 August 2024, Tavira informed the Claimants that it had transferred the 6,268,383 Elektra shares "*to Astor's account, as per Astor's instructions*". According to a trade report supplied by Tavira, this transfer to Astor took place on 29 July 2024.

As a result of recent investigations, the Claimants are now aware that: (i) Astor 3 is controlled by Vladimir "Val" Sklarov (**Mr Sklarov**) who has a long history of fraud and who has been engaged in stock-lending fraud; and (ii) Astor 3 is not a conventional financial institution with the ability to fund loans worth hundreds of millions of dollars from its own capital (or by borrowing the money from legitimate third parties) but in fact an entity used by Mr Sklarov to perpetrate stock-lending fraud.

In the premises, the Representations were false (to the knowledge of Astor 3 and Mr Sklarov) in that: (i) Astor 3 was not a legitimate and honest financial institution and did not engage in legitimate and honest stock-lending activities; and (ii) from the outset, Astor 3 had no intention of complying with its obligations under the SLA, including in particular its obligations not to sell the Elektra shares prior to maturity or default.

Amended Claim Form under CPR rule 17.1(1) dated 6 August 2024

In light of the above, the Claimants consider that they have been victims of a stock-lending fraud conducted by Mr Sklarov via his company Astor 3 that fraudulently induced the Claimants to enter into the SLA, the Closing Statements and the Depository Agreements by knowingly making the Representations that were false. Through this fraud, Astor 3 has gained control of the Collateral Shares owned by Mr Salinas and is wrongfully disposing of them contrary to the terms of the SLA and the Claimants' intentions.

On or about 1 August 2024, the Applicants sent a notice to Astor 3 rescinding the SLA, the Closing Statements and the Depository Agreements on the basis that it entered into those agreements as a result of fraudulent misrepresentations.

On 2 August 2024, Mr Justice Jacobs granted the Claimants a freezing order against Astor 3 and Mr Sklarov; a proprietary injunction against each of Astor 3, Weiser, Tavira and Mr Sklarov and orders for associated relief (the **2 August Order**).

In accordance with the 2 August Order, Tavira wrote to the Claimants informing them that, amongst other things, Astor 3 "*rehypothecated the shares* [the Collateral Shares] *to Cornelius Vanderbilt Capital Management Ltd*."

As a result of recent investigations and publicly available information, the Claimants consider that Cornelius Vanderbilt Capital Management Ltd.  is controlled by Mr Sklarov and used by Mr Sklarov as part of his fraudulent stock-lending schemes.

**(i) Relief arising from Fraudulent Misrepresentation**

*Recission*

1.    The Claimants seek declarations that:

    (1)    the SLA, the Closing Statements and the Depository Agreements have been validly rescinded by the Claimants; and

    (2)    Mr Salinas is the beneficial owner of the Collateral Shares and the traceable proceeds of the Collateral Shares.

2.    In addition, the Claimants seek an order requiring Astor 3, Weiser, and Tavira and Cornelius Vanderbilt Capital Management Ltd. to return the Collateral Shares (comprising 7,204,296 Elektra shares) or their proceeds to Mr Salinas forthwith.

*Damages for deceit*

3. The Claimants have suffered loss and damage equal to the value of any Elektra shares which are not recovered by them on a proprietary basis. Accordingly, Astor 3 is liable to pay damages to the Claimants for the tort of deceit in respect of any losses sustained by the Claimants in consequence of entering into the SLA, the Closing Statements and the Depository Agreements.

**(ii) Contractual Claims**

In the alternative, if (but only if) the SLA has not been (and cannot be) rescinded, the Claimants seek the following relief.

*Order for Redemption*

4. The Claimants seek an order that Astor 3, Weiser and Tavira delivery up the Collateral Shares to Mr Salinas against the payment of all sums owing to Astor 3 under the SLA.

*Damages for breach of contract*

5. To the extent that Astor 3 has wrongly sold or otherwise dealt with Collateral Shares contrary to the terms of the SLA, the Claimants seek damages from Astor 3 for the losses suffered as a result of breaches of the terms of the SLA.

**(iii) Economic Tort Claims**

Further or alternatively, the Claimants have the following causes of action (and seek the following relief) from Astor 3, and Mr Sklarov and Cornelius Vanderbilt Capital Management Ltd.

*Intention to cause harm using unlawful means*

6. If Mr Sklarov alone intended to cause harm to the Claimants by unlawful means by making the fraudulent misrepresentations and/or breaching of the SLA, then the Claimants seek damages from Mr Sklarov equal to the value of any Collateral Shares Elektra shares which are not recovered by them on a proprietary basis.

*Conspiracy to cause harm using unlawful means*

7. Alternatively, if Mr Sklarov acted in concert with Astor 3 and/or Cornelius Vanderbilt Capital Management Ltd. and/or others with the intention of causing harm to the

Claimants by unlawful means (namely the fraudulent misrepresentations and/or the breaches of the SLA), then the Claimants seek damages from both Astor 3, and Mr Sklarov and Cornelius Vanderbilt Capital Management Ltd. equal to the value of any Collateral Shares Elektra shares which are not recovered by them on a proprietary basis.

**(v) Other Relief**

8.    The Claimants claim such other relief as the Court thinks fit.

# EXHIBIT 11

Claim No: CL-2024-000450

07 Aug 2024

CL-2024-000450

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (KBD)**

**On 7 August 2024**

**Before the Honourable Mr Justice Jacobs**

**BETWEEN:**

**(1) RICARDO BENJAMIN SALINAS PLIEGO**

**(2) CORPORACION RBS SA DE CV**

<u>**Applicants/Claimants**</u>

**-and-**

**CORNELIUS VANDERBILT CAPITAL MANAGEMENT LTD**

<u>**Respondents/Defendants**</u>

_____

**FREEZING AND PROPRIETARY ORDER**
_____


**PENAL NOTICE**

**IF YOU CORNELIUS VANDERBILT CAPITAL MANAGEMENT LTD DISOBEY THIS ORDER YOU MAY BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE YOUR ASSETS SEIZED.**

**ANY OTHER PERSON WHO KNOWS OF THIS ORDER AND DOES ANYTHING WHICH HELPS OR PERMITS THE RESPONDENT TO BREACH THE TERMS OF THIS ORDER MAY ALSO BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE THEIR ASSETS SEIZED.**

**THIS ORDER**

1.  This order contains a freezing injunction made against the Respondent, Cornelius Vanderbilt Capital Management Ltd. This Order also contains a proprietary injunction and orders for associated relief against the Respondent. This order was made on 7 August 2024 by Mr Justice Jacobs on the application of: (1) Ricardo Benjamin Salinas Pliego; and (2) Corporacion RBS SA DE CV ("**the Applicants**"). The Judge read the Affidavits listed in Schedule A and accepted the undertakings set out in Schedule B at the end of this Order.

2.  This order was made at a hearing on short notice to the Respondent. The Respondent has a right to apply to the Court to vary or discharge the order—see paragraph 18 below.

3.  There will be a further hearing in respect of this order on 29 August 2024 at the same time and before the same Judge as the return date in respect of the injunctions granted in this matter by Jacobs J on 2 August 2024 with a combined time estimate of 1½ hours ("**the return date**").

4.  This order is effective against the Respondent when served with it or when notice of it is given.

**FREEZING INJUNCTION**

5.  Until after the return date or further order of the Court, the Respondent must not:

    (a) remove from England and Wales any of its or his assets which are in England and Wales up to the value of MXN 5,411,000,000 ("**the Limit**"); or

    (b) in any way dispose of, deal with or diminish the value of any of its or his assets which are in or outside England and Wales up to the Limit.

6.  Paragraph 5 applies to all of the Respondent's assets whether or not they are in its own name and whether they are solely or jointly owned. For the purpose of this order, the Respondent's assets include any asset which it has the power, directly or indirectly, to dispose of or deal with as if it were its own.

7.  The prohibition at paragraph 5 includes the following assets in particular:

(a)  Any money standing to the credit of the Respondent in any bank account including the amount of any cheque drawn on such accounts which has not been cleared.

(b)  Any interest under any trust or similar entity including any interest which can arise by virtue of the exercise of any power of appointment, discretion or otherwise howsoever.

(c)  Any shareholdings beneficially owned by the Respondent or the proceeds of sale if any of them have been sold.

8.  If the total value free of charges or other securities ("**unencumbered value**") of the Respondent's assets in England and Wales exceeds the Limit, the Respondent may remove any of those assets from England and Wales or may dispose of or deal with them so long as the total unencumbered value of the Respondent's assets still in England and Wales remains above the Limit.

9.  If the total unencumbered value of the Respondent's assets in England and Wales does not exceed the Limit, the Respondent must not remove any of those assets from England and Wales and must not dispose of or deal with any of them. If the relevant Respondent has other assets outside England and Wales, it may dispose of or deal with those assets outside England and Wales so long as the total unencumbered value of all its assets whether in or outside England and Wales remains above the Limit.

**PROPRIETARY INJUNCTION**

10.  Until the return date or further order of the court, the Respondent must not in any way dispose of, diminish, deal with, charge, pledge or in any way howsoever deal with the legal or equitable title to or diminish the value of any of the Collateral Shares or their proceeds if they have been sold or otherwise disposed of. The term "Collateral Shares" is defined in paragraph 21 below.

**PROVISION OF INFORMATION**

11.  Subject to paragraph 13 below, the Respondent must by noon London time on 12 August 2024 and to the best of its ability inform the Applicants' solicitors in writing of

(a)   all its assets worldwide exceeding £10,000 in value whether in its own name or not

and whether solely or jointly owned, giving the value, location and details of all such assets; and

(b) whether it holds any Collateral Shares and/or their traceable proceeds and if so the value of said shares or proceeds.

12. Subject to paragraph 13 below, within 7 days of being served with this order, the Respondent must swear and serve on the Applicants' solicitors an affidavit providing the information requested in paragraph 11 above and Schedule C below.

13. If the provision of any of this information is likely to incriminate the Respondent, it may be entitled to refuse to provide it, but is recommended to take legal advice before refusing to provide the information. Wrongful refusal to provide the information is contempt of Court and may render the Respondent liable to be imprisoned, fined or have its assets seized.

**EXCEPTIONS TO THIS ORDER**

14. This order does not prohibit the Respondent from dealing with or disposing of any of its assets in the ordinary and proper course of business and does not prevent the Respondent from spending a reasonable sum on legal advice and representation (so long as this money does not come from the assets set out in paragraph 10 of this order).

15. The Respondent may agree with the Applicants' legal representatives that the above spending limit should be increased or that this order should be varied in any other respect, but any agreement must be in writing.

16. The order will cease to have effect as against the Respondent if it:

(a) provides security by paying an amount equivalent to the Limit (as set out in paragraph 5 of this order) into Court, to be held to the order of the Court; or

(b) makes provision for security in that sum by another method agreed with the Applicants' legal representatives.

**COSTS**

17. The costs of this application are reserved to the Judge hearing the application on the

return date.

**VARIATION OR DISCHARGE OF THIS ORDER**

18.     Anyone served with or notified of this order may apply to the Court at any time to vary or discharge this order (or so much of it as affects that person), but they must first give the Applicants' solicitors three working days' notice of their intention to do so. If any evidence is to be relied upon in support of the application, the substance of it must be communicated in writing to the Applicants' solicitors.

**INTERPRETATION OF THIS ORDER**

19.     A Respondent who is an individual who is ordered not to do something must not do it herself or himself or in any other way. She or he must not do it through others acting on her or his behalf or on her or his instructions or with her or his encouragement.

20.     A Respondent which is not an individual which is ordered not to do something must not do it itself or by its directors, officers, partners, employees or agents or in any other way.

21.     The term "Collateral Shares" shall mean any shares (or interests in shares) in the capital of Grupo Elektra SAB De CV held or formerly held by or for the First Applicant (and includes, for the avoidance of doubt, the traceable proceeds thereof if they have been sold or otherwise disposed of).

**PARTIES OTHER THAN THE APPLICANTS AND RESPONDENT**

22.     **Effect of this order**

It is a contempt of Court for any person notified of this order knowingly to assist in or permit a breach of this order. Any person doing so may be imprisoned, fined or have their assets seized.

23.     **Set off by banks**

This injunction does not prevent any bank from exercising any right of set of it may have in respect of any facility which it gave to the respondent before it was notified of this order.

24. **Withdrawals by the Respondent**

No bank need enquire as to the application or proposed application of any money withdrawn by the Respondent if the withdrawal appears to be permitted by this order.

25. **Persons outside England and Wales**

(a) Except as provided in paragraph 25(b) below, the terms of this order do not affect or concern anyone outside the jurisdiction of this Court.

(b) The terms of this order will affect the following persons in a country or state outside the jurisdiction of this Court:

(i) the Respondent or its officers or its agents appointed by power of attorney;

(ii) any person who–

1. is subject to the jurisdiction of this Court;

2. has been given written notice of this order at its, her or his residence or place of business within the jurisdiction of this Court; and

3. is able to prevent acts or omissions outside the jurisdiction of this Court which constitute or assist in a breach of the terms of this order; and

(iii) any other person, only to the extent that this order is declared enforceable by or is enforced by a Court in that country or state

26. **Assets located outside England and Wales**

Nothing in this order shall, in respect of assets located outside England and Wales, prevent any third party from complying with:

(a) what it reasonably believes to be its obligations, contractual or otherwise, under the laws and obligations of the country or state in which those assets are situated or under the proper law of any contract between itself and the Respondent; and

(b) any orders of the Courts of that country or state, provided that reasonable notice of any application for such an order is given to the Applicants' solicitors.

**COMMUNICATIONS WITH THE COURT**

All communications to the Court about this order should be sent to the Admiralty and Commercial Court Listing Office, 7 Rolls Building, Fetter Lane, London, EC4A 1NL quoting the case number. The telephone number is 020 7947 6826.

The offices are open between 10 a.m. and 4.30 p.m. Monday to Friday.

Dated 7 August 2024

**NAME AND ADDRESS OF APPLICANTS' LEGAL REPRESENTATIVES**

The Applicants' legal representatives are-

Paul, Weiss, Rifkind, Wharton & Garrison LLP
20 Air Street
London
W1B 5AN, U.K.

Attn: Stefan J. Arnold-Soulby

Telephone: +44 207 367 1613

Email: SArnoldSoulby@paulweiss.com

## SCHEDULE A — AFFIDAVITS

The Applicants relied on the following:

(1)    The First Affidavit of EDUARDO GONZALEZ SALCEDA SANCHEZ sworn on 5 August 2024.

(2)    The witness statement of EDUARDO GONZALEZ SALCEDA SANCHEZ dated 7 August 2024.

**SCHEDULE B — UNDERTAKINGS GIVEN TO THE COURT BY THE APPLICANT**

(1)     If the Court later finds that this order has caused loss to the Respondent, and decides that the Respondent should be compensated for that loss, the Applicants will comply with any order the Court may make.

(2)     As soon as practicable the Applicants will serve the amended claim form and issue and serve the application notice seeking the relief in this order (in the form of the draft produced to the Court) in accordance with the order of this Court regarding service of documents on the Respondent dated 7 August 2024.

(3)     The Applicants will file a sworn affidavit in the form of the witness statement of Eduardo Gonzalez Salceda Sanchez dated 7 August 2024 within 7 days of this order.

(4)     The Applicants will serve upon the Respondent, in addition to this order, as soon as reasonably practicable:

    1.   copies of the affidavits and exhibits containing the evidence relied upon by the Applicants, and any other documents provided to the Court on the making of the application;

    2.   the Applicants' skeleton argument and a transcript (if available) or note of the hearing; and

    3.   an application notice for continuation of the order.

(5)     Anyone notified of this order will be given a copy of it by the Applicants' legal representatives.

(6)     The Applicants will pay the reasonable costs of anyone other than the Respondent which have been incurred as a result of this order including the costs of finding out whether that person holds any of the Respondent's assets and if the Court later finds that this order has caused such person loss, and decides that such person should be compensated for that loss, the Applicants will comply with any order the Court may make.

(7)     If this order ceases to have effect (for example, if the Respondent provides security as provided for above) the Applicants will immediately take all reasonable steps to inform in writing anyone to whom they have given notice of this order, or who they have reasonable grounds for supposing may act upon this order, that it has ceased to have effect.

(8)     The Applicants will not without the permission of the Court use any information obtained as a result of this order for the purpose of any civil or criminal proceedings, either in England and Wales or in any other jurisdiction, other than this claim.

(9)     The Applicants will not without the permission of the Court seek to enforce this order in any country outside England and Wales or seek an order of a similar nature including orders conferring a charge or other security against the Respondent or the Respondent's assets.

**SCHEDULE C — INFORMATION REQUESTS**

1.   If and insofar as you hold any of the Collateral Shares, please identify:

    (a)   The dates on which the Collateral Shares were transferred to you; and

    (b)   The basis on which the Collateral Shares were transferred to you;

2.   If and insofar as you held but have subsequently disposed of or transferred away any of the Collateral Shares:

    (a)   Identify the date of every such disposal/transfer and the name of the transferee.

    (b)   Please identify the location of the proceeds of any Collateral Shares that have been disposed of.

    (a)   Identify the basis on which you transferred the shares, including by answering the following questions:

        (i)   On whose instructions you were acting?

        (ii)   If known, who is the specific human person who gave the relevant instructions?

# EXHIBIT 12

Claim No: CL-2024-000450

13 Aug 2024

CL-2024-000450

IN THE HIGH COURT OF JUSTICE

BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES

COMMERCIAL COURT (KBD)

Before: His Honour Judge Pelling KC (Sitting as a Judge of the High Court)


BETWEEN:

(1) RICARDO BENJAMIN SALINAS PLIEGO

(2) CORPORACION RBS SA DE CV

<u>Applicants/Claimants</u>

-and-

ASTOR CAPITAL FUND LTD

<u>Respondent</u>

_____

### FREEZING AND PROPRIETARY ORDER
_____

PENAL NOTICE


IF YOU ASTOR CAPITAL FUND LTD DISOBEY THIS ORDER YOU MAY BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE YOUR ASSETS SEIZED.

ANY OTHER PERSON WHO KNOWS OF THIS ORDER AND DOES ANYTHING WHICH HELPS OR PERMITS THE RESPONDENT TO BREACH THE TERMS OF THIS ORDER MAY ALSO BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE THEIR ASSETS SEIZED.

**THIS ORDER**

1.  This order contains a freezing injunction made against the Respondent, Astor Capital Fund Ltd. This Order also contains a proprietary injunction and orders for associated relief against the Respondent. This order was made on 13 August 2024 by His Honour Judge Pelling KC on the application of: (1) Ricardo Benjamin Salinas Pliego; and (2) Corporacion RBS SA DE CV ("**the Applicants**"). The Judge read the materials listed in Schedule A and accepted the undertakings set out in Schedule B at the end of this Order.

2.  This order was made at a hearing on short notice to the Respondent. The Respondent has a right to apply to the Court to vary or discharge the order—see paragraph 18 below.

3.  There will be a further hearing in respect of this order on 29 August 2024 at the same time and before the same Judge as the return date in respect of the injunctions granted in this matter by Jacobs J on 2 August 2024 and 7 August 2024 with a combined time estimate of 1½ hours ("**the return date**").

4.  This order is effective against the Respondent when served with it or when notice of it is given.

**FREEZING INJUNCTION**

5.  Until after the return date or further order of the Court, the Respondent must not:

    (a) remove from England and Wales any of its or his assets which are in England and Wales up to the value of MXN 5,411,000,000 ("**the Limit**"); or

    (b) in any way dispose of, deal with or diminish the value of any of its or his assets which are in or outside England and Wales up to the Limit.

6.  Paragraph 5 applies to all of the Respondent's assets whether or not they are in its own name and whether they are solely or jointly owned. For the purpose of this order, the Respondent's assets include any asset which it has the power, directly or indirectly, to dispose of or deal with as if it were its own.

7.  The prohibition at paragraph 5 includes the following assets in particular:

(a) Any money standing to the credit of the Respondent in any bank account including the amount of any cheque drawn on such accounts which has not been cleared.

(b) Any interest under any trust or similar entity including any interest which can arise by virtue of the exercise of any power of appointment, discretion or otherwise howsoever.

(c) Any shareholdings beneficially owned by the Respondent or the proceeds of sale if any of them have been sold.

8. If the total value free of charges or other securities ("**unencumbered value**") of the Respondent's assets in England and Wales exceeds the Limit, the Respondent may remove any of those assets from England and Wales or may dispose of or deal with them so long as the total unencumbered value of the Respondent's assets still in England and Wales remains above the Limit.

9. If the total unencumbered value of the Respondent's assets in England and Wales does not exceed the Limit, the Respondent must not remove any of those assets from England and Wales and must not dispose of or deal with any of them. If the relevant Respondent has other assets outside England and Wales, it may dispose of or deal with those assets outside England and Wales so long as the total unencumbered value of all its assets whether in or outside England and Wales remains above the Limit.

**PROPRIETARY INJUNCTION**

10. Until the return date or further order of the court, the Respondent must not in any way dispose of, diminish, deal with, charge, pledge or in any way howsoever deal with the legal or equitable title to or diminish the value of any of the Collateral Shares or their proceeds if they have been sold or otherwise disposed of. The term "Collateral Shares" is defined in paragraph 21 below.

**PROVISION OF INFORMATION**

11. Subject to paragraph 13 below, the Respondent must by 4pm London time on 20 August 2024 and to the best of its ability inform the Applicants' solicitors in writing of

(a) all its assets worldwide exceeding £10,000 in value whether in its own name or not

and whether solely or jointly owned, giving the value, location and details of all such assets; and

(b) whether it holds any Collateral Shares and/or their traceable proceeds and if so the value of said shares or proceeds.

12. Subject to paragraph 13 below, within 10 working days of being served with this order, the Respondent must swear and serve on the Applicants' solicitors an affidavit providing the information requested in paragraph 11 above and Schedule C below.

13. If the provision of any of this information is likely to incriminate the Respondent, it may be entitled to refuse to provide it, but is recommended to take legal advice before refusing to provide the information. Wrongful refusal to provide the information is contempt of Court and may render the Respondent liable to be imprisoned, fined or have its assets seized.

**EXCEPTIONS TO THIS ORDER**

14. This order does not prohibit the Respondent from dealing with or disposing of any of its assets in the ordinary and proper course of business and does not prevent the Respondent from spending a reasonable sum on legal advice and representation (so long as this money does not come from the assets set out in paragraph 10 of this order).

15. The Respondent may agree with the Applicants' legal representatives that the above spending limit should be increased or that this order should be varied in any other respect, but any agreement must be in writing.

16. The order will cease to have effect as against the Respondent if it:

(a) provides security by paying an amount equivalent to the Limit (as set out in paragraph 5 of this order) into Court, to be held to the order of the Court; or

(b) makes provision for security in that sum by another method agreed with the Applicants' legal representatives.

**COSTS**

17. The costs of this application are reserved to the Judge hearing the application on the

return date.

**VARIATION OR DISCHARGE OF THIS ORDER**

18.  Anyone served with or notified of this order may apply to the Court at any time to vary or discharge this order (or so much of it as affects that person), but they must first give the Applicants' solicitors three working days' notice of their intention to do so. If any evidence is to be relied upon in support of the application, the substance of it must be communicated in writing to the Applicants' solicitors.

**INTERPRETATION OF THIS ORDER**

19.  A Respondent who is an individual who is ordered not to do something must not do it herself or himself or in any other way. She or he must not do it through others acting on her or his behalf or on her or his instructions or with her or his encouragement.

20.  A Respondent which is not an individual which is ordered not to do something must not do it itself or by its directors, officers, partners, employees or agents or in any other way.

21.  The term "Collateral Shares" shall mean any shares (or interests in shares) in the capital of Grupo Elektra SAB De CV held or formerly held by or for the First Applicant (and includes, for the avoidance of doubt, the traceable proceeds thereof if they have been sold or otherwise disposed of).

**PARTIES OTHER THAN THE APPLICANTS AND RESPONDENT**

22.  **Effect of this order**

It is a contempt of Court for any person notified of this order knowingly to assist in or permit a breach of this order. Any person doing so may be imprisoned, fined or have their assets seized.

23.  **Set off by banks**

This injunction does not prevent any bank from exercising any right of set of it may have in respect of any facility which it gave to the respondent before it was notified of this order.

24. **Withdrawals by the Respondent**

No bank need enquire as to the application or proposed application of any money withdrawn by the Respondent if the withdrawal appears to be permitted by this order.

25. **Persons outside England and Wales**

(a) Except as provided in paragraph 25(b) below, the terms of this order do not affect or concern anyone outside the jurisdiction of this Court.

(b) The terms of this order will affect the following persons in a country or state outside the jurisdiction of this Court:

(i) the Respondent or its officers or its agents appointed by power of attorney;

(ii) any person who–

    1. is subject to the jurisdiction of this Court;

    2. has been given written notice of this order at its, her or his residence or place of business within the jurisdiction of this Court; and

    3. is able to prevent acts or omissions outside the jurisdiction of this Court which constitute or assist in a breach of the terms of this order; and

(iii) any other person, only to the extent that this order is declared enforceable by or is enforced by a Court in that country or state

26. **Assets located outside England and Wales**

Nothing in this order shall, in respect of assets located outside England and Wales, prevent any third party from complying with:

(a) what it reasonably believes to be its obligations, contractual or otherwise, under the laws and obligations of the country or state in which those assets are situated or under the proper law of any contract between itself and the Respondent; and

(b) any orders of the Courts of that country or state, provided that reasonable notice of any application for such an order is given to the Applicants' solicitors.

**COMMUNICATIONS WITH THE COURT**

All communications to the Court about this order should be sent to the Admiralty and Commercial Court Listing Office, 7 Rolls Building, Fetter Lane, London, EC4A 1NL quoting the case number. The telephone number is 020 7947 6826.

The offices are open between 10 a.m. and 4.30 p.m. Monday to Friday.

**DATED this the 13TH day August 2024**


**NAME AND ADDRESS OF APPLICANTS' LEGAL REPRESENTATIVES**

The Applicants' legal representatives are-

Paul, Weiss, Rifkind, Wharton & Garrison LLP
20 Air Street
London
W1B 5AN, U.K.

Attn: Stefan J. Arnold-Soulby

Telephone: +44 207 367 1613

Email: SArnoldSoulby@paulweiss.com

## SCHEDULE A — AFFIDAVITS

The Applicants relied on the following:

(1)    The First Affidavit of EDUARDO GONZALEZ SALCEDA SANCHEZ sworn on 5 August 2024.

(2)    The Second Affidavit of EDUARDO GONZALEZ SALCEDA SANCHEZ sworn on 8 August 2024.

(3)    The Third Affidavit of EDUARDO GONZALEZ SALCEDA SANCHEZ sworn on 12 August 2024

**SCHEDULE B — UNDERTAKINGS GIVEN TO THE COURT BY THE APPLICANT**

(1)     If the Court later finds that this order has caused loss to the Respondent, and decides that the Respondent should be compensated for that loss, the Applicants will comply with any order the Court may make.

(2)     As soon as practicable the Applicants will serve in accordance with the orders of this Court dated 2 August 2024, 7 August 2024 and 13 August 2024 regarding service of documents: (i) the issued application to amend the amended claim form to join the Respondent as the Sixth Defendant; and (ii) the issued application notice seeking the relief in this order.

(3)     The Applicants will serve upon the Respondent, in addition to this order:

    a.     by 4pm on 13 August:

        i.     copies of the affidavits and exhibits containing the evidence relied upon by the Applicants, and any other documents provided to the Court on the making of the application;

        ii.     the Applicants' skeleton argument; and

        iii.     an application notice for continuation of this order.

    b.     as soon as reasonable practicable, a transcript (if available) or note of the hearing

(4)     Anyone notified of this order will be given a copy of it by the Applicants' legal representatives.

(5)     The Applicants will pay the reasonable costs of anyone other than the Respondent which have been incurred as a result of this order including the costs of finding out whether that person holds any of the Respondent's assets and if the Court later finds that this order has caused such person loss, and decides that such person should be compensated for that loss, the Applicants will comply with any order the Court may make.

(6)     If this order ceases to have effect (for example, if the Respondent provides security as provided for above) the Applicants will immediately take all reasonable steps to inform in writing anyone to whom they have given notice of this order, or who they have reasonable grounds for supposing may act upon this order, that it has ceased to have effect.

(7)     The Applicants will not without the permission of the Court use any information obtained as a result of this order for the purpose of any civil or criminal proceedings, either in England and Wales or in any other jurisdiction, other than this claim.

(8)     The Applicants will not without the permission of the Court seek to enforce this order in any country outside England and Wales or seek an order of a similar nature including orders conferring a charge or other security against the Respondent or the Respondent's assets.

**SCHEDULE C — INFORMATION REQUESTS**

1.    If and insofar as you hold any of the Collateral Shares, please identify:

(a)    The dates on which the Collateral Shares were transferred to you; and

(b)    The basis on which the Collateral Shares were transferred to you;

2.    If and insofar as you held but have subsequently disposed of or transferred away any of the Collateral Shares:

(a)    Identify the date of every such disposal/transfer and the name of the transferee.

(b)    Please identify the location of the proceeds of any Collateral Shares that have been disposed of.

(a)    Identify the basis on which you transferred the shares, including by answering the following questions:

(i)    On whose instructions you were acting?

(ii)    If known, who is the specific human person who gave the relevant instructions?

# EXHIBIT 13

Corrected pursuant to CPR r.40.12(1) on 15TH day August 2024

Claim No: CL-2024-000450

15 Aug 2024

CL-2024-000450

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (KBD)**

**On 13 August 2024**

**Before: His Honour Judge Pelling KC (Sitting as a Judge of the High Court)**


**BETWEEN:**

### (1) RICARDO BENJAMIN SALINAS PLIEGO

### (2) CORPORACION RBS SA DE CV

**Applicants/Claimants**

**-and-**


### ASTOR CAPITAL FUND LTD

**Respondent**

---

### Amended ORDER under the slip rule

---

**UPON** the Claimants' claim filed by way of claim form dated 2 August 2024 and amended on 6 August 2024 (the **Amended Claim** and the **Amended Claim Form**)

**AND UPON** the Claimants' undertaking to issue an application to amend the Amended Claim Form so as to bring a claim against the Respondent in the form of the draft re-amended claim form shown to the Court (the **Re-Amended Claim Form**)

**AND UPON** the Claimants' application (the **Service Application**) for permission to serve the Re-Amended Claim Form and all other documents in these proceedings out of the jurisdiction (including for the avoidance of doubt the Claimants' application for interim relief dated 7 August 2024 and any order the Court makes on that application (the **Injunction Application**)) on the Respondent

**AND UPON** the Court reading the evidence filed

**AND UPON** this order being made at a hearing *ex parte* on short notice to the Respondent

Corrected pursuant to CPR r.40.12(1) on 15TH day August 2024

**AND UPON** hearing Stephen Robins KC for the Claimants

**IT IS ORDERED THAT:**

1.    The Claimant has permission pursuant to CPR 6.36 to serve the Re-Amended Claim Form on the Respondent out of the jurisdiction.

2.    The Claimant has permission pursuant to CPR 6.37(5)(b)(ii) to serve any other documents in these proceedings on the Respondent without obtaining further permission of the Court under CPR 6.36.

3.    The Claimant has permission pursuant to CPR 6.37(5)(b)(i) to serve all documents in these proceedings on the Respondent by email at the following email addresses:

    support@astorcapitalfund.ca

    registrations@mslogic.eu

    Service of documents by email as provided for in this paragraph is to be deemed as served on the Respondent at the time the email is sent even if there is a bounce back from the email address.

4.    The following time periods apply following service of the Re-Amended Claim Form in accordance with paragraph 3 above on the Respondent:

    (1)    within 36 22 days, the Respondent must file an acknowledgment of service and, if appropriate, file and serve an admission;

    (2)    within 28 days of the filing of an acknowledgment of service which indicates an intention to defend, the Claimants must serve particulars of claim; and

    (3)    within 28 days from the service of the particulars of claim, the Respondent must file and serve a defence.

5.    The costs of this application are costs in the case.

**DATED this the 15TH day August 2024**

Corrected pursuant to CPR r.40.12(1) on 15TH day August 2024

**<u>Service of the order</u>**

The Court has provided a sealed copy of this Order to the serving party:

The Applicants/Claimants, care of their solicitors, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 20 Air St, London W1B 5A

Corrected pursuant to CPR r.40.12(1) on 15TH August 2024 by His Honour Judge Pelling KC (Sitting as a Judge of the High Court)

**Claim No: CL-2024-000450**

15 Aug 2024

CL-2024-000450

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (KBD)**

**On 7 August 2024**

**Before the Honourable Mr Justice Jacobs**

**BETWEEN:**

**(1) RICARDO BENJAMIN SALINAS PLIEGO**

**(2) CORPORACION RBS SA DE CV**

**Applicants/Claimants**

**-and-**

**(1) ASTOR ASSET MANAGEMENT 3 LIMITED**

**(2) WEISER GLOBAL CAPITAL MARKETS LTD**

**(3) TAVIRA MONACO SAM**

**(4) VLADIMIR "VAL" SKLAROV**

**(5) CORNELIUS VANDERBILT CAPITAL MANAGEMENT LTD**

**Respondents/Defendants**

_____

**Amended ORDER under the slip rule**

**UPON** the Claimants' claim filed by way of claim form dated 2 August 2024 and amended on 6 August 2024 (the **Amended Claim** and the **Amended Claim Form**)

**AND UPON** the Claimants' application (the **Service Application**) for permission to serve the Amended Claim Form and all other documents in these proceedings out of the jurisdiction (including for the avoidance of doubt the Claimants' application for interim relief dated 7 August 2024 and any order the Court makes on that application (the **Injunction Application**)) on the Fifth Defendant

**AND UPON** the Court reading the evidence filed

**AND UPON** this order being made at a hearing *ex parte* on short notice to the Fifth Defendant

**AND UPON** hearing Stephen Robins KC, counsel for the Claimants

Corrected pursuant to CPR r.40.12(1) on 15TH August 2024 by His Honour Judge Pelling KC (Sitting as a Judge of the High Court)

**IT IS ORDERED THAT:**

1.      The Claimant has permission pursuant to CPR 6.36 to serve the Amended Claim Form on the Fifth Defendant out of the jurisdiction.

2.      The Claimant has permission pursuant to CPR 6.37(5)(b)(ii) to serve any other documents in these proceedings on the Fifth Defendant without obtaining further permission of the Court under CPR 6.36.

3.      The Claimant has permission pursuant to CPR 6.37(5)(b)(i) to serve all documents in these proceedings on the Fifth Defendant by email at the following email addresses info@vanderbilt.ltd and snikersok49@gmail.com. Service of documents by email as provided for in this paragraph is to be deemed as served on the Fifth Defendant at the time the email is sent even if there is a bounce back from the email address.

4.      The following time periods apply following service of the Claim Form in accordance with paragraph 3 above on the Fifth Defendant:

   (1)    within ~~14~~ 23 days, the Fifth Defendant must file an acknowledgment of service and, if appropriate, file and serve an admission;

   (2)    within 28 days of the filing of an acknowledgment of service which indicates an intention to defend, the Claimants must serve particulars of claim; and

   (3)    within 28 days from the service of the particulars of claim, the Fifth Defendant must file and serve a defence.

5.      The costs of this application are costs in the case.

**Service of the order**

The Court has provided a sealed copy of this Order to the serving party:

The Applicants/Claimants, care of their solicitors, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 20 Air St, London W1B 5A

Claim No: CL-2024-000450

15 Aug 2024

CL-2024-000450

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (KBD)**

**IN PRIVATE**

**On 2 August 2024**

**Before the Honourable Mr Justice Jacobs**

**BETWEEN:**

**(1) RICARDO BENJAMIN SALINAS PLIEGO**

**(2) CORPORACION RBS SA DE CV**

**Applicants/Claimants**

**-and-**

**(1) ASTOR ASSET MANAGEMENT 3 LIMITED**

**(2) WEISER GLOBAL CAPITAL MARKETS LTD**

**(3) TAVIRA MONACO SAM**

**(4) VLADIMIR "VAL" SKLAROV**

**Respondents/Defendants**

---

**Amended ORDER under the slip rule**

---

**UPON** the Claimants' claim (the **Claim**) filed by way of claim form dated 2 August 2024 (the **Claim Form**)

**AND UPON** the Claimants' application (the **Service Application**) for permission to serve the Claim Form and all other documents in these proceedings out of the jurisdiction (including for the avoidance of doubt the Claimants' application for interim relief dated 2 August 2024 and any order the Court makes on that application (the **Injunction Application**))

**AND UPON** the Court reading the evidence filed

**AND UPON** this order being made at a hearing without notice to the Respondents

**AND UPON** hearing Stephen Robins KC, counsel for the Claimants

Corrected pursuant to CPR r.40.12(1) on 15TH August 2024 by His Honour Judge Pelling KC (Sitting as a Judge of the High Court)

**IT IS ORDERED THAT:**

1.    The Claimant has permission pursuant to CPR 6.36 to serve the Claim Form on the Defendants out of the jurisdiction.

2.    The Claimant has permission pursuant to CPR 6.37(5)(b)(ii) to serve any other documents in these proceedings on the Defendants without obtaining further permission of the Court under CPR 6.36.

3.    The Claimant has permission pursuant to CPR 6.37(5)(b)(i) to serve all documents in these proceedings on the Defendants by email at the following email addresses:

    (a)    Astor Asset Management 3 Limited and Vladimir "Val" Sklarov: albert.yuen@astorassetgroup.com; gregory.mitchell@astorassetgroup.com; operations@astorassetgroup.com; investments18@msn.com; boychic@tivejo.com

    (b)    Weiser Global Capital Markets Ltd: Collateralservices@weiser.com.bs; info@weiser.com.bs; openaccount@weiser.com.bs

    (c)    Tavira Monaco SAM: INTLOperations@tavirasecurities.com; Patrick@fietje.com; patrick.fietje@tavirasecurities.com; eliotgoodfellow@gmail.com; eliot.goodfellow@taviramonaco.com; eliot.goodfellow@tavirasecurities.com; compliance@tavirasecurities.com; backup@tavirasecurities.com; simon.mason@tavirasecurities.com

Service of documents by email as provided for in this paragraph is to be deemed as served on the relevant Defendant at the time the relevant email is sent, even if there is a bounce back from any one or more of the emails.

4.    The following time periods apply following service of the Claim Form in accordance with paragraph 3 above on the Defendants:

    (1)    within ~~14~~ 22 days for the First, Second and Fourth Defendants and 21 days for the Third Defendant, each of the Defendants must file an acknowledgment of service and, if appropriate, file and serve an admission;

Corrected pursuant to CPR r.40.12(1) on 15TH August 2024 by His Honour Judge Pelling KC (Sitting as a Judge of the High Court)

(2)    within 28 days of the filing of an acknowledgment of service which indicates an intention to defend, the Claimants must serve particulars of claim; and

(3)    within 28 days from the service of the particulars of claim, the Defendants must file and serve a defence.

5.    The costs of this application are costs in the case.

**Service of the order**

The Court has provided a sealed copy of this Order to the serving party:

The Claimant, care of its solicitors, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 20 Air St, London W1B 5AN

# EXHIBIT 14

First Defendant
Witness Statement of Mr. Vladimir Sklarov
First
Exhibit "VS1"
20 August 2024

**IN THE HIGH COURT OF JUSTICE**                    **CLAIM NO. CL-2024-000450**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (KBD)**

**BETWEEN:**

**(1)  RICARDO BENJAMIN SALINAS PLIEGO**

**(2)  CORPORACION RBS SA DE CV**

**Applicants**

**- v -**

**(1)  ASTOR ASSET MANAGEMENT 3 LIMITED**

**(2)  WEISER GLOBAL CAPITAL MARKETS LTD**

**(3)  TAVIRA MONACO SAM**

**(4)  VLADIMIR "VAL" SKLAROV**

**(5)  CORNELIUS VANDERBILT CAPITAL MANAGEMENT LTD**

**(6)  ASTOR CAPITAL FUND LIMITED**

**Respondents**

---

**STATEMENT OF VAL SKLAROV**

---

I, **VAL SKLAROV**, c/o DWF Law LLP, 20 Fenchurch Street, London, EC3M 3AG, United Kingdom **WILL SAY AS FOLLOWS:**

1.   I make this statement on behalf of myself and the First, Fourth, Fifth and Sixth Respondents and in support of the application to set aside the Freezing and Proprietary Orders of 2, 7 and 13 August

2024 (the "**Injunction Orders**"), which shall not be construed as submitting to the jurisdiction of the Courts of England and Wales and without prejudice to the Fourth, Fifth and Sixth Respondents' objections to the Court's jurisdiction for which all rights are reserved. In this statement I refer to the First Respondent as "**Astor 3**", the Fifth Respondent as "**Vanderbilt**" and the Sixth Respondent as "**Astor Capital**".

2.   The facts and matters set out in this statement are within my own knowledge unless otherwise stated, and I believe them to be true. Where I refer to information supplied by others or documents I have reviewed, the source of the information is identified; facts and matters derived from other sources are true to the best of my knowledge and belief.

3.   Although I was named Vladimir at birth, I officially changed my name to "Val" on 20 September 2006 by a court process in Illinois, USA. I was living in the USA and at the time there was a lot of distrust of Russian sounding names around the world. I have lived in the USA most of my adult life, consider myself an American and did not wish to remain "Vladimir".

4.   There is now produced and shown to me a paginated bundle of true copy documents marked "**Exhibit VS1**". Unless otherwise stated, all references to documents in this statement are to Exhibit VS1 and all specific page references are marked "**[Exhibit VS1/##]**".

1.   Overview

5.   The allegations of fraud made in these proceedings by Mr. Salinas and his company RBS are completely baseless, and the Injunction Orders were obtained only by gross misrepresentations and omissions. As I explain in this statement:

   a.   The central complaint of unauthorised stock dealings by Astor 3 in breach of the Stock Lending Agreement between it and RBS and Mr. Salinas (the "**SLA**") is simply incorrect and depends on ignoring provisions of the SLA which plainly contemplate and authorise rehypothecation (further lending-out of, or other transactions in, the stock) by Astor 3.

   b.   Stock which has been loaned out is by its very nature exposed to further transactions which can then be undertaken by the stock borrower, including in particular trading of that stock. This is a main function of the vast global securities lending industry, and a sophisticated and experienced businessman like Mr. Salinas must fully appreciate this.

   c.   Moreover, the intention to engage in such rehypothecation was expressly stated in correspondence in 2021 between Astor 3 and Mr. Salinas's and RBS's representative, Mr. Torti of Fininvesta. An activity now complained of by the Applicants as a breach and indeed a fraudulent breach of the contract was acknowledged at the time as legitimate on behalf of the Applicants.

d.   These provisions of the SLA and this correspondence were not drawn to the attention of Mr. Justice Jacobs (or HHJ Pelling KC on 13 August). Instead, the Court was presented with a selective and extremely limited look at other provisions. The correspondence was never mentioned and does not even feature in the 836-page Hearing Bundle.

e.   The correspondence between Astor 3 and Mr. Salinas's and RBS's representatives also drew attention to the basic commercial logic of the transaction. Astor 3 charged only interest of 1.15% per annum plus a management fee of 0.25% per annum and a one-off 1% origination fee. It was lending at up to 55% of the value of the Elektra stock price (which in 2021 was at an all-time high but typically has been well below that level). This very low return would never itself have motivated a commercial operation to make 5-year loans to RBS. It must always have been obvious to all concerned that there would need to be another way for the lender to make money. That could only be by using the pledged assets in other transactions – as is perfectly common and well-understood in the financial markets.

f.   In addition, the Applicants believed or suspected that Elektra shares were being sold in the market as a result of Astor 3 hypothecating the shares from, at the latest, November 2021 and did not progress the issue until November 2023, or suggest that Astor 3 was acting in breach of contract until July 2024. This delay is not explicable on the Applicants' case and it was glossed over in their evidence and not properly drawn to the Court's attention at the without notice hearings.

g.   Mr. Salinas himself stood to profit under the SLA, which he entered into with the assistance of financial advisors and legal counsel. Mr. Salinas was able to extract liquidity from his shares, while avoiding corporate governance restrictions and capital gains taxes. With an equity-based portfolio heavily reliant on a closely-held stock, Mr. Salinas could not be seen to deal with a significant portion of his shares without a negative market reaction.

h.   Despite all of this, Mr. Salinas and RBS not merely accused the Respondents of breach of contract, but of doing so deliberately and fraudulently. That accusation is not merely incorrect, but has been advanced in a misleading and indeed fundamentally dishonest way.

6.   Mr. Salinas's and RBS's dishonesty was not limited to their allegations of misconduct by the Respondents. They also concealed from the Court vital information as to the commercial and factual background to the proceedings, both in respect of Grupo Elektra SA de CV ("**Elektra**"), Mr. Salinas's principal business whose stock was the subject-matter of the SLA, and in respect of Mr. Salinas himself.

a.   On 26 July 2024, *Simply Wall Street* (a market-leading financial app which claims to have 6 million users) reported that second quarter earnings for 2024 were at a net loss of MXN 644 million (about USD 34 million) versus a profit of MXN 4.94 billion (about USD 250 million) for the same period in 2023. *Simply Wall Street* also stated that earnings had been

declining at an average annual rate of 34% over a 5-year period, and identified Elektra as an investment risk.

b. The Q2 earnings themselves had been reported by the company on 24 July 2024 and had obviously been in preparation and anticipated by the company for some period before then. Elektra's shares then fell by 10% on 26 July 2024 – reported by Bloomberg Financial News as the biggest intraday drop since June 2017.

c. None of this was mentioned to the Court in obtaining the Injunction Orders.

d. On that same day, 26 July 2024, Elektra chose to make an announcement to the market that it had received information from its controlling group of a possible fraud by depositaries of their shares which could cause unusual movements of its price on the stock markets. As a result, the Mexican listing authorities chose to suspend trading in Elektra stock. There has been no further share trading of Elektra shares since 26 July 2024.

e. The impact of Elektra's slide into loss-making has been halted by the suspension of trading which in turn was the predictable result of supposed discovery of fraudulent trading. This however created a need for the company to be seen to be taking action.

f. In short, the supposed dishonest actions of the Respondents provide a convenient escape route for a well-known listed company, which faces disastrous recent financial results, and a run on its shares sufficient for a prominent online investment service to identify it as an investment risk. The share trading suspension has prevented a complete collapse in Elektra's shares but the reason used to obtain that suspension has created a need to find and pursue a scapegoat, which is an obvious (but improper) motivation for these proceedings.

g. This course of events also explains the otherwise inexplicable delay on the part of Mr. Salinas and RBS in acting on the information and suspicions which they accept had for some considerable time concerning the actions of the Respondents and which I referred to above. However despite these supposed concerns, during the period between late 2021 to 2023, Mr. Salinas and RBS were content to receive three further tranches of loan payments, satisfy a margin call by Astor 3 in 2023 by pledging 1,728,207 additional Elektra shares, and request an additional loan from Astor 3 in 2023 against 444,389 newly pledged Elektra shares. Even in late 2023 and early 2024 the Respondents continued discussing potential additional lending of USD 100 million or more.

h. Moreover, Mr. Salinas is not a respectable businessman as the Court obviously assumed in not even requiring him to provide fortification for his and RBS's cross-undertaking.

    i. On 20 March 2024, the Mexican tax authorities stated that Mr. Salinas owed MXN 63 billion (almost USD 4 billion), had 17 open and unresolved tax lawsuits, and seized a golf course

owned by Mr. Salinas.

ii.  Although Mr. Salinas stated he intended to challenge the tax ruling, on 13 June 2024 it was reported he had been ordered to pay an additional USD 1 billion in taxes. This was not a final order but in itself was reported to represent a substantial amount of Mr. Salinas's assets.

iii. In 2005, the United States Securities and Exchange Commission ("**SEC**") brought criminal charges against Mr. Salinas for dishonestly, fraudulently and "elaborately concealing" his personal involvement in a target company which one of his other businesses, TV Azteca, was proposing to acquire. The factual basis for those proceedings was extensively set out by the SEC in public documents. When the acquisition was announced, he profited by USD 109 million. His personal interest had been not only concealed by him in breach of disclosure requirements, but he had positively and publicly denied any such interest when questioned about it. Mr. Salinas paid USD 7.5 million (without admitting or denying liability) to settle the SEC's action and also and also undertook not to be a director of any U.S. public company for a period of five years save under limited circumstances.

iv.  This year, the U.S. Department of Justice ("**DOJ**") indicted an officer of Bank Azteca, also controlled by Mr. Salinas and part of Grupo Elektra, for bribery of a US Congressman. The DOJ announced that it is investigating whether Mr. Salinas was involved.

v.   On 15 August 2024, *La Jornada* (a Mexican news outlet) reported that the National Banking and Securities Commission of Mexico ("**CNBV**") had imposed a fine on Mr. Salinas on 11 July 2024 for an amount of MXN 844,900 for disposing of Elektra shares without a public offering or auction authorised by CNBV.

i.   Grupo Elektra's (and Mr. Salinas's) troubles are relevant not only to the overall credibility of the Applicants' case. They also bear directly on the quantum of the supposed loss and damage and therefore on the size of the freezing order. For all these reasons, they also are matters which plainly should have been disclosed to the Court.

7.  A further respect in which Mr. Salinas and RBS failed adequately to present the Respondents' position concerns Events of Default under the SLA. This is of particular significance in relation to the action taken by Astor 3 at the end of July 2024. In accordance with the SLA, Astor 3 instructed the custodians, Weiser and Tavira, to transfer Elektra shares to its own account. The default provisions in the SLA permit expressly this step following an incurable Event of Default, which is precisely what had occurred in circumstances amounting to a Material Event concerning the financial condition of Mr. Salinas, RBS and Elektra. Elektra's declining performance, suspension of trading, Mr. Salinas's muti-billion dollar debt to the Mexican tax authorities, non-payment of interest and other fees, and other breaches of the SLA, singly and in combination, triggered Events of Default.

8.    I am advised that on the basis of the misrepresentations and omissions summarised above, the Injunction Orders should never have been granted against any of the Respondents and in any event, must now be discharged.

9.    Given the blatant abuse of the Court's process, including obtaining a draconian order against me and the other Respondents without any sort of hearing beforehand, it has been very difficult for me to accept that I should provide Mr. Salinas with information which might enable him to inflict yet further damage beyond what the Injunction Orders have already enabled. I have been advised (without waiving privilege) as to the risks involved in not complying with an order of the Court. I have also been advised that there are circumstances in which the Court will consider discharging an order even where a respondent to it has not complied with it. I believe that the blatant failures in this case amount to such circumstances.

10.   I understand that the Applicants have sought relief for the stated purpose of enabling them to trace Elektra shares. I note that records of trading have been provided by the custodian, Tavira, in responding to the Injunction Orders. The First, Fifth and Sixth Respondents did not maintain their own records of trading in Elektra shares (and for the avoidance of doubt, nor did I). Each of these entities left the records to the custodian and relied on these records, as is normal practice in this market. In any event, the individual shares sold are not traceable or identifiable separately from any other shares of that description. The shares are dematerialised and have no individual serial number. The suggestion that the shares could be traced once they had been sold, like the contention that particular identifiable shares needed to be returned to Mr. Salinas and which appears to have been central to the Applicants' legal theories, is nonsensical. Indeed, this is a further respect in which the Applicants' case was presented in a misleading way.

11.   I now set out the detail to show the way in which the Applicants unfairly and misleadingly presented their case to the Court, and why that case is clearly wrong.

2.   Background

12.   I act as a technical consultant for financial intermediaries. Astor 3, Vanderbilt and Astor Capital are three such entities. I explain this in more detail below. In practice, however, it means that on a day to day basis I have limited knowledge of the precise transactions entered into by those entities and limited access to their correspondence. I am not an owner, nor beneficiary, nor employee or officer of those entities.

3.   The SLA

13.   I am advised that the crux of the case against me and Astor 3 is that Astor 3 engaged in conduct which it and I understood from the outset was contrary to the terms of the SLA and which was dishonestly concealed from Mr. Salinas and RBS. Thus ultimately, it is my and Astor 3's subjective beliefs which are determinative for the allegation of fraud made against us. I am further advised

that the Applicants' case therefore necessarily involves as a first step showing that the SLA did not permit dealings in Elektra shares, and indeed that this was clearly so. On this basis, the Applicants then advance their central theory that Astor 3 (and I) can only have believed and understood that the SLA prohibited actions which were later taken and were always intended to be taken.[1]

14. As I now explain:

(1) The Applicants' case is clearly wrong and misleading in this respect; and moreover

(2) The presentation of the Applicants' case to the Court in obtaining the Injunction Orders in relation to the terms of the arrangements between the parties was seriously unfair, one-sided and grossly selective.

15. The SLA of 28 July 2021 [**Exhibit VS1/39-69**] **expressly** permits Astor 3 to act as it has done regarding the Elektra shares, namely to lend the Elektra shares to the Fifth Respondent, Vanderbilt. The Applicants did not refer at all to those express terms of the SLA that permit Astor 3, prior to an Event of Default, to dispose of, trade, deal-in or rehypothecate the pledged shares.

16. As the recital to the SLA records, by the SLA, Mr. Salinas (the Guarantor[2]) granted to Astor 3 (the Lender) a Lien in the 3.6 million publicly traded shares of Elektra.[3]

17. **Clause II(1)(a)** records in terms that Mr. Salinas "*hereby grants to* [Astor 3] *Lien rights over the Pledged Collateral (i.e. the Elektra shares) and in exchange* [Astor 3] *agrees to advance to the Borrower* […] *a loan of up to c. 3 billion Mexican Peso*".

18. **Clause IV(7)** provides that Mr. Salinas "*hereby grants* […] *Encumbrance rights to Lender in exchange for Borrower receiving a Loan*".

19. **Clause V(4)** provided that Astor 3 had "*Lien and Encumbrance rights in the Pledged Collateral*". Lien is defined as to include "*any Encumbrance of any kind referenced herein concerning the Pledged Collateral of Guarantor*". In other words, the SLA expressly provides that Astor 3 could create an Encumbrance over the Pledged Collateral. Encumbrance in the SLA is defined as including "*lien, mortgage, charge, hypothecation, rehypothecation, rights, barter, pawn, trade,*

---

[1] For example, paragraph 101 of the Applicants' Skeleton Argument of 2 August 2024 cites legal authority that "*Making an offer may amount to a representation that in general terms the offeror intends and has the ability to perform the proposed contract, as they understand it.*" [**Exhibit VS/88**] Paragraph 102 contends for an implied representation "*that the lender, who is given control over those shares, has the intention of complying honestly with its contractual obligations*", [**Exhibit VS/88**] Paragraph 109(2) alleges that Astor 3 "*never honestly intended to comply with its obligations under the SLA including in particular its obligations not to sell the Elektra shares prior to maturity or default* […] *it intended from the outset to get control of the Elektra shares with a view to misappropriating them*". [**Exhibit VS/90**]

[2] Capitalised terms in the text have the meaning given to them by the SLA.

[3] Mr. Salinas is said to hold around 67.5 million shares in Elektra, out of a total of c.200 million Elektra shares (para 48 of Claimants' Skeleton Arguments) [**Exhibit VS/79**].

*dispose, deal-in, pledge, re-pledge, repo, borrow or transfer of security interest in Collateral".[4]*

20. Accordingly, pursuant to **Clauses II(1)(a) and IV(7)** of the SLA, Astor 3 was throughout the term of the Loan contractually entitled to (for example) dispose of, deal in, convert, or rehypothecate the Elektra shares.

21. That was reiterated in bold text in the *"Required Disclosures"* at **Clause X**:

> *"It is mutually understood and agreed that Lender has a financial interest and privilege in the pledged shares according to the parties' understanding and contractual agreement […]"*

> *"During the Loan term, all benefits <u>and proceeds</u> of Pledged Collateral inure to Lender."*

> *"Lender reserves the right to maintain dominion over the Collateral during the Loan Term, <u>which affords Lender the right to deal in, dispose, or convert over the Pledged Collateral</u>"* (emphasis added).

22. That entitlement of Astor 3 was subject to the restriction (**Clause V(4)(b)**) that during the Loan Term, provided there has not been an Event of Default, Astor 3 "[would] *not sell or short-sell the shares of the Pledged Collateral <u>on any publicly traded securities exchange</u>"* (emphasis added). There are a number of features and consequences of that restriction to which the Applicants should have drawn attention:

   a. <u>First</u>, the restriction is limited to selling or short-selling on any public securities exchange. Thus no other form of transaction was prohibited. In particular, and given the extremely wide definition of Encumbrance (the rights for which were granted to Astor 3), hypothecation, rehypothecation, trading, bartering, dealing, repledging, and disposals were all permitted. Rehypothecation in the industry means lending out. The borrower on the other side of that transaction may freely trade, convert, hedge, or further rehypothecate the shares.

   b. <u>Second</u>, it is implicit in that restriction that Astor 3 *was* in fact permitted to sell or short-sell the Pledged Collateral in private (known as Over the Counter or "**OTC**" or Off-Market[5]) transactions:  otherwise the prohibition would not have been limited to a sale on any *"publicly traded securities exchange"*, or would simply have been unnecessary. Thus, for that reason alone, the central contention of the Applicants that the self-same shares as were pledged had

---

[4] The full definition of Encumbrance is "*Lender's legal claim on Pledged Collateral that affects the Borrower's ability to transfer ownership to anyone or to dispose of the Pledged Collateral without Lenders prior written authorization. For purposes of this definition, Encumbrance shall mean lien, mortgage, charge, hypothecation, rehypothecation, rights, barter, pawn, trade, dispose, deal-in, pledge, re-pledge, repo, borrow or transfer of security interest in Collateral. The Pledged Collateral will be restricted to Guarantor and Encumbrance rights exclusively granted to Lender.*"

[5] The International Securities Lending Association ("**ISLA**") located in London, whose members include the world's largest banks and brokerage houses in its glossary describes OTC as: "*Over-the-counter or off-exchange trading is done directly between two parties, without the supervision of an exchange. It is contrasted with exchange trading, which occurs via exchanges.*" [**Exhibit VS/178**] A list of members of the ISLA is at [**Exhibit VS/170-177**]

to be returned cannot be correct.

c. Yet the Applicants' counsel told the Court on 2 August 2024 that "*any change to the pledged collateral that happened as a result of events outside of the lender's control (such as a stock division) will be permissible but subject to that identical securities have to be returned* [...] *those shares will continue in existence as collateral and will not be disposed of in the meantime*" [**Exhibit VS1/124**].

d. <u>Third</u>, as I read and understood that clause at the time Astor 3 entered into the SLA (and as I still understand that clause), that restriction applied to "the Lender". Lender was defined in Clause I(31) to mean "*specifically the Lender described herein* [i.e. Astor 3] *and not any other*". Accordingly, as that definition makes clear, that restriction does not apply to other parties to whom Astor 3 might lend the shares. The restriction would still have value for Mr. Salinas, e.g. in relation to tax which might otherwise be due on his dealings in respect of the shares (avoiding which is a common motivation for securities lending transactions).

23. It was easier for the Applicants' counsel to make the submission he did because he repeatedly referred to the prohibition in Clause V(4)(b) as being simply against "*selling*", omitting the qualification concerning public exchanges. Paragraph 22(4) of the Skeleton Arguments said that Clause V(4)(b) made it "*expressly clear that Astor 3 was obliged to retain the shares (and was not permitted to sell them) save on the occurrence of an incurable Event of Default*" [**Exhibit VS1/75**]. Then at the hearing on 2 August, counsel stated: "*clause* [V(4)(b)] *there is a representation and warranty from Astor 3 that it will not sell or short sell the shares on the pledged collateral during the main term, provided there has not been an event of default. That is an important obligation*" [**Exhibit VS1/124**].

24. In fact, that submission was misleading. As the clause made clear, there was not a general prohibition on sale; rather Astor 3 itself as an entity was not permitted to sell or short-sell the shares "*on any publicly traded securities exchange*" (which it has not). But that vital qualification was simply omitted by the Applicants' presentation to the Judge.

25. Indeed, Vanderbilt, to which Astor 3 lent the shares for a period of 60 months, instructed that the shares be traded but does not know whether these trades were executed by Tavira on-market (i.e. on-exchange) or privately in an OTC (or block) trade since those trades were executed by Tavira. Certainly, the trading instructions make no reference to it [**Exhibit VS1/179**].[6]

26. Astor 3's entitlement was also subject to the restriction (**Clause V(6)**) that Astor 3 would not transfer the securities to its own account with the Depository Broker (i.e. the custodian) unless an incurable

---

[6] In that email, "*sell at market*" is a reference to market price. "*10 – 25% of VWAP*" is a reference to "Volume Weighted Average Price" and refers to the volume to be traded. "*Use discretion*" is an instruction for the broker to act as it considers appropriate. "*GTC*" means "good till cancelled".

Event of Default has taken place. Clearly, whether or not Astor 3 could transfer the shares to its own account at the custodian is a different matter from whether, during the term of the loan, the shares could be lent out or dealt with from Mr. Salinas's account by virtue of the "*dominion*" and "*grant*" of Encumbrance rights conferred on the Lender by the SLA.

27.  Yet, misleadingly, the Applicants did not highlight the distinction. Instead, at paragraph 22(6) of their Skeleton Arguments, the Applicants said "*this wording made clear that Astor 3 could not transfer the Collateral Shares to its own account*" [**Exhibit VS1/76**]. In fact, the clause simply addresses the question of whether the shares could be transferred to Astor 3's custodian account; it says nothing about how the shares could be dealt with when they were still in Mr. Salinas's account (pursuant to the powers Mr. Salinas had given to Astor 3).

28.  Likewise, the requirement at **Clause V(3)** for Astor 3 to credit dividends on the shares to the Guarantor's account, which was relied on by the Applicants, is not inconsistent with any of this. It simply obliged Astor 3 to give credit for dividends received or credited to its account at loan maturity. That reflects **Clause X** which provides that "*During the Loan Term, all benefits and proceeds of Pledged Collateral inure to Lender*".

29.  It is therefore explicitly clear that, during the Term of the Loan, Astor 3 was permitted to lend, rehypothecate, barter, convert, trade, pawn, charge, pledge, repledge and otherwise deal in the way it has done with the Pledged Collateral.

30.  Astor 3 confirmed (**Clause II(7)**) that it would maintain its full ability to release and discharge the Lien and return the Pledged Collateral to Mr. Salinas, *free of any Encumbrance,* within 3 business days of the Borrower's satisfaction of its Obligations (italics added). Again it is implicit in the italicised wording that the parties envisaged that Astor 3 could act in a manner that would lead to the Pledged Collateral being subject to Encumbrances; its obligation was to ensure that at the time it was to be returned the Pledged Collateral would not be subject to Encumbrances.

31.  The definition of Pledged Collateral contemplated that Astor 3 would enter into transactions in respect of it during the term of the Loan. Pledged Collateral "*was the total actual shares pledged **and any shares** or proceeds **resulting from any transaction**, split-up, revision, reclassification, or other like change that may take place **of the Pledged Collateral during the term of the Loan**"* (emphasis added). Astor 3 could therefore return the relevant volume of securities with identical characteristics; it was not necessary to return the very same securities as were pledged, which makes sense as dematerialised securities are fungible and have no serial numbers or other unique identifiers so that any attempt to identify "the same" individual shares would be meaningless.

#### 4. How the SLA was presented to the Court

32. None of the relevant sections of Clauses II and IV were referred to by the Applicants, either in their Skeleton Arguments or at the without notice hearing itself, and so the Court granted the injunction without ever being shown the clauses which expressly permitted Astor 3 to act as it had done. That is all the more remarkable given that by a letter dated 12 June 2024 to the Applicants, Astor 3 had expressly relied on Clause IV(7) as granting it the right "*to exercise Encumbrance rights over the Shares over during the loan term*" [**Exhibit VS1/477**].

33. Any full and fair presentation of the contractual position would have set out each of the clauses referred to above and identified what the Respondents would be liable to say about them, as well as what it had said about them in its letter of 12 June 2024. Indeed, as I explain below, this exercise did not even require any effort on the part of the Applicants or their advisers: Astor 3 had explained in the clearest terms in the email exchange between the parties on 10 September 2021 that it relied on the fact that the SLA had granted it Encumbrance rights, as defined, to support its declared intention to engage in rehypothecation and other dealings over the Pledged Collateral [**Exhibit VS1/327-328**].

34. By contrast, at paragraph 21 of their Skeleton Arguments for the 2 August hearing, the Applicants purported to summarise what they represented were the "*key terms*" of the SLA, but did so without providing the definition of Lien and Encumbrance and without referring to the fact that the SLA expressly provided by Clause II(1)(a) that, as the *quid pro quo* of the Loan, Astor 3 was to have Encumbrance rights over the Pledged Collateral [**Exhibit VS1/74**]. This was despite the fact that "Encumbrance" is referred to 9 times in the SLA, the word "Lien" is referred to 15 times and "Security Interest" is referred to 6 times

35. In other words, the Applicants omitted from its summary of "*key terms*" the very terms (Clause II(1)(a) and IV(7)) that, on their face, gave Astor 3 the express right to deal with the Pledged Collateral during the term of the Loan as the price of Astor 3 making the loan. Astor 3 had expressly relied on Clause IV(7) in its letter to the Applicants dated 12 June 2024 [**Exhibit VS1/477-479**]. Passing reference was made to the existence of that letter in the Applicants' Skeleton Arguments (paragraphs 187 and 53), but it was not quoted [**Exhibit VS1/109, 80**]. I am advised that it was the Applicants' duty to make sure that the Judge had read that letter in full and in any event was specifically aware of the provisions on which the Respondents relied or might rely. At the hearing, leading counsel for the Applicants suggested that he "*should show*" the Judge the letter and gave a page reference. It is not clear from the note whether the Judge was given time to read it [**Exhibit VS1/129**]. However, counsel stated "*As we set out in our skeleton argument, we do not think any of these clauses have any relevance to this question at all. For example, the fact that there is a clause stating that they have a lien or encumbrance over the collateral does not entitle them to appropriate it prior to maturity and without an event of default*" [**Exhibit VS1/129**]. That was clearly an inaccurate submission – the clauses to which Astor 3's letter referred were directly on point,

and on no view could they fairly be said to only apply in the event of default.

36. The Applicants' treatment of Astor 3's own stated position was deficient not only because they failed to give it proper prominence but because, as I have explained above, the Respondents' subjective understanding of the contract is in fact central to the Applicants' entire case of fraud. The case of fraud in turn is the justification for both the freezing order and the proprietary injunction. Instead the Applicants wrongly suggested at paragraph 186 of their Skeleton Argument that disagreements over the contract "*would not in any event prevent the Applicants from meeting the 'good arguable case' and/or 'serious issue to be tried' thresholds*" [**Exhibit VS1/109**]. Disagreements over the contract would have precisely that effect in the context of a case which depends, as the Applicants' does, not simply on being correct as to the meaning of a contract, but on being indisputably correct.

37. To compound matters, the Applicants simply suggested (at paragraph 21(2) of their Skeleton Arguments) that the effect of the agreement was that the loans were secured by a "Lien" over the Pledged Collateral [**Exhibit VS1/74**]. That gave the misleading impression that the lien simply provided a right of recourse against the Pledged Collateral in the event of default, whereas in fact Lien was defined (as the Applicants only mentioned in a later part of the Skeleton Arguments, when addressing a different clause - paragraph 188) so as to grant Encumbrance rights to Astor 3 [**Exhibit VS1/109-110**]. A full and fair presentation would have identified the words of Clauses II(1)(a) and Clause IV(7) and specifically addressed the definition of Lien and Encumbrance within the context of the SLA, and shown the Court the email of 10 September 2021 in which Astor 3 relied on its Encumbrance rights and explained that it was lending out the shares.

38. At the hearing, leading counsel for the Applicants suggested that "*we have set out the key provisions fairly extensively which your Lordship has looked at. In particular, at paragraph 22 of the skeleton, we set out the key provisions restricting the lender's ability to deal with the collateral shares during the term of the loan*" [**Exhibit VS1/124**]. That was untrue, for the key provisions of the SLA (including the first provision relied on in Astor 3's letter of 12 June 2024) had been omitted from the Court.

39. Instead, the Applicants suggested that they had identified only four provisions of the SLA which the Respondents might conceivably rely upon (paragraph 185 of the Skeleton Arguments), namely V(4)(a) and (c), IX(27), and X [**Exhibit VS1/109-111**]. They noted that none of those provisions were in the section entitled Substantive Terms of the Loan, and made the submission that the provisions which might be said to support the Respondents "*sit in tension with the substantive provisions of the SLA which the Applicants submit prevents Astor 3 from dealing in shares prior to the maturity date save in the event of an incurable Event of Default*" (paragraph 185) [**Exhibit VS1/109**].

40. That was an inaccurate and misleading submission. As set out above, Clause II(1)(a) says in terms

that the Mr. Salinas "*hereby grants to* [Astor 3] *Lien rights over the Pledged Collateral* [i.e. the Elektra shares] *and in exchange,* [Astor 3] *agrees to advance to the Borrower* [….] *a loan consisting of* [c. MXN 3 billion pesos]". Clause IV(7) provided that Mr. Salinas "*hereby grants* [….] *Encumbrance rights to Lender in exchange for Borrower receiving a Loan*". The Applicants did not refer to either provision.

41.  Moreover, the Applicants noted that Clause V(4)(a) merely *suggested* a power to transfer rights in Pledged Collateral was found elsewhere in the SLA. It was implicit in their submission that despite this suggestion there was no power to transfer rights in the Pledged Collateral elsewhere in the agreement. They did not go on to highlight the very provisions of the SLA which in fact conferred those rights to Astor 3, namely Clauses II(1)(a) and Clause IV(7). Instead, they wrongly asserted that power only existed on an incurable Event of Default.

42.  A similar point applies to Clause X, which was quoted in paragraphs 192-194 of the Applicants' Skeleton Argument but dismissed as "*boilerplate*" [**Exhibit VS1/111**]. That in itself was unfair. Clause X is in fact worded in ordinary English and is not a clause simply lifted from a standard form, so far as I am aware, nor a clause dealing with mechanical or administrative matters – rather, it is a clause which summarised the commercial understanding of the transaction and gave frank disclosure of legal rights and obligations. The words in Clause X which I have set out above confirm my interpretation of Clauses II and IV (and all the more so given the SLA's provisions governing its own interpretation at clauses IX(3) and (22)).

43.  In addition, the Applicants placed great weight on the fact that part of the definition of Pledged Collateral referred to "*the total actual shares pledged*" (paragraph 22(1) of the Skeleton Arguments) [**Exhibit VS1/74-75**]. What the Applicants did not, and should have, explained to the Court is that the pledged Elektra shares were not shares with a unique identification number; rather they were dematerialised and fungible shares as are all publicly traded securities, and that accordingly the concept of returning the '*actual shares*' pledged was not a meaningful one: there was no distinction between any of the shares of a given class. With that context, the suggestion (at paragraph 22(1)) that "*it is hard to see how the requirement* [to return the total actual shares pledged] *can be reconciled with any suggestion that some other (albeit equivalent) securities could be returned instead*" falls away [**Exhibit VS1/75**].

44.  I note that the SLA, which is in respect of a high value transaction, is not only explicit that by entering into it the parties are assuming considerable risk,[7] but also contains confirmations that the Borrower and Guarantor have taken legal advice as to the effect of the SLA (Clause X), that the Borrower and Guarantor are sophisticated investors (Clause IV(1)), and requires to be (and was)

---

[7] See for example, the definition of "Hybrid Loan" "*this Agreement is structured as an Investment*" where Investment means "*this Loan may be construed as a speculative Investment. Borrower and Guarantor being considered a sophisticated professional investors, and both being aware of all the risks associated with making a major investment where the outcome is unpredictable.*"

initialled on each page including those dismissed as "boilerplate".

    5.   <u>The Custody Management Agreements</u>

45.  In addition to the express provisions of the SLA, to which I have referred, the Custodian Management Agreement dated 2 August 2021 between the Applicants, Astor 3 and Weiser and the Control Agreement between the Applicants and Astor 3 and Tavira Monaco SA dated 13 December 2021 both contained clauses which recorded the Applicants' agreement to Astor 3 dealing with and rehypothecating the pledged shares. See, for example, in the Weiser CMA [**Exhibit VS1/180-187**]:

    a.  Clause 1 "Pledge by Borrower and Guarantor", RBS and Mr. Salinas appointed and authorised Astor 3 during the term of the agreement to have the exclusive lien over the Pledged Collateral, giving Astor 3 "*full power of authority to do and perform all and every act required or necessary to transact in the Pledged Collateral*".

    b.  Clause 3 "Control by Lender", Astor 3's authority included the ability to exercise all rights and privileges that pertain to RBS and Mr. Salinas. By Clause 3.5, during the term of the loan, RBS and Mr. Salinas agreed to unconditionally and irrevocably relinquish, forfeit and renounce any right it may then or in the future have over the accounts in favour of Astor 3, in the form of a lien, and RBS and Mr. Salinas agreed not to inhibit, frustrate or interfere with Astor 3's instructions to Weiser or attempt to seek injunctive relief from any court of law or stock exchange to invalidate, terminate or restrict the CMA.

46.  Most strikingly, Clause 1 of the Tavira Control Agreement [**Exhibit VS1/188**], to which the Applicants were parties, provided: "*the parties acknowledge that* [Astor 3] *may from time to time provide notifications to* [Tavira] *directing it to sell, transfer, pledge, hypothecate, lend, withdraw or redeem any* [...] *stocks in the Accounts* [...] *(each an "Entitlement Order"). The parties further acknowledge that* [Tavira] *shall comply with any such Entitlement Order originated by* [Astor 3] *without any requirement for consent from, or notice to, the Claimants. For the avoidance of doubt, the* [Applicants] *shall have no right whatsoever to object to any Entitlement Order originated by* [Astor 3] *and complied with by* [Tavira]". This clause also was intentionally omitted and not brought to the Court's attention, either in the Skeleton Arguments or at the without notice hearing.

47.  The Weiser Account Terms and Conditions [**Exhibit VS1/194-209**], which were incorporated into the Weiser CMA went substantially further. Also strikingly, those terms confirmed the Applicants' agreement that securities held in the Guarantor's account might be the subject of securities lending by Weiser's custodian, which neither Weiser nor Astor 3 would be able to prevent and would likely be unaware of, but which might result in Mr. Salinas's "shares" being subject to stock lending and sold on-market. I understand this to be a general feature of the equity trading markets where dematerialised fungible securities are held in a chain of custody. This is set out in Clause 3: "*You agree that 'WEISER' may lend any securities held by 'Weiser' for you or on your Account via its*

custodian". "*Account*" is defined in the Weiser CMA as *"The Depository Account(s) maintained by the Borrower and Guarantor and held by the Custodian in favour of the Lender"*. Even more strikingly, Clause 9 permitted Weiser itself to trade in the deposited securities, independently and irrespective of any instructions given by Astor 3 and the terms of the SLA: "*You hereby authorise 'WEISER' to manage and control collateralised securities in any manner it deems appropriate, irrespective of any third party contracts you have entered into. Such control includes and is not limited to transfers, hypothecation, repurchase contracts, and transacting in the securities in any manner."* Once again, this could easily result in large numbers of shares held in Mr. Salinas's account at Weiser being subject to stock lending and sold into the market on exchange or privately as a block trade.

6. <u>Communication between the Parties regarding rehypothecation and Astor 3's dealing in shares</u>

48. After the First Addendum was signed on 9 August 2021, Astor 3 immediately advanced a sum of MXN 501,591,693 to RBS (USD 25,000,000), secured over 563,569 Elektra shares, which were held in Mr. Salinas's personal account with Weiser [**Exhibit VS1/274-282, 325-326**]. This was deemed a "Test Tranche" to make sure that the payment systems would work.

49. On 10 September 2021, Astor 3 advanced another sum of MXN 327,497,030 to RBS, secured by 372,344 Elektra shares held in Mr. Salinas's personal account with Weiser [**Exhibit VS1/283-291**]. This was therefore the second active advance and corresponding receipt of Pledged Collateral by Astor 3.

50. On that same day, Mr. Torti of Fininvesta wrote an email to Weiser and Astor 3, in which he stated that he had noticed some activity in Elektra shares and wanted confirmation that none of the Elektra shares had been lent [**Exhibit VS1/480**].

> *Dear all,*
>
> *Based on some activity in Elektra shares, we would like you to confirm by return of email that none of the Elektra shares pledged by Weiser has been lent (securities lending), as per our agreement.*
>
> *Thanks for confirming, best regards,*
>
> *Alexa*

51. Astor 3 immediately responded to Mr. Torti at 8:53 pm that day, making very clear that such lending and rehypothecation was permitted under the SLA and CMA, that it was what Astor 3 was going to do (and if not would have to reconsider the loan), and that it was standard practice [**Exhibit VS1/327-328**]. Astor 3 wrote:

> *Dear Alexandre,*
>
> *Thank you for your email.*

*Astor will merge or pool collateral rights as a portfolio and underwrites derivatives to hedge its risk and liquidity leverage. This leads to collateral shares being made available for lending to its liquidity providers and other financial institutions who wish to borrow the shares. As we had discussed previously, the shares may be rehypothecated which is standard practice (share borrow-lending between institutions). This can't be stopped or restricted in all cases where the shares are free trading. Otherwise, the shares are restricted and we don't lend against restricted shares. I have never heard of free trading shares being restricted to borrow. When you custody shares with major banks, they all can and do engage in share borrow to each other.*

*This is imperative for loans of this size with very high LTV and at such a low interest rate.*

*You should also note, that everyone's stock can be borrowed. ELEKTRA appears on Interactive Brokers website borrow list. Thus, the entire float, plus some or all of the shares held by insiders can be accessed by major banks, lent out, shorted, etc. Please see the link below to Interactive Brokers Stock Lending program. You will see that ELEKTRA stock is there. Anyone can borrow the stock. Once someone borrows the stock, they can lend it out.*

*Further, we do not see any evidence of stock being hammered by anyone. Price is stable, volume is the same. Not sure what the concern is.*

*https://www.interactivebrokers.com/en/?f=4587&cntry=mexico&tag=Mexico&ib_entity=llcc&ln=*

*Important questions to ask prior to Astor's involvement:*

*1. Is the stock being lent out to anyone by insiders ?*

*2. Is the stock being lent out by any shareholders ?*

*3. Are you aware that the stock can be borrowed and lent out by anyone" ?*

*4. Has the short position increased the past 2 months ?*

*5. Does the Mexican Stock Exchange even allow for the stock to be frozen and not lent out ?*

*This is mostly prohibited in USA, Canada and many other countries.*

*My personal opinion, based on the terms you sought, high LTV and low interest rate, based on the stocks liquidity, I don't think anyone will agree to fund such large sums and not seek ways to enhance their yield. Mathematically it would not make sense.*

*Attached is the closing statement for this months disbursement (MXN 300,000,000).*

*Also, our loan agreement is transparent, the "Encumbrance" clause explains what can potentially take place with the stock, most of which we have no confirm over.*

*If you log into the account at Weiser, you will see that all the stock is there. We have not sold any of it, which is in accordance with the loan agreement.*

*Please speak to Mr Salinas and advise us if this is not an issue. If it is an issue, we would need to revisit internally how to proceed, cause we can't stop or*

> *restrict others from borrowing free-trading unrestricted stock.*
>
> *Please advise how you would like to proceed. If nothing has changed, please have the borrowing entity execute the attached Closing Statement and send us back an email with:*
>
> *"On behalf of the borrower, we do not object to the stock being lent out into the lending pool."*
>
> *Thank you*
>
> *Best Wishes,*
>
> *Gregory Mitchell*

52. Mr. Torti wrote back the same evening confirming that everything was fine and thanking Astor 3 for transferring MXN 300 million [**Exhibit VS1/329**]. (It is clear that his email was in response to what Astor 3 had sent, since it uses the same subject heading as the email cited in the preceding paragraph (which was different from the previous email sent by Mr. Torti).)

> *Dear Gregory*
>
> *As long as all the terms of the contracts signed are duly respected, we are fine.*
>
> *Could you please amend the date in the title of the closing statement (it says August instead of September) and send it back to me? Then thanks for proceeding with the transfer of the MXN 300,000,000 and providing us with a Swift confirmation.*
>
> *Best regards,*
>
> *Alexandre Torti*

53. On 14 September 2021, Ms. Akbar (an intermediary involved in setting up the transaction) sent the executed Closing Statement as requested [**Exhibit VS1/330**].

> *Dear Gregory,*
>
> *Hope you are well. I saw Alexandre did not cc' everyone into the email re: Richard etc, so have resent the signed Closing Statement Tranche 2.*
>
> *Any questions let us know.*
>
> *Kind regards,*
>
> *Zara*

54. On 15 September 2021, Astor 3 countersigned the Closing Statement and immediately ordered the remittance of funds, which was confirmed by Mr. Salceda on 20 September 2021 [**Exhibit VS1/481-482**].

55. In this email exchange, Astor 3 explained to Mr. Salinas's and RBS's representatives that shares would be rehypothecated, and that this was why Astor 3 required the pledge of unrestricted shares.

Astor 3 even sent Mr. Torti a link to the Interactive Brokers Stock Lending program, which allowed Mr. Torti to see in real time that these shares could be accessed by major banks and lent out [**Exhibit VS1/322-324, 327**]. This exchange of correspondence was not brought to the attention of the Court. It plainly should have been, considering that (1) Mr. Salinas's and RBS's representatives received an explanation about Astor's rights under the SLA and acknowledged their understanding by conduct between 2021 and 2024, and (2) the subjective understanding of the parties, and particularly of Astor 3, is critical to the Applicants' case of fraud.

56. The statements in Astor 3's 10 September 2021 email were not at all surprising. On the contrary, they reflect normal market practice in the very well-established securities lending industry: see, for example, the "*Introduction to Securities Lending*", commissioned by (among others) the Internal Securities Lending Association, British Bankers' Association and London Stock Exchange [**Exhibit VS1/210-271**]. As explained in the Executive Summary to that document, once shares are lent, "*the securities can be sold outright and 'on lent'. Both practices are commonplace and an intrinsic part of the functioning of the market.*" [**Exhibit VS1/219**] Once a party agrees to its stock being lent out, trading in that stock, including on the public market, is highly likely. Again, the "*Interactive Brokers Borrow List*" mentioned in the email showed Elektra stock available for borrowing and the practical effect of this — as the email pointed out - was that any person wishing to borrow the stock could do so (and could then engage in the kind of transactions discussed) [**Exhibit VS1/322-324**].

57. On 7 October 2021, Ms. Akbar contacted Astor 3 as a result of Weiser stating that Astor 3's rehypothecation of shares had resulted in Weiser's records showing a change in beneficial ownership of the shares [**Exhibit VS1/332**]. The Borrower was concerned about this because "*they would not be in a position to provide a statement or custodial representation confirming Mr Salinas is the owner of the shares*". I assume that Mr. Salinas needed such a statement available to him in order to provide an explanation for why he had made no disclosures to the market.

58. As reflected in a later e-mail from Ms. Akbar of 19 October 2021, the position was resolved by opening a custody account with Tavira in the name of Mr. Salinas but "*for the benefit of*" Astor 3 [**Exhibit VS1/333-334**]. I understand that Tavira's practice was not to transfer shares from Mr. Salinas's account when shares were rehypothecated from that account by Astor 3 to Vanderbilt.

59. It is clear that, from at least November 2021, the Applicants themselves believed or suspected that the Elektra shares which had been pledged to Astor 3 were being sold on the open market. At paragraphs 75 to 77 of his Affidavit, Mr. Salceda said "*At the end of November 2021, I was aware that a seller of Elektra shares in the Mexican market had been participating with a significant percentage of the daily trading volume* […] *I feared that the cause of this unusual situation might be Astor 3*" [**Exhibit VS1/150-151**].

60. Mr. Salceda or Mr. Salinas were therefore able to monitor any significant trades of Elektra shares in the market. Moreover, Mr. Salceda or Mr. Salinas could have asked their sub-custodians in Mexico to check with the Central Depository register, Indeval, to verify ownership records, share transfers, blocked positions and pledges and liens [**Exhibit VS1/272-273**]; and if Mr. Salceda or Mr. Salinas noticed any activity contrary to the SLA, they could have raised concerns with Astor 3. Notably, neither Mr. Salceda nor Mr. Salinas raised any such concerns with Astor 3 for nearly three years.

61. Furthermore, at no stage did the Applicants bring this delay specifically to the Judge's attention. The Affidavit of Mr. Salceda jumped from November 2021 to a meeting which he sought to arrange in November 2023 (of which no detail is given) [**Exhibit VS1/150-151**]. The Skeleton Arguments jumped from November 2021 (at paragraphs 50 and 51, when the issue was allegedly discovered) to 10 June 2024 (when the issue was raised by the Applicants) without any explanation [**Exhibit VS1/79-80**]. At the hearing, leading counsel similarly glossed over the delay of nearly three years stating "*Applicants had concerns that someone was dealing in Elektra shares. The Applicants wrote to the depository brokers, Weiser and Tavira, to say that they should not dispose of the collateral shares. They did not respond. Astor 3 did. The Applicants' concerns led them to seek legal advice and to appoint investigators*" [**Exhibit VS1/125**]. It was implicit in that submission that the Applicants had acted promptly on becoming aware of the dealings in Elektra shares. The opposite was the case. Moreover, the delay was inconsistent with the Applicants' basic position that the Respondents' dealings with the shares had violated the parties' fundamental understandings.

62. The reality, as had been stated expressly to the Applicants in September 2021, was that Astor 3 was rehypothecating the shares through securities lending. As the Applicants must have been aware, such rehypothecation necessarily involves the possibility that the party to whom the shares are loaned would trade in those shares. Whilst Astor 3 itself was restricted from selling shares in the open market, other parties were not.

7.   The undisclosed problems of Elektra

63. The Applicants also concealed highly material information as to the financial health of Elektra, which contributed to a serious decline of the Elektra share price over the term of the Loan, and then to a free fall at the end of July 2024. This should have been fully and frankly disclosed.

64. When the SLA was signed in July 2021, Elektra's share price was closing at approximately MXN 1,600. However, the Elektra share price was inflated as indicated by its notably high Price to Earnings ratio and Price to Cash/Free Cash Ratio [**Exhibit VS1/335**]. Effectively, the share price did not appear to be reflective of Elektra's performance.

65. From 2021-2024, Elektra's performance as a company was plummeting. Matters became much worse when on 26 July 2024, *Simply Wall Street* (a market-leading financial app which claims to

have 6 million users) reported that earnings had been declining at an average annual rate of 34% over a 5-year period, and declared Elektra to be an investment risk [**Exhibit VS1/338**]. *Simply Wall Street* also stated that Elektra's second quarter earnings for 2024 were at a net loss of MXN 643 million (about USD 34 million) versus a profit of MXN 4.94 billion (about USD 250 million) for the same period in 2023 [**Exhibit VS1/339**]. The drastic turnaround from profit to loss in Q2 2024 is shown in the underlying figures reported by Elektra on 24 July 2024 [**Exhibit VS1/342**].

66. Elektra's underperformance was reflected in the steep decline of its share price. Immediately before the *Simply Wall Street* publication, Elektra's share price had already dropped to MXN 1050, which reflected a 40% drop since 2021 [**Exhibit VS1/355-358**]. The *Financial Times* data below shows the share price since 2008:



67. Once the Q2 2024 results were digested by the market, there then followed an even more precipitous decline:



68. On 26 July 2024, Elektra chose to issue a press release to the market "*to inform investors that it has received information from its controlling group regarding a possible fraud by depositories of their shares, which could cause unusual movements of its share price on the stock markets*" [**Exhibit VS1/359-360**]. As a result of this announcement, the Mexican listing authorities chose to suspend trading in Elektra stock, which remains suspended today.

69. The share suspension and the announcement which led to it were presented to the Court as part of Elektra's response to a discovery of fraud: see paragraphs 124-125 of the Affidavit of Mr. Salceda of 5 August 2024 (which was placed in draft before the Court on 2 August) [**Exhibit VS1/162**]. However, there is an obvious alternative inference – which should itself have been drawn to the Court's attention – that Elektra wished to explain away this share price collapse and to make it appear to the market that it was taking actions to prevent any further price decline. Clearly, Elektra experienced a rapid and troubling decline during the term of the Loan, which

entirely predictably caused a collapse of the share price, with a particularly precipitous drop after publication of the Q2 2024 figures. Although the suspension of trading in Elektra shares prevented a complete collapse, Elektra had to suggest to the market that the reason for the decline was due to supposedly fraudulent transactions. In fact, the transactions carried out with the Pledged Collateral under the SLA (1) were known to and agreed to by Mr. Salinas and RBS, and in any event (2) were not the cause of the sharp fall on 26 July 2024, which was correlated to the release of the highly negative Q2 figures. However, to maintain credibility in the explanation given to the market and the regulator, Mr. Salinas and RBS have proceeded to advance these spurious allegations to seek an injunction against me and the other Respondents.

70. Particularly against the background of the 2021 email correspondence, and the unexplained delay in pursuing suspicions between 2021 and 2023, the Q2 results and resulting share price collapse create an obvious possibility that the legal proceedings are not a genuine response to discovered fraud but are, on the contrary, a manufactured attempt to shore up the price of Mr. Salinas's principal asset. Instead of disclosing that background, however, the Applicants simply concealed it.

71. This concealment was of a piece with the failure to mention Mr. Salinas's major financial problems, which were misleadingly omitted while presenting him in an unqualified manner as one of Mexico's wealthiest individuals, as I now explain.

8. Mr. Salinas's severe financial difficulties

72. In the Skeleton Arguments, Mr. Salinas is claimed to be "*one of the wealthiest individuals in Mexico with a net worth of several billion U.S. dollars*" and is the "*direct or indirect beneficial owner or controller of approximately 67,544,413 shares in Elektra, representing 30.47% of Elektra share capital*" [**Exhibit VS1/73**]. The Applicants relied on this general statement alone to give the Judge comfort that Mr. Salinas could give an unlimited cross-undertaking in damages, without any fortification [**Exhibit VS1/132**]. They also relied on it to make the unsubstantiated assertion (which is a prerequisite of their rescission case) that the Applicants were ready and able to repay the USD 110 million advanced to them.

73. However, due both to Elektra's underperformance from 2021-2024 and the various proceedings involving Mr. Salinas's inability to pay his debt obligations or the debts of his companies to the Mexican tax authorities, the Applicants' claim of Mr. Salinas's net worth warranted further scrutiny.

74. In April 2021, Mr. Salinas filled out a KYC form for on behalf of himself and RBS as part of Astor 3's due diligence process [**Exhibit VS1/361-363**]. In Mr. Salinas's personal KYC form, Mr. Salinas indicated that he was the "*Founder and CEO*" of Elektra (the Issuer), he owned a total of 10% of Elektra shares (not the 30.47% now claimed) and planned to use the loan proceeds to "*refinance some existing loans*". Either Mr. Salinas only owns 10% of Elektra shares or he failed to disclose his entire beneficial Elektra shareholding in the KYC form. At best, Mr. Salinas's claim of his ownership of Elektra shares is confusing.

75. As proof of his ownership of Elektra shares, Mr. Salinas submitted a copy of a BNP Paribas Portfolio Management Report [**Exhibit VS1/363-382**]. The report showed that Mr. Salinas had a negative cash balance of USD 30 million, USD 3.2 million in bonds, and USD 511 million in equities. Notably, 97.85% of his portfolio was tied to 6.9 million Elektra shares, which is again confusing in light of the representations made to the Judge. Moreover, Mr. Salinas's Elektra shares were marked "BLO" (shares held in a blocked position). Reading this report together with Mr. Salinas's KYC form, Mr. Salinas had been heavily shopping around his Elektra shares as collateral for loans with other lenders like Astor 3.

76. In any event, Mr. Salinas's reputation as a wealthy and reputable entrepreneur is further undermined by his involvement in several scandals and open conflicts with various governmental authorities over the years.

   a. In January 2005, the SEC sued TV Azteca and three executives (including Mr. Salinas) for fraud and filed criminal charges, alleging that Mr. Salinas: (i) concealed his role in a series of transactions where Mr. Salinas purchased discounted debt from Unefon and profited on repayment; (ii) sold TV Azteca stock while concealing his self-dealing; (iii) filed false reports and made false public statements; and (iv) failed to disclose to investors his ownership of half of a subsidiary of TV Azteca, Codisco [**Exhibit VS1/385-387**]. The SEC claimed that Mr. Salinas violated several sections of the Securities Exchange Act of 1934, including those related to insider trading, false and misleading statements, and reporting requirements. Although the SEC settled its claims against Mr. Salinas, Mr. Salinas was ordered to pay disgorgement and penalties of USD 7.5 million and to provide an undertaking not to serve as an officer or director of a U.S. public company for a period of five years, except under limited circumstances [**Exhibit VS1/388-390**].

   b. In May 2015, CNBV imposed a fine of MSN 672,900 for a failure to comply with the Securities Marketing Law by failing to lodge a notice of an offer abroad [**Exhibit VS1/391-393**].

   c. In 2017, CNBV imposed a fine of MXN 2,260,000 on TV Azteca, owned by Mr. Salinas, for failing to inform investors of significant operational changes as required by the Bolsa Mexicana de Valores, ("**BMV**") [**Exhibit VS1/394-397**].

   d. In April 2022, *Reuters* reported that TV Azteca was involved in a legal dispute that resulted in an order for the company to pay MXN 2.447 billion to tax authorities concerning income tax, fines and surcharges [**Exhibit VS1/398**].

   e. In February 2023, *The Yucatan Times* reported that the Mexican Tax Administrative Service ("**SAT**") was claiming more than MXN 38 billion from Mr. Salinas's companies, including Grupo Elektra, all derived from irregular tax operations perpetrated from 2013 [**Exhibit VS1/399-400**].

   f. In April 2023, *La Jornada* reported that the CNBV stated that it had applied 32 fines to Banco

Azteca totalling MXN 8.3 m for regulatory breaches [**Exhibit VS1/401-403**].

g.  In November 2023, *AP News* reported that TV Azteca failed to reach an agreement with U.S. bondholders in a dispute involving approximately USD 400 million in bonds and approximately USD 105 million in past-due payments [**Exhibit VS1/404-405**]. These bondholders brought an involuntary bankruptcy petition against TV Azteca.

h.  In December 2023, *Yahoo Finanzas* reported that there were suspicions that Banco Azteca was in on the verge of bankruptcy, which Banco Azteca denied [**Exhibit VS1/406-408**].

i.  In March 2024, *Bloomberg UK* reported that the President of Mexico ordered the seizure of Mr. Salinas's golf course in Oaxaca as part of the government's enforcement against his liability to pay USD 3.8 billion in back taxes [**Exhibit VS1/409-414**].

j.  Also in March 2024, *Fitch Ratings* downgraded Banco Azteca's visibility rating following what is assumed to be the weak corporate governance practices of its controlling group and the sustained high related-party commercial loans [**Exhibit VS1/415-425**].

k.  In May 2024, *Bloomberg UK* reported that U.S. Congressman Henry Cueller had been indicted by U.S. federal prosecutors for bribery payments made by Mr. Salinas's Banco Azteca to a U.S. Congressman and his wife [**Exhibit VS1/426-427**]. The bribes were paid in exchange for help lobbying against U.S. anti-money laundering regulations that threatened the interest of Banco Azteca.

l.  As of May 2024, *Benzinga* (a U.S. financial technology and data company) reported Mr. Salinas's net worth to be only USD 332 million [**Exhibit VS1/428-429**].

m.  On 15 August 2024, *La Jornada* reported that CNBV had imposed a fine on Mr. Salinas on 11 July 2024 in the amount of MXN 844,900 for disposing of Elektra shares without a public offering or auction authorised by CNBV [**Exhibit VS1/430-432**].

77.  As this negative press started to come to light, Astor 3 submitted several information requests to Mr. Salinas and RBS, enquiring about Mr. Salinas's ongoing disputes with the Mexican tax authorities, the seizure of his assets by the Mexican government and whether Mr. Salinas had pledged Elektra shares as collateral in other loan transactions [**Exhibit VS1/433-437**]. To the best of my knowledge, Mr. Salinas and RBS ignored these requests and never responded.

9. Mr. Salinas and RBS triggered several Events of Default under the SLA

78. Astor 3 issued a Notice of Default, dated 27 July 2024, alleging 11 different Events of Default that were triggered by acts and omissions of Mr. Salinas and RBS [**Exhibit VS1/438-450**].

79. Event of Default is defined as "*any of the events specified in Clause VI hereof in addition to any omission or failure to perform a legal or contractual duty as obligated, stated or outlined herein. An Event of Default will cause Acceleration of the Loan*" and forfeiture of the Pledged Collateral.

80. Upon the Event of Default, Astor 3 would (Clause II(7)) dispose of the Pledged Collateral in order to satisfy the obligations of the Borrower and return any excess collateral to Mr. Salinas.

81. In addition, Clause IV(10) provides that the Borrower nor Guarantor would seek injunctive relief from any court of law requesting to freeze the shares and that such injunctive relief shall be an immediate and incurable Event of Default.

82. Astor 3's rights on an Event of Default are not dependent on giving prior notice of it to the Borrower/Guarantor: there is nothing in the SLA to that effect. Of these different Events of Default, which are set out in detail in the Notice, I will highlight some of the most serious examples.

83. *First*, Elektra's announcement of 26 July 2024 constituted an Event of Default pursuant to Clause VI(3)(g) of the SLA. Clause VI(3)(g) provides that an Event of Default is a Material Event upon the financial condition of Elektra, Mr. Salinas or RBS. A "Material Event" is defined as any event or possible outcome which may undermine or alter the value of collateral or prejudice Astor 3's standing lien. In this announcement, Elektra published misleading information to its investors regarding a possible fraud by depositories. An announcement of that kind could only tend to undermine the value of the shares concerned and thereby prejudice Astor 3's lien.

84. *Second*, even if the announcement itself is not deemed to be a Material Event triggering an Event of Default, the suspension in trading of Elektra shares also on 26 July 2024 most certainly constitutes an Event of Default for the same reasons. Additionally, Clause VI(3)(c) of the SLA provides that a suspension in trading of five or more Business Days in respect of the same share class as the Pledged Collateral constitutes an Event of Default.

85. *Third*, in March 2024, SAT made a presentation on tax claims against four companies of Mr. Salinas (including Elektra), totalling MXN 63 billion (USD 3.8 billion), stemming from 17 different court cases covering audits from 2008-2018 [**Exhibit VS1/451-452**]. This tax debt and ongoing tax lawsuits against Mr. Salinas's companies was a Material Event affecting the financial condition of Mr. Salinas and Elektra, and thus constituted an Event of Default pursuant to Clause VI(3)(g) of the SLA.

86. In addition to these examples, Astor 3 relies on the full detail of the Events of Default referenced in the Notice of Default.

87. As RBS and Mr. Salinas triggered several Events of Default, which did not require prior notice declaring an event of default, Astor 3 was entitled to exercise its rights under the SLA and CMAs. Astor 3 was entitled to terminate the SLA and dispose of the Pledged Collateral (Clause II(7)). Further, the Events of Default triggered an acceleration of the loan amounts, interests, costs, fees and expenses, and a forfeiture of the Pledged Collateral (Clause VI(4)). As the Events of Default were incurable, Astor 3 was under no obligation to return the remaining balance of proceeds realised as a result of any sale of the Pledged Collateral or provide an accounting of the disposition of the Pledged Collateral (Clause VI(4)).

88. In accordance with these express provisions of the SLA, Astor 3 issued a Notice of Default, which provided that Mr. Salinas and RBS were "*hereby notified that* [they] *were in default of the SLA which has resulted in* [Astor 3*] terminating the SLA and accelerating any and all amounts due thereunder together with any other remedy which may be afforded to* [Astor 3]" [**Exhibit VS1/439**].

89. Subsequently, Astor 3 forwarded the Notice of Default to Weiser and Tavira and, as permitted under Clause 9.3 of the Tavira CMA and Clauses 4 and 8 of the Weiser CMA, Astor 3 issued Entitlement Orders instructing a transfer of the Pledged Collateral to into Astor 3's account [**Exhibit VS1/453, 456**]. Astor 3 then issued a separate set of Entitlement Orders to Tavira instructing the transfer of the Pledged Collateral at Tavira to Vanderbilt [**Exhibit VS1/454**]. A separate instruction was sent to Weiser to settle the outstanding hedges on 935,716 shares of Elektra Pledged Collateral held at Weiser [**Exhibit VS1/455**].

   10. My relationship with the Respondents

90. Weiser and Tavira are completely separate entities, in which I do not have any ownership or control (either directly or indirectly). Mr. Salceda's Affidavit supporting the Injunction Orders states that "*it is clear that Weiser and Astor 3 are under common control*" and suggests the same for Tavira (paragraph 119) [**Exhibit VS1/161**]. This is an invention of the Applicants for which no proper basis was offered but which appears to have been advanced as part of a mindset to treat everything as suspicious.

91. I do not own (either directly or indirectly) Astor 3 or Vanderbilt. I assisted those companies in the way I now explain. These companies are separate entities, with their own beneficial owners and executives.

92. I would add that Astor 3 was known to the Applicants to be a new company, specifically formed in Canada for the transaction at the request of Mr. Salinas. The original intention had been to use Astor Capital Fund which is a Bahamian company as the Lender but Mr. Salinas rejected it because it was offshore entity and would trigger a Withholding Tax ("**WHT**") liability [**Exhibit VS1/461**].

Astor 3 was then formed as a Canadian Special Purpose Vehicle ("**SPV**") on Mr. Salinas's own instruction [**Exhibit VS1/461**] to take advantage of tax treatment under the North American Free Trade Agreement ("**NAFTA**"). This was openly discussed in emails in the middle of 2021, with complaints being made by Mr. Salinas about the time being taken to obtain company registration documents from the Quebec authorities [**Exhibit VS1/470-471**]. Although it is now suggested that Astor 3's new existence is something suspicious, that is obviously not so where the fact was fully known to the counterparty at the outset. The Applicants failed to bring to the Court's attention that Mr. Salinas's representatives were kept informed on the company formation and even prompted Astor 3 to speed up the process [**Exhibit VS1/461-471**]. Mr. Salceda's statement in his Affidavit that it was a "red flag" that Astor 3 was incorporated around the same time as the preparation of the SLA was misleading [**Exhibit VS1/157**].

93. In this context, each company is formed on behalf of financial intermediaries in order to facilitate their entry into the stock-based lending market. In fact, the First and Sixth Respondents, Astor 3 and Astor Capital, are perfect examples.

   a. Thomas Mellon approached me to help him set up an entity to engage, amongst other activity, in lending against securities. As a result, Astor Capital was formed in April 2019 in Bahamas.

   b. With an incorporated entity, Mr. Mellon was then able to approach potential agents and clients, to develop business on behalf of his own company. This is probably how Mr. Mellon came into contact with Mr. Salinas's agent, Ms. Akbar.

   c. When Mr. Salinas rejected Astor Capital as the lender for the transaction and at his request, Astor 3 was incorporated in Canada.

   d. Once the Parties were ready to negotiate the SLA, a draft SLA was provided to Mr. Salinas. The SLA was open to review between the Lender and its counterparties, under the advisement of independent legal counsel and other advisors, to establish the precise rights and obligations to be agreed by the parties. The SLA that is the subject of this litigation was developed with the input of legal counsel.

   e. Once executed, Astor 3 would then arrange the custodianship of the shares and direct the use of the shares during the loan term.

94. The Fifth Respondent, Vanderbilt, operates differently. Essentially, Vanderbilt is a hedge fund trading firm, which has experience in trading activities of securities and commodities, but it also has own clients to which it has provided stock-based loans in the past. Vanderbilt may engage in stock lending. In this case, it borrowed Elektra stock from Astor 3 with the promise of returning equivalent securities later. Vanderbilt then trades the borrowed stocks (either on or off market), often with the intention of buying them back at a lower price, profiting from the difference.

95.  The relationship between Astor 3 and Vanderbilt is therefore one of contract, typically referred to as a rehypothecation agreement. An example of such an agreement, concerning one of the tranches of Elektra's shares, is at **[Exhibit VS1/472–476]**. Under that agreement, and others in materially identical terms, Astor 3 has agreed to rehypothecate securities to Vanderbilt as a loan of stock for the purpose of generating profit with these securities, which is then split between the parties. Astor 3 therefore does not have title to the subject securities, but rather has lien, encumbrance and rehypothecation rights over them by virtue of its arrangements with the Applicants. Vanderbilt then has the right to manage, lend, rehypothecate, pledge, repledge, pawn, barter or otherwise transact with the securities until termination of that arrangement 60 months hence, at which point Vanderbilt will return equivalent securities back to Astor 3 free of any lien or encumbrance.

11.  The prejudice caused by the Injunction Orders

96.  Given their blatant abuse of the Court's process, the Applicants have improperly obtained world-wide freezing and proprietary injunctions in respect to assets up to a value of MXN 5 billion. The scope of these Injunction Orders is extremely broad. By their very nature, such Orders cause very significant operational and reputational prejudice to the parties subject to them, at least if those parties are in business, as is the case for me, Astor 3, Vanderbilt and Astor Capital. Moreover, Tavira has now completely frozen the accounts of Astor 3 and Vanderbilt. Even the ability under the Injunction Orders to engage in normal course of business transactions, which is more theoretical than real, is not open to Astor 3 and Vanderbilt.

97.  I note that the Applicants state that they are "*ready and able to repay all sums owing to Astor 3 immediately*" (Skeleton Argument, paragraph 92) **[Exhibit VS1/86]**. This statement is not substantiated. The Loan had a lock-up provision for 5 years and was not due to be repaid for a few more years. Furthermore, the SLA states that at maturity, RBS was to provide proof of funds to repay the loan. At no time was this proof presented. Rather, the press reports set out in this statement indicate that Mr. Salinas will not make any such payment willingly. I respectfully submit that the price of any injunction ought to have been for the Applicants to provide a guarantee or other fortification to make good this commitment. If Mr. Salinas is indeed as rich as he portrays himself, then fortification in the order of USD 110 million ought to have been be readily achievable. Such fortification could also then have stood as security for any claim under the cross-undertaking in damages.

98. Astor 3, Vanderbilt and Astor Capital have suffered damage arising from the grant of the Injunction Orders and that damage is presently being assessed. Once it is assessed then I will update the Court as appropriate. However, given the matters set out in this statement, I respectfully request the Court in any event to set aside the without notice Injunction Orders against me and the First, Fifth and Sixth Respondents as soon as possible.

**Statement of truth**

I believe that the facts stated in this statement are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.



...................................................................................................

**VAL SKLAROV**

**Dated:  August 20, 2024**

# EXHIBIT 15

N244

# Application notice

For help in completing this form please read the notes for guidance form N244Notes.

Find out how HM Courts and Tribunals Service uses personal information you give them when you fill in a form: https://www.gov.uk/government/organisations/hm-courts-and-tribunals-service/about/personal-information-charter

| Name of court | Claim no. |
|---|---|
| B&P courts, Commercial court (KBD) | CL-2024-000450 |
| **Fee account no.** (if applicable) | **Help with Fees – Ref. no.** (if applicable) |
| PBA0087558 | **H** **W** **F** – ___ – ___ |
| **Warrant no.** (if applicable) | |

**Claimant's name** (including ref.)
(1) RICARDO BENJAMIN SALINAS PLIEGO
(2) CORPORACION RBS SA DE CV

**Defendant's name** (including ref.)
**(1)** ASTOR ASSET MANAGEMENT 3 LIMITED; **(2)** WEISER GLOBAL CAPITAL MARKETS LTD; **(3)** TAVIRA MONACO SAM; **(4)** VLADIMIR "VAL" SKLAROV; **(5)** CORNELIUS VANDERBILT CAPITAL MANAGEMENT LTD; **(6)** ASTOR CAPITAL FUND LTD

| Date |
|---|
| |

1. What is your name or, if you are a legal representative, the name of your firm?

Enyo Law LLP

2. Are you a
   - [ ] Claimant
   - [ ] Defendant
   - [✔] Legal Representative
   - [ ] Other (please specify) ___

   If you are a legal representative whom do you represent?

   The Claimants

3. What order are you asking the court to make and why?

   As detailed in the evidence set out below and in the attached Draft Order, the Claimants seek an order pursuant to CPR 3.1(3): **(1)** to strike out D1, D4, D5 and D6's Discharge Application unless they comply in full with the disclosure obligations variously directed by Court in freezing orders dated 2, 7, and 13 August 2024; and **(2)** for ancillary relief.

4. Have you attached a draft of the order you are applying for?    [✔] Yes    [ ] No

5. How do you want to have this application dealt with?    [ ] at a hearing    [ ] without a hearing
   [✔] at a remote hearing

6. How long do you think the hearing will last?    ___ Hours    60 Minutes

   Is this time estimate agreed by all parties?    [ ] Yes    [✔] No

7. Give details of any fixed trial date or period    n/a

8. What level of Judge does your hearing need?    Judge

9. Who should be served with this application?    The First, Fourth, Fifth and Sixth Defendants

9a. Please give the service address, (other than details of the claimant or defendant) of any party named in question 9.    n/a

10. What information will you be relying on, in support of your application?

☐ the attached witness statement

☐ the statement of case

☑ the evidence set out in the box below

If necessary, please continue on a separate sheet.

---

**Granting of the Injunction Orders and Service**

*First and Fourth Defendant*

On 2 August 2024, Mr Justice Jacobs granted the following relief (the "**2 August Order**"):

(1)    An interim proprietary injunction against, *inter alia*, Astor Management 3 Limited ("**Astor 3**") (the "**First Defendant**) and Vladimir "Val" Sklarov (the "**Fourth Defendant**") in respect of 7,204,296 shares in Grupo Elektra SAB De CV ("**Collateral Shares**") and/or their traceable proceeds.

(2)    A worldwide freezing order against the First and Fourth Defendants; and

(3)    Ancillary disclosure orders against, *inter alia*, the First and Fourth Defendants ("**Ancillary Disclosure Order**"). Specifically (subject to paragraph 13 of the 2 August 2024 Order on self-incrimination):

    a.    Pursuant to paragraph 11 of the 2 August 2024 Order:

        i. the First and Fourth Defendants were required, by 5pm London time on 6 August 2024, and to the best of their ability inform the Applicants' solicitors in writing of all their assets worldwide exceeding £10,000 in value whether in their own name or not and whether solely or jointly owned, giving the value, location and details of all such assets; and

        ii. Whether they hold any Collateral Shares and/or their traceable proceeds and if so the value of said shares or proceeds.

    b.    Pursuant to paragraph 12 of the 2 August 2024 Order, within 7 days of being served with the 2 August 2024 Order, the First and Fourth Defendants were required to swear and serve on the Claimants' solicitors an affidavit providing the information requested in paragraph 3a above, and as further set out in Schedule C of the Order.

On 2 August 2024, the Claimants served the 2 August Order on the First and Fourth Defendants in accordance with the terms of a separate service order made on the same date granting them permission to serve documents in the proceedings by alternative means.

*Fifth Defendant*

On 7 August 2024, Mr Justice Jacobs granted a worldwide freezing order and proprietary injunction against the Fifth Defendant (the "**7 August Order**"). In summary, the 7 August Order extended the 2 August Order as it applied to the First and Fourth Defendants also to cover the Fifth Defendant.

On 7 August 2024, the Claimants served the 7 August Order on the Fifth Defendant in accordance with the terms of a separate order made on the same date granting them permission to serve documents in the proceedings by alternative means.

*Sixth Defendant*

On 13 August 2024, Mr Justice Jacobs granted a worldwide freezing order and proprietary injunction against the prospective Sixth Defendant[1] (the "**13 August Order**"). In summary, the 7 August Order extended the 2 August Order as it applied to the First and Fourth Defendants also to cover the Sixth Defendant.

---

On 13 August 2024, the Claimants served the 13 August Order on the Sixth Defendant in accordance with the terms of a separate order made on the same date granting them permission to serve documents in the proceedings by alternative means.

**Breaches of the Injunction Orders**

In breach of the 2 August Order, 7 August Order and 13 August Order ("**Injunction Orders**"), the First, Fourth, Fifth and Sixth Defendants have failed to comply at all with the Ancillary Disclosure Orders. The Claimants notified the First and Fourth Defendants of their breaches via email on 7 and 12 August, and the Fifth Defendants via email 13 and 19 August 2024, but received no response.

In the witness statement of the Fourth Defendant served in support of the First, Fourth, Fifth and Sixth Defendants' application to discharge the Injunction Orders ("**Discharge Application**"), the Fourth Defendant expressly accepts that he is in breach of the Injunction Orders ("*Given the blatant abuse of the Court's process, including obtaining a draconian order against me and the other Respondents without any sort of hearing beforehand, it has been very difficult for me to accept that I should provide Mr Salinas with information which might enable him to inflict yet further damage beyond what the Injunction Orders have already enabled. **I have been advised (without waiving privilege) as to the risks involved in not complying with an order of the Court...***" (emphasis added).

In light of the above, the Claimants respectfully seek an order on the terms enclosed. In summary, they seek an order striking out the Discharge Application unless the First, Fourth, Fifth and Sixth Defendants comply with Ancillary Disclosure Order within a short period of time of this order being granted.

11. Do you believe you, or a witness who will give evidence on your behalf, are vulnerable in any way which the court needs to consider?

☐ Yes. Please explain in what way you or the witness are vulnerable and what steps, support or adjustments you wish the court and the judge to consider.

☑ No

# Statement of Truth

I understand that proceedings for contempt of court may be brought against a person who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

☑ **I believe** that the facts stated in section 10 (and any continuation sheets) are true.

☑ **The applicant believes** that the facts stated in section 10 (and any continuation sheets) are true. **I am authorised** by the applicant to sign this statement.

**Signature**



☐ Applicant

☐ Litigation friend (where applicant is a child or a Protected Party)

☑ Applicant's legal representative (as defined by CPR 2.3(1))

**Date**

| Day | Month | Year |
|-----|-------|------|
| 2 2 | 0 8 | 2 0 2 4 |

Full name

Edward John Whitney Allen

Name of applicant's legal representative's firm

ENYO LAW LLP

If signing on behalf of firm or company give position or office held

Partner

Applicant's address to which documents should be sent.

Building and street

Fifth Floor, 1 Tudor Street

Second line of address

Town or city

London

County (optional)

Postcode



| E | C | 4 | Y | 0 | A | H |
|---|---|---|---|---|---|---|

If applicable

Phone number

020 3837 1610

Fax phone number

DX number

Your Ref.

SAL1.1

Email

Edward.Allen@enyolaw.com

salinas@enyolaw.com

**Claim No: CL-2024-000450**

<u>IN THE HIGH COURT OF JUSTICE</u>

<u>BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES</u>

<u>COMMERCIAL COURT (KBD)</u>

**BEFORE: [ ]**

**DATED: [ ]**

**B E T W E E N :**

**(1) RICARDO BENJAMIN SALINAS PLIEGO**

**(2) CORPORACION RBS SA DE CV**

<u>**Claimants**</u>

**-and-**

**(1) ASTOR ASSET MANAGEMENT 3 LIMITED**

**(2) WEISER GLOBAL CAPITAL MARKETS LTD**

**(3) TAVIRA MONACO SAM**

**(4) VLADIMIR "VAL" SKLAROV**

**(5) CORNELIUS VANDERBILT CAPITAL MANAGEMENT LTD**

**(6) ASTOR CAPITAL FUND LIMITED**

<u>**Defendants**</u>

---

*Draft* **ORDER**

---

**UPON THE ORDER** of Jacobs J dated 2 August 2024 granting injunctive relief (the "2 August Order")

**AND UPON THE ORDER** of Jacobs J dated 7 August 2024 granting injunctive relief (the "7 August Order")

**AND UPON THE ORDER** of HHJ Pelling KC (sitting as a High Court Judge) dated 13 August 2024 granting injunctive relief (the "13 August Order") (together with the 2 August Order and the 7 August Order, the "Injunction Orders")

1

**AND UPON THE APPLICATION** of the First, Fourth, Fifth Defendants and prospective Sixth Defendant (the "Sklarov Parties") by application notice dated 20 August 2024 (the "Discharge Application") to set aside or discharge the Injunction Orders

**AND UPON THE CONCESSION** made by the Sklarov Parties (as set out in paragraph 9 of the witness statement of the Fourth Defendant ("Mr Sklarov") dated 20 August 2024) that they have deliberately failed to comply with the Injunction Orders insofar as such orders required the provision of information and documents

**AND UPON THE APPLICATION** of the Claimants for an "unless" order against the Sklarov Parties (the "Debarring Application")

**AND UPON READING** the evidence filed

**AND UPON HEARING** [*insert names of Counsel*]

**IT IS ORDERED THAT:**

1. Unless the Sklarov Parties comply in full with their respective obligations imposed by the paragraphs of the Injunction Orders set out below (together, the "Relevant Obligations") by no later than [*the time falling 48 hours after the time when this order is made*], the Discharge Application shall be struck out without further order of the Court. The Relevant Obligations are as follows:

    a. The obligations imposed on the First and Fourth Defendants by paragraphs 11 and 12 of the 2 August Order;

    b. The obligations imposed on the Fifth Defendant by paragraphs 11 and 12 of the 7 August Order; and

    c. The obligations imposed on the prospective Sixth Defendant by paragraphs 11 and 12 of the 13 August Order.

2. The Sklarov Parties shall pay the Claimants' costs of the Debarring Application on the indemnity basis, to be assessed by detailed assessment if not agreed. A payment on account of such costs in the sum of £[ ] shall be paid by the Sklarov Parties by no later than 4pm on

[*the date falling 24 days after the date of this order*]. The costs of the Discharge Application are reserved.

3. In the event that the Sklarov Parties comply (or purport to comply) with the Relevant Obligations by the deadline set out in paragraph 1 above, the parties shall have liberty to apply to fix a hearing to obtain case management directions for the determination of the Discharge Application.

4. A copy of this order shall be served by the Claimants on the Sklarov Parties.

# ENYO LAW

Fifth floor, 1 Tudor Street, London, EC4Y 0AH

Tel: +44 (0)20 3837 1700

www.enyolaw.com

Our Ref: EJA/SAL1.1                                                    22 August 2024
Your Ref: 109802.1

Listing Office                                         Direct line: +44 (0)20 3837 1610
Commercial Court                                          edward.allen@enyolaw.com
7 Rolls Building
Fetter Lane
London
EC4A 1NL

For the Attention of Michael Tame and Daniel Hull

**BY EMAIL**


Dear Sirs

**Claim No. CL-2024-000450 – Ricardo Benjamin Salinas Pliego & Another v Astor Asset Management 3 Limited and Others**

Introduction

1.    We act for the Claimants in the above proceedings.

2.    We refer to the letter of DWF to the Court dated 20 August 2024 on behalf of the First, Fourth and Fifth Defendants and prospective Sixth Defendant (the **Sklarov Parties**). This enclosed an application (the **Discharge Application**) to set aside or discharge the injunction orders of 2 August, 7 August and 13 August 2024 (the **Injunction Orders**).

Contempt of Court

3.    There is a preliminary point which must be addressed in advance of any substantive consideration of the Discharge Application, as to whether the Court should entertain the Discharge Application at all in circumstances where the Sklarov Parties are in contempt of Court.

4.    It is the Claimants' case that have been defrauded of the shares worth hundreds of millions of US dollars by Mr Sklarov (and his companies), who has a track record of committing stock-lending fraud, and operates through a corporate structure, which His Honour Judge Pelling K.C. found "*appears to be the subject of a number of red flags*" (13 August 2024 judgment).

5.    In the context of this case, compliance with the Injunction Orders is critical. In particular it is essential for the Sklarov Parties to provide the information which the Court has ordered them to provide about assets including the Claimants' shares and/or the traceable proceeds of those shares.

6.    However, the Sklarov Parties have not complied with the Injunction Orders. They have provided none of the information required by paragraphs 11 and 12 and Schedule C of each of the Injunction Orders, whether by affidavit or otherwise.

Enyo Law LLP is a limited liability partnership registered in England and Wales (registered number OC356313).
A list of members is available for inspection at the registered office, First Floor, 1 Tudor Street, London. EC4Y0AH.
Authorised and regulated by the Solicitors Regulation Authority (548866).

E N Y O   L A W

7.   Indeed, Mr Sklarov openly admits that the Sklarov Parties are in breach of the Injunction Orders. See paragraph 9 of Mr Sklarov's statement where he states: "*Given the blatant abuse of the Court's process, including obtaining a draconian order against me and the other Respondents without any sort of hearing beforehand, it has been very difficult for me to accept that I should provide Mr Salinas with information which might enable him to inflict yet further damage beyond what the Injunction Orders have already enabled. **I have been advised (without waiving privilege) as to the risks involved in not complying with an order of the Court...***" (emphasis added).

8.   Accordingly, the Sklarov Parties are in contempt of Court. Further, they are in *deliberate* contempt of Court in circumstances where they have been advised of the risks involved.

9.   The Sklarov Parties' failure to comply with the Injunction Orders is plainly impeding justice and impedes the Court's ability to get to the truth in this case.  Moreover, it runs a substantial risk that future orders or judgments against the Sklarov Parties may be rendered nugatory if the Claimants are not aware of the assets and traceable proceeds that may be available for enforcement and cannot police compliance with the freezing and proprietary orders. As matters stand, the Claimants are still unaware of the location of all of the Collateral Shares and/or their proceeds. If the Sklarov Parties are confident in their rights to the Collateral Shares then there would be no reason for them not to identify where they or their proceeds are presently located.

10.  In these circumstances, it is the Claimants' position that the Court should not entertain the Discharge Application at all unless the Sklarov Parties have complied in full with paragraphs 11 and 12 of the Injunction Orders within a short period of time of any order being granted. Accordingly, we have issued a cross-application for an unless order to that effect (the **Unless Order**). We enclose copies of that application and a draft order with this letter.

11.  Therefore, the Claimants propose that the Unless Order application be dealt with at the return date on 29 August 2024. At present, the hearing is listed for 1.5 hours. We consider that this will be sufficient to address this preliminary point as well as any procedural directions.

Timetable for the Discharge Application

12.  At the hearing on 2 August 2024, Mr Justice Jacobs made it clear that the return date on 29 August 2024 would not afford sufficient time to hear any applications to discharge the Injunction Orders. In particular, the hearing note records the following comments from Mr Justice Jacobs in relation to the time estimate:

> *MR. JUSTICE JACOBS: Ok. Shall we look at the order then? First question is what the time estimate should be. You have a one day time estimate. **So, the way things tend to work is that, on a return date, there is either no opposition and in which case things are dealt with reasonably quickly in half an hour or so, or if there is going to be a major [application for] discharge – it cannot take place there and then as some may want to submit witness evidence. So I would not normally have a time estimate for one day on the return date. I would have an hour and a half on the basis that there may be directions. I will say on this case an hour and half.** If it turns out that you will need more time as there will be a substantial argument on that day then inform the court and they can try to accommodate you, but I think I do not want to set aside a day at this point when the chances are that a day will not be required. So, we will say one and a half hours.* (emphasis added)

ENYO LAW

13.   Further, save for the discrete legal issue addressed above in relation to the Sklarov Parties' ability to bring the Discharge Application at all in circumstances where they are in contempt of Court, the Claimants will not be in a position to address the Discharge Application on 29 August 2024 (even if the time estimate is increased).

14.   In particular, the Claimants will not have sufficient time to prepare evidence in response to the Discharge Application in advance of the return date on 29 August 2024.

15.   Much of the Sklarov Parties' witness evidence, which runs to a 29-page witness statement and 482 pages of exhibits, consists of serious allegations about the Claimants including "*gross misrepresentations*" and "*dishonesty*" both inside and outside of these proceedings.

16.   Moreover, the Sklarov Parties also make serious allegations against the Claimants (and by implication their legal representatives) in relation to their duties of full and frank disclosure and fair presentation, alleging that matters were "*concealed*", "*misleadingly omitted*" and "*selective*" and that the conduct of the application was a "*blatant abuse of the court's process*".

17.   The Claimants are entitled to a proper opportunity to respond to these serious allegations, which they consider to be wholly unfounded.

18.   In these circumstances, the Sklarov Parties' proposed timetable for the Discharge Application, which proposes that the Claimants submit their evidence this Saturday (24 August 2024), just 4 days from having received Mr Sklarov's statement and exhibit, during the vacation period, and only 2 clear working days before delivery of skeleton arguments, is wholly unrealistic.

19.   By way of contrast, the Sklarov Parties have had some 18 days to consider and compile their evidence, since the First and Fourth Defendants were first served with an Injunction Order on 2 August 2024.

**Logistics**

20.   As noted above, the Claimants consider that 1 hour 30 minutes (being the current time estimate for the return date) will be sufficient to address the preliminary point on the Unless Order as well as any procedural directions.

21.   We request a remote hearing, given the nature of the hearing, the August vacation period, and the fact that the Claimant's leading and junior counsel are due to be away from London next week (albeit in the United Kingdom). If the hearing is remote, the Claimants are likely to request that permission be granted for certain persons to dial into the hearing from outside the jurisdiction of England and Wales (subject to the customary undertakings having been provided).

22.   The Claimants' legal representatives are available to assist the Court further in relation to the contents of this letter.

Yours faithfully

*Enyo Law LLP*

**Enyo Law LLP**
**CC. DFW, HFW, Stewarts**

3 (3)

# EXHIBIT 16



Neutral Citation Number: [2024] EWHC 2522 (Comm)

Case No: CL-2024-000450

**IN THE HIGH COURT OF JUSTICE**
**KING'S BENCH DIVISION**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**COMMERCIAL COURT**

Royal Courts of Justice, Rolls Building
Fetter Lane, London, EC4A 1NL

Date: 07/10/2024

Before :

**MR JUSTICE CALVER**

- - - - - - - - - - - - - - - - - - - - -

Between :

**(1) RICARDO BENJAMIN SALINAS PLIEGO**          **Claimants**
**(2) CORPORACION RBS SA DE CV**

**- and -**

**(1) ASTOR ASSET MANAGEMENT 3 LIMITED**          **Defendants**
**(2) WEISER GLOBAL CAPITAL MARKETS LTD**
**(3) TAVIRA MONACO SAM**
**(4) VLADIMIR "VAL" SKLAROV**
**(5) CORNELIUS VANDERBILT CAPITAL**
**MANAGEMENT LTD**
**(6) ASTOR CAPITAL FUND LIMITED**

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Charles Béar KC, Edward Levey KC and Tom De Vecchi** (instructed by **DWF Law LLP**)
for the **First, Third, Fifth and Sixth Defendants / the Applicants**
**Rajesh Pillai KC and Gretel Scott (**instructed by **Holman Fenwick Willan)** for the **Second
Defendant**
**Stephen Robins KC, Henry Phillips and Matthew Abraham** (instructed by **Enyo Law LLP**)
for the **Claimants / the Respondents**

Hearing dates: 20 September 2024
- - - - - - - - - - - - - - - - - - - - -

# JUDGMENT

**This judgment was handed down by the Judge remotely by circulation to the parties' representatives by email and release to The National Archives. The date and time for hand-down is deemed to be 10:00 on Monday 07 October 2024.**

**Mr Justice Calver :**

### *The Discharge Application: Introduction*

1. This is the application dated 20 August 2024 of D1 ("**Astor 3**"), D4 ("**Mr. Sklarov**"), D5 ("**Vanderbilt**") and D6 ("**Astor Capital**") (together, the "**Sklarov Defendants**") by which they seek to discharge or set aside the worldwide freezing and proprietary injunctions granted by Mr. Justice Jacobs on 2 August 2024 and 7 August 2024 and by HHJ Pelling KC on 13 August 2024 (together, the "**Injunctions**") by reason of the Claimants' alleged breach of their duty of full and frank disclosure (the "**Discharge Application**").

2. The application before Jacobs J on 2 August 2024 was made without notice to Astor 3, D2 ("**Weiser**"), D3 ("**Tavira**") and Mr. Sklarov; the application on 7 August 2024 before Jacobs J was made on very short notice to Vanderbilt (who did not attend); and the application on 13 August before HH Judge Pelling KC was made against Astor Capital (who did not attend but who were given informal notice of the hearing). Before me, the parties have proceeded on the basis that each of the defendants should be treated in the same way for the purpose of determining whether or not the injunctions were wrongly obtained on the ground of breach of the Claimants' duty of full and frank disclosure. For that purpose, both parties focussed upon the presentation of the Claimants' case before Mr. Justice Jacobs on 2 August 2024.

3. The Claimants' case, when they obtained the Injunctions, was that as a result of fraudulent misrepresentations, the First Claimant ("**Mr. Salinas**") was persuaded to transfer his shares in a Mexican company called Grupo Elektra SAB De CV ("**Elektra**"), which is listed on the Mexican stock exchange and which were worth more than US$400 million ("**the Collateral**") to two custodians, Weiser and Tavira, as security for loans ("**the Loans**") which were to be advanced by Astor 3 to the Second Claimant ("**RBS**") under a Stock Loan Agreement dated 28 July 2021 ("**the SLA**"). As part of the security, the custody documents entitled Astor 3 to give instructions in respect of the Collateral. Unbeknownst to the Claimants, Mr. Sklarov began to misappropriate and sell the Collateral, using a large portion of the proceeds thereof to fund the very Loans which were to be made to RBS under the SLA and paying away the remainder of the proceeds of sale to himself and various third parties.

4. The Claimants maintain that as soon as Mr. Salinas discovered that Astor 3 was not (as he had been led to believe) a reputable financial institution associated with the well-known Astor family from the United States but was instead a vehicle for fraud by Mr. Sklarov, they applied for the Injunctions.

5. The Sklarov Defendants take issue with this. They maintain that they were entitled to trade the Collateral under the terms of the SLA and in September 2021 they told Mr. Salinas's financial adviser that this was what they would do, as is customary in the stock lending market. They further argue that the Claimants delayed in seeking their injunctive relief, because their real motive in urgently seeking it was to justify to the market the sudden fall in the value of the Elektra shares.

### *The factual background*

6. The relevant factual background to the Discharge Application is as follows.

   *(i) The negotiations and the alleged representations*

7.    During the spring of 2021, Mr. Salinas wanted to refinance a loan from BNP Paribas. Mr. Salceda of Grupo Salinas was responsible for dealing with this. He had been liaising with Mr. Torti of Fininvesta, who acted as a financial adviser for Mr. Salinas. In turn, Mr. Torti dealt with Ms Akbar, a financial adviser liaising with Mr. Sklarov. In his first affidavit (subsequently dated 5 August 2024) which was before Jacobs J at the without notice hearing, Mr. Salceda stated as follows at [30]:

> *"During the course of the negotiations of the SLA, I believed that Astor was a legitimate lending firm. I was told by Mr. Torti that Astor was owned by the wealthy Astor family in the United States (and I understood that he had been told this by Ms Akbar)."*

8.    Mr. Salceda also explained how the key personnel were identified to him as being Thomas Mellon and Gregory Mitchell, said to be respectively the CEO and Managing Director of Astor Wealth Group. During and after the negotiations for the SLA, emails from Astor Capital Fund to Mr. Torti and Ms Akbar were copied to thomas.mellon@astorassetgroup.com and gregory.mitchell@astorassetgroup.com. Before Jacobs J, the Claimants maintained that neither of these individuals in fact exists (this is now admitted by Mr. Sklarov, at least so far as Mr. Mitchell is concerned – see further below).

9.    Before me, the Claimants drew attention to what they called "an internet puff-piece" which they reasonably suggested is likely to have been derived from the Sklarov Defendants themselves (a point with which Mr. Béar KC (leading Edward Levey KC and Tom De Vecchi) for the Sklarov Defendants did not take issue), which states that Astor Asset Management is a "*top financial company*" which "*bear the heavy responsibility of carrying on the family name and legacy. Thomas Mellon … is a descendent of the famed Astor family, a fact not lost on the prestigious financier*"; "*With a financial legacy dating back 200 years, the Astor name is legendary. That legend comes with privilege, but also carries a great responsibility. Thomas Mellon works tirelessly on behalf of his loyal clients and investors. But it is never far from his mind, that he has a duty also, to live up to the name and the legacy*"; "*As the CEO of Astor Asset Management, Thomas Mellon has continued the bold legacy built by his ancestors over 200 years ago*".

10.    There is clearly a good arguable case that prior to entering into the SLA, the Claimants made clear through Mr. Torti that they would provide the Elektra shares as the Collateral for the proposed loan but the shares should not be lent or sold absent a default on the part of the Claimants. That is clear from an email sent on 6 April 2021 by Mr. Torti to Mr. Salceda in which he confirmed the parameters for the loan which had been agreed with the Sklarov Defendants ("*prohibited to sell (unless there is a default) and lend the shares as collateral*"); and an email from Mr. Torti to Ms Akbar dated 4 May 2021 ("*securities lending restriction and short selling restriction considering the volume of Electra shares, we want to make sure that not only the lender, but also the custodian has a formal restriction on short selling or lending Electra stock. As discussed, a clause referring to this in the pledge document could probably meet this purpose*").

11.    The Term Sheet dated 29 March 2021 for the proposed lending, which Mr. Salceda stated in paragraph 45 of his first affidavit was circulated to him in April 2021 and was the basis upon which he decided to pursue a stock-backed lending arrangement with Astor Fund, also stated as follows:

> "**Custodian**
>
> A fully licenced and regulated brokerage firm shall serve as the custodian, with the pledged securities deposited into the Borrower's brokerage account on a per-tranche

basis. <u>Lender, in its sole and absolute discretion, shall identify a custodian broker dealer that shall retain and hold the collateral during the loan term"</u>

**Restrictions on Lender**

<u>During the loan term and while the loan remains in full force and effect, Lender shall not engage in short selling or selling of the Securities.</u>

**Loan Termination and Return of Collateral**

Within three (3) business days after the end of the Loan Term and upon Borrower's payment in full of the Principal Balance and any outstanding Interest Payments and any other costs and fees, <u>Lender shall return the Collateral to the Borrower in the same format as the collateral was originally delivered to Lender.</u>" (emphasis added)

12. The Claimants' case is that it was accordingly led to believe that the relevant Astor company which entered into the SLA (Astor 3) would not sell or trade in the Collateral prior to maturity of the loan or an event of default, and that the collateral would be safeguarded.

13. The SLA was drafted by Mr Sklarov and it was concluded on 28 July 2021 between Astor 3 (as Lender), RBS (as Borrower) and Mr. Salinas (as Guarantor). Consistently with the Term Sheet, in the "Lender Warranties and Representations" section (Clause V) it is expressly provided as follows:

(i) In clause 4b:

"***Dealing with Securities***

*During the Loan Term, provided that there has not been an Event of Default, the Lender will not sell or short-sell the shares of the Pledged Collateral on any publicly traded securities exchange. However, upon the occurrence of an incurable Event of Default, the Lender reserves the right to dispose of the Collateral on any publicly traded securities exchange but is not obligated in doing so*."

(ii) In clause 6:

"***Transfer of Securities****. The Lender will not transfer the securities to its own account unless an incurable Event of Default has taken place…*"

14. Mr. Salceda stated in his first affidavit that these provisions of the SLA (which are the provisions upon which the Claimants particularly rely) and the statements in the Term Sheet (set out above) were very important to him and Mr. Salinas (so that the Elektra share collateral was safeguarded) and without them they would not have entered into the SLA.

15. In his first affidavit, Mr. Salceda concluded as follows:

"*42. In light of the matters set out above, I understood Astor 3 to have made the following representations (prior to the execution of the SLA on 28 July 2021):*

*(1) that Astor 3 was a legitimate and honest financial institution which engaged in legitimate and honest stock-lending activities; and*

*(2) that Astor 3 intended to comply with its obligations under the SLA including in particular its obligations not to sell the Elektra shares prior to maturity or default.*

*(Together, the "Key Representations".)*

*43.  The Applicants executed the SLA on 28 July 2021 in reliance on the Key Representations*."

*(ii) The events of September/October 2021*

16.    The Claimants maintain that their belief that these alleged representations were being adhered to was reinforced by the events of September/October 2021, shortly after the SLA was concluded.

17.    On 10 September 2021 at 2.32pm, Mr. Torti emailed Weiser, Ms Akbar and Astor 3. He stated "*Based on some activity in Elektra shares [on the securities exchange], we would like to confirm by return of email that none of the Elektra shares pledged by Weiser has been lent (securities lending) as per our agreement*."

18.    Gregory Mitchell (whom it is now known is in fact Mr. Sklarov himself) replied at 8.53pm on the same date. His response was, as Mr. Robins KC (leading Henry Phillips and Matthew Abraham) for the Claimants described it, "jargon filled":

> "*Astor will merge or pool collateral rights as a portfolio and underwrites derivatives to hedge its risk and liquidity leverage.  This leads to collateral shares being made available for lending to its liquidity providers and other financial institutions who wish to borrow the shares.  As we had discussed previously, the shares may be rehypothecated which is standard practice (share borrow-lending between institutions).  This can't be stopped or restricted in all cases where the shares are free trading. Otherwise, the shares are restricted and we don't lend against restricted shares. I have never heard of free trading shares being restricted to borrow. When you custody shares with major banks, they all can and do engage in share borrow to each other.*
>
> *...*
>
> *Also, our loan agreement is transparent, the "Encumbrance" clause explains what can potentially take place with the stock, most of which we have no confirm over.*
>
> <u>*If you log into the account at Weiser, you will see that all the stock is there.  We have not sold any of it, which is in accordance with the loan agreement*.</u>
>
> *Please speak to Mr. Salinas and advise us if this is not an issue.  If it is an issue, we would need to revisit internally how to proceed, cause we can't stop or restrict others from borrowing free-trading unrestricted stock.*" (emphasis added)

19.    Whilst Mr. Sklarov spoke about "rehypothecation" being standard practice, Mr. Torti was also told that the stock had not been sold; it was all there. He appears to have been reassured by this as he responded by email later that same evening, stating:

> "*As long as all the terms of the contracts signed are duly respected, we are fine*."

20.    The Claimants maintain that they were further reassured that the representations were being adhered to by reason of the events of October 2021 (being one month later) as follows.

21. On 5 October 2021 Weiser informed Mr. Salceda that the 935,913 shares which Mr. Salinas had transferred to Weiser after the signing of the SLA, had been transferred from Mr. Salinas's account to an account in the name of Astor Capital.

22. This was a cause of concern to Mr. Salceda, who instructed Mr. Torti to send an email to Weiser seeking clarification, which Mr. Torti did. In the absence of a satisfactory resolution to this issue, Mr. Torti emailed Weiser on 19 October 2021 stating that the transfer to Astor Fund had taken place in breach of clause V of the SLA[1] and that the shares should be transferred back to Mr. Salinas's account without delay. Weiser responded on 22 October 2021 but merely stated that they had acted upon Astor 3's instructions under their Custodian Management Agreement. Mr. Torti then emailed Ms Akbar on 23 October 2021 in which he stated as follows:

"*It is very important that you have the sensibility of the necessity for the shares to return to the collateral contract until no later than in this week since if the account statement is issued without the shares there could be trigger an alienation with great tax implications.*

*Please we really need your help to make Astor and Weiser understand that they are breaching and violating the contracts*".

23. Significantly, on 25 October 2021, Ms Akbar told Mr. Torti that Astor 3 had agreed to reverse the instructions to Weiser and to arrange for the shares to be returned to Mr. Salinas's account within 24 hours.

24. The consequence of this was that Astor 3 agreed to sign an addendum to the SLA on 6 December 2021 ("**Addendum 2**") confirming that it would only issue instructions to the custodians in accordance with the terms of the SLA and not otherwise. It is strongly arguable that this would have reinforced the impression in Mr. Salceda's mind that Astor 3 would not deal in the shares in such a manner during the term of the loan (in the absence of an event of default).

25. In light of this incident, Mr. Salinas then insisted that any further tranches of collateral shares should be held by a different custodian in place of Weiser, and Tavira was appointed for that purpose under a control agreement dated 30 November 2021 between (i) RBS; (ii) Astor 3; (iii) Mr. Salinas and (iv) Tavira.

*(iii) The transfer of the Collateral tranches by Mr. Salinas*

26. As stated, the parties had entered into the SLA on 28 July 2021. Thereafter, Mr. Salinas transferred the Collateral for the Loans as follows:

(1)    935,913 shares to Weiser;

(2)    2,350,000 shares to Tavira on 15 December 2021;

(3)    314,087 shares to Tavira on 20 January 2022;

---

[1] It may also have been a breach of clause V6 of the SLA

(4)    1,431,700 shares to Tavira on 22 June 2022;

(5)    128,207 shares to Tavira on 3 April 2023;

(6)    1,600,000 shares to Tavira on 4 April 2023;

(7)    444,389 shares to Tavira on 12 September 2023.


*(iv) The fate of the Collateral which was transferred to Tavira*

27.    This made a total of 6,268,383 shares transferred to Tavira. The evidence of Mr. Salceda was that as at 2 August 2024 a combined total of 7,204,296 shares were held by Weiser and Tavira which were worth Mexican Pesos (MXN) 7.6 billion and US$415m, in respect of Loans of only MXN 2,154,218, 522 or US$115m.

28.    It is now apparent from paragraph 19 of Mr. Sklarov's first affidavit of 2 September 2024 (sworn on 5 September 2024), which he was ordered to swear by way of asset disclosure pursuant to the worldwide freezing injunction, that as soon as the Collateral was transferred to Tavira in the six tranches set out in paragraph 26 above, Astor 3 immediately rehypothecated[2] each tranche of Collateral on to Vanderbilt pursuant to "Rehypothecation Agreements" between them as follows:

   a. On 17 December 2021, Astor 3 rehypothecated 2,350,000 Collateral Shares to Vanderbilt.

   b. On 18 January 2022, Astor 3 "rehypothecated" 314,087 Collateral Shares to Vanderbilt.

   c. On 15 June 2022, Astor 3 "rehypothecated" 1,431,700 Collateral Shares to Vanderbilt.

   d. On 5 April 2023, Astor 3 "rehypothecated" 1,728,207 Collateral Shares to Vanderbilt.

   e. On 13 September 2023, Astor 3 "rehypothecated" 444,389 Collateral Shares to Vanderbilt.

29.    It is the Claimants' case that these "rehypothecations" to Vanderbilt were not, however, reflected in the monthly account statements sent by Tavira to the Claimants; and that it was only in an account statement provided to the Claimants on 1 August 2024 by Tavira that the Claimants were informed that on 29 July 2024 all 6,268,383 shares were subject to "FOP Delivery Out" (meaning "free of payment" by Vanderbilt) "*to Astor's account as per Astor's instructions*". In paragraph 11d of his first affidavit Luke Harris of Tavira appears to accept that this transfer out took place, although he appears to suggest that the transfer out of the shares to Astor 3's account only took place on 29 July 2024, which the Claimants dispute. Either way, Mr. Sklarov admits, in paragraph 20 of his first affidavit, that "*from the shares rehypothecated to Vanderbilt, Astor 3 received proceeds from Vanderbilt's sale and short sale of these shares. From these proceeds, Astor 3*

---

[2] Mr. Sklarov's (disputed) evidence in paragraph 58 of his first witness statement is that he understood that "*Tavira's practice was not to transfer shares from Mr. Salinas's account when shares were rehypothecated from that account by Astor 3 to Vanderbilt.*"

*withdrew USD 43,025,048 by way of a cash redemption, which … was then transferred to the Juris IQ account*" (which is referred to in paragraph 33 below).

30.    It appears from Mr. Sklarov's affidavit evidence that Vanderbilt began selling ~~trading in~~ the Collateral on to third parties immediately upon receipt in small tranches on and continued to do so on almost every trading day between 16 December 2021 and 2 April 2024 via many different Mexican brokers. Mr. Robins KC suggested that these were sales on a publicly traded securities exchange. Mr. Béar KC did not deny that and it seems likely that at least some of them were, as Mr. Sklarov accepts in paragraph 25 of his first witness statement of 1 September 2024 that:

"…*Vanderbilt, to which Astor 3 lent the shares for a period of 60 months, instructed that the shares be traded but does not know whether these trades were executed by Tavira on-market (i.e. on-exchange) or privately in an OTC (or block) trade since those trades were executed by Tavira.*"

31.    Mr. Sklarov suggests in paragraph 24 of that witness statement that this was not a breach of clause V(4)(b) of the SLA because it was not Astor 3 which sold the Collateral; rather it was Vanderbilt. But it is clearly arguable that Astor 3 instigated the sale of the Collateral, not least because a substantial part of the proceeds made their way back to Mr. Sklarov (see paragraphs 33-34 below).

32.    Significantly, in paragraph 53 of his 4th witness statement of 16 September 2024, Mr. Sklarov admits that as a result of the sales of the Collateral between 20 December 2021 to 29 July 2024 referred to above, a total sum of almost US$360m was received by Vanderbilt into its account at Tavira (which is no longer there). *He also accepts that the 3rd, 4th and 5th tranches of the Loans, which were provided to RBS, were funded from the very proceeds of the disposals of Mr. Salinas' own shares (ie. the Collateral) by Vanderbilt, being around $64.5m.*

33.    In paragraph 53c and 54 of his 4th witness statement, Mr. Sklarov states that the balance of the proceeds of the sale of the Collateral was disposed of by way of a transfer of US$271,685,472 from Tavira to client accounts controlled by Mr. JT Singh through his company Jurist IQ or his US Law Firm. Mr. Singh is an associate of Mr. Sklarov. Mr. Singh then apparently transferred back US$216,069,214 to Tavira and some of these monies were, according to paragraph 5 of Mr. Sklarov's second affidavit dated 5 September 2024, paid into different accounts of different companies for which Mr. Sklarov says he provides "consulting services".

34.    Further still, Mr. Sklarov also admits that between 28 July 2021 and 2 August 2024 (when the Injunction was granted), US$9,149,781 was paid to him personally from the Singh Law Firm and Jurist IQ accounts. Of this sum, US$4,388,736 was paid to Bank Hapoalim in Israel.

35.    Mr. Sklarov states in his first affidavit that this left Astor 3 holding about $13.5m, being US$963,000 in cash with Tavira and US$12,604,476 with Weiser.

36.    Meanwhile, Vanderbilt is left with virtually no assets: see paragraph 25 of Mr. Sklarov's first affidavit.

*(v) The fate of the Collateral which was transferred to Weiser*

37.    On 9 August 2024 Weiser served an affidavit of Christos Livadas in which Mr. Livadas stated (in paragraph 17) that Astor 3 had sold 935,716 of the Elektra shares held by Weiser

to Astor Capital on 30 July 2024 for MXN 233,929,000, equivalent to US$12,604,476.49. The Claimants maintain that this was a sale at a significant undervalue, in that the true market value of the said shares at that time was approximately MXN 982,501,800 (based on a share price on the open market was MXN 1,050 per share), equivalent to around US$ 52.1 million. Weiser has disclosed that it holds US$12,604,476.49 for Astor 3.

38.   However, it is not clear what Astor Capital has done with the 935,716 shares. Mr. Sklarov has failed to explain satisfactorily what happened.

39.   It is difficult to reconcile the evidence of Mr. Livadas with the Weiser account statements exhibited by Mr. Sklarov to his fourth witness statement. Those statements appear to show that Astor Capital sold a total of 687,000 shares in Elektra between 27.07.21 and 15.08.21, generating total cash proceeds of MXN 815,025,252. That is equal to 98% of the principal sums advanced to RBS by Astor 3 under the first two tranches of the loan. *On that basis, the Claimants contend that the first two tranches of the loan were, it seems, funded in the same way as the third, fourth and fifth tranches – namely, by selling the Collateral belonging to Mr. Salinas.* (This also makes it difficult to see how it can be true that 935,716 of the shares held by Weiser were sold in July 2024, as asserted by Mr. Livadas). Mr. Béar did not dispute this.

*(vi) Conclusions concerning the transfer of the Collateral*

40.   Accordingly, the foregoing evidence (including in particular that of Mr. Sklarov himself) suggests as follows:

(1)   Upon receipt of the Collateral, Astor 3 immediately started "rehypothecating" or transferring it to Vanderbilt, who then immediately started selling it to third parties, likely in at least some cases on a publicly traded securities exchange;

(2)   Astor 3 does not appear to have provided the Loans itself; rather it sold Mr. Salinas's own Collateral via Vanderbilt and used those funds to provide the Loans.

(3)   A significant tranche of the proceeds of the sale of the Collateral was paid over to Mr. Sklarov himself (including US$9,149,781 being paid to him personally from the Singh Law Firm and Jurist IQ accounts).

**The case as presented before Mr Justice Jacobs**

41.   Before Jacobs J, the Claimants sought both an interim proprietary injunction and a worldwide freezing injunction against the Sklarov Defendants. They accepted, and the parties agreed before me, that it was necessary for the Claimants to satisfy the court that their claims against the Sklarov Defendants raise a serious issue to be tried (for the purposes of the proprietary injunctions) and that they are good arguable claims (for the purposes of the freezing injunctions).

42.   The Claimants made their urgent application to Jacobs J having been informed by Tavira on 1 August 2024 that, as described in paragraph 29 above, on 29 July 2024 all 6,268,383 shares of which Tavira was custodian were subject to "FOP Delivery Out" "*to Astor's account as per Astor's instructions*".

43.   In their skeleton argument before Jacobs J, the Claimants put their case on the following bases:

(1)    Fraudulent misrepresentation;

(2)    Breach of contract;

(3)    An intention to cause harm by unlawful means and/or conspiracy to cause harm using unlawful means;

(4)    A proprietary injunction to restrain the Sklarov Defendants from dealing with or disposing of the Collateral shares or the proceeds thereof.

44.    Mr. Béar KC submitted that Jacobs J granted the Injunctions against the Sklarov Defendants based on the central propositions that trading in the Collateral had occurred and constituted a dishonest misappropriation of those shares, and that the Claimants had only recently discovered this. He submitted that those propositions were false and that the two orders of Jacobs J, as well as that of HHJ Pelling KC were granted "*because of serial and egregious misrepresentations and non-disclosures of both fact and law by Mr. Salinas through his witness … Mr. Salceda … and, regrettably, by [the Claimants'] counsel.*"

45.    Mr. Béar KC submitted that the entire claim of fraud was and is based on Astor 3 putting the Collateral into circulation, resulting in them being traded on the market.    The Claimants' case is that this contravenes the terms of the SLA and that, absent an Event of Default, Astor 3 was permitted only to retain the shares *as collateral* – to keep them in a 'locked box' which could not be opened.    On that approach, any step by Astor 3 which led to the shares being traded would be a breach of the SLA.

46.    But, Mr. Béar KC submits, an allegation of a simple breach of contract, however fundamental, is not enough for a claim of fraud, or for the proprietary claim to the shares which depends entirely on rescission for the alleged fraud.

47.    Indeed, Mr. Béar KC maintains that Astor 3 is not in breach of the SLA at all. As Astor 3 stated in its letter to RBS and Mr. Salinas dated 12 June 2024 ("**the 12 June letter**"), it advances a different construction of the SLA by reference to different provisions, which construction it relies upon as justifying its trading in the collateral in this case. It stated as follows in the 12 June letter:

"Pursuant to the SLA, and as a condition to funding, you granted the Lender an Encumbrance and Lien over the Shares. Section IV.7 states as follows:

*As of the date of this Agreement, the securities constituting the Pledged Collateral are owned by Guarantor free and clear of any Liens, Encumbrance or contractual, statutory, or regulatory limitation or restriction of whatever nature; are in good standing in accordance with their country of issue; and are freely tradeable and transferable securities and Guarantor hereby grants absolute first position Security Interest as a Lien and Encumbrance rights to Lender in exchange for Borrower receiving a Loan.*

Thus, throughout the loan term, you granted the Lender a first position Security Interest in the Shares. Security Interest is defined in Section I(51) of the SLA:

*Security Interest shall mean a Lien or Encumbrance granted by Guarantor to Lender in real property such as securities as Collateral for a Loan to Borrower. The Security interest granted to Lender prevents the Guarantor from disposing or transferring the*

*property or securities until such time as the Loan is repaid by Borrower to Lender and all Obligations of Borrower to Lender are discharged.*

Encumbrance is defined in Section I(21) of the SLA:

*Lender's legal claim on Pledged Collateral that affects the Borrower's ability to transfer ownership to anyone or to dispose of the Pledged Collateral without Lenders prior written authorization. For purposes of this definition, Encumbrance shall mean lien, mortgage, charge, hypothecation, rehypothecation, rights, barter, pawn, trade, dispose, deal-in, pledge, re-pledge, repo, borrow or transfer of security interest in Collateral. The Pledged Collateral will be restricted to Guarantor and Encumbrance rights exclusively granted to Lender.*

Thus, the SLA is express and clear that you granted the Lender the right to exercise its Encumbrance rights over the Shares during the loan term. Indeed, this is further supported by the definition of Lien which the SLA states is "*any Encumbrance of any kind referenced herein concerning the Pledged Collateral of Guarantor. A lien is the Lender's right to retain possession of property belonging to Guarantor until a debt owed by that Borrower is fully discharged per this Agreement.*" As such, the Lender is fully authorized to exercise its Encumbrance rights until such time that your debt is fully repaid in due course in accordance with the SLA.

The Lender's rights in the Shares are further defined in Section V.4, Dealing with Securities, of the SLA. Specifically, Section V.4(c) states that "*the Borrower acknowledges and agrees that the Pledged Collateral will be utilized by Lender to assert its preferential Lien over it.*" Therefore, the Lender has the right to deal-in the Shares to the extent that is defined within the meaning of Encumbrance. The Lender has, at all times, fully complied with and adhered to the language within the SLA.

Moreover, Section X, Required Disclosures, states, in part, that:

*During the Loan Term, all benefits and proceeds of the Pledged Collateral inure to Lender. Lender reserves the right to maintain dominion over the Collateral during the Loan Term, which affords Lender the right to deal-in, dispose, or convert over the Pledged Collateral.*

Therefore, by executing the SLA, you repeatedly re-affirmed the Lender's dominion and Encumbrance over the Collateral."

48.    On any view the SLA is ambiguously worded. However, it is the Claimants' case that it is deliberately so worded, being an instrument designed to allow Mr. Sklarov to perpetrate one of his trade-mark stock-lending frauds (as to which see below), this time against Mr. Salinas.

### The alleged non-disclosures

49.    Before me, Mr. Béar KC argued that in obtaining the injunctions the Claimants were in breach of their duty of full and frank disclosure in respect of the following six separate matters:

(1)    The way in which the Claimants' case was put concerning the key representations;

(2)    The way in which the Claimants presented the terms of the SLA;

(3)   The failure to explain that it is Astor 3's understanding of the contractual terms which matters;

(4)   The Claimants' case on there having been no delay in seeking the relief;

(5)   The Claimants' failure to inform the court of its true motive for applying for injunctive relief

(6)   The Claimants' case as to Mr. Salinas's wealth and probity.

(1)/(2)/(3)   *The Claimants' case concerning the key representations; presentation of the terms of the SLA/failure to explain relevance of Astor's subjective understanding of the terms*

50.   I shall take these three points together as they overlap.

51.   The misrepresentation case advanced before Jacobs J in the Claimants' skeleton argument was as follows:

"*(1) Misrepresentation*

*97. The Applicants have rescinded the SLA on the basis that it was induced by fraudulent misrepresentations, and they seek to recover the Elektra shares on a proprietary basis. They also seek damages against Astor 3 and Mr Sklarov for the tort of deceit.*

*...*

*99. In the present case, the key representations were:*

*(1) that Astor 3 was a legitimate and honest financial institution which engaged in legitimate and honest stock-lending activities[3]; and*

*(2) that Astor 3 intended to comply with its obligations under the SLA including in particular its obligations not to sell the Elektra shares prior to maturity or default[4].*

*100. The first of those representations was implicit in the circumstances of Astor holding itself out as a legitimate and honest financial institution which engaged in legitimate and honest stock-lending activities when offering to enter into the SLA.*

*101. As regards the second of these representations, Chitty explains at [10-14] (by reference to Kingscroft Insurance v Nissan Fire & Marine Co [2000] 1 All ER (Comm) 272 and SK Shipping Europe Ltd v Capital VLCC 3 [2022] EWCA Civ 23): "Making an offer may amount to a representation that in general terms the offeror intends and has the ability to perform the proposed contract, as they understand it". See Civil Fraud at [1-045] ("by entering into the contract the company impliedly represents that it has the present intention, and capacity, to perform its obligations"). In Kingscroft Insurance, for example, Moore-Bick J held that "the representation is likely in most cases to come down to no more than one of honesty in entering into the bargain". Males LJ confirmed in SK Shipping at [51]: "There are some circumstances where an offer to contract on certain terms carries with it an implied representation as to the party's honesty in relation to the proposed transaction. It is not necessary to see why this should*

---

[3] "key representation 1"
[4] "key representation 2"

*be so. Such honesty is the necessary substratum for all commercial dealings. It goes without saying". See, e.g., Property Alliance Group v Royal Bank of Scotland plc [2018] 1 WLR 3529 at [132]-[144]; UBS AG v CWL [2014] EWHC 3615 at [733]-[740]; and Lindsay v O'Loughane [2010] EWHC 529 at [103].*

*102. As set out above, the SLA involved the deposit of high-value shares as collateral for loans. Counterparty honesty is obviously highly important in such circumstances. A representation that the lender, who is given control over those shares, has the intention of complying honestly with its contractual obligations, including his obligation not to dispose of them wrongfully, is so obvious that it goes without saying and will therefore be readily implied. Indeed, no one would contract on any other basis.*"

52. Mr. Béar KC submitted that the 'key representations' are not based on anything alleged to have been specifically said or done by Astor 3, but merely on the fact that what became cl. V of the SLA was put forward as part of the pre-contractual discussions.

53. He argued that to establish fraud the Claimants needed to show not just that these purported misrepresentations were made, but that they were made dishonestly, and that the Claimants accordingly allege that the Sklarov Defendants must always have known that the contract prohibited the dealings which later took place and which they always intended. Accordingly, Mr. Béar KC submitted that the Claimants' case requires them to establish as follows:

(1) the SLA, and in particular cl. V, prohibited the share dealings of which the Claimants now complain;

(2) The Claimants understood the contract in that way;

(3) the Sklarov Defendants (or at least D1 and D4) also understood the contract in that way; and

(4) the Sklarov Defendants never intended to comply with the terms (allegedly) prohibiting the share dealings.

Mr. Béar KC submits that each of these propositions begs the question as to whether the SLA is to be construed as the Claimants suggest. He argues that the existence of a reasonable alternative interpretation of the SLA is fatal to the Claimants' case that Astor 3 could not have honestly believed that its dealing in the shares was permitted.

54. I do not accept Mr. Béar KC's submissions. Jacobs J had before him not only the fact that the parties had entered into the ambiguously worded SLA (which was drafted and put forward by Astor 3); the Claimants also relied upon the following features of the transaction in support of its fraudulent misrepresentation case.

55. First, Mr. Torti was led to believe (by Ms Akbar who had been liaising with Mr Sklarov) that the Claimants were negotiating and contracting with a company owned by the wealthy Astor family in the United States and accordingly that it was a legitimate and honest financial institution.

56. In fact, it was nothing of the sort. Rather (and there is strong evidence to suggest that), Mr. Sklarov used the Astor name precisely in order to mislead the Claimants into believing that this was so, and this was his *modus operandi* for stock-lending frauds perpetrated <u>by him</u>.

57.   Second, there was evidence before Jacobs J that Astor 3 was controlled by Mr. Sklarov: see paragraphs 71-87 of the Claimants' skeleton argument for the hearing before Jacobs J).

58.   Indeed, subsequent to the hearing before Jacobs J, in paragraph 12 of his witness statement of 1 September 2024 Mr. Sklarov sought to distance himself from the alleged fraud by suggesting that he was merely a "technical consultant" for Astor 3, Vanderbilt and Astor Capital and so on a day to day basis he had "limited knowledge" of the precise transactions entered into by those entities and limited access to their correspondence. He said he was "*not an owner, beneficiary nor employee or officer of those entities*". But that arguably appears to have been false, as he then swore two affidavits on 5 September 2024 on behalf of each of those companies as to their respective assets which he states is within his own knowledge. Similarly, his 4th witness statement of 16 September 2024 demonstrates that the "Elektra deal" as he calls it was his idea and his "business strategy."

59.   Third, before Jacobs J the Claimants maintained that Mr. Mellon and Mr. Mitchell (with whom the Claimants dealt in their correspondence with Astor 3 /Astor Capital) did not exist. Significantly, Mr. Sklarov was forced to admit in paragraph 87 of his 4th witness statement that Gregory Mitchell was in fact Mr. Sklarov himself. His purported explanation for this lacks any credibility. He states that he used this pseudonym because the use of his name "Vladimir" had led to him being discriminated in business. But that makes no sense in circumstances where the Claimants have discovered that he legally changed his name to Mark Simon Bentley on 22 April 2018, being long before the SLA was concluded. Indeed, Mr. Sklarov was also compelled to admit in paragraph 88 of the same witness statement that he had given his own solicitors false instructions in this regard, which led them (falsely) to inform the Claimants' solicitors by letter dated 5 September 2024 that "*Mr. Sklarov never dealt directly with Mr. Mitchell but understood he was someone who worked with Mr. Mellon.*" It is clearly arguable that using this pseudonym was an attempt of Mr. Sklarov to distance himself from the company through which he perpetrated the alleged fraud.

60.   So far as Mr. Mellon is concerned, who was the other person with whom the Claimants dealt in respect of this transaction, he too does not appear to exist, with the name being an alias for a Mr. Aleskei Skachkov, a business associate of Mr. Sklarov, as Mr. Sklarov now admits in paragraph 85 of his 4th witness statement. Mr. Allen explains in his 3rd witness statement dated 18 September 2024, served on behalf of the Claimants, that Mr. Skachkov is someone with a significant criminal record.

61.   It appears likely therefore – and certainly there is a good arguable case to such effect - Astor 3 and Astor Capital are creatures of Mr. Sklarov, rather than being legitimate and honest financial institutions which engaged in legitimate and honest stock-lending activities, as Mr. Sklarov sought to portray them as being[5].

62.   Perhaps most significantly, there was evidence before Jacobs J (as there is now before me) that, consistently with his use of the Astor name, Mr. Sklarov has gained some notoriety for setting up companies to which he then gives misleading names (being the

---

[5] Accordingly I do not consider that the Sklarov Defendants can draw any support for their case by reference to the Supreme Court's summary of a typical, bona fide stock lending practice in *Coal Staff Scheme v HMRC* [2022] 1 WLR 2359.

names of well known, reputable financial companies) and which he then uses to perpetrate stock-backed loan frauds. There are numerous instances of this, as follows.

63.    Dr Brent Satterfield owned shares in a listed company called Co-Diagnostics, Inc ("**CDI**"). In early 2018, Dr Satterfield was introduced to Mr. Sklarov who said that his company, America 2030, would make a loan to Dr Satterfield in the sum of US$3.5 million, secured over Dr Satterfield's shares in CDI, which were then worth more than US$7 million. Dr Satterfield handed over the shares, but America 2030 provided only US$67,000 of the loan. Dr Satterfield then discovered that America 2030 had already sold over US$1million of his shares in CDI. On 13 March 2019 Dr Satterfield commenced proceedings against Mr. Sklarov in New York. The New York court referred the dispute to arbitration in New York, pursuant to an arbitration clause in the loan agreement. On 9 July 2021 the AAA tribunal issued an award in favour of Dr Satterfield, holding that Mr. Sklarov had fraudulently induced Dr Satterfield to enter into the loan agreement by knowingly making false representations. The tribunal ordered Mr. Sklarov to return the CDI shares to Dr Satterfield. However, Mr. Sklarov failed to comply. On 12 November 2021 the New York court ordered Mr. Sklarov to return the CDI shares. Again Mr. Sklarov did not comply. On 2 May 2022 the New York court held that Mr. Sklarov was in contempt of court and directed him to purge his contempt, warning that an arrest warrant would be issued if he did not purge his contempt by 6 May 2022. Still Mr. Sklarov failed to comply. On 3 June 2022 the New York court issued a warrant for Mr. Sklarov's arrest. On 19 October 2023 the Supreme Court of the State of New York, Appellate Division, First Judicial Department, dismissed Mr. Sklarov's appeal against the issuing of the arrest warrant, which remains outstanding.

64.    In or around 2019, Mr. Sklarov was sued by Rothschild & Co in respect of his attempts to masquerade under the Rothschild name. Rothschild & Co complained that his use of the Rothschild name to engage in fraud in connection with stock-backed loans was damaging Rothschild & Co's reputation. The U.S. District Court, N.D. Georgia, Atlanta Division, granted a preliminary injunction against Mr. Sklarov. Subsequently, Mr. Sklarov signed a consent order which permanently enjoined him from using the Rothschild name.

65.    On 9 October 2020, Barclays plc sued Mr. Sklarov in respect of his attempts to masquerade under the Lehman name, which had been acquired by Barclays plc, alleging that Mr. Sklarov was the ring-leader of a fraudulent scheme to mislead and to deceive members of the public by "*seeking to … pass themselves off as the legitimate Lehman Brothers*". Barclays observed that Mr. Sklarov had previously sought to operate under various other well-known names with which he had no genuine association, including Credit Suisse First Boston; BNP Paribas Fortis; PricewaterhouseCoopers; Bear Stearns; George Soros Capital; and Warren Buffet Capital. On 19 March 2021 Mr. Sklarov signed a consent order enjoining him from using the Lehman name.

66.    Barclays plc described the nature of the frauds conducted by Mr. Sklarov:

    "*Although Sklarov has used various shell companies to perpetuate each alleged fraud, the fact patterns underlying each of the schemes are nearly identical: a Sklarov-related entity promises to provide a loan to a borrower backed by securities owned by the borrower; the borrower pledges the shares as collateral to the Sklarov-controlled entity; the Sklarov-controlled entity provides little if any of the*

> *promised loan funds to the borrower and then sells or attempts to sell the shares proffered only as collateral, and retains the proceeds*".

67.    In 2020 Sunpower Business Group Pte Ltd and Tournan Trading Pte Ltd (the "**Sunpower Shareholders**") owned shares in Sunpower Group ("**Sunpower**"), a listed company in Singapore. They were introduced to Mr. Sklarov (who appears to have been operating under the name "Mark Bentley", presumably as a result of his name change in April 2018), who told them that his company, America 2030 Nevis, could make a loan on attractive terms, secured over their shares in Sunpower. They transferred their shares in Sunpower to Weiser to be held as security for the loan. Subsequently, they discovered that their shares had gone missing from the account. It became clear that Weiser had sold the shares on the instructions of Mr. Sklarov. The Sunpower Shareholders commenced proceedings in Nevis accusing Mr. Sklarov of fraud and obtained a worldwide freezing order against him. Mr. Sklarov applied to strike out the claim but the Nevis court dismissed his application. Subsequently, Mr. Sklarov ceased to participate in the proceedings, and, in June 2020, the Nevis court issued a judgment in default against him. Mr. Sklarov sought to set aside the judgment in default, but his application was dismissed. The Nevis court held that Mr. Sklarov had carried out a stock-backed loan fraud and that the loan agreements were vitiated due to fraud. Mr. Sklarov's appeal was dismissed by the Court of Appeal of the Eastern Caribbean Supreme Court. On 9 August 2023 the Supreme Court of the Bahamas made an order for the registration and enforcement of the Nevis judgment in the Bahamas.

68.    To similar effect, Prescient Investment Limited ("**Prescient**") executed a loan agreement for $117 million with Mr. Sklarov's company, America 2030, and transferred shares worth £200 million as collateral for the loan. Prescient alleged that Mr. Sklarov had wrongfully ordered a broker to sell some of the shares and to pay the proceeds to America 2030. Prescient obtained an interlocutory injunction from the Hong Kong court to prevent any further disposals of the shares. Mr. Sklarov responded by causing America 2030 to bring a claim in the United States District Court, N.D. Georgia, asserting that the loan agreement permitted America 2030 to sell the collateral immediately, even before it had advanced any of the loan monies. The federal court dismissed America 2030's claims with prejudice and sanctioned Mr. Sklarov personally and enjoined him and his entities.

69.    Again to similar effect, ZS Capital Fund SPC ("**ZS**") owned shares in Zhejiang Cangnan Instrument Group Limited ("**Zhejiang**"). During early 2020 ZS was introduced to an entity named Astor Asset Management 3 Limited (incorporated in St Kitts and Nevis ("**Astor Nevis**") but for the avoidance of doubt, not Astor 3); and, on 12 May 2020 ZS entered into a stock loan agreement with Astor Nevis for a loan of US$31.8 million, secured over the shares in Zhejiang. On 17.06.20 ZS discovered that Astor Nevis had wrongfully dissipated almost 1 million of the shares in Zhejiang. ZS obtained an injunction to restrain Astor Nevis from disposing of any further shares. The dispute was referred to arbitration in Jamaica; and the arbitrator subsequently issued an award in favour of ZS.

70.    Again to similar effect, Fortunate Drift Limited ("**FDL**") owned shares in Yangtze River Port & Logistics Limited ("**YRIV**"). Mr Sklarov's company, America 2030, agreed to lend US$8 million to FDL, secured over shares in YRIV. FDL pledged the shares to America 2030, but America 2030 did not provide the promised loan. FDL then cancelled the loan agreement. However, America 2030 refused to return the shares and instead

began to sell them to third parties. FDL obtained a preliminary injunction to prevent America 2030 from disposing of the shares pending an arbitration in Hong Kong.

71.   And finally to similar effect, Chenming Holdings (Hong Kong) Limited ("**Chenming**") owned shares in Shandong Chenming Paper Holdings Limited ("**Shandong Paper**"), which is listed on the Hong Kong Stock Exchange. Chenming was introduced to Astor Asset Management 2 Limited ("**Astor 2**"), which agreed to make loans secured over Chenming's shares in Shandong Paper, which were lodged with Weiser by way of collateral. The loan agreements were signed by Astor 2 using a fictitious name. Chenming repaid the loan in full, but Astor 2 refused to return the shares in Shandong Paper. Chenming obtained *Norwich Pharmacal* relief from the Hong Kong court and subsequently discovered that almost all of its shares had been fraudulently transferred or sold by Astor 2 shortly after they were deposited with Weiser. On 08.02.24, Chenming commenced proceedings against Astor 2 and others (including Vanderbilt) in the United States District Court Southern District of New York, stating: "*This action … involves a carefully designed scheme by Defendants to enter into sham loan transactions with Plaintiff under the cover of separate shell companies, and fabricate defaults by Plaintiff under the loan agreements, in order to ultimately take possession and control of the Collateral and deprive Plaintiff of its rights to and interest in the same*". These proceedings are ongoing.

72.   It can be seen therefore that Mr. Sklarov and his companies appear to have a well-established *modus operandi* in the case of stock-based loan fraud.

73.   In summary, I consider that there is (and was before Jacobs J) clearly a good arguable case that it was impliedly represented to the Claimants, through Mr. Torti and Ms Akbar, that Astor 3 was a legitimate and honest financial institution which engaged in legitimate and honest stock-lending activities (i.e. key representation 1); that that representation was false and the Claimants were induced as a result to enter into the SLA (as to which, the evidence is summarised in paragraph 108 of the Claimants' skeleton argument before Jacobs J). The fact that (as Mr. Béar KC points out) Astor 3 was a newly-formed company specifically incorporated in Canada at the request of Mr. Salinas for the purposes of this transaction does not undermine the fact that, on the Claimants' case, it was led to believe that it was part of the highly reputable and well-known Astor group of companies engaged in honest stock-lending activities, when it was not.

74.   I also consider that there is a good arguable case, particularly in the light of the pre-contractual negotiations set out above, that it was impliedly represented to the Claimants that Astor 3 intended to comply with its obligations under the SLA including in particular its obligation not to sell the Elektra shares prior to maturity or default (i.e. key representation 2).

75.   As Mr. Robins KC submitted to Jacobs J at the without notice hearing on 2 August 2024 (transcript, p.10G), "*In summary, it appears from the facts that Astor 3 is not a legitimate and honest financial institution and it is to be inferred, particularly in light of Mr. Sklarov's prior stock lending frauds and his modus operandi, that Astor 3 never honestly intended to comply with its obligations under the SLA, including in particular its obligations to sell or otherwise deal with the Elektra shares prior to maturity or default.*"

76.   Contrary to Mr. Béar KC's submission, the Claimants' case before Jacobs J was not simply that a representation that Astor 3 would comply with its obligations under the

SLA follows from the fact that it entered into the SLA on the terms which it did. It was that Mr. Sklarov's use of the Astor name, and his track record of similar stock lending frauds (whereby he disposed of collateral and failed to return it), allowed the court to infer that Astor 3 (Sklarov's company) did not intend to comply with his obligations under the SLA, in particular that it would not sell or short sell the Collateral on any publicly traded securities exchange, as it was clearly the case that Astor 3 understood that it could not do that under the terms of the SLA. I consider that the Claimants had, and have, a good arguable case to that effect.

77.   Accordingly, Mr. Béar KC is wrong to submit that the way the case is put by the Claimants "is a naked attempt to turn a breach of contract claim into a (fraudulent) misrepresentation claim." It goes much further than that.

78.   Mr. Béar KC also criticised the Claimants' summary of the law contained in paragraph 101 of its skeleton argument before Jacobs J., in which they stated as follows:

> "*101. ... In Kingscroft Insurance, for example, Moore-Bick J held that "the representation is likely in most cases to come down to no more than one of honesty in entering into the bargain". Males LJ confirmed in SK Shipping at [51]: "There are some circumstances where an offer to contract on certain terms carries with it an implied representation as to the party's honesty in relation to the proposed transaction. It is not necessary to see why this should be so. Such honesty is the necessary substratum for all commercial dealings. It goes without saying."*"

79.   Mr. Béar KC argued that the authorities "do <u>not</u> support the existence of such wide and, indeed, vague representations of the kind alleged by the Claimants in paragraph 101". He contended that by selectively quoting from *SK Shipping Europe v. Capital VLCC 3* [2022] 2 All ER (Comm) 784 in the manner set out above, the Claimants' counsel inexplicably:

(1)   omitted a critical part of the sentence quoted from [51] of Males LJ's judgment (underlined below):

> "51.   <u>While these cases illustrate a general principle that, in the absence of words of representation, the mere offer of contractual terms will not amount to any representation,</u> there are some circumstances where an offer to contract on certain terms carries with it an implied representation as to the party's honesty in relation to the proposed transaction."; and

(2)   failed to mention that at [48] of *SK Shipping*, Males LJ specifically <u>disagreed</u> with Moore-Bick J's suggestion in *Kingscroft* of a general rule that a party represents that it is able and willing to perform the contract.

80.   Moreover, Mr. Béar KC referred to the fact that in [52] of *SK Shipping* (also omitted by the Claimants), Males LJ emphasised that any implied representation made by a party about its honesty or integrity is limited to the transaction in question. Referring to *Property Alliance Group v. Royal Bank of Scotland* [2018] 1 WLR 3529, Males LJ explained at [52] (emphasis added):

> "... the implied representation made by the bank was limited to sterling LIBOR (the currency of the proposed swap) and did not extend to a representation as to the bank's honesty, either in relation to other LIBOR currencies or generally. <u>It</u>

was the bank's honesty in relation to the particular transaction proposed which mattered."

81.   I agree with Mr. Béar KC's analysis of the relevant authorities, namely that merely by offering to contract, a party does not (without more) thereby impliedly represent that it is able and willing to perform the contract as he understands it. However, *in some circumstances* an offer to contract on certain terms may carry with it an implied representation as to the party's honesty in relation to the proposed transaction.

82.   Whilst the Claimants very properly referred to the three relevant authorities on this question in their skeleton argument before Jacobs J (*Kingscroft*; *SK Shipping* and *Property Alliance Group*) it would have been preferable had their skeleton argument made the point in paragraph 81 above clear (in particular the first sentence). However, I do not think it matters in this case. As Mr. Robins KC made clear in his submissions to Jacobs J,  the Claimants' case is that on the facts of this case, the Claimants' offer to contract on the terms of the SLA *did* carry with it an implied representation as to Astor 3's honesty in respect of the stock-lending transaction, in particular that it did not intend to dispose of the Collateral wrongfully (see paragraph 102 of the Claimants' skeleton argument before the Judge). That representation, upon which the Claimants relied, was false. Evidence of falsity was provided by Mr. Sklarov's numerous other, similar stock-lending frauds and his use of the Astor name. The vehicle of Astor 3 was being used by Mr. Sklarov to perpetrate a stock-lending fraud.  The Claimants had (and have) a good arguable case to this effect. Of course, it is now known by the Claimants that not only was the Collateral sold but Mr. Sklarov used the sales proceeds to fund the Loans themselves to RBS, as well as retaining substantial sums for himself.

83.   Mr. Béar KC also submitted before me that the Claimants failed to explain to the Judge that a party cannot act dishonestly by doing what it subjectively understands the contract to permit. But that is wrong; the Claimants expressly dealt with this point in paragraphs 214-216 of their skeleton argument, in the "Full and Frank Disclosure" section:

"*(3) No dishonesty*

*214. Astor 3 and Mr. Sklarov may take the position that there was no dishonesty in a representation that Astor 3 intended to comply with the terms of the SLA insofar as it relates to the use of the shares in Elektra.*

*215. In particular, they may contend that they honestly believed that the SLA permitted Astor 3 to cause the Pledged Collateral to be sold or disposed of at any time.*

*216. However, any such contention would be a factual allegation which would have to be established by them at trial in due course. On the basis of information available, and having regard to the evidence suggesting the involvement of Mr. Sklarov (a convicted felon) in the transaction, it is submitted that there is a good arguable case of dishonesty.*"

84.   Nor do I accept Mr. Béar KC's criticism of the Claimants that they failed to draw the Judge's attention to the Sklarov Defendants' alternative construction of the SLA, as entitling them to do what they did with the Collateral. On the contrary, in the section on "Full and Frank Disclosure" in the Claimants' skeleton argument before Jacobs J, the Claimants expressly drew the Judge's attention to the 12 June Letter and sufficiently

explained the likely gist of the alternative construction arguments advanced by Astor 3 (see for example paragraphs 184-194).

*Summary*

85.    In short, I do not consider that there was any breach of the Claimants' duty of full and frank disclosure in respect of (i) their implied misrepresentation case; (ii) their explanation as to the contractual arguments open to Astor 3 under the SLA; or (iii) whether they adequately explained that a party cannot be said to have acted dishonestly by doing what it subjectively understands the contract to permit.

*(4) Delay*

86.    Nor do I consider that the Claimants delayed in seeking their injunctive relief. The evidence demonstrates that the factual background to the making of the application before Jacobs J was as follows.

87.    On 1 April 2024, in advance of the Elektra shareholders' meeting on 16 April 2024, Mr. Gayo of Fininvesta emailed Tavira to ask it to obtain passes permitting entry to the shareholders' meeting. Tavira delayed in responding but eventually said that this was impossible.

88.    This gave rise to a concern on the part of the Claimants as to whether Tavira was still actually holding the shares (and accordingly able to grant such passes). Accordingly, on 5 April 2024 Mr. Salceda emailed Tavira stating: "*We need now the evidence of the custody of the 6,263,994 Elektra shares that we deposit in Tavira, without excuses!*"

89.    In response, on 5 April 2024 Tavira provided him with an account statement for Mr. Salinas's account as at 28 March 2024, showing that 6,268,383 Elektra shares were supposedly still held in Mr. Salinas's account.

90.    Luke Harris of Tavira confirmed in an email dated 5 April 2024 that "*Your shares are held in custody at Tavira and as per your statement you have visibility on the positions you hold with Tavira*". None of the matters in paragraphs 28, 30 and 32-35 appear to have been made known to Mr. Salceda.

91.    Tavira's inability to provide any *independent* corroboration of this fact continued to be a cause of concern to the Claimants. As a result, on 10 June 2024 Mr. Salinas sent letters to Tavira and Weiser pointing out that under the contracts "*it is forbidden for you to carry out trades, loan of Shares or any temporal or permanent transfer of such Shares*" and requiring Tavira and Weiser to "*confirm the number of Shares held in the Contract as of the Date of this Letter and provide with proper evidence of the said position. If the Shares are held by custodians and/or sub-custodians, please provide evidence of the number of Shares held by each of them*".

92.    Neither Tavira nor Weiser responded to these letters. Instead, on 12 June 2024 Astor 3 responded to Mr. Salinas, asserting that the "*letters to the Custodians constitute interference which is prohibited by the SLA*" and contending that Astor 3's lien or encumbrance over the Elektra shares gave it the right to "*deal-in, dispose, or convert*" them.

93.    Thereafter, Mr. Salceda explained in paragraphs 84-86 of his first affidavit that:

> "*84. On 2 July 2024, I contacted Gregory Mitchell (of Astor 3) by telephone and explained that the Applicants wished to prepay all sums owing to Astor 3 (in exchange for the return of the Collateral Shares). I followed up with Mr. Mitchell by email on 5 July 2024… where I reiterated the same proposal in writing. Albert Yuen provided a vague response on 8 July 2024: "Your request will be forwarded to the committee as appropriate for consideration".*
>
> *85. I chased for a response on 12 July 2024. On 15 July 2024, Albert Yuen (of Astor 3) responded as follows: "The request we received from you was sent onward and we are currently waiting for further information/instructions. We will be sure to follow up".*
>
> *86. I felt that I was being fobbed off. A few days later, the Applicants instructed Paul Weiss to provide legal advice on this situation, and Paul Weiss instructed Counsel. On Thursday 25 July 2024, I attended a (privileged) consultation with Paul Weiss and Counsel. This resulted in the immediate appointment of Forward Risk…*"

94. Forward Risk, who were investigators, reported to Mr. Salceda on 31 July 2024. They informed him amongst other matters that companies in the Astor Group appeared to belong to Mr. Sklarov and that Mr. Sklarov had been guilty of numerous stock-backed loan frauds (set out above). The Claimants were also informed on 1 August 2024 by Tavira that on 29 July 2024 all 6,268,383 shares of the collateral of which Tavira was custodian were subject to "FOP Delivery Out" "*to Astor's account as per Astor's instructions*".

95. The Claimants then sought their urgent injunctive relief before Jacobs J on 2 August 2024.

96. In the circumstances, I do not consider that the Claimants delayed in seeking their injunctive relief.

97. The Sklarov Defendants contend, however, that the Claimants delayed for more than three years (since September 2021) before seeking the Injunctions and that this inexplicable delay "*was glossed over in their evidence and not properly drawn to the Court's attention*" (Sklarov 1, [5f] and [61]).

98. I do not accept this criticism.

99. The criticism is based upon the alleged fact that in the email sent by "Gregory Mitchell" (Mr. Sklarov) to Mr. Torti on 10 September 2021 (referred to above), he was told "*in the clearest possible terms—that: (a) Astor 3 intended to do the very thing now alleged to be dishonest; and (b) that this was entirely in accordance with the terms of the SLA*". And yet, submits Mr. Béar KC, Jacobs J was not even told about this email.

100. The short answer to this point is that, as Mr. Salceda states in paragraph 16-26 of his 4th witness statement, he and the Claimants were unaware of the material parts of this email exchange and the information contained in it until Mr. Sklarov referred to it in his 1st witness statement of 1 September 2024. Mr. Torti failed to forward it to Mr. Salceda at the time. There was, therefore, no reason for the Claimants to have been aware of it 3 years later when seeking their urgent freezing relief.

101. Mr. Béar KC submits that this is a "wholly inadequate explanation" and "inherently unlikely and not credible". But the court plainly cannot make a finding at this interlocutory stage that the Claimants did receive this email, despite Mr. Salceda's denial

in his witness statement, or that they failed to make reasonable enquiries of Mr. Torti and had they done so they would have discovered it. It may very well have been, for example, that Mr. Torti did not forward the email because he was reassured by the contents of the 10 September 2021 email that Astor 3 was not selling the Collateral and that it was all still in Weiser's account ("*If you log into the account at Weiser, you will see that all the stock is there. We have not sold any of it, which is in accordance with the loan agreement*"); whereas a few weeks later the stock began to be moved out of Weiser's account, sold, and the proceeds used to make the Loans or paid away to third parties including Mr. Sklarov. Either way, the Claimants have given sworn evidence through Mr. Salceda that he and they did not know that the email existed. It is not open to the court to infer otherwise at the interlocutory stage simply because in the email Mr. Torti was told to "*speak to Mr. Salinas and advise us if this is not an issue*".

102.    As set out above, Mr. Torti and the Claimants were also reassured that the Sklarov Defendants were not doing anything untoward with the Collateral as a result of the events of October 2021. When the Claimants complained to Astor 3 and Ms Akbar about the transfer of 935,913 shares by Weiser to Astor Capital in October 2021, their concerns were assuaged at that time by Astor 3's agreement (i) to return the shares to Mr. Salinas's account, (ii) that further tranches of shares would be held with a different custodian and (iii) to the terms of Addendum 2 which confirmed that Astor 3 would comply with the terms of the SLA.

103.    Subsequently the Claimants were provided with regular account statements from Weiser and Tavira showing that the shares were in Mr. Salinas's account and had not been moved. They had no reason to believe at the time that the account statements were inaccurate.

104.    In short, the Claimants have a good arguable case that there was no reason for Mr. Torti or the Claimants to believe that Astor 3 was acting dishonestly in all the circumstances; nor that there was reason to believe that the Collateral was being sold. It follows that the 10 September 2021 email accordingly does not undermine the Claimants' case on key representation 2 in any event, viz that the stock-backed loan transaction was a vehicle for Mr. Sklarov's well-practised fraud and in particular that Astor 3 never intended to comply with its obligation not to sell the Elektra shares prior to maturity or an event of default.

105.    Contrary to Mr. Béar KC's submission, this conclusion is not affected by the WhatsApp messages referred to in the 4th witness statement of Mr. Sklarov which passed between Ms Akbar and Mr. Sklarov on 14 June 2024. These are exchanges to which the Claimants and Mr. Torti were not even parties and so obviously the Claimants could not have disclosed them at the hearing before Jacobs J. Moreover, they apparently concern the Claimants' complaint that Astor 3 was short selling or engaging with third parties to sell. Ms Akbar asks Mr. Sklarov if this is indeed true. Mr. Sklarov responds that "*We already made it clear that Astor is not selling*" – although by this stage it arguably appears that it was. Ms Akbar then tells Mr. Sklarov that Mr Torti spent an hour on the telephone with Mr. Salceda on the 13th June and advised him to review the SLA, and that whilst Mr. Torti "*gets it*", Mr. Salceda is "*a little bit of a loose cannon*". However, precisely what she discussed with Mr. Salceda and/or Mr. Torti in this regard will clearly be a matter for trial.

106.    It follows that I reject Mr. Béar KC's submission that these email and WhatsApp exchanges demonstrate that it was misleading for the Claimants to suggest to Jacobs J that they only discovered the fraud at the consultation with their legal advisers on 25 July

2024 and that rather "there has been an extraordinary and unexplained failure to act or investigate their own purported concerns for almost 3 years."

107.    In any event, there was (before Jacobs J) and is (before me) plainly a risk of dissipation in the present case and the injunction granted by Jacobs J has managed to preserve a substantial portion of the assets and/or their proceeds. In these circumstances, I consider that any delay in bringing the application (which I do not accept occurred) would not have led to the injunction being refused. In *Madoff Securities International Ltd v Raven* [2011] EWHC 3102 (Comm) at [156], Flaux J (as he then was) stated (approved in *JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev* [2015] EWCA Civ 906 per Bean LJ at [34]):

> "*The mere fact of delay in bringing an application for a freezing injunction or that it has first been heard inter partes, does not, without more, mean there is no risk of dissipation. If the court is satisfied on other evidence that there is a risk of dissipation, the court should grant the order, despite the delay, even if only limited assets are ultimately frozen by it.*"

108.    Furthermore, in the context of an application for a proprietary injunction (which the Claimants sought and obtained here), the potential relevance of delay is even more limited because it is not necessary to show that there is any risk of dissipation: see *Madoff* at [128].

*(5) The Claimant's failure to inform the court of its true motive for applying for injunctive relief*

109.    Mr. Béar KC further submitted that the Claimants came to court on 2 August 2024 under the pretext that they had only discovered the alleged fraud at consultation with their legal advisers on 25 July 2024. He suggested that, in fact, what motivated Elektra to make the market announcement on 26 July 2024, which led (at Elektra's request) to the suspension of trading in the shares by the Mexican Stock Exchange on the same day, was the decline in Elektra's share price. He pointed to the fact that on 26 July 2024 *Simply Wall Street* (a market-leading financial app with c. 6m users) reported that Elektra's earnings had been in decline over a 5-year period, and declared Elektra to be an investment risk. This came on the back of reports of Elektra's poor results for Q2 (announced on 24 July 2024) recording a net loss of MXN 643 million (about US$34 million) versus a profit of MXN 4.94 billion (about US$250 million) for the same period in 2023.

110.    Mr. Béar KC said that none of this commercial background was drawn to the court's attention and that it is beyond dispute that the duty of full and frank disclosure requires a 'fair presentation' of the facts. He submitted that in this case, a 'fair presentation' required the Claimants to explain what else had been happening in the critical period prior to the alleged discovery of the fraud on 26 July 2024 and that this provided the motive for the application for injunctive relief.

111.    I reject Mr. Béar KC's speculative submission. The Claimants could not reasonably have anticipated at the hearing before Jacobs J that the Sklarov Defendants would subsequently advance such an argument concerning their motive. Moreover, Mr. Béar KC's submission concerning the financial health of Elektra and the Claimants' motivation for bringing its injunction applications is highly contentious: see paragraphs 126-129 of the Claimants' skeleton argument. This is also a case, therefore, where the

court cannot and will not embark upon a trial within a trial to establish whether or not facts existed which are alleged to be material.

112.  As to that, the duty of full and frank disclosure "*cannot mean that a party must rehearse before the judge at the without notice application a detailed analysis of the range of possible inferences which the defendant may seek to draw ... That is particularly so when both the existence and the relevance of the underlying facts are in dispute*" (*Kazakhstan Kagazy plc v Arip* [2014] EWCA Civ 381 per Elias LJ at [70]).

113.  As Slade LJ held in *The Electric Furnace Co v Selas Corporation of America* [1987] RPC 23 at 29, "*it would be unreasonable to expect a plaintiff ... to anticipate all the arguments, or all the points, which might be raised against his case*". Similarly, Cockerill J held in *Arcadia Energy Petroleum Ltd v Bosworth* [2017] EWHC 3160 (Comm) at [135] that "*it is wrong for the court to expect that every iteration of a defence should be anticipated or that the detail which emerges in the longer phases of preparing the case should be drawn to the attention of the judge*".

114.  It is also important to bear in mind in a case such as the present the sensible observations of Slade LJ in *Brink's Mat Ltd v Elcombe* [1988] 1 WLR 1350 at 1359:

  "*By their very nature, ex parte applications usually necessitate the giving and taking of instructions and the preparation of the requisite drafts in some haste. Particularly, in heavy commercial cases, the borderline between material facts and non-material facts may be a somewhat uncertain one. While in no way discounting the heavy duty of candour and care which falls on persons making ex parte applications, I do not think the application of the principle should be carried to extreme lengths*".

115.  To the same effect, Christopher Clarke J (as he then was) observed in *OJSC ANK Yugraneft v Sibir Energy plc* [2008] EWHC 2614 (Ch) at [106], "*In complicated cases it may be just to allow some margin of error. It is often easier to spot what should have been disclosed in retrospect, and after argument from those alleging non-disclosure, than it was at the time when the question of disclosure first arose*".

116.  In the circumstances of this case, I do not consider that the Claimants can sensibly be criticised as to their presentation of the facts.

  *(6) Mr. Salinas's wealth*

117.  The same point can be made in response to Mr. Béar KC's submission concerning Mr. Salinas's wealth.

118.  Mr. Béar KC referred to the fact that in support of the Claimants' application, it was said that Mr. Salinas is "*one of the wealthiest individuals in Mexico with a net worth of several billion US dollars*": see paragraph 6 of Mr. Salceda's first affidavit 1 and paragraph 11 of the Claimants' skeleton argument before Jacobs J. He observes that both Jacobs J and HHJ Pelling KC took this at face value and "*did not even require the normal precaution for a foreign party obtaining injunctive relief of fortification of the cross-undertaking*".

119.  Mr. Béar KC submits that the Mr Salinas's wealth was relevant not only to the adequacy of the cross-undertaking in damages and fortification, but also to whether the Claimants are entitled to the *substantive relief* to which they claim to be entitled, namely rescission of the SLA and the consequent need to make counter-restitution – it being the Claimants'

assertion that they are "*ready, willing and able to repay all sums owing to Astor 3* [i.e. approx. US$113.9m] *immediately*": see paragraph 135 of Mr. Salceda's first affidavit.

120.   In fact, Mr. Béar KC suggests that Mr. Salinas is not a wealthy individual and that he has had massive financial woes, been beset by scandal, and is guilty of tax evasion.

121.   Once again, this is all highly contentious (see Mr. Salceda's 4th witness statement at [45]) and the court cannot and will not embark upon a trial within a trial to establish whether or not facts existed which are alleged to be material.

122.   Indeed, it is notable that in his first witness statement of 1 September 2024 Mr. Sklarov sought to rely upon three letters dated 21 July 2022, 23 March 2023 and 3 June 2023 in which he said that Astor 3 had raised these issues with the Claimants concerning Mr. Salinas's financial probity and issues with the Mexican tax authorities and regulators. However, Mr. Salceda's evidence (in his 4th witness statement of 8 September 2024) is that the Claimants never received those letters. Despite this, (as the Claimants point out in paragraph 133 of their skeleton argument) Mr. Sklarov has refused to explain how those letters are said to have been sent to the Claimants; and the Claimants allege that the metadata appears to be inconsistent with Mr. Sklarov's evidence. Mr. Sklarov's solicitors have recently confirmed that the Sklarov Defendants no longer rely on the letters.

123.   So far as fortification of the cross-undertaking is concerned, Jacobs J observed at the *ex parte* hearing that fortification, if it arose, would be an issue for the Sklarov Defendants to raise on the return date (transcript, p. 19F-G).

124.   A respondent who seeks fortification must show that there is a sufficient risk that the injunction will cause loss and the likely amount of any such loss: see *Sectrack NV v Satamatics Ltd* [2007] EWHC 3003 (Comm) per Flaux J at [99], applying and approving Harley Street Capital ltd v Tchigirinski [2005] EWHC 2471 (Ch) at [17]-[18] (Mr. Michael Briggs QC, sitting as a Deputy Judge of the High Court).

125.   As Mr. Robins KC submits, the Sklarov Defendants have not applied for fortification nor have they demonstrated, by evidence, that there is any satisfactory basis for requiring the undertaking to be fortified, particularly in the light of (i) Mr. Sklarov's asset disclosure in his affidavit of 2 September 2024 (which suggests very limited assets aside from the Collateral and the sale proceeds thereof); and (ii) the fact that the Collateral transferred under the SLA was worth as much as US$415m, being worth much more than the amount of the Loans: see paragraph 27 above.

        ***Conclusion***

126.   As Mr. Robins KC pointed out, the Sklarov Defendants do not seek to discharge the freezing injunction on the ground that there is no good arguable case in conspiracy or deceit; nor on the ground that there is no risk of dissipation of assets. They do not seek to discharge the proprietary injunction on the ground that there is no serious issue to be tried. They seek to set the injunctions aside solely on the ground that the Claimants were in breach of their duty of full and frank disclosure.

127.   I do not consider that the Claimants were in breach of that duty in any of the respects alleged by Mr. Béar KC, despite his skilful submissions. Indeed, stepping back and looking at the matter in the round, it is plain that the Claimants had to act swiftly once (i) they discovered the alleged fraud in mid to late July 2024; (ii) they received the significant information provided to them by Forward Risk on 31 July 2024; and (iii) they

were informed by Tavira on 1 August 2024 that on 29 July 2024 all 6,268,383 shares of which Tavira was custodian were subject to "FOP Delivery Out" "*to Astor's account as per Astor's instructions*". They did indeed move swiftly and made their application on 2 August 2024. The full and frank disclosure section of their skeleton argument before Jacobs J, contained in paragraphs 181-221, supplemented as it was by Mr. Robins KC's oral submissions, was a sufficiently fair and accurate summary, under pressure of time, of the arguments which they anticipated the Sklarov Defendants might put forward in answer to the application.

128.    The Sklarov Defendants contest the conclusions which the Claimants invited Jacobs J to draw from the evidence, but there is clearly a good arguable case that the representations alleged by the Claimants were made to them, were relied upon by them, and were false and I am not satisfied that the Claimants were guilty of any of the non-disclosures which it is alleged occurred at the hearings before Jacobs J and HHJ Pelling KC. I consider that the remarks of Toulson J (as he then was) in *Crown Resources AG v Vinogradsky* (unreported, 15 June 2001) are apposite in a case such as this[6]:

> "*it is inappropriate to seek to set aside a freezing order for non-disclosure where proof of non-disclosure depends on proof of facts which are themselves in issue in the action, unless the facts are truly so plain that they can be readily and summarily established, otherwise the application to set aside the freezing order is liable to become a form of preliminary trial in which the judge is asked to make findings (albeit provisionally) on issues which should be more properly reserved for the trial itself*".

129.    In all the circumstances the Sklarov Defendants' Discharge Application is dismissed.

---

[6] in a passage approved in *Kazakhstan Kagazy plc v Arip* [2014] EWCA Civ 381 at [36] and followed in *National Bank Trust v Yurov* [2016] EWHC 1913 (Comm) per Males J at [20] and *Petroceltic Resources Limited* [2018] EWHC 671 (Comm) per Cockerill J.

# EXHIBIT 17

First Defendant
Witness Statement of Mr. Vladimir Sklarov
First
Exhibit "VS1"
1 September 2024

**IN THE HIGH COURT OF JUSTICE**                    **CLAIM NO. CL-2024-000450**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (KBD)**

**BETWEEN:**

(1)  **RICARDO BENJAMIN SALINAS PLIEGO**

(2)  **CORPORACION RBS SA DE CV**

**Applicants**

**- v -**

(1)  **ASTOR ASSET MANAGEMENT 3 LIMITED**

(2)  **WEISER GLOBAL CAPITAL MARKETS LTD**

(3)  **TAVIRA MONACO SAM**

(4)  **VLADIMIR "VAL" SKLAROV**

(5)  **CORNELIUS VANDERBILT CAPITAL MANAGEMENT LTD**

(6)  **ASTOR CAPITAL FUND LIMITED**

**Respondents**

---

**STATEMENT OF VAL SKLAROV**

---

I, **VAL SKLAROV**, of 142 Gold Springs Court, Canton, Georgia 30114, USA **WILL SAY AS FOLLOWS:**

1.    I make this statement on behalf of myself and the First, Fourth, Fifth and Sixth Respondents and in support of the application to set aside the Freezing and Proprietary Orders of 2, 7 and 13 August

2024 (the "**Injunction Orders**"), which shall not be construed as submitting to the jurisdiction of the Courts of England and Wales and without prejudice to the Fourth, Fifth and Sixth Respondents' objections to the Court's jurisdiction for which all rights are reserved. In this statement I refer to the First Respondent as "**Astor 3**", the Fifth Respondent as "**Vanderbilt**" and the Sixth Respondent as "**Astor Capital**".

2.  The facts and matters set out in this statement are within my own knowledge unless otherwise stated, and I believe them to be true. Where I refer to information supplied by others or documents I have reviewed, the source of the information is identified; facts and matters derived from other sources are true to the best of my knowledge and belief.

3.  Although I was named Vladimir at birth, I officially changed my name to "Val" on 20 September 2006 by a court process in Illinois, USA. I was living in the USA and at the time there was a lot of distrust of Russian sounding names around the world. I have lived in the USA most of my adult life, consider myself an American and did not wish to remain "Vladimir".

4.  There is now produced and shown to me a paginated bundle of true copy documents marked "**Exhibit VS1**". Unless otherwise stated, all references to documents in this statement are to Exhibit VS1 and all specific page references are marked "**[Exhibit VS1/##]**".

1.  Overview

5.  The allegations of fraud made in these proceedings by Mr. Salinas and his company RBS are completely baseless, and the Injunction Orders were obtained only by gross misrepresentations and omissions. As I explain in this statement:

    a.  The central complaint of unauthorised stock dealings by Astor 3 in breach of the Stock Lending Agreement between it and RBS and Mr. Salinas (the "**SLA**") is simply incorrect and depends on ignoring provisions of the SLA which plainly contemplate and authorise rehypothecation (further lending-out of, or other transactions in, the stock) by Astor 3.

    b.  Stock which has been loaned out is by its very nature exposed to further transactions which can then be undertaken by the stock borrower, including in particular trading of that stock. This is a main function of the vast global securities lending industry, and a sophisticated and experienced businessman like Mr. Salinas must fully appreciate this.

    c.  Moreover, the intention to engage in such rehypothecation was expressly stated in correspondence in 2021 between Astor 3 and Mr. Salinas's and RBS's representative, Mr. Torti of Fininvesta. An activity now complained of by the Applicants as a breach and indeed a fraudulent breach of the contract was acknowledged at the time as legitimate on behalf of the Applicants.

d.  These provisions of the SLA and this correspondence were not drawn to the attention of Mr. Justice Jacobs (or HHJ Pelling KC on 13 August). Instead, the Court was presented with a selective and extremely limited look at other provisions. The correspondence was never mentioned and does not even feature in the 836-page Hearing Bundle.

e.  The correspondence between Astor 3 and Mr. Salinas's and RBS's representatives also drew attention to the basic commercial logic of the transaction. Astor 3 charged only interest of 1.15% per annum plus a management fee of 0.25% per annum and a one-off 1% origination fee. It was lending at up to 55% of the value of the Elektra stock price (which in 2021 was at an all-time high but typically has been well below that level). This very low return would never itself have motivated a commercial operation to make 5-year loans to RBS. It must always have been obvious to all concerned that there would need to be another way for the lender to make money. That could only be by using the pledged assets in other transactions – as is perfectly common and well-understood in the financial markets.

f.  In addition, the Applicants believed or suspected that Elektra shares were being sold in the market as a result of Astor 3 hypothecating the shares from, at the latest, November 2021 and did not progress the issue until November 2023, or suggest that Astor 3 was acting in breach of contract until July 2024. This delay is not explicable on the Applicants' case and it was glossed over in their evidence and not properly drawn to the Court's attention at the without notice hearings.

g.  Mr. Salinas himself stood to profit under the SLA, which he entered into with the assistance of financial advisors and legal counsel. Mr. Salinas was able to extract liquidity from his shares, while avoiding corporate governance restrictions and capital gains taxes. With an equity-based portfolio heavily reliant on a closely-held stock, Mr. Salinas could not be seen to deal with a significant portion of his shares without a negative market reaction.

h.  Despite all of this, Mr. Salinas and RBS not merely accused the Respondents of breach of contract, but of doing so deliberately and fraudulently. That accusation is not merely incorrect, but has been advanced in a misleading and indeed fundamentally dishonest way.

6.  Mr. Salinas's and RBS's dishonesty was not limited to their allegations of misconduct by the Respondents. They also concealed from the Court vital information as to the commercial and factual background to the proceedings, both in respect of Grupo Elektra SA de CV ("**Elektra**"), Mr. Salinas's principal business whose stock was the subject-matter of the SLA, and in respect of Mr. Salinas himself.

a.  On 26 July 2024, *Simply Wall Street* (a market-leading financial app which claims to have 6 million users) reported that second quarter earnings for 2024 were at a net loss of MXN 644 million (about USD 34 million) versus a profit of MXN 4.94 billion (about USD 250 million) for the same period in 2023. *Simply Wall Street* also stated that earnings had been

declining at an average annual rate of 34% over a 5-year period, and identified Elektra as an investment risk.

b.  The Q2 earnings themselves had been reported by the company on 24 July 2024 and had obviously been in preparation and anticipated by the company for some period before then. Elektra's shares then fell by 10% on 26 July 2024 – reported by Bloomberg Financial News as the biggest intraday drop since June 2017.

c.  None of this was mentioned to the Court in obtaining the Injunction Orders.

d.  On that same day, 26 July 2024, Elektra chose to make an announcement to the market that it had received information from its controlling group of a possible fraud by depositaries of their shares which could cause unusual movements of its price on the stock markets. As a result, the Mexican listing authorities chose to suspend trading in Elektra stock. There has been no further share trading of Elektra shares since 26 July 2024.

e.  The impact of Elektra's slide into loss-making has been halted by the suspension of trading which in turn was the predictable result of supposed discovery of fraudulent trading. This however created a need for the company to be seen to be taking action.

f.  In short, the supposed dishonest actions of the Respondents provide a convenient escape route for a well-known listed company, which faces disastrous recent financial results, and a run on its shares sufficient for a prominent online investment service to identify it as an investment risk. The share trading suspension has prevented a complete collapse in Elektra's shares but the reason used to obtain that suspension has created a need to find and pursue a scapegoat, which is an obvious (but improper) motivation for these proceedings.

g.  This course of events also explains the otherwise inexplicable delay on the part of Mr. Salinas and RBS in acting on the information and suspicions which they accept had for some considerable time concerning the actions of the Respondents and which I referred to above. However despite these supposed concerns, during the period between late 2021 to 2023, Mr. Salinas and RBS were content to receive three further tranches of loan payments, satisfy a margin call by Astor 3 in 2023 by pledging 1,728,207 additional Elektra shares, and request an additional loan from Astor 3 in 2023 against 444,389 newly pledged Elektra shares. Even in late 2023 and early 2024 the Respondents continued discussing potential additional lending of USD 100 million or more.

h.  Moreover, Mr. Salinas is not a respectable businessman as the Court obviously assumed in not even requiring him to provide fortification for his and RBS's cross-undertaking.

i.  On 20 March 2024, the Mexican tax authorities stated that Mr. Salinas owed MXN 63 billion (almost USD 4 billion), had 17 open and unresolved tax lawsuits, and seized a golf course

owned by Mr. Salinas.

ii.   Although Mr. Salinas stated he intended to challenge the tax ruling, on 13 June 2024 it was reported he had been ordered to pay an additional USD 1 billion in taxes. This was not a final order but in itself was reported to represent a substantial amount of Mr. Salinas's assets.

iii.   In 2005, the United States Securities and Exchange Commission ("**SEC**") brought criminal charges against Mr. Salinas for dishonestly, fraudulently and "elaborately concealing" his personal involvement in a target company which one of his other businesses, TV Azteca, was proposing to acquire. The factual basis for those proceedings was extensively set out by the SEC in public documents. When the acquisition was announced, he profited by USD 109 million. His personal interest had been not only concealed by him in breach of disclosure requirements, but he had positively and publicly denied any such interest when questioned about it. Mr. Salinas paid USD 7.5 million (without admitting or denying liability) to settle the SEC's action and also and also undertook not to be a director of any U.S. public company for a period of five years save under limited circumstances.

iv.   This year, the U.S. Department of Justice ("**DOJ**") indicted an officer of Bank Azteca, also controlled by Mr. Salinas and part of Grupo Elektra, for bribery of a US Congressman. The DOJ announced that it is investigating whether Mr. Salinas was involved.

v.   On 15 August 2024, *La Jornada* (a Mexican news outlet) reported that the National Banking and Securities Commission of Mexico ("**CNBV**") had imposed a fine on Mr. Salinas on 11 July 2024 for an amount of MXN 844,900 for disposing of Elektra shares without a public offering or auction authorised by CNBV.

i.   Grupo Elektra's (and Mr. Salinas's) troubles are relevant not only to the overall credibility of the Applicants' case. They also bear directly on the quantum of the supposed loss and damage and therefore on the size of the freezing order. For all these reasons, they also are matters which plainly should have been disclosed to the Court.

7.   A further respect in which Mr. Salinas and RBS failed adequately to present the Respondents' position concerns Events of Default under the SLA. This is of particular significance in relation to the action taken by Astor 3 at the end of July 2024. In accordance with the SLA, Astor 3 instructed the custodians, Weiser and Tavira, to transfer Elektra shares to its own account. The default provisions in the SLA permit expressly this step following an incurable Event of Default, which is precisely what had occurred in circumstances amounting to a Material Event concerning the financial condition of Mr. Salinas, RBS and Elektra. Elektra's declining performance, suspension of trading, Mr. Salinas's muti-billion dollar debt to the Mexican tax authorities, non-payment of interest and other fees, and other breaches of the SLA, singly and in combination, triggered Events of Default.

8. I am advised that on the basis of the misrepresentations and omissions summarised above, the Injunction Orders should never have been granted against any of the Respondents and in any event, must now be discharged.

9. Given the blatant abuse of the Court's process, including obtaining a draconian order against me and the other Respondents without any sort of hearing beforehand, it has been very difficult for me to accept that I should provide Mr. Salinas with information which might enable him to inflict yet further damage beyond what the Injunction Orders have already enabled. I have been advised (without waiving privilege) as to the risks involved in not complying with an order of the Court. I have also been advised that there are circumstances in which the Court will consider discharging an order even where a respondent to it has not complied with it. I believe that the blatant failures in this case amount to such circumstances.

10. I understand that the Applicants have sought relief for the stated purpose of enabling them to trace Elektra shares. I note that records of trading have been provided by the custodian, Tavira, in responding to the Injunction Orders. The First, Fifth and Sixth Respondents did not maintain their own records of trading in Elektra shares (and for the avoidance of doubt, nor did I). Each of these entities left the records to the custodian and relied on these records, as is normal practice in this market. In any event, the individual shares sold are not traceable or identifiable separately from any other shares of that description. The shares are dematerialised and have no individual serial number. The suggestion that the shares could be traced once they had been sold, like the contention that particular identifiable shares needed to be returned to Mr. Salinas and which appears to have been central to the Applicants' legal theories, is nonsensical. Indeed, this is a further respect in which the Applicants' case was presented in a misleading way.

11. I now set out the detail to show the way in which the Applicants unfairly and misleadingly presented their case to the Court, and why that case is clearly wrong.

   2. Background

12. I act as a technical consultant for financial intermediaries. Astor 3, Vanderbilt and Astor Capital are three such entities. I explain this in more detail below. In practice, however, it means that on a day to day basis I have limited knowledge of the precise transactions entered into by those entities and limited access to their correspondence. I am not an owner, nor beneficiary, nor employee or officer of those entities.

   3. The SLA

13. I am advised that the crux of the case against me and Astor 3 is that Astor 3 engaged in conduct which it and I understood from the outset was contrary to the terms of the SLA and which was dishonestly concealed from Mr. Salinas and RBS. Thus ultimately, it is my and Astor 3's subjective beliefs which are determinative for the allegation of fraud made against us. I am further advised

that the Applicants' case therefore necessarily involves as a first step showing that the SLA did not permit dealings in Elektra shares, and indeed that this was clearly so. On this basis, the Applicants then advance their central theory that Astor 3 (and I) can only have believed and understood that the SLA prohibited actions which were later taken and were always intended to be taken.[1]

14. As I now explain:

(1) The Applicants' case is clearly wrong and misleading in this respect; and moreover

(2) The presentation of the Applicants' case to the Court in obtaining the Injunction Orders in relation to the terms of the arrangements between the parties was seriously unfair, one-sided and grossly selective.

15. The SLA of 28 July 2021 [**Exhibit VS1/39-69**] **expressly** permits Astor 3 to act as it has done regarding the Elektra shares, namely to lend the Elektra shares to the Fifth Respondent, Vanderbilt. The Applicants did not refer at all to those express terms of the SLA that permit Astor 3, prior to an Event of Default, to dispose of, trade, deal-in or rehypothecate the pledged shares.

16. As the recital to the SLA records, by the SLA, Mr. Salinas (the Guarantor[2]) granted to Astor 3 (the Lender) a Lien in the 3.6 million publicly traded shares of Elektra.[3]

17. **Clause II(1)(a)** records in terms that Mr. Salinas "*hereby grants to* [Astor 3] *Lien rights over the Pledged Collateral (i.e. the Elektra shares) and in exchange* [Astor 3] *agrees to advance to the Borrower* [...] *a loan of up to c. 3 billion Mexican Peso*".

18. **Clause IV(7)** provides that Mr. Salinas "*hereby grants* [...] *Encumbrance rights to Lender in exchange for Borrower receiving a Loan*".

19. **Clause V(4)** provided that Astor 3 had "*Lien and Encumbrance rights in the Pledged Collateral*". Lien is defined as to include "*any Encumbrance of any kind referenced herein concerning the Pledged Collateral of Guarantor*". In other words, the SLA expressly provides that Astor 3 could create an Encumbrance over the Pledged Collateral. Encumbrance in the SLA is defined as including "*lien, mortgage, charge, hypothecation, rehypothecation, rights, barter, pawn, trade,*

---

[1] For example, paragraph 101 of the Applicants' Skeleton Argument of 2 August 2024 cites legal authority that "*Making an offer may amount to a representation that in general terms the offeror intends and has the ability to perform the proposed contract, as they understand it.*" [**Exhibit VS/88**] Paragraph 102 contends for an implied representation "*that the lender, who is given control over those shares, has the intention of complying honestly with its contractual obligations*". [**Exhibit VS/88**] Paragraph 109(2) alleges that Astor 3 "*never honestly intended to comply with its obligations under the SLA including in particular its obligations not to sell the Elektra shares prior to maturity or default* [...] *it intended from the outset to get control of the Elektra shares with a view to misappropriating them*". [**Exhibit VS/90**]

[2] Capitalised terms in the text have the meaning given to them by the SLA.

[3] Mr. Salinas is said to hold around 67.5 million shares in Elektra, out of a total of c.200 million Elektra shares (para 48 of Claimants' Skeleton Arguments) [**Exhibit VS/79**].

*dispose, deal-in, pledge, re-pledge, repo, borrow or transfer of security interest in Collateral*".[4]

20. Accordingly, pursuant to **Clauses II(1)(a) and IV(7)** of the SLA, Astor 3 was throughout the term of the Loan contractually entitled to (for example) dispose of, deal in, convert, or rehypothecate the Elektra shares.

21. That was reiterated in bold text in the *"Required Disclosures"* at **Clause X**:

> "*It is mutually understood and agreed that Lender has a financial interest and privilege in the pledged shares according to the parties' understanding and contractual agreement* […]*"*

> *"During the Loan term, all benefits <u>and proceeds</u> of Pledged Collateral inure to Lender."*

> *"Lender reserves the right to maintain dominion over the Collateral during the Loan Term, <u>which affords Lender the right to deal in, dispose, or convert over the Pledged Collateral</u>"* (emphasis added).

22. That entitlement of Astor 3 was subject to the restriction (**Clause V(4)(b)**) that during the Loan Term, provided there has not been an Event of Default, Astor 3 "[would] *not sell or short-sell the shares of the Pledged Collateral <u>on any publicly traded securities exchange</u>*" (emphasis added). There are a number of features and consequences of that restriction to which the Applicants should have drawn attention:

   a. <u>First</u>, the restriction is limited to selling or short-selling on any public securities exchange. Thus no other form of transaction was prohibited. In particular, and given the extremely wide definition of Encumbrance (the rights for which were granted to Astor 3), hypothecation, rehypothecation, trading, bartering, dealing, repledging, and disposals were all permitted. Rehypothecation in the industry means lending out. The borrower on the other side of that transaction may freely trade, convert, hedge, or further rehypothecate the shares.

   b. <u>Second</u>, it is implicit in that restriction that Astor 3 *was* in fact permitted to sell or short-sell the Pledged Collateral in private (known as Over the Counter or "**OTC**" or Off-Market[5]) transactions: otherwise the prohibition would not have been limited to a sale on any "*publicly traded securities exchange*", or would simply have been unnecessary. Thus, for that reason alone, the central contention of the Applicants that the self-same shares as were pledged had

---

[4] The full definition of Encumbrance is "*Lender's legal claim on Pledged Collateral that affects the Borrower's ability to transfer ownership to anyone or to dispose of the Pledged Collateral without Lenders prior written authorization. For purposes of this definition, Encumbrance shall mean lien, mortgage, charge, hypothecation, rehypothecation, rights, barter, pawn, trade, dispose, deal-in, pledge, re-pledge, repo, borrow or transfer of security interest in Collateral. The Pledged Collateral will be restricted to Guarantor and Encumbrance rights exclusively granted to Lender.*"
[5] The International Securities Lending Association ("**ISLA**") located in London, whose members include the world's largest banks and brokerage houses in its glossary describes OTC as: "*Over-the-counter or off-exchange trading is done directly between two parties, without the supervision of an exchange. It is contrasted with exchange trading, which occurs via exchanges.*" [**Exhibit VS/178**] A list of members of the ISLA is at [**Exhibit VS/170-177**]

to be returned cannot be correct.

    c.    Yet the Applicants' counsel told the Court on 2 August 2024 that "*any change to the pledged collateral that happened as a result of events outside of the lender's control (such as a stock division) will be permissible but subject to that identical securities have to be returned* […] *those shares will continue in existence as collateral and will not be disposed of in the meantime*" [**Exhibit VS1/124**].

    d.    <u>Third</u>, as I read and understood that clause at the time Astor 3 entered into the SLA (and as I still understand that clause), that restriction applied to "the Lender". Lender was defined in Clause I(31) to mean "*specifically the Lender described herein* [i.e. Astor 3] *and not any other*". Accordingly, as that definition makes clear, that restriction does not apply to other parties to whom Astor 3 might lend the shares. The restriction would still have value for Mr. Salinas, e.g. in relation to tax which might otherwise be due on his dealings in respect of the shares (avoiding which is a common motivation for securities lending transactions).

23.    It was easier for the Applicants' counsel to make the submission he did because he repeatedly referred to the prohibition in Clause V(4)(b) as being simply against "*selling*", omitting the qualification concerning public exchanges. Paragraph 22(4) of the Skeleton Arguments said that Clause V(4)(b) made it "*expressly clear that Astor 3 was obliged to retain the shares (and was not permitted to sell them) save on the occurrence of an incurable Event of Default*" [**Exhibit VS1/75**]. Then at the hearing on 2 August, counsel stated: "*clause* [V(4)(b)] *there is a representation and warranty from Astor 3 that it will not sell or short sell the shares on the pledged collateral during the main term, provided there has not been an event of default. That is an important obligation*" [**Exhibit VS1/124**].

24.    In fact, that submission was misleading. As the clause made clear, there was not a general prohibition on sale; rather Astor 3 itself as an entity was not permitted to sell or short-sell the shares "*on any publicly traded securities exchange*" (which it has not). But that vital qualification was simply omitted by the Applicants' presentation to the Judge.

25.    Indeed, Vanderbilt, to which Astor 3 lent the shares for a period of 60 months, instructed that the shares be traded but does not know whether these trades were executed by Tavira on-market (i.e. on-exchange) or privately in an OTC (or block) trade since those trades were executed by Tavira. Certainly, the trading instructions make no reference to it [**Exhibit VS1/179**].[6]

26.    Astor 3's entitlement was also subject to the restriction (**Clause V(6)**) that Astor 3 would not transfer the securities to its own account with the Depository Broker (i.e. the custodian) unless an incurable

---

[6] In that email, "*sell at market*" is a reference to market price. "*10 – 25% of VWAP*" is a reference to "Volume Weighted Average Price" and refers to the volume to be traded. "*Use discretion*" is an instruction for the broker to act as it considers appropriate. "*GTC*" means "good till cancelled".

Event of Default has taken place. Clearly, whether or not Astor 3 could transfer the shares to its own account at the custodian is a different matter from whether, during the term of the loan, the shares could be lent out or dealt with from Mr. Salinas's account by virtue of the "*dominion*" and "*grant*" of Encumbrance rights conferred on the Lender by the SLA.

27. Yet, misleadingly, the Applicants did not highlight the distinction. Instead, at paragraph 22(6) of their Skeleton Arguments, the Applicants said "*this wording made clear that Astor 3 could not transfer the Collateral Shares to its own account*" [**Exhibit VS1/76**]. In fact, the clause simply addresses the question of whether the shares could be transferred to Astor 3's custodian account; it says nothing about how the shares could be dealt with when they were still in Mr. Salinas's account (pursuant to the powers Mr. Salinas had given to Astor 3).

28. Likewise, the requirement at **Clause V(3)** for Astor 3 to credit dividends on the shares to the Guarantor's account, which was relied on by the Applicants, is not inconsistent with any of this. It simply obliged Astor 3 to give credit for dividends received or credited to its account at loan maturity. That reflects **Clause X** which provides that "*During the Loan Term, all benefits and proceeds of Pledged Collateral inure to Lender*".

29. It is therefore explicitly clear that, during the Term of the Loan, Astor 3 was permitted to lend, rehypothecate, barter, convert, trade, pawn, charge, pledge, repledge and otherwise deal in the way it has done with the Pledged Collateral.

30. Astor 3 confirmed (**Clause II(7)**) that it would maintain its full ability to release and discharge the Lien and return the Pledged Collateral to Mr. Salinas, *free of any Encumbrance,* within 3 business days of the Borrower's satisfaction of its Obligations (italics added). Again it is implicit in the italicised wording that the parties envisaged that Astor 3 could act in a manner that would lead to the Pledged Collateral being subject to Encumbrances; its obligation was to ensure that at the time it was to be returned the Pledged Collateral would not be subject to Encumbrances.

31. The definition of Pledged Collateral contemplated that Astor 3 would enter into transactions in respect of it during the term of the Loan. Pledged Collateral "*was the total actual shares pledged **and any shares** or proceeds __resulting from any transaction__, split-up, revision, reclassification, or other like change that may take place **of the Pledged Collateral during the term of the Loan**"* (emphasis added). Astor 3 could therefore return the relevant volume of securities with identical characteristics; it was not necessary to return the very same securities as were pledged, which makes sense as dematerialised securities are fungible and have no serial numbers or other unique identifiers so that any attempt to identify "the same" individual shares would be meaningless.

4. <u>How the SLA was presented to the Court</u>

32. None of the relevant sections of Clauses II and IV were referred to by the Applicants, either in their Skeleton Arguments or at the without notice hearing itself, and so the Court granted the injunction without ever being shown the clauses which expressly permitted Astor 3 to act as it had done. That is all the more remarkable given that by a letter dated 12 June 2024 to the Applicants, Astor 3 had expressly relied on Clause IV(7) as granting it the right "*to exercise Encumbrance rights over the Shares over during the loan term*" [**Exhibit VS1/477**].

33. Any full and fair presentation of the contractual position would have set out each of the clauses referred to above and identified what the Respondents would be liable to say about them, as well as what it had said about them in its letter of 12 June 2024. Indeed, as I explain below, this exercise did not even require any effort on the part of the Applicants or their advisers: Astor 3 had explained in the clearest terms in the email exchange between the parties on 10 September 2021 that it relied on the fact that the SLA had granted it Encumbrance rights, as defined, to support its declared intention to engage in rehypothecation and other dealings over the Pledged Collateral [**Exhibit VS1/327-328**].

34. By contrast, at paragraph 21 of their Skeleton Arguments for the 2 August hearing, the Applicants purported to summarise what they represented were the "*key terms*" of the SLA, but did so without providing the definition of Lien and Encumbrance and without referring to the fact that the SLA expressly provided by Clause II(1)(a) that, as the *quid pro quo* of the Loan, Astor 3 was to have Encumbrance rights over the Pledged Collateral [**Exhibit VS1/74**]. This was despite the fact that "Encumbrance" is referred 9 times in the SLA, the word "Lien" is referred 15 times and "Security Interest" is referred to 6 times

35. In other words, the Applicants omitted from its summary of "*key terms*" the very terms (Clause II(1)(a) and IV(7)) that, on their face, gave Astor 3 the express right to deal with the Pledged Collateral during the term of the Loan as the price of Astor 3 making the loan. Astor 3 had expressly relied on Clause IV(7) in its letter to the Applicants dated 12 June 2024 [**Exhibit VS1/477-479**]. Passing reference was made to the existence of that letter in the Applicants' Skeleton Arguments (paragraphs 187 and 53), but it was not quoted [**Exhibit VS1/109, 80**]. I am advised that it was the Applicants' duty to make sure that the Judge had read that letter in full and in any event was specifically aware of the provisions on which the Respondents relied or might rely. At the hearing, leading counsel for the Applicants suggested that he "*should show*" the Judge the letter and gave a page reference. It is not clear from the note whether the Judge was given time to read it [**Exhibit VS1/129**]. However, counsel stated "*As we set out in our skeleton argument, we do not think any of these clauses have any relevance to this question at all. For example, the fact that there is a clause stating that they have a lien or encumbrance over the collateral does not entitle them to appropriate it prior to maturity and without an event of default*" [**Exhibit VS1/129**]. That was clearly an inaccurate submission – the clauses to which Astor 3's letter referred were directly on point,

and on no view could they fairly be said to only apply in the event of default.

36. The Applicants' treatment of Astor 3's own stated position was deficient not only because they failed to give it proper prominence but because, as I have explained above, the Respondents' subjective understanding of the contract is in fact central to the Applicants' entire case of fraud. The case of fraud in turn is the justification for both the freezing order and the proprietary injunction. Instead the Applicants wrongly suggested at paragraph 186 of their Skeleton Argument that disagreements over the contract "*would not in any event prevent the Applicants from meeting the 'good arguable case' and/or 'serious issue to be tried' thresholds*" [**Exhibit VS1/109**]. Disagreements over the contract would have precisely that effect in the context of a case which depends, as the Applicants' does, not simply on being correct as to the meaning of a contract, but on being indisputably correct.

37. To compound matters, the Applicants simply suggested (at paragraph 21(2) of their Skeleton Arguments) that the effect of the agreement was that the loans were secured by a "Lien" over the Pledged Collateral [**Exhibit VS1/74**]. That gave the misleading impression that the lien simply provided a right of recourse against the Pledged Collateral in the event of default, whereas in fact Lien was defined (as the Applicants only mentioned in a later part of the Skeleton Arguments, when addressing a different clause - paragraph 188) so as to grant Encumbrance rights to Astor 3 [**Exhibit VS1/109-110**]. A full and fair presentation would have identified the words of Clauses II(1)(a) and Clause IV(7) and specifically addressed the definition of Lien and Encumbrance within the context of the SLA, and shown the Court the email of 10 September 2021 in which Astor 3 relied on its Encumbrance rights and explained that it was lending out the shares.

38. At the hearing, leading counsel for the Applicants suggested that "*we have set out the key provisions fairly extensively which your Lordship has looked at. In particular, at paragraph 22 of the skeleton, we set out the key provisions restricting the lender's ability to deal with the collateral shares during the term of the loan*" [**Exhibit VS1/124**]. That was untrue, for the key provisions of the SLA (including the first provision relied on in Astor 3's letter of 12 June 2024) had been omitted from the Court.

39. Instead, the Applicants suggested that they had identified only four provisions of the SLA which the Respondents might conceivably rely upon (paragraph 185 of the Skeleton Arguments), namely V(4)(a) and (c), IX(27), and X [**Exhibit VS1/109-111**]. They noted that none of those provisions were in the section entitled Substantive Terms of the Loan, and made the submission that the provisions which might be said to support the Respondents "*sit in tension with the substantive provisions of the SLA which the Applicants submit prevents Astor 3 from dealing in shares prior to the maturity date save in the event of an incurable Event of Default*" (paragraph 185) [**Exhibit VS1/109**].

40. That was an inaccurate and misleading submission. As set out above, Clause II(1)(a) says in terms

that the Mr. Salinas "*hereby grants to* [Astor 3] *Lien rights over the Pledged Collateral* [i.e. the Elektra shares] *and in exchange,* [Astor 3] *agrees to advance to the Borrower* [….] *a loan consisting of* [c. MXN 3 billion pesos]". Clause IV(7) provided that Mr. Salinas "*hereby grants* [….] *Encumbrance rights to Lender in exchange for Borrower receiving a Loan*". The Applicants did not refer to either provision.

41.  Moreover, the Applicants noted that Clause V(4)(a) merely *suggested* a power to transfer rights in Pledged Collateral was found elsewhere in the SLA. It was implicit in their submission that despite this suggestion there was no power to transfer rights in the Pledged Collateral elsewhere in the agreement. They did not go on to highlight the very provisions of the SLA which in fact conferred those rights to Astor 3, namely Clauses II(1)(a) and Clause IV(7). Instead, they wrongly asserted that power only existed on an incurable Event of Default.

42.  A similar point applies to Clause X, which was quoted in paragraphs 192-194 of the Applicants' Skeleton Argument but dismissed as "*boilerplate*" [**Exhibit VS1/111**]. That in itself was unfair. Clause X is in fact worded in ordinary English and is not a clause simply lifted from a standard form, so far as I am aware, nor a clause dealing with mechanical or administrative matters – rather, it is a clause which summarised the commercial understanding of the transaction and gave frank disclosure of legal rights and obligations. The words in Clause X which I have set out above confirm my interpretation of Clauses II and IV (and all the more so given the SLA's provisions governing its own interpretation at clauses IX(3) and (22)).

43.  In addition, the Applicants placed great weight on the fact that part of the definition of Pledged Collateral referred to "*the total actual shares pledged*" (paragraph 22(1) of the Skeleton Arguments) [**Exhibit VS1/74-75**]. What the Applicants did not, and should have, explained to the Court is that the pledged Elektra shares were not shares with a unique identification number; rather they were dematerialised and fungible shares as are all publicly traded securities, and that accordingly the concept of returning the '*actual shares*' pledged was not a meaningful one: there was no distinction between any of the shares of a given class. With that context, the suggestion (at paragraph 22(1)) that "*it is hard to see how the requirement* [to return the total actual shares pledged] *can be reconciled with any suggestion that some other (albeit equivalent) securities could be returned instead*" falls away [**Exhibit VS1/75**].

44.  I note that the SLA, which is in respect of a high value transaction, is not only explicit that by entering into it the parties are assuming considerable risk,[7] but also contains confirmations that the Borrower and Guarantor have taken legal advice as to the effect of the SLA (Clause X), that the Borrower and Guarantor are sophisticated investors (Clause IV(1)), and requires to be (and was)

---

[7] See for example, the definition of "Hybrid Loan" "*this Agreement is structured as an Investment*" where Investment means "*this Loan may be construed as a speculative Investment. Borrower and Guarantor being considered a sophisticated professional investors, and both being aware of all the risks associated with making a major investment where the outcome is unpredictable.*"

initialled on each page including those dismissed as "boilerplate".

5.  The Custody Management Agreements

45.  In addition to the express provisions of the SLA, to which I have referred, the Custodian Management Agreement dated 2 August 2021 between the Applicants, Astor 3 and Weiser and the Control Agreement between the Applicants and Astor 3 and Tavira Monaco SA dated 13 December 2021 both contained clauses which recorded the Applicants' agreement to Astor 3 dealing with and rehypothecating the pledged shares. See. for example, in the Weiser CMA [**Exhibit VS1/180-187**]:

a.  Clause 1 "Pledge by Borrower and Guarantor", RBS and Mr. Salinas appointed and authorised Astor 3 during the term of the agreement to have the exclusive lien over the Pledged Collateral, giving Astor 3 "*full power of authority to do and perform all and every act required or necessary to transact in the Pledged Collateral*".

b.  Clause 3 "Control by Lender", Astor 3's authority included the ability to exercise all rights and privileges that pertain to RBS and Mr. Salinas. By Clause 3.5, during the term of the loan, RBS and Mr. Salinas agreed to unconditionally and irrevocably relinquish, forfeit and renounce any right it may then or in the future have over the accounts in favour of Astor 3, in the form of a lien, and RBS and Mr. Salinas agreed not to inhibit, frustrate or interfere with Astor 3's instructions to Weiser or attempt to seek injunctive relief from any court of law or stock exchange to invalidate, terminate or restrict the CMA.

46.  Most strikingly, Clause 1 of the Tavira Control Agreement [**Exhibit VS1/188**], to which the Applicants were parties, provided: "*the parties acknowledge that* [Astor 3] *may from time to time provide notifications to* [Tavira] *directing it to sell, transfer, pledge, hypothecate, lend, withdraw or redeem any* [...] *stocks in the Accounts* [...] *(each an "Entitlement Order"). The parties further acknowledge that* [Tavira] *shall comply with any such Entitlement Order originated by* [Astor 3] *without any requirement for consent from, or notice to, the Claimants. For the avoidance of doubt, the* [Applicants] *shall have no right whatsoever to object to any Entitlement Order originated by* [Astor 3] *and complied with by* [Tavira]". This clause also was intentionally omitted and not brought to the Court's attention, either in the Skeleton Arguments or at the without notice hearing.

47.  The Weiser Account Terms and Conditions [**Exhibit VS1/194-209**], which were incorporated into the Weiser CMA went substantially further. Also strikingly, those terms confirmed the Applicants' agreement that securities held in the Guarantor's account might be the subject of securities lending by Weiser's custodian, which neither Weiser nor Astor 3 would be able to prevent and would likely be unaware of, but which might result in Mr. Salinas's "shares" being subject to stock lending and sold on-market. I understand this to be a general feature of the equity trading markets where dematerialised fungible securities are held in a chain of custody. This is set out in Clause 3: "*You agree that 'WEISER' may lend any securities held by 'Weiser' for you or on your Account via its*

custodian". "*Account*" is defined in the Weiser CMA as *"The Depository Account(s) maintained by the Borrower and Guarantor and held by the Custodian in favour of the Lender"*. Even more strikingly, Clause 9 permitted Weiser itself to trade in the deposited securities, independently and irrespective of any instructions given by Astor 3 and the terms of the SLA: "*You hereby authorise 'WEISER' to manage and control collateralised securities in any manner it deems appropriate, irrespective of any third party contracts you have entered into. Such control includes and is not limited to transfers, hypothecation, repurchase contracts, and transacting in the securities in any manner."* Once again, this could easily result in large numbers of shares held in Mr. Salinas's account at Weiser being subject to stock lending and sold into the market on exchange or privately as a block trade.

6.   Communication between the Parties regarding rehypothecation and Astor 3's dealing in shares

48.   After the First Addendum was signed on 9 August 2021, Astor 3 immediately advanced a sum of MXN 501,591,693 to RBS (USD 25,000,000), secured over 563,569 Elektra shares, which were held in Mr. Salinas's personal account with Weiser [**Exhibit VS1/274-282, 325-326**]. This was deemed a "Test Tranche" to make sure that the payment systems would work.

49.   On 10 September 2021, Astor 3 advanced another sum of MXN 327,497,030 to RBS, secured by 372,344 Elektra shares held in Mr. Salinas's personal account with Weiser [**Exhibit VS1/283-291**]. This was therefore the second active advance and corresponding receipt of Pledged Collateral by Astor 3.

50.   On that same day, Mr. Torti of Fininvesta wrote an email to Weiser and Astor 3, in which he stated that he had noticed some activity in Elektra shares and wanted confirmation that none of the Elektra shares had been lent [**Exhibit VS1/480**].

> *Dear all,*
>
> *Based on some activity in Elektra shares, we would like you to confirm by return of email that none of the Elektra shares pledged by Weiser has been lent (securities lending), as per our agreement.*
>
> *Thanks for confirming, best regards,*
>
> *Alexa*

51.   Astor 3 immediately responded to Mr. Torti at 8:53 pm that day, making very clear that such lending and rehypothecation was permitted under the SLA and CMA, that it was what Astor 3 was going to do (and if not would have to reconsider the loan), and that it was standard practice [**Exhibit VS1/327-328**]. Astor 3 wrote:

> *Dear Alexandre,*
>
> *Thank you for your email.*

*Astor will merge or pool collateral rights as a portfolio and underwrites derivatives to hedge its risk and liquidity leverage. This leads to collateral shares being made available for lending to its liquidity providers and other financial institutions who wish to borrow the shares. As we had discussed previously, the shares may be rehypothecated which is standard practice (share borrow-lending between institutions). This can't be stopped or restricted in all cases where the shares are free trading. Otherwise, the shares are restricted and we don't lend against restricted shares. I have never heard of free trading shares being restricted to borrow. When you custody shares with major banks, they all can and do engage in share borrow to each other.*

*This is imperative for loans of this size with very high LTV and at such a low interest rate.*

*You should also note, that everyone's stock can be borrowed. ELEKTRA appears on Interactive Brokers website borrow list. Thus, the entire float, plus some or all of the shares held by insiders can be accessed by major banks, lent out, shorted, etc. Please see the link below to Interactive Brokers Stock Lending program. You will see that ELEKTRA stock is there. Anyone can borrow the stock. Once someone borrows the stock, they can lend it out.*

*Further, we do not see any evidence of stock being hammered by anyone. Price is stable, volume is the same. Not sure what the concern is.*

*https://www.interactivebrokers.com/en/?f=4587&cntry=mexico&tag=Mexico&ib_entity=llcc&ln=*

*Important questions to ask prior to Astor's involvement:*

*1. Is the stock being lent out to anyone by insiders ?*

*2. Is the stock being lent out by any shareholders ?*

*3. Are you aware that the stock can be borrowed and lent out by anyone" ?*

*4. Has the short position increased the past 2 months ?*

*5. Does the Mexican Stock Exchange even allow for the stock to be frozen and not lent out ?*

*This is mostly prohibited in USA, Canada and many other countries.*

*My personal opinion, based on the terms you sought, high LTV and low interest rate, based on the stocks liquidity, I don't think anyone will agree to fund such large sums and not seek ways to enhance their yield. Mathematically it would not make sense.*

*Attached is the closing statement for this months disbursement (MXN 300,000,000).*

*Also, our loan agreement is transparent, the "Encumbrance" clause explains what can potentially take place with the stock, most of which we have no confirm over.*

*If you log into the account at Weiser, you will see that all the stock is there. We have not sold any of it, which is in accordance with the loan agreement.*

*Please speak to Mr Salinas and advise us if this is not an issue. If it is an issue, we would need to revisit internally how to proceed, cause we can't stop or*

*restrict others from borrowing free-trading unrestricted stock.*

*Please advise how you would like to proceed. If nothing has changed, please have the borrowing entity execute the attached Closing Statement and send us back an email with:*

*"<u>On behalf of the borrower, we do not object to the stock being lent out into the lending pool.</u>"*

*Thank you*

*Best Wishes,*

*Gregory Mitchell*

52. Mr. Torti wrote back the same evening confirming that everything was fine and thanking Astor 3 for transferring MXN 300 million [**Exhibit VS1/329**]. (It is clear that his email was in response to what Astor 3 had sent, since it uses the same subject heading as the email cited in the preceding paragraph (which was different from the previous email sent by Mr. Torti).)

> *Dear Gregory*
>
> *As long as all the terms of the contracts signed are duly respected, we are fine.*
>
> *Could you please amend the date in the title of the closing statement (it says August instead of September) and send it back to me? Then thanks for proceeding with the transfer of the MXN 300,000,000 and providing us with a Swift confirmation.*
>
> *Best regards,*
>
> *Alexandre Torti*

53. On 14 September 2021, Ms. Akbar (an intermediary involved in setting up the transaction) sent the executed Closing Statement as requested [**Exhibit VS1/330**].

> *Dear Gregory,*
>
> *Hope you are well. I saw Alexandre did not cc' everyone into the email re: Richard etc, so have resent the signed Closing Statement Tranche 2.*
>
> *Any questions let us know.*
>
> *Kind regards,*
>
> *Zara*

54. On 15 September 2021, Astor 3 countersigned the Closing Statement and immediately ordered the remittance of funds, which was confirmed by Mr. Salceda on 20 September 2021 [**Exhibit VS1/481-482**].

55. In this email exchange, Astor 3 explained to Mr. Salinas's and RBS's representatives that shares would be rehypothecated, and that this was why Astor 3 required the pledge of unrestricted shares.

Astor 3 even sent Mr. Torti a link to the Interactive Brokers Stock Lending program, which allowed Mr. Torti to see in real time that these shares could be accessed by major banks and lent out [**Exhibit VS1/322-324, 327**]. This exchange of correspondence was not brought to the attention of the Court. It plainly should have been, considering that (1) Mr. Salinas's and RBS's representatives received an explanation about Astor's rights under the SLA and acknowledged their understanding by conduct between 2021 and 2024, and (2) the subjective understanding of the parties, and particularly of Astor 3, is critical to the Applicants' case of fraud.

56. The statements in Astor 3's 10 September 2021 email were not at all surprising. On the contrary, they reflect normal market practice in the very well-established securities lending industry: see, for example, the "*Introduction to Securities Lending*", commissioned by (among others) the Internal Securities Lending Association, British Bankers' Association and London Stock Exchange [**Exhibit VS1/210-271**]. As explained in the Executive Summary to that document, once shares are lent, "*the securities can be sold outright and 'on lent'. Both practices are commonplace and an intrinsic part of the functioning of the market.*" [**Exhibit VS1/219**] Once a party agrees to its stock being lent out, trading in that stock, including on the public market, is highly likely. Again, the "*Interactive Brokers Borrow List*" mentioned in the email showed Elektra stock available for borrowing and the practical effect of this – as the email pointed out - was that any person wishing to borrow the stock could do so (and could then engage in the kind of transactions discussed) [**Exhibit VS1/322-324**].

57. On 7 October 2021, Ms. Akbar contacted Astor 3 as a result of Weiser stating that Astor 3's rehypothecation of shares had resulted in Weiser's records showing a change in beneficial ownership of the shares [**Exhibit VS1/332**]. The Borrower was concerned about this because "*they would not be in a position to provide a statement or custodial representation confirming Mr Salinas is the owner of the shares*". I assume that Mr. Salinas needed such a statement available to him in order to provide an explanation for why he had made no disclosures to the market.

58. As reflected in a later e-mail from Ms. Akbar of 19 October 2021, the position was resolved by opening a custody account with Tavira in the name of Mr. Salinas but "*for the benefit of*" Astor 3 [**Exhibit VS1/333-334**]. I understand that Tavira's practice was not to transfer shares from Mr. Salinas's account when shares were rehypothecated from that account by Astor 3 to Vanderbilt.

59. It is clear that, from at least November 2021, the Applicants themselves believed or suspected that the Elektra shares which had been pledged to Astor 3 were being sold on the open market. At paragraphs 75 to 77 of his Affidavit, Mr. Salceda said "*At the end of November 2021, I was aware that a seller of Elektra shares in the Mexican market had been participating with a significant percentage of the daily trading volume* […] *I feared that the cause of this unusual situation might be Astor 3*" [**Exhibit VS1/150-151**].

60.  Mr. Salceda or Mr. Salinas were therefore able to monitor any significant trades of Elektra shares in the market. Moreover, Mr. Salceda or Mr. Salinas could have asked their sub-custodians in Mexico to check with the Central Depository register, Indeval, to verify ownership records, share transfers, blocked positions and pledges and liens [**Exhibit VS1/272-273**]; and if Mr. Salceda or Mr. Salinas noticed any activity contrary to the SLA, they could have raised concerns with Astor 3. Notably, neither Mr. Salceda nor Mr. Salinas raised any such concerns with Astor 3 for nearly three years.

61.  Furthermore, at no stage did the Applicants bring this delay specifically to the Judge's attention. The Affidavit of Mr. Salceda jumped from November 2021 to a meeting which he sought to arrange in November 2023 (of which no detail is given) [**Exhibit VS1/150-151**]. The Skeleton Arguments jumped from November 2021 (at paragraphs 50 and 51, when the issue was allegedly discovered) to 10 June 2024 (when the issue was raised by the Applicants) without any explanation [**Exhibit VS1/79-80**]. At the hearing, leading counsel similarly glossed over the delay of nearly three years stating "*Applicants had concerns that someone was dealing in Elektra shares. The Applicants wrote to the depository brokers, Weiser and Tavira, to say that they should not dispose of the collateral shares. They did not respond. Astor 3 did. The Applicants' concerns led them to seek legal advice and to appoint investigators*" [**Exhibit VS1/125**]. It was implicit in that submission that the Applicants had acted promptly on becoming aware of the dealings in Elektra shares. The opposite was the case. Moreover, the delay was inconsistent with the Applicants' basic position that the Respondents' dealings with the shares had violated the parties' fundamental understandings.

62.  The reality, as had been stated expressly to the Applicants in September 2021, was that Astor 3 was rehypothecating the shares through securities lending. As the Applicants must have been aware, such rehypothecation necessarily involves the possibility that the party to whom the shares are loaned would trade in those shares. Whilst Astor 3 itself was restricted from selling shares in the open market, other parties were not.

7.   The undisclosed problems of Elektra

63.  The Applicants also concealed highly material information as to the financial health of Elektra, which contributed to a serious decline of the Elektra share price over the term of the Loan, and then to a free fall at the end of July 2024. This should have been fully and frankly disclosed.

64.  When the SLA was signed in July 2021, Elektra's share price was closing at approximately MXN 1,600. However, the Elektra share price was inflated as indicated by its notably high Price to Earnings ratio and Price to Cash/Free Cash Ratio [**Exhibit VS1/335**]. Effectively, the share price did not appear to be reflective of Elektra's performance.

65.  From 2021-2024, Elektra's performance as a company was plummeting. Matters became much worse when on 26 July 2024, *Simply Wall Street* (a market-leading financial app which claims to

have 6 million users) reported that earnings had been declining at an average annual rate of 34% over a 5-year period, and declared Elektra to be an investment risk [**Exhibit VS1/338**]. *Simply Wall Street* also stated that Elektra's second quarter earnings for 2024 were at a net loss of MXN 643 million (about USD 34 million) versus a profit of MXN 4.94 billion (about USD 250 million) for the same period in 2023 [**Exhibit VS1/339**]. The drastic turnaround from profit to loss in Q2 2024 is shown in the underlying figures reported by Elektra on 24 July 2024 [**Exhibit VS1/342**].

66. Elektra's underperformance was reflected in the steep decline of its share price. Immediately before the *Simply Wall Street* publication, Elektra's share price had already dropped to MXN 1050, which reflected a 40% drop since 2021 [**Exhibit VS1/355-358**]. The *Financial Times* data below shows the share price since 2008:



67. Once the Q2 2024 results were digested by the market, there then followed an even more precipitous decline:



68. On 26 July 2024, Elektra chose to issue a press release to the market "*to inform investors that it has received information from its controlling group regarding a possible fraud by depositories of their shares, which could cause unusual movements of its share price on the stock markets*" [**Exhibit VS1/359-360**]. As a result of this announcement, the Mexican listing authorities chose to suspend trading in Elektra stock, which remains suspended today.

69. The share suspension and the announcement which led to it were presented to the Court as part of Elektra's response to a discovery of fraud: see paragraphs 124-125 of the Affidavit of Mr. Salceda of 5 August 2024 (which was placed in draft before the Court on 2 August) [**Exhibit VS1/162**]. However, there is an obvious alternative inference – which should itself have been drawn to the Court's attention – that Elektra wished to explain away this share price collapse and to make it appear to the market that it was taking actions to prevent any further price decline. Clearly, Elektra experienced a rapid and troubling decline during the term of the Loan, which

entirely predictably caused a collapse of the share price, with a particularly precipitous drop after publication of the Q2 2024 figures. Although the suspension of trading in Elektra shares prevented a complete collapse, Elektra had to suggest to the market that the reason for the decline was due to supposedly fraudulent transactions. In fact, the transactions carried out with the Pledged Collateral under the SLA (1) were known to and agreed to by Mr. Salinas and RBS, and in any event (2) were not the cause of the sharp fall on 26 July 2024, which was correlated to the release of the highly negative Q2 figures. However, to maintain credibility in the explanation given to the market and the regulator, Mr. Salinas and RBS have proceeded to advance these spurious allegations to seek an injunction against me and the other Respondents.

70. Particularly against the background of the 2021 email correspondence, and the unexplained delay in pursuing suspicions between 2021 and 2023, the Q2 results and resulting share price collapse create an obvious possibility that the legal proceedings are not a genuine response to discovered fraud but are, on the contrary, a manufactured attempt to shore up the price of Mr. Salinas's principal asset. Instead of disclosing that background, however, the Applicants simply concealed it.

71. This concealment was of a piece with the failure to mention Mr. Salinas's major financial problems, which were misleadingly omitted while presenting him in an unqualified manner as one of Mexico's wealthiest individuals, as I now explain.

    8.   Mr. Salinas's severe financial difficulties

72. In the Skeleton Arguments, Mr. Salinas is claimed to be "*one of the wealthiest individuals in Mexico with a net worth of several billion U.S. dollars*" and is the "*direct or indirect beneficial owner or controller of approximately 67,544,413 shares in Elektra, representing 30.47% of Elektra share capital*" [**Exhibit VS1/73**]. The Applicants relied on this general statement alone to give the Judge comfort that Mr. Salinas could give an unlimited cross-undertaking in damages, without any fortification [**Exhibit VS1/132**]. They also relied on it to make the unsubstantiated assertion (which is a prerequisite of their rescission case) that the Applicants were ready and able to repay the USD 110 million advanced to them.

73. However, due both to Elektra's underperformance from 2021-2024 and the various proceedings involving Mr. Salinas's inability to pay his debt obligations or the debts of his companies to the Mexican tax authorities, the Applicants' claim of Mr. Salinas's net worth warranted further scrutiny.

74. In April 2021, Mr. Salinas filled out a KYC form for on behalf of himself and RBS as part of Astor 3's due diligence process [**Exhibit VS1/361-363**]. In Mr. Salinas's personal KYC form, Mr. Salinas indicated that he was the "*Founder and CEO*" of Elektra (the Issuer), he owned a total of 10% of Elektra shares (not the 30.47% now claimed) and planned to use the loan proceeds to "*refinance some existing loans*". Either Mr. Salinas only owns 10% of Elektra shares or he failed to disclose his entire beneficial Elektra shareholding in the KYC form. At best, Mr. Salinas's claim of his ownership of Elektra shares is confusing.

75. As proof of his ownership of Elektra shares, Mr. Salinas submitted a copy of a BNP Paribas Portfolio Management Report [**Exhibit VS1/363-382**]. The report showed that Mr. Salinas had a negative cash balance of USD 30 million, USD 3.2 million in bonds, and USD 511 million in equities. Notably, 97.85% of his portfolio was tied to 6.9 million Elektra shares, which is again confusing in light of the representations made to the Judge. Moreover, Mr. Salinas's Elektra shares were marked "BLO" (shares held in a blocked position). Reading this report together with Mr. Salinas's KYC form, Mr. Salinas had been heavily shopping around his Elektra shares as collateral for loans with other lenders like Astor 3.

76. In any event, Mr. Salinas's reputation as a wealthy and reputable entrepreneur is further undermined by his involvement in several scandals and open conflicts with various governmental authorities over the years.

   a. In January 2005, the SEC sued TV Azteca and three executives (including Mr. Salinas) for fraud and filed criminal charges, alleging that Mr. Salinas: (i) concealed his role in a series of transactions where Mr. Salinas purchased discounted debt from Unefon and profited on repayment; (ii) sold TV Azteca stock while concealing his self-dealing; (iii) filed false reports and made false public statements; and (iv) failed to disclose to investors his ownership of half of a subsidiary of TV Azteca, Codisco [**Exhibit VS1/385-387**]. The SEC claimed that Mr. Salinas violated several sections of the Securities Exchange Act of 1934, including those related to insider trading, false and misleading statements, and reporting requirements. Although the SEC settled its claims against Mr. Salinas, Mr. Salinas was ordered to pay disgorgement and penalties of USD 7.5 million and to provide an undertaking not to serve as an officer or director of a U.S. public company for a period of five years, except under limited circumstances [**Exhibit VS1/388-390**].

   b. In May 2015, CNBV imposed a fine of MSN 672,900 for a failure to comply with the Securities Marketing Law by failing to lodge a notice of an offer abroad [**Exhibit VS1/391-393**].

   c. In 2017, CNBV imposed a fine of MXN 2,260,000 on TV Azteca, owned by Mr. Salinas, for failing to inform investors of significant operational changes as required by the Bolsa Mexicana de Valores, ("**BMV**") [**Exhibit VS1/394-397**].

   d. In April 2022, *Reuters* reported that TV Azteca was involved in a legal dispute that resulted in an order for the company to pay MXN 2.447 billion to tax authorities concerning income tax, fines and surcharges [**Exhibit VS1/398**].

   e. In February 2023, *The Yucatan Times* reported that the Mexican Tax Administrative Service ("**SAT**") was claiming more than MXN 38 billion from Mr. Salinas's companies, including Grupo Elektra, all derived from irregular tax operations perpetrated from 2013 [**Exhibit VS1/399-400**].

   f. In April 2023, *La Jornada* reported that the CNBV stated that it had applied 32 fines to Banco

Azteca totalling MXN 8.3 m for regulatory breaches [**Exhibit VS1/401-403**].

g. In November 2023, *AP News* reported that TV Azteca failed to reach an agreement with U.S. bondholders in a dispute involving approximately USD 400 million in bonds and approximately USD 105 million in past-due payments [**Exhibit VS1/404-405**]. These bondholders brought an involuntary bankruptcy petition against TV Azteca.

h. In December 2023, *Yahoo Finanzas* reported that there were suspicions that Banco Azteca was in on the verge of bankruptcy, which Banco Azteca denied [**Exhibit VS1/406-408**].

i. In March 2024, *Bloomberg UK* reported that the President of Mexico ordered the seizure of Mr. Salinas's golf course in Oaxaca as part of the government's enforcement against his liability to pay USD 3.8 billion in back taxes [**Exhibit VS1/409-414**].

j. Also in March 2024, *Fitch Ratings* downgraded Banco Azteca's visibility rating following what is assumed to be the weak corporate governance practices of its controlling group and the sustained high related-party commercial loans [**Exhibit VS1/415-425**].

k. In May 2024, *Bloomberg UK* reported that U.S. Congressman Henry Cueller had been indicted by U.S. federal prosecutors for bribery payments made by Mr. Salinas's Banco Azteca to a U.S. Congressman and his wife [**Exhibit VS1/426-427**]. The bribes were paid in exchange for help lobbying against U.S. anti-money laundering regulations that threatened the interest of Banco Azteca.

l. As of May 2024, *Benzinga* (a U.S. financial technology and data company) reported Mr. Salinas's net worth to be only USD 332 million [**Exhibit VS1/428-429**].

m. On 15 August 2024, *La Jornada* reported that CNBV had imposed a fine on Mr. Salinas on 11 July 2024 in the amount of MXN 844,900 for disposing of Elektra shares without a public offering or auction authorised by CNBV [**Exhibit VS1/430-432**].

77. As this negative press started to come to light, Astor 3 submitted several information requests to Mr. Salinas and RBS, enquiring about Mr. Salinas's ongoing disputes with the Mexican tax authorities, the seizure of his assets by the Mexican government and whether Mr. Salinas had pledged Elektra shares as collateral in other loan transactions [**Exhibit VS1/433-437**]. To the best of my knowledge, Mr. Salinas and RBS ignored these requests and never responded.

9.   Mr. Salinas and RBS triggered several Events of Default under the SLA

78.  Astor 3 issued a Notice of Default, dated 27 July 2024, alleging 11 different Events of Default that were triggered by acts and omissions of Mr. Salinas and RBS [**Exhibit VS1/438-450**].

79.  Event of Default is defined as "*any of the events specified in Clause VI hereof in addition to any omission or failure to perform a legal or contractual duty as obligated, stated or outlined herein. An Event of Default will cause Acceleration of the Loan*" and forfeiture of the Pledged Collateral.

80.  Upon the Event of Default, Astor 3 would (Clause II(7)) dispose of the Pledged Collateral in order to satisfy the obligations of the Borrower and return any excess collateral to Mr. Salinas.

81.  In addition, Clause IV(10) provides that the Borrower nor Guarantor would seek injunctive relief from any court of law requesting to freeze the shares and that such injunctive relief shall be an immediate and incurable Event of Default.

82.  Astor 3's rights on an Event of Default are not dependent on giving prior notice of it to the Borrower/Guarantor: there is nothing in the SLA to that effect. Of these different Events of Default, which are set out in detail in the Notice, I will highlight some of the most serious examples.

83.  *First*, Elektra's announcement of 26 July 2024 constituted an Event of Default pursuant to Clause VI(3)(g) of the SLA. Clause VI(3)(g) provides that an Event of Default is a Material Event upon the financial condition of Elektra, Mr. Salinas or RBS. A "Material Event" is defined as any event or possible outcome which may undermine or alter the value of collateral or prejudice Astor 3's standing lien. In this announcement, Elektra published misleading information to its investors regarding a possible fraud by depositories. An announcement of that kind could only tend to undermine the value of the shares concerned and thereby prejudice Astor 3's lien.

84.  *Second*, even if the announcement itself is not deemed to be a Material Event triggering an Event of Default, the suspension in trading of Elektra shares also on 26 July 2024 most certainly constitutes an Event of Default for the same reasons. Additionally, Clause VI(3)(c) of the SLA provides that a suspension in trading of five or more Business Days in respect of the same share class as the Pledged Collateral constitutes an Event of Default.

85.  *Third*, in March 2024, SAT made a presentation on tax claims against four companies of Mr. Salinas (including Elektra), totalling MXN 63 billion (USD 3.8 billion), stemming from 17 different court cases covering audits from 2008-2018 [**Exhibit VS1/451-452**]. This tax debt and ongoing tax lawsuits against Mr. Salinas's companies was a Material Event affecting the financial condition of Mr. Salinas and Elektra, and thus constituted an Event of Default pursuant to Clause VI(3)(g) of the SLA.

86. In addition to these examples, Astor 3 relies on the full detail of the Events of Default referenced in the Notice of Default.

87. As RBS and Mr. Salinas triggered several Events of Default, which did not require prior notice declaring an event of default, Astor 3 was entitled to exercise its rights under the SLA and CMAs. Astor 3 was entitled to terminate the SLA and dispose of the Pledged Collateral (Clause II(7)). Further, the Events of Default triggered an acceleration of the loan amounts, interests, costs, fees and expenses, and a forfeiture of the Pledged Collateral (Clause VI(4)). As the Events of Default were incurable, Astor 3 was under no obligation to return the remaining balance of proceeds realised as a result of any sale of the Pledged Collateral or provide an accounting of the disposition of the Pledged Collateral (Clause VI(4)).

88. In accordance with these express provisions of the SLA, Astor 3 issued a Notice of Default, which provided that Mr. Salinas and RBS were "*hereby notified that* [they] *were in default of the SLA which has resulted in* [Astor 3*] terminating the SLA and accelerating any and all amounts due thereunder together with any other remedy which may be afforded to* [Astor 3]" [**Exhibit VS1/439**].

89. Subsequently, Astor 3 forwarded the Notice of Default to Weiser and Tavira and, as permitted under Clause 9.3 of the Tavira CMA and Clauses 4 and 8 of the Weiser CMA, Astor 3 issued Entitlement Orders instructing a transfer of the Pledged Collateral to into Astor 3's account [**Exhibit VS1/453, 456**]. Astor 3 then issued a separate set of Entitlement Orders to Tavira instructing the transfer of the Pledged Collateral at Tavira to Vanderbilt [**Exhibit VS1/454**]. A separate instruction was sent to Weiser to settle the outstanding hedges on 935,716 shares of Elektra Pledged Collateral held at Weiser [**Exhibit VS1/455**].

    10. <u>My relationship with the Respondents</u>

90. Weiser and Tavira are completely separate entities, in which I do not have any ownership or control (either directly or indirectly). Mr. Salceda's Affidavit supporting the Injunction Orders states that "*it is clear that Weiser and Astor 3 are under common control*" and suggests the same for Tavira (paragraph 119) [**Exhibit VS1/161**]. This is an invention of the Applicants for which no proper basis was offered but which appears to have been advanced as part of a mindset to treat everything as suspicious.

91. I do not own (either directly or indirectly) Astor 3 or Vanderbilt. I assisted those companies in the way I now explain. These companies are separate entities, with their own beneficial owners and executives.

92. I would add that Astor 3 was known to the Applicants to be a new company, specifically formed in Canada for the transaction at the request of Mr. Salinas. The original intention had been to use Astor Capital Fund which is a Bahamian company as the Lender but Mr. Salinas rejected it because it was offshore entity and would trigger a Withholding Tax ("**WHT**") liability [**Exhibit VS1/461**].

Astor 3 was then formed as a Canadian Special Purpose Vehicle ("**SPV**") on Mr. Salinas's own instruction [**Exhibit VS1/461**] to take advantage of tax treatment under the North American Free Trade Agreement ("**NAFTA**"). This was openly discussed in emails in the middle of 2021, with complaints being made by Mr. Salinas about the time being taken to obtain company registration documents from the Quebec authorities [**Exhibit VS1/470-471**]. Although it is now suggested that Astor 3's new existence is something suspicious, that is obviously not so where the fact was fully known to the counterparty at the outset. The Applicants failed to bring to the Court's attention that Mr. Salinas's representatives were kept informed on the company formation and even prompted Astor 3 to speed up the process [**Exhibit VS1/461-471**]. Mr. Salceda's statement in his Affidavit that it was a "red flag" that Astor 3 was incorporated around the same time as the preparation of the SLA was misleading [**Exhibit VS1/157**].

93. In this context, each company is formed on behalf of financial intermediaries in order to facilitate their entry into the stock-based lending market. In fact, the First and Sixth Respondents, Astor 3 and Astor Capital, are perfect examples.

   a. Thomas Mellon approached me to help him set up an entity to engage, amongst other activity, in lending against securities. As a result, Astor Capital was formed in April 2019 in Bahamas.

   b. With an incorporated entity, Mr. Mellon was then able to approach potential agents and clients, to develop business on behalf of his own company. This is probably how Mr. Mellon came into contact with Mr. Salinas's agent, Ms. Akbar.

   c. When Mr. Salinas rejected Astor Capital as the lender for the transaction and at his request, Astor 3 was incorporated in Canada.

   d. Once the Parties were ready to negotiate the SLA, a draft SLA was provided to Mr. Salinas. The SLA was open to review between the Lender and its counterparties, under the advisement of independent legal counsel and other advisors, to establish the precise rights and obligations to be agreed by the parties. The SLA that is the subject of this litigation was developed with the input of legal counsel.

   e. Once executed, Astor 3 would then arrange the custodianship of the shares and direct the use of the shares during the loan term.

94. The Fifth Respondent, Vanderbilt, operates differently. Essentially, Vanderbilt is a hedge fund trading firm, which has experience in trading activities of securities and commodities, but it also has own clients to which it has provided stock-based loans in the past. Vanderbilt may engage in stock lending. In this case, it borrowed Elektra stock from Astor 3 with the promise of returning equivalent securities later. Vanderbilt then trades the borrowed stocks (either on or off market), often with the intention of buying them back at a lower price, profiting from the difference.

95. The relationship between Astor 3 and Vanderbilt is therefore one of contract, typically referred to as a rehypothecation agreement. An example of such an agreement, concerning one of the tranches of Elektra's shares, is at [**Exhibit VS1/472-476**]. Under that agreement, and others in materially identical terms, Astor 3 has agreed to rehypothecate securities to Vanderbilt as a loan of stock for the purpose of generating profit with these securities, which is then split between the parties. Astor 3 therefore does not have title to the subject securities, but rather has lien, encumbrance and rehypothecation rights over them by virtue of its arrangements with the Applicants. Vanderbilt then has the right to manage, lend, rehypothecate, pledge, repledge, pawn, barter or otherwise transact with the securities until termination of that arrangement 60 months hence, at which point Vanderbilt will return equivalent securities back to Astor 3 free of any lien or encumbrance.

11. The prejudice caused by the Injunction Orders

96. Given their blatant abuse of the Court's process, the Applicants have improperly obtained world-wide freezing and proprietary injunctions in respect to assets up to a value of MXN 5 billion. The scope of these Injunction Orders is extremely broad. By their very nature, such Orders cause very significant operational and reputational prejudice to the parties subject to them, at least if those parties are in business, as is the case for me, Astor 3, Vanderbilt and Astor Capital. Moreover, Tavira has now completely frozen the accounts of Astor 3 and Vanderbilt. Even the ability under the Injunction Orders to engage in normal course of business transactions, which is more theoretical than real, is not open to Astor 3 and Vanderbilt.

97. I note that the Applicants state that they are "*ready and able to repay all sums owing to Astor 3 immediately*" (Skeleton Argument, paragraph 92) [**Exhibit VS1/86**]. This statement is not substantiated. The Loan had a lock-up provision for 5 years and was not due to be repaid for a few more years. Furthermore, the SLA states that at maturity, RBS was to provide proof of funds to repay the loan. At no time was this proof presented. Rather, the press reports set out in this statement indicate that Mr. Salinas will not make any such payment willingly. I respectfully submit that the price of any injunction ought to have been for the Applicants to provide a guarantee or other fortification to make good this commitment. If Mr. Salinas is indeed as rich as he portrays himself, then fortification in the order of USD 110 million ought to have been be readily achievable. Such fortification could also then have stood as security for any claim under the cross-undertaking in damages.

98. Astor 3, Vanderbilt and Astor Capital have suffered damage arising from the grant of the Injunction Orders and that damage is presently being assessed. Once it is assessed then I will update the Court as appropriate. However, given the matters set out in this statement, I respectfully request the Court in any event to set aside the without notice Injunction Orders against me and the First, Fifth and Sixth Respondents as soon as possible.

**Statement of truth**

I believe that the facts stated in this statement are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

......................................................................................................

**VAL SKLAROV**

**Dated:**

SEP 1, 2024

# EXHIBIT 18

First Defendant
Witness Statement of Mr Val Sklarov
Fourth
Exhibit "VS4"
16 September 2024

**IN THE HIGH COURT OF JUSTICE**                    **CLAIM NO. CL-2024-000450**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (KBD)**

**BETWEEN:**

**(1)  RICARDO BENJAMIN SALINAS PLIEGO**

**(2)  CORPORACION RBS SA DE CV**

**Claimants**

**- v -**

**(1)  ASTOR ASSET MANAGEMENT 3 LIMITED**

**(2)  WEISER GLOBAL CAPITAL MARKETS LTD**

**(3)  TAVIRA MONACO SAM**

**(4)  VLADIMIR "VAL" SKLAROV**

**(5)  CORNELIUS VANDERBILT CAPITAL MANAGEMENT LTD**

**(6)  ASTOR CAPITAL FUND LIMITED**

**Defendants**

---

**FOURTH WITNESS STATEMENT OF VAL SKLAROV**

---

I, **VAL SKLAROV** of 142 Gold Springs Court, Canton, Georgia 30114, **WILL SAY AS FOLLOWS:**

1.    I make this statement on behalf of myself and the First, Fourth, Fifth and Sixth Defendants ("the Astor Parties"), in response to the fourth witness statement of Mr Salceda of 9 September 2024 ("Salceda 4") served on behalf of the Claimants opposing the Astor Parties' application to set aside

1

the freezing orders and proprietary injunctions granted without notice on 2, 7 and 13 August 2024.

2.   The facts and matters set out in this statement are within my own knowledge unless otherwise stated, and I believe them to be true. Where I refer to information supplied by others or documents I have reviewed, the source of the information is identified; facts and matters derived from other sources are true to the best of my knowledge and belief.

3.   There is now produced and shown to me a paginated bundle of true copy documents marked "**Exhibit VS4**". Unless otherwise stated, all references to documents in this statement are to Exhibit VS4 and all specific page references are marked "**[VS4/##]**".

### A.   Introduction

4.   I strongly deny any fraud by myself or by the other Astor Parties. Indeed, the allegations against me and the other Astor Parties make no sense. The Claimants' case is that I committed a fraud which had the following characteristics:

   a.   It involved doing exactly what the contract contemplates and authorises. As the WhatsApp messages demonstrate, Mr Salinas and his advisers fully appreciated that this was the contract which he had entered into, but for reasons of their own have pretended otherwise. The messages also show that the Claimants' allegations of recent discovery of the supposed fraudulent dealings in Elektra shares are a complete fiction. The Claimants have created a fictitious story and deceived the Court with it.

   b.   The supposed fraud involved doing exactly what was notified to the Claimants' representative by an email at the outset of the transaction. The Claimants now say that they never received the email, although it was sent to their representative (Alexandre Torti) in response to a query they had themselves initiated, and they cannot explain his supposed oversight. Regardless of the truthfulness or adequacy of these explanations, they do not deny the email, nor do they explain how it can be consistent with my alleged dishonesty.

   c.   Also importantly, the supposed fraud involved acting with the full cooperation and knowledge of independent broker-dealers (the custodians Weiser and Tavira) who are significant industry players. They are regulated broker dealers in their respective jurisdictions. They also have to maintain relations with major international banks who would not deal with a counterparty suspected of fraud. Tellingly, the Claimants suggested in their without notice applications that the custodians might be creatures of mine. This absurd suggestion has never since been pursued, but it shows the lengths to which the Claimants have to go in order to try and construct a case.

   d.   It involved advancing over US$110 million to the alleged victim, at the risk of the Astor Parties.

2

e.   It was implemented by transactions which were all recorded by the same broker-dealers in their capacity as custodians. There was no attempt to hide anything.

f.   The majority of the proceeds of those transactions were either returned to the broker-dealer, where they largely remain, or were paid to the Claimants, or were taken as commission by the broker-dealer. There was no attempt to dissipate the proceeds over almost three years.

5.   The case against me and the other Defendants is built on the central allegations that the pledged shares should never have been traded; that Mr Salinas and his advisers did not believe the shares were being traded; and that they had no reason to believe that the Defendants thought differently until Astor 3's letter of 12 June 2024, after which they caused to be made an investigation, the fruits of which resulted in an urgent application to Court at the end of July.  This is a false and unreal view of the case. The reality of what Mr Salinas and his team understood appears from a WhatsApp exchange between me (using the name Gregory Mitchell) and Ms Zara Akbar, whom the Claimants used to communicate with Astor 3, in June 2024:





~ Zara Akbar

I agree it's soo annoying as I feel like a repeating cycle

Shares are not frozen and it's clear in the loan agreement. Hence why I asked you the other day if they had in fact read the loan agreement.

If anyone, you, Salinas or Elon Musk or Jeff Bezos has shares in the market, they are accessible to any third party. Any BD or bank can have access to shares. We are stunned Salinas doesn't know that. Alex knows that. Why are we constantly having this disconnect with them.

~ Zara Akbar

Honestly Gregory I've got no idea. One month they are happy as Larry and the next they are having panic attacks

Anyone can borrow anyone's shares. This is how markets work.



Fri, Jun 14

Anyone can borrow anyone's shares. This is how markets work.

Call any BD and ask to borrow ELEKTRA shares, they will ask you "how many do you want".

The float which is number of tradable shares can be borrowed and traded by anyone.

The loan agreement is very clear, Astor does not sell. But we can't control 6 billion people on this planet who may choose to trade ELEKTRA shares.

Salinas owns a bank and has advisors. Surely they can't be that naive.

~ Zara Akbar

I did exactly this yesterday, spent 1 hour over the phone with him about this matter and strongly suggested he reviews the SLA with his legal team so



**Fri, Jun 14**

— Zara Akbar

I did exactly this yesterday, spent 1 hour over the phone with him about this matter and strongly suggested he reviews the SLA with his legal team so he does not trigger any negative impact. He said he would, but then a few hours later he sent this email

Hi Gregory as you can see Alex gets it. Eduardo is a little bit of a loose cannon. Anyway we have a call with him later today

> Are we copied on emails ? I don't see any.

— Zara Akbar
You mean from Weiser?

> We see no emails from anyone on this issue.

— Zara Akbar
Oh did you not get the email from



impact. He said he would, but then a few hours later he sent this email

Hi Gregory as you can see Alex gets it. Eduardo is a little bit of a loose cannon. Anyway we have a call with him later today

> Are we copied on emails ? I don't see any.

— Zara Akbar
You mean from Weiser?

> We see no emails from anyone on this issue.

— Zara Akbar
Oh did you not get the email from Noemi - Salinas's lawyer?

The only other email in this discussion is the one from Weiser - but I do not have a copy of that

Will ask for that for you

6.    (For clarification, the penultimate message in this chain was one which Ms Akbar forwarded to me. I believe it was sent to her by "Alex" (as her next message indicates), i.e. Alexandre Torti. The "him" with whom Mr Torti said he had spent an hour speaking appears to be either Mr Salinas or Mr Salceda.   "Eduardo" is Mr Salceda. Ms Akbar refers to the fact that Mr Salinas was changing his mind from one month to another (she also says "repeating cycle") about whether he was happy with the shares being rehypothecated. This is entirely consistent with my belief (then and now) that he was aware all along of what was going on, contrary to the impression he now seeks to give via Mr Salceda.

7.    The true position is that this was a regularly executed deal, following standard industry practices, and on terms that expressly enabled rehypothecation (onward stock lending) by the cash lender Astor 3. This was in return for providing Mr Salinas with (in his own adviser's words) a *"new huge loan"* - liquidity which he was unable or unwilling to access by openly disposing of his shares.

8.    Mr Salinas has refused to provide any evidence himself. He has hidden behind others, not only in relation to his own understanding of the arrangements, but even to demonstrate his supposed (but in fact highly dubious) wealth, or to establish the reasons behind the recent share suspension which was presented to the court as part of the "discovery" of the supposed fraud. Nor has Mr Salinas provided any evidence to explain or mitigate the numerous deficiencies in the application made on his behalf to obtain draconian relief against me and the other Astor Parties. In fact, and as appears below, it appears all too likely that Mr Salinas has realised the consequences of the terms on which he entered into the deal. He is seeking to accuse me of fraud when (at best) his own advisers were at fault in what they communicated to him and (at worst) he is using his allegations as a convenient way to escape the consequences of his own breaches of relevant securities laws and to stem the drastic decline in the price of Elektra shares.

   **B.  Overview of this statement**

9.    This statement is structured as follows:

   a.    In <u>Section C</u>, I respond to paragraphs 9 to 15 of Salceda 4 in which he seeks to explain the deal and makes various assertions about stock lending practices. What Mr Salceda says cannot be reconciled with the terms of the arrangements entered into in this case.

   b.    In <u>Section D</u>, I explain the commercial background to this deal and how it progressed properly and in accordance with its terms until the suspension trading in Elektra shares (which Salceda 4 now admits was requested by Elektra, i.e. by Mr Salinas) and until the bringing of these proceedings.

c. In <u>Section E</u>, I set out further details of the proceeds of the transactions in Elektra shares. Having now been able to investigate the position more thoroughly, it can be seen that the amounts now held at Tavira and Weiser, and frozen by them, exceed any damages which the Claimants could claim (even if they had any claim). In particular, the Claimants' figure is based on an out-of-date share price which arbitrarily and unjustifiably increases their claim.

d. In <u>Section F</u>, I deal with Mr Salceda's evidence about the suspension of Elektra shares and about Mr Salinas's personal position, both of which the Astor Parties contend were the subject of serious failures in the duty of full and frank disclosure.

e. In <u>Section G</u>, I give further details about the background to this transaction.

## C. Stock lending

10. Salceda 4 accepts that there is some stock-lending where lenders (i.e. the stock borrower) may have the ability to use the stock in further transactions, even prior to an event of default (paragraph 10). What the Claimants' evidence fails to do is: (1) explain how widespread this practice is - in fact, it is very common; or (2) set out why Mr Salceda, or Mr Salinas (who was personally party to the SLA), believed that the terms of the arrangements they had entered into were any different.

11. Instead, Salceda 4 refers, without any specifics, to prior transactions in which it is claimed by Mr Salceda that Mr Salinas had always refused to allow the (cash) lender to rehypothecate (lend out) the stock. I and the Astor Parties obviously had not the slightest knowledge of Mr Salinas's alleged practices. An obvious answer to Mr Salceda's point is therefore that, regardless of Mr Salinas's prior transactions' terms, the critical question is, whatever might have been one party's preferred outcome of negotiations, what <u>this</u> transaction permitted. Nonetheless, given the Claimants' own reliance on those transactions, the Astor Parties' solicitors wrote on 11 September 2024 to seek disclosure of a limited sample of the earlier transactions referred to. On 16 September 2024, the Claimants' solicitors refused, arguing that no specific previous transactions had been mentioned for the purposes of CPR 31.14. Whether this argument of law is technically correct is a matter I leave for submission. Mr Salinas's unwillingness to provide details of prior transactions whose supposed terms he himself relies on is very telling.

12. The stock lending industry is very large and at the top end involves the major banks, JP Morgan, Goldman Sachs etc. They handle blue chip stocks. At the top end of the market, the stockholders want to hold long, e.g. pension funds. In the meantime, they are content to allow major institutions to trade in the stock. The major institutions will have custody agreements which allow them as custodians to engage in such trading by lending or rehypothecating the stock out to others. The effect is to allow securities which would otherwise sit in accounts earning nothing to be used to

support short-term financing for the owner of the securities, and generally to increase liquidity in the markets.

13. At the bottom end of the market, where I operate, the stock is closer to junk stock where the market may well be manipulated and where borrowers often default. The stockholder may be motivated to enter into a stock lending arrangement because it does not want to be seen to be disposing of or borrowing against the stock (for example because they are a director and public and/or regulatory announcements would have to be made) and/or does not want to pay tax on any disposal. However, as with all stock lending, the basic motivation applies as stated in paragraph 10 above. In the case where onward stock lending is permitted:-

   a. The stockholder raises cash because the shares which he has put into custody can be traded and this is a valuable opportunity for the counterparty.

   b. To that end, custodians generally have terms and conditions which entitle them to effect transactions in shares which are deposited with them. I understood this to apply to both Tavira and Weiser, the custodians in this case, as it was common market practice. Tavira and Weiser in turn had the shares on deposit at larger custodians, for example Deutsche Bank or Citibank. These custodians would also have had terms and conditions authorising them to trade in the stock. All the custodians take a commission.

14. The lender will make money if the stock can be traded at a profit, i.e. if the proceeds exceed the loan (if the borrower defaults and does not repay the loan, as is very often the case) or the cost of repurchasing equivalent shares to return collateral to the cash borrower at the end of the loan term (if the borrower does not default). My experience is that borrower defaults are much more typical.

15. The lower end of the market is a risky business. Particularly in Asia, the stock has often been pumped up by market manipulation. In those cases, a loan even at a low LTV may exceed the true value of the stock. The lender can be left with worthless stock. I typically assume that 25-30% of deals will end in a dispute. I have therefore taken great care over the years in which I have been involved in this business to develop and refine standard terms with the benefit of legal advice and which reflect experiences with borrowers. . The standard terms which I use, of which the SLA in this case is an example, are deliberately framed so as to give the cash lender (such as Astor 3) the maximum freedom to put the shares it has taken as collateral into the stock lending market, and to make clear to the cash borrower that (to use one of the many phrases to this effect in the agreement) that the cash lender has *"dominion"* over the shares during the term of the loan, as well as on an event of default.

**D. The Elektra deal**

16. The Elektra deal followed the normal commercial logic for this type of transaction:

   a. The cash loan extended to the borrower has a relatively low interest rate (in this case, 1.15% per annum). This reflects the fact that from the lender's perspective, the opportunity to make money from the transaction overall derives from its ability to use the shares posted as collateral by the borrower to undertake profitable trading strategies or to re-hypothecate the shares to another entity which might undertake such strategies. (This was explained in the email exchange between Astor 3 and Mr Salinas's adviser/representative Alexandre Torti of 10 September 2021.[1])

   b. In order for that opportunity to be available to the lender, it is essential that the lender should benefit from a contractual mechanism in the loan/security agreement which permits those shares to be used (rather than being left untouched in custody). Such a mechanism can be one where title is not transferred but where the lender has a right of use. The SLA provides for such rights, and this was my and the Astor Parties' understanding.

17. From the lender's perspective, the starting point from the outset in 2021 was an expectation that the price of the relevant shares (in Elektra) was too high. I had a firm conviction (which has been fully borne out by later events) that Elektra's share price was unsustainable. The stock price had increased noticeably in the period prior to the loan request, which you often see in manipulated cases. And financials – such as the p/e ratio which had fluctuated significantly – did not justify the high price. Elektra stock seemed like a typical "pump and dump".

18. I therefore confidently believed that the business strategy for the Astor Parties would work as follows:

   a. The lender (Astor 3) would lend funds to the borrower (RBS, a company owned by Mr Salinas which appeared to have been set up to receive the funds obtained by using his shares) having first obtained collateral for that loan in the form of shares, pursuant to a loan agreement which specifically provided for the right to use those shares by onward lending of them.

   b. The cash lender (Astor 3) would lend the shares to another entity (in this case, Vanderbilt) pursuant to Astor 3's rights under the SLA, under a rehypothecation agreement entered into between the (cash) lender and that entity [**Exhibit VS1/472-476**].

   c. The share-borrowing entity (Vanderbilt) would then sell the shares it has borrowed into the market in the expectation that the price will fall. Under the agreement between it and Astor 3,

---

[1] VS1/327-328.

the share borrower assumes an obligation to return equivalent shares to the cash lender at the end of the term of the loan.

d.   Given that obligation, the stock borrower (Vanderbilt) faced the risk that the value of the shares could increase, resulting in it having to expend significant sums re-purchasing equivalent shares to return them to Astor 3 at the end of the term. Equally, the lender (Astor 3) took the risk of having to re-acquire shares to return from a chain of counterparties, or at worst by going into the market, in order to satisfy its obligation to the cash borrower (RBS) to give back the same quantity of shares that it originally received.

e.   However, I believed that Astor 3 and Vanderbilt stood to make a profit because:-

   i.   If the cash borrower, RBS, defaulted, then under the SLA the collateral would accrue to Astor 3. In turn, under its rehypothecation agreement with the stock borrower (Vanderbilt), Astor 3's rights to the shares would accrue to Vanderbilt (there are back-to-back default provisions). Vanderbilt's obligation to return equivalent stock to Astor 3 would fall away. The profit to Astor 3 / Vanderbilt taken together is the difference between the funds raised by Vanderbilt selling the collateral shares into the market, and the loaned sum that (in this default scenario) would remain unpaid by RBS to Astor 3.

   ii.   If the cash borrower (RBS) did repay the loan at the end of the term, it has a right to be returned shares equivalent to the shares it deposited with the cash borrower as collateral. (As I explain below, not only is this the correct construction of the SLA but it was also recorded in explicit terms in Closing Statements sent to RBS, without any comment from RBS or Mr Salinas.) The lender (Astor 3) in that situation has a right to be returned such shares from the stock borrower (Vanderbilt) which, having sold them into the market, has to re-purchase equivalent shares. If – as I and the Astor Parties expected - the price of those shares was then lower than the price at which Vanderbilt originally sold the collateral shares into the market, Vanderbilt would make a profit. (Vanderbilt would then be obliged to share the profit with Astor 3 under the rehypothecation agreement between those two parties.)

19.   From the perspective of Mr Salinas, the commercial logic was that he was able to obtain a "huge" cash sum (in the words of his own adviser) from his shares in circumstances where he was not seen by the wider market to be selling or otherwise raising money against the shares. Such transactions by major stockholders may undermine market confidence, or require certain public announcements or regulatory reports to be made, and it is often desirable for them to avoid such issues.

20.   Central to the implementation of this strategy is the role of the custodian or broker-dealer (i.e. Tavira / Weiser). The role of the custodian is to provide custody services to both the borrower

(RBS) and the lender and any related entities (Astor 3 and Vanderbilt) in relation to the collateral shares. If the custodian is prepared to declare that as a matter of its accounting, the borrower has a positive balance of the relevant shares (which certain custodians will do on the basis that the borrower has the benefit of a promise from a chain of third parties to return equivalent shares to it), then the cash borrower gets what it needs – liquidity from the shares - without having to disclose the transactions or run the risk of triggering a tax event on a disposition of those shares.

21. I also note an email of 4 May 2021 from Mr Torti of Fininvesta to Zara Akbar, with Mr Salceda in copy [**Exhibit EGSS1/224**]. Mr Torti expressed congratulation on *"this huge new loan"* and stated that the client *"wants to ahead with this loan asap."* He then identified various points including

> *"1) Due diligence on Astor to be done by myself: as agreed and even if we have a high image on the lender, I should either have a personal meeting or a Zoom with the relevant officers of Astor to understand the group better, who the shareholders are, etc*
>
> *2) …considering the volume of Elektra shares, we want to make sure that not only the lender, but also the custodian has a formal restriction on short selling or lending Elektra stock"*.

22. I did not of course see this internal email at any time until these proceedings. I do not recall and am not aware of the Claimants having done any due diligence on Astor. However, this email also suggests that Mr Salinas and his team were well aware of the role of custodians in facilitating securities lending (hence the suggestion of asking for a formal restriction on custodians). Moreover, it would have been obvious to Mr Torti and to all Mr Salinas's representatives that the eventual agreements did not achieve the aspiration in the 4 May email. In particular:-

23. The eventual agreement did not contain an unqualified restriction on selling or short selling, but only on the "*Lender*"[2] doing so *"on any publicly traded securities exchange"* (clause V.4(b) of the SLA).

24. As to the agreements entered into by the custodians Weiser and Tavira:

   a.  There was no restriction on Weiser. The "Weiser Account Agreement Terms and Conditions" provide that:

        i.  Clause 7 [**Exhibit VS1/202**]: Mr Salinas agreed that *""WEISER" may lend any securities held by "WEISER" for you or on your Account via its custodian*."

---

[2] "Lender" is defined in the SLA in the following terms (clause I.31): "*'Lender' shall mean specifically the Lender described herein and not any other for purposes of this Agreement.*" [**VS1/39-69**]

ii. Clause 9 **[Exhibit VS1/203]**: Mr Salinas authorised Weiser to "*manage and control collateralized securities in any manner it deems appropriate… Such control includes and is not limited to transfers, hypothecation, repurchase contracts, and transacting in the securities in any manner.*"

b. Those terms were included in the Weiser account opening form signed by Mr Salinas **[Exhibit VS1/194-209],** and Mr Salceda appears to acknowledge that they formed part of the contract between Mr Salinas / RBS and Weiser in his first affidavit at paragraph 60.

c. Tavira was entitled (and indeed required) to undertake any transactions in the pledged shares it was instructed to undertake by Astor 3 (as lender) – whether such instructions directed it to "*sell, transfer, pledge, hypothecate, lend, withdraw or redeem*" any such shares (clause 1 of the Control Agreement ("the Tavira Agreement") **[Exhibit VS1/188]**).

d. Both the agreements with Tavira and Weiser refer to the SLA in numerous places.

e. Tavira and Weiser were both therefore entitled to carry out the trades they did, and appear to have carried them out with knowledge of the terms of the agreement reached between Astor 3 and Mr Salinas / RBS and the extent of the rights granted to Astor 3 under it; i.e. the SLA.

25. The email exchange of 10 September 2021 was directly inconsistent with any notion that Elektra's shares would not be traded [**Exhibit VS1/327-329**].

26. Mr Salinas's representatives did not state why he wanted to go ahead with the loan "asap". The intermediaries Astor dealt with, including Ms Akbar, often emphasised the need to proceed quickly. I am now aware from media reports **[Exhibit VS4/71-77]** that it was around this time in 2021 that Mr Salinas acquired the 105 metre "superyacht", the 'Lady Moura' (of which he is still the owner), for a sum similar to that lent by Astor 3.

27. Astor 3 was set up as a new company with full visibility of Mr Salinas's team. They did not want to use existing Astor companies for tax reasons due to those companies' jurisdictions. With their knowledge, as Mr Salceda now accepts, Astor 3 was incorporated in Canada at their request as a vehicle for the lending to RBS. This took place after two previous vehicles proposed for the deal (in respectively the US and in St Kitts & Nevis) did not go forward as the Claimants considered them unsuitable. [**Exhibit VS1/460-461**]

28. Because Astor 3 was a new company and an unknown quantity, the Claimants obviously needed to take steps to secure their position. In each case of a loan tranche, therefore, they deposited shares with the custodian on an escrow basis (as, for example, an email from Mr Torti dated 23 July 2021 indicates **[Exhibit VS4/21-22]** with Weiser confirming 3.6 million shares were deposited

12

on 30 July 2021 [**Exhibit VS4/23-24**]) and in return Astor 3 deposited cash (for example, the first tranche was released on or around 9 August 2021 as I mentioned in my first witness statement at paragraph 48). The two deposits were then released.

29. I have seen paragraph 48 of Salceda 4 in which he accepts that the recent incorporation of Astor 3 was not a red flag but was something specifically demanded by Mr Salinas. Mr Salceda seeks to excuse the contrary assertions which were strongly made in obtaining the *ex parte* injunctions as due to an unexplained "oversight" on his part in his first affidavit. (His first affidavit supported each of the injunctions sought on 2, 7 and 12 August 2024.)

30. I do not accept that this was an innocent and non-culpable oversight. I also note that his first affidavit claimed that no legal advice was taken and generally suggested that the Claimants were somehow unable to protect their interests by negotiation or otherwise (paragraph 33 of Mr Salceda's first affidavit). The reality is that:

31. As only one example, there was negotiation about (among other things) the governing law and jurisdiction clause [**Exhibit VS4/25**]:

   a.  In an email dated 1 May 2021, Ms Akbar raised the issue (along with a number of other negotiating points), suggesting that Mr Salinas and RBS "*would prefer UK law as the governing law and jurisdiction. Should any issues arise then it would go to litigation rather than Arbitration.*"

   b.  By June 2021, the issue was still open. Astor 3's email of 24 June 2021 to Ms Akbar stated:

   > "*Only issue left unresolved is dispute resolution. Our legal will not accept UK, does not want Bahamas or Canada. They want Singapore if it's court. If it's arbitration, they want Singapore, St Kitts & Nevis or Jamaica.*"

   c.  However, ultimately the signed agreement contained an English governing law and jurisdiction clause, in line with Mr Salinas's / RBS's preference.

32. The interest rate of 1.15% under the SLA was a rate proposed by Mr Salinas / RBS themselves through their advisors (and ultimately accepted by Astor 3). I have now been shown an internal email sent by Mr Torti at [**EGSS4/3-4**] in which he refers to some alternative terms apparently offered to RBS by BNP Paribas involving a slightly higher interest rate. I did not see that email at the time. I assume that the interest rate proposal made to Astor 3 by the Claimants was made with that apparently alternative potential loan in mind. The loan-to-value ratio offered by Astor 3 was significantly greater than that offered by BNP Paribas; i.e. the loan from Astor 3 was much larger than the BNP offer. In this regard, I note that media reports indicated that the asking price for Mr Salinas's super-yacht "Lady Moura" was US$125 million [**Exhibit VS4/71-77**].

13

33. As I noted in my first witness statement, the SLA itself contains confirmations that the Borrower and Guarantor have taken legal advice as to the effect of the SLA (clause X), that the Borrower and Guarantor are sophisticated investors (clause IV(1)), and requires to be (and was) initialled on each page [**Exhibit VS1/39-69**]. The Closing Statements each contain similar confirmations.  For example, the first Closing Statement dated 9 August 2021 states: "*Any and all arrangements between Lender, Borrower and Guarantor have been negotiated and determined by and between their respective counsel.*" [**Exhibit VS1/280**]

34. Following entry into the SLA, the initial advances to RBS and receipt of shares as collateral proceeded smoothly.  Shortly after the SLA and its First Addendum were signed, a Closing Statement dated 9 August 2021 was signed and Astor 3 immediately advanced a sum of MXN 501,591,693 (US$25 million) to RBS, secured over 563,569 Elektra shares, which were deposited in Mr Salinas's personal account with Weiser.[3]  On 10 September 2021, the second Closing Statement was signed and Astor 3 advanced another sum of MXN 327,497,030 to RBS, secured by 372,344 Elektra shares deposited in Mr Salinas's account with Weiser.[4]

35. In November / December 2021, Tavira was appointed as custodian for the final three tranches of lending.  An agreement was executed on 13 December 2021 [**Exhibit VS1/188-193**], though it is stated to be effective as of 1 November 2021.  I note that Mr Salceda addresses the reason for the transfer from Weiser to Tavira again in his fourth witness statement at paragraphs 27 to 29.  As regards what I had said about it in my first witness statement, he says:

> "27.  In particular, Mr Sklarov appears to suggest that the Claimants instigated the transfer because they needed to "provide a statement or custodial representation confirming Mr Salinas" was the owner of the Collateral Shares even where those shares had been rehypothecated by Astor 3."

36. Mr Salceda then goes on purportedly to quote paragraphs 57 and 58 of my first witness statement, saying the explanation in those paragraphs is "not correct and is materially misleading".  I do not accept this characterisation of my evidence.

37. First, the manner in which the passage in my witness statement is quoted is itself misleading and incomplete as it omits two sentences from my paragraph 57.

38. Mr Salceda suggests I said the following in my witness statement (and I note there is no indication that any words have been omitted):

> "57.  On 7 October 2021, Ms. Akbar contacted Astor 3 as a result of Weiser

---

[3] VS1/274-282, 325-326.  Closing Statement at EGSS1/153-160.
[4] VS1/283-291.  Closing Statement at EGSS1/161-169.

> *stating that Astor 3's rehypothecation of shares had resulted in Weiser's records showing a change in beneficial ownership of the shares [**Exhibit VS1/332**].*
>
> *58. As reflected in a later e-mail from Ms. Akbar of 19 October 2021, the position was resolved by opening a custody account with Tavira in the name of Mr. Salinas but "for the benefit of" Astor 3 [**Exhibit VS1/333-334**]. I understand that Tavira's practice was not to transfer shares from Mr. Salinas's account when shares were rehypothecated from that account by Astor 3 to Vanderbilt."*

39. In fact, I said (with the part omitted by Mr Salceda underlined):-

> *"57. On 7 October 2021, Ms. Akbar contacted Astor 3 as a result of Weiser stating that Astor 3's rehypothecation of shares had resulted in Weiser's records showing a change in beneficial ownership of the shares [Exhibit VS1/332]. <u>The Borrower was concerned about this because "they would not be in a position to provide a statement or custodial representation confirming Mr Salinas is the owner of the shares". I assume that Mr. Salinas needed such a statement available to him in order to provide an explanation for why he had made no disclosures to the market.</u>*
>
> *58. As reflected in a later e-mail from Ms. Akbar of 19 October 2021, the position was resolved by opening a custody account with Tavira in the name of Mr. Salinas but "for the benefit of" Astor 3 [Exhibit VS1/333-334]. I understand that Tavira's practice was not to transfer shares from Mr. Salinas's account when shares were rehypothecated from that account by Astor 3 to Vanderbilt."*

40. Second, as will be apparent from the passage omitted by Mr Salceda, the assertion he says was incorrect – that the Claimants needed "*to provide a statement or custodial representation confirming Mr Salinas was the owner of the shares*" – is simply what Ms Akbar (the Claimants' representative) said in the email I quoted. I understood Ms Akbar to be saying that Mr Salinas's concern was that he needed an account statement showing that he was the owner of the shares for tax purposes, because the email I had seen from her said the following:-

> *"Dear All*
>
> *Hope you are well. I've just had a lengthy call with Mr. Salinas and co. and I would like to convey the following:*
>
> *It is very important you have the sensibility of the necessity for the shares to return to the collateral contract until no later than in this week, since if the account statement is issued without the shares there will be trigger for an alienation which has a great tax implication for us. It is vital we have the shares back in the pledged account.*
>
> *Please we really need your help to make Astor and Weiser understand.*
>
> *Is there anything you can do to assist? This is a serious issue for the borrower and one which needs to be resolved before the end of October as they need to print a statement for October showing he is still the beneficiary.*

15

> *We are progressing with Taviras account opening but I'm unsure if that will happen in time."*

41. Third, I went on to say in paragraph 57 of my first witness statement that "*I assume*" Mr Salinas needed a statement to provide an explanation for why he had made no disclosures to the market. That is the conclusion I drew from the email correspondence to which I have referred. I do not know Mr Salinas's true motivation, and never suggested my understanding was more than an inference. Mr Salceda says that the true explanation is that the Claimants were concerned that Weiser had transferred Collateral Shares from Mr Salinas's account to the account of Astor Capital in breach of the SLA (paragraph 28 of his fourth witness statement). But the allegation of breach of the SLA was never stated in any of the correspondence which I saw, and would have been inconsistent with the exchange of correspondence in September 2021.

42. In December 2021 I decided that trading in the shares held with Tavira should start – I am reminded by the disclosure provided by Tavira that the first trade by Vanderbilt in Elektra shares was on 16 December 2021 [**Exhibit LH1/16**]. I therefore contacted Tavira. Tavira requested sight of the agreement with RBS and Mr Salinas, which I provided, first by WhatsApp on 16 December 2021 and then (as requested by Tavira) by email: see **[Exhibit VS4/30-31]**. It was standard practice for Tavira to see the underlying agreement between the lending entity and the borrower. I understood that this gave them comfort that the share dealings were authorised.

43. I had no difficulty whatsoever in providing the SLA to Tavira, since I had no doubt that the SLA authorised Astor 3 to hypothecate the shares to Vanderbilt and, in turn, that Vanderbilt was permitted to trade in the shares. Tavira must have understood the SLA in the same way, since they accepted Vanderbilt's instructions to trade in Elektra's shares and did so over an extended period.

44. Vanderbilt's authorisation to trade the shares was derived from a rehypothecation agreement between Astor 3 (as stock lender) and Vanderbilt (as stock borrower) dated 17 December 2021 **[Exhibit VS4/4-8]**, clause III of which stated:-

> *"III. AUTHORIZATIONS*
>
> *The Lender* [i.e. Astor 3] *hereby authorizes the Borrower* [i.e. Vanderbilt] *to act as set forth in this Section.*
>
> *1.     The rehypothecated Securities will be lent to Borrower by Lender as agreed;*
>
> *2.     The Lender hereby authorizes the Borrower to execute with other third parties securities loan agreements and engage in any and all dealings, or trades, including derivatives, options, puts and calls as the Borrower may deem appropriate at Borrowers sole discretion;*
>
> *3.     The Lender hereby authorizes and permits the subject Securities to be rehypothecated to Borrower, pursuant to this Agreement."*

16

45. Further versions of the rehypothecation agreement between Astor 3 and Vanderbilt were later signed on 15 June 2022, 5 April 2023 **[Exhibit VS1/472-476]**, and 13 September 2023 **[Exhibit VS4/14-20]**.  Clause III is identical in each version.

46. On or around 4 February 2022, the third Closing Statement was signed and Astor 3 advanced MXN 532,484,020 to RBS, secured over 1,299,497 Elektra shares deposited in Mr Salinas's account with Tavira.[5] Having now had more time to review the documents, I draw to the Court's attention that the third and later Closing Statements all included a provision stating that the "*LENDER WILL AT ALL TIMES MAINTAIN ITS ABILITY TO RETURN AN <u>EQUIVALENT</u> NUMBER OF ISSUER SECURITIES VALUED AT FAIR MARKET VALUE.*" The words "return an equivalent number of shares" are obviously inconsistent with any notion that the shares pledged as collateral would remain untouched and be returned on repayment of the loan – yet that was the central contention made to the Court in order to obtain the without notice injunctions.

47. On or around 22 June 2022, the fourth Closing Statement was signed and Astor 3 advanced MXN 613 million to RBS, secured over 2,796,290 Elektra shares deposited in Mr Salinas's account with Tavira.[6]

48. On or around 15 September 2022, the fifth Closing Statement was signed and Astor 3 advanced MXN 179,645,808 to RBS secured over 444,389 Elektra shares deposited in Mr Salinas's account with Tavira.[7]

49. On 23 March 2023, Astor 3 made a margin call for 1,728,207 additional Elektra shares.  Mr Salinas complied with that margin call and transferred the relevant shares to his account with Tavira.

50. In total, MXN 2,154,218,552.55 was advanced to RBS by Astor 3.  7,204,296 Elektra shares were pledged by Mr Salinas – of which 935,913 were deposited with Weiser and 6,268,383 deposited with Tavira.

E.      The transactions in Elektra shares

51. Over the total period to 26 July 2024, Tavira conducted trades on behalf of Vanderbilt, and Weiser conducted trades on behalf of Astor Capital **[VS4/115-311]**. As explained in my previous evidence,

---

[5] Closing Statement at EGSS1/170-177.
[6] Closing Statement at EGSS1/178-188
[7] Closing Statement at EGSS1/189-198.

Astor 3, Astor Capital and Vanderbilt did not keep their own records of transactions but left this to the broker-dealer. As I indicated above, I am now in a position as a result of information being supplied by Tavira and Weiser to set out further details of the proceeds of the trades undertaken. Having now been able to investigate the position more thoroughly with my advisors, and as I set out below, the amounts now held by Tavira and Weiser and frozen by them exceed the sums which the Claimants could claim (even if they had any claim).

52. Since the commencement of the proceedings, the following information has been provided by Tavira:

   a. PDFs sent on 5 August 2024 and again exhibited in the witness statement of Mr Harris of 13 August 2024. Those documents set out details of each trade undertaken by Tavira for Vanderbilt in Elektra shares, including: the trade date; the settlement date; the nature of the order; the volume traded on each occasion; the price; a code identifying a broker used for the trade; and the commission amount charged by Tavira (I refer to exhibit LH1/16-24).

   b. Excel spreadsheets provided to me by Mr Harris on or about 2 September 2024. These contain entries for multiple deals, not limited to Elektra.

53. DWF (who have an internal forensic accounting team) have begun to analyse this data and have sought, so far as they can, to identify Elektra trading entries. DWF have then analysed the information which I understand shows as follows as regards the cashflows:

   a. The equivalent of approximately US$359.4 million was received by Vanderbilt into its account at Tavira from sales of Elektra shares during the period 20 December to 29 July 2024, noting that the transaction currency was in Mexican pesos. This sum was derived by my advisors from the trading data exhibited by Tavira [**LH1/16-24**].

   b. The third, fourth and fifth loan tranches of the loan by Astor 3 to RBS were funded from the proceeds of those disposals, totalling approximately MXN 1.27 billion, which equates to around US$64.5 million. These amounts (being MXN 510,000,000; MXN 592,871,767 and MXN 173,586,459) are shown as "cash received" in RBS's Tavira Account TMC 63 **[EGSS2/41]**.

   c. US$271,685,472 million from those disposals was transferred from Tavira to client accounts controlled by JT Singh through his international law practice, Jurist IQ, or his US practice, Singh Law Firm. (See my first affidavit at paragraphs 8, 13(a), 20, 26(a) and 35(c).) This amount was derived by a summation of the balances included in **EGSS2/35-36**.

54. I understand from bank information provided to DWF by Mr Singh that US$216,069,214 was transferred back from the Singh client accounts to Tavira **[VS4/78-114].** (In addition, further sums were transferred from the Singh client account in respect of tranches 1 and 2 of the loan, being US$25,426,012.85 on 17 August 2021; and US$15,237,011.72 on 17 September 2021.) In other words a total sum of c. US$40.66 million. In a table below I set out details of the transfers that made up that total, including their dates, the Chase Bank transaction references and the Tavira account numbers ("TMC ref"):-

| Date | Amount (US$) | Chase Bank transaction reference | TMC ref. |
|---|---|---|---|
| Tuesday, 5 April 2022 | 40,000,000 | 3663572094Es | TMC 50 |
| Friday, 15 April 2022 | 8,000,000 | 3408852105Es | TMC 87 |
| Friday, 15 April 2022 | 8,000,000 | 3411792105Es | TMC 83 |
| Friday, 15 April 2022 | 9,000,000 | 3420872105Es | TMC 86 |
| Monday, 13 June 2022 | 5,000,000 | 3310132164Es | TMC 99 |
| Monday, 13 June 2022 | 10,000,000 | 3290042164Es | TMC 87 |
| Monday, 13 June 2022 | 10,000,000 | 3284842164Es | TMC 94 |
| Monday, 13 June 2022 | 10,000,000 | 3300852164Es | TMC 50 |
| Monday, 27 June 2022 | 2,079,214 | 3521252178Es | TMC 57 |
| Thursday, 20 October 2022 | 20,000,000 | 3365992293Es | TMC 121 |
| Monday, 5 December 2022 | 8,000,000 | 3325762339Es | TMC 121 |
| Monday, 5 December 2022 | 7,000,000 | 3344252339Es | TMC 119 |
| Monday, 5 December 2022 | 7,000,000 | 3345652339Es | TMC 84 |
| Monday, 5 December 2022 | 8,000,000 | 3327162339Es | TMC 83 |
| Friday, 24 February 2023 | 1,990,000 | 3350583055Es | TMC 53 |
| Thursday, 28 March 2024 | 2,000,000 | 3549134088Es | TMC 139 |
| Monday, 22 July 2024 | 15,000,000 | 3496674204Es | TMC 139 |
| Monday, 22 July 2024 | 15,000,000 | 3520684204Es | TMC 140 |
| Monday, 22 July 2024 | 15,000,000 | 3523374204Es | TMC 144 |

| Date | Amount (US$) | Chase Bank transaction reference | TMC ref. |
|------|---------|----------------------------------|----------|
| Monday, 22 July 2024 | 15,000,000 | 3515994204Es | TMC 143 |
| **TOTAL** | **216,069,214** | | |

55.  In addition to those sums, there are also several smaller sums which were paid from funds which may have been traceable proceeds of sales in Elektra shares:

56. Mr Singh has identified that between 28 July 2021 and the date of the injunction (2 August 2024) US$9,149,781 of traceable proceeds was paid to me from the Singh Law and JIQ Accounts.  I cannot confirm that this is correct, but I do not dispute it.  Of this amount, $4,388,736 was paid to Bank Hapoalim in Israel.  I have disclosed the sums that remain unspent in that account in my first affidavit.

57. Without any waiver of privilege, Mr Singh has also identified sums that Jurist IQ and Singh Law have been paid which he considers may potentially derive from Traceable Proceeds.  I do not know how he has identified whether payments received may or may not derive from traceable proceeds but note that he has identified the figure US$ 4,534,752.64.  These payments were made in respect of legal fees, disbursements (e.g. external legal fees, support services, travel reimbursement etc) and other additional costs.

58. I recall there were commissions to be paid to Zara Akbar, through her entities Enness Global Mortgages and Thalia Capital Corporation.  These commissions were in respect of origination and other fees and payments and total some US$4.9 million.  As far as I am aware Mr Salinas and RBS were aware of these commissions (and I note Mr Torti referred to them in an email to Mr Salceda at **[EGSS4/3-6]**). I cannot confirm whether all of these sums were in fact paid as DWF have so far only been able to identify US$1,063,623.21 that was paid to Thalia and Enness.  It is likely that some or all of these funds constitute traceable proceeds.

59. As to the cash and other assets that remain on accounts at Tavira and Weiser, based on the spreadsheets, account statements and other witness statements (from Tavira and Weiser) which have been provided to the Court, it now appears to me that there are the following cash and assets which are in principle subject to the proprietary injunction obtained by the Claimants dated 2 August 2024:-

20

a.  Cash and other assets worth US$227,492,214 in Tavira. This comprises assets derived from the US$216,069,214 sent to Tavira from the Singh client accounts, together with existing cash balances of US$10,460,000 and US$963,000 held by Tavira for Vanderbilt and Astor 3 respectively.

b.  US$ 12,604,476.49 in an account in Astor 3's name at Weiser **[VS4/312-319]**. This arose from a sale of 935,176 shares in Elektra to Astor Capital. (The account balance in total is US$ 12,613,929.45.)

c.  US$ 7,588,082.08 in an account in Astor Capital's name at Weiser. (In paragraph 37(a) of my first affidavit I had estimated this figure to be US$ 7.6 million.)

d.  US$ 107,663.19 in an account in Vanderbilt's name at Weiser. (In paragraph 25(d) of my first affidavit I had estimated this figure to be USD 108,000.)

e.  In addition, there are the following shares in Elektra held at Tavira and Weiser:-

    i.  Tavira holds 336,475 shares. At the current market price of MXN 944.95, those shares have a value of MXN 317,952,051 or approximately USD 16.5 million.

    ii.  Weiser holds 197 shares with a value of approximately USD 9,600 in Astor 3's account **[VS4/312-319]**.

60. Tavira also holds other shares in an account for Vanderbilt worth around US$6.7 million.

61. In the circumstances, the various statements and other documents provided by Tavira and Weiser demonstrate that there are assets worth approximately US$262.5 million which have been frozen as potentially the proceeds of trading in Elektra shares.

62. Under the worldwide freezing order obtained by the Claimants dated 2 August 2024 against Astor 3, Weiser, Tavira and me ("the WFO"), the sum frozen is MXN 5,411,000,00 (which equates to around USD 273.8 million based on the rates as at 13 September 2024 on www.xe.com).

63. The Claimants seem to have arrived at that figure in the following way (according to paragraphs 47 and 146 of their skeleton argument for the hearing on 2 August 2024):-

    a.  The Claimants stated that the value of the 7,204,296 shares was MXN 7,565,879,616. I note that they based that valuation on the market price of shares in Elektra on 23 July 2024, which was MXN 1050. In fact, by the time they applied to Court over a week later, that share price was already out of date. The market price of Elektra shares had fallen by 10% to MXN 944.95, which would have resulted in a valuation of MXN 6,807,699,505.20. The choice the Claimants

made to give the shares a value based on an out of date price from a date apparently chosen arbitrarily was not explained to the Court in obtaining the without notice injunctions.

b.   The Claimants then subtracted from the valuation they gave those shares the principal amount due from RBS to Astor 3 under the loan agreement between them of MXN 2,154,218,552.55.

c.   Rounding the result of that calculation down to the nearest 1 million resulted in a figure of MXN 5,411,000,000.

64.   In reality, because of the fall in price of Elektra shares, I am advised that the figure sought to be frozen by the Claimants ought to have been lower.  Based on the market price at the time of suspension, the Elektra shares were worth (at most) MXN 6,807,699,505.20.  Indeed, if trading in the shares had not been suspended, it seems likely that their value would be less than MXN 944.95 per share, perhaps significantly so.  But even on this favourable assumption to the Claimants, deducting from that MXN 6.8 billion figure the principal amount due from RBS to Astor 3 under the loan agreement of MXN 2,154,218,552.55 results in a figure of MXN 4,653,480,952.65 (or rounded down to the nearest 1 million, MXN 4,653,000,000). In dollar terms, this is US$235 million.

65.   The value of the Claimants' claim is therefore at most US$235 million - significantly less than the value (approximately US$262.5 million) of the assets which have been identified and which are presently frozen at Tavira and Weiser. The WFO is on any view unjustifiable.

**F.   The alleged discovery of fraud**

66.   Paragraph 32 of Salceda 4 suggests that "*it was only following Astor 3's letter received on 13 June 2024 (dated 12 June 2024) that I became increasingly concerned that Astor 3 might have disposed of a significant quantity of the Collateral Shares*".  This does not make sense to me because, quite apart from the WhatsApp exchange referred to at the beginning of this statement, I understood that both Zara Akbar and Alexandre Torti had always been clear that the Elektra shares would be rehypothecated – I (using the name Gregory Mitchell) had repeatedly discussed this with them.  I would speak to Mr Torti at least once a year, in or around the fall of 2021, in the spring or summer 2022, and the spring or summer of 2023.  I distinctly recall he understood that the stock would be rehypothecated by Astor 3 and that he made statements to the effect that "I know what you are doing, lending the stock out, and it's fine because it is in the SLA and we know how the business works.  So long as you follow the contract we do not have an issue."   I also recall Ms Akbar telling me that both Mr Torti and Mr Salinas thought the arrangements were fine but that Mr Salceda was making waves.  I repeatedly emphasised that all Mr Salinas's team needed to do was read the SLA, which Astor was complying with.

22

67. Leaving aside the fact that it is the Claimants' own case that they had concerns about trading of Elektra shares in September and October 2021 (about which they did little), I note that in early April 2024 the Claimants initiated a chain of correspondence in which they sought information about attendance at the Elektra shareholders' meeting to be held on 16 April 2024. This is exhibited to Mr Salceda's first statement at [**EGSS1/398-425**]. Among other things, Mr Torti sought clarification as to the identity of the sub-custodian of the Elektra shares, suggesting a failure to answer his question would be "*worrisome and will lead to negative consequences*" [**EGSS1/398-399**]. The impression sought to be conveyed by the Claimants' evidence that they moved promptly to investigate their supposed concerns is a false one. I believe Mr Salinas's concern was simply to ensure that he could continue to present himself as the owner of the same number of shares as before. I note that Mr Salceda continues to assert that the suspension of trading in Elektra shares is referable to the "discovery of the fraud" and not Elektra's disastrous Q2 2024 results [**Salceda4/39**]. As I indicated in my first witness statement, Elektra reported its Q2 2024 on 24 July 2024. Elektra shares then fell by 10% on 26 July 2024 to MXN 944.95. Indeed, the price had already been falling steadily for some time. In March 2024 it had been as high as MXN 1,200.

68. To the extent it is alleged by the Claimants, it is entirely implausible to suggest that the supposed "disruption" in the share price of Elektra immediately prior to the suspension of trading can have had anything to do with the trades in Elektra shares undertaken by Vanderbilt. DWF have prepared a graph [**Exhibit VS4/32**] which compares (for the period December 2021 to 26 July 2024) the volume of trading in Elektra shares generally in the market place with the volume of shares traded by Vanderbilt. The trades undertaken by Vanderbilt throughout were a small fraction of daily trading volumes. On certain occasions there were particularly large volumes traded in the market, but as can be seen from the graph this was not attributable to Vanderbilt's activities.

69. Furthermore, there is reason to believe that Elektra shares have been consistently over-valued for some time due to manipulation by Mr Salinas and Elektra of the market for its shares.

*Non-disclosures by Elektra and Mr Salinas contrary to Mexican securities law*

70. It appears that Mr Salinas and Elektra have failed to disclose significant transactions to the market, including the Loan. By concealing these transactions from the market, Mr Salinas was able to pledge significant volumes of Elektra shares without alerting the market. Had he disclosed such transactions, it would have created a negative market perception as to the company's stability and the price of Elektra shares would have fallen.

71. Without any waiver of privilege, I am informed by Mexican counsel that Mr Salinas and Elektra have positive obligations to disclose significant transactions or events to the Mexican authorities.

72. Pursuant to Article 50 of the Mexican Securities Issuers' Regulations [**Exhibit VS4/33-47**], Elektra

is required to disclose any transaction that represents, at a minimum, 5% of the issuer's consolidated assets, liabilities or total capital, or 3% of its total consolidated sales from the previous fiscal year. If this threshold value is reached, the transaction is deemed to be a "relevant" transaction and Elektra must disclose this transaction to the regulator, the *Comisión Nacional Bancaria y de Valores* ("the CNBV"). According to Article 89 of those Regulations, a failure to disclose such transactions shall permit CNBV to apply sanctions in accordance with the Market Securities Law.

73. Further, pursuant to Article 363 of the Mexican Market Securities Law **[Exhibit VS4/50-54]**, Mr Salinas is deemed to be an insider with access to privileged information because he is a shareholder who holds, directly or indirectly, 5% or more of Elektra's share capital. As an insider, Mr Salinas is prohibited from entering into or instructing the execution of transactions, directly or indirectly, of any kind unless he discloses the transaction to the public.

74. In light of these obligations, Elektra and Mr Salinas were obliged to disclose the Loan to the CNBV and the public as:

    a.  Mr Salinas directly and indirectly owned more than 5% of Elektra's share capital.

    b.  Mr Salinas pledged 7,204,296 million Elektra shares as collateral for the Loan.

    c.  As per the fifth Closing Statement, the fair market value of the collateralised shares at the time totalled MXN 6,324,937,555.89 **[VS1/315]**, which exceeded 5% of Grupo Elektra's total equity capital in each year from 2021-2023 and 3% of its total consolidated sales from the previous fiscal years.

75. I understand that neither Elektra nor Mr Salinas made any such disclosures regarding the Astor Loan.

76. Further, at paragraph 11 of Mr Salceda's Fourth Witness Statement, he claims to have arranged "*numerous stock lending transactions on behalf of Mr Salinas over two decades*". Without the benefit of the information underlying these transactions, it is unclear whether Elektra or Mr Salinas have complied with their disclosure obligations for those transactions.

77. Mr Salinas has identified one stock lending transaction at paragraph 13 of his witness statement, the BNP Paribas loan of 2021 (the "**BNP Loan**"). Notably, Mr Salinas's BNP Paribas Portfolio Management Report of April 2021 shows that 6,900,000 Elektra shares held blocked positions **[VS1/364-382]**. Although it is unclear whether these shares were used as the collateral for the BNP Loan, Mr Salinas (as an insider) would have been obligated to disclose the pledging of this collateral. However, the Elektra's 2021 annual reports show no such disclosure.

78. As I stated in my first witness statement, Mr Salinas and his companies have previously been fined by CNBV for a failure to disclose relevant transactions:-

    a. According to Forbes Mexico, on 2 February 2022, CNBV imposed a fine on Grupo Elektra for MXN 2,264,700 for the failure to disclose information to the public on investment activity from 2017, which had not been disputed by Grupo Elektra as of the date of the fine **[Exhibit VS4/55-64]**.

    b. According to *La Jornada*, on 11 July 2024, CNBV imposed a fine of MXN 844,900 on Mr Salinas for failing to report a sale of Elektra shares without a public offering or authorised auction **[VS1/430-432]**.

79. Shares of Elektra also trade on the Spanish stock exchange and Article 19 of the European Securities Regulations require any and all sales, purchases or share pledges to be publicly disclosed and this was not done either.

*The Repurchase Fund*

80. Paragraph 17 of Salceda 4 states that, within Grupo Salinas (the overall umbrella group for Mr Salinas's various interests), he operates a Repurchase Fund, whose function is to be a "*market-maker in Elektra shares, in accordance with Mexican company law*", buying or selling Elektra shares that exceed the availability in the market. Mr Salceda explains that his involvement within the Repurchase Fund allowed him to be "*aware of the volume of Elektra shares being traded in the market at any given time*".  He suggests in paragraph 19 that the Repurchase Fund was purchasing "*an unusually high number of shares*" in early September 2021.

81. Without any waiver of privilege, I have been informed by Mexican counsel that although repurchase of Elektra's own shares is not *per se* prohibited under Mexican law, there are certain restrictions under Mexican law.  For example, the sale and acquisition of shares must be disclosed to the CNBV, the stock exchange and to the public.  Further, if the Repurchase Fund buys or sells stock for market stabilisation purposes (which appears from Mr Salceda's evidence to be the case), any repurchase would be deemed to be a "relevant event" and therefore subject to mandatory disclosure obligations.  Failing such disclosures, the Repurchase Fund would be in violation of Mexican law and subject to sanctions by the CNBV.

82. I have reviewed Elektra's annual reports from 2021-2023 and found that Elektra has only disclosed three repurchase transactions since 2007 **[Exhibit VS4/65-67]**:-

    a. On 17 July 2007, through an extraordinary shareholders' meeting, the shareholders approved that the company would acquire 8% of the shares held by each shareholder at MXN 238 per

share, which represented a 22% premium over the average market price of the stock in the previous 20 business days.

b.   On 9 December 2016, 12,177,285 shares were acquired by the Repurchase Fund, which exceeded 5% of the outstanding shares in circulation. These shares became the company's treasury shares.

c.   On 28 December 2022, 11,680,000 shares were acquired by the Repurchase Fund, which exceeded 5% of the outstanding shares in circulation. These shares became the company's treasury shares.

d.   Aside from these three transactions, I have not seen any other disclosures by Elektra regarding the repurchase of shares by the Repurchase Fund, whether for the purposes of market stabilisation or otherwise. If Mr Salceda's statement that an "unusually high" number of shares were being repurchased in September 2021, these should have been disclosed to the market and the CNBV.

**G.   Further details about the background to the transaction**

83.   I understand that the Claimants have contended that Thomas Mellon is fictitious and simply my alter ego. This is untrue. He is a real person. I exhibit at **[ - ]** a copy of a US passport which he sent me. I believe he sent it by Signal in the autumn of 2021. I took a picture of it on my phone but I no longer have the Signal message itself. I am uncertain if the messages were deleted when my phone was updated, or because they are old, or because Thomas set the settings for messages to be deleted.

84.   For the avoidance of doubt, I cannot verify the authenticity of the passport but can say that the photograph is accurate. By contrast, some other images of Thomas which the Claimants' investigators Forward Risk have found are not accurate and (so far as I can judge) appear to use the top half of his head but to have altered the bottom half **[Exhibit EGSS1/9-10]**. The Astor Wealth Group pages which the Claimants have put forward **[Exhibit EGSS1/650-662]** are not connected with Astor 3. They relate to a new outfit which I understand Thomas has apparently been trying to launch since 2023. He asked me to become involved but nothing has come of it and I have not heard from him for some time.

85.   Thomas Mellon was first known to me as Aleksei Skachkov. He was (so I understood) of Russian origin but lived in Atlanta. We started doing deals together in around 2019. We discussed the name of the company that he would use – he wanted to use the name Astor. He used the name Thomas Mellon for his business activity.

26

86. Around the end of September 2021 or beginning of October 2021, Thomas and I had a disagreement. He started to demand payment of his share in the profits from the deal with RBS / Mr Salinas. He was not entitled to payment at that stage as no profits had been realised – as I have described above, these depended on the outcome of the loan (including whether it was repaid or defaulted on, and on the market price of Elektra shares). Ultimately, around the beginning of October 2021 we reached agreement on the terms of his departure  and Thomas ceased to be involved with Astor 3. From that point on, I handled all communications and dealings of Astor 3 with Mr Salinas's / RBS's representatives and intermediaries. Although Thomas was in contact with me again last year about possible new business, I have not heard from him for some time.

87. Throughout the period in which I dealt with Mr Salinas's / RBS's representatives through Astor, I did so under an assumed name – Gregory Mitchell. This was a name I had been using in business deals since around 2018, and continued to use since then. I have never thought that there was anything inappropriate about this, and I always felt I have good reasons for it. I was born in Ukraine and I have been discriminated against throughout my life, initially as a Jew in the Soviet Union, and then as a Russian when I moved to the USA as a child. The fact my name was 'Vladimir' made life difficult for me at school, and later in life in business. The memories of the treatment I suffered remain painful. So I adopted a Western pseudonym. I saw this as no different from an actor using a different name, or a doctor of Chinese ethnicity using a Western name to practice in the USA. Without waiving privilege, I took advice from Mr Singh who said that it was not a problem so long as I did not sign contracts in that name.

88. On, 5 September 2024, DWF wrote a letter to Enyo Law **[VS4/69-70]** on my instructions saying among other things that: "*Mr Sklarov never dealt directly with Mr Mitchell but understood he was someone who worked with Mr Mellon.*" I accept that the instructions I gave DWF were not accurate. This was wrong and I apologise to the Court. I have never thought there was anything wrong about corresponding under an assumed name, but the Claimants have made very serious allegations against me, among other things suggesting there was something wrong with that practice, and I was scared to admit it.

## STATEMENT OF TRUTH

I believe that the facts stated in this statement are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

**VAL SKLAROV**

**16 September 2024**

.....................................

Signed

27