# Exhibit C

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| *In re* Application of RICARDO BENJAMIN SALINAS PLIEGO & CORPORACIÓN RBS S.A. de C.V., for an Order Pursuant to 28 U.S.C. § 1782 Authorizing Discovery for Use in a Foreign Proceeding | Case No._____ |

**DECLARATION OF JOHN VEYSEY IN SUPPORT OF RICARDO BENJAMIN SALINAS PLIEGO & CORPORACIÓN RBS S.A. de C.V.'S EX PARTE APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 AUTHORIZING DISCOVERY FOR USE IN A FOREIGN PROCEEDING**

I, P. JOHN VEYSEY, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      I am attorney at law duly authorized to practice law in the State of New York, California, and Massachusetts and I am admitted to practice in various federal courts, including the United States District Court for the Southern District of New York.

2.      I make this Declaration in support of the ex parte Application for an Order Pursuant to 28 U.S.C. § 1782 Authorizing Discovery for Use in a Foreign

Proceeding (the "**Application**") filed by Ricardo Benjamin Salinas Pliego & Corporación RBS S.A. de C.V. (hereinafter, the "**Applicants**").

3.    On August 23, 2024, my office filed an ex parte Application for an Order Pursuant to 28 U.S.C. § 1782 Authorizing Discovery for Use in a Foreign Proceeding in the United States District Court for the Southern District of New York on behalf of the Applicants (the "**New York Application**"). *See In Re Application Ricardo Benjamin Salinas Pliego & Corporación RBS S.A. C.V., for an Order Pursuant to 28 U.S.C. § 1782 Authorizing Discovery for Use in a Foreign Proceeding*, No. 1:24-mc-00394 (S.D.N.Y. Aug. 23, 2024) (ECF 1). The New York Application is attached hereto as **Exhibit 1** and the associated case docket is attached hereto as **Exhibit 2**.

4.    On September 9, 2024, U.S. District Judge Lewis Kaplan granted the New York Application, and my office issued subpoenas to Jaitegh Singh, Singh Law Firm, Jurist IQ Corp. (collectively, the "**Singh Respondents**"), and JPMorgan Chase Bank, N.A. ("**JPMC**") shortly thereafter. (Ex. 2, ECF 9).

5.    On September 30, 2024, and October 7, 2024, Singh Respondents filed requests for extensions to respond to Applicants' subpoenas. (*Id*., ECF 10, 15). Judge Kaplan ordered the Singh Respondents to respond to Applicants' subpoenas by

October 10, 2024. (*Id*., ECF 10). On October 16, 2024, Judge Kaplan denied the Singh Respondents' further extension requests. (*Id*., ECF 17).

6.    The Singh Respondents and JPMC began producing documents starting on October 15, 2024. Since then, the Singh Respondents have since made five partial productions. Production remains ongoing. My office has since reviewed the produced records and provided them to Applicants' counsel in the U.K. Action.

7.    On October 18, 2024, JPMC produced a collection of bank records totalling nearly 3,000 pages (the "**JPMC Documents**"). JPMC did not designate this production as confidential and did not propose or require any protective order in connection with this production.

8.    On October 21, 2024, Judge Kaplan entered a Stipulated Confidentiality Agreement and Protective Order previously submitted by Applicants and the Singh Respondents (the "**Singh Protective Order**"). (Ex. 2, ECF 19). The Singh Protective Order does not apply to the JPMC Documents. The Singh Protective Order is attached hereto as **Exhibit 3**.

9.    The JPMC Documents consist of bank account statements and account opening documentation, including both information related to the individuals

associated with the subject matter of this Application and the accounts of third parties unrelated to the present proceedings.

10.    In light of the foregoing, the pages of the JPMC Documents attached hereto as **Exhibit 4** are a small subset of the full production. These pages reflect the most pertinent transactions for purposes of this Application. Accordingly, the pagination (which maintains the original page numbers as provided by JPMC) are sequential, but not consecutive.

11.    Additionally, the redactions on these pages and the Notice of Motion and Motion to Seal that Applicants are filing contemporaneously with the Application are intended to protect the confidentiality of the information in those records, and to comply with relevant provisions of the most current Singh Protective Order to the extent that any records are identical to those subject to that protective order.  If the Court prefers an *in camera* review of the entirety of the JPMC Documents (versus the redacted excerpts attached hereto), Applicants can provide as much.

I declare under penalty of perjury under the laws of the State of Georgia and the

United States of America that the foregoing is true and correct.

Executed this 10th day of December, 2024, at Boston, Massachusetts.


Dated: December 10, 2024          Respectfully submitted,

                                  NELSON MULLINS RILEY &
                                  SCARBOROUGH LLP

                                  By:

                                  P. John Veysey
                                  john.veysey@nelsonmullins.com
                                  One Financial Center, Suite 3500
                                  Boston, MA 02111
                                  Tel: (617) 217-4645 Fax: (617) 217-4710

                                  Attorney for Ricardo Benjamin Salinas
                                  Pliego and Corporación RBS S.A. de C.V.

# EXHIBIT 1

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re* Application of RICARDO BENJAMIN SALINAS PLIEGO & CORPORACIÓN RBA S.A. C.V., for an Order Pursuant to 28 U.S.C. § 1782 Authorizing Discovery for Use in a Foreign Proceeding | **RICARDO BENJAMIN SALINAS PLIEGO & CORPORACIÓN RBS S.A. de C.V. NOTICE OF APPLICATION AND EX PARTE APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 AUTHORIZING DISCOVERY FOR USE IN A FOREIGN PROCEEDING**<br><br>Date: August 23, 2024<br>Time:<br>Courtroom: _____ |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT on August 23, 2024, or as soon as the matter may be heard, before the General Duty Judge, otherwise assigned, in the Southern District of New York, 40 Foley Square, Room 2103 , New York, NY, Applicants Ricardo Benjamin Salinas Pliego ("**Salinas**") and Corporación RBS S.A. C.V. ("**RBS**") and (collectively the "**Applicants**") move this Court for an Order in support of its Ex Parte Application for an Order Pursuant to 28 U.S.C. § 1782 Authorizing Discovery for Use in a Foreign Proceeding (the "**Application**") from J.P. Morgan Chase & Co. ("**JPMC**"), Jaitegh "JT" Singh and his law firm Singh Law Firm, P.A. (collectively "**Singh**" or "**Mr. Singh**"), and Jurist IQ Corp. ("**Jurist IQ**"), for use by the Applicant in a foreign civil proceeding in the United Kingdom. Given the relief sought, Applicants may be available for a hearing, unless the Court prefers to rule on the Application without a hearing.

Concurrent with this Application, Applicants submit the enclosed Related Case Statement relating to pending action *Chenming Holdings (Hong Kong) Limited v. Sklarov et. al.*, No. 1:24-cv-00935 (S.D.N.Y. Feb. 8, 2024), and their Corporate Disclosure Statement pursuant to Local Rule 7.1.

This Application is based on this Notice of Motion and the Applicants' Memorandum of Points and Authorities, the Declaration of Eduardo Gonzalez Salceda Sanchez, the Declarations of Edward Allen as outside counsel of RBS, and any other matters as may be presented to the Court at or prior to the hearing.

Dated: August 23, 2024                    Respectfully submitted,

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

By:    */s/ P. John Veysey*
         P. John Veysey
         john.veysey@nelsonmullins.com
         One Financial Center, Suite 3500
         Boston, MA 02111
         Tel: (617) 217-4645 Fax: (617) 217-4710

         Alan F. Kaufman
         Charles N. Hurley
         330 Madison Avenue
         27th Floor
         New York, NY 10017
         Tel: (202) 689-2890

         Attorneys for Applicants
         RICARDO BENJAMIN SALINAS PLIEGO &
         CORPORACION RBS S.A. de C.V.

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re* Application of RICARDO BENJAMIN SALINAS PLIEGO & CORPORACIÓN RBS S.A. C.V., for an Order Pursuant to 28 U.S.C. § 1782 Authorizing Discovery for Use in a Foreign Proceeding | Case No._____<br><br>**RICARDO BENJAMIN SALINAS PLIEGO & CORPORACIÓN RBS S.A. de C.V. MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR EX PARTE APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 AUTHORIZING DISCOVERY FOR USE IN A FOREIGN PROCEEDING**<br><br>Date: ____<br>Time: 10:00 AM<br>Courtroom: _____ |

Applicants Ricardo Benjamin Salinas Pliego ("**Mr. Salinas**") and Corporación RBS S.A. de C.V. ("**RBA**") (collectively the "**Applicants**"), submit this application to discover and confirm the whereabouts of certain assets, including those held in bank accounts held by Jurist IQ Corp. ("**Jurist IQ**") at J.P. Morgan Chase & Co. ("**JPMC**") (the "**Jurist IQ Account**"), Jurist IQ's Principal Jaitegh "JT" Singh and his law firm Singh Law Firm, P.A. (collectively "**Singh**" or "**Mr. Singh**"). These assets include the proceeds of Mr. Salinas' stock that Applicants believe Mr. Singh's affiliates since sold or otherwise unlawfully converted. Applicants require this information to support their pending action in England (the "**English Action**") that seeks injunctive and other relief after persons and companies with whom Mr. Singh is associated that defrauded and continue to defraud Mr. Salinas of stock worth hundreds of millions of dollars. Applicants' investigations indicate that the respondents in the English Action sent the proceeds from Mr. Salinas' shares that they unlawfully converted, and other outstanding shares, to the Jurist IQ Account.

Applicants also require information about other activity and assets may have been processed through the Jurist IQ Account (whose beneficiary is the "Jurist Iq Corp Attorney Trust Account IOLA") to enforce orders already entered in the English Action. This Application will help Applicants advance the English Action by further understanding the wrongdoers' identities, whereabouts, and actions relating to the massive stock-lending fraud perpetrated against Mr. Salinas. This Application will also advance Applicants' goals to preserve the assets and proceeds these wrongdoers are actively trying to steal, which Applicants filed the English Action to enjoin.

## I.    INTRODUCTION

Mr. Salinas is a businessman in Mexico who is the founder and chairman of Grupo Salinas, a conglomerate with interests in various businesses in Mexico. In 2021, Grupo Salinas and parties representing themselves as the "Astor Group," reached a series of lending agreements between Astor Asset Management 3 Limited ("**Astor 3**"), a putative Astor Group affiliate, and Applicant RBS. Mr. Salinas, as Guarantor, agreed to transfer over shares in Grupo Elektra S.A.B. de C.V. ("**Elektra**"), a publicly traded subsidiary of Grupo Salinas, to a custodian to hold as collateral for Astor 3 and ultimately transferred over 7 million shares in Elektra (the "**Collateral Shares**"). The parties' agreements required that Astor 3 would not dispose of, transfer, sell, or take other actions as to the Collateral Shares except in event of a default or upon the overall loan's maturity, as defined by those agreements.

In 2024, Applicants discovered that Astor 3 began to illegally misappropriate and convert the Collateral Shares. After Applicants quickly acted to address this breach, Astor 3 escalated its misappropriation. Through their investigation, Applicants determined that Astor 3 is a front for one Vladimir "Val" Sklarov ("**Sklarov**") and his associates. Various court filings and other legal disputes reveal Mr. Sklarov's modus operandi is to set up entities that pose as legitimate financial

institutions willing to loan companies money, who then solicit and gain control of the borrowers' stock as collateral for those loans, before quickly misappropriating that collateral. This practice is commonly known as stock-backed lending fraud.

Upon the Applicants' discovery of possible irregularities regarding Mr. Salinas' Collateral Shares, the Astor 3 Parties brazenly escalated their illegal acts to stifle any effort by the Applicants to protect their interests. Applicants immediately sought to enjoin the Astor 3 Parties and the Custodian Parties in the English Action. The Applicants' goals in the English Action are to prevent further misappropriation or dissipation of the Collateral Shares, enjoin the Astor 3 Parties from committing further harm and recover damages for the harm already caused. Due to the Astor 3 Parties' subterfuge, Applicants are unable to determine what shares remain in the Astor 3 Parties' custody or the status of any proceeds from shares transferred. Applicants cannot secure this information or confirm the identity of the individuals and entities behind the Astor 3 Parties' scheme without access to the bank accounts and individuals in this District.

Applicants submit this Application with the utmost urgency. Applicants' potential losses resulting from the Astor 3 Parties' fraud and illegal conduct could exceed $290 million USD without prompt intervention by the necessary legal authorities. Applicants must identify and access individuals and accounts in this jurisdiction to secure that relief. Applicants thus submit this Application to collect information necessary to sustain their expedited English Action.

## I.     RELEVANT FACTS

### A.     The Applicants

Mr. Salinas is founder and chairman of Grupo Salinas. Mr. Salinas' holdings include interests in Grupo Elektra S.A.B. de C.V. ("**Elektra**"). Elektra is incorporated in Mexico and is publicly traded on the Mexican and Spanish stock exchanges. **Exhibit 1**, Declaration of Eduardo Gonzalez Salceda Sanchez, ¶5. Elektra is part of Grupo Salinas and primarily operates financial

services and consumer goods entities in Mexico, Central America, and South America. *Id.*, ¶6. RBS is a company incorporated in Mexico that Mr. Salinas beneficially owns and controls. *Id.*, ¶5.

Inclusive of the shares subject to the fraudulent activities at issue here, Mr. Salinas is the direct or indirect beneficial owner or controller of approximately 67,544,413 shares in Elektra, which represents 30.47% of Elektra's share capital. *Id.*, ¶6.

**B.    Mr. Salinas' Companies Explore Fundraising and Enter a Stock Lending Agreement with Astor 3.**

In 2021, Grupo Salinas, through its Vice President for Financial Investment & Analysis Eduardo Gonzalez Salceda Sanchez ("**Mr. Salceda**"), began to explore raising finance by offering Elektra as collateral. *Id.*, ¶¶19–20. A third-party financial advisor, Alexandre Torti ("**Mr. Torti**"), introduced Mr. Salceda to individuals representing themselves as agents of the "Astor Group." *Id.*, ¶¶22–23. Mr. Torti, with whom Mr. Salceda previously worked and trusted, represented that the Astor Group was owned by the Astor family, whose wealth and generations of business and political prominence are well-known. *Id.*, ¶¶22–25. Mr. Torti's conduit to the Astor Group was one Zara Akbar, whose firm is located in the United Kingdom. *Id.*, ¶22. Before Mr. Torti's introduction, Mr. Salceda was not familiar with Ms. Akbar. *Id.*, ¶23. Mr. Salceda and Grupo Salinas relied on Mr. Torti's due diligence in this process. *Id.*, ¶24. Eventually, through these contacts, Mr. Salceda connected with an individual at the Astor Group called "Gregory Mitchell," the Astor Group's managing director. *Id.*, ¶26. Mitchell's correspondence included emails that copied one "Thomas Mellon." *Id.*, ¶26. Applicants now believe that both names are fictitious and that no such individuals exist. *Id.*

Applicants and the Astor Group eventually negotiated a stock lending agreement and related addenda (the "**SLA**"). Ex. 1, ¶¶19, 27–40. Under the SLA, Astor Asset Management 3 Limited ("**Astor 3**") lent Applicant RBS funds in several tranches that eventually totaled

$2,154,218,552.55 MXN (approximately $113,892,457.76 USD at current exchange rates) (collectively, the "**Loan**"). *Id.*, ¶¶15, 48. RBS secured these loans through delivery of 7,204,296 of Elektra shares owned by Mr. Salinas as collateral (the "**Collateral Shares**"). *Id.*, ¶¶48–49. Under these terms, the SLA designated RBS as the "Borrower" and Mr. Salinas as "Guarantor." *Id.*, ¶11. Grupo Salinas and Astor 3 entered the operative SLA and its related addenda between July 28, 2021 (the "**First Addendum**"), December 6, 2021 (the "**Second Addendum**"), June 13, 2022, (the "**Third Addendum**"), and July 19, 2022 (the "**Fourth Addendum**"). *Id.*, ¶¶58–63.

Several key terms in the SLA, which is governed by English law, are relevant to this Application. *Id.*, ¶31(g). The SLA and related addenda include restrictions to safeguard the Collateral Shares. First the SLA prohibits Astor 3 from selling, short-selling, or transferring any Collateral Shares from their designated account, unless upon an incurable "Event of Default." *Id.*, ¶34(c–f). If any such event is triggered, and Astor 3 sells any of the Collateral Shares, any proceeds Astor 3 earns from those sales must first be applied to any "outstanding Principal balance, interest and fees…" *Id.* Importantly, the SLA defines the Collateral Shares as the *actual* shares that Mr. Salinas supplied as Guarantor, and not some substitute or equivalent. *Id.*, ¶35. In other words, the SLA forecloses any right by Astor 3 to possess, rehypothecate, or otherwise deal with the Collateral Shares during the term of the Loan—they were delivered to remain untouched.

Finally, upon RBS' satisfaction of its obligations under the SLA, the SLA requires Astor 3 to return the Collateral Shares in identical form within three business days. *Id.*, ¶35. Therefore, the SLA's terms left no doubt that Astor 3 could not access the Collateral Shares before a default.

### C. Astor 3 Handpicks Sklarov Collaborators Weiser and Tavira as Custodians of the Collateral Shares.

To ensure the protections just described, the SLA and its related addenda provided that third party custodians would hold the Collateral Shares as Depository Brokers, and that only in the

event of an incurable default could Astor 3 request these custodians transfer Collateral Shares to Astor 3's accounts. *See, e.g.* Ex. 1, ¶¶13–14, 34(e). This original custodian was Weiser Global Capital Markets Ltd. ("**Weiser**"), an entity incorporated in the Bahamas. *Id.*, ¶14. Again, this confirms that Astor 3 was never permitted actually possess, dispose of or otherwise deal with the Collateral Shares so long as Applicants complied with the SLA's terms.

During negotiations, Astor 3 conditioned the Loan on being able to choose and appoint Weiser as custodian. *Id.*, ¶29. Mr. Salceda was responsible for opening the Depository Broker account with Weiser. *Id.* That process revealed no irregularity or concern that would provoke Applicants' reasonable suspicions. *Id.* Since this dispute arose, Applicants discovered that Weiser worked with Mr. Sklarov in other similar stock lending schemes. *Id.* ¶¶101, 138. Several cases filed in this District support this. *See, e.g. Chenming Holdings (Hong Kong) Limited v. John Does*, No. 1:24-cv-00935 (S.D.N.Y. Feb. 8, 2024); *Hryn et al. v. Weiser Global Capital Markets Ltd., et al.*, No. 1:21-cv-08437 (S.D.N.Y. Oct. 13, 2021) ("**Hryn v. Weiser**").

Within eight weeks of Astor 3's first two lending tranches, Weiser created concerns about its compliance with the SLA. In October 2021, Weiser notified Applicants that Astor 3 issued an Entitlement Order, as defined in Weiser's custodian agreement, requesting that Weiser transfer 935,913 shares of the Collateral Shares to "Astor Capital Fund Ltd." *Id.* ¶52. This entity was previously unknown to Applicants. *Id.* Applicants since discovered that Astor Capital Fund Ltd. was registered as a corporation in Ottawa, Ontario on June 28, 2021, around the same time period that Applicants and Astor 3 were finalizing the SLA. *See, e.g.* Ex. 1, ¶110.

Astor 3's request to Weiser directly breached Section V.6 of the SLA, and Applicants responded quickly. Mr. Salceda immediately engaged Mr. Torti and Ms. Akbar to demand that Weiser return the shares. Ex. 1, ¶¶52–55. On October 22, 2021, Weiser responded that it was

required to honor Astor 3's request. *Id*. Applicants once again asserted that Astor 3 and Weiser's actions were clear breaches under the SLA. *Id*. On October 25, Mr. Torti and Ms. Akbar reported to Applicants that Astor 3 confirmed to them that it transferred the shares back to the appropriate Weiser account. *Id*., ¶54. Mr. Salceda reasonably presumed that because Astor 3 was relatively prompt in its compliance with Applicants' requests, the incident was probably due to a mistake or misunderstanding by Astor 3 and Weiser, versus purposeful misconduct. *Id*., ¶55. Mr. Salceda further concluded that Astor 3's correction confirmed that it understood and accepted that it could not remove any Collateral Shares from the Weiser account for its own use. *Id*.

Nonetheless, to prevent further errors by Weiser, Applicants insisted that Astor 3 replace Weiser with another Depository Broker for future lending tranches. *Id*. Astor 3 complied and appointed a new firm, Tavira Monaco SAM ("**Tavira**"). *Id*., ¶¶14, 29, 52, 57. Tavira's custodian agreement was similar to the one Weiser entered, including similar "Entitlement Order" terms. *Id*., ¶51. Applicants worked to foreclose this issue and eliminate these seemingly conflicting terms between the SLA and the custodian agreements by negotiating the Second Addendum, which required Astor 3 to comply with the SLA's terms, effectively negating Astor 3's separate Entitlement Orders rights. The parties entered this "2nd Addendum" on December 6, 2021. *Id*., ¶60. These terms reinforced the SLA's fundamental safeguards that Astor 3 could *not* access the Collateral Shares unless RBS defaulted. *Id*. Tavira received and held all subsequent shares that Mr. Salinas pledged in future lending tranches, among other functions. *Id*., ¶¶15–16.

### D. Suspicious Activity Triggers Applicants' Investigation of the Astor 3 Parties—Applicants' Investigation Triggers the Astor 3 Parties' Escalation.

Because of Mr. Salinas' 30.47% ownership percentage in Elektra's share capital, he and his team monitor and receive large amounts of data on Elektra trading activity. Based on this activity, Applicants developed concerns that Astor 3 was possibly trading the Collateral Shares,

all of which were Elektra stock. Ex. 1, ¶65. Applicants demanded multiple reassurances from the

Custodian Parties. *Id*., ¶67. In April 2024, in response to Applicants' other requests for

reassurances, Tavira wrote to Mr. Salceda to reassure him that it still held the Collateral Shares in

compliance with the SLA. *Id*., ¶68. Applicants took further actions after these letters and other

meetings did not resolve Applicants' reasonable concerns. *Id*., ¶¶69–78.

For example, on June 10, 2024, Mr. Salinas, responding to irregularities Elektra's existing

share numbers, sent letters to all banks and custodians of Elektra shares to confirm the applicable

shares were being validly held. *Id*., ¶69. This correspondence included letters to Weiser and Tavira,

demanding they adhere to comply with their own duties and not dispose of the Collateral Shares.

*Id*. Neither responded by way of letter. *Id*.

On June 13, 2024, Astor 3, having apparent notice of the Weiser and Tavira letters just

described, sent Applicants an oddly formatted letter, without any signatory and of otherwise

dubious origin, via an email address from the "Operations" department at Astor Asset Management

Group. *Id*., ¶70. Neither the letter nor the email listed any individual to whom Applicants could

respond to discuss the letter. *Id*. In the letter, Astor 3 did not assert that any Event of Default

occurred, but instead warned Mr. Salinas not to "interfere" with Weiser or Tavira. *Id*., ¶72. Astor

3 further stated that it had an unrestricted right to dispose of the Collateral Shares. *Id*., ¶71.

Applicants worried that Astor 3 was misappropriating the Collateral Shares and took

prompt action to demand further reassurances from Astor 3. *Id*., ¶73. Applicants also demanded to

fully pay the outstanding Loan balance to take possession of the Collateral Shares, to foreclose

further risk. *Id*., ¶74–75. Astor 3's vague responses provided little reassurance. *Id*. Applicants,

through counsel, proceeded to appoint outside consultants to investigate the Astor Group, where

Applicants discovered that the Astor Group was controlled by Mr. Sklarov. *Id*., ¶¶76–78.

E.      **Applicants Investigate Mr. Sklarov's Background and Connection to Astor 3.**

Mr. Sklarov has been the subject of numerous lawsuits and other legal actions. By way of example only, he was convicted of felony Medicare fraud in the 1990s and was sentenced to one year in prison and ordered to pay $14 million in restitution. Ex. 1, ¶¶79–80.

At some point, Mr. Sklarov became active in stock-backed lending schemes and created a variety of companies to further those schemes and conceal his own role in the process. *Id.*, ¶81. A March 2018 holding in the United States District Court for the District of Colorado describes a plaintiff company's discovery that Mr. Sklarov had a "extensive criminal record" when it decided to file its legal action recover shares pledged to another of Mr. Sklarov's businesses under a lending agreement similar to the SLA. *See*, *Two Rivers Water & Farming Co. v. Am. 2030 Cap. Ltd.*, No. 19-CV-01640-CMA-STV, 2019 WL 5535227, at *1 (D. Colo. Oct. 25, 2019). Earlier that year, the same court issued a temporary restraining order against Mr. Sklarov's companies to enjoin him from selling the plaintiff's restricted shares they pledged as loan collateral. *Id.* The Colorado court supported its holding on the "substantial likelihood" the plaintiffs would prevail on the merits as the agreements at issue were probably void and unenforceable because they were procured through fraud. *Two Rivers Water & Farming Co. v. Am. 2030 Cap. Ltd.*, No. 19-CV-01640-CMA, 2019 WL 10301526, at *2 (D. Colo. June 13, 2019).

Subsequent legal actions demonstrate that Mr. Sklarov's modus operandi is to impersonate legitimate financial institutions like the New York Stock Exchange, Barclays, Rothschild, and BlackRock, or to use company names that otherwise reflect affiliations with prominent business dynasties like the Rothschild, Vanderbilt, and Astor families. Ex. 1, ¶¶79–80.  The most comprehensive example is the *Hryn v. Weiser* complaint described above, where the plaintiffs include dozens of entities engaged in stock-backed lending operations identical to terms found in the SLA. *See, e.g.* Ex. 1, ¶101. There, a Plaintiff named Yelyzaveta Lata verified that she was a

principal of various organizations that include, "Astor Asset Management Ltd," "Astor Asset Management 3 Ltd" (i.e. Astor 3), "Astor Capital Fund Ltd.," various entities including "America 2030 Capital Limited," and "Bentley Rothschild Capital Limited," among others like "Blackrock Capital" and "Sal Oppenheim Ltd." (the **Lata Declaration**"). *Id.*, p. 37.

Other federal court filings further confirm Mr. Sklarov's affiliation with these entities. For example, the *Two Rivers* action noted above identifies Mr. Sklarov as the CEO of Defendants Bentley Rothschild Capital Limited ("**BRC**") and America 2030 Capital Limited ("**America 2030**"), which the Lata Declaration lists in the same corporate family as Astor 3. *Two Rivers Water & Farming Co.*, No. 19-CV-01640-CMA-STV, 2019 WL 10301526, at \*2.

Mr. Singh, who appears in these matters, confirms an even more direct connection between Mr. Sklarov and these entities. In the *Two Rivers* matter, Mr. Singh, who regularly represents Mr. Sklarov and his interests, appears as counsel for BRC and America 2030. *See Id.*, *passim*; *Two Rivers Water & Farming Co.*, No. 19-CV-01640-CMA-STV, 2019 WL 5535227, at \*1–2) (describing Mr. Singh's representation of BRC and America 2030 in related arbitration). Mr. Singh's appearances on Mr. Sklarov's behalf, or as a co-defendant, are extensive. *See, e.g. Sklarov v. Co-Diagnostics, Inc.*, No. 20-CIV-60461, 2020 WL 2513103, at \*1 (S.D. Fla. May 13, 2020) (Singh appearing for Mr. Sklarov in his individual capacity as plaintiff)[1]; *Satterfield v. Vstock Transfer, LLC,* 220 A.D.3d 551, 198 N.Y.S.3d 40 (2023) (Singh appearing as Sklarov's counsel in order upholding contempt ruling against Sklarov, BRC, and America 2030, and warrant for

---

[1] As recently as 2023, Mr. Singh separately filed and litigated Florida lawsuits on Mr. Sklarov's behalf asserting defamation-related claims against parties that allegedly used the internet to anonymously accuse Mr. Sklarov and several of his companies of fraud and other wrongdoing. *See, e.g. Sklarov v. John Doe, et. al.*, Case No. 50-2021-ca-007012 (Fla. 15th Cir. Ct. Jun. 4, 2021); *Sklarov v. John Doe, et. al.*, Case No. 50-2022-ca-008357 (Fla. 15th Cir. Ct. Aug. 22, 2022) *Sklarov v. John Doe*, Case No. 50-2023-cc-009636 (Fla. 15th Cnty. Ct. Jul. 25, 2023).

Sklarov's arrest for failure to return collateral shares in fraud action arising from similar stock-baked lending arrangement); *Satterfield* [sic] *v. Vstock Transfer, LLC*, No. 650311/2019, 2022 WL 1302355, at *2–4 (N.Y. Sup. Ct. Apr. 30, 2022) (noting Singh's ongoing representation of Sklarov, BRC, and America 2030).[2]

Mr. Singh is also a direct defendant in other actions against Mr. Sklarov and these Astor 3-related entities. *See, e.g. Chenming Holdings*, No. 1:24-cv-00935 (S.D.N.Y. Jun. 28, 2024); *Barclays PLC et. al. v. Sklarov*, No. 20-cv-8437 (S.D.N.Y. Oct. 9, 2020).

In another matter, legitimate institutions under the Rothschild brand prevailed in a trademark infringement action directly against Mr. Sklarov for attempts to register the name "BENTLEY ROTHSCHILD." *Rothschild & Co. Continuation Holdings A.G. v. Sklarov*, 440 F. Supp. 3d 1385, 1392 (N.D. Ga. 2020). That court's holdings indicated Mr. Sklarov and Mr. Singh's direct efforts to register the "Bentley Rothschild" mark. *Id.*, *passim*. The Georgia court eventually found Mr. Sklarov liable for trademark infringement. *Id.*

In 2020, Barclays asserted a similar lawsuit in this district against Mr. Sklarov and Mr. Singh. Ex. 1, ¶81; *Barclays PLC*, No. 20-cv-8437 (S.D.N.Y. Oct. 9, 2020). Notably, the *Barclays* Complaint, starting at paragraph 240 and its related exhibits identify where Mr. Sklarov, through Mr. Singh, attempted to register trademark "Astor Capital," along with other similar and suspicious names, with the USPTO. *Id.*, ¶¶ 240–243. As the *Barclays* plaintiffs credibly assert, Mr. Singh signed several of these applications as "General Counsel" for Sklarov-related entities applying for

---

[2] The final award entered in the *Satterifield* matter (the **"Satterfield Award"**), where Mr. Sklarov was found liable for stock-backed lending fraud, demonstrates in multiple places identical provisions and other features to those agreements and addenda the Astor 3 Parties negotiated with the Applicants. *See, e.g.* Ex. 1, ¶¶86-87.

these marks. *Id.*, ¶242. There, Judge Kaplan entered a permanent injunction against both Mr. Sklarov and Mr. Singh, who signed a related consent order.

Among other examples of Mr. Sklarov's stock-based lending schemes connected to Astor 3, Applicants' investigation located other litigation in Jamaica and St. Kitts against Astor 3, and also identified other agreement templates and documents with direct similarities to the terms proposed by Astor 3 in its agreements with the Applicants. Ex. 1, ¶85.

Perhaps the most direct example that removes any doubt that Astor 3 is one of Mr. Sklarov's many alter egos appears in 2019, when Mr. Sklarov and Mr. Singh registered Astor Capital Fund Ltd. as a foreign corporation in Indiana. *Id.*, ¶100. When this entity was registered, Mr. Sklarov was listed as the CEO. *Id.* By April 2020, "Thomas Mellon," who appears in Applicants' initial correspondence with the Astor Group in 2021 while negotiating the SLA, replaced Mr. Sklarov in the entity's corporate records and became the CEO, director, and registered agent of Astor Capital Fund Ltd. *Id.* Mr. Singh appears as the entity's legal representative and signed the document authorizing "Thomas Mellon" as head of the company. *Id.*

**F.  Applicants Take Prompt Measures to Prevent Astor 3 and Sklarov from Committing Further Harm.**

Upon these discoveries, Applicants requested a suspension of trading of Elektra shares in late July 2024. *Id.*, ¶¶111–113. Astor 3, in turn, escalated their efforts to misappropriate the Collateral Shares, presently valued at $416,394,035 USD (at current exchange rates). The Astor 3 Parties' escalation appears to be a direct response to Applicants' correspondence, demonstrating the clear intention to illegally convert or dispose of the Collateral Shares. *Id.*, ¶¶118–121.

Applicants promptly filed *ex parte* applications for injunctions and other orders against Astor 3, Sklarov, Weiser, and Tavira in England (the "**English Action**"). *Id.*, ¶123.

On August 2, 2024, Mr. Justice Jacobs of the Business and Property Courts of England and Wales, Commercial Court, granted that *ex parte* application and issued a Freezing and Proprietary Order against Astor 3, Weiser, Tavira, and Sklarov (the "**Freezing Order**"). Ex. 2, ¶¶33–36. The Freezing Order enjoined Astor 3 and Mr. Sklarov from removing any assets held in England or Wales up to a value of $5,411,000,000 MXN, or in any way disposing of, dealing with or diminishing the value of any of their assets in or outside England and Wales to the same monetary value, and enjoined all respondents from taking any action to deal with, diminish, or dispose of the Collateral Shares or any related sale proceeds, wherever located, until further notice. *Id*. It included a Penal Notice to each respondent for non-compliance. *Id*., ¶27.

The Freezing Order also required the respondents to produce information to Applicants by certain deadlines. It set an August 6, 2024, deadline for Astor 3 and Sklarov to provide Applicants' counsel with written information on total assets held "worldwide exceeding £10,000 in value whether in their own name or not and whether solely or jointly owned, giving the value, location and details of all such assets" and "whether they hold any Collateral shares and/or their traceable proceeds and if so the value of said shares or proceeds." It set an August 5, 2024, deadline for Weiser and Tavira to provide similar information. To date, only Tavira responded with this information, as described below. Ex. 1, ¶¶129–130. Weiser, through counsel, vaguely requested more time to respond and has since failed to comply sufficiently with the obligations imposed on it by the English court. *Id*., ¶32(b).

On August 3 and 5, 2024, Applicants received an email from operations@astorassetgroup.com in which the sender, referred to only as "Global Operations" at "Astor Asset Group," asserted that Applicants defaulted on their Loan and forfeited all of the Collateral Shares and demanded accelerated payment for the remaining $120 million USD

principal. Ex. 1, ¶132. These and July 30, 2024, emails were the first ever notices Astor 3 ever sent that describes a default in any way, and in all events clearly disregards the plain terms of the SLA on the disposition of the Collateral Shares in the event of default. *Id.*, ¶119.

On August 7, 2024, English Action court issued a second Freezing and Proprietary Order (the "August 7 Order") this time against Cornelius Vanderbilt Capital Management Ltd. ("Vanderbilt"). **Exhibit 2**, Declaration of Edward Allen, ¶39. The August 7 Order imposed the same restrictions on Vanderbilt as it did Freezing Order did against Astor 3, Weiser, Tavira, and Sklarov. On August 13, 2024, the English Action court issued an Approved Judgment in favor of Applicants and against Astor Capital Fund Ltd. (the "August 13 Order"). *Id.*, ¶ 41. Ultimately, the English Action court found that it was prepared to extend the Freezing Order to Astor Capital. *Id.*

### G. Applicants Establish Reasons to Investigate Mr. Singh's Connections to Mr. Sklarov, Including Discovery of Mr. Singh's Accounts in New York.

Tavira's August 5, 2024, email response to the Freezing Order confirmed Applicants' central concerns. It stated the following:

*Tavira currently holds in custody 336,475 shares of Grupo Elektra SAB De CV valued at USD 15,709,093.*

*Astor Asset Management 3 Limited rehypothecated the shares to Cornelius Vanderbilt Capital Management Ltd.*

*The attached Excel file (Elektra.xlsx) shows the dates and amounts of share sales undertaken by Cornelius Vanderbilt Capital Management Ltd.*

*Astor Asset Management 3 Limited currently has in custody with Tavira USD 963k in cash in its account.*

*Cornelius Vanderbilt Capital Management Ltd holds in custody with Tavira USD 10.46m in cash plus USD 6.7m worth of other shareholdings.*

*Attached are the cash redemptions for both Astor Asset Management 3 Limited (AA Redemptions) and Cornelius Vanderbilt Capital Management Ltd (CV Redemptions).*

*These redemption proceeds were sent to their lawyers' trust account held at JP Morgan Chase (see attached JIQ Wiring Instructions)*

> *Also attached are the trade reports for both Ricardo Salinas and Corporacion RBS SA de CV which show the share and cash movements in the accounts."*

Ex. 1, ¶ 129.

The Excel spreadsheet Tavira attached (the "**Tavira Spreadsheet**") purportedly sets out the dates and amounts of the share transactions undertaken by Cornelius Vanderbilt Capital Management Ltd. ("**Vanderbilt**"), an entity previously unknown to the Applicants, as part of the rehypothecation they described. *Id*., ¶¶130–131. The Tavira Spreadsheet indicates 635 transactions recorded between December 16, 2021, and July 26, 2024. *Id*., ¶130(a). While the precise nature of the transactions requires further clarification, the aggregate number of Collateral Shares traded appears to have been 5,960,424 (of the 6,268,383 Collateral Shares that the SLA required Tavira to hold). *Id*. Tavira attached two other spreadsheets that indicate cash redemptions by Astor 3 and Vanderbilt totaling what Applicants perceive to be $43,025,048 and $228,660,424, respectively. *Id*., ¶130(a–c). The Vanderbilt sheet includes July 2024 redemptions. *Id*., ¶130.

In reviewing this, Applicants determined that Elizabeta Lata, the same individual who signed the Lata Declaration described above, approved a July 29, 2024, transfer of the entire amount of collateral shares held in the Tavira account to Astor 3. Ex. 2, ¶ 17.

Finally, and most germane to this Application, Tavira attached a document that purportedly sets out the details of the bank account for which the cash redemptions were paid on behalf of Astor 3 and Vanderbilt. Ex. 1, ¶130(d). The account is with "*Jurist Iq Corp Attorney Trust Account IOLA*" held by JPMC in New York. *Id*. (the "**Jurist IQ Account**"). Jurist IQ is an entity associated with Mr. Singh, who is listed elsewhere as the Chief Executive Officer of Jurist IQ Corp. *Id*.

Applicants promptly investigated Vanderbilt, which remains ongoing. *Id*., ¶130, 134–137. Aside from connections to Mr. Singh, as just explained, Oksana Hryn appears as a Vanderbilt

employee. *Id.*, ¶136(d). Ms. Hryn is Mr. Singh and Mr. Sklarov's known associate and beneficial owner of Astor 3, who signed a statement on Vanderbilt's behalf in the *Hryn v. Weiser* case described above. *Id.* Applicants separately discovered that in August 2023, Mr. Singh sent a letter on Ms. Hryn's behalf offering to pay Offshore Alert, a finance monitoring organization, $25,000 to remove an article they posted about the 2021 *Hryn v. Weiser* lawsuit. *Id.*, ¶101(b).

On August 6, 2024, concerned that the Tavira documents appear to show Vanderbilt held and then sold a significant number of Collateral Shares, Applicants' counsel emailed Vanderbilt. *Id.*, ¶139. The email recited Freezing Order and its Penal Notice, asserting that Vanderbilt was required to comply with the Freezing Order's requirements if it possessed any assets owned or jointly owned by Astor 3 and Mr. Sklarov. *Id.* To date, Applicants received no response. *Id.* Applicants subsequently obtained a further freezing order from the English court, in materially the same terms as the order described above, directed at Vanderbilt. Ex. 2, ¶39.

Other developments only exacerbated Applicants' concerns. On August 9, 2024, Weiser provided some limited information and revealed that on July 30, 2024, it executed a sale of nearly all of the 935,913 shares it held for Mr. Salinas at a severely undervalued price to Astor Capital. *Id.*, ¶17. This informed to Applicants' decision to add Astor Capital as a Respondent in the English Action. On August 20, 2024, Mr. Sklarov, through counsel in England, demonstrated he has no intention of complying with the English Court's orders by filing a Discharge Application – which effectively asks the English Court to vacate its prior orders. *Id.*, ¶44. Mr. Sklarov filed a witness statement demonstrating his goal to further obstruct the process by fighting any request for information. Resolving any doubt that he is connected to the other shell companies, he filed these statements for himself, Astor 3, Vanderbilt, and Astor Capital. *Id.*, ¶¶43–44

Finally, and around the same time, Applicants learned about other litigation in this District against Mr. Sklarov, Singh, Jurist IQ, and Vanderbilt, among other defendants, where the plaintiffs credibly assert that Vanderbilt is yet another fake company operated by and associated with Mr. Sklarov engaged in stock-backed lending fraud. *See* Ex. 1, ¶138; *Chenming Holdings (Hong Kong) Limited v. Sklarov et al.*, No. 1:24-cv-00935 (S.D.N.Y. Jun. 28, 2024)(ECF 30) ("the **Chenming Complaint**"). The *Chenming* plaintiffs amended their original February 8, 2024, Complaint to add specific defendants after Judge Failla granted their motion to seek expedited discovery to identify the individuals and companies underlying those plaintiffs' fraud claims. *See generally id.*, ECF 6 and 10. A lender called "Astor 2" appears in that litigation, and expedited discovery revealed that it maintains an IOLTA account with the Jurist IQ Account. *See id.*, ECF 30, ¶¶ 17, 20, 22, 50, 88–91, 96, 98–101. The *Chenming* Complaint identifies a variety of other New York-based accounts besides the Jurist IQ Account that Mr. Singh opened for Vanderbilt and were instrumental to the fraud and conversion those plaintiffs allege. *Id.*, ¶¶ 23, 25–26, 50, 60, 70, 96, 98.

The *Chenming* Complaint describes a fraud scheme nearly identical to what Applicants assert in the English Action and describe here, including, but not limited to, use of Weiser as a custodian broker and use of the operations@astorassetgroup.com email address. *Id.*, ¶¶ 27–52.

The *Chenming* Complaint further confirms the reality Applicants now confront after having exhausted all other efforts to track down Sklarov, Astor 3, and their collaborators in the attempt to prevent further harm as a result of their unlawful misappropriation and conversion. The lone result in that effort—Tavira's August 5th disclosures—reveal that the Jurist IQ Account either currently holds or processed at least what Applicants approximate are nearly $272 million in redemption proceeds relating to Mr. Salinas' shares. Ex. 1, ¶130(b–c). This represents nearly 70% of the total

value of the Collateral Shares at current exchange rates, to say nothing of the over $100 million in outstanding but unaccounted for Collateral Shares that Applicants suspect Mr. Sklarov, Mr. Singh, and Vanderbilt are keeping in or processed through the Jurist IQ Account.

The Jurist IQ Account is in this Court's jurisdiction. Applicants require access to information in and regarding that account, and to other records and information in Mr. Singh's possession, to protect their rights accordingly in the English Action. This Application is the proper means to discover that and other information, which Applicants submit with the utmost urgency.

## II.   LEGAL STANDARD

Section 1782 authorizes "[t]he district court of the district in which a person resides or is found [to] order [them] to give [their] testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . upon the application of any interested person . . . ." 28 U.S.C. § 1782(a). To obtain discovery under Section 1782, an applicant must meet three statutory requirements: (1) the person or entity from whom discovery is sought "resides or is found" in this district; (2) the discovery must be for the purpose of "use in a proceeding" before a "foreign or international tribunal;" and (3) the application must be made by an "interested person" in the foreign judicial proceeding." *In re Application of Shervin Pishevar*, 439 F. Supp. 3d 290, 300 (S.D.N.Y. 2020), adhered to on reconsideration sub nom. *In re Pishevar*, No. 119MC00503JGKSDA, 2020 WL 1862586 (S.D.N.Y. Apr. 14, 2020)(citations omitted).

Once the District Court has determined that the mandatory requirements for relief under Section 1782 are met, the Court is free to grant discovery in its discretion. *Id*. The United States Supreme Court identified the following discretionary factors courts should consider in evaluating a Section 1782 application: (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding;" (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to

U.S. federal-court judicial assistance;" (3) "whether the discovery request is an "attempt to circumvent proof-gathering restrictions or other policies of a foreign country or the United States;" and (4) whether the discovery requested is "unduly intrusive or burdensome." *Id.*; *In re Zouzar Bouka; Vision Indian Ocean S.A.*, 637 F. Supp. 3d 74, 82 (S.D.N.Y. 2022), *modified on reconsideration sub nom. In re Bouka,* 654 F. Supp. 3d 283 (S.D.N.Y. 2023) (citing *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264 (2004) ("*Intel*").

## III.   ARGUMENT

United States District Courts are empowered by 28 U.S.C. § 1782 to compel discovery for use in a proceeding in a foreign or international tribunal. In this case, the Applicants request information from the Jurist IQ Account, JPMC, and Mr. Singh, all of which are located within the jurisdiction of this Court, regarding information on Applicants' Collateral Shares, and/or the status or disposition of those shares or proceeds from their sale, for use in a civil proceeding in England. For the reasons set forth below, this Court should grant this Application, and authorize the issuance of the Subpoenas attached as **Composite Exhibit 3.**

### A.   The Discovery Sought Meets the Statutory Requirements of Section 1782.

1.   <u>The Parties from Which Discovery Is Sought Are Found in this District.</u>

The parties from which the Applicant seeks discovery, specifically the Jurist IQ Account, Singh, and JPMC, are all found in this District. Singh and his law firm, Singh Law Firm, P.A., who style themselves as "New York Stock Loan Lawyers," publicly maintain their principal office in New York, New York. (See, e.g. https://www.singhfirm.com/new-york/stock-loan/ (last visited August 22, 2024). JPMC is a Delaware corporation with headquarters in New York, New York. Jurist IQ is registered in New York, and Singh is listed as its CEO. Ex. 1, ¶130(d). All are found within this District. Accordingly, the first statutory requirement is satisfied.

2.      The Discovery Is Intended for Use in a Foreign Proceeding.

The second statutory requirement is that the discovery sought is intended "for use" in a "foreign or international tribunal." See, e.g., *Intel Corp.*, 542 U.S. at 258. To meet the "for use" test, the materials sought need not be discoverable, *id.* at 243, nor must the applicant even show that the materials are admissible as evidence in the foreign jurisdiction. *In re Roz Trading Ltd.*, 2007 WL 120844, at *2 (N.D. Ga. Jan. 11, 2007) ("§ 1782 aid [is] appropriate even in situations where the tribunal would not order such discovery itself, or might decide not to accept all discovery properly ordered pursuant to § 1782(a)…"). Section 1782(a) may also be invoked where future proceedings are "likely to occur" or are "within reasonable contemplation." *Intel Corp.*, 542 U.S. at 258–59; *In re Appl. Of Grupo Qumma*, No. M 8-85, 2005 WL 937486, at *3 (S.D.N.Y. Apr. 22, 2005); *In re Grynberg*, 223 F. Supp. 3d 197, 202 (S.D.N.Y. 2017) (a pending action is not required, only that the information sought might serve some use in the foreign proceeding).

The discovery Applicants seek is relevant to the English Action and potential other actions Applicants may need to launch against individuals unnamed but potentially revealed through this discovery, or, at the very least, to preserve the status quo the English Court sought to enforce in the Freezing Order. *See e.g.*, Ex. 2, ¶¶32–39. The discovery sought relates to uncovering the status of Applicants' Collateral Shares, or any proceeds arising from their sale or conversion, and any other evidence to support Applicants' misappropriation claims in the English Action. *See e.g.*, *id.*, ¶¶61, 63. To date, Astor 3, Mr. Sklarov, Weiser, Tavira, and Vanderbilt, among other parties unknown, have failed to provide sufficient assurances as to the status of the Collateral Shares. Information sought in the proposed subpoenas is germane to the English Action and will be used accordingly.

3.      The Applicant Is an Interested Person in the Foreign Judicial Proceeding.

Applicants are "interested persons" under Section 1782 because Applicants filed the English Action for misappropriation of the Collateral Shares, and an investigation must proceed

20

after that to protect Applicants' Interests. *Intel Corp.*, 542 U.S. at 256 (holding that a complainant who triggered a European Commission investigation is an "interested person" under Section 1782). Applicants' proposed discovery thus satisfies the requisite statutory elements.

**B.      The Discovery Sought Meets the *Intel* Discretionary Factors.**

The Court should also grant this Application for Discovery based on the discretionary factors identified by the Supreme Court in *Intel*.

1.      Singh, Jurist IQ and JPMC Are Not Participants in the Foreign Proceeding.

The first *Intel* factor is "whether the person from whom discovery is sought is a participant in the foreign proceeding." *Intel Corp.*, 542 U.S. at 264. Mr. Singh, Jurist IQ, and JPMC are not parties or participants in the English Action, and it is not expected that they will become parties. Ex. 1, ¶142. Applicants also note that Mr. Singh's regular status as Sklarov's attorney in the U.S. is immaterial, as he is not licensed to practice in England and cannot participate in the English Action. Accordingly, this factor weighs in favor of granting the Application. *See Intel Corp.*, 542 U.S. at 264 ("the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad.").

2.      No Challenges Exist Regarding the Nature of the Foreign Tribunal and the English Government's Probable Receptivity to the Court's Assistance.

The second *Intel* factor requires the Court to consider "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance." *Intel Corp.*, 542 U.S. at 264. "This factor focuses on whether the foreign tribunal is willing to consider the information sought." *Fed. Republic of Nigeria v. VR Advisory Services, Ltd.,* 499 F. Supp. 3d 3, 13 (S.D.N.Y. 2020), *vacated and remanded on other grounds*, 25 F.4th 99 (2d Cir. 2022), and *vacated and remanded on other grounds*, 27 F.4th 136 (2d Cir. 2022). Under this factor, courts look for

"authoritative proof that a foreign tribunal would *reject* evidence obtained with the aid of § 1782." *Euromepa S.A. v. R. Esmerian, Inc*., 51 F.3d 1095, 1100 (2d Cir. 1995). In the absence of authoritative proof that a foreign tribunal would reject evidence obtained through Section 1782, courts tend to err on the side of permitting discovery. *See In re Zouzar Bouka*, 637 F. Supp. at 88.

There are no known restrictions or any policies under the laws of England limiting U.S. federal court judicial assistance, and courts in England are receptive to assistance in discovery by U.S. federal courts. Ex. 2, ¶¶6–8. Furthermore, this District has granted Section 1782 discovery for use in English proceedings. *See, e.g. In re Application of Shervin Pishevar*, 439 F. Supp. at 303.

Here, the inquiry is more direct. The English Court already issued Worldwide Freezing Orders and other orders that include a penal notices to the respondents listed therein, explaining the penalties for failure to comply with the Freezing Orders' requirements. Ex. 2, 34–45. In response, the Astor 3 Parties actively defied the English Court's orders meant to preserve the status quo and value of the Collateral Shares or any related funds. *Id*. Information supplied by Tavira expressly identifies bank accounts in this District as the focal point of the illegal activity Applicants seek to enjoin. *Id*., 50–54. The information sought through this Application will be important to the enforcement and analysis of claims and orders in that matter. Therefore, because the evidence shows that the United Kingdom is receptive to U.S. federal court judicial assistance, and because there is nothing to show that the English court would object to discovery of the information sought by this Application, this factor weighs in favor of authorizing discovery.

3.  Discovery Sought Through this Application Is Not an Attempt to Circumvent the Foreign Tribunal's Proof-Gathering Restrictions.

The third *Intel* factor is whether the request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel Corp.*, 542 U.S. at 264–65. Courts have found that this factor weighs in favor of discovery where

there is "nothing to suggest that [the applicant] is attempting to circumvent foreign proof gathering restrictions." *In re Google Inc.*, No. 14-mc-80333-DMR, 2014 WL 7146994, at *3 (N.D. Cal. Dec. 15, 2014); see also *In re Atvos Agroindustrial Investimentos S.A.*, 481 F. Supp. 3d 166, 177 (S.D.N.Y. 2020)*.* Here, the Applicants are not attempting to circumvent any foreign proof-gathering restrictions or other policies of England or the United States. Ex. 2, ¶61. Indeed, the English Court ordered the same information in the Worldwide Freezing Order, but the respondents in that action, known to evade subpoenas and otherwise obfuscate their identities and locations, have failed to comply properly or at all with those requests while they are otherwise converting or purloining Applicants' assets. The information they did supply, via Tavira's response, requires confirmation and discovery in this District, where the accounts listed are located.

### 4.    The Requested Discovery Is Not Unduly Intrusive or Burdensome.

The fourth and final *Intel* factor is whether "the discovery requested is unduly intrusive or burdensome." *Intel Corp.*, 542 U.S. at 265. Requests are unduly intrusive and burdensome where they are not narrowly tailored and appear to be a broad "fishing expedition" for irrelevant information. *In re Atvos Agroindustrial Investimentos*, 481 F. Supp. at 177. The discovery sought by the Applicants is not unduly intrusive or burdensome. It is narrowly tailored only to seek information sufficient to satisfy two goals. First, to indicate or provide further details regarding Collateral Shares' status and any related proceeds, recipients, or transactions relating to their sale or conversion. This information carries the immediate and obvious benefit to uphold the purpose of the English Court's Freezing Orders and allows the Applicants to take reasonable measures to prevent further damage to or disposal of the Collateral Shares. This information will also help the Applicants identify other persons or contacts who may have accessed the Collateral Shares or related proceeds. This information will assist the Applicants in the English Action.

Second, this information will enable the Applicants to confirm that the Astor 3 Parties, including Mr. Sklarov and any other individuals yet unnamed, are actually responsible for the misappropriation, conversion, and illegal retention of Applicants' Collateral Shares. Confirmation of this information will enable Applicants to work around the Astor 3 Parties' elaborate and well-documented schemes to elude apprehension and liability.

Third, with regard to Mr. Singh, he is the only individual who has consistently affiliated himself with Mr. Sklarov and his network of companies in recent years. His bank account appears to be the likely place the Astor 3 Parties deposited the assets they stole from Applicants. Other federal courts have justified service of subpoenas on Mr. Singh in lawsuits arising from similar schemes following Mr. Sklarov's evasion. *Two Rivers Water & Farming Co.*, No. 19-CV-01640-CMA-STV, 2019 WL 5535227, at *1–2; *also see First Bank of Highland Park v. Sklarov*, 2019 IL App (2d) 190210, ¶ 31, 137 N.E.3d 218, 226 (noting in foreclosure action against Sklarov that Sklarov has been based in Europe for "last several years").

Fourth, the information sought from Mr. Singh and Jurist IQ does not, by its inclusion, create a privilege risk. Attorney client privilege protects communications between a client and their attorneys that are intended to be confidential for the purpose of obtaining or providing legal assistance. *Brennan Ctr. for Justice at New York Univ. Sch. of Law v. U.S. Dep't of Justice*, 697 F.3d 184, 207 (2d Cir. 2012). The subpoenas attached to this Application do not seek any communications or their contents that involve Mr. Singh's legal advice to his clients, but facts as to the location and status of other persons, shares, funds, and accounts. In other words, attorney-client privilege only protects communications, not underlying facts. *Bennett v. Cuomo*, No. 22CIV7846VSBSLC, 2024 WL 80271, at *6 (S.D.N.Y. Jan. 8, 2024), citing *Upjohn Co. v. U.S.*,

449 U.S. 383, 389 (1981). In any event, Mr. Singh and his clients will have the burden to assert

why privilege applies to the information sought by Applicants at the appropriate juncture.

Therefore, because the discovery requested here is limited and will only seek identifying

information of the accounts, contact information, and other limited data like date and time for

information like trades and deposits, the request is not unduly intrusive or burdensome.

5.    There Are No Other Steps Available to Locate this Information.

As the Applicants outline above, they took extensive measures to protect their interests in

the Collateral Shares throughout the term of the SLA. The Applicants worked promptly to seek

the English Court's intervention within days of the Astor 3 Parties' stated intention to

misappropriate the collateral shares, and upon investigation of the Astor 3 Parties' actual

principals. The English Court, in turn, issued multiple Freezing Orders immediately upon hearing

Applicants' application. Those Orders commanded those Respondents, on penalty of law, to

submit information on their existing assets, including the Collateral Shares by clear deadlines.

These parties both failed to comply and indeed escalated their stated intention to misappropriate

the Collateral Shares. With limited points of contact through which Applicants might secure this

information for the English Action besides the Jurist IQ Account and Mr. Singh, the Applicants

are justified in seeking foreign discovery in this jurisdiction.

## IV.    CONCLUSION

Applicants satisfy the statutory requirements of Section 1782 and the discretionary *Intel*

factors. In light of the twin aims of Section 1782 to provide efficient assistance to foreign

litigants and to encourage foreign countries by example to provide similar assistance to U.S.

courts, this Court should exercise its discretion to authorize discovery be served upon the Jurist

IQ Account, Mr. Singh, JPMC so that the Applicants can conduct limited discovery to identify

the information necessary to protect its interests in the English Action.

Dated: August 23, 2024

Respectfully submitted,

NELSON MULLINS RILEY & SCARBOROUGH LLP

By:    */s/ P. John Veysey*

        P. John Veysey
        john.veysey@nelsonmullins.com
        One Financial Center, Suite 3500
        Boston, MA 02111
        Tel: (617) 217-4645 Fax: (617) 217-4710

        Alan Kaufman
        Charles N. Hurley
        330 Madison Avenue
        27th Floor
        New York, NY 10017
        Tel: (202) 689-2890

        Attorneys for Ricardo Benjamin Salinas Pliego and
        Corporación RBS S.A. de C.V.

# EXHIBIT 2

ECF,REOPEN

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:24-mc-00394-LAK

In Re: Pliego et al.                                    Date Filed: 08/23/2024
Assigned to: Judge Lewis A. Kaplan
Cause: M 77 Application to have subpoena issued to person living
in this district re: action in foreign cou

**Respondent**

**Jaitegh Singh**                          represented by **Louis A. Pellegrino , III**
                                            Dentons US LLP
                                            1221 Avenue of The Americas
                                            New York, NY 10020
                                            212-398-5795
                                            Email: louis.pellegrino@dentons.com
                                            *ATTORNEY TO BE NOTICED*

**Respondent**

**Singh Law Firm**                         represented by **Louis A. Pellegrino , III**
                                            (See above for address)
                                            *ATTORNEY TO BE NOTICED*

**Respondent**

**Jurist IQ Corp.**                        represented by **Louis A. Pellegrino , III**
                                            (See above for address)
                                            *ATTORNEY TO BE NOTICED*

**Applicant**

**Ricardo Benjamin Salinas Pliego**        represented by **Peter John Veysey , Jr**
                                            Nelson Mullins Riley & Scarborough LLP
                                            Associate
                                            One Financial Center
                                            Suite 3500
                                            Boston, MA 02111
                                            617-217-4645
                                            Email: john.veysey@nelsonmullins.com
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

**Applicant**

**Corporacion RBS S.A. C.V.**              represented by **Peter John Veysey , Jr**
                                            (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/23/2024 | 1 | MISCELLANEOUS CASE INITIATING DOCUMENT - MOTION Ex Parte Application for an Order Pursuant to 28 U.S.C. § 1782 Authorizing Discovery for Use in a Foreign Proceeding . (Filing Fee $ 52.00, Receipt Number BNYSDC-29795794)Document filed by Corporacion RBS S.A. C.V., Ricardo Benjamin Salinas Pliego.(Veysey, Peter) (Entered: 08/23/2024) |
| 08/23/2024 | 2 | MISCELLANEOUS COVER SHEET filed..(Veysey, Peter) (Entered: 08/23/2024) |
| 08/23/2024 | 3 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Corporacion RBS S.A. C.V...(Veysey, Peter) (Entered: 08/23/2024) |
| 08/23/2024 | 4 | MEMORANDUM OF LAW in Support *of Ex Parte Application for an Order Pursuant to 28 U.S.C. 1782 Authorizing Discovery For Use In a Foreign Proceeding*. Document filed by Corporacion RBS S.A. C.V., Ricardo Benjamin Salinas Pliego. (Attachments: # 1 Exhibit 1a, # 2 Exhibit 1b, # 3 Exhibit 1c, # 4 Exhibit 1d, # 5 Exhibit 1e, # 6 Exhibit 1f, # 7 Exhibit 1g, # 8 Exhibit 1h, # 9 Exhibit 1i, # 10 Exhibit 1j, # 11 Exhibit 1k, # 12 Exhibit 1l, # 13 Exhibit 2a, # 14 Exhibit 2b, # 15 Exhibit 2c, # 16 Exhibit 2d, # 17 Exhibit 2e, # 18 Exhibit 2f, # 19 Exhibit 3).(Veysey, Peter) (Entered: 08/23/2024) |
| 08/23/2024 | 5 | DECLARATION of John Veysey in Support re: 4 Memorandum of Law in Support,,. Document filed by Corporacion RBS S.A. C.V., Ricardo Benjamin Salinas Pliego. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D).(Veysey, Peter) (Entered: 08/23/2024) |
| 08/23/2024 | 6 | PROPOSED ORDER. Document filed by Corporacion RBS S.A. C.V., Ricardo Benjamin Salinas Pliego..(Veysey, Peter) **Proposed Order to be reviewed by Clerk's Office staff.** (Entered: 08/23/2024) |
| 08/23/2024 | 7 | NOTICE of Notice of Related Case. Document filed by Corporacion RBS S.A. C.V., Ricardo Benjamin Salinas Pliego..(Veysey, Peter) (Entered: 08/23/2024) |
| 08/26/2024 | | Case Designated ECF. (vba) (Entered: 08/26/2024) |
| 08/26/2024 | | MISCELLANEOUS CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Lewis A. Kaplan. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district-judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at http://https://nysd.uscourts.gov/rules/ecf-related-instructions. .(vba) (Entered: 08/26/2024) |
| 08/26/2024 | | **\*\*\*NOTICE TO COURT REGARDING PROPOSED ORDER. Document No. 6 Proposed Order was reviewed and approved as to form. (tp)** (Entered: 08/26/2024) |
| 09/09/2024 | 8 | LETTER addressed to Judge Lewis A. Kaplan from P. John Veysey dated 9/6/2024 re: Application seeks to discover and confirm the whereabouts and certain assets. Document filed by Corporacion RBS S.A. C.V...(ks) (Entered: 09/09/2024) |
| 09/09/2024 | 9 | ORDER GRANTING RICARDO BENJAMIN SALINAS PLIEGO & CORPORACION RBS S.A. de C.V.'S APPLICATION FOR AN ORDER PURSUANT TO 28 U,S,C. § 1782 AUTHORIZING DISCOVERY FOR USE IN A FOREIGN PROCEEDING: For the foregoing reasons, the Court GRANTS the Application (DKT1) and authorizes the Applicants to serve subpoenas attached to the Application as Composite Exhibit 3. This order is without prejudice to any timely objections that may be duly made by the person and entity to be served. IT IS SO ORDERED (Signed by Judge Lewis A. Kaplan on 9/9/2024) (ks) (Entered: 09/09/2024) |

| | | |
|---|---|---|
| 09/30/2024 | 10 | ENDORSED LETTER addressed to Judge Lewis A. Kaplan from Jaitegh Singh dated 9/30/24 re: request an extension of thirty (30) days to respond to the subpoenas. ENDORSEMENT: Granted to the extent that time to respond is extended to and including October 10, 2024 and otherwise denied. The proponent of the subpoena shall file any papers in opposition to a further extension of time no later than October 6, 2024. The denial of an extension of time to respond beyond October 10 is without prejudice to a renewed application on or after October 7, 2024. SO ORDERED., ( Motions due by 10/7/2024.) (Signed by Judge Lewis A. Kaplan on 9/30/24) (yv) (Entered: 09/30/2024) |
| 10/04/2024 | 11 | FIRST LETTER MOTION for Extension of Time *In Opposition to Further Extensions of Time for Jaitegh Singh, Esq. et al. to Respond to Applicants' Subpoenas* addressed to Judge Lewis A. Kaplan from John Veysey dated October 4, 2024., FIRST LETTER MOTION for Discovery *In Opposition to Further Extensions of Time for Jaitegh Singh, Esq. et al. to Respond to Applicants' Subpoenas* addressed to Judge Lewis A. Kaplan from John Veysey dated October 4, 2024. Document filed by Corporacion RBS S.A. C.V., Ricardo Benjamin Salinas Pliego. (Attachments: # 1 Exhibit Chenming Holdings v. Sklarov Amended Complaint, # 2 Exhibit 2024.09.06 Sklarov English Action Affidavit, # 3 Exhibit 2024.09.06 Sklarov English Action Witness Statement).(Veysey, Peter) (Entered: 10/04/2024) |
| 10/07/2024 | 12 | NOTICE OF APPEARANCE by Louis A. Pellegrino, III on behalf of Jaitegh Singh, Singh Law Firm, Jurist IQ Corp...(Pellegrino, Louis) (Entered: 10/07/2024) |
| 10/07/2024 | 13 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Singh Law Firm..(Pellegrino, Louis) (Entered: 10/07/2024) |
| 10/07/2024 | 14 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Jurist IQ Corp...(Pellegrino, Louis) (Entered: 10/07/2024) |
| 10/07/2024 | 15 | LETTER addressed to Judge Lewis A. Kaplan from Louis A. Pellegrino dated October 7, 2024 re: response to Applicants' Letter dated October 5, 2024 (Dkt. #11). Document filed by Jurist IQ Corp., Jaitegh Singh, Singh Law Firm..(Pellegrino, Louis) (Entered: 10/07/2024) |
| 10/08/2024 | 16 | SECOND LETTER MOTION for Extension of Time *In Opposition to Further Extensions of Time for Jaitegh Singh, Esq. et al. to Respond to Applicants' Subpoenas* addressed to Judge Lewis A. Kaplan from John Veysey dated October 8, 2024. Document filed by Corporacion RBS S.A. C.V., Ricardo Benjamin Salinas Pliego..(Veysey, Peter) (Entered: 10/08/2024) |
| 10/16/2024 | 17 | ORDER denying 11 Letter Motion for Extension of Time; denying 11 Letter Motion for Discovery; denying 16 Letter Motion for Extension of Time. Having considered all the parties submissions carefully, the request for additional time is DENIED. The Clerk shall terminate Dkt 11 and 16 as well. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 10/16/2024) (ks) (Entered: 10/16/2024) |
| 10/17/2024 | 18 | PROPOSED PROTECTIVE ORDER. Document filed by Corporacion RBS S.A. C.V., Ricardo Benjamin Salinas Pliego. (Attachments: # 1 Proposed Order Letter to Chambers re Stipulated Protective Order).(Veysey, Peter) (Entered: 10/17/2024) |
| 10/21/2024 | 19 | STIPULATED CONFIDENTIALITY AGREEMENT AND PROTECTIVE ORDER...regarding procedures to be followed that shall govern the handling of confidential material... (Signed by Judge Lewis A. Kaplan on 10/20/2024) (jjc) (Entered: 10/21/2024) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 11/18/2024 11:48:50 | | | |
| **PACER Login:** | nmrs0003 | **Client Code:** | 085167/01500-pjv |
| **Description:** | Docket Report | **Search Criteria:** | 1:24-mc-00394-LAK |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

# EXHIBIT 3

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10-21-24

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

*In re* Application of RICARDO BENJAMIN
SALINAS PLIEGO & CORPORACION RBS
S.A. C.V., for an Order Pursuant to 28 U.S.C. §
1782

Case No: 24 Misc. 394 (LAK)

---

## STIPULATED CONFIDENTIALITY AGREEMENT AND PROTECTIVE ORDER

      Applicants Ricardo Benjamin Pliego, and Corporacion RBS SA (collectively

"Applicants"), and Respondents Singh Law Firm, P.A.; Jaitegh Singh, Esq.; and Jurist IQ Corp.

(collectively, the "Respondents," and together with the Applicants, the "Parties") request that

this Court issue a protective order pursuant to Federal Rule of Civil Procedure 26(c) to protect

the confidentiality of nonpublic and sensitive information that Respondents may need to disclose

in connection with the subpoenas served in this action;

      WHEREAS, on August 23, 2024, Applicants filed the above-captioned action on the

miscellaneous docket in this district, pursuant to 28 U.S.C. § 1782 (the "§ 1782 Action"),

requesting the issuance of three subpoenas to Respondents (the "Subpoenas") seeking discovery

for use in a foreign proceeding in support of an action currently pending in the Business and

Property Courts of England and Wales Commercial Court (claim number CL-2024-000450, the

"English Action");

      WHEREAS, in the interest of protecting the legitimate interests of the parties in

maintaining the confidentiality of certain information to be disclosed during the discovery

process:

      IT IS HEREBY AGREED as follows:

      1.    This Stipulation is being entered into to facilitate the production, exchange, and

discovery of documents and information by the Respondents to the Applicants pursuant to the

Subpoenas (hereinafter the "Discovery Material"). It is the intent of the Parties that information

will not be designated as confidential for tactical reasons and that nothing be so designated

unless it is highly sensitive information and there is a good faith belief that it has been maintained in a confidential, non-public manner, and there is good cause why it should not be part of the public record of this case or of the English Action.

2.      Nothing in this Stipulated Confidentiality Agreement and Protective Order shall be interpreted or construed as changing any burden of proof or persuasion with respect to any confidentiality designation or burden with respect to any sealing request.

3.      "Producing Party" shall mean the Respondents to the § 1782 Action.

4.      "Receiving Party" shall mean the Applicants to the § 1782 Action and/or anyone receiving Confidential Information pursuant to ¶ 8 below, but not the Court and its personnel as defined in ¶ 10, below.

5.      With respect to Discovery Material the Producing Party has designated as "Confidential" pursuant to this Order, no Receiving Party may disclose such Confidential Discovery Material to anyone else except as expressly permitted hereunder.

6.      With respect to the Confidential portion of any Discovery Material, the Producing Party or its counsel may designate such portion as "Confidential" by: (a) stamping or otherwise clearly marking as "Confidential - Subject to Protective Order" the protected portion in a manner that will not interfere with legibility or audibility.

7.      Nothing contained in this Order will be construed as: (a) a waiver by a Party or person of its right to object to the Subpoenas or any future discovery request; (b) a waiver of any privilege or protection; or (c) a ruling regarding the admissibility of any document, testimony, or other evidence, either in the § 1782 Action, the English Action, or any other proceeding.

8.      Where the Producing Party has designated Discovery Material as Confidential, the Receiving Party may disclose such information only to the following persons:

> (a) The named Applicants in the § 1782 Action, as well as their current officers, directors, employees and agents who are assisting with the § 1782 Action or the prosecution of the English Action;

(b) counsel of record for Applicants in the § 1782 Action or the English Action, and any lawyers retained or employed by the Applicants in connection with the § 1782 Action or the English Action, and employees of their firms ("Counsel");

(c) The respondents in the English Action, which are Asset Management 3 Limited, Weiser Global Capital Markets LTD, Tavira Monaco SAM, Vladimir Sklarov, Cornelius Vanderbilt Capital Management LTD, and Astor Capital Fund Limited, (collectively "English Action Respondents") as well as their current officers, directors and employees who are assisting with the defense of the English Action, but only after such persons have first executed a Consent to Protective Order ("Consent") in the form annexed as Exhibit A hereto.

(d) counsel of record for the English Action Respondents, and any lawyers retained or employed by the English Action Respondents in the English Action, and employees of their firms, but only after such persons have first executed a Consent in the form annexed as Exhibit A hereto;

(e) persons or entities that provide litigation support services (such as copy-service providers and document-management consultants) that are retained by a party or counsel in the § 1782 Action or the English Action, but only after such person has first executed a Consent in the form annexed as Exhibit A hereto;

(f) as to any document, its author, its addressee, and any other person indicated on the face of the document as having received a copy prior to it being produced herein;

(g) any witness who counsel for a party in the § 1782 Action or the English Action in good faith believes may be called to testify at a hearing, deposition, or trial in the § 1782 Action or in the English Action for whom disclosure of Confidential Discovery Material is reasonably necessary to participate in the prosecution or defense of those actions, provided such person has first executed a Consent in the form annexed as Exhibit A hereto;

(h) testifying independent experts or independent expert consultants who are retained in connection with the § 1782 Action or the English Action, provided such person has first executed a Consent in the form annexed as Exhibit A hereto;

(i) stenographers engaged to transcribe depositions that the parties conduct in the § 1782 Action or in the English Action; and

(j) this Court, including any appellate court, its support personnel, and court reporters;

(k) The English Court supervising the English Action, including any appellate court, its support personnel, and court reporters;

(l) Any other person designated to receive Confidential Discovery Material with written permission provided by the Producing Party.

9.      Before disclosing any Confidential Discovery Material to any person referred to in subparagraphs 8(c)-(e) and (g)-(h) above, counsel must provide a copy of this Order to such person, who must sign the Consent in the form annexed as Exhibit A hereto stating that he or she has read this Order and agrees to be bound by its terms. Said counsel must retain each signed Consent and hold it in escrow.

10.     For the avoidance of doubt, nothing in Paragraph 8 shall impose any limitation on the ability of the Producing Party to disclose its own Confidential Discovery Material. The Producing Party shall not be required to obtain an executed Consent from its own current or former employees with respect to disclosure of its own Confidential Discovery Material.

11.     This Order binds the Parties and certain others to treat as Confidential any Discovery Materials so classified. The Court has not, however, made any finding regarding the confidentiality of any Discovery Materials, and retains full discretion to determine whether to afford confidential treatment to any Discovery Material designated as Confidential hereunder.

12.     This Order shall have no force and effect on the use of any Discovery Material at any hearing or other proceeding before the Court in the § 1782 Action.

13.     Confidential Discovery Material used in the English Action shall be subject to the collateral use restrictions set forth in Rule 31.22(1) of the Civil Procedure Rules applicable in the English Action. To the extent any Receiving Party seeks to file Confidential Discovery Material in the English Action, they will request that the English court maintain the confidentiality of such material, and will, at a minimum, prior to filing, redact social security numbers, taxpayer identification numbers, birth dates, and financial account numbers, such as bank account numbers, except where the content of the identifying information just described is specifically required by the Receiving Party in the English Action, including, but not limited to, confirming the identity or association of certain accounts, individuals, or Defendants, such that the Receiving Party requires disclosure of any such relevant Confidential Discovery Material to the English court, whereupon, the Receiving Party may provide that material to the Defendants and the English court without redactions as to the specific content and for the limited purposes just described. Where possible or available, the Receiving Party may apply partial redactions in the circumstances described in the preceding sentence to fulfill the purposes of any such limited disclosure.

14.     In filing Confidential Discovery Material with this Court, or filing portions of any pleadings, motions, or other papers that disclose such Confidential Discovery Material ("Confidential Court Submission"), the Parties shall publicly file a redacted copy of the Confidential Court Submission via the Electronic Case Filing System. The Parties shall file an unredacted copy of the Confidential Court Submission under seal with the Clerk of this Court, and the Parties shall serve this Court and opposing counsel with unredacted courtesy copies of the Confidential Court Submission. Any Party that seeks to file Confidential Discovery Material under seal must file an application and supporting declaration justifying—on a particularized basis—the sealing of such documents. The parties should be aware that the Court will unseal documents if it is unable to make "specific, on the record findings . . . demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Lugosch v. Pyramid Co. of Onondaga,* 435 F.3d 110, 120 (2d Cir. 2006). Notwithstanding any other

provision of this paragraph, if the Parties stipulate that specific portions of a document are both confidential and immaterial to the § 1782 Action, a Party may publicly file a version of the document with those confidential and immaterial portions redacted, and that party need not submit an unredacted version to the Court or file a motion to seal.

15.    If the motion to seal is granted, the filing Party (or, as appropriate, non-party) shall ensure that all documents (or, if directed by the Court, portions of documents) that are the subject of the order to seal are filed in accordance with the procedures that govern the filing of sealed documents on the Electronic Court Filing system. If the Producing Party's timely motion to seal is denied, then the Party (or, as appropriate, non-party) making the filing shall take steps to replace the redacted filing with its corresponding unredacted version.

16.    Any Receiving Party in the § 1782 Action who objects to any designation of confidentiality may at any time serve upon counsel for the Producing Party a written notice stating the grounds of the objection. If the Parties cannot resolve the objection within 5 days after the time the notice is received, it shall be the obligation of the Producing Party to file an appropriate motion on or before the 5th day following receipt of the notice requesting that the Court determine whether the disputed information should be subject to the terms of this Order. If the Producing Party fails to file such a motion within the prescribed time, the disputed information shall lose its designation as Confidential, and shall not thereafter be treated as Confidential in accordance with this Order. The Producing Party shall bear the burden of establishing that good cause exists for the disputed information to be treated as Confidential. The Parties shall treat the disputed materials as Confidential pending the Court's resolution of a timely-filed motion.

17.    Any Party who requests additional limits on disclosure (such as "attorneys' eyes only" in extraordinary circumstances), may at any time serve upon counsel for the recipient Parties a written notice stating with particularity the grounds of the request. If the Parties cannot reach agreement promptly, counsel for all affected Parties will address their dispute to the Court.

18.     Confidential Discovery Material will be used solely for the prosecution and
defense of the § 1782 Action and the English Action, and shall not be used in any other
proceeding, or for any business, regulatory, commercial, competitive, personal or other purpose
whatsoever. Confidential Discovery Material will not be disclosed orally or in writing to anyone
except the following persons: (1) the persons identified in Paragraph 8 of this Order in
accordance with the terms set forth herein; or (2) when the Court, after notice to all Parties,
permits disclosure.

19.     Nothing in this Order prevents the Receiving Party from producing any
Confidential Discovery Material in its possession in response to a lawful subpoena or other
compulsory process, or if required to produce by law or by any government agency having
jurisdiction, provided that, unless precluded by applicable laws or rules, the Receiving Party
gives written notice to the Producing Party as soon as reasonably possible before the disclosure
is made, and if permitted by the time allowed under the request, at least 10 days before any
disclosure.  Upon receiving such notice, the Producing Party will bear the burden to oppose
compliance with the subpoena, other compulsory process, or other legal notice if the Producing
Party deems it appropriate to do so.

20.     Each person who has access to Discovery Material designated as Confidential
pursuant to this Order must take all reasonable precautions to prevent the unauthorized or
inadvertent disclosure of such material.

21.     If a Receiving Party receives documents or other materials that it has reason to
believe are subject to a good faith claim of attorney-client privilege, work product protection, or
other privilege or immunity from disclosure, the Receiving Party must refrain from examining
the documents or other materials any more than is essential to ascertain whether the documents
or other materials are reasonably subject to such a claim.  The Receiving Party shall promptly
notify the Producing Party in writing that the Receiving Party possesses documents or other
material that appears to be privileged or otherwise protected from disclosure and treat the
material as if it had never been produced.

22.     If, in connection with this litigation, a Producing Party discloses information that is subject to a claim of attorney-client privilege, attorney work product protection, or any other privilege or immunity from disclosure, such disclosure shall not constitute or be deemed a waiver or forfeiture of any claim of privilege, work product protection, or other privilege or immunity from discovery with respect to the disclosed information or its subject matter.  In addition, a Producing Party may use its own document *(e.g.,* as a deposition or hearing exhibit) containing material that is subject to a claim of privilege or immunity from disclosure for the purpose of establishing the basis of such claim without waiver of any applicable privilege or immunity from disclosure, unless the Producing Party affirmatively uses or relies upon the specific material contained in the document that is subject to the claim of privilege or immunity from disclosure for any purpose other than establishing the basis of such claim.

23.     If the Producing Party seeks to claw back materials subject to a claim or privilege or other protection, the Producing Party must provide notice in writing to the Receiving Party specifying the production number of the documents it wishes to claw back and the basis of the claim of attorney-client privilege, work product doctrine, and/or any other applicable privilege or immunity relied upon in support of its request.

24.     If a Producing Party makes a claim of disclosure of privileged or otherwise protected material, the Receiving Party shall, within five business days, return or destroy all copies of the material, and provide a certification of counsel that all such information has been returned or destroyed, unless the Receiving Party seeks to dispute that the information is privileged or otherwise protected as set forth below.  Until the dispute is resolved or ruled upon, the Receiving Party shall undertake to keep such information restricted solely for use in connection with the dispute over the privilege or protection.

25.     Within five business days after the notification that such material has been returned, destroyed, or kept for the limited purpose described in § 24, the Producing Party shall produce a privilege log with respect to the disclosed information.

26.     The Receiving Party may move the Court for an Order compelling production of the materials that the Producing Party contends is privileged or otherwise protected from disclosure. Pursuant to the parties' obligations set forth herein, the motion shall not quote or paraphrase the substance of the document subject to the motion to compel beyond the description of the document contained in the privilege log entry for the document. The motion shall be filed under seal, and shall not assert as a ground for entering such an Order the fact or circumstances of the production in this action.

27.     The Producing Party retains the burden of establishing the privileged or protected nature of any material it contends is privileged or otherwise protected from disclosure. Nothing in this Order shall limit the right of any Producing Party or Receiving Party to request an *in camera* review of the material.

28.     Unless the parties otherwise agree or a court of competent jurisdiction otherwise orders, within 60 days of the final disposition of the § 1782 Action and the English Action— including all appeals—all Receiving Parties must either return all hard copy Confidential Discovery Material—including all copies thereof—to the Producing Party, or destroy such material—including all copies thereof. In either event, by the 60-day deadline, the Receiving Party must certify its return or destruction by submitting a written certification to the Producing Party that affirms that it has not retained any copies, abstracts, compilations, summaries, or other forms of reproducing or capturing any of the Confidential Discovery Material. Notwithstanding the foregoing: (i) the Parties shall confirm that they will continue to treat as Confidential any Discovery Materials so designated that have been received electronically and that cannot be returned or destroyed, and shall take reasonable measures to ensure that unauthorized persons do not have access to Confidential information; and (ii) outside counsel are permitted to retain copies of all pleadings, motion papers, court filings made under seal, transcripts, legal memoranda, correspondence, attorney work product, written discovery responses, deposition and trial exhibits, and expert reports, even if such materials contain Confidential Discovery Material,

subject to a continuing obligation to protect information designated Confidential pursuant to this Order.

29.    This Order will survive the termination of the litigation and will continue to be binding upon each Receiving Party.

30.    This Court will retain jurisdiction over all persons subject to this Order to the extent necessary to enforce any obligations arising hereunder or to impose sanctions for any contempt thereof.

_Notwithstanding anything to the contrary herein:_

_1.    Any papers filed under seal in this action shall be made part of the public record unless or otherwise _____ the Court otherwise orders._

_10/21/24_

_2.    Any person may apply to the Court for access to any papers filed under seal pursuant to this order. Should such an application be made, the person or persons who designated the sealed material as Confidential shall have the burden of establishing good cause for the continuation of the sealing order unless the Court previously made an individualized determination of the existence of good cause for sealing._

_Date: 10/20/24_

Louis A. Kaplan
United States District Judge

SO STIPULATED AND AGREED.

Dated: October 17, 2024

**NELSON MULLINS RILEY &
SCARBOROUGH LLP**

By: /s/ *P. John Veysey*

P. John Veysey
One Financial Center, Suite 3500
NELSON MULLINS RILEY &
SCARBOROUGH LLP
Boston, MA 02111
617-217-4645
Email: john.veysey@nelsonmullins.com

*Counsel for Ricardo Benjamin Salinas Pliego
and Corporacion RBS S.A. C.V.*

Respectfully Submitted,

**DENTONS US LLP**

By: /s/ *Louis A. Pellegrino*

Louis A. Pellegrino
Justine N. Margolis
Charles M. Farrell
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: +1 212 398 5795
louis.pellegrino@dentons.com

*Counsel for Jaitegh Singh, Singh Law Firm,
and Jurist IQ Corp.*

Exhibit A
to Stipulated Confidentiality
Agreement and Protective Order

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

*In re* Application of RICARDO BENJAMIN
SALINAS PLIEGO & CORPORACION RBS
S.A. C.V., for an Order Pursuant to 28 U.S.C. §
1782

Case No: 24 Misc. 394 (LAK)

## CONSENT TO PROTECTIVE ORDER

I, _____, acknowledge that I have read and understand the

Stipulated Confidentiality Agreement and Protective Order ("Protective Order") in this action

governing the non-disclosure of those portions of Discovery Material that have been designated

as Confidential, and agree to be bound by and abide by the terms thereof. I agree that I will not

use or disclose such Confidential Discovery Material except to those persons qualified to receive

such information pursuant to the Protective Order and only for purposes of the prosecution or

defense of the above captioned action or the action pending in Business and Property Courts of

England and Wales Commercial Court, claim number CL-2024-000450. I agree that at the

conclusion of the litigation I will return all Confidential Discovery Material to the Party or

attorney from whom I received it, or certify that it has been destroyed. By acknowledging these

obligations under the Protective Order, I understand that I am submitting myself to the

jurisdiction of the United States District Court for the Southern District of New York for the

purpose of any issue or dispute arising hereunder.

_____

Date:

# Exhibit 4

*To be Filed Under Seal*